h8fdatih

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

          v.                                 15 Cr. 0867(RMB)

MEHMET HAKAN ATILLA, et al.,

               Defendants.

------------------------------x

                                             August 15, 2017
                                             9:14 a.m.

Before:

               HON. RICHARD M. BERMAN,

                                             District Judge

                    APPEARANCES

JOON H. KIM
     Acting United States Attorney for the
     Southern District of New York
BY:  SIDHARDHA KAMARAJU
     DAVID DENTON
          Assistant United States Attorneys

FLEMING RUVOLDT PLLC
     Attorneys for Defendant
BY:  CATHY A. FLEMING
     ROBERT J.  FETTWEIS

HERRICK, FEINSTEIN LLP (NYC)
     Attorneys for Defendant
BY:  THOMAS E. THORNHILL

          – also present –

Jonathan Lettieri, Pretrial Services Officer

Asiye Kay, Turkish Language Interpreter

1    THE COURT:  How are you all?

2    MS. FLEMING:  Good morning, your Honor.

3    THE COURT:  Good morning.  Please be seated.

4    So, as you know, we are here this morning to discuss a

5    bail application, the issue of bail, for Mr. Atilla.  I've read

6    the papers quite carefully, and I'm happy to hear from counsel,

7    if they wish to be heard further.

8    I would like to say at the outset that, as the lawyers

9    sort of may know, our purpose is not to be discussing the guilt

10   or the innocence of the defendant in these proceedings,

11   although we do touch on issues such as the weight of the

12   evidence, etc., etc., but the presumption of innocence is very

13   much alive and well, and the defendant is presumed to be

14   innocent unless and until such time as a jury, for example,

15   determines, if it did, that he was not.

16   So with that introduction, I am happy to hear from

17   Ms. Fleming.  Ms. Fleming, do you wish to be heard?

18   MS. FLEMING:  Thank you, your Honor.

19   Your Honor, we have a Turkish interpreter.  Do we need

20   to swear her?

21   THE COURT:  No.  We don't need to do that, but we will

22   note for the record that we have a certified Turkish

23   interpreter and ask Mr. Atilla if he is able to understand

24   these proceedings with the help of the interpreter?

25   THE DEFENDANT:  I understand.

h8fdatih

1          MS. FLEMING:  Your Honor, thank you.  And the Court is

2    well aware of the standards under the Bail Reform Act.  So I am

3    just going to highlight that we are trying to establish what

4    would be the least restrictive conditions that will serve the

5    purpose of bail, which is to secure and give the Court

6    assurances that the defendant will appear for further

7    proceedings under the least restrictive conditions, and

8    incarceration is the most restrictive conditions that could be

9    imposed.

10          We have proposed a package which the government made

11    light of in its papers, and I want to amplicate it a little

12    further.  We did propose an unsecured -- a bond that was

13    secured by property that is in Turkey.  We are prepared to sign

14    over the papers and the rest of it to be held in escrow so the

15    government has a better shot at getting it if they think that

16    is an issue.  His wife is prepared to cosign.  They already

17    have his passports.  They already have an agreement not to

18    retain travel documents.  He has agreed to electronic

19    monitoring.  He will report, and the rest.

20          But what they didn't refer to and what we put in our

21    papers and what we have discussed with the government is he's

22    also willing to agree to any conditions that are suggested by

23    the government or imposed by the Court that will help satisfy

24    his burden, and we had suggested or included what some other

25    courts have done.  One of the things they have done is put

1    software on computers to make sure that the computers only are

2    doing discovery and not going anywhere else.  We have suggested

3    video cameras on an apartment.  The government said an

4    apartment of his own choosing.  We are happy to have the

5    government either approve it or be involved in the selection of

6    an apartment.

7         We have been racking our brains and thought about the

8    following, and I'm well aware of the Court's opinion in

9    Mr. Zarrab's case about private jails and a concern that only

10   the very wealthy have them, and despite the government

11   suggesting that Mr. Atilla is wealthy, he's not poor but he's

12   not wealthy.  He has many years of working and has saved up

13   moderate savings, but he's not wealthy.  He doesn't have the

14   means to flee.

15        But what we would suggest is the following.  We have

16   been working as much as we can work.  Counsel has been seeing

17   him in the jail, and I'll get to the conditions of that because

18   it does implicate his due process to some degree.  Virtually

19   every day, some counsel has met with him in the jail to try to

20   go over what's going on or he has been working on trying to get

21   through the Turkish discovery in the case with challenging

22   restrictions at that.  We are proposing that in addition to him

23   being in an apartment with electronic monitoring, video

24   cameras, whatever software the government and the technology

25   people say is approved to them, perhaps putting in an alarm

1    system with a code that only a few people have the code to and

2    not Mr. Atilla, and we would suggest that since he will be

3    working at the law firms, either mine or the Herrick firm,

4    virtually seven days a week, we can have somebody go get him at

5    the apartment, escort him to the law firm, and take him back.

6    And, in addition, we can arrange to have somebody acceptable to

7    the government and known to the government who can live in the

8    premises.  And it will be the obligation of the persons who are

9    there that if he's not there or he doesn't show or somehow

10   disappears, to notify law enforcement immediately.  It's not

11   the private security guards.  He doesn't have the means to have

12   private security guards, but it's a pretty close approximation

13   of making sure he is accounted for all the time.

14          And he will be in a situation where he will be working

15   with counsel.  We have trial ten weeks away, and we are working

16   very hard, very diligently to get this done, your Honor.  And

17   it's really a way to assure that he's going to be here.  And it

18   puts the burden on people, including people who have licenses

19   to practice law, to make sure that if for some reason he's not

20   there, law enforcement is notified right away.

