UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x
                                                                     :
UNITED STATES OF AMERICA
                                                                     :
                              v.                        S4 15 Cr. 867 (RMB)
                                                                     :
REZA ZARRAB, et al.,
                                                                     :
                         Defendants.
                                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  x


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT MEHMET HAKAN ATILLA'S
MOTION TO DISMISS SUPERSEDING INDICTMENT S4,
OR ALTERNATIVELY FOR SEVERANCE**


HERRICK, FEINSTEIN LLP                    FLEMING RUVOLDT PLLC
Victor J. Rocco                           Cathy Fleming
Thomas E. Thornhill                       Robert Fettweis, *pro hac vice*
David M. Rosenfield                       1700 Broadway, 28th Floor
2 Park Avenue                             New York, NY  10019
New York, NY  10016

## TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................................1

POINT ONE      ATILLA CANNOT BE CHARGED FOR ACTIVITY THAT IS
EXCLUSIVELY FOREIGN BASED WITH NO DIRECT US
EFFECT ........................................................................................4

    1.    IEEPA (International Emergency Economic Powers Act) ......................5

    2.    Executive Orders 12957 and 12959 ...................................................6

    3.    CISADA (Comprehensive Iran Sanctions, Accountability and Divestment
Act) ................................................................................................6

    4.    IFSR (Iranian Financial Sanctions Regulations).................................7

    5.    The National Defense Authorization Act for FY 2012 ........................8

    6.    Executive Order 13622 .....................................................................9

    7.    ITRA (Iran Threat Reduction and Syria Human Rights Act) .............10

    8.    IFCA (Iran Freedom and Counter-Proliferation Act of 2012)............10

    9.    Executive Order 13645 ...................................................................11

POINT TWO      THE SANCTIONS REGIME DOES NOT APPLY CRIMINAL
PENALTIES TO CONDUCT OF A FOREIGNER IN THESE
CIRCUMSTANCES ....................................................................13

POINT THREE    THERE IS NO ALLEGATION LINKING ATILLA WITH THE US ..........16

POINT FOUR    THE SANCTIONS LAWS PROVIDE THE EXCLUSIVE BASIS
FOR PUNISHING EVASIVE CONDUCT....................................19

POINT FIVE     ALTERNATIVELY, IF NOT DISMISSED, MR. ATILLA'S CASE
MUST BE SEVERED FROM MR. ZARRAB'S ...........................23

CONCLUSION ........................................................................................24

i

# TABLE OF AUTHORITIES

**Page**

## Federal Cases

*ABC Charters, Inc. v. Bronson,*
  591 F. Supp. 2d 1272 (S.D. Fla. 2008) ................................................................20

*Connally v. General Constr. Co.,*
  269 U.S. 385 (1926)................................................................23

*Grunewald v. United States,*
  353 U.S. 391 (1957)................................................................19

*Kotteakos v. United States,*
  328 U.S. 750 (1946)................................................................23

*Krulewitch v. United States,*
  336 U.S. 440 (1949)................................................................19

*Lutwak v. United States,*
  344 U.S. 604 (1953)................................................................19

*Morrison v. National Australia Bank, Ltd.*
  561 U.S. 247 (2010)................................................................13

*United States v. Al Kassar,*
  660 F.3d 108 (2d Cir. 2011)................................................................13

*United States v. Bilzerian,*
  926 F.2d 1285 (2d Cir. 1991)................................................................21

*United States v. Bowman,*
  260 U.S. 94 (1922)................................................................13

*United States v. Coplan,*
  703 F.3d 46 (2d Cir. 2012)................................................................21

*United States v. Minarik,*
  875 F.2d 1186 (6th Cir. 1989) ................................................................20, 21

*United States v. Pirro,*
  212 F.3d 86 (2d Cir. 2000) *sub appeal,* 9 F. App'x 45 (2d Cir. 2001)....................................1

*United States v. Quinn,*
  401 F. Supp. 2d 80 (D.D.C. 2005) ................................................................15

*United States v. Turoff,*
   853 F.2d 1037 (2d Cir. 1988) ............................................................... 23

*United States v. Yousef,*
   327 F.3d 56 (2d Cir. 2003) ............................................................. 13, 14

*United States v. Zarrab,*
   2016 WL 6820737 (S.D.N.Y. Oct. 17, 2016) ............................... passim

## **Statutes, Rules and Regulations**

18 U.S.C. § 371 .......................................................................... 20, 21

18 U.S.C. § 831 ................................................................................ 13

18 U.S.C. § 1001 .............................................................................. 21

18 U.S.C. § 1203 .............................................................................. 13

18 U.S.C. § 2339B ........................................................................... 12

22 U.S.C. § 8513a ......................................................................... 8, 10

22 U.S.C. § 8804 ................................................................... 10, 11, 12

22 U.S.C. § 8809 .............................................................................. 10

26 U.S.C. § 7206 .............................................................................. 21

31 CFR. § 560.203 ....................................................................... 6, 19

31 CFR § 560.204 ................................................................... 5, 6, 14

31 CFR § 561.201 ............................................................................... 7

31 CFR § 561.202 ............................................................................... 7

31 CFR § 561.203 ........................................................................... 7, 9

31 CFR § 561.204 ................................................................... 5, 7, 9

31 CFR. § 561.205 ............................................................................ 19

31 CFR § 561.301 ............................................................................... 8

31 CFR § 561.701 ............................................................................... 7

50 U.S.C. § 1701 ....................................................................... 11, 12

50 U.S.C. § 1705 ................................................................................................5

Executive Order 12957 ........................................................................................9

Executive Order 12959 ........................................................................................6

Executive Order 13622 ................................................................................7, 9, 19

Executive Order 13645 ..............................................................................11, 12, 19

Fed. R. Crim. P. 7(d) .........................................................................................24

Fed. R. Crim. P. 8(b) .........................................................................................23

Pub. L. 111-195, Comprehensive Iran Sanctions, Accountability and Divestment Act ................6

Pub. L. 112-81, National Defense Authorization Act for FY 2012 ........................................8, 9, 10

Pub. L. 112-158, Iran Threat reduction and Syria Human Rights Act of 2012 ...........................10

