UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                             :

UNITED STATES OF AMERICA

                                             :

           v.                              :         S4 15 Cr. 867 (RMB)

                                             :

REZA ZARRAB, et al.,

                                           :

          Defendants.

                                           :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

**MEMORANDUM OF LAW OF DEFENDANT MEHMET HAKAN ATILLA IN
OPPOSITION TO THE GOVERNMENT'S MOTIONS *IN LIMINE***

HERRICK, FEINSTEIN LLP
Victor J. Rocco
Thomas E. Thornhill
David M. Rosenfield
2 Park Avenue
New York, NY 10016

FLEMING RUVOLDT PLLC
Cathy Fleming
Robert Fettweis, *pro hac vice*
Jonathan Stern
1700 Broadway, 28th Floor
New York, NY 10019

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...............................................................................................iii

PRELIMINARY STATEMENT ........................................................................................1

ARGUMENT ....................................................................................................................1

POINT I      THE GOVERNMENT'S MOTION IN LIMINE THAT "CO-CONSPIRATOR STATEMENTS IN FURTHERANCE OF THE CHARGED CONSPIRACIES SHOULD BE ADMITTED" CANNOT BE FULLY ADDRESSED AT THIS TIME, AND, AS IT RELATES TO TRANSCRIPTS OF CALLS, IS IMPROPER, AND THEREFORE SHOULD BE DENIED ...........................................................................................1

    A.    The Government Should Not be Permitted to Introduce into Evidence Transcripts of Calls Where No Recording Has Been Produced, as Such Transcripts Do Not Meet the Standards of Admissibility ......................................1

    B.    The Government's Motion in Limine that Co-Conspirator Statements in Furtherance of the Conspiracies Should be Admitted into Evidence, Cannot Be Responded to at This Time and Should be Denied .............................3

POINT II    THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE THE TESTIMONY OF MR. ATILLA'S PROPOSED EXPERTS IS IMPROPER AND CANNOT BE DECIDED AT THIS TIME ...........................6

    A.    Mr. Brummond Should be Permitted to Testify ................................................6

        1.    Mr. Brummond's Testimony is Not Barred by *Touhy* Regulations ............6

        2.    Mr. Brummond Has Extensive General Expertise on Iranian Secondary Sanctions that is Directly Relevant to This Case and Does Not Usurp the Court's Role ................................................................8

    B.    Professor Özçelik Should Be Permitted to Testify in Full ...................................12

POINT III   THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE THE "PUBLIC AUTHORITY" DEFENSE SHOULD BE DENIED ..........................18

POINT IV   THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE THE "VICTIM FAULT" DEFENSE CANNOT BE ADDRESSED AT THIS TIME ........................................................................................................19

i

POINT V      THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE USE
OF THE FACT THAT MR. ATILLA WAS NOT ARRESTED OR
CHARGED IN THE TURKISH CORRUPTION INVESTIGATION
SHOULD BE DENIED ........................................................................................ 20

POINT VI      THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE ANY
EVIDENCE OR DISCUSSION OF THE JOINT COMPREHENSIVE
PLAN OF ACTION CANNOT BE ADDRESSED AT THIS TIME ................... 22

POINT VII      THE GOVERNMENT'S MOTION IN LIMINE TO LIMIT THE CROSS
EXAMINATION OF U.S. TREASURY OFFICIALS TO THE SCOPE
OF THEIR DIRECT EXAMINATION CANNOT BE ADDRESSED AT
THIS TIME ....................................................................................................... 22

POINT VIII      THE GOVERNMENT'S MOTION IN LIMINE TO PRECLUDE CROSS
EXAMINATION OF ITS EXPERTS DUBOWITZ AND SCHANZER
OF THE FOUNDATION FOR DEFENSE OF DEMOCRACIES
CONCERNING THE FDD'S DONORS AND GOVERNANCE
SHOULD BE DENIED ........................................................................................ 26

POINT IX      MR. ATILLA RESERVES HIS RIGHT TO RESPOND TO THE
GOVERNMENT'S SUPPLEMENTAL MOTION IN LIMINE FILED
UNDER SEAL ................................................................................................... 27

CONCLUSION ................................................................................................................. 28

## TABLE OF AUTHORITIES

**Page**

### Federal Cases

*Beech Aircraft Corporation v. Rainey*,
    488 U.S. 153 (1988) ..................................................................................21

*Cheshire Med. Ctr. v. W.R. Grace & Co.*,
    853 F. Supp. 564 (D.N.H. 1994), *aff'd*, 49 F.3d 26 (1st Cir. 1995) ......................25

*CPG Intern. LLC v. Georgelis*,
    2015 WL 1786287 (M.D. Pa. Apr. 20, 2015) ................................................25

*Fuentes v. T. Griffin*,
    829 F.3d 233 (2d Cir. 2016) ....................................................................23

*Hart v. RCI Hospitality Holdings*,
    90 F. Supp. 3d 250 (S.D.N.Y. 2015) .........................................................25

*Katt v. City of New York*,
    151 F. Supp. 2d 313 (S.D.N.Y. 2001) ........................................................25

*Shultz v. Butcher*,
    24 F.3d 626 (4th Cir. 1994) ....................................................................20

*U.S. v. Gasperini*,
    2017 WL 3140366 (E.D.N.Y. July 21, 2017) ................................................16

*U.S. v. Lara*,
    181 F.3d 183 (1st Cir. 1999) ...................................................................24

*U.S. v. Mendiola*,
    707 F.3d 735 (7th Cir. 2013) ...................................................................16

*United States v. Abel*,
    469 U.S. 45 (1984) ..............................................................................23

*United States v. Al-Moayad*,
    545 F.3d 139 (2d Cir. 2008) .....................................................................4

*United States v. Birnbaum*,
    337 F.2d 490 (2d Cir. 1964) .....................................................................4

*United States v. Borst*,
    62 F.3d 43 (2d Cir. 1995.) .....................................................................20

*United States v. Boyle*,
No. 08 CR 523 (CM), 2010 WL 286624 (S.D.N.Y. Jan. 15, 2010) ......................... 15

*United States v. Caracappa*,
614 F.3d 30 (2d Cir. 2010) ................................................................. 25

*United States v. Desena*,
260 F.3d 150 (2d Cir.2001) ................................................................... 4

*United States v. Fuentes*,
563 F.2d 527 (2d Cir. 1977) ................................................................... 2

*United States v. Gigante*,
166 F.3d 75 (2d Cir.1999) ..................................................................... 4

*United States v. Hankey*,
203 F.3d 1160 (9th Cir.2000), *cert. denied*, 530 U.S. 1268 (2000) ...................... 24

*United States v. Harbour*,
809 F.2d 384 (7th Cir. 1987) ................................................................ 25

*United States v. Kashmiri*,
2011 WL 1326373 (N.D. Ill. Apr. 11, 2011) ..........................................19, 20

