1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          15 CR 867 (RMB)

5   MEHMET HAKAN ATILLA,

6            Defendant.

7   ------------------------------x

8                                       New York, N.Y.
                                        November 6, 2017
9                                       11:07 a.m.

10

    Before:
11
                     HON. RICHARD M. BERMAN,
12
                                        District Judge
13

14                       APPEARANCES

15  JOON H. KIM
         Acting United States Attorney for the
16       Southern District of New York
    MICHAEL LOCKARD
17  SIDHARDHA KAMARAJU
    DAVID DENTON
18  DEAN SOVOLOS
         Assistant United States Attorneys
19

    HERRICK FEINSTEIN LLP
20       Attorneys for Defendant
    BY:  VICTOR J. ROCCO
21       THOMAS E. THORNILL
         -and-
22  FLEMING RUVOLDT PLLC
    BY:  CATHY ANN FLEMING
23

    ALSO PRESENT:  ASIYE KAY, Turkish Interpreter
24                 SEYHAN SIRTALAN, Turkish Interpreter
                   MICHAEL CHANG-FRIEDEN, Paralegal
25

1            THE COURT:  So, sorry for the brief adjournment of

2     today's conference, which was a function of the work that the

3     attorneys did over the weekend, and I just wanted to make sure

4     I had absorbed all of that before the conference today.  In the

5     order that was docketed this morning adjourning the conference

6     from nine to 11, I included a statement that there are from

7     here through trial no further submissions unless there's prior

8     order or approval by the Court.  That is my practice in

9     criminal cases after motions in limine have been filed, so I'm

10    not expecting any further submissions.

11           You'll remember that the purpose of today's conference

12    was and is to resolve the issues between Mr. Atilla's counsel

13    and the government with respect to the protective order

14    agreement relating to documents in this case.  As to that, the

15    parties signed and agreed to this protective order on or about

16    June 19, 2017, and actually entered into that arrangement even

17    before I was involved.  I so ordered that agreement so it has

18    been and is in place.  And that is the prearranged and noticed

19    focus of today's hearing.

20           Before I go any further I should mention that we have

21    Turkish language interpreters here and ask Mr. Atilla if he's

22    able to understand these proceedings with the help of the

23    interpreter.

24           THE DEFENDANT:  Thank you, your Honor.  Yes, I can.

25           THE COURT:  Okay.  So before we turn to the protective

1  order, there are a few things I'd like to discuss or

2  underscore, including something so very fundamental in our U.S.

3  system of justice and in our Constitution and which applies in

4  this and every other criminal case, whether the defendant is a

5  U.S. citizen or not, and that is the presumption of innocence,

6  which attached, is attached, has attached to Mr. Atilla and

7  which everyone who is interested in this case should be aware

8  of and understand that it applies, the presumption of

9  innocence, that is, 100 percent, no matter what we say in our

10 discussion today or at any other time during these proceedings

11 in considering and ruling upon defense counsel's various

12 applications, motions, and letters, for example.

13          Mr. Atilla has consistently maintained his innocence.

14 And even if he had not actively and vocally maintained his

15 innocence, he is presumed to be innocent of all the charges

16 against him.  That is and has been true throughout these

17 proceedings and it remains true unless and until such time, if

18 it should occur, he is proven guilty beyond a reasonable doubt

19 after a trial by jury.  And, in addition, Mr. Atilla is

20 entitled and understandably he has also consistently pressed

21 for in this court a speedy trial under our laws and our

22 Constitution.

23          The current trial date of November 27 I believe

24 satisfies Mr. Atilla's request for a speedy trial.  Indeed,

25 that date of November 27, 2017 was requested by defense counsel

1    and I granted that request pushing back the scheduled trial to

2    this, which was then October 30, 2017, to November 27.

3              My recollection is that defense counsel requested

4    adjournments, including adjournment of the first selected trial

5    date, which you'll recall was August 21, 2017, to October 30,

6    2017, and then from October 30 to November 27, in each instance

7    with the expression by or on behalf of Mr. Atilla his

8    expression of eagerness to get to trial and to be vindicated,

9    which by the way I totally understand as well.

10             But just to put a fine point on it, the chronology is

11   as I recall the following, roughly.

12             On April 13, 2017, Mr. Rocco stated that "Mr. Atilla

13   just handed me a note and said I do not want to extend the

14   August 21, 2017 date.  August is too far out."

15             No. 2, by letter, I think this was dated April 21,

16   2017.  Defense counsel, Mr. Rocco, said with respect to

17   adjournment of the trial date, Mr. Atilla now understands that

18   because of the many complexities and challenges presented by

19   this case, it is in his interest, despite his being currently

20   detained, that the August 21 trial date be adjourned for the

21   reasons counsel set forth during the appearance of April 13,

22   2017.  That was in a letter.

23             On April 24, Mr. Rocco said that with that

24   understanding and having a series of conversations with

25   Mr. Atilla and discussed with him the issues that are posed by

an August 21 trial date and given the amount of materials and

the way we think that discovery will unfold here -- it was in

court -- Judge, and it will include going abroad, talking to

witnesses abroad and having perhaps foreign depositions,

perhaps foreign depositions, I believe that the August 21 trial

date is impractical.

By order of the Court dated May 16, 2017, I determined

that upon defense counsel's request for additional time, the

Court is rescheduling this trial of this matter to Monday,

October 30, 2017.

In June of this year, Mr. Rocco advised the Court that

"we are working with the October 30 date in mind as a firm date

and Mr. Atilla, who is in custody, is anxious to keep that

date."

And so on June 12, 2017, in an order put out by me, I

stated that the Court notes that it earlier adjourned the trial

principally at counsel's or Mr. Atilla's request from August 21

to October 30, 2017.

Later, after the summer, on September 25, 2017,

Mr. Rocco mentioned or stated the following.  "Given what

happened to me this summer and given the superseding

indictment, it was our intention to come into the court and to

request some additional time to prepare for trial and our

client has authorized us to make a request to November 27,

which is roughly a 28- or 29-day extension, in light of those

1  events."  And, as a result, on September 25, 2017, I issued an

2  order in which I granted defense counsel's request for

3  adjournment of the trial to November 27, 2017.

4       This issue was the principal subject of the

5  correspondence back and forth over the weekend -- two letters

6  from the defense, I think, one on Friday, one on Sunday, and

7  one letter in between from the government.  I think I have that

8  right.

9       So let me just say this in order to save everybody a

10  lot of time, energy, and effort.  I have no doubt that counsel

11  for the government and the defense are fully immersed in the

12  law and the facts of this case and will certain be ready to go

13  on the law and the facts even if they have considerable more

14  hard work to do, as is always true, in the three remaining

15  weeks before trial.

16       (Continued on next page)

17

18

19

20

21

22

23

24

25

1          THE COURT:  Their readiness and preparedness are ably

2    and fully demonstrated in their various thorough motions in

3    limine as to which I am preparing to rule, in their proposed

4    jury instructions which I have not intentionally reviewed, but

5    I thought I saw that they were in excess of 100 pages, and in

6    the defense motion to dismiss this case, which is still

7    pending.

8          So we will pick a jury on November 20, maybe 21 if we

9    need it, as scheduled, and we will have opening statements and

10   the government's first witnesses on November 27 here in this

11   courtroom as stated.

12         Just to close the legal loop, because the thrust of

13   the defense letter over the weekend was the defendant seeking

14   to adjourn the trial until January of 2018.

15         So my conclusion is that having read all of the

16   letters -- I think one dated the 3rd, two dated November 5 --

17   and having reviewed the applicable case law, respectfully no

18   further adjournment is warranted or feasible for the following

19   additional reasons, in addition to the chronology that I just

20   outlined:

21         One, we are on the eve of trial, two weeks from

22   picking a jury and three weeks from the trial.  As I said

23   before, all the pretrial filings are in, and they are sub

24   judice.

25         Two, defense counsel agreed that the November 27,

1   2017, trial date was adequate to accommodate all aspects of the

2   case, including foreign depositions.

