HBGQATIc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3              v.                          15 CR 867 (RMB)

4   MEHMET HAKAN ATILLA,
                    Defendant.
5   ------------------------------x

6                                      New York, N.Y.
                                       November 16, 2017
7                                      11:00 a.m.

8

    Before:
9
                       HON. RICHARD M. BERMAN,
10                                     District Judge

11
                            APPEARANCES
12  PREET BHARARA
         United States Attorney for the
13       Southern District of New York
    MICHAEL LOCKARD
14  SIDHARDHA KAMARAJU
    DAVID DENTON
15       Assistant United States Attorney

16  HERRICK FEINSTEIN LLP
         Attorneys for Defendant
17  VICTOR J. ROCCO
    THOMAS E. THORNHILL
18
    FLEMING RUVOLDT PLLC
19       Attorneys for Defendant
    CATHY ANN FLEMING
20  ROBERT J. FETTWEIS

21  -Also Present-

22  Special Agent Jennifer McReynolds
    Michael Chang-Friedan
23  Asiye, Interpreter (Turkish)
    Seyhan Sirtalan, Interpreter (Turkish)

24

25

1          (In open court)

2          THE COURT:  Good morning, everybody.  So on my to-do

3     list for today is to start with the Mr. Atilla's motion.

4          We should mention first we have a Turkish language

5     interpreter and make sure Mr. Atilla is able to understand with

6     the help of the interpreter.

7          THE DEFENDANT:  Yes, I can understand.  Thank you.

8          THE COURT:  Great.  Thank you.

9          So I was saying next that I thought I would start with

10    Mr. Atilla's motion to dismiss the indictment in this matter

11    and then take a short break, and then we might talk about the

12    motions in limine.

13          At the outset, I am going to say what I've said

14    before; and that is, that in discussing the motion to dismiss,

15    and particularly in discussing a court resolution and the in

16    limine motions as well, this discussion bears no impact upon

17    the question of whether or not Mr. Atilla is guilty of any of

18    the charges in this case.  He is presumed to be innocent, has

19    been up until now, will continue to be until such time, if it

20    were to come about, that a jury determines that he is guilty

21    beyond a reasonable doubt.  So I don't want anything that I say

22    today to be construed as in any way impinging on that

23    fundamental U.S. legal system principle.

24          So, I have before me the motion of Mr. Atilla through

25    counsel and the reply.  Those are dated October 9, 2017 and

HBGQATIc

1    October 23, 2017.  And that is the defense motion to dismiss,

2    and in the alternative for severance.  And I have the

3    opposition dated October 16, 2017 from the government.  Did

4    counsel wish to be heard on that motion or did you want me to

5    rule on the papers?

6         MR. ROCCO:  Your Honor, I think given the lateness of

7    the hour, it makes most sense for your Honor to rule.  If there

8    is anything that the Court wants to hear, I'd be happy to

9    address any issue that your Honor may have.

10        THE COURT:  I appreciate that.  So some of these

11   issues, indeed, substantially all -- not entirely all -- but

12   were resolved previously in the ruling or related to the ruling

13   on Mr. Zarrab's motion to dismiss, but this is a new

14   indictment, it has different issues and, hence, the opportunity

15   if you wish to say anything before I do rule.

16        MR. ROCCO:  Well, your Honor, I do think that this

17   indictment is significantly different than the original

18   indictment.  It raises the question of whether --

19        THE COURT:  You mean the original indictment.

20        MR. ROCCO:  The original indictment and the preceding

21   superseding indictment that were filed against Mr. Zarrab,

22   including the indictment that was filed against Mr. Atilla.

23   Virtually, the original indictment against Mr. Atilla that

24   named Mr. Atilla was bereft of any reference to -- I think

25   there were three references to him in the indictment.  There

1     were no factual, specific factual allegations.

2             The newer indictment added, I want to say, roughly 20

3     pages of factual allegations against Mr. Atilla and Halkbank,

4     and raises specifically what we describe as errors in the

5     government's indictment that talks about violations of

6     sanctions interchangeably with the idea of prohibitions.  And

7     our position in those papers is, quite frankly, a violation of

8     a sanction is not a violation of a prohibition.  And in order

9     for someone to be prosecuted for a violation of IEEPA, there

10    needs to be underlying prohibitions that have been violated,

11    and that requires a predicate finding by the Department of

12    Treasury that, in fact, there is conduct to be prohibited.  The

13    government uses the word sanctions.

14            THE COURT:  The government --

15            MR. ROCCO:  Uses -- I apologize -- the words sanction,

16    prohibition interchangeably.  That is not the way the Sanctions

17    Regime has been established.

18            There was interaction with OFAC and Halkbank that's

19    reflected in many of the government's exhibits that we have

20    seen and have been marked.  I think there is something like

21    6,000 exhibits marked for trial that we are still working our

22    way through, and in fact haven't gotten all of them.  Most

23    importantly, transcripts and translations of transcripts that

24    were originally in Turkish.

25            But going back to the indictment and the motion to

1    dismiss, Judge, this use of prohibition and sanction in an

2    interchangeable way is a fundamental misconstruction of the

3    Sanctions Regime, and, quite frankly, a violation -- a

4    sanctionable activity is not illegal activity, and, therefore,

5    cannot be criminal activity.  Prohibited activity can be

6    criminal activity and can be a predicate for prosecution.

7    That's not what's going on here.  And the further issue we make

8    given the way the government has pled these schemes in the

9    indictment, it's clear to us that --

10             THE COURT:  This is in the so-called (S4)?

11             MR. ROCCO:  The indictment -- if I may, your Honor,

12   the indictment that I'm referencing is the indictment that we

13   address the motion to and that is (S4).  The briefing on (S4)

14   on our motion is substantially different than our briefing on

15   the earlier indictment (S3).

16             But as we say in our motion to dismiss, the

17   government, in effect, pleads two separate schemes:  A scheme

18   that is located entirely outside of the United States and a

19   scheme that's located -- apparently touches American banks.

20   And there is no specific factual allegation connecting

21   Mr. Atilla to the activity in the United States.

22             The government has its typical bromide, well, the

23   activity is -- there are allegations in the indictment --

24   general allegations in the indictment that would cover that and

25   make the connection alleging that this is in fact one

1   conspiracy that started outside the United States and then came

2   back on American banks.

3       We say and ask the Court to use its discretion and

4   take a peek behind those allegations, those general allegations

5   and require the government to plead a specific fact in support

6   of that allegation because it is a predicate essentially for a

7   violation of IEEPA and a violation of mail fraud statute, and a

8   violation of the Klein conspiracy.

9       So, in a very brief nutshell, Judge, that's what's

10  different about this briefing regarding this indictment.  And

11  as Mr. Zarrab has not participated in any of these briefings,

12  obviously, the only word, the only arguments have been advanced

13  by Mr. Atilla.  And I just note for the record that apparently

14  Mr. Zarrab is not here again today, and we haven't seen him, as

15  I think I indicated last time.

16      THE COURT:  The record can reflect that he is not here

17  nor is his counsel, Mr. Brafman.

18      MR. ROCCO:  Nor have they been here on the last two or

19  three occasions.  But, Judge, if you have questions, I'm happy

20  to answer them as best I can.  That's basically the thrust of

21  the arguments we made in connection with the latest motion to

22  dismiss indictment (S4).

23      THE COURT:  Mr. Lockard, did you want to respond.

24      Just so I'm clear, you were saying your first point

25  was that there has to have been some administrative agency

1    ruling or determination before there could be this indictment?

