**The Law Firm**

**Fleming . Ruvoldt** PLLC

**Cathy Fleming**
**(201) 518-7907 (direct)**
**cfleming@flemingruvoldt.com**

250 Moonachie Road
Suite 501
Moonachie, NJ 07074
(201) 518-7878

1700 Broadway, 28th floor
New York, NY 10019
(212) 706-1850

December 14, 2017

Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Courtroom 17B
New York, NY 10007-1312

      Re:    <u>United States v. Mehmet Hakan Atilla, et al,</u> S4 15 Cr. 867 (RMB)

Dear Judge Berman:

      Defendant Mehmet Hakan Atilla moves for a mistrial based on the Government's continuous elicitation of inadmissible, confusing and overly prejudicial evidence, despite repeated objections by defense counsel, during the testimony of Huseyin Korkmaz on December 11, 2017 and December 12, 2017, and based as well upon the additional reasons set forth herein.

      The Korkmaz testimony related to a 2012-2013 law enforcement investigation in Turkey, in which he participated as a Turkish law-enforcement officer. The investigation initially involved allegations of gold smuggling, money laundering, and conducting of a criminal enterprise. It later included within its scope allegations of bribery. It culminated in December 2013 with multiple arrests and the contemporaneous issuance of a 500-page Turkish investigative report.

Defendant Atilla was not charged with any crime in Turkey. There was no evidence that he had either paid or received a bribe. He was not involved in any of the other activities investigated in Turkey. But for the better part of three days during the trial of defendant Atilla, Mr. Korkmaz provided testimonial opinions, conclusions, speculation and recitations derived solely and directly from the overwhelming number of hearsay statements and hearsay documents contained or referenced in the Turkish investigative report or otherwise based upon the underlying Turkish investigation.

As discussed below, admission of this testimony violates the Confrontation Clause of the United States and defies established evidence rules and case law interpreting these rules. The defendant has been prejudiced to such a degree that the fundamental fairness of the trial has been irreparably undermined. Mistrial is the only appropriate remedy.

A.   <u>Improper Korkmaz Testimony on the First Day</u>.

Mr. Korkmaz is a former Turkish police officer who was involved in an investigation of an organization led by Reza Zarrab. During the course of his December 11, 2017 appearance, the Government repeatedly elicited testimony of his "understanding" of what was about to happen, or what was happening, as well as his "understanding" of purposes of meetings or events. His "understandings" were often based on recorded phone conversations in which he did not participate but subsequently reviewed. (See, for example, Tr. at 1304, 1306-07). Other times, he explained his understanding of the significance of photographs taken by others during physical surveillances in which he was not a participant. (Tr. at 1296, 1300, 1301). He offered his understanding of documents seized during searches where he was not present. (Tr. at 1573, 1578, for example). He also improperly testified to his opinion – based on the entirety of the

investigation conducted in Turkey – of the respective roles of various members of the alleged criminal organization. (See, for example, Tr. at 1282).

Mr. Korkmaz's testimony was improper *ab initio*, when, over objection, he was asked whether he "became familiar with an investigation involving Reza Zarrab, Mehmet Hakan Atilla, and others." (Tr. at 1280). The investigation resulted in some 26 arrests, but <u>not</u> in Mehmet Hakan Atilla's arrest. It was an investigation of criminal activity in Turkey, for Turkish crimes under Turkish law. Its existence should have had no place in this American prosecution.

Mr. Korkmaz went on to testify as to the roles of various people. He testified about, for example, "the organization that was being led by Reza Zarrab," "Zafer Caglayan and Suleyman Aslan were acting as leaders." (Tr. at 1280). Further, he was asked, "Based on your investigation, did you have an understanding of who number one was" – and responded "Yes," and named the current President of Turkey (Tr. at 1282). The repeated testimony implicating high level officials in Turkey based on hearsay evidence is inappropriate on many levels. It is impermissible under Fed. R. Evid. 702; it is irrelevant under Fed. R. Evid. 401; and it is overly prejudicial to the defendant on trial under Fed. R. Evid. 403.

