UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                            :

UNITED STATES OF AMERICA

                                            :

    - v. -                                  S4 15 Cr. 867 (RMB)

                                            :

MEHMET HAKAN ATILLA

                                            :

                     Defendant.

                                            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## MEMORANDUM OF LAW IN OPPOSITION TO
## MEHMET HAKAN ATILLA'S MOTION FOR A MISTRIAL

                                   JOON H. KIM
                                   Acting United States Attorney for the
                                   Southern District of New York

Michael D. Lockard
Sidhardha Kamaraju
David W. Denton, Jr.
  Assistant United States Attorneys
Dean C. Sovolos
  Special Assistant United States Attorney
      *Of Counsel*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND .................................................................................................................. 2

    A.    The Charges in the Superseding Indictment ................................................ 2

    B.    The Defendant's Opening Statement .......................................................... 3

    C.    The Testimony of Reza Zarrab ................................................................... 5

    D.    The Testimony of Huseyin Korkmaz ......................................................... 7

    E.    Atilla's Mistrial Motion ........................................................................... 11

DISCUSSION .................................................................................................................... 11

    I.    Law Applicable to Mistrial Motions ........................................................ 11

    II.    Korkmaz's Testimony about the Turkish Investigation is Relevant to
        the Charges Against Atilla and Not Unfairly Prejudicial ....................................... 12

    III.    The Evidence From the Turkish Investigation Has Been Authenticated.............. 14

    IV.    Atilla's Evidentiary Objections Are Without Merit............................................... 17

    V.    The Court Properly Overruled Defense's Objection to Korkmaz's
        Testimony about his Concerns of Retaliation ....................................................... 22

    VI.    To the Extent Any Error Has Occurred, A Curative Instruction is a
        Sufficient Remedy ................................................................................................. 23

CONCLUSION.................................................................................................................... 24

# PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in opposition to defendant Mehmet Hakan Atilla's motion for a mistrial.  For the reasons set forth below, Atilla's motion should be denied.

At bottom, Atilla's motion is based on a mischaracterization of the testimony of Huseyin Korkmaz, a former police officer with the Turkish National Police (the "TNP").  During trial, Korkmaz testified about various aspects of a TNP public corruption investigation (the "Turkish investigation") that focused on many of the same allegations that are at issue in the case against Atilla pending before this Court.  In particular, the Turkish investigation examined whether Reza Zarrab bribed certain Turkish government and banking officials to help to facilitate his Iranian sanctions evasion business through Halk Bank.  Korkmaz's testimony is thus directly relevant to the charges pending in this trial, which involve that same Iranian sanctions scheme, facilitated and promoted by that same bribery.  And moreover, Korkmaz's testimony as to how the evidence obtained during the Turkish investigation was collected is more than sufficient – particularly when coupled with the Government's other evidence (including Zarrab's own testimony) – to authenticate that evidence for use at this trial and to establish his personal knowledge.

Atilla's attempts to mischaracterize this testimony as improper hearsay, opinion testimony, or as unfairly prejudicial are entirely meritless.  None of Korkmaz's testimony constitutes hearsay, either because it does not involve testimony about an out-of-court statement, a foundational element for hearsay, or is properly admitted pursuant to a hearsay exception or for a non-hearsay use.  Similarly, while claiming that Korkmaz improperly opined as to Atilla's guilt, Atilla's motion fails to cite a single instance of where that actually happened – instead it

bases that argument on testimony from Korkmaz about the well-founded findings of the Turkish investigation about bribes paid to others. Moreover, to the extent Korkmaz offered his understanding of events that occurred during the investigation, such testimony is squarely permissible under governing case law.

Finally, nothing Atilla points to constitutes an error. But even accepting for purposes of argument that any of Atilla's complaints had any merit, they would still not be a basis for the Court to take the significant and serious step of granting a mistrial – a step which courts are to exercise only with the greatest of caution. That is particularly the case when a curative instruction – which juries are presumed to follow as a matter of law – would more than suffice to counter any purported harm.

## BACKGROUND[1]

### A. The Charges in the Superseding Indictment

The defendant is charged with six counts in the Superseding Indictment. First, he is charged with participating in a conspiracy to defraud the United States, in violation of Title 18, United States Code, Section 371. Second, he is charged with participating in a conspiracy to violate the International Emergency Economic Powers Act (the "IEEPA"), in violation of Title 50, United States Code, Section 1705. Third, he is charged with committing bank fraud, in violation of Title 18, United States Code, Section 1344. Fourth, he is charged with participating in a conspiracy to commit bank fraud, in violation of Title 18, United States Code, Section 1349. Fifth, he is charged with money laundering by promoting the IEEPA violations, bank fraud, and foreign bribery through transactions passing through the United States, in violation of Title 18,

---

[1] For purposes of brevity, the Government does not recite the entire factual background of this case or the charges against the defendant, both of which the Court is intimately familiar with.

2

United States Code, Section 1956.  Sixth, he is charged with participating in a conspiracy to commit money laundering by promoting the IEEPA violations, bank fraud, and foreign bribery, also in violation of Title 18, United States Code, Section 1956.

