

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 16, 2017

**BY EMAIL AND ECF**

Honorable Richard M. Berman
United States District Judge
Daniel Patrick Moynihan U.S. Courthouse
Southern District of New York
500 Pearl Street, Room
New York, New York 10007

      Re:    **United States v. Mehmet Hakan Atilla,**
              **S4 15 Cr. 867 (RMB)**

Dear Judge Berman,

      The Government respectfully submits this letter in opposition to the motion by the defendant, Mehmet Hakan Atilla, for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Atilla Mot."). For the reasons set forth below, Atilla's motion should be denied in its entirety – the evidence introduced by the Government at trial demonstrates each element of the crimes that Atilla has been charged with beyond a reasonable doubt.[1]

    **I.**    **Applicable Law**

      Federal Rule of Criminal Procedure 29(a) provides that, upon a defendant's motion, the Court can enter "a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." The rule also permits the Court to defer ruling on such a motion until the jury begins deliberations or until after a jury verdict. *See* Fed. R. Crim. P. 29(b). If the Court defers its ruling, then "'it must decide the motion on the basis of the evidence at the time the ruling was reserved.'" *United States* v. *Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (quoting Fed. R. Crim. P. 29(b)).

      When considering a Rule 29 motion, the Court must view the evidence presented in the light most favorable to the government. *See Jackson* v. *Virginia*, 443 U.S. 307, 319 (1979); *United States* v. *Puzzo*, 928 F.2d 1356, 1361 (2d Cir.1991). All permissible inferences must be drawn in the Government's favor. *See Jackson*, 443 U.S. at 319. The Second Circuit has observed that "the Court 'must determine whether upon the evidence, giving full play to the right of the jury to

---

[1] The Court has reserved its decision on Atilla's motion until after the jury has deliberated. If Atilla renews his motion after a verdict, the Government respectfully requests an opportunity to supplement its opposition to address any new arguments made by Atilla.

determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt.' " *United States* v. *Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *United States* v. *Mariani*, 725 F.2d 862, 865 (2d Cir.1984)). Accordingly, in assessing the evidence, the Court ultimately asks whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States* v. *Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting Jackson, 443 U.S. at 319). "[I]f the court "concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Guadagna*, 183 F.3d at 129 (internal citation and quotation omitted)..Under this standard, "[a] court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States* v. *Espaillet*, 380 F.3d 713 (2d Cir. 2004) (internal quotation omitted). And, if the defendant is challenging a jury's verdict finding him guilty, then the defendant "bears a very heavy burden," *United States* v. *Desena,* 287 F.3d 170, 177 (2d Cir. 2002), and faces "an uphill battle." *United States* v. *Jones*, 30 F.3d 276, 281 (2d Cir. 1994); *see also*, *e.g.*, *Autuori*, 212 F.3d at 114.

    **I.**    **The Evidence Demonstrates that Atilla Knowingly Participated in Conspiracies to Violate U.S. Sanctions, Defraud U.S. Financial Institutions, and Engage in Promotional Money Laundering**

Atilla's principal challenge to the counts of the Superseding Indictment charging him with conspiring to violate the International Emergency Economic Powers Act (the "IEEPA") (Count Two); conspiracy to commit bank fraud and bank fraud (Counts Three and Four); and conspiracy to commit money laundering and money laundering (Counts Five and Six) is that he claims that there is insufficient evidence to show that he knew that the Iranian oil proceeds being withdrawn from Halk Bank were being used as part of transactions passing through the U.S. financial system. Atilla is wrong.

Atilla argues that only evidence showing his knowledge that the money was being used for any type of international financial transfer was testimony from Reza Zarrab about a meeting that occurred on October 4, 2012 at Halk Bank between Zarrab, members of an Iranian oil delegation, Suleyman Aslan, and Atilla. Zarrab testified that at that meeting, there were two primary topics: (i) a plan to bring Iranian oil proceeds held at Indian and Italian financial institutions to Halk Bank, where they would ultimately be transferred to Zarrab as part of the gold scheme; and (ii) demands by the Iranian delegation that Halk Bank allow them to make international transfers using this money directly from Halk Bank, rather than having to pass it through Zarrab. He further testified that Aslan agreed to the first request – transferring the funds held in India and Italy to Halk Bank – but that Aslan declined the Iranians' request to process their international payments directly through Halk Bank. Zarrab described that Aslan said that the Iranians could continue to use the "existing system" to make those payments, while pointing at Zarrab. Zarrab also described how, after the Iranians balked at Aslan's refusal, Atilla then similarly responded that it would not be possible for Halk Bank to be the intermediary for the Iranians' international payments, but that these payments could be made through the "existing system." Zarrab testified that he understood the phrase the "existing system" to be a reference to the gold scheme that Zarrab had previously described and diagrammed for the jury.

