HBS3ATI1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                              S4 15 Cr. 867 RMB

5   MEHMET HAKAN ATILLA,

6                Defendant.

7   ------------------------------x

8

9                                           November 28, 2017
                                            8:45 a.m.
10

11

12  Before:

13                  HON. RICHARD M. BERMAN,

14                                          District Judge
                                             and a jury
15

16

17                      APPEARANCES

18  JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
    MICHAEL DENNIS LOCKARD,
20  SIDHARDHA KAMARAJU,
    DAVID WILLIAM DENTON, JR.,
21  DEAN CONSTANTINE SOVOLOS,
         Assistant United States Attorneys
22

23

24

25

1

2              (APPEARANCES Continued)

3

4

5    HERRICK, FEINSTEIN LLP (NYC)
          Attorneys for defendant Atilla
6    BY:  VICTOR J. ROCCO, Esq.
          THOMAS ELLIOTT THORNHILL, Esq.
7         – and –
     FLEMING RUVOLDT, PLLC
8    BY:  CATHY ANN FLEMING, Esq.
          ROBERT J. FETTWEIS, Esq.
9         – and –
     LAW OFFICES OF JOSHUA L. DRATEL, P.C.
10   BY:  JOSHUA LEWIS DRATEL, Esq.
                    Of counsel

11

12   Also Present:
          JENNIFER McREYNOLDS, Special Agent FBI
13        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
          MS. ASIYE KAY, Turkish Interpreter
14        MS. SEYHAN SIRTALAN, Turkish Interpreter

15

16

17

18

19

20

21

22

23

24

25

1          (In open court; jury and defendant not present)

2          THE COURT:  Do you all want to say anything in support

3   or opposition to the motion that's been filed?

4          MS. FLEMING:  Yes, your Honor.  After the letter was

5   filed --

6          THE COURT:  Hold on a second.  Your client is not

7   here.  Is that all right?

8          MS. FLEMING:  Yes.  He doesn't know about this yet.

9          THE COURT:  He doesn't know about what?

10          MS. FLEMING:  He doesn't know what I'm about to tell

11   the Court.

12          THE COURT:  He doesn't know about the letter

13   application?

14          MS. FLEMING:  We haven't advised him.  There is

15   something that happened after the letter application.  40

16   minutes after the letter was filed, we received from the U.S.

17   attorney's office another file containing some 11,000

18   documents, e-mails --

19          THE COURT:  I'm going to deal with that.  Do you want

20   to be heard in support of your motion or in opposition.  That's

21   all I'm asking.  Or do you want me to rule on the papers?

22          MS. FLEMING:  We want to be heard.

23          THE COURT:  Everybody sit down.  Go ahead.  You've got

24   five minutes.

25          MR. ROCCO:  Mr. Fettweis is going to argue this.

1          MR. FETTWEIS:  Good morning.  The defense has asked

2     you for a two-week adjournment of the trial.

3          THE COURT:  Counsel, I know that.  You've got five

4     minutes.  I've read the papers.  Tell me what is most

5     significant about your application.

6          MR. FETTWEIS:  What has happened very recently, your

7     Honor, since the application was filed last night, we received

8     more than 10,000 pages of Jencks material for the government's

9     most important witness, almost all of which is in Turkish.

10    And --

11         THE COURT:  Who is the witness?

12         MR. ROCCO:  We cannot say, your Honor.

13         THE COURT:  You can say.

14         MR. FETTWEIS:  Reza Zarrab.  We received more than

15    10,000 pages of Jencks material from Mr. Zarrab, mostly

16    involving e-mails in Turkish.  And this morning at 5:30 a.m. we

17    received another delivery of government -- of revised

18    government exhibits, and just within the last few minutes we

19    received still another delivery of Jencks material that we

20    haven't had any sort of chance to look at yet.

21         All four law firms in this case, your Honor, and all

22    the lawyers have been working seven days a week, extremely long

23    hours.  The lawyers are, as you've indicated yesterday, as you

24    saw yesterday, highly responsible, highly experienced lawyers.

25    We are all saying to you there is simply not enough time to

1    absorb all the new material that's been dumped on us and

2    continues to be dumped on us to ensure that the defendant

3    receives a fair trial.

4              THE COURT:  I got it.  Do you want to respond?

5              MR. LOCKARD:  Yes, your Honor.  I'll address just the

6    production of e-mails from last night.  So that material is

7    not --

8              THE COURT:  Counsel, there is not going to be any

9    rebuttal.

10             MR. LOCKARD:  That material is not 3500 material.

11             THE COURT:  I'm sorry?

12             MR. LOCKARD:  The material is not 3500 material.  That

13   material was produced because we learned approximately less

14   than a week ago that defense counsel had served a subpoena on

15   the BOP for records relating to that particular inmate.  BOP

16   did not have the responsive records, but we did because we had

17   previously obtained them.

18             THE COURT:  It might be better if you spoke at the

19   podium so everybody could hear.

20             MR. LOCKARD:  So, the e-mails are not 3500 material

21   because, as far as we are aware, there is nothing in there that

22   relates to the subject matter of that defendant's testimony.

23   But, they were produced because defense counsel served the

24   bureau of prisons with a subpoena for records.  We learned

25   about the subpoena from the bureau of prisons approximately a

1    week ago.  We were advised that the BOP did not have those

2    records.  We did, because we had previously obtained them, so

3    we produced them.  So if they had gotten them from the BOP, it

4    would have been on the same timeline and the same volume.

5           But in our view, that is not 3500 material because it

6    is not the statements of the defendant relating to the subject

7    matter of his testimony.

8           With respect to the additional materials recently

9    produced, as trial prep continues, there are additional

10   statements of witnesses arising from that trial prep, and they

11   are produced on an ongoing basis.  We are not going to stop

12   prepping witnesses, 3500 material is not going to stop being

13   created, and we are not going to stop disclosing it.

14          And lastly, with respect to the revised translations,

15   as we've noted in our letter, we've tried to get stipulations

16   on translations, we've been unable to do.  So we've been unable

17   to identify the scope or documents that are disputed or not

18   disputed.  So, if we are going to put on translators, they are

19   going to review the translations, make final edits, put them

20   into final trial form, and we'll produce them in the final form

21   that we intend to offer them.

22          So that's all that's happened within the last 24

23   hours.

24          MS. FLEMING:  I have to correct the misstatement about

25   the subpoena.  It is just not accurate.  First of all, we

HBS3ATI1

1    served a Touhy request to the government concerning our

2    application to the bureau of prisons.  It wasn't for e-mail, it

3    was for login sheets and for telephone records for a specified

4    period of time.  And we were told that it was too burdensome,

5    and the U.S. attorney's office was going to move to quash.

6           Last night what we received were almost 11,000

7    e-mails, most of which are in Turkish, of Mr. Zarrab for this

8    time period.  We don't know what they say.  None of us speak

9    Turkish and we are not allowed to share with our Turkish

10   counsel because of the protective order, and we are not allowed

11   to show the materials because it was represented as 3500

12   material.  Subject to the protective order, we have to print it

13   out and show it to our client in his presence.

14           THE COURT:  I got it.

15           MS. FLEMING:  That is not --

16           THE COURT:  Did you also serve a subpoena on chambers?

17           MS. FLEMING:  No.  We made a Touhy request, your

18   Honor.  We hadn't served the subpoena yet because what we had,

19   we hadn't heard yet from the bureau of prisons.  We had heard

20   back from the U.S. attorney's office, they were going to be

21   moving to the quash, and the bureau of prisons said it was too

22   burdensome.  So we hadn't served a subpoena yet.

23           But it had been for a specific period of time for

24   telephone calls and visitor logs.

25           THE COURT:  Okay.  Got it.  I'm going to have a ruling

1    for you in a couple of minutes.  Just to give you some

2    highlights.

3         First of all, I'm not adjourning the trial date, and

4    I'll explain why in detail in a couple of minutes.

5         Second, I am asking the government or directing that

6    all Brady material, all Brady material for the trial be served

7    by this evening, say 6 or 7 o'clock this evening.  And I'm

8    going to give you an accelerated advanced look at what's

9    upcoming.  So, for example, by I think I say 6 in the order

10   this evening, 6 or 7, I want you to advise the defense of all

11   the witnesses for this week, and all exhibits for this week,

12   and then going forward on Fridays of each week, including this

13   week, to give them an advanced look for the week after.  So

14   there should be no surprise as to exhibits that are going to be

15   introduced or witnesses that are going to be called and

16   presented and who they are.  And again, all Brady material to

17   be produced today.

18        So, thanks.  I'll call you back in a minute, we're

19   typing up an order.

20        MS. FLEMING:  May I excuse myself for a few minutes to

21   step outside?

22        THE COURT:  Sure.

23        (Pause)

24        (Defendant present)

25        MR. KAMARAJU:  Would your Honor like us to ask for

HBS3ATI1

1    permission to approach the witness?

2              THE COURT:  Sure.  You can say "May I approach."

3              MR. KAMARAJU:  And for publishing exhibits to the

4    jury, same thing?

5              THE COURT:  Yes.

6              Why you're here, who are the witnesses that are going

7    to be called for today?

8              MR. KAMARAJU:  Special Agent James Atwater will be the

9    first witness, and we've told defense counsel this.

10             THE COURT:  I want to put it on the record.

11             MR. KAMARAJU:  Okay.  Special Agent James Atwater will

12   be the first witness.

13             THE COURT:  That's an FBI special agent?

14             MR. KAMARAJU:  Yes, your Honor.  We'll then have a

15   witness from OFAC, Lisa Palluconi, from OFAC.

16             MR. LOCKARD:  P-A-L-L-U-C-O-N-I.

17             MR. KAMARAJU:  Then after that it will be Mark

18   Dubowitz, D-U-B-O-W-I-T-Z.  He's one of the government's expert

19   witnesses.

20             And then if we -- that may take us through the end of

21   the day, but if it doesn't then I expect we'll have Bulent

22   Bulut, B-U-L-E-N-T B-U-L-U-T.  I'm sorry.  He is an FBI

23   linguist.  And depending on what the schedule is, the last

24   witness today may be Reza Zarrab, R-E-Z-A Z-A-R-R-A-B.

25             THE COURT:  That might be today?

1          MR. KAMARAJU:  Just depending.  I suspect --

2          THE COURT:  If it weren't today, it would be first

3   thing?

4          MR. KAMARAJU:  Either first thing or shortly

5   thereafter, I imagine.  Your Honor, just because it may

6   actually be today, we're not sure yet, but it will certainly be

7   by tomorrow, the government would ask to unseal the plea

8   proceedings related to Mr. Zarrab.

9          THE COURT:  Sure, there is no problem with that.  But

10  it seems to me, in light of what Ms. Fleming said, it might be

11  smarter to put him on for tomorrow so they get a chance to go

12  through some of the materials that you gave them yesterday.

13         MR. KAMARAJU:  That's fine, your Honor.

14         MS. FLEMING:  I asked my office to get them printed

15  out.  We have to have our client look through these materials

16  tonight.  I don't know how we're going to do that with the

17  bureau of prisons.

18         THE COURT:  The same way that I -- not that I'm

19  anywhere near in this situation -- reviewed your letter and the

20  government's letter from 9:30 last night until about 2 o'clock

21  in the morning and drafted a response.  So the same way the

22  week before I reviewed your letter on Sunday, it came in a day

23  before jury selection.  So in a big trial, complicated trial,

24  that's what lawyers and judges do.  You have to do a lot of

25  work.  I counted some 8 to 13 attorneys.

1          I don't know that everybody -- this is just my

2     thinking, you have to organize your own defense, I don't know

3     that everybody has to be in court all day every day.  There

4     could be some people whose job it is to go through all of these

5     voluminous documents and put them in some sort of order for the

6     rest of you.  So, some people can take some witnesses to

7     cross-examine, or if it is your own witness have direct

8     examination.  That's really the only realistic way that one can

9     go about doing these trials.

10          It is not uncommon, incidentally, that the government

11     is somewhat late -- I wouldn't say late, this case I'm trying

12     to speed them up.  But this happens and it happens on a regular

13     basis, so you have to be prepared for it and you have to know

14     how to handle it.

15          MS. FLEMING:  Your Honor, we have divvied it up and

16     the lawyers are fine working through the night.  We have a

17     problem because of the protective order.

18          THE COURT:  I am suggesting they work through the day.

19     I don't think it is great that anybody work through the night.

20     I'm saying instead of everybody being in court, maybe somebody

21     should be in a room somewhere coordinating, going through,

22     summarizing, that kind of thing with the documents.  That's

23     what I'm saying.

24          MS. FLEMING:  The problem is they're in Turkish, and

25     our client speaks Turkish and he cannot have the materials

HBS3ATI1

1    without a lawyer present.  The bureau of prisons does not allow

2    us to stay after 8 o'clock at night.  So he cannot keep the

3    materials, he cannot go through the materials unless a lawyer

4    is present with him.  So that gives us the window of from

5    whenever we finish court today, whenever the marshals get him

6    back to the MCC for that little window of time, and we already

7    have documents being printed out.  He cannot physically go

8    through them in that window of time with whatever lawyer goes

9    over to talk to him about them.

10            THE COURT:  Or paralegal.

11            MS. FLEMING:  Or a paralegal.  But the problem is

12   going to be the window of time that he physically is allowed to

13   have the materials.  That's the problem.  Not the lawyers.

14   None of us speak Turkish unfortunately.

15            THE COURT:  There is a Turkish lawyer I thought on the

16   case.

17            MS. FLEMING:  He's not allowed by the protective order

18   to see the material.

19            THE COURT:  Who is he?

20            MS. FLEMING:  His name is Halil Uzun if I've said it

21   correctly.  He is not allowed by the protective order.

22            THE COURT:  Is that correct?

23            MR. KAMARAJU:  I believe under the terms of the

24   protective order, but the government will consent if it will

25   facilitate trial preparation to allow that Turkish lawyer to

1   rereview these documents.

2              MS. FLEMING:  Thanks.

3              MR. DENTON:  Just one thing while we're here.  I'm

4   sorry.  I believe yesterday --

5              THE COURT:  You know we're here a long time.

6              MR. DENTON:  Given that the government expects to call

7   Mr. Dubowitz relatively early, I think Mr. Harrison indicated

8   yesterday he might have some application pertaining to the

9   exhibit that Mr. Dubowitz will use.  It might make sense to

10  address that now before we get started.

11             THE COURT:  Can't do it right now.  So thanks.

12             We're still waiting on one juror.

13             (Pause)

14             THE COURT:  Just so you know what the schedule is, the

15  jury is now all here.  We're going to bring them out in a

16  minute.  First thing we'll do is swear in the jury and I'll

17  give them some preliminary jury instructions.  And then we'll

18  have, after that, we'll have opening statements.

19             And how long do you think your opening will be?

20             MR. DENTON:  About half an hour, your Honor.

21             MR. ROCCO:  I'd say half hour, Judge.

22             THE COURT:  Then we'll get to the first witnesses.  We

23  should have a fair amount of momentum behind us.

24  Simultaneously, we're going to post on the docket an order

25  denying the application to adjourn the trial.  And my chambers

1    will bring up, I guess there is about 30, 30 of you, and so

2    we'll have copies if you want to have them in your hand in the

3    next five or 10 minutes.  But, I think we should call the jury

4    as soon as possible and start the trial.  So just give us a

5    minute or so.

6                (Jury present)

7                THE COURT:  Good morning, everybody.  Please be

8    seated.

9                I think we have one more juror.  How is your head

10   cold?

11               JUROR NO. 1:  Better.  Thank you, sir.

12               THE COURT:  This will make it better.

13               I'm going to ask everybody except the jurors to be

14   seated.  First thing we're going to do is swear you in as

15   jurors, then I'm going to give you some preliminary jury

16   instructions.  Then we're going to have opening statements and

17   the first series of witnesses.

18               THE DEPUTY CLERK:  If you could all raise your right

19   hands, please.

20               Do you solemnly swear or affirm that you shall well

21   and truly try this issue now on trial and a true verdict give

22   according to the law and the evidence?

23               THE JURY:  I do.

24               THE COURT:  Please be seated.

25               Members of the jury, now that you've been sworn, let

1    me tell you, briefly, something about your role and your duties

2    as jurors and give you what I call preliminary instructions.

3         At the end of the trial, I will give you more detailed

4    instructions or jury charges, and those instructions will

5    govern your jury deliberations.

6         At the end of the presentation of the evidence, and my

7    final charges to you, it will be your duty to decide from the

8    evidence what the facts are.  You and you alone are the

9    determiners of the facts.  You will hear the evidence, decide

10   what the facts are, and then apply those facts to the law which

11   I will give you.  And that's how you reach your verdict.  In

12   doing so, you must follow the law whether you agree with it or

13   not.

14        Under the law, a defendant is presumed to be innocent,

15   and he or she cannot be found guilty of the crimes charged in

16   the indictment, unless a jury, in this case you all, after

17   having heard all of the evidence in the case, unanimously

18   decides that the evidence proves his or her guilt beyond a

19   reasonable doubt.

20        In a criminal case, the burden of proof remains with

21   the prosecution.  In order for the jury to return a verdict of

22   guilty, the prosecution must prove beyond a reasonable doubt

23   that a defendant is guilty.  A person charged with a crime has

24   absolutely no burden to prove that he or she is not guilty.

25        You must not take anything that I may say or do during

1    the trial as indicating what your verdict should be.  For

2    example, don't be influenced by my taking notes.  What I write

3    down may have nothing to do with this trial or with what you

4    will be concerned with during the trial.

5          Let's talk a minute or two about evidence.  You, the

6    jurors, decide what the facts are from the evidence that will

7    be presented here in court in the courtroom while everybody's

8    present.  That evidence may consist of the testimony of

9    witnesses, it certainly will in this case.  It will also

10   include documents and other things received into evidence as

11   exhibits, and any facts on which the lawyers may agree or

12   stipulate, or that I may instruct you to find.

13         There are two kinds of evidence.  One is called direct

14   evidence and the other is called circumstantial evidence.

15   Direct evidence is testimony by a witness about what that

16   witness personally saw or heard or did.  Circumstantial

17   evidence is indirect evidence, that is, it is proof of one or

18   more facts from which you may find another fact.

19         You as jurors may consider both direct and

20   circumstantial evidence in deciding this case.  The law permits

21   you to give equal weight to both, or no weight if that's what

22   you were to decide.  Because it's up to you, the jurors, to

23   decide how much weight, if any, to give to any particular

24   evidence.

25         As the sole determiners of the facts, you, the jurors,

must determine which witnesses you believe and what portion of

their testimony you accept, and what weight you attach to it.

At times during the trial I may sustain objections to

questions that are asked.  And when that happens, I will not

permit the witness to answer, or, if, as sometimes happens, the

witness has already answered, I shall instruct the jury and the

court stenographer that the answer be stricken from the record

and that you disregard it and dismiss it from your minds.

In reaching your decision, you may not draw any

inference from an unanswered question where an objection has

been sustained nor may you consider testimony that I have

ordered stricken from the record.

The law requires that your decision be made solely

upon the evidence presented to you.  The items I exclude from

your consideration will be excluded because they are not

legally admissible as evidence.  The law does not, however,

require you to accept all of the evidence that I do admit.

In determining what evidence you will accept, you must

make up your own minds and do your own evaluation of the

testimony given by each of the witnesses and of the documents

presented to you, and you determine the weight which you choose

to give to each witness's testimony or to an exhibit.  There is

no magical formula by which you should evaluate testimony or

exhibits.  I will at the end give you some guidelines for

determining the credibility of witnesses in my final

1    instructions.

2         At this time, suffice it to say you bring with you to

3    this courtroom all of the experience and background of your

4    lives.  You do not leave your common sense outside the

5    courtroom.  The same types of assessments that you use in your

6    everyday dealings are the assessments that will apply in your

7    deliberations.

8         We've handed out legal pads and pens.  You certainly

9    are free to take notes.  You should be aware that any notes

10   that you take are not evidence in the case.  They are your

11   personal notes and may be used to refresh your own

12   recollection, but they are not considered evidence in the case.

13        Also what is not evidence are the questions and the

14   objections of the attorneys and neither is the testimony that I

15   may instruct you to disregard.  The statements and arguments of

16   the attorneys during any part of the trial are also not

17   evidence, and further, anything that you may see or hear when

18   the court is not in session, even if what you were to see or

19   hear is done or said by one of the parties or one of the

20   witnesses, that would not be evidence.

21        Only what is admitted into evidence here when court is

22   in session and all of the parties and all of the jurors are

23   present may be considered competent evidence.

24        So with that, I'll turn to the government for the

25   first opening statement.

1      MR. DENTON:  Thank you, your Honor.

2      THE COURT:  You bet.

3      MR. DENTON:  This is a case about lies.  Lies that

4   were told to the United States by people doing the bidding of

5   the Islamic Republic of Iran, the world's foremost state

6   sponsor of terrorism.  Lies that threatened the national

7   security of our country.  Lies that were devised and told by

8   this man, Mehmet Hakan Atilla, the defendant.

9      His lies blew a billion-dollar hole in the U.S.

10  economic sanctions on Iran, the laws that were supposed to

11  limit Iran's ability to fund and promote illicit activities by

12  strangling its access to oil money.  Atilla and his lies played

13  a crucial role in giving Iran access to U.S. dollars and

14  American banks.  Access that U.S. laws were meant to preclude.

15     Because the point of Atilla's lies, the object at the

16  end of it all, was to be able to lie to American banks,

17  including banks right here in Manhattan, to trick them into

18  thinking that hundreds of millions of dollars that he was

19  laundering had nothing to do with the government of Iran.  And

20  to do it in a way that would keep the bank where he worked from

21  being blacklisted by the American government.

22     Since 1979, the Islamic Republic of Iran has posed a

23  constant threat to the national security of the United States.

24  To counter that danger, the United States has imposed laws that

25  restrict trade and banking with Iran, what we call economic

1    sanctions, designed to cut Iran off from the money it needs to

2    pay for dangerous activities around the world, and to maintain

3    its repressive regime at home.

4           Those economic sanctions were so effective that by

5    2011, the government of Iran had a problem.  Iran had become

6    such a global outcast that if its government did not find a way

7    to get access to cash, the economy would literally collapse.

8           That's why, in March 2011, the Supreme Leader of Iran,

9    the Ayatollah, called for an economic jihad, a government

10   directed struggle to overcome the embargo, the economic

11   sanctions that were isolating Iran.

12          But to conduct the economic jihad, Iran did not need

13   soldiers.  Iran needed a banker.  To conduct the economic

14   jihad, Iran needed Atilla.  Iran needed Atilla to come up with

15   a way to violate and get around U.S. laws.  To move money

16   around the world, despite U.S. economic sanctions, by hiding

17   the fact that the money belonged to Iran.  Iran needed Atilla

18   to design a secret system for Iran to launder billions of

19   dollars of Iranian money sitting in bank accounts in Turkey.  A

20   plan to fool the U.S. government so the government of Iran

21   could send that money through banks in the United States and

22   Europe.

23          And Atilla was in just the right place to do it.  He

24   worked at a bank in Turkey called Halkbank.  Halkbank is an

25   important place to the government of Iran, because Atilla's

1    bank was one of the few places in the world willing to let Iran

2    spend the money that it made by selling oil.

3            And at his bank, Atilla was an important man.  He's

4    the deputy general manager in charge of international banking.

5    One step below the bank's top executive, the general manager.

6    Atilla's an expert on finance and economic sanctions,

7    particularly on American sanctions.  Just the person Iran

8    needed to cover its tracks.

9            So to break U.S. laws in service of Iran, Atilla and

10   his bank agreed to tell one of the biggest lies the banking

11   world has ever known.  They lied to hide the fact that Halkbank

12   was laundering billions of dollars in Iranian oil proceeds so

13   the government of Iran could get around U.S. law.  They lied to

14   make it seem like Iran's oil money was being used to buy gold

15   for jewelry or shipments of food, when, really, it was being

16   sent through U.S. banks to secretly make payments at the

17   direction of the government of Iran.

18           They lied in ways Atilla specifically designed to

19   violate U.S. laws.  They lied with front companies, with forged

20   documents, with fake transactions.  They lied to American

21   government officials in meetings, letters and e-mails.  And

22   they covered up their lies with millions of dollars in bribes

23   to the highest-level officials of the Turkish government.

24           It is a serious federal crime to conspire to violate

25   the sanctions laws.  It is a serious federal crime to lie to

1    the U.S. government agencies charged with implementing those

2    sanctions, to avoid being penalized for breaking them.  It is a

3    serious federal crime to launder money for Iran, and to defraud

4    American banks by lying to them.  These are serious federal

5    crimes that compromise our national security, and this man

6    committed them, which is why we're here today.

7         So, this opening statement is just a preview of the

8    evidence that you are going to hear during this trial.  But

9    before I talk a little more about the facts, I want to say a

10   word about the law.

11        As Judge Berman told you yesterday and today, at the

12   end of the case, he's going to give you instructions on the

13   law, and it is only what he tells you, not what anyone in the

14   courtroom might say, that you are sworn to follow.  But I want

15   to try to give you a couple of basic principles now so you know

16   what to listen for as you hear to the evidence.

17        First, as I said, U.S. law makes it a crime to do

18   business for Iran through banks in the United States.  In

19   practice, what that means is virtually any significant

20   transaction for Iran in U.S. dollars will break the law.

21   Because to send money electronically -- it's called a wire

22   transfer -- in U.S. dollars, it almost always has to be routed

23   through bank systems located in the United States, including

24   right here in New York.

25        These are powerful laws, because the U.S. dollar is

1   the most stable, most important currency in the world.  And

2   you'll learn during this trial that if, like Iran, you can't do

3   business in U.S. dollars, you pretty much can't do business at

4   all.

5          Second, U.S. law gave foreign banks like Atilla's bank

6   a choice.  You can either do business with Iran, or you can do

7   business with the United States, but you can't have it both

8   ways.  So the law also imposes penalties for double dealing.

9   You cannot play both sides.  Hide your business with Iran, lie

10  to the American government about what you're doing to try to

11  avoid being punished for working with the Iranian government.

12         Ladies and gentlemen, there is no doubt that the

13  transactions you're going to hear about in this trial are

14  elaborate.  That was on purpose.  They had to be.  Because the

15  U.S. sanctions laws that we've been talking about are strict,

16  and got progressively stricter, so evading them is no simple

17  matter.  But at its core, the evidence at trial will prove that

18  the crime Atilla committed is simple and clear.

19         (Continued on next page)

20

21

22

23

24

25

1          MR. DENTON:  He lied.  He lied in a lot of different

2     ways.  He told lies, straight up falsehoods to U.S. government

3     officials.  He taught co-conspirators to lie by telling them

4     how to make fake documents.  He facilitated lies to U.S. banks

5     by making it possible for his co-conspirators to pretend, with

6     a straight face, that their money didn't come from the

7     government of Iran.  He lied to help Iran repeatedly evade U.S.

8     sanctions to the tune of billions of dollars.  Atilla lied

9     because he was the person who knew how.

10          For all these lies to work, it took an expert, someone

11    who had studied the U.S. sanctions in Iran and knew how to get

12    around them.  Atilla was the one who could teach everyone how

13    to tell the right lies.  Atilla was the one who could design

14    the secret system with the express purpose to evade the U.S.

15    laws that prevented Iran from moving its money.

16          Ladies and gentlemen, you don't need to be a banking

17    expert to know right from wrong.  Every one of you knows the

18    difference between a truth and a lie.  Every one of you knows

19    the difference between how someone acts when they're honest and

20    how someone acts when they're hiding something.  And the

21    evidence will show that lying and hiding is exactly what Atilla

22    did.  The evidence is going to pull back the curtain on a fraud

23    of truly global proportions, billions of Iranian dollars moving

24    in a scheme so large that it affected the economies of

25    countries in the Middle East, and so large that it was

1    protected by government ministers in Turkey and Iran.

2            As you'll hear during this trial, Iran has basically

3    one thing that the rest of the world is interested in buying,

4    oil.  And because of American economic sanctions on Iran, by

5    2012 Turkey, a country that historically has ties to Iran and

6    shares borders with it, Turkey was the only country in the

7    world willing to buy that oil.  The problem is that because of

8    American economic sanctions, Turkey couldn't just give Iran

9    cash to pay for the oil.

10           So billions of dollars in money that Turkey owed Iran

11   for oil was just sitting there, locked up in bank accounts at

12   Atilla's bank.  When the Ayatollah declared the economic jihad,

13   all that money in Atilla's bank was a big part of it.  Iran

14   needed to find a way to use that money to pay for things all

15   around the world; so Iran found a front man, a gold trader

16   named Reza Zarrab.  Zarrab could provide the phony facade,

17   enabling Iran to get access to that money, and Iran would pay

18   him a cut of the profits.

19           So in late 2011 Zarrab wrote two letters, one to the

20   President of Iran and one to the head of the Central Bank of

21   Iran, in which he pledged his allegiance to the economic jihad

22   and offered to help Iran launder its money.  And for a plan for

23   how to do it, Iran turns to the bank holding all its money,

24   Halkbank and to Atilla, the bank's head of international

25   banking.  Zarrab would provide the means and Atilla would

1    provide the method, the secret system to keep these

2    multimillion-dollar transactions secret.

