HBTPATI1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

             v.                        S4 15 Cr. 867 RMB

MEHMET HAKAN ATILLA,

             Defendant.

------------------------------x
```

November 29, 2017
9:15 a.m.

Before:

HON. RICHARD M. BERMAN,

District Judge
and a jury

APPEARANCES

JOON H. KIM,
     United States Attorney for the
     Southern District of New York
MICHAEL DENNIS LOCKARD,
SIDHARDHA KAMARAJU,
DAVID WILLIAM DENTON, JR.,
DEAN CONSTANTINE SOVOLOS,
     Assistant United States Attorneys

HBTPATI1

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
        Attorneys for defendant Atilla
BY:   VICTOR J. ROCCO, Esq.
        THOMAS ELLIOTT THORNHILL, Esq.
        - and -
FLEMING RUVOLDT, PLLC
BY:   CATHY ANN FLEMING, Esq.
        ROBERT J. FETTWEIS, Esq.
        - and -
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:   JOSHUA LEWIS DRATEL, Esq.
                  Of counsel


Also Present:
        JENNIFER McREYNOLDS, Special Agent FBI
        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
        MS. ASIYE KAY, Turkish Interpreter
        MS. SEYHAN SIRTALAN, Turkish Interpreter

1              (Trial resumed.  Jury not present)

2              (At the side bar)

3              THE COURT:  I don't know whose issue it is.

4              MS. FLEMING:  I think it's everybody's.

5              MR. ROCCO:  MSNBC had a piece last night on Zarrab, a

6    long piece, more than a couple of minutes.  Now I didn't see it

7    directly, your Honor.  This has been reported to me.

8              THE COURT:  On whose show?

9              MR. ROCCO:  MSNBC.  I don't know which show, but I

10   know it was broadcast at least twice, and my concern is that

11   the jury saw it, and I'm asking that the Court inquire of the

12   jury this morning whether they've seen anything involving this

13   case on the media.

14             THE COURT:  Okay.

15             MR. KAMARAJU:  I mean, I think --

16             THE COURT:  They have an instruction.

17             MR. KAMARAJU:  I was going to say that it seems to me

18   the simplest thing would be --

19             THE COURT:  That I gave to them every day.

20             MR. KAMARAJU:  I think that the simple thing would be

21   if your Honor wants to instruct them again about media coverage

22   and don't follow it.  If somebody has seen it, they'll say.

23             MR. ROCCO:  That's fine.

24             THE COURT:  I will do that.  I'll do it at the end of

25   the day because they're not going to see it during the day, and

HBTPATI1

```
 1    I'll underscore it --
 2              MR. ROCCO:  Fine.
 3              THE COURT:  -- at that time.  How about that; is that
 4    fair?
 5              MR. ROCCO:  Yes.
 6              MS. FLEMING:  I know Rachel Maddow did a very long
 7    piece a couple of weeks ago, a whole segment on basically
 8    Zarrab and the whole case.
 9              THE COURT:  Oh, really?
10              MS. FLEMING:  Yes.  There was a big piece on it.
11              MR. ROCCO:  The whole thing.  And the problem with
12    this is there's so much press from so many different angles.
13    Now it's about Flynn and what Zarrab is doing with Flynn.
14              THE COURT:  Are you calling him?
15              MR. KAMARAJU:  I will say that I don't anticipate any
16    testimony about Michael Flynn and, at most, he'll be in our
17    rebuttal case.
18              MS. FLEMING:  You never know.  We may issue a subpoena
19    for him.
20              MR. ROCCO:  If we're here long enough.
21              THE COURT:  Did you have something?
22              MR. KAMARAJU:  The only other thing, we had the
23    prospect of Mr. Zarrab diagramming.  Your Honor just wanted to
24    think about it, and I anticipate it may come up relatively
25    early this morning.  I just wanted to check.
```

HBTPATI1

1          THE COURT:  I have no conceptual problem with it.  I

2     just wonder if it's a security issue or not, and I think that

3     maybe I'll ask the security people if they have any --

4          MR. KAMARAJU:  By all means.

5          THE COURT:  Is that okay with all of you?

6          MS. FLEMING:  Fine.  He's my witness, Judge; so I'll

7     be objecting.  I have two quick things.

8          THE COURT:  Objecting to?

9          MS. FLEMING:  All the incredibly objectionable things

10     that will be done during direct.

11          THE COURT:  Remind me, has anybody else done that in

12     this case?

13          MR. KAMARAJU:  No one else has done a diagram yet.  We

14     haven't had, other than the initial FBI agent who testified --

15          THE COURT:  Okay.  Okay.

16          MR. KAMARAJU:  -- that have been experts.

17          THE COURT:  I've had it in a lot of other trials; so

18     let me just check with them and see.

19          MS. FLEMING:  I do have -- during the linguist, I do

20     have a clip of, that I'm going to play, showing ambiguity in

21     sentences and it is Groucho Marx saying:  I shot an elephant in

22     my pajamas this morning and what he did in my pajamas, I don't

23     know.  Just a preview.

24          THE COURT:  I'll ask the marshals what they think

25     about that.

HBTPATI1

