HC1PATI1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              S4 15 Cr. 867 RMB

MEHMET HAKAN ATILLA,

             Defendant.

------------------------------x

                                 December 1, 2017
                                 9:04 a.m.

Before:

                   HON. RICHARD M. BERMAN,

                                 District Judge
                                  and a jury

                         APPEARANCES

JOON H. KIM,
        United States Attorney for the
        Southern District of New York
MICHAEL DENNIS LOCKARD,
SIDHARDHA KAMARAJU,
DAVID WILLIAM DENTON, JR.,
DEAN CONSTANTINE SOVOLOS,
        Assistant United States Attorneys

HC1PATI1

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
        Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
        THOMAS ELLIOTT THORNHILL, Esq.
        - and -
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
        ROBERT J. FETTWEIS, Esq.
        - and -
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
                    Of counsel


Also Present:
        JENNIFER McREYNOLDS, Special Agent FBI
        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
        MS. ASIYE KAY, Turkish Interpreter
        MS. SEYHAN SIRTALAN, Turkish Interpreter

1          (Trial resumed; jury not present)

2          THE COURT:  So please be seated.  There are a couple

3     of things that I want to go over with the lawyers before we

4     start the trial for today, and I think there's three, as I

5     remember.

6          First thing is that after we broke up, the District

7     Executive and his staff I think solved the problem of the feed

8     into the overflow courtroom and, as I understand it, not being

9     technologically particularly savvy, they drew a feed from the

10    jury box down to the overflow courtroom.  So they'll, down

11    there, be able to see or not see what the jury can see.

12         In other words, so presumably a document, before it's

13    entered, will not be seen, and after it's entered, will be

14    seen, just as the jury.  So that's the ideal solution and Ed

15    Friedland and his team, who are in the back there, are

16    responsible for doing it.  They did it last night; so that's

17    good news.

18         MR. DENTON:  Just one more thing, to follow up on

19    that, your Honor.  The U.S. Attorney's Office is also making

20    published exhibits available electronically at the end of the

21    day for the press, subject to some logistical difficulties with

22    respect to the subject to connection issues that we'll discuss.

23         THE COURT:  But you're not doing that such that it

24    will slow down the trial, right?

25         MR. DENTON:  No, definitely not.

1          THE COURT:  You're not diverting your own time and

2     resources, so to speak?

3          MR. DENTON:  No.

4          THE COURT:  Do you have help doing that?

5          MR. DENTON:  We think we found an efficient solution,

6     your Honor.

7          THE COURT:  Great, great.  So that's good.

8          The second is that I looked over the transcript and my

9     notes yesterday.  One reason I don't like to have sidebars or

10    too many, sometimes they're inevitable, is that it interrupts

11    the flow of the examination or wherever we are in trial, and

12    I'm a little bit concerned that I may have done that yesterday,

13    particularly at the end of the day when -- I don't remember

14    where exactly.  I think it was a transcript the government was

15    talking about, and I think I said, Are we done, and something

16    to that effect, and the government said, well, just a couple

17    more questions.

18         I think the effect of my having that sidebar before

19    that was to condense that a little bit too much.  So if you

20    need to, or Mr. Kamaraju is doing it, go over that again, the

21    end part, I think that's fair.  So then that's two.

22         Three is the question about authentication.  So,

23    again, this is somewhat by memory, which is mine, certainly

24    fallible, but my recollection is that over the last -- there's

25    Tuesday, Wednesday, Thursday -- well, three days of testimony,

HC1PATI1

1    we had this issue with transcripts versus recordings, there

2    were a couple of instances we had transcript and recording.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HC13ATI2

1          THE COURT:  On other occasions, we had transcript, no

2     recording.  That is to say, live recording in the courtroom.  I

3     think there is also a scenario, I looked over the previous

4     motions back and forth, maybe a scenario where there are no

5     recordings, but there are transcripts.  So, these raise

6     important issues about authenticity and authentication.

7          I know the government has said that authentication in

8     some instances is yet to come, perhaps through another witness,

9     other than the witness who is actually on the recordings.  It

10    strikes me that is -- and I'm certainly not suggesting how you

11    do your trial.  I think that would be helpful, whoever that is

12    down the road.

13          But, some of the transcript information from yesterday

14    in particular, and I'm having trouble quite remembering which

15    was just transcript and which was transcript plus recording, I

16    feel had some information in it that was pretty far reaching,

17    let's say.  And I think it would be useful to go back to that,

18    if my memory is correct that there was transcript, no

19    recording, play that recording, and to ask -- I think

20    Mr. Zarrab -- was he in all of those conversations yesterday?

21          MR. DENTON:  Yes, your Honor.

22          THE COURT:  So at least, and maybe even more than at

23    least, but I think it's valuable, certainly, where there is

24    information in there that is far reaching, for example, there

25    is a mention in the testimony that the prime minister was

HC13ATI2

1    involved somehow, and also one or more ministers.  And I don't

2    feel that that information should just be, you know, lightly

3    put out there.  So I think the more authentication or

4    involvement there can be, the better.

5           And so I would like to go back, my memory is that it's

6    one transcript, but it may be more than that.  And it may

7    ultimately behoove us in this proceeding for the integrity of

8    the proceeding to have Mr. Zarrab, who is asked in each

9    instance did he hear this recording, listen to it, and

10    presumably that meant before he took the witness stand.  And he

11    said "yes" in each instance.  We didn't ask him exactly when,

12    but so that's one possibility.

13           But I think even better, especially, as I say, since

14    there this is such sensitive information in there.  And also,

15    by the way, as to Mr. Atilla, also because he is the person

16    most involved in this trial, where he is mentioned, we ought to

17    I think make sure that Mr. Zarrab -- I think we ought to play

18    that recording, get it into the record, and the witness should

19    be asked, in my opinion, is that what the recording says or is

20    that what the transcript says.  Something like that.

21           MR. DENTON:  Yes, your Honor.

22           THE COURT:  We did that in one or two instances where

23    they were short recordings.

24           MR. DENTON:  Just a few things, your Honor.  First,

25    obviously, as your Honor noted yesterday, there are multiple

HC13ATI2

1    paths of authentication.  The most direct one, which is

2    Mr. Zarrab testifying as to his personal participation and

3    communications, was not something that was briefed because his

4    cooperation was still under seal at that point.

5         So there is going to be another witness who will

6    essentially duplicate the authentication in his capacity as the

7    case agent in sort of the traditional way.  That is not a

8    necessary condition for authentication.  Mr. Zarrab's personal

9    participation --

10        THE COURT:  Yes.

11        MR. DENTON:  With respect to the playing of the

12   recordings, in large part, this is an effort to be helpful to

13   the jury, since obviously when translations are introduced, the

14   English translation is the evidence.  It is not the Turkish

15   audio.  And given that some of the calls are a little bit

16   lengthy and not particularly helpful to the jury, we're trying

17   to be a little bit efficient.  Obviously, the testimony has

18   been going on for several days now.

19        To the extent there are times where it would be

20   helpful, if the Court has particular suggestions, we can try

21   and see if there is an orderly way to incorporate that into the

22   presentation of evidence.

23        The calls that were played yesterday were ones that

24   directly involved the defendant, which is part of the reason

25   why we thought it was worth belaboring, even if the audio was

1    not by itself helpful to the jury.

2              THE COURT:  And they weren't that lengthy.  Some are

3    longer I guess than others.

4              MR. DENTON:  Your Honor, I think --

5              THE COURT:  So I'm saying that sort of belt and

6    suspenders.  I had no doubt, because you had said that you were

7    going to endeavor to authenticate with another person, I think

8    you've said, case agent or whomever has knowledge about the

9    recordings.

10             But what I'm suggesting is, in addition to that, so it

11   may take us a little longer and it will be somewhat less

12   efficient, but I think it would add gravitas to the

13   presentation.

14             MR. DENTON:  Yes, your Honor.

15             THE COURT:  By the way, I'm not thinking about your

16   case, the government's case.  I'm thinking about the proceeding

17   all together.  So I'm thinking as much about the defendant in

18   making this suggestion as I am about the government.  I'm not

19   trying to suggest how anybody should run their case.  But I am

20   concerned enough to raise the point.

21             MR. DENTON:  Yes, your Honor.  We can talk about which

22   specific recordings in particular, other than the one your

23   Honor mentioned, we can play.  We can figure out the

24   technological solution there.

25             Just with respect to one thing as a formal matter, the

1    reference to sort of belt and suspenders, defense counsel has

2    made continuing speaking objections to authenticity.  Our

3    understanding as to the contents of conversations that

4    Mr. Zarrab was a personal participant in, those objections have

5    been overruled.  That those are fully authenticated and the

6    content is admissible.  What is still subject to connection is

7    the metadata reflected on page one, which is obviously not

8    being published at this time.

9             THE COURT:  Right.

10             MR. DENTON:  That's our understanding of the Court's

11    rulings on that.

12             THE COURT:  We'll hear from the defense in a moment.

13    That was my understanding as well.

14             MR. DENTON:  Yes, and I wanted to flag one other

15    authentication issue with respect to Mr. Zarrab, which deals

16    with e-mail communications.  He is obviously fully capable of

17    authenticating any e-mail that he is a party to, as any witness

18    would be.

19             THE COURT:  Correct.

20             MR. DENTON:  There are other e-mails --

21             THE COURT:  There were a couple yesterday that came to

22    his company, but not to him directly.

23             MR. DENTON:  So we think this is an area where we're

24    in a classic subject to connection scenario.  The reasons those

25    are not being admitted fully now is because we could not reach

HC13ATI2

1    stipulations as to records custodians.  All of those e-mails

2    will be authenticated in a formal sense by witnesses from the

3    various e-mail service providers.  However, Mr. Zarrab's

4    testimony is necessary to explain what these documents are, who

5    the recipients of them are, why they're relevant to his

6    business.

7              THE COURT:  Yes.

8              MR. DENTON:  For example, I expect today we will show

9    him e-mails received by employees of his containing payment

10   instructions from Iran.  He did not personally receive them,

11   but he knows what they are, he can describe their relevance to

12   his business.

13             We think it is appropriate, given that the only thing

14   left is for a service provider to come in and say these were

15   business records provided in response to a search warrant, that

16   those be admitted subject to connection and published, so that

17   the jury can understand what he's describing about their

18   relevance.

19             THE COURT:  I agree with all of that.  And I have

20   one -- again, it is my memory.  Maybe it is clear in the

21   transcript.  It could be clearer in an e-mail, for example, to

22   which he's not himself a party, that he can tell us that this

23   is a typical business record with his company or part of the

24   business of his company to have documents such as this.

25             MR. DENTON:  Yes, your Honor, we can go through that.

 1                 THE COURT:  Yes.

 2                 MR. ROCCO:  I think yesterday, just this last point I

 3     think yesterday the issue was really these were not only

 4     records of Mr. Zarrab's company, but they were records that

 5     Mr. Zarrab had received from third parties, and in some

 6     instances, so we're talking about something like an invoice

 7     that came from somebody other than Mr. Zarrab's company.  And

 8     Mr. Zarrab --

 9                 THE COURT:  Came to the company?

10                 MR. ROCCO:  To the company.

11                 THE COURT:  You're talking about the attachments to

12     one of those e-mails yesterday?

13                 MR. ROCCO:  Yes.  And in some instances they are

14     attachments to e-mails.  That originate from third parties and

15     they contain hearsay and that's what our objection was.  Our

16     objection was primarily hearsay and also authenticity.

17                 THE COURT:  Also what?

18                 MR. ROCCO:  Authenticity.  I'm sorry, your Honor.

19     Also authenticity.  So, I don't think that, I don't think that

20     that issue really has been addressed by the government.  These

21     documents from third parties, especially.

22                 THE COURT:  For example, what if a vendor sent one of

23     Mr. Zarrab's companies a bill.  You don't think that comes in?

24                 MR. ROCCO:  I think if Mr. Zarrab saw the bill, I

25     think if Mr. Zarrab could testify to the fact that he was --

HC13ATI2

1    that he recognized the bill and the bill was, that the bill was

2    posted in the records, and there is a whole chain of events

3    that occur when you authenticate a document.  That's not what's

4    been happening with Mr. Zarrab.  It's only happened in a few

5    instances.  But it happens, and it is double or triple hearsay.

6    That's primarily what our objection is.

7            THE COURT:  You're saying that the person who got the

8    bill has to come, even if it is the mailroom?  You have to be

9    realistic here too.

10           MR. ROCCO:  No, I'm not saying that.  I'm saying there

11   is generally a chain of events that allows a person other than

12   the person in that mailroom who received the document who is

13   knowledgeable about records, to testify to what those records

14   are.  Typically, that testimony would come from a custodian of

15   records.  If a custodian is not available, if there is a way

16   that Mr. Zarrab can identify and say that -- not only

17   authenticate the document in the sense of saying that the

18   document is reliable because he's seen it before, he recognizes

19   that the bill got paid.  That's something that would provide

20   authenticity.  I don't think the government is doing very much

21   in terms of any of these third-party records of authenticating

22   them.

23           MR. DENTON:  I think Mr. Rocco is wrong about the law,

24   your Honor.  Obviously a business can incorporate third-party

25   records into its own records.  Also a custodian or a person

1      with authority over the company, like Zarrab, can say these are

2      the types of records that we received, that we used in our

3      regularly conducted business for this purpose.

4              THE COURT:  So my point was I'm not sure that has

5      always been asked, so that loop should be tightened or closed.

6              MR. DENTON:  That's fine.  We can do that.  But he

7      obviously, like any records custodian, does not need personal

8      knowledge of the specific document in order to authenticate it.

9              THE COURT:  I trust you and Mr. Rocco to know the law

10     better than I do.  I'm just saying as a practical matter, and

11     what makes sense to a jury and to the proceeding, is that we do

12     the best we can to confirm, let's say, any information that

13     flows out of this courtroom.

14             MR. DENTON:  We can build out a little more the

15     foundation for the business and the explanation of what purpose

16     his company used these records for, even if they were received

17     from third parties.

18             MR. ROCCO:  In some instances -- I don't want to make

19     this any more protracted than it has to be.  In some instances

20     when you're talking about records, you could get by Googling.

21     So, in that situation, I think that we really need to be

22     careful and make sure that there is at least some foundation

23     laid for the documents.

24             With respect to what your Honor opened with, in terms

25     of the playing these recordings --

1            THE COURT:  With respect to what?

2            MR. ROCCO:  Playing the recordings.  The recordings

3    that were played yesterday, your Honor, involved Mr. Atilla.

