HC5PATI1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4               v.                        S4 15 Cr. 867 RMB

5   MEHMET HAKAN ATILLA,

6               Defendant.

7   ------------------------------x

8

9                                       December 5, 2017
                                        9:26 a.m.
10

11

12  Before:

13                  HON. RICHARD M. BERMAN,

14                                      District Judge
                                          and a jury
15

16

17                      APPEARANCES

18  JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
    MICHAEL DENNIS LOCKARD,
20  SIDHARDHA KAMARAJU,
    DAVID WILLIAM DENTON, JR.,
21  DEAN CONSTANTINE SOVOLOS,
         Assistant United States Attorneys
22

23

24

25

HC5PATI1

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
        Attorneys for defendant Atilla
BY:   VICTOR J. ROCCO, Esq.
        THOMAS ELLIOTT THORNHILL, Esq.
        – and –
FLEMING RUVOLDT, PLLC
BY:   CATHY ANN FLEMING, Esq.
        ROBERT J. FETTWEIS, Esq.
        – and –
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:   JOSHUA LEWIS DRATEL, Esq.
                    Of counsel


Also Present:
        JENNIFER McREYNOLDS, Special Agent FBI
        MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
        MS. ASIYE KAY, Turkish Interpreter
        MS. SEYHAN SIRTALAN, Turkish Interpreter

HC5PATI1                         Trial

1          (Trial resumed)

2          (In open court; jury not present)

3          THE COURT:  Please be seated.  So this morning within,

4    I don't know, the last 20 minutes or so, I placed on the public

5    docket both the defense letter dated yesterday, December 4, and

6    the government's response, which I asked for by yesterday

7    evening and which I received; so it's also dated December 4.

8          These letters discuss, as you're probably aware or

9    maybe you're aware, the recent discovery given to the defense

10   by the government.  So those letters are both on the public

11   docket, and I also included a short order ruling on the

12   discovery materials, and I did that because I think it's very

13   important that everyone be able to see and read both sides of

14   the story regarding the legal import of those discovery

15   materials.

16         The defense letter was on the docket yesterday

17   temporarily, as I understand it, and I think it was there

18   because it was not marked subject to a protective order and it

19   was withdrawn because it was, in fact, subject to a protective

20   order.  My feeling is that since it was already viewed and

21   widely commented upon publicly, without the benefit of knowing

22   the other side of the story, there is no longer any good reason

23   for that letter or the government's response not to be publicly

24   available, and so they are both.

25         As I mentioned in my order, I do not believe the

1    material discussed in the defense letter is Brady material.  It

2    is not exculpatory, as that term was used in the Brady case,

3    nor is it the basis of a defense, as that phrase is used in

4    Brady.  At the same time, those materials may certainly be used

5    by the defense to impeach, if the defense wishes to use it in

6    that fashion.

7           Now, as to the timeliness of the disclosures, I do not

8    find that the government violated my order regarding Brady

9    materials.  At the same time, I do believe that the government

10   should, and is directed to, make disclosures more promptly

11   going forward than it perhaps has done in the past and in

12   accordance with the Court's recent discussions with the

13   parties, which, as I remember correctly, should be Friday

14   evenings by 7:00 for the following week.  I'm not sure, but I

15   think that these materials were produced on Sunday; is that

16   right?

17          MR. KAMARAJU:  Saturday.

18          THE COURT:  Saturday at 11:57 p.m.  In any event, I'd

19   like to get those to the defense by Friday, as I recently

20   discussed with all of you.  So that's it with respect to those

21   letters.

22          What I'm going to do today, now that the jury is

23   already here, I want to play some more of those transcripts and

24   perhaps get that all completed.  If counsel for the government

25   could show me that list of remaining transcripts.

HC5PATI1                    Trial

 1          MR. KAMARAJU:  Yes, your Honor.

 2          (Pause)

 3          THE COURT:  Okay.  So let's play the ones that have

 4   the arrow next to it.  Does that leave only the 25-minute

 5   transcript, if we do that?

 6          MR. KAMARAJU:  I believe there's one more.  I think

 7   that's a nine-and-a-half minute call, I believe.  If I could

 8   have one minute, I'll see if that's right.

 9          (Pause)

10          Yes, your Honor.  I think there's one more, that's

11   298-T, that's nine-and-a-half minutes.

12          THE COURT:  So let's play that also now, and we'll

13   have that one remaining, which I'm going to do sometime today

14   as well.

15          MR. KAMARAJU:  Okay.  And then, your Honor, as far as

16   any more for the government's direct, my colleagues remind me

17   there are a couple of exhibits I forgot to move into evidence

18   through Mr. Zarrab.  I plan to do that.

19          THE COURT:  Well, he's going to be on the stand for

20   the transcript part anyway; so if you need more with him

21   afterwards, that's fine.

22          MR. KAMARAJU:  Okay.

23          THE COURT:  And even ask him the same kind of

24   preliminary questions about the recordings that you're about to

25   play.

1          MR. KAMARAJU:  Okay.

2          THE COURT:  Okay.  So let's get the jury.

3          (Jury present)

4          THE COURT:  Hi, how are you?  So please be seated,

5    everybody.

6          THE DEPUTY CLERK:  Sir, before we begin, I'd like to

7    remind you that you're still under oath.

8          THE WITNESS:  (In English)  Yes.

9          THE COURT:  So I've asked the government to continue

10   with some of those recordings, and counsel will indicate, as

11   usual, which transcript it pertains to and reflect that

12   transcript on your screens.  So if you wish to follow along,

13   you can do that.

14         MR. KAMARAJU:  May I proceed, your Honor?

15         THE COURT:  Yes.

16         MR. KAMARAJU:  So the first call is Government

17   Exhibit 291-T.

18   REZA ZARRAB,

19        called as a witness by the Government,

20        having been previously duly sworn, testified as follows:

21   DIRECT EXAMINATION

22   BY MR. KAMARAJU:

23   Q.  Mr. Zarrab, do you remember this call?

24   A.  Yes, I remember, sir.

25   Q.  Have you listened to a recording of it?

HC5PATI1                          Zarrab - Direct

1          THE COURT:  Can you speak into that microphone.

2          MR. KAMARAJU:  Sure.

3   Q.  Have you listened to a recording of it?

4   A.  Yes, sir.  I listened to it.

5          MR. KAMARAJU:  Your Honor, with the Court's

6   permission, we'd like to play the audio for 291-T.

7          THE COURT:  And it's about how long?

8          MR. KAMARAJU:  And it is about nine minutes.

9          THE COURT:  Okay.

10          (Audiotape played)

11   BY MR. KAMARAJU:

12   Q.  Now, Mr. Zarrab, was that a recording of the conversation

13   reflected in Government Exhibit 291-T?

14   A.  Yes, sir.

15   Q.  And does Government Exhibit 291-T accurately reflect that

16   conversation?

17   A.  Yes, sir.

18          MR. KAMARAJU:  With the Court's permission, we'd go on

19   to the next call.

20          THE COURT:  Sure.

21          MR. KAMARAJU:  It's Government Exhibit 297-T.  It's

22   approximately four minutes.

23          THE COURT:  Okay.

24          (Audiotape played)

25   BY MR. KAMARAJU:

1   Q.  Now, Mr. Zarrab, was that a recording of a conversation

2   reflected in Government Exhibit 297-T?

3   A.  Yes, sir.

4   Q.  And does Government Exhibit 297-T accurately reflect that

5   conversation?

6   A.  Yes, sir.

7           MR. KAMARAJU:  Your Honor, the next call is Government

8   Exhibit 298-T.  It's about nine-and-a-half minutes.

9           THE COURT:  Okay.

10          (Audiotape played)

11  BY MR. KAMARAJU:

12  Q.  Now, Mr. Zarrab, was that conversation the conversation

13  reflected in Government Exhibit 298-T?

14  A.  Yes, sir.

15  Q.  And does Government Exhibit 298-T accurately reflect the

16  conversation we just heard?

17  A.  Yes, sir.

18          MR. KAMARAJU:  Your Honor, the next call is Government

19  Exhibit 300-T.  It's about four minutes.

20          THE COURT:  All right.

21          (Audiotape played)

22  BY MR. KAMARAJU:

23  Q.  Now, Mr. Zarrab, was that a recording of the conversation

24  reflected in Government Exhibit 300-T?

25  A.  Yes, sir.

1    Q.  And does Government Exhibit 300-T accurately reflect the

2    conversation we just heard?

3    A.  Yes, sir.

4            MR. KAMARAJU:  All right.  Your Honor, the next call

5    is Government Exhibit 304-T, and it's about six minutes.

6            THE COURT:  Okay.

7            (Audiotape played)

8    BY MR. KAMARAJU:

9    Q.  Mr. Zarrab, was that a recording of the conversation

10   reflected in Government Exhibit 304-T?

11   A.  Yes, sir.

12   Q.  And does Government Exhibit 304-T accurately reflect the

13   conversation we just heard?

14   A.  Yes, sir.

15           MR. KAMARAJU:  Your Honor, the last call is Government

16   Exhibit 306-T.

17           THE COURT:  How long?

18           MR. KAMARAJU:  It's about a minute.

19           THE COURT:  Yes.  You know what, I think I'm going to

20   do the long one too, actually.

21           MR. KAMARAJU:  Okay.

22           THE COURT:  Because it's part of Mr. Zarrab's

23   testimony; so I don't know how we would do it otherwise.

24           MR. KAMARAJU:  Okay.  We'll cue that up for after.

25           (Audiotape played)

HC5PATI1                    Zarrab - Direct

1    BY MR. KAMARAJU:

2    Q.  Mr. Zarrab, was that a recording of the conversation

3    reflected in Government Exhibit 306-T?

4    A.  Yes, sir.

5    Q.  And does Government Exhibit 306-T accurately reflect that

6    conversation?

7    A.  Yes, sir.

8              MR. KAMARAJU:  So the next one we discussed,

9    Government Exhibit 232-T, it's about 25 minutes.

10             THE COURT:  Okay.  This is the last one, right?

11             MR. KAMARAJU:  Your Honor, I believe there's actually

12   just one more.  I'm just figuring out how long it is.  We'll go

13   to 232-T and move on.

14             THE COURT:  This is the longer one?

15             MR. KAMARAJU:  Yes.

16             THE COURT:  So bear with us.  It's, what, 25 minutes?

17             MR. KAMARAJU:  25 minutes.

18             (Audiotape played)

19             (Continued on next page)

20

21

22

23

24

25

HC53ATI2                        Zarrab - Direct

1   Q.  Mr. Zarrab, did we just listen to a recording of a

2   conversation reflected in Government Exhibit 232-T?

3   A.  Yes, sir.

4   Q.  Does Government Exhibit 232-T accurately reflect the

5   conversation we just heard?

6   A.  Yes, sir.

7            MR. KAMARAJU:  Last one, your Honor.

8            THE COURT:  One more?

9            MR. KAMARAJU:  Government Exhibit 229-T, and it is

10  about two and a half minutes long.

11           THE COURT:  Okay.

12           (Audio recording playing)

13  Q.  Mr. Zarrab, did we just hear a conversation that was

14  reflected in Government Exhibit 229-T?

15  A.  Yes, sir.

16  Q.  Does Government Exhibit 229-T accurately reflect that

17  conversation?

18  A.  Yes, sir.

19           MR. KAMARAJU:  I believe that's all the calls, your

20  Honor.

21           THE COURT:  Great.  Thanks for your patience.  I think

22  it is helpful that everybody knows what the jury knows.

23           Do you have anything else for Mr. Zarrab?

24           MR. KAMARAJU:  I have another 15 minutes or so.

25           THE COURT:  Do you need a break?  We'll take a

 1   five-minute break.

 2              (Jury excused)

 3              THE COURT:  We'll resume in about five minutes.

 4   Thanks.

 5              (Recess)

 6              (In open court; jury present)

 7              THE DEPUTY CLERK:  Sir, again I'd like to remind you,

 8   you're still under oath.

 9              THE WITNESS:  Yes, ma'am.

10              MR. KAMARAJU:  May I proceed, your Honor?

11              THE COURT:  Sure.

12   BY MR. KAMARAJU:

13   Q.  Mr. Zarrab, I'd like to show you what has been marked for

14   identification as Government Exhibit 1270, 1270-T, 1271,

15   1271-T, 1272, 1272-T, 1273, 1273-T, 1274, 1274-T, 1275, 1275-T,

16   1276, 1276-T, 1277, 1277-T, 1278, 1278-T, 1279, 1279-T and 1280

17   and 1280-T.

18              MR. KAMARAJU:  All the exhibits that I mentioned that

19   are dash T have already been admitted subject to connection.

20              MS. FLEMING:  We stipulated to the translation, your

21   Honor.

22              MR. KAMARAJU:  May I approach?

23              THE COURT:  Yes.

24              MR. KAMARAJU:  I thought it might be easier for a hard

25   copy for you.

1          THE COURT:   Thanks.

2    Q.  Mr. Zarrab, can you just take a moment to review those

3    exhibits.

4    A.  Yes, sir.

5    Q.  Have you had a moment to look at them?

6    A.  Yes, sir.

7    Q.  Do you recognize them?

8    A.  Yes, sir, I recognize them.

9    Q.  What are they?

10   A.  They're messages.

11   Q.  Who are the participants to those messages?

12   A.  They are messages between myself and my lawyer who had

13   political connections.

14   Q.  Approximately when did these communications take place?

15   A.  In the year of 2014 and continuing from there.

16   Q.  What was the general topic of these conversations?

17   A.  They're about Halkbank and about the Iranian trade with the

18   bank.

19   Q.  Do these communications -- I'm sorry, you said they

20   occurred in 2014?

21   A.  Yes, sir.  The best I can remember.

22   Q.  Generally speaking, what were you discussing about Halkbank

23   and the Iranian business?

24   A.  This is about continuing on with the existing -- the former

25   system at Halkbank for this trade.

HC53ATI2                        Zarrab – Direct

1    Q.  So are these communications about your attempts to restart

2    your business at Halkbank?

3    A.  Yes, sir.

4                THE COURT:  This is after the December arrest in 2013?

5                THE WITNESS:  Yes, your Honor.

6                MR. KAMARAJU:  The government would offer Government

7    Exhibit 1270, 1270-T, 1271, 1271-T, 1272 -- actually, 1272,

8    1273, 1274, 1275, 1276, 1277, 1278, 1279 and 1280.