21          So it seems to me that those and any other

22   combinations that either the government wants to suggest or the

23   Court wants to suggest should certainly be able to assure his

24   presence.  In addition to surrendering his -- they already have

25   his travel documents, but agreeing not to get any more, not

h8fdatih

1    having the ability to go get them, etc.  He has agreed to give

2    a waiver of extradition to be held in escrow.  He has agreed

3    and his wife has agreed to cosign.

4         I have photos -- I was in Istanbul last week, your

5    Honor, meeting with potential witnesses.  I had the opportunity

6    to go to his home, which is an apartment about five minutes

7    from his -- the bank where he works.  And despite all the

8    suggestions that Halk Bank isn't really to be trusted because

9    they won't admit what he has done wrong, I had the opportunity

10   to visit  Halk Bank.  It is a major commercial bank of very

11   sizable proportions, a real financial institution.  I have

12   photos of his home.  I met with his wife and his son.  She is

13   willing to sign all the papers, risking everything they have

14   ever worked for, and despite -- and I do make the distinction

15   between him and the codefendant.  The codefendant does have a

16   lifestyle and he did have the means to abscond if he wanted to.

17   I'm not suggesting he would have, I don't know.  But he has the

18   means to do it; Mr. Atilla does not.

19        And so I think that there has to be a combination

20   unless you are going to say that somebody who has the sad

21   fortune of only being a visitor to the country -- and we have

22   conceded he does not have ties here except he came here on

23   business, but has the misfortune of coming here, is locked up

24   for their own safety in jail.  So I say that up front saying

25   that whatever it takes that will secure his release -- and I

1 point out to the Court, this is not an application that was

2 made lightly. It wasn't made at the beginning of the case. It

3 took until defense counsel got into the case, reviewed the

4 government's case in discovery and we saw what was there. It

5 took until we got to know the defendant to be willing to say

6 that we are willing to have him in our offices seven days a

7 week to work with him.

8 He is actively, actively working on the defense of the

9 case with us and cooperating and working well with us. And it

10 is this point that we really believe that this is a good time

11 to make the application.

12 So with that and saying as many bells and whistles as

13 the Court wants and whatever the government wants to suggest,

14 we are willing to do.

15 I want to talk for a minute about how it is

16 implicating his due process rights, and I don't say this

17 lightly and I don't fault the Bureau of Prisons. We understand

18 that they have a huge institution that they have to take care

19 of. We understand they have rules. But it has really been a

20 challenge -- and that's a nice word -- for trying to deal with

21 getting in and going through the discovery. Put aside the fact

22 that if I'm working in my office on something and I need to get

23 a question answered quickly, I simply don't have the means to

24 get to the client and say what's the answer to this. It has to

25 go on a list and I have to wait until I get to the MCC and I

h8fdatih

1 get in and I can ask him and the moment is gone.  Put aside

2 that I have to arrange to have a Turkish interpreter to make

3 sure that I have something -- if it is a Turkish document that

4 needs to be read and interpreted.

5 We have logistical issues when we get there.  There

6 are timing issues if you are in the middle of something, and

7 the MCC has been pretty good about letting us stay past 7:30

8 but by 8 o'clock we are out the door.  If there is a problem

9 getting in because something has happened on one of the

10 floors -- and we don't fault the MCC for this -- we sit

11 downstairs and wait for hours at times before we get in.  If

12 the rooms are all full, we wait until the rooms are -- a room

13 becomes available for somebody.  If there is a lockdown, we

14 can't get in and we try to work.  We know what the general

15 lockdowns are.  But if there is a lockdown because something

16 has happened, we can't get in.  And it really has been a

17 challenge.

18 If you're working on something and something comes up

19 and you don't have those materials with you, now you can't say

20 let me go get those materials -- and this is a case where there

21 is a lot of materials -- let me go get those materials and we

22 can cross-reference them.

23 I am representing to your Honor that we have worked

24 unbelievably diligently to try to get into this case and

25 understand it, and it has been really difficult to do this.

1   And it has been exacerbated by the fact that Mr. Atilla is

2   incarcerated.  We can't reach him by phone.  We do have email

3   to a limited degree, but it is not when you need it at the time

4   you need him.  So that has really been a problem.

5         So now if you go back and you just look at what the

6   factors are that are really of the most concern, the government

7   makes a big deal about the nature of the charges.  It is the

8   IEEPA conspiracy and the bank fraud conspiracy.  And your Honor

9   is right, and you have properly said in a prior bail

10  application with a codefendant that what will happen at trial

11  will happen at trial and you will look at that, and you have

12  also said, and we appreciate it, that the presumption of

13  innocence is right here and stands with Mr. Atilla.

14        The government says he's facing decades in jail.  I

15  don't accept that.  I've done the calculations roughly, to the

16  extent I can, under the guidelines, the defense team has.  Our

17  guidelines' calculations come out generously for the

18  government's sake.  Maybe we're wrong.  Maybe we haven't seen

19  the adjustments or know what they are going to try to load up

20  in the event he is convicted, and I say "in the event" with all

21  seriousness, but we come up with somewhere around 60 months as

22  a worst-case scenario for Mr. Atilla.  There is no loss that we

23  see to any victims, and the bank fraud is proposed by a loss

24  table, and under the IEEPA, which is a harder one, the analysis

25  looks at somewhere around at its strongest, without loading up

h8fdatih

1   on adjustments and looking at what we thought was there, it may

2   be a five-year sentence.  So it is not decades in jail, as the

3   government suggests in its briefs.