Pub. L. 112-239, National Defense Authorization Act for FY 2013 ................................10, 11, 12

## Miscellaneous

Carswell & Davis, *Economic and Financial Pressures,* in *American Hostages in Iran*, (published by Council on Foreign Relations) .........................................................19

Rennack, *Iran-US Economic Sanctions*, Congressional Research Service, R43311 ....................20

OFAC Iran Sanctions Frequently Asked Questions, available at https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_iran.aspx#cisada ...........6

Mehmet Hakan Atilla ("Mr. Atilla") moves to dismiss the charges against him alleged in Indictment S4 ("Indictment").  These charges rest on a fatal misconstruction of the governing statutory and regulatory scheme ("Iranian Sanctions Regime" or "Sanctions Regime") and some alleged, but non-existent connection between Mr. Atilla and the potentially criminal conduct of others. Although pretrial dismissals are disfavored, the Court of Appeals appears to encourage such a pre-trial challenge: the "timing of the defendant's objection [to an indictment] is important to the level of scrutiny employed; a defendant who objects to the indictment before trial . . . is entitled to a more exacting review of the indictment than one who waits until after the trial to object." *United States v. Pirro,* 212 F.3d 86, 92 (2d Cir. 2000), *sub appeal*, 9 F. App'x 45 (2d Cir. 2001).  Where a pleading raises facial concerns about the theory of the prosecution, or the sufficiency of its evidence, it is especially prudent for the Court to parse carefully its boilerplate allegations and require at least an allegation of minimal, critical facts – facts which cannot be mustered here.

## FACTUAL BACKGROUND

Mr. Atilla is an official at Halkbank, a bank owned principally by the Republic of Turkey.  The Indictment alleges that he violated the Iranian Sanctions Regime as a result of activity that occurred entirely *outside* the US.  It then also appears to allege that that foreign activity somehow led to the use of US financial institutions. As a result, Mr. Atilla has been charged with conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), conspiracy to commit bank fraud, conspiracy to commit money laundering, substantive bank fraud and money laundering violations, as well as conspiracy to defraud the US.

The Indictment differs in substantial respects from earlier pleadings in this case. Paragraphs 33-55 allege two totally new schemes based entirely outside the US involving Mr. Atilla and his employer, Halkbank. Under the Sanctions Regime these schemes undoubtedly

could have resulted in Mr. Atilla, Halkbank and others being added to the US "sanctions list," but that is all.  The second part of the Indictment, which basically tracks allegations in the earlier four indictments (paragraphs 56-84) alleges another, *entirely separate* scheme – one which apparently involved the proceeds of sanctionable activity, but, even as alleged, is not integral to, or even a part of, the schemes alleged in paragraphs 33-55.  Unlike the activity alleged in paragraphs 33-55, participation in this third scheme at best could support a criminal prosecution because it involved US banks (and only if we are wrong in Point Two below that the law does not apply to a foreigner whose only activity was outside the US).  Most tellingly, no specific facts are alleged in the Indictment to connect Mr. Atilla to this separate scheme.

The new charges against Mr. Atilla proceed on a doubly flawed theory of prosecution that is anchored in a misconstruction of the Sanctions Regime and tethered to alleged foreign conduct with no discernable connection to the US.  We know this from many of the newly added paragraphs in the Indictment which mistakenly equate merely *sanctionable* activity under the Sanctions Regime with conduct that is *prohibited* by it. The two terms are very different in their meaning and their significance: only *prohibited* conduct can serve as a basis for prosecution. *Sanctionable* conduct, on the other hand (typically conduct that is entirely foreign with no US nexus), cannot; at most, it can only land a foreign entity or individual on a sanctions list. The government appears to have conceded as much with respect to earlier charges against Mr. Zarrab (*See* Tr. of Proceedings, June 2, 2016 at 44-45, *United States v. Zarrab*, Case No. 1:15-cr-00867-RMB (Dkt. # 38)) – a position this Court endorsed when it noted that while Mr. Zarrab "may not be a 'U.S. person'…he may nonetheless be charged under the IEEPA and ITSR which encompass conduct emanating 'from the United States,' and/or involves 'property [] subject to the jurisdiction of the United States."  *United States v. Zarrab*, 2016 WL 6820737, *10

2

(S.D.N.Y. Oct. 17, 2016) ("Court Op."). In its detailed description of what constitutes criminal conduct under the Sanctions Regime in ¶¶33-55, the latest Indictment seems to ignore that critical nexus and broadens the basis for criminal liability to include purely foreign conduct by a foreign person.

Thus, the new allegations in the Indictment describe as *prohibited* activity (including efforts to evade or avoid the Iranian Sanctions Regime), activity that indisputably is not *prohibited,* but merely *sanctionable* under the Sanctions Regime. In fact, the Indictment regularly uses the words interchangeably and incorrectly assumes that a foreigner, like Mr. Atilla, can be prosecuted for violating a series of US orders, regulations and statutes simply by conducting activity that the US disapproves of and can sanction. (*See*, *e.g.*, Ind. ¶¶ 34-35). From start to present, the Sanctions Regime has never authorized the prosecution of a foreigner for entirely foreign activity that does not involve or affect a US person or entity, even when that activity displeases the US and is otherwise subject to sanctions under the statutory/regulatory scheme.

Thus, the charges against Mr. Atilla, based on conduct entirely outside the United States which had no impact in the US (Ind. ¶¶ 33-55), cannot support a criminal charge against him, and the charges based on use of US financial institutions (Ind. ¶¶ 56-84) lack any factual connection to Mr. Atilla (and even if they did, he could not be prosecuted as a foreigner for his foreign activity). This means that all of the charges against him except the *Klein* conspiracy must be dismissed or stricken because they all rest on alleged violations of the Sanctions Regime that are not criminal or are unrelated to Mr. Atilla. The *Klein* charge is also baseless because evasion and avoidance of the Sanctions Regime has been addressed by Congress and the Executive in the carefully wrought, comprehensive statutory/regulatory mosaic that governs

Iranian sanctions, and here, Mr. Atilla is not charged with activity that evaded or avoided *prohibitions* (as the evasion provision of the Regime requires).