*United States v. Le*,
No. Crim. 3:08cr516, 2009 WL 2947370 (E.D. Va. Sept. 14, 2009) ...................... 14

*United States v. Lieberman*,
637 F.2d 95 (2d Cir. 1980) .................................................................... 4

*United States v. Liew*,
No. CR 11-00573-1 (JSW), 2013 WL 6441259 (N.D. Cal. Dec. 9, 2013) ............... 14

*United States v. Litvak*,
808 F.3d 160 (2d Cir. 2015) ..............................................................9, 10

*United States v. Maldonado-Rivera*,
922 F.2d 934 (2d Cir. 1990) ..............................................................5, 6

*United States v. McDarrah*,
No. 15cr.1182 (PAC), 2007 WL 273799 (S.D. N.Y. January 31, 2007) ............... 21

*United States v. Morel*,
751 F. Supp. 2d 423 (E.D.N.Y. 2010) ...................................................... 24

*United States v. Palacios*,
677 F.3d 234 (4th Cir. 2012) ................................................................ 15

*United States v. Rodriguez,*
    122 F. Supp. 3d 1258 (D.N.M. 2015)...............................................................25

*United States v. Salah,*
    462 F. Supp. 2d 915 (N.D. Ill. 2006)...............................................................24

*Vasquez v. Virga,*
    No. CV 12-2167, 2015 WL 3616994 (C.D. Cal. Mar. 13, 2015)..........................15

## State Cases

*Weller v. Am. Broadcasting Co., Inc.,*
    232 Cal. App. 3d 991 (Cal. Ct. App. 1991)......................................................16

## Statutes Rules and Regulations

31 C.F.R. § 1.11...................................................................................................6, 7

31 C.F.R. § 560.204............................................................................................10

Executive Order 13622 § 10(d)..........................................................................11

Executive Order 13645 § 14(c) .........................................................................11

Fed. R. Evid. 106................................................................................................21

Fed. R. Evid 403...............................................................................5, 20, 22, 23

Fed. R. Evid 611.........................................................................................23, 25

Fed. R. Evid 702......................................................................................16, 17, 18

Fed. R. Evid 801.................................................................................................3, 4, 5

Iran Threat Reduction and Syria Human Rights Act of 2012 § 212 ...........................11

## Miscellaneous

3A Wigmore, Evidence, § 945 at 782 (Chadbourn rev. 1970)....................................24

Larsen, *Navigating the Federal Trial,* § 7:40 (2016 ed.) ...........................................26

**PRELIMINARY STATEMENT**

Defendant Mehmet Hakan Atilla hereby responds to the government's nine motions *in limine*, one of which is sealed. Most importantly, it should be recognized that virtually all of the motions *in limine* are hobbled by the fact that Mr. Atilla has not yet received the government's witness and exhibit lists or *Jencks* material. Moreover, since many of the motions *in limine* are specific to testimony and/or other evidence that *may* or *may not* be adduced by the government at trial, the issues raised cannot be fully addressed until when, or if, that testimony is offered at trial.

**ARGUMENT**

**POINT I**

**THE GOVERNMENT'S MOTION *IN LIMINE* THAT "CO-CONSPIRATOR STATEMENTS IN FURTHERANCE OF THE CHARGED CONSPIRACIES SHOULD BE ADMITTED" CANNOT BE FULLY ADDRESSED AT THIS TIME, AND, AS IT RELATES TO TRANSCRIPTS OF CALLS, IS IMPROPER, AND THEREFORE SHOULD BE DENIED**

The government's initial motion *in limine* provides that "Co-Conspirator Statements in Furtherance of the Charged Conspiracies Should Be Admitted." (Doc. 322 at 11.) As will be discussed, the government's proffer cannot be evaluated in a vacuum. Additionally, to the extent that the motion appears to proffer naked transcripts of alleged telephone conversations, unsupported by a foundational recording that is independently admissible into evidence, it is also unfounded.

**A.    The Government Should Not be Permitted to Introduce into Evidence Transcripts of Calls Where No Recording Has Been Produced, as Such Transcripts Do Not Meet the Standards of Admissibility**

In its memo of law in support of its motion *in limine* to admit co-conspirator statements, the government indicates that "the evidence will include…recordings of telephone calls and transcripts of telephone calls…" (Doc. 322 at 11.) Moreover, in the "Background" section of its

memo of law, the government cites various calls in which only transcripts, with no accompanying recordings, were produced, such as transcripts of various calls that purportedly occurred on July 2, 2013. (*Id.* at 7.) For the reasons discussed below, these transcripts are not admissible.

In Mr. Atilla's motions *in limine*, we moved to preclude the admission of any recordings of calls, as well as the fruits of these recordings -- which necessarily would include any transcripts -- on various grounds, including a lack of reliability, an inability to properly authenticate them and the rule of completeness. (*See* Doc. 319 at 1-7 and Doc. 320.)

We alternatively requested that, should the Court not preclude the recordings (and fruits) based on our motion papers, a hearing be held on the admissibility of the recordings. While we believe that we already addressed this issue in our motions *in limine* by use of the words "and fruits," we want to make our position crystal clear: if any transcripts are offered into evidence in the absence of accompanying recordings, the transcripts should be precluded for the same reasons that any underlying, corresponding recordings should be precluded. Indeed, even if the Court were inclined to consider admitting recordings into evidence -- and we submit that it should not do so -- admitting transcripts into evidence where no recordings have been produced would be even more problematic, for the reason that a recording could not be used to attempt to check the accuracy of the transcript. As with the recordings, if the Court is not prepared to preclude the transcripts where no recordings have been produced based on our motion papers, we request a pre-trial hearing on admissibility.

The Second Circuit has held that "the 'general standard,' for admitting recordings [and, of course, transcripts relating thereto] into evidence is that the offeror 'produce clear and convincing evidence of authenticity and accuracy.'" *United States v. Fuentes*, 563 F.2d 527, 532

(2d Cir. 1977). The government, in describing the types of evidence it intends to offer at trial in its motion *in limine*, has not addressed this issue. (S*ee* Doc. 322 at 11.) Therefore, the government clearly has not met this standard. Moreover, if the government seeks to introduce copies of recordings instead of originals, or only transcripts of recordings, the government will need to comply with Federal Rules of Evidence ("FRE") 1002-1004 as well, relating to best evidence.

Put simply, the government has not demonstrated that the recordings, or the transcripts, meet the standards for admissibility. Therefore, the motion *in limine*, as it relates to introducing transcripts without accompanying recordings, should be denied.

**B.    The Government's Motion *in Limine* that Co-Conspirator Statements in Furtherance of the Conspiracies Should be Admitted into Evidence, Cannot Be Responded to at This Time and Should be Denied**

The government discusses the issue of, and provides legal argument in support of, the purported admissibility of co-conspirator statements at length in its memo of law. In doing so, the government relies upon the hearsay exception found in FRE 801(d)(2)(E), and provides examples of various purported statements it believes should be admitted into evidence at trial under the co-conspirator exception to the hearsay rule. (Doc. 322 at 11-21.)