3          As the government mentions in its letter, it referred

4   to a conference that we had.  I forget the date of the

5   conference, but the government said that defense counsel

6   indicated that an adjournment to the currently scheduled trial

7   date of November 27, 2017, would be sufficient to address the

8   defense's anticipated need for testimony from foreign witnesses

9   noting "that's why we proposed it."

10         Defense counsel also recognized that, "We may find

11  ourselves in the position where, if we don't have the time to

12  do it, that your Honor has our feet to the fire and may say

13  it's too late."  I think those quotes are found also in the

14  government's letter of November 5, 2017.

15         Three, defense has failed to file a Rule 15

16  application for foreign depositions, notwithstanding the fact

17  that foreign depositions have been discussed on the record for

18  months in this case.

19         Four, the Rule 15 process, even if it ever could be

20  completed, would delay the trial at least, at least, well into

21  2018 with both defendants in this case sitting in jail, and

22  that is something that we should not countenance.

23         Such a delay and such an adjournment would totally

24  disrupt these proceedings, and in my judgment, be unfair to the

25  defense.  There are a series of citations cited in the

1    government's letter of November 5 which I have reviewed, those

2    cases, and I incorporate the case law citations from the

3    government's letter into this ruling.

4           So, with that, I would like to turn to the protective

5    order which is, after all, the subject of today's hearing and

6    which defense counsel has sought to eliminate or have

7    eliminated or modify.

8           I'm happy if defense counsel and/or the government

9    wishes to be heard.  I'm also prepared to decide the matter on

10   the submissions.  It's your call.

11          MS. FLEMING:  Your Honor, I'd like to be heard on the

12   protective order.  As you said before, we tried to work within

13   it.  It's been, to a significant degree, unworkable as we've

14   tried to interview witnesses and prepare.  I want to emphasize

15   this is not so that we can in any way make public, take it out,

16   or have it be wholesale or publish the information that is

17   here.

18          I'll focus on the recordings in particular.  We've

19   cited as an example to the Court that there were four

20   recordings which the government contended contained the voice

21   of our client.  One of them we can prove intrinsically that it

22   does not contain the voice of our client.

23          But, unfortunately, it requires playing the recordings

24   for people who are on the recordings or other people identify

25   the voices on the recordings or to help us understand the

1    transactions on the recordings that involved the banks or other

2    places or people that are on the recordings.

3         We have spoken with the government and talked about of

4    course we will keep them.  We are officers of the court.

5    Whoever has access to these materials, we've advised them of

6    the protective order.  We've had people sign and provide them

7    to the Court under seal, those people who have done it so far.

8    We will of course continue to keep that with anybody who is

9    there.

10        We have had some people who are concerned about giving

11   their personal home information to the court as opposed to,

12   perhaps, employment information.  As we told the government,

13   when we're able to reach people, we will know how to get them

14   if we need it.  We really have found it unworkable.

15        I advised the Court that on our first trip it was

16   narrowed that we played a recording for someone, believing it

17   was okay under the protective order, and on our second trip,

18   realized it might not be.  We didn't play recordings for

19   someone, even though that person we believed was on the

20   recording.  So we were unable to do it.  On the first trip, it

21   did in fact confirm that it is not our client on the recording.

22   It is someone else.

23        That's something that we really need to be able to do

24   in terms of putting together a defense in this case.  It has

25   hampered us because we have tried to abide by the protective

1     order.  We obviously don't want to be in violation of an order

2     of this Court.  We take it very seriously.

3            So we are asking for a modification of this.  It has

4     hampered us in terms of what we are doing.  We are still trying

5     to get facts together in terms of moving forward.  We do have

6     foreign witnesses, several of whom who will come here, but

7     others who are unwilling to come here.

8            Judge, I'm just going to say parenthetically, we were

9     going to request permission to file under seal today.  We have

10    a Rule 15 application ready, and we've given summaries to the

11    government of our witnesses.  We could get them done in the

12    next two weeks to get these done before trial.

13           In any event, in terms of doing the fact finding,

14    again -- I really emphasize -- that we really are seeking this

15    so we can accomplish our jobs as defense.  We do not seek to

16    publish this or make it in any way out in the open.

17           We do understand the concerns of privacy no, which is

18    why we have asked and the government has consented to us filing

19    under seal our witness information pending it becoming public

20    at a trial.

21           That's really what our concern is.  We don't want to

22    be in violation of an order, but we really need to be able to

23    confirm or help people confirm for us whether someone is just

24    background on the recording or is part of the a transaction and

25    help us follow up on a transaction.

1              MR. ROCCO:  Judge, if I may, since I'm the culprit.

2    We entered into a stipulation before we received any discovery

3    from the government, including my clients under Rule 16.  I saw

4    the protective order as a key to the government's discovery and

5    the only way that we would get access to the government's

6    discovery without imposing and burdening the Court

7    unnecessarily.

8              I agreed to it with the understanding that we could

9    come back to the Court if this proved unworkable and

10   problematic and ask the Court to release us from this

11   disability.  I was out after a serious surgery for six weeks as

12   I explained to the Court last time.

13             In that period, Ms. Fleming and Mr. Thornhill and

14   others went to Turkey and started to interview witnesses and

15   learned in that trip and in another trip in earlier October

16   that the protective order prevented them from doing things that

17   we needed to do.

18             So, frankly, Judge, I can't imagine that that

19   stipulation is a stipulation forever, especially in a criminal

20   case.  We're not even with the government.  The government has

21   had any meticulous chronology the Court set forth.

22             The government has had more than three years to

23   investigate this case.  The indicted case was originally two

24   years ago.  Mr. Zarrab was scheduled to go to trial six months

25   after he was arrested.  Mr. Atilla was concerned about jail.

1   Obviously he's not a person that wants to spend any time of his

2   life in jail.  Mr. Zarrab is not here today.

3           The questions that have arisen in the use of that

4   protective order and the burdens it has presented us have been

5   really problematic.  That's why we went back to the government

6   to seek a modification of the protective order.  When the

7   government refused, obviously we were forced to present the

8   issue to the Court.

9           THE COURT:  I thought they did agree to some

10  modifications of the protective order.

11          MR. ROCCO:  Not the essential modifications that we

12  proposed, Judge.

13          THE COURT:  You originally proposed that you eliminate

14  the protection order.  Two parts.

15          MR. ROCCO:  Judge, we understand the practicalities,

16  and we understand the government's need for protection here.

17  We're not looking to compromise the government's investigation.

18  We're not interested in compromising national security.  We're

19  interested in adequately defending Mr. Atilla.

20          THE COURT:  Sure.

21          MR. ROCCO:  In going forward with discovery, it's one

22  thing at the inception of the case to agree to a methodology,

23  but if that methodology doesn't work, especially where a

24  defendant has a constitutional right to a fair trial and due

25  process in a criminal case, we saw the need to come back and

1    ask the Court to modify the agreement and the order that was

2    based on an agreement, a stipulation.

3           When the government refused to do that, Judge, give us

4    the relief we thought we needed, and we stopped well short

5    vacating the protective order.  We asked to come back before

6    Court.

7           THE COURT:  Does the government wish to be heard?

8    Mr. Lockard?

9           MR. LOCKARD:  Yes, your Honor.  There are a couple

10   things about the chronology and about the content of the

11   protective order that I think are not correctly reflected in

12   the discussion that you've just heard.

13          First, as a matter of timing, the discovery was

14   provided to defense counsel well before the protective order

15   was entered.  There was an agreement that they would maintain

16   that discovery as an attorneys'-eyes-only basis, but we did not

17   want to delay their access to it while they discussed a

18   stipulated protective order.

19          THE COURT:  I think Mr. Rocco agrees.

20          MR. LOCKARD:  So there is no sword hanging over

21   anybody's head.  There was no extortion here in getting a

22   protective order.  This was a protection order that was

23   stipulated to between the parties.

24          As the Court knows, there are a variety of ways of

25   formulating how to get out of a stipulated protective order,

1   but they all require a fairly high showing that has come

2   nowhere near to being made here.

3            First, just under the terms of the protective order as

4   it exists, there is a category of discovery that can be shown

5   to prospective of witnesses or overseas persons without any

6   requirements or any restrictions under the protective order.