2              MR. ROCCO:  Sanctionable activity, your Honor, is not

3    criminal activity, and the way the statute regs, the Sanctions

4    Regime is set up is that there is a requirement that there be a

5    finding by the Secretary of Treasury or the President, your

6    Honor.  We briefed it, I just don't recall, an executive or

7    someone associated with the Executive Department.  But

8    essentially there has been sanctionable activity.  If there is

9    sanctionable activity determinations, that person can be

10   prohibited from dealing with U.S. financial institutions, and

11   it becomes the attempt to deal with U.S. financial institutions

12   that is -- that may be a predicate for an IEEPA violation.

13             This is clear in the law.  It's clear in the

14   regulations and statute.  In fact, it's clear in many of the

15   OFAC communications that the government has produced in

16   discovery here between OFAC, The Department of Treasury and

17   Halkbank.

18             The government tries to argue -- and this is clear

19   only in the most recent indictment -- that Mr. Atilla engaged

20   in activities that were designed to conceal sanctionable

21   activity that was allegedly engaged in by Halkbank from U.S.

22   authorities, and that in itself, the government argues, is an

23   effort to evade sanctions.

24             But that again raises the issue of prohibited

25   activity, and that is not a prohibited activity.  So the U.S.

1    may not like what's being done abroad, but the way the

2    Sanctions Regime has been established is it looks inward.  It

3    is nuanced.  It's not blunderbuss.  It is aimed principally at

4    American financial institutions, and it is designed to block

5    access by foreign banks to American financial institutions when

6    and if foreign banks engaged in sanctionable activity, but that

7    requires a preliminary determination by the Department of

8    Treasury that that institution -- here, it would be Halkbank --

9    was barred from dealing with U.S. financial institutions.  That

10   never happened.

11            THE COURT:  So there was this -- well, let me hear

12   from the government.  He was about to get up, I think, to

13   respond to your point.

14            MR. ROCCO:  Thank you, your Honor.

15            MR. LOCKARD:  Your Honor, I hear Mr. Rocco raising

16   basically two arguments in support of the motion to dismiss:

17   One about the legal distinctions between secondary sanctions

18   which authorize the imposition of sanctions versus primary

19   sanctions under the Iranian Transactions and Sanctions

20   Regulations; and, secondly, some formulation of the charged

21   conspiracy as encompassing two schemes, one of which is

22   entirely abroad.  I'll address each of those two arguments.

23            And I think the response to the first argument is the

24   charge that Mr. Rocco is arguing against is a strawman charge.

25   That's not the charge that is brought in the indictment.  The

1    indictment does not charge criminal violations of the secondary

2    sanctions.

3         What the indictment charges is that under Section 1705

4    of the IEEPA, there was a criminal violation of what is

5    prohibited under the statute which is to violate, attempt to

6    violate, conspire to violate or cause a violation of any

7    license, order, regulation or prohibition.

8         So, the secondary sanctions include prohibitions.  One

9    of those prohibitions is transactions designed to avoid other

10   prohibitions, and so very clearly under the sanctions it is

11   itself a prohibition to engage in conduct intended to avoid the

12   Treasury Department from imposing restrictions and prohibitions

13   on the bank.

14        THE COURT:  Mr. Lockard, it would be better if you

15   used the podium, I'm told, or spoke into the microphone so

16   everybody could hear.

17        MR. LOCKARD:  I think the mike at the podium might be

18   slightly taller.

19        THE COURT:  I think you should start again.  People

20   may not have been able to through the interpreters hear

21   everything.  So it would be worth you starting over.

22        MR. LOCKARD:  Sure, your Honor.  I can't promise I'll

23   use the exact words, but hopefully I'll use some of them.

24        THE COURT:  Well, I hope you say the same thing.

25        MR. LOCKARD:  So, as I was saying, the argument that

1    Mr. Rocco advanced, I heard two basic arguments.  One is about

2    the nature of the sanctions and specifically the operation of

3    the secondary sanctions.  And the second argument being about

4    the nature of the charged conspiracy, which Mr. Rocco described

5    as encompassing two schemes, one of which occurred entirely

6    abroad.  So I will address each of those two arguments in turn.

7        As I was saying, the charge that Mr. Rocco is arguing

8    against is not the charge that's actually contained in the

9    indictment.  The indictment does not allege that it is a

10   criminal violation to engage in conduct that could expose

11   somebody to secondary sanctions.

12       What the indictment charges is it is a criminal

13   offense to engage in a prohibited transaction, which is what

14   the terms of the relevant orders and regulations say:

15   Transactions intended to avoid the imposition of prohibitions

16   under those sanctions.  And so the indictment in great factual

17   richness, much more than is required for purposes of a motion

18   to dismiss an indictment, describes conduct undertaken by

19   Mr. Atilla and co-conspirators to engage in conduct that would

20   trigger the imposition of sanctions and those associated

21   prohibitions and to do so through transactions designed to

22   avoid the imposition of those sanctions.

23       And so in every way and under the letter of the

24   regulations and the IEEPA as they're written, that is a

25   violation of a prohibition that triggers the application of

1705.  There's more that could be said on that topic, but I
think that is enough to be said on that topic.

          With respect to the second argument about the nature
of the alleged conspiracy, the charged conspiracy is one
conspiracy.  It is a conspiracy whose ultimate goal is to allow
Iran, a nation under heavy economic sanctions, especially at
the time of the charged offense, to allow Iran to have
virtually unfettered access to funds that otherwise would be
highly restricted.  And the indictment, again, in much more
factual richness than is required for motion to dismiss
purposes, describes various ways in which Mr. Atilla and his
co-conspirators attempted to give Iran that access, one of
which took place entirely abroad and all of which involved both
deceptive conduct and misrepresentations directed to U.S.
Government officials, all of which involved Mr. Atilla's
employer, its attempts to maintain its access to property and
bank accounts in the United States despite the co-conspirators'
conduct, and it involved the purpose of allowing funds to be
freed up to be used in international financial transactions
anywhere in the world, including through U.S. banks, and in
fact resulted in the movement of substantial funds through U.S.
banks.

          So no aspect of the scheme occurred entirely abroad,
and all of it was focused on and directed at attempts to
violate and avoid U.S. sanctions, to deceive U.S. banks and

1    U.S. regulators and to allow funds to be moved through U.S.

2    banks.

3                THE COURT:  That otherwise would have been blocked.

4                MR. LOCKARD:  That's exactly right.

5                THE COURT:  So I am going to refer to some arguments

6    that are -- specifically, they are arguments that are presented

7    or have been presented by counsel.  I may not specifically

8    refer to in this ruling.  I'm aware of them and incorporated

9    them into my analysis, and it does not change the outcome that

10   I am about to describe.

11               By way of very brief background, on September 6, 2017,

12   Mr. Atilla was charged, along with eight other

13   co-defendants/co-conspirators including Reza Zarrab, Mehmet

14   Zafer Caglayan, Suleyman Aslan, Levent Balklan, Abdullah

15   Happani, Mohammad Zarrab, Camelia Jamshidy and Hossein

16   Najafzadeh.  So they had been charged together in all counts of

17   a six count superseding indictment, we're referring to it as

18   (S4).  It's a 52-page document, and they are charged with the

19   following crimes:

20               One is a conspiracy to defraud the United States in

21   violation of 18 United States Code, Section 371.  That is Count

22   One, also referred to at times as the Klein conspiracy.

23               They are also charged in Count Two with conspiracy to

24   violate the International Emergency Economic Powers Act, herein

25   referred to and has been referred to this morning as IEEPA.