The prosecutor next, over objection, adduced testimony that Mr. Suleyman Aslan was the leader of an organization under investigation in Turkey, and that there were "others at Halkbank whose conduct was within the scope of the investigation," namely "Mr. Hakan Atilla, Levant Balkan, Hakan Aydogan" (none of whom were charged) (Tr. at 1290). The prosecution then elicited hearsay testimony concerning what the investigation showed about people receiving bribes -- three of whom were never even charged in Turkey. The charges against the fourth (Aslan) were thereafter dismissed. (Tr. at 1290-1292).

The prosecution then asked about the "principal investigative techniques" in the investigation. According to Mr. Korkmaz, they were:

> Identification of communications and interception of such communications, surveillance through technical tools, physical surveillance, security camera footage, analysis of emails, documents that were obtained through institutions, auditors and expert reports, pieces of evidence that were seized during the searches within the operation, and also the digital evidence that were seized during the operation.

(Tr. at 1293).

Thereafter, the prosecution had Mr. Korkmaz identify and testify about images obtained during the investigation, including at least one used in a "deposition" of Mr. Aslan's wife in Turkey. (Tr. at 1297).

The witness also testified about certain of his conclusions. For example, he said that some money involved in the investigation was to be given to Bilal Erdogan, the son of the then-Prime Minister. (Tr. at 1323). Korkmaz also opined that a resumption of the gold trade had occurred after July 2013, at a time when the United States sanctions on Iranian gold trading were in full effect. (Tr. at 1323).

At an ensuing break, the defense orally moved for a mistrial. The Court asked the Government to explain the relevance to Mr. Atilla of the testimony to that point. It is undisputed that Attila never solicited nor received any bribes, nor is there any evidence that he had any knowledge of bribes. AUSA Lockard said "I think he [*i.e.*, Korkmaz] sort of broadly described how these payments relate to the Iranian oil proceeds. And that's what we're going to focus in throughout the rest of the testimony." (Tr. at 1327). But that is not what happened.

Following the break, Mr. Korkmaz resumed his testimony about the law enforcement "operation" conducted in Turkey on December 17, 2013: "searches … conducted in homes or

business places of suspects … capture and detention of suspects," and "individuals who were questioned as part of the operation." (Tr. at 1373). Thereafter, again over objection, the prosecution elicited that Mr. Korkmaz had been jailed in Turkey, had obtained "some" parts of the investigative file from an unnamed Turkish prosecutor and others from a Turkish law enforcement digital lab technician (without explaining Turkish court orders deeming the prosecution improper and null) and – remarkably – eliciting his knowledge of perceived "risks" of his returning to Turkey:

> Q: How, if at all, did the risks that you perceived from returning to Turkey change as a result of the additional steps you took by leaving Turkey and bringing the evidence with you?
>
> A. During that time, in the public arena, in the press, there were news published about individuals in custody who were being tortured. I was aware of the bad treatments that I would be subject to, and I could call that torture, actually. The high risks that I would face if I were to be extradited, even through official channels, if I were to be extradited, I knew what I would face. But what made me really uneasy in these countries was anything that could be done against me through unofficial means, and for that reason, I was not going out of the house much in these countries.

(Tr. at 1391). Of course, none of the would-be perpetrators of this "torture," which Mr. Korkmaz learned of through the press, were identified. Nor were these "risks" in any way connected to Mr. Atilla.

B.     The Second Day of Testimony.

Mr. Korkmaz's direct examination continued on December 12, 2017. It was characterized once again by conclusory statements riddled with hearsay and opinion and absence of any personal knowledge.

Among other problems with the evidence:

(a)     Mr. Korkmaz did not even attempt to identify a chain of custody for any of the evidence he brought with him without authorization from Turkey;

5

(b) He offered opinion evidence on suspects' roles and on the significance of various locations (*e.g.*, "Orient Bazaar," tr. at 1569), impermissible under Fed. R. Evid. 702; *see United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005);

(c) He repeatedly testified to hearsay – what he was told by others, in essence -- thereby orally presenting the Turkish police report to the jury. For example, he testified about the fruits of searches at various locations (Tr. 1569, 1573-1575) without indicating any personal involvement in the searches or in the recovery of the materials introduced into evidence through his testimony;

(d) He repeatedly testified as to what he had learned from the investigation. (See, for example, tr. at 1576, 1592, 1593).