### B.    The Opening Statements

On November 28, 2017, the parties gave their opening statements.  During its opening statement, the Government described the scheme that it anticipated the evidence at trial would demonstrate.  In particular, the Government stated that the evidence would show that, since at least 2012, Iranian oil proceeds belonging to the Government of Iran were laundered through Halk Bank through fraudulent financial transactions involving gold and food.  (*See*, *e.g.*, Tr. 21).  The Government further described how the evidence would show that these laundered funds were used to create an anonymized slush fund – stripped of any apparent tie to Iran – that could be used to make financial payments on behalf of Iranian entities, including payments through U.S. financial institutions.  (*See*, *e.g.*, *id*. at 22-23).  The Government described how this conduct would violate U.S. sanctions in effect at the time.  (*See id*.).  In addition, the Government told the jury how the evidence would show that the scheme was facilitated through bribes paid to, among others, the former Turkish Minister of the Economy and the former general manager (head executive) of Halk Bank.  (*See id*. at 26-27).

In his opening statement, defense counsel, among other things, repeatedly attacked the credibility of several of the Government's witnesses and the Government's evidence, including Reza Zarrab, Huseyin Korkmaz, and the evidence from the Turkish investigation that Korkmaz provided to the Government.  For example, defense counsel argued that the jury should discount the "the mountains of evidence, fancy exhibits, technical testimony about recorded calls and wiretaps, references you'll hear to judicial coups in Turkey, a Turkish investigation, where discredited prosecutors and investigators were fired."  (Tr. 44).

In criticizing Korkmaz, defense counsel specifically invoked the political controversy that embroiled Turkey in the wake of the Turkish investigation and asked the jury to disregard the evidence from that investigation – including wiretapped calls – because the Turkish investigative and prosecutorial teams consisted of "partisans":

> The recordings come from a controversial Turkish investigation, something that's been described as a judicial coup d'etat. The investigation roiled Turkey. It turned Turkey upside down with allegations of wrongdoing on the parts of the investigators, the prosecutors, and the judges who ran the investigation. It's a political potboiler, a mess, and it's damaged Turkey internally.
>
> The people who ran this investigation are partisan. They're partisan at least to the extent that they have a vested interest in the investigative work they did. Those people weren't satisfied when the investigation was discredited in Turkey, and maybe that's a human reaction to months of very hard work.

(*Id.* at 59). Defense counsel went on to argue that the jury should not trust these "partisans" or their evidence because they had broken Turkish law by removing the evidence from Turkey and giving it to the Government:

> What did they do? They broke Turkish law. They brought the fruits of their investigation, some of them, here to the United States. In doing it, as I say, they broke Turkish law. That's not the way governments communicate with governments. You don't have police officers take the invest -- the fruits of an investigation, investigative fruits, and just take them out of their country and bring them to a foreign country.
>
> Ask yourselves what would you think if an American prosecutor did that. If the reverse was true. Took evidence that taxpayers in America paid for, and brought it someplace else to be used as a basis for a prosecution. The evidence will show that these people not only took the law in their own hands, they had a powerful motive to prove to the entire world that they were right, and that the Turkish government was wrong. Halkbank -- just one further thought on the evidence. That evidence was accumulated back in 2013. It's been four long years. Who knows what in that cache still exists. What evidence is missing from that stolen bundle of evidence. Who knows what's been destroyed or mislaid as a result of the very unorthodox way that crucial evidence has been

> handled. How can you trust partisans or how can you trust
> anything they've touched.

(*See id*. at 60).

Defense counsel also argued in his opening that "the real culprit at Halk Bank" was not the defendant, but rather Suleyman Aslan, the General Manager of the bank at the time. (*See id*. at 53). Defense counsel stated that the evidence would show that Aslan was corrupt because he had been paid bribes by Zarrab, and that, as a result, it was Aslan, not Atilla, who enabled Zarrab's business at Halk Bank. (*See id*.). In other words, during his opening, defense counsel affirmatively invoked Aslan's corruption as a defense to the charges against Atilla.

### C.    The Testimony of Reza Zarrab

On November 29, 2017, the Government called Reza Zarrab as a witness. Between direct and cross-examination, Zarrab testified for almost eight trial days. During that time, Zarrab testified about his experience with Iranian sanctions evasion, including by helping Iranian entities process financial payments through the U.S. banking system. (*See, e.g.*, Tr. 273, 288). He also testified how, beginning in early 2012, he joined a conspiracy to use gold exports to extract Iranian oil proceeds belonging principally to the National Iranian Oil Company ("NIOC") that were effectively frozen at Halk Bank, and to use the proceeds from those gold exports to fund international financial payments – including through the U.S. financial system – on behalf of Iranians. (*See, e.g.*, *id*. at 315-316, 321-323). Zarrab also testified about Atilla's personal role in the gold scheme as well as a the fraudulent food scheme, which went into effect after U.S. sanctions caused Halk Bank to curtail Zarrab's gold trade for a short period of time. For example, Zarrab testified about: (i) Atilla's participation in meetings with Iranian officials at which the prospect of funding accounts at Halk Bank with NIOC's oil proceeds held abroad and the Iranians' desire to be able to make international financial payments using those proceeds

were discussed; (ii) instances in which Atilla instructed Zarrab how to document transactions to make them appear compliant with U.S. sanctions; and (iii) Atilla's contributions to the design of the food scheme and concealing the fact that the transactions did not, in fact, involve real trade. (*See*, *e.g.*, *id*. at 360, 393-397, 569-70).