Atilla claims that this testimony is insufficient to show Atilla's knowing participation in a scheme that would touch on U.S. banks because, according to his motion, "[i]nternational money transfers are not synonymous with U.S. money transfers – one can make great use of the international monetary system (most notably with Euros) without ever touching the U.S." (Atilla Mot. at 1). This argument substantially understates the import of Zarrab's testimony. That testimony establishes not only that Atilla was aware that the funds being pulled from Halk Bank were being used to fund international payments, but more specifically shows that he was aware that the money was being transferred to Zarrab's company – a Turkish entity – to fund international payments *on behalf of Iranian clients that Halk Bank itself refused to process directly* In other words, Atilla knew that the Iranian oil proceeds were being transferred out of Halk Bank to a Turkish company, which had the effect of hiding the Iranian connection, and then being used to fund transactions that Halk Bank itself should not be doing. And the Government's other witnesses explained exactly what types of Iranian transactions would be problematic for a foreign financial institution. Lisa Palluconi, the Government's expert from the Department of Treasury's Office of Foreign Assets Control ("OFAC"), also testified about how U.S. sanctions prohibited the processing of financial transactions on behalf of Iranian entities, such as the "international money transfers" discussed at the October 4 meeting, through U.S. financial institutions And Mark Dubowitz, the Government's expert on Iranian history and Adam Szubin both testified that the primary sanctions in curtailing Iran's ability to do business at the time were those imposed by the United States, the United Nations, and the European Union.

Thus, when taken with Zarrab's testimony, this testimony shows that Atilla was aware that the purpose of the "existing system" was to allow the Iranian oil proceeds to be used in a manner that they could not be utilized while in a traditional financial institution (like Halk Bank) and that the principle restrictions on the Iranians' ability to use that money as they wished was economic sanctions imposed by the international community, including the United States. Standing alone, this testimony is sufficient to establish that Atilla was aware that the purpose of the scheme was to launder the Iranian oil proceeds so that they could be used to evade the whole suite of Iranian sanctions in place at the time – U.S., U.N., and E.U. *See United States* v. *Truman*, 688 F.3d 129, 139 (2d Cir. 2012) (explaining that "even the testimony of a single accomplice witness is sufficient to sustain a conviction, provided it is not incredible on its face . . . or does not def[y] physical realities" (internal citation and quotation omitted)). Atilla of course is free to argue to the jury that he thought that the purpose of the scheme was only to evade U.N. or E.U. sanctions, but certainly a "'rational trier of fact' could reject that argument, in light of this evidence. *See Autuori*, 212 F.3d at 114.

Of course, contrary to Atilla's argument, this testimony is also not the only evidence introduced by the Government at trial that shows his awareness of the purpose of the scheme. For example, the Government introduced scores of wiretapped calls that detailed the scheme. As one example, the Government's case included a call between Zarrab and Atilla on July 9, 2013 and testimony from Zarrab about that call which showed that Atilla was warning Zarrab about inconsistencies in documents submitted by Zarrab's company that could draw scrutiny, demonstrating Atilla's knowledge that the purpose of these transactions was nefarious. The Government also introduced other wiretapped calls in which Atilla's directions as to how to tailor the documentation so that the transactions appeared compliant with U.S. sanctions, such as, for example, a February 21, 2013 call between Zarrab and one of his employees, Abdullah Happani,

in which Zarrab explained that Atilla had instructed him as to whether to list Iran or the United Arab Emirates as the ultimate destination of gold shipments on export documents, even though the gold was never actually going to Iran, based on changes in U.S. sanctions.