3           You'll learn about a series of actual meetings in 2012

4    and 2013 where the method was set up, extraordinary meetings,

5    meetings involving people from the very top of the government

6    of Iran, the oil minister, the head of the National Iranian oil

7    Company, Iranian bank chiefs and oil company executives,

8    meetings involving Atilla, the Haltbank general manager,

9    Zarrab, and the Turkish Minister of the Economy.

10          What did they do?  They formed a conspiracy, an

11   agreement to break U.S. law.  So why was Turkey's Minister of

12   the Economy involved?  Two reasons.  First, because the

13   government of Turkey owns Atilla's bank; and second, because

14   the minister had been bribed.  In exchange for half of Zarrab's

15   profits, Turkey's Minister of Economy agreed to cover for

16   laundering Iranian oil money out of Turkey, out of Atilla's

17   bank.

18          Then Zarrab and the minister he had bought cut

19   Halkbank's general manager in on the deal.  For years they paid

20   kickbacks out of the profits Zarrab made from Atilla's system

21   to ministers, customs officials and anyone else in the Turkish

22   government who needed to be bought.  And the evidence will show

23   that the co-conspirators agreed on Atilla's method to make it

24   seem as if the money was moving legitimately.  See, it wasn't

25   enough just to break the law and send the money to Iran.  That

1    didn't do any good because then everyone would still know that

2    the money was dirty, they would know that it belonged to Iran

3    and Iran couldn't do anything with it.

4         So they needed a cover story. They needed to lie.

5    They needed the money look as if it was clean, stripped of any

6    connection to Iran. That way, the co-conspirators could slip

7    that money back into the international financial system,

8    tricking American and European banks into thinking that Iran

9    had nothing to do with all that oil money. Some of you might

10   have heard of money laundering before. That's what it means,

11   cleaning dirty money or lying to make illegal money look

12   legitimate.

13        But this was no ordinary money laundering. As you'll

14   learn, the crucial part of the lie was to make it possible for

15   Iran's money to go through American banks. So Atilla had to

16   come up with a very specific way for his co-conspirators to lie

17   that would fool the American government into thinking that

18   Atilla and his bank were still following U.S. law. So Atilla

19   provided the method to secretly break U.S. law by finding and

20   exploiting two loopholes.

21        So how did it actually work? You'll learn that, at

22   first, the scheme used a loophole that made it legal to sell

23   gold, not to the government of Iran but to private people and

24   companies in Iran. So under the scheme, when an Iranian bank

25   needed to pay someone in U.S. dollars somewhere else in the

world, they'd use the Iranian oil money that had accumulated at

Halkbank to buy huge quantities of gold from one of Zarrab's

front companies.

        Atilla and his bank gave those front companies

instructions on how to paper over the transactions with phony

documents.  So even though the gold was bought with the Iranian

government's oil money, it looked like the gold was sold to

private companies in Iran, making it look like they were taking

advantage of that loophole.  Then, like something out of a spy

story, the gold would get packed into suitcases, given to

couriers who would take it as luggage on international flights.

        But instead of going to private companies in Iran,

like the fake documents said it was, the couriers would take

the gold to Dubai, a city in the United Arab Emirates, the hub

of business and finance.  Once the couriers got to Dubai, their

suitcases full of gold, they'd give the gold to another front

company, taking instructions from Iran, which would sell it for

U.S. dollars or whatever currency Iran needed.

        And the plan was massively successful.  Before the

scheme started in 2011, the entire Turkish economy exported

about $55 million worth of gold for Iran.  A year later, once

the scheme was underway, Zarrab's front companies alone

exported almost $6.3 billion in gold.  And Atilla was a

critical architect of the system responsible for this massive

uptick in exports, all driven by the scheme to evade U.S. law.

1    But you don't move billions of dollars for Iran

2    without eventually attracting attention, and the U.S. Treasury

3    Department caught on.  They figured out that private citizens

4    in Iran were not buying billions of dollars in gold just for

5    earrings.  So the U.S. they changed the law.  They closed the

6    loopholes.  They said that they would punish banks like

7    Atilla's for selling gold to anyone in Iran, not just the

8    government.

9    And to make sure that Atilla's bank knew that the law

10   was changing, officials from the Treasury Department went to

11   Turkey.  They met with Atilla.  They met with the head of his

12   bank.  They met with the Minister of Economy, and the U.S.

13   government told them that they had to stop what they were

14   doing.  And Atilla personally promised the U.S. government that

15   he understood American law and that his bank would stop selling

16   gold to anyone in Iran.

17   But Atilla didn't stop.  He just changed the scheme.

18   He found another way to do it.  He was the sanctions expert; so

19   not only did he find another loophole, he upgraded the whole

20   scheme.  This time, the co-conspirators would use a different

21   exception to the sanction, a humanitarian section, which

22   allowed Iran to use some of its oil money to buy food.  So

23   instead of pretending to export gold to Iran, you'll learn that

24   Atilla devised a system to let the coconspirators to pretend to

25   sell food.

1       The rest of the scheme stayed pretty much the same,

2   same front companies that were in the jewelry business, buying

3   literally tons of gold just months before, now all of a sudden

4   were in the food business.  You'll hear that they changed their

5   business because Atilla's bank told them to as part of the new

6   system.  Atilla's boss was explicit about who masterminded the

7   scheme, referring to it in messages as the method provided by

8   Hakan Atilla.

9       Atilla was the one who called Zarrab to get moving

10  when some of the front companies were slow making the switch.

11  Those front companies could then prepare fake customs

12  documents, from Dubai again, lying that they were selling beef

13  or wheat or frozen chicken breasts to Iran.  They made those

14  documents for Halkbank because Atilla told them to, so that his

15  bank could lie and claim to the U.S. that those transactions

16  fit within that humanitarian exception.

17      But there was no food.  There were no humanitarian

18  shipments.  This time, the lie wasn't just where the gold

19  stopped or whose gold it was, it was all a lie.  The whole

20  thing was a sham.  There was no food at all.  Wheat does not

21  come from Dubai.  The city is surrounded on three sides by the

22  Arabian Desert.  So instead of doing real business, once again,

23  the government of Iran had turned its cash at Atilla's bank

24  into a slush fund, a pool of money which it could use to send

25  payments through American banks without anyone being the wiser.

1          The evidence will show that the most important part of

2     the scheme was the part that Atilla was directly responsible

3     for, the part that happened at his bank because in all of the

4     versions of the scheme, it was there that the most critical lie

5     was told, the lie that the gold was for things like jewelry or

6     that the money was for food, or even that any food was actually

7     shipped at all.  The lie Atilla crafted was the lie that made

8     it look like the money belonged to front companies and not to

9     the government of Iran.

10          And you'll learn about the fake documents that were

11     particularly important to that lie because those documents are

12     what the U.S. government and American banks would look at to

13     make sure that Atilla's bank wasn't violating laws, wasn't

14     doing business for Iran.  So the fake documents had to be

15     perfect.  But Zarrab wasn't a banker or a sanctions expert.  He

16     was the front guy.  Atilla was the expert.

17          So the evidence will prove that the defendant coached

18     Zarrab on how to forge the right documents.  When Zarrab messed

19     up and submitted documents with obvious mistakes on them,

20     mistakes that could unravel this whole lie, Atilla was the one

21     who told him how to fix it.  When there were problems with

22     transactions and Zarrab called the bank's general manager, he

23     said he talked to Atilla to fix it because while many people

24     participated in this fake food scheme, Atilla was the scheme's

25     architect, the man who devised the lies that needed to be told

1    and figured out how to tell it.

2            And again, the method worked.  The cash looked like it

3    belonged to those Dubai companies, Atilla's bank looked like it

4    was following U.S. law, and no one knew that, in truth, the

5    money behind it all was the Iran government's oil money.  And

6    the evidence will prove that once it was in Dubai, that Iranian

7    government used that money to make it illicit payments all over

8    the world, payments that made the whole process necessary in

9    the first place, including payments through American banks,

10   tricking those banks that never knew they were shelling out

11   U.S. dollars on behalf of the Iranian government.  The evidence

12   will show that the entire point of Atilla's scheme was to make

13   those payments possible.

14           And you'll hear that Atilla went beyond just designing

15   this scheme.  He actively protected it.  Once more, U.S.

16   government saw how much money was moving and that the story

17   just didn't add up.  So, again, some of the highest-ranking

18   officials from the U.S. Treasury Department arranged meetings

19   and calls with Atilla's bank to express their concerns.

20   Treasury officials went to Turkey, and Halkbank officials came

21   right here in the United States.

22           And who did Halkbank send to talk to them?  Atilla.

23   And what did he say?  He lied.  He told them that all that

24   gold, gold that was really going to make payments for the

25   Iranian government, that was just for jewelry.  The defendant

1    talked to those Treasury Department officials about sending

2    payments for food and lied to the U.S. government about the

3    business that Halkbank was doing with the government of Iran

4    under the guise of a humanitarian exception.

5           He even lied directly about Zarrab, tried to minimize

6    him as just someone who did a little trade business with

7    Halkbank, hiding the fact that Zarrab was moving billions of

8    dollars worth of Iranian oil money and that he had a direct

9    line to the head of the bank and the Turkish Minister of

10   Economy to do it.

11          You'll also learn that the defendant's lies to the

12   U.S. government were not the only way that the members of this

13   conspiracy protected their scheme.  They paid millions of

14   dollars in bribes to protect it.  Every time the Iranian

15   government sent money through this pipeline, Atilla's bank took

16   a commission and Zarrab took a cut.  And from his cut, people

17   got paid.  Atilla's boss got a taste, packed for him in cash in

18   shoe boxes.  Turkey's Minister of the Economy got half.  Other

19   ministers in Turkey got bought off too, and the scheme needed

20   protection because law enforcement was watching and listening.

21          First, it was the Turkish police, regular cops in

22   Istanbul, running a smuggling investigation stumbled onto the

23   corruption of their government, the bribe payments being made

24   to allow Atilla's scheme to proceed.  So they did what police

25   do.  They did wiretaps, making recordings of phone calls, they

1   did surveillance, they followed the money.  And when they

2   conducted searches in late 2013, they found proof of this

3   crime.  Those shoe boxes of bribe money at the home of Atilla's

4   boss, ledgers of bribes to ministers, documents in the offices

5   of Atilla's bank and Zarrab's front companies proving the

6   existence of the scheme to launder money for Iran.

7           But those police officers didn't get to see their hard

8   work result in justice in Turkey.  You see, all those bribes,

9   all that protection money paid by the co-conspirators?  It

10  bought a coverup.  Corrupt officials within the Turkish

11  government organized a purge of the cops and prosecutors who

12  ran the case, sent many of them to jail and shut down the

13  investigation.  And you'll learn that as part of this coverup,

14  the same corrupt high-ranking Turkish officials instructed

15  Zarrab to put up even more bribe money for the judges, millions

16  and millions in bribes, so that everything could be made to go

17  away.  Zarrab paid the money.  Co-conspirators got out of jail,

18  and the case the Turkish police had developed was dismissed.

19          While the bribes got rid of the case, they could not

20  get rid of the evidence.  The wiretaps of Atilla, Zarrab, other

21  co-conspirators, the documents that had been collected, they

22  all remained in files maintained by the police.  But because of

23  the bribes, because of the coverup, they did not see the light

24  of day until now, until this trial here in New York.

25          And you'll hear during this trial that even that close

1    call with Turkish law enforcement did not stop Atilla and his

2    co-conspirators.  With their coverup bought and paid for, the

3    scheme went right back to work.  It was too lucrative to stop.

4    Following Iranian oil money out of Atilla's bank and out of

5    Iran and to Dubai banks, just like before.  Some of the cast

6    changed, the lies stayed the same, and Atilla kept telling

7    them.

8            He was still overseeing the phony paperwork, still

9    lying to the Treasury Department about what his bank was doing,

10   and the scheme was still protected with bribes.  This time,

11   paid directly to a fixer for the same dirty Turkish officials

12   who arranged for the corruption cases to disappear.  The scheme

13   that Atilla designed wasn't about normal finance, or normal

14   politics.  It was a racket, plain and simple.

15           But it turns out the Turkish cops weren't the only

16   ones who were watching.  Since 2013, counter-intelligence

17   division of the FBI had also been on the case, running its own

18   independent investigation of Atilla's scheme through the United

19   States.  Through painstaking work, executing search warrants

20   for e-mails, reviewing banking records, analyzing export

21   documents, the FBI pieced together what was going on, and the

22   evidence they found tells the same story that the evidence

23   collected by the Turkish police did, the same story that the

24   U.S. Treasury Department suspected; that Atilla was working

25   with Zarrab and the other co-conspirators to launder billions

1   of dollars in Iranian oil money through Halkbank, using phony

2   documents, and that the money was going to payments through

3   American banks with the government of Iran pulling the strings

4   behind the scenes.

5          So what sort of evidence will the United States use to

6   prove its case in this trial?  Well, for starters, there will

7   be those recordings.  You'll hear Atilla's own words on tape as

8   he coached Zarrab on how to fix errors in fake shipping

9   documents, telling him he needs to correct the paperwork for

10  the front companies so Halkbank can process transactions for

11  Iran.  You'll see other members of the conspiracy talking about

12  Atilla.

13         Atilla was so important to the functioning of this

14  conspiracy that when some of them tried to organize a similar

15  setup with a bank in China, Zarrab told them that it wouldn't

16  work unless they found a man like Atilla to help run the secret

17  system.  You're going to see key documents collected by the FBI

18  using search warrants and subpoenas.  They gathered

19  communications between the co-conspirators, e-mails, text

20  messages, online chats through smart phone programs like

21  WhatsApp.  Like messages, where Atilla's boss at Halkbank asked

22  Zarrab if he's okay with the method proposed by Atilla for how

23  to run the scheme.

24         The FBI also found a trail of ledgers showing the flow

25  of Iranian oil money from the bank accounts of Iranians at

1  Halkbank, out to the accounts of the scheme's front companies,

2  and then on to front companies in Dubai, accompanied by fake

3  documents claiming that hundreds of thousands of tons of food

4  were shipped to Iran, food that never existed.

5          You're going to see plane tickets and export documents

6  for those couriers, carrying gold in suitcases, to money

7  exchangers in Dubai.  And you'll see the point of it all, the

8  instructions from Iran to the co-conspirators for where they

9  wanted their money paid, and then the corresponding records

10 from the American banks that unwittingly processed Iran's

11 orders.  Each piece is a link in the chain, the story of

12 Atilla's secret system.

13         And you're going to get help in understanding that

14 system and how all these documents and recordings and documents

15 fit together from witnesses who will tell you about the scheme

16 from the inside and from the outside.  You'll hear about it

17 from the inside from Reza Zarrab himself.  Because of his

18 participation in this scheme, Zarrab has pleaded guilty to

19 violating U.S. laws.  He has accepted responsibility for

20 busting sanctions and laundering money, and he has decided to

21 cooperate with the government.

22         It's because of his crimes, because he was part of the

23 same conspiracy as Atilla, that he can tell you the inside

24 story and expose the truth behind all those elaborate lies.

25 He'll tell you the story firsthand, as he lived it, of how

1   Atilla instructed him on how to tell the right lies so that

2   together they could move billions of dollars for Iran.  He'll

3   walk you through the wiretaps and calls that he was a part of,

4   like those calls with Atilla orchestrating a scheme.

5           He'll go step by step through the shipping documents

6   and bank ledgers and payment instructions from Iran and the

7   money out of the American banks, the evidence collected by the

8   FBI showing you how it fits together.  The true story of all

9   the lies.

10          And you'll also learn more about the scheme from the

11  outside, from one of the Turkish police officers who uncovered

12  the conspiracy in Turkey.  He'll tell you about their

13  painstaking work to build their case and all the evidence they

14  collected, and you'll see how, from the outside of the scheme,

15  they uncovered the same story that you'll hear about from

16  Zarrab on the inside.  And he'll tell you about how all his

17  hard work was swept under the rug by the Turkish government,

18  how he was falsely sent to jail just for doing his job and how

19  he fled his homeland to come to the United States.

20          Other witnesses will tell you about being lied to by

21  Atilla.  Two former undersecretaries of the treasury, the top

22  officials in the U.S. government charged with implementing

23  American sanctions on Iran will testify about their meetings

24  and phone calls with the defendant, about how they made sure

25  that he understood exactly what U.S. law required, how they

1   warned him not to launder money for Iran, and about how Atilla

2   lied to them, promised that Halkbank was doing real diligence

3   on all these transactions, that Halkbank was committed to

4   complying with U.S. law and that, of course, none of those

5   billions of dollars was for the government of Iran.

6        You'll hear from witnesses who work at banks here in

7   New York, who will tell you about how international

8   transactions, like the ones we're talking about, get processed,

9   and you'll hear from experts who will help you understand the

10  economics here.  The scheme Atilla devised was so much money

11  that it literally changed the course of nations, and so it's

12  important to understand what was happening in the Middle East

13  during that time period after 2010 to see why the Iranian and

14  Turkish governments were so desperate for Atilla's conspiracy

15  to succeed.

16       Like I said when I started here, this is just a

17  preview.  This is just to give you some context for all the

18  evidence that you'll see and hear in the next couple of weeks.

19  At the end of this trial, after all the testimony is in, all

20  the exhibits Judge Berman talked about that have been received

21  and the recordings played, we'll have a chance to talk to you

22  about how the evidence proves the defendant's guilt beyond a

23  reasonable doubt.

24       For now, I just want to ask you all to do three things

25  during this trial.  Pay close attention to all the evidence.

1    Follow Judge Berman's instructions on the law, and like he told

2    you, use your common sense, the same common sense you use every

3    day.  Every one of you knows what it means to tell a lie.

4    Every one of you knows how people act when they are doing

5    something shady or in secret.  Just apply that common sense as

6    you assess the evidence that you see and hear in this trial.

7         If you do those three things, you will give Hakan

8    Atilla what everyone is entitled to in this courtroom, a fair

9    and just trial.  And if you do all of that, you will reach the

10   only conclusion supported by evidence, that Atilla is guilty,

11   guilty of participating in a conspiracy to break U.S. sanctions

12   on Iran and of conspiring to lie to the U.S. Treasury

13   Department about it; guilty of conspiring to cheat American

14   banks, deceiving them by hiding the fact that the money that

15   they were moving really belonged to the government of Iran;

16   guilty of money laundering, of washing the mark of Iran's

17   economic jihad off those dollars so that they could be used,

18   used to pay millions in bribes to Turkish government officials,

19   and used to turn U.S. dollars into Iran's wages of sin.  Guilty

20   beyond a reasonable doubt.  Thank you.

21        THE COURT:  Thank you, counsel.  Hold on one second.

22        (Pause)

23        Thanks a lot.  Mr. Rocco?

24        MR. ROCCO:  Thank you.  Your Honor, the prosecution

25   team, ladies and gentlemen of the jury, my name is Victor

1   Rocco, and it's my privilege, along with Cathy Fleming, Todd

2   Harrison and Joshua Dratel, to represent Hakan Atilla.

3   Economic jihad, an economic holy war, these are the words of

4   Reza Zarrab, one of the government's principal, if not the

5   government's principal, witness in this case.  They are words

6   that he wrote to the then-president of Iran, pledging to fight

7   U.S. economic sanctions.  Who knows whether Zarrab wrote that

8   letter out of religious zealotry or sheer opportunism, but not

9   surprisingly, Reza Zarrab joined the struggle and made a

10  fortune for himself.

11          There's another war going on in this case.  On the one

12  side is Reza Zarrab.  The evidence will show that he waged a

13  jihad, an economic jihad against the United States, sanctions

14  against Iran for years and years.  He made hundreds of millions

15  of dollars, as a result of which he used to buy jets and yachts

16  and people.  During the jihad, he paid tens of millions of

17  dollars to people all over the world.

18          Now, when talking about Mr. Zarrab, please understand

19  that he was eventually arrested here in the U.S. for

20  masterminding this worldwide conspiracy and jailed.  Then,

21  because he's the master of the deal, he made the deal of a

22  lifetime, a deal with the government, what we call a plea deal,

23  in which he agreed to plead guilty and to cooperate against

24  Mr. Atilla.  In exchange, Zarrab got what he hopes to be a

25  get-out-of-jail-free card, possible witness protection for him

1    and his family and perhaps an opportunity to stay here in the

2    United States forever.  It's already paid off for him.  He's no

3    longer in jail.  He's squirreled away with some FBI agents in

4    some unknown place.

5             On the other side of the jihad, the war that's being

6    fought is Hakan Atilla.  He's a Turkish civil servant.  He's an

7    officer at Halkbank, and as you heard from the government,

8    Halkbank is -- the majority of it is owned in a major way by

9    the Turkish government.  In other words, the Turkish government

10   is the majority shareholder of the bank, but there are other

11   interests in the bank, outside interests, private interests,

12   all over the world.

13            Halkbank is known as Turkey's principal conduit to its

14   lawful business with Iran.  There's no surprise that Halkbank

15   does business with Iran.  The whole world knows it.  The Office

16   of Foreign Assets Control, a division of the Department of

17   Treasury knows it, and watched Halkbank and its dealings with

18   its neighbor, Iran, and watched the flow of money between

19   Turkey and Iran.  No surprises.

20            The evidence will show that Hakan Atilla is not

21   corrupt.  He took no bribes.  He took none of the tens of

22   millions of dollars that Zarrab salted all over the world.

23   Hakan Atilla is a hard-working person like all of you, a senior

24   bank officer.

25            What happens?  He gets arrested and is being

1    prosecuted not in Turkey, here in the United States for doing

2    what, in fact, was his job.  Ladies and gentlemen, how's that

3    getting things completely backwards?  Turning things upside

4    down, turning them on their head?  I submit to you that we just

5    fell into a rabbit hole, only this isn't like Alice in

6    Wonderland.  It's real life, with real human consequences

7    because Hakan Atilla and his family have been devastated by

8    this prosecution.

9            Now, that's what the evidence in this case is all

10   about.  That's what the evidence will show, a dedicated,

11   hard-working civil servant caught in the middle of a storm, a

12   swirling, huge international storm of intrigue, lies and

13   massive corruption.  Hakan Atilla is just another one of Reza

14   Zarrab's many victims, a hapless and helpless pawn.

15           So you will hear evidence from the witness stand in

16   the form of testimony and exhibits will be offered, and the

17   evidence in this case will be massive.  There will be a tsunami

18   of evidence that will be presented by the government in this

19   case.  That evidence, I submit to you, is essentially about one

20   man and his scheme, Reza Zarrab, and the huge web of deceit and

21   corruption that he wrought over three continents and who is now

22   being coddled by our government.

23           Most remarkably about all of this is how much of this

24   occurred right under the eyes of OFAC, right under the eyes of

25   the United States Department of Treasury.  This trial, ladies

 1  and gentlemen, I submit to you, is really the Reza Zarrab show.

 2          Now, don't be deceived by the mountains of evidence,

 3  fancy exhibits, technical testimony about recorded calls and

 4  wiretaps, references you'll hear to judicial coups in Turkey, a

 5  Turkish investigation, where discredited prosecutors and

 6  investigators were fired.  These things sound like they're

 7  right out of a James Bond movie, a John Le Carre novel.  Ask

 8  yourself, as you hear this evidence, what does this evidence

 9  say about Hakan Atilla?  Not what it says about Reza Zarrab,

10  though pay attention to that as well, though, because it tells

11  you everything that you need to know about Reza Zarrab.

12          I submit to you that, virtually, the evidence here

13  shows nothing more than the fact that Hakan Atilla is innocent

14  of the charges against him.  He was misled and duped by Zarrab.

15  He was misled and duped by his own boss, Suleyman Aslan, who

16  became a pawn of Zarrab.  He was mislead by his boss, who was

17  paid millions of dollars.  He was misled by Reza Zarrab, as

18  Halkbank employees were misled by Reza Zarrab.

19          I ask you to follow the evidence in this case, keep

20  your eye on the bouncing ball.  The evidence will tell you who

21  the real culprits are and who should be punished.  We're not

22  here to defend Hakan Atilla's bosses.  We're not here to defend

23  his employer.  We're here to defend Hakan Atilla.  We're not

24  here to defend the Republic of Turkey or Turkish ministers.  We

25  have one client and one client only.  Along with Cathy Fleming

1    and our team, we're here privileged to be here representing

2    Hakan Atilla.

3          Some months ago, Mr. Atilla was arrested.  He stood in

4    the well of this court and entered a plea of not guilty.  He's

5    persisted in that plea.  He stands here today, before all of

6    you, each of you, prepared to defend himself against the

7    charges and to accept your verdict.

8          I say it's our privilege to represent Mr. Atilla

9    because as he stands in front of you, he's presumed innocent.

10   Presumption of innocence is no abstract concept.  It's a real,

11   living protection, a protection that protects each one of us.

12   It requires you to believe Hakan Atilla is innocent unless and

13   until you determine, based on all the evidence -- evidence, not

14   surmise, not suspicion, not speculation, but evidence.

15         You've taken a solemn oath to maintain that

16   presumption, to honor that presumption, and I know that you

17   will honor it.  Mr. Atilla is Turkish, but just like we

18   Americans, he's protected by the presumption of innocence.

19   Presumption of innocence is one of the strongest presumptions

20   under law because wrapped inside of it, it carries two

21   additional protections in criminal cases that are equally

22   sacred, the highest standard of proof the law knows, proof

23   beyond a reasonable doubt, and the further requirement that

24   it's the prosecution's burden, the prosecution's burden always

25   to establish guilt beyond a reasonable doubt.

1    Mr. Atilla is assumed, presumed innocent, and the

2  burden of proving otherwise is always, always on the

3  government, and the government must overcome that presumption

4  by proof beyond a reasonable doubt to your satisfaction.  The

5  burden never shifts from the government to the defense.  The

6  defendant in a criminal case can choose to do nothing.  He

7  doesn't have to call witnesses.  He doesn't have to

8  cross-examine witnesses.  He doesn't have to take the witness

9  stand.  He can stand mute.  The burden is on the government to

10  prove Hakan Atilla's guilt beyond a reasonable doubt.

11    Daniel Webster, the Great American statesman and

12  lawyer, famously once said that "Justice is man's greatest

13  enterprise in life."  Man's greatest enterprise in life.  You

14  are just about to enter that great enterprise.

15    Now, who is Hakan Atilla?  He's 47 years old.  He's

16  Turkish born and bred.  He speaks good, but not perfect,

17  English.  That's why we have interpreters here interpreting for

18  him.  He's married with a child in college.  He's worked for

19  Halkbank for 22 years, his entire career since graduating from

20  college.  Halkbank is a large bank.  It's one of the sixth --

21  it's either the sixth or eighth largest bank in Turkey.  It has

22  900 branches, 17,000 employees.  It's, as I said earlier,

23  Turkey's major conduit for business with Iran.

24    Hakan's wife also works at the bank.  They're decent,

25  hard-working people.  He's a civil servant.  He makes $120,000

1    a year.  He's paid no bonuses.  He owns no stock in the bank.

2    He's paid a straight salary.  Hakan rose through the ranks of

3    the bank to become one of eight, more or less -- the number

4    changes from time to time -- deputy general managers of the

5    bank.  He's in charge of the bank's international banking

6    department.  He's responsible for Halkbank's relationships with

7    foreign banks and their investors.

8           He has no responsibility -- he has no responsibility

9    for approving the commercial transaction -- for approving

10   commercial transactions, and he approved none of the commercial

11   transactions in this case.  Those transactions are approved by

12   the foreign operations department of the bank, and that

13   department is supervised by another deputy general manager,

14   another VK deputy general manager of the bank.

15          Hakan was arrested when he came to the United States

16   last March with some business colleagues on a routine business

17   trip.  Since then, he's been jailed and separated from his

18   family.  Hakan came here twice after Reza Zarrab was arrested

19   by the United States a year earlier, in March of 2016.  And

20   when Zarrab was arrested, it was front-page news in Turkey.  It

21   was news here in the United States.  It was news all over the

22   world.  Anyone whoever knew of or dealt with Reza Zarrab knew

23   that he was arrested and, by the way, he was arrested, not

24   surprisingly, getting off a private jet at Disney World with

25   $100,000 in spending money for a family vacation.  $100,000 in

1    spending money, that's more -- twice as much as the average

2    American makes in a year.  To Reza Zarrab, it was pocket

3    change.

4           Even though Zarrab had been arrested a year earlier,

5    Hakan thought that he had nothing to fear in coming to the

6    United States on business.  Why would he?  He'd done nothing

7    wrong.  He actually came here first in September of 2016, went

8    back to Turkey, and then came again six months later, roughly

9    six months later, in March of 2017.  But again, had nothing to

10   fear because four years earlier, in a Turkish criminal

11   investigation involving many of the very transactions that are

12   at issue in this case, Hakan spent four, four-and-a-half hours,

13   on New Year's Eve in December '13 being interviewed by Turkish

14   investigators as part of the Turkish investigation that the

15   government referenced earlier.

16          He had nothing to hide.  He was never arrested or

17   charged with a crime in Turkey.  Others, including Reza Zarrab

18   and Hakan's then boss Suleyman Aslan, were arrested.  There

19   will be no evidence that Hakan Atilla was ever bribed, not a

20   scintilla of evidence.  Unlike his boss, who was paid millions

21   of dollars in bribes.

22          So, now, who's Reza Zarrab?  Well, you know that he's

23   the mastermind of a worldwide massive sanctions avoidance and

24   money laundering scheme that made him fabulously wealthy.  He's

25   also a master deal maker, and a pillar on which the government

has chosen, our government has chosen, to rest its case against

Hakan Atilla.  Zarrab, Reza Zarrab, I would submit to you, will

seem valid in a suit.