```
 1              MS. FLEMING:  Right.  The jurors were coming in while
 2     everybody was signing in.  Could we do an explanation so they
 3     don't think it has anything to do with terrorism or Zarrab or
 4     anything?  I'm a little concerned.
 5              THE COURT:  They wanted the security, to be perfectly
 6     honest with you.
 7              MR. DRATEL:  Has the jury been exposed to that?
 8              THE COURT:  They may have seen it, and then they see
 9     it going through.
10              MS. FLEMING:  Yes, they did.  They came in and they
11     saw it.
12              MR. DRATEL:  That's problematic.
13              MR. ROCCO:  I agree with Mr. Dratel, and I think it's
14     problematic.
15              THE COURT:  What do you say?
16              MR. DRATEL:  Can they bring in the jury by itself?
17              MS. FLEMING:  They've already seen it.
18              MR. DRATEL:  Oh, they're already inside.
19              THE COURT:  They see other people.
20              MS. FLEMING:  What happened is I just came back in and
21     they said:  Have you signed in?  And they said:  Oh, jury jury.
22     And they said:  Okay, just go in.
23              THE COURT:  So one of the reasons -- you know, and I
24     don't want to misstate it.  So yesterday the overflow
25     courtrooms failed because of whatever, they were unable to show
```

HBTPATI1

<pre>
 1    the exhibits down there, which caused those people all to come

 2    here, and then they anticipated that there are going to be a

 3    lot more people here today.

 4             Presumably the overflow still is working now; so

 5    that's part of it.  It's not the full story.  They just wanted

 6    additional security for the courtroom because they anticipate

 7    it's going to be very crowded, particularly with Zarrab.  So I

 8    mean, that's the real background.  You think about it, if you

 9    come up with something with the government --

10             MR. ROCCO:  Thank you.

11             MS. FLEMING:  And just my final thing is two days ago,

12    at the beginning of the trial, I gave your court clerk two

13    subpoenas, one is addressed to the police officer and one is to

14    Zarrab, for them to produce documents, assets things like that.

15             THE COURT:  We have that.  Do you need that?

16             MS. FLEMING:  Well, I need to serve it on them.  He's

17    going to take the stand today.  I need to serve it on the

18    government.  I need the Court signature on it.

19             THE COURT:  Oh, actually, I wasn't paying a lot of

20    attention because I figured you weren't sure if he was going to

21    be called at that time and --

22             MS. FLEMING:  No, I --

23             THE COURT:  You were.

24             MS. FLEMING:  At that point.

25             THE COURT:  I have no problem with that.  I don't
</pre>

1     know.

2              MS. FLEMING:  It's tight now because he's taking the

3     stand today, but I'd like to serve --

4              MR. ROCCO:  Mr. Anello is in the courtroom.

5              THE COURT:  Is that his lawyer?

6              MR. ROCCO:  Yes.

7              THE COURT:  We should have him as part of this.

8              MR. ROCCO:  I have no problem.

9              (Pause)

10             THE COURT:  Ms. Fleming?

11             MS. FLEMING:  I have a subpoena for your client that

12    the Judge has to sign, but I'd like to give it to you after the

13    Judge signs it.

14             THE COURT:  So I hadn't signed it because I wasn't

15    sure if she knew that he was testifying, but she's saying that

16    she did, and notwithstanding that, she's seeking a subpoena.  I

17    haven't even --

18             MS. FLEMING:  No, no, it's a subpoena for documents.

19             THE COURT:  So in the normal course, I would sign it

20    and it would be up to you to evaluate it.

21             MR. ANELLO:  Right.

22             MS. FLEMING:  If you have issues with it, give me a

23    call.

24             MR. ANELLO:  I have to ask the client if we can accept

25    it, and assuming we can, I'll accept it.

HBTPATI1

<table>
<tr><td>1</td><td>THE COURT:  Fair enough.  Okay.</td></tr>
</table>

1          THE COURT:  Fair enough.  Okay.

2          MR. ROCCO:  Then we're going to need an instruction.

3  We're going to need some help getting the marshal service or

4  some direction.

5          MR. DRATEL:  We may have a solution on the instruction

6  on security.  We propose that the Court instruct the jury that

7  the reason for the wanding outside of the security is to keep

8  recording devices out because we don't bring recording in the

9  courtroom.

10         MS. FLEMING:  We like that, and it also will tell

11  people in the audience don't do it.

12         THE COURT:  Would you write something up, a sentence,

13  and I'll -- that you agree on.

14         MR. LOCKARD:  Yes.

15         MR. DENTON:  Yes.

16         THE COURT:  You agree with that.

17         MR. ANELLO:  I will discuss it with Mr. Zarrab, and

18  then I will get back with you.

19         MR. KAMARAJU:  Just one final.  Just logistically, we

20  had discussed having Mr. Zarrab on the stand before the jury

21  came in.

22         THE COURT:  Oh, did you hear this too, I guess?

23         MR. KAMARAJU:  Which I believe is the marshals'

24  preference and defense counsel's preference.

25         MS. FLEMING:  No objection.

HBTPATI1

| 1 | MR. KAMARAJU:  So at the time that the witness |

1          MR. KAMARAJU:  So at the time that the witness

2    concludes who is immediately going to precede Mr. Zarrab, take

3    a quick break for the jury.

4          MR. ANELLO:  Judge, is there any objection to us

5    sitting in the front row while Mr. Zarrab testifies?

6          THE COURT:  Not at all.

7          MR. ANELLO:  Thank you.

8          THE COURT:  So Christine has spoke to the juror and

9    excused her, and she was delighted.  So I'm going to move

10   everybody down.  I don't want to leave a gap.

11         MR. ROCCO:  So juror No. -- you're going to move

12   everyone down, and the first alternate won't replace her?  The

13   first alternate will become juror No. 12?

14         THE COURT:  The first alternate -- yes, that's right.

15         MR. ROCCO:  Sure.

16         MS. FLEMING:  By the way, I watched 11 yesterday after

17   we broke, and he was awake, I thought.

18         THE COURT:  Okay.

19         MR. ROCCO:  The litmus test is we'll see what he does

20   during Zarrab.

21         MS. FLEMING:  Well, if he's asleep during Zarrab, I

22   think we'll all agree.  It depends on which part.

23         THE COURT:  It depends.  I don't know if you had an

24   observation.

25         (Pause)

HBTPATI1

| 1 | MS. FLEMING:  Thank you.

2 | THE COURT:  And this one is for?

3 | MS. FLEMING:  The named police officer.  He's not in

4 | the public yet, Judge.

5 | THE COURT:  That's this person?

6 | MS. FLEMING:  Yes, yes.  And his name has not

7 | surfaced, shockingly.  Although, I noticed in the press

8 | yesterday it said "police officer."  I guess you must have said

9 | "police officer" in your opening, but that has not surfaced.

10 | THE COURT:  Does he have counsel, too?

11 | MS. FLEMING:  I don't know.

12 | MR. LOCKARD:  What's the question?

13 | MR. ROCCO:  The police officer.

14 | MR. DENTON:  Does he have counsel?

15 | MR. KAMARAJU:  An attorney?

16 | MR. LOCKARD:  Not with respect to this matter.

17 | MS. FLEMING:  So who do I serve it on?

18 | MR. LOCKARD:  How about we ask him if he'll accept

19 | service?

20 | MS. FLEMING:  Well, all right.  If not --

21 | THE COURT:  Or can you, on his --

22 | MR. LOCKARD:  I don't think I can accept on his

23 | behalf.

24 | MR. ROCCO:  No, he can't.

25 | MR. LOCKARD:  We'll ask him.

1              THE COURT:  Does he need counsel?

2              MR. LOCKARD:  I don't think so.  He can certainly ask

3     for it, if he wants, but I don't think he needs it.

4              THE COURT:  I don't know.  So I've signed it.

5              MR. LOCKARD:  Maybe now he does.

6              THE COURT:  Well, I don't know if he needs CJA.

7              MS. FLEMING:  I would ask the U.S. Attorney's Office

8     to help with this.

9              MR. LOCKARD:  Of course.

10             MR. DENTON:  We'll ask him.

11             MR. KAMARAJU:  We'll just talk to him about it.

12             MS. FLEMING:  If I give it to you, can you guys make a

13    copy of the signed one?

14             MR. LOCKARD:  Can we do it over one of the breaks?  I

15    just don't want to be responsible for it and lose it.

16             MS. FLEMING:  I'm not allowed to touch originals.

17    That's a rule in my office.

18             THE COURT:  Does it say recording on the thing or

19    electronics?

20             MS. FLEMING:  It says electronics.

21             THE COURT:  I'm going to say recording and other

22    electronics.  All right?

23             MR. KAMARAJU:  Just a last thing --

24             THE COURT:  Wait, I just want to put that on.  So I

25    have a joint instruction, agreed to by the defense and the

HBTPATI1

1    government, with respect to the increased security outside the

2    courtroom, which I will read to the jurors at the beginning of

3    today's session.  I'll make this Court Exhibit A, or the next

4    court exhibit attached to this transcript.  I'm sorry.

5         MR. KAMARAJU:  I was just going to say just one last

6    logistical.  When Mr. Zarrab testifies, he's going to be doing

7    it through a translator; so it will be one of the FBI linguists

8    who is going to testify earlier today, and then a second

9    translator to dispel that person.

10        THE COURT:  So if he were doing his diagramming, would

11   the translator go with him?

12        MR. KAMARAJU:  I imagine he's going to do the

13   diagramming right here; so if the translator is right here, he

14   would have no problem hearing him.  If he does, he can move

15   closer.

16        MS. FLEMING:  Why aren't we using a court-certified

17   interpreter?

18        MR. KAMARAJU:  He could be sworn.  He's working.  We

19   did this for his guilty plea.

20        MR. LOCKARD:  I think our practice is we typically

21   supply an interpreter for our witness, rather than using a

22   court interpreter.

23        MR. DENTON:  For all our witnesses.

24        MR. ROCCO:  I've never seen that.

25        MR. KAMARAJU:  The court interpreter is going to be

HBTPATI1

1    sworn in, just like they were prior proceedings; so that's the

2    only significance between a court certified.

3              MS. FLEMING:  What happens if there's a difference?

4              (Discussion off the record)

5              THE COURT:  So going back to the earlier issue related

6    to that subpoena.

7              MS. FLEMING:  Okay.

8              THE COURT:  So I feel uncomfortable that someone who

9    is coming as a witness is going to be served with a subpoena

10   and has no counsel.  So with your permission, I'm going to call

11   the CJA.

12             MR. ROCCO:  I have no problem with that.

13             MS. FLEMING:  Sure.

14             THE COURT:  If you have any problem --

15             MR. ROCCO:  Sure.  I think that's great.

16             THE COURT:  I don't think that person would know what

17   the do with your subpoena.

18             MR. ROCCO:  So nothing will happen until --

19             MS. FLEMING:  I think that's fine.

20             THE COURT:  So we'll call that person sooner, and you

21   can have a conversation with them.

22             MS. FLEMING:  That's fine.  We have a good suggestion.

23             MR. ROCCO:  And, your Honor, I think we need to talk

24   through just a little bit, for a couple of minutes, about what

25   the government proposes to do with this interpreter that it's

HBTPATI1

1    providing specifically for Mr. Zarrab's testimony.

2              (Pause)

3              THE COURT:  So the lawyers for both sides have agreed

4    that it would be okay if Mr. Zarrab gets up and draws a diagram

5    in the location currently approved by the court security

6    officials.

7              (Continued on next page)

HBTPATI1

1                    (In open court) (Jury present)

2            THE COURT:  So good morning, everybody.  Nice to see

3      you.  Please be seated.  Before we start, I just want to

4      mention to the jury, they may have noticed, that there are some

5      additional court security officers outside the courtroom.  So

6      there is, in Federal Court, a prohibition against recording,

7      and the reasons that they are there is they want to make sure

8      that recording and electronic devices are not entered into the

9      courtroom.

10           And with that, we'll pick up with the

11     cross-examination by the defense of Mr. Dubowitz.

12           MR. HARRISON:  Thank you, Judge.  After reviewing the

13     record, we don't need to ask any questions.  Thank you.

14           THE COURT:  Okay.  You're excused, Mr. Dubowitz.

15           So we'll have the government's next witness.

16           (Witness excused).

17           MR. SOVOLOS:  Good morning, your Honor.  The

18     government calls Bulent Bulut.

19           THE COURT:  Could you spell that please.

20           MR. SOVOLOS:  B-u-l-e-n-t, B-u-l-u-t.

21           THE DEPUTY CLERK:  Sir, if you would remain standing

22     and raise your right hand.  Do you solemnly swear or affirm

23     that the testimony that you shall give this court and jury in

24     this issue now on trial shall be the truth, the whole truth and

25     nothing but the truth?

1                THE WITNESS:  I do.

2                THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

3     Could you please state your full name for the record.

4                THE WITNESS:  Bulent Bulut.

5                THE DEPUTY CLERK:  Could you spell your first name, as

6     well as your last name?

7                THE WITNESS:  B-u-l-e-n-t, B-u-l-u-t.

8                THE DEPUTY CLERK:  Thank you, sir.  Feel free to

9     adjust this microphone.  Make sure you're speaking into it.

10               MR. SOVOLOS:  Judge, may I?

11               THE COURT:  Yes.

12    BULENT BULUT,

13         called as a witness by the Government,

14         having been duly sworn, testified as follows:

15    DIRECT EXAMINATION

16    BY MR. SOVOLOS:

17    Q.  Good morning, sir.

18    A.  Good morning.

19    Q.  What do you do for a living?

20    A.  I'm a language specialist for the Department of Justice.

21    Q.  And within the Department of Justice is there a particular

22    agency you're assigned to?

23    A.  Yes.

24    Q.  What agency is that?

25    A.  FBI.

1   Q.  And what language?  You're a language specialist.  What

2   language does that relate to?

3   A.  To Turkish.

4   Q.  By way of background, where did you grow up?

5   A.  I grew up in Turkey.

6   Q.  And how long did you live in Turkey?

7   A.  For about 21 years.

8   Q.  Now, what language is primarily spoken in Turkey?

9   A.  Turkish.

10  Q.  Are there multiple Turkish dialects?

11  A.  There are multiple dialects, yes.

12  Q.  Could you give us some examples, please?

13  A.  There are dialects that would be spoken by, for example,

14  people of Azeri descent.

15            THE COURT:  Could you lean a little into that mic.

16            THE WITNESS:  Absolutely.

17            THE COURT:  That's right.

18  A.  Azeri dialect would be one.  There are various dialects

19  spoken by Turkish people in the southern or eastern districts

20  of Turkey.

21  Q.  So there are regional differences and dialects?

22  A.  Yes.

23  Q.  And where did you attend college?

24  A.  I attended two colleges in Turkey, in Istanbul, and also

25  one here in the United States.

1    Q.  Did there come a time when you moved out of Turkey?

2    A.  Yes.

3    Q.  Okay.  And when was that?

4    A.  I moved out of Turkey in 1997.

5    Q.  And where did you move to, sir?

6    A.  To Utah.

7    Q.  Did you attend college in the United States?

8    A.  I did.

9    Q.  Okay.  And where was that?

10   A.  That was in Salt Lake City.

11   Q.  Mr. Bulut, when did you begin to work for the FBI?

12   A.  In 2011.

13   Q.  And what was your title at that time?

14   A.  I was a contract linguist.

15   Q.  When did you become a language specialist?

16   A.  In 2012.

17   Q.  Okay.  As a language specialist for the FBI, what are your

18   roles and responsibilities?

19   A.  My roles and responsibilities are to translate and

20   interpret documents or material that I may be assigned to work

21   on.

22   Q.  So when you say materials, what are you referring to?

23   A.  I'm referring to documents or recordings.

24   Q.  And what portion of your job involves translating?

25   A.  All of it.  I translate all the time.

1   Q.  So you translate from Turkish to English; is that correct?

2   A.  That is correct.

3   Q.  Do you ever translate from English to Turkish?

4   A.  Yes, I do.

5   Q.  Can you give us some examples of the types of documents

6   you've translated?

7   A.  I translate routine correspondence between agencies,

8   between countries.

9   Q.  And can you give us some examples of recordings that you

10  have translated?

11  A.  I have translated phone conversations, phone recordings,

12  body wires.

13  Q.  Okay.  So in addition to documents and recordings that you

14  translate, are you ever tasked with any other duties as a

15  language specialist?

16  A.  Yes, I am.

17  Q.  Can you give us what those other duties are?

18  A.  I'm routinely assigned to interpret in different settings

19  and meetings or trainings, et cetera.

20  Q.  Are those in-person meetings?

21  A.  Some are in person, some are in conference settings, yes.

22  Q.  Okay.  And are there particular positions in the Department

23  of Justice that you translate for?

24  A.  Yes.  So as assigned, I translate for special agents, for

25  unit chiefs, for assistant directors, the director of the FBI,

1   the attorney general I have translated for.

2   Q.  Okay.  And the attorney general of the Department of

3   Justice?

4   A.  Correct.

5   Q.  Did you receive any certifications as a language specialist

6   in the FBI?

7   A.  Yes, I did.

8   Q.  Can you tell us what those are, sir?

9   A.  The FBI provides two levels of specialized training for

10  language specialists, and I have taken and completed

11  successfully both of those.

12  Q.  Did you receive any training as a language specialist while

13  you're on the job?

14  A.  I have received various levels of training as needed

15  throughout my career.

16  Q.  Can you give us some relevant examples, please?

17  A.  An example would be specialized training in translation

18  methodology.

19  Q.  Do you read Turkish-language newspapers?

20  A.  Yes, I do.

21  Q.  Turkish-language magazines and books?

22  A.  I do.

23  Q.  Do you watch Turkish-language television?

24  A.  I do.

25  Q.  You also read English newspapers and books?

1   A.  Yes, I do.

2   Q.  And you watch English-language television?

3   A.  Yes.  I do, yes.

4   Q.  Let's talk a little bit about the process of creating an

5   English-language transcript of a Turkish document.  Can you

6   describe the steps that you take in that job?

7   A.  I would follow the standard translation methodology to

8   prepare for the translation by reading through the documents,

9   material and by understanding what it entails and what the main

10  idea is and come up with a glossary or terminology base as

11  needed, and then I would translate the document as a draft, and

12  then I would review, as a third step, what I just translated.

13  Q.  Okay.  What is a verbatim translation?

14  A.  A verbatim translation would be one where the meaning of

15  the -- the source material that's provided is given accurately,

16  meaning by meaning in the target language.

17  Q.  Are all translations verbatim?

18  A.  No.

19  Q.  What's the alternative to verbatim translation?

20  A.  That would be a summary translation.

21  Q.  What about the process of creating an English-language

22  transcript of a recording?

23  A.  I would follow the same procedure.  That would be to

24  prepare for the translation, go over the material, and then

25  translate in draft format, and then go over in my review.

1    Q.  Are there any quality control measures in the process of

2    translating documents and recordings, sir?

3    A.  Yes.

4    Q.  What are those, what are those measures?

5    A.  It's the review that I just mentioned that's done by the

6    translator himself.

7    Q.  Three-step review?

8    A.  Yes.  So starting with the self-review, then we go into a

9    peer review, what we call operational review, and after the

10   peer review, there's also a step on random selection, as we

11   call it, language quality control, where the quality of the

12   translation is reviewed again.

13   Q.  Okay.  What are the responsibilities of a quality control

14   reviewer?

15   A.  It is to check the target and material for accuracy and

16   consistency.

17   Q.  Have you served in that capacity?

18   A.  Yes, I have.

19   Q.  And generally, the documents and recordings that are

20   translated, is there only one fair translation of a document or

21   recording?

22   A.  No.

23   Q.  Can you explain that?

24   A.  As a principle, the meaning of a document or the material

25   that's translated, it is not word by word; therefore, there are

1   many ways to convey that meaning in the target language.

2              MR. SOVOLOS:  Your Honor, the United States offers

3   Bulent Bulut as an expert in translation and interpretation of

4   Turkish into English.

5              THE COURT:  I'm going to allow that.

6              MS. FLEMING:  No objection, your Honor.

7              MR. ROCCO:  No objection.

8              MR. SOVOLOS:  Your Honor, may I approach?

9              THE COURT:  Yes.

10  BY MR. SOVOLOS:

11  Q.  Mr. Bulut, I'm handing you what has been marked as

12  Government Exhibit 9001 for identification.  Do you recognize

13  that?

14  A.  Yes, I do.

15  Q.  What is that, sir?

16  A.  It's a CD.

17  Q.  How do you know what that is?  Have you reviewed that CD?

18  A.  Yes, I did.

19  Q.  How do you know that that's the CD that you reviewed?

20  A.  It has my initials on it; so I initialed it after I

21  reviewed it.

22  Q.  Did you participate in the translation of the documents and

23  recordings in English?

24  A.  Yes, I did.

25  Q.  How did you participate?

1    A.  I have translated a number of them that's provided on the

2    CD, as well as reviewing material that was translated by other

3    translators.

4            MR. SOVOLOS:  Your Honor, I've also handed a list of

5    the government exhibits to the clerk and to the court reporter

6    and defense counsel.  Those are the government exhibits on that

7    list.  I'd ask that they be reflected in the record.

8            THE COURT:  The record will so reflect.

9    BY MR. SOVOLOS:

10   Q.  Mr. Bulut, there's markings in these transcripts that have

11   "UI" on them?

12           THE COURT:  I'm sorry, you said there are markings?

13   Q.  There are markings on some of these transcripts that have

14   "UI" on them?

15   A.  Yes.

16   Q.  Can you describe for us what that is?

17   A.  That stands for unintelligible.

18   Q.  And what do you intend to convey when you put

19   "unintelligible" on the transcript?

20   A.  When there's a word spoken in a recording that's audible

21   but not intelligible because, for example, somebody else might

22   be overlapping that sentence or that word and it's not

23   intelligible.  We would mark that section as UI or as

24   unintelligible.

25   Q.  And did the documents on the disk go through any quality

1   control process?

2   A.  They've all been reviewed, yes.

3   Q.  Mr. Bulut, as an expert, do these contain fair and accurate

4   English translations of the Turkish content you reviewed?

5   A.  Yes, they do.

6              MR. SOVOLOS:  Your Honor, the Government offers the

7   English-language translation from Turkish identified in the

8   list of exhibits provided into evidence?

9              MS. FLEMING:  Objection, your Honor.  The underlying

10  evidence has not been offered or authenticated yet.

11             MR. SOVOLOS:  Subject to connection, Judge?

12             THE COURT:  Subject to connection, I'll allow it.

13             (Government's Exhibits 201-T through 233-T, 236-T,

14  238-T through 269-T, 273-T, 274-T, 276-T through 279-T received

15  in evidence)

16             (Government's Exhibits 288-T, 291-T, 293-T through

17  298-T, 300-T, 301-T, 304-T through 390-T, 314-T, 316-T, 326-T,

18  336-T through 357-T, received in evidence)

19             (Government's Exhibits 359-T, 380-T, 381-T, 721-T,

20  726-T, 727-T, 734-T, 736-T, 740-T, 745-T, 749-T, 750-T, 752-T,

21  818-T through 822-T received in evidence)

22             (Government's Exhibits 827-T, 1001-T through 1004-T,

23  1201-T, 1204-T through 1208-T, 1266-T through 1293-T, 2001-T

24  through 2004-T, 2007-T through 2011-T received in evidence)

25             (Government's Exhibits 2015-T, 2016-T, 2019-T through

HBTPATI1                          Bulut - Cross

1    2022-T, 2024-T through 2041-T, 2043-T, 2044-T, 2045-T, 2047-T