4    They were the only ones in which Mr. Atilla was a participant.

5    And we would object to essentially allowing the government to

6    go over testimony, testimony again, and that's what will happen

7    here, the jury has seen the transcripts, they've heard

8    Mr. Zarrab's testimony.  And essentially what's happening now

9    would be that the jury would be hearing it again.  And I don't

10   think that there is any reason --

11           THE COURT:  It is a very unusual circumstance.  If you

12   look at the transcript, as I did, we were in a big rush at the

13   end of the day, he thought I told him to sit down.  And he said

14   but I have one or two more questions.

15           I don't run the railroad that way.  You come up with

16   your part of the case, you'll get the same kind of treatment.

17           MR. ROCCO:  I appreciate that.

18           THE COURT:  Here's the bottom line:  I want whatever

19   comes out of here to be as professional, whether you're talking

20   about authenticity or hearsay or whatever, to show that, you

21   know, information is not flowing out of the courtroom that, as

22   far as me, the judge, didn't try to take every step to make

23   sure that it was -- not say true or not true, that's for the

24   jury to decide.  But that the process in presenting it was

25   entirely professional and that people would understand it.

1              MR. ROCCO:  Your Honor, I certainly defer to the

2     Court.  That's your province and that's your ruling.  But I

3     think that in the situation you're talking about, I think

4     you're talking about this Chinese conspiracy, which I

5     understand had --

6              THE COURT:  Honestly, I don't think I was talking

7     about a Chinese -- maybe I was.  I'll take a look at my notes

8     again.

9              I'm not concerned so much with the merits of the

10    discussion.  I'm just concerned that I felt that we were at the

11    end and we were trying to close up, and that I may have cut the

12    questioning short.  And I didn't mean to do that and don't mean

13    for that to happen.

14             I thought it might have been one or two questions.

15    Whether it was about China or not, I don't recall.  I think it

16    was after China or it might have been part of the China

17    discussion.

18             You're making a bigger thing out of this than I had.

19    I'm just saying, I didn't mean it to have universal

20    significance.  I just didn't mean to cut him off.  That's all.

21             MR. ROCCO:  We have --

22             THE COURT:  It happens, by the way, in every trial

23    that I've ever been in, even without me saying that, usually

24    the next day, the defense lawyer or the government says, "You

25    remember yesterday when we left off when I was asking you" such

HC13ATI2

1    and such and such and such.  It happens all the time.  That's

2    really all I'm talking about.

3            MR. ROCCO:  Okay.  Thank you, Judge.

4            THE COURT:  You bet.

5            MR. DENTON:  Just one housekeeping thing since we are

6    on the subject of the audio recordings.  We received notice

7    before trial there was some briefing about an expert who the

8    defense plans to call who will testify about intonations and

9    such.

10           We don't know what recordings he's reviewed or what

11   conclusions he will draw on what basis, since we haven't gotten

12   any report from that expert.  Obviously that's something that

13   we will need help ourselves, given that no one from the

14   government speaks Turkish.

15           So we wanted to flag for your Honor that no report of

16   the expert's conclusions or bases has been provided yet, and we

17   would ask that be provided far enough in advance to allow us to

18   get help in reviewing it.

19           THE COURT:  Good.  We're still waiting for one juror

20   to arrive.

21           It doesn't mean you have to talk to fill the time.

22           MR. DENTON:  Since we have the time, your Honor.  You

23   mentioned one specific recording that you thought it would be

24   valuable to play.  It is just going to take us a moment

25   technically.  We wonder if there are other recordings that the

1    Court or the defense thinks we should play the audio for.

2              THE COURT:  You can talk to them as to what they

3    think.  Yes, I think it's the information particularly about

4    the prime minister and one or more cabinet members was on one.

5    Was it all on the same recording?  That's one I definitely want

6    to have played, but I don't think it would be terrible to play

7    them all.  I'll leave that to you and the defense counsel.

8              MR. KAMARAJU:  We can speak to defense counsel about

9    it.  I think there is one specific recording that I believe

10   your Honor is referring to which has some discussion about

11   directives given or suggested by the prime minister and with

12   respect to other Turkish banks.  I think that's the one your

13   Honor is referring to.

14             THE COURT:  Yes.  There is also, is there mention in

15   that same of a minister role?

16             MR. KAMARAJU:  Yes.

17             THE COURT:  In that same recording?

18             MR. KAMARAJU:  Yes, there is a reference to

19   essentially a cabinet-level official for the Treasury.  Both

20   are referred to in the same.

21             THE COURT:  That for sure.  Again, I don't want

22   anybody to think we're just casually making these references.

23   And one way I think we can help that is by playing the

24   recording.  So that one is for sure.

25             MR. KAMARAJU:  Okay.  If we can just take a moment to

HC13ATI2

1    confer.

2              THE COURT:  You can, because we're still down one

3    juror.

4              MS. FLEMING:  Judge, my application yesterday was when

5    they have the transcript, I didn't ask that they play every

6    recording, but I think the underlying recordings have to be put

7    in evidence.  If the jury wants to hear it, the jury can listen

8    to them, even if it is in Turkish, for the intonations.

9              THE COURT:  I'm going a step further.  Under my

10   suggestion, both would happen.  You would both play it and it

11   would be in the record.

12             MS. FLEMING:  The ones we've already done, I would

13   like to have them put in evidence.

14             THE COURT:  I did have one other process question.

15   So, if counsel could approach just for a moment.

16             (At the sidebar)

17             THE COURT:  Just a thought.  We wound up with a pretty

18   large jury.  I think it's probably obvious to them and a lot of

19   people that they're not all going to be deliberating.

20             I think it is important to have reserves, but I was

21   thinking maybe letting the last one, whoever that is, loose

22   today and maybe at the end of next week, if we're still

23   standing, all of us, maybe letting one or two more go.  Or do

24   you want to just keep them all around?  We have 17.

25             MS. FLEMING:  I had a Christmas Eve verdict several

HC13ATI2

1      years ago.  And we reached the point where we were really close

2      to losing --

3                 THE COURT:  I get it.  I'm just throwing it out there.

4      Before the end of the day, because obviously we're going to

5      send them home, so if someone doesn't have to come back.

6                 MR. ROCCO:  Sure.

7                 THE COURT:  I think I would do maybe one.  I'll leave

8      it to you, think about it, and see.  And if you don't want to

9      do it, that's fine too.

10                MR. KAMARAJU:  Just a process question.  Do you intend

11     to take a midmorning break today?

12                THE COURT:  Yes.  We're going to get them a snack

13     around 11:30 I think.

14                MR. KAMARAJU:  Just thinking about the recording issue

15     and us gathering it, and I think we'd have to have Mr. Zarrab

16     authenticate it.  We can handle all that.  It will take us a

17     little longer.

18                THE COURT:  They're all here.  I'll be right out.

19                (Continued on next page)

20

21

22

23

24

25

1              (In open court)

2              THE COURT:  I think we have the jury here and we'll

3    continue with the direct examination of Mr. Zarrab.

4              (Jury present)

5              THE COURT:  So we're going to continue with the

6    government's direct examination of Mr. Zarrab.

7              THE DEPUTY CLERK:  Sir, before we begin, I'd like to

8    remind you, you're still under oath.

9              THE WITNESS:  Yes, ma'am.

10   REZA ZARRAB,

11        called as a witness by the Government,

12        having been previously sworn, testified as follows:

13   DIRECT EXAMINATION (Continued)

14   BY MR. KAMARAJU:

15   Q.  Good morning, Mr. Zarrab.

16   A.  Good morning, sir.

17   Q.  Do you recall yesterday I think we ended discussing a time

18   period in April of 2013.  Do you remember that?

19   A.  Yes, sir.

20             MR. KAMARAJU:  Mr. Chang-Frieden, if you can pull up

21   Government Exhibit 1002-T.

22   Q.  I believe this is where we ended.  Do you see at the top

23   where you ask, "Hopefully we don't have a problem in the food

24   subject, do we?"

25   A.  Yes, sir.

1    Q.  What did you mean by that?

2    A.  As I had mentioned yesterday, this is at the direction of

3    Mr. Suleyman Aslan, and as the gold restrictions are about to

4    begin, the direction was for us to start food.  And I'm asking

5    whether there would be any problem with the food starting, and

6    I'm trying to get a confirmation on whether there was any issue

7    with that.

8    Q.  At the time you sent this, were you actively sending food?

9    A.  You mean physically, food?

10   Q.  Yes.

11   A.  No, I never sent food, physically.

12   Q.  Do you see next where Aslan says, "No, we don't have a

13   problem in the food, do you have a problem with the method

14   proposed by Hakan Atilla?"

15        Then he goes on to say, "Related to the food trade

16   payments."  Do you see that?

17   A.  Yes, I see that, sir.

18   Q.  What did you understand him to mean?

19   A.  We had held conversations about how the food transactions

20   would be handled with the bank, what methods would be used,

21   he's asking whether the latest method that we had reached an

22   agreement on, that whether I had any problems with that.  And

23   this is the method that Mr. Hakan Atilla had also provided

24   guidance in and made additions to.  And that provided -- and

25   he's asking me if this last template was something that I had

1   agreed with, and if there are any issues that I may have had

2   with it.

3   Q.  If we can go to your response which I believe is the next

4   message down on both exhibits.  How do you respond?

5   A.  I say, "No.  That is absolutely a very correct method."

6   Q.  So at the time that you were exchanging these messages with

7   Suleyman Aslan, had you discussed a method to do food payments

8   with Hakan Atilla?

9   A.  Yes, I had talked to, met with Mr. Suleyman Aslan and

10  Mr. Hakan Atilla, on this method.

11  Q.  So we'll get into the particulars of that method in a

12  moment.  But, do you remember testifying yesterday about a

13  telephone conversation you had with Hakan Atilla?

14  A.  Yes, I remember that.

15  Q.  Do you remember testifying that during that conversation,

16  it was your belief that Mr. Atilla didn't know that there was

17  no food involved in the transactions?

18  A.  Yes, absolutely.  In that conversation, Mr. Hakan Atilla

19  had no clue that there would be no actual food being sent.

20  Q.  Was that conversation before or after this WhatsApp

21  exchange with Suleyman Aslan?

22  A.  That conversation was before this WhatsApp messages that

23  we're looking at here.

24  Q.  So, I'd like to focus on the time period between that, the

25  phone conversation you testified about, and these WhatsApp

1    messages.  Okay?

2              So, after you had that phone conversation with Hakan

3    Atilla, what did you do?

4    A.  I met with Suleyman Aslan at the bank.

5    Q.  I believe you testified about that meeting before, right?

6    A.  Yes, sir.

7    Q.  Could you describe for the jury what happened at that

8    meeting.

9    A.  Of course.  I'll summarize shortly.

10             In that meeting with Suleyman Aslan, I explained to

11   Mr. Suleyman that the amount was not being deposited into the

12   account with regards to food.  I said that Mr. Hakan Atilla had

13   no information about this matter.  I said that Mr. Hakan Atilla

14   had no information that food was not being actually sent.  I

15   said he suggested to me over the phone that this should be done

16   with a letter of credit.  And just as I said yesterday, he then

17   made a phone call, and he instructed Mr. Hakan to go ahead and

18   carry out this transaction.

19   Q.  You mentioned a letter of credit.  What is that?

20   A.  It is a method of payment that is used in real trade

21   situations where it is a letter that is written from one bank

22   to the other bank, whereas when the goods are loaded, the bank

23   would release the payment to the other bank by providing this

24   letter upfront.

25   Q.  So, to be clear, does the payment get sent before the goods

1   are loaded?

2   A.  It would come to the bank as a letter of credit.  Since I

3   never used a letter of credit in my life, I don't have much

4   information in that regard, so I know only roughly.

5   Q.  Would you have been able to obtain a letter of credit if

6   you never actually sent any food?

7             MS. FLEMING:  Objection, Judge.

8             THE COURT:  Overruled.  If you know.

9   A.  No, it would not have happened with that letter of credit.

10  Q.  The conversation that you had with Suleyman Aslan, was that

11  in reference to any particular financial transaction?

12  A.  Yes, it was related to a pending amount of money, it was

13  money that was waiting and we -- and I also talked to him about

14  the system in general.

15  Q.  What did you discuss about the system in general?

16  A.  In summary, we talked about what we could do, what I could

17  provide as sufficient documentation for this, and I mentioned

18  that the customs documentation that I had utilized in my tea

19  trade before, that I could provide that document also.  So we

20  talked about that in general.

21            And Mr. Suleyman said let's see these documents, and

22  then let's develop the final version of how this would be

23  executed.

24  Q.  The payment that had been delayed, was it processed after

25  this meeting?

 1   A.  Perhaps it was with some delay.  Because we had a specific

 2   period of time in which we had to provide documentation for

 3   food trade transactions.  In other words, we had some time in

 4   order for us to be able to get the documentation and submit

 5   them to the bank afterwards.

 6              MR. KAMARAJU:  Mr. Chang-Frieden, can we pull up

 7   Government Exhibit 297-T, please, this was previously admitted

 8   in evidence, and publish it from page two.  Could we keep going

 9   to the next page, please.  I'm sorry, one more page.  And

10   towards the bottom of the page.

11   Q.  First of all, who is this conversation with?

12   A.  This is between Abdullah Happani and myself.

13   Q.  Why were you calling Happani at this time?

14   A.  After I had left the meeting at the bank, I'm giving a

15   summary of the bank to Abdullah Happani.

16              THE COURT:  Giving a summary of what?

17              THE INTERPRETER:  Summary of the meeting to Abdullah

18   Happani.

19   Q.  So, we looked at this call briefly yesterday.  But I want

20   to ask you, at the top, do you see "The man made the call in my

21   presence"?

22   A.  Yes, sir.

23   Q.  What do you mean there?

24   A.  I'm saying that Mr. Suleyman Aslan had called Mr. Hakan

25   Atilla in my presence.

 1   Q.  What do you go on to say?

 2   A.  I say he said he will do this job.

 3   Q.  After that, you say, "Hakan Atilla threw a wrench in the

 4   gears and he threw this thing."

 5   A.  Yes, I'm telling Abdullah Happani that Hakan Atilla was

 6   blocking this, he was throwing a wrench in the gears.

 7   Q.  What do you mean by that?

 8   A.  I mean, during that day, Mr. Hakan Atilla was throwing a

 9   wrench in the gears in order to block this transaction.

10   Q.  Is that why you spoke to Suleyman Aslan?

11   A.  Certainly, that's why I want to do a meeting, and I told

12   him Mr. Hakan Atilla had no information about this matter.

13   Q.  What does Happani ask you?

14   A.  He is asking so are they receiving into the account now.

15   Q.  What is "the six"?

16   A.  It is a reference to the 6 million transaction that was

17   sent from Iran.