9                MS. FLEMING:  Can we get the the name of the lawyer

10   whose name was on it?

11   Q.  What's the name of the attorney?

12   A.  Mustafa Dogan.

13               MR. KAMARAJU:  Government will offer them.

14               THE COURT:  I'll allow them.

15               (Government's Exhibit 1270 through 1280 received in

16   evidence)

17   BY MR. KAMARAJU:

18   Q.  I didn't have a lot of questions on those, Mr. Zarrab.

19               I'd like to show you a different exhibit.  Government

20   Exhibit 6012.  Can you take a look at that.

21   A.  Yes, sir.

22   Q.  Do you recognize it?

23   A.  I recognize it, sir.

24   Q.  What is it?

25   A.  It's electronic mail, sir.

1   Q.  Who sends the e-mail?

2   A.  Jafar Saeid, sir.

3   Q.  Who is that?

4   A.  It is one of the employees that worked in my company during

5   that time frame, sir.

6   Q.  Who receives the e-mail?

7   A.  Aykut Okumus, sir.

8   Q.  Remind us who that is.

9   A.  Aykut Okumus is one of the employees that worked in my

10  company during that period of time, and he worked in the

11  department that had communication with the bank.

12  Q.  What is the date of the e-mail?

13  A.  August 5, 2013, sir.

14  Q.  We can turn to the next page of the exhibit.

15          Do you recognize what's here?

16  A.  I recognize it, sir.

17  Q.  What is it?

18  A.  This is a sample invoice.  It is one of those documents

19  that we turn in to Halkbank.  It is among those documents that

20  would be submitted to Halkbank.

21  Q.  Can we go to the next page, please.

22          Do you recognize this?

23  A.  Yes, sir.

24  Q.  What is it?

25  A.  And this also is one of the documents that is part of the

1    documentation that would be submitted to the bank, to Halkbank.

2    Q.  Was that type of document submitted regularly to the bank?

3    A.  This is one of those documents that would fall into the set

4    of documents that we turn in to submit to the bank per

5    transaction, sir.

6              MR. KAMARAJU:  The government would offer Government

7    Exhibit 6012 and ask to publish it to the jury.

8              MS. FLEMING:  Objection.  Foundation and hearsay.

9              THE COURT:  I'll allow it.

10             MR. KAMARAJU:  If we can go back to page two.

11             (Government's Exhibit 6012 received in evidence)

12   Q.  Remind us again what this document is.

13   A.  It is a pro forma or it's an invoice, and it is the invoice

14   that shows what would correspond with the payment that had been

15   sent from Iran.

16   Q.  Does this invoice reflect what goods are supposedly being

17   shipped?

18   A.  On the document.

19   Q.  Yes.

20   A.  In other words, there is no real products being shipped.

21   Only on the document.  This document shows it as if they are,

22   yes.

23   Q.  What does the document say is being shipped?

24   A.  (In English) Frozen chicken leg.

25   Q.  Where does it say frozen chicken leg comes from?

HC53ATI2                    Zarrab - Direct

1   A.  It shows under the item "description" section.

2   Q.  What country does the frozen chicken leg originate in?

3   A.  Ukraine.

4   Q.  What is the quantity of the frozen chicken leg that's

5   reflected on this document?

6   A.  It's 4,365 tons.

7   Q.  Where are the frozen chicken legs supposed to be delivered?

8   A.  To Iran.

9   Q.  Where on this document do you see that?

10  A.  When we look that the document as it's shown on the screen,

11  from the very top it is the second box down and over, and it

12  says "final delivery place."

13  Q.  Do you see the box that says "amount" on almost the bottom

14  right of the screen there?

15  A.  Yes, sir.

16  Q.  What's that?

17  A.  It's the total amount for the chicken legs.

18  Q.  What is listed there?

19  A.  5,107,050 euros, sir.

20  Q.  Do you see where it says "name of the beneficiary company"?

21  A.  Yes, I see that, sir.

22  Q.  What's that field represent?

23  A.  So this is the name of the buyer's account, and it

24  represents the money that would be sent for the chicken legs

25  for this transaction.

HC53ATI2                          Zarrab - Direct

1   Q.  Do you see where it says "name of the bank"?

2   A.  Yes, sir.

3   Q.  What is listed there?

4   A.  This is the name of the bank that the money would be sent

5   to from Iran and that money would be received at.

6   Q.  On this document, which bank is that?

7   A.  Turkey Halkbank.

8        MR. KAMARAJU:  Can we go to the next document.

9   Q.  What's this?

10  A.  This is also one of those documents that would be turned to

11  the bank as documentation.

12  Q.  What does this document reflect?

13  A.  This also has some information about the transaction.

14  Q.  Do you see where it says "frozen chicken leg"?

15  A.  Yes, I see that, sir.

16  Q.  What is that a reference to?

17  A.  This is the product that's supposedly going to Iran.

18       MR. KAMARAJU:  Can we turn to the next document.

19  Q.  What are we looking at here?

20  A.  This is the SWIFT message, the telex message that was sent

21  from Iran for the payment to be made with Halkbank.

22  Q.  When you say "payment," what is it a payment for?

23  A.  For the frozen chicken legs.

24       MR. KAMARAJU:  Can we go to the next document, please.

25  Q.  What's this?

 1   A.  And this is the instruction by Royal Company saying that

 2   the money should be transferred to the Halkbank account of the

 3   supplier company, and by Royal I mean the company that I own.

 4   And by Atlantis Capital General Trading, I mean the company

 5   that is under my control.

 6          MR. KAMARAJU:  Can we look at the next one.

 7   Q.  What's this?

 8   A.  This is an instruction from Atlantis Capital Trading to

 9   Halkbank.  And with this document, Atlantis accepts to receive

10   the money that would be coming from Royal account.

11          MR. KAMARAJU:  Can we move to the next one, please.

12   Q.  What's this document?

13   A.  And this is the supplier invoice that Atlantis Capital

14   General Trading had cut for Royal Maritime.

15   Q.  If we can look at the next document.  What's this?

16   A.  It is not very legible, but I'm testifying based on its

17   similarity to the documents that we had seen.  It is a customs

18   document.  It is a Dubaian customs document.

19   Q.  Does it show that frozen chicken legs were exported?

20   A.  Yes, sir, that's written.

21   Q.  Could we look at the next document.  What's this?

22   A.  This is a bill of lading, sir.

23   Q.  What is reflected under the description of goods?

24   A.  Frozen chicken legs, sir.

25   Q.  Do you see at the top where it says "declaration of

1    export"?

2    A.  Yes, sir.

3    Q.  Did you say this was a bill of lading?

4    A.  This is like a bill of lading.  I had mentioned the small

5    vessels that were going to and from Iran.  And for those

6    vessels, this represents the customs exit form.  For example,

7    it could also show all the information related to the transport

8    such as the ship's information, so it goes for anything for

9    those types of small vessel shipments.

10   Q.  Can we look at the next document, please.  What's this?

11   A.  I can't see the top section.

12           THE COURT:  Do you all have it?  There you go.  Is

13   that better?

14           MR. KAMARAJU:  We'll try again.

15   Q.  What is this?

16   A.  And this is the final invoice that was cut by Royal, sir.

17   Q.  When would you typically cut the final invoice?

18   A.  At the last, the final phase.

19   Q.  Do you see at the top where it says "Credit Institution for

20   Development"?

21   A.  Yes, I see that, sir.

22   Q.  What is that?

23   A.  This is the name of an Iranian bank, sir.

24   Q.  From these documents, can you tell what role the Iranian

25   bank was supposed to be playing in this transaction?

1  A.  The frozen chicken legs were purchased by the Iranian bank,

2  sir.

3  Q.  Mr. Zarrab, were you ever in the frozen chicken leg

4  business?

5  A.  I've never traded chicken, sir.

6  Q.  I'd like to show you what has been marked for

7  identification as Government Exhibit 6013.

8          Do you recognize this exhibit?

9  A.  Yes, sir, I recognize it.

10  Q.  What is it?

11  A.  It is an electronic mail, sir.

12  Q.  Who sent it?

13  A.  Jafar Saeid, sir.

14  Q.  Who is it sent to?

15  A.  Aykut Okumus, sir.

16  Q.  Do both of those people work for you?

17  A.  Yes, both of these individuals were among the personnel

18  that worked with me at that time.

19          MR. KAMARAJU:  Can we turn to the next page of the

20  exhibit, please.  Blow that up.

21  Q.  What's this?

22  A.  This is a document that is for a different product, but is

23  one that was within the set of documents that we had looked at

24  earlier.

25  Q.  So, is this an example of the kind of document you

1   submitted to Halkbank?

2   A.   Yes, sir.

3   Q.   What kind of document is this?

4   A.   It's the pro forma, the first invoice, sir.

5            MR. KAMARAJU:   If we can turn to the next, turn to the

6   next page.

7   Q.   What's this?

8   A.   This is the message that's sent so that the money would be

9   sent from the Iranian bank to our account, sir.

10  Q.   Mr. Zarrab, is this a package of documents that would

11  typically be submitted to Halkbank?

12  A.   Yes, sir.

13           MR. KAMARAJU:   Government would offer Government

14  Exhibit 6013.

15           MS. FLEMING:   Objection.  Foundation and hearsay.

16           THE COURT:   I'll allow it.

17           (Government's Exhibit 6013 received in evidence)

18           THE COURT:   Are you going to ask more questions about

19  it?

20           MR. KAMARAJU:   Yes, just a couple.

21           THE COURT:   Sure.  For example, what product is

22  covered?

23           MR. KAMARAJU:   Yes, your Honor.  That's exactly what I

24  was going to ask.

25  Q.   We're on page two of the exhibit.  I believe you testified

1   this is a pro forma invoice; is that right?

2   A.  Yes, sir, that's correct.

3   Q.  Does it relate to a purported shipment of goods?

4   A.  Only on the document, sir.

5   Q.  What goods are shown on the document?

6   A.  (In English) Coconut virgin oil.

7   Q.  Where is the coconut virgin oil supposed to originate?

8   A.  Indonesia.

9   Q.  How much coconut virgin oil was supposed to be shipped?

10  A.  2,360 tons.

11  Q.  What's the amount of the transaction?

12  A.  5,074,000 euros, sir.

13  Q.  Who is selling the coconut virgin oil, according to the

14  document?

15  A.  Royal Maritime Industrial Machinery Company, which is the

16  company that I own, sir.

17  Q.  Who is listed on the document as the buyer for the coconut

18  virgin oil?

19  A.  Credit Institute for Development.

20  Q.  Remind us, what's that?

21  A.  This is an Iranian bank, sir.

22  Q.  I'd like to show you what's been marked for identification

23  as Government Exhibit 6014.

24  A.  Yes, sir.

25  Q.  Do you recognize this document?

1    A.  I recognize it, sir.

2    Q.  What is it?

3    A.  It's an electronic mail, sir.

4    Q.  Who is it from?

5    A.  Jafar Saeid, sir.

6    Q.  Who is it to?

7    A.  Aykut Okumus, sir.

8    Q.  Do they both work for you?

9    A.  Yes, sir, both of these individuals worked for my company

10   during that period of time.

11   Q.  What's the date of the e-mail?

12   A.  August 5, 2013, sir.

13   Q.  Can we turn to the next page, please.  What's this?

14   A.  This is also the initial invoice, the pro forma invoice

15   that is provided by our company, sir.

16   Q.  When you say provided by your company, who would it be

17   provided to?

18   A.  This is one of those documents that belongs to the package

19   of documents that are given to the bank.

20          MR. KAMARAJU:  The government would offer Government

21   Exhibit 6014.

22          MS. FLEMING:  Objection.  Foundation and hearsay.

23          THE COURT:  I'll allow it.

24          (Government's Exhibit 6014 received in evidence)

25          MR. KAMARAJU:  If we can publish that at page two,

1    please.

2    Q.  What good is listed on this document as being shipped?

3    A.  Frozen chicken breast.

4    Q.  According to the document, where does the frozen chicken

5    breast come from?

6    A.  It's Brazil, sir.

7    Q.  According to the document, where does it go?

8    A.  Bandar Abbas, Iran, sir.

9    Q.  According to the document, how much frozen chicken breast

10   was supposed to be shipped?

11   A.  745 tons, sir.

12   Q.  What was the amount of the transaction?

13   A.  It is 5,114,425 euros -- excuse me.  Turkish lira, sir.

14   Q.  Who is supposed to be selling the frozen chicken breast,

15   according to the document?

16   A.  It's Royal Maritime Industrial Machinery Company, which is

17   the company that I own, sir.

18   Q.  Who is supposed to be buying the frozen chicken breast,

19   according to the document?

20   A.  Credit Institution for Development, sir.

21          MR. KAMARAJU:  Last one.  Could we please pull up for

22   identification Government Exhibit 6015.

23   Q.  Do you recognize it?

24   A.  Yes, sir, I recognize it.

25   Q.  What is it?

1    A.  It is an electronic mail, sir.

2    Q.  Whose it from?

3    A.  From Jafar Saeid, sir.

4    Q.  Who is it to?

5    A.  Aykut Okumus, sir.

6    Q.  What's the date of the e-mail?

7    A.  August 5, 2013, sir.

8            MR. KAMARAJU:  Can we turn to the next page, please.

9    Q.  What's this?

10   A.  It the pro forma invoice that was submitted by our company,

11   the company that I own, to the bank.

12           MR. KAMARAJU:  The government would offer Government

13   Exhibit 6015.

14           MS. FLEMING:  Objection.  Foundation and hearsay.

15           THE COURT:  I'll allow it.

16           (Government's Exhibit 6015 received in evidence)

17           MR. KAMARAJU:  And ask to publish at page two.

18           THE COURT:  Okay.

19   Q.  Mr. Zarrab, according to the document, what goods were

20   supposed to be shipped?

21   A.  Virgin olive oil, sir.

22   Q.  How much virgin olive oil was supposed to be shipped?

23   A.  1,011 tons, sir.

24   Q.  What was the value of the transaction?

25   A.  It is 5,095,440.

1   Q.  According to the document, who was selling the virgin olive

2   oil?

3   A.  The Royal Maritime and Industrial Machinery Trade Company,

4   sir.