4          You have to look at the strength of the case, and I

5   would like to spend a minute on this because we have spent time

6   on it.  The government talks -- and their papers are loaded

7   with what is in the search warrant applications, and they spent

8   a lot of time talking in generalities, as opposed to what the

9   specific evidence is against Mr. Atilla.  And they talk about

10  this glorious plan we have about sanctions against Iran and how

11  serious it is.  None of us dispute that.  We get it.  There are

12  serious sanctions with Iran.  And people who violate it, it is

13  serious charges.  But when you strip all of that away and look

14  at what the case is against Mr. Atilla, it is a pretty

15  different story.

16         What happened, your Honor, as we piece it together, is

17  that there was an investigation that went on for a number of

18  years in Turkey that kind of hit -- it became public in

19  December of 2013.  And it turned out there were recordings of

20  approximately -- there were about 3,000 recordings, according

21  to pen registers and things that we have looked at.  There were

22  a number of people who were charged, including the codefendant

23  here.  Mr. Atilla was never charged by the Turkish authorities.

24  Since then, the courts in Turkey have deemed those wiretaps to

25  be illegal, and they have deemed that those wiretaps were

h8fdatih

1    obtained including on the basis of false documentation and the

2    like.  So there is an issue with -- even under the liberal

3    standard of foreign evidence, there is a real issue on that.

4         In addition, we are going to have evidentiary issues

5    because there are references to transcripts and there are

6    references to transcripts we don't have and there are no

7    underlying recordings.  The government is using as a roadmap a

8    Turkish report by people who are now fugitives and by people

9    who are being prosecuted by the Turkish government.  They are

10   still going to have authentication issues.  I don't know how

11   they are going to do it, and I actually was going to bring up

12   at the end of the conference that maybe we ought to talk about

13   how we are going to figure out -- maybe it is a motion in

14   limine, but there is going to be serious authentication issues

15   in this case.

16        But the bottom line is the case is predicated on

17   something that was done in Turkey in 2013 that became public

18   where Mr. Atilla was never charged, and, in fact, he is a

19   complainant and intercepted improperly by people and by having

20   things that were done improperly in Turkey.  He had -- he was a

21   complainant.  And I don't want to give away the defense.  We

22   would do it in an ex parte submission, but the government is

23   wrong on certain of its allegations and identifications, which

24   we are going to be able to prove.

25        So the strength of the case is simply not what the

h8fdatih

government says.  And that also is a big and powerful incentive

for Mr. Atilla to clear his name.  He's worked at the Halk Bank

and it is a serious commercial back.  He has worked there for

22 years, and he is really looking forward to clearing his name

here.

        We put in the papers, your Honor, the problems with

the recordings, and, again, even under the lower standard, they

would never meet the standards of American admissibility, even

under the lower standards for foreign-seized evidence.  It

would be shocking to me if they get into evidence.

        History and characteristics:  Mr. Atilla has never

been charged with a crime, including in Turkey, in this

investigation.  He has no criminal history.  He was steadily

employed at Halk Bank for 22 years.  He rose up through the

ranks.  He was not a political person at all.  He has been

married for 22 years.  He has got a 20-year-old son who is in

university.  He is a citizen of Turkey.  He has been a model

prisoner since he has been at the MCC and the MDC and the MCC.

You know the history of him going back and forth.  His history

and characteristics speak well to his character.

        And I understand the government's reluctance to accept

his word.  I'm asking your Honor to weigh his word that he is

willing to pledge his word as well as his life's savings and

his ownership to the court.

        And, finally, in terms of danger to the community,

h8fdatih

1  it's really -- he possessed a firearm in Turkey.  That's a big

2  deal in Turkey because it is hard to be licensed to have a

3  firearm in Turkey.  He doesn't have a firearm here.  He's the

4  not going to have a firearm here.  And he certainly does not

5  pose a danger to the community, and he certainly would not pose

6  one when given all the bells and whistles that we have

7  suggested in terms of any release on bail under any conditions

8  that he would have and particularly since he is going to be

9  with lawyers seven days a week between now and the trial.

10      So, your Honor, with every bit of sincerity and

11  earnest pleading that I can put before this Court, I am asking

12  that you release him on bail on any set of conditions that the

13  Court will consider that will be the least restrictive that

14  will meet the requirements of the Bail Reform Act that will

15  give you reasonable assurance that he will appear for trial and

16  will also allow us to prepare adequately and meet the

17  October 30th -- 31st -- 30th trial date that we have in this

18  matter.  Thank you.

19      THE COURT:  Thank you, Ms. Fleming.

20      Counsel for the government.

21      MR. KAMARAJU:  Yes, your Honor, and I don't want to

22  belabor or repeat too much from our papers so I will just

23  respond to a few points that defense counsel made.

24      Initially, it appears clear and I think defense

25  counsel even acknowledged that the defense has to concede the

1  facts that show that the defendant is a flight risk.  He has,

2  without dispute, no ties to the United States.  He has only

3  visited here on a handful of occasions, the government's

4  understanding, for business.  He has, balanced against that, a

5  number of substantial connection to the nation of Turkey, and

6  we addressed your Honor about some issues in connection with

7  this bail application and also his codefendant Zarrab's bail

8  application, about Turkey's ability or willingness to extradite

9  its citizens back to the United States for purposes of criminal

10  prosecution.  Our understanding is that they will not do that

11  even in the face of a waiver of extradition.  So the defendant

12  has a substantial reason to want to get back to Turkey, and

13  once he gets there, there is certainly no guarantee that he

14  will ever come back.