**POINT ONE**
**ATILLA CANNOT BE CHARGED FOR ACTIVITY THAT IS EXCLUSIVELY FOREIGN BASED WITH NO DIRECT US EFFECT**

To the extent the government seeks to charge Mr. Atilla for the activity conducted outside of the US (the activity from ¶ 33 through ¶ 55), it cannot do so. Such a prosecution is not authorized by the Sanctions Regime. It would be an unprecedented exercise of authority by the US. Because of the lack of notice and any nexus to the US, it also would violate the Due Process Clause of the Constitution.

The US started addressing sanctions against Iran back in the 1970s, first blocking Iran's properties held *in the US*. Then, in the 1990s, the US prevented US persons/entities from engaging in commerce with Iran, again prohibiting only US persons/entities from acting. The Obama administration ratcheted up the Sanctions Regime, seeking to isolate Iran from the global financial system. In every instance, as sanctions expanded, they were aimed at prohibiting US persons/entities from dealing with foreign entities that were outside Iran, when those foreign entities supported activities the US did not like because they were helping Iran's efforts.

One thing has remained immutable throughout this entire accretive process: no statute, order or regulation has ever allowed the criminal prosecution of a foreigner for having engaged in conduct that is merely sanctionable. At most, the foreigner has lost the privilege of dealing with the US. Only if it continued to deal with the US or avail itself of US facilities (*e.g.*, banking) after being listed, could it be prosecuted, along with the US entity/person which assisted it, for that conduct alone.

1.  IEEPA (International Emergency Economic Powers Act)

The first statute cited in the Indictment, IEEPA, is the basis for nearly all of the successive executive orders and regulations and even serves as the penalty provision for the three subsequent statutes also cited in the Indictment (NDAA, ITRA and IFCA).

IEEPA states that violations of any "license," "order," "regulation" or "prohibition" "issued" under IEEPA can be prosecuted.  50 U.S.C. §§1705 (a) and (c).  Violations of prohibitions ("prohibitions" being a term of art in the statutes, orders and regulations) provide the basis for US prosecutions – conduct that is disallowed by the law.  And a "prohibition" applies by its express definition to a US person or to conduct emanating from the US (including US persons engaging in commerce with Iran or with an entity on the sanctions list).  *See*, e.g., 31 CFR §560.204 (applying prohibition to exports "from the United States, or by a United States person, wherever located"); 31 CFR §561.204(a) (applying prohibitions and conditions on correspondent account opening/maintenance to "[a] U.S. financial institution").

Although the evasion and avoidance requirement does not have comparable language (meaning it could apply to foreign entities in the first instance), that requirement still applies only to evasion of prohibitions and prohibitions, as mentioned, apply only to US persons or conduct emanating from the US.  Listing on a sanctions list is not a violation of anything – it is, at most, the basis for the US deciding that the listed entity cannot be dealt with *by a US person*.  It is the predicate for a prosecution only when someone with a US connection deals with that listed entity.

OFAC guidance is clearly in line with this reasoning:  "A finding by the Treasury Department that a foreign financial institution knowingly engages in one or more of the sanctionable activities is necessary *before the Treasury Department can prohibit* or impose strict

conditions on the opening or maintaining in the United States of correspondent accounts or payable-through accounts for that foreign financial institution" (emphasis added). (OFAC Iran Sanctions Frequently Asked Questions, available at https://www.treasury.gov/resource-center/faqs/Sanctions/Pages/faq_iran.aspx#cisada, No. 155).

2. Executive Orders 12957 and 12959

Executive Orders 12957 and 12959, issued on March 15 and May 6, 1995, respectively, essentially state that the US cannot send certain goods, technology or services to Iran. Regulations (the Iranian Transactions and Sanctions Regulations, "ITSR") effected these orders by providing that doing so is prohibited unless the transaction is first licensed. This prohibition includes sending funds from the US or by US persons and any transactions that evade the ITSR. EO 12959 §1(b) and (g); 31 CFR §§560.203-560.204.  These rules do not state that a foreign entity or individual cannot send non-US services to Iran from outside the US.  Thus, Halkbank did not need an OFAC license to provide services to Iran, as it is not a US entity.

3. CISADA (Comprehensive Iran Sanctions, Accountability and Divestment Act)

CISADA, Pub. L. 111-195, was enacted in 2010.  Although it is not referenced in the Indictment, it forms an important part of the mosaic of the Iranian sanctions framework that is cited in the Indictment, especially the so-called secondary sanctions against foreign financial institutions ("FFIs").  CISADA enables the US to sanction FFIs that are not located in Iran (*e.g.*, Halkbank) if that non-Iranian FFI helps the Central Bank of Iran (or Iranian financial institutions that are on a list) conduct financial transactions that help Iran obtain weapons of mass destruction or directly deal with the Islamic Revolutionary Guard Corps ("IRGC").  Once sanctioned, the foreign non-Iranian bank cannot establish a new US correspondent bank account, and is restricted in its use of any existing US correspondent bank account.

Once again, Congress made clear that, *at most,* it could put foreign banks on notice that, if they do certain things the US does not like, they will not be able to use US financial facilities – not that they will be subject to criminal prosecution.

4. IFSR (Iranian Financial Sanctions Regulations)

IFSR regulations were initially issued under CISADA. As the US added sanctions against FFIs that dealt with Iran, IFSR was amended to correspond with those new sanctions under IEEPA, EO 13622, ITRA and the NDAA. IFSR consists of two components: one to punish *subsidiaries of US* financial institutions for doing certain things, and others to *sanction* FFIs not owned or controlled by US financial institutions that do things the US does not like, but can only sanction (put on a list). 31 CFR §§561.201-561.204. Certain relationships with sanctioned entities or individuals then would serve as a basis for prosecuting US individuals or US entities that dealt with them.