The government's motion *in limine* regarding the purported admissibility of co-conspirator statements is really nothing more than a proffer, which cannot be responded to at this time, and therefore should be denied.

FRE 801(d)(2)(E) permits the admission of hearsay statements by co-conspirators only if:

> the government establishes by a preponderance of the evidence that there was a conspiracy, that both the declarant and the party against whom the statements were offered were members of the conspiracy, and that the statements were made during and in furtherance of the conspiracy.

First, "'there must be some independent corroborating evidence of the defendant's participation in the conspiracy'" before this hearsay exception can be applied. *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir.1999) (*quoting United States v. Tellier*, 83 F.3d 578, 580 (2d Cir.1996)); *see also United States v. Desena*, 260 F.3d 150, 158 (2d Cir.2001). Here, since trial has not even begun, the government has failed to provide the Court with any independent, corroborating evidence of Mr. Atilla's participation in any conspiracy.

Second, even if the government can demonstrate a specific conspiracy by a preponderance of the evidence, and there is independent evidence of a defendant's participation therein, each allegedly admissible co-conspirator statement must be independently considered, because not every statement about or relating to an alleged conspiracy satisfies the "in furtherance of" requirement of FRE 801(d)(2)(E). A trial court errs if, when admitting an out-of-court declaration under Rule 801(d)(2)(E), it "ma[kes] no findings" establishing that the declarant was a member of the conspiracy and acting in furtherance of that conspiracy. *United States v. Al-Moayad*, 545 F.3d 139, 173-74 (2d Cir. 2008). The requirement that the statement was "in furtherance of" a conspiracy under FRE 801(d)(2)(E) is designed both to assure its reliability and to be consistent with the presumption that the co-conspirator would have authorized it. *See United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir. 1980). Declarations of a co-conspirator are only competent evidence where they are part of "the execution of the plan, and have been impliedly authorized by the others." *United States v. Birnbaum*, 337 F.2d 490, 495 (2d Cir. 1964).

Put simply, to be in furtherance of a conspiracy, a statement must in some way have been designed to promote or facilitate the achievement of a goal of the conspiracy. Finally, even

when a co-conspirator's statement is otherwise admissible under FRE 801(d)(2)(E), it still may be inadmissible under FRE 403's balancing test.

In footnote 2 of its brief, the government suggests that "[m]any of the communications and records" it seeks to introduce as ostensible co-conspirators statements "are also admissible as present sense impressions, . . . statements of then-existing mental or physical conditions . . . recorded recollections,. . . records of regularly conducted activity, . . .statements against penal interest, . . . and other bases." (Doc. 322 at 11.) However, the government has provided no indication of just what statements it might be referencing in that footnote. Under these circumstances, neither Mr. Atilla nor this Court has any information to utilize in evaluating the merit, or lack thereof, of the government's suggestion. Any ruling relating to these supposed alternative bases for admissibility will therefore have to await the trial.

Finally, the alleged conspiracy underlying the admission of a purported co-conspirator statement must be the same as that charged in Indictment S4. If instead the evidence shows the existence of multiple conspiracies, the statement cannot be admitted unless both the declarant and the defendant are shown to have been members of the same conspiracy charged in the indictment. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990).

The bottom line is that the government's proffer concerning co-conspirator statements cannot be responded to at this time, and therefore should be denied. The issue of whether certain testimony at trial may be admissible under the co-conspirator exception to the hearsay rule simply cannot be determined until when, or if, that evidence is actually offered, statement by statement, at trial either through the testimony of witnesses or through records.

**POINT II**

**THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE THE TESTIMONY OF MR. ATILLA'S PROPOSED EXPERTS IS IMPROPER AND CANNOT BE DECIDED AT THIS TIME**

The government seeks to preclude all of the testimony of Mr. Atilla's proposed expert David Brummond, a former OFAC official who will testify about OFAC's structure and functions relative to the Iranian sanctions.  (Doc. 322 at 22-28.)  The government also seeks to preclude most, but not all, of the testimony of Professor Öner Özçelik, who will testify about various Turkish linguistic and cultural matters.  (*Id.* at 28-34.)  The motion is improper for the reasons stated herein.  Moreover, since Mr. Atilla has not received the government's evidence or *Jencks* material, and therefore cannot know at this time the witnesses and testimony he will need to defend himself, the government's motion *in limine* to preclude Mr. Atilla's proposed expert testimony cannot be decided at this time.

**A.      Mr. Brummond Should be Permitted to Testify**

The government moves to bar David Brummond's proposed expert testimony on several grounds: (a) Mr.Brummond needs the U.S. Treasury Department's permission to testify, which he did not ask for and would not receive anyway; (b) even with such permission, his testimony would be irrelevant and/or a usurpation of the Court's role; and (c) his background renders him unqualified to address the issues on which he is to testify.  All of the government's objections are meritless.

**1.      Mr. Brummond's Testimony is Not Barred by *Touhy* Regulations**

The government first argues that Mr. Brummond's testimony would be impermissible under the Treasury Department's *Touhy* regulations (31 C.F.R. § 1.11(f)(1)) because he did not obtain agency counsel approval, and his testimony does not fit within the exemption for "general

expertise gained while employed at [Treasury]." 31 C.F.R. § 1.11(f)(3). Contrary to the government's position, however, Mr. Brummond will not be asked to testify about any specific matter he worked on at OFAC, any particular determination that OFAC made, or any entity or individual that OFAC dealt with.

Rather, as we describe in greater detail below, Mr. Brummond gained general expertise as a Senior Advisor in OFAC's Compliance Division unit that handled financial institutions matters, including, the functioning of secondary sanctions generally, which are implicated in the case against Mr. Atilla, and how they differ from primary sanctions; OFAC's general approach to dealing with foreign institutions with respect to secondary sanctions; how sanctions impacted financial institutions; and OFAC's general processes for making sanctions determinations. (*See* the Declaration of David M. Rosenfield in Opposition to the Government's Motions *in Limine* dated November 6, 2017 ("Rosenfeld Decl."), ¶ 5(a)). Moreover, contrary to the government's claim, Mr. Brummond's general expertise testimony is expressly exempted under *Touhy, even if* it pertains to "information, subjects, or activities." This is so because the exemption distinguishes between general policies and approaches (even if, by definition, those policies and approaches were applied in specific cases) and the details of any specific case or specific decision.

Thus, no *Touhy* request need be made, and Mr. Brummond's contemplated testimony fits squarely within Treasury's exemption for former employee testimony. Finally, in making this argument, we do not waive our position that the *Touhy* regulations are unconstitutional and/or inapplicable within the context of a federal criminal proceeding.

2. **Mr. Brummond Has Extensive General Expertise on Iranian Secondary Sanctions that is Directly Relevant to This Case and Does Not Usurp the Court's Role.**

The government next objects that Mr. Brummond's expertise on Iranian sanctions, even if allowable, would not be relevant to this case. But the nature of the Indictment makes its relevance clear.