7            There is a mechanism for the defendant and his counsel

8   to obtain the Court's authorization without any notice to the

9   government to show certain materials to specified individuals.

10  It just requires that the people who see those materials, to

11  sign a stipulation acknowledging the terms of the protective

12  order and acknowledging the Court's jurisdiction to take steps

13  to enforce it.

14           So there has been no showing whatsoever that defense

15  counsel has tried those procedures and they haven't worked.  We

16  have no idea whether they have been tried because it doesn't

17  require any notice to the government, but certainly there has

18  been no representation that they have actually tried to work

19  within the protective order.

20           In addition, as the Court noted, the government has

21  offered certain modifications to address the concerns raised by

22  defense counsel.  Specifically, when this was first raised to

23  the Court in their October, I believe, 20 letter, there were a

24  handful of specific issues that were raised, and we made

25  proposals that fully addressed each of those with one

1    exception.

2            There was an issue raised about being able to play

3    recordings to people who were participants.  We agreed that we

4    would modify the protective order so they could be played for

5    people who were believed to be participants.

6            There was an issue raised about electronic

7    communication which were not emails, and we proposed a

8    modification to address exactly that concern.  There was a

9    question raised about disclosing United States bank financial

10   transactions, and we made a proposed modification to address

11   exactly that concern.

12           So each of those substantive issues that were raised

13   in the October 20 letter, we made a proposal that we think both

14   protects the real, legitimate, in fact, stipulated to

15   governmental interest here in being able to control and

16   document the disclosure of information that has been developed

17   in the course of a national security investigation, information

18   and evidence that has been obtained from a variety of sensitive

19   sources.

20           We've proposed reasonable modifications to address

21   exactly the concerns the defense counsel raised.  I think the

22   only concern that we cannot agree to a modification on is the

23   idea that the individual as to whom the information is shown or

24   disclosed can somehow withhold key information to identify who

25   those people are.

1          The idea that we're going to have a protective order,

2   that we're going to have a disclosure stipulation so that

3   people overseas who are already very difficult to enforce the

4   order against in the first place, can then go ahead and

5   withhold the information that is necessary to both specifically

6   identify those people and to locate them just robs the

7   protective order basically of all of its force entirely.

8          So we think that including information to sufficiently

9   both locate and specifically identify those people not to be

10  disclosed to the government but to be disclosed to the Court is

11  an important requirement, and if there are individuals who are

12  not willing to provide that information, it seriously

13  undermines our confidence that they will abide by the terms of

14  the protection order in any event.

15         So that's the government's response to the motion to

16  modify or vacate.  Despite that we have not reached agreement

17  with Mr. Atilla's counsel about the protection order, we are

18  still willing to enter into the modifications that we have

19  previously proposed.

20         THE COURT:  I take it you would have no quarrel with a

21  person giving a work telephone number as opposed to a home

22  telephone number?

23         MR. LOCKARD:  The concern about that, your Honor, is

24  that people change jobs.  So, if all you have is a name and a

25  former work address, it makes it very difficult to know who

1   that person is or where they are.

2          We don't know who these witnesses are, potential

3   witnesses are.  We don't know what kind of employment they have

4   or what kind of employer they have.  We don't know how regular

5   or institutional or not these employers might be.

6          It's very difficult to know what that means in terms

7   of actually identifying and notifying people.

8          MS. FLEMING:  Judge, to the extent that people were

9   worried about their homes, we obviously are talking to bank

10  personnel and things like that.  We really only ran into the

11  issue with one person.  Everyone else we provided it to the

12  Court.

13         The issue really was we have said to them that we will

14  obviously make sure that they would provide their employer's

15  information.  If they're not employed, we would have

16  identifying information.

17         If we are able to get a hold of them -- we're officers

18  of the Court -- we will be able to provide the information

19  about how we got a hold of them.  Those concerns can be put

20  aside.  This is in a country in which we just did a reading on

21  how many wiretaps there were.

22         THE COURT:  Counsel makes a point that there is a

23  provision under the protection order which, for example,

24  hypothetically if there is one person who you wanted to supply

25  his or her work phone instead of a home phone, you could, even

 1   without involving the government, make an application to me.  I

 2   never got such an application.

 3           MS. FLEMING:  Judge, here is the problem.  Turkey is

 4   seven hours ahead of New York.  The interviews are at times --

 5   most of the interviews we've done have been at nonbusiness

 6   hours, including when it's been the middle of the night here

 7   when you've had a witness in front of you.

 8           There have been recordings where we said, let's call

 9   the Court, and it's been 3:00 in the morning.  Not to mention

10   you've just given us an order.  Your rules don't allow

11   telephone calls into chambers.

12           THE COURT:  There are a couple different issues there.

13   I don't really view it as my function to be 24/7 available for

14   phone conversations.

15           MS. FLEMING:  We agree with that.  We accepted

16   everything that they said as a modification.  We asked them to

17   go a little farther.  For example, on the recording, the voice

18   identification is not an insignificant issue here.

19           THE COURT:  I was going to ask this before.  I'm not

20   quite understanding.  So you want to ask someone, other than

21   Mr. Atilla, for example, whether that's Mr. Atilla's voice on a

22   particular recording?

23           MS. FLEMING:  Or it may be someone else's voice that

24   may not even be Mr. Atilla but there's somebody allegedly a

25   coconspirator here.  Remember we have a lot of people who we

1    understand the government is going to try to offer recordings,

2    if our motion to preclude is not granted.  Therefore, we want

3    to find out who the voices are.  There is a significant issue

4    on misidentification here.

5          THE COURT:  How would that come in, for example, into

6    evidence?  Somebody says, oh, I don't think that's Mr. Atilla's

7    voice.  I think that's my uncle Harry.

8          MS. FLEMING:  Either a witness could testify to it or

9    in the case of the person who going to say, oh, that's me and

10   not him, we could go to the witness and say, is this you?

11   Could you please identify yourself on this.

12         It's not easy.  It's in Turkish.  It's a difficult

13   process because it's in Turkish and people who speak and

14   understand Turkish understand this much better than we do.

15         We're not playing this on air radio saying, whose

16   voice is this?  People were making educated guesses as to who

17   this might be and what these transactions are they're talking

18   about could lead us to who could help us with this.  It is a

19   very limited group of people, and your Honor will have a list

20   of who it is that we have talked to about this.

21         This is core evidence that the government, I believe,

22   intends to offer in this case.  It has really been difficult.

23   We can't use the English version of the transcripts to show

24   anybody because that's precluded, and we can't play the

25   recordings to have somebody try to help us identify what's

1   going on in it.

2          This isn't go play it willy-nilly anywhere.  This is

3   really targeted with a limited number of people with whom we're

4   speaking, including people who are involved in this bank and

5   these transactions.

6          If they hear a voice and they say it's not theirs

7   which they've already said it's not theirs and we think it's

8   theirs.  And I don't want to ever be accused of, you played it

9   for me.  It's not so and so.

10          THE COURT:  I do think he addressed that problem.

11          MS. FLEMING:  He did.  He said if I think it's there.

12          THE COURT:  So I don't really get what's remaining as

13   the problem.

14          MS. FLEMING:  There could be recordings, for example,

15   with the codefendant and somebody that he has that we want to

16   say, do you recognize these voices?

17          THE COURT:  That's not hearsay for a third party to

18   say whose voice that is?

19          MS. FLEMING:  We're trying to find out what's going on

20   here.

21          THE COURT:  I'm just trying to understand your

22   problem.

23          MS. FLEMING:  The problem --

24          THE COURT:  I think they said that you could play it

25   for people whom you believed are on the recording.

1              MR. ROCCO:  Your Honor --

2              THE COURT:  No.  That's the other thing.  When we get

3    to trial, you're going to do one witness, and you're going to

4    do another.

5              MS. FLEMING:  The issue really is that we are

6    confronted with Turkish recordings, some of whom we believe had

7    misidentified the speakers, including people who aren't

8    physically there but other people we've dealt with them we

9    believe can identify the voices.

10             If they tell us who those people are on the voices, we

11   can then follow up on it with an investigation.  It's the same

12   way the government investigates, we also investigate, by

13   following up to see if it's there.  If it leads to something,

14   great.  If it doesn't, then it doesn't.