1    That's 50 United States Code, Sections 1701 through 1707, and

2    the Iranian Transactions and Sanctions Regulations, sometimes

3    referred to as ITSR, 31 C.F.R. Parts 560 and 561.

4           And, third, they are charged with bank fraud in

5    violation of 18 United States Code, Sections 1344 and 2.  That

6    is Count Three.

7           Fourth, in Count Four they are charged with conspiracy

8    to commit bank fraud in violation of 18 United States Code,

9    Sections 1344 and 1349.

10          And fifth, they are charged with money laundering in

11   violation of 18 United States Code, Sections 1956(a)(2)(A) and

12   2.  That's Count Five.

13          And finally in Count Six, they are charged with

14   conspiracy to commit money laundering in violation of 18 United

15   States Code, Sections 1956(a)(2)(A) and 1956(h).

16          Those are the six charges which are lodged against all

17   of defendants, including Mr. Atilla.

18          So when I summarize, again, the motion to dismiss, it

19   may not include all of counsel's arguments specifically, but

20   they are all embraced in the ruling.

21          In summary, defense counsel argues, among other

22   things, that the charges against Mr. Atilla are based on

23   conduct entirely outside of the United States which had no

24   impact in the United States and cannot support a criminal

25   charge against him, and that the charges based on the use of

1    the United States financial institutions lack any factual

2    connection to Mr. Atilla; and even if there were such a factual

3    connection to him, he could not be prosecuted as a foreigner

4    for his foreign activity.

5        Another of defense counsel's arguments is that without

6    a basis for prosecuting Mr. Atilla under what is described in

7    the motion papers as the Sanctions Regime, the entire

8    indictment falls with the exception of the Klein conspiracy

9    charged in Count One.  Absent a violation of the Sanctions

10   Regime the IEEPA counts, the bank fraud counts and the money

11   laundering counts, according to the defense, have no legal

12   basis and must be dismissed.

13       And with regard to the Klein conspiracy charged in

14   Count One, the defense argues that Mr. Atilla cannot be charged

15   with attempting to impair or impede a U.S. government function

16   if he did not know of, or had reason to foresee, such a

17   connection.

18       Additionally, defense notes that: "We are not saying

19   that the government cannot seek to prosecute under two

20   different statutes that both proscribe the same conduct.

21   Instead, we submit that where a more recent statute or

22   regulation specifically addresses but does not proscribe the

23   activity in question, the government cannot end run that

24   statute by resorting to a broader, older law."

25       Defense counsel states too that this "Court appears to

have concluded that IEEPA and ITSR can be applied to a foreign

national involved in conduct emanating from the United States

or property within the United States" but defense counsel

"respectfully suggests that the Court reached the wrong

conclusion."

The government responds -- this is a summary, but it

includes some quotes from the government's brief just as I have

quoted from the defense brief.  The government counters that:

"The indictment clearly describes how the alleged conduct fits

together as one coherent conspiracy to remove Iranian oil

proceeds held at Halkbank, and to launder them so that the

connection between the funds and Iran was obscured, which

allowed the money to be used for, among other things,

transactions passing through U.S. banks that would otherwise

have been blocked."

According to the government, the whole point of these

transactions was to create a pool of laundered funds for Iran's

use; that is, "the conspiracy that Mr. Atilla is alleged to

have willfully joined, helped design and lied to U.S.

regulators about," these are all allegations, allegations that

must be presumed as true on a motion to dismiss.

And according to the government, as a member of the

conspiracy, Mr. Atilla is responsible for all of the acts

encompassed by the conspiracy, including the transactions

executed through U.S. banks even if he did not personally

1     participate in them.

2          So, as you are aware, in reviewing a motion to dismiss

3     an indictment, the Court must take the allegations of the

4     indictment as true.  A cite for that is *United States v.*

5     *Hashmi*, 2009 WL 4042841, Southern District case from 2009.  And

6     the decision as to whether to prosecute generally rests within

7     the broad discretion of the prosecutor.  A prosecutor's

8     pretrial charging decision is presumed to be legitimate.  This

9     cite is *United States v. Sanders*, 2011 F. 3d 711, a Second

10    Circuit decision of 2000.  "A defendant who is charged with

11    being a participant in a conspiracy, even if he committed no

12    act within the United States, is subject to prosecution in this

13    country so long as one of the conspirators commits an overt act

14    in furtherance of that conspiracy within the territory of the

15    United States."  This quote comes from a relatively recent case

16    called *United States v. Akova*, 2016 WL 7116127 (N.D Georgia

17    2016).

18         An indictment is said to be sufficient if it contains

19    the elements of the offenses charged and fairly informs a

20    defendant of the charges against which he must defend.  This

21    cite is *United States v. Chalmers*, 474 F. Supp. 2d 555, a

22    Southern District case from 2007.  It is also said that "an

23    indictment need do little more than to track the language of

24    the statute charged and state the time and place (in

25    approximate terms) of the alleged crime or crimes."That also is

1    from the *Chalmers* case 474 F. Supp. 2d 559.

2        The Court finds that the indictment here (S4) should

3    not be dismissed.  Among other reasons, it contains all of the

4    elements of the offenses charged and fairly informs Mr. Atilla

5    of the charges against which he must defend.  The indictment

6    tracks the statutory language of all of the offenses charged.

7    It describes in detail a "multi-year scheme to violate and

8    evade U.S. are national security controls against the

9    government of Iran."

10       The indictment also explains, among other things, that

11   "the leaders of a Turkish bank majority owned by the Government

12   of Turkey," which is a reference to Halkbank, "knowingly

13   facilitated the scheme, participated in the design of

14   fraudulent transactions intended to deceive U.S. regulators and

15   foreign banks, and lied to U.S. regulators about HalkBank's

16   involvement."  That's a quote from (S4) at paragraph three.

17       The Court further finds that the defendant has had

18   more than adequate notice of the nature of the charges pending

19   against him, including, among other things, from the

20   indictment, the earlier complaint and from discovery.  The cite

21   is *United States v. Wolf*, 2003 WL 2359107.  In that case, the

22   Court denied a motion to dismiss to dismiss the indictment and

23   a motion for a bill of particulars where the indictment "mostly

24   tracked the language of the relevant statutes" and the "alleged

25   fraud" -- this is a different case -- "the alleged fraud in

1    that case is spelled out in far greater detail in the criminal

2    complaint to which the defense has access."

3          The Court also notes that in Mr. Atilla's motion for

4    bail dated July 28, 2017, the defense argued, among other

5    things, that the criminal charges against Mr. Atilla, which at

6    that time were two counts, a conspiracy to violate IEEPA and

7    ITSR and a conspiracy to commit bank fraud, are eminently

8    defensible.  This is what was stated by defense counsel in the

9    bail application.  This is defense counsel's point of view.

10   Indeed, the information which has been provided in discovery

11   suggests that the case against him, Mr. Atilla, is tenuous at

12   best.  The charges apparently are predicated on a series of

13   transactions involving a number of Reza Zarrab's companies and

14   Halkbank in 2013, which are described in the complaint leading

15   to Mr. Atilla's arrest.  The transactions took place between

16   Dubai, Iran and Turkey, and involved sales of gold and food

17   between Turkish and Iranian entities for which Halkbank served

18   as the settling bank.  This is all from the submission from the

19   defense with respect to bail.