All of this testimony stemmed from the same Turkish investigation that was dismissed by a Turkish court -- an investigation as to which defendant Atilla was never charged, making the entire Turkish report and investigation irrelevant, but highly prejudicial, to him.

C. Testimony on the Third Day.

In one sense, testimony on the third day constituted much of the same as described above. Over and over, Mr. Korkmaz testified in response to questions about what he had learned or concluded "from your investigation" or "in your investigation." (See, for example, tr. at 1629, 1637, 1638, 1640 and 1641). Once again, he failed to establish any basis for personal knowledge regarding, for example, where a meeting involving Reza Zarrab had taken place (tr. at 1637) or which Iranians had attended meetings in Turkey (at 1538) or how he knew that Aslan had received a bribe on a particular day. (At 1657).

But he did add some new dimensions to the impropriety of his testimony. On several occasions, the prosecutors asked him about recorded telephone calls for which a transcript existed but as to which there was no actual recording. (See, for example, Tr.at 1631, 1647, 1654, 1662, and 1665). He said that he had listened to the calls at one time, but never said that he had a role in their recording. He said that he had reviewed the transcripts, but never said that he had participated in their preparation. Instead, he claimed that, by use of a transcript, he was able to refresh his recollection about the contents of a call.

Although he did provide some generalized information about the recording process on cross-examination (Tr. at 1748-1751), he did not specify who had actually recorded any such now-lost call. He did not testify about the type of equipment that was used, or what had been done to ensure its reliability. He did not say anything about how he recognized the voices on the calls. He did not testify about how the recordings were maintained once the investigation concluded and he was fired, or who maintained them thereafter, or what steps were taken to prevent alteration, either at the time of the alleged recording or later. He never said that he had compared the transcripts to the actual recordings at any time. In short, he provided absolutely no information that a court would normally look to in connection with the authentication process for this kind of evidence.

Additionally, he was permitted to testify over objection about a disk containing, he said, documents and other items seized during the search of the Aslan home, which were thereafter introduced into evidence based upon his testimony. (Tr. at 1673; GX 2006 through 2054). He did not say that he had participated in the search, and did not identify by name those who did (although he did note some investigators' initials on certain seized records). He did not testify

about how the documents were maintained after their seizure, or who maintained them, or what was done to prevent alteration or destruction of any of the materials so seized.

Furthermore, he testified over objection about an analysis he had performed on a large quantity of digital records, telephone intercepts, search evidence and expert reports seized or obtained, apparently by others, during the Turkish investigation. (Tr. at 1681-1685). He evinced no personal knowledge about how any of these items came to be in the Turkish file. He created two Excel spreadsheets from this analysis. He worked for about ten months on it and the underlying spreadsheets after coming to the United States, finishing in October 2017. (Tr. at 1682; GX 8051 and 8054).

D.  Police Reports Such as the Turkish Investigation Report Are Inadmissible Hearsay.

Rule 803(8) of the Federal Rules of Evidence provides that police reports, when offered by the Government in a criminal case, are inadmissible hearsay. As early as 1977, the Second Circuit found that Congress's purpose in enacting the exclusion in Rule 803(8) was to prevent the Government from proving its case against an accused through out-of-court reports and documents prepared by law enforcement personnel. *See United States v. Oates*, 560 F.2d 45, 72 (2d Cir. 1977) ("We thus think it manifest that it was the clear intention of Congress to make evaluative and law enforcement reports absolutely inadmissible against defendants in criminal cases."). Yet, Mr. Korkmaz repeatedly testified about events, theories, and conclusions evinced in and drawn from the Turkish investigative report.

There is more than a little irony in the fact that Mr. Korkmaz has testified so extensively about Turkish criminal procedures. His production of evidence in this courtroom was made possible by his own violation of Turkish criminal law. He simply stole the Turkish evidence. Without any authorization, he obtained some of the evidence from a Turkish prosecutor and

other items from a Turkish digital evidence lab technician. (Tr. 1385-86). Stolen evidence in hand, he fled from Turkey, made his way to the United States and delivered the purloined materials to the U.S. Attorney in the Southern District of New York. The latter office accepted them, apparently without reservation.