In addition, and critically for the instant motion, Zarrab testified about the substantial number of bribe payments he made to officials to facilitate the sanctions evasion scheme occurring at Halk Bank. For example, Zarrab described how, to get Halk Bank to allow him to conduct the Iranian gold exports using the oil proceeds at the bank, Zarrab agreed to pay a bribe to Mehmet Zafer Caglayan, the then Turkish Minister of the Economy, which consisted of a 50% share of Zarrab's profits from the Iranian business through Halk Bank. (*See id*. at 302). Notably, defense counsel did not object to that testimony initially, (*see id*.), only objecting later on relevance grounds when the Government sought to introduce an accounting record prepared by Zarrab's staff that detailed the payments to Caglayan. (*See id*. at 303). Similarly, Zarrab testified about how he agreed to pay bribes to Aslan with Caglyan's permission, again, without objection from defense counsel. (*See id*. at 435-38). Zarrab also testified about a bribe paid to Baris Guler, son of Muammer Guler, then Turkish Minister of the Interior, in exchange for a letter from the Turkish Chamber of Commerce intended to help to free up Iranian money frozen in China. (*See id*. at 459-62).

Finally, during his testimony, Zarrab testified about evidence obtained through the Turkish investigation. For example, Zarrab listened to and testified about numerous telephone conversations that were intercepted as part of the Turkish investigation and confirmed that all of those calls actually happened, that the recordings properly captured the conversations that occurred, and that the transcripts accurately reflected those conversations. (*See*, *e.g.*, *id*. at 407,

425, 500, 577-78; *see also id*. at 1032 (Zarrab confirming that the recordings he had listened to while testifying captured real conversations)).  Similarly, Zarrab testified that Government Exhibit 1002 accurately reflected a series of WhatsApp communications between himself and Aslan.  (*See id*. at 480-81).  Finally, Zarrab also identified images of a diagram of the fake food scheme that he had drawn himself and of customs documents that he used in his sanctions evasion business.  (*See id*. at 573-74, 668).

D.     **The Testimony of Huseyin Korkmaz**

On December 11, 2017, the Government called Huseyin Korkmaz as a witness.  Korkmaz testified that he previously was a Deputy Inspector with the TNP and supervised an investigation into criminal activity occurring in Turkey that involved three groups: one led by Zarrab, Caglayan, and Aslan; one led Muammer Guler; and the third group led by one of Zarrab's competitors.  (*See id*. at 1280).  Korkmaz further described how, sitting atop the Zarrab group and the Guler group there was another individual who led both, and who was known as "number one."  (*See id*. at 1281-82).  Korkmaz identified "number one" as Recep Tayyip Erdogan, who was, at the time, the Prime Minister of Turkey.  (*See id*. at 1282).  Korkmaz also testified as to how the investigation shifted over time from an investigation into Zarrab related to gold smuggling into a broader investigation into bribery and corruption.  (*See id*. at 1287-88).

The principal subject of the investigation was bribery.  (*See id*. at 1290).  Korkmaz identified certain individuals whose conduct fell within the scope of the investigation, including Atilla, Levant Balkan (another Halk Bank employee), and Hakan Aydogan (another Halk Bank employee).  (*See id*. at 1290).  He also testified that the investigation had shown that Aslan was receiving bribes, but that Atilla and Balkan had not.  (*See id*. at 1290-91).  At no point during his testimony, however, did he express any opinion as to the guilt of Atilla with respect to any of the crimes charged in Turkey, or any of the charges that are at issue during this trial.

Korkmaz also testified about some of the primary investigative techniques used during the Turkish investigation (the fruits of which were introduced during this trial) including interception of communications, surveillance, and obtaining documentary and electronic records (*See id*. at 1293). Korkmaz explained that it was the evidence obtained as a result of these techniques that formed the basis of his understanding. (*See id*.). Based on that, Korkmaz testified as to his understanding of certain events that were uncovered as part of the investigation.

For example, Korkmaz described that certain couriers travelled to meet Caglayan's son ni late August 2013, and identified a photograph of the couriers and backpacks they were carrying that contained cash. (*See id*. at 1303-04). In that case, Korkmaz testified that this understanding was based on his having listened to intercepted telephone conversations during the investigation. (*See id.*; *see*, *e.g.*, *also*, *id*. at 1306-07, 1318, 1322). Korkmaz also testified about intercepted communications, and explained his understanding, based on his investigation, of what certain communications meant. For instance, he testified about the fact that a WhatsApp message from Aslan to Zarrab referred to the "famous date of February 6, 2013," and that he believed that the reference to February 6, 2013 was tied to a change in U.S. sanctions regulations that occurred on that day (something Zarrab confirmed). (*See id*. at 493-95; 1592). Similarly, Korkmaz explained the context for certain intercepted telephone calls that he had learned through his investigation. For example, Korkmaz testified about a call in which Zarrab and one of his employees, Abdullah Happani, discussed having to go back to "passengers." Korkmaz explained that the Turkish investigation had revealed that it was more expensive for Zarrab to ship gold using couriers and that he believed that this call therefore concerned shipping the gold to Dubai, instead of Iran – something Zarrab also confirmed. (*See id*. at 361-62; 1595-96).