In addition to the wiretapped evidence, the Government also elicited testimony about and introduced exhibits concerning meetings and calls between Atilla and U.S. Treasury Department officials, including Szubin and David Cohen, both of whom were called as witnesses. Both Cohen and Szubin described how, on several occasions, they described the sanctions to Atilla and others at Halk Bank, and explicitly cautioned Atilla about the exact type of conduct that was occurring at Halk Bank, with his help, and how it would violate U.S. sanctions. Cohen and Szubin's testimony, together with the several email memoranda describing these interactions that were introduced into evidence, show that Atilla was warned about how the Government of Iran used front companies to purchase gold, how Turkish traders were transferring Iranian monies held at Turkish banks abroad, and even specifically raised questions about Zarrab's dealings with Halk Bank. Cohen and Szubin also testified about representations made to them by Atilla that the Government has proven are demonstrably false, including Atilla's description of the extent of Halk Bank's dealings with Zarrab at an October 2014 meeting with Cohen. All of this shows that Atilla (i) understood U.S. sanctions and how to make transactions look like they complied with these sanctions even though they did not, (ii) knew that U.S. regulators were concerned about the very trade with Zarrab that Atilla was helping to facilitate through his coaching of Zarrab; and (iii) Atilla had concealed material information from OFAC about the scheme. This evidence amply demonstrates that Atilla was aware that Zarrab's business at Halk Bank was designed to violate U.S. sanctions and is sufficient to convict Atilla under either an actual knowledge or conscious avoidance theory. *See United States* v. *Ferguson*, 676 F.3d 260, 278 (2d Cir. 2011) ("Red flags about the legitimacy of a transaction can be used to show both actual knowledge and conscious avoidance.") (internal citation omitted).

Finally, the Government has introduced considerable evidence that the scheme actually did pass through FDIC-insured U.S. financial institutions. The parties agreed by stipulation that the victims U.S. financial institutions are FDIC-insured. The Government introduced data from these institutions that shows that transactions like the ones described by Zarrab were processed by U.S. financial institutions. And Zarrab explained several exhibits that showed essentially one such transaction from start to finish, including the payment instruction originating in Iran, moneys being transferred within Halk Bank from an Iranian bank that had received money from the National Iranian Oil Company ("NIOC") to one of Zarrab's company's accounts, the funds being transferred between Zarrab's companies, and the funds then being used to fulfill the payment instructions from the Iranian client through a transaction that passed through a U.S. bank. "While success of the unlawful venture is not an essential element of the crime of conspiracy here charged, such success may constitute most powerful evidence of essential elements of the Government's proof, namely, proof that the conspiracy in fact existed and that the misappropriations in fact were made." *See United States* v. *Kole*, 442 F. Supp. 852, 853–54 (S.D.N.Y. 1977).

With respect to Count Two, there is also a second basis for the jury to conclude that Atilla conspired to violate U.S. sanctions, which is his participation in a campaign to avoid the imposition of sanctions on Halk Bank by OFAC under the so-called "secondary sanctions" for the bank's facilitation of improper transactions on behalf of Iranian government entities, including the Central

Bank of Iran and the NIOC. As set forth in the Government's extensive briefing in response to Atilla's motion to dismiss the Superseding Indictment, by its plain language and pursuant to well-established canons of construction, the IEEPA criminalizes conspiracies to violate the regulations and executive orders adopted to implement the American embargo against Iran, including regulations and orders that prohibit transactions intended to "evade" and "avoid" the prohibitions set forth in those regulations and orders. *See* 50 U.S.C. § 1705; 31 C.F.R. § 560.203; 31 C.F.R. § 561.205; Executive Order 13622 §9(a); Executive Order 13645 §13(a); Dkt. No. 308, p. 9-15. While Atilla re-argues in his Rule 29 motion his claim that the secondary sanctions cannot be the basis for a criminal violation of IEEPA, the Court has already rejected that claim when it denied his motion to dismiss the Superseding Indictment, and that is now the law of the case. *See United States* v. *Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2003) (law-of-the-case doctrine "holds 'that when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' . . . 'unless 'cogent' and 'compelling' reasons militate otherwise'") (quoting *United States* v. *Uccio*, 940 F.2d 753, 758 (2d Cir. 1991) and *United States* v. *Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000)). And nothing that has emerged during trial merits the Court revisiting that conclusion because, as OFAC has indicated, this case presents a unique set of facts and essentially presents a matter of first impression.