The evidence will certainly show him to be a man you

can't trust.  Zarrab is guilty of more than just masterminding

vast sanctions and a money laundering scheme, offering to fight

an economic jihad on behalf of Iran against the United States.

The evidence will show you that on the way to doing that, he

did other bad things.  He paid fortunes in bribes, fortunes in

bribes to businessmen and government leaders all over the

world, in Russia, in China, in Iran and in Turkey, and he did

it to get what he wanted, anything and everything that he

wanted.

Whether it was to avoid sanctions or destroying

competitors or their businesses or even buying his brand of

justice, he paid money upfront.  To Zarrab, bribery was a way

of life, a never-ending story.  He never saw a bribe he didn't

like.  To Zarrab, everyone has a price, everything has a price,

nothing is too small for a bribe, nothing is too large for a

bribe.  One of the recordings that the government referenced

earlier on, the government's own proof, Zarrab actually says

everyone's got a price.

The evidence will show that Zarrab's bribes also

didn't stop when he was arrested and jailed here in the United

States.  When he was in jail, after he was arrested, he

1  continued to pay bribes.  He bribed a prison guard and other

2  prisoners so he would have special privileges and special

3  treatment, forbidden access to food, to special food, to

4  liquor, to drugs and to women.  Old habits die hard, or maybe

5  they don't die at all.

6        The evidence will show that Zarrab went through dozens

7  of lawyers, high-priced.  Paid millions of dollars in legal

8  fees to get himself out of a jam, out of this jam.  He even

9  hired Rudy Giuliani and a former attorney general of the United

10 States to help him out.  When that failed, when he couldn't get

11 himself out, that technique didn't work, he resorted to

12 something else.  He failed to them, all that money, all those

13 legal fees failed to get him what he wanted.

14        Hakan Atilla became Zarrab's ace in the hole, a

15 commodity, something he could sell, someone that Zarrab sees as

16 his get-out-of-jail-free card, his E-ZPass to a reduced jail

17 sentence, or no jail time at all.  By testifying against Hakan

18 Atilla, Zarrab hopes that he can buy his freedom, a shortcut

19 back to his lavish life of the rich and famous.

20        At some point the government is going to put Reza

21 Zarrab on the witness stand.  It will open a sewer in this

22 courtroom and Zarrab will crawl out, the same Zarrab who

23 pledged to wage economic jihad against the United States and is

24 now being coddled by the government.  The government will hold

25 its nose and tell you what a bad guy Reza Zarrab is, he's a

1    liar, a cheat, a corrupter of men on a staggering scale, a

2    one-man crime waive.

3           It will put him on the witness stand and parade a long

4    list of his lies, deceptions and crimes in front of you, but

5    the government will also tell you that it takes its witnesses

6    where it finds them and tell you that Reza Zarrab has finally

7    found religion, he's reformed because it's in his best

8    interests to do so.  The government will ask you to believe

9    him.  Ask yourself -- the government will ask you, why would

10   Reza Zarrab implicate Hakan Atilla in his crimes?  I submit to

11   you, ladies and gentlemen, the reason is obvious.  Reza Zarrab

12   knows the value of a down payment.  Hakan Atilla is his down

13   payment to his way to Zarrab's way to a cushy lifestyle.

14          If you think for a moment, for one second that Reza

15   Zarrab would let the truth stand in his way to a sentencing

16   break, whether he cares what happens to Hakan Atilla, Zarrab

17   would not know Hakan Atilla if he tripped over him.  They

18   existed on different planets, in different galaxies.  They have

19   different values, different priorities.  All of that's true.

20   They lived in separate universes until came to see that Hakan

21   Atilla was his get-out-of-jail-free card, his E-ZPass to a

22   lesser sentence.  I'm going to ask you, as Zarrab testifies, as

23   you listen to his testimony, please bear all of this in mind.

24   This is part of the government's case against Hakan Atilla.

25          Now, what will the evidence show to be the

1    indisputable facts?  I think the evidence will show that Hakan

2    Atilla, the so-called architect of this scheme, rarely

3    communicated with Zarrab.  They weren't friends, confidantes or

4    conspirators.  They didn't even like each other.  Reza Zarrab

5    saw Hakan Atilla as an obstacle, a monkey wrench in his

6    schemes, someone who got in his way.  He even complained about

7    him to his friend, Suleyman Aslan.  He claimed that Atilla was

8    getting in his way.

9            So what did Zarrab do?  He did what he does best.  He

10   went around Hakan Atilla, directly to Suleyman Aslan, Hakan's

11   boss, the guy that Zarrab bought for millions and millions of

12   dollars in bribes.  He went to Suleyman for what he wanted.  In

13   the recordings, by the way, Zarrab actually brags about his

14   techniques.  He says if the difficult one won't do it, then go

15   to a higher one.  If the difficult one won't do it, just go

16   over his head.

17           The evidence will show that during the roughly 15

18   months during which the Turkish authorities were wiretapping

19   and listening to these telephone conversations, Atilla spoke to

20   Zarrab six times, six times.  By contrast, he spoke to Suleyman

21   Aslan 32 times, but they communicated by chat.  There are

22   thousands in the same period, thousands of chats and text

23   messages back and forth between Suleyman Aslan and Zarrab.

24   There's not a text message or chat in that same period with

25   Hakan Atilla.

1      Atilla may have seen Zarrab at the bank on occasion,

2    but never alone, perhaps once or twice.  They never socialized

3    or met outside the bank.  Their six telephone conversations

4    lasted a total of 22 minutes and 51 seconds over a 15-month

5    period.  The average call is less than four-minutes long.

6    Weeks, even months go by where there's no contact between

7    Atilla and Zarrab.  There is constant contact between Zarrab

8    and Suleyman Aslan in the same period of time.

9      Again, follow the money.  Where do you go?  Who do you

10   talk to when you're paying someone off?  That's the person you

11   pay.  So I suppose the old adage, you want to know what

12   happened?  Follow the money and the money leads -- goes from

13   Reza Zarrab directly to Suleyman Aslan.

14     Now, money buys access and control, and no one knows

15   that better than Reza Zarrab.  He's been doing it for years and

16   years and years.  And as I say, the evidence will show that the

17   real culprit at Halkbank is its former chief executive officer,

18   who shamelessly took millions of dollars in bribes from Zarrab

19   and became his tool before they both were ultimately caught up

20   in a corruption scandal in Turkey and arrested.

21     Those bribes, the bribes that were paid to Suleyman

22   Aslan, were based on commissions that Aslan was paid for the

23   transactions that Zarrab did with the bank.  He was paid

24   between three and four dollars per thousand dollars, or roughly

25   three-tenths of a percent.  The evidence will show you that

1    based on that, that Aslan had every reason in the world to push

2    these transactions through Halkbank.  Hakan Atilla had none.

3    He took nothing from Reza Zarrab.  He was indebted to no one.

4            Now, that's part of the government's case.  Let's talk

5    about another part.  It's goldmine of conversations, recorded

6    conversations, which I submit to you, in fact, is a minefield

7    of reasonable doubt.  What do the recordings say and what don't

8    they say?  First, they're in Turkish and they're ambiguous and

9    they're confusing because they say many things.  They say many

10   different and contradictory things, but they also tell you, if

11   you listen closely to them, read the transcripts, that there's

12   a story of deception and secrecy that demonstrates that Hakan

13   Atilla isn't in the middle of this, isn't the architect of this

14   scheme.  He is the odd man out.

15           The recordings are interesting for the way in which

16   Zarrab and Hakan speak to each other.  Don't only read the

17   transcripts, but even though the recordings are in Turkish,

18   listen to them.  I'd ask you to do that, please, because the

19   recordings, the sound tells you a lot.  Listen to the tone of

20   their conversation, the voice inflection, compare the formal

21   and distant way that Reza Zarrab speaks to Hakan Atilla on the

22   six occasions that their conversations are recorded, with the

23   familiar way that he speaks to his own comrade.  This is

24   Zarrab's comrade, Abdullah Happani, his sidekick, and more

25   importantly, the warm way that he talks to Suleyman Aslan in

1   the chats.

2          You'll see the chats.  You can read the chats and see

3   the way that they talk to each other, the way they communicate

4   with each other.  It's a constant back and forth.  It's like

5   two unholily lovers.  What's not on these recordings is more

6   important, to my mind, and I urge you to consider what I'm

7   saying to you.  What's not on the recordings is more important

8   than what's on the recordings.  With Hakan, there are no

9   friendly exchanges, no terms of endearment, no banter, no

10  secrets, no intimacies.  The conversations are brief and

11  strictly business.  There is no discussion of politics or

12  social events, just business.

13         No one talks about phony documents or making things up

14  or forgery, at least not with Hakan Atilla.  There's no secret

15  words or codes or clandestine requests to meet.  Nobody says

16  there's no food involved in these transactions.  Hakan Atilla

17  and Reza Zarrab talk about some problems, some documents that

18  accompanied some shipments of food.  Hakan Atilla and Zarrab

19  talk about food and the necessary documentation for some of

20  these transactions, which isn't surprising.

21         If these were totally made up, bogus shipments, why

22  don't they talk about that directly in these conversations?

23  Why all the back and forth?  As you listen to the tapes, or the

24  recordings or you read the transcripts, why all the back and

25  forth about particulars?  Instead they discuss discrepancies in

1    documents that simply prevent transactions from being proposed

2    or processed through the bank.  It sounds like an ordinary

3    conversation between a bank employee, who's trying to help a

4    long-time and important bank customer.

5           Reza Zarrab did not show up one day on the doorstep of

6    Halkbank and start doing large amounts of business with the

7    bank.  Reza Zarrab's family was in the jewelry business.  They

8    were well known, a Turkish businessman who did years of

9    business transactions with Halkbank.  He was a well-known and

10   well-regarded customer of the bank.

11          It sounds like -- as I say, these conversations sound

12   like ordinary conversations between a bank employee, who's

13   trying to help a long-time customer, an important customer of

14   the bank, to document properly transactions so that the

15   transactions can be paid.  That's what bankers do.  They help

16   customers.  There's nothing sinister or criminal about that.

17          (Continued on next page)

18

19

20

21

22

23

24

25

1          MR. ROCCO:  In fact, when they have conversations,

2     Hakan doesn't say we're going to do things this way or we're

3     going to do things that way.  There is an open debate about the

4     nature of the documentation.  He's not the person who approves

5     the transactions.  He said I will talk to my colleagues, and

6     the matters are worked out ultimately by people not involved in

7     Hakan Atilla.

8          There is nothing in the evidence to say that these

9     conversations were nefarious.  As I say, it's just someone

10    trying to do his job.  Hakan Atilla had no motive to do

11    otherwise.

12         As you listen to the evidence in this case, as you see

13    Reza Zarrab on the witness stand, ask yourself why would Reza

14    Zarrab need Hakan Atilla or anyone's help to help falsify

15    documents.  You'll hear that Reza Zarrab was accomplished at

16    doing this stuff long before he ever saw Hakan Atilla, long

17    before he ever knew Hakan Atilla.  He was expert.  He is a

18    master of deception.  He did not need Hakan Atilla's help in

19    telling him how to falsify documents.  You'll hear that from

20    the recordings that the government will play for you that are

21    submitted in evidence.

22         He had been falsifying documents and misleading people

23    for years.  Hakan Atilla is doing his business for the bank

24    when he's dealing with Reza Zarrab.  There is nothing in the

25    evidence that you'll hear to suggest that Hakan Atilla knows

1    that his boss has been corrupted, because he's been paid

2    massive bribes and he's owned by Reza Zarrab and he's doing

3    Reza Zarrab's bidding.

4        By the way, why would Suleyman Aslan compromise

5    himself?  Why would he tell, go to Hakan Atilla and tell Hakan

6    Atilla that he is being paid millions of dollars in bribes by

7    Reza Zarrab?  Suleyman Aslan knew everything that was going on

8    with Zarrab.  He knew of his deceptions.  Aslan is driving the

9    bus deciding what's to be done.  Why would Hakan suspect his

10   boss of wrongdoing?  The evidence will show that Suleyman Aslan

11   actually goes to his people in the operations department to

12   make sure that things went the way that Suleyman Aslan and Reza

13   Zarrab wanted them to go.  He doesn't trust Hakan Atilla to do

14   it.  He does it himself.

15       The evidence will show that Suleyman Aslan and Zarrab

16   were playing a game and that Hakan Atilla was the odd man out.

17       As Aslan is busy stuffing his pockets or his shoeboxes

18   with Zarrab's bribes, he's using Hakan as a foil to give people

19   in the bank the impression that it's business as usual and

20   everything is on the up and up.

21       Now, let's talk a little bit about the recordings that

22   were made during the Turkish investigation because they are a

23   story in their own right.  There are literally thousands of

24   recorded conversations that were intercepted by Turkish law

25   enforcement over a period of roughly 15 months.  As I say,

among these thousands of phone calls, there are six between

Reza Zarrab and Hakan Atilla.  Only six.  Unlike the

conversations with Suleyman Aslan where there are thousands of

chats and texts.  Zarrab doesn't have Hakan Atilla's telephone

number, cell phone number, in his contacts.  He does have

Suleyman Aslan's telephone number and cell number in his

contacts.

The recordings come from a controversial Turkish

investigation, something that's been described as a judicial

coup d'etat.  The investigation roiled Turkey.  It turned

Turkey upside down with allegations of wrongdoing on the parts

of the investigators, the prosecutors, and the judges who ran

the investigation.  It's a political potboiler, a mess, and

it's damaged Turkey internally.

The people who ran this investigation are partisan.

They're partisan at least to the extent that they have a vested

interest in the investigative work they did.  Those people

weren't satisfied when the investigation was discredited in

Turkey, and maybe that's a human reaction to months of very

hard work.

What did they do?  They broke Turkish law.  They

brought the fruits of their investigation, some of them, here

to the United States.  In doing it, as I say, they broke

Turkish law.  That's not the way governments communicate with

governments.  You don't have police officers take the invest --

 1   the fruits of an investigation, investigative fruits, and just

 2   take them out of their country and bring them to a foreign

 3   country.

 4          Ask yourselves what would you think if an American

 5   prosecutor did that.  If the reverse was true.  Took evidence

 6   that taxpayers in America paid for, and brought it someplace

 7   else to be used as a basis for a prosecution.

 8          The evidence will show that these people not only took

 9   the law in their own hands, they had a powerful motive to prove

10   to the entire world that they were right, and that the Turkish

11   government was wrong.  Halkbank -- just one further thought on

12   the evidence.  That evidence was accumulated back in 2013.

13   It's been four long years.  Who knows what in that cache still

14   exists.  What evidence is missing from that stolen bundle of

15   evidence.  Who knows what's been destroyed or mislaid as a

16   result of the very unorthodox way that crucial evidence has

17   been handled.  How can you trust partisans or how can you trust

18   anything they've touched.

19          Now, the government made a big deal about lies that

20   were made by employees of Halkbank.  They actually in opening

21   did not reference only Mr. Atilla.  On four or five occasions,

22   the word used was "they."  Ladies and gentlemen, Mr. Atilla is

23   a he.  He's one person.  We don't speak about guilt in criminal

24   cases as being collective.  There is no "they."  It's what you

25   attribute, what you put right at the feet of Hakan Atilla that

1    incriminates him or exculpates him.  It's not what they did at

2    Halkbank.

3            You'll hear from witnesses who worked for or who used

4    to work for the Office of Foreign Asset Control which is part

5    of the Treasury Department.  The U.S.'s Iranian sanctions

6    regime isn't the law of the world.  It isn't the law of Turkey.

7    Turkey didn't create the sanctions regime, and Halkbank and

8    Turkey have no obligation to follow it, to enforce it, or to

9    police it.  It has no obligation, none, not at all.

10           Halkbank decided voluntarily to stay away from

11   activity that would cause the U.S. government to sanction.

12   Now, sanction means that the U.S. government ultimately has

13   right to prohibit U.S. institutions from doing business with

14   foreign banks.  Halkbank is a foreign bank.  Halkbank does

15   complies with sanctions, of course it wants access to the U.S.

16   financial markets because, admittedly, U.S. financial markets

17   are the most important financial markets in the world.  They

18   need access to U.S. financial institutions.  Halkbank does.

19           Obviously, though, Turkish banks don't start every

20   transaction with the same mindset that U.S. banks start

21   transactions.  This isn't a bank on Wall Street.  It is a

22   Turkish bank 5,000 miles away.  Different language, different

23   culture, different customs.

24           The prosecutor here wants to put an American lens over

25   everything everywhere.  But that's not the way things work in

1    the real world.  Turkey is 5,000 miles away and it doesn't

2    always see things the way the U.S. sees things.  It is a

3    neighbor of Iran.  They share a common border.  They're major

4    trade partners and they have mutual influences over each other.

5    The American government knows that.  OFAC knows that.

6            These sanctions are mind-numbingly complex to ordinary

7    Americans.  Even to American lawyers and bankers.  And they're

8    constantly changing.  They're so complex that the government

9    needs an expert to testify here to you to explain what those

10   sanctions are and how they've evolved over the years.

11           The evidence will show that Hakan Atilla knew the U.S.

12   sanctions regime and generally understood it.  Halkbank and

13   Hakan Atilla wanted to comply with U.S. sanctions and OFAC's

14   rules.  They didn't want to be cut off, as I say, from the U.S.

15   banks.  Halkbank isn't regulated, is not regulated, by OFAC.

16   And OFAC never notified Hakan Atilla or Halkbank that it was

17   investigating the bank for sanctions violations.  To the

18   contrary, OFAC continually praised Halkbank for its help.  And

19   Halkbank is known to OFAC as Turkey's main channel for trade

20   with Iran.  And OFAC knew that the bank took its responsibility

21   seriously.  Hakan Atilla met and communicated with OFAC, but

22   these contacts by and large were often for educational

23   purposes.

24           Halkbank didn't hide from OFAC.  How could it?

25   Everyone knew that Iran and Turkey share a common border.  And

1    they also know, knew that Halkbank regularly sought guidance

2    from OFAC with respect to changing rules and with respect to

3    certain transactions.  If a transaction raised a question,

4    Halkbank raised it with OFAC.  Halkbank continually brought

5    things to OFAC's attention.  Where are they hiding?

6           It was no secret that Halkbank facilitated

7    transactions with Iranian banks or that it was dealing with

8    Reza Zarrab.  OFAC knew that, but never put Zarrab on the

9    sanctions list.  Hakan Atilla suggested in a meeting with OFAC

10   in October of 2014 to put Reza Zarrab on the sanctions list.

11   As we stand here today, after Reza Zarrab has already pled

12   guilty to violating sanctions, guess who is still not on the

13   sanctions list?  Reza Zarrab.

14          Ask yourself with all the resources that the United

15   States has behind it, that OFAC and the Department of Treasury,

16   the United States Department of Treasury didn't know that Reza

17   Zarrab was violating U.S. sanctions, the very sanctions that

18   OFAC was created to enforce.  If OFAC didn't know it, and if

19   OFAC was misled, how does the U.S. government, how does the

20   prosecution expect Hakan Atilla to have known it?  Hakan Atilla

21   doesn't have the FBI at his disposal.  Hakan Atilla doesn't

22   have the CIA at his disposal.  He works for a bank in Turkey.

23   Ask yourself why is the double standard?

24          Standing in judgment of a fellow human being with a

25   family, a wife and son, in a court of law is a difficult thing

1   to do.  It requires you to decide facts that may result in

2   someone being punished under the law.  It requires, I submit to

3   you, hard work, fortitude, and an openmindedness.  Most of all,

4   it requires you to undertake what you do, keeping an open mind

5   and bearing in mind the presumption of innocence that Hakan

6   Atilla enjoys under the law.  And at the same time, bearing in

7   mind the very high burden that the government has to prove

8   guilt beyond a reasonable doubt.  As I say, and as Judge Berman

9   will instruct you, the burden that never shifts.

10          I submit to you that the government's evidence in this

11   case will not meet that high burden.

12          Just one last word.  There is a great monument to

13   freedom a couple of blocks away from here, The Freedom Tower,

14   and we know, all of us know what happened there.  That tower,

15   as magnificent as it is, in comparison to the monument to

16   freedom and democracy that's represented by this courthouse,

17   this courtroom, where justice is meted out, by a jury, every

18   day, without fear or favor, is the greatest monument to me that

19   exists in our democracy and to our freedoms.

20          You've sworn, you've taken an oath this morning and

21   sworn to judge Hakan Atilla on the basis of evidence that's

22   produced in this courtroom alone.  If you were charged, you

23   would have the right to expect nothing less than that if you

24   were on trial.  I ask you to honor that oath.  Thank you.

25          Thank you, Judge.

Hbs3ati3

1          THE COURT:  Thank you, counsel.

2          So, two quick things.  One is I'd like to, before we

3    have the first witness, give you this instruction.  It is that

4    the defendant, Mr. Atilla, is not charged with any terrorism

5    offense nor is there any suggestion that he was involved in any

6    terrorist attack.  You should consider the evidence you are

7    about to hear and that is admitted in this case only for the

8    purpose of determining whether Mr. Atilla is guilty of the

9    crimes charged in the indictment, and for no other purpose.

10          And the second thing I'd like to do is to give you a

11    five-minute break.

12          (Jury excused)

13          THE COURT:  You're also welcome to take five minutes

14    and we'll have the first witness who is a FBI special agent?

15          MR. KAMARAJU:  Yes, your Honor.  Special Agent James

16    Atwater.  Your Honor, meanwhile we were going to set up the

17    face board in the well.

18          THE COURT:  No problem.

19          (Recess)

20          (In open court; jury not present)

21          THE COURT:  Just as a heads up for counsel, one of the

22    jurors has a school-work conflict.  It's just that she didn't

23    fully fathom yesterday.  So she's here, and I required that she

24    be here for the day, and I said I would talk to the lawyers

25    toward the end of the day so as not to interrupt the flow.  But

Hbs3ati3

1    so we'll talk 4:45 or something like that.  Okay?

2              We're going to get the jury back and once they're

3    seated we'll ask you to call your first witness.

4              MR. KAMARAJU:  Okay.

5              THE COURT:  Oh.  Hold on.  We're going to call in the

6    jury.  Counsel, if you can slide down.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hbs3ati3

1          (Jury present)

2          THE COURT:  Just as you'll see, we're having a little

3     trouble with the audio feed in another courtroom who are also

4     viewing the trial.  So we've invited them to come up here while

5     they try and fix the audio feed.  So if you see six or seven

6     people walk in, that's where they're coming from.

7          So, let's have the first government witness.

8          MR. KAMARAJU:  Thank you, your Honor.  The United

9     States calls Special Agent James Atwater to the stand.

10          THE COURT:  James?

11          MR. KAMARAJU:  Atwater.

12          THE DEPUTY CLERK:  Sir, if you can step up here,

13     please.  Remain standing for a moment and then raise your right

14     hand.

15          Do you solemnly swear that the testimony that you

16     shall give this Court and jury in this issue now on trial shall

17     be the truth, the whole truth, and nothing but the truth, so

18     help you God?

19          THE WITNESS:  I do.

20          THE DEPUTY CLERK:  Could you please state your full

21     name for the record.

22          THE WITNESS:  James Atwater.

23          THE DEPUTY CLERK:  Spell your last name, please.

24          THE WITNESS:  A-T-W-A-T-E-R.

25      JAMES ATWATER,

1     called as a witness by the Government,

2     having been duly sworn, testified as follows:

3  DIRECT EXAMINATION

4  BY MR. KAMARAJU:

5  Q.  Good morning.

6  A.  Good morning.

7  Q.  Sir, do you work?

8  A.  I work for the FBI.

9  Q.  What is your title with the FBI?

10 A.  Special agent.

11 Q.  Are you assigned to any particular squad with the FBI?

12 A.  I work for the Counterintelligence Division of the New York

13 Field Office on a counterproliferation squad.

14 Q.  Is your squad focused on any particular nations or regions

15 of the world?

16 A.  We primarily focus on the government of Iran.

17 Q.  What are some of your typical duties as a special agent

18 involved in the Iranian counterintelligence investigations?

19 A.  We investigate matters of sanctions evasion, illicit

20 financing --

21     THE COURT:  Can you speak slower and a little more

22 into that microphone.

23     THE WITNESS:  Yes, sir.

24     THE COURT:  Say that please again.

25 Q.  You can move the microphone closer to you.

1    A.  Is that better?

2             THE COURT:  Yes.

3             THE WITNESS:  Sorry about that.

4    A.  We investigate an array of matters concerning sanctions

5    evasion, illicit financing, export controls, and other

6    intelligence matters as they relate to the government of Iran.

7    Q.  I'd like to direct your attention to March of 2017.  Were

8    you on duty at that time?

9    A.  Yes, sir.

10   Q.  Did there come a time when you were stationed at J.F.K.

11   Airport during that month?

12   A.  Yes.

13   Q.  Why was that?

14   A.  I was to identify an individual at a terminal and transport

15   him for an interview.

16   Q.  Special Agent Atwater, did you actually identify and

17   approach an individual at the airport?

18   A.  I did.

19   Q.  Looking around the courtroom today, do you see the

20   individual that you approached?

21   A.  I do.

22            MR. ROCCO:  We'll concede identity, your Honor.

23            THE COURT:  Could you just tell us where he's seated.

24            THE WITNESS:  He is seated at the second table,

25   closest to the audience, wearing a headset.

1          THE COURT:  So the record will reflect that the

2    witness has identified the defendant Mr. Atilla.

3          MR. KAMARAJU:  May I approach, your Honor?

4    Q.  I'm showing you what's been marked as Government Exhibit 1

5    for identification.  Do you recognize that document?  Or I'm

6    sorry.  Do you recognize that exhibit?

7    A.  Yes.

8    Q.  What is it?

9    A.  A picture of the individual.

10   Q.  When you say "the individual," is that the individual you

11   stopped?

12   A.  Yes.

13         MR. KAMARAJU:  Your Honor, the government offers

14   Government Exhibit 1 into evidence.

15         THE COURT:  I'll allow it.

16         (Government's Exhibit 1 received in evidence)

17         MR. KAMARAJU:  Permission to publish?

18         THE COURT:  Sure.

19         MR. KAMARAJU:  Thank you, your Honor.

20   Q.  Special Agent Atwater, when you approached the defendant,

21   did you identify yourself as an FBI agent?

22   A.  I did.

23   Q.  Did the defendant give you anything after you approached

24   him?

25   A.  He gave me his cell phones, he had another number of

1  identifying documents, and bags.

2              MR. KAMARAJU:  May I approach, your Honor?

3              THE COURT:  Sure.

4  Q.  I am showing you what's been marked for identification as

5  Government Exhibit 75.  Do you recognize that document?

6  A.  Yes.

7  Q.  What is it?

8  A.  A business card.

9  Q.  How do you recognize it?

10 A.  The individual had it on his person at the time we

11 approached him.

12             MR. KAMARAJU:  Your Honor, the government offers

13 Government Exhibit 75.

14             MR. ROCCO:  No objection.

15             THE COURT:  I'll allow it.

16             (Government's Exhibit 75 received in evidence)

17             MR. KAMARAJU:  Your Honor, the government would ask to

18 publish Exhibit 75 to the jury.

19             THE COURT:  Okay.  Are you going to pass it around?

20             MR. KAMARAJU:  I think it's up on the screen.  Can

21 everybody see it?

22             A JUROR:  The screen is not working.

23             MR. KAMARAJU:  Then I'll pass it around.

24             A JUROR:  Now it is.

25 Q.  Can you see it on your screen, Special Agent Atwater?

1    A.  I do.

2            MR. KAMARAJU:  Everybody's got it?  Great.

3    Q.  What's written at the top of Government Exhibit 75?

4    A.  Halkbank.

5    Q.  As we scroll down, what's the next thing that's written on

6    Government Exhibit 75?

7    A.  Directly under Halkbank?

8    Q.  Yes.

9    A.  Productive Turkey's Bank.

10   Q.  What is the next thing written down there?

11   A.  Mehmet Hakan Atilla.

12   Q.  And below that?

13   A.  Deputy general manager, international banking.

14           MR. KAMARAJU:  With the Court's permission I'd like to

15   place this on the face board.

16           THE COURT:  Sure.

17   Q.  What's written below deputy general manager?

18   A.  International banking.

19   Q.  Do you see anything written below that?

20   A.  Head office, and a number of what appear to be addresses.

21   Q.  I believe you testified before that the defendant had given

22   you some cell phones when you approached him; is that right?

23   A.  Yes.

24           MR. KAMARAJU:  Your Honor, may I approach?

25           THE COURT:  Sure.

1   Q.  I'm showing you what's been marked for identification as

2   Government Exhibit 1600 and 1800.  Take a look at those.  Do

3   you recognize those exhibits?

4   A.  Yes.

5   Q.  What are they?

6   A.  Cell phones.

7   Q.  To be specific, are those the cell phones that the

8   defendant gave you?

9   A.  Can I open them?

10          Yes.

11          MR. KAMARAJU:  Your Honor, the government would offer

12  Government Exhibit 1600 and 1800 in evidence.

13          MR. ROCCO:  No objection, your Honor.  But can we have

14  the question read back?

15          THE COURT:  Which question?

16          MR. ROCCO:  The question that was just put to the

17  Special Agent Atwater.  There was a lapse between the time the

18  question was asked and the time the witness answered.  And

19  unfortunately the question was not in my mind.  The answer was

20  "yes."

21          THE COURT:  Okay.  So if you could read back the last

22  answer and the question before it.