2    through 2054-T, 3614-T, 3617-T, 3622-T, received in evidence)

3              (Government's Exhibits 3623-T, 3629-T, 3631-T through

4    3636-T, 3639-T through 3649-T, 3651-T, 3655-T, 3658-T, 36-59-T,

5    3660-T, 3664-T, 3666-T, 3668-T, 3670-T, received in evidence)

6              (Government's Exhibits 3675-T, 3676-T, 3679-T, 3680-T,

7    3682-T through 3687-T, 3689-T, 3691-T through 3694-T, 3706-T,

8    3708-T, 3710-T, 3744-T, 3746-T, 3753-T received in evidence)

9              (Government's Exhibits 3760-T through 3764-T, 3787-T

10   through 3792-T, 4658-T through 4663-T, 4788-T, 4790-T were

11   received in evidence)

12             MR. SOVOLOS:  Nothing further.  Thank you, sir.

13             THE COURT:  Any questions?

14             MS. FLEMING:  Yes, your Honor.  Thank you.

15   CROSS-EXAMINATION

16   BY MS. FLEMING:

17   Q.  Good morning, Mr. Bulut.  Did I say it correctly?

18   A.  Good morning.

19   Q.  No?

20   A.  Bulent.

21   Q.  Would it be Bulent Bey if I were in Turkey?

22   A.  How you say it is just fine by me.  Thank you.

23   Q.  Now, you would agree with me, would you not, sir, that

24   there is an art to translation?

25   A.  Certainly.

1  Q.  And you work only for the FBI; is that true?

2  A.  That is true.

3  Q.  You don't work for private people?

4  A.  I do not.

5  Q.  And you told the prosecutor that you have to look at the

6  translation and look at the meaning of the document when you're

7  translating, correct?

8  A.  I look at the meaning of the material that's provided on

9  the documents, yes.

10  Q.  And that it's -- you can't always get an exact translation,

11  it's not word for word from Turkish to English, is it?

12  A.  That would be correct, you cannot do word by word.  That's

13  why we do meaning by meaning.

14  Q.  And, in part, that's based on the fact that English and

15  Turkish are based on different underlying origins, correct?

16  A.  I do not believe so.

17  Q.  Well, for example, they're not both romance languages, are

18  they?

19  A.  They're not.

20  Q.  And, in fact, English is an Indo-European based language?

21          THE COURT:  Is a what?  I'm sorry?

22  Q.  Indo-European based language, correct?

23  A.  Correct.

24  Q.  And Turkish is a Ural-Altaic based language, correct?

25  A.  That is correct.

1    Q.   So those are different bases, correct?

2    A.   Correct.

3    Q.   So when you are translating, people who are experts in the

4    field will agree, do they not, sir, that there's always some

5    loss of meaning in the translation?

6    A.   I do not believe that is correct.

7    Q.   Have you heard of a gentleman -- I'm going to spell his

8    name because there's no way you will recognize it if I try to

9    say it.  Have you heard of a professor named O-g-r dot

10   -g-o-r-f-e-r-s-a-r-i-k-a-s, at a university in Turkey?

11   A.   No.

12   Q.   Who writes on the subject of linguistics and he teaches

13   linguistics.  Have you read any of his writings?

14   A.   Not any of his writings, no.

15   Q.   Have you read any writings -- have you read anything on

16   linguistics in terms of translations and the problems with it

17   between Turkish and English?

18   A.   Not as it would pertain to problems between Turkish and

19   English, but I've had many materials as far as translation

20   methodology.

21   Q.   Well, have you read anything, specifically in your training

22   in terms of Turkish and English, specifically related to some

23   of the difficulties of translating Turkish and English

24   language?

25   A.   Yes, absolutely.

1   Q.   Could you identify for us what materials you've read

2   related specifically to the difficulties in translating Turkish

3   to English?

4   A.   I have attended, for example, a training offered by the

5   Monterey Institute of Language, and in that training there were

6   many materials that I cannot recall right now what the names of

7   each book would be, but we have discussed the difficulties

8   between English and Turkish translations in that training in

9   detail.

10  Q.   Can you identify any literary or any professor or anybody's

11  works that you've read in the field of linguistics, who is an

12  expert in the field, that discusses the problems of Turkish

13  into English?

14  A.   I cannot recall any of the names at this time.

15  Q.   But you did tell the prosecutor that, for example, that if

16  there is not -- let me withdraw.

17        You said that they're not perfect translations.

18  They're good translations, you try to do the best, but they're

19  not word for word accurate, correct?

20  A.   That is not what I said.

21  Q.   You said there can be more than one meaning?

22  A.   I said there may be different ways to convey that one

23  meaning.

24  Q.   And, in fact, when you grew up -- where did you grow up in

25  Turkey?

1    A.   In Istanbul.

2    Q.   Quite a difference from Istanbul to Utah?

3    A.   Excuse me?

4    Q.   There's a big difference of moving from Istanbul to Utah?

5    A.   Perhaps.

6    Q.   Where did you learn English?

7    A.   In Utah.

8    Q.   So when you --

9    A.   Excuse me.  I had taken some English classes in my years in

10   Istanbul, too.

11   Q.   And how old were you when you moved to Utah?

12   A.   21.

13   Q.   Are you familiar with the term homonym?

14   A.   Homonym?

15   Q.   Do you know what a homonym is?

16   A.   No.

17   Q.   In the English language, are you aware that words with the

18   same spelling and pronunciation but have different meanings are

19   called homonyms?

20   A.   The way you pronounced that word, I do not recognize.  I'm

21   sorry.

22   Q.   So are you aware that, for example, the word "bark" has two

23   different meanings?

24   A.   Yes, of course.

25   Q.   There's bark on a tree and bark of a dog?

1   A.  Yes.

2   Q.  You recognize that?

3   A.  Yes.

4   Q.  And, for example, "company" can have two different

5   meanings.  Do you recognize that as being a homonym?

6   A.  Absolutely.

7   Q.  And there are similar homonyms --

8           THE COURT:  Well, wait a minute.  I don't know if he

9   recognized it.  I don't know if he realizes that it's called a

10  homonym.

11  Q.  All right.  You realize that there are words in the English

12  language that have -- that sound exactly the same but have two

13  different meanings, correct?

14  A.  Yes, I do.

15  Q.  And, in fact, there are words in the English language that

16  have multiple meanings, more than two meanings, that have --

17  excuse me, that sound exactly the same but have more than two

18  meanings, correct?

19  A.  That is correct.

20  Q.  The word "to"?

21  A.  That is correct.

22  Q.  The same is true in Turkish; isn't that true?

23  A.  That is true.

24  Q.  And, in fact, I'm not going to be able to say these words

25  properly either, but the word "hala" -- did I say that anywhere

1    near properly, h-a-l-a?

2    A.  That's right.

3    Q.  And "car," did I say that anywhere near properly?

4    A.  Yes.

5    Q.  And "yuz," y-u-z?

6    A.  Yes.

7    Q.  "Gul," G-u-l?

8    A.  Mmm, hmm.

9    Q.  And so on and so forth?

10   A.  Yes.

11   Q.  So the same is true in Turkish and English, there are words

12   that sound the same and have multiple meanings.  And then there

13   are also words that sound the same, are spelled differently and

14   have different meanings in both English and Turkish, right?

15   A.  Right.

16   Q.  So for instance, in English, the word stair.  You walk up a

17   stair.  I can also stare at you.  That's correct?

18   A.  That's correct.

19   Q.  Or sun.  I have a son, and I look up at the sun, correct?

20   A.  Correct.

21   Q.  And there are examples like that in Turkish as well?

22   A.  Correct.

23   Q.  Now, in English there are also sentences that when you read

24   them, have different meanings; is that fair to say?

25   A.  Yes, of course.

 1                MS. FLEMING:  And I'd like -- could I ask for some
 2       help here.
 3                And, your Honor, I've shown this to the government.
 4       Q.  I'd like to show you a sentence and ask if you could tell
 5       us the meaning of the sentence.
 6                MS. FLEMING:  Is it on for everybody?  No.  Could we
 7       show it to the jury?
 8                THE COURT:  Yes, sure.  Can you see it?
 9                JUROR:  No.
10                MS. FLEMING:  It's on?
11                THE COURT:  Got it?  Thank you.
12       BY MS. FLEMING:
13       Q.  Could you tell us what the meaning of that sentence is?
14       A.  In English, I presume?
15       Q.  If you want any of us to understand it, it would be
16       helpful.
17       A.  Well, as it says.
18       Q.  Well, what does it say?
19       A.  "I saw a man on a hill with a telescope."
20       Q.  And what does that mean?
21       A.  It appears it could have two meanings.  There could be a
22       hill with a telescope on it, or there was a man that I saw, or
23       there was a man with a telescope on that hill that I saw.
24       Q.  In fact, there could be more than two meanings?
25       A.  Exactly.

1    Q.  So, for example, there is a man on a hill, and I'm watching

2    him with my telescope, that could be one meaning, correct?

3    A.  Potentially.

4    Q.  Another meaning, would you agree, there is a man on a hill,

5    and he has a telescope; is that correct?

6    A.  That is correct.

7    Q.  Another meaning there is, a man on a hill, and he is on a

8    hill that also has a telescope on it, correct?

9    A.  Yes, correct.

10   Q.  Fourth meaning, I am on a hill, and I saw a man using a

11   telescope?

12   A.  Yes.

13   Q.  There's a man on a hill, and I am sawing him with a

14   telescope; do you see that?

15   A.  I find it unlikely, but that is correct.

16   Q.  It's unlikely, but --

17              THE COURT:  I don't see it.

18              MS. FLEMING:  It's unlikely, but we're in trouble --

19              THE COURT:  What did that last example say?

20              MS. FLEMING:  I'm sorry, your Honor?

21              THE COURT:  I don't see that last example, but I'm not

22   a witness.

23              MS. FLEMING:  I agree, your Honor, but who saw

24   President Trump being elected.

25   BY MS. FLEMING:

1   Q.  All right.  So let's do another example.  May I show the

2   next one?  Could you tell us the meaning of this sentence?  "We

3   saw her duck," what does that mean?

4   A.  This might also have multiple meanings, such as we saw her

5   animal, that's duck, or it could also mean that we saw her in a

6   ducking motion, but we saw her duck.

7   Q.  We looked -- or the Court's favorite one.  We used a saw to

8   cut her duck?

9   A.  Right.

10  Q.  And if I could show you the third example, can you tell us

11  what this sentence means, "I shot an elephant in my pajamas"?

12  A.  No, I cannot.

13              (Videotape played)

14  Q.  Are there the same kinds of multiple meanings that happen

15  in sentences in Turkish?

16  A.  Certainly.

17  Q.  And so, again, it is an art, as you are translating, to be

18  able to determine from the context what is happening, correct,

19  sir?

20  A.  That is correct.

21  Q.  Now, you translated based on recordings that were given to

22  you by the government, correct?

23  A.  Yes.

24  Q.  And you translated only recordings that were given to you;

25  you didn't select them, right?

HBTPATI1                          Bulut - Cross

1   A.  That is correct.

2   Q.  And the process that you did was you listened to them and

3   you prepared a draft transcript, correct?

4   A.  I prepared for translation before that draft translation,

5   basically.  So there's a procedure I have to follow to prepare

6   for translation, then I prepare my draft translation.

7   Q.  So you prepared a glossary?  You listened to it first, and

8   prepared a glossary of the words you heard?

9   A.  Yes.

10  Q.  And then you prepared your first-draft translation?

11  A.  That is correct.

12  Q.  And you listened a second time?

13  A.  As many times as needed.

14  Q.  And you kept listening?

15  A.  Yes.

16  Q.  And you said you had peer review?

17  A.  Yes.

18  Q.  Now, in addition to peer review, did you also have the

19  benefit of having Reza Zarrab also listen to some of those

20  transcripts to make corrections on them?

21  A.  As I was translating?  No.

22  Q.  How about when you weren't translating?

23          THE COURT:  Whoa, whoa.  You've got to give him a

24  chance to answer.

25  A.  So can you repeat that question, please?

1          THE COURT:  Can you read back the question, please.

2          (Record read)

3    A.   No.

4    Q.   You never saw any transcripts with any corrections that

5    came from Reza Zarrab?

6    A.   I did see that there were translations where he says -- or

7    he had marked the translation.

8    Q.   And did you accept his corrections?

9    A.   No.

10   Q.   Not any of them?

11   A.   There were some that I had not reviewed at that time, and

12   there were some that were corrected afterwards, not based --

13   Q.   My question?

14   A.   Not based on the suggestion made by the individual.

15   Q.   My question is, did any of the corrections that he made on

16   the transcripts, did you accept them in your translations?

17   A.   I did not accept any of them, no.

18   Q.   And did he hear or did he add on the transcript, you saw

19   that he had added things to?  Did you accept that he had heard

20   things on the recordings that you had not heard?

21   A.   No.  In fact, I went with what I heard, and if there was

22   anything marked as what he had heard, I said here's what I

23   heard and here's what it should be.

24   Q.   How many times have you met with Mr. Zarrab to translate

25   for him?

HBTPATI1                        Bulut - Cross

1    A.   To interpret for him?

2    Q.   Yes.

3    A.   Multiple times.

4    Q.   And when you meet with somebody and translate for them,

5    does it become more easy to understand what they're saying?

6    A.   Perhaps.

7    Q.   Well, did you find that it was more easy to -- did you find

8    that it was easier for you to understand the transcript after

9    you had met with him and listened to him in person?

10   A.   No.

11   Q.   Did you dispute some of the translations that were given to

12   you that were Mr. Zarrab's suggestions on transcripts?

13   A.   Can you repeat that question again, please?  Are you

14   speaking of the translation?

15   Q.   Yes.  When you got transcripts back that had Mr. Zarrab's

16   corrections on them, did you dispute some of his corrections?

17   A.   I disputed basically all of them.

18   Q.   You disputed all of them?

19   A.   Yes.

20   Q.   And how did you mark the transcripts where you disputed

21   what he had on them?  Did you do it in writing?

22   A.   No.

23   Q.   How did you dis -- did you describe to anyone that you were

24   disputing those descriptions that Mr. Zarrab had?

25   A.   Yes.

1    Q.  And would you share with us to whom you told that you were

2    disputing it?

3    A.  With the prosecutors.

4    Q.  Was there peer review on the transcripts that you have

5    identified for us that are on the CD that has been marked here?

6    A.  They have been reviewed.

7    Q.  And it was peer reviewed?

8    A.  It was peer reviewed.

9    Q.  Was it by other members of the FBI?

10   A.  Correct.

11   Q.  Was it by anyone other than members of the FBI?

12   A.  No.

13   Q.  And can you tell us who at the FBI also was part of the

14   peer review?

15   A.  The FBI has multiple language specialists, and all of these

16   documents I used, you find on the CD, were all reviewed by me

17   as a final review, and there were some that were reviewed prior

18   to my final review.

19   Q.  So were all of the transcripts reviewed and peer reviewed

20   or some of them?

21   A.  All of them were reviewed.

22   Q.  Other than by you?  You indicated a minute ago that some of

23   them were reviewed by others?

24   A.  Sure.

25   Q.  Were a hundred percent of the transcripts that you have

1   identified on that transcript were all reviewed by others?

2   A.  The way that our process works is the translator cannot do

3   his own peer review.  So those that I would have translated

4   would have been reviewed by others, and those that were

5   translated by others would have been peer reviewed by me.

6   Q.  Were there others on the CD that you've identified here?

7   Were there others translated by others that you did peer

8   review?

9   A.  That is correct.  There were some translations that I have

10  reviewed.

11  Q.  Can you identify on the list that you have --

12          MS. FLEMING:  And I don't believe we've marked it as

13  any identifying number, your Honor, so perhaps we should mark

14  it as an exhibit number for the record.

15          THE COURT:  Sure.

16          MS. FLEMING:  The government's number.  Is there a

17  number you want to ascribe to this document?

18          THE COURT:  You can call it Court Exhibit.

19          MS. FLEMING:  Why don't we call it Court Exhibit C?

20          THE COURT:  Whatever we're up to.

21          MS. FLEMING:  Court Exhibit C.

22  BY MS. FLEMING:

23  Q.  Can you identify for us which, on Court Exhibit C, are the

24  transcripts that you did peer review on, as opposed to those

25  which you actually did the translations on?

 1    A.  I can.

 2    Q.  All right.

 3              THE COURT:  Do you have a copy of it?

 4              THE WITNESS:  I do not.  I just have a CD, and I have

 5    a hard time reading through it.

 6              MS. FLEMING:  May I approach?

 7              THE COURT:  You may.

 8              MS. FLEMING:  This is only my copy.

 9              THE DEPUTY CLERK:  It's only my copy.

10              MS. FLEMING:  Perhaps you could --

11              THE COURT:  It's marked, just so you know, Court

12    Exhibit C.

13    BY MS. FLEMING:

14    Q.  Right.  Court Exhibit C, can I give you a pen, can you mark

15    which ones you did peer review on versus --

16    A.  Based on the numbers I see here, I will not be able to

17    identify them.  So if I look at the translations, I would be

18    able to identify them for you.

19    Q.  Do you know who it was that did the translations that you

20    did peer review on?

21    A.  We would be able to find that information.

22    Q.  You don't know who it was?

23    A.  I know some.  I don't -- who did the translation is not a

24    matter in the review process.

25    Q.  My question is, do you know who they were?

1    A.  I know some of them.

2              THE COURT:  Can you tell from that list who did what?

3              THE WITNESS:  The file names or exhibit numbers listed

4    on this list do not reflect the translation; so it's hard for

5    me to determine which one is whose translation.

6    Q.  I'm asking in general.  Do you know what other special

7    agents of the FBI did translations on the transcripts that are

8    reflected on Court Exhibit C that you testified about?  Do you

9    know the names of --

10   A.  I know the FBI language specialists that would have

11   provided translations on these material.

12   Q.  I'm asking you if you can identify the names for us of the

13   people who did do it, not who would do it, who did do it?

14   A.  Sure.  I was not provided their names; so I'm unable to

15   tell you exactly who or which translation was translated by

16   whom.

17   Q.  So you simply did peer review on a number of these?  You

18   did not prepare -- so of the ones that you simply did peer

19   review on, do you know whether those people, those special

20   agents of the FBI, do you know whether they had transcripts

21   from Reza Zarrab that had corrections on them?

22   A.  I do not know, but they're not special agents.  They're

23   specialists.

24   Q.  I'm sorry, specialists.  FBI employees?

25   A.  Yes.

1    Q.  Do you know whether they had transcripts with Reza Zarrab

2    corrections on them?

3    A.  I do not know.

4    Q.  So you don't know what their processes were?

5    A.  They would follow the same methodology because we go

6    through the same training.

7    Q.  Well, you don't know that, sir.

8            THE COURT:  Whoa, whoa.

9    Q.  You're saying they're supposed to do that, right?

10           THE COURT:  You're asking questions, right?  You're

11   not giving testimony.

12   Q.  Do you know that for a fact, of your own personal

13   knowledge, sir?

14   A.  I have attended trainings with all of our Turkish employees

15   or Turkish-language specialists, and I do know that we all

16   would follow the same methodology on how we translate a

17   document or any material that we're given.

18   Q.  And do you know for a fact that every person who translated

19   it did exactly what they were supposed to do in this case on

20   every single transcript?

21   A.  That is what we always do, whether it's this list of

22   translations or any translation that we're provided.  That is

23   what we always follow.

24   Q.  And you're testifying under oath that you know for a fact

25   that they did it, from your personal knowledge, sir?

1    A.  I was not sitting next to them.  I'm just saying that we

2    always follow this methodology, and I'm sure that they would

3    have followed it.

4    Q.  On this list that's Court Exhibit C, how many of these

5    transcripts did you personally do?  Let me withdraw.

6    Imprecise.

7           On the list, how many did you personally translate, as

8    opposed to peer review?

9    A.  I do not recall.

10          MS. FLEMING:  Nothing further.

11          THE COURT:  Okay.  Anything else?

12          MR. SOVOLOS:  Yes, Judge, briefly.

13   REDIRECT EXAMINATION

14   BY MR. SOVOLOS:

15   Q.  Mr. Bulut, everything on that disk, all the transcripts

16   contain fair and accurate representations or translations of

17   English to Turkish or Turkish to English, correct?

18   A.  Yes, that is correct.

19   Q.  And to the extent that anyone provides input on edits, are

20   some of those typographical edits?

21   A.  Yes, absolutely.

22   Q.  Can you describe what a typographical edit is, just to be

23   clear?

24   A.  That would be a spelling error, an extra space or an extra,

25   I don't know, comma that doesn't belong somewhere.

HBTPATI1                    Bulut – Redirect

1   Q.  And that's part of your role as a language specialist,

2   correct?

3   A.  That is correct.

4            (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HBT3ATI2                        Bulut - Redirect

1   Q.   Okay.  To the extent that anyone suggests edits when you're

2   reviewing a document, do you sometimes independently agree with

3   what those edits are?

4   A.   Yes.

5              MR. SOVOLOS:  One second, Judge.

6              Nothing further, Judge.

7              THE COURT:  Okay.  I'll excuse the witness.  Thank you

8   very much.

9              Next government witness.

10             MR. LOCKARD:  The United States calls Anush

11  Djahanbani.

12             THE DEPUTY CLERK:  Do you solemnly swear that the

13  testimony that you shall give this Court and jury in this issue

14  now on trial shall be the truth, the whole truth, and nothing

15  but the truth, so help you God?

16             THE WITNESS:  I do.

17             THE DEPUTY CLERK:  Could you please state your full

18  name for the record.

19             THE WITNESS:  Anush Djahanbani.

20             THE DEPUTY CLERK:  Spell your first name and last

21  name.

22             THE WITNESS:  A-N-U-S-H, last name is

23  D-J-A-H-A-N-B-A-N-I.

24             THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

25   ANUSH DJAHANBANI,

1           called as a witness by the Government,

2           having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. LOCKARD:

5    Q.  Good morning, sir.

6    A.  Good morning, sir.

7    Q.  Who is your employer?

8    A.  FBI.

9    Q.  What do you do at the FBI?

10   A.  I'm a linguist.

11   Q.  If in what language are you a linguist?

12   A.  Farsi and German.

13   Q.  Bring the mic closer to you as well if that's easier.

14           THE COURT:  You said Farsi?

15           THE WITNESS:  And German.

16   Q.  Where is Farsi spoken?

17   A.  In Iran, also called Persian.

18   Q.  For how long have you been a linguist with the FBI?

19   A.  Almost three years.

20   Q.  Where did you grow up?

21   A.  In Iran, in Germany, and in the U.S.

22   Q.  For how long did you live in Iran?

23   A.  Off and on for about 18 years, Germany about eight years,

24   and 38 years in the U.S.

25   Q.  38 years here in the United States?

1    A.  Plus four years college.

2    Q.  Where did you get your degree?

3    A.  Yale University.

4    Q.  After obtaining your degree from Yale, did you work in

5    fields other than translation and interpretation?

6    A.  After Yale, I went to back to Iran where I was president of

7    an airline company.

8    Q.  For how long did you live in Iran after graduating from

9    Yale?

10   A.  Four years.

11   Q.  Did you then move to the United States?

12   A.  Right, then I came back to the United States.

13   Q.  For how long did you work in the United States before you

14   joined the FBI?

15   A.  35 years.

16   Q.  Generally speaking, what's your professional background?