18   Q.  How do you respond to Happani?

19   A.  I say they call me and they were going to move it over and

20   deposit it.  And the bank had questions, they had called me,

21   and right during that time, but I was unable to answer the call

22   because it was right during that time.

23   Q.  What did you mean by the bank had questions?

24   A.  I mean, I don't remember what it was, the bank had a

25   question, I don't know what it was.  I did not answer that

1   phone call, so I don't know what it could have been.  But, it

2   could have been that they were going to ask when the document

3   would be ready regarding this transaction.  So I don't remember

4   exactly what it may have been.

5           But, as a result of the meeting, as I left

6   Mr. Suleyman Aslan, my understanding was that the transaction

7   would be taken care of and the money would be transferred.

8           MR. KAMARAJU:  Mr. Chang-Frieden, can we please pull

9   up Government Exhibit 298-T.  I believe it has also been

10  admitted in evidence.  Publish that from page two.

11  Q.  Mr. Zarrab, who is this call with?

12  A.  It's with Mr. Hakkan Aydogan.

13  Q.  Who is that?

14  A.  Hakkan Aydogan was an individual that worked at a lower

15  rank within the international department of Halkbank.

16  Q.  Do you recall when this call occurred?

17  A.  It was after the meeting.

18  Q.  Just to be clear for the record, which meeting are you

19  talking about?

20  A.  It is after the meeting that I had had with Mr. Suleyman

21  Aslan.

22  Q.  Now, do you see on page two where you say, "Now look, let

23  me explain the transaction to you in general."

24  A.  Yes, I see that.

25  Q.  Prior to this conversation, had you ever spoken to Hakkan

HC13ATI2                        Zarrab - Direct

1    Aydogan about doing the food business?

2    A.  No, I had not talked to him regarding this matter.

3    Q.  Do you remember testifying about meetings in October of

4    2012 at Halkbank?

5    A.  Yes, I remember that.

6    Q.  Was Hakkan Aydogan in those meetings?

7    A.  No, he was not.

8    Q.  Do you remember you testified about meeting with Suleyman

9    Aslan on a few occasions prior to this call?

10   A.  Yes, I remember that.

11   Q.  Was Hakkan Aydogan in those meetings?

12   A.  No, Hakkan Aydogan was not in those meetings.

13   Q.  Was Hakan Atilla in any of those meetings?

14   A.  There were times where Hakan Atilla was present in

15   meetings.

16   Q.  What was your understanding of Hakkan Aydogan's role at

17   Halkbank?

18   A.  Hakkan Aydogan was one of the bank employees that was

19   dealing with Iranian transactions.

20              (Continued on next page)

21

22

23

24

25

1   Q.  Okay.  And how was his role different than Hakan Atilla's?

2   A.  The role of Mr. Hakan Atilla was that he was the person

3   with the highest authority.  He was at the head of the

4   international department.  In quick summary, Hakkan Aydogan was

5   not a person that I was corresponding with at that time that

6   much.

7   Q.  Now, in this call, if you go on to the next thing you say,

8   do you see at the bottom where you say:  "Here's how it is.  In

9   Dubai, there is a serious volume of food going from Iran to

10  Dubai"?

11  A.  Yes, I see that.

12  Q.  What did you mean by that?

13  A.  Just as I had explained to Mr. Hakan Atilla in the morning,

14  this is yet another time now I'm trying to explain this to

15  Mr. Hakkan Aydogan.

16  Q.  Now, subsequent to this call with Hakkan Aydogan, did you

17  meet with Suleyman Aslan again?

18  A.  Could you repeat the question again?

19  Q.  Sure.  After you had this call with Hakkan Aydogan, was

20  there another meeting with Suleyman Aslan?

21  A.  You mean later, after this phone conversation?

22  Q.  Yes.

23  A.  Yes.

24  Q.  Approximately when was that meeting?

25  A.  It would be very close.  It would not be that far from each

1    other.  It would be within the same month.

2    Q.  And was there anyone else at that meeting?

3    A.  In one of them there was.

4    Q.  Okay.  Who was that?

5    A.  Mr. Hakan Atilla.

6    Q.  Okay.  Did that meeting occur before or after the WhatsApp

7    chats that we looked at with Suleyman Aslan earlier today?

8    A.  It was before because the WhatsApp messages that we were

9    looking at, it shows that the method was complete.  In other

10   words, the meeting that was held between me and Mr. Suleyman

11   and Mr. Hakan, in that meeting we finalized this final version

12   of how this method would work and how the system would be

13   implemented.

14   Q.  Where was that meeting?

15   A.  At Halkbank.

16        MR. KAMARAJU:  Your Honor, with the Court's

17   permission, I'd ask that, as he describes the contents of the

18   meeting, Mr. Zarrab is allowed to diagram it as a

19   demonstrative, as he did yesterday.

20        THE COURT:  That's fine.  One thing, Mr. Zarrab, who

21   was at the meeting that you just talked about?

22        THE WITNESS:  Mr. Suleyman Aslan, general manager of

23   Halkbank, Mr. Hakan Atilla and myself, and we finalized the

24   system and the method by discussing it.

25        THE COURT:  At this meeting?

1          THE WITNESS:  Yes, in that meeting, your Honor.

2          THE COURT:  Okay.

3   BY MR. KAMARAJU:

4   Q.  So, Mr. Zarrab, would you mind describing -- and as you're

5   going, if you could diagram it, I think that would be helpful,

6   with the Court's permission.

7          MR. KAMARAJU:  Can everybody see?  Sorry, except for

8   your Honor.

9          THE COURT:  That's okay.  Don't worry about me.

10  BY MR. KAMARAJU:

11  Q.  Okay.  So in a typical food transaction that would be run

12  through the method that we discussed, what would be the first

13  thing that happens?

14  A.  You mean within the system that we utilized?

15  Q.  Yes.

16          THE COURT:  So is this going to be the post-gold

17  system?

18          THE WITNESS:  Yes, your Honor, but it was also

19  utilized along with gold, too.

20          THE COURT:  Okay.

21          THE WITNESS:  In other words, both systems worked

22  alongside each other, and when gold stopped, then we turned to

23  food.  And when Mr. Hakan Atilla found a loophole with regards

24  to the gold, then we continued on with gold later as well.

25  BY MR. KAMARAJU:

HC1PATI3                    Zarrab - Direct

1   Q.  And what did you draw up there?

2   A.  It's the NIOC, the National Iranian Oil Company, it's the

3   seller of oil products in Iran.  The first leg of this

4   transaction again begins with Iran selling crude oil and gas to

5   Turkey.  Tupras in Turkey buys crude oil from NIOC, and Botas

6   buys natural gas from NIOC in Turkey.  NIOC sends the product

7   to Tupras and Botas, and after that, Tupras and Botas make

8   their payments to NIOC.

9   Q.  And remind us, what is Tupras?

10  A.  Tupras is a petroleum refinery company located in Turkey.

11  Q.  And Botas?

12  A.  Botas is a gas company.  It's the company that buys gas

13  from Iran.

14          These payments take place within Halkbank.  After

15  this, the NIOC would transfer this money over to a bank in Iran

16  in order to facilitate its access to this money.

17  Q.  And why did it transfer the money to the Iranian bank?

18  A.  Because NIOC would not be able to make the international

19  payments that I'm about to draw in a little bit directly by

20  itself.

21  Q.  Why not?

22  A.  Due to regulations of the U.S. embargo and also due to

23  international sanctions.

24  Q.  Did you discuss that fact with anybody at NIOC?

25  A.  Many times.  In fact, NIOC had that request to be able to

 1   make these payments directly through the bank, as well, and

 2   they were not able to do so.

 3   Q.  Did you discuss it with anybody at Halkbank?

 4   A.  In my presence, during a meeting where I attended, Halkbank

 5   was approached with this request to be able to make these

 6   payments directly, and they were refused and I was at that

 7   meeting.

 8   Q.  And when you say Halkbank, who from Halkbank was at that

 9   meeting?

10   A.  Mr. Suleyman Aslan and Mr. Hakan Atilla.

11   Q.  So what happened next?

12   A.  NIOC would transfer the money to the account of Sarmayeh

13   Bank within Halkbank.

14   Q.  Okay.  And what happens after that?  What did you draw up

15   there?

16   A.  Iran Sarmayeh Bank.  Underneath that, Sarmayeh Exchange,

17   and underneath that is Toseh Tejarat.

18   Q.  Remind us, what is Toseh Tejarat?

19   A.  Toseh Tejarat was a company that was established by

20   Sarmayeh Exchange.  That is a front company that makes their

21   transactions appear as if they are commercial transactions.

22   Q.  Was that the same company that was involved in the gold

23   trade?

24   A.  Yes.  It was utilizing gold, as well, and there were other

25   companies also.

1    Q.  So what happens after that?

2    A.  NIOC would send payments instructions to Sarmayeh Exchange.

3    Q.  Okay.  And what would be typically contained in those

4    payment instructions?

5    A.  The recipient of this money, the beneficiary's name, the

6    final destination bank, the currency, and the account

7    information for the company.  It's a payment instruction.

8    Q.  Okay.  What happens after the payment instruction gets sent

9    to Sarmayeh?

10   A.  I'm drawing this with regards to food.

11   Q.  What's that?

12   A.  Volgam Gida is the food company that I own.  It's the

13   company through which I run the food business.

14   Q.  And when you say it's the company that you own, did Volgam

15   ever ship any actual food?

16   A.  No, never.

17   Q.  So what happens then?  What's then?

18   A.  Centrica Company is a company in Dubai that is owned by my

19   group in Dubai.

20   Q.  Has Centrica ever shipped out any food, actual food?

21   A.  There was -- within the food trade, there was never an

22   instance where food was ever sent to Iran.  This was all a

23   system that was developed in order to be able to make the

24   international payments that were instructed.  So the purpose of

25   this was to get the money out of Halkbank, where it had

1   accumulated.  So it's the food version of the gold.

2   Q.  Okay.  So what happens after that?

3   A.  Sarmayeh Bank would send a message to Halkbank.  It would

4   be a telex.  As a result of that, money would be transferred

5   from Sarmayeh's account to Volgam.

6   Q.  Okay.  Would there be a reason given for that transfer?

7   A.  It would contain the pro forma number, and the food would

8   be specified, but on this paper, it would show the pro forma

9   number.

10  Q.  Okay.  And what is the pro forma number in reference to?

11  A.  In other words, that would be the number of the first pro

12  forma that our company, Volgam, would have cut for Toseh

13  Tejarat.

14  Q.  And was that intended to reflect the food transaction

15  between Volgam and Toseh Tejarat.

16  A.  Yes.

17  Q.  So what happens after that?

18  A.  This money would be transferred into the Centrica account

19  within Halkbank.

20  Q.  And would there be a reason given for that internal

21  transfer?

22  A.  This would be the supplier of food in appearance.

23  Q.  And to make sure we're clear, who would be the supplier of

24  food in appearance?

25  A.  Centrica Dubai company.

1   Q.   And what would Volgam appear to be?

2   A.   The company that is selling the food to Iran.

3   Q.   And both of those companies are under your control?

4   A.   Yes.  Certainly, sir.

5   Q.   So what happens after the money gets transferred into the

6   Centrica account?

7   A.   There are two separate, different methods.  I will draw the

8   first one at this point, Bank of Baroda in Dubai.  Within the

9   Bank of Baroda in Dubai, there would be an account for Centrica

10  Dubai or the Centrica Company or Atlantis Trading.  And here,

11  we had this other company that was a food company, Atlantis

12  General.

13  Q.   What is Atlantis General?

14  A.   It's a food supplier.  In other words, for a certain period

15  of time we used Atlantis General, and we would be using

16  Centrica Dubai for a certain period of time.

17  Q.   Who controlled Atlantis General?

18  A.   It was a Royal Group, which was me.

19  Q.   And when you say Atlantis was a food supplier, do you mean

20  that it supplied real, physical food?

21  A.   None of the companies that I'm drawing on this diagram here

22  would ever be involved in sending actual food because there was

23  no actual trade out there.  This was just an accessory in order

24  to be able to carry out the money orders.

25  Q.   So what happens next?

1    A.  Halkbank would send a message to Bank of Baroda.  Centric

2    or Atlantis, whichever one is working at that point, that money

3    would be transferred into the account of that one.  So now, the

4    money is in Dubai, in Baroda.  This is just an example that I'm

5    drawing here; so it would be in Bank of Baroda, either in

6    Centrica Dubai or Atlantis, and in this example, I'm using

7    Centrica Dubai.

8    Q.  What happens next?  We're going to see if we can get you a

9    darker marker.  Here, why don't you try this one.  That's fine.

10   Please proceed.

11   A.  So, of course, as this transaction is being carried out,

12   the payment instruction would have been received by my company,

13   Royal Group.

14   Q.  Okay.  So what happens then?

15   A.  The money would be in control of Atlantis and Centrica, in

16   their accounts in Dubai.

17   Q.  So what would you do with the money?

18   A.  We would take the payment instructions that we had received

19   from Iran and direct it towards our company Atlantis in Dubai.

20   Q.  Why would you do that?

21   A.  Can you rephrase the question, please?

22   Q.  Sure.  What was the purpose of transmitting the payment

23   instruction from your company from -- to the company in Dubai?

24   A.  In order to be able to make the payments, you need to have

25   the money.  Since the money is in Dubai here, that's why it is

1   here.  In this diagram that is true, the money is now in Dubai.

2   But there are times when we got the money out in Turkey and

3   sent it out of Turkey, but that is not an example I'm depicting

4   here.

5   Q.  Okay.  So let's keep going with this one.  So what do all

6   the color lines mean?  Can you tell us what you're writing?

7   A.  The orange color is to show money movement, and the blue

8   one shows the initial payment order that was put in by Iran or

9   by Iranians.  And in Dubai, just like it was with the gold, the

10  both, the blue and the orange, merge, they come together.  In

11  other words, the money and the instructions merged together.

12        Then, the Rostamani Exchange makes the payment at the

13  order of -- that is received from our company.

14  Q.  Why is Rostamani Exchange used to make that payment?

15  A.  Rostamani Exchange, if this were a U.S. dollars exchange,

16  would use its accounts at Standard Charter in the U.S.A.  But,

17  first, this Euro would be converted into dirhams and we would

18  make the payment to Rostamani in dirhams.

19  Q.  Remind us again, what is dirhams?

20  A.  Dirham is the local currency used in Dubai, in United Arab

21  Emirates.

22        If this were a dollar transaction, the amount of this

23  transaction would be transferred by Rostamani to Standard

24  Charter, and a copy of that would also be sent to the Bank of

25  China at the end of this, let's say $25 million or one or three

 1    or five million.