5           THE COURT:  The amount you stated is in what currency?

6           THE WITNESS:  Turkish lira, your Honor.

7   Q.  Who is supposed to be buying the virgin olive oil,

8   according to the document?

9   A.  Credit Institute for Development, sir.

10  Q.  Mr. Zarrab, have you ever traded coconut virgin oil?

11  A.  I've never traded coconut oil.

12  Q.  Have you ever traded frozen chicken breasts?

13  A.  No.  I've never done frozen chicken legs either.

14  Q.  Have you ever traded virgin olive oil?

15  A.  No, sir, I never traded olive oil either.

16  Q.  Did you ever tell anyone at Halkbank that you did trade any

17  of those products?

18  A.  No.  They only had what's shown on the documents.

19  Q.  Are the documents that we've been looking at, are those the

20  kinds of documents you were discussing with Halkbank?

21  A.  Yes, sir.  These are the documents that are presented to

22  Halkbank from our company.

23  Q.  Are these the kinds of documents that you were discussing

24  with Hakan Atilla?

25  A.  Yes, sir.  It is among the set of documents, the

1   documentation, that was agreed upon in the beginning.

2            MR. KAMARAJU:  If I could have just one moment, your

3   Honor.

4            No further questions at this time, your Honor.

5            THE COURT:  Thank you.  Ms. Fleming for

6   cross-examination.

7            MS. FLEMING:  Thank you, your Honor.

8            Your Honor, may I proceed?

9            THE COURT:  Sure.

10  CROSS-EXAMINATION

11  BY MS. FLEMING:

12  Q.  Good morning, Mr. Zarrab.  My name is Cathy Fleming, and

13  along with the other people at the counsel's table, I represent

14  Mr. Atilla.

15  A.  Good morning, ma'am.

16  Q.  We met briefly once at the MDC for about a minute, correct?

17  A.  No, ma'am.

18  Q.  You don't remember meeting me at the MDC to find out when

19  your lawyers were going to leave so we would have the

20  opportunity to meet with our client?

21  A.  I remember, ma'am.

22  Q.  You have declined to meet with any of us with your lawyers

23  so that we could interview you and ask you any of the facts;

24  isn't that true?

25  A.  I have met with this lady twice, that was also in the back

HC53ATI2                          Zarrab - Cross

 1   during a court hearing.  So not once, but I had met her twice.

 2              That's why I had said no to one time, ma'am.

 3   Q.  So when I was speaking with my client in the back, you saw

 4   me, correct?  That's what you're referencing?

 5   A.  The lady, just like in the MDC, as she was passing by she

 6   said hello, hello, and passed by just like during that time.

 7   Q.  But you have refused to be interviewed by Mr. Atilla's

 8   counsel in the presence of your lawyers just so we could ask

 9   you about questions before this trial; isn't that true?

10   A.  Yes, I refused to meet with Mr. Hakan Atilla's lawyers.

11   Q.  And that is because you were angry at what Mr. Atilla and

12   his lawyers said about you in motion papers; isn't that

13   correct?

14   A.  It is absolutely not correct, no.

15   Q.  Isn't that what you had your lawyer tell us?

16   A.  It is one of those things that I had asked him to convey.

17   Q.  Let me just ask you a couple of questions to make clear

18   what we heard on direct.

19              You never paid a bribe to Mr. Atilla, correct?

20   A.  No, I have never paid bribes to Mr. Hakan Atilla, ever.

21   Q.  And Mr. Atilla has never asked you for any money, ever,

22   correct?

23   A.  That is correct; Mr. Hakan Atilla has never requested any

24   money from me, ever.

25   Q.  And you are aware that he was never fond of you; is that

1    fair to say?

2    A.  That is fair, ma'am.

3    Q.  It's fair that you did not like him either?

4    A.  That is fair, ma'am.

5    Q.  It's also fair to say that during the time of your business

6    at Halkbank, you complained about Mr. Atilla to his boss,

7    Mr. Suleyman Aslan?

8    A.  Sometimes, ma'am.

9    Q.  In fact, in addition to the recording we heard where you

10   called him a wrench in the gears, you have complained about him

11   at other times, correct?

12   A.  That is absolutely correct, ma'am.

13   Q.  It's also true that in your phones he was never -- he was

14   not in your contacts that we have here in discovery, correct?

15   A.  That is correct.  Mr. Hakan Atilla's phone number is not

16   among the contacts that was in the discovery.

17   Q.  And we have seen in Exhibit 1002 and 1002-T approximately

18   1,000 or slightly more than 1,000 messages between you and

19   Mr. Suleyman Aslan; is that correct?

20   A.  I don't know the count of the messages, but it is true that

21   I was in a more regular contact with Mr. Suleyman Aslan; that

22   is correct.

23   Q.  More regular contact.  Do you agree with me that there are

24   approximately 55 pages contained in Government Exhibit 1002,

25   and approximately 15 to 20 messages per page?

1    A.  As I said, I don't recall, I don't know the page count.

2    But it is true that I was in a close relationship with

3    Mr. Suleyman Aslan.

4              MS. FLEMING:  Your Honor, may I approach?

5              THE COURT:  Sure.

6    Q.  And your chats with Mr. Aslan only covered the period from

7    December 2012 through approximately the end of November 2013;

8    isn't that correct?

9    A.  I don't know the exact date range that is reflected on the

10   document that you're holding, ma'am.

11   Q.  In addition to Mr. Aslan, you had chats with a number of

12   other people, correct?

13   A.  Can I get a more specific question?

14   Q.  Do you remember whether in 2012 and 2013 whether you did

15   WhatsApp chats with any other people?

16   A.  Of course, there would have been many messaging sessions.

17   Q.  Do you remember -- withdrawn.

18             MS. FLEMING:  Your Honor, may I approach?

19             THE COURT:  Sure.

20   Q.  I'm going to show you what's been entered into evidence as

21   Government Exhibit 1002 and ask you to take a look at

22   Government Exhibit 1002 and see if that helps your memory on

23   what time frame is covered by those chats with Suleyman Aslan.

24   A.  On this document that was handed to me just now, the date

25   range shows that the messaging began on December 23, 2012, and

HC53ATI2                      Zarrab - Cross

1    ended on November 22, 2013.

2    Q.  You have 1002, which is the Turkish version.  Can you tell

3    us how many pages are contained reflecting that approximate 11

4    months and then approximately how many messages there are per

5    page?

6              MR. KAMARAJU:  Objection.

7              THE COURT:  I'll allow it.

8    A.  The page count of the document I was just handed over to me

9    appears to be 49.  And the message count that I counted on the

10   first page is 16, ma'am.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  And it's true, is it not, that you never had a single chat

2   message with Mr. Atilla, correct?

3   A.  I don't recall whether there was any message with

4   Mr. Atilla, but I just don't recall.

5   Q.  He's not in your phone is he?  His number is not in your

6   phone, is he, sir?

7           THE COURT:  We've been over that, haven't we?

8           THE INTERPRETER:  Could you please repeat that?

9           MS. FLEMING:  Withdrawn.

10  Q.  You've had, since you were arrested in this case, the

11  discovery in this case, correct?

12  A.  By discovery, I don't know what you mean.

13  Q.  Did you receive, as a defendant in this case, all of the

14  recordings that were provided by the government for you to

15  review?

16  A.  It is true that discovery documents were provided to my

17  lawyers since my arrest, and this evidence was provided from

18  time to time in part, and I don't know what date range or what

19  it covered as far as what was provided to us.

20  Q.  You certainly listened to many, many recordings in Turkish,

21  have you not, sir?

22          THE COURT:  You mean here in court or outside?

23          MS. FLEMING:  No, outside.  Prior to coming to court.

24  A.  I don't understand exactly what you mean by "many."

25  Q.  Before you agreed to cooperate with the government, you

1    certainly listened to some of your recorded conversations in

2    discovery, correct?

3    A.  No, that is absolutely not correct.

4    Q.  You had not listened to any of your conversations before

5    you made a decision to plead guilty?

6    A.  When the CD came, out of curiosity I opened up and I

7    listened to a few, but I didn't listen to the rest because I

8    already knew them from December 17th.

9    Q.  So you had listened to them back in Turkey, back in

10   December 2013, January 2014?

11              MR. KAMARAJU:  Objection.

12   A.  That is not correct.

13   Q.  And after you agreed to plead guilty with the government,

14   you certainly listened to many of the recordings more than

15   you've heard played in this courtroom, correct?

16   A.  No, it was not many more than this.  Maybe a few more,

17   maybe a few less, I don't know.

18   Q.  You listened to less calls in preparation for trial than

19   you heard here in the courtroom; is that your testimony?

20   A.  No, I'd like to correct what was understood.  What I meant

21   was the use of the saying in Turkish more or less.  So what I

22   meant was that I listened to the conversations.  I have not

23   listened to hundreds of them, not that many, but I have

24   listened to more or less the conversations that you're

25   referring to.

HC5PATI3                    Zarrab - Cross

1    Q.   And -- There's no question.

2    A.   And, again, I'd like to make sure this is on the record,

3    that we're talking about a Turkish --

4    Q.   There's no question.

5              THE COURT:  He's answering your question.

6              MS. FLEMING:  Your Honor, I think I'm asking questions

7    yes or no.

8              THE COURT:  Well, if that's the case, we haven't done

9    that yet.

10             MS. FLEMING:  Well, I'd ask the Court to please

11   instruct the witness to answer my questions responsively.

12             THE COURT:  You have to ask the question yes or no.

13   BY MS. FLEMING:

14   Q.   Have you listened to more than 50 calls in Turkish before

15   you came to court?

16             THE COURT:  Yes or no?

17   Q.   Yes or no.

18   A.   I don't remember the count.

19   Q.   Have you listened to more than four calls with Mr. Atilla's

20   voice on it?

21   A.   I listened to four.  I don't recall anything over that.

22   Q.   Now, you've been involved in the cash exchange business and

23   various -- the various kinds of businesses that you've

24   described here, since at least 2010; yes or no?

25   A.   Yes, ma'am.

 1   Q.  And you did not even meet Mr. Atilla until sometime late in

 2   2012, according to your testimony, correct?  Yes or no.

 3   A.  Yes, ma'am.

 4   Q.  Now, you told us in this court that you remember him at an

 5   October meeting in 2012; do you remember that?

 6   A.  I did not mean that as the first ever meeting, ma'am.

 7   Q.  You told us that you remembered him being at a meeting

 8   where you discussed business related to what you called the

 9   Iranian business in October 2012; yes or no?

10   A.  Yes, ma'am, that's correct.

11   Q.  But in preparation for testimony and in your proffers, do

12   you remember telling the prosecutors and the FBI that you

13   remembered definitely Levent Balkan being there, but you

14   weren't sure if Mr. Atilla was there for that one?  Do you

15   remember that; yes or no?

16   A.  No, that is not correct.

17   Q.  Do you remember meeting with members of the prosecution

18   team on August 23rd, 2017?  It was your very first proffer

19   meeting.  Do you remember that meeting?

20   A.  I don't recall it as a date.  What I remember is the first

21   proffer meeting; that is correct.

22   Q.  But you don't remember telling those prosecutors -- I'll

23   withdraw it and ask it differently.

24           In fact, didn't you tell those prosecutors in that

25   proffer meeting that Balkan was definitely there, not sure if

1    Atilla was there for that one; yes or no?

2    A.   No, ma'am, that is not correct.

3    Q.   Now, you also testified to a number of meetings with

4    Mr. Atilla.  It is true, is it not, sir, that you have met with

5    Mr. Atilla approximately a handful of times?

6    A.   That is correct, ma'am.

7    Q.   And by a handful of times, you mean you've met with him

8    approximately five times?

9    A.   I counted the fingers on both hands, ma'am.

10   Q.   So a handful of times to you means ten?  That's a yes?

11   A.   I don't recall the exact count for those, ma'am.

12   Q.   Do you recall telling the prosecutors and the FBI that you

13   had met with Mr. Atilla a handful of times; yes or no?

14   A.   I have expressed to the prosecutor's office that I did not

15   have many meetings with Mr. Hakan Atilla, and that is correct.

16   Q.   Now, you've had other involvement with money exchange and

17   money laundering schemes in other countries other than Turkey,

18   correct?  Yes or no.

19   A.   It is true that I was involved in money exchange pertaining

20   to Iranian trade that was done outside of the country of

21   Turkey; that is correct.

22   Q.   Isn't it also true that you were involved in money

23   laundering involving Russia prior to 2010?

24   A.   No, that is not correct, ma'am.

25   Q.   Wasn't your chauffeur stopped at the border with $150

 1  million in cash in connection with your dealings in Russia in

 2  2010 -- in 2007, I believe it was, yes or no?  '7.

 3  A.  No, ma'am; that is not correct.

 4  Q.  Was your chauffeur ever stopped at the border in customs

 5  with $150 million in cash?

 6  A.  My driver was never stopped in Russia with $150 million in

 7  cash ever, ma'am.

 8  Q.  It was at the Turkey border, wasn't it, with customs, in

 9  connection with business involvement -- let's just stop at

10  that.  Wasn't he stopped at the Turkey customs with 150 million

11  in cash?

12  A.  No, that is absolutely not correct, ma'am.

13  Q.  You also were involved in business in China, correct?  And

14  in connection -- correct, yes or no?

15  A.  That is absolutely correct, ma'am.

16  Q.  And you also had a business partner in Iran, correct?

17  A.  Yes, ma'am; that is correct.

18  Q.  And his name was what, sir?

19  A.  There were different ones from time to time.  Which time

20  frame are you referring to?

21  Q.  Were you partners with somebody named Babak Zanjani?

22  A.  There was never a time of partnership with the individual

23  named Babak Zanjani, ma'am.

24  Q.  Didn't you have business with Babak Zanjani?

25  A.  In trade, just like with other Iranians.  That individual

1    had sent money to my account too, ma'am.

2    Q.  In addition to trade and sending money to your account,

3    didn't you, in fact, keep some of his money in your accounts on

4    his behalf?

5    A.  That is absolutely not correct, ma'am.

6    Q.  Didn't you purchase or be involved in a business deal with

7    him involving a plane from Ghana that had gold, 1.5 million

8    tons of gold that landed in Turkey?  Excuse me.  I think I

9    misspoke.  1.5 tons of gold, not 1.5 million tons of gold.