15          Defense counsel also, while trying to minimize the

16  defendant's resources, noted that he is not a poor man.  He

17  has, by his accounting, a substantial quantity of cash located

18  in Turkey, certainly more than enough to abscond.  He may not

19  have the wealth that his codefendant Zarrab has but he also

20  doesn't need it.  The question for the bail application is not

21  whether he is on par with the wealth of his codefendant, it is

22  does he have sufficient wealth and the resources to abscond.

23  And the answer is clearly yes, your Honor.  He has, by his own

24  accounting, approximately $100,000 in cash in Turkey in

25  addition to all the illiquid assets that are there.

h8fdatih

1    So what you have is is you have a situation with a

2    foreign national with no reason to remain in the country other

3    than this prosecution and every reason to want to return to a

4    place that will not send him back here to face prosecution and

5    which is beyond the jurisdiction of both the Court and the

6    reach of the government.  You have a bail application in that

7    instance where it is very similar to the one already considered

8    by your Honor with respect to the codefendant Zarrab.  All of

9    those factors in connection matter a lot.

10    And counsel try to distinguish Zarrab in a couple of

11    ways, and I would like to talk about those before turning to

12    some of the bail package elements that she alluded to.  The

13    first way is counsel suggested that the potential sentence in

14    this case is not as significant as the government articulates.

15    Initially, just as a matter of the statutory maximum -- and

16    obviously your Honor, in the event of a conviction, would do a

17    guidelines' calculation and would also advise the defendant of

18    the potential statutory maximum penalties here.  The bank fraud

19    statute alone carries a 30-year maximum penalty.  The IEEPA

20    statute carries an additional 20 years.  The guidelines

21    calculation that defense counsel articulate --

22    THE COURT:  When you say "additional," you mean in

23    addition --

24    MR. KAMARAJU:  Separately, the statute itself carries

25    a 20-year penalty.

h8fdatih

1      And the guidelines' calculation that defense counsel

2 articulated is premised, as I understood it, their allegation

3 or their assertion that they are not able to identify loss.

4 The Court has already found that the Indictment alleges loss

5 with respect to the bank fraud counts.  That was on Zarrab's

6 motion to dismiss the indictment.  The Court spent a lengthy

7 amount of time actually discussing the allegations of loss,

8 whether they include potential intended loss, which is

9 sufficient to satisfy the bank fraud statute, or actual loss.

10      And just as with Zarrab, when you look at the

11 transactions that are ultimately at issue in this case, they

12 are in the millions of dollars.  So the guidelines' calculation

13 that defense counsel proffered, I'm sure in the event of a

14 conviction they will argue to your Honor.  Your Honor now knows

15 that the government will be arguing a guidelines' calculation

16 that is substantially higher and the defendant knows that.  So

17 the fact of where the sentence may end up does not deter from

18 right now he is facing a potential sentence in the decades.  So

19 he has an incentive to flee in addition to the fact that he has

20 such substantial roots in Turkey.  So that distinction between

21 his case and Zarrab's case simply doesn't hold up, your Honor.

22      The other sort of attempted distinction is the weight

23 of the evidence.  And as your Honor said, and you said in

24 connection with the Zarrab application as well, we are not here

25 to try the case against the defendant.  We are not here to try

1    the case against the defendant on a bail application.  We are

2    not here to test the government's evidence or to prove the

3    defendant's guilt.  But what the defense would have you believe

4    is that in the context of a bail application, charges that have

5    already been approved by a magistrate judge, charges that have

6    been approved by a grand jury that the defendant would roll the

7    dice that at trial he would be able to persuade a jury that on

8    the face of it these calls don't mean what they are, that the

9    remainder of the government --

10          THE COURT:  These calls don't mean what they say?

11          MR. KAMARAJU:  What they say.

12          That the other evidence that the Court has already

13    sort of considered in connection with the Zarrab bail

14    application, all of which would be admissible as part of the

15    conspiracy against this defendant, that that evidence wouldn't

16    counsel against guilt.  And all of this is premised on the idea

17    that the defendant wishes to clear his name.  He has expressed

18    that through his plea of not guilty.  But the question for your

19    Honor is is there a substantial risk that given the opportunity

20    to avoid even the potential of facing that lengthy sentence, is

21    there a reasonable probability that he is going to flee?  And

22    the answer is yes, your Honor, because he has the incentive to,

23    he has the ability to, and he has a place to go.  So when you

24    couple all of those things together, the only real distinction

25    between this case and the Zarrab case is we are talking about

1   two different defendants.  All of the flight factors --

2              THE COURT:  Different charges, too.

3              MR. KAMARAJU:  Yes, though there is a point that I

4   would like to respond to that is sort of articulated a few

5   times in Mr. Atilla's bail submission, which is he says that

6   he's not charged with the most serious offenses.  I'm not sure

7   what the rubric is for determining what that is, but he is

8   charged with a national security offense and he is charged with

9   defrauding U.S. financial institutions.  So those are serious

10  offenses however you want to compare them to what's left, and

11  those are the same charges, minus the crime conspiracy charge

12  and the money laundering charge, that Mr. Zarrab is facing.

13             So when you look at that, then the only real question

14  is is there any bail package that can mitigate his flight risk.