Crucially, IFSR allows for the prosecution of an FFI even before it is listed on any sanctions list if it *both* engages in certain transactions involving IRGC *and* is controlled or half or more owned by a US financial institution. *See* 31 CFR §§561.202, 561.701(b)(2). In effect, an FFI that is a US institution's subsidiary is considered a US institution. By so delimiting the prohibition to US controlled institutions, OFAC has emphasized that a US nexus is essential in order to prohibit and punish actions criminally: if an FFI could be prosecuted for any activity that simply could trigger sanctions, any FFI could be prosecuted for any of the conduct articulated in IFSR, not just US controlled FFIs. It would then have been superfluous to authorize prosecution of only those FFIs that are US controlled.

The government's misconstruction of the entire Sanctions Regime to allow for the prosecution of entirely foreign conduct is demonstrated by its reference to IFSR. The Indictment

alleges (Ind. ¶ 18) that IFSR allows further *prosecution* of the avoidance or evasion of any of its "provisions."  But according to the express terms of IFSR, only evasion or avoidance of *prohibitions*, not "provisions," can trigger prosecution, and (i) there are no *prohibitions* until entirely foreign conduct is determined to be sanctionable, and (ii) only then are US persons or US entities prohibited from having specified dealings with the sanctioned foreign entity.  *See* 31 CFR §561.301(a).

5. The National Defense Authorization Act for FY 2012 ("NDAA")

Attached to the NDAA are "sanctions" for FFIs that conduct or facilitate significant financial transactions with the Central Bank of Iran or Iranian financial entities designated under IEEPA.  And there was a 180-day grace period for foreign government-controlled FFIs doing oil transactions, after which that FFI faced *sanctions* unless the foreign nation first reduced its consumption of oil (which Turkey did).  Finally, there is an exception for government-controlled foreign banks, like Halkbank, doing non-oil transactions. Pub. L. 112-81 §1245(d), 22 U.S.C. §8513a(d).

The express basis for prosecution under this NDAA provision is the authority in IEEPA to do so.  So whatever IEEPA reaches criminally, the NDAA's reach is no broader. Because IEEPA only reaches conduct with a US nexus, the NDAA is so limited too.

Once again, the Indictment misrepresents the scope of the NDAA and in doing so, evidences the government's fundamental misconception of its authority to prosecute. Three times in a single paragraph, the Indictment erroneously labels as *prohibitions* conduct that is, by the statute's very terms, merely sanctionable. (Ind. ¶ 12; *see* NDAA at §1245(d)(1)(A) (prohibiting just the opening and maintaining of US correspondent accounts)).  The FFI is not prohibited from engaging in the activity that gets it sanctioned; indeed, it can continue to do that same

activity without prosecution.  *Only after that determination* does any NDAA prohibition kick in – a prohibition on opening or maintaining a correspondent account for that FFI *in the US.*  *See* NDAA §1245(d)(1)(A); 31 CFR §561.203(a) (providing that prohibitions follow imposition of sanctions); 31 CFR §561.203(c) (providing the IFSR's NDAA-related "prohibitions," all of which apply to US financial institutions).

6.  Executive Order 13622

Executive Order 13622, issued July 30, 2012, modifies Executive Order 12957 by creating an additional *power to determine* when certain activity merits *sanctions* against (a) FFIs that purchase from anyone in Iran, including NICO, NIOC (petroleum related Iranian entities) and the Central Bank of Iran unless their country reduced its petroleum purchases; or (b) persons that help the Iranian government obtain precious metals or US notes. If any of these actions occur, the Treasury can *sanction* the foreigner by prohibiting or restricting its US correspondent accounts or prohibiting US transactions in its property.  EO 13622 §§1, 5; 31 CFR §561.204.

The Indictment also misconstrues and misstates EO 13622, and, by doing so, again betrays the government's fundamental misunderstanding of the basic structure of the Sanctions Regime and its role in US prosecutions.  Paragraph 13 of the Indictment alleges that the President imposed restrictions (implying that he can restrict *an FFI*) when in fact, the only restrictions the President authorized the Treasury Secretary to impose are *not* on how that FFI generally conducts its business (the Executive is powerless to do so), but on how that FFI can interact with *US persons or US entities.*  EO 13622 §1(b).  In other words, the President cannot stop the FFI from pursuing the conduct the United States has found sufficiently objectionable to sanction the FFI; the FFI is free to keep doing that objectionable conduct as long as it does not

involve a US person/entity or US financial institution.  Only then can the US person/entity be prosecuted (and under this Court's ruling, foreign entities as well).  *See* Court Op. at *10.

### 7.  ITRA (Iran Threat Reduction and Syria Human Rights Act)

ITRA, Pub. L. 112-158, amends the NDAA, so its criminal authority is derivative of the NDAA, which itself is derived from IEEPA.  ITRA requires sanctioning of FFIs, including FFIs owned by foreign governments, if they knowingly facilitate significant financial transactions with the Central Bank of Iran or designated Iranian banks unless for purposes of bilateral trade. ITRA §504(a)(1) (amending NDAA §1245(d), 22 U.S.C. §8513a(d)).  So, for example, where Turkey trades oil with Iran, an FFI can be sanctioned unless the proceeds remain in Turkey, and the item traded to Iran comes from Turkey.  Here, the Indictment portrays ITRA correctly, stating that if an FFI facilitated a transaction that failed to meet the bilateral trade requirements, it is subject to "U.S. sanctions" (Ind. ¶ 15).  In other words, divergence from the ITRA's bilateral trade condition does *not* provide a basis to prosecute the FFI.  It subjects the FFI to sanctions, which then can lead to prosecutable prohibitions under the NDAA (which ITRA amends).

### 8.  IFCA (Iran Freedom and Counter-Proliferation Act of 2012)

After ITRA came IFCA, Pub. L. 112-239, in 2013, which expanded the US effort to target gold transactions with Iran by expanding the ability to *sanction* anyone abroad who engaged in those kinds of transactions with Iran (including with non-government entities).  IFCA §1245(a)(1)(A), 22 U.S.C. §8804(a)(1)(A).

The basis for prosecution under IFCA (as with every other applicable aspect of the Sanctions Regime relevant in this case) is IEEPA:  IFCA refers back to IEEPA's criminal provision, IFCA §1253(b), 22 U.S.C. §8809(b), so, again, its reach is no greater than IEEPA's

(which allows prosecution of only those who violate prohibitions, orders, regulations and licenses – not those who merely engage in conduct that merits sanctions).