As Mr. Atilla argued in his earlier pending motions, the Indictment alleges that he committed a crime by violating and/or evading or avoiding OFAC's *secondary* sanctions against Iran. *See* Doc. 307; Indictment ¶90. To our knowledge, that is an unprecedented extension of the sanctions never before applied to any foreign individual or entity. As a result, the jury is entitled to know the message OFAC conveyed regarding its Iranian sanctions program to the broad community of institutions outside the U.S., of which Halkbank was a part, when the jury is assessing whether Mr. Atilla intended to violate the law. The government contends that the only Treasury communications that are relevant are those with Halkbank, but the OFAC messages to foreign institutions that Mr. Brummond helped develop and deliver were meant to be heard, and followed, by all, including Halkbank. In this regard, Mr. Brummond provided training and awareness presentations to foreign institutions, including presentations in London, Oslo, and Dubai. (Rosenfield Decl. ¶ 5(b).)

In his service as a Senior Advisor in OFAC's Compliance Division, Mr. Brummond developed a series of training presentations and modules to explain to foreign institutions the general differences between the operation of secondary and primary sanctions against Iran. He then delivered this training to domestic and foreign institutions. (*Id*., ¶ 5(c).) This general expertise qualifies him to explain to the jury the differences between primary sanctions against U.S.-related dealings with Iran, and secondary sanctions involving foreign dealings with Iran, as

well as the perceptions, foreign and domestic, including at banks such as Halkbank, as to how these sanctions would be applied. Without this kind of expertise, the jury will have no way to gauge, not only Halkbank's perceptions, but also Mr. Atilla's mindset or his culpability. Indeed, Mr. Brummond's testimony on this point will be particularly relevant to the issue of Mr. Atilla's state of mind, and hence his culpability, if Mr. Atilla chooses to testify.

Contrary to the government's contention, this testimony does not intrude on the role of the Court to instruct the jury. It is, as mentioned, offered so that the jury can adequately assess Mr. Atilla's lack of criminal intent. *See United States v. Litvak*, 808 F.3d 160, 188-90 (2d Cir. 2015) (vacating convictions where court excluded evidence relating to the atmosphere surrounding defendant's activities, including testimony by defendant's supervisors that conduct was not regarded as unlawful at his company, because the testimony "would support [the defendant]'s attempt to introduce a reasonable doubt as to his intent to defraud, *i.e.,* that he held an honest belief that his conduct was not improper or unlawful, a belief the jury may have found more plausible in light of his supervisors' approval of his colleagues' substantially similar behavior").

Mr. Brummond worked for eight years in the unit of OFAC's Compliance Division that was responsible for guidance on and enforcement of sanctions applicable to financial institutions. He was not solely focused on insurance entities. He gained significant general expertise on how the U.S. sanctions OFAC administers apply to depository institutions. (*Id.*, ¶ 5(d).) Indeed, he was trained by the Federal Reserve Bank of Atlanta on SWIFT messaging, ACH and Fedwire transfers and other domestic and international electronic payment systems, and spearheaded OFAC's relationships and interactions with various regulators of state-chartered banks, finalizing memoranda of understanding with the various banking commissioners. (*Id.*, ¶ 5(e).) Moreover,

as a Senior Advisor in the Compliance Division unit responsible for sanctions compliance and enforcement, Mr. Brummond served in multiple leadership roles interfacing with federal and state banking regulators on behalf of OFAC regarding U.S. sanctions matters, including the Federal Financial Institutions Examination Council, the formal interagency body empowered to prescribe uniform principles, standards, and report forms for the federal examination of financial institutions by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Office of the Comptroller of the Currency, and the Consumer Financial Protection Bureau. (*Id.*, ¶ 5(f); *see also* www.ffiec.gov.)

As a key participant in drafting the 2008 OFAC Enforcement Guidelines, Mr. Brummond was instrumental in constructing the policies and processes incorporated into the Guidelines. He created the Penalty Matrix in the Guidelines that explains the calculation of OFAC's enforcement responses, which, if the conduct was egregious, could include referral to the Department of Justice for criminal prosecution. (*Id.*, ¶ 5(g).) Through this work on the Guidelines, Mr. Brummond gained expertise on the way OFAC and the financial services industry communicated, and he understood best practices for institutions to follow in due diligence and screening. (*Id.*, ¶ 5(h).)

Mr. Brummond's expertise on these relevant subjects is not diminished at all by Mr. Brummond's considerable expertise in insurance as opposed to banking. Indeed, the issues are quite comparable from one sector to the other. To illustrate, the government alleges that Mr. Atilla conspired to evade the ban against the export of U.S. financial services to Iran. Insurance services and banking services are treated the same way under the applicable prohibition. *See* 31 C.F.R. § 560.204 (not differentiating between financial services in the

insurance and banking sectors). U.S. dollar wire transfers do not differ materially for purposes of OFAC regulations depending on whether they originate at foreign banks or insurance companies. Similarly, the government alleges that Mr. Atilla violated sanctions targeting the National Iranian Oil Company ("NIOC"). The Iran Threat Reduction and Syria Human Rights Act of 2012 ("ITRA") imposes sanctions on the provision of insurance services to NIOC that are analogous to the sanctions on the provision of banking services to NIOC. *See* ITRA § 212. The government also alleges that Mr. Atilla violated the sanctions addressing petroleum-related transactions with Iran in Executive Order 13622, and those addressing precious metals transactions with Iran in Executive Order 13645. *See* Indictment ¶ 90. The definitions applicable to those sanctions define the term "financial institution" to include both "a depository institution" and "an insurance company." (EO 13622 §10(d); EO 13645 §14(c).)

In addition, because Mr. Brummond was familiar with the regulation of money transmission and non-depository entities which engaged in the business of offering wire transfers or similar transmittals of funds (Rosenfield Decl. ¶ 5(i)), his testimony will go to the heart of the government's charge that Mr. Atilla violated OFAC sanctions via wire transfer transmittals of money through the global payments system. Mr. Brummond's training and leadership at OFAC instilled in him a general expertise regarding the role of international money transfers in the global payments system, and how, if at all, those transfers could invite the application of any sanctions. (*Id.*, ¶ 5(j).)

In short, Mr. Brummond's extensive experience is not limited to insurance companies, but rather, extends to other financial institutions and financial transactions, including wire transfers, and other forms of transnational money transmission -- precisely the financial industry sectors and transaction types at issue in this case. Finally, if the Court has further concerns about

whether Mr. Brummond is qualified, Mr. Atilla respectfully requests that the Court take live testimony outside the presence of the jury to consider this issue. (The same would be true with respect to Professor Özçelik's qualifications as an expert in Turkish culture; *see* below).