15             But by not being able to follow up on that step while

16   we're there in Turkey at whatever hour it is, it's a problem

17   for us.  It's limited instances.  This isn't 150 recordings

18   that we want to play, but there are a number of them that fall

19   into that category.

20             THE COURT:  You want to ask people if this is your

21   voice on this recording?

22             MS. FLEMING:  That part we have several of those.  The

23   government has already said that's okay.  They don't mind if we

24   do that.  There is a second part where we want to say, do you

25   recognize the voices on this recording?

1          Because we believe that the government has accepted

2    misidentifications of the people speaking Turkish on it.  You

3    probably haven't read it yet, Judge.

4          One of the allegations in the complaint is that the

5    FBI agent swore that she identified Mr. Atilla's voice from a

6    YouTube video.  It's not him.

7          THE COURT:  How do you want to establish that it's not

8    Mr. Atilla's voice?

9          MS. FLEMING:  Well, we played a recording for the

10   person who is on that because we were able to figure out from

11   the conversations and other evidence, and he has confirmed that

12   it was him, not Mr. Atilla.

13         THE COURT:  And he's going to come and get on the

14   stand and testify, that that's me?

15         MS. FLEMING:  He's assured me he's willing to testify

16   via a Rule 15 deposition.

17         THE COURT:  We also crossed that bridge.

18         MS. FLEMING:  I was hoping, your Honor, you're going

19   to allow us to file under seal that application before you deny

20   it.

21         THE COURT:  I already did.  We are two weeks from

22   selecting a jury.  For the reasons I already said, it's too

23   little and too late.  As I said in the ruling, the issue of

24   foreign depositions has been discussed here since before June,

25   maybe May, whenever.  No application has ever been made to this

1    minute.

2                MS. FLEMING:  It has, your Honor.

3                THE COURT:  It has not been made.  It first came up in

4    your letter on Friday afternoon that you were interested in

5    making such a filing.

6                Where was the filing?

7                MS. FLEMING:  Your Honor, we have discussed it --

8    you're right -- at proceedings.  There was a superseding

9    indictment in this case.

10               THE COURT:  I don't say it just to be technical.  Just

11   a Rule 15 filing has to meet a threshold, a bar of elements

12   that explain why such a deposition should be allowed.  It's not

13   an easy burden.

14               MS. FLEMING:  We are aware of that, and that's why

15   several fact-finding trips to Turkey precede this application,

16   your Honor.  The reason why is we needed the Court's permission

17   to file it under the seal, we needed the consent of the

18   government before we could approach the Court.  We have it.  We

19   would ask permission that we file it and you review it before

20   you deny it.

21               THE COURT:  I already did.  I'll keep that request

22   under advisement.

23               MS. FLEMING:  Even if not, I'll ask that the Court

24   take it under seal so that we have it as part of the record.

25               THE COURT:  I got it.

1            MR. ROCCO:  Your Honor, may I concur with Ms. Fleming?

2            THE COURT:  Sure.

3            (Pause)

4            MS. FLEMING:  Mr. Rocco, reminded me, and it is true,

5    before this superseding indictment -- the superseding

6    indictment set out in detail what the allegations of the

7    government are.

8            If you compare our motions to dismiss on the first one

9    we were involved in and this one, we think it's a shifting

10   theory, as a matter of fact.  We think that the facts have

11   changed significantly in terms of at least our understanding of

12   what's involved here.

13           As I said, we've made two trips to Turkey and plan

14   another one very shortly.  We believe that we can get these

15   depositions done.  It's not easy, and we understand the Court

16   has its obligations.  Our client has been extremely anxious to

17   go to trial.

18           We have had to explain to him, more difficult to

19   explaining to the Court, why we have needed more time.  The

20   amount of work that we have needed to try to get even to this

21   point has been overwhelming, even with a substantial number of

22   pretty experienced lawyers doing it.

23           I am telling the Court as an officer of the court who

24   has done this an awfully long time, we have needed the time,

25   and we do need the time.  The Rule 15 application we have

1   identified in the report.

2        The government got yesterday a fairly detailed proffer

3   of what our witnesses are going to say.  This is before we've

4   gotten their witness list or their marked exhibits.

5        We don't even marked exhibits or a list of the

6   exhibits they're using at trial.  We have a superseding

7   indictment that came down in September.  It's the first week in

8   November, Judge.  It's not that we have been sitting here for

9   months and months and months and letting grass grow.  We have

10  really not.

11       I guess, at a minimum, I would ask that we be entitled

12  to give you a written submission for the record at least of

13  what we have been doing that would be holding this up.

14       THE COURT:  I have no doubt.  I'm not looking to be

15  the teacher looking at your homework.  I'm just saying that

16  there was time.  The issues were discussed, and I think it's

17  unrealistic and unfair to present a Rule 15 application two

18  weeks before we're selecting a jury.  That's all.

19       MS. FLEMING:  Judge, the unfairness is to the

20  defendant who is entitled to a fair trial.  We don't even

21  have --

22       THE COURT:  It's not only.  There is the integrity of

23  the proceeding.  It's the government preparing its case.  It's

24  not just the defendant.  Of course I would guarantee -- and I

25  do guarantee -- the defendant a fair trial.

1          Notwithstanding what you've said today and what you've

2    said in your submissions and given the logistics of taking

3    depositions in Turkey -- we had this specific discussion in the

4    transcript months and months ago -- I would have thought that

5    if there were going to be those depositions -- by the way, you

6    say in these submissions that these are people who may be

7    witnesses.

8          You know, the trial won't go smoothly --

9          MR. ROCCO:  My apologies, Judge.  I understand that.

10   I'm sorry.

11         THE COURT:  So just that.  Here we are two weeks

12   before.  So the answer is no for the reasons that I said up

13   until now.  I'll take under advisement whether it would be

14   helpful to have it in the record.

15         Did you want to address any of these deposition

16   problems that the defense is facing?

17         (Pause)

18         MR. LOCKARD:  Your Honor, not very much.  I will just

19   add on the Rule 15 issue.  Just one minor correction.  I think

20   Ms. Fleming indicated that the government's consent was

21   required before any such motion was filed.  That's of course

22   not the case.

23         Although we have repeatedly offered to discuss any

24   proposed Rule 15 depositions over the course of the pretrial

25   proceedings so that if there are issues that can be consented

1   to or procedures that can be adjusted, we can have that

2   discussion.

3           I think, as Mr. Atilla's counsel noted, we were first

4   provided information about the proposed Rule 15 depositions

5   over the weekend.

6           THE COURT:  I don't recall it in great detail, but I

7   do recall that we had discussion months ago here, and I

8   suggested that you and the government get together and talk

9   about these depositions.

10          Or are these depositions going to be attempted to be

11  submitted as evidence and is the government interested in

12  cross-examination?  Because if they just had direct testimony,

13  how would there be any cross-examination if the witness is not

14  going to be at the trial?  There were all those logistics.

15          I thought those conversations were going to take place

16  and the possibility of stipulating in lieu of depositions, if

17  the government was not going to Turkey, for example, to do

18  cross at any deposition that was held.  I never heard another

19  word about it until late Friday afternoon.

20          MR. ROCCO:  Your Honor, may I.  I really feel that I'm

21  responsible for this.

22          THE COURT:  I'm not trying to blame anybody.  I'm just

23  saying, we are here at eve of trial, and one of the cases that

24  is specifically cited in the government's letter specifically

25  says no Rule 15 depositions on the eve of trial.  That was one

1   of the bases for that ruling.

2          How could it be more eve than we are today, two weeks

3   from picking a jury?  How could it be more eve than three weeks

4   today having the government's opening statement and yours and

5   going to trial?  That's what I'm saying.

6          Without any of that meet-and-confer, does the

7   government want to go to Turkey?  I remember in fact it was

8   also discussed maybe it wouldn't be in Turkey.  Maybe it would

9   be in a third country that would be more conducive to everybody

10  going.

11         Well, maybe there would be a stipulation or could be a

12  stipulation.  The government -- I don't want to speak for the

13  government.  I certainly wouldn't approve of them introducing

14  a recording saying that it's me when in fact it's Judge Pauley,

15  and I can't imagine that they would want to do that.