20         Mr. Atilla, a senior manager at the bank, is allegedly

21   connected to these transactions through a small number of brief

22   recorded Turkish telephone conversations in which various

23   transaction documents relating to the sale of food are

24   discussed by people identified on transcripts as Mr. Atilla and

25   Mr. Zarrab, among others.  It seems to be the government's

1  theory that those transactions involve forged or somehow

2  falsified documents and the sales of foodstuff were bogus.

3          Defense counsel further argues that the notion that

4  Mr. Atilla was linked to the U.S. transactions is against the

5  overwhelming evidence and allegations in this case, for none of

6  the Halkbank food or gold transactions were dollar-based.

7          This is now me speaking, not the defense.  The Court's

8  prior jurisdictional analysis regarding defendant Zarrab and

9  other alleged co-conspirators and prior indictments applies to

10  Mr. Atilla.  The indictment alleges that Mr. Atilla, Mr. Zarrab

11  and others were co-conspirators.  The indictment is -- well, I

12  will refer you to my earlier decision and order dated

13  October 17, 2016 in which the motion there, Mr. Zarrab's

14  motion, was denied.

15          The indictment here alleges a domestic nexus between

16  the defendant and his co-conspirators' conduct and the United

17  States, i.e., the exportation of services from the United

18  States.  These also are set forth in the decision and order

19  dated October 17, 2016.  And it is of no legal moment that

20  defendant Atilla is not named in an overt act in paragraphs 56

21  through 84.

22          The Second Circuit Court of Appeals has made it

23  abundantly clear that the execution of money transfers from the

24  United States to Iran on behalf of another, whether or not

25  performed for a fee, constitutes the exportation of a service

HBGQATIc

 1    and may be in violation of IEEPA and ITSR.  The cite is *United*

 2    *States v. Banki*, 685 F. 3d 99 a Second Circuit decision from

 3    2012.

 4            Similarly, in *United States v. Homa International*

 5    *Trading Corp.* where defendant was convicted of violating the

 6    IEEPA and the ITSR by "planning and implementing the transfer

 7    of funds from the United States to bank accounts in Iran via

 8    Dubai and the UAE," in that case, the Second Circuit rejected

 9    defendant's argument on appeal following conviction that there

10    was insufficient evidence to demonstrate that his money

11    transfer services were services prohibited by embargo

12    regulations.  This is a quote from the Second Circuit decision:

13    "In our view, the execution on behalf of others of money

14    transfers from the United States to Iran is a 'service' under

15    the terms of the Embargo."  The Second Circuit also held that

16    "the Embargo's prohibition on the exportation of services

17    applies where the benefit of such services is received in Iran,

18    if such services were performed in the United States."  I refer

19    you also to *United States v. Saboonchi*, 214 WL 1831149 case

20    from Maryland in 2014 where the Court stated that the "embargo

21    to include all exportation and re-exportation, direct and

22    indirect, with the specific destination of Iran...is a simple,

23    unambiguous bar...of all exportation to Iran."

24            The Court finds that the indictment here, the (S4),

25    reflects the elements of each count in the indictment and

HBGQATIc

1    establishes a sufficient nexus between Mr. Atilla and his

2    co-conspirators' conduct and the United States.  And,

3    therefore, the question of whether the IEEPA and the ITSR,

4    whether they apply extraterritorially, need not be reached.  In

5    *United States v. Mostafa*, the district court here -- not me,

6    but another judge here -- held "There is a sufficient domestic

7    nexus between the allegations...to avoid the question of

8    extraterritorial application altogether.  Overt acts occurred

9    in the United States."

10         More recently -- I referred to this case earlier from

11   *United States v. Akova*, that court in Georgia observed the

12   following:  The judge says, "I readily conclude that Congress

13   intended for the IEEPA to apply extraterritorially...

14   Likewise, the ITR [Iranian Transactions Regulations] broadly

15   prohibits anyone, directly or indirectly, from engaging in or

16   facilitating trade between the United States and Iran,

17   including through third countries."

18         The Court goes on to say that:  "It would be illogical

19   to conclude that Congress intended only to prohibit individuals

20   on U.S. soil or U.S. citizens abroad from trading with Iran,

21   but allow foreign persons to export goods from the U.S. to

22   trade with Iran and harm the national security interests of the

23   United States."  Again, the cite is *United States v. Akova*,

24   2016 WL 7118273 (N.D Georgia).

25         In conclusion, the dismissal of an indictment is an

extraordinary remedy reserved only for extremely limited

circumstances implicating fundamental rights, and it is my

judgment that such circumstances are not present here.  The

cite is *United States v. De La Pava*, 268 F. 3d 157 (2d Cir.

2001).

Consequently, the motion to dismiss is respectfully

denied.

The motion to dismiss, as you all are probably aware,

also had an alternative branch to it relating to severance, and

that alternative branch is similarly denied.

Mr. Atilla is charged with participating in the same

conspiracies as eight other defendants, i.e., at its core,

circumventing U.S. sanctions against Iran via Halkbank.  A

non-frivolous conspiracy charge is sufficient to support

joinder of defendants under F.R.Cr.P. 8(b), and the fact that

evidence may be admissible against one defendant but not

against others does not require separate trials, nor in my

judgment is there any basis to strike portions of the

indictment.  The cite is *United States v. Tomero*, 496 F. Supp.

2d 253.  Counsel for Mr. Atilla may renew its applications

before such time as the indictment is submitted to the jury

should Mr. Atilla ultimately be found guilty.

So that is the ruling.  We will take a short break if

you'd like -- I would, in any event, like a minute or two --

and then turn our attention to the motions in limine

1          Is that all right with you?

2          MR. LOCKARD:  Yes, your Honor.

3          MR. ROCCO:  Thank you, Judge.

4          (Recess)

5          THE COURT:  So I am not going to be able in ultimate

6     detail to resolve all the motions in limine at this time.  I

7     think I will give you a fair heads up of where I'm heading with

8     respect to each of them.

9          But what I do plan to do is have a further conference

10    on Tuesday at 2:00.  So for that conference, I'm going to need

11    some more detail.  Also, it's my experience that as we get

12    closer to trial, people sometimes slim down their cases, so

13    there may not be as many experts as names are currently

14    floating around and, indeed, there may not be as many fact

15    witnesses as names are floating around.  I don't need to go

16    into all these names, I don't think, at this time and I hope

17    actually that there is some slimming down that occurs before

18    Tuesday.

19         In that connection, we are still looking today for a

20    list of names and places.  We need that for the voir dire.

21         Let me first give you some general outline rulings.

22         First, there is a motion in limine by the defense to

23    preclude recordings from Turkey, I think this is for the 2013

24    period proceedings.

25         Before I get to that, is it the government's intention

HBGQATIc

1   to play the recordings?  I think the answer is yes, but also to

2   have transcripts.  Are there any situations where there are

3   just transcripts and no recordings, for example?

4               MR. LOCKARD:  So I think the actual playing of

5   recordings is likely to be limited since they are in Turkish,

6   but we will have transcripts and translations prepared of any

7   recording that we would offer.

8               I think the answer is with respect to calls for which

9   there is no audio to produce, we will not be offering

10  transcripts or translations, although those documents may exist

11  as a tool to refresh recollection or as a past recollection

12  recorded but not be offered.