Fed. R. Evid. 602 permits the introduction of testimony only where the witness has personal knowledge of the matters underlying the testimony. Mr. Korkmaz had no (or little) personal knowledge of the events to which he was testifying. He was not present at the searches; he did not monitor the wiretaps; he did not take the photographs; he did not perform the surveillances. His testimony constituted an oral police report. It epitomized the reasons why the Federal Rules of Evidence prohibit the admission of such a document and such testimony.

If the Government were allowed to proceed in every case the way it has done here, a case agent could merely read the final investigation report, review the underlying documents and other items gathered during the investigation, and come into court with a summary of the "evidence" sufficient to convict the defendant. There would be no need for inconvenient items such as witnesses with firsthand knowledge or authentication of business records or identification of a chain of custody or any hearsay analysis at all. The conviction rate would go up. But such a procedure -- the one utilized by the Government here -- would, as explained herein, violate the Constitution's Confrontation Clause, federal evidentiary rules, and established case law.

In this case, furthermore, the Government's presentation of the Turkish investigation and the underlying report were designed to sensationalize the case. The report itself is inarguably barred from evidence. Yet, when the Government elicited testimony from that report, it paraded

the 500-page document itself in front of the jury, as if to demonstrate not only its heft but also its seriousness.

E.  The Testimony of Mr. Korkmaz Is Impermissible Lay Witness, and Law Enforcement Witness, Opinion.

In *Garcia*, 413 F.3d at 210-12 (2d Cir. 2005), the Court held that it is erroneous "to allow law enforcement witnesses to express opinions as to defendants' culpability based on the totality of information gathered in the course of their investigations." 413 F.3d at 211. That, however, is precisely what Mr. Korkmaz did in response to Government questioning. He continually relied upon the information contained in the Turkish investigative report to formulate his responses to that questioning. In so doing, he improperly invaded the province of the jury. *See also*, *United States v. Kaplan*, 490 F.3d 110, 118-119 (2d Cir. 2007); *United States v. Yakabov*, 712 F.2d 20, 26 (2d Cir. 1983).

In *United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004), the Court remarked upon the insidious result that would arise from permitting law enforcement agents to opine on issues properly within the province of the jury. Rejecting a Government argument that such testimony is permissible as opinion testimony under Fed. R. Evid. 701(b), the Court declared:

> The argument fundamentally misunderstands Rule 701(b). Were it to be accepted, there would be no need for the trial jury to review personally any evidence at all. The jurors could be "helped" by a summary witness for the Government who could not only tell them what was in the evidence but tell them what inferences to draw from it. That is not the point of lay opinion evidence.

*Grinage*, 390 F.3d at 750.

In the present case, Mr. Korkmaz regularly crossed the line established in the above-discussed cases. As a result, the jury has been irrevocably tainted. This Court should therefore grant the mistrial application.

F. <u>The Confrontation Clause of the Constitution Bars This Testimony</u>.

In *Crawford v. Washington*, 541 U.S. 36, 55 (2004), the Supreme Court held that the Confrontation Clause of the Constitution barred the admission of out-of-court testimonial statements where the defendant has no opportunity to cross-examine the witness. Here, the testimony of Mr. Korkmaz is premised upon the statements and observations of others in Turkish law-enforcement who, with their own personal knowledge, provided information for the Turkish report.

Thus, when Mr. Korkmaz purports to testify about documents recovered in searches conducted by others (*e.g.*, Tr. at 1297-98, 1570) or surveillances he did not personally conduct (Tr. at 1316) or, more generally, what he learned from participating in the investigation (tr. at 1640, to cite just one example), he is improperly providing what should have been testimonial statements from others. More generally, whenever he testifies about findings or conclusions or opinions derived from the Turkish report or the Turkish investigation -- and his testimony is replete with such statements -- the Confrontation Clause prohibits the receipt of such testimony into evidence. The jury has now been tainted by the wholesale admission of this improper evidence. Mistrial is the only remedy.

G. <u>The Absence of Any Rule 403 Analysis</u>.

Mr. Korkmaz's speculative testimony about possible torture he might have faced in Turkey, admitted over defense objection, raised images of unlawful and sadistic violence that, he inferred, would have been inflicted upon him by certain of defendant Atilla's alleged co-conspirators in the Turkish government. Despite a defense objection to this testimony under Fed.