In addition to this testimony, Korkmaz explained how evidence was collected during the Turkish investigation, including evidence that was admitted at trial. First, Korkmaz described the typical process for how he, as a supervisor, would organize search teams and the instructions he would provide about how and where the searches should be conducted. (*See id*. at 1394). He also described how he would stay in communication with surveillance and search teams during the operation and how evidence would be secured, witnessed, inventoried, and stored. (*See id*. at 1395-1397). He specifically testified that this procedure was followed during the arrest operation for the Turkish investigation (the "December 17 Operation"), and that he instructed his officers to go to certain locations and search for particular items. (*See*, *e.g.*, *id*. at 1297-98; 1301). Korkmaz also testified that he was stationed at the TNP offices while the search teams were out and when they returned. (*See id*. at 1396-98). Korkmaz further described how at the TNP station, he tasked an officer to take photographs of the evidence seized during the December 17 Operation and give the photographs to Korkmaz for inclusion in Korkmaz's report. (*See id*.).

Similarly, Korkmaz described the process of how telephone calls were intercepted during the Turkish investigation. He testified about the Turkish law enforcement wiretapping system and how it was used to intercept telephone calls generally. (*See id*. at 1586-87). He also testified as to how the system would generate certain metadata for the calls, such as the time and date of the call and the telephone numbers of the participants. (*See id*.). Korkmaz also described how he reviewed at least hundreds, and perhaps thousands, of calls and transcripts of calls that were intercepted as part of the Turkish investigation. (*See id*. at 1579). When asked about particular calls that the Government offered, Korkmaz testified that he recognized the specific exhibits as

calls intercepted and Turkish transcripts prepared as part of the investigation in which he personally participated. (*See id*. at 1580-81).

Korkmaz also testified as to how he was able to obtain a copy of some of the evidence collected during the Turkish investigation and transport it to the United States, where it was admitted at trial. Thus, he testified that, in August of 2016, he decided to leave Turkey. (*See id*. at 1385). When leaving, he brought with him the records from the Turkish investigation that he was able to obtain. (*See id*.). Korkmaz described how he collected discs from the prosecutor responsible for the investigation, which contained audio files of intercepted calls; transcripts in Turkish of intercepted calls, including calls for which he was not able to obtain the audio files; scanned statements of interviews and other records obtained during the investigation; and scanned expert reports. (*See id*. at 1386-87). He also testified about additional digital evidence he obtained, consisting of forensic reports and file exports from electronic media seized during the investigation. (*See id*. at 1387-88). Later, during trial, when asked about evidence from the Turkish investigation that the Government sought to admit, Korkmaz testified that he had reviewed the CDs that the Government was offering and had confirmed that they contained materials obtained in the investigation and that he had personally brought to the United States from Turkey. (*See*, *e.g.*, *id*. at 1566, 1573, and 1585).

Korkmaz also testified about his perception of the risks that were associated with him leaving Turkey with the evidence from the Turkish investigation and delivering it to U.S. authorities. In particular, Korkmaz testified that:

> During that time, in the public arena, in the press, there was news published about individuals in custody who were being tortured. I was aware of the bad treatments that I would be subject to, and I could call that torture, actually. The high risks that I would face if I were to be extradited, even through official channels, if I were to be extradited, I knew what I would face. But what made me really

uneasy in these countries was anything that could be done against me through unofficial means, and for that reason, I was not going out of the house much in these countries.

(*See id*. at 1392).  Defense counsel objected to this question based on "relevance and 403."  (*See id*.).  The Court overruled the objection.  (*See id*.).

###    E.    Atilla's Mistrial Motion

On December 11, 2017, after Korkmaz was asked about bribe payments to Egeman Bagis, the then Turkish Minister of the European Union, the defense moved for a mistrial at a sidebar.  (*See id*. at 1309).  After the Court requested a written submission, the defense filed a motion electronically on December 13, 2017.  At the Court's suggestion that defense supplement its submission to account for Korkmaz's testimony today, the defense filed the instant supplemental motion.

## **DISCUSSION**

Atilla's motion for a mistrial based on a fundamental mischaracterization of the law and the trial record.  None of the alleged errors claimed by Atilla is in fact an error and, even to the extent they were errors, they do not come close to creating the type of "manifest necessity" required to grant the extraordinary remedy of a mistrial.  Atilla's motion should be denied in its entirety.

## I.    Law Applicable to Mistrial Motions

"A defendant's motion for a mistrial may be granted where something has occurred to interfere with the defendant's right to a fair trial."  *United States* v. *Yannai*, 791 F.3d 226, 242 (2d Cir. 2015).  A court's power to grant a mistrial should be used only "'with the greatest caution, under urgent circumstances, and for very plain and obvious causes.'"  *United States* v. *Klein*, 582 F.2d 186, 190 (2d Cir. 1978) (quoting *United States* v. *Perez,* 22 U.S. 579, 580 (1824)).  As an alternative to the drastic remedy of a new trial, a district judge has the option of