The same evidence that demonstrates that Atilla knew that the end purpose of the scheme was to engage in financial transactions on behalf of Iranian entities in violation of, among others, U.S. sanctions shows that he entered a conspiracy to avoid the imposition of sanctions on Halk Bank under the secondary sanctions. The Government introduced evidence that Atilla knew that, for example, Iranian oil proceeds were held at Halk and that OFAC was concerned about how they were being used. Similarly, the Government established that Atilla was aware that Zarrab was using this money to purchase gold, which would be prohibited by the secondary sanctions. And the Government's evidence included wiretapped calls showing how Atilla instructed Zarrab as to how to make sure the documents would appear real and show that the transactions at issue complied with sanctions regulations. The Government also offered evidence showing that OFAC could impose sanctions on a foreign financial institution like Halk Bank if it facilitated precisely these types of transactions and that the consequence of such sanctions could be the termination of that foreign financial institution's ability to deal with the U.S. market, which would be a deathblow to the bank. Finally, the Government submitted evidence that showed that Atilla concealed the true nature of Zarrab's business at Halk Bank from U.S. regulators, the very people who could impose these severe penalties on Halk Bank. The Government has more than satisfied its burden on this theory as well.

Accordingly, the Government respectfully submits that there is no basis to judgment of acquittal on Counts Two, Three, Four, Five, and Six of the Superseding Indictment, and that Atilla's motion should be denied.

## II. Atilla's Attack on Count One is Meritless as Matter of Law and Fact

Count One charges Atilla with participating in a conspiracy to defraud the United States, and in particular to defraud the U.S. Treasury Department in connection with its administration of the U.S. embargo against Iran. Atilla concedes "[t]hat alleged evasion, as a matter of proof, has been adequately established by the government to survive a legal challenge under 18 U.S.C. 371."

(*See* Atilla Mot. at 2). He then bizarrely argues, however, that the Court should nevertheless dismiss Count One:

> However, we urge the Court to consider dismissing this charge as well because it is clear that no rational jury could conclude that Mr. Atilla's conduct "impeded" Treasury's functions, as it must under the law. At most, the government has proven that Mr. Atilla sought to deceive Treasury by telling them what Halkbank was doing to ensure compliance with the sanctions. It is, however, undisputed that Mr. Atilla told Treasury just the opposite: that Halkbank was having great difficulty determining whether gold transactions (for example) complied with the sanctions. *See* GX 7020, 4/12/2013 Cable re A. Szubin Meeting with Halk Bank, at 3 ("Halk explained it had had great difficulty in trying to determine the origin of these trades, and the ultimate destination.")

In other words, in one sentence, Atilla concedes that the Government has proven that Atilla tried to "deceive Treasury" by assuring them that Halk Bank was taking steps to comply with sanctions, but in the next sentence, argues as a factual matter, Atilla was doing the exact opposite. Setting aside the incoherence of this argument, Atilla was right the first time – the Government's proof at trial has demonstrated clearly that Atilla and others engaged in deceptive acts that pertained to (and in fact impeded) Treasury's administration of the U.S. sanctions regime. For instance, the Government introduced evidence of a meeting between Atilla and Cohen in October 2014 when Cohen was seeking information about Halk Bank's dealings with Zarrab. Cohen testified that Atilla told him, in sum and substance, that Zarrab had received a loan from Halk Bank and that Halk Bank had facilitated some foreign trade for Zarrab, a far cry from the billions of dollars-worth of Iranian oil proceeds that Atilla and Halk Bank had helped Zarrab launder on behalf of the Iranians. Given that, as Cohen testified, one of the key goals of the sanctions regime was to limit the ways in which Iran was able to use its oil proceeds, misleading Treasury as to the extent of Zarrab's business that involved those very oil proceeds obviously hindered Treasury's efforts to administer the sanctions. *See United States* v. *Bilzerian*, 926 F.2d 1285, 1302 (2d Cir. 1991) (giving false information to the SEC or IRS impairs their administration of their regulatory schemes in violation of Section 371).