23          MR. ROCCO:  I apologize, your Honor.

24          (The record was read)

25          (Government's Exhibit 1600, 1800 received in evidence)

1    Q.  Special Agent Atwater, you testified that you were supposed

2    to transport the defendant to somewhere around the airport that

3    night; is that right?

4    A.  Yes.

5    Q.  What was the purpose of transporting him to that location?

6    A.  For an interview.

7    Q.  Were you going to conduct that interview?

8    A.  Repeat the question?

9    Q.  Were you the one who was going to conduct that interview?

10   A.  No.

11   Q.  Did you in fact transport him to another location?

12   A.  I did.

13   Q.  Was the defendant interviewed at that location?

14   A.  He was.

15           MR. KAMARAJU:  Your Honor, may I approach?

16           THE COURT:  Yes.

17   Q.  I am showing you what's been marked for identification as

18   Government Exhibit 70.  Do you recognize that exhibit?

19   A.  Yes.

20   Q.  What is it?

21   A.  The post-arrest interview.

22           THE COURT:  The what?

23           THE WITNESS:  Post-arrest interview.

24   Q.  How do you recognize it?

25   A.  I signed the back of it.  I saw it yesterday.

1              MR. KAMARAJU:  Your Honor, the government offers

2    Government Exhibit 70.

3              THE COURT:  I'll allow it.

4              MR. ROCCO:  I have no objection.

5              (Government's Exhibit 70 received in evidence)

6              MR. KAMARAJU:  If I could just have one moment, your

7    Honor.

8              THE COURT:  Yes.

9              MR. KAMARAJU:  Your Honor, no further questions at

10   this time.

11             THE COURT:  Any cross-examination?

12             MR. ROCCO:  Yes, your Honor.

13             THE COURT:  Go ahead.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1    CROSS-EXAMINATION

2    BY MR. ROCCO:

3    Q.  Good morning, Special Agent Atwater.  My name is Victor

4    Rocco, and I represent Hakan Atilla.  How long have you been a

5    special agent?

6    A.  About three years.

7    Q.  And as part of your training as a special agent, you were

8    taught how to execute warrants; am I correct, search warrants

9    and arrest warrants?

10   A.  Yes.

11   Q.  And the day that you met Mr. Atilla at JFK, did you have an

12   arrest warrant?

13   A.  Yes.

14   Q.  And that arrest warrant was achieved by a magistrate judge

15   of this court?

16   A.  Yes.

17   Q.  And when you were waiting for Mr. Atilla, you were waiting

18   to arrest him; am I correct?

19   A.  I was waiting to transport him.

20   Q.  Well, who was tasked with executing the arrest warrant?

21   A.  I don't recall.

22   Q.  Was it another member of the FBI or another special agent

23   of the FBI?

24   A.  Yes, to my knowledge.

25   Q.  And had you seen the arrest warrant before Mr. Atilla was

1  arrested?

2  A.  I did.

3  Q.  Had you read the complaint that was the support of that

4  arrest warrant?

5  A.  Yes.

6  Q.  And when did you do that, how long before Mr. Atilla was

7  arrested?

8  A.  It was the day of, but I don't recall the exact time.

9  Q.  On the day of the arrest, then, you're saying that you

10  looked at the warrant and you also looked at the supporting

11  complaint; am I correct?

12  A.  Yes, to my knowledge.

13  Q.  And you're familiar enough with warrants to know that a

14  warrant is an order of the court, correct?

15  A.  Yes.

16  Q.  The arrest warrant directs you to arrest immediately the

17  person who is named in the warrant; is that correct?

18  A.  Yes.

19  Q.  And when you went to the terminal where you met

20  Mr. Atilla -- am I correct you met him at a terminal?

21  A.  Yes.

22  Q.  And Mr. Atilla wasn't expecting to be arrested; am I

23  correct?

24  A.  Not to my knowledge.

25  Q.  And was there another special agent with you?

1   A.  There were several agents present at the time.

2   Q.  Who were those special agents?  When you say several, how

3   many were there?

4   A.  There were ICE agents, Immigrations and Customs

5   Enforcement, and there was another special agent as well.

6   Q.  Which agency was tasked with the responsibility of

7   arresting Mr. Atilla?

8   A.  The FBI.

9   Q.  Okay.  And can you tell me names of the other FBI agents

10  that were on the scene when you first approached Mr. Atilla?

11  A.  Special Agent Ben Denk was with me at the time we

12  transported him.

13  Q.  Any other special agents of the FBI with you?

14  A.  I don't recall any others at the time.

15  Q.  Let's see if we can just set the stage for this.  So

16  Mr. Atilla was waiting to board a flight; am I correct, at the

17  time that you approached him?

18  A.  Yes.

19  Q.  And was it you that approached him with Special Agent Denk?

20  A.  Yes.

21  Q.  And where was Mr. Atilla at the time?

22  A.  He was outside of the terminal, and then he was called into

23  the gate, in between the airport and the specific terminal.

24  Q.  I'm sorry.  Just physically where was he located?  He was

25  not inside the terminal at the boarding gate at the time that

1   you approached him?

2   A.  He was in the terminal, outside of the boarding gate.

3   Q.  I'm sorry, I misunderstood you.  So he was not yet online?

4   A.  No, but then he was called toward the gate, in between the

5   terminal and the airport -- or the airplane.

6   Q.  And he was called to the gate by whom?

7   A.  I don't know exactly.

8   Q.  Was he called by a representative of ICE, by a special

9   agent of ICE?

10  A.  I don't recall.

11  Q.  Do you recall if he was interviewed by a special agent from

12  ICE?

13  A.  I believe they did a customary check.

14  Q.  When you say a customary check, what did that consist of?

15  A.  Just asking did he have any -- the amount of money he had

16  on his person.  I wasn't -- I didn't hear exactly what they

17  spoke about; so I can't speak to that.

18  Q.  Do you recall that Mr. Atilla had money on him at the time

19  that he was arrested?

20  A.  Yes.

21  Q.  And do you recall how much money it was?

22  A.  No.

23  Q.  Does 1500 American dollars and 500 pounds sound familiar to

24  you?

25  A.  I can't recall.

1    Q.  Do you recall at any time taking Mr. Atilla's personal

2    effects in addition to his telephones?  Were you the agent that

3    processed Mr. Atilla?

4    A.  I don't recall if it was me specifically who processed him.

5    Q.  Do you recall if his property was inventoried?

6    A.  Yes.

7    Q.  Do you recall if there was a report made of the property

8    that was inventoried?

9    A.  Yes.

10   Q.  And do you recall whether you made that report?

11   A.  There were several agents present.  There were a lot of

12   items he had.  I can't speak to if it was exactly me who wrote

13   the report, but I was present at the time of some of the

14   inventory.

15   Q.  Well, there's an inventory report and there's a report of

16   the arrest, correct?

17   A.  Yes.

18   Q.  They're separate reports; am I correct?

19   A.  To my knowledge, yes.

20   Q.  The report of the arrest is incorporated into an FBI 302?

21   A.  Yes.

22   Q.  And there's a separate form that essentially inventories

23   the defendant's property, correct?

24   A.  I believe so, to my knowledge.

25   Q.  So when you met Mr. Atilla, you first approached him.  Did

1  you tell him he was under arrest?

2  A.  No.

3  Q.  Okay.  And so you, without telling him he was under arrest,

4  did you tell him that you wanted him to accompany you?

5  A.  Yes.

6  Q.  Did you tell him where he was going?

7  A.  We told him he was coming to a more secure facility where

8  he could be interviewed.

9  Q.  Did you tell him that he was going to be asked questions

10  then?

11  A.  Yes.

12  Q.  And did you tell him where you were taking him?

13  A.  Not specifically.

14  Q.  Did you tell him he was going to miss his plane?

15  A.  No.

16  Q.  Was he concerned about missing his plane?

17  A.  He was.

18  Q.  And did you tell him that he didn't have to worry about

19  missing his plane, that there are always planes flying from JFK

20  to London?

21  A.  I don't recall.

22  Q.  And at the time that you took Mr. Atilla off line, you knew

23  that Mr. Atilla was under arrest, correct?

24  A.  Yes.

25  Q.  But that's not something that you communicated to

1    Mr. Atilla; is that correct?

2    A.   Yes.

3    Q.   You just told Mr. Atilla that you wanted to take him to a

4    more secure facility where he can answer questions?

5    A.   Yes.

6    Q.   Now, when you took Mr. Atilla -- at the time you approached

7    Mr. Atilla, were you wearing a recording device?

8    A.   I believe so.

9    Q.   And did you tell Mr. Atilla that you were recording your

10   conversation with him?

11   A.   No.

12   Q.   And was Special Agent Denk wearing a recording device as

13   well?

14   A.   I can't recall specifically who was wearing the recording

15   device.

16   Q.   Well, when you wear a recording device, there's a record

17   made of -- a recording made of sounds or questions, right; am I

18   correct?

19   A.   Yes.

20   Q.   Do you remember seeing that recording?

21   A.   Seeing the recording?

22   Q.   Seeing the recording.  The recording is -- there's a

23   recording that's physically made; am I correct?

24   A.   I don't recall seeing it.

25   Q.   Well, isn't it important to know the chain of custody of

1   the recording?

2   A.   Yes.

3   Q.   And isn't it -- if you were wearing the recording, would

4   you not have identified the recording by placing your initials

5   on it?

6   A.   Yes.

7   Q.   And do you recall doing it with the recording of the

8   interview?

9   A.   I don't recall.

10  Q.   So how long did it take you, after you approached

11  Mr. Atilla and asked him to accompany you to another facility

12  to ask questions, how long did it take you to transport

13  Mr. Atilla to that other facility?

14  A.   Maybe 15 minutes.

15  Q.   And was it a 15-minutes drive from that terminal to the

16  second facility?

17  A.   No, maybe five.

18  Q.   Okay.  And that second facility is the RA, or resident

19  agency, out at JFK; am I correct?

20  A.   Yes.

21  Q.   That's an FBI facility?

22  A.   Yes.

23  Q.   And when you arrived there with Mr. Atilla, you essentially

24  turned Mr. Atilla over to other people; am I correct?

25  A.   Yes.

1    Q.  And you did that.  At that point, had you told Mr. Atilla

2    that he was under arrest?

3    A.  No.

4    Q.  So that's roughly how many times -- how much time elapsed

5    from the time you originally approached Mr. Atilla to the time

6    that you delivered him to the custody of other people, was

7    Mr. Atilla effectively in your custody?

8    A.  Yes.

9    Q.  How long a time?

10   A.  Again, maybe 15 minutes; 15, 20 minutes.

11   Q.  Fifteen or 20 minutes.  And all that time, Mr. Atilla

12   wasn't free to leave; am I correct?

13   A.  No.

14   Q.  And before Mr. Atilla was told that he was under arrest,

15   did you have occasion to take any property from him?

16   A.  Yes.

17   Q.  And what property did you take from him?

18   A.  His cell phones.

19   Q.  And how many cell phones did he have?

20   A.  Two.

21   Q.  And you didn't tell Mr. Atilla you were taking the cell

22   phones because he was under arrest; am I correct?

23   A.  You are correct.

24   Q.  And what did you tell him?  What pretext did you use to

25   taking his phones?

1    A.  I don't recall.

2    Q.  Do you recall telling him that he was in a secure facility

3    and you didn't want him to take photographs?

4              THE COURT:  That what?

5    Q.  That he was in a secure facility and you did not want him

6    to take photographs.  Do you recall saying that?

7    A.  No.

8    Q.  As you sit here today, you have no recollection of what

9    pretext you used to take Mr. Atilla's phones?

10   A.  He voluntarily give me his cell phones.  I asked him if I

11   could hold onto them as we transported him to the facility, and

12   he gave no objection.

13   Q.  So is it your testimony, Special Agent, that Mr. Atilla

14   took two cell phones out of his pocket and gave them to you and

15   asked you to hold them?

16   A.  No.  I asked him if I could have them.

17   Q.  Okay.  So tell me why you told him you wanted the cell

18   phones?

19   A.  I don't recall exactly what I said.

20   Q.  Okay.  When you took the cell phones, though, you do know

21   that you did not tell him that he was under arrest?

22   A.  Yes.

23   Q.  Okay.  Now, when you took the cell phones, what did you do

24   with the cell phones when you took custody of them?

25   A.  I held onto them.

1    Q.  And you held onto them, and what did you do with them when

2    you surrendered custody of him?

3    A.  Repeat the question?

4    Q.  What did you do before you turned custody of these cell

5    phones over to someone else?

6    A.  I don't recall exactly what I did.

7    Q.  Did you initial them?  You identified the phones just a few

8    moments ago on the witness stand?

9    A.  Yes.

10   Q.  How is it you were able to identify the phones?

11   A.  They were within the chain of custody, and I recognized

12   them when they were presented to me.

13   Q.  When you say they were in the chain of custody, when you

14   took the phones from Mr. Atilla, did you put it in a wrapper

15   and did you put your initials on that wrapper?

16   A.  I don't recall if I did that.

17   Q.  Okay.  So can you --

18           MR. ROCCO:  May I, your Honor?  May I approach?

19           THE COURT:  Yes.

20   Q.  So I'm going to show you Government Exhibit 1800, if you

21   don't mind.  Can you remove the phone from the evidence

22   package?

23           THE COURT:  Go back there.

24           MR. ROCCO:  Sure.  You want me to go to the --

25           THE COURT:  Yes.

1          MR. ROCCO:  Then I'm going to leave them both.  Thank

2    you, Judge.

3    BY MR. ROCCO:

4    Q.  So can you take the phone out of the package.  And can you

5    tell me how you recognize that to be the phone that you took

6    from Mr. Atilla?

7    A.  It was presented to me within the chain of custody, and it

8    looked like the phones that I seized from him that day.

9    Q.  What kind of a phone is it?

10   A.  An iPhone.

11   Q.  And what about that iPhone allows you to identify it as the

12   phone that you took from Mr. Atilla?

13   A.  Nothing specific about the iPhone itself that's in the

14   hardware.

15   Q.  And is there anything on the outside of the iPhone?

16   A.  Yes.

17   Q.  And what is it, the case?  Is there any marking on the case

18   that allows you to identify the iPhone specifically as

19   Mr. Atilla's iPhone?

20   A.  No.

21   Q.  Is there anything about the phone that allows you -- the

22   phone itself or the foil that it's wrapped in -- let me ask

23   you.  Have you ever seen that telephone in that foil before?

24   A.  Yesterday.

25   Q.  And are your initials on that foil?

1   A.   No.

2   Q.   Do you know how the phone came to be wrapped in the foil?

3   A.   No.

4   Q.   When you last saw the foil -- when you last saw the

5   telephone, it was not wrapped in foil; am I correct?

6   A.   No, it was wrapped in the foil when I saw it last.

7   Q.   The last time by -- the last time is yesterday?

8   A.   Yes.

9   Q.   When you saw it at the airport the day that Mr. Atilla was

10  arrested, was the phone wrapped in foil?

11  A.   No.

12  Q.   So the foil was added sometime after you took the phone

13  from Mr. Atilla and the time you saw it yesterday; am I

14  correct?

15  A.   Yes.

16  Q.   And do you know who put the foil on the phone?

17  A.   I can't say for sure, but I assume the CART lab.

18  Q.   Your lab did.  Is there an indication that you lab did it?

19  A.   Yes.

20  Q.   And how was that indication noted on the tinfoil?

21  A.   There is a bar code on the back of the phone that says

22  New York CART lab.

23  Q.   So does the CART lab identify that phone as Mr. Atilla's

24  phone, or does it simply identify it as a phone that the CART

25  lab had custody of?

1    A.  A phone that the CART lab had custody of.

2    Q.  Thank you.  Now, can you --

3              MR. ROCCO:  Your Honor, may I approach the witness?

4              THE COURT:  Yes.

5    Q.  Special Agent Atwater, I'm going to direct your attention

6    to Government Exhibit 1600 in front of you, and can you tell me

7    what that is?

8    A.  His cell phone.

9    Q.  I'm sorry, is that a question or an answer?

10             THE COURT:  That was the answer to your question.

11             MR. ROCCO:  It sounded like it was a question to my

12   question, your Honor.  I apologize.

13   Q.  Do you know that to be Mr. Atilla's cell phone?

14   A.  Yes.

15   Q.  And how do you know it to be Mr. Atilla's cell phone?

16   A.  It was presented to me yesterday.

17   Q.  And are there any markings, any initials on that cell phone

18   or on the foil?  If you can take it out of the evidence

19   envelope, I'd appreciate it.  So can you look at the phone and

20   tell me if there's anything on the phone that allows you to

21   identify it as Mr. Atilla's cell phone?

22   A.  There are no identifying markings indicating it was his

23   phone.

24   Q.  And you didn't mark it as something that you had taken from

25   Mr. Atilla; am I correct?

1   A.  No.

2   Q.  And, again, the phone, the cell phone is wrapped in

3   tinfoil.  At the time you took the phone from Mr. Atilla, was

4   it wrapped in tinfoil?

5   A.  No.

6   Q.  Did you wrap the telephone in tinfoil at any time?

7   A.  Not aside from just a second ago.

8   Q.  And the last time you saw the phone, the phone was not

9   wrapped in tinfoil; am I correct?

10  A.  No.

11  Q.  Let me withdraw the question because last night you saw the

12  phone for the first time wrapped in tinfoil; am I correct,

13  Special Agent Atwater?

14  A.  Yes.

15  Q.  You had not seen that before; am I correct?

16  A.  Yes.

17  Q.  At what time -- at what point after you accosted Mr. Atilla

18  was he informed that he was under arrest?

19  A.  I don't specifically recall, but I believe it was at some

20  point during the interview.

21  Q.  And were you present for the interview?

22  A.  I was in an adjacent room.

23  Q.  Did you participate in the interview?

24  A.  I did not.

25  Q.  Did you listen to the interview?

1  A.  Yes.

2  Q.  How did you come to listen to the interview?

3  A.  It was being recorded.

4  Q.  And were you listening to it live, as it was being

5  recorded, or did you listen to a recording of the interview?

6  A.  I was listening to it live, but I've also seen a recording

7  of the interview.

8  Q.  And you've listened to the recording of the interview?

9  A.  Not in its entirety.

10  Q.  Is that recording a video recording or just an audio

11  recording?

12  A.  A video recording.

13  Q.  And that's a different recording than the recording that

14  you made when you took custody of Mr. Atilla; am I correct?

15  A.  Yes.

16          MR. ROCCO:  I have no further questions, your Honor.

17          THE COURT:  Anything else?

18          MR. KAMARAJU:  Nothing further, your Honor.

19          THE COURT:  Thanks very much, Special Agent.  Thanks

20  very much.  Just leave it there.  We'll take care of

21  everything.

22          (Witness excused)

23          THE COURT:  We'll have the next government witness.

24          MR. LOCKARD:  The United States government calls Lisa

25  Palluconi.

1          THE DEPUTY CLERK:  Ma'am, if you could step up here.

2     Step up to the chair and remain standing for a moment and then

3     raise your right hand.  Do you solemnly swear that the

4     testimony that you shall give this Court and jury in this issue

5     now on trial shall be the truth, the whole truth and nothing

6     but the truth so help you God?

7          THE WITNESS:  I do.

8          THE DEPUTY CLERK:  Could you please state your full

9     name for the record?

10         THE WITNESS:  Lisa Marie Palluconi.

11         THE DEPUTY CLERK:  Could you spell your last name,

12    please.

13         THE WITNESS:  P, as in Paul, -a-l-l-u-c-o-n-i.

14         THE DEPUTY CLERK:  Thank you, ma'am.  You may be

15    seated.  Feel free to move up the chair and adjust the

16    microphone.  Thank you.

17         MR. LOCKARD:  Your Honor, may I inquire?

18         THE COURT:  Yes.

19    LISA PALLUCONI,

20         called as a witness by the Government,

21         having been duly sworn, testified as follows:

22    DIRECT EXAMINATION

23    BY MR. LOCKARD:

24    Q.  Good morning, Ms. Palluconi.  Could you tell us who is your

25    employer?

1    A.   The U.S. Department of the Treasury.

2    Q.   And for how long have you been with the U.S. Department of

3    Treasury?

4    A.   A little over five years.

5    Q.   And what's your current title?

6    A.   My current title is Sanctions Coordinator for the Office of

7    Foreign Assets Control, or OFAC.

8    Q.   And for how long have you been the sanctions coordinator

9    for OFAC?

10   A.   About a year.

11   Q.   And for how long have you been with the Department of the

12   Treasury overall?

13   A.   A little over five years.

14   Q.   In your five years with the Department of the Treasury,

15   have you had a principal focus in your professional

16   responsibilities?

17   A.   I have.  I have focused on the Iran sanctions program.

18   Q.   And in addition to your position as sanctions coordinator,

19   have you held other responsibilities at OFAC or at the Treasury

20   Department?

21   A.   I have.

22   Q.   What other roles have you played?

23   A.   I've been an attorney in the office of the chief counsel

24   for foreign assets control.  The office of the chief counsel

25   provides legal support to OFAC.

1    Q.  And have you worked with other federal agencies in your

2    role in the U.S. Treasury Department?

3    A.  I have.

4    Q.  What agencies have you worked with?

5    A.  I was a director at the National Security Council at the

6    White House.

7    Q.  So, Ms. Palluconi, you mentioned that your principal focus

8    at OFAC has been the Iran sanctions program?

9    A.  Correct.

10   Q.  Can you describe, just at a very basic level, what do you

11   mean by the Iran sanctions program?

12   A.  The Iran sanctions program is a series of statutes,

13   regulations and executive orders that administer economic

14   sanctions against Iran.

15   Q.  And in your position at the U.S. Treasury Department, have

16   you provided advice to others about the Iran sanctions program?

17   A.  Yes.

18   Q.  Does that include legal advice?

19   A.  Yes.

20   Q.  And have you played a role in the drafting of any executive

21   orders or regulations that have been promulgated as part of

22   that program?

23   A.  I have.

24           MR. LOCKARD:  Your Honor, the government offers

25   Ms. Palluconi as an expert in the Iran sanctions program.

1          THE COURT:  I'll allow that.

2          MR. LOCKARD:  And just as a matter of logistical

3     convenience, if I could approach the witness?

4          THE COURT:  Sure.

5     BY MR. LOCKARD:

6     Q.  Handing you two documents that have been marked for

7     identification as Government Exhibit 8040 and 8041, and we'll

8     turn back to those in just a moment.

9          THE DEPUTY CLERK:  Could you please repeat the

10    numbers, counsel?

11         MR. LOCKARD:  It is 8040 and 8041 for identification

12    only.

13    Q.  So, Ms. Palluconi, before we dive specifically into the

14    Iran sanctions program, what are the typical features of a

15    sanctions program?

16    A.  Typically, a sanctions program is established through a

17    declaration of national emergency via an executive order issued

18    by the President.

19    Q.  And under what authority is a national emergency declared,

20    specifically in the context of a sanctions program?

21    A.  So the President has this authority via statute titled the

22    International Emergency Economic Powers Act, otherwise known as

23    IEEPA.

24         THE COURT:  IEEPA?

25         THE WITNESS:  IEEPA.

 1    Q.   The I-E-E-P-A, for short?

 2    A.   Yes.

 3    Q.   And once a national emergency has been declared, what then

 4    will follow in a typical sanctions context?

 5    A.   Typically, sanctions are -- many sanctions are delegated to

 6    the Department of the Treasury to implement, and that is then

 7    further delegated within the Treasury Department to the Office

 8    of Foreign Assets Control to administer those sanctions through

 9    regulations and guidance, for example.

10    Q.   And does the sanctions program typically include

11    prohibitions?

12    A.   It does.

13    Q.   And, again, at a very basic level, what types of

14    prohibitions would a sanctions program typically involve?

15    A.   The sanctions program typically consists of prohibitions on

16    activity by U.S. persons and activities within or through the

17    United States, including the United States' financial system.

18    Q.   And in the context of the sanctions program, is there a

19    concept known as licensing?

20    A.   There is.

21    Q.   And what is that?

22    A.   So also under the IEEPA statute authority, there's the

23    authority to issue licenses for activity that's otherwise

24    prohibited.  So the sanctions prohibit the activity, but

25    through the administration of sanctions, OFAC, for example, has

1    the ability to license, in other words, authorize activity

2    that's otherwise prohibited.

3    Q.   And who can apply for a license?

4    A.   Any party.

5    Q.   Are you also familiar with something called the Specially

6    Designated Nationals List?

7    A.   I am.

8    Q.   And can you give us a general overview of what that list

9    is?

10   A.   The Specially Designated Nationals and Blocked Persons

11   list, or otherwise known as the SDN list, lists those

12   individuals' property or interest in properties have been

13   blocked by OFAC.  In other words, sanctioned persons whose

14   property has to be blocked by the U.S., for instance.

15             THE COURT:  Could you give us an example?

16             THE WITNESS:  Sure.  So, for example, on the SDN list

17   there could be an individual or entity that's been sanctioned

18   for proliferation of weapons of mass destruction, and so if

19   that individual or entity tries to do a financial transaction

20   through the U.S., flowing money through a U.S. bank, that U.S.

21   bank is prohibited from processing that transaction, but also

22   has to block it or freeze it.  So the funds have to be frozen

23   by the bank and otherwise be dealt with, and the bank within

24   ten days has to notify OFAC of such blocking.

25   BY MR. LOCKARD:

1    Q.  Let's talk a little bit about the Iran-specific sanctions

2    program, and in furtherance of that, if you could look at the

3    exhibit that's in front of you marked GX8040.  Do you recognize

4    that document?

5    A.  I do.

6    Q.  And did you review it before your testimony today?

7    A.  I did.

8    Q.  And did you participate in its creation?

9    A.  I did.

10   Q.  And would displaying this assist you in providing your

11   testimony in court today and in explaining the sanctions

12   program?

13   A.  Yes, it would.

14        MR. LOCKARD:  Your Honor, I'd like to publish 8040 as

15   a demonstrative.

16        THE COURT:  I'll allow it.

17   Q.  Okay.  So can you explain to us, generally, what's listed

18   here on the screen in front of us?

19   A.  So these are a series of executive orders issued under

20   IEEPA pertaining to the Iran sanctions program, starting with

21   the declaration of national emergencies, building upon it, as

22   well as a reference to implementing regulations issued by OFAC.

23   Q.  And has the President of the United States declared a

24   national emergency with respect to the government of Iran?

25   A.  Yes.

1    Q.  And is that national emergency still in force?

2    A.  It is.

3    Q.  And has it been continuously in force since it was first

4    announced?

5    A.  Yes, since March 15th, 1995.

6              THE COURT:  Is that the first entry on the

7    demonstrative?

8    A.  Correct.  The first entry was the declaration of national

9    emergency, March 15th, 1995.

10   Q.  Had there been prior declarations of national emergency

11   with respect to the government of Iran and its policies?

12   A.  Yes.

13   Q.  What is the relationship between the national emergencies

14   declared in these orders that are listed before us and the

15   current sanctions regime?

16   A.  So the first declaration of national emergency was in 1979.

17   That was to deal with the situation with Iran and the Iran

18   hostage situation at that time.  It was later dealt with

19   through the Algiers accords.  This was a separate declaration

20   of national emergency, which led to a comprehensive trade

21   embargo on Iran.

22   Q.  So let's advance to the next slide.  And so here we've

23   highlighted a series of executive orders and something called

24   the Iranian Transactions Regulations, the ITR or I-T-S-R, or

25   ITSR?

1    A.   Yes.

2    Q.   So are these the executive orders and regulations

3    pertaining specifically to the Iran sanctions program that

4    you've been discussing?

5    A.   Correct.

6    Q.   Let's advance to the next slide.  Generally speaking, what

7    are these three executive orders from 1995 and 1997?

8    A.   These executive orders are the foundational executive

9    orders that created a comprehensive trade embargo between the

10   United States and Iran.

11   Q.   If we could advance.  And are these the executive orders

12   that establish that a national security -- the threat to

13   national security that established those sanctions?

14   A.   That's correct.  And by declaring a national emergency, the

15   President has to find that, in this case, for the actions and

16   policy of the government of Iran constitute an unusual and

17   extraordinary threat to the national security foreign policy

18   and economy of the United States.

19   Q.   Advance again.  And then declared a national emergency to

20   deal with that threat; is that correct?

21   A.   Correct.

22   Q.   And then advance one more.  So you had mentioned something

23   called a comprehensive trade embargo.  Why don't we turn to the

24   next slide.

25            How was that comprehensive trade embargo implemented?

1    A.   So OFAC issued regulations to implement the trade embargo,

2    as well as guidance.  We call them frequently asked questions.

3    Q.   And if we can move one forward.  Can you describe to us the

4    principal features of that trade embargo, as implemented in the

5    ITSR?

6    A.   Two of the critical features of a comprehensive trade

7    embargo are both the prohibition on imports, in this case the

8    prohibition on imports of Iranian-origin goods or services into

9    the United States.  A second key component of a comprehensive

10   trade embargo is a prohibition on the exports or the re-exports

11   to Iran or the government of Iran by U.S. persons located

12   anywhere, or from the United States.

13   Q.   If we could advance a couple more.  Does this prohibition

14   on the export of services, how does that relate to specifically

15   banking or financial transactions?

16   A.   So, for example, a U.S. financial institution could not

17   provide financial services to Iran, to Iranian transactions or

18   to the government of Iran, wherever located.