17   A.  Mainly business.  I was always an executive in different

18   businesses.

19   Q.  In the course of your professional career, have you used

20   translation skills as part of your business?

21   A.  Throughout my business, yes with clients, with customers,

22   with other manufacturers, suppliers, always.

23   Q.  Does that include both in Farsi and German?

24   A.  Both Farsi and German.

25   Q.  What types of tasks do you perform as a Farsi linguist for

1    the FBI?

2    A.  I translate documents and audio material.

3    Q.  Can you give us some examples of some of the kinds of

4    documents that you translate.

5    A.  E-mails, chats, statements, bank statements, charts.

6    Q.  Do you in your personal life read Farsi language

7    newspapers, magazines, books, that sort of thing?

8    A.  All the time.

9    Q.  Do you also read English newspapers, books and magazines?

10   A.  All the time.

11   Q.  In your personal life, do you watch Farsi language

12   television or listen to Farsi language radio?

13   A.  I do.

14   Q.  Do you also do the same with English language television

15   and radio?

16   A.  I do.

17              MR. LOCKARD:  The government offers Mr. Djahanbani as

18   an expert in translation and interpretation between Farsi and

19   English.

20              MS. FLEMING:  No objection.

21              THE COURT:  I'll allow it.

22              MR. LOCKARD:  Judge, may I approach?

23              THE COURT:  Yes.

24   Q.  Mr. Djahanbani, I'll ask you if you can take a look at the

25   documents I've placed in front of you.

1   A.  Yes.

2            MR. LOCKARD:  Which, for the benefit of the record,

3   consists of the following exhibits which I'll now list.  It is

4   a slightly shorter list than we dealt with previously.

5            Government's Exhibits 1297, 1298, 3228, 3231, 3254

6   through 3256, 3292, 3309, 3312, 3314, 3316, 3319, 3322, 3323,

7   4539, 735, 737, and 901.  And the second stack of corresponding

8   dash T exhibits for each those other exhibit numbers.

9   Q.  Do you recognize the documents that have the dash T?

10  A.  Yes, I do.

11  Q.  How do you recognize them?

12  A.  I either translated them or reviewed them.

13  Q.  Did you again review those specific documents prior to your

14  testimony today?

15  A.  Yes, I did.

16  Q.  How do you know that you did that?

17  A.  I initialed it.

18  Q.  Do those documents with the dash T letter, are they fair

19  and accurate English translations of the Farsi portions of the

20  corresponding exhibits?

21  A.  Yes, they are.

22            MR. LOCKARD:  The government offers those dash T

23  exhibits subject to connection.

24            THE COURT:  I'll allow them.

25            (Government's Exhibit 1297-T, 1298-T, 3228-T, 3231-T

HBT3ATI2                        Djahanbani – Cross

1    received in evidence)

2              (Government's Exhibit 3254-T through 3256-T, 3292-T,

3    3309-T received in evidence)

4              (Government's Exhibit 3312-T, 3314-T, 3316-T, 3319-T,

5    3322-T received in evidence)

6              (Government's Exhibit 3323-T, 4539-T, 735-T, 737-T,

7    901-T received in evidence)

8              MR. LOCKARD:  No further questions.

9              MS. FLEMING:  You anticipated my objection, Judge.

10   Thank you.

11             THE COURT:  I did?

12             MS. FLEMING:  You said you'll allow them subject to

13   connection.  The objection is no authentication.  That's all.

14             THE COURT:  All right.  I thought I was just saying

15   I'll allow it.

16   CROSS-EXAMINATION

17   BY MS. FLEMING:

18   Q.  Only one question.  Only one question, sir.  Did you

19   translate a single conversation in Farsi that involved

20   Mr. Atilla?

21   A.  Sorry, could you explain the question?  I didn't

22   understand.

23   Q.  You did not translate a single conversation that was in

24   Farsi that had Mr. Atilla in it, did you?

25   A.  Not in this batch.

1   Q.   Not in any batch, sir?

2   A.   I may have, yes.

3   Q.   You may have?  Do you recall that you did, sir?

4   A.   No, not 100 percent.

5          MS. FLEMING:  Thank you.

6          THE COURT:  Okay.  Thanks very much.  We'll excuse the

7   witness.  Thank you.

8          (Witness excused)

9          MR. KAMARAJU:  Your Honor, this might be a good time

10  to take a quick break.

11         THE COURT:  We'll take a quick break and I'll excuse

12  the jury and anybody else if they wish.  Just two minutes.

13         (Recess)

14         (Jury present)

15         THE COURT:  So we'll have the next government witness.

16         MR. KAMARAJU:  Thank you, your Honor.  The United

17  States calls Reza Zarrab.

18         May I proceed?

19         THE COURT:  Hold on a second.

20         THE DEPUTY CLERK:  Sir, I'm going to swear you in

21  first.  If you can raise your right hand.  Do you solemnly

22  swear or affirm that you will justly, truly, fairly and

23  impartially interpret these proceedings to the best of your

24  ability, so help you God?

25         THE INTERPRETER:  I do.

HBT3ATI2

1          THE DEPUTY CLERK:  Could you please state your name

2     for the record.

3          THE INTERPRETER:  Tekin Esendal, T-E-K-I-N

4     E-S-E-N-D-A-L.

5          THE DEPUTY CLERK:  Thank you, sir.

6          Sir, could you please stand and raise your right hand.

7     Do you solemnly swear or affirm that the testimony that you

8     shall give this Court and jury in this issue now on trial shall

9     be the truth, the whole truth, and nothing but the truth, so

10    help you God?

11         THE WITNESS:  Yes, ma'am.

12         THE DEPUTY CLERK:  Could you please state your name

13    for the record.

14         THE WITNESS:  Reza Zarrab.

15         THE DEPUTY CLERK:  Could you spell your first name as

16    well as your last name.

17         THE WITNESS:  (In English) R-E-Z-A Z-A-R-R-A-B.

18         THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

19         THE COURT:  For the jury, Mr. Zarrab is going to speak

20    in Turkish and the gentleman to his right is going to translate

21    into English.

22     REZA ZARRAB,

23         called as a witness by the Government,

24         having been duly sworn, testified as follows:

25    DIRECT EXAMINATION

1    BY MR. KAMARAJU:

2    Q.  Good morning, Mr. Zarrab.

3    A.  Good morning, sir.

4    Q.  Where were you born, sir?

5    A.  In Iran, Tehran.

6    Q.  Are you a citizen of Iran?

7    A.  Yes, sir.

8    Q.  How long did you live in Iran?

9    A.  Approximately until I was a year and a half old.

10   Q.  Where did you live after that?

11   A.  In Turkey, and for a short period of time in Dubai.

12   Q.  Are you a citizen of Turkey?

13   A.  Yes, sir.

14   Q.  Is there a Turkish version of your name that you go by?

15   A.  Yes.

16   Q.  What is that?

17   A.  Reza Sarraf.

18   Q.  Sir, in addition to the Turkish and Iranian citizenships,

19   do you hold any other citizenships?

20   A.  Yes, I have, sir.

21   Q.  What other citizenships do you hold?

22   A.  I'm also a Macedonian citizen.

23   Q.  How old are you, sir?

24   A.  34, sir.

25   Q.  Are you married?

1    A.  Yes, sir.

2    Q.  Do you have any children?

3    A.  I have a daughter.

4    Q.  Where do your wife and daughter live?

5    A.  In Istanbul, Turkey.

6    Q.  Sir, do you speak English?

7    A.  Yes, I do, but not perfectly.

8    Q.  Is it your first language?

9    A.  No, sir.

10   Q.  What is your first language?

11   A.  Turkish.

12   Q.  Are you more comfortable today testifying with the

13   assistance of a Turkish interpreter?

14   A.  Yes, of course.

15           MR. KAMARAJU:  Your Honor, may I approach?

16           THE COURT:  Yes.

17   Q.  I'm showing you what has been marked as Government Exhibit

18   20 for identification.

19           Do you recognize that exhibit?

20   A.  Yes.

21   Q.  What is it?

22   A.  My picture.

23           MR. KAMARAJU:  Your Honor, the government offers

24   Government Exhibit 20.

25           THE COURT:  I'll allow it.

1           MS. FLEMING:  No objection.

2           (Government's Exhibit 20 received in evidence)

3           MR. KAMARAJU:  Your Honor, may I publish Government

4    Exhibit 20?

5           THE COURT:  Sure.

6           MR. KAMARAJU:  Thank you.

7    Q.  Sir, I'd like to direct your attention to March of 2016.

8    A.  Yes, sir.

9    Q.  Where were you living at that time?

10   A.  Istanbul, Turkey.

11   Q.  Did you travel to the United States during that month?

12   A.  Yes, I did, sir.

13   Q.  Where did you travel to?

14   A.  From Istanbul to Miami.

15   Q.  Were you traveling alone?

16   A.  No, sir.

17   Q.  Who were you traveling with?

18   A.  Together with my family.

19   Q.  What was the purpose of that trip?

20   A.  A family vacation and also taking my daughter to

21   Disneyland.

22   Q.  What happened when you arrived in the United States?

23   A.  I was arrested.

24   Q.  Who arrested you, sir?

25   A.  FBI.

1   Q.  Were you interviewed by the FBI agents after they arrested

2   you?

3   A.  Yes, I was.

4   Q.  Were you completely truthful with them during that

5   interview?

6   A.  I did not, no.

7   Q.  Why not, sir?

8   A.  I did not know what I was facing, and after a long trip, I

9   was shocked and I -- I couldn't give the right answers.  I was

10  afraid.

11  Q.  Sir, after you were arrested, were you interviewed by a

12  pretrial services officer in Miami?

13  A.  Yes, in Miami, yes.

14  Q.  Were you completely truthful during that interview?

15  A.  Not exactly.  Not wholly.

16  Q.  After you were arrested, did you hire attorneys to explore

17  whether you could be released pursuant to a prisoner exchange?

18  A.  Within the legal limits, yes, of course.

19  Q.  To your knowledge, did those attorneys in fact explore

20  those options?

21  A.  Yes, sir.

22  Q.  Were they successful?

23  A.  No.

24  Q.  Did there come a time when you met with the FBI again?

25  A.  Yes, sir.

1   Q.  How did that come to be?

2   A.  After I decided to cooperate with the government, I had a

3   meeting with the FBI.

4   Q.  At the time you began to cooperate with the government, had

5   Hakan Atilla already been arrested?

6   A.  Yes, sir.

7   Q.  Did anyone else attend those meetings?

8   A.  My lawyers and the prosecution.

9   Q.  Sir, have you pleaded guilty to any crimes in the United

10  States?

11  A.  Yes, sir.

12  Q.  What are those crimes?

13  A.  I pled guilty to seven crimes.

14          (In English) Defrauding United States, violating IEEPA

15  sanctions, money laundering, conspiracy to money launder, bank

16  fraud, conspiracy for bank fraud, paying bribe for federal

17  prison guard.

18  Q.  In connection with your guilty plea, did you enter into a

19  cooperation agreement with the United States?

20  A.  Yes, sir.

21  Q.  What do you understand your primary obligations to be under

22  that cooperation agreement?

23  A.  Yes.

24  Q.  What are those obligations?

25  A.  Three main things:  To speak exactly the truth, to

1    cooperate with the United States government, never to commit

2    any crime after this.

3    Q.   What is your understanding of what happens if you fulfill

4    those obligations?

5    A.   Can I hear the question once more?

6    Q.   Certainly.  What do you understand happens if you fulfill

7    your obligations under the cooperation agreement?

8    A.   The government will write a 5K1 letter to the Court.

9    Q.   What do you understand would be in that 5K letter?

10   A.   All the crimes that I have committed, all the help that I

11   provided to the United States government, good and bad,

12   everything.

13   Q.   Sir, why did you decide to cooperate?

14   A.   Cooperation was the fastest way to accept responsibility

15   and to get out of jail at once.

16   Q.   Has anybody promised you what your sentence will be?

17   A.   Definitely not.

18   Q.   Who will determine your sentence?

19            THE INTERPRETER:  May I have that --

20   Q.   Who will determine your sentence?

21   A.   Honorable judge.

22   Q.   What do you understand will happen if you don't fulfill

23   your obligations under the cooperation agreement?

24   A.   The prosecution will not write the 5K1 letter.

25   Q.   Could you be prosecuted for any additional crimes if you

HBT3ATI2                      Zarrab - Direct

1    don't testify truthfully?

2    A.  Yes, of course.

3    Q.  Sir, you testified earlier about hoping to get out of jail.

4    Are you currently in the custody of the Federal Bureau of

5    Investigation, the FBI?

6    A.  Yes, sir.

7    Q.  Are you monitored continuously by FBI agents?

8    A.  Yes, sir.

9    Q.  Do they have you staying in a hotel somewhere?

10   A.  No, sir.

11   Q.  Are you free to come and go as you please?

12   A.  Definitely not.

13   Q.  How long have you been held in the custody of the FBI?

14   A.  A couple of weeks.

15   Q.  Where were you before that?

16   A.  MDC Brooklyn jail.

17   Q.  Where were you before the MDC?

18   A.  MCC Manhattan jail.

19   Q.  Prior to being taken into FBI custody, have you been in

20   jail since the day you were arrested by the FBI?

21           Prior to having been taken into FBI custody a couple

22   of weeks ago, have you been in jail since the day you were

23   arrested by the FBI?

24   A.  Yes.

25   Q.  You testified that you pleaded guilty to bribing a federal

1    corrections officer.  Is that right?

2    A.  Yes, sir.

3    Q.  Could you please generally describe for the jury what made

4    you guilty of that crime.

5    A.  I bribed the prison guard to bring me alcohol and to let me

6    use his cell phone.

7    Q.  The other crimes that you pleaded guilty to --

8    A.  Yes.

9    Q.  Do those relate to a scheme to evade U.S. sanctions?

10   A.  Yes, sir.

11   Q.  Generally speaking, could you please describe what that

12   scheme was to the jury.

13   A.  I will try to explain it as best my knowledge and in the

14   simplest way.

15          The funds of Iranians which accumulated to gas and oil

16   sales, and on the other side the Iranians had the international

17   payment orders.  I received those orders, and I made their

18   international financial payments.  Their income from gas and

19   oil sales was accumulated in Halkbank.  Taking those moneys out

20   of Halkbank, I made the international payments.

21   Q.  Okay.  Sir, we'll talk about that scheme in a little more

22   detail.  But, looking around the courtroom, do you recognize

23   anyone who participated in that scheme with you?

24   A.  Yes, sir.

25   Q.  Could you please describe where that person is sitting.

1    A.  He's on the defense table.

2    Q.  Okay.  Could you please describe him by an article of

3    clothing that he's wearing.

4    A.  Yes.  He's wearing a gray suit, he has a dark red tie.

5            MR. KAMARAJU:  Your Honor, would the record reflect

6    that Mr. Zarrab has identified the defendant.

7            THE COURT:  Is he sitting next to counsel, to your

8    knowledge?

9            THE WITNESS:  Yes.  Right there.

10           THE COURT:  The record will so reflect that the

11   witness has identified Mr. Atilla.

12   BY MR. KAMARAJU:

13   Q.  What is the defendant's name?

14   A.  Hakan Atilla, Mr. Hakan Atilla.

15   Q.  Who is Hakan Atilla?

16   A.  He's the deputy general manager of Halkbank in Istanbul,

17   Turkey, and he's also the head of the international branch of

18   that bank.

19   Q.  Sir, what is Halkbank?

20   A.  It is a Turkish bank in Turkey.

21   Q.  Mr. Zarrab, generally speaking, how did Hakan Atilla help

22   you with the scheme that you described?

23   A.  I will try to explain in the simplest way.

24           To be able to realize the payments of the Iranians,

25   and to be able to take the money out of Halkbank, he helped

HBT3ATI2                        Zarrab - Direct

1   develop the method and the system that we used to improve the

2   system, and he made sure that the system and method worked.

3   Q.  Why did you need a system to withdraw money from Halkbank?

4   A.  Because the Iranians could not use the income they

5   developed from the oil and gas sales, they could not use that

6   money for their international payments.

7   Q.  When you say Hakan Atilla helped to design the system, what

8   do you mean?

9           MS. FLEMING:  Objection, your Honor.

10          THE COURT:  Overruled.

11  A.  Hakan Atilla is the most knowledgeable person about the

12  sanction rules in the bank.  He made contributions to make our

13  scheme look like it's complying with the American sanctions.

14  Q.  Okay.  We'll talk about those contributions in a little

15  more detail.

16          First I'd like to ask you some questions about

17  yourself.  Okay?

18  A.  Of course.

19  Q.  Before you were arrested in the United States, did you

20  work, sir?

21  A.  Yes, sir.

22  Q.  What did you do for work?

23  A.  I have a foreign exchange bureau, and I would do foreign

24  exchange transactions and money transfers.  Also construction

25  sector, I had a furniture producing factory, and a shipbuilding

HBT3ATI2                    Zarrab - Direct

1   in the maritime sector.

2   Q.  For the record, could you explain what you mean by foreign

3   exchange business?

4   A.  Receiving from customers some money in any denomination,

5   and changing it with another kind of currency.

6   Q.  How did you learn that business?

7   A.  That's my father's profession.

8   Q.  Does your father have such a business?

9   A.  Yes, sir.

10  Q.  What is the name of that business?

11  A.  Al Nafees Exchange.

12  Q.  Where is Al Nafees Exchange located?

13  A.  In Dubai.

14  Q.  What country is Dubai in?

15          THE INTERPRETER:  What country?

16  Q.  What country is Dubai in?

17  A.  United Arab Emirates.

18  Q.  Do you have any other family members who worked at Al

19  Nafees?

20  A.  Yes, sir.

21  Q.  Who is that?

22  A.  My big brother.

23  Q.  How long did you work at Al Nafees Exchange?

24  A.  Approximately two years.

25  Q.  What did you do after you left?

1   A.  I went on doing my own foreign exchange business.

2   Q.  You testified that in addition to foreign exchange, you had

3   other businesses that you were in; is that right?

4   A.  Yes, sir.

5   Q.  I believe you mentioned a shipping business?

6   A.  Yes, sir.

7   Q.  What are some of the other businesses that you were

8   involved in?

9   A.  Furniture production, building construction, also while I

10  was working with my father in Dubai, I participated in the tea

11  trade.

12  Q.  About how old were you when you participated in the tea

13  trade?

14  A.  Maybe 16, 17.

15  Q.  Turning back to your currency exchange businesses, what are

16  the names of some of those businesses?

17  A.  Beginning with the Royal Group, Durak Doviz, Atlantis

18  Capital General Trading, Centrica, Tasbasi Doviz.  Some of

19  these are owned by me, and some of these are under my control.

20  There are also different, many companies.

21  Q.  And the companies that you named, are those under Royal

22  Group?

23  A.  Yes, all of those work under the roof of my Royal Group.

24  Q.  To be clear, Royal Group is your business?

25  A.  Yes, sir, I'm the owner of Royal Group.

1    Q.  Mr. Zarrab, when you first started your money changing

2    business, what kind of customers typically used your services?

3    A.  Turkish, Azeri, and the Azeri that live in Russia and also

4    some of them Iranians.

5    Q.  Was a big part of your business Iranian customers at that

6    time?

7    A.  No.

8    Q.  Did there come a time when you started to get more Iranian

9    customers?

10   A.  Yes, sir.

11   Q.  Approximately when did that start?

12   A.  Approximately within the year of 2010.

13   Q.  What happened with your Iranian business at that time?

14   A.  Iranian trade become alive in Turkey very much.

15   Q.  Around that time, were you introduced to any significant

16   Iranian customers?

17   A.  After finding access to be able to take the Iranian money

18   out of the bank, yes.

19   Q.  Who is Huseyin Agajooni?

20   A.  He's my first customer, when I started doing high-volume

21   business with the Iranians in Turkey, he's also a person that I

22   made partners with.

23   Q.  When you say he was your customer, what did you do for

24   Agajooni?

25   A.  Mr. Agajooni was taking money out of Iran from the Iranian

1    banks and Iranian foreign exchange offices, and was bringing it

2    to Aktif Bank, and I was exchanging it to tomans and giving it

3    to the customers.  To the Iranian customers in Iran, as tomans.

4    Q.  So --

5    A.  I want to correct something in the recording.  Mr. Agajooni

6    was sending money to the Iranian banks -- from the Iranian

7    banks.  Yes, sir.

8    Q.  So.  Let's break that down a little bit.  First of all, you

9    referred to something called a toman.  What is that?

10   A.  It is the Iranian money.

11   Q.  Why did Agajooni need you to get the money out of Iran?

12               THE INTERPRETER:  Once more, please.

13   Q.  Why did Agajooni need you to get the money?

14   A.  Because of the sanctions, Iranians were not allowed to

15   access their own money.  There were limited persons who can get

16   their money out of there, and I was one of them.

17   Q.  Now, you also mentioned Aktif Bank; is that right?

18   A.  Yes, sir.

19   Q.  I believe your testimony was that you received money from

20   Agajooni at Aktif Bank; is that right?

21   A.  The money sent by Mr. Agajooni came to Aktif Bank, and I

22   was able to take the money out of Aktif Bank.

23   Q.  What is Aktif Bank?

24   A.  It is an investment bank in Turkey.

25   Q.  And the sanctions that you testified about before, do you

1   understand that they apply to transactions involving Aktif

2   Bank?

3   A.   This is a whole -- so the instructions that were given to

4   me by the Iranians to make international payments, that money I

5   took from the Aktif Bank.  It's a whole thing.

6   Q.   Did you have to remove it from Aktif Bank because of the

7   sanctions?

8   A.   Yes, because the Iranians could not make their payments

9   directly, they used me as a go between.

10  Q.   When you were first approached about performing financial

11  services for Agajooni, did you have a bank account already at

12  Aktif Bank?

13  A.   No, sir.

14  Q.   When you agreed to work with Agajooni, did you approach

15  Aktif Bank about opening such an account?

16  A.   Yes, yes, I made that demand.

17  Q.   Were you able to open an account at Aktif Bank at that

18  time?

19  A.   No, in my first attempt, I was unsuccessful.

20  Q.   Were you told why you would not be allowed to open an

21  account there?

22  A.   Yes.

23  Q.   Why was that?

24  A.   In my first attempt, Aktif Bank told me that the customers

25  who worked with Iran need a special permission to open an

1    account.  And that permission was never given.  And in my first

2    attempt, the account was never opened.

3    Q.  After you were initially rejected by Aktif Bank, did you

4    give up with opening an account there?

5          THE COURT:  Did what?

6    Q.  Did you give up on opening an account there?

7    A.  No.

8    Q.  What did you do?

9    A.  I started to try again.

10   Q.  What are some of the steps you took to try again?

11   A.  I called Mr. Egemen Bagis, who is the E.U. minister of

12   Turkey, which I interact socially, and I asked for his help in

13   that subject.

14         MR. KAMARAJU:  I'd like to show the witness Government

15   Exhibit 13 please, your Honor.

16         THE COURT:  Okay.

17         MR. KAMARAJU:  For identification.

18         THE COURT:  All right.

19   Q.  Do you recognize that?

20   A.  Yes, sir.

21   Q.  What is it?

22   A.  It a picture of Honorable Mr. Egemen Bagis.

23         MR. KAMARAJU:  The government offers Government

24   Exhibit 13.

25         THE COURT:  I'll allow it.

 1              (Government's Exhibit 13 received in evidence)

 2              MR. KAMARAJU:  We'd ask permission to publish it for

 3      the jury.

 4              THE COURT:  Sure.

 5              MR. KAMARAJU:  Can you pull it up on the jury screens.

 6              THE COURT:  I think we're going to change interpreters

 7      at the moment.  So I'll ask Christine to swear in the second

 8      interpreter.

 9              MS. FLEMING:  Judge, I didn't have a chance to do it,

10      but I'd like to object on relevance grounds.

11              THE COURT:  Okay.  Overruled.

12              THE DEPUTY CLERK:  Raise your right hand, please.  Do

13      you solemnly swear that you will justly, truly, fairly and

14      impartially interpret these proceedings to the best of your

15      ability, so help you God?

16              THE INTERPRETER:  Yes, I do.

17              THE DEPUTY CLERK:  Could you please state your full

18      name for the record.

19              THE INTERPRETER:  Bulent Bulut, B-U-L-E-N-T B-U-L-U-T.

20      Q.  Sir, what did you ask Egemen Bagis to do?

21              MS. FLEMING:  Objection, Judge.  Hearsay.

22              THE COURT:  Overruled.

23              THE INTERPRETER:  I still did not hear the last part

24      of that question.  What did you ask?

25      Q.  What did you ask Mr. Egemen Bagis to do?

HBT3ATI2                      Zarrab - Direct