 2            The transaction that had started here gets merged with

 3    the money right here, and here it would be finalized.  So the

 4    transaction got started up here, gets finished up down here,

 5    which means that the Iranian's money orders would be fulfilled

 6    in whatever currency and wherever they had requested them to be

 7    made.  This would be fulfilled.

 8            At this point, the transaction side of this at

 9    Halkbank would not be completed because we need to submit

10    documentation to the Halkbank that would be corresponding to

11    the money that we had received.

12    Q.  What kind of documentation did you need to submit?

13    A.  First, pro forma invoice; second, final invoice; third

14    customs declaration; fourth, the shipping document; and fifth

15    would be supplier invoice and the instructions.

16    Q.  When would you typically submit those documents?

17    A.  Just like it was with gold, we had a certain period of time

18    to be able to submit these documents; so within that time

19    period after the completion of the transaction, we would submit

20    these documents.

21    Q.  And what was the purpose of submitting that documentation

22    to Halkbank?

23    A.  That is in order to conceal this transaction.  That's where

24    the method and the system kicks in place.  So the summary of

25    this entire transaction is that it is there to make it appear

1    as if it was a food trade transaction and not a money transfer

2    transaction.

3           And, also, in the meeting that was held with

4    Mr. Suleyman and with the meeting with the three people, in

5    other words, Mr. Hakan Atilla, was the discussion of this

6    method and designing of this method.

7    Q.  Okay.  Before we turn to that, let me ask one quick

8    question.  You've said that parts of this are just like it was

9    with the gold; do you remember that?

10   A.  Yes, absolutely.

11   Q.  What parts overlap with the gold transaction here?

12   A.  The purpose and the result.  Here and here.

13   Q.  Okay.  So let's talk about what's different.  What's

14   different between the food system and the gold system?

15   A.  With the gold, the gold was being exported from Turkey over

16   to Dubai.  In other words, there was a physical export that was

17   being made, and it was being reflected in the export for

18   Turkey.

19   Q.  And what about the food?

20   A.  There was nothing out there as far as -- in terms of food.

21   Q.  So how would you make it look as if there were actual food

22   transactions?

23   A.  We were submitting fake documents to the bank.

24   Q.  So you testified earlier that parts of this system were

25   agreed to during the meeting with Aslan and Atilla; is that

1    right?

2    A.   Yes, that's correct.

3    Q.   Could you describe for the jury what those are?

4    A.   In that meeting, everybody had contributions made with

5    regards to this system.  For example, the idea of transferring

6    the money from Volgam to Centrica within Halkbank was from

7    Mr. Hakan Atilla.

8    Q.   Did he have give a reason for why he proposed that?

9    A.   Because he did not want the payment coming from Iran to

10   Volgam, he didn't want that going directly to Dubai.

11   Q.   What was your understanding of when he said he didn't want

12   the payment going directly from Volgam to Dubai?

13   A.   So all concerns that Mr. Levent Balkan had, they were all

14   coming back together.

15   Q.   Could you describe those concerns again?

16   A.   It's Iranian transaction, it's Volgam, it's owned by me.

17   The fact that it would be shown in international banking

18   transactions even if it's in Euros, it would show the relation

19   to Iran.  Otherwise, there was no technical instruction for

20   Volgam being able to send money directly to Centric and Dubai,

21   and Halkbank could also make a direct payment to Atlantis or

22   Centrica Dubai through Bank of Baroda.

23        In that case, the sender would have shown up as Volgam

24   and the recipient would have shown up as Centrica.  In this

25   example, the sender is Centrica and so is the recipient.  When

1    the sender and recipient are the same, the transaction would

2    not draw attention at the correspondent banks.

3    Q.   Is there anything else discussed during that meeting?

4    A.   Yes.   I told the individual that I would be using small

5    vessels.   Based on my tea trade experience, that I would be

6    able to provide documentation that would show that I would be

7    using small vessels.

8    Q.   Let's be clear.   You said the individual, who are you

9    referring to?

10   A.   I did not mean a specific individual.   What I meant was I

11   was speaking at that meeting; so we were discussing as a group.

12   There was nothing specific individual with this.

13   Q.   Okay.

14   A.   Mr. Hakan Atilla asked for a bill of lading.   He asked

15   whether we could provide a bill of lading.

16   Q.   What's a bill of lading?

17   A.   This document that shows the loading onto vessels.

18   Q.   And what kind of information is typically reflected on a

19   bill of lading?

20   A.   The company that sent the goods, the goods, the destination

21   point, the amount and the shipping company, in other words,

22   which vessel was transporting it.

23   Q.   Had you had experience with bills of laiding before?

24   A.   No, I didn't have much experience.   I was sending the tea

25   to Iran on these small vessels in the past.

1   Q.   Remind us, how old were you when you were doing that tea
2   business?
3   A.   Between 16 and 17.
4   Q.   So how did you respond when Atilla asked you whether you
5   could provide a bill of lading?
6   A.   I said, of course, we can submit that.
7   Q.   And what did he say in response?
8   A.   Then he said when the bill of ladings are entered, there is
9   some questioning on the loading of the goods in terms of large
10  companies, you know that, right?  In other words, whether the
11  goods were sent or not could be traced.
12  Q.   And what was your understanding of what he meant by that?
13  A.   That is to mean that the lower-rank employees at the bank,
14  or other people elsewhere, when they enter this number for the
15  bill of lading, they would be able to trace whether the
16  shipment actually occurred or not, such as for large companies,
17  like Maersk, they would be able to look that up.
18  Q.   Why would that be a problem?
19  A.   Because there were never goods shipped.  So I told him that
20  we could not submit that.  I said, we could provide the
21  documentation from other small vessels.  Since the small
22  vessels are not affiliated with large companies, there would be
23  no tracing of it.
24           Here, there is one section missing.
25  Q.   Okay.  What is it?

1   A.  Later on, at certain times we used another Turkish bank

2   between Bank of Baroda and Halkbank.

3   Q.  Did you want to try to add that to your diagram?

4   A.  If there's space, I will do so.

5   Q.  What would happen with this additional Turkish bank?

6   A.  From Centrica or Atlantis, it would go to the Centrica

7   account within Türkiye Finans Bank in Turkey.  From there, it

8   would be sent to the Centrica account in Dubai, and there was a

9   specific reason for this.

10  Q.  What was that?

11  A.  Since Bank of Baroda knew that Halkbank was a correspondent

12  for Iranian transactions, it began to feel a concern in terms

13  of transactions coming from Halkbank.

14  Q.  Who at Halkbank was concerned about that?  Withdrawn,

15  withdrawn.

16          MS. FLEMING:  Your Honor, there's no question pending.

17          THE COURT:  Yes, there's no question.

18  Q.  So why was an additional Turkish bank involved?

19  A.  Bank of Baroda began to feel concern with regards to

20  transactions that were coming directly from Halkbank.

21  Q.  How would this address that concern?

22  A.  Because Türkiye Finans Bank was not doing any trade with

23  Iran.  So within this system, the connection to Iran is

24  completely cut out.

25  Q.  Was that your idea, to involve another Turkish bank?

1    A.  Yes.

2    Q.  Was that discussed at the meeting?

3    A.  No.

4    Q.  Was there anything else discussed at the meeting that you

5    were testifying about between Aslan, Atilla and yourself?

6    A.  No.  In general, this is what I remember.

7    Q.  Now, did you come to any agreement about what documents

8    would be provided?

9    A.  Yes.

10   Q.  So what types of documents were you going to provide after

11   this meeting?

12   A.  The documents that I have written down right here

13   pertaining to loading onto small vessels, the invoice of the

14   supplier company that is sending to Volgam.  So everything that

15   I have written down here as a list.

16   Q.  Mr. Zarrab, I'm going to ask you to return to the witness

17   stand.

18        MR. KAMARAJU:  And, your Honor, with the Court's

19   permission, we would mark what Mr. Zarrab has drawn as

20   Government Exhibit 9503 and offer it as a demonstrative.

21        THE COURT:  I'll allow it.

22        (Government's Exhibit 9503 received in evidence)

23   BY MR. KAMARAJU:

24   Q.  Showing you what's been marked for identification as

25   Government Exhibit 745, do you recognize this exhibit?

1   A.  Yes, I recognize it.

2   Q.  What is it?

3   A.  This is an abbreviated version of the diagram that's there.

4              THE COURT:  You mean that you just drew?

5              THE WITNESS:  Yes, your Honor.  It's an abbreviated

6   version of that, but it shows the same thing.

7   BY MR. KAMARAJU:

8   Q.  Do you know who drew it?

9   A.  It was me.

10  Q.  Was it drawn before you were arrested?

11  A.  I don't recall the time.

12  Q.  Was it drawn before you were arrested in Miami?

13  A.  That is definite.

14  Q.  And you said it was an abbreviated version of what's

15  depicted in Government Exhibit 9503; is that right?

16  A.  Yes, sir.

17  Q.  Does it depict either the food or the gold system?

18  A.  Yes, sir.  In fact, it says food.

19             MR. KAMARAJU:  Your Honor, the government would offer

20  Government Exhibit 745 and ask permission to publish it.

21             MS. FLEMING:  Objection, hearsay, Judge.

22             THE COURT:  I'll allow it.

23             (Government's Exhibit 745 received in evidence)

24             MR. KAMARAJU:  If we could publish that,

25  Mr. Chang-Frieden.

HC1PATI3                         Zarrab - Direct

1   BY MR. KAMARAJU:

2   Q.  Okay.  So let's just start at the top left, okay?  Do you

3   see where it says "IR bank"?

4   A.  Yes, sir.

5   Q.  What's that?

6   A.  Bank in Iran.

7   Q.  Okay.  And then do you see the next box down?

8   A.  I see it, sir.

9   Q.  What's written there?

10  A.  It says "Halk," sir.

11  Q.  And what's that a reference to?

12  A.  It's Halkbank, sir.

13  Q.  Do you see the two boxes below Halkbank?

14  A.  Yes, sir.

15  Q.  What are those intended to depict?

16  A.  It depicts the buyer that would be buying the food in Iran,

17  and also, it shows the supplier company that would be supplying

18  the food.

19              (Continued on next page)

20

21

22

23

24

25

1   Q.   Okay.  It appears there is a word written in Turkish to the

2   right there.  Do you see that?

3   A.   Yes, sir.

4   Q.   What word is written there?

5   A.   Gida.

6   Q.   Do you know what "Gida" is in English?

7   A.   (In English) Food.

8   Q.   Is there a box below that?

9   A.   There is, sir.

10  Q.   What's that box?

11  A.   It's Halk, Halkbank, sir.

12  Q.   So, the two Halkbank boxes and the two boxes in between

13  those, what is that intended to depict?

14  A.   It's a diagram showing that there would be a transfer made

15  within Halkbank, between two companies such as here, from the X

16  company to the A company, and following that, then the money

17  would be sent out of Halkbank just like I had drawn on the

18  diagram over there earlier.

19  Q.   Okay.  Do you see what is the box drawn below the lowest

20  Halkbank box?

21  A.   It is Dubai, sir.

22  Q.   What is below that?

23  A.   It goes into a different section there.  And there is Royal

24  there.

25  Q.   What is Royal?

1    A.   It is a company owned by me.

2    Q.   Then what is to the right of that?

3    A.   Deniz, which represents DenizBank.

4    Q.   What is to the right of that?

5    A.   It's the symbol for dollars.

6    Q.   What is depicted to the right of the dollar sign?

7    A.   Then it shows arrows, meaning the international payments

8    were being made.

9    Q.   Mr. Zarrab, is this the system that you agreed to with

10   Hakan Atilla?

11   A.   Yes.

12            MR. KAMARAJU:   We can take that down.

13   Q.   You testified that there were certain documents that you

14   had to obtain for this system; is that right?

15   A.   That is correct.

16   Q.   Did you make efforts to get those documents?

17   A.   A lot.

18   Q.   Were you making efforts to get those documents even before

19   the meeting with Hakan Atilla?

20   A.   Of course, I actually took samples of documents that I

21   could be submitting, I took those to the meeting.

22   Q.   I'd like to show you what's been marked for identification

23   as Government Exhibit 238-T.   Take a moment to review that,

24   please.   Thank you.

25            Do you recognize the exhibit?

1    A.  Yes, I recognize it, sir.

2    Q.  What is it?

3    A.  Transcript of a phone conversation.

4    Q.  Do you remember the call?

5    A.  Yes, I remember, sir.

6    Q.  Were you a participant in the call?

7    A.  Yes, sir, I was a party to this.

8    Q.  Have you listened to an audio recording of the call?

9    A.  Yes, I listened to it, sir.

10   Q.  Did the recording accurately capture your conversation?

11   A.  Yes, sir.

12   Q.  Was that conversation in Turkish?

13   A.  Yes, it was in Turkish.

14   Q.  Does this transcript reflect the Turkish phrases that were

15   used during that conversation?

16   A.  I don't understand the question fully.  Can you please

17   repeat.

18   Q.  That was a poorly worded question is what I'll say.

19          Does the transcript here, 238-T, properly reflect the

20   conversation in Turkish?

21   A.  Yes, sir, it reflects it.

22   Q.  Who were you speaking with?

23   A.  Serdar, who is an employee of mine who was working in Dubai

24   during that time.

25   Q.  What was the general purpose of the call?

1    A.  I had called, the purpose of this call was, I had called

2    him to discuss the documents that we can obtain to be able to

3    submit to Halkbank.

4              MR. KAMARAJU:  The government would offer Government

5    Exhibit 238-T into evidence.

6              MS. FLEMING:  Objection.

7              THE COURT:  I'm going to allow it.

8              (Government's Exhibit 238-T received in evidence)

9              MR. KAMARAJU:  Can we publish that from page two to

10   the jury, please.

11   Q.  Do you see near the top of the page, where you say "Serdar,

12   do you know those langes, those wooden ships that transport

13   goods to Iran?"

14   A.  Yes, sir.

15   Q.  What did you mean here?

16   A.  In Dubai, right by the shoreline, you can actually see,

17   those that are driving by the shore from their cars, they can

18   see the wooden vessels that are docked on the side.  They are

19   the small tonnage vessels, because this is a shore that is a

20   short distance from Iran, and this is where the shipping can

21   occur.  These vessels are there.

22   Q.  Were you referring to the same kinds of vessels that you

23   proposed using during the meeting with Aslan and Atilla?

24   A.  Yes.  I am preparing documentation that could be submitted.

25   And I'm telling Serdar to go and obtain documentation regarding

1   these vessels, these ships.  I mean, I was going to take these

2   documents with me to the meeting and show them during the

3   meeting.