10   A.  It is true that Babak Zanjani had sent one-and-a-half tons

11   of gold from Ghana to us to sell to my company in Turkey.  That

12   is correct, ma'am.

13   Q.  And, in fact, sir, you had problems in Iran in relationship

14   with that and other business deals; isn't that true?

15           THE COURT:  I'm sorry, I didn't get the question.

16   Q.  You have problems in Iran, you have legal problems if you

17   go to Iran; isn't that true?

18   A.  To my knowledge, there is not any, ma'am.

19   Q.  Have you told the prosecutors that you have not gone back

20   to Iran for a number of years because you've been concerned

21   about going there?

22   A.  Of course, I have always had concerns about going to Iran,

23   but that's because of my lifestyle.

24   Q.  And you have no concerns about any of your legal exposure

25   in Iran based on your business dealings, is that what you're

HC5PATI3                    Zarrab - Cross

1   telling us?  Yes or no?

2   A.  Under normal circumstances, there should not be any

3   concern.

4   Q.  How about now, do you have any concern, because of your

5   legal problems, of going to Iran; yes or no?

6   A.  Certainly there is.

7   Q.  And how about your relationship with Babak Zanjani, do you

8   have any concerns about going to Iran based on your

9   relationships with him; yes or no?

10  A.  My concern about going to Iran or not going to Iran has

11  nothing to do with my relationship with Babak Zanjani, ma'am.

12           MS. FLEMING:  Your Honor, I'm saying "yes or no" at

13  the end of my questions.  May I ask that the Court please

14  instruct the witness to answer my questions.

15  Q.  You testified on the first day, in response to questions,

16  that cooperation is the fastest way to accept responsibility

17  and to get out of jail at once.  Isn't that what you said; yes

18  or no?

19  A.  Yes, I did say that that was the fastest method.

20  Q.  And, indeed, since you have agreed to cooperate, your life

21  has improved in the United States, correct?  Yes or no?

22  A.  I don't understand what you mean by standard of life; so I

23  can't answer that question.

24  Q.  Well, you're no longer in the MDC, are you, sir?  Yes or

25  no?

1    A.   Correct, I am not at the MDC, ma'am.

2    Q.   And the MDC is a jail that's in Brooklyn, correct?

3    A.   Yes, ma'am; that's correct.

4    Q.   It's very unpleasant, correct?

5    A.   We should not be offensive to the MDC that much.

6    Q.   You have to wear prison clothes, correct?

7    A.   During certain hours, ma'am.

8    Q.   You're locked up at the times they tell you you need to be

9    locked up, correct?

10   A.   Absolutely so, ma'am.

11   Q.   There are a significant number of rules that make -- there

12   are a significant number of rules, correct?

13   A.   Yes, ma'am; that is correct.

14   Q.   You have to eat whatever the MDC puts out in front of you,

15   correct?

16   A.   No; that is not correct, ma'am.

17   Q.   You eat what they prepare in their cafeteria and put out,

18   correct?

19   A.   No; that is not correct, ma'am.

20   Q.   You can't order in, can you?

21   A.   No.  We can cook it ourselves.

22   Q.   And, in fact, you have very much wanted to be out of jail

23   since you were arrested, correct?  Yes or no.

24   A.   Yes, ma'am; that is absolutely correct.

25   Q.   And you have very much wanted to get out at least on bail

1    before you are sentenced, correct?

2    A.   When I was arrested earlier on, we did make an application

3    for being released on bail; that is correct, ma'am.

4    Q.   And even after that, when you started cooperating, you and

5    your lawyers have discussed with the prosecutors that you would

6    like to make an application for bail; it will be discussed

7    after trial, correct?

8    A.   It is true that my lawyers will be meeting in order to

9    discuss the bail conversation after the trial; that is correct,

10   ma'am.

11   Q.   And you've been told that while there are no promises or

12   guarantees, that it will be discussed after this trial whether

13   you can get out on bail, right?

14   A.   It is my understanding that an application for bail could

15   be made at any time, and there is the possibility of having a

16   conversation of bail after the trial too, yes.

17   Q.   Now, you also told us that your cooperation agreement --

18             THE COURT:  Excuse me.  "Us," being?

19             MS. FLEMING:  All of us in the courtroom.

20             THE COURT:  "You testified," right?

21             MS. FLEMING:  Yes.

22   Q.   When you testified --

23   A.   Yes, ma'am.

24   Q.   -- you told the jury that you had three main obligations

25   under your cooperation agreement.  You said you needed to speak

1  exactly the truth; isn't that correct?

2  A.  Yes, ma'am.

3  Q.  You said you needed to cooperate with the United States; is

4  that correct?

5  A.  Yes, ma'am.

6  Q.  And you said you need never to commit any crime after this?

7  A.  Yes, ma'am.

8  Q.  That's correct?  And you said, in exchange, you will get a

9  5K letter to the Court, which will explain all of the crimes I

10  have committed, all the help I have provided to the United

11  States government, good and bad and everything?  Did I say it

12  accurately?

13  A.  Yes, ma'am.

14  Q.  But your cooperation agreement actually requires you to do

15  more than that, doesn't it, sir?

16  A.  For example?

17       MS. FLEMING:  Your Honor, may I use the easel?

18  Q.  Your cooperation agreement is written, isn't it?

19  A.  Yes, ma'am.

20  Q.  And your cooperation agreement requires that you provide

21  "substantial assistance in the investigation or prosecution of

22  others;" isn't that correct, sir?

23  A.  I don't remember the verbatim that's mentioned in the

24  agreement, but the fact that I would be cooperating and

25  providing information is correct, ma'am.

1          MS. FLEMING:  Your Honor, may I approach?

2          THE COURT:  Sure.

3  Q.  Mr. Zarrab, would you look at that.  Read it to yourself.

4  A.  Which section, ma'am?

5  Q.  I'm going to direct your attention to it in one minute.  On

6  page 5, in the middle of the page, the second full paragraph

7  down, starting in the middle, if you could look at that to

8  yourself.  There's a sentence that says:  "In addition, if this

9  office determines that the defendant has provided substantial

10  assistance" --

11          MR. KAMARAJU:  Objection, your Honor.  She's reading.

12          THE COURT:  Sustained.

13  Q.  Would you read the sentence that starts "In addition" to

14  yourself?

15          THE INTERPRETER:  Can I just read it real quick so I

16  can also help him?  Excuse me, does it start with "In addition,

17  if this office"?

18          MS. FLEMING:  May I go point it out, your Honor?

19          THE COURT:  Sure.

20          MS. FLEMING:  Thank you.  Got it?

21          THE INTERPRETER:  Excuse me.  So you highlighted the

22  whole section.

23          THE COURT:  Counsel, could you point it out to the

24  witness and not the interpreter.

25          MS. FLEMING:  I'm sorry, I thought -- right here.

1    A.  I'm reading, ma'am.  "In addition" --

2    Q.  Don't read it out loud.  Read it to yourself, please.

3    A.  Okay.

4           (Pause)

5           If you can translate this for me so I understand what

6    it says.

7           MS. FLEMING:  Could you please do it without the

8    microphone.

9           THE INTERPRETER:  Without the microphone?

10          MS. FLEMING:  Please.

11          (Pause)

12   A.  Yes, ma'am, I read it.

13   Q.  Does that refresh your recollection that you are required,

14   under your plea agreement, to provide substantial assistance in

15   an investigation or prosecution in order for the government to

16   make a 5K1.1 motion?

17   A.  Yes, it reminds me that I need to provide substantial

18   assistance, and I also know that I need to provide substantial

19   assistance.

20   Q.  And the 5K motion can only be made by the government,

21   correct?

22   A.  Yes, ma'am.

23   Q.  And a 5K motion is made by the government if they believe

24   you have complied with all of your obligations under the

25   agreement, including providing substantial assistance, to ask

1  the sentencing judge to sentence you below the sentencing

2  guidelines; isn't that correct?

3  A.  Yes; that is correct, ma'am.

4  Q.  And if you do not comply with those understandings,

5  including providing substantial assistance, it is correct, is

6  it not, that the government is released from its obligation to

7  make a 5K motion?

8  A.  There are many obligations that I need to fulfill within my

9  cooperation agreement with the government, and this is one of

10  those.

11  Q.  And it is the government who decides if you have fulfilled

12  them, correct?

13  A.  That is correct, ma'am, absolutely.

14  Q.  And if the government decides you have not fulfilled them,

15  they are released from their obligations, correct?

16  A.  That is correct, ma'am.

17  Q.  Now, from the first day that you were arrested by the FBI,

18  you have been told by the government, meaning the FBI, that it

19  was in your best interest to cooperate, correct?

20  A.  That is correct.  When I was arrested the first time at the

21  airport, that was mentioned to me.

22  Q.  And do you recall that they told you that you were facing

23  years and years in jail?

24  A.  Yes, ma'am; that's correct.

25  Q.  And do you recall the FBI agent telling you, the more you

1    help us, the more we can help you with the amount of time you

2    will see in prison?

3    A.   I don't recall those sentences exactly, ma'am.

4    Q.   I'll come back to that.

5    A.   Certainly.

6    Q.   And you lied to the FBI when you were arrested, correct?

7    A.   Yes; that is correct, ma'am, I did lie.

8    Q.   You were arrested in Miami, correct?

9    A.   Yes, ma'am.  I was arrested in Miami; that is correct.

10   Q.   And you spent a few weeks in Miami before you were sent up

11   to New York; is that also correct?

12   A.   Yes, ma'am; that is correct as well.

13   Q.   But you had your lawyers make their first proffer to the

14   government in August of 2016; is that correct?

15   A.   I don't recall the exact date of the first ever proffer

16   regarding cooperation with the government.

17   Q.   Was it a few months after you were arrested?

18   A.   No, ma'am.

19   Q.   It was before Mr. Atilla had been arrested; isn't that

20   true?

21   A.   What are you referring to?  I don't understand the question

22   very well.

23   Q.   When your attorneys went in and your attorneys made their

24   first proffer, do you recall that?

25   A.   The time that my lawyers went in and discussed the details

1  about cooperation with the government was before Mr. Atilla was

2  arrested; that is correct, ma'am.  But I did not enter into a

3  cooperation at that time.

4  Q.  And the way it works is that an attorney goes in and tells

5  the government what information you have about criminal

6  activity, correct?

7            MR. KAMARAJU:  Objection.

8            THE COURT:  I'll allow it.  I'm not sure it's so easy

9  to understand that question.

10            MS. FLEMING:  Judge, I'm doing my best.

11            THE COURT:  No, no, I know.  Maybe you could rephrase

12  that.

13  BY MS. FLEMING:

14  Q.  With the first meeting, your attorneys met with the

15  government and you were not present, correct?

16  A.  Yes, ma'am.

17  Q.  And do you understand that to be an attorney proffer?

18  A.  No, ma'am.

19  Q.  Do you understand that the attorneys discussed with the

20  government what information you might have, to see whether a

21  cooperation agreement will be of interest to the government?

22  A.  Yes, ma'am.

23  Q.  And it's fair to say that your attorneys never mentioned

24  the name of Mr. Atilla when they went and met before he was

25  arrested, fair?

1    A.   During their first meeting, they did not talk about any

2    names, ma'am.

3    Q.   The process that goes forward, you waited -- it took a year

4    between that first meeting and your second meeting, your second

5    attorney proffer to continue discussions with the government

6    about cooperating; is that fair to say?

7    A.   No, that would not be fair, ma'am.

8    Q.   How long was it between your first proffer session and the

9    second; do you remember?

10   A.   I never attended a proffer session with the prosecutors a

11   year ago, ma'am.

12   Q.   All right.  Let me rephrase my question.

13   A.   Please.

14   Q.   The first time you attended a proffer session with the

15   government was in August of 2017; is that correct?

16   A.   Yes, ma'am; that is correct.

17   Q.   And your lawyers had met with the government approximately

18   a year before that for the first time to discuss it, but it had

19   not gone through; is that fair?

20   A.   That they -- it was approximately a year when they had

21   first had that meeting, yes; that would be fair, ma'am.

22   Q.   Now, in between, in that year, you had attorneys in Turkey

23   and in the United States who were trying to secure your release

24   through political means; isn't that true?

25   A.   Within the bounds of law, they did make efforts, and that

1    is correct, ma'am.

2    Q.  And, in fact, you hired Rudy Giuliani and former Attorney

3    General Michael Mukasey as your attorneys in the United States

4    to try to work out a solution for you in Turkey, correct?

5    A.  That is correct, ma'am.

6    Q.  And you believed that this was going to work for a year,

7    correct?

8    A.  I thought that it may become possible, ma'am.

9    Q.  And, in fact, you are furious with people in Turkey that it

10   did not work; isn't that true?

11   A.  I don't have any anger towards anybody, ma'am.

12   Q.  A proffer process -- I'd like to focus you on after you

13   agreed to cooperate with the government, what that process

14   looks like, okay?

15   A.  Go ahead, ma'am.

16   Q.  So in August of 2017, your American attorneys went in again

17   and made a second attorney proffer to the United States

18   government and started the process for you to cooperate again,

19   correct?

20   A.  That is not correct, ma'am.

21   Q.  Didn't your attorneys meet with the U.S. Attorneys on

22   August 17th, 2017, to start the process again for you?

23   A.  They did that, ma'am.

24   Q.  And then you went in and met with the prosecutors and FBI

25   and did something called a proffer; is that correct?

 1    A.  That is correct, ma'am.

 2    Q.  Now, a proffer means that they interview you and you tell

 3    them what you know, and then the government tells you --

 4            THE COURT:  Do you want him to answer it?

 5            MS. FLEMING:  I'm trying to finish the question,

 6    Judge.

 7            THE COURT:  Oh.

 8    Q.  -- and in order for the government to tell you whether they

 9    are willing to enter into a cooperation agreement with you?

10    A.  That is correct, ma'am.

11    Q.  And, in fact, you signed something called a proffer

12    agreement.  Do you remember doing that?

13    A.  I remember, ma'am; that's correct.

14    Q.  And the government agrees it won't use directly against you

15    what you tell them in the proffer agreement?