15  And the bail package that the Court already rejected with

16  respect to Mr. Zarrab I think provides guidance as to how it

17  should treat Atilla's bail package.  Counsel says that they

18  will accept any condition, whether it is computer monitoring,

19  video monitoring, alarm systems.  All of those things beg one

20  question.  First, who is doing the monitoring?  In Zarrab's

21  proposed package, it was Guidepost.  It is unclear to me who in

22  Mr. Atilla's package it would be, whether it would be the

23  government who would be doing the monitoring, whether it would

24  be a private firm.  But in any event, what that get us into is

25  the thicket that the Court recognized, which is whether we are

1    talking now about conditions of release, which the Bail Reform

2    Act does authorize, or conditions of detention, which are not

3    authorized under the Bail Reform Act.  And this is a point that

4    your Honor picked up on in connection with Zarrab's proposed

5    bail package, and there your Honor noted that when we start

6    getting to this place where we are talking about private guards

7    having to ensure the defendant's place, or this instance I

8    suppose government 24-hour monitoring, those are conditions

9    that are present at the MCC.

10          The MCC is a place right now where the defendant is

11    monitored on a regular basis, where his computer usage is

12    monitored, where his telephone usage is monitored.  All they

13    are talking about is shifting that from the MCC to a place in

14    the community.  So just as with Zarrab's private security guard

15    package, this sort of expansive "we'll give you anything

16    approach" takes us right back to a place where your Honor

17    didn't want to go, which is a situation in which we're

18    discussing conditions of detention and not release.  And many

19    courts -- and we cited them in the Zarrab application and they

20    are cited in the Court's order on denying Zarrab bail -- many

21    courts have held that that is inappropriate.

22          So that's the broad problem with the package that

23    that's sort of been articulate by Atilla.  We've gone through

24    and addressed the specific principles in our papers, so I am

25    not going to spend a lot of time on that.  But the basic

h8fdatih

1    fundamental flaw with all of them is everything that the

2    defendant proffers as securing his presence -- everything and

3    everyone -- are based in Turkey.  They don't actually provide

4    any meaningful security to ensure that he would come back here.

5    So I think from that perspective, given the fact and

6    particularly the already substantial bail package that the

7    Court found didn't mitigate the risk of flight or flight risk,

8    there is no reason to believe that it would mitigate the flight

9    risk with respect to this defendant.

10         I just want to briefly touch on the due process

11   concerns that Ms. Fleming raised.  That argument was also

12   raised by Zarrab in connection with his bail application, and

13   the government has and will continue to try to help defense

14   counsel as much as possible by pointing to specific evidence,

15   by providing a laptop, in the first instance, as we have done

16   for both the defendants.  But this is not the first case with

17   substantial evidence that involves a detained defendant.  Your

18   Honor has seen cases, for example, in which there are thousands

19   of wiretaps and defendants are detained.

20         It cannot be a due process violation, in other words,

21   to detain a defendant simply because there is a substantial

22   amount of evidence.  If that were the case, then the Bail

23   Reform Act would include that as one of the factors.  It does

24   not.  The Bail Reform Act does not discuss hindrance to trial

25   preparation as one of the factors that the Court is to

1  consider.

2  And if your Honor thinks about it, what basically

3  would happen in that circumstance is anytime the government has

4  a substantial volume of evidence, defendants would get bailed.

5  That can't be the law.  And in fact it is not the law, and

6  there are no cases cited, at least to our knowledge or to the

7  government's research, that support that proposition.

8  So I don't think there is a due process argument

9  there.  And, frankly, that did not sway the Court when it came

10  to Zarrab, who has the precisely same evidentiary challenges

11  and is also located currently at the MDC.  So I don't think any

12  of these factors should sway the Court from what is a

13  straightforward application of the Bail Reform Act, a

14  straightforward application of the case law.  You have a

15  foreign national facing a substantial sentence with ties to a

16  country where we may never be able to get him back.

17  Unless your Honor has any questions?

18  THE COURT:  I don't.

19  MS. FLEMING:  May I just briefly respond, your Honor,

20  to just a couple of points?

21  THE COURT:  Sure.

22  MS. FLEMING:  The first is there is a very big

23  difference between Mr. Atilla and Mr. Zarrab.  Mr. Zarrab was

24  arrested.  Mr. Atilla came here knowing about the arrest of

25  Mr. Zarrab.  No fear, came here, and was arrested a long time

1    after it.  Mr. Zarrab has been here a lot longer and has had a

2    lot longer to digest the evidence, and, by the way, there is a

3    lot more evidence against Mr. Zarrab -- many, many, many more

4    tapes, much, much, much more evidence and the volume is much

5    greater.

6           And I just would point out to the Court that under the

7    Bail Reform Act, 18 U.S.C. Section 3142, that the factors

8    are -- the standard is that to consider whether there are

9    conditions of release that will reasonably assure the

10   defendant's presence.  I'm not trying to just shift defenses,

11   your Honor.  I think it is overkill with everything we have

12   suggested.  But I really think that it is appropriate for this

13   defendant to have bail.  I think there are conditions that will

14   reasonably assure this Court of his presence, and I think that

15   the Bail Reform Act makes it very clear that if there is a way

16   to give reasonable assurance to this Court that he will appear

17   for proceedings, that the Court should figure out a way to give

18   bail and we are requesting that you do so.

19          THE COURT:  All right.  So first let me assure you

20   that this being Mr. Atilla's bail application, I have and am

21   considering it independent of Mr. Zarrab or anybody else except

22   as the cases may support precedent for whatever I determine to

23   do.

24          So, all right.  This is going to take a couple of

25   minutes.  I want to go over all the factors I have considered.

1    So by submissions dated July 20, 2017 and July 28,

2    2017, defense counsel requests bail for Mr. Atilla.  Defense

3    counsel proposes the following bail package, although as

4    Ms. Fleming has indicated, she is also comfortable with any

5    other conditions that may be imposed by the Court.  But the

6    conditions proposed by the defense are:

7        1.  A personal recognizance bond cosigned by

8    Mr. Atilla's wife in any amount proposed by the Court and

9    secured by the following property -- Mr. Atilla's family

10   primary residence in Istanbul worth approximately $350,000 US.