Once again, the Indictment gets it wrong by confusing *sanctionable* conduct with conduct that is *prohibited;* and in doing so, yet again, overstates the government's authority to prosecute. Paragraph 16 alleges that under IFCA, *prohibited* activity (which as we have seen throughout the Sanctions Regime may serve as a basis for prosecution) was broadened to include what a foreigner does in an entirely foreign transaction (Ind. ¶ 16). In fact, the subject conduct, trading gold and precious metals with Iran, never has been *prohibited*; it remains sanctionable at most. The Indictment also incorrectly states that additional restrictions were implemented by IFCA (in fact, what IFCA adds are additional triggers for the imposition of sanctions – not restrictions on a foreigner's conduct, because a foreigner is beyond the US's power under the statutes in question, and the US is not authorized to restrict what that foreigner can do (and even under this Court's ruling, only where that foreigner then acts with US entities or individuals).  Court Op. at *10. *See* IFCA §1245(a)(1), 22 U.S.C. §8804(a)(1) (requiring imposition of five or more sanctions described in section 6(a) of the Iran Sanctions Act of 1996, 50 U.S.C. §1701, each of which provides a basis for prohibitions involving US persons).  And the Indictment incorrectly alleges that the *prohibitions* against trading gold with Iran (the violation of which can be prosecuted) have been "broadened" when, in fact, there never were any *prohibitions* against foreigners trading gold with Iran in the first place.

9.  Executive Order 13645

The final piece of the Sanctions Regime relevant to this case (and cited in the Indictment) is EO 13645, issued June 3, 2013, which implemented further rules governing gold transactions. It does *not* prohibit any foreign individual or entity from engaging in gold transactions with Iran

– it simply makes those foreign individuals and entities *sanctionable* if they do so. EO 13645 §7(a).

Once again, at paragraphs 16 and 17, the Indictment misconstrues and misstates the applicable law and alleges that IFCA prohibits dealing in precious metals on behalf of Iran. IFCA did no such thing. Instead, it *addressed* those transactions when conducted by foreigners, allowing the US to sanction foreign individuals and entities and then, *and only then,* to prohibit US persons and US institutions from being used by those sanctioned entities (and prohibit US interactions with those sanctioned entities in those situations as well). *See* IFCA §1245(a)(1), 22 U.S.C. §8804(a)(1) (requiring imposition of five or more sanctions described in section 6(a) of the Iran Sanctions Act of 1996, 50 U.S.C. §1701, each of which provides a basis to prohibit activity by US persons).  As it has in every part of the Sanctions Regime, the prohibition was directed at conduct and activity involving US entities or persons.

Beyond the analysis of the statutes, orders and regulations that comprise the Iranian Sanctions Regime, it is instructive that there have been no civil or criminal actions brought against foreign entities or individuals whose conduct is sanctionable, where those entities or individuals did nothing with US individuals or entities.  This is significant, for the sanctions in question have been on the books and aggressively enforced by the government for the past 40 years.  This includes trying to prosecute or civilly penalize foreigners for continuing to engage in the conduct that got them sanctioned in the first place.   The point is driven home further by a comparison to other US statutes that apply their proscriptions to foreign citizens: they do so by clear, express language.   *Compare* the Anti-Terrorism Act's express provision on extraterritoriality at 18 U.S.C. §2339B(d)  (applying the criminal penalties to non-US persons: "after the conduct required for the offense occurs an offender is brought into or found in the US,

even if the conduct required for the offense occurs outside the United States"), Hostage Taking (at 18 U.S.C. §1203(b)(1)(B)) and Nuclear Materials (at 18 U.S.C. §831(c)(3)) (both of which apply criminal penalties to foreigners found in the United States).

In short, from the time of its inception through the present in each iteration of the Iranian Sanctions Regime, Congress and the Executive have made clear that foreign entities and individuals cannot be prosecuted for entirely foreign conduct.   So no prosecution is authorized on that basis, and if the US were to now seek to prosecute foreigners for entirely foreign activity that has no US nexus, such a prosecution would violate fundamental notions of due process, guaranteed by the Fifth Amendment.  The due process protections apply to Mr. Atilla. *See, e.g., United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).

**POINT TWO**
**THE SANCTIONS REGIME DOES NOT APPLY CRIMINAL PENALTIES TO CONDUCT OF A FOREIGNER IN THESE CIRCUMSTANCES**

This Court appears to have concluded that IEEPA and ITSR can be applied to a foreign national involved in conduct emanating from the US or property within the US.  Court Op. at *10. We most respectfully suggest that the Court reached the wrong conclusion.

The analysis of this question starts with *United States v. Bowman*, a Supreme Court decision that expressly left *open* whether US criminal law could be applied to a citizen of Great Britain.  260 U.S. 94, 102-03 (1922).  It is an issue the Supreme Court has never resolved (if anything, the Court arguably has expressed discomfort with extraterritorial application in decisions like *Morrison v. National Australia Bank, Ltd.*, 561 U.S. 247 (2010)  The presumption against application of US law to foreign nationals is not absolute: Congress can overcome that presumption but the lesson of the case law is that it must do so unambiguously.  Even *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003) – a Second Circuit terrorism decision referenced by

13

this Court in its decision on Zarrab (Court Op. at *9) – held that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains." *Yousef*, 327 F.3d at 86.  As the Circuit observed, while "Congress…may legislate…in excess of the limits posed by international law," there must be legislation that clearly does so – not an after-the-fact interpretation by the prosecution of some unstated authority, which seems to be the case here.  *Id.* at 93.  Thus, although the Court appeared to rely on the need for the US to defend itself as a reason for dispensing with the presumption against extraterritoriality (Court Op. at *8-10), the Sanctions Regime's very careful calibration suggests otherwise.

The Sanctions Regime generally does not express an intention to apply its criminal reach to foreigners conducting their activity abroad.