**B.** **Professor Özçelik Should Be Permitted to Testify in Full**

As noted in Mr. Atilla's October 27, 2017 expert disclosure letter to the government, Mr. Atilla anticipates that Professor Özçelik will provide the following expert testimony:

- The relationships in Turkey, in general, between businessmen and their clients, including bankers.

- The deferential nature of the relationships between individuals who work at a company and their supervisors.

- If the recordings are admitted into evidence, the tone of certain relevant recordings, and what the tone suggests about the relationship between the parties participating in the phone calls, *e.g.*, very close, friendly, businesslike, formal.

- If the recordings are admitted into evidence, the meaning of certain words and phrases based on intonation patterns and context.

- If the recordings are admitted into evidence, the meaning of certain words and phrases not generally used by Americans in their conversations, but used routinely by Turks.

- The battle between the Erdogan government and the Gulenist movement in Turkey as it impacts upon this case, particularly with respect to the 2012-2013 Turkish investigation and its aftermath.

(Rosenfield Decl., Exhibit A.)

The government has no objection to the fifth bullet point above of Professor Özçelik's testimony, *i.e.*, "the meaning of certain words and phrases not generally used by Americans in their conversations, but used routinely by Turks." (Doc. 322 at 34.) The government objects to the remaining areas of Professor Özçelik's proposed testimony, pp. 31-34, as well as his

qualifications as a cultural expert on "Turkish history, politics, sociology, or business culture." (*Id.* at 30.)

A review of Professor Özçelik's background and CV (Doc. 322-3), confirms that he is, in fact, not only an expert in Turkish linguistics, which the government does not and cannot dispute, but also in Turkish culture. Indeed, Turkish linguistics is tied to Turkish culture. (Rosenfield Decl., ¶ 7(f).)

Professor Özçelik grew up in Turkey along the Black Sea coast and lived there until 2004, when he was 21. He attended college in Turkey. (Id. at ¶¶ 7(a)-(b).) As Professor Özçelik's CV notes, from 2000 to 2004 he attended Boğaziçi University in Istanbul, and received a B.A. from the Department of Foreign Language Education. (Doc. 322-3 at 2.) Professor Özçelik left Turkey in 2004 to obtain his Masters Degree in Linguistics at the University of Pittsburgh, which he received in 2006. He then moved to Montreal, Canada to obtain his PhD in Linguistics from McGill University, and he did so in 2012. Since 2012, he has served in various positions at Indiana University. He travels to Turkey once or twice a year to attend conferences and to visit his family, who still live there, and he has visited Turkey almost every year since he left in 2004. He is intimately familiar with Turkish society and culture. (Rosenfield Decl., ¶¶ 7(c), (d) & (g).)

As noted in Professor Özçelik's CV, he has taught and will continue to teach the following courses at Indiana University:

> 'Intro to Turkey: Language and Society' (CEUS R181), Department of Central Eurasian Studies, Indiana University, Bloomington.
>
> 'Language and Society in Turkey' (CEUS 299), Department of Central Eurasian Studies, Indiana University, Bloomington.

13

> 'Central Eurasian Languages and Cultures (CEUS-R 199), Department of Central Eurasian Studies, Indiana University, Bloomington.

(*Id.* ¶ 7(h); Doc. 322-3 at 13-14.)  The two Turkish courses, while focused on Turkish language and society in general, also include studies of and discussions about interpersonal relationships in Turkey.  (Rosenfield Decl., ¶ 7(i).)  Finally, since 2014, he has been the Facility Advisor to the Turkish Student Association at Indiana University. (Doc. 322-3 at 22.)  The Turkish Student Association, which consists primarily of students who are citizens of Turkey, organizes several Turkish cultural events each year.  (Rosenfield Decl., ¶ 7(j).)

Thus, particularly since Professor Özçelik teaches two college courses at a major university that specifically cover Turkish society, and given his Turkish background, he is clearly an expert not only in Turkish linguistics, but also in Turkish culture.

In numerous cases, courts have permitted testimony by cultural experts such as Professor Özçelik.  For example, the court in *United States v. Liew*, No. CR 11-00573-1 (JSW), 2013 WL 6441259, at *7 (N.D. Cal. Dec. 9, 2013) permitted an expert in Chinese culture to testify as to Chinese cultural norms and the meaning of certain terms as they are used in the Chinese business context.

Additionally, in *United States v. Le*, No. Crim. 3:08cr516, 2009 WL 2947370, at *9 (E.D. Va. Sept. 14, 2009), a defendant was permitted to withdraw his guilty plea by relying in part on expert testimony as to Vietnamese cultural norms. The defendant, who was accused of making threats, introduced expert testimony indicating that the phrases used by the defendant, along with certain actions, may have appeared threatening but were, in the defendant's culture and language, not threatening.  For example, the expert testified that (a) the defendant's use of the phrase "cut his head off" represents an idiom in Vietnamese that expresses an insult rather than a threat, and

(b) a person sealing a document in his own blood is a Vietnamese tradition that vouches for the truthfulness of the contents of the document rather than a threat.

Further, courts have routinely permitted the introduction of expert testimony concerning the culture of gangs and organized crime groups. *See, e.g., United States v. Boyle*, No. 08 CR 523 (CM), 2010 WL 286624, at *2 (S.D.N.Y. Jan. 15, 2010) (permitting expert testimony as to operation, structure, membership and terminology of organized crime family); *United States v. Palacios*, 677 F.3d 234, 243 (4th Cir. 2012) (permitting expert testimony as to operation, structure, membership and terminology of MS 13 gang). *See also Vasquez v. Virga*, No. CV 12-2167 (MWF() JC), 2015 WL 3616994, at *13 (C.D. Cal. Mar. 13, 2015) (relying upon defense's gang culture expert's testimony in determining applicability of gang enhancement for sentencing purposes).

The government argues that Professor Özçelik's proposed testimony should be precluded because it "improperly would seek to explain Atilla's state of mind and intent, and would tell the jury what result to reach." (Doc. 322 at 30.) This argument is specious; the proffered testimony is offered merely to explain to the jury objective facts about Turkish language and culture. An explanation of Turkish culture on such issues as client relationships, employment relationships, and personal relationships (based on the tone of a call), will aid the jury in understanding certain norms of Turkish culture. These explanations, which the jury can appropriately use to consider Mr. Atilla's state of mind, certainly would not, however, "tell the jury what result to reach."

The government also suggests that the "tone" of certain recordings and what that tone suggests about the parties' relationship are "outside his expertise as a linguistics expert" and "are squarely matters for the jury to assess." (*Id.* at 32.) However, Professor Özçelik's primary specialty as a Turkish linguist is "phonology," which specifically considers the intonation of

15

conversations. (Rosenfield Decl., ¶ 7(e).) Moreover, since the recorded calls are in Turkish, not English, Professor Özçelik's testimony will be particularly helpful, as it will assist the jury to have an expert explain a call's intonation and what it conveys about the relationships between the parties to the call. *See* FRE 702.