16         So that's what I don't understand.  It's sort of a

17  cumbersome situation -- this is not blame -- that everybody has

18  been placed in on Friday.  I think I first saw it at 4:00 or

19  4:30 in the afternoon.  It makes no sense to me.

20         MR. ROCCO:  May I?  I really must apologize for this

21  because, in large part, it's due to my absence.  It's been

22  almost two months.

23         THE COURT:  I appreciate taking responsibility, but I

24  don't think it's fair, even what you're saying, because when

25  you proposed the November 27 date, you said in fact that that

1  was needed to accommodate the time that you were not there,

2  among other reasons.  So it's not fair to go back to that.

3           MR. ROCCO:  If I may, Judge.  What I did say to the

4  Court was that Mr. Atilla was insisting limiting me to the

5  amount of time that I could request.  I did not believe -- I

6  would try my damnedest to do what needed to be don in the

7  period that I requested an adjournment for.  Mr. Atilla would

8  not allow me to ask for any more time.

9           That goes back to the date, as your Honor has quoted

10 from I think it was the day he was detained on the original

11 indictment in this case, Mr. Atilla wanted to go to trial the

12 following day.

13          THE COURT:  I appreciate that.  And as I said, that is

14 one of the reasons that we are going to trial on November 27.

15          MR. ROCCO:  If I can also say, Judge, Mr. Atilla has

16 no concept of what the American system of justice is.  He has

17 no idea of what a trial is.

18          THE COURT:  You know what.  He has a better idea of

19 you or me what it's like to sit in jail waiting for a trial.

20 That's why we have a Speedy Trial Act in the United States.

21          MR. ROCCO:  But he has a right to waive that, Judge.

22 He has a constitutional right.

23          THE COURT:  Sure.

24          MR. ROCCO:  He's come to a realization, and that's why

25 he's so penorious in allowing me to ask for additional time.  I

1   told Mr. Atilla that I want the to ask for 90 days, and I

2   didn't do that.

3          I was prepared to offer a resignation on September 25,

4   which was the day that I returned from my surgery, because I

5   didn't think that I could get the work done.  I realized that

6   if I was going to do that, I would put Mr. Atilla in an even

7   worse position and your Honor would be angry thinking that I'm

8   playing games with the Court.

9          So what I did was I hung myself by my own petard.  I

10  confess that.  This was not practicable to be accomplished in

11  30 days.  I've come back to work since September 25, and there

12  hasn't been a day that we've taken off, and we've been working

13  12 to 15 hours a day, Ms. Fleming and our teams.  That goes a

14  little bit beyond than what the Court needs to know.  I

15  understand that.  Judge, we can't --

16         THE COURT:  Just to save you time.  I am not moving

17  the trial date.

18         MR. ROCCO:  I got that.  I understand that.  I

19  understood it.  Your Honor made it clear.  When you started,

20  even before you ruled, I understand what your Honor's ruling

21  is.

22         All I want the Court to understand is I really want

23  the record to reflect this is an impossible task.  These are

24  witnesses who have exculpatory evidence that they are prepared

25  to offer.  They are prepared to testify.  They are not prepared

1    to appear in the United States.

2              THE COURT:  And they're not prepared to be

3    cross-examined?

4              MR. ROCCO:  Of course, they are, Judge.

5              THE COURT:  How are they going to be cross-examined?

6              MR. ROCCO:  Video conferences, Judge.  I did a video

7    conference in front of Judge Rakoff 12 or 14 years ago.

8              THE COURT:  We had this discussion on the record.

9              MR. ROCCO:  In this case?

10             THE COURT:  Yes, we did.

11             MS. FLEMING:  It was with me, your Honor.  I suggested

12   live during the trial, and the Court said no, not during the

13   trial.  It would have to be by deposition.  That's my

14   recollection of our conversation.

15             MR. ROCCO:  Your Honor, just for the record, these are

16   critical witnesses to Mr. Atilla.  I don't think that

17   Mr. Atilla understood the work that needed to be done before we

18   could identify prospective witnesses.

19             Judge, part of what you do in doing a pretrial

20   investigation is determine what witnesses you're going to call.

21   They don't appear on your doorstep full blown.

22             You can interview a witness and come to a conclusion,

23   even if the witness is favorable to your client, that the

24   witness is in-credible and isn't worthy of belief.  So we have

25   an obligation to put to the system, as officers of the court,

1   to vet witnesses.

2          And identifying witnesses, interviewing witnesses,

3   takes an enormous amount of time, especially when we're doing

4   it an ocean and a continent away, especially when we're doing

5   it in foreign languages, especially when we ask to talk to

6   witnesses and schedule a meeting at 12:00 in the afternoon and

7   don't show up until 4:00 or 6:00 at night.

8          These people don't understand the sanctity of the

9   American legal system.  They're foreigners.  So we've tried our

10  best, and we've been able to identify witnesses, and the

11  witnesses that we are offering that we're proffering are

12  witnesses who provide exculpatory evidence, Judge.

13         However we've gotten here, I'm telling you that

14  Mr. Atilla is being deprived of his right to interpose a fair

15  defense, a vigorous defense, and he's entitled to that under

16  the law.

17         THE COURT:  It's no help to the Court to get half a

18  deposition, whether it's written, whether it's video, however

19  it's taken, preferably live.  So there is no way a jury can

20  assess the credibility of a witness, unless that witness is

21  subject to cross-examination in the same way that the direct

22  was adduced.

23         MR. ROCCO:  Your Honor, what the government --

24         THE COURT:  I'm not doing anything.  I would have

25  taken depositions, if you want to know what I would do, but

1    it's really not relevant what I would do.  I would have had

2    those depositions months ago.  That's what I would have done.

3           MR. ROCCO:  Your Honor, I am trying to explain --

4    perhaps I have not done it adequately -- why these depositions

5    didn't occur.  I do want to say just one further thing.  We're

6    not proposing half depositions.  What we propose is to have the

7    government participate and cross-examine witnesses of course.

8    I was told on earlier in this case that he is not traveling to

9    Turkey.

10          THE COURT:  In that conversation it was also discussed

11   briefly -- I thought it was a good idea.  I don't know whatever

12   came of it.  I do remember the government saying it was not

13   going to travel to Turkey, but there was an alternative that

14   the witness could travel to London or someplace that everybody

15   could go to.

16          MR. ROCCO:  For the record, Judge, these are not

17   people under our control.

18          THE COURT:  To my knowledge, no one has ever asked

19   them that.

20          MR. ROCCO:  I'm sorry?

21          THE COURT:  To my knowledge, that's the problem.  To

22   my knowledge, none of this has been explored.  It was explored

23   here.  It wasn't explored there.  You're kind of doing it as --

24          MR. ROCCO:  As an officer of the court, I'm

25   representing to the Court that these people are not under our

1   control.  If your Honor is skeptical of that --

2            THE COURT:  I'm not suggesting they are.  I can't

3   force them to come here if they don't want to come here if they

4   don't want to come.

5            MR. ROCCO:  Nor could we force them to go to a place

6   outside.

7            THE COURT:  No, but you could ask them.  You suggested

8   to me --

9            MR. ROCCO:  Your Honor, we have.  If I could just

10  finish this one thought, sir.

11           THE COURT:  Yes.

12           MR. ROCCO:  In the Rule 15 application that

13  Ms. Fleming has asked your Honor to consider accepting, we say

14  that there are two witnesses who are willing to come to the

15  United States.

16           THE COURT:  So that's easy.  So how many other

17  witnesses?

18           MR. ROCCO:  Four others.

19           THE COURT:  All right.

20           MR. ROCCO:  Each of the four others provide

21  exculpatory information, testimony, regarding Mr. Atilla.  By

22  the way, Judge, if I were the government, I'd be the happiest

23  people on the face of the earth because we've done the

24  investigation.  We're given the opportunity to mine the

25  testimony of these people, cross-examine them, and bring out

1   whatever the truth is.