13              THE COURT:  All right.  So the fundamental issue here

14  is -- and the transcripts and also, for that matter, recordings

15  would certainly be admissible if the government were able to

16  authenticate the recordings and/or the transcripts and if they

17  are relevant.  They would be admissible, so the motion to

18  preclude them is denied, assuming the authentication, etc. is

19  demonstrated.  I think that's one of the things we can talk

20  about on Tuesday or at least preview on Tuesday afternoon.

21              As to co-conspirator statements, the rules are pretty

22  clear about what needs to be demonstrated beforehand; that

23  there is a conspiracy, for example, that the members included

24  the declarant and the party against whom the statement is

25  offered, and that the statement was made during the course and

1    in furtherance of the conspiracy.  That is from the *Bourjaily*

2    *v. United States*, 483 U.S. 171 (1987).

3           Experts:  So experts, generally speaking, are welcome.

4    Too many are not as welcome as fewer.  I am hoping that there

5    is a slimming down in the expert pool between now and Tuesday

6    so that we can move things along and avoid overlap.

7           I didn't see anything in the submissions of either

8    party that would require a particular hearing with respect to

9    the experts.  So the experts, you have to show that they are

10   expert and what their expertise is and how that will help the

11   jury understand and decide the case.

12          So each side go through the list.  I think the defense

13   has two experts.  I don't know if there are more.  The

14   government had more than two.  Let's figure out on Tuesday how

15   many are left, and we will see where that gets us.

16          There is a motion to preclude -- this relates to

17   Mr. Zarrab -- the letter using the phrase "economic jihad" and

18   maybe other letters as well.  And the government in response to

19   the defense motion to preclude points out that these letters,

20   one is signed by Mr. Zarrab apparently and to Amadinejad, and

21   the other is a draft to the general manager of the Central Bank

22   of Iran.  They are not directly connected to Mr. Atilla, but

23   the government argues that they should be admissible as

24   statements made by Mr. Zarrab in furtherance of the conspiracy

25   and his background.  These letters are referenced in the

1   indictment at paragraphs 24(A) and (B).

2           Where are they in the exhibit binders?  What would be

3   a handy way to find them in the exhibit binders as opposed to

4   going through all of the binders?

5           MR. LOCKARD:  I don't have that proposed exhibit

6   number handy, but we will --

7           THE COURT:  Could you get that and tell us about that.

8           MR. LOCKARD:  We will.

9           THE COURT:  Earlier in my career on the bench I had a

10  trial, an economic trial, in which the government in its

11  diligence I think produced 14 binders for each juror, those

12  black thick binders.  So as things eventuated, there was a

13  stack next to each juror of those 14 binders making it almost

14  impossible on a regular basis to see the juror.  But more than

15  that, the nature of the examination was -- and this is

16  serious -- the nature of the examination was if the jurors

17  would open their binder one to Exhibit 17, for example, and

18  open binder seven to Exhibit 14 and compare them.  That was the

19  testimony.  It was a sight to behold.  I would argue or

20  caution -- I won't argue, but I would caution against similar

21  practice here.  So the binders should be helpful, not,

22  obviously, impediment.

23          So those letters, I agree that from what I know about

24  them, and I will take a look at them again when you let me know

25  where they are in the exhibits, but I think that the motion to

 1   preclude is denied and counsel should discuss, both defense and

 2   the government, whether some instruction is appropriate that

 3   reflects that Mr. Atilla is certainly not charged with a

 4   terrorism offense or participating in that in any way so you

 5   can work out, I think, an appropriate stipulation relating to

 6   those letters.

 7           So the government has a motion in limine to admit

 8   co-conspirator statements, and the rules, as I said before, are

 9   pretty clear when a co-conspirator statement can come in and

10   whether those criteria are met.  I think that's all I need to

11   say about that now.  If you have any disputes or specifics, we

12   will discuss them Tuesday afternoon.  The idea for me is to

13   clear away these discussions on Tuesday so that we don't slow

14   down the trial with sidebars or hearings within a hearing, as

15   it were.

16           So what I said before about experts also applies to

17   the defense experts.  It is a little unclear to me how one of

18   the defense experts; that is to say, who is an expert in

19   linguistics and the Turkish culture, how that person would have

20   expertise to cover all the topics that defense counsel is

21   suggesting.  I could see, for example, how it would be helpful

22   if that person knows that there's a discussion here, that that

23   person might talk about the conflict between the Erdogan and

24   the Gülen-ist movement in Turkey as it might impact the case.

25   If someone were expert on that, that probably would be all

1  right.

2         If the person could say whether the recordings, if

3  they are admitted, or the transcripts, the meaning of certain

4  words and phrases, how that might differ if that person knew

5  from American use of similar terms, that would probably be OK.

6         Also, as to the meaning of certain words and phrases,

7  they would be admissible it seems to me if they illuminate

8  helpful context or Turkish intonation, for example.

9         A little less easy for me to see how a person could

10  talk about the relationship between parties participating in

11  the phone calls as to whether it were very close, friendly or

12  etc.  That would be a bit of a stretch for a person who is not

13  one of the people in that phone call to be able to be helpful

14  about it.  Similarly, although there may be something to be

15  said by such an expert if the person really were expert in this

16  matter generally of the relationship between individuals at

17  work.

18         So I'm not ruling on all the categories, but you

19  really do have to stick to the person's expertise and be able

20  to demonstrate in advance how that expertise applies to a

21  particular -- otherwise, there are likely to be objections

22  during the course of the testimony which happens.  It would be

23  better for it not to happen, so maybe counsel could meet and

24  confer in advance about who is going to testify to what and see

25  if you can't have agreement.

1          You were also, I think, talking, somebody was, in the

2     motions back and forth about the possibility of stipulations is

3     always a helpful technique if the parties can agree.  Sometimes

4     you can't, you are unable to avoid calling that person, and it

5     may be preferable to have the person than to have a stipulation

6     of testimony, but I think both sides here need to have, if you

7     haven't already, a good meet and confer about all of these

8     issues and see how you can come to agreement if you can, so we

9     only need to discuss the issues as to which there's

10    disagreement.

11         So there's this issue, the government talked about

12    precluding evidence that defendants were acting under the

13    public authority of a foreign government.  I'm not sure exactly

14    whether there's going to be such testimony.  That's something

15    you should meet and confer about and see if that remains to be

16    an issue that we even need to discuss.

17         There's also a government motion to preclude evidence

18    with respect to bank fraud offenses on the basis of what is

19    referred to as purported victim fault.  I don't know if that is

20    something that is theoretical or not so you could talk about

21    that before Tuesday and let me know if there is still something

22    to discuss.

23         The government sought to preclude evidence that

24    Mr. Atilla was not arrested or charged in a corruption

25    investigation in Turkey.  I don't have any problem with that

1   being brought out.  It's true.  As far as I know, he was not

2   implicated in that so I think he should be able to say that.

3            There were other issues relating to something called a

4   Joint Comprehensive Plan of Action and also certain donors to

5   something called The Foundation For Defense Democracy.  I don't

6   know if these are really live issues or will be.  So if they

7   aren't, let me know on Tuesday; and if they are, tell me what

8   the remaining issues are.

9            I think those are the highlights of the motions in

10  limine.  I really would like to get it refined to serious

11  concrete debate or dispute, rather, if there is any, if it

12  isn't resolved before Tuesday.  Hopefully it will be.

13           That's really it for me.  Does anybody else want to

14  add anything?