R. Evid. 403, the Court admitted it without balancing its probative value against the prejudicial impact.

The prejudicial impact is plain. Associating the defendant with the specter of mindless and cruel political violence at the hands of his government-based alleged co-conspirators is almost guaranteed to inflame the jury against the defendant. What's more, the testimony was introduced without any basis for a suggestion that Atilla could ever have foreseen the possibility that his supposed co-conspirators would act in such a reprehensible way. Neither is there any allegation in the indictment that any co-conspirator engaged or was prepared to engage in violence in order to fulfill the alleged objects of any conspiracy.

The probative value of this testimony, then, is nil. Its prejudicial impact is substantial. The jury cannot be expected to disregard or minimize what it has heard in this regard. Admission of this shocking testimony into evidence constitutes an additional reason why the declaration of a mistrial is now the only reasonable remedy.

H.   <u>A Cautionary Instruction Would Be Insufficient to Undo the Harm</u>.

"Where an inadmissible statement is followed by a curative instruction, the court must assume 'that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it, unless there is an overwhelming probability that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be devastating to the defendant.'" *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d Cir. 2008), quoting from *Greer v. Miller*, 483 U.S. 756, 765 n.8 (1987). Here, of course, the presentation of inadmissible evidence was not inadvertent. Nor did it constitute an isolated statement; instead, it continued for the better part of Mr. Korkmaz's testimony. Given the time during which the jury was continuously exposed to this testimony, the likelihood is high that, in the words of the *Greer*

Court, "the effect of the evidence would be devastating to the defendant." This is particularly true since, from Day 1 of this trial, the Government has exposed the jury to concepts such as Iranian terrorism and China-based conspiracies involving Reza Zarrab and other such irrelevancies that had no connection whatever to the defendant or to the charges in the indictment.

The circumstances here are akin to those facing the Court in *United States v. Aly*, 1989 WL 34039 (S.D.N.Y. Apr. 4, 1989). There, the Court dealt with a defendant's *in limine* motion to exclude anticipated co-conspirator statements. The Court determined that it would admit those statements provisionally, subject to connection. If, however, that connection never materialized, the Court said that it would instruct the jury to disregard the hearsay "or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility . . . declare a mistrial if the defendant asks for it." At *1, *quoting* from *United States v. Geany* [sic], 417 F.2d 1116, 1120 (2d Cir.), *cert. denied*, 397 U.S. 1026 (1970).

Here, so much inadmissible and highly prejudicial evidence has already come before this jury that, as the *Aly* Court warned, a cautionary instruction would be "of doubtful utility." The defendant therefore respectfully asks for a mistrial.

I.  The Failure to Authenticate Audio Recordings and Seized Records.

    1.  The Existing Recordings.

Mr. Korkmaz has failed to properly authenticate those existing audio recordings derived from the Turkish investigation that were admitted into evidence here subject to authentication. He never testified about having personal knowledge of the date of any call. He has not testified to personal familiarity with any of the voices he has identified in his testimony. Apart from his generalized testimony on cross-examination (Tr. at 1748-1751), he has provided no testimony

13

about precisely how the recordings were made, how the recording equipment was tested, what steps were taken to prevent alteration of the evidence (especially after his firing), what were the names and positions of those who made the recordings, or what chain of custody existed for the recordings up to the time he delivered them in New York. He has not addressed how the metadata underlying any call was preserved. He has not even affirmed that they were in fact never altered, probably because he has no first-hand basis for such testimony. He testified that he had reviewed hundreds of recordings and/or transcripts, without identifying most of the ones that he had so reviewed. (Tr. 1079-1088). Thus, the audio recordings, instead of being authenticated, were treated in an amorphous, collective and offhand fashion.

In *United States v. Knohl*, 379 F.2d 427, 440 (2d Cir. 1967), the Second Circuit recognized the uniquely powerful effect that audio recordings can have on the jury, and accordingly imposed requirements to ensure that the presentation of this evidence comports with standards of basic fairness. The Court further declared:

> We are not unmindful, however, that tape recordings are susceptible to alteration and that they often have a persuasive, sometimes a dramatic, impact on a jury. It is therefore incumbent on the Government to produce clear and convincing evidence of authenticity and accuracy as a foundation for the admission of such recordings; and where the court accepts them as authentic and accurate but the evidence is conflicting on these points, it must caution the jury to scrutinize the evidence with care.