giving a curative instruction. *See*, *e.g., United States* v. *Fermin*, 32 F.3d 674, 677 (2d Cir. 1994), overruled on other grounds by *Bailey* v. *United States*, 516 U.S. 137 (1995) (mistrial motion based on testimony of agent regarding defendants' "criminal histories" properly denied where district court gave limiting instruction and any resulting prejudice was "minimal and harmless"). Recognizing that a trial judge is in the best position to decide if there is "manifest necessity" to declare a mistrial when unforeseen events occur at trial, a district court's decision is afforded the "highest degree of respect." *Corey* v. *Dist. Crt. of Vt.*, 917 F.2d 88, 90 (2d Cir. 1990) (quoting *Arizona* v. *Washington*, 434 U.S. 497, 511 (1978)); *see also United States* v. *Millan*, 17 F.3d 14, 19-20 (2d Cir. 1994); *Dunkerly* v. *Hogan*, 579 F.2d 141, 145 (2d Cir. 1978). Accordingly, a district court's decision to deny a motion for a mistrial is reviewed only for abuse of discretion. *United States* v. *Carson*, 52 F.3d 1173, 1188 (2d Cir. 1995).

## II. Korkmaz's Testimony about the Turkish Investigation is Relevant to the Charges Against Atilla and Not Unfairly Prejudicial

To the extent Atilla argues that evidence of bribery in Turkey related to the sanctions evasion scheme described in the Superseding Indictment is not relevant to him and prejudicial, he is wrong. Under Federal Rule of Evidence 401, "[e]vidence is relevant if ... it has any tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401. "[T]he definition of relevance under Fed. R. Evid. 401 is very broad." *United States* v. *Certified Envtl. Servs.*, *Inc.*, 753 F.3d 72, 90 (2d Cir. 2014). Barring some contrary rule or statute precluding introduction of the evidence, all relevant evidence is admissible at trial. Fed. R. Evid. 402.

Atilla is charged with participating in a conspiracy to launder billions of dollars in Iranian oil proceeds through Halk Bank in violation of U.S. sanctions, which was facilitated through actions taken by Turkish government officials, some of whom were being bribed for their efforts.

That scheme involved, among other things, financial transactions concerning fraudulent gold and food shipments which were, as Korkmaz testified, at the heart of the Turkish investigation. In connection with that conduct, Atilla is charged with, among other things, participating in conspiracies to violate U.S. sanctions and to commit money laundering by, among other things, engaging in financial transactions that promote sanctions evasion *and foreign bribery*. Therefore, Korkmaz's testimony concerning bribes that were paid to facilitate these fraudulent gold and food schemes is relevant not only as direct evidence of the sanctions evasion scheme charged by the Government, but also of the money laundering conspiracy, which requires the Government to prove that the scheme was intended to, among other things, promote foreign bribery.

Moreover, that the evidence at trial to date does not show that Atilla paid or received a bribe is legally irrelevant because he is charged with participating in a conspiracy, and "[s]o long as a transaction is within the general scope of a scheme on which all defendants had embarked, a defendant not directly connected with a particular fraudulent act is nonetheless responsible therefor if it was of the kind as to which all parties had agreed." *United States* v. *Amrep Corp.*, 560 F.2d 539, 545 (2d Cir. 1977). Atilla is free to argue to the jury that he had no involvement with the bribes paid to facilitate and promote the scheme, but he cannot cut off the Government's right to put in evidence of the bribery scheme that is directly relevant to the charges against him. *See generally United States* v. *Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997) ("[E]vidence of uncharged criminal activity is not considered other crimes evidence under Fed.R.Evid. 404(b) if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.") (internal quotations and citations omitted).

Finally, contrary to Atilla's claim, because evidence of the bribery scheme that was the subject of the Turkish investigation is directly relevant to the charges against Atilla, this evidence is not unfairly prejudicial. "[E]vidence is unduly prejudicial only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States* v. *Kadir*, 718 F.3d 115, 122 (2d Cir. 2013) (citation omitted). Rule 403 "does not bar powerful, or even 'prejudicial' evidence. Instead, the Rule focuses on the 'danger of *unfair* prejudice,' and gives the court discretion to exclude evidence only if that danger '*substantially* outweighs' the evidence's probative value." *United States* v. *Garmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998). "Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, *even evidence relating to acts committed by co-defendants*, is admissible against the defendant." *United States* v. *Salameh*, 152 F.3d 88, 111 (2d Cir. 1998). Thus, the acts of other co-conspirators of bribery, like Zarrab and Aslan, can properly be admitted against Atilla, particularly given that bribery is an element of the charged crimes. That is particularly the case given that defense counsel argued in his opening that the *jury should blame Aslan because he was corrupt*. – that is, that the bribery evidence was *exculpatory*.

## III.   The Evidence From the Turkish Investigation Has Been Authenticated

Atilla's claim that a mistrial is warranted because the evidence from the Turkish investigation has not been properly authenticated is flatly contradicted by the law and the facts. Atilla simply ignores the substantial evidence in the record already authenticating this evidence, which includes testimony from Korkmaz *and Zarrab*. He also disregards the actual burden imposed by the law for authenticating evidence. Indeed, all of his arguments go to, at best, chain of custody, which is an argument about the weight to be accorded to evidence, not the admissibility of that evidence.