Atilla next argues that no rational juror could find that Treasury had been impeded because Treasury did not sanction Zarrab despite, as Atilla describes it, (i) OFAC had issued a civil penalty against Al Nafees Exchange ("Al Nafees"), which Atilla claims belongs to Zarrab; (ii) Al Nafees had not paid that penalty; (iii) Zarrab's arrest in Turkey for bribery, among other things; and (iv) "Mr. Atilla expressly invited Treasury to sanction Zarrab in 2014 so Halkbank would have a basis for not dealing with him." (*See* Atilla Mot. at 4). In essence, Atilla argues that if these "facts" did not cause Treasury to sanction Zarrab, then nothing Atilla said would have caused him to be sanctioned. Initially, Atilla's factual arguments are unsupported by the record, and even if he could argue these inferences to the jury, on a Rule 29 motion, all inferences are drawn in the Government's favor. *See United States* v. *Sheehan*, 838 F.3d 109, 119 (2d Cir. 2016) (stating that court reviewing sufficiency challenge must "credit[ ] every inference that could have been drawn in the government's favor" (internal quotation marks omitted)). Thus, Atilla argues that OFAC's enforcement action against Al Nafees should have some bearing on OFAC's decision to sanction Zarrab, but Zarrab testified that Al Nafees was his father's business, and that Zarrab stopped

working there long before OFAC levied a civil penalty against Al Nafees. Similarly, Atilla argues that OFAC should have sanctioned Zarrab after he was arrested in Turkey, but that arrest was based on public corruption allegations, not violations of U.S. sanctions. And finally, with respect to Atilla's purported "invitation," Cohen testified that he did not understand Atilla's comments in that light, but rather that Atilla had said, in essence, that because Treasury had not placed Zarrab on the Specially Designated Nationals list, Halk Bank was going to keep doing business with him.

Moreover, Atilla's argument is at bottom nothing more than a claim that the conspiracy in which he engaged could not be successful because Treasury was not relying on or did not care what Atilla said. Putting aside the illogic of the argument that senior Treasury officials traveled to Turkey to meet with and ask questions of senior executives at Halk Bank, including Atilla, for essentially no reason, Atilla's argument fails as a matter of law. The "illegality of [a conspiracy] does not depend upon the achievement of its goal and it therefore does not matter that the ends of the conspiracy were from the beginning unattainable." *United States* v. *Shellef*, 507 F.3d 82, 105 (2d Cir. 2007). Atilla is charged with participating in a conspiracy to defraud Treasury – the fact that, according to him, he could not have defrauded OFAC because OFAC was never going to sanction Zarrab is legally irrelevant.

Atilla's Rule 29 motion should also be denied with respect to Count One.

## III. The Evidence Shows that Atilla Was Part of a Single Conspiracy

Finally, Atilla moves for a judgment of acquittal on all of the conspiracy counts (Counts One, Two, Four, and Six) because, he claims, the Government has introduced evidence of multiple conspiracies. In essence, this argument is a rehash of Atilla's motion for severance, in that he argues that there is no evidence that he was aware of the U.S. nexus to the scheme and thus has been misjoined. (*See* Atilla Mot. at 6). As set forth above, however, there is considerable evidence that Atilla knew exactly what the purpose of Zarrab's withdrawal of the Iranian oil proceeds from Halk Bank was, *i.e.*, launder the money so that it could be used in ways that were prohibited by various sanctions regimes, including the American embargo, and that Atilla took acts to further that scheme. (*See supra* p. 2-4). Indeed, the evidence shows that Atilla participated in a meeting where the scheme was discussed and, on other occasions, communicated with other members of the conspiracy about the scheme, including Zarrab. Thus, the cases to which Atilla cites are entirely inapplicable. *See Shellef*, 507 F.3d at 96 (tax counts could not be joined with other counts because no evidence of connection other than that counts involved same business); *United States* v. *Figueroa*, No. 08 Cr. 749 (ARR), 2010 WL 11463852, at *11 (E.D.N.Y. Mar. 2, 2010) (no evidence of common goal or purpose); *United States* v. *Kouzmine*, 921 F. Supp. 1131, 1133 (S.D.N.Y. 1996) (no allegation that they had any knowledge of or participation in co-conspirators' schemes); *United States* v. *Lech*, 161 F.R.D. 255, 257-58 (S.D.N.Y. 1995) (indictment charged three distinct bribery conspiracies and no evidence that defendant knew of all of the conspiracies); *United States* v. *Giraldo*, 859 F. Supp. 52, 54 (E.D.N.Y. 1994) (two narcotics trafficking conspiracies could not be joined because they did not overlap in time or involve "substantial identity of participants"). Moreover, Atilla's argument simply ignores the Government's theory under the secondary sanctions, which would also be a basis for a conviction under Count Two. A

rational juror could clearly find that Atilla knew of the goals of the scheme and willfully participated in them.