19   Q.   And do the regulations identify what is considered the

20   government of Iran for purposes of the sanctions?

21   A.   They do.

22   Q.   And how do they do that?

23   A.   Through a definition in the regulations.  Government of

24   Iran is defined as threefold:  One is the actual government,

25   the political agencies or instrumentalities of the government;

 1    the second is any entity owned or controlled by the government

 2    of Iran; and third is any individual or entity acting for or on

 3    behalf of the government of Iran.

 4    Q.  So in the slide here it lists a couple of entities.  Are

 5    these three entities all considered part of the government of

 6    Iran for purposes of the sanctions?

 7    A.  Yes.

 8    Q.  And what are the three entities that are listed here?

 9    A.  The first is the Central Bank of Iran, or CBI; the second

10    is the National Iranian Oil Companies, or NIOC; and third is

11    the Naftiran Intertrade Company.

12            THE COURT:  Can you spell that?

13    A.  N-a-f-t-i-r-a-n, Intertrade Company, or NICO.

14    Q.  Does OFAC have a mechanism for identifying what entities or

15    individuals are considered part of the government of Iran?

16    A.  It does.

17    Q.  And how does it do that?

18    A.  OFAC would issue a determination of identification and

19    publish that individual or entity on its SDN list, the

20    Specially Designated National and Blocked Persons list.

21    Q.  Now, do the sanctions treat individuals and entities as not

22    part of the government of the Iran until that kind of

23    designation is made?

24    A.  No.  The regulations are clear that if you meet the

25    definition of the government of Iran, that three-part

1    definition, regardless of whether OFAC identifies you, you are

2    still treated as government of Iran under the regulation.

3    Q.  Let's talk a little bit about the export of services to

4    Iran or the government of Iran.  Do the regulations also give

5    guidance on how to determine whether services have been

6    exported to Iran or to the GOI, the government of Iran?

7    A.  Yes.

8    Q.  And how do they do that with respect to the export of

9    services to Iran?

10   A.  The regulations explain that if you, as a person or from

11   the U.S., if you were to export services to Iran or to the

12   government of Iran, or where the benefit of services is

13   otherwise received in Iran, any of those three would be a

14   prohibited export of services.

15   Q.  And do any of the regulations talk about how to determine

16   when services have been exported specifically to the government

17   of Iran?

18   A.  Yes.

19   Q.  And what do they say about that?

20   A.  They explain that the benefit of services performed

21   anywhere in the world on behalf of the government of Iran is

22   presumed to be received in Iran.

23   Q.  Now, as part of the definition of the government of Iran,

24   you testified about the concept of others acting for or on

25   behalf of the GOI.  Does that concept have application

1  elsewhere in the sanctions program?

2  A.  There are different parts of the sanctions program where

3  conduct could be sanctionable or a person could be sanctioned

4  for acting for or on behalf of a sanctioned person or engaged

5  in sanctioned conduct.

6  Q.  So what are one of the examples that you gave was a

7  financial transaction that would involve the transfer of funds

8  in or through a United States bank?  What would the sanctions

9  say about a transaction not done in the name of an Iranian

10 institution but done by someone else on behalf of an Iranian

11 institution?

12 A.  So the coefficient on an export of goods, technology and

13 services hit both direct and indirect.  In other words, if

14 someone else did the financial transaction on behalf of the

15 government of Iran or an Iranian person, then they would --

16 that would also be prohibited.

17 Q.  And if such a transaction was done on behalf of or for the

18 benefit of an individual on the SDN list, what would the U.S.

19 bank's obligation be if it were aware of that fact?

20 A.  It would have to block the transaction.  In other words, it

21 would have to freeze the funds and report that to OFAC within

22 ten days.

23 Q.  All right.  Let's take a look at the next slide.  All

24 right.  So we've been talking about the 1997 -- the 1995 and

25 1997 executive orders and the trade embargo established by

1  those three orders.  What is the February 2012 executive order?

2  A.  So this executive order built on the Iran sanctions

3  program, and it is an executive order that blocks the

4  government of Iran and any Iranian financial institution.

5  Q.  So if we could advance.  All right.  And do the blocking

6  concepts that you've been talking about apply in this context

7  with respect to Iranian financial institutions?

8  A.  Yes.

9  Q.  And what's considered an Iranian financial institution

10 under this particular executive order?

11 A.  So any financial institution in Iran, any financial

12 institution that's owned or controlled by such financial

13 institution would all be considered Iranian financial

14 institutions and blocked under this order.

15 Q.  Would an Iranian financial institution be able to conduct a

16 financial transfer through the United States even before this

17 executive order had been passed?

18 A.  No, it would be prohibited.  The one distinction is before

19 this executive order, the funds could just be returned to Iran.

20 They didn't have to be blocked, in other words, frozen.  After

21 this executive order, any transaction that the government of

22 Iran or an Iranian financial institution had an interest in

23 would be required to be blocked by the financial institution.

24 Q.  Okay.  So we've returned to our list of executive orders

25 and regulations.  If we could advance.  Now, the next order and

1   regulations highlighted here are called relating to the weapons

2   of mass destruction proliferators.  Is this a sanctions program

3   that is specifically related to Iran?

4   A.  No, it's general.  It's not country specific.

5   Q.  Have Iranian entities and individuals been designated under

6   these regulations?

7   A.  Yes.

8   Q.  All right.  Let's look at the next slide.  What is the

9   general focus of the national emergency and regulations

10  relating to the weapons of mass destruction proliferators

11  program?

12  A.  So this executive order is a blocking program which blocks

13  the property of weapons of mass destruction proliferators, as

14  well as their supporters.

15  Q.  And the implementing regulations were adopted in April of

16  2009?

17  A.  That's correct.

18  Q.  If we could advance.  I think you described this as another

19  blocking program?

20  A.  Correct.

21  Q.  So you mentioned the concept of designating or identifying

22  individuals and entities.  Let's talk a little bit about

23  entities that have been identified under the Iranian

24  transactions and sanctions program and executive order 13599,

25  that February 2012 executive order, as part of the government

1    of Iran or an Iranian financial institution.  So if we look at

2    1995, if we can advance just one more.  Do you recognize those

3    two entities?

4    A.  I do.

5    Q.  And with respect to designation or identification what if

6    anything happened in 1995 concerning those two entities?

7    A.  So the national emergency was declared in 1995, and as part

8    of that, OFAC issued some guidance, I believe in August of

9    1995, and gave some clarity on Iranian financial institutions

10   vis-a-vis some of the provisions in the original order.  Bank

11   Mellat and Bank Saderat were among those identified as Iranian

12   financial institutions.

13   Q.  And generally speaking, what are Bank Mellat and Bank

14   Saderat?

15   A.  So these are Iranian banks owned or controlled by the

16   government of Iran.

17   Q.  And since 1995 and their identification as part of the

18   government of Iran, has it been prohibited to export financial

19   services directly or indirectly to those entities from the

20   United States or through the United States?

21   A.  Yes.  So following those foundational EOs, there was a

22   prohibition on financial services to Iran and their government.

23   Q.  And if you look at 2008, do you recognize those two

24   entities?

25   A.  I do.

1   Q.  And are these the two parts of the government of Iran that

2   you testified about earlier?

3   A.  Yes.

4   Q.  The National Iranian Oil Company and Naftiran Intertrade

5   Company?

6   A.  Correct.

7   Q.  And what happened in 2008 with respect to those two

8   companies?

9   A.  These two companies were identified by OFAC as entities

10  owned or controlled by the government of Iran.

11  Q.  And if we go to 2010 and 2012, do you recognize those

12  entities?

13  A.  I do.

14  Q.  And generally, what happened with respect to those entities

15  in 2010 and 2012?

16  A.  OFAC identified these entities as being owned or controlled

17  by the government of Iran.

18  Q.  Okay.  Let's advance to the next slide, and go back to the

19  weapons of mass destruction regulations that you had talked

20  about a few moments ago.  Has OFAC designated Iranian entities

21  and companies under this sanction program?

22  A.  Yes.

23  Q.  And specifically, in 2007, do you recognize those two

24  entities?

25  A.  I do.

1   Q.  And what happened with respect to them in 2007 under the

2   weapons of mass destruction sanctions?

3   A.  So OFAC made a determination to designate those two

4   entities, meaning that their property and interest in property

5   was then blocked or frozen or U.S. persons or anyone within the

6   U.S. jurisdiction had a requirement to block.

7   Q.  Okay.  And Bank Mellat is listed there.  Is that the same

8   Bank Mellat that was already listed as part of the government

9   of Iran in 1995?

10  A.  Yes.

11  Q.  And at a very broad level, what is the Islamic

12  Revolutionary Guard Corps?

13  A.  So this is basically a military group that has different

14  ground forces, Navy, Air Force, et cetera, that reports to the

15  Supreme Leader in Iran.

16  Q.  If you look at 2012 --

17          THE COURT:  Counsel, before we go to 2012, I think

18  this might be a good time for our lunch break.

19          MR. LOCKARD:  Yes, your Honor.

20          THE COURT:  If that's okay with everybody.  So we'll

21  excuse the witness and ask you to be back at 2:00.  Thank you.

22  And I just have one comment for the jury.

23          (Witness temporarily excused)

24          So if you wish to, you can use the cafeteria in the

25  eighth floor in this building, or you're free to go outside

1    anywhere you'd like to go.  But I wanted to mention, since

2    you're in the building and a lot of us are also in the

3    building, yesterday I said that one of the conduct of the jury

4    should be not to let anyone talk to you about the case or about

5    anyone who has anything to do with it, and you remember I said

6    if someone should try to talk to you about the case, please

7    report that to Christine or me immediately.

8            But there's another part, which I'm also going to tell

9    you this evening before you go home.  In this regard, the

10   attorneys and the parties are not supposed to talk to the

11   jurors even if to offer a friendly greeting.  So if you happen

12   to see any of them as you're out and about, they will and

13   should ignore you.  Please don't take offense to that.  They're

14   only acting properly by doing so.  So why don't you be back at

15   2:00 in the jury room, and we'll see you then.  We'll pick up

16   with the same witness.

17           (Jury not present)

18           THE COURT:  So if the parties and the attorneys would

19   not, I would prefer that you avoid the eighth floor cafeteria

20   since the jury may well be in there so you won't even bump into

21   them.  So thanks very much.  I'll see you at 2:00.

22           MR. HARRISON:  Judge, just one quick reminder as to

23   the next witness, Mr. Dubowitz.  I do have an application,

24   whenever your Honor wants to hear that.

25           THE COURT:  Do it right now.

1        MR. HARRISON:  Mr. Dubowitz is going to testify about

2    the history of the sanctions regime.  As we're seeing right now

3    from this witness, she's giving a pretty clear recitation of

4    the history of the sanctions regime.  So I think, frankly, I

5    would ask to preclude all of his testimony as duplicative of

6    what Ms. Palluconi is saying.  I don't think they need it, and

7    it becomes sort of mor evident that the reason that the

8    government wants to put his testimony in is to get all this

9    other stuff in that I was raising before with the Court.

10        THE COURT:  Now you're losing me.  So, first,

11    respectfully, so I decide if it's duplicative or should come in

12    or not.

13        MR. HARRISON:  Sure.

14        THE COURT:  So we can move that off the table, but

15    what's the problem with it as you see it?

16        MR. HARRISON:  The problem is that the presentation

17    that the government wants to at least show to the jury, through

18    Mr. Dubowitz, has repeated references to terror, terrorism,

19    hostage taking of the United States citizens, jihad, pictures

20    of scary looking middle eastern guys who have no relation to --

21        THE COURT:  Pictures of what?

22        MR. HARRISON:  Scary looking middle eastern guys that

23    have no relation to Mr. Atilla, a symbol of a fist raised in

24    the air with a machine gun, which again has no relation to

25    Mr. Atilla.  It's not necessary.  I think that it's prejudicial

 1  to Mr. Atilla, and I don't think that they should be allowed to

 2  show that presentation to the jury.

 3          THE COURT:  So you've seen it?

 4          MR. HARRISON:  Yes, Judge.

 5          THE COURT:  And what is it, a movie or is it a --

 6          MR. HARRISON:  I've seen a PowerPoint copy.

 7          THE COURT:  I haven't seen it.

 8          MR. HARRISON:  I can hand up a copy to the Court with

 9  a letter that I have.

10          THE COURT:  Sure.

11          MR. HARRISON:  I gave a copy of this to the government

12  yesterday morning.

13          THE COURT:  Okay.  Did you have any response?

14          MR. DENTON:  Yes, your Honor.  It's, frankly, a

15  somewhat absurd mischaracterization of the presentation.  First

16  of all, to the extent that there are what Mr. Harrison

17  described as pictures of scary looking middle eastern guys,

18  they are pictures of designated individuals who work at

19  designated entities in Iran who met with people, including the

20  defendant, as part of meetings pertaining to the conspiracy

21  charged in this case.  They are all individuals about whom

22  there will be other direct evidence, and so their role and the

23  role they play at particular companies and entities is

24  particularly important.

25          With respect to the issue of terrorism or jihad, on

 1    terrorism, the only references here are to the fact that

 2    certain entities have been designated under regulations

 3    pertaining to their support for terrorism.

 4         The government has been very careful to instruct

 5    Mr. Dubowitz and all of its witnesses that, given the evidence

 6    in this case, references to specific acts of terrorism or any

 7    implication of the defendant's involvement in them should not

 8    be made.  But to try and excise the fact that these entities

 9    were designated for, in general, their support of terrorism

10    seems like a severe error.

11         The final thing I'll just note is that to the extent

12    that there have been allusions made to a fist holding a

13    machinegun, that's not clip art, your Honor.  That is the crest

14    of the Islamic Revolutionary Guard Corps, which plays a central

15    role in not just in the Iranian economy, but particular facets

16    of the Iranian economy that are at issue here.  And I would

17    suggest that the Court take a look at that one in particular,

18    which is page 7 of the presentation.

19         Given the IRGC's incredible involvement in terrorist

20    activity around the world, this is about as sanitized a

21    description of their activities as could be created and still

22    be the truth.  So I think we've gone far out of our way to

23    avoid prejudice to the defendant here and that all of these

24    things are relevant facts that will play a role in the

25    conspiracy charged in this case.

1          THE COURT:  Okay.  So I'll take a look at it over the

2    lunch break.  My inclination and likely ruling is that I will

3    allow it over the objection of the defense, but I will read

4    more carefully what you have submitted.  You will recall that

5    just before the first witness, I gave an instruction to the

6    jury specifically that your client is not being charged with

7    terrorism or any terrorist acts; so I think that the jury heard

8    that, and I think that will probably suffice.

9          What I would say is, to the extent that we can move

10   things along and try to avoid repetition, that would be

11   appreciated, but thanks very much.

12         MR. HARRISON:  Thanks, Judge.  There's also in the

13   letter a request, Judge, for a limiting instruction in relation

14   to the word jihad, since the government has now opened on it

15   and they have it in this presentation more than once.  So I'd

16   request that instruction be given to the jury at some point,

17   too.

18         And I think under 403, I appreciate the Court giving

19   the instruction to the jury that you gave, but under 403, this

20   is going to confuse the jury more than anything.  You told them

21   that he's not charged with terrorism and now we're talking

22   about a lot of terrorism.

23         THE COURT:  That's not my reaction.  It doesn't sound

24   very confusing to me in the least, but I'll certainly look at

25   your letter.  Okay.

1          And so, counsel, that instruction, so to speak, that I
2     gave to the jury implies to all of you, and you remember even
3     if to offer a friendly greeting, that's something I prefer you
4     not do.  So okay?
5               MR. LOCKARD:  Yes, your Honor.
6               MR. KAMARAJU:  Yes, your Honor.  Thank you.
7               THE COURT:  So thank you very much.
8               (Luncheon recess)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HBS3ATI5

                          AFTERNOON SESSION

                             2:00 p.m.

          (In open court; jury and defendant not present)

          THE COURT:  One open item from before our lunch break.

Mr. Harrison, does it matter if Mr. Atilla is not here or do

you want to wait until he comes?

          MR. HARRISON:  I think you can go ahead, your Honor.

          THE COURT:  Respectfully I'm going to deny the

application.

          (Defendant present)

          THE COURT:  Two grounds.  First, I think we really

went over this issue in earlier letters from the government and

the defense, which resulted in the Court's order dated

November 22, 2017.  And in particular, number 10, which was

called defendant's motion to preclude the "economic jihad"

letters.  The defendant's motion was denied there as well and I

indicated that the Court may provide the jury with the

following limiting instruction, which is the very one that I

gave this morning before the first witness.  I think that does

cover the waterfront.

          In addition, though, I did review Mr. Harrison's

letter and the exhibits, and I did not conclude, for example,

that there were any scary Middle Eastern men, to use

Mr. Harrison's phrase, and I didn't think that there was any

fear or would be of guilt by association.  And I've also

HBS3ATI5

1    earlier allowed the testimony, so the government indicated at

2    that time that they would try and be as non-duplicative as

3    possible.  So we'll have the jury and see if they're there.

4                MR. LOCKARD:  Your Honor, would you like the witness

5    to start back up in the stand?

6                THE COURT:  You can since it's a witness that's

7    already been called.

8                (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         (Jury present)

2              THE COURT:  We're going to have our witness and we'll

3    pick up with the direct examination.

4              THE DEPUTY CLERK:  Ma'am, before we begin I'd like to

5    remind you that you're still under oath.

6              Thank you.

7    BY MR. LOCKARD:

8    Q.  Good afternoon, Ms. Palluconi.

9    A.  Good afternoon.

10   Q.  Why don't we start where we left off before the lunch

11   break.  We were talking about certain designations that OFAC

12   has made pursuant to the Weapons of Mass Destruction

13   Proliferators Sanction Program.  And we had just looked at some

14   designations made in 2007 of Iran's IRGC and Bank Mellat.

15             THE COURT:  Do you all have it on your screen?

16             A JUROR:  No.

17             THE COURT:  I don't either.

18             MR. LOCKARD:  I think it's revving up.

19             THE COURT:  Okay.  There we go.

20             MR. LOCKARD:  Thank you, Mr. Chang-Frieden.

21   Q.  All right.  So, under the Weapons of Mass Destruction

22   Proliferators Program, what happened with respect to the

23   National Iranian Oil Company in 2012?

24   A.  So in September, the National Iranian Oil Company, or NIOC,

25   was identified by OFAC as an agent or affiliate of the IRGC,

1    that's Iran's Islamic Revolutionary Guard Corps.

2    Q.  What, if any, steps did the OFAC take as a result of

3    identifying NIOC as an agent of affiliate of the IRGC?

4    A.  So the SDN list was updated to reflect that NIOC was an

5    agent or affiliate of the IRGC, and a special tag was put on

6    the SDN list so the regulated public could be aware of this.

7    Q.  So now let's talk about 2013.  And what happened in 2013

8    with respect to NICO?

9    A.  So following NIOC's identification, they were further

10   designated under the Executive Order 13382, and following that,

11   because NICO is owned or controlled by NIOC, NICO was likewise

12   designated under Executive Order 13382, and its property and

13   interest in property was blocked under that order.

14   Q.  So, we've touched on NICO previously and the fact it was

15   identified as part of the government of Iran under a separate

16   OFAC identification.  When you say that NICO is owned or

17   controlled by the National Iranian Oil Company, very generally

18   speaking, what is NICO?

19   A.  So, NICO was basically a foreign trade arm of NIOC.  So

20   facilitating a trade of petroleum products outside of Iran.

21   Q.  Have various individuals and officers affiliated with NICO

22   also been designated, been placed on the SDN list?

23   A.  Yes.

24   Q.  So, we've been discussing a series of sanctions regulations

25   targeting things like blocking property in the United States or

1    prohibiting the export of services out of the United States or

2    the import of those services into the United States.

3              Is there another type of sanctions program that OFAC

4    implements and administers?

5    A.  Yes.  So the comprehensive trade embargo that we were

6    talking about shorthanded by calling it primary sanctions as

7    opposed to a different type of sanction that OFAC administers,

8    which is the so-called secondary sanctions.

9    Q.  What is the difference between a primary sanctions program

10   and a secondary sanctions program?

11   A.  So, a secondary sanctions program principally targets the

12   activity of non-U.S. persons conducted outside of the United

13   States or outside the involvement of any U.S. persons.  And if

14   a, for example, if the Treasury Departments determines that

15   certain activity, certain sanctionable activity has occurred,

16   then they can cut off that foreign party from access to the

17   United States.  Principally the financial system for the

18   authorities that Treasury administers.

19   Q.  So in other words, if that entity engages in transactions

20   that do not go through the United States but nonetheless fall

21   under a category of sanctioned conduct, OFAC can take what

22   kinds of steps?

23   A.  So, for example, the secondary sanctions we have in the

24   banking sector, if OFAC were to determine that the sanctionable

25   conduct occurred, it could issue such determination and with

1    respect to a foreign bank, for example, that engaged in that

2    activity, they could put them on a special list called a 561

3    list, and that basically says that that foreign bank can no

4    longer -- well, it prohibits U.S. financial institutions for

5    holding correspondent or payable-through accounts for that

6    foreign bank.

7             MR. HARRISON:  I couldn't hear part of the answer.

8             (The record was read)

9    Q.  When you say correspondent account or a payable-through

10   account, on a very general level, what kind of account is that?

11   A.  It is essentially when a U.S. bank holds an account for a

12   foreign bank and it enables that foreign bank to process

13   payments through that account or hold deposits in the account.

14   A payable-through account similarly is a correspondent account,

15   but it enables them direct or indirect access for the customers

16   of that foreign bank to likewise float transactions through the

17   U.S.

18   Q.  So, has OFAC implemented secondary sanctions relating to

19   Iranian, specifically its oil industry?

20   A.  Yes.

21   Q.  And its financial industry?

22   A.  Yes.

23   Q.  So let's look at the next slide.

24             Generally speaking, what are the statutes, executive

25   orders, and other authorities that are listed in this slide.

1    A.  So this slide outlines a variety of secondary sanctions

2    under either statutory authority or executive order.

3    Q.  So let's take them one by one.  Starting with the

4    December 11, 2011 statute called the 2012 National Defense

5    Authorization Act.  What is this act, the NDAA, say about

6    secondary sanctions with respect to Iran?

7    A.  So it would require these prohibitions or the conditions on

8    U.S. correspondent or payable-through accounts of foreign banks

9    if OFAC were to determine that the foreign bank has knowingly

10   conducted or facilitated a significant financial transaction

11   with the Central Bank of Iran or any designated financial

12   institution.

13   Q.  Are there exceptions to this sanctions program?

14   A.  There's two principal exceptions under this sanctions

15   program.  The first is for transactions in the sale of food,

16   medicine or medical devices to Iran.  So a foreign bank that

17   engages in those transactions would not be subject to these

18   sanctions on the basis of those transactions.

19          The second category is transactions by foreign banks

20   in countries that have been determined to significantly reduce

21   their purchases of Iranian crude oil.

22   Q.  Is the exception related to food, medicine and medical

23   devices, is that found in other places in the Iran sanctions

24   program?

25   A.  It is.  So, under our primary sanctions, for example, the

1    prohibitions of U.S. persons and activity in the U.S., there

2    are what we call general licenses, they're authorizations that

3    enable the sale of similar commodities by U.S. persons to Iran

4    either if they fall under that general license or there is a

5    provision where parties could write in and ask for a specific

6    license from OFAC for a particular transaction or set of

7    transactions.

8    Q.  Why is there, generally speaking, an exception for trade

9    involving food, medicine or medical devices?

10   A.  Essentially it extends from a policy, foreign policy to

11   enable these types of transactions for the Iranian people.

12   Q.  Let's look at the next authority in this timeline,

13   Executive Order 13622.  Does that order from July of 2012

14   obtain provisions relating to secondary sanctions on Iran?

15   A.  It does.

16   Q.  Advance to the next slide.  What kind of secondary

17   sanctions does this executive order have specifically with

18   respect to the petroleum industry?

19   A.  So, this executive order, which builds upon the foundation

20   of secondary sanctions, has the same sort of prohibitions on

21   the opening or maintaining of correspondent or payable-through

22   accounts if the foreign bank is determined to have knowingly

23   conducted or facilitated a significant financial transaction

24   for NIOC or NICO or for petroleum purchases from Iran.

25   Q.  How does this provision differ from the provision that we

1   looked at under the NDAA relating to Central Bank of Iranian

2   designated banks?

3   A.  So the NDAA focused on particular banks being involved in

4   the transaction.  Either the Central Bank of Iran or

5   designated -- a designated Iranian bank.  Here, this builds

6   upon it sort of filling a gap that even if these Iranian

7   financial institutions weren't involved, if it involves sales

8   by NIOC or NICO or any other entity that's for petroleum

9   purchases from Iran, this would expose that activity to

10  secondary sanctions.

11  Q.  Are there also exceptions to this sanctions provision under

12  the July 2012 executive order?

13  A.  Yes.

14  Q.  What are those?

15  A.  So these are the same two, from a substantive perspective,

16  the same two exceptions that we just discussed.  The first is

17  for the sale of food, medicine or medical devices to Iran.  And

18  the second is for transactions by foreign banks in countries

19  that have been determined to have significantly reduced their

20  purchases of Iranian crude oil.

21  Q.  What, if any, relationship is there between Executive Order

22  13622 and the IEEPA, the statute that we talked about in your

23  testimony this morning?

24  A.  So Executive Order 13622 is promulgated under the authority

25  of IEEPA as an executive order issued by the president.  So it

1  is an Executive Branch authority as opposed to a statutory

2  authority, but it still has the same force of implementation.

3  Q.  As a result of that, is it addressed to the same national

4  emergency as the other executive orders that we discussed

5  addressed?

6  A.  It is.

7  Q.  That's the national emergency with respect to the

8  government of Iranian and its policies?

9  A.  That's correct.

10 Q.  Does Executive Order 13622, the one from July 2012, include

11 additional provisions relating to trade with Iran?

12 A.  It does.  So, switching back to our primary sanctions, this

13 authorizes the U.S. government, Department of Treasury, to

14 block the property and interest in property of those

15 individuals that provide goods or services or material support

16 to the purchase or acquisition of U.S. currency, U.S. bank

17 notes.  Dollar bank notes, for example.  Or precious metals by

18 the government of Iran, which includes the Central Bank of

19 Iran.

20       The second piece of that is also allowing for blocking

21 for those that provide material support or goods or services to

22 NIOC, NICO, or the Central Bank of Iran.

23 Q.  When you talk about precious metals, is gold a precious

24 metal under these regulations?

25 A.  Yes.

1   Q.  And then lastly, for purposes of today, is there also a

2   prohibition on transactions to avoid the other prohibitions in

3   the executive order?

4   A.  Yes, that's included in the executive order.

5            MR. LOCKARD:  Can we now turn back to our timeline.

6   Q.  We've talked about the initial secondary sanctions from the

7   2012 NDAA, the additional secondary sanctions you just

8   described in the blocking prohibition from the July 2012

9   executive order.

10           What is the August 10, 2012 Iran Threat Reduction and

11  Syria Human Rights Act?

12  A.  This is a statute known as the TRA, and the TRA, one

13  principal component of it is it amends the NDAA, which we just

14  discussed in a couple key respects.

15  Q.  What key respects does the TRA amend the NDAA?

16  A.  So it amends those two exceptions that we discussed

17  previously.

18  Q.  So, with respect to the exception for food, medicine and

19  medical devices, how is that amended?

20  A.  So it expanded the exception to also include agricultural

21  commodities.

22  Q.  What about the exception for transactions in countries that

23  had significantly reduced their crude oil procurement from

24  Iran?

25  A.  So the amendment narrowed that exception and in a couple of

1    ways.  One, it said that if you're a significantly reducing

2    country -- there was about 20 of them, these countries -- that

3    the exception would only apply to bilateral trade, transactions

4    between Iran and that country that had been given -- the banks

5    in that country that had been given the exception.

6    Q.  You said there were about 20 countries that had qualified

7    for the significant reduction exception.  Was Turkey among

8    those countries?

9    A.  Yes.

10   Q.  You also talked about bilateral trade.  Can you explain a

11   little bit more about what you mean about bilateral trade.

12   A.  It's implemented in our regulations.  Bilateral trade

13   refers to trade between that country with the exception and

14   Iran.  It has to be, for example, trade, if we're talking about

15   Turkey, Turkish goods have to be originating.  In other words,

16   they have to be produced in Turkey, they have to be

17   manufactured in Turkey, or otherwise substantially transformed

18   to be an originating good.  And the sale and the export of

19   those goods must be directly to Iran to qualify as bilateral

20   trade.

21   Q.  So what about conduct involving Iranian oil sale proceeds

22   held at a bank in, for example, Turkey.  What could be the

23   consequences for engaging in financial transactions with those

24   oil proceeds that do not fit within either of these two

25   exceptions that you just described, either the bilateral trade

1    or trade in agricultural commodities, food, medicine and

2    medical devices?

3    A.   Our regulations are clear that any proceeds, so bilateral

4    trade, purchasing of Iranian petroleum, any proceeds from that,

5    proceeds to Iran, have to be deposited in a financial

6    institution in that significant reducing, significantly

7    reducing country, and may not be repatriated to Iran.  Those

8    proceeds can only be used to further fund bilateral trade or

9    they can be used for this humanitarian trade, the agricultural

10   commodities, food, medicine, medical devices.

11          The regulations also set forth very specific

12   requirements how a Turkish manufacturer, for example, could be

13   paid out of those funds.  It had to be by check, for example,

14   or by an order to another Turkish bank to that manufacturer,

15   could not be issued in cash, for example.