```
 1   A.  I asked Mr. Egemen Bagis to help me in opening that bank
 2   account.
 3   Q.  What specifically did you ask him to do?
 4   A.  I asked him if he had known the general manager of the
 5   bank.  He told me that they had known each other previously
 6   from the United States.  And he arranged for an appointment.  I
 7   went to the meeting.
 8   Q.  What is the position of general manager at a Turkish bank?
 9   A.  He would be the individual that has the highest authority
10   in the bank, the person that would be directing the bank.
11   Q.  Did Bagis introduce you to the general manager of Aktif
12   Bank?
13   A.  Yes, Mr. Egemen arranged for the appointment, and I went to
14   the meeting.
15   Q.  After that meeting, were you able to open an account at
16   Aktif Bank?
17   A.  Yes, sir.
18   Q.  Did you ultimately receive money for Agajooni at the bank
19   accounts held at Aktif Bank?
20   A.  Yes, sir.
21   Q.  Did you ultimately return it to Agajooni in Iran?
22   A.  Yes, sir.
23   Q.  Initially, approximately how much money per day were you
24   processing for Agajooni?
25   A.  In the beginning the transactions started at between 5 to
```

1   10 million euros.

2   Q.  Just for the record, what is a euro?

3   A.  The joint currency used by the European Union.

4            THE COURT:  That amount was per day?

5            THE WITNESS:  At the very beginning that was the

6   volume of transactions per day.

7   Q.  Was that on behalf of Agajooni's Iranian customers?

8   A.  Yes, sir.

9   Q.  Did there come a time when your business with Agajooni

10  began to slow down?

11  A.  There was, sir.

12  Q.  Why did that happen?

13  A.  Because we used almost all of the funds that the Iranians

14  had at Aktif Bank.

15  Q.  What did you do after that?

16  A.  I tried to find other customers who had funds there.

17  Q.  Were you looking for other Iranian customers?

18  A.  Certainly.

19  Q.  Were there any specific kinds of Iranian customers you were

20  looking for?

21  A.  Of course, I was after the customers that would possibly

22  have the most money in Turkey.

23  Q.  Which kinds of customers were those?

24  A.  The Central Bank of Iran, Mellat Exchange.

25  Q.  Okay.  Let's start with the Central Bank of Iran.  What is

HBT3ATI2                          Zarrab - Direct

1    your understanding of what that is?

2    A.  It is the Central Bank of Iran, the safe of the government

3    of Iran.

4    Q.  By safe, do you mean that's where they keep money?

5    A.  It's the authority that has authority over the Iranian

6    currency.

7    Q.  Did you approach the Central Bank of Iran about doing

8    business with them?

9    A.  Yes, sir.

10   Q.  How did you approach them?

11   A.  Through the acquaintances of my father, a meeting was

12   organized where my father was also present.

13   Q.  Approximately how many meetings did you have initially with

14   the Central Bank of Iran?

15   A.  On the first day of meetings, there were two meetings.

16   Q.  Who attended the the first meeting?

17   A.  I attended that one.  My father did.  Mr. Bahmani, who was

18   the president of the Central Bank of Iran, attended.

19               (Continued on next page)

20

21

22

23

24

25

1   Q.  And what was discussed at that meeting?

2   A.  During that meeting, those individuals who had been working

3   with the Central Bank at that time, I mentioned to the Central

4   Bank that I could provide a better price point than those

5   individuals, in terms of delivery of bank notes such as cash,

6   U.S. dollars, delivering bills, currencies, and I told them

7   that I could also provide the market stability for the Iranian

8   currency on their behalf.

9   Q.  Now, did Bahmani agree to your proposal?

10  A.  Yes, sir.

11  Q.  And after he agreed to your proposal, what happened next?

12  A.  He called over Ms. Kian Irad to his room, who was the

13  person responsible at that time, and there was a meeting

14  organized with the technical team.

15  Q.  And what was the purpose of the meeting with the technical

16  team?

17  A.  It was the devising or drafting of an agreement between us

18  and the Central Bank discussing the conditions, the terms of

19  that agreement.

20  Q.  Who was at that second meeting?

21  A.  Ms. Kian Irad, Mr. Godarzi, Mr. Yakubi, Mr. Tarelli and

22  Mr. Bibi.

23  Q.  I'm not going to ask you who all those people are, but who

24  is Mr. Bibi?

25  A.  He was the head of the Herasat department within the

1   Central Bank.

2   Q.  What is Herasat?

3   A.  Herasat is the intelligence department of the Central Bank

4   of Iran.

5   Q.  Now, were you also able to reach an agreement to provide

6   financial services to the Central Bank of Iran?

7   A.  Yes, sir.

8   Q.  And I believe you testified that one of those services was

9   delivery of cash to the Central Bank of Iran; is that right?

10  A.  Yes, that's correct, sir.

11  Q.  What is your understanding of why the Central Bank of Iran

12  needed cash delivered?

13  A.  They were holding reserves of cash at their Central Bank.

14  I don't know the exact reason behind it, but that's what it

15  was.

16            MS. FLEMING:  Judge, can we get a time frame?

17  Q.  Approximately when was this?

18  A.  It's between 2010 and 2011.

19  Q.  Did there come a time when you stopped providing these

20  services directly to the Central Bank of Iran?

21  A.  Yes, sir.

22  Q.  And did you try to restart that direct relationship with

23  the Central Bank of Iran?

24  A.  Yes, sir.

25  Q.  Now, what did you try to do to try to reestablish that

1   relationship?

2   A.  I have made a few attempts.  One of them was when I wrote a

3   letter to -- another letter to the Central Bank of Iran.

4   Q.  And did you write any other letters as well?

5   A.  Yes.

6   Q.  I'd like to show you what's been marked as Government

7   Exhibit 901 and 901-T.  901-T has already been introduced

8   subject to connection.  Apparently, we are having a technical

9   difficulty; so I'm going to show you a hard copy.

10               MR. KAMARAJU:  Are we still able to pull it up for the

11  jury?  May I approach, your Honor?

12               THE COURT:  Sure.

13               MR. KAMARAJU:  My apologies, your Honor.

14               THE COURT:  That's fine.  Do you have an extra one?

15               MR. KAMARAJU:  Yes, I'll bring one up for you.

16  BY MR. KAMARAJU:

17  Q.  While we're pulling that up, let me ask.  Do you recognize

18  Government Exhibit 901?

19  A.  Yes, sir.

20  Q.  What is it?

21  A.  This is one of the letters that I had written up.

22               MR. KAMARAJU:  Can everybody see it on their screens?

23               THE COURT:  I have it on mine.

24               MR. KAMARAJU:  Your Honor, to be clear, I think

25  there's a dispute.  The government would offer Government

1    Exhibit 901.

2              THE COURT:  Okay.  I'm going to allow it.

3              MS. FLEMING:  We object on relevance and 403.

4              THE COURT:  I'm going to allow it.

5              (Government's Exhibit 901 received in evidence)

6              THE COURT:  Can you all see it?

7              JUROR:  No.

8              MR. KAMARAJU:  In the meanwhile I'm going to take it

9    back and publish it physically with the jury.  It's back on?

10             JUROR:  Yes.

11             THE COURT:  Do you have the two on your screen?

12             THE WITNESS:  Yes, sir.

13             THE COURT:  And, jury, you have the two on your

14   screen?

15             JUROR:  Yes.

16             THE COURT:  Okay, good.

17   BY MR. KAMARAJU:

18   Q.  Now, Mr. Zarrab, who is this letter addressed to?

19   A.  To Ahmadinejad.

20   Q.  Who is that?

21   A.  It's the president of the Republic in Iran during that time

22   period.

23   Q.  And why is this letter addressed to him?

24   A.  I will summarize.  An Iran businessman with good political

25   clout told me that he could reintroduce me back into working

1    with the Central Bank of Iran.  He said he had a good

2    relationship -- good relations with Ahmadinejad himself and

3    Ahmadinejad's office, and asked me to draft a letter to

4    Ahmadinejad, and this is that letter.

5    Q.  And as a result of drafting this letter, were you

6    ultimately successful in reestablishing a relationship with the

7    Central Bank of Iran?

8    A.  No, sir.

9            MR. KAMARAJU:  Now, Mr. Chang-Frieden, could you

10   please show the witness, with Court's permission, Government

11   Exhibit 4539 and 4539-T, which I believe has been admitted

12   subject to connection.

13   Q.  So let's start with 4539.  Do you recognize this document?

14   A.  Yes, sir.

15   Q.  What's the date of the document?

16   A.  December 3rd, 2011, sir.

17   Q.  And what is it?

18   A.  It's an electronic mail.

19   Q.  And could we flip to the second page of that document,

20   please.

21            Do you recognize what we're looking at here?

22   A.  Yes, sir.

23   Q.  What is it?

24   A.  This is the first letter that I had written to the Central

25   Bank, sir.

1                MR. KAMARAJU:  Your Honor, the government would offer

2      Government Exhibit 4539 and 4539-T.

3                MS. FLEMING:  Objection, hearsay and 403.

4                THE COURT:  I'll allow that.

5                (Government's Exhibits 4539 and 4539-T received in

6      evidence)

7                MR. KAMARAJU:  And could we publish that, please,

8      Mr. Chang-Frieden.

9                Everybody got it?  Okay.  Great.

10     BY MR. KAMARAJU:

11     Q.  So tell us again, what was the purpose of this letter?

12     A.  After I had made that agreement with the Central Bank, my

13     business with them was short-lived.  So this was for me to be

14     able to work with them again, that this was an attempt in that

15     regard.

16     Q.  Now, did you draft Government Exhibit 4539 and the

17     attachment?

18     A.  No, sir.

19     Q.  Who drafted Government Exhibit 4539?

20     A.  Mr. Soroush Najafzadeh.

21     Q.  And who drafted the letter to the Central Bank of Iran

22     that's attached?

23     A.  Soroush Najafzadeh.

24     Q.  Who is Soroush Najafzadeh?

25     A.  Soroush Najafzadeh is the son of Hossein Najafzadeh.

HBTPATI3                         Zarrab - Direct

1    Q.   Okay.  And who is Hossein Najafzadeh?

2    A.   Mr. Najafzadeh is the person at the head of Mellat Exchange

3    and is CEO.

4    Q.   What is the Mellat Exchange?

5    A.   Mellat Exchange is the exchange office owned by Mellat

6    Bank, sir.

7    Q.   And what is Mellat Bank?

8    A.   It's one of the biggest government banks in Iran.

9    Q.   Now, were you aware of any other names that Hossein

10   Najafzadeh was called?

11   A.   Yes, sir.

12   Q.   What were those other names?

13   A.   Hossein Nafti.

14   Q.   What does Nafti mean?

15   A.   It means petrol, petroleum.

16   Q.   And in what language is that?

17   A.   In Farsi, sir.

18   Q.   And what's your understanding of why he was called that?

19   A.   Hossein Najafzadeh was one of the largest customers of the

20   Iranian oil companies, and they were working with the Mellat

21   Bank.

22   Q.   Now, what's your understanding of why it was important that

23   he worked with a lot of Iranian oil companies?

24        Let me repeat that.  What was your understanding of

25   why it was important that he worked with a lot of Iranian oil

1  companies?

2          MS. FLEMING:  Can we have the basis of the

3  understanding, your Honor?

4          THE COURT:  Overruled.

5  A.  Because the proceeds of the Iranian government was all

6  consisting of oil and gas sales.

7  Q.  Now, you testified earlier that you were trying to develop

8  a business relationship with Bank Mellat; is that right?

9  A.  With Mellat Exchange, yes, sir.

10  Q.  And why did you want to work with Mellat Exchange?

11  A.  Because Mellat Exchange had a really high volume of

12  transactions and the funds they had in Turkey were high as

13  well.

14  Q.  Did you meet with Hossein Najafzadeh about developing a

15  relationship with Mellat Exchange?

16  A.  Could you repeat that question, please.

17  Q.  Did you meet with Hossein Najafzadeh about developing a

18  relationship with Mellat Exchange?

19  A.  Yes, sir.

20  Q.  And were you ultimately able to reach such an agreement?

21  A.  Yes, I did, sir.

22  Q.  What services were you supposed to provide pursuant to that

23  agreement?

24  A.  The agreement had two aspects to it.  One part of that was

25  to get their money that they had in Turkey and pay it to them

1    in tumens.

2              The second part of this was to fulfill the

3    international money transfer orders for Mellat Exchange.

4    Q.  And could you explain a little bit about what you mean by

5    international money transfer orders?

6    A.  Of course.  It entails being able to fulfill any need for

7    money payments that need to be made worldwide.

8    Q.  And what is your understanding of why Mellat Exchange

9    needed you to conduct those payments for it?

10   A.  Since they did not have direct access to the funds to be

11   able to fulfill these, they needed me.

12   Q.  Okay.  Now, to your knowledge, could Bank Mellat conduct

13   financial transactions through U.S. banks, at that time?

14   A.  No, sir.

15   Q.  And what's your understanding of why that was?

16   A.  That was due to the existing embargo, sir.

17   Q.  When you are referring to the embargo, is there any

18   specific countries that you're referring to imposing that

19   embargo?

20   A.  It was the embargo by the United States of America and also

21   the embargoes by the United Nations.

22   Q.  What would happen if a U.S. bank knew that a transaction

23   that it was presented with was on behalf of Bank Mellat?

24              MS. FLEMING:  Objection.

25              THE COURT:  Sustained.  Could you rephrase that.

1    Q.  What's your understanding of what a U.S. bank would do if

2    it knew that Bank Mellat was involved in the transaction?

3    A.  They would not have intermediated that.

4    Q.  And what's your understanding of why they wouldn't have

5    done that?

6    A.  Due to the embargo sanctions and the regulations that were

7    put in place by the United States of America.

8    Q.  Did you, in fact, conduct financial transfers for Bank

9    Mellat that were processed by U.S. banks?

10   A.  Yes, sir.

11   Q.  And in order to do that, did you have to conceal any

12   information?

13   A.  Yes, sir.

14   Q.  What type of information would you need to conceal?

15   A.  I needed to conceal that this was a payment related to

16   Iran.

17   Q.  And were any of your transactions ever rejected by a U.S.

18   bank?

19   A.  Yes, there were times where that happened.

20          MR. KAMARAJU:  Your Honor, just as a matter of

21   scheduling, I don't know if you intended to take a morning

22   break.

23          THE COURT:  I was just going to turn to the jury.  Do

24   you want to take five minutes at this time, or do you want to

25   keep going until lunch?  Go ahead.

1            MR. KAMARAJU:  Okay.  Sounds good to me.

2            THE COURT:  Counsel, maybe I should ask, do you want

3   to take five minutes?

4            MR. KAMARAJU:  I'm fine to proceed, your Honor.

5            THE COURT:  Go ahead.

6            MR. ROCCO:  Your Honor, my advanced age, can I step

7   out or be excused?

8            THE COURT:  Sure, sure.

9            MR. KAMARAJU:  May I proceed then, your Honor?

10           THE COURT:  Yes.

11   BY MR. KAMARAJU:

12   Q.  Now, Mr. Zarrab, you testified that Hossein Najafzadeh,

13   that he worked for Mellat Exchange; is that right?

14   A.  Yes, sir.

15   Q.  And I believe you testified that Mellat Exchange was Bank

16   Mellat's exchange house; is that right?

17   A.  Yes, sir.

18   Q.  And could you tell us, what is an exchange house?

19   A.  It's an institution that changes or exchanges several

20   different currencies and makes currency transfers.

21   Q.  Do Iranian exchange houses deal in Iranian currency?

22   A.  Iranian exchange offices work in a different way in

23   comparison to the other exchange offices in other parts of the

24   world.  Yes, they can also do transactions using Iranian money,

25   but the main objective is to broker the international money

 1    transfers that their banks cannot do.

 2    Q.  Did there come a time when you were approached by a

 3    representative of another Iranian exchange house?

 4    A.  Yes, sir.

 5    Q.  Which exchange house was that?

 6    A.  Sarmayeh Exchange.

 7    Q.  And what is Sarmayeh Exchange?

 8    A.  It's the exchange office owned by the Sarmayeh Bank.

 9    Q.  And what is Sarmayeh Bank?

10    A.  It's an Iranian bank.

11    Q.  Who was the Sarmayeh Exchange representative that

12    approached you?

13    A.  Mr. Rajaeieh.

14    Q.  Okay.  And what is Mr. Rajaeieh's first name, if you know?

15    A.  Mohammad Reza Rajaeieh.

16            MR. KAMARAJU:  Your Honor, with the Court's

17    permission, I'd like to show the witness Government Exhibit 8

18    for purposes of identification.

19            THE COURT:  I'll allow it.

20            MR. KAMARAJU:  May I approach, your Honor?

21            THE COURT:  Sure.

22            MR. KAMARAJU:  Thank you.

23    BY MR. KAMARAJU:

24    Q.  I'm putting in front of you what's also been marked as

25    Government Exhibit 8.  Do you recognize that?

1   A.  Yes, sir.

2   Q.  What is it?

3   A.  It's a picture of Mr. Rajaeieh.

4           MR. KAMARAJU:  Your Honor, the government offers

5   Government Exhibit 8.

6           THE COURT:  I'll allow it.

7           MS. FLEMING:  Objection, relevance.

8           (Government's Exhibit 8 received in evidence)

9           MR. KAMARAJU:  And permission to publish, your Honor?

10          THE COURT:  Yes.

11          MR. KAMARAJU:  Thank you.

12  BY MR. KAMARAJU:

13  Q.  Now, when did you first meet Rajaeieh?

14  A.  I first met him in Azerbaijan.

15  Q.  Approximately when was that meeting?

16  A.  I think it was by the end of 2010 or maybe within 2011.

17  Q.  What was the purpose of that meeting?

18  A.  He told me that there's a meeting by a businessman, whom I

19  met before, in Azerbaijan and this was between this businessman

20  and Iranian officials, and he wanted me to participate in that

21  meeting.

22  Q.  And did you end up agreeing to do any business as a result

23  of that meeting with Rajaeieh?

24  A.  No, sir.

25  Q.  Now, after that meeting in Azerbaijan, did you meet with

1    Rajaeieh again?

2    A.  Yes, I have, sir.

3    Q.  Approximately when was the next meeting that you had with

4    Rajaeieh?

5    A.  After returning from Azerbaijan and Turkey, in a short

6    while, we had a meeting.

7    Q.  And what was the purpose of that meeting?

8    A.  Rajaeieh wanted to work with me at Sarmayeh Exchange.

9    Q.  What did he want you to do for Sarmayeh Exchange?

10   A.  Just as I am making for Mellat Exchange, he wanted me to

11   broker the international payments of Sarmayeh Exchange.  In

12   short, to take the money which was lying in Halkbank and make

13   international payments using that money.

14   Q.  We'll come back to Halkbank in a second, but at that

15   meeting, did you agree to work with Rajaeieh?

16   A.  No, sir.

17   Q.  Why not?

18   A.  I was already working with Mellat Exchange with my full

19   capacity, and I didn't need another customer.

20   Q.  Did there come a time when that changed?

21   A.  Yes, it did, sir.

22   Q.  Why did it change?

23   A.  There was some cold wind blowing in my relationship with

24   Mellat Exchange; so I accepted to work with Sarmayeh Exchange.

25   Q.  And I'm going to have to ask you, what do you mean by "a

1   cold wind" in your relationship?

2   A.  Mr. Najafzadeh did try to circumvent me and try to work

3   with his own children.  Because they violated the principle of

4   working only with me, so I needed the urge to reinforce my

5   customer base.

6   Q.  Did that cause you to have another discussion with

7   Rajaeieh?

8   A.  Yes, we made a meeting -- we had a meeting.

9   Q.  At that time, did you agree to do transactions on behalf of

10  Sarmayeh Exchange?

11  A.  He told me that they have a very high volume of funds; so I

12  accepted.

13  Q.  Now, at the time you agreed to work with Sarmayeh Exchange,

14  were you still processing transactions through Aktif Bank in

15  Turkey?

16  A.  Aktif Bank, at that period of time, had stopped my

17  transactions.

18  Q.  Do you have an understanding of why they stopped your

19  transactions?

20  A.  They received a warning from the United States, and they

21  stopped brokering those transactions, and they were partly

22  working directly by themselves.

23  Q.  When you say they were working directly, what do you mean?

24  A.  Aktif Bank was working directly with the Iranians, and I

25  was eliminated.

1   Q.  Now, was the Aktif Bank business a significant source of
2   your income?
3   A.  Absolutely, yes.
4   Q.  And what happened to your income when that business
5   stopped?
6   A.  It was diminished.
7   Q.  At that point, did you seek out other sources of income?
8   A.  I tried to work with Halkbank to go on doing.
9   Q.  Why did you want to work with Halkbank at that time?
10  A.  Because the entire amount of money that is owned by the
11  Iranians was already deposited in Halkbank.
12  Q.  How did you learn that there was Iranian money held at
13  Halkbank at that time?
14  A.  Many times when payments were sent to me in Aktif Bank,
15  when there was a delay in the payments, either the Aktif Bank
16  representatives or the Iranian bank representatives were
17  telling me that the money transfer was held in Halkbank.  In
18  addition, it was evident that the Iranian oil money was
19  accumulated in Halkbank.
20          THE COURT:  Counsel, could you give us a time frame?
21          MR. KAMARAJU:  Absolutely.
22  Q.  Approximately when did you decide to first approach
23  Halkbank?
24  A.  Beginning of 2012, sir.
25          THE COURT:  2012, did you say?

1            THE INTERPRETER:  Yes, sir.

2   A.  I want to reiterate something.  I had an account and I had

3   relations and transactions with Halkbank before 2012.  I had

4   received the money that was for the machinery export to the

5   factory that was established by my father to Halkbank.

6   Q.  So let me ask a clearer question then, for the record.

7   Approximately when did you decide to approach Halkbank about

8   the Iranian oil proceeds that were held there?

9   A.  In 2012.

10  Q.  Now, Mr. Zarrab, who is Ahmet Alacaci?

11  A.  He's a jeweler established in Istanbul, Turkey.

12  Q.  Okay.  And does he trade in any precious metals?

13  A.  Yes, sir.

14  Q.  What kinds of precious metals does he trade-in?

15  A.  Ingot gold.

16  Q.  How did you first meet Alacaci?

17  A.  Through the introduction of Turker Sargin, who was a person

18  who was working for me in my establishment at that time.

19  Q.  Now, did you ever discuss the Iranian oil proceeds held at

20  Halkbank with Alacaci?

21  A.  Ahmet Alacaci told me but through the gold trade he will be

22  able to extract money from Halkbank.

23  Q.  And did you test out his idea?

24  A.  Yes, of course.

25  Q.  Why did you test it out?

HBTPATI3                     Zarrab - Direct

1    A.  Because had the system worked, we would have devised a way

2    to get the Iranian money out of Halkbank.

3    Q.  And did it work?

4    A.  Yes, it did.

5    Q.  Okay.  Now, at a high level, what was the system that

6    Alacaci had proposed?

7                THE COURT:  You mean summary?

8    Q.  Yes, just summarizing it.

9    A.  Payments would come to Halkbank in exchange for gold

10   purchases from Iran and Alacaci would take that money, buy gold

11   and export the gold and would pay the money to us, and then we

12   could realize the international money transfers on behalf of

13   the Iranians using that money.

14   Q.  Did you work with Alacaci to do that?

15   A.  Yes, we did, sir.

16   Q.  Did there come a time when you approached Halkbank about

17   working with them directly and not through Alacaci?

18   A.  I wanted to work with Halkbank directly without eliminating

19   Alacaci, and I made an application for that.

20   Q.  What caused you to want to work with Halkbank directly?

21   A.  Their transaction volume was very high, and as a person

22   who's already doing this, I wanted to be the first source in

23   this business.

24   Q.  Now, did you approach someone at Halkbank about doing that?

25   A.  Yes.

HBTPATI3                     Zarrab - Direct

1   Q.  Who did you approach at Halkbank?

2   A.  I spoke with the general manager of Halkbank.

3   Q.  And at that time, who was the general manager of Halkbank?

4   A.  Mr. Suleyman Aslan.

5           MR. KAMARAJU:  Your Honor, may I approach?

6           THE COURT:  Yes.

7   Q.  I'm showing you what's been marked for identification as

8   Government Exhibit 17.  Do you recognize that?

9   A.  Yes, sir.

10  Q.  What is it?

11  A.  It's a photograph of Mr. Suleyman Aslan.

12          MR. KAMARAJU:  Your Honor, the government would offer

13  Government Exhibit 17.

14          THE COURT:  I'll allow it.

15          (Government's Exhibit 17 received in evidence)

16          MR. KAMARAJU:  And permission to publish, your Honor?

17          THE COURT:  Sure.

18          MS. FLEMING:  Again, can we just get a time?

19          THE COURT:  Okay.

20          MS. FLEMING:  Judge, I have not objected to leading.