4   Q.  Do you see a little further down where you say, "Go to the

5   customs office in Qoor and pick up two books of manifests,

6   blank manifests.  Companies fill those out, you know."

7   A.  I see that, sir.

8   Q.  What did you mean by that?

9   A.  Previously, but first I'd like to explain the part about

10  Qoor.  Qoor is the harbor where these small vessels are docked.

11  And over there, there is a customs building that pertains to

12  these.

13          I'm providing with directions to go to that customs

14  building there, and in that building, on the information desk,

15  there are blank manifest documents.  So, when I was sending tea

16  to Iran, I would be doing the same thing with that trade.  I

17  would go into the building, pick up a blank manifesto, and I

18  would be filling out the loading information on there to use it

19  as a document.

20  Q.  Do you see a little further down where you say, "You fill

21  it out, you know, and then the customs office applies the

22  signature and the stamp."

23  A.  Yes, I see that, sir.

24  Q.  What did you mean?

25  A.  I'm describing the procedure here, just as I said earlier,

1    you'd pick up the manifest, you fill it out with the loading

2    information, and you take this document then to a customs

3    officer within the same building, and have him stamp that

4    document indicating that it had been exported, that this was

5    sent out of Dubai.

6    Q.  I'd like to show you what's been marked for identification

7    as Government Exhibit 240-T.  Do you recognize the exhibit?

8    A.  Yes, sir, I recognize it.

9    Q.  What is it?

10   A.  It is a transcript of a phone conversation.

11   Q.  Do you remember the call?

12   A.  Yes, I remember, sir.

13   Q.  Were you a participant in the call?

14   A.  Yes, sir, I had taken part.

15   Q.  Have you listened to an audio recording of this call?

16            MS. FLEMING:  No objection, subject to connection.

17            THE COURT:  Go ahead.  You can still ask your

18   questions.

19            MR. KAMARAJU:  Sorry?

20            THE COURT:  I said you can still ask the questions.

21            MS. FLEMING:  Sorry, I thought I was helping.

22   A.  Yes, I have listened to it, sir.

23   Q.  Does the audio recording accurately capture the

24   conversation?

25   A.  Yes, sir.

1   Q.  Does this transcript accurately reflect the Turkish portion

2   of that conversation?

3   A.  Yes, sir.

4   Q.  Who are you speaking with?

5   A.  Abdullah Happani.

6          MR. KAMARAJU:  Your Honor, the government would offer

7   Government Exhibit 240-T.

8          THE COURT:  I'll allow it.

9          (Government's Exhibit 240-T received in evidence)

10         MR. KAMARAJU:  If we can put that up on the screen.

11  Q.  Do you see third box down where you say, "I wanted to say,

12  let's not do rice for the first one, let's do sugar.  Um,

13  Gudarzi can research his prices right away.  He had obtained a

14  pro forma from that Brazilian company in the past."

15  A.  Yes, I see that, sir.

16  Q.  What are you referring to there?

17  A.  I'm telling Abdullah Happani that we should not do rice as

18  the first transaction.

19  Q.  Why not?

20  A.  Gudarzi was an individual that was working in Turkey at

21  that time on behalf of Sarmayeh Bank, Sarmayeh Exchange.  They

22  previously had obtained pricing information from Brazil for

23  sugar.  And independently from me, they had wanted to send

24  sugar, real sugar, to Iran.

25         Since Mr. Gudarzi had obtained this information in the

 1   past, and since he had an office within our office, what I'm

 2   saying is by using this information, since we don't know

 3   anything about food, we could use this sugar information to

 4   submit.

 5   Q.  Where did Gudarzi work again?

 6   A.  Gudarzi worked for Sarmayeh Exchange, but he had a room

 7   within my company.

 8   Q.  I'd like to show you now what's been marked for

 9   identification as Government Exhibit 244-T.  Do you recognize

10   this exhibit?

11   A.  Yes, sir.

12   Q.  What is it?

13   A.  It is a phone conversation between myself and Abdullah

14   Happani.  It is a transcript of it.

15   Q.  Do you remember the call?

16   A.  I remember, sir.

17   Q.  And you mentioned you were a participant to the call?

18   A.  Yes, sir.

19   Q.  Have you listened to a recording of this call before?

20   A.  I listened to it, sir.

21   Q.  Did the recording accurately capture your conversation?

22   A.  Yes, sir.

23   Q.  Does this transcript properly reflect the Turkish that was

24   used during that conversation?

25   A.  Yes, sir.

1   Q.  What was the general purpose of this call?

2   A.  It is about funds that were hit to Halkbank, the funds that

3   were sent to Halkbank, I'm asking Abdullah who had hit the

4   money and who had done the back and forth.

5   Q.  What do you mean by "hit?"

6   A.  That's just a term that is used to say whether they had

7   sent it from Iran.

8           MR. KAMARAJU:  The government would offer Government

9   Exhibit 244-T.

10          THE COURT:  I'll allow it.

11          MR. KAMARAJU:  And ask for permission to publish it

12  beginning at page two.

13          THE COURT:  Okay.

14          (Government's Exhibit 244-T received in evidence)

15          MR. KAMARAJU:  Can we turn to page three of the

16  document, please.

17  Q.  Do you see where you say, "Have you received the customs

18  document."

19          It's about the middle of the page.

20  A.  Yes, I see that, sir.

21  Q.  Why were you asking Happani for the customs documents?

22  A.  I had asked for documentation from Dubai from Serdar and

23  others, I'm asking him so that did Serdar go and do you have

24  the manifests there.

25  Q.  Do you see a little further down where you say, "Have, have

1    him or her make 10 copies of what I sent to the office.  Put

2    them in the safe.  This is very important.  If they get

3    misplaced, our business stops."

4    A.  Yes.

5    Q.  What did you mean there?

6    A.  There was perhaps a document that had been received to be

7    submitted to the bank in Iran.  I'm -- I'm referring to that

8    document.

9           I'd like to make a correction.

10          There was a document that was sent from Iran to us in

11   order to be submitted to the bank.  I'm saying that he should

12   get it translated, and put it in a safe.  Make a photocopy of

13   it and put it in the safe, because it's a very important

14   document.

15   Q.  Why was that document so important?

16   A.  Because the bank was going to request this document from

17   others that work with the bank, and these individuals were not

18   going to be able to provide this document, and this is -- this

19   was important because of that.

20   Q.  What general type of document are we talking about?

21   A.  So, we were provided with a certain document that indicated

22   that Safir was authorized to send goods, gold, into Iran, that

23   there was this permission provided for them to do importing

24   into Iran of such goods.

25   Q.  So, were you continuing to do the gold business at the same

1     time as you were starting the food business?

2     A.  Yes, initially they were going -- happening together.

3     Q.  I'd like to show you what's been marked for identification

4     as Government Exhibit 300-T.  Do you recognize it?

5     A.  Yes, sir.

6     Q.  What is it?

7     A.  It is a transcript of a phone conversation.

8     Q.  Were you a participant to the conversation?

9     A.  Yes, sir.

10    Q.  Do you remember the conversation?

11    A.  I remember, sir.

12    Q.  Have you listened to an audio recording of the

13    conversation?

14    A.  I listened to it, sir.

15    Q.  Did it accurately capture your conversation?

16    A.  Yes, sir.

17    Q.  Does this transcript properly reflect the Turkish that was

18    used during that conversation?

19    A.  Yes, sir.

20    Q.  What was the general purpose of this call?

21    A.  If I may ask for just a minute to read it.

22    Q.  Of course.

23              So, what was the general purpose of the call?

24    A.  We were, in general, we were talking about our competitor,

25    Ahmet Alacaci.  In addition to that, Abdullah is referring to

1     what I had drawn on this diagram earlier, about gold, when we

2     were transferring money from Safir to Rona, there was a request

3     for -- the bank was requesting supplier invoice.

4              So, this is a phone conversation that encompasses many

5     topics.  So one of them was the currency exchange rate

6     differences that would occur, and I was talking about that.

7     And if there is anything specific that you want me to say out

8     of that, I can do that.

9     Q.  Sure.

10             MR. KAMARAJU:  Your Honor, I'd offer Government

11    Exhibit 300-T and ask to publish it and I can direct Mr. Zarrab

12    to a specific page to discuss.

13             THE COURT:  I'll allow it.

14             (Government's Exhibit 330-T received in evidence)

15    Q.  Could you turn to page three.  I'm sorry, it starts at the

16    bottom of page two.

17             Do you see the section there at the last box where

18    Happani says, "No, there is this thing in addition to the one

19    month.  Because of this invoice, this thing."

20             Do you see the box that starts there?

21    A.  Yes, sir.

22    Q.  What did you understand Happani to be telling you there?

23    A.  That there was a lot of up and downs with gold during that

24    time period between Turkey and Dubai.  For each kilogram of

25    gold, there was a difference of $1,000.  In other words, when

1   we take gold to Turkey and export it to Dubai, to sell, in

2   other words, to convert it into cash so that we can fulfill the

3   Iranian money instructions, so, this difference in price, it

4   was so much per kilogram.  Abdullah is telling me that talk to

5   the bank, I don't want to be buying gold at this time.  They

6   should not be asking for a supplier invoice.  He says they

7   should not be asking for this for about a month or so.

8   Q.  Could we turn to page four.  You see that second full block

9   there where you say, "Every time I call, I owe something.

10  Every time I call.  Do you understand?  Maybe it's a trivial

11  thing, but I don't know.  Long live Photoshop.  Just give it to

12  them and let them print away.  What could happen?"

13  A.  Yes, I see that.

14  Q.  What did you mean there?

15  A.  The bank was asking for the partnership structure document

16  for a company, this had come up yesterday too.  So, they were

17  saying that one of those documents was missing a signature, it

18  was missing the apostille on that document.

19          So, Abdullah is telling me, regarding that document,

20  that I should call the bank and that they should accept that

21  document.  And I'm saying that every time I call Mr. Suleyman I

22  end up being indebted.  So, because of that, I'm saying there

23  is this one signature missing in this document, just use

24  Photoshop and go ahead and give it to the bank.

25          MR. KAMARAJU:  Your Honor, I don't know if you wanted

1     to take the midmorning break now.

2              THE COURT:  Yes, we're going to take a break now.  And

3     I think we'll take a 15-minute break.

4              (Jury excused)

5              (Witness not present)

6              MR. ROCCO:  Your Honor, do we need the most wanted

7     list in front of the jury constantly?  Can we have it taken

8     down, please?

9              THE COURT:  Sure.

10             MS. FLEMING:  Your Honor, for completeness we'd like

11    that recording played.  I thought we were going to play all the

12    recordings.

13             THE COURT:  I did too.

14             MR. ROCCO:  So did I.

15             MR. KAMARAJU:  I'm sorry, I misunderstood.  I thought

16    there were specific ones.

17             MS. FLEMING:  I didn't want to keep interrupting but I

18    was trying to help shorten things.

19             THE COURT:  I was concerned about one in particular

20    that you are going to play first or whatever.  Right?

21             MR. KAMARAJU:  Yes.

22             THE COURT:  But, that was, I was thinking the same

23    thing, that we'd play them all and get them into evidence that

24    way.  Even though, it will just take time because they're in

25    Turkish I assume.

1          MR. KAMARAJU:  We're happy to do that.  Just so, maybe

2     if ultimately all the parties are going to agree to put them in

3     evidence, can I offer them subject to connection without having

4     to show each one to Mr. Zarrab?

5          And the only reason I say that, the way we

6     authenticated them yesterday was Mr. Zarrab initialed the CD

7     containing the audio recording that he had listened to and we

8     played that recording.  He identified the CD from that

9     recording.  We don't have individualized signed CDs for all of

10    them.  He will testify, as he has I believe, that he listened

11    to the recording that's referenced in the exhibit.  After he

12    says that, could we then play the recording at that point?

13         THE COURT:  Sure.

14         MS. FLEMING:  I think if you do that, and maybe what

15    we can do is after hours do individual CDs so it's for the

16    record or something so that -- right now you've got them all as

17    a huge file that they may not all come in, right.  I think you

18    have to make a CD of what actually is played at some point for

19    the record.

20         THE COURT:  Oh.

21         MR. KAMARAJU:  I think we're going to reference the

22    fact that certain exhibits are being played.

23         MS. FLEMING:  You have to make a exhibit physically if

24    it ever goes up to another court as to exactly what was played.

25         MR. KAMARAJU:  I believe our plan is to introduce a CD

 1    of all of the audio.

 2              MS. FLEMING:  I don't think you're going to get all

 3    the audio in.

 4              THE COURT:  You can work this out.

 5              Here's the plan.  The plan is we've got some muffins

 6    for the jury, and so that's why we'll take a little longer than

 7    usual.  Like 15, maybe 20 minutes.  And then we'll come back

 8    and go until 2 o'clock and that will be it for today.

 9              MS. FLEMING:  Thank you.

10              THE COURT:  You are going to play that?

11              MR. KAMARAJU:  We can play this one.

12              THE COURT:  When they come back in?

13              MR. KAMARAJU:  The one we were just talking about?

14              THE COURT:  The one from yesterday.

15              MR. KAMARAJU:  Sure.

16              THE COURT:  If you want to play this one too, that

17    would be fine.

18              MR. KAMARAJU:  Okay.

19              (Recess)

20              (Continued on next page)

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  So we're going to see if the jury is ready

3     to come back in.

4              (Jury present)

5              THE COURT:  Okay.  Everybody can be seated.

6              THE DEPUTY CLERK:  Sir, again, I'd like to remind you

7     that you're still under oath.

8              THE WITNESS:  Thank you.

9              MR. KAMARAJU:  Mr. Chang-Frieden, can you please pull

10    up the transcript for Government Exhibit 206-T.

11             This exhibit was previously admitted.

12    BY MR. KAMARAJU:

13    Q.  Have you taken a second to review that?

14    A.  Yes, sir.

15    Q.  And have you listened to a recording of that conversation

16    before?

17    A.  Yes, sir.

18             MR. KAMARAJU:  At the Court's suggestion, I'd like to

19    publish the audio for Government Exhibit 206-T, which we will

20    mark as Government Exhibit 206-A later.

21             THE COURT:  They're going to play the recording so it

22    will be part of the record.

23             (Audiotape played)

24    BY MR. KAMARAJU:

25    Q.  Mr. Zarrab, do you remember that call?

1    A.  I remember it, sir.

2    Q.  And what were you describing for Happani in that call?

3    A.  I'm giving him a summary after I had just left the meeting

4    that I had with Mr. Suleyman.