16    A.  During that first meeting, that proffer agreement was

17    presented to me and was read to me and was also interpreted

18    into Turkish for me, but I don't recall all the paragraphs and

19    all the conditions set therein; so I don't want to misinform or

20    provide a wrong answer because I don't recall all those things.

21    Q.  Do you remember how many sessions you had with the members

22    offer the U.S. Attorney's Office and the FBI before they agreed

23    that they would have a cooperation agreement with you?

24    A.  I don't recall the exact count of meetings, ma'am.

25    Q.  Does the number 12 meetings sound correct?

1    A.  Sounds fair, ma'am.

2    Q.  And they were long sessions, weren't they?

3    A.  Yes, ma'am; they were long sessions.

4    Q.  And then after -- I'll go through in more detail, but after

5    they -- after those 12 sessions, the government said, yes,

6    we'll enter into the cooperation agreement with you, right?

7    A.  Despite the fact that I don't recall the exact count of

8    those meetings, it is true that after so many meetings, they

9    did say that they were willing to enter into cooperation

10   agreements and sign it; that is correct, ma'am.

11   Q.  And the cooperation agreement is what we talked about

12   before, where you have obligations and the government has

13   obligations under that, for you to plead guilty, correct?

14   A.  That is correct, ma'am.

15   Q.  Now, after you entered into the cooperation agreement, you

16   pleaded guilty to a number of crimes, correct?

17   A.  That is correct, ma'am.

18   Q.  And you pleaded guilty to seven crimes; is that correct?

19   A.  That is correct, ma'am.

20   Q.  And you did that on October 25th, this year, right?

21   A.  I don't recall the exact date, ma'am.

22   Q.  Approximately, does that sound right?

23   A.  I think it would be fair if we would say it was during that

24   time frame somewhere.

25   Q.  And since the day that you pleaded guilty, you have been

1    with the U.S. Attorney's Office or the FBI almost every day; is

2    that fair to say?

3    A.  That would be fair to say, ma'am.

4    Q.  Did you have meetings with them over this past weekend?

5    I'm not talking about just being in the custody of the FBI this

6    past weekend.

7              THE COURT:  Wait, wait.  What's the question?

8              MS. FLEMING:  I'm about to ask the question of

9    meetings.  I'm giving the instruction.

10   Q.  I'm not talking about just being in the custody of the FBI,

11   but did you have meetings with members of the United States

12   Attorney's Office even over this past weekend?

13   A.  That is correct that I had meetings, ma'am.

14   Q.  And would it be fair to say that, in total, since August of

15   2017, you have had more than 35 sessions with the United States

16   Attorney's Office discussing the facts of this case?

17   A.  I don't recall the number, ma'am.

18   Q.  It has been many days; is that fair to say?

19   A.  That would be fair, absolutely, ma'am.

20   Q.  And it's been many hours; is that fair to say?

21   A.  That would be fair to say, as well, ma'am.

22             MS. FLEMING:  Your Honor, what time do you want to

23   break?  I am about to go into a new area.

24             THE COURT:  We can break now.  So let's take our lunch

25   break and pick up again at 2:00, how's that?

HC5PATI3                          Zarrab - Cross

1                    (Jury not present)

2                    THE COURT:  They want to know if you want the

3       exhibits.

4                    MS. FLEMING:  I know.  I'm going to leave them up

5       there.  It's Jencks material; it's not an exhibit.

6                    THE COURT:  You might want to.

7                    MS. FLEMING:  I'm happy to take it back now.  I just

8       didn't want to keep going back and forth.

9                    THE COURT:  Okay.

10                   MS. FLEMING:  Your Honor, may I come get it?

11                   THE COURT:  Yes, sure.  Okay.  We'll see you at 2:00.

12                   (Luncheon recess)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         AFTERNOON SESSION

2                            2:00 p.m.

3          (In open court; jury present)

4          THE DEPUTY CLERK:  Sir, before we begin, I'd like to

5   remind you, you're still under oath.

6          THE WITNESS:  Yes, ma'am.

7          THE COURT:  Ms. Fleming.

8          MS. FLEMING:  Thank you, your Honor.  May I continue?

9          THE COURT:  Yes.

10  BY MS. FLEMING:

11  Q.  Mr. Zarrab, when we broke we were talking about your

12  proffer and the timeline.

13          During the process of meeting with the prosecutors,

14  you actually did work on the various transcripts that we've had

15  here in court; isn't that correct?

16  A.  Which meetings are you referring to?

17  Q.  When you met with the prosecutors in preparation for trial,

18  you listened to recordings and made corrections to the

19  transcripts; is that correct?

20  A.  Yes, ma'am.  In the transcripts that were in Turkish, I did

21  try to make corrections where there were things either missing

22  or were not understood.  I tried to make corrections on those.

23  Q.  And you also did the same thing for the Turkish and English

24  interpretation on the chats, on the various chats that were

25  Turkish and English; is that correct?

1   A.  That is not correct, ma'am.

2   Q.  You didn't make any corrections on Mr. Aslan's chats, on

3   the translations?

4   A.  It's regards to the English sections of the chats with

5   Mr. Aslan, I had nothing to do with that, and I did not make

6   any corrections.

7   Q.  You did go through on Mr. Aslan's chats and make notations

8   as to which chats were important, didn't you?

9   A.  With regards to the chats with Mr. Suleyman Aslan on

10  WhatsApp, I did go through those, and I did mark them as

11  sections and I did try to make relevant -- put the relevant

12  sections together, where possible, ma'am.

13  Q.  And you highlighted those that were important by putting

14  stars next to them, correct?

15  A.  Those that were very important for me, I did put a star

16  next to them, and I did say that they were very important for

17  me.

18  Q.  You actually wrote the word "important" in English next to

19  some of them, correct?

20  A.  Yes, there are sections where I did write down "important,"

21  ma'am.

22  Q.  In addition in these sections when you were getting ready

23  for trial in this matter, you also drew a number of charts for

24  the members of the FBI and the prosecution team, correct?

25  A.  Can I get the question one more time, please?

HC53ATI4                      Zarrab - Cross

1    Q.  During this trial preparation period, you prepared charts,

2    you drew charts for members of the prosecution team, correct?

3    A.  Yes, ma'am, just like the diagrams that I had drawn here, I

4    had drawn some diagrams, charts, for the prosecution also.

5    Q.  And you prepared Excel spreadsheets for members of the

6    prosecution team, correct?

7           THE INTERPRETER:  I'm being asked to repeat it again.

8    A.  No, that is not correct.  What I did was I prepared that

9    Excel file for my own use, and later I presented that Excel

10   file to prosecution so that it could be used as evidence as

11   needed in the trial.

12          Because among my obligations is the presenting of all

13   my work, things I might work on, to the prosecution.

14   Q.  And that is in connection with your providing substantial

15   assistance in the investigation and prosecution of others,

16   correct?

17   A.  In terms of assistance, the most important thing is to tell

18   the truth, ma'am.

19   Q.  In addition, during your proffer sessions, before you were

20   preparing for trial, before you pled guilty, you discussed with

21   the government ways that you could trap people to bring them to

22   the United States so they could be arrested or to other places

23   in the world -- let me withdraw it.

24          You discussed with the government ways to trap people

25   so that they could be arrested and brought to the United

HC53ATI4                           Zarrab - Cross

1     States; is that correct?

2     A.  We did not converse about anybody specific to be trapped.

3     However, as a result of my cooperation, had there been a

4     request from the prosecutor's office, had there been such a

5     request, then I would be obligated to fulfill that, ma'am.

6     Q.  Do you recall telling the prosecutors that you believed you

7     could get Rajaeieh to Germany?

8     A.  I did tell the prosecutor's office that Mr. Rajaeieh

9     travels to Germany frequently, and that there might be a

10    possibility for Rajaeieh to travel to Germany, ma'am.

11    Q.  And yes or no:  Did you tell them that you owe him 15 to 20

12    million dollars, and that could be used as a way to trap him?

13    A.  I did not say 15 to 20.  I did say that there was an

14    approximately $14 million debt.  And I did say that, that's

15    correct, ma'am.

16    Q.  And there are other people who you told the government

17    about where their passports were, where they traveled, in order

18    to tell them where they might be able to find them, correct?

19            THE INTERPRETER:  Could you repeat that question,

20    please.

21    Q.  You told the government about other people's travel habits

22    throughout Europe, correct?

23    A.  Within the scope of all the questions that were asked to

24    me, I did provide all the truthful answers that I had for those

25    to the prosecutor's office, ma'am.

1   Q.  When you were arrested in Miami, you had arrived in Miami

2   in a private jet, correct?

3   A.  No, ma'am, that is not correct.

4   Q.  You were carrying approximately $103,000 in currency; is

5   that correct?

6   A.  I was carrying $102,000, ma'am.

7   Q.  And that was for your trip to Disney World; is that

8   correct?

9   A.  This was the money that would be needed for our trip that

10   was for 10 days, for seven individuals, in the United States

11   for this trip.

12        MS. FLEMING:  Your Honor, may I approach the easel?

13   Q.  Mr. Zarrab, I would like to talk about what your agreement

14   provided that you would plead guilty to.  Now, you had a plea

15   agreement that obligated you to plead guilty to certain crimes,

16   correct?

17   A.  Yes, ma'am, that's correct.

18   Q.  You have in fact pleaded guilty to those crimes, correct?

19   A.  For seven charges, that's correct, ma'am.  I did plead

20   guilty to those seven charges.

21   Q.  Could you identify them for me, please.

22   A.  Certainly.  One, conspiracy to defraud United States.  Two,

23   conspiracy to violate IEEPA sanctions charge.

24        It's possible that I may miss some legal terms in

25   there, but madam would know.

1            (In English) Money laundering, conspiracy for money

2   laundering, bank fraud.

3   Q.  What else?

4   A.  (In English) Conspiracy for bank fraud.

5   Q.  What else?

6   A.  (In English) Bribing federal prison guard.

7   Q.  Corrections officer; is that fair to say?  Federal guard?

8   A.  The guard, the warden at the jail.  I don't know what you

9   would want to use in English for that.

10  Q.  And do you know how many years in jail you are facing as a

11  maximum sentence for all of these crimes?

12            MR. KAMARAJU:  Objection, your Honor.

13            THE COURT:  Sustained.

14            MS. FLEMING:  Judge, may I be heard?

15            THE COURT:  No.

16  Q.  As a result of agreeing to plead guilty to these crimes,

17  you were also told that you would not be charged with other

18  crimes, correct?

19  A.  I don't know about the legal terms that may be used in

20  there.  Those are what my lawyers would handle.  But as far as

21  what the --

22            THE INTERPRETER:  I'm going to have to ask him to

23  repeat again.

24  A.  So just the section that I am aware of, and the part that

25  my lawyers advised me of, it's stated that if I were to commit

1   a crime again, that could be investigated, I could be

2   prosecuted, and I could be charged with that again.  One of

3   these, for example, is if I were to lie, I could be charged

4   with a new charge.

5   Q.  Do you recall that your plea agreement says if you live up

6   to your plea agreement, that there are other crimes that you

7   have already committed that you will not be charged for?

8   A.  There are crimes that are outside the jurisdiction of the

9   United States, so there are those crimes where United States

10  does not have jurisdiction over them anyway.  And I don't know

11  if the madam is referring to any other crimes other than those.

12  Q.  Do you recall whether your plea agreement provides that you

13  will not be charged with making material misstatements to FBI

14  agents after you were arrested in your post-arrest interview?

15  A.  It is correct that there would be no new prosecution on

16  that crime.  But, what I understand is that during sentencing,

17  the misrepresentations made to the FBI would also be taken into

18  consideration in terms of what sentence I might receive.

19  Q.  Do you also understand that, pursuant to your plea

20  agreement, you will not be prosecuted for making material

21  misrepresentations during an interview with the pretrial

22  services officer in Florida after you were arrested; yes or no?

23  A.  Just the same with the previous, this would also be one

24  where there would not be a new investigation regarding this

25  charge, but that in my sentencing, the Court would consider

1    this in sentencing me, and this would be one of the factors

2    that would be considered for sentencing.

3    Q.  So the answer to my question as to whether you will be

4    charged is "no."

5              THE COURT:  What was your question?

6              MS. FLEMING:  Whether he would be charged with a new

7    crime, yes or no.

8              THE COURT:  I don't know if that was exactly.  Let's

9    have a readback of the question.

10             (The record was read)

11             MS. FLEMING:  I stand corrected, your Honor.

12   Q.  Do you also understand --

13             THE COURT:  Do you want him to answer or no?

14   Q.  Please.  Can you answer that yes or no?

15   A.  Yes, there would be no new investigation opened with

16   regards to this.

17   Q.  Do you understand if you live up to your plea agreement,

18   you will not be charged with smoking synthetic marijuana on one

19   occasion in the MCC in 2016, to the extent that you have

20   disclosed such participation to the office, as of the date of

21   your plea agreement; yes or no?

22   A.  I don't know whether this is a crime or not in law.  It may

23   be a regulation within the jail.  And my answer then is no,

24   there would be no investigation open with regards to this.  In

25   other words, even without this agreement.

HC53ATI4                    Zarrab - Cross

1    Q.  Putting aside that last one that you don't know if it is a

2    crime or not, you understand that the other crimes that you

3    will not be prosecuted on are serious offenses.

4    A.  I am aware that they're serious offenses, but the crimes

5    that I have pleaded guilty to are much more serious offenses.

6    Q.  These crimes that you're not being prosecuted for happened

7    in 2016 in the United States, correct?

8    A.  That is correct, ma'am.

9    Q.  These crimes that you're not being prosecuted for all

10   happened after you were arrested, correct?

11   A.  That is correct, ma'am.

12   Q.  And what you referenced earlier about there are other

13   crimes that the United States does not have jurisdiction that

14   you are not being prosecuted for, are other crimes that you've

15   told the U.S. attorney's office about that you've committed in

16   other countries, correct?

17   A.  If you're referring to the bribes that I had paid in Turkey

18   that I mentioned in the court also, then that is a yes.

19   Q.  It's more than bribes to officials in Turkey, isn't it,

20   Mr. Zarrab?  Under your plea agreement, you are also not

21   going -- the office has said it's not -- has no jurisdiction

22   over paying bribes to corporate representatives in or between

23   2002 and March of 2016; isn't that correct?

24           THE INTERPRETER:  Could you repeat what

25   representatives again, please?