11       2.  Mr. Atilla's vacation home in Izmir, Turkey worth

12   approximately $140,000.

13       3.  Farmland in Izmir, Turkey owned by Mr. Atilla and

14   his wife, worth approximately $160,000.  In addition,

15   investment property of Mr. Atilla's in which he does not as yet

16   have title, and also a savings account at Halk Bank, where he

17   is employed, currently valued at approximately $140,000.

18       The defense have also proposed electronic monitoring,

19   reporting to Pretrial Services on whatever schedule is

20   requested and subject to surprise visits from Pretrial

21   Services, home detention in an apartment that Mr. Atilla will

22   rent in Manhattan, surrender of passports, and, as I mentioned

23   at the outset, any other conditions imposed by the Court,

24   including pen registers on telephones, signed waivers of

25   extradition, video and telephone monitoring, and computer

1  surveillance.

2      By submission dated August 7, 2017, the government, as

3  has been indicated in oral presentations today, opposes bail.

4  Among other things, the government states there is no

5  combination of conditions that would reasonably secure the

6  defendant's appearance in court, including the bail package

7  proposed by Mr. Atilla.

8      The Pretrial Services' report has been done, as it is

9  in every case, dated March 28, 2017, and updated as recently as

10 August 9, 2017, and it states that there is no condition or

11 combination of conditions to reasonably assure Mr. Atilla's

12 appearance in court, and Pretrial Services recommends that

13 Mr. Atilla be detained.

14     Pretrial Services states that Mr. Atilla poses a risk

15 of nonappearance for the following reasons.  One is the

16 possession of a Turkish passport.  Two is no familial or

17 residential ties to the United States.  Three is the fact that

18 he is a citizen of another country and has no legal status in

19 the United States except as a visiting businessperson

20 originally.  Four, strong familial, residential and employment

21 ties to Turkey, and, five, frequent international travel.  This

22 is from the report.  I am summarizing.

23     They also say, Pretrial Services does, that Mr. Atilla

24 poses a risk of danger for the following reasons:  One is

25 financial danger owing to the nature of the instant offenses,

h8fdatih

1    and two is possession of a firearm located in Turkey.

2              The statute in question is 18 United States Code

3    Section 3142, which in pertinent part reads as follows:

4              Release on personal recognizance or unsecured

5    appearance bond.

6              The judicial officer shall order the pretrial release

7    of the person on personal recognizance or upon execution of an

8    unsecured appearance bond in an amount specified by the Court

9    subject to the condition that the person not commit a federal,

10   state or local crime during the period of release unless the

11   judicial officer determines that such release will not

12   reasonably assure the appearance of the person as required, or

13   will endanger the safety of any person -- any other person or

14   the community.  The burden of proof is clear and convincing

15   evidence that a defendant presents a danger to the community,

16   and it is preponderance of the evidence with respect to flight

17   risk.

18             Citations include United States v. Mercedes, at 254

19   F.3d 433, a Second Circuit case from 2001, where the Court

20   stated that "the Court, evaluating risk of flight, is to

21   consider the nature of the offense, the weight of the evidence

22   against the suspect, the history and character of the person

23   charged, and the nature and seriousness of the risk to the

24   community."  The cite is United States v. Dreier, 596 F.Supp.2d

25   831, a Southern District case from 2009.

h8fdatih

1        So let's consider those factors that do need to be

2   considered in a bail application, one being the nature and

3   circumstances of the offenses charged.  Here Mr. Atilla is

4   charged in two counts of an otherwise four-count indictment.

5   He is charged with, one, conspiracy to violate the

6   International Emergency Economic Powers Act, 50 United States

7   Code Sections 1701 to 1707, and also the Iranian Transactions

8   and Sanctions Regulation at 31 C.F.R. parts 560 and 561.  That

9   is with respect to Count Two of the Indictment.  He is also

10  charged with conspiracy to commit bank fraud, in violation of

11  18 United States Code Section 1344.  He is charged in Count

12  Three with that offense.

13       The defense argues that Mr. Atilla is not charged with

14  any crime of violence.  The government argues that the

15  indictment alleges a scheme by defendants, plural, to help

16  evade U.S. sanctions on behalf of a wide array of designated

17  Iranian government and government-owned entities.  That scheme

18  allegedly involved, among other things, the use of front

19  companies, false documents, bulk cash shipments and stripping

20  of wire information.  Through that alleged scheme, the

21  defendants helped the government of Iran and Iranian entities

22  process millions of dollars worth of financial transactions

23  through the U.S. financial system and also that the American

24  financial institutions would not have otherwise processed.

25       The Court finds with respect to this factor, the first

factor, that the charges against Mr. Atilla are serious and, relatedly, that the defendant, if he were to be convicted -- and he is presumed, as I said at the outset, to be innocent and he has maintained his innocence throughout, but if he were to be convicted, he could face a substantial term of imprisonment. So this first factor weighs in favor of detention.

The second factor is the weight of the evidence against the person. Defense counsel argues that the lack of evidence against Mr. Atilla favors his release on bail and that, at best, he is a minor figure. Defense counsel states that the indictment is unusually bereft of any factual detail with respect to Mr. Atilla. She also argues that the offenses in which Mr. Atilla is charged are classic white-collar offenses and neither includes any allegations of violence.