In concluding that the Sanctions Regime did reach foreigners like Zarrab, this Court appears (in dictum) to have adopted the government's argument that 31 CFR §560.204 must apply to a foreign national because the first clause, addressing the "exportation, re-exportation, sale or supply…from the United States," would be otherwise superfluous given the second clause's wording – "by a United States person…."  Court Op. at *9.  Although the Court did not use the word "superfluous," its analysis appears to have been based on that notion.

However, Section 204's provisions can be read to prohibit different activities.  Section 204 prohibits exports and re-exports *from the US* of certain items by anyone (what we will call Prong 1) *or* export or re-export of certain items *from anywhere only by US persons* (wherever those US persons are located) (what we will call Prong 2).  This Court appears to have reasoned that the fact that the Executive thought it necessary to apply Prong 2 (items that need not have come from the US) only to US persons must mean that Prong 1 (items coming from the US) applies to both US and non-US persons.  But the fact is that Prong 2 can serve a necessary

14

function not served by Prong 1:  Prong 2 covers items where one would not automatically conclude that US persons are prosecutable (items that did not come from the US in the first instance) absent some clear indication of intent.   To ensure that US persons would know that this conduct (relating to items not coming from the US) was reachable no matter where they were located (hardly a self-evident proposition), the Executive presumably determined that it needed to make its intent clear by expressly applying Prong 2 to US persons.   Under this construction, Prong 2 serves a different purpose from Prong 1, meaning that it was not superfluous *even if Prong 1 only covered US persons* (as we contend).

Further, and alternatively, if what we describe as the Court's "superfluous" analysis is to be honored, that analysis must be applied consistently.  By the same reasoning utilized by the Court in interpreting 204, there would be no reason for the same Executive to have enacted only one section later (31 CFR §560.205) a provision that addresses some of the very same conduct listed in section 204, but expressly restricts the prohibition to non-US persons.  In this regard, it cannot be denied that 205 governs the same basic area as 204:  specified items that come directly or indirectly from the US in the first instance.  That is the language used in both 204 and 205.  So if the Court is right that Prong 1 of 204 covers non-US persons (and justifies prosecuting Mr. Atilla), there would have been no need for section 205 because it would simply reiterate what Prong 1 of 204 already authorized.

By singling out non-US persons, Section 205 stands in stark contrast to the other parts of the Sanctions Regime.  It sets forth a clear expression of Executive intent to prohibit acts by a foreign national, unlike the first prong of 204.

If we are right, it follows that the only way that a foreign national can be charged criminally under the Sanctions Regime is if he violates section 205.  *See, e.g., United States v.*

*Quinn*, 401 F. Supp. 2d 80, 103 n. 23 (D.D.C. 2005) (explaining that section 205 was charged because of a defendant who was a foreigner).  And because section 205 is limited to the re-export of items that required a license *in 1995*, and financial services (the basis for the charges in this case) did not require such a license, it would *not* apply to Mr. Atilla even if he re-exported US financial services.

### POINT THREE
### THERE IS NO ALLEGATION LINKING ATILLA WITH THE US

If we are wrong about the application of the Sanctions Regime to foreigners (Point Two), the government still must show that the foreigner, here Mr. Atilla, was knowingly involved in causing US banks to participate in prohibited conduct.  That conduct is described in paragraphs 56 onward, and on the face of the Indictment, there is no adequate basis to link Mr. Atilla to it.

Paragraph 56 discusses a scheme to transform into American dollars, through US banking facilities, the money Mr. Zarrab earned from allegedly illicit Iranian transactions.  This activity is the linchpin of the case against Mr. Zarrab, as the government repeatedly made clear in its opposition to his motion to dismiss an earlier indictment. (Tr. of Proceedings, June 2, 2016 at 45, *United States v. Zarrab*, Case No. 1:15-cr-00867-RMB (Dkt. # 38);   Mem. Opp'n Def. Zarrab's Mot. Dismiss Ind. S2, at 16 n.6 (Dkt. # 75); Tr. of Proceedings, Oct. 5, 2016 at 13, *United States v. Zarrab*, Case No. 1:15-cr-00867-RMB (Dkt. # 88)).

The obvious and fatal failure to link Mr. Atilla to US conduct is nothing new to the government. We have raised this deficiency loudly and clearly twice before, both in Mr. Atilla's bail application and again in his motion to dismiss the original indictment against him, but the government has failed to heed it for, despite superseding the earlier indictment, it has failed to correct this flaw even when just a single allegation of fact would do. To the contrary, the latest

Indictment against Mr. Atilla only underscores the absence of any connection between him and any US related transactions.

*First,* the absence of the requisite link is clear.  Mr. Atilla is not mentioned even once in connection with the US dollar transactions starting at paragraph 56 of the Indictment (nor was he in any earlier versions of the Indictment). That stands in stark contrast to his named involvement in the entirely foreign activity listed in paragraphs 33-55, and to the alleged involvement of Mr. Zarrab and certain of his relatives and business associates in paragraphs 56-84.  The absence of his name is especially meaningful when contrasted with the way his name and alleged conduct (and Halkbank's) courses through paragraphs 33-55, describing the first two schemes in the Indictment.

*Second,* it is clear that no link is alleged because the government *cannot* do so.  Mr. Atilla's purported connection to the US banking system or a US dollar scheme is never once mentioned in any prior indictment, in any document provided by the government in its massive discovery, or in any internal Turkish investigative report recapping extensive investigations by Turkey's prior administration (many of which are hundreds of pages long).  Moreover, the notion that Mr. Atilla was linked to the US transactions is against the overwhelming evidence (and allegations) in this case, for none of the Halkbank food or gold transactions were dollar based. And it is contrary to logic:  for Iran, Mr. Zarrab and even Halkbank, the value from the first two Turkish based schemes (the gold and food/medicine schemes) was available without turning the proceeds of those schemes into dollars. Iran was able to use its funds from oil and gas sales to Turkey, and Mr. Zarrab was paid handsomely (according to the Indictment and discovery materials) for his work as well.

The choice to turn the proceeds into dollars was, just as the structure of the Indictment implies, a choice that was neither necessary or inevitable.  The alleged scheme attained its goals: Mr. Zarrab got paid in Euros and Turkish Lira, and Iran got access to funds from its oil sales *before* any US nexus financial transfer.  Mr. Zarrab's further goals were superfluous to Mr. Atilla.