Finally, the government argues that, "Courts have routinely precluded the testimony of linguistics experts who purport to be able to divine through expertise some meaning from recordings, even though the jury will itself hear the recordings." (Doc. 322 at 33.) However, the three cases cited by the government in support of its proposition (*id.* at 33-34) each involved an *English* recording for which the defense sought to introduce a linguist to testify as to predisposition or intent. Conversely, courts do permit linguists to testify in cases in which the recordings are in a *foreign* language. *See, e.g.*, *U.S. v. Mendiola*, 707 F.3d 735, 739-42 (7th Cir. 2013) (Drug Enforcement Administration linguist's lay witness testimony as to her identification of defendant's voice on recorded conversations, which were in Spanish, was properly admitted in drug trafficking trial — "[i]t is simply common sense that an English-speaking jury cannot adequately identify voices in languages in which they are not familiar or even fluent. This is why defendant Mendiola's myriad references to opinions in which courts held that juries could compare photographs or surveillance video themselves are inapt."); *U.S. v. Gasperini*, 2017 WL 3140366 (E.D.N.Y. July 21, 2017) (motion to exclude Italian linguists denied; the government planned to use Italian linguists' testimony in connection with translations of Italian language documents); *Cf. Weller v. Am. Broadcasting Co., Inc.*, 232 Cal. App. 3d 991 (Cal. Ct. App. 1991) (affirming admission of expert linguist testimony regarding choice of words, tone and inflection of speakers in English language commercials).

The government also argues that the cultural issues on which Professor Özçelik will testify (Turkish banker - customer relationships, Turkish employee - supervisor relationships, and relationships between individuals based on the tone of recordings) amount to "stereotypes" "generalized cultural conclusions" and are "matters for the jury to assess." (Doc. 322 at 31-32.) The government's arguments are inapposite because we do not know what evidence the government will seek to introduce at trial, and, more particularly, if admissible, which of the recordings will be introduced into evidence. How can the government argue that Professor Özçelik's proposed testimony "is not grounded in the evidence in this case" (Doc. 322 at 29), when we do not yet even know what the evidence will be? Moreover, since evidence that the government likely intends to introduce at trial through the recordings relates to such Turkish cultural and linguistic issues as banker-customer relationships, employee-supervisor relations and the relationships between individuals as reflected by how they speak to one another in terms of tone and intonation, testimony by Professor Özçelik on these issues, which are certainly not known by the average American, would aid the jury in its determination of relevant facts, including Mr. Atilla's state of mind, and would therefore be admissible under FRE 702.

Finally, the clash between the current Turkish government and the Gulenist movement as it impacts on this case (the 2013 prosecution by Gulenists on which this case is premised, and the subsequent discrediting of the investigation by the Erdogan government), a key issue in this prosecution, would also not be known to the average juror. Accordingly, expert testimony on this issue from a Turkish cultural expert would aid the jury in its determination of relevant facts, and is therefore admissible under FRE 702.

## POINT III

### THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE THE "PUBLIC AUTHORITY" DEFENSE SHOULD BE DENIED

The government seeks to preclude Mr. Atilla, an employee of a bank controlled by the Republic of Turkey, from offering evidence, cross-examination or argument that his conduct was "authorized, endorsed, or otherwise directed by Turkish government officials." (Doc. 322 at 35.) The government's motion should be denied. As an initial matter, there is no indication that Mr. Atilla intends to offer any such defense, and the predicate for the government's claim that he may offer such a defense — that he admitted in a post-arrest statement that he did only what he was told to do (Doc. 322 at 35) — is palpably false.

The government's motion is anomalous because it is, in fact, the government that wants to offer testimony and argument that Mr. Atilla was directed by senior Turkish officials to do what he did. In particular, the government proffers expert testimony regarding "the relationship between the Republic of Turkey and Iran, and Turkey's role in Iran's sanctions evasion efforts." (*Id*. at 51.) The government also alleges in the Indictment (at paragraphs 2 and 41) that high-level Turkish officials participated in and protected the alleged scheme, and states in its motion *in limine* that "the Government of Turkey instructed Zarrab and Halk Bank to resume gold exports" after the U.S. declared the sale, supply, or transfer of precious metals to Iran to be a sanctionable activity. (*Id.* at 6.)

The government claims, without direct support, that a foreign government cannot authorize a violation of U.S. law and that, therefore, evidence that Mr. Atilla was directed, directly or indirectly, by Turkish officials to engage in the alleged conduct should be precluded as irrelevant — unless, of course, it is offered by the government. It may be true that a foreign

18

government cannot authorize an individual living and acting in the United States to violate U.S. law.  *See United States v. Kashmiri*, 2011 WL 1326373, at *3 (N.D. Ill. Apr. 11, 2011).  If a foreign government's directs an employee of an entity owned by that foreign government to engage in certain activity — and if that employee acts only in that foreign country — he or she should be protected from prosecution outside of that jurisdiction as allegedly violating another country's laws, including U.S. law.  The relevance of such evidence, however, cannot be determined in a vacuum.  We, therefore, urge the Court not to address the issue of whether Mr. Atilla can interpose a Public Authority defense until trial.

## POINT IV

### THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE THE "VICTIM FAULT" DEFENSE CANNOT BE ADDRESSED AT THIS TIME

The government argues that,

> The Government anticipates that it will introduce evidence at trial about the harms that can befall U.S. financial institutions that facilitate transactions barred by the U.S. embargo on Iran.  The Government further anticipates that this will include evidence about U.S. financial institutions that have been found by U.S. regulators and law enforcement officials to have enabled Iranian sanctions evasion and the penalties that have been levied against such financial institutions.  The Government moves to preclude any cross-examination or argument at trial by the defense that the fact that certain financial institutions knowingly participated in evading U.S. sanctions against Iran constitutes a defense against the bank fraud charges in the Superseding Indictment.

(Doc. 322 at 38.)

Because the use of "victim fault" evidence by the government will not be determined until trial, this motion cannot be addressed at this time.

We also object to the government's plan to "introduce evidence at trial about the harms that can befall U.S. financial institutions that facilitate transactions barred by the U.S. embargo

on Iran." (*Id.*) Such evidence is not relevant to this case, and, more particularly, to the issue of whether Mr. Atilla committed the crimes with which he is charged. Put simply, any harm to U.S. banks is not an element of the crimes charged, and therefore, any such evidence would be limited to sentencing, if Mr. Atilla were convicted. *See, e.g,. United States v. Borst,* 62 F.3d 43, 48 (2d Cir. 1995). It would also be unnecessarily prejudicial to Mr. Atilla.

Finally, if U.S. banks acted improperly, and thus, as the government indicates, "enabled Iranian sanctions evasion," such evidence, if relevant and admissible, is clearly fair game for cross-examination of bank witnesses, as, at the very least, Mr. Atilla is entitled to explore the bank's intent in evading sanctions, its credibility and its bias.