2           THE COURT:  Where?  Not here; right?

3           MR. ROCCO:  I can't force them to come here.

4           THE COURT:  Not here.

5           MR. ROCCO:  In Turkey by video conference.  They could

6   be cross-examined.  Your Honor, by the way, we can examine the

7   witnesses directly on videotape here from the United States,

8   and the government can cross-examine the witnesses by video

9   conference so that the jury doesn't -- so that's essentially --

10          THE COURT:  Is that what you're proposing?

11          MR. ROCCO:  I'll propose it.  Your Honor, I'd be crazy

12  not to propose it.

13          THE COURT:  I don't think --

14          MR. ROCCO:  It was not what we proposed.

15          THE COURT:  You were going to take it there, and then

16  they were going to do it video from here.  Right?

17          MR. ROCCO:  I don't know if we even got to that level,

18  your Honor.

19          THE COURT:  That's my problem.

20          MR. ROCCO:  I'm sorry.

21          THE COURT:  We're going to take a break.  You're going

22  to meet-and-confer with the government -- these

23  meet-and-confers could get everybody a lot further than they

24  have been.  I don't know what seems to be the impediment -- and

25  see if you can't come up with some proposed solution here, and

1    then we'll reconvene.  So you can use the jury room for that,

2    folks.  Thanks a lot.

3              (Recess)

4              THE COURT:  So where we were or where I had hoped we

5    were, I was about to give you a ruling on the protective order

6    issues.  That is what I propose to do.  After that you can let

7    me know where your meet-and-confer brought us.

8              So, by letter dated October 20, 2017, and dated

9    October 26, 2017, the defense has applied to vacate or modify

10   the protective order that was entered on consent on or about

11   June 19, 2017.

12             The defense argues that the protective order has

13   impeded its ability to interview in Turkey prospective

14   witnesses and states that some potential witnesses have

15   declined to sign the protective order "out of concern regarding

16   the submission of their personal information to a United States

17   court."

18             Defense also states that it has been limited in its

19   ability to play recordings and show documents to potential

20   witnesses, and counsel states that much of the material

21   provided in discovery has been available through other means.

22             In its October 26 letter, the defense attached a

23   letter dated October 24, 2017, which was a letter it had sent

24   to the government.  In the October 24, 2017, letter, defense

25   counsel accepts the government's proposals to modify the

1    protective order but also contends that the government's

2    proposals do not go far enough.

3              Defense counsel restates the government's I'll call

4    them agreed-to enlargements to the protective order as follows.

5    These are those that the government has presumably agreed to:

6    One, that defense counsel may play a recording for anyone it

7    believes in good faith is a participant in the recorded

8    conversation; two, defense counsel may show all electronic

9    communications to or from a Halkbank employee to any current or

10   former Halkbank employee; and three, defense counsel may show

11   any current or former employee of Halkbank financial records of

12   U.S. Banks'.

13             In the government's October 26 letter, the government

14   describes this modification somewhat differently.  The

15   government says that all of the financial data in the discovery

16   could be shown to but not left with Halkbank employees.

17             With the proposed modifications, defense counsel

18   states it is fine with requiring a signed acknowledgment of

19   having received a copy of the protective order from anyone to

20   whom we show any protected materials and filing such

21   acknowledgment under seal.

22             Defense counsel also states that we will have each a

23   potential witness to whom any protected materials are shown

24   include work-related contact information.  The providing of

25   work-related contact information, as we've discussed a few

1   minutes ago, was not included in the government's 10-26-2017

2   letter.  And we've heard, during the course of this hearing,

3   this conference, the government's response to that issue.

4           By letter dated October 26, 2017, the government

5   states that the protective order agreed to by the parties

6   properly balances the defendant's need to prepare for trial

7   with the national security interests at play.

8           The government also states that Mr. Atilla's "bald

9   declaration that the government's investigation has come to an

10  end is a nothing but incorrect speculation and that Mr. Atilla

11  is simply incorrect when he claims that just because the

12  discovery does not specifically disclose which individuals have

13  provided information to the government, there is no remaining

14  threat to witness safety."

15          The government states further that defendant's

16  proposal to show or play any communication to anyone is

17  "untenable because it essentially creates the possibility for

18  unfettered dissemination of material collected as part of a

19  national security investigation in countries, for example,

20  Iran, Turkey, and Dubai, that are at the heart of the

21  allegations in the indictment."

22          Based upon the written submissions of counsel and the

23  helpful oral argument and having reviewed the government dated

24  June 19, 2017, the Court denies the defense application to

25  vacate the protective order and grants the defendant's

1   application to -- I'm using the phrase -- enlarge the

2   protective order to the extent of the government's proposed

3   modifications to the current protective order as discussed.

4          The Court finds that the government has met its burden

5   of establishing good cause to support the Court's issuance and

6   continuance of the existing protective order.  Cites are

7   United States v. Smith, 985 F.Supp.2d, an S.D.N.Y case from

8   2013.  Also United States v. Gangi, 1998 WL 226196, a Southern

9   District case from May of 1998.

10         Among other things, the government is reasonably

11  concerned about:  One, the safety of others against physical

12  harm; two, the confidentiality of ongoing related

13  investigations; and three, also national security.

14         While courts generally make a finding of good cause

15  before issuing a protective order, the Court need not do so

16  where the parties stipulate to the order, as they've done in

17  this case.

18         If a party takes steps to release documents subject to

19  a protective order or a third person challenges the propriety

20  of the order, then the party opposing disclosure has the burden

21  of established good cause to continue the protective order in

22  effect.

23         The central concern in determining whether access

24  should be granted to documents sealed under a protective order

25  is whether that order was relied upon in the decision to

1    produce documents.  Cites include United States v. Benzer, 2015

2    WL 92003065 from the Court in Nevada where the court held,

3    "Good cause remains the standard, even where the parties

4    consent to a stipulated protect sufficient order."

5           Protective orders are routinely granted prior to the

6    production of documents pursuant to 18 U.S. Code, Section 3500.

7    Where there are legitimate security concerns.  Cites include

8    United States v. Pascrano, 2006 WL 2270432, an Eastern District

9    case from 2016.

10          Also United States v. Garcia, 406 F.Supp.2d 304, a

11   Southern District case from 2005, also United States v.

12   Williams, 2005 WL 664933, a Southern District case, 2005.

13          Protective orders are also granted pursuant to the

14   Classified Information Procedures Act, so-called CIPA, 18 U.S.

15   Code, at 3, Sections 1 through 16, and Federal Rule of Criminal

16   Procedure 16(d)(1) when the disclosure adversely could affect

17   national security.  See also United States v. Aref, 533 F.3d

18   72, a Second Circuit case from 2008; as well as United States

19   have the Farekh, 2006 WL 4444778, an Eastern District case from

20   2016; and United States v. Abu Jihaad, 2008 WL 346121, District

21   of Connecticut, 2008.

22          The protective order in this case has enlarged and

23   modified in accordance with the government's proposals, is

24   tailored further to support counsel's ability fully to prepare

25   the defense of Mr. Atilla.

1          As agreed to in the government's proposed

2    modifications, defense counsel may disclose voice

3    communications to anyone who participated in the

4    communications.

5          Defense counsel may also show electronic

6    communications involving a Halkbank employee to anyone at

7    Halkbank, and defense counsel may also share materials that are

8    available to the defendant from sources other than the

9    discovery.

10          The Court has taken and will continue to take all

11   appropriate steps to ensure that Mr. Atilla receives a fair and

12   speedy trial and to support the presumption of innocence that

13   all defendants enjoy.

14          The Court further directs that the government shall

15   undertake good-faith review periodically of the discovery and

16   the status of pending investigations, national security

17   concerns, and the safety of others and shall advise the Court

18   as to whether and when any further modifications should be made

19   to the protective order.

20          The protective order dated June 19, 2017, was

21   developed and agreed to, as I understand it, by experienced and

22   sophisticated counsel for the defense and the government prior

23   to its submission to the Court to be so ordered.

24          Based upon the record herein, the Court perceives no

25   basis, apart from the enlargements proposed by the government,

1   to depart from the parties' protection order agreement.

2          So that's it for the principal issue of today's

3   conference.

4          Did you want to say anything further with respect to

5   the issue of Rule 15 depositions?