15           MS. FLEMING:  Yes, your Honor, we do.

16           We've made some *Touhy* requests from the government.

17  We have not heard back from them.  We're getting awfully close

18  to trial.  We have trial subpoenas prepared, and we would like

19  to submit them to the Court.  We just have not heard back.

20  They went out -- the *Touhy* letters went out November 1.

21           THE COURT:  Well, maybe after -- well, now or after,

22  you know, we break up, you can work these things out.  You're

23  welcome to stay in the courtroom.

24           MS. FLEMING:  The problem is some of these people

25  don't work for the government any more, so we need to give them

1    heads up.  We tried to comply with the regulations, but we are

2    getting awfully close to the trial, and it's Thanksgiving, so

3    we really would like to get the subpoenas out.

4              THE COURT:  I agree with that.

5              MS. FLEMING:  By the way, we did preserve in our

6    letter the right to argue that the only circuit that has said

7    so far that the *Touhy* regulations are unconstitutional is the

8    Ninth Circuit, so we have preserved that issue in our letter,

9    and I would like to preserve that on the record.

10             THE COURT:  Yes, I think that's something you should

11   be able to work out.

12             Anything else?

13             MS. FLEMING:  Judge, we have a number of other issues.

14             The Court precluded us from giving any more

15   submissions and the government, I guess, asked permission --

16             THE COURT:  I was actually doing that as a favor to

17   all of you.  I thought you had enough with the submissions, so

18   I was trying to be helpful.

19             MS. FLEMING:  Unfortunately, things come up that we do

20   need to bother the Court with if we can't work them out with

21   the government.  They're lovely guys, but we have not been able

22   to work a lot out with the government.  We see things very

23   differently on lots of issues.

24             But one of the things is that your Honor entered a

25   protective order with regard to the Jencks Act materials.  We

1    still don't have them.  The government has tied it to they are

2    not going to give us Jencks Act material unless we stipulate

3    certain evidence coming into evidence, which putting aside how

4    incredibly offensive that is that they would try to extort

5    stipulations on evidence to get something that is Jencks Act.

6    And it is the practices of the Court in saving judicial economy

7    require early to help people prepare for trial so we're not

8    interrupting the trial after somebody has testified on direct

9    examination.

10          There are reasons we may not want to stipulate to all

11   of these records.  I think it is grossly unfair that it would

12   be tied to the two.  You've entered the protective order, and

13   we would ask that you require that the government produce the

14   Jencks materials.

15          That would include a witness list.  We have been

16   operating in a vacuum here.  As you can tell from our motions

17   in limine, we still don't know how they're going to

18   authenticate or attempt to authenticate these recordings.  I

19   won't go into a lot of it because some of it is covered under

20   the protective order, but we are really operating in a vacuum

21   less than a week before we are picking a jury in a trial.

22          THE COURT:  Do you want to do one by one and hear from

23   them as to each one?

24          MR. LOCKARD:  Thank you, your Honor.

25          Before that, I will quickly identify two proposed

1    exhibit numbers for the Court.  The first is Government Exhibit

2    901, and 901-T is the translation.

3            THE COURT:  Is this the letter?

4            MR. LOCKARD:  Yes, your Honor.

5            THE COURT:  The economic jihad letter?

6            MR. LOCKARD:  Yes, your Honor.  And also proposed

7    Government Exhibit 4539 and the corresponding dash T exhibit.

8            Very quickly with respect to the *Touhy* issue, defense

9    counsel did copy us on *Touhy* requests that they submitted to

10   Main Justice and to Treasury.  We noticed that they were not

11   directed to the correct component and directed them to the

12   correct people so that they could be considered and acted upon

13   and have been encouraging a prompt response, and we will

14   continue to do so.

15           With respect to the --

16           THE COURT:  You redirected them, as it were?

17           MR. LOCKARD:  Yes, your Honor, to make sure that they

18   got to the right desk as quickly as possible.

19           With respect to the production of 3500 material, I

20   think that that has been cast in an inaccurate light.

21           So we did say, as we said I think at the last

22   conference on the record, that we were prepared to produce 3500

23   material on Monday if we also got certain stipulations that

24   would facilitate that production and would allow us to devote

25   trial prep resources to preparing the material well in advance

1   of trial.

2            We got agreement on zero stipulations so far.  Applied

3   for a protective order on Tuesday.  It was entered yesterday,

4   and we expect to begin producing 3500 material today after the

5   conference, which I think addresses both that issue as well

6   as --

7            THE COURT:  Your point is now that I've signed a

8   protective order, that facilitates your dissemination of 3500

9   material.

10           MR. LOCKARD:  Exactly, your Honor.

11           And the reason why those two issues are tied is

12  because both the production of 3500 material and trial

13  preparation both require resources.  Stipulations help to

14  streamline both trial and trial prep and allows to devote

15  resources to early disclosure on other matters.  But

16  nonetheless, we are where we are and we are going to begin

17  producing it today.

18           That should also address, I think, the questions

19  concerning a witness list, although I will note that there has

20  been substantial notice about likely witnesses in this trial,

21  and that has been the subject of some of the motions in limine

22  so there is not a vacuum.  There's actually been a substantial

23  amount of identification of likely witnesses to date.

24           MS. FLEMING:  Judge, on the stipulations, they gave us

25  three.  One of them is for bank records.  I don't think we even

1    have the bank records yet, so it's hard to stipulate when we

2    haven't seen the exhibits yet to certain exhibits, and again,

3    we will deal with it.

4           On the protective order, we did not submit anything in

5    reply.  We were mindful of the Court's order not to submit

6    anything, and we have the same juggling act getting ready for

7    trial as the government does.  But in 3500 there is a mechanism

8    for dealing with sensitive material.  It is the Jencks Act, and

9    the government, I respectfully suggest, did not follow what the

10   proper way to do it is.  The 3500 in the statute gives away to

11   redact certain materials and provides how you do it and how you

12   preserve the materials in the event of an appeal down the road.

13   And we think that would have been the better road to go in

14   terms of this protective order.

15          The protective order -- we have a client that we need

16   to share materials with.  We're dealing with it under, as you

17   know, we complained about it probably ad nauseam to the Court

18   this May, but we're dealing with going to the MCC a lot and

19   trying to work with him there.  He does a lot of work on his

20   own at night to be prepared for us the next day.

21          And I know the government probably is not accepting

22   this but we are sensitive to the issues related to any kind of

23   witness issues.  We are sensitive to it on both sides, and I

24   think that we would probably be very willing to deal with any

25   of those issues, but to have a protective order that prohibits

1      and inhibits us to do things with our client I think is more

2      difficult.  So I think the proper method should have been to

3      follow what the 18 U.S.C. 3500 said should be done.

4              In terms of our Rule 15 depositions --

5              THE COURT:  Yes.  Where are we at?

6              MS. FLEMING:  -- we received the Court's order, and we

7      spoke with the government, and we started to put all the

8      logistics in place to get this all done, and the government

9      emailed to us that they are now talking to their folks at the

10     Office of International Affairs (OIA) and they need to get back

11     to us on whether in fact they can do the depositions or not.

12             They suggested November 20 and 21 because there are

13     multiple counsel.  We will try to work dates out with them.  I

14     don't think those are good dates.  Those are jury selection

15     dates, and the Court just set a conference those dates, and,

16     frankly, I think both counsel should be here for those

17     important things.  I think the defendant should be able to be

18     at both of them if he can be at both of those events.