These recordings were the subject of defendant's motion *in limine* to preclude, or at a minimum for a hearing (Doc. 319). The Court's pretrial ruling was that the Government would be permitted to use recordings so long as they could be authenticated. That requirement was not sufficiently met during the Korkmaz testimony. He has failed to lay a full and proper foundation for the admission of any audio recording or any transcript of a recording. The Government has therefore failed to meet its "subject to authentication" obligation. As a result, an abundance of

14

recordings and transcripts and resultant information that should never have seen the light of day have instead been presented to the jury.

    2. The Missing Recordings.

In effect, the method that the Government has employed to introduce the contents of missing audio calls is the same that it might utilize if a case agent were in an adjoining room listening to two people converse and taking notes that he or she could use later to refresh his or her recollection about the contents of the conversation. But it should not be that simple. Mr. Korkmaz was not in the next room and he was not taking contemporaneous notes. Instead, he relied upon someone else to operate a recording device and still another person to prepare a transcript. It is, in other words, as though someone else was in the other room and thereafter told Mr. Korkmaz about the conversation. His testimony about the contents of the lost recordings was rank hearsay.

Was the recording device in working order? Was it only recording every other word? Was it erasing whole sentences or whole paragraphs as it went all along? How were the recordings maintained, particularly after his termination from the police force? By whom? Were they ever altered? Was there any mechanism in place to prevent alteration? And, as for the transcript of each lost call, who prepared it and who verified its contents against the original recording?

The Government must "'produce clear and convincing evidence of authenticity and accuracy' as a foundation for the admission of . . . recordings." *United States v. Fuentes*, 563 F.2d 527, 532 (2d Cir. 1977), citing *United States v. Knohl*, 379 F.2d at 440. Here, by contrast, the Government has provided no evidence that could serve as a foundation for a finding of authenticity, either as to the existing recordings or as to the lost ones. Because the Korkmaz

testimony about the contents of missing recordings is based directly upon the "authenticity and accuracy" of the recordings, the testimony is without foundation. If the recording device, for example, was defective, the testimony is defective. In the absence of any evidence about the authenticity of those missing recordings, the testimony about their contents should not have been admitted. But the jury has now heard that testimony. The defendant has been severely prejudiced.

J.  Massive Amounts of Inadmissible Evidence Derived from the Turkish Investigation Have Been Improperly Admitted into Evidence.

The defense has periodically advised the Court, and sought relief from it on occasion, concerning the continuing Government proclivity for belated delivery of massive amounts of trial exhibits and 3500 material. The Government has regularly produced thousands of pages of documents, including quantities of untranslated Turkish materials, at the eleventh or twelfth hour. On December 12, 2017, the Government offered into evidence trial exhibits GX 605 through GX 614. They comprise over 7,000 documents, not counting a substantial quantity of emails contained in at least one email archive file. These documents are largely the fruits of the Turkish investigation.

The record is devoid of any evidence regarding who seized or otherwise obtained these documents, how they were maintained, whether any chain of custody was created, or how they were protected from loss or alteration. Mr. Korkmaz apparently has no personal knowledge of any of this. He was, in effect, a supervising agent, maintaining a presence above the fray. That lofty position provides him no basis to offer a proper foundation for any of the admitted evidence. This too has resulted in substantial, incurable prejudice to the defendant.

For all the foregoing reasons, the defendant respectfully requests the granting of a mistrial in this matter.

Respectfully submitted,

HERRICK FEINSTEIN LLP

By: /s/ Victor J. Rocco
    Victor J. Rocco
    Two Park Avenue
    New York, New York 10016
    (212) 592-1400

FLEMING RUVOLDT PLLC

By: /s/ Cathy Fleming
    Cathy Fleming
    1700 Broadway, 28th floor
    New York, New York 10019
    (212) 706-1850

McDERMOTT WILL & EMERY LLP

By: /s/ Todd Harrison
    Todd Harrison
    340 Madison Avenue
    New York, New York 10173
    212-547-5727

LAW OFFICES OF JOSHUA L. DRATEL

By: /s/ Joshua L. Dratel
    Joshua L. Dratel
    29 Broadway, Suite 1412
    New York, New York 10006
    212-571-3792

cc:    All Counsel