Korkmaz's testimony establishing how the recordings, photographs, and other evidence were obtained, when combined with Zarrab's prior testimony and the contents of those materials themselves clearly establish a *prima facie* case of authentication. *See*, *e.g.*, *United States* v. *Tin Yat Chin*, 371 F.3d 31, 37-38 (2d Cir. 2004) (proponent is not required "to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be"; rather, Rule 901 is satisfied "if sufficient proof has been introduce so that a reasonable juror could find in favor of authenticity or identification"); *United States* v. *Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (requirement of proof of authenticity is satisfied if proponent introduced sufficient evidence to support reasonable juror's conclusion in favor of authentication"). *See also United States* v. *Kelly*, 14 F.3d 1169, 1175 (7th Cir. 1994) (to authenticate seized evidence, all government must show is that it took reasonable precautions to preserve the exhibit in the original condition; adequate chain of custody can be shown even if foundation evidence does not exclude all possibilities of tampering).

The distinctive characteristics of this evidence—and the fact that Zarrab testified that he recalled participating in, and the contents of, numerous of the telephone calls that were recorded—further support authentication of these materials. Specifically, Rule 901(b)(4) specifically permits proponents to authenticate an item of evidence by identifying its "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken together with all of the circumstances." Fed. R. Evid. 901(b)(4). Indeed, the Second Circuit has held that proof of authenticity may consist entirely of circumstantial evidence. *See*, *e.g.*, *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990) (authentication evidence may be direct or circumstantial; circumstantial evidence includes distinctive characteristics of exhibit, such as contents of writing); *United States* v. *Khan*, 53 F.3d 507, 516 (2d Cir. 1995)

(circumstantial evidence buttressing self-identification of caller on telephone was adequate to establish, for authentication purposes, identity of caller).

In this vein, proof of authenticity is necessarily fact specific, particularly when it consists of circumstantial evidence.  While there are few set patterns establishing proof of authenticity by circumstantial evidence, courts have found circumstantial evidence like that described above sufficient to establish authenticity.  *See*, *e.g.*, *United States* v. *Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991) (holding that tape recordings of telephonic and other conversations that occurred in co-defendant's house were authenticated by totality of the circumstances, particularly including content of the conversations); *United States* v. *McGlory*, 968 F.2d 309, 329-30 (3d Cir. 1992) (handwritten notes were properly authenticated by circumstantial evidence that they were found in trash can outside one of defendant's residences and in search of those residences pursuant to search warrant, some notes were on paper from notebook found in one of defendant's residences, some notes were on paper from tablets from hotel at which defendant stayed, and the contents of the notes were internally consistent with other evidence).  That the Government cannot offer testimony establishing a complete chain of custody with respect to the evidence is not a bar to its admission.  *See*, *e.g.*, *United States* v. *Morrison*, 153 F.3d 34, 56 (2d Cir. 1998) (breaks in chain of custody do not bear on admissibility of exhibit on authenticity grounds, they relate to weight to be accorded to the evidence, which is for the jury to determine).

Similarly, circumstantial evidence of authentication can include details in a document or a recording that are known only to a small group of people.  *See*, *e.g.*, *Maldonado-Rivero*, 922 F.2d at 956 (communique was properly authenticated, in part, by evidence it contained references to information that only member of conspiracy would know); *United States* v. *Helmel*, 769 F.2d 1306, 1311 (8th Cir. 1985) (when content of writings is such that they could have been

written only by persons involved in transactions at issue in lawsuit, their authenticity is considered reliable); *United States* v. *Smith*, 223 F.3d 554, 570 (7th Cir. 2000).

Moreover, the Second Circuit has held that authentication of a document or recording does not necessarily require identification of the author of that document or the individual who made the recording.  For example, where the contents of papers seized from the office of a sham bank revealed a connection between that sham bank and the defendants, "[t]he papers were relevant no matter who their author was; contents themselves authenticated the documents even though the government could not identify the author of the documents).  And when a document's contents show that the author knew of the conspiracy's activities and thus must have been a member of the conspiracy, document is authenticated as to all members of the conspiracy.  *See United States* v. *Wilson*, 532 F.2d 641, 644 (8th Cir. 1976); *see also United States* v. *Prevezon Holdings Ltd.*, 319 F.R.D. 459, 462-63 (S.D.N.Y. 2015) (attorney could authenticate photographs taken of documents in Russian criminal file).

Atilla's challenge to the authentication of these records – in particular the wiretaps – is particularly meritless given his own attempt to introduce and rely upon these same wiretapped calls and transcripts.  Attempting to manufacture a basis for a mistrial motion after relying on this same evidence is pure gamesmanship.

## IV.    Atilla's Evidentiary Objections Are Without Merit

Atilla further argues that a hodgepodge of evidentiary objections render Korkmaz's testimony improper.  Atilla is wrong on all fronts.

First, Korkmaz's testimony about the targets of the Turkish investigation, and in particular, that they were grouped into three organizations led by Zarrab, Aslan and Caglayan, and "Number 1," identified as then Turkish Prime Minister Recep Tayyip Erdogan, is not hearsay.  As a matter of black letter law, hearsay is an out-of-court statement that is offered to

prove the truth of the matter asserted. Fed. R. Evid. 801(c). Korkmaz's testimony that he participated in an investigation in Turkey that focused on these three "organizations" headed by these men does not purport to describe an out-of-court statement at all, and thus, cannot be hearsay. Rather, this testimony describes Korkmaz's conduct, which, as described above, is relevant to the charges against Atilla because it bears on the bribery scheme. (*See supra* pp. 11-12).