Atilla also now engrafts another layer on this argument, claiming that the Government has improperly introduced evidence of (i) "Zarrab's apparent conspiracy to trade with Russia in a manner that risked sanctions"; (ii) "Zarrab's apparent conspiracy to trade with China in a manner that risked sanctions"; and (iii) Zarrab's apparent conspiracy to convert the proceeds of sanctionable trade with Iran (either with Iran, China or Russia) into dollars." (Atilla Mot. at 4). Atilla claims that the Government has charged all of these "apparent conspira[cies]" as one conspiracy, which is the basis for Counts One, Two, Four, and Six. (*See id*.). Atilla's argument has no basis in the language of the Superseding Indictment or the evidence at trial.

Contrary to Atilla's claim, Counts One, Two, Four, and Six are extensively described in the Superseding Indictment and clearly show that the conduct with which Atilla has been charged is the scheme to launder Iranian oil proceeds held at Halk Bank. Atilla is not charged with seeking to evade sanctions in China or Russia. And Atilla points to nothing in the Superseding Indictment, because he cannot, that supports his argument that somehow any of the counts charge him with Russian sanctions evasion or Chinese sanctions evasion.

The conduct Atilla is charged with concerns efforts to use Iranian oil proceeds in ways that are not permitted by U.S. sanctions. To the extent the Government introduced evidence concerning that activity that occurred in China, that is because that evidence is probative of this conduct. For example, this evidence is relevant because it showed that when presented with essentially the same "system" for laundering Iranian oil proceeds that Zarrab was operating at Halk Bank, Chinese banks refused, and essentially shut down Zarrab's business shortly after learning of the Iranian connection. Such evidence proves, among other things, the willfulness of the charged conduct. Similarly, conversations between Zarrab and one of his employees about analogies between employees at a Chinese bank and Halk Bank employees, including Atilla, demonstrate that Zarrab was dealing with, among others, Atilla concerning his Iranian business, and his perception of how each of those Halk Bank employees played a role in the scheme. Thus, all of this evidence is relevant. And even accepting for purposes of argument the defense's claim that these conversations should not be admitted as co-conspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E), that is irrelevant, because these conversations reflect the participants' state of mind, and thus would have been admissible under Fed. R. Evid. 803(3) in any event. Thus, Atilla has not suffered any prejudice, because all of the evidence admitted him concerning Zarrab's activities in China was relevant and admissible. .*See United States* v. *Spinelli*, 352 F.3d 48, 55-56 (2d Cir. 2003) (upholding denial of severance motion and denying prejudicial spillover claim where "much of the evidence about [co-defendant's] crimes would have been admissible at a separate trial of [defendant], since it was relevant to proving the nature and scope of the conspiracy").

Finally, with respect to Zarrab's activities in Russia, that evidence was elicited primarily through the defense's cross of Zarrab, which asked Zarrab about supposed cash deliveries he arranged to Russia. The Government, on the other hand, has never argued that Atilla was involved in any of Zarrab's business in Russia, or that he is guilty of any crime connected to Zarrab's business dealings in Russia. The Government has not even alleged that Zarrab engaged in sanctions evasion in Russia. To the extent the Government has introduced – without publishing

to the jury -- some exhibits that show that financial transactions involving Zarrab's business and Russian entities or in rubles, that does nothing more than establish that Zarrab does in fact have an international money changing business, a fact that he testified about. Thus, Atilla's contention that he has suffered prejudice because the records contains some meager evidence of Zarrab's business dealings in Russia is nothing more than a red herring.

For the foregoing reasons, the Government respectfully submits that the defendant's motion for a judgment of acquittal should be denied in its entirety.

Respectfully submitted,

JOON H. KIM
Acting United States Attorney

by: _____/s/_____
Michael D. Lockard,
Sidhardha Kamaraju,
David W. Denton, Jr.
  Assistant United States Attorneys
Dean C. Sovolos,
  Special Assistant United States Attorney
(212) 637-2193/6523/2744/2213

cc: Counsel of record (by email)