16   Q.   What would be the potential consequences to the Turkish

17   bank if its transactions did not fit within those requirements?

18   A.   So, it could be sanctioned under the NDAA, and that

19   sanction is the prohibition on U.S. -- prohibition on U.S.

20   correspondent and payable-through accounts.  In other words, it

21   would cut that foreign bank, cut them off from the U.S.

22   financial system.

23   Q.   When did this narrowing provisions of the TRA from

24   August 2012, when did they come into effect?

25   A.   They came into effect on February 6, 2013.

1   Q.  So the date that the restrictions came into effect was

2   after the date that the statute was publicly enacted?

3   A.  Yes, it had a 180-day period before the implementation was

4   to take effect.

5   Q.  So, let's turn to the next step in the timeline.  So, the

6   January 2, 2013, Iran Freedom and Counterproliferation Act.  Is

7   that the IFCA?

8   A.  Correct.

9   Q.  What provisions did the IFCA have relating to trade with

10  Iran?

11  A.  So, one key provision in the IFCA was sanctionable conduct

12  with a sale, supply or transfer of precious metals directly or

13  indirectly to Iran.  To or from Iran.

14  Q.  So you testified earlier about provisions relating to gold

15  trade or precious metals trade with Iran from the July 2012

16  executive order.  How do the provisions of the January 2nd,

17  2013 IFCA differ from the earlier precious metals provisions?

18  A.  So, this broadens what was captured in 13622, which was

19  precious metals specific to the government of Iran.  Whereas

20  this is trade and precious metals to or from Iran, and it

21  doesn't require that the government of Iran be involved.

22  Q.  When did this provision take effect after it was enacted in

23  January of 2013?

24  A.  July 1st, 2013.

25  Q.  Let's look now at the last entry in our timeline.  So the

130

June 3, 2013 Executive Order 13645, does this have provisions

relating to secondary sanctions against the government of Iran?

A.  It does.

Q.  Do those provisions include provisions relating to the oil

industry?

A.  It does.

Q.  So, what does Executive Order 13645 say about those

secondary sanctions?

A.  So one of the provisions in this executive order also is

what we call the correspondent or payable-through account

sanction on foreign banks if they're determined to have

knowingly conducted or facilitated significant financial

transactions on behalf of certain Iranian persons on the SDN

list, including NIOC and NICO.

Q.  Are there exceptions for that sanctions?

A.  Yes.

Q.  What are those exceptions?

A.  So two of the key exceptions are the ones we discussed

earlier.  One for food, medicine, agricultural commodities or

medical devices or for transactions in petroleum and petroleum

products that meet the significant reduction exception under

the NDAA.

Q.  Okay.  In the sanction provision relating to transactions

on behalf of certain persons on the SDN list including NIOC and

NICO, we talked a little bit about "on behalf of" earlier in

1    your testimony.  In the context of financial transactions, what

2    does "on behalf of" mean for this provision?

3    A.  So it could mean direct or indirect, if ultimately the

4    transaction was intended for the benefit of those sanctioned

5    parties, even if they're not the actual named parties in the

6    transaction.

7    Q.  And does the June 2013 executive order also contain

8    provisions relating to precious metals trade with Iran?

9    A.  It does.

10   Q.  Are those similar to the provisions under the IFCA?

11   A.  Yes, it is an implementation of the IFCA sanctionable

12   conduct.

13   Q.  What does the executive order say about transactions to

14   avoid other provisions in the executive order?

15   A.  So this executive order contains a provision that prohibits

16   transactions that avoid or have the purpose of avoiding any of

17   the prohibitions in that executive order.

18   Q.  When did this executive order take effect?

19   A.  July 1st, 2013.

20   Q.  What, if any, relationship is there between the June 2013

21   executive order and the IEEPA statute?

22   A.  So this executive order was issued pursuant to IEEPA, and

23   it falls under the national emergency pertaining to Iran that

24   was declared in 1995.

25   Q.  Overall, what is the trend of the sanctions over this

1  timeline that we've looked at from December of 2011 until the

2  summer of 2013?

3  A.  So, it was an expanding and escalating trend, particularly

4  with respect to these secondary sanctions.

5        THE COURT:  Could you explain what you mean by

6  "expanding and escalating."

7        THE WITNESS:  So if you look back to the timeline, you

8  see that the secondary sanctions started, started with just the

9  financial sector, in other words, the Iranian -- the Central

10  Bank, and designated Iranian banks, and then it started to

11  expand and fill the gap, so it is not just the banks, it is

12  anything with NIOC or NICO or the petroleum sector.  And when

13  you get to IFCA, it is much more expansive.  The entire IFCA

14  provision is any Iranian person on the SDN list.

15        So you've gone from just the banking sector to any

16  Iranian person on the SDN list, and then you see the sort of

17  proliferation of the secondary sanctions in sectors within IFCA

18  such as the gold and precious metals trade.

19  Q.  When we talk about the SDN list, did the SDN list contain

20  NIOC and NICO at the time that the IFCA took effect?

21  A.  It did.

22  Q.  So transactions with NIOC or NICO would be covered under

23  the provisions under the IFCA?

24  A.  They would.

25        MR. LOCKARD:  If I may approach, your Honor?

1      THE COURT:  Yes.

2   Q.  Show you some additional exhibits which are marked at this

3   point solely for identification as Government's Exhibits 818

4   and 818-T through Government's Exhibit 822 and 822-T.

5      Okay?  Ms. Palluconi, I'll ask that you take a look at

6   those exhibits.

7      MR. LOCKARD:  I apologize, your Honor.  Just one

8   moment.  I'm going to borrow these back for just a second.

9      MR. ROCCO:  Excuse me, your Honor.  It is my fault.

10  Thank you, your Honor.

11  Q.  Here you go.  Okay.

12      Now, Ms. Palluconi, do you recognize the documents

13  that I've just handed you a moment ago?

14  A.  I do.

15  Q.  Have you reviewed them prior to your testimony today?

16  A.  Yes.

17  Q.  When is the first time you saw those documents?

18  A.  Yesterday.

19  Q.  Had you ever seen them before yesterday?

20  A.  No.

21  Q.  Are you able to recognize certain aspects of those

22  documents?

23  A.  I am.

24  Q.  What aspects are you able to recognize?

25  A.  On, for example, on Exhibit 818, the schematic looks to be

1   the same schematic in our OFAC guidance which is called

2   frequently asked questions that were issued on February 6,

3   2013, with respect to the implementation of the narrowing of

4   the significant reduction exception to bilateral trade.

5   Q.  You had spoken previously about the guidance that OFAC

6   offers.  Is that one of the forms of guidance that OFAC offered

7   about the secondary sanctions provisions?

8   A.  Yes.

9   Q.  Are there other aspects of those documents that you

10  recognize as relating to frequently asked questions or OFAC

11  guidance about the secondary sanctions?

12  A.  Yes.  So the schematics in the non-English versions are the

13  same, and the translations look to be close to identical of

14  what's in our frequently asked questions.  And as well as the

15  particular numbers here of questions they seem to be from --

16  they appear to be translations from that OFAC's website's

17  frequently asked questions.

18  Q.  That's all I have for you about those documents.  Now we're

19  going to turn back to licensing.

20          So we talked earlier about the OFAC's licensing

21  authority.  Based on your role at the U.S. Treasury Department

22  and OFAC, are you familiar with the licensing process?

23  A.  I am.

24  Q.  Are you familiar with the recordkeeping practices of OFAC

25  with respect to license applications and issued licenses?

1   A.  I am.

2   Q.  Does OFAC maintain a record of license applications and

3   granted licenses?

4   A.  It does.

5   Q.  So have you reviewed OFAC records relating to license

6   applications or granted licenses in connection with your

7   testimony this afternoon?

8   A.  Yes.

9   Q.  So now I would like you to take a look at what's been

10  marked again for identification purposes as Government's

11  Exhibit 8041 which should be in front of you.  And is that an

12  OFAC record relating to a license history check?

13  A.  It is.

14  Q.  What's a license history check?

15  A.  So this is conducted by a division within OFAC who examines

16  our licensing records to determine whether certain licenses

17  have been issued or have not been issued for certain parties.

18  Q.  Does this license history check specifically relate to

19  whether licenses had been applied for to provide goods and

20  services to Iran or the government of Iran?

21  A.  Yes.

22  Q.  Does it contain a list of entities for whom that check was

23  performed or with respect to whom that check was performed?

24  A.  It does.

25  Q.  I'm going to ask you to look at a few of the entities that

1    are on that list.  Based on these records, has the Al Nafees

2    Exchange obtained a license to provide goods or services to

3    Iran?

4    A.  No.

5              THE COURT:  Could you spell that.

6              MR. LOCKARD:  A-L space N-A-F-E-E-S Exchange LLC.

7    I'll continue to spell these names as we go through them.

8              THE COURT:  The question again just was whether that

9    entity has applied for a license?  Is that what you asked?

10             MR. LOCKARD:  That's correct.  Whether based on OFAC's

11   license keeping records that you've reviewed, that entity had

12   ever applied for or received a license to provide goods or

13   services to Iran or to the government of Iran.

14             THE COURT:  And the answer was?

15             THE WITNESS:  For Al Nafees, no.

16   Q.  Then number 15 on that list, an individual named Taha Ahmet

17   Alacaci.  Has that individual ever applied for or received a

18   license to provide goods or services to Iran or the government

19   of Iran?

20   A.  No.

21   Q.  Next page, number 33.  Asi Kiymetli Madenler Turizm.  Has

22   that company applied for or received a license to provide goods

23   or services to Iran or to the government of Iran?

24   A.  No.

25   Q.  Now I'm just going to list the names and the same questions

1    for each of them.

2            Number 36, Suleyman Aslan?

3    A.  No.

4    Q.  Number 40, Atlantis Capital General Trading?

5    A.  No.

6            MR. ROCCO:  Your Honor, if I may just for one second.

7    Has this been offered in evidence this document?  I don't think

8    so.

9            MR. LOCKARD:  It has not.

10           MR. ROCCO:  Well, she's reading from a document that's

11   not in evidence.

12           MR. LOCKARD:  We offer Government's Exhibit 8041.

13           THE COURT:  I'll allow it.  Continue the questions and

14   answers.

15           (Government's Exhibit 8041 received in evidence)

16   Q.  Number 40, Atlantis Capital General Trading.

17   A.  No.

18   Q.  Number 56, Binsabt Jewellery LLC also known as the Dubai

19   Exchange?

20   A.  No.

21           MR. LOCKARD:  Your Honor, if I could have just one

22   moment.

23   Q.  So rather than continue to read through these, is it fair

24   to say that, except for certain exceptions that are noted in

25   the first one or two pages of Exhibit 8041, the remaining

138

HBS3ATI5                    Palluconi - Cross

1   entities and individuals listed in that appendix have never

2   applied for or received a license from OFAC to export or

3   provide goods or services to Iran or to the government of Iran?

4   A.  That's correct.

5          MR. LOCKARD:  No further questions, your Honor.

6          THE COURT:  Cross-examination, counsel.

7          MR. ROCCO:  Yes, your Honor.

8   CROSS-EXAMINATION

9   BY MR. ROCCO:

10  Q.  Ms. Palluconi, my name is Victor Rocco.  It's nice to put a

11  face to a name.  Thank you for being here.  I have a couple of

12  questions for you.

13         You described yourself as a sanctions coordinator for

14  OFAC.  Am I correct?

15  A.  Correct.

16  Q.  And as part of being sanctions coordinator, part of your

17  responsibilities is to focus on I think what you described as

18  the U.S. Iranian sanctions regime?

19  A.  Correct.

20  Q.  So, how long have -- I think you said that you've been

21  doing that, focusing on Iran and the Iranian sanctions regime

22  for is it the past year.  Am I correct?

23  A.  Five years, or a little over five years on Iran.

24  Q.  In the past year, you moved to your present position as

25  sanctions coordinator?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    A.   Correct.

2    Q.   As sanctions coordinator, does that mean that -- well, why

3    don't you tell me, if you will, what a sanctions coordinator

4    does.

5    A.   Sure.  So this is a detail position.  I come from the

6    counsel's office at OFAC.  And this sanction coordinator

7    position was set up originally to focus on the implementation

8    of the joint comprehensive plan of action and to coordinate

9    OFAC's implementation of that.  Those requirements.  It is also

10   known as the Iran nuclear deal.

11         But the position has expanded, so that I'd say maybe

12   10, 15 percent of the time I help support the coordination of

13   other sanctions programs at OFAC.

14   Q.   But is it fair to say then that 85 percent of your time is

15   spent focusing on the Iranian sanctions regime?

16   A.   Yes, that sounds accurate.

17   Q.   As part of your responsibilities, obviously, you are a

18   lawyer, you're trained.  How long have you been practicing law?

19   A.   16 years.

20   Q.   And for a good part of your career, you've been now dealing

21   almost daily with the Iranian sanction regime; am I correct?

22   A.   That's accurate.

23   Q.   You've testified before as an expert on Iranian sanctions?

24   A.   As an agency witness.

25   Q.   And as an agency witness you testified as an expert as

1    recently as May in this building; am I correct?

2    A.  I testified in May, yes.

3    Q.  Is the expertise that you have acquired involving Iranian

4    sanctions something that you have acquired in the course of

5    your duties?

6    A.  As well at OFAC.

7    Q.  Has there been special training for that?

8    A.  As part of the chief counsel's office, new attorneys are

9    trained within the program that they support.

10   Q.  In terms of training, is it formal or is it -- well, is it

11   a formal program?

12   A.  It is informal.

13   Q.  How long does it usually take before you're up to speed on

14   sanctions?

15   A.  I'd say maybe six months.

16   Q.  That's as a trained lawyer it took you six months.  Is it

17   fair to say -- I don't want to mischaracterize anything.  Is it

18   fair to say it took you six months or so as a trained lawyer to

19   become conversant in Iranian sanctions?

20            THE COURT:  I didn't understand the question.

21            MR. ROCCO:  I'll try it another way.  I apologize.

22   Q.  Did it take you roughly six months as a trained lawyer to

23   become conversant in the Iranian sanction regime?

24   A.  Well, I think to implement it from the agency's perspective

25   it did.  Prior to that in the private sector I did cover Iran

1   sanctions as part of lots of different issues that I covered

2   from an international trade lawyer perspective.

3   Q.  So it's fair to say that -- my point is simple.  It took

4   you some period of time as a trained lawyer to understand these

5   sanctions regime; am I correct?

6   A.  I think to be an expert.  I would say I came into OFAC

7   understanding the premise of the sanctions regime, but not how

8   the president issues an executive order or -- things from an

9   administrative law perspective that I had to learn once I

10  joined the legal team supporting OFAC.

11  Q.  Is it fair to say that in explaining to others the

12  sanctions regime itself, that took you some time to acquire

13  that as a separate skill?

14  A.  I don't think so.

15  Q.  Have you, in the course of learning the sanctions, is it

16  also true that the sanctions regime is changing?

17  A.  Yes, that's accurate.

18  Q.  I think you testified on direct examination that in the

19  period of 2012-2013, it had changed.  Am I correct?

20  A.  Yes, that's correct.

21  Q.  Part of your learning the sanctions regime is keeping up

22  with what I'll describe as an evolving set of rules?

23  A.  That's correct.

24  Q.  And you do that how, Ms. Palluconi?

25  A.  Well, as an agency lawyer responsible for helping the

1    agency craft regulations and craft guidance, it's working,

2    working through the authorities, taking the statute, and

3    helping advise what was my client at the time, OFAC, develop

4    the guidance for the regulated community, for the public to

5    explain those statutory sanctions, to develop the regulations

6    for the public so they understand what the requirements are.

7    Q.  Is it fair to say that OFAC doesn't regulate foreign banks?

8    A.  So OFAC is not a banking regulator, that's correct.

9    Q.  But OFAC interacts with foreign banks, foreign financial

10   institutions; am I correct?

11   A.  That's correct.

12   Q.  And OFAC regularly interacts with foreign banking

13   institutions; is that correct?

14   A.  That's accurate.

15   Q.  In dealing with foreign banking institutions, is it OFAC's

16   mission to help foreign banks understand the sanctions regime?

17   A.  I think that's part of its mission.

18   Q.  Does OFAC do that by -- is there a formal discourse?  Is

19   there a way that a foreign bank interacts with OFAC in terms of

20   training?  Are there formal training seminars?

21   A.  So one group within OFAC is called our compliance group.

22   Among other things that they are charged with outreach

23   principally to banks.  They have relationships with U.S. banks,

24   with banks all over the world.  One avenue for informal

25   outreach and discussion and training, they have a hotline where

1    they answer questions, for example.  They have an e-mail

2    account where they issue guidance informally via e-mail for

3    questions that come in.

4    Q.  I think you mentioned something called FAQs on your direct

5    examination.  What are the FAQs?

6    A.  So these are frequently asked questions.  This is one

7    mechanism that OFAC uses to issue guidance to the public.  It's

8    published on our website.

9    Q.  Does OFAC issue FAQs with respect to the Iranian sanction

10   regime?

11   A.  Yes.

12   Q.  Does OFAC keep count of the number of FAQs that it issues

13   on the Iranian sanctions regime?

14   A.  I know it keeps count across sanctions programs.  I can't

15   recall if they counted up within each separate program.

16   Q.  Am I wrong to say that there are approximately 400 FAQs for

17   the Iranian sanction regime alone?

18   A.  I don't know the -- I don't know the exact number for Iran

19   alone.  But a lot.  Definitely a lot.

20   Q.  Would it be in -- I don't want you to guess, but is it a

21   fair estimate that it's roughly 400?

22   A.  I really don't recall.  I haven't counted them up.

23   Q.  When OFAC interacts with foreign banks, and is it fair to

24   say that they are giving guidance to foreign banks, that OFAC

25   will meet with foreign banks, OFAC representatives?

1    A.  Yes, OFAC representatives have met with foreign banks.

2    Q.  Both here in the United States and overseas?

3    A.  I believe so, yes.

4    Q.  Is that something that you do?

5    A.  In the counsel's office, no, not normally.

6    Q.  It would be fair to say that you've never met Mr. Atilla?

7    A.  Not that I recall, no.

8    Q.  Have you ever met with representatives of Halkbank?

9    A.  No, not that I recall.

10   Q.  As part of your direct testimony, I think that you

11   identified a series of entities that were pursuant to the ITSR

12   and to Executive Order 13599, specially designated by OFAC.

13   Among those organizations were Bank Sarmayeh.  Do you recall

14   that?

15   A.  Yes, I believe that was on the list.

16   Q.  Was Bank Sarmayeh identified as an arm or part of the

17   Iranian government?

18   A.  I would have to go back to that determination.  But it's --

19   13599 blocks Iranian financial institutions, and it's

20   definitely an Iranian financial institution.

21   Q.  Does that mean it's owned or controlled by the government

22   of Iran?

23   A.  Not necessarily.

24   Q.  So, what other way would it be designated pursuant to

25   Executive Order 13599?

1    A.  So we use the term "identify" because they meet the

2    definition.  They're already blocked under the definition.

3    OFAC identifies these entities just to be helpful.

4            There were two different bases within that executive

5    order.  One is to be the government of Iran, or the other is to

6    be an Iranian financial institution.  And obviously it is an

7    Iranian financial institution.  I don't recall if OFAC further

8    made a determination on whether it was the government of Iran.

9    Q.  The sanctions regime, under the sanctions regime there is

10   nothing illegal about, let's say, Halkbank, a Turkish bank,

11   doing business with Bank Sarmayeh, correct?  It's not a

12   violation of the law?

13   A.  As long as it doesn't involve the U.S. financial system or

14   U.S. persons.

15   Q.  Precisely.  And in fact, all those entities that you

16   identified on that slide, NIOC, NICO, Bank Mellat, there is

17   nothing illegal or unlawful about Turkish banks dealing with

18   those entities, provided that they do not involve a U.S.

19   financial institution.  Am I correct?

20   A.  Well, could be sanctionable.

21   Q.  Okay.  But sanctionable is not -- sanctionable, you correct

22   me if I'm wrong, sanctionable isn't unlawful or illegal.  Am I

23   correct?

24   A.  Tell me what you mean by "unlawful."

25           THE COURT:  Now we're going the wrong way.

1          MR. ROCCO:  Thank you, Judge.  I understand.  And I

2     think a lot of her testimony came very close to that line.

3          THE COURT:  Let's pick up from here.

4     Q.  I believe you testified that Turkey qualified for an

5     exemption under the reduced petroleum purchase exemption; am I

6     correct?

7     A.  Yes, significantly reduced.

8     Q.  That's a determination that was made by OFAC?

9     A.  By the State Department.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.   And the State Department then reports that to OFAC?

2   A.   They publish it.  Certainly on their website and maybe also

3   on the federal register.

4   Q.   Oaky.

5           MR. ROCCO:  Your Honor, just one second.

6           (Pause)

7           It was a pleasure.  Thank you.  It was nice meeting

8   you.

9           THE COURT:  Thanks very much.

10          MR. ROCCO:  Thank you, your Honor.

11          THE COURT:  Any further questions?

12          MR. LOCKARD:  Just very briefly, your Honor.

13  REDIRECT EXAMINATION

14  BY MR. LOCKARD:

15  Q.   So, Ms. Palluconi, Mr. Rocco had asked you some questions

16  about Bank Sarmayeh, and Bank Sarmayeh was identified as an

17  Iranian financial institution, was not designated under the

18  sanctioning program; is that right?

19  A.   Right.  The Executive Order 13599 is not a designation.  It

20  doesn't have to be designation because it's already blocked by

21  our regulation by the definition of an Iranian financial

22  institution.

23  Q.   And I think as you testified on direct, the Iranian

24  National -- the National Iranian Oil Company and the Naftiran

25  Intertrade Company, NIOC and NICO, both of them were

1   designated; is that right?

2   A.  They were both identified and then later designated.  They

3   were identified as the government of Iran by OFAC, and then

4   later designated under our executive order for weapons of mass

5   destruction proliferators and their supporters.

6   Q.  So with the secondary sanctions relating to financial

7   transactions for or on behalf of a designated entity, would

8   those apply to transactions that Bank Sarmayeh conducted for

9   NIOC or NICO?

10  A.  If it were on behalf of them.  So, again, the criteria is

11  that the foreign bank knowingly conducted significant

12  transactions.  So if the foreign bank was aware, it had

13  knowledge or reason to know, then they could be subject to

14  sanction.

15          MR. LOCKARD:  Nothing further, your Honor.

16          THE COURT:  Is that it?  We will excuse the witness

17  then and ask for the government's next witness.

18          MR. ROCCO:  Your Honor, I just have one second before

19  we leave this witness.

20          (Pause)

21          Your Honor, if I may?

22  RECROSS EXAMINATION

23  BY MR. ROCCO:

24  Q.  Ms. Palluconi, have you read the indictment in this case?

25          THE COURT:  Is this the subject of the redirect?

1           MR. ROCCO:  It is.  It's going to be specifically.

2           THE COURT:  That's what it needs to be.  That's what

3    it needs to be.

4           MR. ROCCO:  I understand that, your Honor.

5           THE COURT:  Okay.

6           MR. ROCCO:  Well, I'm going to ask specifically a

7    question about Bank Sarmayeh, that's the question on redirect.

8           THE COURT:  What's the question?

9    BY MR. ROCCO:

10   Q.  So is it fair to say that Sarmayeh -- are you familiar with

11   Bank Sarmayeh?

12   A.  No, not too much.

13   Q.  Are you familiar with an entity called Sarmayeh Exchange?

14   A.  No.

15          MR. ROCCO:  No further questions, your Honor.

16          THE COURT:  Okay, thanks.  Now we'll excuse the

17   witness, and ask for the government's next witness.

18          (Witness excused)

19          MR. DENTON:  Your Honor, the United States calls Mark

20   Dubowitz.

21          THE DEPUTY CLERK:  Sir, if you could come up here,

22   please.  Step up to the witness stand and remain standing for a

23   moment and then raise your right hand, please.  Do you solemnly

24   swear that the testimony that you shall give this Court and

25   jury in this issue now on trial shall be the truth, the whole

1   truth and nothing but the truth so help you God?

2            THE WITNESS:  I do.

3            THE DEPUTY CLERK:  Could you please state your name

4   for the record.

5            THE WITNESS:  Mark Dubowitz, D-u-b-o-w-i-t-z.

6            THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

7   You're free to pull in the chair and adjust the microphone.

8            MR. DENTON:  May I inquire, your Honor?

9            THE COURT:  Sure.

10  MARK DUBOWITZ,

11       called as a witness by the Government,

12       having been duly sworn, testified as follows:

13  DIRECT EXAMINATION

14  BY MR. DENTON:

15  Q.  Good afternoon.

16  A.  Good afternoon.

17  Q.  Where do you work?

18  A.  I work at the Foundation for Defense of Democracies in

19  Washington, D.C.

20  Q.  What is that?

21  A.  It's a think tank or a policy institute focused on national

22  security and foreign policy.

23  Q.  What is your position there?

24  A.  I'm the CEO.

25  Q.  How long have you worked at the Foundation for the Defense

1    of Democracies?

2    A.   For just over 14 years.

3    Q.   Generally speaking, what do you do as the CEO for the

4    Foundation for Defense of Democracies?

5    A.   My responsibilities include managing and overseeing the

6    organization, working on fund-raising, and also, I spend a fair

7    amount of time working on Iran and sanctions issues.

8    Q.   Can you describe some of the types of work that your

9    organization does?

10   A.   So we focus, again, on that foreign policy.  Generally, we

11   spend a lot of our time working on Middle East issues on

12   terrorism, on nuclear proliferation, on finance, money

13   laundering; so do a lot of work on Iran, Iraq, Syria, Lebanon,

14   a number of other countries -- Turkey, a number of countries in

15   the Middle East.

16   Q.   And what type of work do you do on those issues?

17   A.   So as a policy institute, a think tank, our job is to do

18   research and analysis on these issues and provide that

19   information to policy makers in Congress or in the executive

20   branch, as well as working with the media and helping explain

21   the complexities of what's taking place in the Middle East and

22   in this broader world of terrorism proliferation.

23   Q.   Could you describe a little bit more about your personal

24   education and background?

25   A.   So I have a BA in philosophy.  I have a J.D., a law degree.

1    I have an MBA, and I also have a Masters in international

2    public policy.

3    Q.  Besides the Foundation for the Defense of Democracies, are

4    you affiliated with any other academic or research

5    institutions?

6    A.  I was for a while a lecturer at the University of Toronto,

7    in Toronto, Canada, where I taught for a couple of years on

8    sanctions issues and nuclear issues; so I'm no longer teaching

9    there.  So the answer is, right now, I'm only affiliated with

10   FDD, or the Foundation for Defense of Democracies.

11   Q.  You mentioned earlier that one of your areas of focus was

12   Iran.  As part of your focus on Iran, have you researched

13   recent history and governance in Iran?

14   A.  Yes.

15   Q.  And, again, could you generally describe the sort of

16   research that you do on those issues?

17   A.  So we have a research team that looks at the Iranian threat

18   to the United States and our allies.  We do extensive work on

19   their nuclear program, their missle program, their terrorist

20   activities.  We do a lot of work on their economy, and the role

21   of sanctions and illicit finance, and there are four of my

22   colleagues who are Farci speakers.  They spend a lot of time

23   looking at internal Iranian developments taking place in Iran,

24   in the political structure and the dispute between the various

25   parties in Iran.

1          So we have an extensive focus on Iranian issues,

2   including the global threat network, Iran and its area and its

3   many surrogates, like Hezbollah and other terrorist

4   organizations.

5   Q.  What sorts of materials do you consult in conducting that

6   kind of research?

7   A.  Anything that's publicly available in English, Farci,

8   Arabic, Turkish.  We have a number of foreign language speakers

9   at FDD, and so anything public, in the public domain, anything

10  in the open sources is available to us as part of that

11  research.

12  Q.  Have you published any work on, in particular, economic

13  sanctions on Iran?

14  A.  I have.  I published numerous reports, pieces for

15  newspapers.  I've also testified a number of times before the

16  U.S. Congress and foreign legislatures, and my testimony has

17  been made available in the public domain for anyone to see.

18  Q.  Approximately how many times have you testified before

19  Congress?

20  A.  So I've testified over 20 times before Congress and the

21  Canadian Parliament.

22  Q.  And, again, generally, what was the subject of your

23  testimony?

24  A.  Almost exclusively on Iran and almost exclusively on the

25  interplay between Iran and sanctions and nuclear issues.

1    Q.  Have you ever testified as an expert witness in court

2    before?

3    A.  No, this is my first time.

4    Q.  Are you being paid by the government for your time here

5    today?

6    A.  I am not.

7    Q.  What about for the time you spent getting ready to testify?

8    A.  No.

9          MR. DENTON:  Your Honor, the government offers Mark

10   Dubowitz as an expert on Iran and Iranian sanctions.

11         THE COURT:  I'm going to allow that.

12   BY MR. DENTON:

13   Q.  Mr. Dubowitz, did you prepare a presentation to assist you

14   in your testimony today?

15   A.  Yes, I did.

16   Q.  And did you have help from research assistants in preparing

17   it?

18   A.  I did.

19   Q.  Does that report reflect the results of some of your

20   research on Iran and Iranian sanctions?