21          THE COURT:  We'll --

22          MS. FLEMING:  -- but now I'd like --

23          THE COURT:  One thing at a time.  So we're going to

24  get a time frame, counsel.

25          MR. KAMARAJU:  My next question, your Honor.

1   BY MR. KAMARAJU:

2   Q.  Approximately when did you approach Suleyman Aslan?

3   A.  Beginning of 2012.

4   Q.  Did you end up meeting with Aslan?

5   A.  Yes, I did, sir.

6   Q.  What did you discuss with him during that first meeting?

7   A.  I wanted to broker a gold trade.

8   Q.  Did Aslan agree to let you do that?

9           MS. FLEMING:  Objection to leading, Judge.

10          THE COURT:  Overruled.

11  A.  He did not, sir.

12  Q.  Did he tell you why not?

13  A.  He said I am too popular to do the gold trade, and I'm a

14  person who's very transparent, everybody can see.

15  Q.  What did you understand him to mean that you were popular?

16  A.  Because my wife was a famous artist in Turkey, I was a

17  person who was within the public eye all the time.

18  Q.  What did you do after Suleyman Aslan turned you down?

19  A.  I went on trying to convince the bank to let me do the gold

20  trade again.

21  Q.  And did you speak with anybody outside of the bank about

22  trying to do the gold trade at that time?

23  A.  Yes, I did.

24  Q.  Who was that?

25  A.  Mr. Zafer Caglayan.

1   Q.   At that time, who was Zafer Caglayan?

2   A.   Mr. Zafer Caglayan was the economy minister at that period

3   of time.

4   Q.   The economy minister of which country?

5           THE COURT:  At which time?

6           THE INTERPRETER:  I'm sorry?

7   Q.   Which country?

8   A.   Republic of Turkey.

9           THE COURT:  And when was this?

10          THE WITNESS:  End of 2011, beginning of 2012.

11          MR. KAMARAJU:  Your Honor, may I approach?

12          THE COURT:  Sure.

13  Q.   I'm showing you what's been marked for identification as

14  Government Exhibit 12.  Do you recognize that document?

15  A.   Yes, sir.

16  Q.   What is it?

17  A.   It's a photograph of Mr. Zafer Caglayan.

18          MR. KAMARAJU:  Your Honor, the government would offer

19  Government Exhibit 12.

20          MS. FLEMING:  Objection, relevance.

21          THE COURT:  I'll allow it.

22          (Government's Exhibit 12 received in evidence)

23          MR. KAMARAJU:  Permission to publish, your Honor?

24          THE COURT:  Yes.

25  BY MR. KAMARAJU:

1   Q.  Now, when you contacted Zafer Caglayan, did you know him?

2   A.  May I take the question once more, please.

3   Q.  Sure.  At the time you contacted him about the Halkbank

4   business, did you know Zafer Caglayan?

5   A.  Yes, sir.

6   Q.  How did you know him?

7   A.  I had previously met him.

8   Q.  Where had you met him?

9   A.  As acquaintance.  He eats in the same fish restaurant that

10  we went as a family.  We saw each other and we met there.

11  Q.  Why did you contact him after Aslan turned you down?

12  A.  Because he was the economy minister of the Republic of

13  Turkey, and I was thinking that the bank -- bank's rejection of

14  my proposal was baseless because in the same period of time

15  they let somebody else do it.  They had already made a trial

16  using Ahmet Alacaci; so I asked him why the bank is rejecting

17  me just because I was a person in the public eye, and if he can

18  help me with this matter or not.

19  Q.  What did Caglayan say?

20  A.  He said he would look at it and get back to me.

21  Q.  Now, during that conversation, did you tell Caglayan what

22  it is you were trying to do at Halkbank?

23  A.  Yes, sir.

24  Q.  Did that include the connection to Iran?

25  A.  Yes, of course.

1  Q.  Now, after you had that discussion with Caglayan, did you

2  hear from him again?

3  A.  Yes, sir.

4  Q.  Approximately when did you hear from him again?

5  A.  In a very short while he called me.

6  Q.  And what did you discuss during that conversation?

7  A.  We had a face-to-face meeting.

8  Q.  And what did you discuss during that meeting?

9  A.  He got some more information about the details of the

10  trade.  He asked about the profit margins, and he said I can

11  broker this, providing there's a profit share 50/50.

12  Q.  Did you agree to pay Zafer Caglayan 50 percent of your

13  profits?

14  A.  Yes.

15  Q.  Now --

16          MS. FLEMING:  Can we get a time, Judge, please?

17          THE COURT:  Okay.  If you remember the time you had

18  this agreement?

19          THE WITNESS:  2012.

20          THE COURT:  Any month, can you remember?

21          THE WITNESS:  Beginning of 2012.

22          MR. KAMARAJU:  Your Honor, also, I think we're about

23  to come to a document.

24          THE COURT:  Okay.

25          MR. KAMARAJU:  Actually, let's do that.

1          Mr. Chang-Frieden, could you please.  I'd like to show

2     the witness Government Exhibit 3730 marked for identification.

3     BY MR. KAMARAJU:

4     Q.   Now, Mr. Zarrab, do you recognize this exhibit?

5     A.   Yes, sir.

6     Q.   Okay.  What is it?

7     A.   That's an e-mail.

8     Q.   Who is sending this e-mail?

9     A.   Abdullah Happani.

10    Q.   Who is Abdullah Happani?

11    A.   He is the second authorized person after me in the company

12    that I own.

13    Q.   And who is receiving this e-mail?

14    A.   It's me, sir.  Myself.

15         MR. KAMARAJU:  And can we turn to the next page,

16    please, Mr. Chang-Frieden.

17    Q.   Generally speaking, what are we looking at here,

18    Mr. Zarrab?

19    A.   We're talking about in this exhibit the amount of bribe

20    paid to Mr. Zafer Caglayan as a result of the trade that was

21    made.

22         MR. KAMARAJU:  Your Honor, the government would offer

23    Government Exhibit 3730.

24         MS. FLEMING:  Objection, relevance.

25         THE COURT:  I'll allow it.

1          MS. FLEMING:  Objection to the foundation.

2          THE COURT:  I'll allow it.

3          (Government's Exhibit 3730 received in evidence)

4          MR. KAMARAJU:  And could we please publish that

5    exhibit to the jury?  If you can turn back the page, please.

6          THE COURT:  It would be helpful to know about its

7    preparation.

8          MR. KAMARAJU:  Could we turn to Page 2 of the exhibit.

9    BY MR. KAMARAJU:

10   Q.  Now, you testified that this document relates to bribe

11   payments made to Caglayan; is that right?

12   A.  Yes, sir.

13   Q.  Who prepared this document?

14   A.  That's an internal accounting record of ours.

15   Q.  And internal to one of your companies?

16   A.  Yes, sir.

17   Q.  And what was the purpose of preparing this document?

18   A.  It was the accounting of 50 percent of the trade that was

19   made, that the payments that came, and the record of the money

20   that was paid out.

21   Q.  Okay.  Let's look at the first column, the one marked --

22   what is that labeled?

23   A.  Transaction date.

24   Q.  And it says "tran date" there; is that right?

25   A.  Yes, sir.  It's an abbreviation.

1    Q.  What is that called for --

2            THE COURT:  I'm sorry.  For the record, you said it's

3    an abbreviation?

4            THE INTERPRETER:  Yes, "it's an abbreviation."

5    Q.  What does that column represent?

6    A.  The date of the payment of the money.

7    Q.  And what's the date of the first payment reflected here?

8    A.  March 19, 2012.

9    Q.  Do you see the column labeled "narration"?

10   A.  Yes, sir.

11   Q.  And what's that column intended to represent?

12   A.  It's the explanation column.

13   Q.  Okay.  So let's look at the entry in this column for the

14   first payment.  What does it say there?

15   A.  "Cash to Cha."

16   Q.  And what does that mean?

17   A.  The cash that was sent to Caglayan.

18   Q.  Now, let's go to the next column.  What's that mean?

19   A.  FCy.

20   Q.  And what does that column represent?

21   A.  The currency of the money that was paid.

22   Q.  And what currency is listed here for the first payment?

23   A.  Euro.

24   Q.  And let's go over to the next column.  What does that

25   column represent?

1    A.  Debit.

2    Q.  And what does that column mean?

3    A.  The amount of money paid.

4    Q.  And what is the amount reflected in the debit column of the

5    first payment?

6    A.  1,750,000 Euros.

7    Q.  We can take that exhibit down for a moment.  I'd like to

8    show you what's been marked as Government Exhibit 3733.  Do you

9    recognize that exhibit?

10   A.  Yes, sir.

11   Q.  What is it?

12   A.  That's an e-mail.

13   Q.  Who sends this e-mail?

14   A.  Myself.

15   Q.  And who receives the e-mail?

16   A.  Again, myself.

17   Q.  Could we turn to the second page of the exhibit.

18   Mr. Zarrab, what are we looking at here?

19   A.  That's the statement of account for Mr. Zafer Caglayan.

20   This is the internal accounting of our company.

21   Q.  So is it like the prior exhibit we looked at?

22   A.  Yes, sir, but this also includes different money,

23   currencies.

24          MR. KAMARAJU:  Your Honor, the government would offer

25   Government Exhibit 3733.

1          MS. FLEMING:  Your Honor, objection, foundation,

2     hearsay and relevance.

3          THE COURT:  Okay.  So let's hear a little bit about

4     the document.

5          MR. KAMARAJU:  Sure.

6     BY MR. KAMARAJU:

7     Q.  Could you explain what this document is?

8     A.  This is the record for the monies that were paid to

9     Mr. Zafer Caglayan.

10    Q.  And who prepared this record?

11    A.  My accounting.

12    Q.  And what was the purpose of this document being prepared?

13    A.  To give it to Mr. Zafer Caglayan.

14    Q.  And why did you need to give it to Mr. Zafer Caglayan?

15    A.  There was some kind of a discrepancy between the monies

16    that he received and the monies that he paid.

17         MR. KAMARAJU:  Your Honor, the government would offer

18    Government Exhibit 3733.

19         MS. FLEMING:  Same.

20         THE COURT:  We'll allow it.

21         (Government's Exhibit 3733 received in evidence)

22         MR. KAMARAJU:  Could we publish that for the jury,

23    please.

24         (Continued on next page)

25

1   Q.  I'm not going to walk through the document.  Turn to page

2   two, please.

3          Could you explain for the jury generally what this

4   document is.

5   A.  This is the list of moneys that were paid to Mr. Zafer

6   Caglayan from the income that was -- from the -- the profit

7   that was generated through the Iranian trade.

8          MR. KAMARAJU:  You can take that exhibit down.

9          THE COURT:  Just a second.  This is from what period?

10  Beginning when and ending when?

11         THE WITNESS:  March 19, 2012 is beginning, it goes

12  until 27th of March 2013.

13         THE COURT:  It is an itemization of all the payments

14  made to that individual?

15         THE WITNESS:  No.  There are more payments that were

16  not included in this list.

17         THE COURT:  So, just staying with this list for a

18  moment, is there a total of the number of payments made between

19  March 12 and March 19?

20         THE WITNESS:  Yes, as a euro there is.

21         THE COURT:  Where is that total?

22         THE WITNESS:  Total is 31,589,500 euros.  That's the

23  part that's only euros.

24         THE COURT:  I see.

25         THE WITNESS:  There are different currencies here.

1   $4,696,911, 2,465,000 Turkish liras, also there are other

2   payments which was not reflected in this statement of account.

3          THE COURT:   Thank you.

4   Q.  So Mr. Zarrab, I'll ask you.  How much in euros in total

5   did you pay Zafer Caglayan in connection with the business at

6   Halkbank?

7   A.  I'm thinking that I paid bribe in the amount of 45 to 50

8   million euros.

9   Q.  I believe you testified that you paid him in other

10  currencies as well?

11  A.  Yes, sir.

12  Q.  What other currencies were those?

13  A.  Turkish lira and United States dollars.

14  Q.  Approximately how much in U.S. dollars did you pay Zafer

15  Caglayan in connection with the Halkbank?

16  A.  I think approximately $7 million or so I have paid.

17  Q.  How about Turkish lira, approximately how much did you pay

18  in Turkish lira to Zafer Caglayan in connection with the

19  Halkbank scheme?

20  A.  2,465,000 Turkish liras.

21  Q.  Let's turn back to that meeting that you had with Zafer

22  Caglayan when you agreed to make these payments, okay?

23  A.  Yes, sir.

24  Q.  After that meeting with Zafer Caglayan, did you meet with

25  Suleyman Aslan again?

1   A.  Yes, I did.

2            MS. FLEMING:  I have to object to the leading.  This

3   is too important an area to have the leading.

4            THE COURT:  Go ahead.

5            MS. FLEMING:  We really need to get dates too.

6            THE COURT:  Yes.  Go ahead.

7   Q.  What did you discuss with Aslan?

8   A.  I explained to Mr. Suleyman Aslan the summary of my meeting

9   with Zafer Caglayan, that the account will be opened and I

10  could broker the gold trade.

11  Q.  Approximately when did this meeting with Aslan occur?

12  A.  Beginning of 2012.

13  Q.  Did Aslan agree that you could broker those transactions at

14  Halkbank?

15  A.  Yes, he did.

16  Q.  I believe you testified earlier that you had agreed to work

17  with Rajaeieh at Sarmayeh Exchange?

18            THE COURT:  Are you moving to another topic?

19            MR. KAMARAJU:  I am.

20            THE COURT:  This might be a good time for us to take

21  our lunch break.  It's 12:25.  So if the jury could be back

22  here at quarter to 2, we'll pick up with additional testimony

23  at that time.

24            (Recess)

25            (Continued on next page)

                          AFTERNOON SESSION

                              1:40 p.m.

           (At the sidebar)

           THE COURT:  A technical problem has surfaced with

respect to the overflow courtroom.  In short, it is that the

exhibits are displayed in the overflow courtroom before they

have been admitted as exhibits in the main courtroom.  It is a

technical problem that I'm told can't be fixed, at least until

the end of the week or when we're not in the courtroom.

           So, counsel and I have discussed the issue, and one of

the ways to solve the problem, so to speak, is just to cut off

the exhibit feed to the overflow courtroom, and I think that

both sides seem to be agreeable to that.

           MR. KAMARAJU:  We're fine with that, your Honor.

           MR. ROCCO:  We're fine.

           THE COURT:  Let's see if they can do it.

           (In open court; jury present)

           THE COURT:  Two things.  One is for the jury, that

we've asked that they warm up the room a little bit.  I didn't

think it was a problem but I saw one juror wearing gloves and a

scarf and a hat.

           And the other is for the people in the overflow

courtroom, which I think is on the 14th floor, there is some

technical problem which has not been experienced in the main

courtroom where we are.  Down there is that there is difficulty

1   with displaying exhibits on a separate screen.  So, the

2   solution, it is not a great one, but they won't, in the

3   overflow courtroom, to be able to see the exhibits.  They'll be

4   able to hear and see the proceeding, but not the exhibits.

5          With that, we'll turn to the direct examination of

6   Mr. Zarrab.

7          THE DEPUTY CLERK:  Sir, before we begin I'd like to

8   remind you that you are still under oath.

9          THE WITNESS:  Yes.

10          MR. KAMARAJU:  May I proceed, your Honor?

11          THE COURT:  Sure.

12   BY MR. KAMARAJU:

13   Q.  Before the break, Mr. Zarrab, do you remember testifying

14   about payments you made to Zafer Caglayan?

15   A.  Yes, sir.

16   Q.  What form did those payments take?

17   A.  In cash, as valuable items, and also bank wire transfers.

18   Q.  Were there any transfers to members of Caglayan's family?

19   A.  There were, sir.

20   Q.  Sir, I am showing you what's been marked as government

21   exhibit 3660.  Sir, do you recognize this document?

22   A.  Yes, sir.

23   Q.  What is it?

24   A.  It is an electronic mail.

25   Q.  Who sent this e-mail?

 1   A.   Umut Bayraktar.

 2   Q.   Who is that?

 3   A.   Umut Bayraktar is one of the staff members I had working

 4   for me at that time in my company.

 5   Q.   Was he involved in your businesses with Halkbank?

 6   A.   For a while.

 7   Q.   What is the date of this e-mail?

 8   A.   November 1st, 2012.

 9   Q.   Could we turn to the second page, please.  I don't want you

10   to read from the document.  Could you just generally describe

11   what this is.

12   A.   It is a bank receipt.

13             MR. KAMARAJU:  Your Honor, the government would offer

14   Exhibit 3660.

15             MS. FLEMING:  Objection.  Foundation, hearsay.

16             THE COURT:  Let's hear a little more about it.

17   Q.   I'm sorry.  Could you repeat what this document was?

18   A.   It is a bank receipt showing the payment that was made to

19   Zafer Caglayan's sibling.

20   Q.   Was there a payment made to Zafer Caglayan's sibling?

21   A.   Yes, sir.

22             THE COURT:  Could you tell us when and how much, etc.,

23   etc.

24   Q.   Approximately when was that payment made?

25   A.   It was October 31, 2012, sir.

1    Q.  Approximately how much was that payment for?

2    A.  It was 2,465,250 Turkish liras.

3    Q.  Do you know why that payment was made?

4    A.  Yes.

5    Q.  Why was it made?

6    A.  It was a payment that was made to look as if it was made in

7    exchange for gold trade, but it was, in reality, a payment that

8    was made through the Iranian trade.

9             THE COURT:  Through what?

10            THE WITNESS:  Through the profit that was obtained

11   from Iranian trade.

12            MR. KAMARAJU:  Your Honor, the government would offer

13   Government Exhibit 3660.

14            MS. FLEMING:  Same objection.

15            THE COURT:  I'll allow it.

16            MR. KAMARAJU:  And also 3360-T, which was previously

17   admitted subject to connection.

18            THE COURT:  I'll allow that too.

19            (Government's Exhibit 3660, 3660-T received in

20   evidence)

21            MR. KAMARAJU:  Can we please publish that to the jury.

22   Can we pull up 3660-T, the translation.  On 3660 can we also go

23   to the second page of that.

24   Q.  On 3660, the second page, does that document list a

25   receiver of funds?

1    A.  Yes, it is shown.

2    Q.  I'm sorry who is listed as the receiver?

3    A.  Mehmet Senol Caglayan.

4    Q.  Do you know who that is?

5    A.  Yes.

6    Q.  Who is that?

7    A.  Zafer Caglayan's sibling.

8    Q.  Does the document show who sent those funds?

9    A.  Yes.

10   Q.  What is listed on the document as who sent those funds?

11   A.  Cihan Kiymetli Madenler LTD.

12   Q.  Do you know what that is?

13   A.  Yes.

14   Q.  What is it?

15   A.  It's one of the gold companies that was working under the

16   umbrella of Royal Group and in our control.

17   Q.  Could you explain what you meant when you said this related

18   to the profits from the Iranian business.

19   A.  Of course.  I'll summarize it shortly.

20          The proceeds that were obtained from the oil and gas

21   sales of Iran, which had been accumulating at Halkbank, and

22   there are financial transactions that the Iranians have in

23   exchange for these.  And removing the funds from Halkbank, in

24   order to remove the money from Halkbank and to execute these

25   international money transfers for the Iranians, so this is the

1    profit that is received from this entire system.  So this is a

2    part of it.

3    Q.  Why was it being paid to Mehmet Senol Caglayan?

4    A.  At the request of Mr. Zafer Caglayan.

5    Q.  I believe you testified earlier about conversations you had

6    with Rajaeieh; is that right?

7    A.  That is correct.

8    Q.  I'd like to direct your attention to early 2012.  Do you

9    recall having any conversations with Rajaeieh during that time

10   period about Halkbank?

11   A.  I recall, sir.

12   Q.  What did you discuss?

13   A.  Mr. Rajaeieh said that there were 2 billion euros that were

14   at Halkbank for Sarmayeh Bank or for Sarmayeh Exchange.

15   Q.  Do you know what the source of those euros were?

16   A.  This is the proceeds that Iran was receiving for oil and

17   gas sales that it was making to Turkey.

18   Q.  How do you know that?

19   A.  Based on what Mr. Rajaeieh told me during that meeting, in

20   our conversations during that meeting, and I also knew that

21   Turkey was buying oil and gas from Iran.  And also, the

22   purchasers of this foreign countries who were purchasing same,

23   the moneys paid for those purchases were also coming to

24   Halkbank, some part of that was coming.

25           So, in the end, as a summary of our meeting with

 1    Mr. Rajaeieh, he said that there was international transaction

 2    for 2 billion euros or equivalent that was in different

 3    currencies, so that is what our meeting consisted of.

 4    Q.   Do you know who Sarmayeh's customers were at that time?

 5    A.   Companies that belonged to the Iranian oil ministry, the

 6    oil ministry and other companies.

 7    Q.   Have you ever heard of something called NIOC?

 8    A.   Yes, I heard, sir.

 9    Q.   What is NIOC?

10    A.   National Iran Oil Company.  It is a petroleum company that

11    is affiliated with the Iranian oil industry.

12    Q.   What does NIOC do?

13    A.   NIOC sells the crude oil of Iran.

14    Q.   I'm showing you what's been marked for identification as

15    Government Exhibit 3727.  If we can start at the top e-mail.

16    A.   Yes, sir.

17    Q.   Do you recognize this document?

18    A.   Yes, I recognize this.

19    Q.   What is it?

20    A.   It is an electronic mail.

21    Q.   Who is it from?

22    A.   Mohammed Alipoor.

23    Q.   Who is that?

24    A.   Mohammed Alipoor is the second person in charge of a

25    company called NICO who operates under the NIOC under Iranian

1    oil ministry.

2    Q.  What is NICO?

3    A.  NICO is a government company who also sells petroleum

4    products of Iran, just like NIOC does, but does so in a more

5    flexible way.

6    Q.  What do you mean by more flexible?

7    A.  This is like a front company, since there was more

8    bureaucracy involved with NIOC, NICO had more range of

9    movement, in terms of its authority to make decisions.  It is a

10   form of the branch of NIOC, it is a bureaucratic system of NIOC

11   made simple in a company.

12   Q.  What is the date at the top e-mail?

13   A.  March 18, 2013.

14   Q.  Can we scroll down on the e-mail.  What do you see there?

15   A.  It is an electronic mail.

16   Q.  What is the date of that e-mail?

17   A.  3/15/2013.

18   Q.  Could you summarize what the e-mail is about.

19   A.  The summary of the e-mail is this.  This was the minutes

20   from the meeting that Sarmayeh Exchange had with NIOC.  Because

21   the largest customer that NIOC had was Sarmayeh Exchange.  As

22   NICO and NIOC are one and the same anyway.

23           MR. KAMARAJU:  The government would offer Government

24   Exhibit 3727.

25           MS. FLEMING:  Objection.  Foundation, hearsay and

1    relevance.

2              THE COURT:  I'm going to allow it.

3              (Government's Exhibit 3727 received in evidence)

4              MR. KAMARAJU:  Can we publish that.  Can we blow up

5    the bottom e-mail, please, Mr. Chang-Frieden.

6    Q.  Mr. Zarrab, do you recognize any of the e-mail addresses

7    that are on this document?

8    A.  There are some that I recognize among them.

9    Q.  Which ones do you recognize?

10   A.  I recognize the e-mail address for Mohammed Alipoor,

11   Jashnsaz Seifollah, Rajaeieh, and Imam Mehdizadeh.

12   Q.  Which e-mail do you recognize as Rajaeieh's e-mail?

13   A.  M_Rajaeieh@Yahoo.com.

14   Q.  Which e-mail do you recognize as Imam Mehdizadeh?

15   A.  ImamMehdizadeh@Yahoo.com.

16   Q.  Do you see the name there -- I'm going to butcher it I'm

17   sure.  But Seifollah Jashnsaz?

18   A.  Yes, sir.

19   Q.  Do you know who that is?

20   A.  I know, sir.

21   Q.  Who is that?

22   A.  He is the authority at the head of NICO.

23   Q.  Sir, were you a gold trader?

24   A.  Money transfers and gold trade done together.

25   Q.  Were you ever involved in a gold transaction that didn't

1  involve an Iranian client?

2  A.  I did, sir.

3  Q.  Do you think you would be able to diagram for the jury what

4  that kind of transaction would look like?

5  A.  Of course.

6          MR. KAMARAJU:  Your Honor, with the Court's

7  permission, I would like to ask for Mr. Zarrab to be allowed to

8  diagram on the poster board over there.

9          THE COURT:  Behind the interpreter?

10         MR. KAMARAJU:  Yes, behind the interpreter.

11         THE COURT:  And this would be for what purpose?

12         MR. KAMARAJU:  We'll use it as a demonstrative, your

13  Honor.

14         THE COURT:  Okay.  I'll allow it.

15  Q.  Mr. Zarrab, could you please step off the witness stand.

16         MR. KAMARAJU:  Your Honor, may I approach to hand him

17  some pens?

18         THE COURT:  Sure.

19         MR. KAMARAJU:  Can everybody see if it's right there?

20         A JUROR:  No.

21         MR. KAMARAJU:  Mr. Zarrab, if you can move it just a

22  little bit.

23         THE COURT:  Can you all see, or no?  I see one hand.

24         MR. KAMARAJU:  Maybe if we can have the interpreter

25  move to the other side.