5    Q.  Was it at that meeting that you agreed to pay bribes to

6    Suleyman Aslan?

7    A.  Yes, sir.

8    Q.  And were you still paying bribes to Suleyman Aslan at the

9    time that you met with him and Atilla to devise the system?

10   A.  Is the question pertaining to food?

11   Q.  Yes.  I should have been specific.  Yes, the food system.

12   A.  Yes, I was giving bribes to Mr. Suleyman Aslan.

13            MR. KAMARAJU:  Mr. Chang-Frieden, could you bring up

14   Government Exhibit 207-T.

15   Q.  Now, Mr. Zarrab, do you remember this telephone call?

16   A.  I remember it, sir.

17   Q.  Did you listen to a recording of it?

18   A.  I listened to it, sir.

19            MR. KAMARAJU:  And the government would ask to play

20   the audio, which we will mark later as Government

21   Exhibit 207-A.

22            THE COURT:  Okay.

23            (Audiotape played)

24   BY MR. KAMARAJU:

25   Q.  Mr. Zarrab, do you remember that call?

1    A.  Yes, sir.

2    Q.  And maybe if we could turn to the third page of the

3    transcript.  Do you see there at the top Erker asks you:  "Are

4    your guests gone?" and I guess he asks it twice, and then do

5    you see where you respond:  "No, they are here.  Bahmani will

6    come on Monday"?

7    A.  Yes, sir.

8    Q.  Remind us who Bahmani was?

9    A.  He's the president of the Central Bank of Iran.

10   Q.  And had you previously met with him?

11   A.  Yes, I had met with him, sir.

12   Q.  And I believe you testified that you had met with other

13   Iranian officials, as well, in connection with the Halkbank

14   business; is that right?

15   A.  Yes, that is correct, with Iranian delegates.

16   Q.  Did you meet with any Iranian delegates or representatives

17   around the time that you came up with the proposed food method?

18   A.  Yes.  There was one that I was constantly in contact with

19   Iranians, and there was conversation during this time period

20   also.

21          The Iranians were constantly coming and going to and

22   from Turkey from the oil ministry.

23   Q.  And what was the Iranians' primary concern during this

24   time?

25          MS. FLEMING:  Objection.

1              THE COURT:  During which time?

2    Q.  I'll direct your attention to April of 2013.

3    A.  The Iranians don't care about the internal system that is

4    used, whether it be the gold system or the food system.  Their

5    only concern is that a system may be cut off, resulting in

6    their international payments not being made.

7    Q.  And what prompted you to begin to explore switching from

8    the gold system to the food system?

9    A.  Due to changes in the U.S. embargo, as well as restrictions

10   on this with regards to gold paid and payments made to Iran

11   through that.  We were going to be restricted in being able to

12   make payments to Iran, and that's why a change to food was

13   necessary.

14   Q.  Thank you.

15             MR. KAMARAJU:  Mr. Chang-Frieden, could you please

16   pull up Government Exhibit 238-T.

17             This is one of the calls that we looked at earlier

18   today.  With the Court's permission, we will play the audio and

19   mark it later.

20             THE COURT:  Yes.

21             THE WITNESS:  Certainly.

22             (Audiotape played)

23   BY MR. KAMARAJU:

24   Q.  Mr. Zarrab, do you remember having that phone call?

25   A.  Yes, sir.

1        MR. KAMARAJU:  I'd like to go on to Government

2   Exhibit 240-T.  This is on a call we had seen earlier this

3   morning.  Your Honor, may I play the audio?

4        (Audiotape played)

5   BY MR. KAMARAJU:

6   Q.  And, Mr. Zarrab, do you remember having that telephone

7   call?

8   A.  Yes, I remember, sir.

9        MR. KAMARAJU:  I'd like to pull up Government

10  Exhibit 244-T, and with the Court's permission, we will play

11  the audio.

12        THE COURT:  Sure.

13        (Audiotape played)

14  BY MR. KAMARAJU:

15  Q.  Now, I believe you testified during this call you were

16  talking about obtaining customs documents; is that right?

17  A.  Yes.  So I'm asking whether they had arrived or not.

18  Q.  Did you use customs documents in both the gold system and

19  the food system?

20  A.  No, these customs documents were only for use within the

21  food system.

22        MR. KAMARAJU:  Now, could we please bring up the

23  transcript for Government Exhibit 300-T, please.

24        And, your Honor, may we play the audio?

25        THE COURT:  Sure.

1            (Audiotape played)

2    BY MR. KAMARAJU:

3    Q.   Now, Mr. Zarrab, I believe before we broke, this is the

4    call that we were dealing with; so I'm going to ask you a

5    couple more questions about it.  Okay?

6            Do you see where you say:  "Just get it printed.  What

7    could happen?  We had those from a while back anyway.  They

8    won't go into so much detail.  We already know that the

9    partnership structure is not problematic"?

10   A.   Yes, sir.

11   Q.   And then you go on to say:  "The approval, if it happens,

12   don't give the man the approval yet, okay?"

13   A.   Yes, sir.

14   Q.   What were you saying there?

15   A.   So this money that had been sent belongs to a customer by

16   the name of Miandapci.  This individual, this Iranian

17   individual had already sent to us a wire in the past.  We had

18   already received his company's partnership structure from that

19   previous transaction; so we already had it.

20           So we already knew that within that partnership

21   structure there was nothing related to the Iranian government;

22   so we know that it was there.  But since that document was

23   missing, they were not depositing the money into the account;

24   so there was something missing within the apostille of this

25   document.

HC1PATI5                        Zarrab - Direct

```
 1   Q.  Why was it important that there was no connection to the
 2   Iranian government?
 3   A.  It was important to the bank because of the regulations in
 4   the bank.
 5   Q.  Did you discuss that with anyone at the bank?
 6   A.  This was not an issue during the previous version of the
 7   regulations, but when the regulations changed, I received a
 8   call from the bank notifying me of the need.
 9              THE COURT:  Which bank are you referring to?
10   Q.  I was referring to Halkbank, but to clarify, sir, which
11   bank were you talking about?
12   A.  Halkbank, your Honor.
13   Q.  And do you remember who you spoke with at Halkbank about
14   it?
15   A.  No, I don't.  It was a call that had come from the branch
16   during that time.
17              MR. KAMARAJU:  Can we please pull up Government
18   Exhibit 306-T, and this one I don't believe has been admitted
19   yet.
20              THE COURT:  Has not?
21              MR. KAMARAJU:  Has not been admitted.
22   BY MR. KAMARAJU:
23   Q.  Mr. Zarrab, would you take a moment to look at that.
24              (Pause)
25   A.  Yes, sir.
```

HC1PATI5                          Zarrab - Direct

1    Q.   Do you recognize that exhibit?

2    A.   I recognize it, sir.

3    Q.   What is it?

4    A.   The transcript of a phone conversation.

5    Q.   Did you participate in this conversation?

6    A.   Yes, I took part, sir.

7    Q.   And do you remember the call?

8    A.   I remember it, sir.

9    Q.   What was the general purpose of the call?

10   A.   Since within the food system, in the method that I

11   described earlier, a supplier company would be needed by

12   Halkbank for the Iranian food system, I am telling my employee

13   Sadegh Rastgar, to go to Dubai as soon as possible to go ahead

14   and take care of the necessary steps so that the company could

15   be established so that we can take care of what's needed.

16           MR. KAMARAJU:  Your Honor, the government would offer

17   Government Exhibit 306-T and ask to play the audio.

18           MS. FLEMING:  Subject to connection.

19           THE COURT:  I'll allow it.

20           (Government's Exhibit 306-T received in evidence)

21           (Audiotape played)

22   BY MR. KAMARAJU:

23   Q.   Now, do you see where you say "Sadegh, I need a favor.

24   Have them issue a Dubai visa very quickly," that section there?

25   A.   Yes, sir, I see that.

1    Q.  And you go on to say:  "Did you hear me?  Also, go to Dubai

2    and register a food company there in Bulbuyan's name"?

3    A.  Yes, sir.

4    Q.  And then:  "Bring its documents over in order to open an

5    account here.  Did you hear me?  The gold business will stop as

6    of next Wednesday"?

7    A.  Yes, I see that, sir.

8    Q.  What did you mean there?

9    A.  I'm saying that since the gold trade is about to stop and

10   we need to complete the infrastructure for the food system, I'm

11   telling my employee, Sadegh, to go ahead and go to Dubai and

12   establish a company under the name of one of my employees

13   there, by the name of Bulbuyan, and go ahead and get that taken

14   care of, obtain the documents and bring them over so we can go

15   on with this, in order to open the account for it at Halkbank.

16   Q.  Okay.  And on Government Exhibit 9503, the diagram you drew

17   of the food system, what company would you be talking about

18   here?

19   A.  So I can't see from here, but what I'm referring to on that

20   diagram is the supplier company.  So I'm referring to, let's

21   say, Atlantis General Trading or Centrica, though Centrica

22   comes at a later date.  I'm just referring to the company that

23   would be needed to show as a supplier company for this

24   transaction.  That's what I'm referring to.

25   Q.  Do you remember approximately when this call took place?

1   A.  I don't recall.  It must be within that time frame of the

2   food trade, which is probably around the fourth or the fifth

3   month of the year.  I don't recall the exact time, but it

4   should be about that time.

5   Q.  So directing your attention to May of 2013, were there any

6   meetings with any Iranian officials during that month?

7   A.  Yes, there was one.  There was a meeting held.

8   Q.  Were you part of that meeting?

9   A.  I had attended some portions of it.

10  Q.  While you were at the meeting, who else was in attendance?

11  A.  There were a few meetings.

12  Q.  Okay.  Let's start with the first one.

13  A.  The minister of oil from Iran and his delegation had come

14  with him.  By the oil minister of Iran, I mean Ghasemi.

15  Q.  Anyone else?

16  A.  And all the members of the delegation that came with him.

17  Jashnsaz, Kikousokhan, Alipour, Rajaeieh.  There was an

18  individual by the name Gormi.

19  Q.  Do you know who that is?

20  A.  I had met this individual there only.  I had not had any

21  close relationship with him beforehand.  He is an individual at

22  a very high level within the foreign affairs ministry of Iran,

23  but I don't have much information about this individual.

24  Q.  Okay.  In addition to the Iranian individuals you

25  mentioned, was there anybody else at the meeting?

1    A.   There were others in there too that I did not know.  Since

2    the minister came with his own delegation, it was a large

3    delegation, and there were others in that delegation.

4    Q.   Where did the meeting take place?

5    A.   It was at the Marriott Hotel in Ankara.

6    Q.   And what was the purpose of the meeting?

7    A.   Mr. Suleyman Aslan attended the first meeting.  Again, just

8    as always, there was a topic of Iranians wanting to bring their

9    money that was in Japan over; so that was discussed.  In other

10   words, they were trying to transfer their money in Japan into

11   Halkbank and that's what was discussed.

12        Aside from that, again, the Iranian's put pressure on

13   Mr. Suleyman on their ability to make direct payments on their

14   own.  So that was the scope.  There was only Mr. Suleyman Aslan

15   for Halkbank at that meeting.

16   Q.   Okay.  Now, you testified about two companies in Turkey

17   that would receive -- that would pay NIOC, Tupras and Botas; is

18   that correct?

19   A.   Yes, that is correct, sir.

20        (Continued on next page)

21

22

23

24

25

HC13ATI6                          Zarrab - Direct

1   Q.  What is Botas?

2   A.  Botas is the company that is buying the gas.

3   Q.  Were Iranian gas proceeds ever used to fund the purchase

4   and export of gold -- withdrawn.  Let me ask a better question.

5         Were Iranian gold proceeds held at Halkbank between

6   2012 and 2013 ever used to purchase gold for export?

7         THE COURT:  I think you said Iranian gold proceeds.

8   Do you want to ask that again?

9         MR. KAMARAJU:  Third time is the charm hopefully, your

10  Honor.

11  Q.  Were the proceeds from the sales of Iranian gas that were

12  held at Halkbank between 2012 and 2013 ever used to fund the

13  purchase of gold and export?

14  A.  Yes.

15  Q.  So, were there times when both oil, Iranian oil proceeds

16  and Iranian gas proceeds helped to fund the gold business that

17  you were doing?

18  A.  That is correct, sir.

19  Q.  Did there come a time when that stopped and you were only

20  using the proceeds from gas sales?

21  A.  Yes.

22  Q.  Why did that happen?

23  A.  There were changes made to the embargo regulations in the

24  U.S.  I will provide a very short summary of that.

25         NIOC, the Iranian government, the proceeds that they

1   were receiving from their sales of oil, the crude oil, the

2   United States banned the use of that money in purchasing gold

3   and using it for purchase of gold.

4   Q.  How did you learn about that?

5   A.  I discussed this matter with Mr. Suleyman, and there was a

6   loophole in the regulation of the embargo, and this loophole

7   was identified by Mr. Hakan Atilla.

8   Q.  How did you learn it was identified by Atilla?

9   A.  During my meeting with Mr. Suleyman, Mr. Suleyman said that

10  Mr. Hakan Atilla had worked on the regulation, that he had

11  reviewed the regulations, and since the regulations said

12  "petroleum products," by pointing out the weakness in that

13  verbiage that was used, he said gas would not be counted as a

14  petroleum product.

15          And based on that, a brand new system and method was

16  designed within Halkbank for that.

17  Q.  Okay.  I don't think I'm going to ask you to draw that one

18  right now, but could you summarize what that new system

19  entailed?

20  A.  It's pretty simple so I won't draw it, but if you want I

21  can show it on the diagram that is already there.

22          MR. KAMARAJU:  Your Honor?

23          THE COURT:  Sure.

24  A.  At Halkbank, Sarmayeh bank had one account for euros or

25  Parsian had one account for euros.  Normally, at a bank in an

1    account for a certain currency, there would be only one such

2    currency account for a company.

3           So with the diagram that I had drawn, there was one

4    account for NIOC.  So within the bank, a second account was

5    established for every one of these.  And Tupras then sent oil

6    payments to NIOC's oil account separately, and Botas' was going

7    there separately.  So they separated oil and gas payments.  So,

8    they were not putting everything in one basket.  They separated

9    it so they were putting it into two separate baskets.

10   Q.  Why did they separate it?

11   A.  Because the money that was coming into Tupras could only be

12   used to broker food trade or medicine or humanitarian aid.

13   However, the proceeds that were coming in through the gas

14   purchases, since the embargo regulation had said petroleum

15   products, that one was available to be used for gold trade.

16          So, after this, while doing gold trade from Sarmayeh

17   or Parsian, the money was coming to the gold company.  If it

18   was for food trade, then it was coming from or through their

19   petroleum account.