1           MS. FLEMING:  Corporate.  Corporate bribery.

2     A.  I did not bribe my own company employees.  That may be a

3     translation issue.

4     Q.  Your plea agreement reflects that there is no prosecution

5     because of no jurisdiction for procuring prostitutes for others

6     in or about 2013; is that correct?

7     A.  Yes, ma'am, that is correct.

8     Q.  It also says that you will not be prosecuted because of no

9     jurisdiction for understating your income on your Turkish tax

10    returns, your filings, between 2002 and March of 2016.  Isn't

11    that correct?

12    A.  Because it is not within the jurisdiction, it is also true

13    that there will be no prosecution on that one as well, ma'am.

14    Q.  But in fact you did understate your Turkish filings for

15    2002 through 2016, correct?

16    A.  That is absolutely correct, ma'am.

17    Q.  You also are not being prosecuted because of no

18    jurisdiction for assaulting another individual in the Republic

19    of Turkey in or about 2014; is that correct?

20    A.  I was prosecuted for that in Turkey already, ma'am.

21          MR. KAMARAJU:  Your Honor, if defense counsel intends

22    to go through other provisions of the cooperation agreement, it

23    makes sense to offer it so the jury can follow along.

24          MS. FLEMING:  Your Honor, they're welcome to do their

25    examination any way they want.

1           THE COURT:  Can you all come up for a short sidebar.

2           (At the sidebar)

3           THE COURT:  It is my practice always to give defense

4    counsel latitude in asking questions, but I have to say I

5    really don't know where this is all leading and what is the

6    significance of, for example, here is a concrete example which

7    I couldn't understand at all.  So, he's charged with and pled

8    to seven counts, and you asked him to remember, and you are

9    drawing on the chalkboard the seven counts or however many he

10   gives you.

11          What's the point of that?  Why couldn't you just ask

12   him, since you like to have yes or no answers, did you plead to

13   defrauding banks, yes or no?  Did you plead to conspiracy to

14   defraud banks, yes or no?

15          This is really going nowhere.

16          MS. FLEMING:  Well, with respect, your Honor, I don't

17   agree, and, frankly, I've never had a Court preclude me finding

18   out how much time someone was facing before, ever.

19          THE COURT:  You didn't know how to ask the question.

20   There is a very simple way to ask that question and you weren't

21   even in the universe of how to ask that question.  So think

22   about that.  Talk to Mr. Rocco.  Or maybe even the prosecutors

23   could give you a hand on that.

24          Really.  I'd like to get to this case pretty soon.

25          (Continued on next page)

1          (In open court)

2          MS. FLEMING:  Your Honor, we agree we'll put the plea

3    agreement into evidence.

4          THE COURT:  Great.

5          MS. FLEMING:  Let's move it.  Let's mark it as

6    Defendant's Exhibit 12.  We already premarked some exhibits.

7    We'll substitute a clean one.  I had marked this to show the

8    witness.

9          THE COURT:  Sure.

10         (Defendant's Exhibit 12 received in evidence)

11   Q.  You discussed that you had pled guilty to bribing a guard

12   while you were in prison here in the United States, correct?

13   And you -- why don't you describe for us what you did.

14         THE COURT:  I don't know if that's the way to ask the

15   question.  Do you want to ask him what did he do that caused

16   him to plead guilty to that charge?  Is that the question you

17   want to ask?

18         MS. FLEMING:  Sure, Judge.

19   Q.  What did you do that caused you to plead guilty to that

20   charge?

21   A.  I bribed a guard in the jailhouse where I was being held,

22   ma'am.

23   Q.  How much did you pay the guard?

24   A.  Approximately $45,000, ma'am.

25   Q.  How did you get $45,000 to this guard?

HC53ATI4                      Zarrab - Cross

1    A.  Along with my other expenses, as money was being sent from

2    Turkey, this amount was sent and it was paid.

3    Q.  Who paid it to him?

4    A.  The madam attorney that I had during that time who was

5    present here at that time.

6    Q.  A Turkish attorney, correct?

7    A.  Yes, ma'am, a Turkish attorney.

8    Q.  In exchange for that $45,000, this guard brought you

9    alcohol; is that correct?

10   A.  Not only alcohol, ma'am.

11   Q.  What else did he bring you?

12   A.  A few times I used the personal cell phone of this guard as

13   well, ma'am.

14   Q.  Did he also give you medication?

15   A.  Yes, ma'am.  A few times when I had a cold, he brought

16   Dayquil and I took Dayquil.

17   Q.  Other than getting it in the commissary, you're not allowed

18   to do that in the MCC without going to the commissary, correct?

19   A.  It is true that Dayquil is not sold at the jail commissary,

20   ma'am.

21   Q.  And by using a cell phone that the guard provided you, you

22   were not on the prison system where the phone calls are

23   recorded; isn't that correct?

24   A.  That is absolutely correct, ma'am.  That phone would not be

25   recorded.

1    Q.  Who did you use that phone to call, the cell phone?

2    A.  My wife, also to talk with my daughter with video, and with

3    one of my lawyers and one time with my uncle, based on my

4    recollection.  I also recall that I had talked to my sister,

5    based on my recollection.

6    Q.  Anyone else?

7    A.  These are the ones that I remember, ma'am.

8    Q.  And again, to be clear, the attorney you spoke with is an

9    attorney in Turkey, not in the United States, correct?

10   A.  Yes, ma'am, that is absolutely correct.

11   Q.  Now, did you violate other rules while you were in the MCC

12   or the MDC?

13   A.  I did at MCC, ma'am.

14   Q.  Did you pay other inmates so that you could use their

15   telephone time?

16   A.  It is true that when my 300 minutes were up, I did pay

17   other inmates to be able to use their minutes, ma'am.

18   Q.  Did you also pay people to sit at a computer so that if you

19   wanted to use the e-mails, you wouldn't have to wait in a line?

20   A.  That is not correct, ma'am.

21   Q.  Back in 2015, you and Suleyman Aslan had a conversation on

22   chat concerning why you had not been put on the OFAC list; do

23   you recall that?

24   A.  I remember that, ma'am.

25   Q.  As you sit here today, are you on the OFAC list yet?

1    A.  As of now, I don't know, ma'am.

2    Q.  Has anyone ever told you, you are on the OFAC list?

3              MR. KAMARAJU:  Objection.

4              THE COURT:  Overruled.

5    A.  There hasn't been anybody who told me I was on OFAC list up

6    until this point, ma'am.

7    Q.  And do you recall what your conversation with Mr. Aslan was

8    about why you weren't on the OFAC list in 2015?

9    A.  I remember it partially, ma'am.

10   Q.  Do you remember saying you weren't on it because you hadn't

11   violated any sanctions?

12   A.  This is a long message, ma'am, and what I'm telling

13   Mr. Suleyman Aslan is that with these money transfers, there

14   was no payment with regards to weapons or anything nuclear, and

15   that's why I was not put on the OFAC list.

16   Q.  Didn't you say because we didn't violate any embargo?

17   A.  If you were to cut the beginning and the latter part of the

18   conversation and you look at that one sentence only, that would

19   be correct, ma'am.

20   Q.  Part of your plea agreement is that you've agreed to

21   forfeit whatever it is that you personally derived from this,

22   these schemes and the crimes to which you pled guilty; isn't

23   that correct?

24   A.  That is correct, ma'am.

25   Q.  How much money did you make from all of these crimes?

HC53ATI4                        Zarrab – Cross

A.   I don't recall how much exactly, ma'am.

             (Continued on next page)

1    Q.  How about generally, do you recall how much money generally

2    you made between 2010 and 2016 from all of these schemes that

3    you've told us about for the last four days?

4    A.  I don't remember exactly, but it could be $100 million,

5    maybe more than that, maybe $150 million.

6    Q.  How did you make money on these transactions?

7    A.  I made money along with everybody else.

8    Q.  How did you make the money on these transactions?

9    A.  Through the payment orders that I had received from the

10   Iranians, by fulfilling these orders for the Iranians, by using

11   the proceeds that Iran had deposited in Halkbank for its oil

12   sales to Turkey.

13   Q.  And did you get a commission cut?

14   A.  In my previous answer I had already mentioned that I had

15   received a commission on these.  It might have been a

16   translation error.  Let's just make sure that's corrected.

17   Yes, ma'am, I did receive commission.

18   Q.  And what percentage commission did you receive?

19   A.  Ma'am, are you asking what the total is, or are you asking

20   what was left for me?

21   Q.  What was left for you?  What was your commission that you

22   made on these deals?

23   A.  After paying the commission for the bank, and after paying

24   the other bribes, and after deducting all of the expenses, it's

25   approximately 0.4 or 4 per thousand to 5 per thousand, ma'am.

HC5PATI5                         Zarrab - Cross

Q.   Now, banks take commissions on legitimate transactions,

don't they, Mr. Zarrab?

A.   Banks get their cut from transactions that are executed,

ma'am.

Q.   And -- withdrawn.

         You told us during your direct examination that prior

to going to Halkbank, you had been involved with a number of

other banks in various schemes, correct?

A.   Do you mean the Aktif Bank, ma'am?

Q.   That's one of them, right?

A.   Yes, ma'am.  In early 2010, I did work with Aktif Bank.

Q.   And is there a bank called Agajooni?  I'm sorry for the

pronunciation.  A-g-a-j-o-o-n-i.

A.   I'll make the correction on that one.  It's Agajooni,

ma'am, and it's an exchange office in Iran with which I was

working.  It's actually an individual, a partner individual

that I was working with in Iran.  It is not a bank, ma'am.

Q.   Thank you.  Did you also work with Bank Mellat and its

exchange?

A.   It is true that I worked with Mellat Exchange, which is

affiliated with Bank Mellat, ma'am.

Q.   And that was before you had approached Halkbank, correct?

A.   That is correct, ma'am.

Q.   And you also approached the Central Bank of Iran; is that

correct?

HC5PATI5                          Zarrab - Cross

1    A.   That's correct, ma'am.

2    Q.   And you did that through your father?

3    A.   Yes, ma'am.

4    Q.   And you worked with them before you worked with Halkbank?

5    A.   I worked with them before I was working with Halkbank,

6    that's correct, ma'am.

7    Q.   Now, your father has an exchange -- and again forgive me

8    for the pronunciation -- Al Nafees Exchange?  Did I say it

9    correctly?

10   A.   You pronounced it perfectly well, ma'am.

11   Q.   That's one.  And you worked with Al Nafees Exchange,

12   correct?

13   A.   That is correct, ma'am.

14   Q.   That's a money exchange business in Dubai?

15   A.   It's an exchange office that was in Dubai in that time

16   period, that is correct, ma'am.

17   Q.   And what years did you work with Al Nafees?

18   A.   To the best of my recollection, it was between when I was

19   16 and 17, ma'am.

20   Q.   And did you have business with the Al Nafees Exchange after

21   you started working?

22   A.   I could not perceive what time period you are referring to;

23   so if you can please rephrase with a more specific range.

24   Q.   Let me withdraw.  During the time frame between 2010 and

25   2015, who owned Al Nafees?

HC5PATI5                        Zarrab - Cross

1    A.   It was my father, ma'am.

2    Q.   Did you have any ownership interest in Al Nafees during

3    that time period?

4    A.   I never had any partnership or any shares held with

5    Al Nafees at any given time, ma'am.

6    Q.   Were you aware of the business of Al Nafees during that

7    time frame that you were also working in money exchange, 2010

8    to 2015?

9              THE INTERPRETER:   Could you repeat that question,

10   please.

11   Q.   Were you aware of your father's business, Al Nafees, during

12   that time frame, 2010 to 2015?

13   A.   It would not be fair to say that I knew everything, but, of

14   course, I was aware of what was going on.

15   Q.   Were you aware that your father was accused of violating

16   U.S. sanctions?

17   A.   Yes, ma'am.   I had heard about it.

18   Q.   And that was in August of 2014?

19   A.   No, ma'am, that was much before that.

20   Q.   You're aware that he paid a penalty in August of 2014; is

21   that fair?

22   A.   That would not be fair, ma'am, because my dad did not pay a

23   fine.

24   Q.   Do you know what stripping is in connection with money

25   exchange transfers?

1   A.  I don't know, ma'am.

2            MS. FLEMING:  Your Honor, we want to play some

3   recordings to authenticate them, just the voice recordings.

4   They're in Turkish.  We will have to connect them up with an

5   interpreter later.  May we do that now?

6            THE COURT:  I'm not sure I understand.

7            MS. FLEMING:  We have some recordings that we want to

8   use.  We are going to have to -- we have sent transcripts, but

9   we just need to play them and have them identify voices with

10  the witness.

11           THE COURT:  The recordings of Mr. Zarrab?

12           MS. FLEMING:  Yes.  We just need him to identify the

13  voices.  They're in Turkish.  If you want to give the --

14           THE COURT:  There's not going to be any translation.

15           MS. FLEMING:  There won't be any questioning about it

16  except who's on it.

17           THE COURT:  Is there going to be a translation?

18           MS. FLEMING:  Yes, down the road, when our interpreter

19  is on.

20           THE COURT:  Oh, not today?

21           MS. FLEMING:  No.  It's not our case.  Our interpreter

22  will be on during our case.

23           THE COURT:  I'm not sure I understand.  You're going

24  to ask him questions in English?

25           MS. FLEMING:  Judge, I'm going to have him

1    authenticate the recordings.

2              THE COURT:  I know, but how are you going to do that?

3    Are you going to ask him --

4              MS. FLEMING:  I was going to ask him if he recognizes

5    the voices and identify the speakers, and then we'll deal with

6    it later.

7              THE COURT:  Sure.

8              MS. FLEMING:  Okay.

9              (Pause)

10             Thank you.  Judge, I'll do this after the break.

11   We'll work it out with them after the break.

12             THE COURT:  Okay.

13             MS. FLEMING:  I'll go on to something else.

14   BY MS. FLEMING:

15   Q.  Mr. Zarrab, you've described for us earlier about some of

16   the documents that your office had created that were false; do

17   you remember that?

18   A.  Documents?

19   Q.  You've identified for us some exhibits this morning that

20   you said were not real documents, they reflected fake

21   transactions?