The defense also argues that Mr. Atilla is named in none of the 28 overt acts set forth in the indictment, and none of the overt acts even refer either to Mr. Atilla or to Halk Bank. Defense counsel notes that based on their review of the pen registers purporting to list more than 3,000 calls and texts intercepted by the Turkish authorities, there are perhaps twelve conversations in which Mr. Atilla appears to have been involved. The government has produced recordings and corresponding transcripts for, according to the defense, only four of those twelve conversations. It has produced transcripts alone of six additional conversations allegedly

1    involving Mr. Atilla for which the defense has been told there

2    are no corresponding recordings.

3         For two alleged conversations between Mr. Atilla and

4    Mr. Zarrab, both on July 15, 2013, there apparently is neither

5    a recording nor a transcript.  This is the defense speaking.

6    This highly unusual set of circumstances promises serious

7    evidentiary issues under both the Fifth and Sixth Amendments.

8    It is hard, according to the defense, to imagine the

9    admissibility of such evidence.

10        The government counters with respect to the weight of

11   the evidence against Mr. Atilla.  "Mr. Atilla" -- this is a

12   quote from the government -- "played a critical role in

13   allowing Iran to leverage its oil resources in an unfettered

14   manner.  By helping Zarrab complete illegal shipments that were

15   purchased with Iranian oil proceeds to Iran, Mr. Atilla and

16   Mr. Zarrab," according to the government," and their

17   co-conspirators helped Iran ease the pressure imposed by U.S.

18   sanctions.  In particular, Mr. Atilla used his considerable

19   influence at Halk Bank, as one of its top executives, to use

20   the bank to conceal Mr. Zarrab's sanctions-busting transactions

21   while at the same time attempting to shield Halk Bank from

22   secondary sanctions that could have been levied by the Office

23   of Foreign Assets Control."

24        That's all the government speaking.

25        "Additionally," the government states, "the evidence

1    against Mr. Atilla includes, among other things, emails and

2    other electronic communications, intercepted telephone calls

3    and bank records.  This evidence establishes," according to the

4    government, "conclusively the existence of the sanctions

5    evasion network dedicated to furthering the 'economic jihad'

6    referred to in the draft letter to Ayatollah Khomeini found in

7    Mr. Zarrab's email.

8              "Moreover, this evidence shows clearly that this

9    network moved millions of dollars illegally for Iranian

10   entities, including Bank Mellat, the National Iranian Oil

11   Company, the Naftiran Intertrade Company, and Mahan Air.

12   Furthermore, the evidence linking Mr. Atilla to the Halk Bank

13   portion of the scheme is," according to the government,

14   "substantial.

15             "Through, among other things, intercepted

16   communications and emails, the government will establish at

17   trial that Mr. Atilla knew that Zarrab was processing

18   fraudulent transactions through Halk Bank and gave instructions

19   on how to make the fraudulent documents more believable and

20   that he helped facilitate those transactions and did so knowing

21   such transactions violated U.S. sanctions."

22             That's the government speaking.

23             And the government also says that "Intercepted

24   communications between Mr. Zarrab and Mr. Atilla and between

25   Zarrab and other co-conspirators shows that Mr. Atilla was

 1    helping to facilitate transactions for Zarrab that were

 2    contradictory to assurances given to U.S. regulators."

 3         "Also," according to the government, "Mr. Atilla's

 4    role in the scheme to evade U.S. sanctions was primarily to use

 5    Halk Bank, along with others, to conceal Mr. Zarrab's shipments

 6    of gold and currency to Iran that violated U.S. sanctions.  The

 7    defendant's efforts to conceal these shipments included, among

 8    other things, creating and using false documentation to make it

 9    appear that Mr. Zarrab's transactions were for humanitarian

10    purposes that would exempt the transactions and Halk Bank from

11    the sanctions regime.

12         "Mr. Zarrab and Mr. Atilla discussed the gold and

13    purported food transactions and how the scheme would work.  For

14    example, in one call" -- this is related by the government --

15    "Mr. Zarrab explained how the purported food transactions would

16    be conducted in the same manner as the previous gold

17    transactions, including a description of how U.S. dollars could

18    be used as part of the scheme.  In other calls, Mr. Atilla and

19    Mr. Zarrab discussed the kinds of records that Mr. Zarrab would

20    provide to Halk Bank to document these transactions, including

21    the fact that Mr. Zarrab's documents were on their face not

22    credible and needed to be revised.  For instance, in one call,

23    it is alleged that Mr. Atilla noted that the amount of

24    foodstuffs reflected on Mr. Zarrab's documents could not

25    possibly be shipped on the vessels of the size that Mr. Zarrab

h8fdatih

1   claimed to be using, and Mr. Atilla instructed Mr. Zarrab in

2   the future to double-check the purported transaction amounts

3   and the purported ship capacities," and, "according to the

4   government, "in other call Mr. Atilla and Mr. Zarrab discussed

5   the fact that Mr. Zarrab's documents claimed that wheat

6   Mr. Zarrab was purportedly to ship originated in Dubai which

7   Mr. Atilla pointed out was impossible."

8           Jurisdictional and evidentiary and other issues are

9   currently the subject of a pretrial motion to dismiss.  The

10  defense reply is due I believe on or about August 21, and brief

11  oral argument is scheduled for September 7, 2017, at 11 a.m.

12          These matters are not being decided or determined at

13  this time.  Cites are <u>United States v. Bellomo</u>, 944 F.Supp.

14  1160, a Southern District case from 1996, where the Court

15  stated, "The issue now before the Court is whether there is a

16  risk that defendant will flee the jurisdiction or endanger

17  others before trial can be held, not whether he is guilty or

18  innocent of the charges in the indictment."