*Third,* the government will not be able to defend its failure to link Mr. Atilla to the US nexus conduct by claiming that the scheme described in paragraphs 56-84 on is interrelated with the earlier described foreign schemes because the wording it chose for its Indictment would undercut that claim.  The Indictment describes three *separate* schemes: "The Gold Export Scheme" (page 16); "The Fraudulent Food and Medicine Trade Scheme" (page 22); and "[The] Scheme To Provide International Wire Transfer Services for the Government of Iran and Iranian Companies and Persons" (page 29).  Any doubt about their separateness is dispelled by the words chosen by the government right at the start of its description of the third scheme (the International Wire Service Scheme, ¶ 56), the only one which allegedly involved US banks:  "*In addition* to providing the Government of Iran access to the proceeds of Iranian oil and gas sales deposited at Turkish Bank-1, the defendants *also* conducted international financial transfers with *these proceeds* and other funds held for the benefit of Iranian companies and individuals…." (emphasis added).   The Indictment does *not* say that these wire transfers, which involved "U.S. financial institutions," were part of a unified overall plan.  To the contrary, the wording – and simple logic – suggests they were separable for, as the Indictment makes clear, Halkbank's involvement was not necessary to the US transfers, and their value was gained without the US connection.

In short, the three schemes were not necessary to each other and, in simple logic (as described above), need not have been.  Their separateness precludes the government from roping in Mr. Atilla by virtue of his connection to the foreign based Schemes 1 and 2.  *Cf. Krulewitch v. United States*, 336 U.S. 440 (1949); *Lutwak v. United States*, 344 U.S. 604 (1953); *Grunewald v. United States*, 353 U.S. 391 (1957).  Without a basis for prosecuting Mr. Atilla under the Sanctions Regime, the entire Indictment falls, with the exception of the *Klein* conspiracy charged in Count One.  Absent a violation of the Sanctions Regime (which means that Mr. Atilla cannot be held responsible for US financial transfers), the IEEPA counts, the bank fraud counts, and the promotional money laundering counts have no legal basis and must be dismissed.

**POINT FOUR**
**THE SANCTIONS LAWS PROVIDE**
**THE EXCLUSIVE BASIS FOR PUNISHING EVASIVE CONDUCT**

This Court observed that the basis for the alleged *Klein* impairment is the purported effort to strip Iranian entities from the underlying banking transactions that otherwise would have been reviewed by OFAC and rejected.  Court Op. at *8.  This cannot survive against Mr. Atilla.

*First, Klein* does not apply to this case.  The statutes, orders and regulations comprising the Sanctions Regime were intended to occupy the entire field of sanctions, to the exclusion of all other laws, unless expressly included in the Sanctions Regime, and the Sanctions Regime provides that evasion or avoidance of sanctions can be prosecuted *only* with respect to efforts to avoid or evade violations of "prohibitions."  31 C.F.R. §§560.203, 561.205; EO 13622 §9(a); EO 13645 §13(a).

As a matter of foreign policy, implicating the delicate intersection with foreign commerce and affairs, it had to be this way.  *See, e.g.,* Carswell & Davis, *Economic and Financial Pressures,* in *American Hostages in Iran*, at 31 (published by Council on Foreign Relations)

19

(making clear how careful the US was not to offend FFIs because of concerns over the US dollar, US banks and the overall efforts with Iran:  "with the exception of measures taken as a corollary to military action, the sanctions imposed against Iran were the most comprehensive imposed by the United States in this century [the 20th]").  *Cf. ABC Charters, Inc. v. Bronson,* 591 F. Supp. 2d 1272, 1304 (S.D. Fla. 2008) ("The federal government made clear … that it intends to occupy the field when it comes to regulating interactions with Cuba").   As Congress' own Research Service concluded:  the Sanctions regime targeting Iran is "arguably the most complex the United States and the international community have ever imposed on a rogue State."  Rennack, *Iran-US Economic Sanctions,* Congressional Research Service R43311.  The danger of any other interpretation is illustrated by the recent treaty with Iran over nuclear arms (JCPOA).  That treaty lifted certain aspects of the Sanctions Regime.  If the government is right and it could apply other non-Regime statutes to conduct that could have violated these now lifted provisions, the Treaty would be potentially breached by prosecutorial circumvention of Congressionally reviewed terms.

Case law interpreting the *Klein* conspiracy prong of 18 U.S.C. § 371 makes clear that where a scrupulously crafted regulatory scheme articulates clear limitations on the proscription of evasive conduct – conduct identical to that addressed by Section 371 – those specific limitations govern, and *Klein* cannot be used to supplement or end run those specific limitations. The portion of *United States v. Minarik,* 875 F.2d 1186 (6th Cir. 1989) that survives requires this result.

In *Minarik,* the court addressed a *Klein* conspiracy based on a defendant's conduct that impeded the collection of money which he owed the IRS.  Although the Internal Revenue Code specified the circumstances in which a taxpayer can be prosecuted for concealing his assets (*see*

26 U.S.C. § 7206), the government chose to proceed under the more general prohibition established by *Klein* under Section 371. The circuit court affirmed the district court's dismissal of the *Klein* count, noting that when Congress addresses a problem in a specific way, the more general fraud clause of Section 371 should not be used to create additional crimes. *Id.* at 1193-94 (emphasis added).

While the expansiveness of the *Klein* doctrine has been questioned by the Second Circuit in *United States v. Coplan,* 703 F.3d 46, 59 (2d Cir. 2012), cautioning against courts, not Congress, creating crimes, our argument does not depend on paring back *Klein.* Instead, the part of the reasoning in *Minarik* that requires courts to give preference to narrower, subsequent statutes designed to fully manage and occupy the area in question (a doctrine that stems from Supreme Court rulings) demands that the evasion/avoidance provision in the Sanctions Regime be given the precedence that Congress meant it to have. Indeed, unlike the situation in *United States v. Bilzerian,* 926 F.2d 1285 (2d Cir. 1991), where Congress passed the broader statute (18 U.S.C. §1001, the "False Statements Statute") *after* passing the narrower securities statute, the exact opposite occurred here: the Executive enacted its narrower regulations knowing full well that the *Klein* conspiracy doctrine had existed for decades. Allowing a prosecutor to choose which of two statutes (or both) to apply to activity that would violate both laws is quite different from allowing a prosecutor to choose a more general statute (here, Section 371) in order to end run a narrower, carefully crafted proscription tailored to the precise circumstances of the case (here, the Sanctions Regime prohibition on evasion/avoidance). Judge Winter's thoughtful dissent in *Bilzerian* bears repeating – that it would be "somewhat odd" that the same body (there Congress, here the "Executive" would act to render its own actions "superfluous."). 926 F.2d at 1305.