## POINT V

### THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE USE OF THE FACT THAT MR. ATILLA WAS NOT ARRESTED OR CHARGED IN THE TURKISH CORRUPTION INVESTIGATION SHOULD BE DENIED

The government argues that Mr. Atilla should be precluded from advising the jury that the 2012-2013 public corruption investigation of high-ranking officials in Turkey did not result in the filing of any criminal or other charges against him. (Doc. 322 at 41-44.) The government argues that this information is either irrelevant or prejudicial. (*Id*. at 42.) The converse is true. Significantly, FRE 403, which protects against the introduction of improperly prejudicial evidence, does so for the purpose of "protect[ing] a jury from drawing improper inferences." *Shultz v. Butcher*, 24 F.3d 626, 631 (4th Cir. 1994). It is the one-sided proffer of evidence suggested by the government, not by Mr. Atilla, from which the jury is likely to draw an improper inference, and conclude that Mr. Atilla either has a bad character or must have engaged in conduct that Turkey found objectionable. This would clearly violate FRE 403, and would thus not be permissible.

Specifically, what the government would like to do, it appears, is to itself inform the jury that Turkish authorities conducted a lengthy public corruption investigation, during the course of which they wiretapped various telephones and obtained recorded conversations in which Mr. Atilla was an alleged participant. Having tarred Mr. Atilla with this information, the government would then have the jury draw its own speculative conclusion as to how all of this must have turned out for him -- likely that he was charged. Once the government opens the door by informing the jury that Turkish prosecutors intercepted certain of Mr. Atilla's phone conversations, Mr. Atilla must be allowed to close that door by establishing that no charges in Turkey were ever brought against him.

In *Beech Aircraft Corporation v. Rainey*, 488 U.S. 153, 172 (1988), the Supreme Court recognized the continuing viability of the common-law rule of completeness, even after its partial codification in FRE 106. The Court quoted with approval the following language from Wigmore:

> "[T]he opponent, against whom a part of an utterance has been put in, may in turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance. 7 J. Wigmore, Evidence in Trials at Common Law §2113, p. 653 (J. Chadbourn rev. 1978)."

*See also, United States v. McDarrah*, No. 15cr.1182 (PAC), 2007 WL 273799 at *8 (S.D.N.Y. January 31, 2007).

The common-law rule of completeness should be applied to obviate the potential prejudice in this situation. Here, the problem arises not from an utterance, but from the evidence (in a form currently unknown to the Defense) that the government will rely upon to establish the existence and scope of the Turkish investigation, and where the recordings came from. Once the government opens that door, the jury could easily – indeed, would likely -- conclude that the

Court is shielding it from the outcome of the Turkish investigation as to Mr. Atilla precisely because that outcome was harmful to him.

Unless Mr. Atilla is allowed to demonstrate that the opposite is true (*i.e.,* that he was not charged), the introduction of any evidence regarding the Turkish investigation would be overly and gratuitously prejudicial to him. *See* FRE 403. No case cited by the government holds to the contrary. Instead, in the cases that the government cites to argue that such evidence is improper, there was no suggestion of bad or criminal acts sufficient to mark the defendant as a subject of an investigation other than the one leading to the indictment at issue. (Doc. 322 at 41-44.)

### POINT VI

### THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE ANY EVIDENCE OR DISCUSSION OF THE JOINT COMPREHENSIVE PLAN OF ACTION ("JCPOA") CANNOT BE ADDRESSED AT THIS TIME

The government argues that Mr. Atilla should be precluded "from arguing at trial (or attempting to introduce related trial evidence) to the effect that the adoption and implementation of the JCPOA is a defense to the charged offenses." (Doc. 322 at 44.) Because we do not know what evidence the government will seek to introduce at trial, and since it is possible that some of the government's evidence could touch on the JCPOA, this motion *in limine* cannot be responded to at this time.

### POINT VII

### THE GOVERNMENT'S MOTION *IN LIMINE* TO LIMIT THE CROSS EXAMINATION OF U.S. TREASURY OFFICIALS TO THE SCOPE OF THEIR DIRECT EXAMINATION CANNOT BE ADDRESSED AT THIS TIME

The government has identified six current or former officials of the U.S. Treasury Department who it anticipates calling as witnesses at trial. (Doc. 322 at 46.) The government notes that "these officials have worked on a variety of the U.S. government's most highly

sensitive matters, some of which may have also involved U.S. policy towards Iran, Turkey, or both," (*id.*), and then argues:

> The Government intends to limit the scope of direct examination of these witnesses only to their interactions with Turkish banking and government officials, including Atilla, Aslan, Balkan, and Caglayan. The Treasury Witnesses will describe both information communicated to those individuals by the U.S. Department of Treasury and the representations made by those individuals in response. Accordingly, the Court should ensure that cross-examination of these witnesses is limited to those interactions only.

(*Id.*) The government also requests that the Court "preclude inquiry as to [the witnesses] opinions on the interpretation of the Iranian sanctions regime or on whether certain conduct would or would not have been illegal." (*Id.* at 50.)

The government requests that the Court rule now, without the benefit of the witnesses' actual direct testimony, that cross-examination be limited "solely as to the interactions [of these witnesses] with Turkish banking and government officials that will be the subject of their direct testimony." (*Id.* at 49.) The government seeks to likewise limit its production of *Jencks* material to statements of these witnesses relating only to that specific testimony. (*Id.*)

There can be no question that the government's motion *in limine* cannot be addressed at this time given that the Treasury witnesses have not testified.

Even the government concedes, at it must, that these Treasury witnesses may be cross-examined not only concerning the matters brought up on direct examination, but also on matters of credibility. (*Id.* at 47; *see* FRE 611(b).) Credibility questions will necessarily include questions that may reveal bias, prejudice, or ulterior motive. *See Fuentes v. T. Griffin*, 829 F.3d 233, 247 (2d Cir. 2016). Bias covers any hostility or prejudice a witness may have against a party. *See United States v. Abel*, 469 U.S. 45, 52 (1984) ("Bias is a term used in the 'common

law of evidence' to describe the relationship between a party and a witness which might lead the witness to slant, unconsciously or otherwise, his testimony in favor of or against a party. Bias may be induced by a witness' like, dislike, or fear of a party, or by the witness' self-interest. Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); *United States v. Hankey*, 203 F.3d 1160, 1171 (9th Cir. 2000), *cert. denied*, 530 U.S. 1268 (2000) ("Bias, of course, covers all varieties of favor."); *see also* 3A Wigmore, Evidence, § 945 at 782 (Chadbourn rev. 1970)).

In *United States v. Salah*, 462 F. Supp. 2d 915, 923 (N.D. Ill. 2006), the court expressly noted the broad scope of cross-examination afforded a criminal defendant as against Israel Security Agency ("ISA") agents:

> Defendant Salah will have ample opportunity to cross examine the ISA agents and to present his theory of the defense through these agents. Defendant can confront these witnesses on myriad topics including, how they treated Defendant when he was in their custody, their potential bias against Palestinians, their potential bias in favor of the United States, and their prior testimony during the suppression hearing or the Israeli hearing to the extent such testimony is impeaching.