6          MR. ROCCO:  Your Honor, we met.  We conferred.  I made

7   the following proposal.  We certainly understand the

8   government's right to participate in the examination of

9   proffered witnesses.  We would expect that they would have a

10  full-blown opportunity to cross-examine any witnesses.

11         We have made good-faith efforts to have these

12  witnesses appear here in the United States, but there are at

13  some point four witnesses who have made it clear to us that

14  they will not come to the United States, and there are

15  difficulties with them traveling and visas to travel to other

16  countries.  So the depositions essentially would take place in

17  Turkey.  We agreed that we would participate in the

18  direct examination from the United States.

19         We would do our direct examination via video

20  conference.  The government could do cross-examination via

21  video conference.  We would do it at a location in Istanbul

22  that satisfied the government.  We would propose that we do it

23  at a video conference center.

24         If we could not get a counselor or official from the

25  embassy, the U.S. Embassy, to attend and monitor the

1    deposition, we offered that we would pay for the government to

2    choose a monitor from a private law firm here in the

3    United States to attend the deposition, to ensure the integrity

4    of the deposition, also to be the custodian of both defense and

5    government exhibits.

6            I think that was our position, Judge.  The government

7    said that it would take our offer under advisement.  It sounds

8    to me like it will be ultimately rejected by the government for

9    its part.

10           The government raised with us the possibility of

11   stipulated testimony by the defense witnesses, and we advised

12   the government that we would take that under advisement.

13           I think that pretty much covers what I think happened

14   during this meet-and-confer.

15           THE COURT:  In your proposal, what do you do about an

16   oath, and what do you do about enforcement?

17           MR. ROCCO:  Well, enforcement always goes -- threats

18   of perjury, by the way, I think go to the weight of the

19   evidence.  There are a couple cases that essentially say it is

20   not an issue of admissibility.  It goes to the weight.  The

21   government could argue to the jury --

22           THE COURT:  I'm not understanding.

23           MR. ROCCO:  Deposition testimony.

24           THE COURT:  Yes.  Meaning someone perjured themselves.

25           MR. ROCCO:  That does not dictate whether it's

1  admissible or not.  If they perjure themselves, they could be

2  prosecuted for either obstruction of justice or perjury.

3            THE COURT:  Where?

4            MR. ROCCO:  Well, in the United States.

5            THE COURT:  What jurisdiction do I have over a witness

6  that you find in Turkey and depose in Turkey?

7            MR. ROCCO:  Let's take a country other than Turkey.

8            THE COURT:  No.  Let's take Turkey because that's

9  where it is.

10           MR. ROCCO:  If the witness has perjured himself, if

11 the perjurer was brought before the Court, certainly the

12 perjurer could be charged with a crime, and if the perjurer was

13 brought before this Court, the perjurer could be punished for

14 the crime.

15           That's an issue of weight, not admissibility.  I think

16 that's one of the government's concerns.  Without the

17 enforcement sanction, the reliability of the witness' testimony

18 is questionable, but as I say, I think that's a jury question.

19 It's weight, not admissibility.

20           Oath, your Honor.  We could inquire of a counselor

21 official taking an oath.  This is a Muslim country.  I don't

22 know whether the witnesses would take an oath or whether it

23 would be an affirmation.

24           I don't see why having witnesses present, if in fact

25 it's an affirmation, that wouldn't satisfy admissibility

1    requirements here in the United States.

2             We certainly, as any other issue that we're dealing

3    with where the depositions take place when they take place,

4    what time of day they take place, who the identity of the

5    monitor is, what the location of the examination.  We can

6    certainly ensure that the oath itself or whatever the process

7    is, oath or affirmation, is followed.

8             Thank you, Judge.

9             THE COURT:  Just to be clear, you're proposing a

10   deposition, not a mechanism for direct and cross-examination

11   during the trial.  Is that right?

12            MR. ROCCO:  It would be before the trial.  We are

13   proposing a deposition, just like in a civil case.  We'll have

14   a transcript.  Objections during the deposition will be to

15   form.

16            THE COURT:  How does the government get to object?

17            MR. ROCCO:  As we would to their cross-examination.

18            THE COURT:  Let's say they're not going to Turkey.

19            MR. ROCCO:  I'm sorry.  I didn't make myself clear.

20            THE COURT:  I didn't understand.

21            MR. ROCCO:  At any deposition, we would conduct the

22   deposition.  Direct would be done by us here in New York.

23   Cross-examination would be done by the government here in

24   New York.  So there is direct and cross.

25            The government is entitled, certainly entitled, to

1    attend.  There are visa issues with the government.

2              THE COURT:  To what?

3              MR. ROCCO:  To attend the deposition.  If we were to

4    do it live, both parties being in Turkey, if we were going to

5    be in Turkey, the government could be in Turkey.  It's not

6    practicable for reasons we don't need to burden the record on.

7    I understand that.

8              What I'm proposing is that the parties are essentially

9    situated.  We'll do our direct from New York.  The people from

10   the U.S. Attorney's Office will do their cross-examination and

11   any further examination from New York as well.

12             THE COURT:  So there are two possibilities.  You could

13   do that, or you could just do the testimony in that fashion at

14   the trial.

15             MR. ROCCO:  Yes.  I think it's something that

16   Ms. Fleming has said was offered in the past.  That's certainly

17   possible.  Were could do it during trial.

18             Ms. Fleming has had better experience with that than I

19   have.  It can be disruptive.  Certainly, Judge, these are

20   important witnesses.  Certainly if that's the mechanism that

21   they're available, that's the mechanism that we're prepared to

22   follow.

23             It may be that it's preferable to what we proposed

24   when we met and conferred with the government, simply to do a

25   live feed during trial.

1              THE COURT:  Do you want to comment?

2              MR. LOCKARD:  Just very briefly, your Honor.  I think

3    Mr. Rocco recapitulated some of the concerns that we had

4    expressed about that.  I think we have both logistic and

5    reliability concerns about those procedure, including, as the

6    Court noted, how do you administer the oath, where is the court

7    reporter, how do you handle dealing with the exhibits.  There

8    are a lot of logistical issues.

9              THE COURT:  Including, not only exhibits, I suppose,

10   including recording exhibits.

11             Are these witnesses who are going to be presented with

12   recordings?

13             MR. ROCCO:  Perhaps, your Honor.  Perhaps.

14             THE COURT:  How are you going to do that?

15             MR. ROCCO:  We could play the recordings for them as

16   if they were sitting here in the courtroom.

17             THE COURT:  You would play them from here, and they

18   hear them?

19             MR. ROCCO:  We could play them from here.  As I

20   offered the government to have a monitor present.  The monitor

21   can travel to Istanbul with the government's exhibits and our

22   exhibits.  It will be the monitor of the government's choosing

23   to secure our evidence and their evidence.  I don't think

24   that's a difficult step at all.

25             THE COURT:  Sorry.

1          MR. LOCKARD:  There is also a concern -- we would have

2     to look into this issue, but there is a very likelihood that

3     this kind of procedure would require a request to Turkey under

4     a Mutual Legal Assistance Treaty.

5          Often conduct that involves U.S. personnel taking

6     actions or interviewing people under oath or not under oath in

7     a foreign country requires the concurrence of the host country

8     to do so.  That's true in many jurisdictions whether

9     depositions are voluntary or involuntary.  It still often

10    requires the host country to authorize U.S. official action on

11    their soil like that.

12         If counselor officials are going to be involved,

13    that's another reason why diplomatic requests may be required.

14    I think there are also two significant issues with respect to,

15    as the Court noted, the reliability of any testimony held in a

16    country where U.S. government personnel cannot travel.

17         It's our understanding, based on a lot of public

18    reporting recently, that there are issues with the issuing of

19    visas between those two countries.  It's our understanding

20    based on that public reporting, that not only should we not go

21    there, we cannot get a visa there.

22         So, if you're going to have someone who is a citizen

23    of Turkey, who cannot be extradited from Turkey because they

24    are a citizen being examined by U.S. government personnel who

25    cannot travel to Turkey, it leads one to question how much

1   value an oath has under those circumstances.