19             But we are now in a little bit of a holding pattern,

20     and I'm not blaming the team from the United States Attorney's

21     Office, but it appears to us that because of whatever is going

22     on with the Office of International Affairs that we are simply

23     going to run out of time or are not going to be able to do

24     these depositions after we worked pretty hard to get an order.

25             And I don't know what the status of that is or they

1    know it.  We are trying to put plan B into effect, which is

2    basically begging and groveling these witnesses if they are

3    given safe passage to come to the United States.  As you could

4    see from our submission, we think they are pretty key witnesses

5    for our client's defense.

6           I am the one who spoke with them directly, among other

7    people.  They were really very, very reluctant and did not want

8    to come to the United States.  Happy to testify via live video

9    feed or in depositions.  If we have to go to plan B, we will do

10   whatever we can, but I am not in the least bit comfortable that

11   we are going to be able to convince anybody even with safe

12   passage.  I think we may need the Court's help in at least

13   getting OIA to give an answer to the U.S. Attorney"s Office.

14          And, secondly, when we asked for safe passage for the

15   four witnesses we've identified there, they told us we have to

16   know whether they are willing to come here.  It's sort of the

17   chicken and egg.  The answers we get back from people who are

18   in Turkey who are helping us with logistics ask, well, how do I

19   get people to go if I can't tell them they have safe passage.

20   So we're asking the Court's help on this dilemma.

21          THE COURT:  We're happy to help you in any way we can.

22   Frankly, I was assuming or thinking those Rule 15 depositions

23   were done by now.

24          MS. FLEMING:  They should have been.

25          THE COURT:  This was some time ago that I signed that

HBGQATIc

1    order, but --

2           MR. LOCKARD:  Your Honor, I can add a little bit to

3    the record.  Really, the issue with the Rule 15 depositions is

4    the fact that a motion was made on the eve of trial.  This is a

5    process that is not a fast one.  And even when there are

6    individuals who are willing to voluntarily testify, it still is

7    not a fast one.  I can provide a little bit of additional

8    information about that.

9           THE COURT:  No, I understand.  I understand.  And it

10   did come up somewhat late, but it's a condensed period of time

11   that we were dealing with.

12          MR. LOCKARD:  There's a significant issue that I think

13   we've referred it to, but I think it would be helpful to lay it

14   out a little more fully in this context, which is that -- so

15   there is a long history of experience with the Department of

16   Justice in conducting Rule 15 depositions in voluntary and in

17   voluntary situations by video conference and in person.

18          What we have been advised by the component of the

19   Department of Justice that coordinates these issues is that

20   typically even in video conference depositions, even in

21   voluntary depositions, host country authorization typically

22   still is required in the form of letters rogatory.  And in fact

23   some jurisdictions consider it a potential criminal offense for

24   foreign government officials to take sworn testimony of a

25   national in their country.  So it is a significant issue of

international relations and a significant issue for the people
who would potentially be participating in those depositions.

So it is our understanding that the Office of
International Affairs has contacted the Turkish Ministry of
Justice to advise them of the contours of the proposed
depositions and to seek a formal position, and we don't have it
yet.  Until we have it, we can't do it.

So that is the issue.  It's not an issue of government
slowness or recalcitrance.  It's an issue of the lateness of
the request and the types of things that have to be done to
make them happen.

In terms of the safe passage issue, it's a very
abstract issue.  No one actually has asked the government to
consider safe passage.  It's been asked hypothetically is this
something we would be prepared to grant, but no witness to our
knowledge has asked for it.  And if it is asked, then there's a
process for considering it, but it can't happen until it's
requested.

THE COURT:  When you say "asked," you mean some form
or some application or some affidavit or --

MR. LOCKARD:  Or just a request.

THE COURT:  Or a request by counsel?

MR. LOCKARD:  It's a hypothetical.

THE COURT:  By counsel?

MR. LOCKARD:  By counsel.

HBGQATIc

1          MR. ROCCO:  If I may address this, your Honor.  I'd

2   like to give this a little color.  I asked Mr. Lockard twice

3   for safe passage, and I was told once at least after the

4   witnesses were identified --

5          THE COURT:  Just so it's clear, it means that they can

6   come with assurance that they can leave after they testify.

7          MR. ROCCO:  And not be arrested.

8          THE COURT:  And not be arrested.

9          MR. ROCCO:  Yes, that they have safe passage in and

10  out of the country.

11         Ms. Fleming in her interviews in September, I believe,

12  raised that issue with four or five of the witnesses, and they

13  were adamant that they did not want to come to the United

14  States.

15         THE COURT:  That they would not come.

16         MR. ROCCO:  They would not come.

17         THE COURT:  That was my understanding when we talked

18  about the video depositions that this would be helpful to you

19  because they were not going to come.

20         MR. ROCCO:  They refused, your Honor.  Last week when

21  your Honor was reluctant to even take the Rule 15 motion --

22         THE COURT:  Well, I not only took it, but I granted

23  it.

24         MR. ROCCO:  You did and you gave us time to do the

25  depositions, but I asked Mr. Lockard as a fallback would the

1   government agree to give any of these people safe passage, and

2   at that point we had identified four of our witnesses, and we

3   were talking specifically about four of our witnesses.  And

4   when Ms. Fleming says it's a chicken-and-egg thing, it's a

5   little bit like the Paris peace negotiations during the Viet

6   Nam War -- if I may finish this thought, Judge.

7             THE COURT:  Yes.

8             MR. ROCCO:  We've identified the people.  It is

9   difficult for us to go back and say, "Well, if you say you're

10  coming to the United States, the government will then consider

11  offering you safe passage."  It is much more of an inducement

12  to a prospective witness who is traveling from abroad to the

13  United States to say "The government told us that you will have

14  safe passage and we are in the process of arranging that."

15            In terms of what happened with the foreign

16  depositions --

17            THE COURT:  Wait.  Wait.  Wait.  Before you get to

18  that, so my understanding at the time you submitted the

19  application to me was these were helpful to the defense, but

20  they were, as you said before today, adamantly refusing and

21  they would not come to the United States.  So I thought that

22  was the remaining option was to take their deposition by video,

23  etc.  So that can't happen or now are they willing to come?

24            MR. ROCCO:  Your Honor, I cannot tell you that they're

25  willing to come.  We have approached them.  We have approached

1  them again through an intermediary to see if they would

2  entertain coming if the government offered them safe passage.

3  What the government is saying, I understand Mr. Lockard's

4  comments last week when we spoke, this is on the 6th, is that

5  the government does not want to entertain these requests in a

6  vacuum.  So in other words, people are going to have to commit

7  to come to the United States before the government would

8  undertake a process, and only God knows how long that will

9  take, and only God knows whether the government will be

10  prepared to give any of these four witnesses safe passage.  So

11  in terms of --

12         THE COURT:  I have no experience in that field, but

13  this is an off-the-cuff, it sounds like.  You can't get a

14  decision like that this afternoon.

15         MR. ROCCO:  Well, I don't, quite frankly, think it

16  should take all that long, your Honor, but I think it would be

17  certainly well for us to know so we can go to our witnesses and

18  say "the government is prepared to give you safe passage" so

19  they can make arrangements to come to the United States.

20         THE COURT:  Why not just do those video depositions

21  and put them in the bank anyway.  I'm surprised to hear that

22  they are not done.