Second, to the extent Korkmaz testified as to his "understanding" of certain events or aspects of the criminal conduct being investigated based on his review of intercepted communications or other records obtained during the Turkish investigation, that is still admissible testimony. Initially, the intercepted calls or other communications about which Korkmaz testified all pertain to and further the bribery scheme and are thus non-hearsay co-conspirator statements themselves. *See* Fed. R. Evid. 801(d)(2)(E) (statement is not hearsay "if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy"). Thus, Korkmaz's recounting of the substance of those communications is no different than an undercover agent relaying a conversation between two co-conspirators that he overheard. And, if, as the defense contends, there are issues that go to what he heard based on problems with the recordings, then those are matters for cross examination, not threshold admissibility. *See United States* v. *Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001) ("Any doubts raised by such a challenge [to the reliability of recordings] would, however, go to the weight to be given to the tapes by the jury, not to their admissibility."). Nor is it impermissible opinion testimony for Korkmaz to have given his understanding of events or communications during the investigation because he was not offered as an expert. *See United States v. Cuti*, 720 F.3d 453, 460 (2d Cir. 2013) ("[A] witness's

specialized knowledge . . . does not render his testimony 'expert' as long as the testimony was based on his 'investigation and reflected his investigatory findings and conclusions, and was not rooted *exclusively* in his expertise.'" (quoting *Bank of China* v. *NBM LLC*, 359 F.3d 171, 181 (2d Cir. 2004) (emphasis added)); *accord United States v. Rigas*, 490 F.3d 208, 224 (2d Cir. 2007) (reasoning that a witness's specialized knowledge, or the fact that he was chosen to carry out an investigation because of this knowledge, does not render his testimony "expert" as long as it was based on his "investigation and reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise . . ." ); *see also United States* v. *Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008) (affirming admission, as lay opinion, of the testimony of a cooperating witness about the meaning of a code used between defendant and another based on the witness's "insider perceptions of a conspiracy of which he was a member").

Third, even if it could be argued that Korkmaz's testimony was based on hearsay, it would still be admissible to explain the circumstances of the investigation and the background that led to the crimes being investigated in Turkey. *United States* v. *Lubrano*, 529 F.2d 633, 637 (2d Cir. 1975) (no error in admitting testimony concerning instructions from agent to confidential source regarding narcotics transaction, even though testimony linked actions of confidential source with defendant); *see also United States* v. *Tracy*, 12 F.3d 1186, 1201 (2d Cir. 1993) ("Most of the testimony challenged as hearsay was given by investigating agents, describing information received from informants during the course of the government's 1 ½–year investigation."); *United States* v. *Pedroza*, 750 F.2d 187, 200 (2d Cir. 1984) (out-of-court statement could be used to "show the circumstances surrounding the events, providing explanation for such matters as the understanding or intent with which certain acts were performed"). And that is equally true with respect to Atilla's argument that the Confrontation

Clause somehow bars the admission of this testimony. *See United States* v. *Paulino*, 445 F.3d 211, 216-17 (2d Cir. 2006) (statements offered for the non-hearsay purpose of establishing context or background do not implicate the Confrontation Clause). Here, the jury has to understand what types of conduct prompted the TNP officers to take certain steps – without that background, key investigative steps would make no sense, and would confuse the jury.

Fourth, Atilla's claim that Korkmaz's testimony is barred by Federal Rule of Evidence 803(8)(ii) has no merit because the Government has never sought to introduce the Turkish Police Report or to introduce the communications about which Korkmaz testified through the public records hearsay exception codified in 803(8)(ii). Instead, the Government offered the communications and records obtained through the Turkish investigation and about which Korkmaz testified were offered as co-conspirator statements pursuant to Federal Rule of Evidence 801(d)(2)(E). That is a typical and well-established basis upon which to introduce out-of-court statements. *See generally Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987). On the other hand, Atilla's bizarre claim that such testimony constitutes an "oral police report" that is impermissible has no basis in law, which is highlighted by the fact that he does not cite a single case in support of that position.

Fifth, Atilla's claim that Korkmaz improperly opined as to the defendant's guilt is simply a blatant mischaracterization of Korkmaz's testimony. Atilla does not point to a single instance in which Korkmaz expressed any opinion as to Atilla's guilt of the Turkish charges, let alone the charges before this Court. Atilla feebly gloms on to one statement made by Korkmaz that Atilla's conduct was among the conduct being investigated in Turkey. But that is merely a statement of fact, not opinion – Atilla's conduct was also being investigated, as demonstrated by the calls in which he was intercepted and the fact that he was interviewed by Turkish law

enforcement. Korkmaz never went beyond that to say that he believed that Atilla was guilty. At most, he testified that the investigation had revealed that other co-conspirators, like Aslan, had received bribes, but that too is not an opinion, but merely a factual statement. And, even to the extent that it could be construed as opinion testimony, it is hardly prejudicial to Atilla, given that his defense counsel argued that Aslan was corrupt in his opening statement. is hardly an opinion about Atilla's guilt. This is a far cry from the circumstances of *United States* v. *Garcia*, 413 F.3d 201, 210-211 (2d Cir. 2005), in which the case agent testified to his opinion that the defendant on trial was part of a drug conspiracy. Despite having scoured days' worth of testimony, Atilla cannot point to any scrap of Korkmaz's testimony that is even remotely similar.