21   A.  Yes.

22         MR. DENTON:  Your Honor, may I approach?

23         THE COURT:  Yes.

24   Q.  Handing you what's been marked for identification as

25   Government Exhibit 8001, Mr. Dubowitz, do you recognize that?

1   A.  I do.

2   Q.  What is it?

3   A.  This is the presentation that I and my research staff

4   prepared for this case.

5   Q.  Will the presentation that's marked as Government

6   Exhibit 8001 assist you in explaining your testimony to the

7   jury today?

8   A.  Yes, it will.

9         MR. DENTON:  Your Honor, the government offers

10  Government Exhibit 8001.

11        THE COURT:  I'm going to allow --

12        MR. HARRISON:  Just note for the record my previous

13  objection to it.

14        THE COURT:  Sure.  I'll allow it.

15        (Government's Exhibit 8001 received in evidence)

16        MR. DENTON:  And if we could publish that, your Honor,

17  page by page as it becomes relevant.

18        THE COURT:  Yes.

19  BY MR. DENTON:

20  Q.  So, Mr. Dubowitz, what are we looking at here?

21  A.  This is a map of the world.

22  Q.  And I think, if I'm not horribly mistaken, you should be

23  able to mark things on your screen.  Okay.  Well, maybe not.

24  Let's just start very basically, then.  Can you just tell us

25  the general area of the world where Iran is located?

1    A.  Yes.  So Iran is located in what is known as the Middle

2    East, and that's that area that is near Africa and near Europe.

3    If you look at the map on your screens, it's sort of under

4    Russia.

5    Q.  Can we go to the next page.  So what are we looking at

6    here, Mr. Dubowitz?

7    A.  That's a bit easier to see; so that is part of the Middle

8    East, and there you can see Iran and its neighbors.

9    Q.  And could you tell us about what some of the major

10   neighbors of Iran are?

11   A.  So Iran's major neighbors include Iraq, Turkey, Armenia.

12   Azerbaijan, Turkmenistan, Afghanistan, Pakistan, and then if

13   you see, you look at Iran, there's a body of water called the

14   Persian Gulf, and across from Iran are a number of countries

15   like Oman, the United Arab Emirates, Qatar, Saudi Arabia and

16   Kuwait.

17   Q.  Are you familiar with the City of Dubai?

18   A.  I am.

19   Q.  Where is the City of Dubai located?

20   A.  So Dubai is in the United Arab Emirates.  On your map,

21   that's the small country in orange that's just next to Saudi

22   Arabia and Oman, and Dubai is just right on the water there,

23   and it's sort of northeastern -- or northwestern part of the

24   UAE.  I don't know if everybody can see that.

25   Q.  Mr. Dubowitz, in the context of Iran, are you familiar with

1   the term the economic jihad?

2   A.  I am.

3   Q.  Go to the next page.  Mr. Dubowitz, what is the economic

4   jihad?

5   A.  The economic jihad was a term that was used by the Supreme

6   Leader of Iran Ali Khamenei in a speech in March 2011 when he

7   announced that that year -- the Persian year goes from March to

8   March -- and so March 2011 to March 2012, he announced that

9   that year was the year of the economic jihad.

10  Q.  I'm going to ask you a little bit more about that timing

11  and that person in a moment, but for now, could you read the

12  sentenced that are highlighted on page 3 of Government

13  Exhibit 8001?

14  A.  "The sanctions which were imposed on us by the enemies of

15  our nation were an attempt to thwart the accelerated progress

16  of our country."

17          "The measures adopted by our government officials and

18  the cooperation of the people foiled the enemies' plot."

19          "I hereby name this year as The Year of Economic

20  Jihad, and I expect our officials, who work for the executive

21  branch, the legislative branch and the economic sectors of the

22  country, and our dear people to make selfless efforts in the

23  economic arena.  It is not enough to move forward at an

24  ordinary pace."

25  Q.  In the first sentence you read there's a reference to

1   sanctions.  What is your understanding of what the sanctions

2   referenced in that sentence are?

3   A.   These were the economic sanctions that were imposed by the

4   United States, by the European Union, by a number of other

5   countries, including Japan and South Korea, Canada, and these

6   were sanctions that were imposed on Iran as a result of its --

7   a range of its dangerous and illicit activities.  Some of those

8   sanctions had a significant economic impact on Iran, and that's

9   what he's referring to.

10  Q.   So what is your understanding of the purpose of the

11  economic jihad as related to those economic sanctions?

12  A.   So the Arabic word jihad, which can also be translated as

13  struggle, he's talking about an economic struggling and

14  struggling against these sanctions.  And he is -- he's giving

15  his blessing, he's endorsing the use of any measures, including

16  sanctions evasion in order to try and fortify Iran against the

17  use of these economic measures.

18          MR. HARRISON:  Judge, I'm just going to object to any

19  further --

20          THE COURT:  Overruled.  You heard it.

21  Q.   Mr. Dubowitz, who gave this speech?

22  A.   So this is given by Iran's Supreme Leader, Ali Khamenei.

23  Q.   And who is that in the context of Iran?

24  A.   So he is the most powerful person in Iran.  He has almost

25  absolute political and religious authority in the country, and

1    he has been the Supreme Leader for many years, dating back to

2    the late 1980s.

3    Q.  Is the Supreme Leader an elected position?

4    A.  He is not elected, no, no.  He was basically appointed by

5    the previous Supreme Leader, or recommended by the previous

6    Supreme Leader, who is Supreme Leader Khomeini.

7    Q.  If we could go to the next page.  And is that Ali Khamenei

8    on the left of page 4 here?

9    A.  Yes, that's Ayatollah Ali Khamenei.

10             MR. DENTON:  Your Honor, may I approach?

11             THE COURT:  Yes.

12   Q.  Showing you what's been marked for identification as

13   Government Exhibit 9.  Do you recognize that?

14   A.  Yes, that's the Supreme Leader Ali Khamenei.

15             MR. DENTON:  The government offers Government

16   Exhibit 9.

17             THE COURT:  I'll allow it.

18             (Government's Exhibit 9 received in evidence)

19   BY MR. DENTON:

20   Q.  Mr. Dubowitz, who is the current president of Iran?

21             MR. HARRISON:  I'm sorry, just for the record, I

22   object based on relevance.

23             THE COURT:  Overruled.

24   A.  So the current Iranian President is Hassan Rouhani.  He's

25   the individual that's on the right-hand side of your page, the

1    screen.

2    Q.   And how long has he been the President of Iran?

3    A.   He has been President since 2013.

4    Q.   Who was the President of Iran at the time that the economic

5    jihad was declared?

6    A.   The President at that time was Mahmoud Ahmadinejad, who was

7    President of Iran from 2005 to 2013.

8    Q.   Is the President of Iran a democratically elected position?

9    A.   He's not democratically elected in the way that we would

10   all understand democratically elected.  There are elections in

11   Iran, but those are tightly constrained, highly controlled

12   elections where the Supreme Leader and his associates have

13   significant influence over who is selected to run in those

14   so-called elections.

15              MR. DENTON:  Your Honor, may I approach?

16              THE COURT:  Yes.

17   Q.   I'm showing you what's been marked for identification as

18   Government Exhibit 10.  Do you recognize Government Exhibit 10,

19   Mr. Dubowitz?

20   A.   Yes, that's former Iranian President Ahmadinejad.

21              MR. DENTON:  Your Honor, the government offers

22   Government Exhibit 10.

23              THE COURT:  I'll allow it.

24              MR. HARRISON:  Same objection, your Honor.

25              THE COURT:  I'll allow it.

1        (Government's Exhibit 10 received in evidence)

2        MR. DENTON:  And, your Honor, may we publish

3   Government Exhibits 9 and 10?

4        THE COURT:  Yes.

5   BY MR. DENTON:

6   Q.  Mr. Dubowitz, I see under the entry for Ayatollah Khamenei

7   on the left that the armed forces are noted.  What role do the

8   armed forces play in the government of Iran?

9   A.  So Iran has really two armed forces.  It has its

10  traditional military, which dates back to the time of the Shah

11  of Iran, and then it has another armed forces called the

12  Islamic Revolutionary Guard Corps, or the IRGC, which was set

13  up after the Iranian revolution to guarantee the survival of

14  the Islamic Republic and answers to the Ayatollah himself.

15  Q.  Broadly speaking, what role does the Iranian government

16  play in the Iranian economy?

17  A.  So the Iranian government plays an enormous role in the

18  Iranian economy, both through state-owned entities, state-owned

19  companies, as well as through the role of the Islamic

20  Revolutionary Guard Corps, and its extensive network of

21  companies and entities in that economy.

22  Q.  We're going to come back to that in a little bit, but I

23  want to turn to economic sanctions to start.  Let me go to the

24  next page.  So, Mr. Dubowitz, when did the U.S. first impose

25  economic sanctions on Iran?

1    A.  So the first sanctions were imposed in November of 1979

2    through an executive order that blocked Iranian government

3    property, and this took place after U.S. citizens were taken

4    hostage in the U.S. embassy in Iran.

5    Q.  Has the United States imposed additional economic sanctions

6    on Iran since then?

7    A.  Yes.  The United States has imposed extensive economic

8    sanctions since 1979.

9    Q.  Has the nature of those economic sanctions changed as well?

10   A.  Yes.  The sanctions that were originally imposed in the

11   '70s and '80s were very much focused on U.S. persons, that

12   prevented U.S. persons from doing business with Iran in most

13   circumstances, and over time, those sanctions became what we

14   call secondary sanctions, where they also focused on trying to

15   prevent non-U.S. persons, foreign persons, from doing business

16   with Iran except in very limited ways.

17   Q.  So let's talk a little bit about this evolution.  What

18   we're looking at here is a time period that you identified as

19   Phase One of economic sanctions on Iran.  What was going on

20   during this time period that prompted the imposition of the

21   sanctions that are noted here?

22   A.  So the U.S. embassy was taken over during the Iranian

23   revolution and American citizens were taken hostage through the

24   1980s.  Iran and its terrorist surrogates, including Hezbollah,

25   were responsible for numerous terrorist attacks against

1    Americans and other foreign nationals.  There were a number of

2    attacks on our embassies.  The marine barracks were bombed in

3    Beirut.

4         MR. HARRISON:  Just my continuing objection.  I

5    believe it's beyond the scope.

6         THE COURT:  Your objection is noted, and I'll take it

7    as an objection to all the testimony; so you don't have to make

8    it, you know, every so often.

9         MR. HARRISON:  Thank you, your Honor.

10   A.  So in the bombing of our marine barracks, which killed 241

11   marines, Iran was responsible for that directly and also

12   indirectly through its terrorist surrogate Hezbollah.

13   Q.  If I can just ask, what were economic sanctions designed to

14   do with respect to these various concerns during this time

15   period?

16   A.  They had a number of different objectives.  First and

17   foremost, was to try and change the conduct of the Iranian

18   government, to get it to stop its illicit activity, including

19   its support for terrorism.  It was also designed to punish that

20   activity and to deny the Iranian regime the money it needed in

21   order to fund its terrorist activity, and also malign conduct.

22        And also, over time, as the sanctions escalated and

23   started to have a severe impact on Iran's overall economy, it

24   was an attempt to try to change the calculus of the regime with

25   respect to a full range of its dangerous activities, including

1    its nuclear program, missle program, support for terrorism and

2    other malign activity.

3    Q.  So that's Phase One.  Let's talk about Phase Two, if you go

4    to the next page.  So what have you identified here in

5    August 2002 as the start of Phase Two?

6    A.  If the 1980s and 1990s were really characterized by a U.S.

7    concern over Iran's terrorist activities, early 2000s,

8    including August 2002, the United States became increasingly

9    concerned as well about Iran's nuclear program.

10            In August 2002 an Iranian exile group revealed the

11   presence of these hidden clandestine nuclear facilities in two

12   facilities, one in a place called Natanz and another in Arak.

13   And these were publicly revealed in -- through the summer and

14   the end of 2002, which underscore that Iran had been engaged in

15   a significant buildup of a military nuclear program in a covert

16   way.

17   Q.  So during this time period that you've identified as Phase

18   Two, was the United States the only entity imposing economic

19   sanctions on Iran?

20   A.  No.  During this time period, in addition to the United

21   States, the United Nations Security Council passed multiple

22   Security Council resolutions demanding that Iran suspend its

23   enrichment, also imposing sanctions on numerous Iranian

24   entities that were engaged in illicit nuclear activities or

25   missle activities and then went further and imposed sanctions

1    on the Islamic Revolutionary Guard and Iran's export of

2    advanced weaponry.

3    Q.  So I want to talk now a little bit about the Islamic

4    Revolutionary Guard Corps, which you've mentioned a number of

5    times.  So first of all, does this page, page 6, reflect when

6    the IRGC was designated?

7    A.  Yes.  The IRGC was designated in 2007.  It was

8    designated -- the IRGC was designated for its role in

9    proliferation activities and the IRGC Quds force, which is its

10   overseas arm through which it conduct the majority of terrorist

11   activities.  It was also designated at the same time for

12   terrorism.

13   Q.  Mr. Dubowitz, you mentioned earlier, when you were talking

14   about the role of the Iranian government in the Iranian

15   economy, the role played by the Islamic Revolutionary Guard

16   Corps.  What is the Guard Corps' role with respect to the

17   Iranian economy?

18   A.  The Guard Corps is a major player in the Iranian economy.

19   There are estimates that it controls somewhere between 20 and

20   40 percent of the economy, and that its annual income may be as

21   high as a-sixth of Iran's total GEP.  It's heavily involved in

22   the financial sectors, commercial sectors, extensive interest

23   in construction, and energy and the defense industries.  It

24   controls billions of dollars in companies and corporate

25   businesses.

1            And the IRGC controls, either directly or in

2   cooperation with the numerous defense companies, about

3   20 percent of the Tehran Stock Exchange, which is Iran's main

4   stock exchange.  So extensive corporate, economic and financial

5   holdings in Iran.

6   Q.  When you say that the Islamic Revolutionary Guard Corps

7   controls companies, are you talking about formal or informal

8   control?

9   A.  Both, actually.  So they have formal control through

10  shareholding, through a presence on boards of directors.  They

11  also have informal control and significant influence through

12  the placement of key personnel in companies, and also the role

13  of the IRGC, given its formidable strength and visibility in

14  Iran, there are indirect ways that the IRGC can persuade and

15  influence how economic decisions are made and how contracts are

16  given.

17  Q.  So you mentioned particular individuals.  Do members of the

18  IRGC play any notable role in the Iranian economy?

19  A.  They do.  Many IRGC commanders, former commanders take

20  positions in the economy, in major state-owned entities, in the

21  energy sector, and financial sector throughout Iran's economy,

22  particularly in the more strategic sectors of the economy, the

23  lucrative and important sectors to Iran's overall industrial

24  growth and its national security.

25            And these current and former IRGC commanders have

1    significant influence over the economy, as well as many of them

2    get very wealthy in those positions.

3    Q.  Are you familiar with a man named Rostam Ghasemi?

4    A.  Yes, I am.

5    Q.  And who is Rostam Ghasemi?

6    A.  So Rostam Ghasemi is also one of the IRGC commanders that I

7    mentioned earlier.  He was former head of the IRGC conglomerate

8    called Khatam al-Anbiya, KAA.  He was also the former Minister

9    of Petroleum between 2011 and 2013.

10   Q.  If we can go to the next page, please.  What is the

11   significance of the Ministry of Petroleum in Iran?

12   A.  One of Iran's most important ministries because of the

13   significant role that petroleum plays in Iran's economy; so

14   it's a significant ministry in controlling Iran's oil

15   production, in making decisions about foreign firms and their

16   investment in the energy sector, and is involved in decisions

17   on Iran's export of oil and natural gas.  So it's a significant

18   ministry with a lot of influence.

19   Q.  When you say that it's a significant ministry, given the

20   role of petroleum in Iran's economy, can you tell us a little

21   bit more about the role that oil production and exportation

22   plays in Iran's economy?

23   A.  So oil, both production and export, comprise somewhere in

24   the neighborhood of 20 to 25 percent of Iran's total GEP.  Iran

25   is a significant natural gas producer, maybe the second largest

1    natural gas reserves in the world, mostly after Russia, third

2    or fourth oil reserves in the world; so Iran is a major energy

3    player.  It's a member of OPEC.  The ministry of petroleum is,

4    again, a significant role for anybody to have in the Iranian

5    regime, the Iranian elite, where you can wield enormous

6    influence.

7                MR. DENTON:  Your Honor, may I approach?

8                THE COURT:  Sure.

9    Q.  Showing you what's been marked as Government Exhibit 6,

10   Mr. Dubowitz, do you recognize Government Exhibit 6?

11   A.  I do.  That's Rostam Ghasemi, who is the former Minister of

12   Petroleum for the government of Iran.

13               MR. DENTON:  The government offers Government

14   Exhibit 6.

15               THE COURT:  I'll allow it.

16               MR. HARRISON:  Same objection.

17               THE COURT:  I'll allow it.

18               (Government's Exhibit 6 received in evidence)

19   BY MR. DENTON:

20   Q.  Mr. Dubowitz, is there a particular company responsible for

21   oil production in Iran?

22   A.  There is.  It's the National Iranian Oil Company, or NIOC,

23   N-I-O-C.

24   Q.  So what is the National Iranian Oil Company?

25   A.  So that's the state-owned company that is overseen by the

1   Minister of Petroleum, and it's responsible for oil and natural

2   gas production and distribution.

3   Q.  And why is oil and natural gas production and distribution,

4   as you were describing it earlier, particularly important to

5   Iran's economy?

6   A.  Iran is a major player in energy markets, natural gas

7   markets, oil markets.  It exports today about two-and-a-half

8   million barrels a day of crude oil.  It's involved in natural

9   gas development and increasingly in natural gas export to

10  regional markets, and it's the source of a significant percent

11  of Iran's overall national wealth.

12  Q.  You referred a number of times to the export of energy

13  products by these companies.  What is the significance of the

14  fact that Iran is exporting oil and natural gas?

15  A.  Well, Iran has been involved in global energy markets; so

16  it operates overseas.  It exports oil to major economies like

17  the European Union, to China, to Japan, South Korea, and there

18  was a period of time where sanctions were particularly

19  impactful.  It had a significant impact on Iran's ability to

20  export oil and natural gas and created serious economic

21  difficulties for the Iranian government.  So if Iran can't

22  export its oil and natural gas, if it can't actually

23  participate in energy markets, it has a significant impact on

24  the Iranian government.

25  Q.  What is the currency of Iran?

1    A.   The currency is rial.

2    Q.   Is the Iranian rial a currency that is used in global

3    energy markets?

4    A.   It is not.

5    Q.   What currencies are typically used in global energy

6    markets?

7    A.   The most important currency is the U.S. dollar; so majority

8    of trade in global energy markets is denominated in U.S.

9    dollars but also the European -- the Euro, the Swiss franc are

10   used as alternatives, but the U.S. dollar is the most

11   important.

12   Q.   And why are those currencies used and not the rial?

13   A.   The major reason is those currencies are fully convertible

14   into other currencies.  So you're able to exchange the U.S.

15   dollar with every currency in the world.  The rial is not

16   convertible.

17        They are also very reliable currencies.  The U.S.

18   dollar does not fluctuate wildly; so it's a fairly dependable

19   and predictable currency.  Whereas, the Iranian rial has

20   fluctuated significantly over a number of years, certainly I've

21   been analyzing this.  And there are very deep U.S.

22   dollar-denominated capital markets.  So in terms of equity

23   markets and debt markets, there's a significant percentage of

24   those markets that is denominated in the U.S. dollar.

25   Q.   So we've been talking about that National Iranian Oil

1   Company.  Is there also a particular company principally

2   responsible for natural gas production in Iran?

3   A.   There is.  It's the National Iranian Gas Company, the NIGC.

4   Q.   Can we go to the next page, please.  And, again, what is

5   the NIGC?

6   A.   So it's a state-owned company, like the National Iranian

7   Oil Company, except it's responsible for the sale and export of

8   natural gas, and it's heavily involved in Iran's natural gas

9   production, as well as looking at natural gas domestic

10   consumption and increasingly expanding Iran's ability to export

11   its natural gas.

12   Q.   And, again, have both the NIOC and the NIGC been designated

13   under U.S. sanctions laws?

14   A.   They have.

15   Q.   Mr. Dubowitz, are you familiar with a concept of a front

16   company?

17   A.   I am.

18   Q.   What is a front company?

19   A.   A front company is used to disguise or hide the role of a

20   designated company, a sanctioned company in a trade.  So if you

21   want to do a business transaction but you want to obscure the

22   role of the sanctioned company, you would create what is known

23   as a front company, which would be set up for the purposes of

24   hiding and obscuring that role.

25   Q.   Do the National Iranian Oil Company and the National

1    Iranian Gas Company ever use front companies in connection with

2    their operations?

3    A.   They do.

4    Q.   Why do they use front companies?

5    A.   So they would use front companies because both the National

6    Iranian Oil Company and the National Iranian Gas Company were

7    sanctioned under U.S. law, and so in order to do a transaction,

8    especially during a certain time period when these sanctions

9    were applied internationally, they set up front companies,

10   overseas front companies.  They could then operate and sell oil

11   and do these kinds of deals and hide the role of the original

12   sanctioned company in that transaction.

13   Q.   If we could go to the next page, please.

14        Mr. Dubowitz, what are the companies listed here?

15   A.   So there are three companies, Naftiran Intertrade Company,

16   which is known as NICO; Naftiran Intertrade Company Sarl, NICO

17   Sarl; and Hong Kong Intertrade Company known as HKICO.

18   Q.   And what, if any, relationship do these companies have to

19   the NIOC and NIC that you were just talking about?

20   A.   So all three of them are subsidiaries of the National

21   Iranian Oil Company.

22   Q.   Have these companies been designated under U.S. sanctions?

23   A.   Yes.

24   Q.   Why have they been designated?

25   A.   They were designated originally back in 2008 because they

1    were owned or controlled by the government of Iran, and then

2    HKICO was known as an a NIOC front company in 2012, and then

3    NICO was designated in 2013 because it was owned or controlled

4    by the National Iranian Oil Company, which itself had been

5    designated because of its role in supporting proliferation.

6    Q.  And based on your research and expertise, what did these

7    companies do for the parent entity, the National Iranian Oil

8    Company?

9    A.  So they serve as a overseas trading arm.  They provide the

10   parent company with access to foreign exchange and foreign

11   exchange funding in hard currency.  And so their role is really

12   to help facilitate these trades, help to finance these trades,

13   and increasingly as the parent company was sanctioned, obscure

14   the role of the parent company in these overseas activities.

15   Q.  When you say hard currency, what do you mean by that?

16   A.  Hard currency would be convertible currencies like the U.S.

17   dollar or the Euro, currencies that are reliable, easily

18   convertible and accepted worldwide.

19   Q.  And so in describing the role of these companies as to

20   provide foreign exchange in hard currency for the NIOC, why

21   does the NIOC need foreign exchange or hard currency?

22   A.  So the NIOC needs hard currency to pay for anything that it

23   wants to import from around the world.  So if NIOC, or really

24   the Iranian government in general, wants to buy anything from

25   overseas companies, those companies don't want to be paid in

1    rials.  They want to be paid in dollars or Euros, and so these

2    overseas arms of the National Iranian Oil Company, their job is

3    to go out and ensure if Iran is selling its oil or natural gas,

4    that it gets access to dollars or Euros, to hard currency that

5    it can either use to buy what it needs and/or send that money

6    back to Iran so the Iranian government has access to hard

7    currency for its own economic needs.

8    Q.  If we could go to Page 12, please.  Just shifting gears

9    briefly for a moment.  Mr. Dubowitz, what is Mahan Air?

10   A.  So Mahan Air is one of Iran's largest commercial airlines.

11   Q.  And has Mahan Air been designated under U.S. sanctions

12   laws?

13   A.  It has.  It was designated in 2011 under executive order

14   13224 for providing support to the Iranian Revolutionary Guard

15   Quds force, which the airline was sending weapons and funds and

16   personnel to Syria and to Iraq, and so it was designated for

17   its support for terrorism.

18          MR. DENTON:  Your Honor, I don't know if you were

19   intending to take an afternoon break.  If we were, this would

20   be a good point or I'm happy to continue.

21          THE COURT:  Is that a polite way of asking for a

22   break?

23          MR. DENTON:  I just wanted to flag this as a breaking

24   point.

25          THE COURT:  I'm happy to take five minute if the jury

1    wants to.  We'll take a five-minute break.

2                (Jury not present)

3                THE COURT:  Okay.  We'll take five minutes.

4                (Recess)

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  It's juror No. 8.  These are my notes from

3    when you all picked her, but she says that she has to go to

4    school three days a week and works two days a week.  She did

5    say she had no spare time in answer to that question.

6          MR. ROCCO:  And I remember --

7          THE COURT:  So she wanted to be out this morning.  We

8    said -- I said that, no, you'd have to stay for today, and I

9    would discuss it.  In part, I did that because I don't want to

10   encourage anybody else thinking, oh, I'll just come in and say

11   to the judge it's just not working for me, kind of thing;

12   so....

13         MR. ROCCO:  I do remember -- I do better remembering

14   faces, your Honor.  I'd like to see her again, but I think I

15   have no objection to letting her go.

16         THE COURT:  We have plenty of alternates.

17         MS. FLEMING:  You should never keep anybody on a jury

18   that doesn't want to be here.

19         MR. ROCCO:  Well, I'd like to see her.

20         THE COURT:  I think that's fair.  And would you take a

21   look also at juror number --

22         MR. ROCCO:  17?

23         THE COURT:  We have 18.  Yeah, the guy who's been two

24   down from her or three.  Yeah, juror No. 11.  So I have

25   personally noticed he's asleep almost the entire time,

1    certainly today.  I hadn't noticed it before somebody brought

2    it to my attention.  So today I've been paying attention.  They

3    had said he was asleep.  He hasn't asked to be relieved or

4    anything, but there you have it.

5         MR. ROCCO:  Okay.  But I think with the first juror,

6    juror No. 8, subject to -- I can't imagine that I'm going to

7    have certain feelings about not letting her go.  I agree with

8    what Ms. Fleming just said.

9         THE COURT:  What did she say?

10        MS. FLEMING:  I said I don't really like to keep

11   people on a jury who don't want to be on a jury.

12        MR. ROCCO:  Nor do I.

13        THE COURT:  I don't know if it's the case with the

14   second person.

15        MS. FLEMING:  I sometimes listen with my eyes closed.

16   I was falling asleep during some of the testimony today.

17        THE COURT:  I thought it was riveting, didn't you?  So

18   I don't know what you all think about that, or you can take a

19   look.

20        MR. ROCCO:  Take a moment, that's all I'd like to do.

21        MS. FLEMING:  Give us some time to watch.

22        THE COURT:  I think if we're going to decide, we

23   shouldn't bring her back.

24        MR. ROCCO:  Today?

25        THE COURT:  Another day.

1          MR. ROCCO:  No, I agree.

2          THE COURT:  If you're going to look at him --

3          MS. FLEMING:  Give us another day to watch him.  We

4   have Reza Zarrab tomorrow.  If he is sleeping during Reza

5   Zarrab....

6          THE COURT:  Is that right?  Because chambers got a

7   call from Canadian TV and said is he coming today, and I told

8   the person in chambers to say very unlikely that he would come

9   today.  Are you planning for him tomorrow?

10         MR. KAMARAJU:  I think he'll be tomorrow.  I would

11  anticipate he's going to be on tomorrow.

12         THE COURT:  Is he the next witness after this one?

13         MR. KAMARAJU:  There's a couple of translators first

14  and then him.

15         THE COURT:  Translator witnesses?  Short, relatively

16  short?

17         MR. KAMARAJU:  I think so.

18         THE COURT:  Okay.

19         MR. ROCCO:  Okay.  Thank you, your Honor.

20         (Pause)

21         (Continued on next page)

22

23

24

25

1          (Jury present)

2          THE COURT:  We'll continue with the direct examination

3    of Mr. Dubowitz.

4          MR. LOCKARD:  Your Honor, we're having minor technical

5    difficulty with getting the exhibit back up on the screen.

6          THE COURT:  Oh.

7          THE DEPUTY CLERK:  Sir, I'd like to remind you that

8    you're still under oath.

9          THE COURT:  Can you do it the old fashioned way?

10         MR. DENTON:  We can certainly try, your Honor.  I

11   don't think we have enough to hand out but we can certainly

12   keep going with assistance.

13         THE COURT:  How many --

14         MR. DENTON:  We might try the middle fashioned way and

15   see if the Elmo will work.

16         THE COURT:  There we go.

17         MR. DENTON:  All right.

18         If we can go to the next page, Mr. Chang-Frieden.

19   Q.  Just briefly going back to your outline of phase two.  I

20   want to focus your attention on the entry from October 25,

21   2007.  And in particular there are a number of bank entities

22   listed here.

23         What is the significance of banks being designated at

24   this time?

25   A.  So, the U.S. government in building up the sanctions regime

1   realized that one of the most effective ways to stop Iran from

2   conducting these dangerous activities was to try to curb their

3   ability to finance these activities.  And particularly to send

4   money abroad to support terrorism or the procurement of parts

5   for the nuclear program or the missile program.

6         In addition, the financial sector is the lifeblood of

7   any economy, and was also a realization that if they could

8   constrain the Iranian banking sector, they could impose

9   significant economic costs on Iran in order to change that

10  illicit conduct.

11        MR. DENTON:  Mr. Chang-Frieden, if we could go to the

12  next page, please.