```
 1              THE COURT:  Bring it right out there where the
 2    interpreter is standing.
 3              MR. KAMARAJU:  Can everybody see?  Thank you, your
 4    Honor.
 5    A.  So the diagram that I've been asked to draw is one that
 6    gold trade transaction that does not involve Iran; is that
 7    correct?
 8    Q.  Yes, that's right.
 9              Mr. Zarrab, what is the first step in one of those
10    transactions?
11    A.  The first step is one -- I'll give an example from Dubai
12    that would be the company or the person that we would sell the
13    gold to in Dubai.
14              This is our company that I will place here as the
15    seller.  Royal Group is my company, we'll sell the gold.  And
16    the buyer company in Dubai, as an example, is the Bin Sabt
17    Company in Dubai.
18    Q.  What is that company?
19    A.  The largest gold bullion buyer and seller in Dubai.
20    Q.  What happens next?
21    A.  For the gold that we're going to sell, the price and
22    fineness of that gold that we would sell would be established
23    first.  The amount is then determined.  So I will give an
24    example for a 100-kilogram transaction.  Gold transaction.
25              In this case, Royal would sell 100 kilograms of gold
```

1    bars to Bin Sabt into the account of a company that's

2    affiliated with Royal Group in Turkey.  I will give an example

3    of Finansbank here.

4    Q.  What is Finansbank?

5    A.  Finansbank is a Turkish bank located in Turkey.  In there,

6    there is an account for Royal Group.

7    Q.  What happens next?

8    A.  The information between Royal Group and Bin Sabt as to this

9    sale that was agreed upon, including who would be the receiver,

10   the amount and the unit price would be put in writing as a pro

11   forma.

12   Q.  Then what?

13   A.  There is a Bank of Baroda in Dubai.  And the Bank of Baroda

14   would have an account for Bin Sabt.  I will draw the money

15   movement with the red marker.  Bank of Baroda would send an

16   instruction to Finansbank.  And an amount that would be for the

17   100 kilograms of gold would be sent from the Bin Sabt account

18   into the Royal account.  Let's say $15 million.  We would

19   receive plus 15 million in our account, and $15 million would

20   be debited from Bin Sabt's account.

21           And as for the movement of the goods, I will draw that

22   in with a blue marker.  In exchange for that payment, then the

23   Royal Group would send 100 kilograms of gold, and in exchange

24   for that, there would be a shipment documentation for this.

25   This is gold from oil.

 1   Q.  What kinds of documentation would be associated with this

 2   transaction?

 3   A.  A pro forma document, when the money -- when the payment is

 4   made, there would be a SWIFT message, and let me load the goods

 5   and there would be a cargo loading document that would show

 6   that.  And the transaction would be completed as such.

 7               MR. KAMARAJU:  With the Court's permission I will mark

 8   this as Government Exhibit 9501 and offer it as a

 9   demonstrative.

10               THE COURT:  I'll allow it.  Did you have more

11   questions of Mr. Zarrab?

12               MR. KAMARAJU:  No, I'll move on.

13               (Government's Exhibit 9501 received in evidence)

14   Q.  Mr. Zarrab, did any of the gold transactions that you were

15   involved in involve Sarmayeh Exchange?

16   A.  Certainly.

17   Q.  Of those transactions, did any of them also involve

18   Halkbank?

19   A.  In general.

20   Q.  Would you be able to diagram a transaction involving

21   Sarmayeh and Halkbank?

22   A.  You mean the Iranian money transfer and gold combined?

23   Q.  Would you be able to diagram one of those transactions?

24   A.  Certainly.

25               MR. KAMARAJU:  With the Court's permission, I ask that

1    Mr. Zarrab be allowed to do that.

2                  THE COURT:  Sure.

3                  MR. KAMARAJU:  Is that good for everybody?

4    A.  This is, I'll be drawing the gold trade with Iran here.

5                  MR. HARRISON:  With your permission, Judge, I can't

6    see from there.

7                  THE COURT:  That's fine.

8    A.  Primarily the transaction, the transaction would primarily

9    begin with Iran selling crude oil and gas to Turkey.  I'm

10   placing that company here.

11   Q.  What company is that?

12   A.  It is NIOC.  National Iran Oil Company.

13   Q.  Who would NIOC sell oil to in Turkey?

14   A.  It would sell crude oil to Tupras.  It would sell national

15   gas to Botas.

16   Q.  What is Tupras?

17   A.  Tupras is the refinery company that would purchase the

18   crude oil from Iran in Turkey.

19                  Now I will draw Botas.

20   Q.  Please.

21   A.  And Botas would be purchasing gas.

22   Q.  What happens after NIOC sells gas or oil to one of those

23   companies?

24   A.  NIOC would deliver oil and gas to Tupras and Botas.  And as

25   a result of this, Tupras and Botas would owe money to NIOC.

1    Q.   What happens next?

2    A.   Tupras, Botas, and NIOC have accounts at Halkbank.

3    Q.   What is that box that you're drawing; what does that

4    represent?

5    A.   I will draw the companies that would have accounts at

6    Halkbank within this box.  After the oil sale has been

7    executed, then again I will draw the money movement with a red

8    marker.  Within Halkbank, Botas and Tupras would make their

9    payment to NIOC.

10   Q.   What happens after the money comes into the NIOC account?

11   A.   Here I'm going to give you an example for 50 million euros.

12   Then the bank in Iran would get on line.

13   Q.   Explain what you mean.

14   A.   Now I'm going to draw the example for Sarmayeh in Iran.

15            Sarmayeh Bank in Iran, I will put the accounts that

16   are at Sarmayeh Bank inside this box.

17            With the blue marker I'm going to mark the Iranian

18   money orders.  Sarmayeh Exchange, Sarmayeh Exchange receives

19   the international money order from NIOC.

20   Q.   What do you mean when you say "international money order"?

21   A.   I mean they're payments that they need to pay, that they

22   need to make worldwide.  This could be anywhere from China to

23   Singapore to Taiwan, anywhere worldwide.  And in different form

24   currencies.

25            Sarmayeh Exchange has a front company called Toseh

1    Tejarat.

2    Q.   Why does Sarmayeh Exchange need a front company?

3    A.   The company had been formed in order for the gold trade to

4    happen, so it is not just a currency exchange office making

5    this transaction.

6                 (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  Why is that important?

2  A.  In order for this to fit in with the nature of the

3  business, so that it would appear to be a real trade.

4        Sarmayeh Bank has an account within Halkbank.  As a

5  seller of all the orders that have been put in, NIOC will

6  transfer money with Halkbank to Sarmayeh Bank.

7  Q.  Why would the NIOC transfer that money to the Sarmayeh

8  Bank?

9        MS. FLEMING:  Objection, foundation.

10        THE COURT:  Overruled.

11        THE WITNESS:  Can I continue?

12        THE COURT:  Yes.

13  A.  Because NIOC is not able to make international money

14  transfers to Halkbank.

15  Q.  Why not?

16  A.  Based on the regulations and sanctions put in place by the

17  United States, as well as the United Nations.  In short, they

18  have restrictions on the payments for themselves.

19  Q.  So what happens after the money goes into the Sarmayeh

20  account?

21  A.  Here, I'm giving an example of NIOC sending 20 million

22  Euros to Sarmayeh Bank.  Sarmayeh Bank would end up with 20

23  million.  20 million Euros would be deducted out of NIOC's

24  account, and they would be left with a 30 million Euro balance.

25  At this point, my company would get on line with this

1    transaction.

2    Q.  How so?

3    A.  The next step is for Sarmayeh to give me the money so that

4    I can fulfill its international money order request or, in

5    short, I need to have the money so I can make the payment for

6    that transaction.

7    Q.  How do you get the money?

8    A.  At this point, I'm going to place my own company inside the

9    Halkbank box.  Safir Altin is one of the gold companies that I

10   have, that I own.

11   Q.  So what happens next?

12   A.  Sarmayeh Bank will send a telex to Halkbank.

13   Q.  What is a telex?

14   A.  It's one of the communications methods that I use between

15   banks.  It would give the order to take 20 million out of

16   Sarmayeh's account and move it into Safir's account.

17   Q.  Would there be any reason given for that transfer?

18   A.  Of course.  There would be some information inside this

19   telex.

20   Q.  What kind of information?

21   A.  The seller's name, which would be Toseh Tejarat, and the

22   receiver's name, which would be Safir, which is me, and the

23   nature of the transaction.  It would say gold because I'm

24   giving an example for gold trade.

25   Q.  Then what happens?

1   A.   20 million Euros would arrive in Safir's account.  That 20

2   million Euros would be deducted from Sarmayeh's account.

3   Q.   Then what?

4   A.   Now, just as the pro forma example that I provided in the

5   previous example, there is the company that supplies the gold

6   for this.  I will place that one in a box now.

7   Q.   Mr. Zarrab, I believe you testified about a pro forma, what

8   is that?

9   A.   Pro forma is a pro forma invoice that would show the

10  amount, the number, the unit price of the gold that would be

11  exchanged between my company Safir and Toseh Tejarat.

12  Q.   Who would the pro forma be submitted to?

13  A.   It would be given to the bank and also to Sarmayeh with --

14  the number would be given to Sarmayeh.

15  Q.   So what's the next step?

16  A.   Safir Altin would then transfer this money to its supplier,

17  and 20 million Euro would be deducted from Safir's.

18  Q.   What would happen next?

19  A.   All these transactions would be taking place within the

20  Halkbank.  The next step would be to remove this money out of

21  Halkbank.

22  Q.   Before you do that, why were these transactions taking

23  place within Halkbank?

24  A.   Because the Iranian money is within Halkbank, and by moving

25  this money around within Halkbank, we're getting this close to

1    the point where it could leave Halkbank.  In fact, one of the

2    methods that was designed is this, because NIOC would not be

3    able to do this directly.

4    Q.  Why not?

5    A.  Due to the embargo and the sanctions of the United States,

6    as well as the embargoes and sanctions and regulations of the

7    United Nations.

8    Q.  Typically, how would you get the money out of Halkbank?

9    A.  I will continue to draw, please.  Rona would have an

10   account in Denizbank in Turkey in a different bank.  Either in

11   Euros or the Turkish lira, the money would be transferred from

12   the Roman account in Halkbank and to its own account in

13   Denizbank.

14   Q.  What is Denizbank?

15   A.  The Turkish bank.

16   Q.  What happens after this?

17   A.  Halkbank would send a message to Denizbank, and money would

18   be removed or deducted from Rona's account at Halkbank and

19   would arrive at its account in Denizbank.

20   Q.  Then what would happen?

21   A.  And now the Royal Bank would get back the money again.  So

22   within this money movement, the international money order that

23   Sarmayeh had given to Sarmayeh Exchange would arrive in my

24   office.  This is a payment order.

25   Q.  Would you do anything with that payment order?

HBTPATI5                          Zarrab - Direct

A.  Of course.  Once we receive this money, then we would begin

executing that transaction, but we're not there yet.  So then

we would purchase gold worth 20 million Euro from Rona.  In

other words, that money would be converted into gold.  So let's

give you an example for 200 kilograms.

          Royal would purchase 200 kilograms of gold from Rona.

Now, Royal has 200 kilograms of gold in its hands, which is

equivalent to the 20 million that was up here.  We would

receive this gold from Rona physically.  My staff members would

go to the Rona office with suitcases, and they would load it in

the suitcases and come back.

Q.  What would they do with the suitcases?

A.  Now, we would be at the point where we would be exporting

this gold because we would need to close that transaction up

here.

Q.  How would you close that transaction?

A.  Based on the direction provided by Halkbank, if the final

destination for this is Iran, then it would be shown as

destination Iran.  So let me give an example for your eye.  I

will continue.

Q.  So what would happen then?

A.  These couriers, I mean physically would transport the gold

to Dubai.  But all the customs document that's made in Turkey,

the document would show the final destination is Iran,

transiting through Dubai.

1   Q.   Why would the documents show -- well, did the gold ever end

2   up in Iran?

3   A.   The gold would never go to Iran.

4   Q.   What happened to the gold?

5   A.   They would go to our office in Dubai.

6   Q.   And what would happen to it there?

7   A.   200 kilograms were taken from Royal.  Now, in my company in

8   Dubai, in Atlantis' safe there would be 200-kilos of gold.

9   Q.   And what would happen to it then?

10  A.   Now, it would be at a point where this gold would be sold

11  and would be converted back into cash.

12  Q.   Before you get there, why didn't you ship the gold to Iran?

13  A.   Because there's no need for gold or money in Iran.  We need

14  to make the international payments for it.  I would not be able

15  to make the international payments with money that's in Iran.

16  Q.   So why do the documents say that they were going to Iran?

17  A.   Halkbank told us that, based on regulations for a while,

18  that we would need to put Iran on the documents, and that's why

19  we put Iran.

20          MS. FLEMING:  Objection to "Halkbank told us," Judge.

21          THE COURT:  Overruled.

22  Q.   Who did you discuss that with at Halkbank?

23  A.   It would be me.

24  Q.   And who at Halkbank did you speak with?

25  A.   With Mr. Suleyman or with Mr. Hakan Atilla.

1  Q.  Now, you testified that there was cash -- well, let's go

2  back.  What did you do with the gold that was in your Dubai

3  office?

4  A.  Now would be the point where we would sell this gold.  The

5  Bin Sabt company that I had mentioned earlier in Dubai, we

6  would sell the 200 kilos of gold to Bin Sabt, to it, and we

7  would get dirham in return for that.

8  Q.  What are dirhams?

9  A.  Dirham is a local currency in Dubai, in the United Arab

10  Emirates.

11  Q.  And just for the convenience of the record, could you spell

12  dirham?

13  A.  D-H-S.

14  Q.  So what happens with the dirhams after you have them?

15  A.  Let's say 20 million Euros would be the equivalent of about

16  50 million dirhams.  Since there is little room left over

17  there, I'm going to have to continue from this side.

18  Q.  What are you drawing now?

19  A.  Rostamani Exchange.

20  Q.  What is that?

21  A.  It's an exchange office that is involved in financial

22  transactions and financial transfers in Dubai.

23  Q.  So what happened next?

24  A.  And they have an account with Standard Charter in the

25  United States.

1    Q.   So what happens after that?

2    A.   So we would pay this 50 million dirhams to Rostamani, and

3    in return for that, the Royal office, Royal's Istanbul office

4    would take the international money order that I had received to

5    the Dubai office, to Atlantis, and Atlantis would give it to

6    Rostamani.  So Atlantis is my company.  And as a result, the

7    instruction and the money would have joined together.  In other

8    words, the blue and the red lines would merge here.

9    Q.   Then what would happen?

10   A.   As an example, this is an example, Bank of China, it would

11   go to the X company, which is the information that was given by

12   Iran in the first place.  I will give an example for $10

13   million.  Rostamani would send its message to Standard Charter

14   U.S.A.  If Bank of China has an account with Standard Charter,

15   then the money would transfer to them through that account.  If

16   there is not an account there, then another American bank would

17   be used as intermediary.

18             MR. KAMARAJU:  So, may I approach, your Honor?

19             THE COURT:  Yes.

20   Q.   Mr. Zarrab, what is the purpose of this part of the

21   diagram?

22   A.   I did not see where you were pointing.

23   Q.   Okay.  Let me try it again.  What was the purpose of this

24   part of the diagram?

25   A.   Here, the money that cannot be sent out, it's getting that

1   money to this point from there.  In other words, it's

2   connecting that with this here.  That section is the heart of

3   all of this.

4   Q.  Okay.  And just so we're clear on the record, could you

5   tell us what section you're describing specifically?

6   A.  I'm talking about the Halkbank section.

7            MR. KAMARAJU:  Your Honor, the government would ask to

8   mark this as Government Exhibit 9502 and offer it as a

9   demonstrative.

10           THE COURT:  So I'm going to allow that.

11           (Government's Exhibit 9502 received in evidence)

12           THE COURT:  So I'm selfless and defer always to the

13  jury, and since I haven't seen the diagram, I'm going to ask

14  Mr. Zarrab.  How many separate transactions, approximately,

15  would you demonstrate on that last diagram to get the money

16  from where it couldn't leave, to where it could leave,

17  approximately?

18           THE WITNESS:  I will count.

19           THE COURT:  Approximately.

20           THE WITNESS:  Approximately, a minimum of ten.

21           THE COURT:  Got it.  Thank you.

22           THE WITNESS:  Can I be seated?

23           THE COURT:  Yes.  Can you just move that diagram over

24  here.

25           MR. KAMARAJU:  Is that all right, your Honor?

1          THE COURT:  Yes.

2          THE INTERPRETER:  We're going to switch real quick.

3          THE COURT:  Sure.

4          THE INTERPRETER:  We're going to switch interpreters.

5          THE COURT:  Yes.

6          (Pause)

7    BY MR. KAMARAJU:

8    Q.  Mr. Zarrab, I'd like to show you what's been marked for

9    identification as Government Exhibit 3800.  If we can blow up

10   the top there?

11         MS. FLEMING:  I'm sorry, ours isn't working.

12         MR. KAMARAJU:  My apologies, your Honor.  We appear to

13   have lost defense counsel's table; so I'm handing them a hard

14   copy.

15         THE COURT:  You lost?

16         MR. KAMARAJU:  Their screens aren't working.

17   BY MR. KAMARAJU:

18   Q.  Mr. Zarrab, do you recognize this exhibit?

19   A.  Yes, sir.

20   Q.  How do you recognize it?

21   A.  It's an electronic mail.

22   Q.  And how do you know?

23   A.  I'm the sender, and the receiver is -- it was sent to me.

24   Q.  I'm sorry, I couldn't hear you.

25   A.  It was sent to me.

1   Q.  And let me just be clear, are you referring to the bottom

2   part of the document or the top part of the document?

3   A.  This e-mail is coming to me.

4   Q.  Okay.

5          MS. FLEMING:  Your Honor, no objection to this

6   document.

7          MR. KAMARAJU:  Okay.

8          THE COURT:  Okay.

9          MR. KAMARAJU:  Then, your Honor, the government offers

10  Government Exhibit 3800.

11         THE COURT:  Then I'll allow it.  It would be funny if

12  I didn't.

13         MR. KAMARAJU:  Yes, there's always a first.

14         (Government's Exhibit 3800 received in evidence)

15         MR. KAMARAJU:  Could we publish for the jury.

16  BY MR. KAMARAJU:

17  Q.  Mr. Zarrab, do you see at the top there?  Who's listed in

18  the "to" line?

19  A.  Levent Balkan.

20  Q.  Who is Levent Balkan?

21  A.  He is one of the authorized persons who worked at Halkbank

22  during that period and who is involved in a part of the

23  operation.

24  Q.  Okay.  At that time, where in Halkbank did Levent Balkan

25  work?

1    A.   In the international department.

2    Q.   Can we turn to the exhibit -- I'm sorry, to the second

3    page, please.  Mr. Zarrab, what are we looking at here?

4    A.   May I look at it?

5    Q.   Please.

6    A.   Yes.

7    Q.   What is it?

8    A.   That's the instruction for a money transfer from NIOC

9    account to Sarmayeh Bank account within the Halkbank.  I can

10   show it on my diagram, if you want.

11   Q.   I think we'll ask you to do that a little bit later, but

12   for the moment, is this reflected on your diagram?

13   A.   Yes, of course.

14   Q.   Okay.  You can take that down.

15           Mr. Zarrab, I'd like to show you what's been marked

16   for identification as Government Exhibit 304-T, which has been

17   admitted subject to connection.  Can we turn to the second

18   page.  Mr. Zarrab, could you take a moment to review this

19   exhibit?

20   A.   Yes, sir.

21   Q.   Do you recognize this exhibit?

22   A.   Yes, I do, sir.

23   Q.   Could we turn to the first page of the document, please.

24   Now, Mr. Zarrab, do you recognize this?

25   A.   Yes, sir.

1    Q.  What is this document?

2    A.  It's a transcription of a telephone call.

3    Q.  Have you reviewed this transcription before?

4    A.  Yes, sir.

5    Q.  Do you remember this call?

6    A.  Yes, sir.

7    Q.  Did you participate in this call?

8    A.  Yes, I participated.

9    Q.  Did this call relate to the Iranian business at Halkbank?

10             MS. FLEMING:  Objection, your Honor, to the form.

11             THE COURT:  Sustained.

12   Q.  What does this call relate to?

13   A.  This is related to the general manager of Halkbank and

14   myself, and it's about a credit transaction within Halkbank.  I

15   want to correct this.  There may be a translation mistake.  The

16   telephone conversation has two sectors.  The first part is

17   about the credit that I have asked for, and the second part is

18   related to the Iranian business, Iranian transaction.

19             MR. KAMARAJU:  Your Honor, the government would offer

20   Government Exhibit 304-T.

21             THE COURT:  I'll allow it.

22             MS. FLEMING:  Judge, is there -- I think the

23   appropriate method is to have the underlying recording go into

24   evidence, and then have this go in.  And I also assume that

25   this would go in as an 801(d)(2)(E) and it will go in subject

1    to.

2              MR. KAMARAJU:  Your Honor, I'd like to have a sidebar

3    on this.

4              THE COURT:  Yes, come up.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Let me just see if I understand this.  So

3     this purports to be a transcript of a phone call between Zarrab

4     and Aslan, right?

5          MS. FLEMING:  Right.  So there's --

6          THE COURT:  Hold on.  So it's got the names in one

7     column, the English translation in another, and the Turkish

8     language in a third column.

9          MS. FLEMING:  Right.

10          THE COURT:  He wants to enter it, and you think what?

11          MS. FLEMING:  There's a couple.  First of all, in

12     terms of the co-conspirator statement, I understand you're

13     going to let it in under 801(d)(2)(E), subject to a connection

14     in the conspiracy.

15          Secondly, they have to authenticate the identification

16     that's on the front of it as to all the identifying information

17     as to how it was authenticated there, because you know that

18     there's an issue with recordings.

19          And, third, I think that even though it's a Turkish

20     language, I think the appropriate way to do it is the recording

21     gets admitted, and then if there's a transcript and they can

22     authenticate the transcript with the other information or take

23     it off the front page with the identifying information, or make

24     it -- put the rest of it in, but until they can identify when

25     that's taken and the rest of it, I object to the jury seeing

1    that.

2                    THE COURT:  You mean until it's played?  You want it

3    to be played first?

4                    MS. FLEMING:  Until they can identify the dates and

5    the rest of the information as to when it's there.  He can

6    identify his voice, I get that.

7                    MR. KAMARAJU:  He can also identify who else is on the

8    call.

9                    MS. FLEMING:  He can identify who's on the call.  Like

10   I said, I get that.  The other information as to where it's

11   from --

12                   THE COURT:  You can ask if he remembers the call, and

13   if he remembers the conversation as a result --

14                   MR. KAMARAJU:  I believe he testified he does remember

15   the call.

16                   THE COURT:  You could do it on more detail.  That

17   would satisfy me.

18                   MS. FLEMING:  I'm saying the front page of it that has

19   that information, we're challenging the wiretap information as

20   being valid.  I don't think that should be shown to the jury,

21   and they're going to call somebody who's going to try to

22   identify it.

23                   MR. ROCCO:  It's also hearsay.  That doesn't come in.

24                   THE COURT:  That's a different issue.

25                   MR. ROCCO:  I'm not talking about the co-conspirator.

1    The substance of the document comes in --

2              THE COURT:  I'm going to allow --

3              MR. ROCCO:  I got that.

4              THE COURT:  -- the CD and then this purports to be a

5    reflection of the CD; so I'm still not understanding what your

6    problem is.

7              MR. ROCCO:  I'm not going to -- go ahead, Cathy.

8              THE COURT:  You're objecting to something on here?

9              MS. FLEMING:  Yes.

10             THE COURT:  Which?

11             MS. FLEMING:  I object that somebody else put all this

12   on, in terms of reflecting what was done in terms of call ID,

13   target phone number, et cetera until that's --

14             THE COURT:  You can indicate how this --

15             MR. KAMARAJU:  Sure.  He's not the witness to do that,

16   but we do intend to call a witness who's going to be able to

17   provide that information.

18             THE COURT:  So we'll do that subject to -- did you ask

19   for it to be subject to that?

20             MR. KAMARAJU:  I didn't.  I'm happy to.  I think it

21   makes sense to publish it to the jury, at least the subsequent

22   transcript part.

23             THE COURT:  Yes.

24             MS. FLEMING:  And then, secondly, even though it's

25   Turkish, we are requesting that the underlying -- the recording

1    go into evidence.  We want to play inflections and challenge on

2    the rest of it with these recordings.

3              MR. KAMARAJU:  If the defense counsel wants to

4    introduce specific calls into evidence, they can do that.

5              THE COURT:  You're not planning to?

6              MR. KAMARAJU:  There are some calls that we may, but

7    I'm not intending to do it for all of the hundreds of calls

8    because typically a transcript --

9              THE COURT:  It's fair.

10             MS. FLEMING:  I think we offer it under completeness,

11   under 104 that under completeness, they should get it.

12             THE COURT:  I have to look at that.

13             MS. FLEMING:  That, in fairness, it ought to be

14   considered together.

15             THE COURT:  Maybe you can write a little letter about

16   that together.  Seriously.

17             MR. ROCCO:  No, no, we'll do that.

18             MS. FLEMING:  All right.

19             THE COURT:  It seems to me, ultimately, this is

20   entitled to come in, but if it needs to be, you know, made a

21   little bit more precise to satisfy you, I don't mind that.

22             MS. FLEMING:  I love that the standard will be

23   satisfying me.

24             MR. KAMARAJU:  So just to be clear, your Honor, if we

25   publish it to the jury, we should start publishing it on the

1    second page?

2              MR. ROCCO:  Yes.

3              MS. FLEMING:  Yes.

4              THE COURT:  For now, unless you can, through him,

5    satisfy that issue.  Still, candidly, I'm not sure I understand

6    the issue, but if you can --

7              MR. KAMARAJU:  That's fine.  I'll just ask

8    Mr. Chang-Frieden to go to the second page and then publish it

9    to the jury.

10             THE COURT:  That's fine.

11             MS. FLEMING:  Thank you, your Honor.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  So we're going to take a five-minute

3     break, and then we'll resume right after that.

4          (Jury not present)

5          (Recess)

6          (Jury present)

7          THE COURT:  Okay.  Please be seated, everybody.  Just

8     for your planning, I think we'll go another hour, until around

9     4:30, and then we'll let the jurors go home and have a good

10    night.

11         MR. KAMARAJU:  Thank you, your Honor.  May I proceed,

12    your Honor?

13         THE COURT:  Sure.

14         MR. KAMARAJU:  Mr. Chang-Frieden, could you turn to

15    Page 2 of Government Exhibit 304-T, and can we publish that to

16    the jury, please.

17         THE COURT:  Yes.

18    BY MR. KAMARAJU:

19    Q.  Now, Mr. Zarrab, who are you speaking with during this

20    call?

21         THE COURT:  Do you remember having this conversation

22    as reflected in the transcript?

23         THE WITNESS:  Yes, Honorable Judge.

24    Q.  Now, on this page -- so let me ask you.  Who were you

25    speaking with during this call?

1    A.  Ms. Zeynep Ersun.

2    Q.  Who is that?

3    A.  Assistant secretary to Mr. Suleyman Aslan, and Mr. Suleyman

4    Aslan himself.

5    Q.  Okay.  Now, do you see three-quarters down the page where

6    you say "thank God"?

7    A.  Yes, sir.

8    Q.  What does Aslan say in response?

9    A.  There are no problems there related to this, only now a

10   little ago Mr. Hakan Atilla told me that NIOC has the 70

11   million transferred to your account.

12   Q.  What did you understand him to be saying there?

13           THE COURT:  Excuse me, was it from or to your account?

14           THE WITNESS:  This transfer was made directly from

15   NIOC account to my account.

16           THE COURT:  Okay.

17   BY MR. KAMARAJU:

18   Q.  What did you understand him to be saying there?

19   A.  There has been a mistake being made.

20   Q.  What kind of mistake?

21   A.  A big mistake.

22   Q.  Why would it be a big mistake?

23   A.  So Iranian side made the mistake --

24           THE COURT:  You're too close --

25   A.  -- by sending the sanction money to my account directly,

HBTPATI5                         Zarrab - Direct

1     without passing through the bank.

2                 (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HBT3ATI6                     Zarrab - Direct

1    Q.  Why would that be a mistake?

2    A.  I could not receive money directly from NIOC.

3    Q.  Why not?

4    A.  Because of the rules and regulations of the United States,

5    and United Nations, I could not receive gold or -- I'm sorry.

6    Gas or oil money directly to my account.

7    Q.  Who did you understand him to be referring to when he said

8    Hakan Atilla?

9    A.  Mr. Hakan Atilla, who is the head of international

10   department.

11   Q.  Is that the defendant?

12   A.  Yes, sir.

13   Q.  If we could turn to page three -- I'm sorry.  Let me stay

14   on page two.

15           Do you see where Aslan says "But it's a direct one"?

16           THE INTERPRETER:  We don't have that page.

17           THE COURT:  You might.

18           THE INTERPRETER:  Yes, we have it, I'm sorry.

19           MR. KAMARAJU:  With your permission, maybe I'll hand

20   up a hard copy to the interpreter.

21           THE COURT:  I think they found it.  But no problem.

22           MR. KAMARAJU:  Just in case it's helpful.

23           THE INTERPRETER:  Thank you very much.

24   Q.  So what did you understand him to be saying there?

25   A.  As it was necessary to send it from NIOC to an Iranian

1    bank, by mistake it was sent directly to my account.

2    Q.  Let's look at your response.

3    A.  "No, not direct.  They made a mistake.  It will go to

4    Sarmayeh, Shahr Bank, Bank Shahr.  You stop it and I will get

5    it corrected.  They are stupid, they are retarded."

6    Q.  What do you mean when you said it will go to Sarmayeh?

7    A.  The money was supposed to be sent from the NIOC account

8    directly to Sarmayeh bank, or to Shahr bank, which is a