20          So, over here, it was basically merging back together

21   again, but within the bank they had been separated based on

22   that purpose.  So that's the short version of it.

23   Q.  You can return to the witness stand.  Thank you,

24   Mr. Zarrab.

25          Mr. Zarrab, the Iranian gas sale proceeds held at

1    Halkbank, who did they ultimately belong to?

2    A.   They were Iranians.

3    Q.   Which Iranians?

4    A.   The government of Iran.

5         MR. KAMARAJU:  Mr. Chang-Frieden, can we pull up

6    Government Exhibit 1002-T and 1002 and go to page 41.

7    Q.   Do you see where you say, "Parsian wanted to send our bank

8    200 million and they were going to transfer it over to us.

9    This site did not accept 202, they said we no longer accept

10   202."

11   A.   Yes, I see that, sir.

12   Q.   What were you saying there?

13   A.   As I had mentioned yesterday, there are many accounts

14   within Halkbank belonging to Iranian banks.  So, from the funds

15   that are at the Parsian bank for NIOC, 200 million Turkish

16   liras was supposed to be sent to the bank that I was working

17   with, which was the Parsian Bank.

18        THE INTERPRETER:  Correction.  To Sarmayeh Bank.

19   A.   And we were to make the Iranian payments from there.  So I

20   was explaining to the general manager, Suleyman Aslan, that

21   they said they would send over 200 million, but the 202 was not

22   accepted because 202 could not be accepted any longer.

23   Q.   Do you know what that 200 million Turkish lira payment was

24   with regards to?

25   A.   Since it's coming from Parsian, it's most likely it is for

1    gas.  Since it's Parsian, it is likely gas.  Because the gas

2    payments were typically committing it to Parsian Bank.

3    Q.  What's the date of that communication?

4    A.  28/5/2013.

5    Q.  Does Aslan respond?

6    A.  He would have responded.  I can't see.

7    Q.  Okay.  What's he say in response?

8    A.  He says, "I'm looking into it, Mr. Reza.  There shouldn't

9    be such a restriction.  There must be something else but I will

10   solve the problem, Mr. Reza."

11           MR. KAMARAJU:  Mr. Chang-Frieden, can we please pull

12   up Government Exhibit 3799 and show it for identification.

13   Q.  Take a moment to review the document, please.

14   A.  I see it, sir.

15           MR. KAMARAJU:  Can we turn to the next page, also.

16           THE WITNESS:  Would it be possible to enlarge this a

17   little more?  Yes, sir.

18   Q.  Do you recognize Government Exhibit 3799?

19   A.  I recognize it, sir.

20   Q.  What is it?

21   A.  This is a message for money that was sent from Parsian to

22   the Credit Institute for Development, that is under the

23   Sarmayeh Bank.  It is a bank that we were working with.

24   Q.  Let's turn to the first page of the exhibit.  What are we

25   looking at here?

1   A.  If we may go back to the SWIFT portion, because there was

2   an error and there was a portion about Halkbank, and I think

3   there was an error in conveying that portion so I want to

4   correct it.

5   Q.  Okay.

6   A.  So this message involves asking for transfer of 50 million

7   euros from Parsian's account that was within Halkbank.

8   Q.  We'll come back to the SWIFT in a second.  Let's go back to

9   the first page.

10          What are we looking at here, Mr. Zarrab?

11  A.  It is an electronic mail.

12  Q.  Who is it from?

13  A.  It's from me, sir.

14  Q.  Who is it to?

15  A.  Mr. Hakan Atilla, sir.

16  Q.  What is the date of the e-mail?

17  A.  May 29, 2013, sir.

18  Q.  How do you recognize the document?

19  A.  It's my e-mail, sir; it's one that I had sent.

20  Q.  What's the subject line?

21  A.  Forward SWIFT 202 50 million.

22          MR. KAMARAJU:  The government would offer Government

23  Exhibit 3799.

24          MS. FLEMING:  Judge, can I just confer for one minute?

25          (Pause)

HC13ATI6                          Zarrab - Direct

1            MS. FLEMING:  Thank you, Judge.

2            MR. KAMARAJU:  Your Honor, the government offers

3    Government Exhibit 3799.

4            THE COURT:  I'll allow it.

5            (Government's Exhibit 3799 received in evidence)

6            MR. KAMARAJU:  Can we publish that, please?

7            THE COURT:  Sure.

8    Q.  First, on the e-mail portion, under the "to" line, after

9    the e-mail address there, do you see where it says to

10   Mr. Alipour?

11   A.  Yes I see that, sir.  To Mr. Alipour enteghali bank.

12   Q.  Do you recognize who Mr. Alipour is there?

13   A.  Yes, sir.  It's Mr. Alipour at NICO.  He's the second

14   person after Mr. Jashnsaz.

15   Q.  Do you know what enteghali bank is?

16   A.  Enteghali bank means in Farsi language the transaction

17   between two banks.  It's a bank-to-bank transfer.

18   Q.  Let's turn to the next page.  What is this?

19   A.  It is a message, sir.

20   Q.  What kind of message?

21   A.  It is a communications message that is used between banks.

22   Q.  Do you see at the top where it says, near the top, where it

23   says Parsian Bank?

24   A.  I see it, sir.

25   Q.  What is Parsian Bank?

HC13ATI6                          Zarrab - Direct

1    A.  It is a bank in Iran, sir.

2    Q.  Do you see on this document, do you recognize what Parsian

3    Bank is supposed to represent?

4    A.  I can see it, sir.

5    Q.  Do you see below it, it says Credit Institute for

6    Development?

7    A.  I see that as well, sir.

8    Q.  Do you know what that is?

9    A.  I know, sir.

10   Q.  What is it?

11   A.  This is a bank in Iran who is the receiver in Halkbank.

12   Sarmayeh Bank and Bank Mellat typically worked with the Credit

13   Institute, and especially Bank Mellat would generally make its

14   payments through the Credit Institute.

15   Q.  Remind us, what is Bank Mellat?

16   A.  Mellat Bank is one of the largest banks in Iran.

17   Q.  Going down to what appears to be the second section.  Do

18   you see the line that starts 32A?

19   A.  I see it, sir.

20   Q.  At the top there.  What information is being conveyed in

21   that section?

22   A.  That's the effective date for the transaction, currency,

23   and the amount, the number.

24   Q.  What amount is reflected here?

25   A.  It is 50 million euros.

HC13ATI6                          Zarrab - Direct

1   Q.  What is the date of the transaction?

2   A.  It's May 28, 2013.

3   Q.  The next box or section, it starts 50K.  Do you see that?

4   A.  I see it, sir.

5   Q.  What information is conveyed in this section?

6   A.  It shows the customer name that initially made the order

7   for this wire.

8   Q.  Who is list here as the customer?

9   A.  N.I.G.

10  Q.  Do you know what that is?

11  A.  No, I don't know exactly.  It might represent National

12  Iranian Gas, but I'm not sure.

13          MS. FLEMING:  Objection, your Honor.  Move to strike.

14          THE COURT:  Overruled.

15  Q.  The next box, 53A, what's that section?  What is that

16  section intended to show?

17  A.  It's the sender correspondent bank.

18  Q.  What bank is listed there?

19  A.  It is the Halkbank of Turkey Incorporated.

20  Q.  Is that Halkbank?

21  A.  Yes, sir.

22  Q.  Then the next box down, where it says receiver's

23  correspondent, what information is that section supposed to

24  show?

25  A.  This is the correspondent for the receiver, sir.

1    Q.  What bank is listed there?

2    A.  Halkbank of Turkey.

3    Q.  Is that Halkbank?

4    A.  Yes, sir.

5    Q.  What does it mean that the sender's correspondent account

6    and the receiver's correspondent account is the same?

7    A.  Since the transaction is occurring within the bank, between

8    accounts, that's why it would show the same under sender and

9    receiver.  So this is a transfer within the bank.

10   Q.  Who is the transfer from?

11   A.  So the order was received from the N.I.G. company, but the

12   money is coming from Parsian Bank.

13   Q.  Who is the transfer to?

14   A.  To the Credit Institute for Development Bank.

15   Q.  Why did you send this SWIFT to Hakan Atilla?

16   A.  In order for Mr. Hakan Atilla to follow up on the

17   transaction.

18   Q.  Why did you want Hakan Atilla to follow up on the

19   transaction?

20   A.  Since it was a transaction that involved the international

21   department, since it was an inner bank transaction, I wanted

22   him to follow up and see that the money was transferred and

23   deposited into the account.

24           MR. KAMARAJU:  Mr. Chang-Frieden, would you please go

25   back to Exhibit 1002-T, and go to page 45 on 1002-T.

1    Q.  So do you see the message at the top there, 17/6/2013,

2    10:49:24.

3    A.  English and Turkish views are different.

4    Q.  One second.  Is that right?

5    A.  Yes, that's correct, sir.

6    Q.  Do you see where you say, "Want to start the food business

7    as of today in a very fast manner.  I hope it's okay with you."

8    A.  Yes, sir.

9    Q.  What did you mean by that?

10   A.  We were to stop the gold trade right away and turn pretty

11   quickly to food trade only.  That's what we were doing.

12   Q.  Do you see where Aslan responds, "If there are no problems

13   related to the method and documentation of course you can

14   start."

15   A.  Can I get the question one more time, please.

16   Q.  One second.  We just had a little hiccup there.  Okay.

17          So, do you see where Aslan says, "As far as we spoke

18   with Mr. Hakan Atilla, we have no problems related" -- my

19   apologies.  Do you see where Aslan says --

20          MR. KAMARAJU:  The box above, Mr. Chang-Frieden,

21   sorry.

22   Q.  "If there were no problems related to the method and

23   documentation, of course you can start."

24   A.  Yes, sir.

25   Q.  What did you understand him to be saying there?

1   A.  So he's saying the final version of the method and the way

2   which I had drawn earlier, he's saying that's good and we can

3   go ahead and get started on that.

4   Q.  What do you say in response?

5   A.  I say "As far as we spoke with Mr. Hakan Atilla, we have no

6   problems related to methods and documentation."

7   Q.  Do you see where Aslan says, "Fine, then start.  But then

8   again, don't start too fast.  You will accelerate later."

9   A.  Yes, sir.

10  Q.  What did you understand him to be saying there?

11  A.  So he's saying you should go slowly, you should not just

12  get into it so fast and push it so much where you get a brand

13  new company, and start pulling 30 to 40 million of transactions

14  per day.  Until the system is established, he wants the system

15  to be established first.

16  Q.  Do you have an understanding of why he wanted the system to

17  be established first?

18  A.  Whenever transactions or a new method is started, of course

19  there might be some hiccups.

20          MR. KAMARAJU:  Mr. Chang-Frieden, can we turn to page

21  49 of the same exhibit.

22  Q.  Do you see at the top where you say, "My dear general

23  manager, I may have some problems related to the bank's new

24  documentation guidelines related to our latest transactions."

25  A.  Yes, sir.

HC13ATI6                          Zarrab - Direct

1    Q.  What did you mean by that?

2    A.  So, the bank, the branch, had started to ask for additional

3    documents on top of the method and the way that we had already

4    agreed upon.

5    Q.  Was that a problem?

6    A.  It was a big problem.

7    Q.  Why?

8    A.  Because there was no actual transfer products, so the

9    document that they were requesting, requiring, was near

10   impossible to obtain.

11   Q.  What does Aslan respond?

12   A.  He says, "I will solve that subject.  Don't worry,

13   Mr. Reza."

14   Q.  Mr. Zarrab, I'd like to show you what's been marked for

15   identification as Government Exhibit 316-T.  Do you recognize

16   that exhibit?  It's not on the screen.  Sorry.

17            Take a moment to review it, please.

18   A.  Yes, sir.

19   Q.  Do you recognize it?

20   A.  I recognize it, sir.

21   Q.  What is it?

22   A.  It is a transcript of a phone conversation that was between

23   myself and Suleyman Aslan.

24   Q.  Do you remember the call?

25   A.  I remember it, sir.

HC13ATI6                        Zarrab - Direct

1  Q.  Generally speaking, what was the call about?

2  A.  This was in regards to the document and the documentation

3  problem we had been experiencing, which we had messaged about

4  earlier.  In other words, about the requirements that were

5  being brought up by the lower ranked employees.

6            MR. KAMARAJU:  The government would offer Government

7  Exhibit 316-T and ask to publish the transcript and play the

8  audio.

9            THE COURT:  I'll allow it.

10           (Government's Exhibit 316-T received in evidence)

11           (Audio recording playing)

12           THE COURT:  Counsel, we're going to take a two-minute

13  break.  I will excuse the jury first.

14           (Jury excused)

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  Can I see counsel for a minute.

2           (At the sidebar)

3           THE COURT:  So, this is a topic I raised actually a

4    couple of times already with you all.  And it has to do with

5    Juror Number 10, who I mentioned to you on at least one or two

6    occasions.

7           I have a direct line of sight to him, and he's just

8    sleeping.  He's slept all day today.  Wakes up for a second or

9    so, has a sip of water, goes right back to sleep.  So it is my

10   plan to excuse him.

11          MR. ROCCO:  It is formally Juror Number 11.

12          THE COURT:  I think it's 10.

13          MR. ROCCO:  He was 11.  He's moved up to 10.  I cannot

14   see him.  I've tried to see him.  But the monitor is in the

15   way.  So I can't --

16          MS. FLEMING:  The only time I watched him, he was

17   awake.  But I didn't watch him today.

18          THE COURT:  I've been watching him all day long.  And

19   I'm going to excuse him.  Do you have any objection?  It could

20   be over your objection if you object.

21          MS. FLEMING:  I object.

22          MR. KAMARAJU:  We don't have a problem.

23          THE COURT:  I think I have the authority to do it on

24   my own, just as monitor of the proceeding.

25          MR. KAMARAJU:  Yes, your Honor.

1           THE COURT:  Just for the record, so today it's almost

2    100 percent of the time that he's been here.  It's now 1:40.

3    And on the other occasions, it was at least -- this is an

4    estimate -- 40 percent of the days, so that I don't think is

5    adequate.

6           MR. ROCCO:  Your Honor, after you brought it to our

7    attention the first time, I noticed the second day he was

8    actually taking notes.

9           THE COURT:  I'm not so sure he does.  So he woke up

10   today and took his pad, put it in his hand, and then as he was

11   looking at the pad, he went right back onto his hand and right

12   back asleep.  So maybe he was on that occasion.

13          MR. ROCCO:  Your Honor, I haven't seen him for the

14   past two days.