22   A.  The ones that I had said that they were false?

23   Q.  Yes.

24   A.  Yes, ma'am.

25   Q.  And, in fact, you had entire portions of your offices that

1    were devoted to getting these false documents; isn't that fair

2    to say?

3    A.   Not necessarily departments, but a few people.

4    Q.   And so, for example, one of the false documents, one kind

5    of false document that you had in your business was you had an

6    actual stamped customs document that you would present to the

7    banks, correct?

8    A.   That is absolutely correct, ma'am.

9    Q.   And I want to focus.  Let's break it down into the two

10   kinds of transactions.  All right?  I want to break this down

11   to the gold transactions.

12   A.   Go ahead, ma'am.

13             THE INTERPRETER:  For translation, sorry.

14   Q.   One of the things you told us is that there really was

15   gold?

16   A.   Most of the time, yes, ma'am.

17   Q.   In the China recordings that we heard this morning, there

18   was no gold, right?

19   A.   With regards to gold trade, the same system was also

20   attempted in China but refused by the bank in China.  So the

21   answer for madam's question would be, no, and that we had made

22   attempts to run gold trade and the same system in China as

23   well.

24   Q.   The gold trade that was done with Halkbank was, in fact,

25   you really had gold; there was actual gold bars, correct?

HC5PATI5                        Zarrab - Cross

1    A.   Yes, ma'am.

2    Q.   And that started, you identified for us, somewhere around

3    October of 2012, and I believe you told us the last payments

4    were made sometime at the end of May 2013 or mid-June 2013; is

5    that right?

6    A.   No, that is not correct, ma'am.

7    Q.   You described for us that Mr. Atilla was the head of

8    international banking.  That's what you thought his title was,

9    correct?

10   A.   Mr. Hakan Atilla is at the head of the international

11   department at Halkbank; that is correct, ma'am.

12   Q.   And you repeatedly called him the deputy general manager,

13   correct?

14   A.   Yes, the deputy general manager, the head person in the

15   international department, ma'am.

16   Q.   You're aware, are you not, that Halkbank, at the time, had

17   seven or eight deputy general managers, depending on what month

18   it was during that 2002 to 2015 time frame, correct?

19   A.   No, ma'am, I didn't.  I do not know.

20   Q.   Now, you've talked about dealing with the staff several

21   times during your testimony, at Halkbank.

22   A.   Yes, it is true that I mentioned that I had spoken with

23   various staff members at this bank.

24   Q.   And you also talked about you spoke with people at the

25   branch, correct?

1    A.   No, ma'am.   What I testified to was that with the branch,

2    very minimal level.   It would be my personnel and my company

3    that would be speaking to branch staff members.

4    Q.   And what branch did your businesses bank with at Halkbank?

5    A.   It's the corporate branch in Ikitelli, ma'am.

6    Q.   And do you know approximately how many branches there are

7    of Halkbank in Turkey?

8    A.   I don't know the number, ma'am.

9    Q.   Now, you would leave the dealing with the people at the

10   branch up to your staff people, correct?

11   A.   With regards to our branch?   Yes, ma'am.

12   Q.   But you were aware that at Halkbank headquarters, there was

13   a staff that dealt with foreign operations and sanctions,

14   correct?

15   A.   That is not correct, ma'am.   I was not aware.

16   Q.   Did you ever deal with somebody named Binnur, B-i-n-n-u-r?

17   Do you remember speaking with Binnur at Halkbank?

18   A.   The name Binnur sounds familiar, but I cannot recall any

19   conversation that I may have had with Miss Binnur at the time,

20   ma'am.

21   Q.   Do you remember speaking -- forgive me with the

22   pronunciation.   Do you remember speaking with anyone named

23   Seydit, S-e-y-d-i-t, at Halkbank?

24   A.   You may be referring to Mr. Seydit Ahmet; is that correct,

25   ma'am?

1    Q.  Yes.

2    A.  Yes, that is absolutely correct, ma'am, with Mr. Seydit

3    Ahmet, I had conversation during 2014 and 2015, after my arrest

4    and mostly during the year 2015.

5    Q.  I want to show you what's been marked as Defendant's

6    Exhibit 102.  Do you recognize Defendant's Exhibit 102?

7    A.  So I see that it's a business card.

8    Q.  Do you recognize it?

9    A.  So I see it as a business card.  If I may get the question

10   a little more specific?  I don't understand what you're asking

11   exactly.

12   Q.  Have you ever had the business card of Hakkan Aydogan?

13   A.  I may have received it.  I don't recall, ma'am.

14   Q.  Do you know what his title is at Halkbank?

15   A.  After my arrest and in 2014, when I went to Halkbank to

16   meet with Mr. Ali Fuat initially, I met with Mr. Hakkan

17   Aydogan.

18   Q.  My question is, do you know what his title is?

19   A.  I know that he was working with foreign transactions.

20   That's all, ma'am.

21   Q.  Have you ever heard of the department foreign operations?

22   A.  Yes, I'm familiar with that phrase from the bank, the

23   operations section.  I recall that from the bank.

24   Q.  And do you know whether Hakkan Aydogan was the head of

25   foreign operations during the -- withdrawn.

1          Do you know whether Hakkan Aydogan took the job of

2     Levent Balkan when he left Halkbank?

3     A.   I was not mentioned that Levent Balkan had left and Hakkan

4     Aydogan came in in his place.  That's not something I recall;

5     so I don't know.

6     Q.   Do you know what Levent Balkan's title was when he was at

7     Halkbank?

8     A.   I don't know what his title may have been on his business

9     card, but I know that he was involved in the operational side

10    of things, and I did have communication with Mr. Levent Balkan,

11    ma'am.

12          THE COURT:  Do you want to take a five-minute break?

13    Remember, we're going to end today at 4:30; so let's take a

14    five-minute break.

15          (Jury not present)

16          (Recess)

17          (Jury present)

18          THE COURT:  Please be seated, everyone, and we'll

19    continue with the cross-examination of Mr. Zarrab.

20          MS. FLEMING:  Thank you.  Your Honor, may I proceed?

21          THE COURT:  Yes.

22          THE DEPUTY CLERK:  Sir, you're still under oath.

23          THE WITNESS:  (In English)  Yes.

24    BY MS. FLEMING:

25    Q.   You used a phrase in some of the recordings that we heard

1    this morning and over the last few days of "cikinova" or

2    "cikina."  Those are references to false documents; is that

3    correct?

4    A.  Yes, ma'am.  Cikinova is a term that we use amongst

5    ourselves when referring to any trade that does not involve

6    real trade and also any documents that may contain false

7    information.

8    Q.  And that phrase was around before you ever went to

9    Halkbank, wasn't it, sir?

10   A.  That is not correct, ma'am.

11   Q.  Could we pull up 201-T, please.  Could I ask that the front

12   page -- looking at page 2.  201-T is in evidence.

13        Do you remember what the date of this call is?

14   A.  The date is actually on the screen, ma'am.

15   Q.  Well, does that help you remember the date?

16   A.  It says September 19th, 2012, ma'am.

17        MS. FLEMING:  Could we publish that to the jury, that

18   page, please?

19        THE COURT:  Sure.

20   Q.  And if you look down at the bottom, you use the term

21   "cikinova;" do you see that, sir?  Happani uses it at the

22   second-from-the-bottom?

23   A.  Yes, I see that, ma'am.

24   Q.  I'd like to go back to discussing the customs documents,

25   the documents that were presented.  And, again, looking at the

1    gold transactions --

2    A.  Yes, ma'am.  Go ahead.

3    Q.  -- the documents that are presented have actual customs

4    seals on them, don't they?

5    A.  So we're talking about gold, ma'am, right?

6    Q.  Yes.

7    A.  Yes, ma'am; that is correct.

8    Q.  And, in fact, you're aware that at a company in Turkey,

9    like Halkbank, they can look online to see whether, in fact,

10   the customs document matches up online to whether the goods

11   have actually gone out through customs as reflects on the

12   document, correct?

13   A.  I don't know what Halkbank may or may not be able to check

14   within their own internal systems online, ma'am.

15   Q.  And when you talked about passengers in some of the

16   conversations, the way gold was actually transported was by

17   suitcases or valise, by people physically carrying it, correct?

18   A.  That is correct, ma'am.

19   Q.  And it's wrapped and it's sealed, correct?

20   A.  So I did not see how it would be packed inside the suitcase

21   myself directly, but I presume that's how it is, ma'am.

22   Q.  And it has the markings on the package that seals, that

23   shows the weight and the purity of the gold in the package,

24   correct?

25   A.  If what you're referring to is the markings on each of the

1  bars that indicates the fineness and the kilogram of that

2  particular bar, that would be correct, ma'am.

3  Q.  But also on the package, so that customs can verify the

4  weight and purity of the gold that is going out through customs

5  in the sealed package, that is going through its borders;

6  you're aware of that, sir, aren't you?

7  A.  I've never seen that package, ma'am.

8  Q.  And Halkbank required that those custom documents be

9  returned to Halkbank after the goods had passed through

10 customs, correct?

11 A.  That is correct, as I had testified before, we were

12 submitting all of the documentation, customs documentation,

13 after the export to Halkbank, ma'am.

14 Q.  And in addition, when the gold was destined to go to Iran,

15 at the times that it was required to be done when it was going

16 to Iran, Halkbank required that boarding passes for the flight

17 of the passengers carrying the gold be submitted to Halkbank,

18 didn't it?

19 A.  That is absolutely correct, ma'am.

20 Q.  And to make it clear, when the order comes in to buy the

21 gold, a customer has purchased the gold, the goods go out

22 through customs and the transfers are -- the documentation is

23 supposed to come back before the transaction is completed,

24 correct?

25 A.  That is not correct, ma'am.

1  Q.  But what happens here is there were advance payments

2  against the transfers, correct?

3  A.  There were payments that were made in advance, yes, and

4  after the export of the gold, we had a certain period within

5  which we needed to get the documentation and submit them to the

6  bank, but that would be after the export.

7  Q.  Correct.

8  A.  In other words, the money -- in other words, there was a

9  period of time between the time that money would be received by

10  us and the gold would be exported.

11  Q.  Okay.  But when you got involved, it would be because the

12  bank was holding up the payments to your companies because the

13  documentation had not been provided, correct?

14  A.  No.

15  Q.  The conversations that we have heard in the last few days,

16  you are complaining about it getting held up because the staff

17  is not releasing the payments?

18  A.  With specific reference to the call, the conversation that

19  I testified about before, which was with Abdullah Happani, I'm

20  talking about why the payment had not been transferred yet.

21  And what I want to clarify with the madam here is that it was

22  not only when the bank had not transferred the money that I was

23  getting involved in this transaction.

24  Q.  But at least some of the time it was because you were upset

25  because the bank had not transferred the funds yet, correct?

HC5PATI5                        Zarrab - Cross

1   A.  No, I was not getting upset.  It's not necessarily getting

2   upset.  I was just trying to figure out why the money was not

3   being transferred.

4   Q.  You were calling the bank to find out why the money had not

5   been transferred, that's why you were involved, right?

6   A.  That is correct, in some examples, ma'am.

7   Q.  And you don't deal with the people at the branch, right?

8   A.  I would talk with them sometimes, but when the matter is

9   not resolved at the branch level, then I would talk with people

10  at the headquarters level.

11  Q.  I thought you told us before the break that you always

12  leave talking to the branch to the people in your staff?

13  A.  Before the break, that is not the sentence that I used.

14  What I said was I rarely speak with the branch, and I would

15  generally leave the conversations with the branch to my staff

16  members.

17          (Continued on next page)

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   Q.  You are aware that Mr. Atilla's job was not to be over the

2   foreign operations group, aren't you, sir?

3   A.  I did not know every single responsibility that may have

4   been given to Mr. Hakan Atilla within the bank.  I'm -- I was

5   not his boss, and I don't know what his entire list of

6   responsibilities may have consisted of.

7   Q.  How many times did you speak to Levent Balkan during the

8   time you were dealing with Levent Balkan at Halkbank?

9   A.  I don't recall clearly, ma'am.

10  Q.  Did you know Levent Balkan before October of 2012 when you

11  went to Halkbank?

12  A.  I knew him before, yes, ma'am.

13  Q.  How did you know him before?

14  A.  From the bank regarding the transactions, I had conversed

15  with him before.

16  Q.  Had you ever met him before 2012?

17  A.  I don't recall, ma'am.

18  Q.  Do you recall that Mr. Balkan left the bank somewhere in or

19  about February of 2013?

20  A.  I don't recall the exact date, ma'am, but I do recall that

21  after a while, Levent Balkan had left Halkbank.

22  Q.  Do you remember that you would go to him when you had a

23  problem with money not being transferred and speaking to him

24  about documentation that was missing?

25  A.  Sometimes, but I don't recall that exactly or in a specific

1   way.

2   Q.  You spoke with him more than you spoke ever with

3   Mr. Atilla; isn't that true?

4   A.  There is a high possibility that I had talked to him more

5   than Mr. Hakan Atilla, ma'am.

6   Q.  Do you remember speaking to Mr. Levent Balkan, for example,

7   about partnership structures of companies in Iran?

8   A.  I mean, I don't recall the specific conversation that madam

9   might be referring to, but if my memory could be refreshed,

10  maybe I could remember a specific conversation on that.

11  Q.  I'm asking what you remember in general.  You've testified

12  for a few days as to your memory.  What do you remember in

13  general?

14          THE COURT:  What do you mean, what do you remember in

15  general?

16  Q.  What do you remember without having to refresh your

17  recollection about how many times you spoke with Levent Balkan?

18  A.  Madam, I need to be 100 percent correct and truthful in

19  what I say here, and the reason why I mentioned or had this

20  question for you is because I cannot make or come up with

21  opinions or estimate things because I need to be -- because I

22  need to be 100 percent correct in what I say here.

23  Q.  Do you remember any conversations that you had with Levent

24  Balkan about partnership structures without me showing you a

25  piece of paper?

HC53ATI6                         Zarrab - Cross

1    A.  Right now, I don't recall that.  But for example, I

2    remember the HSBC for 1,800,000.  That phone conversation where

3    the 1,800,000 was mentioned.  I recall that one.

4    Q.  Do you remember a conversation where you're telling

5    Mr. Happani send two to Levent's boss?  Do you remember that

6    conversation?