19          I'm also relying on United States v. Fama, at 2013 WL

20  2467985, a Southern District case from 2013, where the Court

21  stated, "The Court recognizes the difficulty inherent in

22  assessing the government's case before trial and is mindful not

23  to reach any conclusions about defendant's guilt or innocence."

24          For purposes of this bail application, the Court finds

25  that the evidence against Mr. Atilla appears at this stage as

1 previously described and appears to be strong.  This factor

2 weighs in favor of continued detention also.

3         The third factor is the history and characteristics of

4 Mr. Atilla.  Here the defense argues that there is no evidence

5 of any intent or ability on his part to flee the jurisdiction.

6 The defense states that defendant has no aliases, he's not

7 independently wealthy, nor does he have access to huge sums of

8 money.  The defense also states that Mr. Atilla and his wife

9 are willing to pledge their entire life savings to assure the

10 Court of his appearance.

11         The government argues that Mr. Atilla is deeply rooted

12 in Turkey.  He has lived there his entire life and has a wife

13 and son there.  He has spent more than 20 years working at Halk

14 Bank, which we have earlier established is a bank 51 percent

15 approximately owned by the Republic of Turkey, which has

16 afforded him opportunities to travel around the world.  He and

17 his wife own outright at least three properties and invest in a

18 fourth in Turkey.  He has -- this is, again, the government

19 speaking -- he has, according to his Pretrial Services

20 interview, more than $100,000 in the bank in Turkey.

21         Mr. Atilla is 46 years old.  He is married, has one

22 adult child.  He is a citizen of Turkey.  There is no dispute

23 that Mr. Atilla has no ties to the United States.  There is

24 also no contention that Mr. Atilla has any criminal history

25 apart from the allegations in this case.

1      He has worked at Halk Bank virtually all of his adult

2  life.  He has traveled worldwide for employment, according to

3  Pretrial Services.  His steady employment, lack of criminal

4  history, and strong home life weigh in favor of release, but

5  are offset in this case by his citizenship, residency,

6  employment in Turkey and ties to Turkey, his financial

7  resources, and his complete lack of ties in the United States,

8  and so this factor also weighs in favor of detention.

9      Additionally, I should point out that property located

10  in Turkey is not real collateral for a bond before a U.S. Court

11  because neither the Court nor the government has the ability to

12  forfeit the property.  Thus, in essence -- and this is the

13  government's position -- what Mr. Atilla has proposed is an

14  unsecured $2 million bond.

15      So this third factor also weighs in favor of continued

16  detention.

17      Finally, we come to the fourth factor, the nature and

18  seriousness of the danger to any person or the community that

19  would be posed by the person's release.  And here I refer to

20  comments of others who have concluded that undermining U.S.

21  sanctions against Iran may well pose a threat to the United

22  States.

23      A former U.S. undersecretary for terrorism and

24  financial intelligence, Mr. Adam Szubin, has stated the

25  following.  This is a quote:  "Iran continues to be the world's

h8fdatih

1 leading state sponsor of terrorism and plays a significant role

2 in destabilizing the Middle East region.  It supplies funding,

3 weapons to Hizballah and to the Assad regime and to the Houthis

4 in Yemen."  This is a quote from Mr. Szubin.  "It continues to

5 develop its ballistic missile program in contravention of U.N.

6 Security Council provisions, and it continues to violate human

7 rights."  This quote comes from Mr. Szubin's testimony before

8 the House Committee on Foreign Affairs May 25, 2016.

9            So I come to the conclusion that this fourth and final

10 factor also weighs in favor of detention.  And so that being

11 the case, I am not going to approve a bail package.

12            I did want to add this thought, however.  The Court is

13 taking judicial notice of the fact that there have been in this

14 matter an unusual stream of out-of-court contacts between the

15 executive branches of the governments of Turkey and the United

16 States regarding this case and apparently, from published

17 reports, regarding the proposed repatriation of defendants

18 Zarrab and Mr. Atilla without a trial.  This raises the issue

19 that I wish to mention, and the issue is whether the government

20 of Turkey, at the least, would have any interest and incentive

21 to support bail requirements, including the obligation to

22 appear in court and not to flee the jurisdiction.  I raise this

23 as a concern.  As I say, the four factors without this also

24 support continued detention.

25            Based upon the facts presented here and after having

h8fdatih

1    reviewed carefully the parties' submissions and applicable

2    authorities, and for the reasons that I have stated, I

3    respectfully conclude that the government has shown by a

4    preponderance of the evidence that Mr. Atilla poses a risk of

5    flight and that no condition or combination of conditions will

6    reasonably assure his appearance at trial.

7             I have taken serious note of his desire to clear his

8    name in this matter, and I believe that that is best

9    accomplished by staying on the trial schedule that we currently

10   have in place.

11            Thank you very much.

12            MS. FLEMING:  Your Honor.

13            THE COURT:  Yes.

14            MS. FLEMING:  We are not part of any conversations

15   with the Turkish government.  I want the Court to know that.

16   If, however, we can get assurances from authorities that they

17   would abide an extradition or other conditions, may we reapply

18   for bail?

19            THE COURT:  You have to look at the statute about when

20   you can make such an application.

21            MS. FLEMING:  I understand.

22            THE COURT:  I was pointed and careful to note that the

23   four conditions that support -- that one considers in

24   determining whether there should be bail all favor continued

25   detention and that my mentioning this as an additional point

h8fdatih

1    was separate and apart from those four conditions.

2              MS. FLEMING:  I understood, but I wanted the Court to

3    know we are not part of any conversation --

4              THE COURT:  I appreciate that, and Mr. Rocco I think

5    had mentioned that as well.  Thank you very much.

6

7                              -   -   -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25