When the proper precedence is given, it is clear that the alleged conduct by Mr. Atilla does not violate the narrower, subsequent provision of the Sanctions Regime (charged in Count 2).  As mentioned, under the Regime, it is only where actions are taken to divert Treasury from being able to detect violations of *prohibitions* that prosecution may occur.  The government gets that *wrong twice* by conveying, in paragraphs 33 and 90, that there are punishable evasions of the "requirements" of "U.S. law" and "restrictions."

With respect to evasion of prohibitions, the government will not be able to claim that Mr. Atilla's purportedly evasive conduct violated the evasion provision in the Sanctions Regime. Without some allegation that Mr. Atilla knew of the US transactions described in the Indictment, he cannot be charged (as he has been in Count Two) with evasion to avoid a prohibition against those transactions.   As mentioned, there is no allegation in the Indictment that would suggest that Mr. Atilla knew that US banking facilities would be involved in purely Turkish Lira and Euro denominated transactions.  To the contrary, in all of the actions alleged in the Indictment with respect to the disguising of transactions, Mr. Atilla's name is strikingly absent.  In fact, in the original indictment against Mr. Zarrab (the focal point of this Court's opinion denying Zarrab's motions), the government laid out 13 instances (¶14 a-m) where the purported *Klein* conspiracy was achieved, and none of those 13 instances mention Mr. Atilla by name or position, directly or indirectly.  Indeed, as the government surely knows, to the extent he was involved in the transactions in question, Mr. Atilla took measures to ensure that Iran's connection to those transactions was clear and remained intact and, as discussed, it was neither inevitable nor necessary for the proceeds of whatever Mr. Atilla handled to be turned into dollars.

*Second,* even if *Klein* applied, the charges against Mr. Atilla are deficient.    If the *Klein* charge is based on disguising a transaction to deflect US Treasury review, the government must

at least allege that Mr. Atilla knew of a potential US connection to these purely foreign based transactions.   He plainly cannot be charged with attempting to impair or impede a US government function if he did not know of (or had no reason to foresee) such a connection.

Finally, to the extent a *Klein* charge is allowed to remain in the circumstances of this case, Mr. Atilla would have been deprived of adequate notice under the due process clause.  *See, e.g., Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926) (a statute that "either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the essential of due process of law").

### POINT FIVE
### ALTERNATIVELY, IF NOT DISMISSED,
### MR. ATILLA'S CASE MUST BE SEVERED FROM MR. ZARRAB'S

As discussed, there are three separate "schemes" charged in the Indictment, each of which is, in essence, a separate conspiracy.  "The Gold Export Scheme" and the "The Fraudulent Food and Medicine Trade Scheme" both describe Mr. Atilla's connection to some extent.  By contrast, as discussed in detail above in Point Three of this brief, there are no allegations whatsoever concerning Mr. Atilla's participation in the third scheme, the international wire transfer scheme alleged in paragraphs 56-84.  Accordingly, if not dismissed, Mr. Atilla's case must be severed from Mr. Zarrab's.

Fed. R. Crim. P. 8(b) "does not permit joinder of defendants solely on the ground that the offenses charged are of 'the same or similar character.'"  *United States v. Turoff*, 853 F.2d 1037, 1042 (2d Cir. 1988).  As the Supreme Court held in *Kotteakos v. United States*, 328 U.S. 750, 775 (1946), it is a "substantial right" of each defendant "not to be tried en masse for the conglomeration of distinct and separate offenses committed by others."

Mr. Atilla must be severed from Mr. Zarrab because the international wire transfer scheme – the only allegation with a US nexus – alleges no connection of Mr. Atilla to it.  We challenged the government to do so and the government responded with silence in its superseder.

Finally, should Mr. Zarrab for some reason not be a defendant at Mr. Atilla's trial, we request that paragraphs 56-84 be stricken from the Indictment.  In Mr. Zarrab's absence, paragraphs 56-84 would be surplusage, and would have to be stricken pursuant to Fed. R. Crim. P. 7(d).

## CONCLUSION

For the above reasons, this Court should dismiss Indictment S4 because the charges resting on foreign activity without a US nexus (¶¶ 33-55) are not based on law, the charges based on the US nexus described in ¶¶ 56-84 are insufficiently linked to Mr. Atilla, and even if adequately linked, he could not be prosecuted as a foreign official whose activity was entirely foreign.  The bank fraud and money laundering charges must fall when these charges fall, leaving only a *Klein* conspiracy, which is unauthorized as a matter of law because of the narrower evasion proscription in the Sanctions Regime and because here too, the link between Mr. Atilla and any "impairment" of Treasury is non-existent.  Alternatively, if not dismissed, the case against Mr. Atilla must be severed from that of Mr. Zarrab.

Dated: New York, New York
        October 9, 2017

Respectfully submitted,

HERRICK, FEINSTEIN LLP                    FLEMING RUVOLDT PLLC

By:___s/Victor J. Rocco___                By:___s/Cathy Fleming___
   Victor J. Rocco                        Cathy Fleming
   Thomas E. Thornhill                    Robert Fettweis, *pro hoc vice*
   David M. Rosenfield                    1700 Broadway, 28th Floor
   Two Park Avenue                        New York, New York  10019
   New York, New York  10016              (212) 706-1850
   (212) 592-1400                         (212) 706-1855 (fax)
   (212) 592-1500 (fax)

*Attorneys for Defendant Mehmet Hakan Atilla*

HF 11728963v.3