Indeed, a court generally cannot "limit the scope and extent of cross-examination . . .if it would 'keep[] from the jury relevant and important facts bearing on the trustworthiness of crucial testimony.'" *United States v. Morel*, 751 F. Supp. 2d 423, 433 (E.D.N.Y. 2010). Limitation is proper only where a jury is "in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility." *Id*.

Moreover, cross-examiners may inquire into issues not mentioned on direct examination, but related to and made relevant by that examination. *See U.S. v. Lara*, 181 F.3d 183, 199 (1st

Cir. 1999). Cross-examination need only be reasonably related to the subject matter of the direct examination. Courts allow "any matter germane to the direct examination … tending to elucidate, modify, explain, contradict, or rebut [direct] testimony." *United States v. Rodriguez*, 122 F. Supp. 3d 1258, 1265 (D.N.M. 2015) (internal citation omitted). Indeed, many courts "have liberally interpreted the extent of … [a] direct examination for purposes of establishing the proper scope of the cross-examination." *United States v. Harbour*, 809 F.2d 384, 388-89 (7th Cir. 1987) (internal citation omitted). As the Second Circuit has stated:

> It is, of course, unrealistic to expect that direct examination and cross-examination will be perfectly congruent.... The latter need only be reasonably related to the former, and matching the two requires the district court to make a series of judgment calls.

*United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010). *See also, Katt v. City of New York*, 151 F. Supp. 2d 313, 366 (S.D.N.Y. 2001) (after defendant testified concerning his allegedly "business like and cordial" interactions with plaintiff, cross-examination relating to broader company policies, and personal understanding of certain situations, was permissible as "reasonably related" to, though much broader than, the direct examination).

Finally, courts routinely allow cross examination beyond the scope of direct where it would be more effective for determining the truth, and to avoid wasting time by having to call the witness to testify a second time. *See* FRE 611(b) (on cross, court may allow inquiry into additional matters as if on direct examination); *Hart v. RCI Hospitality Holdings*, 90 F. Supp. 3d 250, 273 (S.D.N.Y. 2015) (allowing witnesses to testify a single time for efficiency and avoidance of redundancy); *Cheshire Med. Ctr. v. W.R. Grace & Co.*, 853 F. Supp. 564, 572 (D.N.H. 1994), *aff'd*, 49 F.3d 26 (1st Cir. 1995) (allowing cross beyond the "traditional strictures of cross-examination" in order to promote judicial efficiency); *CPG Intern. LLC v. Georgelis*,

2015 WL 1786287, at *5 n.8 (M.D. Pa. Apr. 20, 2015) (allowing questioning beyond the scope

of direct in the interest of expediency and judicial efficiency). A court "may allow counsel to

examine beyond the scope of direct examination when it contributes to the orderly and

intelligible presentation of the evidence, when it will assist the jury in understanding the

evidence, or when the witness is one whose position or circumstances preclude or make it

inconvenient for him or her to return later in the trial." Larsen, *Navigating the Federal Trial,* §

7:40 (2016 ed.).

## POINT VIII

### THE GOVERNMENT'S MOTION *IN LIMINE* TO PRECLUDE CROSS EXAMINATION OF ITS EXPERTS DUBOWITZ AND SCHANZER OF THE FOUNDATION FOR DEFENSE OF DEMOCRACIES ("FDD") CONCERNING THE FDD'S DONORS AND GOVERNANCE SHOULD BE DENIED

The government notes that it expects to call as expert witnesses Mark Dubowitz and Dr.

Jonathan Schanzer of the FDD. (Doc. 322 at 51.) The subject-matter of their testimony is

described in the government's expert witness disclosure. (Doc. 321-1.) The government seeks

to limit the cross-examination of Mr. Dubowitz and Dr. Schanzer, arguing that,

> The government seeks a ruling *in limine* precluding cross-examination of these witnesses on any matters pertaining to donations received, the identities of individual or institutional donors, or the general governance of the FDD because these do not have any bearing on the witness' credibility, nor are they relevant to the events at issue at trial. On the other hand, these matters are subject to legitimate privacy interests of the charitable donors and permitting inquiry into this matter could chill legitimate charitable giving and free association.

(Doc. 322 at 52.)

Once again, as with the U.S. Treasury witnesses, the government's motion *in limine*

cannot be responded to at this time, and therefore should be denied, given that the FDD

26

witnesses have not yet testified. (Indeed, in Mr. Atilla's motions *in limine*, we have sought to exclude their entire testimony as overly prejudicial and irrelevant.)

If the FDD witnesses do testify, however, Mr. Atilla should be able to cross-examine them on issues surrounding FDD's donations, including the identities of its donors, as this bears upon the witnesses' potential bias against Mr. Atilla. Moreover, the names of FDD's primary donors have been widely disseminated in the public arena. *See, e.g.*, the August 6, 2013 article from the *Jewish Telegraphic Agency* entitled "Top Jewish Republicans funding Iran sanctions think tank," and the July 19, 2011 article from thinkprogress.org entitled "EXCLUSIVE: Documents Shed Light on Those Underwriting The Foundation For Defense of Democracies." (Rosenfield Decl., Exs. B & C.) Thus, the government's argument that such questioning would impinge upon the "legitimate privacy interests of charitable donors and permitting inquiry into this matter could chill legitimate giving and free association" (Doc. 322 at 52), is spurious.

Finally, cross-examination of the "general governance" of the FDD, if it is either related to the witnesses' direct examination or bears upon the witnesses' credibility, should be permitted.

## POINT IX

### MR. ATILLA RESERVES HIS RIGHT TO RESPOND TO THE GOVERNMENT'S SUPPLEMENTAL MOTION *IN LIMINE* FILED UNDER SEAL

The government has filed a supplemental motion *in limine* under seal without revealing the specific evidence on which it is premised. Accordingly, Mr. Atilla reserves his right to respond to this motion when the specific factual evidence which is the basis for the motion becomes available to the Defense. Having reviewed the motion, Mr. Atilla also believes that it cannot be responded to until trial.

# CONCLUSION

For the foregoing reasons, the government's motions *in limine* should be denied.

Dated: New York, New York
November 6, 2017


Respectfully submitted,

HERRICK, FEINSTEIN LLP                    FLEMING RUVOLDT PLLC

By:   s/Victor J. Rocco                    By:   s/Cathy Fleming
    Victor J. Rocco                        Cathy Fleming
    Thomas E. Thornhill                   Robert Fettweis, *pro hac vice*
    David M. Rosenfield                   Jonathan Stern
    Two Park Avenue                       1700 Broadway, 28th Floor
    New York, New York  10016              New York, New York  10019
    (212) 592-1400                        (212) 706-1850
    (212) 592-1500 (fax)                  (212) 706-1855 (fax)


*Attorneys for Defendant Mehmet Hakan Atilla*

HF 11773420v.8