2           Your Honor, one last, just so it's out there as

3   everybody considers this.  The Court has under Rule 15 the

4   authority to order a deponent to bring documents and other

5   materials to the deposition.

6           The references to the testimony that we've received

7   include references to documentary materials or communications

8   which we would be asking the Court to order be produced by the

9   deponent at the deposition, and it's unclear what force or

10  effect or enforceability that kind of order would have under

11  these circumstances either.

12          So those are the government's concerns, and that's why

13  we're opposed; that if there are proposed testimonial

14  stipulations, that we could consider those in lieu of this kind

15  of procedure.

16          MR. ROCCO:  Your Honor, addressing the issue of

17  Turkish involvement and the need to have appropriate letters

18  rogatory or MLATs, we've made that inquiry.  We've been told

19  that the depositions are voluntary.  We do not need the Turkish

20  government's involvement; that these witnesses are available.

21  They're free to testify.

22          We examined this painstakingly because we were

23  concerned that we would have to proceed by letters rogatory,

24  which is even a slower process than MLAT, but we're told that

25  the Turkish government need not be involved in this at all.

1    Thank you, Judge.

2            THE COURT:  So I made my position clear earlier.  You

3    should look at the transcript of today's proceeding with

4    respect to the feasibility at this late date of Rule 15

5    application with respect to foreign depositions in terms of

6    whether it's, as I say, feasible, whether it's reliable,

7    whether it's practical.

8            I didn't think so earlier in the proceeding when I

9    ruled as I did because it just struck me -- I could very well

10   be wrong -- that this could not be put in place at this late

11   date, given the fact that we're starting the trial on

12   November 27.

13           So that ruling stands.  I will take your submission.

14   From what I've heard, Ms. Fleming, I don't think -- maybe it

15   is.  I'd be surprised if your submission is up to date in the

16   sense of covering the issues that have been discussed here

17   today.

18           There is no point if it isn't.  If it doesn't deal

19   with those issues that I saw and see as legal and practical

20   hurdles, there's no point in submitting it.  You can submit

21   whatever you want, but I'm just saying.  I'm sure it doesn't

22   take into account the discussions that you've had with the

23   government at my urging in the meet-and-confer.

24           Personally I think it would make more sense if it did,

25   if it were up to date.  Without saying that I'm going to change

1    my mind in any way, if you want to have it in the record and

2    you want me to review it, I'll do that, with those

3    qualifications, just so you understand where I'm coming from.

4              MS. FLEMING:  Your Honor, I would like it in the

5    record, and I would be happy to supplement it.

6              THE COURT:  That's happened before.  I just want a

7    document that, practically speaking, is one that is feasible.

8    If you put it in on its face and it's not going to be workable,

9    there's no point really in my looking at it and then another

10   one comes in which is different.  Put your best foot forward on

11   behalf of Mr. Atilla in one submission and get it to me.

12             MS. FLEMING:  We'll have it to your Honor tomorrow

13   morning.  May we have permission to do it under seal?  Because

14   it identifies witness information which the government agrees

15   should be confidential.

16             THE COURT:  Sure.  I think you should explore a little

17   bit further -- I don't know how far you got in your

18   exploration, but the idea of stipulations of testimony.

19   Frankly, that sounds to me like certainly that's workable,

20   doable.

21             I don't know if you can get agreement with the

22   government, but it strikes me that at this late date and under

23   these circumstances -- foreign language, Turkey, interpreter,

24   voice recognition -- it just strikes me that, as I was

25   suggesting -- I think more than suggesting -- at the outset of

1  today's hearing, I don't think it's feasible, and I don't think

2  it's going to be necessarily fair to both sides.

3          I'll go the extra mile.  You're the defense.  On his

4  behalf you can submit it.  Put your best foot forward, and

5  we'll see where it goes.

6          When are you planning to go by the way?

7          MS. FLEMING:  I was waiting to hear the what the

8  Court's order on the protective order was.  And by the way,

9  would your Honor like to give us a mechanism?  I'm certainly

10  not going to bother you in the middle of the night, your Honor.

11  If we run into a problem, any suggestions for it?

12          THE COURT:  I don't know what problems you might run

13  into.

14          MS. FLEMING:  We understand that one is now covered.

15  But we also had a situation where we had a transaction being

16  discussed in a recording where we weren't sure what the

17  transaction was, and we thought a witness could help us with

18  it.  We didn't believe he was on the recording.

19          So that was one that I would probably be seeking the

20  Court's relief on that.

21          THE COURT:  How would I know?

22          MS. FLEMING:  I would be asking if we could call

23  chambers.  I guess we'll have to try to schedule the meetings

24  with people so that they meet with us late at night so that

25  it's in the business day here.

1          THE COURT:  Or you could just do it, and it would be

2    subject to objection.

3          MS. FLEMING:  I don't want to violate the order.  I

4    would certainly not want to do it.

5          THE COURT:  I don't know why you would have reluctance

6    of talking to the other party in the order.  It is so ordered,

7    but it is an agreement between you and the government asking

8    them if this, in their understanding, violates the order or

9    not.

10         MS. FLEMING:  First of all, it would be 3:00 in the

11   morning for them too.

12         THE COURT:  It's okay to call the judge.

13         MS. FLEMING:  Judge, we didn't call you.  We didn't

14   bother you.  We're officers of the court.  We really do

15   recognize limitations.  We will do our best and work with it.

16         THE COURT:  So will we.  I think in the

17   first instance, as I was trying to suggest before, you might

18   get further with the government than -- I'm a glass-half-full

19   judge -- than without them.  I think that's a fruitful area for

20   you to explore.

21         When you're ready, I will take a look at your

22   submission and see if it changes my mind.

23         MS. FLEMING:  Thank you, your Honor.

24         THE COURT:  There is one technical thing.  For names

25   and places for the voir dire, we've got a lot of names.

1   Usually we ask for what they do or where they live.  Just on a

2   casual review, it looks like they're all in Turkey, or many of

3   them are Turkish names.

4           You need to go through that list and get a little more

5   specific as to either where -- if they're people, where they

6   live.  If they're entities, what they do and where they do

7   them.

8           MR. LOCKARD:  Yes, your Honor.

9           THE COURT:  The other thing is since it's a pretty

10  fulsome list, think about a format where we could just hand

11  them to jurors instead of me reading however many hundred names

12  you got here.

13          MR. LOCKARD:  We had contemplated suggesting something

14  like that as well.

15          There is one additional procedural issue from the

16  government.  In accordance with the Court's instruction for no

17  further filings without advance permission from the Court, our

18  letter had referred to the government's intention to seek,

19  either by stipulation or without a stipulation, a protective

20  order for the disclosure of 3500 materials.  We would just ask

21  for the Court's permission to file either a stipulated or not

22  stipulated motion to that effect.

23          THE COURT:  There is one other thing.  It came up I

24  thought -- maybe I misheard.

25          Ms. Fleming, I thought you mentioned that something

1  had been filed by you with me under seal some time ago, and I

2  for the life of me -- maybe I do have it, but I can't --

3         MS. FLEMING:  What we filed under seal, your Honor, is

4  a return from both trips we filed with the Court those forms

5  that people sign that we had shown information to.

6         THE COURT:  I don't remember.  Maybe they're in our

7  file or something?

8         MS. FLEMING:  I believe they are, your Honor.  It has

9  shown up.

10         THE COURT:  Fair enough.  We'll take a look.  Thanks a

11  lot.  Nice to see you all.

12         MR. WEISER:  Ben Wiser for the New York Times on

13  behalf of the press.

14         The defense has referred to making filings under seal

15  related to the deposition proposals, perhaps the government in

16  return.

17         Could we ask that filings be made with redactions but

18  not completely under seal so that we can read arguments and

19  anything else.  And if we want to contest redactions, we can do

20  that.  Under seal completely doesn't seek to give that

21  conspiracy.

22         THE COURT:  Why don't you talk to the government and

23  see if that's a fair point.

24         MS. FLEMING:  We're fine as long as witness

25  information is protected.  That's fine.

1          THE COURT:  I think they have no problem with that.

2   Good point.  Thanks.

3          (Adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25