23         MR. ROCCO:  Your Honor, it's because the government --

24  and we are not questioning the government.  We are not

25  questioning the Office of International Affairs.  Essentially,

1    the Office of International Affairs is saying that personnel at

2    the Department of Justice cannot participate in foreign

3    depositions without permission of the foreign country, and that

4    makes sense to me and it's logical.

5        We had been advised, because we have liaison

6    correspondent counsel in Turkey, that the Turkish government

7    did not care; that we could go forward with these depositions

8    provided that we were not using compulsory process in Turkey.

9        So if depositions were conducted voluntarily -- this

10   is based on conversations that this lawyer had with people in

11   the Ministry of Justice, we were set to go.  I'm not faulting

12   the government for this at all.  Ms. Fleming was not faulting

13   the government for this at all.  We are where we are, and what

14   we are trying to do now is if we can do it before trial, get

15   these depositions done.  If we can't, then what we're trying to

16   do is get these witnesses here.  I think what Ms. Fleming was

17   asking, is there any way that the Court can help us get safe

18   passage.

19       THE COURT:  I don't know is the answer.  I've never

20   been in that -- I would be surprised if it was -- I shouldn't

21   say I would be surprised.  I just don't know what's entailed

22   and what the Court's role in that process could or should be.

23   I have no idea.

24       MR. ROCCO:  We can brief that, your Honor, if your

25   Honor would lift the moratorium on filings to allow us to do

1    it.

2         MR. LOCKARD:  I think the fundamental factual problem

3    is that what we have been told is that these witnesses have

4    advised defense counsel that even if they had it, they still

5    wouldn't come.

6         THE COURT:  That's what I understood.

7         MR. LOCKARD:  So the request is will you give it

8    anyway and see if that changes their mind?  And the answer is

9    Mr. Atilla's counsel does not represent these witnesses.  These

10   witnesses are their own people.  If they want to request safe

11   passage, we will consider it, but under the circumstances that

12   we have right now, nobody is asking for it.  In fact, they said

13   "even if you gave it, we wouldn't come."  Under those

14   circumstances this seems like a very moot conversation.

15        THE COURT:  How easy, Mr. Lockard, or soon do you

16   think this issue about the video depositions -- for example,

17   what Mr. Rocco just said, somebody said that as long as it's

18   not compulsory that the government of Turkey wouldn't care or,

19   you know, wouldn't -- I don't know what the word is.  I thought

20   that sounded like a fruitful avenue for them to present

21   testimony on behalf of Mr. Atilla, which they should be able to

22   do.

23        MR. LOCKARD:  As I said, the request has been passed

24   to the correct component of the foreign government that handles

25   issues and is authorized to make the representations on this

1    matter and we are awaiting to hear.

2           THE COURT:  Maybe you could speak with Mr. Rocco and

3    put U.S. officials in touch with whomever told him that the

4    government wouldn't care if they weren't compulsory and close

5    the loop or something like that.

6           MR. LOCKARD:  We haven't received that name.  If they

7    have that name, we're happy to pass it along.

8           THE COURT:  OK.

9           MR. ROCCO:  Thank you, your Honor.

10           THE COURT:  All right.  So I think are we done.

11           MS. FLEMING:  I'm just checking.  I thought

12   Mr. Lockard might have something.  I'm checking over the list.

13           MR. ROCCO:  Your Honor, this is --

14           THE COURT:  I'm really recommending that you all stay

15   after we adjourn and hash out as much as you can and also

16   winnow the issues down that would need to be discussed on

17   Tuesday at 2:00.

18           MR. ROCCO:  Judge, I hate to make this sound like a

19   shopping list, but there are filings under seal.  This is not

20   something we can deal with the government with.  We've raised

21   it, but we need the Court's help if anything is to be done

22   here.  There were legal filings roughly two weeks ago,

23   actually, I think today that essentially cut off or are tied to

24   our Rule 16 requests and also to the government's Brady

25   obligations.

1      Quite frankly, Judge, that puts us in a terrible

2  dilemma, in a terrible bind as far as Mr. Atilla is concerned

3  because we don't know what these materials are.  And by

4  definition, they are material to defense if they are covered by

5  Rule 16.  I don't know what was submitted --

6      THE COURT:  They may or may not be, it seems to me.

7      MR. ROCCO:  Well, I think the government made that

8  representation that they are not, but Ms. Fleming and I have

9  been doing this for a little while, and both of us have a very

10  hard time figuring out how that can be true.  It's an oxymoron.

11  If it's Rule 16 material, it's Rule 16 material, it's material

12  to the defense.  Obviously, if it's Brady material, it's

13  material to the defense.

14      I don't understand how the government and how any

15  statute essentially repeals or rolls back a client's right to a

16  fair trial, and, quite frankly, if this is material that bears

17  on our defense, we're entitled to it.

18      THE COURT:  You should talk further with them.

19      MR. ROCCO:  We will, and maybe they can educate us,

20  Judge.  Thank you.  But we really did want to put that on the

21  record.

22      MS. FLEMING:  One other thing, a heads up.  I'm sure

23  we can deal with it Tuesday, but I don't know if you would

24  allow us to submit it.  In light of the recent media coverage

25  that's been going on with recent attacks with revelations about

HBGQATIc

1  Michael Flynn and whatever role he has had with the Turkish

2  government, we may want to submit some additional questions for

3  voir dire.

4          THE COURT:  Oh.  Well, you should do that ASAP.

5          MS. FLEMING:  OK.

6          THE COURT:  You can do that.  Rest assured that my

7  effort here is certainly to provide Mr. Atilla with a fair

8  trial.  That's fundamental.

9          MS. FLEMING:  We are trying to live within your rules,

10  Judge, and I'm sorry we're doing a shopping list, but we wanted

11  to make sure we covered it.  Could we get you questions Monday?

12  Would that be adequate before we start picking a jury?

13          THE COURT:  We're doing that Monday.  It would have to

14  be today.

15          MR. ROCCO:  Your Honor, can we do it over the weekend?

16          MS. FLEMING:  It's not going to be a lot.

17          THE COURT:  It wouldn't be a lot.

18          MS. FLEMING:  It's going to be a couple questions.

19          MR. ROCCO:  It's going to be a handful, five or six

20  questions.

21          THE COURT:  Maybe you could email them to the chambers

22  email address.  If you don't have that, Ms. Murray will give it

23  to you.

24          MS. FLEMING:  We'll share them with the government,

25  obviously.

1          THE COURT:  OK.  I think that's it.

2          MS. FLEMING:  Just on the subpoenas, I just would ask

3    the Court allow us to serve them under *Touhy*, and we will make

4    sure a cover letter goes saying we're waiting to hear from the

5    government but we need to give you advance notice and serve the

6    subpoenas on people.  Could we do that, please?

7          THE COURT:  I don't have a problem.

8          MS. FLEMING:  Thank you.

9          THE COURT:  Thanks.  Nice to see you all.

10         MR. ROCCO:  Your Honor, one final question.  My client

11   has asked me repeatedly to ask the Court, and, quite frankly,

12   it does go a bit to trial planning.

13         Is Mr. Zarrab going to be on trial with Mr. Atilla or

14   not?

15         THE COURT:  So the one perk that comes with being a

16   judge is you don't have to answer questions, as witnesses do

17   and lawyers do.  I'd say just keep your eye on the docket and

18   the materials.

19         MR. ROCCO:  Thank you, your Honor.

20         MS. FLEMING:  Thank you, your Honor.

21         (Adjourned)

22

23

24

25