Sixth, Atilla's argument that Korkmaz lacked personal knowledge to testify about the results of searches is without basis. Korkmaz testified in painstaking detail as to how searches were typically conducted under his supervision and how, in this specific case, he directed that these searches would occur. (*See supra* p. 9). He further testified to how the search teams returned and went through the process of cataloguing evidence under his supervision, and how he reviewed that evidence to prepare his report. (*See id.*). And, when explaining what particular documents were, he explicitly described them in the context of what the search teams assigned to specific search locations brought back, of which he having personally witnessed the teams' return, obviously had personal knowledge. (*See id.*). Defense was of course free to cross him on the limits of his knowledge, but that does not mean that he did not have personal knowledge of exactly what he testified to – what was delivered to him by the search teams he tasked and directed.

**V.      The Court Properly Overruled Defense's Objection to Korkmaz's Testimony about his Concerns of Retaliation**

Atilla also argues that it was error to allow Korkmaz to testify as to his fears of retaliation and harm because the Court did not conduct an explicit analysis under Federal Rule of Evidence 403, and because the unfair prejudicial value of this testimony purportedly outweighs its probative value. Again, Atilla's argument misses the mark. Atilla's counsel objected on both relevance and 403 grounds when this testimony was elicited and the Court overruled those objections. (*See supra* pp. 10-11). "Where the issues of both the probative value and possible prejudicial effect of admitting prior act evidence are presented to the district court when it makes its decision to admit such evidence, a mechanical recitation of the Rule 403 analysis is not required." *United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992). This testimony was plainly relevant to Korkmaz's testimony, in that it explained, among other things, why he had to flee Turkey quickly and was unable to take measures to secure a complete set of the evidence, a fact that defense has argued vociferously. And there is no prejudice to Atilla because the Government has not elicited any testimony and will not argue that Atilla is responsible for any of the potential retaliation against Korkmaz.

Furthermore, it was not error in any event because the defense opened the door through such testimony by attacking Korkmaz's credibility as a "partisan" who had stolen evidence from Turkey. (*See supra* pp. 4-5). As a result of the defense opening this door, the Government was entitled to elicit testimony that rebutted the perception argued by the defense that Korkmaz was motivated by political animosity and had fabricated evidence. *See United States* v. *Cosentino*, 844 F.2d 30, 33 (2d Cir. 1988) (where credibility of cooperator was attacked in opening statement, Government was entitled to introduce cooperation agreement to show, among other things, penalties for lying in direct examination to rebut impression that cooperator would lie);

*United States* v. *Siraj*, 468 F. Supp. 2d 408, 422 (E.D.N.Y. 2007) aff'd, 533 F.3d 99 (2d Cir.

2008), and aff'd, No. 07-0224-CR, 2008 WL 2675826 (2d Cir. July 9, 2008) (Government

allowed to elicit testimony that confidential informant had provided useful information about

terrorist activity in the past because defense argued in opening statement that the New York City

Police Department had used illegal or inappropriate law enforcement tactics).  Here, by attacking

Korkmaz as a "partisan," the defense injected the political dissension in Turkey into the trial,

thereby requiring the Government to rebut the suggestion that Korkmaz's testimony should be

viewed with disfavor because he had a political agenda.  His testimony that he was afraid as to

the possible consequences of secreting this evidence out of Turkey, but nonetheless elected to do

so cuts against that claim, and thus is entirely permissible.

**VI.     To the Extent Any Error Has Occurred, A Curative Instruction is a Sufficient
         Remedy**

    None of the errors complained of by Atilla are, in fact, errors.  But even if they were, they

certainly do not constitute the type of "manifest necessity" required to justify a mistrial.  Nothing

has happened that interferes with Atilla's "right to a fair trial," particularly given that almost

everything he complains of was already elicited through Zarrab, including (a) the widespread

bribery that facilitated the sanctions evasion scheme centered at Halk Bank; (b) the scope and

type of evidence secured through the Turkish investigation; and (c) the efforts that the Turkish

government would make to retaliate against witnesses who testify about the scheme.  Thus, even

if one could argue that introduction of some evidence through Korkmaz was erroneous, it cannot

be said that there is "a strong likelihood that the effect of the evidence [introduced through

Korkmaz] would be devastating to the defendant."  *United States v. Elfgeeh*, 515 F.3d 100, 127 (2d

Cir. 2008) (internal quotation and citation omitted).  As a result, a curative instruction would be

sufficient to cure any error, and it is presumed that the jury "will follow an instruction to disregard

inadmissible evidence inadvertently presented to it . . . ." *See id.* Case law requires that the Court only grant a mistrial "with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Klein*, 582 F.2d at 190 (internal citation and quotation omitted). Atilla, on the other hand, has cavalierly demanded such relief on the basis of non-objectionable testimony that is well within the Court's authority to allow. Atilla's motion for a mistrial should be denied.

## CONCLUSION

Accordingly, the Government respectfully requests that the Court deny the defendant's motion for a mistrial.

Dated: New York, New York
    December 14, 2017

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

by: _____*/s/*_____

Michael D. Lockard/Sidhardha Kamaraju/
David W. Denton, Jr.
Assistant U.S. Attorneys
Dean C. Sovolos
Special Assistant U.S. Attorney
(212) 637-2193/6523/2744/2213