13  Q.  Mr. Dubowitz, what are the five banks that you've indicated

14  here?

15  A.  So these are all Iranian banks that are owned or controlled

16  by the government of Iran.

17  Q.  Could you tell us what those five banks are.

18  A.  In order, Bank Melli, Bank Mellat, Bank Sepah, Bank

19  Keshavarzi, and Bank Refah Kargaran.

20  Q.  I want to ask you in particular about Bank Mellat for a

21  moment.  You note here that it is a privately owned Iranian

22  financial institution, but you've listed it here with other

23  banks owned or controlled by the government of Iran.

24        Can you help us understand how a privately owned

25  institution is owned or controlled by the government of Iran.

1    A.   So in the case of Bank Mellat, less than 50 percent of the

2    bank was owned by the government of Iran through a variety of

3    different organizations, pension funds, in particular.  In

4    2012, based on Bank Mellat's statements, around 40 to

5    44 percent of the bank was owned by the government of Iran in

6    that way.

7              So it's not -- it doesn't cross the 50 percent

8    threshold that you normally talk about with owned or

9    controlled.  But 44 percent gave the Iranian government

10   significant influence over the operations of that bank, and

11   that's why the U.S. Treasury Department sanctioned the bank as

12   being owned, in this case controlled, by the government of

13   Iran.  So it wasn't majority ownership, but the control factor

14   of these various pension funds, government pension funds gave

15   the Iranian government enormous influence and control.

16             MR. DENTON:  If we can go to the next page, please.

17   Q.   So in addition to designations related to ownership or

18   control by the government of Iran, have other Iranian banks

19   been designated for their own particular activities?

20   A.   Yes.  There have been a number of banks that have been

21   designated because they've been involved in financing Iran's

22   nuclear program, its missile program, or they've been enabling

23   financial transactions for the Islamic Revolutionary Guard

24   Corps, as well as banks that are supporting Iran's terrorism,

25   that have been relating to the financing of terrorism.

1          On this slide are six of the main banks that have been

2     designated for these reasons.

3     Q.   What are those six banks?

4     A.   Bank Mellat, Bank Melli, Bank Sepah, Bank Saderat, Mehr

5     Bank and Ansar Bank.

6     Q.   If we can move to the next page, please.  Let's talk about

7     phase three of the economic sanctions as you identified it.

8          So generally speaking, what was going on in phase

9     three, this time period from 2010 to 2014?

10    A.   So, in terms of the political environment, concerns about

11    Iran's nuclear program had increased significantly as well as

12    Iran's ballistic missile program, their overseas activities,

13    their support for terrorism, their growing support for the

14    Syrian regime and the slaughter that was taking place in Syria,

15    and their overall generally destabilizing activities in the

16    Middle East.  So there was a growing concern in the

17    international community, including in the United States, about

18    these dangerous activities, and the U.S. government began to

19    significantly expand the sanctions regime against Iran.

20    Q.   Generally speaking, in what ways did the U.S. government

21    expand the sanctions on Iran during this time period?

22    A.   Well, generally, they went after Iran's banking sector in

23    ways that they hadn't gone after before in a very comprehensive

24    way, in blacklisting the entire Iranian banking sector because

25    of its role in money laundering.

1          They went after Iran's energy sector, not only the

2     investment in the energy sector, but the ability of Iran to

3     actually sell its most important commodity, which was crude

4     oil.

5          They went after other sectors of the economy, the auto

6     sector, which is Iran's second largest sector after energy.

7     They went after shipping and shipbuilding.  And really began,

8     between 2010 and 2013, 2014, to go after major strategic

9     sectors of the economy in a much more comprehensive way than

10    the United States had ever done.

11    Q.  If we can go to the next page, please.

12         Just start focusing in here with December 31, 2011.

13    Generally speaking, what happened that day?

14    A.  So that day the United States Congress passed the National

15    Defense Authorization Act, which it does every year in order to

16    fund the Pentagon.  But there was a specific section of that

17    legislation called Section 1245.  It did something very

18    important.  It for the first time blacklisted the Central Bank

19    of Iran, and made it sanctionable for any financial institution

20    to do business with the Central Bank of Iran as well as other

21    Iranian financial institutions.  Except in cases involving oil

22    and humanitarian goods where there was some limited exceptions

23    that financial institutions could take advantage of to allow

24    Iran to buy humanitarian goods, as well as if countries who

25    were buying Iranian oil could continue buying that oil, and the

1    banks could continue processing those transactions, as long as

2    those countries were significantly reducing their purchases of

3    Iranian oil over a specific time period.

4    Q.  Let's talk a little bit about the Central Bank of Iran.  If

5    we can go to the next page.

6         So, first of all, Mr. Dubowitz, is the Central Bank of

7    Iran known by any other names?

8    A.  It's known as Bank Markazi.

9    Q.  Has the Central Bank of Iran been designated under U.S.

10   sanctions?

11   A.  It has.  It was designated in 2011 as part of the entire

12   financial sector.  Jurisdiction of money laundering concern.

13   And then again it was designated specifically under the

14   National Defense Authorization Act, and the Iran Threat

15   Reduction Act where the Central Bank itself was blacklisted.

16   Q.  I want to talk first about that 2011 reference you made to

17   a money laundering concern.  What is the significance of that

18   designation?

19   A.  The designation is done under something called the U.S.A.

20   Patriot Act, and Section 311 of that Patriot Act essentially

21   says that this bank, and indeed, in the case of Iran, the

22   entire jurisdiction of Iran, is a jurisdiction of primary money

23   laundering concern.  Which is the U.S. government has issued a

24   warning to the global financial sector if you do business with

25   Iran's financial sector, you are exposing yourself to massive

risks because of the involvement of that sector in money

laundering, in sanctions evasion, in the financing of illicit

nuclear and ballistic missile components, and because of its

support for terrorism.

So really it's a warning to the international

financial system that don't go near this banking sector.  It is

an enormous risk.

Q.  So, focusing for a moment on the sources of that risk, what

sorts of practices was the Central Bank of Iran involved in

around this time that led to a money laundering concern with

respect to the Central Bank of Iran?

A.  The Central Bank of Iran stopped playing the role

exclusively of a central bank.  It started to play the role of

a transactional bank, and it was involved in a number of

illicit transactions, including transferring funds ultimately

to support terrorism, for facilitating transactions where Iran

was buying parts and components for its nuclear program and its

missile program.

Q.  Just before we get into the purposes of the transactions,

can you explain to us what you mean by it stopped playing the

role of a central bank and started serving the role of a

transactional bank.

A.  So a central bank, like the Federal Reserve in the United

States, is not a bank that you and I can do business with.

It's a bank that is fundamentally in control of the country's

1    monetary policy.

2            And so, the federal bank, federal bank chairman is

3    involved in setting kind of macroeconomic targets for the

4    health of an economy.  But the central bank is not, you know,

5    is not a commercial bank.  It is not involved in day-to-day

6    transactions, like Citibank would in the United States.

7            So, the Central Bank of Iran stopped being the Federal

8    Reserve, and started playing the role of not only looking at

9    monetary policy but it started to act like an illicit Citibank

10   in conducting transactions in furtherance of terrorism and

11   proliferation.

12   Q.  Putting aside what the end purpose of the transactions was,

13   was there anything about the conduct of the transactions

14   themselves that gave rise to this money laundering concern?

15   A.  The transactions themselves were illicit.  So they were,

16   they were considered to be illegal under U.S. law, in some

17   cases under European, Canadian, Japanese, South Korean and

18   other countries.  They were illegal because they were

19   transactions not just for trading normal commercial goods and

20   services, but they were specifically transactions in

21   furtherance of illicit transactions, nuclear missiles, support

22   for terrorism, support for Iran's overseas military activity,

23   things that had been designated under U.S. law, national law of

24   many countries, as well as in some cases designated by the

25   United Nations Security Council.

1    Q.  If we can go to the next page, please.  Mr. Dubowitz, who

2    is this depicted here?

3    A.  So this individual is Mahmoud Bahmani.  And he was governor

4    of the Central Bank of Iran from 2008 to 2013.

5    Q.  What does it mean to say he was the governor of the Central

6    Bank.  What role is that?

7    A.  It's like the chairman of the Federal Reserve.  He's the

8    head of the central bank.

9            MR. DENTON:  Your Honor, may I approach?

10           THE COURT:  Yes.

11   Q.  Showing you what's been marked as Government Exhibit 4.  Do

12   you recognize Government Exhibit 4, Mr. Dubowitz?

13   A.  Yes, that's Mahmoud Bahmani who is the former governor of

14   the Central Bank of Iran.

15           MR. DENTON:  The government offers Government Exhibit

16   4.

17           MR. HARRISON:  Same objection, your Honor.

18           THE COURT:  I'll allow it.

19           (Government's Exhibit 4 received in evidence)

20           MR. DENTON:  Your Honor, may we publish Government

21   Exhibits 4 and 6?

22           THE COURT:  Yes.

23   Q.  Go back to the timeline and move to the next page, please.

24   So, Mr. Dubowitz, you've noted here one Executive Order 13599.

25   Is that part of the expansion of sanctions on Iranian financial

1    institutions that you were describing earlier?

2    A.   Yes.  It was an executive order that was issued by

3    President Obama specifically to block the property of the

4    government of Iran and Iranian financial institutions, so they

5    required U.S. banks to block or to freeze any transactions with

6    Iran.

7    Q.   You can go to the next page.

8         So, what happened on March 15, 2012?

9    A.   So on that date, a organization called SWIFT denied access

10   to a number of Iranian banks which had been blacklisted by the

11   European Union for engaging in illicit transactions, money

12   laundering sanctions evasion.

13   Q.   What is SWIFT?

14   A.   So SWIFT is a financial messaging system.  It is the global

15   financial messaging system.

16        So if I want to wire transfer money from my account to

17   your account, my bank will send financial information

18   identifying the name of my bank, the bank number, the branch

19   number, the account number, and then it will identify your

20   number as well.  So that the number, the right amount of money

21   goes from my account to the right account, to your account.

22        So SWIFT is really the financial messaging backbone of

23   the global financial system.  It is something that, I remember

24   this kind of in the old days, this used to be done by telex,

25   where telex instructions were sent.  And then it became fax

1    instructions that were sent from bank to bank.

2           But then it became much more technologically

3    sophisticated with the SWIFT system where all of this was done

4    through electronic transmission of information that was done

5    very quickly to global banks around the world.

6    Q.  Is access to the SWIFT system important for banks?

7    A.  It's critical.  If you don't have access to the SWIFT

8    system, you're effectively shut out from the financial system,

9    because you no longer can conduct any financial transactions,

10   you can't send this financial messaging information to other

11   banks.  And by being cut out, it is also a warning to the

12   global financial system that if this bank has been cut out of

13   SWIFT, there must be something of serious concern when it comes

14   to this bank.  This bank is essentially financially

15   radioactive.

16          MR. DENTON:  Mr. Chang-Frieden, if we could skip ahead

17   to page 23.

18   Q.  We talked a moment ago about Executive Order 13599,

19   Mr. Dubowitz.  Could you tell us about some of the financial

20   institutions that were designated under that executive order.

21   A.  Yeah.  There were six financial institutions.  Bank

22   Sarmayeh, Bank Pasargad, Bank Saman, Parsian Bank, Credit

23   Institution for Development, and Eghtesad Novin Bank.

24   Q.  Remind us if you could what was the significance of these

25   entities being designated under 13599?

1    A.   So, they were designated under this executive order which

2    would mean that any transactions between these banks and that

3    would touch the U.S. financial system will become within the

4    jurisdiction of the United States, or be conducted by a U.S.

5    person, that those transactions would be blocked.  And any

6    assets that were in U.S. jurisdiction would be -- would be

7    effectively frozen.

8    Q.   What is the significance for a financial institution like

9    these here of being unable to conduct transactions with U.S.

10   persons?

11   A.   It's very, very significant.  So, any time you're

12   conducting a transaction in the U.S. dollar, the transaction

13   has to be settled by, ultimately, by a U.S. bank.  And these

14   transactions actually take place through a very -- a very quick

15   what we cull a u-turn transaction, where if a foreign bank is

16   doing business in U.S. dollars, even if it is not with a U.S.

17   bank or U.S. customer, that transaction has to be cleared

18   through New York, through a U.S. financial institution in New

19   York City.

20            And so, if you no longer can do business with U.S.

21   banks, if you can't do business with U.S. persons, it becomes

22   extremely difficult to do transactions with the U.S. dollar.

23   Q.   I want to talk a little bit about the effect that these

24   sanctions had.

25            MR. DENTON:  If we could go, Mr. Chang-Frieden, to

1    page 26 now.

2    Q.  Mr. Dubowitz, what does the term "balance of payments"

3    refer to?

4    A.  So, balance of payments is essentially the difference

5    between exports and imports of a country.  And it is your

6    ability to export your goods and services and your ability to

7    pay for imports of goods and services of a country.

8            So if a country -- countries look to have a healthy

9    balance of payments, and they also look to have sufficient

10   foreign exchange reserves in dollars or euros that give them

11   protection against a balance of payments crisis.

12   Q.  What constitutes a healthy balance of payments?

13   A.  It depends on -- it goes country by country, so there is no

14   healthy number.  But it would essentially mean that you've got

15   sufficient foreign exchange reserves to pay for, at a bare

16   minimum, at least six months of imports.  Preferably much more.

17   And countries have these reserves which are essentially dollars

18   or euros or Swiss francs or perhaps Canadian dollars in

19   reserve.  And that money allows them to ensure that they can

20   control the health of their economy, their ability to continue

21   to import the goods and services they need to run that economy.

22   Q.  Just to break this down to a very basic level, in terms of

23   the balance of payments, do most countries want to have more

24   exports than imports?

25   A.  They do.  They do.  And if they have more imports than

1    exports, then they better have significant foreign exchange

2    reserves in order to pay for that.

3    Q.  So, tell us a little bit about what is depicted on page 26

4    about the effect that U.S. sanctions had on the balance of

5    payments as relative to Iran.

6    A.  Well, what I'm showing in the graph there is the accessible

7    foreign exchange reserves that Iran had between 2007 to 2013.

8    And that's in U.S. dollars in billions.  So you can see that

9    2007 to 2012, Iran had significant foreign exchange reserves,

10   somewhere in the neighborhood of 80 billion to $100 billion.

11        But then as the very significant sanctions were

12   imposed by the United States, Europe, United Nations and other

13   countries, you saw a significant drop in Iran's ability to

14   access those foreign exchange reserves.  By 2013 Iran only had

15   $20 billion in accessible foreign exchange reserves.  The rest

16   of that money was frozen abroad or was highly restricted abroad

17   in special accounts that Iran could use, but only in a very

18   limited way.

19        So Iran, as a result, had significantly lower foreign

20   exchange reserves, and was increasingly facing a balance of

21   payments crisis.

22   Q.  So, you put some emphasis and explained a little bit of the

23   concept of accessible foreign exchange reserves.  Does this

24   graph reflect Iran only earning $20 billion in foreign exchange

25   in 2013?

1    A.  It reflects effectively how much did Iran have in its bank

2    account and its ability to access that money.  It's like

3    having, you know, it's like having a thousand dollars in your

4    own account, but let's say 80 percent of that is restricted in

5    some way.  It's been restricted by the IRS or garnished by some

6    other state agency, and you can only access $20 or 20 percent

7    of that.

8            So in the case of Iran, Iran had about $100 billion

9    but they could only access $20 billion of that because much of

10   that money was tied up in these restricted accounts.  And they

11   could only use that money for very limited purposes, in the

12   country in which that money was collecting.

13           MR. DENTON:  Can you go to the next page, please.

14   Q.  I want to focus your attention on the entry here for

15   January 2, 2013, Mr. Dubowitz.  In particular, the reference to

16   the provision of precious metals to Iran.

17           Can you tell us a little bit about what was going on

18   around this time that made the provision of precious metals to

19   Iran the subject of U.S. sanctions.

20   A.  So there was concern in Congress and in the administration

21   that Iran, as it was increasingly shut out from the global

22   financial system, as it increasingly was unable to use the U.S.

23   dollar, increasingly the euro for transactions, as its foreign

24   exchange reserves or its accessible foreign exchange reserves

25   dropped significantly, Iran was looking for other instruments

1    of value in order to pay for both the illegal and legal goods

2    that it needed.

3          And it increasingly looked to gold as a instrument of

4    value, something that was recognized around the world and was

5    very valuable in terms of its ability to exchange gold for the

6    goods that it was looking for.

7          And so, with this increasing practice over the past

8    couple years, there was a real concern to prohibit Iran

9    entirely, both the government of Iran and individual Iranians,

10   from accessing, using, trading, transferring gold.  So, with

11   this National Defense Authorization Act for 2013, it included a

12   provision that prohibited the use of gold in any way.

13   Q.  Why is gold a good medium for Iran to use for those types

14   of transactions?

15   A.  It's a good medium to use because it's widely recognized,

16   there is a very active and deep market for the sale and

17   purchase of gold.  There is a value to gold, to a gold bar, to

18   an ounce of gold.  It has an international value.

19         And so, as Iran was looking for alternative

20   instruments of value, after currency, gold was sort of the next

21   best thing that they could use.  You could take gold, you can

22   also change gold into money as well as use gold for the direct

23   transfer to a seller of a good that you were looking for.

24         MR. DENTON:  You can go to the next page, please.

25   Q.  Then what happened on March 15, 2013?

A.   So, the U.S. government continued to expand the pressure on

Iran.  It authorized new sanctions against foreign financial

institutions that were conducting financial transactions with

the National Iranian Oil Company, with banks that were

designated by the United States, and passed a number of -- a

consolidated list of regulations which essentially issued a

warning to the global financial system that if you do business

with these designated banks, if you do business with the

National Iranian Oil Company and other designated Iranian

entities, you risk being subject to major penalties, including

being cut off from the U.S. financial system, and the U.S.

market.

Q.   In addition to sanctions imposed on the National Iranian

Oil Company and the companies dealing with it directly, were

individuals associated with the oil sector in Iran also subject

to U.S. sanctions?

A.   They were.

         MR. DENTON:  You can go to the next page, please.

Q.   Who is depicted here, Mr. Dubowitz?

A.   An individual named Ahmed Ghalebani.

Q.   Who is Ahmed Ghalebani?

A.   So he is an individual who is very active in Iran's energy

sector.  He served as the managing director of the National

Iranian Oil Company, and he is a director of a number of NIOC's

subsidiaries and front companies, including Petro Suisse

Intertrade Company and the Hong Kong Intertrade Company.  He

was brought into the oil ministry by former president

Ahmadinejad, and became heavily involved in Iran's energy

sector.

        MR. DENTON:  May I approach?

        THE COURT:  Yes.

Q.  Showing you what's been marked for identification as

Government Exhibit 2.  Do you recognize that?

A.  Yes, that is Ahmed Ghalebani and he was former managing

director of the National Iranian Oil Company.

        MR. DENTON:  The government offers Government Exhibit

2.

        MR. HARRISON:  Same objection, your Honor.

        THE COURT:  I'll allow it.  How much more direct do

you have?

        (Government's Exhibit 2 received in evidence)

        MR. DENTON:  No more than 10 minutes, your Honor.

        THE COURT:  Okay.  Because we just have 10 minutes

left.

        MR. DENTON:  I think we can finish.  I'll move

quickly, your Honor.  We can move to the next page.

Q.  Who is this?

A.  So this gentleman is Seifollah Jashnsaz, and he was the

chairman of Naftiran Intertrade Company Sarl as well as the

director of Hong Kong Intertrade Company and Petro Suisse.

1   Q.  If you can remind us what the relationship between National

2   Iranian Oil Company and Naftiran Intertrade Company?

3   A.  Naftiran Intertrade Company or NICO is a subsidiary of the

4   National Iranian Oil Company, NIOC.  So think of NICO as a

5   subsidiary of NIOC.

6   Q.  If we can move to the next page, please.

7   A.  I would just add both these gentlemen have been designated

8   under U.S. law.

9   Q.  What about the three people listed here, Mr. Dubowitz; have

10  they been designated under U.S. law?

11  A.  They have.  They were designated under the same executive

12  order as the two previous individuals.

13  Q.  Who are these individuals?

14  A.  So the first individual is Hashem Pouransari, who is a NICO

15  official and managing director of Asia Energy Trading LLC.

16  Farzad Bazargan, he was a managing director of Hong Kong

17  Intertrade Company.  And Mahmoud Nikousokhan, who was NIOC's

18  finance director, also director of Petro Suisse Intertrade

19  Company.

20          MR. DENTON:  Your Honor, may I approach?

21          THE COURT:  Yes.

22  Q.  Showing you what's been marked for identification as

23  Government Exhibits 3, 5, and 7.  Do you recognize those?

24  A.  Yes.

25  Q.  What are they?

1    A.  So, individual here is Hashem Pouransari.  And then the one

2    on the right is page number 30, I referred to, and that's

3    Seifollah Jashnsaz.  And slide 31, this gentleman here is

4    Mahmoud Nikousokhan, who is the NIOC finance director and the

5    director of Petro Suisse.

6              MR. DENTON:  The government offers Government Exhibits

7    3, 5 and 7.

8              MR. HARRISON:  Same objection, your Honor.

9              THE COURT:  Overruled.  I'll allow them.

10             (Government's Exhibit 3, 5, 7 received in evidence)

11             MR. DENTON:  May we publish them, your Honor?

12             THE COURT:  Yes.

13             MR. DENTON:  Mr. Chang-Frieden, if we can turn to the

14   last page of Mr. Dubowitz's exhibit.

15   Q.  Mr. Dubowitz, what effect were the sanctions having on the

16   Iranian economy writ large by 2012 and 2013?

17   A.  The sanctions were having a huge impact in that period of

18   time.  The Iranian economy was essentially crashing.  They

19   were, by our assessment, four to six months away from a balance

20   of payments crisis.  Iranian GDP had dropped by 6 percent in

21   the 2012-2013 fiscal year, and again another 2 percent in the

22   year following that.

23             Inflation unofficially was about 35 percent, was

24   official inflation.  Unofficial inflation was about 80 percent.

25   The Iranian rial had collapsed in value and unemployment had

1   skyrocketed.  The Iranian economy was on its knees.

2   Q.  Why was this attributable to the effect of economic

3   sanctions?

4   A.  It was attributable to economic sanctions because the

5   sanctions had effectively isolated Iran from the global

6   financial energy and commercial sector.  Iran was increasingly

7   unable to do regular commercial and financial energy trade, it

8   was cut off from the SWIFT system, its banks had been

9   blacklisted, its main energy companies had been designated.  So

10  Iran was facing significant challenges in trying to keep its

11  economy going.  And that was certainly exacerbated by the

12  economic mismanagement of the economy under former Iranian

13  president Mahmoud Ahmadinejad, which just made matters worse.

14          MR. DENTON:  If I could just have a minute, your

15  Honor.

16          No further questions, your Honor.

17          THE COURT:  Thank you.  Could I see Mr. Rocco for a

18  minute and one of the government counsel as well.

19          (Continued on next page)

20

21

22

23

24

25

HBS3ATI7

1          (At the sidebar)

2          THE COURT:  Juror Number 8 has asked to be excused and

3     I was asking counsel if they are comfortable with that.

4          MR. ROCCO:  I'm fine with it.

5          MR. DENTON:  That's fine, your Honor.

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HBS3ATI7

1          (In open court)

2          THE COURT:  Mr. Dubowitz, I'll excuse you today and

3    pick up tomorrow for cross-examination.

4          THE WITNESS:  Thank you, your Honor.

5          (Witness not present)

6          THE COURT:  For the jurors, before you go, let me just

7    remind you of the jury instructions I gave you yesterday.

8    First, do not talk to each other about the case or about anyone

9    who has anything to do with it until the end of the case when

10   you go to the jury room to decide on your verdict.

11         Second, do not talk with anyone else about this case

12   or about anyone who has anything to do with it until the trial

13   has ended, and you have been discharged as jurors.  And by

14   talk, I'm also referring to e-mailing, texting, tweeting,

15   blogging, etc.  I'm referring to any type of communication in

16   any forum, including, without limitation, Facebook, MySpace,

17   Twitter, Instagram, Snapchat, LinkedIn, YouTube, etc.

18         Additionally, do not remain in the presence of other

19   persons who may be discussing this case, either face to face

20   orally or online.  Anyone else includes members of your family

21   and your friends and embraces social media.  You may tell them

22   that you are a juror in a case, but please don't tell them

23   anything else about the case until after you've been discharged

24   by me.

25         Third, do not let anyone talk, as broadly defined, to

1    you about the case, or about anyone who has anything to do with

2    it.  And if someone should try and talk to you about the case,

3    please report that to me or Christine immediately.

4            In this regard, the attorneys and the parties are not

5    supposed to talk to jurors, even if to offer just a friendly

6    greeting.  So if you happen to see any of them outside the

7    courtroom, they will and should ignore you.  Please don't take

8    offense, they're only acting properly by doing so.

9            Fourth, do not read any news or internet stories or

10   articles or blogs or listen to any radio or television or

11   internet or cable reports about the case or about anyone who

12   has anything to do with the case.

13           And fifth, please do not do any type of research or

14   any type of investigation about the case on your own.

15           So, we're making very good progress.  We'll pick up

16   tomorrow morning with Mr. Dubowitz and his cross-examination.

17   Thanks very much.  See you at 9:15 tomorrow.

18           (Jury excused)

19           THE COURT:  Thanks very much.  We'll see you tomorrow

20   9:15.

21           MR. DENTON:  Just one thing briefly.

22           THE COURT:  Yes.

23           MR. DENTON:  Obviously with Mr. Dubowitz's direct

24   having concluded, no one will have any substantive

25   conversations with him.  We'd like permission that the FBI

1    agents be allowed to stay in touch with him to ensure his

2    arrival on time tomorrow morning.

3              THE COURT:  Any problem with that?

4              MR. HARRISON:  That's fine, Judge.

5              THE COURT:  Okay.  That works.  See you tomorrow.

6              MR. KAMARAJU:  Because we anticipate Reza Zarrab

7    testifying tomorrow, there is two logistical points I wanted to

8    raise.

9              One is, and we've raised this with the marshals and

10   defense counsel.  We anticipate that Mr. Zarrab may diagram

11   portions of his testimony for the jury's benefit.  So in those

12   instances he may step down from the stand with your Honor's

13   permission.

14             And then the second one is just whether your Honor

15   wanted Mr. Zarrab on the stand before the jury walked in to

16   avoid him coming in from the cell block in front of the jury.

17             THE COURT:  That's often what we do, but I'll leave it

18   up to you all.

19             MS. FLEMING:  Can I ask how long do you think he'll be

20   on the stand?  A couple days, right?

21             MR. KAMARAJU:  I anticipate he'll be on the stand for

22   a couple of days.

23             THE COURT:  Tomorrow is Wednesday.  What is your

24   estimate of when he would start testifying?  I won't hold you

25   to it.  But I was thinking late morning perhaps.

1          MR. KAMARAJU:  I think that's fair.  Depending on how

2     long the cross of Mr. Dubowitz goes, I anticipate late morning.

3     Maybe early afternoon.

4          THE COURT:  Okay.  And then you're thinking also

5     Thursday and Friday as well?

6          MR. KAMARAJU:  I think it's fair to budget through

7     Friday.

8          THE COURT:  Okay.  All right.

9          MR. HARRISON:  Is that for direct?

10          MR. KAMARAJU:  For direct.  I don't think it will take

11     all of Friday.

12          MS. FLEMING:  We only sit half days Friday.

13          THE COURT:  We'll see where we are.  But normally on a

14     Friday I stop around no later than 2.

15          MS. FLEMING:  The only reason I ask, Judge, is because

16     Mr. Atilla does prayers at 1:30 to 2:30 on Fridays.

17          THE COURT:  He'll make that.

18          MR. ROCCO:  Your Honor, just one thing.  Can we take

19     this exhibit down?

20          THE COURT:  Yes.

21          MR. ROCCO:  Thank you.

22          (Adjourned until November 29, 2017, at 9:15 a.m.)

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 JAMES ATWATER

Direct By Mr. Kamaraju . . . . . . . . . . . . .68

Cross By Mr. Rocco . . . . . . . . . . . . . .76

LISA PALLUCONI

Direct By Mr. Lockard . . . . . . . . . . . .92

Cross By Mr. Rocco . . . . . . . . . . . . . 138

Redirect By Mr. Lockard . . . . . . . . . . 147

Recross By Mr. Rocco . . . . . . . . . . . . 148

MARK DUBOWITZ

Direct By Mr. Denton . . . . . . . . . . . . 150

GOVERNMENT EXHIBITS

Exhibit No.                                    Received
 1   . . . . . . . . . . . . . . . . . . . . .70

 75    . . . . . . . . . . . . . . . . . . . .71

 1600, 1800   . . . . . . . . . . . . . . . .73

 70    . . . . . . . . . . . . . . . . . . . .75

 8041   . . . . . . . . . . . . . . . . . . 137

 8001   . . . . . . . . . . . . . . . . . . 155

 9   . . . . . . . . . . . . . . . . . . . . 159

 10   . . . . . . . . . . . . . . . . . . . 161

 6   . . . . . . . . . . . . . . . . . . . . 168

 4   . . . . . . . . . . . . . . . . . . . . 187

 2   . . . . . . . . . . . . . . . . . . . . 196

 3, 5, 7   . . . . . . . . . . . . . . . . . 198