9    different bank.  To their account.

10   Q.  Would that step have been reflected on your diagram,

11   Government Exhibit 9502?

12   A.  Yes, that was the step which indicates the money passing

13   from NIOC to Sarmayeh.  But there is no indication of any

14   payment that's coming directly to me from NIOC in the diagram

15   that I had made.

16   Q.  Why is that?

17   A.  Because it was not supposed to be, they could not send it

18   to me because of the sanctions, regulations and rules.  If they

19   would be able to send it to me, they could also be able to make

20   their own foreign payments in the world.

21            MR. KAMARAJU:  Can we turn to page three, please.

22   Q.  Do you see at the top where you say "Please process this as

23   a null transaction as if it never happened"?

24   A.  I see that, sir.

25   Q.  What did you mean there?

1   A.   This is a restricted transaction, so it just disregard this

2   all together.

3   Q.   Are you asking Halkbank to disregard it?

4   A.   Yes, sir.

5   Q.   Do you see a little further down where Aslan says "No, they

6   can't transfer this money to you, this, this is exactly the

7   kind of issue that is subject to sanction"?

8   A.   Yes, sir.

9   Q.   What did you understand Aslan to be saying there?

10  A.   This is exactly contradictory to the American sanctions.

11  Q.   Why was that?

12  A.   Because it's coming to my account directly from NIOC, in

13  contradiction of the sanctions rules.

14  Q.   Mr. Zarrab, in connection with the Government Exhibit 9502,

15  the diagram of Iranian gold transactions, was there any

16  documentation provided in connection with those transactions?

17  A.   Yes, of course.

18  Q.   Was it you who provided documents?

19  A.   They were prepared by my company.

20  Q.   What kinds of documents did you provide?

21  A.   Pro forma invoice.

22  Q.   What's that?

23  A.   I'm talking according to the schematics that I draw.  The

24  details and information related to the gold trade between Toseh

25  and Safir.

1    Q.  Okay.  Were there any other documents?

2            THE COURT:  Excuse me, I had a question.  You used the

3    phrase "pro forma" just now.  I think you used it before too.

4    What do you mean by pro forma?

5            THE WITNESS:  Yes, your Honor.  I will explain it

6    right now.

7            Pro forma is the first step before the final invoice.

8    Q.  So, what's the difference between a pro forma invoice and a

9    final invoice?

10   A.  There are may be a lot of differences that may happen

11   between the date of the pro forma invoice, and the date of the

12   final invoice.  For example, the exchange rate may change, the

13   other information may change, it's like a template of the trade

14   that will be made.

15           THE COURT:  Got it.

16   Q.  Just to wrap that up.  When do you submit the pro forma

17   invoice?

18   A.  We firstly give Iran only the number of the pro forma

19   invoice.  Because gold is not transported to Iran, physically.

20   These are all, you know, regulations, rules, formalities.

21   Q.  What would a pro forma be used for in a non-Iranian oil

22   transaction?

23   A.  Plays the same role, but at that time it will be a real

24   trade.

25   Q.  When in the process would you submit a final invoice?

1   A.   That's a final invoice because all the information on the

2   invoice is set.  So the exchange rate and other information,

3   and also, export documentation or customs documentation is also

4   submitted together with the final invoice to the bank.  And

5   also the vendors invoice will be submitted.

6   Q.   What is a customs declaration?

7   A.   The export documents that will be made in Turkey while you

8   are exporting the gold out of Turkey.

9   Q.   Are customs declarations used in your normal gold trade?

10  A.   Yes, of course.

11  Q.   What kind of information is typically contained on the

12  customs declaration?

13  A.   The buyer, the country that it will be exported to, the

14  exporter, the amount, and also some more information that I

15  cannot remember right now.

16  Q.   Mr. Zarrab, I'd like to show you what's been marked for

17  identification as Government Exhibit 3585.  Let's look if we

18  can blow up the top part of that page.  Do you recognize this

19  document?

20  A.   I recognize it, sir.

21  Q.   What is it?

22  A.   It is an electronic mail, sir.

23  Q.   Who is it from?

24  A.   Gita Taheri.

25  Q.   Who is Gita Taheri?

HBT3ATI6                        Zarrab - Direct

1   A.  Gita Taheri is one of my staff members that worked at my

2   Royal Group at that time.

3   Q.  Who is this e-mail to?

4   A.  It's to me, sir.

5   Q.  What is the date of the e-mail?

6   A.  May 15, 2012.

7           MR. KAMARAJU:  Can we turn to the next page, please.

8   Q.  Do you recognize this?

9   A.  Yes, sir.

10  Q.  What is it?

11  A.  It is a Republic of Turkey customs declaration.

12  Q.  Are there any goods listed on that declaration?

13  A.  Yes, sir.

14  Q.  What goods are listed there?

15  A.  Gold bars, sir.

16          MR. KAMARAJU:  The government would offer Exhibit

17  3585.

18          MS. FLEMING:  Objection.  Foundation and hearsay.

19          THE COURT:  Do you want to explore a little bit more?

20          MR. KAMARAJU:  Sure.

21  Q.  Do you see Halkbank on this document anywhere?

22  A.  Yes, sir.

23  Q.  Was this document prepared in connection with -- withdrawn.

24          Do you see any Iranian bank information on this

25  document?

1    A.  I see, sir.

2    Q.  What is that information?

3    A.  Bank Pasargad, Tehran, Iran, sir.

4    Q.  Is this document related to the scheme you diagrammed in

5    Government Exhibit 9502?

6    A.  Yes, sir.

7            MR. KAMARAJU:  The government offers Government

8    Exhibit 3585.

9            THE COURT:  I'll allow it.

10           (Government's Exhibit 3585 received in evidence)

11   Q.  What language is the document in, sir?

12   A.  It's in Turkish, sir.

13   Q.  Is the ultimate destination of the gold reflected on this

14   document?

15   A.  Yes, it shown, sir.

16   Q.  What's written there?

17   A.  It's Iran Islamic Republic.

18   Q.  Mr. Zarrab, did you export any gold to Iran using money

19   held at Halkbank?

20   A.  No, sir.

21   Q.  Did you always list Iran as the ultimate country of

22   destination on customs declarations?

23           MS. FLEMING:  Objection.

24   A.  No, sir.

25   Q.  What determined what you wrote as the ultimate destination?

 1    A.  Halkbank, sir.

 2    Q.  Is this document --

 3            THE COURT:  Could you explain that?  I didn't

 4    understand.  Would you ask the question again.

 5            MR. KAMARAJU:  Sure.

 6    Q.  You testified that you prepared, your company prepared

 7    customs declarations in connection with the scheme described in

 8    Government Exhibit 9502.  Is that right?

 9    A.  Yes, sir.

10    Q.  Did those customs declarations declare an ultimate

11    destination for the gold?

12    A.  Yes, sir.

13    Q.  What country is reflected on the exhibit before you as the

14    ultimate destination?

15    A.  Islamic Republic of Iran, sir.

16    Q.  Was that the case for all the customs declarations that you

17    prepared as part of this scheme?

18    A.  No, sir.  Other countries were also written there, sir.

19    Q.  What determined what country you listed there?

20            THE COURT:  You mean what factors?  Is that what

21    you're asking?

22            MR. KAMARAJU:  I can ask it that way, your Honor.

23    Q.  What factors determined what countries you listed there?

24    A.  Sir, we were writing this at the direction of Halkbank,

25    depending on whatever they said.  If they said Iran, we would

1    put Iran.  If not, we would put Dubai.

2    Q.  Who did you discuss that with at Halkbank?

3    A.  Mr. Suleyman Aslan and Mr. Hakan Atilla.

4    Q.  I'd like to show you what's been marked for identification

5    as Government Exhibit 229-T.

6            MR. KAMARAJU:  Mr. Chang-Frieden, if we can turn to

7    the second page of that exhibit.

8    Q.  Mr. Zarrab, just take a moment to review this exhibit,

9    please.

10   A.  Of course.  I reviewed it, sir.

11   Q.  What is this document?

12   A.  It is a transcript of a phone conversation.

13           MS. FLEMING:  Judge, I need to be heard on this.  I

14   need to be heard on this.

15           THE COURT:  Well, okay.  Do you want to make a speech?

16           MS. FLEMING:  No, I think -- I would be happy to do it

17   here, but I don't think you'd like it.

18           THE COURT:  Okay.  So quickly though.

19           (Continued on next page)

20

21

22

23

24

25

1              (At the sidebar).

2              THE COURT:  Can I take a look with you.

3              MS. FLEMING:  Yes.

4              THE COURT:  Go ahead, Ms. Fleming.

5              MS. FLEMING:  Judge, the reason I brought it up here

6     is there is a reference to a Hakan in here.  This is not Hakan

7     Atilla.  And --

8              THE COURT:  So we can make that clear.

9              MS. FLEMING:  I just asked --

10             MR. DENTON:  How do you know that?

11             MS. FLEMING:  Because I've read the transcripts.

12             MR. KAMARAJU:  That's a question for cross.

13             MS. FLEMING:  I think that's really misleading to put

14    this in front of the jury the way this examination is going and

15    suggest it's him.

16             THE COURT:  I don't know how much --

17             MR. KAMARAJU:  I can ask him.

18             THE COURT:  Hakan is probably as common as Richard is

19    in New York.

20             MS. FLEMING:  I think it's more common.

21             (Continued on next page)

22

23

24

25

 1              (In open court)

 2     BY MR. KAMARAJU:

 3     Q.  Do you recognize this exhibit?

 4     A.  I recognize it, sir.

 5     Q.  What is it?

 6     A.  It is a transcript of a phone conversation.

 7     Q.  Do you remember it?

 8     A.  I remember, sir.

 9              THE COURT:  You remember the conversation?

10     Q.  Do you remember the telephone conversation?

11              THE WITNESS:  Yes, your Honor.

12     Q.  Who participated in the conversation?

13     A.  It is Abdullah Happani and myself.

14     Q.  Remind us who Abdullah Happani is.

15     A.  Abdullah Happani is the second person in charge in my Royal

16     company after me.

17     Q.  Without reading from the document, what is the general

18     substance of the conversation you had with Happani here?

19     A.  With regards to the gold exports we were doing through

20     Halkbank, due to some changes in the U.S. embargo regulations,

21     this is a conversation where we're discussing the final

22     destination about the gold trade would be changing.

23              MR. KAMARAJU:  The government would offer Government

24     Exhibit 229-T subject to connection and ask that we be allowed

25     to publish it from page two on.

1            THE COURT:  I'm going to allow it.

2            (Government's Exhibit 229-T received in evidence)

3    Q.  All right.  Now, do you see at the top of page two you say

4    "I talked to Hakan and they are going to transfer soon"?

5    A.  I see it, sir.

6    Q.  What did you mean there?

7    A.  Money had been sent to our account from Iran, from either

8    Sarmayeh Bank or some other bank.  The money -- the money had

9    not been received by us yet.  It had not been deposited at this

10   point.  I'm saying that I had just spoken to Mr. Hakan Atilla

11   and that the money would be deposited soon.

12   Q.  Do you see two boxes down where you say "Also, call that

13   Mr. Zhini and tell him Mr. Reza has talked to Mr. Hakan and

14   there was a problem but it has been resolved"?

15   A.  I see it, sir.

16   Q.  What did you mean there?

17   A.  Mr. Zhini was the branch manager where our account resides.

18   I'm telling him to follow up on the fact that I had talked to

19   Mr. Hakan, and that the transfer would be made soon.

20   Q.  What was the problem that you were referring to?

21   A.  Since there was regulation changes within the U.S. embargo

22   during that time, the bank was going to determine the final

23   destination point that should be on the customs declarations.

24   Q.  How did you learn about the change in the regulations?

25   A.  From the bank, sir.

1   Q.  Who did you discuss it with at the bank?

2   A.  With Mr. Hakan Atilla, sir.

3   Q.  Do you see further down when you say "Um, for the exports

4   write 'transit to Iran through Dubai' on the declarations

5   again."

6   A.  Yes, sir.

7   Q.  What did you mean there?

8   A.  For a while, prior to this conversation, we were putting

9   the final destination point as Dubai.  I'm telling Abdullah we

10  have to go back to putting Iran down.  And I'm saying that in

11  order for it to be Iran, we need to start using physical

12  couriers to do this.

13  Q.  Why would you need to use physical couriers in that case?

14  A.  When we were sending it to Dubai, since it was going

15  actually to Dubai, we were using a shipment company.  So during

16  the time where the bank was accepting the final destination

17  point being Dubai, the gold was being sent through a cargo

18  service.

19          But when it changes to Iran, since the gold cannot go

20  to Iran, and since they will not go to Iran, the couriers would

21  look as if they are going to Iran via Dubai, but they would

22  unload the gold in Dubai and would return back to Turkey.

23  Q.  So, why is it that you could use a cargo service if the

24  gold was listed as going to Dubai?

25  A.  Because the gold was actually going to Dubai.

1    Q.  Why did that matter?

2    A.  So for that, the information put on the declaration or the

3    customs document was correct.

4    Q.  How did you make it -- why did you then have to switch to

5    couriers?

6    A.  Because we needed to go back to Iran.

7    Q.  How did you make it look like they were going back to Iran?

8    A.  We went back to the courier system, couriers were taking

9    the gold physically from Turkey to Dubai, and they were

10   supposed to carry it physically to Iran after Dubai.  But they

11   were not doing that transport.  They were taking it to our

12   office in Atlantis in Dubai, and they were leaving them there.

13   Q.  Mr. Zarrab, do you see a little further, two blocks down on

14   this where you say "Brother, there is no way.  That is what the

15   regulations indicate.  Do that for 10 days -- for a week."

16   A.  Yes, sir.

17   Q.  What did you mean there?

18   A.  I mean when the bank told us that this is a regulation,

19   that's what we need to do, that's what we had to do.  It was

20   not up to us, it was not our choice.

21   Q.  Who did you discuss that with at the bank?

22   A.  Mr. Suleyman Aslan and Mr. Hakan Atilla.

23   Q.  Do you see a little further down where you say "They

24   should, um, review the regulation, this is what the regulations

25   say at the present time."

1   A.  Yes, sir.

2   Q.  What did you mean there?

3   A.  Mr. Hakan Atilla was supposed to review the regulations,

4   and provide guidance on this.  And I am saying that it had

5   changed to Iran, and that's what we need to do at this point.

6   And what I said was that that's what it appears to be at this

7   point.

8   Q.  The scheme that you diagrammed in Government Exhibit 9502,

9   did you actually use that at any point?

10  A.  Can you repeat the question, please?

11  Q.  Let me rephrase.

12          The scheme that you diagrammed in Government Exhibit

13  9502.  Did you withdraw money from Halkbank using that scheme?

14  A.  Of course, we withdrew all of it from Halkbank anyway.

15  Q.  Approximately how much money did you withdraw from Halkbank

16  as part of that scheme?

17  A.  A few billion.

18          THE COURT:  A what?

19          THE INTERPRETER:  A few billion.

20          THE WITNESS:  A few billion.

21          THE COURT:  Billion what, euros, dollars?

22          THE WITNESS:  Procurement of euros.  It is euros and

23  Turkish liras, and referring to it as euros only as an

24  equivalent of euros.

25  Q.  And the few billion euros that you withdrew, was it all

1   sent to Dubai ultimately?

2   A.  You mean the gold, physically?

3   Q.  Yes.  Let me say that question better.

4         The few billion euros that you testified about, was

5   that used to purchase gold?

6   A.  This few billion euros is the money where we fulfilled the

7   international money orders that we had received from Iranians

8   under the disguise of gold trade.

9   Q.  Did you discuss that with people at the bank?

10  A.  Certainly.

11  Q.  Who did you discuss it with at the bank?

12  A.  Mr. Suleyman Aslan, with Mr. Hakan Atilla.

13  Q.  Were there other people you talked about it with at the

14  bank?

15  A.  With Mr. Levent Balkan.

16  Q.  Anyone else?

17  A.  These were the people that I remember at the senior level

18  that I -- that I conversed with at a general level.  And in

19  later time periods with Hakan Aydogan, with Mr. Saeed Ahmet.

20  Q.  I'd like to show you what's been marked for identification

21  as Government Exhibit 3582.  Do you recognize this document?

22  A.  I recognize it, sir.

23  Q.  What is it?

24  A.  Electronic mail.

25  Q.  How do you recognize it?

1    A.  This e-mail had been sent to me, sir.

2    Q.  Who sent it to you?

3    A.  Emir Eroglu.

4    Q.  Who is that?

5    A.  Emir Eroglu is one of my staff members that worked at my

6    company during that time frame.

7    Q.  What is the date of the e-mail?

8    A.  May 7, 2012.

9    Q.  Can we turn to the next page of the exhibit.  And do you

10   recognize this, Mr. Zarrab?

11   A.  Yes, sir.

12   Q.  What is it?

13   A.  The account information and the address information for my

14   companies' accounts at Halkbank.

15   Q.  What were these accounts used for?

16   A.  This account was used for gold trade.

17           MR. KAMARAJU:  The government would offer Government

18   Exhibit 3582.

19           MS. FLEMING:  No objection.

20           THE COURT:  I'll allow it.

21           (Government's Exhibit 3582 received in evidence)

22           MR. KAMARAJU:  Can we please publish the second page.

23   Q.  Do you see a bank identified here?

24           THE COURT:  First of all, is this in Turkish?

25           THE WITNESS:  Yes, your Honor.

1                MR. KAMARAJU:  Thank you, your Honor.

2       Q.  Do you see a bank name identified here?

3       A.  Yes, sir.

4       Q.  Do you see the name of one of your companies identified

5       here?

6       A.  Yes, sir.

7       Q.  What is the name of that company?

8       A.  Safir Altin Ticaret Ithalatve Ihracat LTD Company.

9       Q.  Is that the Safir that you drew up on Government Exhibit

10      9502?

11      A.  Yes, sir.

12      Q.  Down at the bottom of the document, do you see what appears

13      to be a string of numbers there?

14      A.  I see that, sir.

15      Q.  What is the first string of numbers, the one at the top?

16      A.  These are account numbers.

17      Q.  Do you see at the end of that top string of numbers it says

18      TL?

19      A.  Yes, sir.

20      Q.  What is that?

21      A.  This is my Turkish lira account number.

22      Q.  Just to be clear, where is this account held?

23      A.  Halkbank of Turkey.

24      Q.  Are there any other currency accounts listed on this

25      document?

 1   A.   Yes, sir.

 2   Q.   What other currency accounts are listed?

 3   A.   Dollars and euros, sir.

 4   Q.   Were these accounts used as part of the scheme that you

 5   diagrammed in Government Exhibit 9502?

 6   A.   The ones in Turkish liras and euros, sir.

 7          MS. FLEMING:  Can I hear that answer again?

 8          THE INTERPRETER:  The ones in Turkish liras and euros,

 9   sir.

10   Q.   I'd like to show you what's been marked for identification

11   as Government Exhibit 201-T.

12          MR. KAMARAJU:  Can we go to page two of that exhibit.

13   Q.   Take a moment to review that, Mr. Zarrab.

14   A.   Yes, sir.

15   Q.   Do you recognize it?

16   A.   Yes, sir.

17   Q.   What is it?

18   A.   It is a transcript of a telephone conversation.

19   Q.   Do you remember this telephone call?

20   A.   Yes, sir.

21   Q.   Who participated in the call?

22   A.   Abdullah Happani and myself, sir.

23   Q.   What is the general substance of the conversation?

24   A.   The orders that were sent by Sarmayeh Bank were being paid

25   with a delay because of the shortage of low supply of dirhams

1    in Dubai and this was about that.

2              MR. KAMARAJU:  The government offers Government

3    Exhibit 201-T subject to connection and ask to publish it from

4    page two on.

5              THE COURT:  I'll allow it.

6              MS. FLEMING:  On the transcripts I just have the same

7    objections I've put.  I don't have to keep jumping up and down

8    if you let me have a continuing objection.

9              THE COURT:  Sure.

10             (Government's Exhibit 201-T received in evidence)

11   Q.  Mr. Zarrab, do you see where you say around the middle of

12   the page "She's not nursing it, brother, Sarmayeh came in today

13   but the woman didn't process it.  You should personally get

14   involved in this dirham business."

15   A.  Yes, sir.

16   Q.  What did you mean there?

17   A.  What I had drawn on the diagram with blue lines regarding

18   the instructions.  Those instructions were being received, but

19   the woman who was dealing with these dirham payments in our

20   company had not made these payments yet.

21   Q.  Who is that woman that you're referring to?

22   A.  Kamelia Jamshidy.

23   Q.  Did she work for you?

24   A.  Yes, sir.

25   Q.  If you look down a little further, two blocks down you say,

1   do you see where you say, "Okay, but let's speed it up a bit

2   and at least take care of these guys' transactions."

3   A.  Yes, sir.

4   Q.  What did you mean there?

5   A.  I mean, speed up these transactions, the transactions that

6   are pending with from Sarmayeh, fulfill those.  International

7   payments, speed those up.

8   Q.  Then do you see where Happani responds "They request it at

9   banks out of your control and so on.  I mean, all of a sudden."

10  A.  I see it, sir.

11  Q.  What did you understand Happani to be saying there?

12  A.  Sometimes, and many times, Sarmayeh would have dirham

13  payments also.  The banks that they indicate in relation to

14  these requested payments in Dubai, I didn't have -- we didn't

15  have accounts or didn't have access, easy access to these.

16  Q.  Then do you see a little while down where Happani says

17  "Okay, well, we'll speed things up.  We have taken it easy with

18  dirham for a couple of days.  I wanted to send more to cikonova

19  and so on."

20  A.  I see it, sir.

21  Q.  What did you understand him to mean when he said "We'll

22  speed things up"?

23  A.  What he's saying is I would ensure that dirham is

24  accumulated in Dubai by sending more gold to Dubai.

25  Q.  Where he said "I wanted to send more to cikonova and so

1    on," what did you understand him to mean there?

2    A.   Cikonova was a code that we used amongst ourselves within

3    my staff members and myself for transactions that don't reflect

4    real transactions -- fake transactions.  We would use the word

5    cikonova.  Sometimes there was no export of gold out of Turkey.

6    When gold was not sent out physically, we were ending up with

7    less dirhams in Dubai.  This is what I mean here.  In other

8    words, Abdullah is telling me we have shortage of dirhams

9    because of that.

10   Q.   Were the transactions that you did or that you diagrammed

11   in Government Exhibit 9502, were those cikonova?

12   A.   No.  No.  It was real gold, most of that was sent out or

13   exported out of Turkey.

14           MR. KAMARAJU:  I'm happy to press on, but I'm moving

15   to another section.

16           THE COURT:  I think we'll stop a little early, but

17   we're making good progress.  So we'll excuse the witness for

18   today.

19           (Witness is not present)

20           THE COURT:  Before I excuse the jury, I just want to

21   remind you, as I do each day, first, please do not talk with

22   each other about this case or about anyone who has anything to

23   do with it until the end of the case when you go to the jury

24   room to deliberate to decide on your verdict.

25           Second, please don't talk with anyone else about the

HBT3ATI6

1    case or about anyone who has anything to do with it until the

2    trial has ended, and you've been discharged as jurors.  And by

3    "talk," I'm referring to e-mailing, texting, tweeting,

4    blogging, I'm also referring to any type of communication in

5    any forum, including without limitation Facebook, MySpace,

6    Twitter, Instagram, Snapchat, etc.

7         Additionally, do not remain in the presence of other

8    persons who may be discussing this case, either orally or

9    online.  "Anyone else" includes members of your family and your

10   friends, and embraces social media.  You may tell them that you

11   are a juror in a case, but please don't tell them anything else

12   about the case, until after you've been discharged by me.

13        Third, do not let anyone talk to you about the case or

14   about anyone who has anything to do with it.  And if someone

15   should try and talk to you about the case, please report that

16   to Christine or me immediately.

17        And as I said before in this regard, attorneys and

18   defendants are not supposed to talk to jurors, even to offer a

19   friendly greeting.  So if you happen to see any of them outside

20   the courtroom, they will, as they should, ignore you and please

21   don't take offense.  They'll only be acting properly by doing

22   so.

23        And fourth, do not read any news or internet stories

24   or articles or blogs or listen to any radio or cable television

25   or TV or internet reports about the case or about anyone who

HBT3ATI6

1       has anything do with it.

2              And lastly, fifth, please do not do any type of

3       research or any type of investigation about the case on your

4       own.  As I suggested on the first day, and of course it still

5       applies, the parties are entitled to have you personally render

6       a verdict in this case on the basis of your independent

7       evaluation of the evidence that is presented here in the

8       courtroom.  So, obviously, speaking to others about the case,

9       even including family members, before you deliberate, or

10      exposing yourself to evidence outside the courtroom in any way

11      could compromise your jury service and fairness to the parties.

12             So, we've had a good day and making good progress.

13      We'll see you tomorrow at 9:15.  Thanks very much.

14             (Jury excused)

15             THE COURT:  I don't know if you have anything for me.

16      I have one small item for you.  One small concern that I have.

17             During the last break, I inquired of the agent who

18      accompanies Mr. Zarrab whether there was any reason that

19      Mr. Zarrab could not appear in court in civilian clothes.  And

20      the agent said he knew of none.  Typically, though, he would

21      need a court order to that effect.

22             My feeling is, and my experience is, that it's hard

23      enough to appear in court as a party under any circumstances,

24      and certainly no reason, if the individual wishes, there is

25      certainly no reason to make things more difficult by not

HBT3ATI6

1    providing, for example, a shirt and a tie or jacket or

2    whatever.  And just wanted you all to know that I would sign an

3    order to that effect every time that an attorney would ask me,

4    and I would do the same in this case if I were asked.

5            MR. KAMARAJU:  Your Honor, I understand the Court's

6    point.  I do think we need to look at this in a bit of context.

7    Defense counsel --

8            THE COURT:  I'm not -- I just want to make sure things

9    are fair.  And as I say, I think it is hard enough to appear

10   here, especially if you are a party.  And I'm just sharing --

11   I'm not directing that anything happen.  It is just my based on

12   my observations and my experience.

13           MR. KAMARAJU:  Your Honor, we can certainly ask

14   Mr. Zarrab if he has a preference.

15           THE COURT:  If he wishes to.

16           MR. KAMARAJU:  We will do that.

17           THE COURT:  Okay.  So then also we had, I can't

18   remember the name, there is a witness, Turkish witness who is

19   coming up I think next week, you said, and it was the subject

20   of one of the defense's subpoena requests.  I asked if that

21   person were represented by counsel.  And that person is not,

22   and nobody had any objection, so we're appointing a CJA counsel

23   and that person is Susan Kellman.

24           MS. FLEMING:  Okay.

25           THE COURT:  So it would probably be best to be in

HBT3ATI6

1      contact with Ms. Kellman with respect to that subpoena.  Okay?

2              Great, thanks.  I'll see you tomorrow.

3              MR. KAMARAJU:  Thank you, your Honor.

4              (Adjourned until November 29, 2017, at 9:15 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        INDEX OF EXAMINATION

 2   Examination of:                            Page

 3   BULENT BULUT

 4   Direct By Mr. Sovolos  . . . . . . . . . . 222

 5   Cross By Ms. Fleming . . . . . . . . . . . 232

 6   Redirect By Mr. Sovolos  . . . . . . . . . 250

 7    ANUSH DJAHANBANI

 8   Direct By Mr. Lockard . . . . . . . . . . 253

 9   Cross By Ms. Fleming . . . . . . . . . . . 257

10    REZA ZARRAB

11   Direct By Mr. Kamaraju . . . . . . . . . . 260

12                      GOVERNMENT EXHIBITS

13   Exhibit No.                             Received

14    201-T through 233-T, 236-T, 238-T . . . . . 231

15              through 269-T, 273-T, 274-T,

16              276-T through 279-T

17    288-T, 291-T, 293-T through 298-T,  . . . . 231

18              300-T, 301-T, 304-T through

19              390-T, 314-T, 316-T, 326-T,

20              336-T through 357-T,

21    359-T, 380-T, 381-T, 721-T, 726-T,  . . . . 231

22              727-T, 734-T, 736-T, 740-T,

23              745-T, 749-T, 750-T, 752-T,

24              818-T through 822-T

25    827-T, 1001-T through 1004-T, 1201-T, . . . 231
```

```
 1              1204-T through 1208-T, 1266-T

 2              through 1293-T, 2001-T through

 3              2004-T, 2007-T through 2011-T

 4     2015-T, 2016-T, 2019-T through 2022-T,  . . . 231

 5              2024-T through 2041-T, 2043-T,

 6              2044-T, 2045-T, 2047-T through

 7              2054-T, 3614-T, 3617-T,

 8              3622-T,

 9     3623-T, 3629-T, 3631-T through 3636-T,  . . . 232

10              3639-T through 3649-T, 3651-T,

11              3655-T, 3658-T, 36-59-T,

12              3660-T, 3664-T, 3666-T,

13              3668-T, 3670-T,

14     3675-T, 3676-T, 3679-T, 3680-T, 3682-T  . . . 232

15              through 3687-T, 3689-T, 3691-T

16              through 3694-T, 3706-T,

17              3708-T, 3710-T, 3744-T,

18              3746-T, 3753-T

19     3760-T through 3764-T, 3787-T through . . . . 232

20              3792-T, 4658-T through 4663-T,

21              4788-T, 4790-T

22     1297-T, 1298-T, 3228-T, 3231-T   . . . . . . 256

23     3254-T through 3256-T, 3292-T, 3309-T  . . . 257

24     3312-T, 3314-T, 3316-T, 3319-T, 3322-T   . . 257

25     3323-T, 4539-T, 735-T, 737-T, 901-T   . . . . 257
```

 1   20       . . . . . . . . . . . . . . . . . 262

 2   13       . . . . . . . . . . . . . . . . . 276

 3   901      . . . . . . . . . . . . . . . . . 283

 4   4539 and 4539-T  . . . . . . . . . . . . 285

 5   8    . . . . . . . . . . . . . . . . . . . 292

 6   17       . . . . . . . . . . . . . . . . . 298

 7   12       . . . . . . . . . . . . . . . . . 300

 8   3730     . . . . . . . . . . . . . . . . . 304

 9   3733     . . . . . . . . . . . . . . . . . 307

10   3660, 3660-T   . . . . . . . . . . . . . . 314

11   3727     . . . . . . . . . . . . . . . . . 319

12   9501     . . . . . . . . . . . . . . . . . 323

13   9502     . . . . . . . . . . . . . . . . . 335

14   3800     . . . . . . . . . . . . . . . . . 337

15   3585     . . . . . . . . . . . . . . . . . 355

16   229-T    . . . . . . . . . . . . . . . . . 360

17   3582     . . . . . . . . . . . . . . . . . 365

18   201-T    . . . . . . . . . . . . . . . . . 368

19

20

21

22

23

24

25