15          MR. KAMARAJU:  I won't take offense to any of this.

16          THE COURT:  We'll do it at the end of the day.  Not in

17   front of anybody.  Just say thanks for your service and you're

18   excused.

19          MR. KAMARAJU:  Are we still planning to go until

20   2 o'clock?

21          MR. ROCCO:  Our objection is noted.

22          (Recess)

23          (Jury present)

24          THE COURT:  We're going to, as I mentioned, end in

25   about 15 minutes for this week.  I'll give you instructions

1    before you leave and then we'll see you again on Monday.

2              MR. KAMARAJU:  May I proceed, your Honor?

3              THE COURT:  Sure.

4    BY MR. KAMARAJU:

5    Q.  Mr. Zarrab, when we broke we were talking about Government

6    Exhibit 316-T.  If we can pull that back up on everybody's

7    screen.

8    A.  Yes, sir.

9    Q.  So do you see on the first page where you say, "I mean,

10   they're different things.  The request from the support staff

11   at headquarters vary and change often."

12   A.  Yes, sir.

13   Q.  What did you mean there?

14   A.  So I tried to explain to Mr. Suleyman that there are some

15   requests coming that are beyond the scope of the method and the

16   system that we had agreed upon.

17   Q.  Could we turn to page three, please.  You see at the bottom

18   of the page, where you say, "So once the company that sold us

19   the goods cuts the final invoice, we can make the transfer to

20   them, then Mr. Hakan said that this might cause problems in the

21   future."

22              Do you see that block?

23   A.  Yes, I see that.

24   Q.  What did you mean there?

25   A.  So, this is within the Halkbank, the supplier company that

HC13ATI6                        Zarrab - Direct

1    was requested, what we were saying was as the money comes to

2    Volgam Food, we want to be able to handle this transaction.

3    Whereas Mr. Hakan was saying it would be better if the customs

4    document was received and submitted also to be able to do this.

5    Q.  At the time of this call, were you speaking with Atilla

6    about documentation-related issues?

7    A.  Yes, there was a phone conversation during this time frame

8    of this call.

9    Q.  Do you remember generally what you said during that

10   conversation?

11   A.  So, there was an abnormal occurrence within the bank during

12   this time.  So, the low-ranked staff, the support staff, they

13   were not supposed to ask for these documents from us.  So, and

14   as I told the general manager, we have made a technical error

15   and we had sent a large amount.  And the low-ranked employees

16   at the bank who did not know about the situation -- and when I

17   say "the situation," I'm referring to employees that did not

18   know about the system not involving real food.  This resulted

19   in some suspicion amongst those individuals and they began to

20   request more documentation.

21        So, I'm trying to explain that, but as of this stage,

22   I didn't know what the problem was.

23   Q.  Could we turn to page six of the exhibit.  Do you see about

24   midway down the page, you said, "Mr. dear general manager, it

25   is sufficient, but, um, actually it does not get stuck at

1   Mr. Hakan so much.  Where it gets really stuck is lower."

2   A.  Yes, I see that, sir.

3   Q.  What did you mean there?

4   A.  So, I'm saying this is not getting stuck at Mr. Hakan

5   Atilla, it's getting stuck at the lower ranks.

6   Q.  Do you see where Aslan goes on to say, "It does not get

7   stuck at Hakan Atilla either, does it?  Where it gets stuck is

8   lower, much lower."

9   A.  So, as you listen to the voice recording, you can actually

10  see that Aslan was overlapping as I was saying what I was

11  saying.  So in the transcript here, it looks different, but in

12  the actual recording, you can see that he's saying Hakan Atilla

13  just as I'm saying Hakan.  And thus, this is not two different

14  Hakans.  We're just talking about Hakan Atilla and it is

15  overlapping.  So we're both referring to Hakan Atilla.

16  Q.  Okay.  What is your response to what Aslan says?

17  A.  I say, "No, it's getting stuck lower."

18          MR. KAMARAJU:  Mr. Chang-Frieden, can we pull up

19  Government Exhibit 261-T.

20  Q.  Mr. Zarrab, please take a moment to review that.

21  A.  Yes, sir.

22  Q.  Do you recognize it?

23  A.  I recognize it, sir.

24  Q.  What is it?

25  A.  It is a transcript of a phone conversation between myself

HC13ATI6

1    and Mr. Hakan Atilla.

2    Q.  Do you remember the call?

3    A.  I remember, sir.

4    Q.  What was the general subject of the call?

5    A.  There were two subjects, sir.  For one of those, they

6    thought that a transaction had erroneously arrived at Volgam

7    for gold.  And for the second one, with regards to the fake

8    customs documents that we had submitted to the bank, Mr. Hakan

9    Atilla was making phone calls and giving warnings about the

10   mistakes that we were making.

11             MR. KAMARAJU:  The government would offer Government

12   Exhibit 261-T and ask to play the audio and publish the

13   transcript to the jury.

14             THE COURT:  Okay.  I'll allow it.

15             (Government's Exhibit 261-T received in evidence)

16             (Audio recording playing)

17             MR. KAMARAJU:  Your Honor, I intend to spend some time

18   on this call.  So do you want me to keep going?

19             THE COURT:  No, it is just about 2 o'clock.  I think

20   we'll excuse the witness.  See you on Monday.

21             (Witness not present)

22             THE COURT:  If the jury will just remain for a minute

23   I'll give you my instructions and you can go home too.

24             We've had a good week, and I appreciate your help and

25   your service.

HC13ATI6

1          So, between now and Monday, we'll pick up Monday at

2     9:15.  I remind you, please don't talk to each other about the

3     case or about anyone who has anything to do with it, until the

4     end of the case when you go to the jury room to deliberate on

5     your verdict.

6          Second, do not talk with anyone else about the case or

7     about anyone who has anything to do with it until the trial has

8     ended and you've been discharged as jurors.

9          Third, don't let anyone talk to you about the case or

10    about anyone or anything to do with it.  If someone should try

11    and talk to you about the case, please report that to Christine

12    or myself immediately.

13         Fourth, do not read any news or internet stories or

14    articles or blogs or listen to any radio or TV or cable reports

15    about the case or about anyone who has anything to do with it.

16         And fifth, please don't do any type of research or any

17    type of investigation about the case on your own.

18         So, good week, and I'll see you all 9:15 on Monday.

19    Thanks so much.

20         (Jury excused)

21         THE COURT:  Maybe we can get a little preview of

22    what's next, what to anticipate for next week from the

23    government.

24         MR. KAMARAJU:  Yes, your Honor.  I anticipate the

25    direct will be over for Mr. Zarrab on Monday.

HC13ATI6

1          THE COURT:  Okay.  In that connection, are we going to

2     do some more of the recordings?  Can you get from the earlier

3     days, get them to the record, to add them?

4          MR. KAMARAJU:  We can certainly do that, your Honor.

5     I don't think that will drag his direct past one day.  It is

6     possible.

7          THE COURT:  It doesn't take that long.

8          MR. KAMARAJU:  Okay.  But yes, we can go back and play

9     some of the -- play the earlier ones.

10         THE COURT:  Then we have a really complete record.

11    And interestingly, I noticed that all the jurors, pretty much,

12    even as the Turkish recording was being played, were looking at

13    the transcript, I assume the English language section.  So, I

14    think is it very helpful.

15         MR. KAMARAJU:  Certainly, your Honor.

16         THE COURT:  So finished with him and then we would go

17    to cross.

18         MS. FLEMING:  Oh yes.

19         THE COURT:  And then any guesstimate about how long

20    that might take?

21         MS. FLEMING:  I think we can expect at least a day,

22    your Honor.

23         THE COURT:  And then where are we headed for

24    additional witnesses?

25         MR. KAMARAJU:  So, after any redirect, we'd then have

HC13ATI6

1    a special agent from the FBI, and then three Department of

2    Treasury witnesses, we'll provide the names to defense counsel

3    and to the Court.

4            THE COURT:  Great.

5            MR. KAMARAJU:  And then we anticipate, if we get

6    through those, which will depend how long cross and redirect

7    go, we would be calling certain bank witnesses.

8            THE COURT:  So what is your estimate, rough estimate

9    over all, how long do you think the trial will go?

10           MR. KAMARAJU:  Can I have one moment to confer with my

11   colleagues?

12           THE COURT:  Sure.

13           MR. KAMARAJU:  Your Honor, at this pace I think we

14   anticipate we would rest not next week, but early the following

15   week.

16           THE COURT:  So in the third week.

17           MR. KAMARAJU:  Yes.

18           THE COURT:  Okay.  And you don't have to say, but does

19   the defense think, if you wish to say, put on an affirmative

20   case?

21           MR. ROCCO:  Your Honor, as all defense lawyers will

22   say at this point, we don't know.

23           THE COURT:  Okay.  Fair enough.  So, the reason I'm

24   asking is, well, I'll have to deal with it, we'll talk more

25   about it next week.  One of the jurors was later in December

HC13ATI6

1  planning a trip and was asking whether it would be safe to pick

2  December 21 or should it be December 22.  But I'll talk to you

3  further about it on Monday.  It sounds like we're going to make

4  that schedule anyway.  Right?

5          So, and one final thing as I mentioned.

6          MS. FLEMING:  Actually, your Honor, we have waited to

7  hear back if OIA was going to respond on our Rule 15

8  depositions.  I know we're way past the deadline.  We've never

9  heard that they were going, they heard back from Turkey.  We

10  had offered an alternative of live streaming of witnesses from

11  Turkey.  The Court may appreciate right now why some of our

12  witnesses are important.

13          THE COURT:  I've always thought your witnesses were

14  important.  I was always, frankly, surprised that they wouldn't

15  come and be here in court.  They were certainly welcome to.

16  And I think that you mentioned, I don't know, three or so or

17  more were Halkbank employee, so perhaps the bank would even

18  underwrite the trip.  But you said they --

19          MS. FLEMING:  The problem is they wanted safe passage,

20  and we had that chicken-egg issue of unless they would commit

21  to coming, the government wouldn't tell us whether they would

22  give any safe passage.

23          THE COURT:  I read the transcript just last night

24  about the discussion.  I'm not sure it is the government's

25  fault or your fault.  I'm surprised it didn't happen.  But you

1  recall we then went to the alternative of video depositions

2  with you and the government being here, and those witnesses

3  being deposed in Turkey.  And frankly, I was disappointed and

4  still am that that couldn't be arranged either.  It seems that

5  it's in everybody's interest to do that.

6        Looking at the transcript and the discussions, I never

7  understood why that hasn't happened either.  You're certainly

8  welcome to introduce them into the trial.

9        MS. FLEMING:  Our understanding, your Honor, is that

10 the government's not allowed to participate unless the

11 government gets permission from the Office of International

12 Affairs.  That's what had been told to us.  That they --

13       THE COURT:  I didn't see that.  Is that the case?  I

14 didn't see that in the transcript.

15       MR. KAMARAJU:  Your Honor, the issue was if there was

16 going to be participation by federal law enforcement agents

17 from the United States in activities that touched on Turkey, we

18 were trying to get official confirmation that the government of

19 Turkey would not object to that.  All we had at this point,

20 defense counsel mentioned they had spoken to somebody.  OIA has

21 reached out to the Ministry of Justice, and is waiting to hear

22 from them as to whether they have an issue with us doing this.

23 So it is not a matter of OIA waiting to give us permission.  It

24 is the Ministry of Justice has not approved us doing this.

25       MS. FLEMING:  But they couldn't go forward until they

HC13ATI6

1    had --

2             THE COURT:  You know, I'm still as perplexed as I was

3    before.  Frankly, I mean, this is just off the cuff.  I think

4    between the government of the United States at the front table,

5    and the defense at the back, including the bank owned by

6    51 percent by the government of Turkey, if you aren't able to

7    arrange for video depositions, I'm frankly mystified, both of

8    you.  I don't mean to blame one or the other.  But it strikes

9    me that where there is a will, there is a way, and this is not

10   even complicated.  I didn't think these witnesses coming here

11   in person was all that complicated.  We've been talking about

12   this a month or more.  And certainly I don't think that a

13   deposition with you all from New York and witnesses there would

14   be complicated.

15            I'm still surprised.  You're welcome still to try and

16   I urge you to do it.  And I think if you put your minds to it,

17   I've always thought that it would happen.  But it hasn't

18   happened.

19            MS. FLEMING:  Thank you, Judge.

20            THE COURT:  There is one or small thing.  Not so the

21   small I guess.  I raised with you, well, with counsel at

22   sidebar earlier in the week, unfortunately on I think two

23   occasions, it was my observation that one of the jurors in my

24   direct line of sight has been sleeping almost the whole trial.

25   I have to tell you today almost all day.

HC13ATI6

1      He seemed like a very nice fellow, but not

2  surprisingly, when we did the voir dire, if you remember, in

3  answer to my question what do you like to do in your spare

4  time, he said sleep.  And that maybe should have told us.

5      So anyway, I think under the Federal Rules of Criminal

6  Procedure 24(c) and cases including *U.S. v. Peters*, 617 F.2d

7  503, that's a Seventh Circuit case, I think I have that

8  authority.

9      I think that there is perhaps an objection from the

10 defense and no objection from the government.  But I plan to

11 notify that juror that, with thanks, we thank him for his

12 service up until now, but he's excused from the rest of the

13 trial.

14     I just don't think a juror can perform his duties, him

15 or her, unless they pay attention to what's going on in the

16 courtroom.  And like I say, today to me was the icing on the

17 cake.  Almost the entire time the juror was here, he was -- and

18 really sound asleep, too, I might say.  Not just dozing.

19     So, anyway, that's what I plan to do.  So have a great

20 weekend and I'll see you all Monday at 9:15.

21     (Adjourned until December 4, 2017, 9:15 a.m.)

22

23

24

25

```
1                          INDEX OF EXAMINATION

2    Examination of:                              Page

3     REZA ZARRAB

4    Direct By Mr. Kamaraju . . . . . . . . . . . 548

5                        GOVERNMENT EXHIBITS

6    Exhibit No.                                 Received

7     9503    . . . . . . . . . . . . . . . . . . 573

8     745     . . . . . . . . . . . . . . . . . . 574

9     238-T   . . . . . . . . . . . . . . . . . . 579

10    240-T   . . . . . . . . . . . . . . . . . . 582

11    244-T   . . . . . . . . . . . . . . . . . . 584

12    330-T   . . . . . . . . . . . . . . . . . . 587

13    306-T   . . . . . . . . . . . . . . . . . . 599

14    3799    . . . . . . . . . . . . . . . . . . 609

15    316-T   . . . . . . . . . . . . . . . . . . 616

16    261-T   . . . . . . . . . . . . . . . . . . 622

17

18

19

20

21

22

23

24

25
```