7    A.  That one, I recall absolutely very clearly, ma'am.

8    Q.  And you said send it to Levent's boss, not to Mr. Atilla's

9    boss, didn't you, Mr. Zarrab; yes or no?

10   A.  Yes, ma'am, that absolutely correct.  I said send to

11   Levent, Mr. Levent Balkan's boss, that is absolutely correct.

12   Q.  In fact, that was in connection with the October 2012

13   transaction that you testified about where Mr. Suleyman first

14   approached you for getting cut into your deal; do you remember

15   that?

16   A.  It was in October 2012 that Mr. Suleyman Aslan had

17   approached me about receiving a bribe.  But to tie that to a

18   specific transaction would not be fair.

19   Q.  Going back to the partnership structure.

20   A.  Of course, ma'am.

21   Q.  Halkbank required that in connection with gold transactions

22   with Iran, that if there were sales to companies in Iran, a

23   partnership structure of the company be provided, correct?

24   A.  Just as I had testified earlier, madam, Halkbank requested

25   that the companies that send money to our account from Iran,

1    their documentation, their partnership structure, be presented

2    to the bank; that's correct, ma'am.

3    Q.  It was partnership or shareholder structure to show they

4    were private companies and not connected to the government of

5    Iran, correct?

6    A.  It was a document that was requested by the bank in order

7    to show that the company did not have any government agency or

8    individuals that are affiliated with the government amongst its

9    partnership, ma'am.

10   Q.  And in fact, the first conversation on the telephone that

11   you had with Mr. Atilla in February of 2013 was him following

12   up on where was the partnership structure, correct?

13   A.  It would not be correct to say that.  That may have been my

14   first conversation with Mr. Atilla.  But I do recall that this

15   was a conversation with Mr. Atilla about the partnership

16   structure document that was needed.

17   Q.  The first telephone -- are you done?

18           The first telephone conversation we had here in

19   evidence is February 6, 2013.

20           MS. FLEMING:  Can we pull up GX 226, please.

21   A.  Ma'am, I don't have the evidence, so I don't know that the

22   first conversation we have on evidence to be on certain date, I

23   just don't have them with me.

24   Q.  Your phones were wiretapped in Turkey for a significant

25   period of time, weren't they, sir?

1   A.  That is correct, ma'am.

2   Q.  There were many, many, many calls of yours that were

3   captured on a wiretap, right?

4   A.  It is true that many were recorded, ma'am.

5   Q.  Have you seen any in this courtroom or any that you have --

6   withdrawn.

7        Have you reviewed any conversations with Mr. Atilla

8   that are before February 6, 2013, any recorded telephone

9   conversations?

10  A.  I did not look at the dates.  I did not look at the

11  specifics, ma'am.

12       MS. FLEMING:  You can take that down.  Thank you.

13  Q.  In addition to the customs declarations and the boarding

14  passes and the partnership structures, there were other

15  documents that Halkbank required in connection with the gold

16  sales, correct?

17  A.  That is correct, ma'am.

18  Q.  You described for us earlier a pro forma invoice that was

19  the first document that you supplied, correct?

20  A.  Pro forma invoice is also among those documents that are

21  presented to the bank, yes, ma'am.

22  Q.  Then also, is there a document at the end that ties it all

23  up, that the transaction is filled, it's completed?

24  A.  So, they would all be sent to the bank as a package, ma'am.

25  Q.  And your companies actually provided real boarding passes

HC53ATI6                         Zarrab - Cross

1    for real flights that went to Iran, correct?

2    A.   That would be partial.  There were some transactions that

3    involved the boarding passes showing that, and there were some

4    transactions that did not involve such.

5    Q.   There was certain times that it was required and certain

6    times it was not, correct, Mr. Zarrab?

7    A.   Do you mean between Dubai and Iran, ma'am?

8    Q.   I misunderstood your answer.  Are you saying that you would

9    send people -- withdrawn.

10        Are you saying you would buy tickets to Iran with

11   stopovers in Dubai, provide the tickets -- is that -- are you

12   saying that you would provide the tickets that show through to

13   Iran but people would get off in Dubai?

14   A.   Yes, ma'am.

15   Q.   You provided tickets and boarding passes that showed

16   through to Iran, correct?

17   A.   Yes, ma'am.

18   Q.   On other documents -- withdrawn.

19        Let's go to the October transactions you talked about.

20        MS. FLEMING:  Could we pull up, please, and just show

21   the transcript for 205-T.  And I'd like to look at page three.

22   Q.   Mr. Zarrab, you say here to Mr. Erker, "But do you know

23   what these idiots are missing out on, you will be collecting

24   all the money."

25   A.   Yes, ma'am.

HC53ATI6                          Zarrab - Cross

1    Q.  Can you explain what you mean by that, please?

2    A.  I'm talking about the companies that would be sending money

3    from India and Italy, ma'am.

4    Q.  You're not talking about Halkbank being the idiots?

5    A.  Madam, the funds were to come from India and from Italy.

6    Q.  Would you go to page two, please.  Would you look up where

7    the middle of the page where it says "It's complicated."  Next

8    to it, it says "karmasik."  If I've said that anywhere near

9    close.

10            Is the translation for "karmasik," is it "it's

11   complicated" or "it's mixed"?

12            MR. KAMARAJU:  Objection.

13            THE COURT:  I'll allow it.

14   A.  Ma'am, there are many translators in this courtroom.  And

15   my English is not up to making that translation here.

16   Q.  Is the reference to -- is the reference to the fact that

17   the moneys are mixed; is that's what is being discussed there?

18   A.  No, ma'am, that's not what I mean.

19   Q.  A little further down, Mr. Zarrab, you're telling Mr. Erker

20   "I did not provide them with a specific name, I said it could

21   be Arab-Turk, Garanti."  Do you see that?

22   A.  Yes, ma'am, I see that.

23   Q.  But you knew at that time who it was going to be, correct?

24   A.  No, ma'am, I did not know.

25            MS. FLEMING:  I'm sorry, this is in evidence.  The

1    jurors should have this on.  Sorry.

2              THE COURT:  They don't have it.

3              MS. FLEMING:  Now I'm done with it.

4    Q.  I'd like to pull up if we could GX 211 which is in

5    evidence.

6              And does that help you with the date, Mr. Zarrab, as

7    to what date that conversation is?

8    A.  It's October 24, 2012, ma'am.

9    Q.  This is a conversation between you and Mr. Balkan, correct?

10             MS. FLEMING:  This is not in evidence yet.  Can we

11   pull up GX 219.  Can you turn to the next page, please.

12   Q.  Mr. Reza, do you recognize this call from the transcript?

13   And my next question is going to be have you listened to the

14   recording?

15   A.  If you can allow me some time to review the transcript real

16   quick.

17   Q.  Please.

18   A.  That's fine?  Thank you.

19             (Pause)

20   A.  Ma'am, if possible, can we also look at the next page as

21   well?

22             MS. FLEMING:  Turn to the next page, please.

23             (Pause)

24   A.  And also to the next page, please?

25             (Pause)

1    A.  Yes, ma'am, I recall this conversation.

2    Q.  Do you recall whether you have listened to the conversation

3    and compared it to the transcript?

4    A.  I don't remember that, ma'am.

5              MS. FLEMING:  Your Honor, can we play Government

6    Exhibit 219, let him follow along, and I would actually move it

7    into evidence.  I don't know if the government has an

8    objection.

9              MR. KAMARAJU:  We don't object, your Honor.  The jury

10   should follow along at the same time.

11             MS. FLEMING:  Thank you.

12             (Government's Exhibit 219 received in evidence)

13             MS. FLEMING:  Just start at page two, please.

14             THE COURT:  Do they have it on their screen?

15   Q.  Just as we're getting ready to start, who are the

16   participants?

17             THE COURT:  Can you get it to that screen?

18             MS. FLEMING:  Do you have it up for the jury?

19   Q.  Who are the participants to this conversation?

20   A.  It appears to be the Ms. Secretary that had transferred the

21   call at the bank, and also it is myself and Levent Balkan.

22             MS. FLEMING:  Could I impose on the government to play

23   it?  Government Exhibit 219?

24   Q.  While we're waiting for that to be hooked up, could we also

25   show you Government Exhibit 273, just not to the jury, just to

1    Mr. Zarrab.

2              Could you look at Government Exhibit 273 and see if

3    you have listened to this recording and if you recognize this

4    transcript.

5    A.   I recall this conversation, ma'am.  But I don't remember

6    whether I listened to it or not.

7              MS. FLEMING:  Your Honor, when we're ready to hook up,

8    we would also move Government Exhibit 273 into evidence.

9              MR. KAMARAJU:  No objection.

10             THE COURT:  I'll allow it.

11             (Government's Exhibit 273 received in evidence)

12   Q.   Who are the participants on Government Exhibit 273, the

13   transcript that's in front of you, Mr. Zarrab?

14   A.   It's Ms. Mehtap from Halkbank and myself, sir.

15   Q.   Mehtap works in the foreign operations department at

16   headquarters at Halkbank, correct?

17   A.   I don't remember exactly, ma'am.

18   Q.   Let me show another one.  Can we show just to Mr. Zarrab GX

19   215.

20             Would you please look at Government Exhibit 215 and

21   tell us whether you recognize this one from the transcript and

22   whether you've listened to this recording.

23   A.   Ma'am, if possible, can we also go to the third page of

24   this transcript, please?

25   Q.   Sure.

1   A.  Yes, ma'am, I remember this conversation and this

2   transcript.

3            MS. FLEMING:  We would move 215 in evidence.

4            MR. KAMARAJU:  No objection, your Honor.

5            THE COURT:  I'll allow it.

6            (Government's Exhibit 215 received in evidence)

7   Q.  Who are the participants to Government Exhibit 215, that

8   call?

9   A.  That would be Mr. Levent Balkan and myself, ma'am.  But

10  whether I had listened to it or not, I do not remember.

11  Q.  Showing you what's been marked as Government Exhibit 221.

12  Just do Mr. Zarrab.

13           Mr. Zarrab, would you look at that and see whether you

14  recognize it and whether you compared it to a recording.

15  A.  If possible, the same way, if you can please go to the next

16  page.  Thank you, ma'am.

17           MS. FLEMING:  Mr. White, next page?

18  A.  I remember this, ma'am.

19  Q.  Do you remember whether you've listened to the recording?

20  A.  I do not remember that, ma'am.

21           MS. FLEMING:  We would move Government Exhibit 221

22  into evidence.

23           MR. KAMARAJU:  No objection.

24           THE COURT:  I'll allow it.

25           (Government's Exhibit 221 received in evidence)

1          MS. FLEMING:  Is 225 in evidence?  Can we show

2     Government Exhibit 225 to Mr. Zarrab only.

3     A.  I remember this conversation, ma'am.

4          MS. FLEMING:  Your Honor, we'd move Government Exhibit

5     225 into evidence.

6          MR. KAMARAJU:  I think we had it in evidence but we

7     don't object either way.

8          THE COURT:  I'll allow it if it's not already in.

9          (Government's Exhibit 225 received in evidence)

10         MS. FLEMING:  Do you want me to play a couple of them

11    right now, Judge?  There are a couple quick ones.

12         THE COURT:  Sure.

13         MS. FLEMING:  Ready?  Could we start with -- let's

14    start with Government Exhibit 215.

15         THE COURT:  How long is that, do you know?

16         MS. FLEMING:  None of them are long, your Honor.

17         THE COURT:  Play one.

18         MS. FLEMING:  All right.

19         THE COURT:  Maybe we'll start with that tomorrow

20    morning.  It's almost 4:30.

21         MS. FLEMING:  Thank you, your Honor.

22         THE COURT:  We'll excuse the jury for today with my

23    same instructions, please don't talk to each other about the

24    case or about anyone who has anything to do with it.

25         Please be seated, everybody.  Could you please be

HC53ATI6                        Zarrab - Cross

1    seated.

2              Please don't talk to each other about the case or

3    about anyone who has anything to do with it until the end of

4    the case when you go to the jury room to deliberate.

5              Second, do not talk with anyone else about the case or

6    about anyone who has anything to do with it until the trial has

7    ended, and you've been discharged as jurors.

8              Third, do not let anyone talk to you about the case or

9    about anyone who has anything to do with it, and if someone

10   should try and talk to you about the case, please report that

11   to Christine or me immediately.

12             Fourth, do not read any news or internet stories or

13   cable or articles or blogs or listen to any radio or TV or

14   cable TV or internet reports about the case or about anyone who

15   has anything to do with it.

16             And fifth, please do not do any type of research or

17   any type of investigation about the case on your own.  So,

18   we're making good progress.  I'll let you go for today and I'll

19   see you at 9:15 tomorrow morning.  Thanks a lot.

20             (Jury excused)

21             THE COURT:  Ms. Fleming, we'll line up the recordings

22   for tomorrow.

23             MS. FLEMING:  Yes.

24             THE COURT:  You'll line them up for tomorrow morning?

25             MS. FLEMING:  Maybe we can impose on the paralegal who

1    never sleeps.

2              THE COURT:  I'll see everybody in the morning.  And

3    the CSO will tell you when the coast is clear.  Thank you.

4              MR. KAMARAJU:  Thank you, your Honor.

5              (Adjourned until December 6, 2017, at 9:15 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2   Examination of:                              Page

3   REZA ZARRAB

4   Direct By Mr. Kamaraju . . . . . . . . . . . 755

5   Cross By Ms. Fleming . . . . . . . . . . . . 777

6                       GOVERNMENT EXHIBITS

7   Exhibit No.                                  Received

8    1270 through 1280  . . . . . . . . . . . . 763

9    6012     . . . . . . . . . . . . . . . . . 765

10   6013     . . . . . . . . . . . . . . . . . 771

11   6014     . . . . . . . . . . . . . . . . . 773

12   6015     . . . . . . . . . . . . . . . . . 775

13   219  . . . . . . . . . . . . . . . . . . . 844

14   273  . . . . . . . . . . . . . . . . . . . 845

15   215  . . . . . . . . . . . . . . . . . . . 846

16   221  . . . . . . . . . . . . . . . . . . . 846

17   225  . . . . . . . . . . . . . . . . . . . 847

18                       DEFENDANT EXHIBITS

19   Exhibit No.                                 Received

20    12   . . . . . . . . . . . . . . . . . . . 815

21

22

23

24

25
```