HC7PATI1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                 v.                        S4 15 Cr. 867 RMB

5    MEHMET HAKAN ATILLA,

6                 Defendant.

7    ------------------------------x

8

9                                          December 7, 2017
                                           9:00 a.m.
10

11

12   Before:

13                    HON. RICHARD M. BERMAN,

14                                         District Judge
                                             and a jury
15

16

17                         APPEARANCES

18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22

23

24

25

HC7PATI1                    Trial

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
     Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
     THOMAS ELLIOTT THORNHILL, Esq.
     – and –
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
     ROBERT J. FETTWEIS, Esq.
     – and –
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
                Of counsel


Also Present:
     JENNIFER McREYNOLDS, Special Agent FBI
     MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
     MS. ASIYE KAY, Turkish Interpreter
     MS. SEYHAN SIRTALAN, Turkish Interpreter

 1          (Trial resumed; jury not present)

 2          THE COURT:  Please be seated.  So in just a moment

 3   we're going to have some oral argument on an issue that has

 4   come up with respect to some of the witnesses that the

 5   government has yet to call.  So just give me one minute and

 6   I'll be right back.

 7          (Pause)

 8          So by way of background, the correspondence which has

 9   given rise to today's pretrial proceedings, is a letter that

10   the government wrote on December 6th, 2017, and to which also

11   on December 6th, yesterday, the defense responded.

12          Why don't I just start with the government.  You did

13   not, in your letter, seek any particular application is my

14   understanding, but why don't you just present the background of

15   the issue.

16          MR. LOCKARD:  Yes, your Honor.  The reason we didn't

17   include any request for Court action is because we don't think

18   any is required.  We learned from discussions with OFAC --

19          THE COURT:  You never would have known that at 1:30

20   this morning when I was reading the defense letter, which was a

21   little bit later than 8:00 p.m.

22          MR. ROCCO:  I thought it was 9:00, I apologize.

23          THE COURT:  Who's counting, Mr. Rocco.  But, anyway,

24   go ahead.

25          MR. LOCKARD:  Yes, your Honor.  So our letter was

1    intended to bring to the Court's and defense counsels'

2    attention basically an issue that we learned from our

3    discussions with OFAC that we don't think has any legal or

4    evidentiary effect in these proceedings, but given the fact

5    that it has been an issue of discussion and of motion practice,

6    we thought the better practice was just to bring the issue to

7    the Court's attention so that defense counsel could make

8    whatever applications they thought were appropriate.  Our view

9    is that nothing has changed, nothing should change.

10          So basically what our letter describes, and I'm going

11   to put this in the context of what I understand to be defense

12   counsel's positions from their letter of yesterday evening.  I

13   want to start by defining what the scope of the issue is

14   because I think the letter from defense counsel addresses an

15   issue of different scope and different consequence than what it

16   is that we're talking about in this case.

17          What we're talking about in this case is essentially

18   OFAC's experience with the avoidance prohibitions in the

19   secondary sanctions, which has been the topic of both briefing

20   and testimony in these proceedings.  And the bottom line of it

21   is that OFAC has no experience with applying the avoidance

22   prohibition in circumstances like this one because it has not

23   encountered any circumstances like this one.

24          And by "circumstances like this one," what I mean is

25   evidence demonstrating that a foreign financial institution has

1    engaged in a considered, intentional and prolonged practice of

2    deception, including the direction of creating false documents,

3    including assisting and establishing a scheme involving layered

4    transactions and layered entities.

5          All of which has the ultimate goal of being able to

6    engage in financial transactions that subject that bank to

7    sanctions under OFAC's regulations including, in particular,

8    losing its ability to have corresponding accounts in United

9    States and to be able to have access to the U.S. financial

10   system, engaging in that kind of conduct to be able to both

11   have the Iran business and avoid the imposition of the

12   secondary sanctions.  OFAC --

13         THE COURT:  In effect what you're saying by hiding

14   this scheme -- so, more or less, I think you're saying it's a

15   case of first impression because this is not even at the front

16   end, it's before the front end of the sanctions scheme.  You're

17   saying it's a conspiracy designed to prevent the regulators, if

18   you will, from knowing that there is such a scheme.

19         MR. LOCKARD:  That's exactly right, your Honor.  So

20   the regulations, from a regulatory perspective, provide OFAC

21   with a series of tools that it can use to encourage or

22   discourage conduct, and one of those tools is the ability to

23   impose these sanctions that cut foreign financial institutions

24   off from the U.S., which is an important and, in some cases,

25   virtually life-threatening event for a financial institution.

1          What's alleged in this case, and what we think the

2     evidence has shown and will continue to show, is that there was

3     intentional conduct by high-level officers at that bank to

4     prevent Treasury from being able to use those tools by engaging

5     in sanctionable conduct and not just hiding it but actively

6     deceiving Treasury about it.

7          THE COURT:  When you're saying by high-level

8     officers --

9          MR. LOCKARD:  I mean the general manager of the bank,

10    the deputy general manager of the bank and several department

11    heads.

12         THE COURT:  Or stated in other terms, the persons that

13    you feel are engaged in this broad conspiracy?

14         MR. LOCKARD:  That's correct, your Honor.  The

15    defendant and his co-conspirators.

16         So what we have alerted --

17         THE COURT:  Which of course would include Mr. Zarrab,

18    too.

19         MR. LOCKARD:  Yes.  Not as a member of the foreign

20    financial institution, but certainly as a co-conspirator.

21         THE COURT:  Right.

22         MR. LOCKARD:  So what we've alerted the Court to and

23    defense counsel to, is OFAC does not have experience with

24    addressing a situation like that and has not had an opportunity

25    to consider what avoiding prohibitions means under the

1   regulations in that context.

2          So this is not about what the sanctions define as

3   sanctionable conduct.  I think there has already been expert

4   testimony about that fact.  There has been cross-examination

5   about that fact.  I think there is largely not a lot of

6   disagreement about what conduct the sanctions define as

7   sanctionable at the time.  This case is about the Court's

8   providence to determine under the law when that can become a

9   willful violation of the IEEPA for avoiding those sanctions.

10         There has been cross-examination, for example, of the

11  OFAC expert witness, Ms. Palluconi, about what conduct is

12  sanctionable, both direct and cross-examination about what

13  consequences can follow from the imposition of sanctions, what

14  prohibitions follow from the imposition of sanctions, and I

15  think the Court drew the correct line when the expert witness

16  was questioned about when that becomes unlawful because that is

17  a question for the Court to answer in its instructions to the

18  jury.  And that's the line that the government is asking the

19  Court to continue to draw with respect to the cross-examination

20  of witnesses.

21         THE COURT:  So just one quick question.  So are you

22  saying -- I think you are, and to my knowledge it may well

23  be -- is this case here in the Southern District a case of

24  first impression?

25         MR. LOCKARD:  In that respect, it is.

HC7PATI1                          Trial

1            THE COURT:  Okay.

2            MR. LOCKARD:  Yes.

3            THE COURT:  Mr. Rocco?

4            MR. ROCCO:  Good morning, Judge.

5            THE COURT:  Good morning.

6            MR. ROCCO:  So we addressed most of these issues in

7    the late-hour submission last night.  I tried my best, your

8    Honor, to get it to you on time or roughly within that time,

9    that window.

10           The effect of what the government has done here on the

11   defense is essentially deprive us of the opportunity to try

12   to -- or tried to deprive us of the opportunity to explore

13   what, in effect, became a drumbeat over years by two of its

14   witnesses as to the effect of these secondary sanctions because

15   it has always been the rule, it has always been stated by

16   people at OFAC when meeting foreign financial institutions like

17   Halkbank, that the consequence of violating sanctions is

18   sanctions, that it is not a criminal prosecution.

19           And we're not talking about whether OFAC is enforcing

20   the law or not enforcing the law.  By the way, it's Department

21   of Treasury that defines -- it's essentially been delegated the

22   authority to define what sanctions are and what remedies are

23   appropriate.  We're not talking about decisions to prosecute,

24   but here, it has been made clear time and time again that the

25   only consequence of violating sanctions is to be barred from

1    the American financial system and not -- no one was ever told

2    in these meetings, educational seminars, face-to-face meetings

3    with the bank, that someone stood in danger of being prosecuted

4    or that their conduct is unlawful.

5           So that whether you're violating sanctions or whether

6    you're evading or avoiding someone detecting sanctions being

7    violated, that is not a prohibited act that serves as a

8    foundation for a criminal prosecution.  That's what makes this

9    case a case of first impression and a case that's unique.

10          When it comes to the interaction, what people from

11   OFAC told Halkbank and told Mr. Atilla, essentially, is that if

12   you violate sanctions, you stand to be barred from the American

13   financial system.  That's it.  And here, we have a unique

14   statute --

15          THE COURT:  They told them that directly?

16          MR. ROCCO:  They told them that directly, your Honor.

17          THE COURT:  Somebody said to him if you violate

18   sanctions --

19          MR. ROCCO:  The consequence is being barred from the

20   American financial institution.  No one ever said that it was

21   illegal to violate sanctions or it was unlawful to violate

22   sanctions, and that's the heightened scienter requirement of

23   IEEPA.  Essentially, in order to be to be prosecuted under

24   IEEPA, in order to be convicted under IEEPA -- you will charge

25   the jury according to the law and the decision is yours, your

1    Honor.

2            But as I read the law, the requirement is willfulness,

3    and willfulness in this context is knowledge that the activity

4    is unlawful.  And what we have here is this cacophony of

5    statements that never led people to believe that they could be

6    prosecuted.

7            THE COURT:  You're not disputing that there can be

8    criminal prosecutions in the context of the sanctions, do you?

9            MR. ROCCO:  There certainly can be criminal

10   prosecutions in the context of sanctions for violating primary

11   sanctions, for violating secondary sanctions, but in instances

12   where the conduct abroad has an impact here in the United

13   States and where the defendant knows that the conduct abroad

14   has impact here in the United States and that defendant also

15   knows that his acts are unlawful, that's fairly unique to the

16   sanctions regime.

17           This what I call uber requirement or super-scienter

18   requirement that there's also knowledge of wrongdoing or

19   unlawfulness, and that's what's so important about the

20   testimony of these witnesses because they're going to testify

21   that they weren't telling people that their conduct was

22   unlawful or illegal.  They've told people that if you engage in

23   this kind of conduct, you can be barred from the American

24   financial system.  So that's one argument, Judge.

25           The second is, essentially, I think what's happened

1    here because this prosecution is so unique, is that the

2    Department of Justice is acting like the Department of

3    Treasury.  It is the Treasury Department that gets to make the

4    rules, and the Treasury Department rules did not prohibit this

5    kind of conduct.  It made it sanctionable but not prosecutable.

6            The third argument we make is essentially this is

7    burden shifting.  They are essentially saying that we can offer

8    this evidence only if the defendant testifies, and that seems

9    to me, under Litvak and a whole series of cases involving

10   financial crimes, that it's never the burden of the defendant

11   to prove his good faith.  It is always the government's

12   responsibility, the government's burden to prove beyond a

13   reasonable doubt --

14           THE COURT:  So there's a quote in the papers from a

15   Southern District case, I think it was Judge Keenan's case,

16   perhaps.

17           MR. ROCCO:  Yes, Banki.

18           THE COURT:  Banki.  And there is a quoted phrase in

19   there that I don't know that it shifts the burden.  Judge

20   Keenan would never shift the burden of proof in a criminal

21   case, but it does talk about the absence of -- I forget the

22   exact phrase, but it does talk about the absence from the

23   defense side of any indication of reliance --

24           MR. ROCCO:  Well, as I recall Banki, Judge --

25           THE COURT:  I'm just talking about the narrow phrase

1    that you objected to, that you say shifts the burden of proof

2    in a criminal proceeding unlawfully.  Do you remember that

3    phrase?

4              MR. ROCCO:  I don't.  I disagree -- I don't disagree.

5    Banki is right because Banki, on its facts is right, and Banki

6    was relying on what, in effect, was no statement, no action or

7    inaction.  We're, in effect, saying that there was a positive

8    interaction, that there were statements made that the defendant

9    or people at Halkbank are entitled to rely on, and we're

10   entitled -- I think the government has a burden here to

11   overcome.  And we have a right to explore on cross-examination

12   the effect of those statements, what those statements were and

13   the effect that it had on -- here, on Mr. Atilla.

14             THE COURT:  Okay.  So just one question I have for

15   you, and then I'll take a couple of minutes and rule.  I don't

16   think it's all that complicated, actually, the issue that's

17   presented.

18             But so how could the OFAC representatives, who

19   interacted with your client, have given any guidance to your

20   client about activity which, through deception, allegedly, they

21   were unaware of?

22             MR. ROCCO:  Well, the proviso allegedly -- I think the

23   proviso allegedly is important because, quite frankly, I think

24   that the conduct here that ultimately led to this prosecution

25   was conduct that OFAC had a general idea of occurring.

1              OFAC was focused already on Zarrab, I believe as early

2    as 2012, Judge, especially when the Al Nafees Exchange ran into

3    problems with OFAC, and there were interactions -- there were

4    discussions about OFAC.  In fact, in one meeting in October of

5    2014, Mr. Atilla asked, I think it was -- it was then Under

6    Secretary Cohen, to put Zarrab on a sanctions list and said,

7    because OFAC raised questions about whether Halkbank should be

8    dealing with Zarrab.

9              In fact, I'd say it was a warning.  I think the

10   response was both put him on the sanctions list so we're

11   prohibited from dealing with him, and OFAC never did that.  In

12   fact, I think Mr. Zarrab testified on cross-examination that

13   he's still not on the sanctions list.

14             THE COURT:  I got it.

15             MR. ROCCO:  So there was -- OFAC wasn't shy about

16   giving advice, wasn't shy about asking questions or, in fact,

17   wasn't shy about -- Halkbank wasn't shy about answering

18   questions or asking questions of OFAC.  There was a strong

19   track record of interaction between Halkbank and OFAC.

20             THE COURT:  Okay.  Last word.  You get the last word.

21             MR. LOCKARD:  Just in an effort --

22             THE COURT:  I think maybe you should go there.

23             MR. ROCCO:  My client asks to make clear that it was

24   the then-general manager of the bank who had the discussion

25   about Mr. Zarrab.

1          THE COURT:  That would be --

2          MR. ROCCO:  His name was Ali Fuat.  He was general

3    manager in 2014.

4          THE COURT:  So you're talking about 2014?

5          MR. ROCCO:  Meeting with OFAC and, well, it was a

6    meeting between OFAC and Halkbank, representatives of Halkbank.

7          THE COURT:  And maybe I misunderstood you.

8          MR. ROCCO:  No, I apologize, Judge, if I confused you.

9          THE COURT:  You're saying that Halkbank asked OFAC to

10   put Mr. Zarrab on the sanctions list?

11         MR. ROCCO:  Oh, yes.  Oh, yes.

12         THE COURT:  In that meeting?

13         MR. ROCCO:  In 2014, yes.  Yes.

14         THE COURT:  Okay.  I got it.  Last word from

15   Mr. Lockard.

16         MR. LOCKARD:  Thank you, your Honor, and just to be

17   both brief and hopefully helpful, I just want to make clear

18   again what the scope of the issue is.  We have no dispute with

19   the proposition that defense counsel is entitled to explore

20   what it is that Mr. Atilla was told in his meetings with

21   Treasury officials.  That, of course is relevant to his state

22   of mind, and defense counsel can then argue from those

23   discussions what it is that Mr. Atilla understood.

24         And if their argument is that he believed that it was

25   lawful to deceive the Treasury Department about the conduct the

1    bank was engaged in, that's an argument that they can make.

2    That's, obviously, a slight recast of the argument, but they're

3    certainly entitled to make arguments about Mr. Atilla's state

4    of mind based on what he was told.

5         I think what we are asking the Court to enforce in the

6    questioning of witnesses, is the line between fact testimony

7    and legal opinion, which is the Court's province, and also to

8    limit testimony about statements to people who are not

9    Mr. Atilla, which are not relevant to Mr. Atilla's state of

10   mind, as Judge Keenan, we think, correctly observed in the

11   Banki case.

12        So I think that really is the narrow way that this

13   plays out in terms of the witness testimony, and that's the

14   line that we're asking the Court to draw.

15        THE COURT:  I got it.  Okay.  So I'm going to take a

16   couple of minutes and then give you a ruling.

17        As a practical matter, we have told the jury -- I

18   think I raised with everybody the issue that the jury was

19   looking for some time this week to review their notes, as to

20   which I instructed them they could do that, but they couldn't

21   deliberate.  Anyway, now is the time that they're doing that.

22   So we have, I think, at least until 10:30 before we can resume

23   the trial because the jury was, in fact, doing that.  So there

24   you go.

25        MR. LOCKARD:  Your Honor, since nature abhors a

1   vacuum, there are a couple of issues that we'd also like to

2   raise with the Court.  They're very brief.

3          THE COURT:  Nature may, but judges don't.

4          MR. LOCKARD:  So with the Court's permission, there

5   are just a couple of things we'd like to flag.  So the first

6   issue is a scheduling issue.

7          THE COURT:  Yes.

8          MR. LOCKARD:  And it arises because the next several

9   witnesses on the government's witness list, three out of the

10  next four, are people who have come in from out of town --

11         THE COURT:  Right.

12         MR. LOCKARD:  -- in order to testify.

13         THE COURT:  Yes.

14         MR. LOCKARD:  So that has presented a scheduling

15  problem because we have had them available since earlier this

16  week, based on sort of evolving estimates of how long

17  cross-examination of Mr. Zarrab would take, which happens and

18  we understand.

19         But it has also had a consequence of having several

20  people from out of town waiting for several days, which has

21  presented some scheduling conflicts and some issues.  And so

22  we'd like to make a proposal on how to resolve those in the

23  next couple of days.  We essentially have two alternative

24  proposals, either of which would work for the government, that

25  we wanted to present.

1          THE COURT:  Have you presented them to the defense?

2          MR. LOCKARD:  We have raised them.  I don't know if

3     they have a position on either one of those proposals, but we

4     have flagged what it is we intend to ask for.

5          MR. ROCCO:  I'm sorry.  We spoke for a couple of

6     minutes, and I haven't had a chance to talk to co-counsel about

7     it.

8          THE COURT:  Why don't you do that now, while I'm doing

9     this, since we have the time.

10          MR. LOCKARD:  Yes, your Honor.

11          MR. ROCCO:  And I think that your Honor's ruling may

12     also affect how long my cross-examination is, and that may

13     affect the scheduling as well.

14          THE COURT:  Well, I think his remarks are really

15     aimed, so to speak, at Ms. Fleming more than anything else.

16          MR. ROCCO:  Oh, I hope not.

17          MR. LOCKARD:  My remarks are just aimed at trying to

18     provide some scheduling --

19          THE COURT:  No, no, but I mean if they were here and

20     they were available to testify this morning, you could call

21     them, except we haven't finished with Mr. Zarrab.

22          MR. LOCKARD:  We'll discuss it with defense counsel.

23     Just to flag it for the Court, the proposals would involve

24     either, with the Court's permission, to have potentially a gap

25     in testimony at the end of the day tomorrow, or to end up

1    taking a witness out of turn early next week, basically to

2    interrupt one witness to put on another witness and then resume

3    the first witness.

4                 THE COURT:  I'm pretty flexible, but I don't really

5    want people hanging around all week, if possible.

6                 MR. LOCKARD:  Yes, sir.

7                 THE COURT:  Or more than necessary; so why don't you

8    talk about that.  Was there something else?

9                 MR. LOCKARD:  The second issue, your Honor, is related

10   to an issue that we had flagged yesterday about the production

11   and use of transcripts of calls, the translations of calls --

12                 THE COURT:  Right.

13                 MR. LOCKARD:  -- by the defense.  And so we received

14   another batch last night, which we have not had an opportunity

15   to review.  They are of calls that I believe we have produced

16   at least draft translations of in the past, and we don't know

17   what differences there are between the ones that we received

18   and the ones that are going to be used today.

19                 So it does present us with a little bit of a problem

20   in knowing how to deal with those translations, to the extent

21   that they are used today in court.  So we wanted to, first of

22   all, just object to their use and, in the alternative, to ask

23   that if they are used, that they be used only as an aid to the

24   witness and that they not be published to the jury until such

25   time as they are able to be received in evidence.

HC7PATI1                    Trial

1          THE COURT:  So that's something else you can talk

2     about in the next couple of minutes or so.  All right?

3          MR. LOCKARD:  Thank you, your Honor.

4          THE COURT:  Okay.  That's very helpful.

5          (Recess)

6          (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court; jury not present)

2           THE COURT:  I have brief comments which will include

3     the discussion about which we've heard oral argument this

4     morning.  And when that is finished, and it will only take a

5     minute or two, we'll call in Mr. Zarrab and –– oh.  Before we

6     do that.  Is there any resolution of the scheduling issue?

7           MR. LOCKARD:  Yes, your Honor.  So with the Court's

8     leave, the proposal would be to continue with the witness order

9     as we had currently planned, which will have after Mr. Zarrab

10    finishes, Special Agent Rob Tringale, followed by David Cohen.

11    Where we're asking for the Court's leave, if Mr. Cohen finishes

12    before the end of the day tomorrow, our next witness would then

13    be available Monday morning, leaving a little bit of a gap.

14    That's why we'd ask for the Court's permission to proceed in

15    that matter.

16          THE COURT:  Gap between Mr. Cohen and Monday?

17          MR. LOCKARD:  Yes, your Honor.

18          THE COURT:  That's fine with me.  Sure.

19          MR. LOCKARD:  Sorry, so then the other corollary to

20    that is the witness who otherwise would have followed Mr. Cohen

21    is not available again until Tuesday.  So we would then pick up

22    Monday, and with the Court's leave again, interrupt whichever

23    witness is testifying Monday for Mr. Adam Szubin to testify on

24    Tuesday morning, and then when his testimony is complete, to

25    then resume with the witness who was on the stand.

HC73ATI2

1          THE COURT:  I have no problem with that.  I have no

2     problem with going out of order if it is okay with all of you.

3          MR. LOCKARD:  Thank you, your Honor.

4          THE COURT:  Once I give the ruling then we'll call in

5     Mr. Zarrab, and the jury is ready, and so we'll continue with

6     cross-examination.  So the ruling is as follows:

7          Based on the entire record in this matter, and now I'm

8     referring to both the Zarrab proceedings, let's call them, and

9     the Atilla proceedings, because there is some obvious overlap

10    between them, and that record includes two separate motions to

11    dismiss, which dealt in some detail, I might say, with the

12    sanctions, among other things, with the sanctions regimes we've

13    been discussing throughout the trial but in particular this

14    morning.  And along with such related issues as criminal

15    prosecutions, primary and secondary sanctions,

16    extraterritoriality.  The record also includes bail

17    applications made both by Mr. Zarrab and Mr. Atilla,

18    suppression motions.  Also very extensive, perhaps

19    unprecedentedly so, certainly in my experience, series of

20    Curcio proceedings as well as extensive motion in limine

21    practice about which counsel have submitted briefing.  And also

22    supplemental letters, including the two letters dated

23    December 6, 2017, about which we have heard this morning during

24    the oral argument.

25          So, having made and done that review, I find as

HC73ATI2

1    follows:

2            First, the record throughout this case, in my opinion,

3    is extremely thorough, comprehensive, and I'm pleased to tell

4    you consistent; two, the record supports the Court's overriding

5    goal, which has been to treat Mr. Zarrab and Mr. Atilla fairly

6    throughout these proceedings, and to accord them due process

7    and speedy resolutions of their respective cases; three, the

8    government anticipates calling as witnesses in the near future

9    a number of current and former U.S. Department of Treasury

10   officials who, it is my understanding, will testify as fact

11   witnesses about their interactions with Turkish banking and

12   government officials, and, among the list of banking officials

13   is Mr. Atilla.  This is entirely appropriate for the government

14   to do.  And fourth, defense counsel will be permitted to

15   cross-examine the witnesses that I've referred to, relating

16   their cross-examination to the direct examination, and defense

17   counsel will also be permitted, on cross, to include limited

18   questioning regarding historical OFAC enforcement practices and

19   guidance.

20           So with that, we'll ask to have Mr. Zarrab and then

21   the jury.

22                   (Continued on next page)

23

24

25

1          (Jury present)

2          THE DEPUTY CLERK:  Sir, before we begin, I'd like to

3    remind you, you're still under oath.

4          THE COURT:  We will continue with the

5    cross-examination of Mr. Zarrab.

6          MS. FLEMING:  Thank you, your Honor.

7     REZA ZARRAB,

8    CROSS-EXAMINATION

9    BY MS. FLEMING:

10   Q.  Good morning, Mr. Zarrab.

11   A.  Good morning, ma'am.

12   Q.  Yesterday, I showed you one of the timelines that you had

13   created, and my question was whether you had identified in that

14   timeline any meeting between the time period of April 10, 2013,

15   and April 22, 2013, a meeting with Mr. Hakan Atilla.

16          Remember that question?

17   A.  Yes, ma'am.

18   Q.  And you told me not in that version of the timeline you had

19   created.  Do you remember that answer?

20   A.  Yes, ma'am.

21   Q.  So I would like to show you what's been marked as 3501-54,

22   3501-025, 3501-055, 3501-021, 3501-23 --

23          MR. KAMARAJU:  Your Honor, we object.

24          THE COURT:  These are what?

25          MS. FLEMING:  Timelines.  And 3501-24.

1             May I approach, your Honor?

2             THE COURT:  I think it would be easier if you did one

3    at a time, to be honest with you.

4             MS. FLEMING:  May I have them identified?  May I try

5    to speed it up by having him identify them all?  I think I can

6    do it in a couple of questions, your Honor.

7             THE COURT:  Go ahead.

8             MS. FLEMING:  May I approach?

9    Q.  Mr. Zarrab, would you look through the exhibits I've just

10   handed you, and they are marked on the side with a sticker just

11   to show you date range.

12            Would you tell us, please, whether those are timelines

13   you created.

14   A.  Yes, ma'am.

15   Q.  Those are all timelines you created when you were working

16   with the prosecution team during the time of your cooperation

17   with the prosecution; is that correct?

18   A.  Yes, ma'am.

19   Q.  Would you look through the exhibits I just handed you

20   during the time ranges marked on the side with the yellow

21   stickers, from April 10, 2013, until April 22, 2013, and see

22   whether you have identified any meetings with Mr. Atilla during

23   those date ranges.

24            MR. KAMARAJU:  Your Honor, objection.  She's asking

25   about documents that are not in evidence.

1           MS. FLEMING:  They're not in evidence.

2           THE COURT:  He said they're not.

3   Q.  Do you remember --

4           MS. FLEMING:  Allow me to withdraw and redo it.

5   Q.  Do you remember having any meetings with Mr. Atilla?

6           THE COURT:  No.  Okay.  Go ahead.

7   Q.  Do you recall any meetings with Mr. Atilla between April 10

8   and April 22, 2013?

9           THE COURT:  You mean apart from the documents?

10          MS. FLEMING:  Apart from the documents.

11  A.  I do not remember, ma'am.  I do not remember the exact date

12  of a meeting.

13          MS. FLEMING:  I'd like to pick back up -- I'd like to

14  play a recording.  We're not putting transcripts up, your

15  Honor -- wait.  May I have a minute, please.

16          (Pause)

17          MS. FLEMING:  We have a stipulation, your Honor, so it

18  saves us some time.  Thank you.

19          Could I ask, please, that we pull up 316-T and I

20  believe it's in evidence.  Could I ask that 316 be played to

21  the jury and displayed for the jury.

22          THE COURT:  Has it been already on the government's

23  case or no?

24          MR. KAMARAJU:  Yes, your Honor.

25          THE COURT:  Sure.

1          (Audio recording playing)

2     Q.   Do you remember this call, Mr. Zarrab?

3     A.   Yes, ma'am, I remember it.

4     Q.   And this call took place on July 2, 2013, correct?

5     A.   Based on the document that is being shown to me, that is

6     correct, ma'am.

7     Q.   In this call you are complaining to Suleyman Aslan that you

8     are having problems because the staff at Halkbank is giving you

9     a problem about demanding different documents at different

10    times, correct?

11    A.   That is correct; yes, ma'am.

12    Q.   If I could direct your attention to page three, please.  Do

13    you see at the bottom where you have a reference to Mr. Hakan

14    on the very bottom entry?

15    A.   Yes, ma'am.

16    Q.   I think you told us that's Hakan Atilla, correct?

17    A.   Yes, ma'am.

18    Q.   Do you see that what you're complaining about is that

19    Mr. Hakan said this might cause us problems in the future.  Do

20    you see that?

21    A.   Not as a complaint, but I see that, ma'am.

22    Q.   And then you say "He said that the goods should be sent by

23    the person and then we should make the transfer into the

24    person's account."  Do you see that?

25    A.   Yes, ma'am, I see that.

1  Q.  So you are reporting to Mr. Aslan that Hakan Atilla has

2  been telling you he wants the goods to be sent first, and then

3  the money will be transferred into the person's account,

4  correct?

5  A.  That is correct, but I'm referring to goods that do not

6  exist, ma'am.

7  Q.  If you go to page four, you are saying that you had -- you

8  first had some difficulties with him about that, and then got

9  over that issue of Mr. Atilla wanting you to send the goods

10  first, and then the payment would ship.  Do you see that?

11  A.  So, I don't see any disagreement here between us in terms

12  of what I said.  In Turkish, I'm just saying that there was

13  that issue and we got over it and we're ready to move on.

14  Q.  Then the next issue that you bring up is that you have been

15  asked if you can provide an SGS inspection certificate; do you

16  see that?

17  A.  Yes, ma'am.

18  Q.  You actually explained to Mr. Aslan what an SGS inspection

19  is, correct?

20  A.  Yes, I explained to Mr. Suleyman Aslan; that is correct,

21  ma'am.

22  Q.  On December 4 you testified that it was at a meeting in --

23  after Ali Fuat was at the bank and after you had been arrested

24  and you had returned, that you had a meeting and the concept of

25  an inspection certificate was raised; do you remember that

1   testimony?

2   A.  I don't recall the exact date of December 4, but I do

3   recall that I testified about an inspection document related to

4   this time, yes.

5   Q.  You told us that Mr. Atilla discussed companies that would

6   be acceptable to the bank for inspection certificates,

7   including SGS, Kotechna, and Baltic.  Do you remember that?

8   A.  That is correct, ma'am, I remember saying that these would

9   include SGS, Kotechna, and Baltic and a few others that I could

10  not remember at the time; that is something that I said, yes.

11  Q.  You also told us it was difficult to get an SGS inspection

12  certificate because they actually inspect the goods on the

13  ships to make sure that -- to check what the foods are or the

14  products are that are being shipped, correct?

15  A.  That is correct, yes, ma'am.

16  Q.  What is SGS?

17  A.  It is an inspection company, ma'am, to the best of my

18  knowledge.

19  Q.  It is a quality inspection, correct?

20  A.  When I was involved in tea trade from 16 to 17, we were

21  using SGS to ensure that the quality of the tea that the

22  customer had ordered was the tea that we were sending, so that

23  is correct, ma'am, yes.

24  Q.  Your tea trade was legitimate, correct?

25  A.  Yes, ma'am, that is correct.

1   Q.   If I could direct your attention to page six in the middle.

2   You explained that the sentences were -- you refer to Mr. Hakan

3   and Mr. Aslan is referring to Hakan Atilla, that you talked

4   over each other at the same time.  Do you remember that?

5   A.   That is correct, ma'am, I remember that.

6   Q.   What you are telling him, isn't it correct -- withdrawn.

7            Isn't it correct that what you are telling Mr. Aslan

8   is it doesn't get stuck at Mr. Hakan so much.  Do you see that?

9   A.   I remember that, yes.

10  Q.   A little farther down, Mr. Aslan is trying to calm you

11  down; isn't that correct?

12  A.   I was already calm during the phone conversation, but

13  Mr. Aslan is saying he's going to go ahead and solve it.

14  Q.   He says at the bottom of page six "I'll gather up all my

15  colleagues tomorrow and go over these one by one."  Do you see

16  that?

17  A.   Yes, ma'am, I see that.

18  Q.   And do you understand him to be telling you that he's going

19  to talk to everyone in the foreign operations department who

20  has been asking you for documents?

21  A.   I do not know to which employee he was referring to when he

22  said he would gather everybody and talk to everyone in that

23  section, ma'am.

24  Q.   Am I correct that he then says, "Then I'll tell you clearly

25  which documents are needed and which are not."

1   A.  Yes, ma'am, I see that.  I recall the conversation but I

2   don't want to go off of what's in my memory, if you can also

3   show on the page please, so I can see it.

4           MS. FLEMING:  Please go to page seven.

5   Q.  Mr. Aslan then goes on to tell you a little farther in the

6   conversation, if you want to scroll through seven and eight,

7   please, when you're ready.  That he will talk to his colleagues

8   and get it lightened for you.

9           Do you see that?

10  A.  Which page are we on now?  Would it be possible to

11  highlight is it so we can move faster in getting to that?

12          MS. FLEMING:  Put up seven and eight, please.

13  Q.  If you could look, please, on page -- at the top of page

14  eight.  Mr. Aslan says "I'll lighten things up after I talk to

15  my colleagues tomorrow.  I'll expedite it, okay?"

16          Do you see that?

17  A.  Yes, ma'am, I see that.

18  Q.  Then a little farther down on eight, you tell him "So we

19  get stuck in the lower ranks.  It is not related to Mr. Hakan."

20  Do you see that?

21  A.  Yes, ma'am.

22  Q.  Is that Hakan Atilla again?

23  A.  Yes, ma'am, that is Mr. Hakan Atilla.

24  Q.  That's a reference going back to where you said earlier it

25  doesn't get stuck so much; isn't that correct?

HC73ATI2                      Zarrab - Cross

1    A.  Yes, ma'am, that is the same thing that I'm saying, my

2    things were not getting stuck at or with Mr. Hakan Atilla that

3    much; that is correct.

4    Q.  That much, right?

5    A.  Yes, ma'am, that is correct.

6    Q.  Getting stuck somewhat, but not that much; is that correct?

7           THE COURT:  That wasn't the testimony.  So if you're

8    going to ask a question, ask it.

9           MS. FLEMING:  If we can go please to T 1002 at page 50

10   in the English version.  And it is July 9, if we can please

11   bring the Turkish up, too.  It is July 9 at 8:36.

12          THE WITNESS:  If I can get the Turkish version also

13   that corresponds with this.

14          MS. FLEMING:  Can you highlight the Turkish one,

15   please, Mr. White.

16          THE WITNESS:  I see the Turkish section now, ma'am.

17   Q.  In that WhatsApp chat in the morning on July 9, Mr. Aslan

18   is giving you a heads up that Mr. Hakan is going to probably

19   call you today and on two subjects, correct?

20   A.  That is correct, ma'am.

21   Q.  He tells you that the first relates to whether the company

22   that starts with the letter V has the field of business

23   properly in its documents.  And the second issue is there is an

24   incompatibility related to the capacity of the ships.

25   A.  Yes, ma'am.

1    Q.  In fact, Mr. Atilla called you later that morning, correct?

2    A.  I don't recall the exact date, whether it happened on that

3    morning or not, I don't recall.  But I did have a conversation

4    with Mr. Hakan Atilla on those two topics, that is correct.

5    Q.  Do you remember having two phone conversations in between

6    this chat and Mr. Hakan Atilla's call to you with Mr. Happani?

7    A.  Ma'am, as I had mentioned before, Mr. Happani was my right

8    arm and I would speak to him maybe 50 times a day.  So if there

9    is any specific call that you're referring to, if that could be

10   brought up on the screen, that way I could answer your question

11   better and more correctly and with a more material answer as to

12   what you had asked.

13   Q.  Do you remember telling Mr. Happani that Mr. Suleyman had

14   told you Volgam had not been entered at Halkbank?

15   A.  When you say "not entered," I don't understand what you

16   mean by that.

17   Q.  Do you remember having a conversation where you told

18   Mr. Happani that there was a problem with the tonnage, that

19   there was going to be a call about?

20   A.  I had had many conversations with Abdullah Happani, and I

21   don't recall anything specific, and I would like to ask if you

22   have anything specific as to a conversation that could be

23   pulled up on the screen so I can refer to it as I answer.  So

24   that it would refresh my mind as I answer your question.

25           MS. FLEMING:  Your Honor, may I approach?

1          THE COURT:  Sure.

2     Q.  I'm going to show you what's been marked as Defendant's

3     Exhibit 901.  I'm going to ask you to read it to yourself, and

4     see if it refreshes your recollection as to having a

5     conversation with Mr. Happani on July 9.

6     A.  Yes, ma'am, I remember this.

7     Q.  So does that refresh your recollection that you had a phone

8     call with Mr. Happani in which you told him that Mr. Suleyman

9     had told you that you added food to Volgam, but the bank had

10    not entered it into their system, meaning that food had not

11    been entered into the system as being associated with Volgam?

12    Do you remember that?

13    A.  Yes, ma'am, I remember that.

14    Q.  And then Mr. Happani said "I will send them now."  Do you

15    remember that?

16          MR. KAMARAJU:  Objection, your Honor.  She's reading

17    from a document not in evidence.

18          THE COURT:  I'll allow it.

19    Q.  And then Mr. Happani said "Send them now, please."  Do you

20    remember that?

21    A.  No, that is not correct.  Maybe it is being read

22    incorrectly.  What Abdullah Happani is saying is he is sending

23    again to the bank right away.

24    Q.  And you told him "No, wait.  Let Hakan Atilla call first,

25    because it shouldn't be understood that Mr. Suleyman has

1    contacted us."  Isn't that correct?

2    A.  That is correct, ma'am.

3    Q.  And then later on, you also say -- or withdrawn.

4            You and Mr. Happani discussed that there is a problem

5    with the tonnage.  Do you remember that in this phone

6    conversation on July 9?

7    A.  I recall talking about the possibility with a problem with

8    the tonnage in this conversation, yes, ma'am.

9    Q.  And Mr. Happani says, "Yes, we never looked at that,"

10   correct?

11   A.  That is correct, ma'am.

12   Q.  And you say, "How are we going to explain that.  Let him

13   call."  Isn't that correct?

14   A.  That is correct, ma'am.

15   Q.  Then following that is when Mr. Atilla called you.

16   A.  I don't recall the timing, but based on this document it

17   appears that he would have called after this, so that is

18   correct, ma'am.

19   Q.  In fact, you never let Mr. Hakan Atilla know that

20   Mr. Suleyman had given you the heads up that he would be

21   calling, did you?

22   A.  That is correct, ma'am, I did not tell him.

23           MS. FLEMING:  Sorry, your Honor, I have to straighten

24   some of the documents out, it fell after the break.  I'll move

25   forward and then come back.  I'm just pleased it took three

1    days for it to happen.

2           Could we pull up 269, please.

3    Q.  Before we get there, I have one other question.  One other

4    area.

5           You had an employee who worked for you named Sinem,

6    S-I-N-E-M?

7    A.  That is correct, ma'am.

8    Q.  In fact, with regard -- withdrawn.

9           In the business that you were doing, this Iranian

10   business, your part of it, there were many of your employees

11   that knew exactly what was going on, correct?

12   A.  Yes, they knew, ma'am.

13   Q.  But you did not want Sinem to know what was going on,

14   correct?

15   A.  No, that is not correct, ma'am.

16   Q.  Don't you have conversations with Mr. Happani in which you

17   tell him that you want him to keep him away from it so he

18   wouldn't know what was going on?

19   A.  What I'm saying here is that I don't want Sinem to learn

20   the method with which we are doing this with the bank for food

21   trade.  And I'm telling Mr. Happani that I don't want her to

22   learn this in terms of how we're doing it with the bank.

23   Q.  There came a point in 2013 where the bank would no longer

24   intermediate gold trades, correct?

25   A.  Though I don't remember the exact date, there were times

1     that the gold trade, based on the crude oil sales proceeds, had

2     stopped.  That is correct, ma'am.

3     Q.  There is also a time it stopped because of the change in

4     the sanctions laws; do you remember that in 2013?

5     A.  I'm talking about the exact same thing, ma'am, anyway.

6     Q.  The way the gold trades worked were that you would provide

7     a pro forma, send the gold, move the money, and then at the end

8     of the transaction, within a certain period of time, had to get

9     all the documents to Halkbank to complete the paperwork,

10    correct?

11    A.  That is not correct, ma'am.

12    Q.  You had a certain period of time after you had --

13    withdrawn.

14          You would issue a pro forma invoice, correct?

15    A.  That is correct.

16    Q.  There would be payment for the purchase, correct?

17    A.  That is correct, ma'am.

18    Q.  The gold would then be transferred out of the country of

19    Turkey, correct?

20    A.  No, that -- this is where it's not correct.

21    Q.  You didn't -- there was real gold involved in your

22    transactions.  You've told us that, correct?

23    A.  That is absolutely correct.  But what is incorrect is the

24    order of what was mentioned here by madam.

25    Q.  Getting to the end, after the gold has moved, and the

1   payment has been made for the gold, your company has a certain

2   period of time to get the documents back to Halkbank to show

3   that the shipping and the export and the rest of it was done,

4   correct?

5   A.   That is not correct, ma'am.

6   Q.   You didn't have to provide the customs documents until

7   after the gold had left the country, did you, sir?

8   A.   So, the time frame, the period that is allowed to our

9   company by the bank was between the time that the money would

10  arrive, and the time that the gold would be exported out.  We

11  were given a certain amount of time to receive the money and to

12  prepare for the export, do the export, and then we needed to

13  get this package of documentation and take it to the bank,

14  after the export.  But the time, the period that was extended

15  to us was for between the payment, receipt of payment, and

16  export of gold.

17  Q.   But after Halkbank's piece of it was finished, meaning the

18  transfer of the money, you still had time to get the documents

19  back to the bank so they could complete their paperwork,

20  correct?

21  A.   Yes.  We were being given a specific period of time in

22  order for us to export the gold, ma'am.

23  Q.   There were times that people at the bank would call you to

24  say please get the documents in, we've made payment, and we

25  need the documents to close out the transactions, correct?

1    A.  That is correct, ma'am.  They were getting in contact with

2    us regarding this matter from the bank; that is correct.

3    Q.  When they would call you and say we need the document, your

4    companies would in fact send the documents to Halkbank,

5    correct?

6    A.  Sometimes the documents that we would submit were not

7    getting on record quickly.  So there was this discrepancy

8    between the branch and the headquarters in terms of getting

9    documents on record.  And then there were times where the delay

10   was being caused by us, and if that were to be the case, then

11   we would complete the documentation.

12   Q.  You would in fact respond -- withdrawn.

13            MS. FLEMING:  Could we play 269, please.  It's in

14   evidence.  It's short, your Honor.

15            (Audio recording playing)

16   Q.  Mr. Reza, this is an example of Mr. Atilla calling you to

17   say the bank is looking for the documents to finish the

18   paperwork, correct?

19   A.  That is correct, ma'am, yes.

20   Q.  The payments had already been made, correct?

21   A.  Yes, ma'am, that is correct.

22   Q.  The gold had already been shipped out of Turkey, correct?

23   A.  It would be needed that it should have been sent.

24   Q.  You in fact got the paperwork back to Halkbank within a

25   reasonable period of time after this call, correct?

1    A.  I don't remember, ma'am.  I don't remember whether the

2    documents had already been submitted and were at the branch or

3    if we had submitted them within a few days after, I don't

4    remember.

5    Q.  And I guess what you're saying about the shipments is when

6    Mr. Atilla called you, if the gold hadn't actually already gone

7    yet, you took care of making sure the gold went out so you

8    could then submit the documents back to Halkbank, correct?

9    A.  Yes, in fact here I'm telling him that I believed that this

10   had already been exported.

11   Q.  By the time of this call, in September 2013, the financial

12   portion at Halkbank had already been completed, correct?

13   A.  So, the mention or the reference to financial transaction

14   at Halkbank, I did not understand that section.

15   Q.  Withdrawn.

16        MS. FLEMING:  I'm done with the recordings.  Thank

17   you.

18   Q.  I asked you the other day about your driver being caught

19   with cash and you told me I had the facts wrong, correct?

20   A.  That is correct, ma'am.

21   Q.  Your driver is named Turgut Happani, correct?

22   A.  Turgut Happani was an employee of mine that worked with me

23   for a time period, but he was never my driver, ma'am.

24   Q.  Forgive me.  And in fact, was he an employee of yours

25   during 2011, 2012, 2013?

HC73ATI2                           Zarrab - Cross

1   A.  I don't recall the exact dates, but Turgut Happani was in

2   my personnel and he was one of my employees for a time.

3   Q.  Did he work for you back in 2011?

4   A.  What I remember is that he might have been working.

5   Q.  Was he working for you in 2010, do you remember?

6   A.  I remember, he was working with me, ma'am.

7   Q.  While he was your employee, was he one of 14 people stopped

8   with suitcases or backpacks of cash by the Russian Federal

9   Customs Services?

10  A.  They were not captured by the customs, but they were

11  stopped by the customs, ma'am.

12          MS. FLEMING:  Could you show Mr. Zarrab only, not the

13  jury, I think it is 101.

14  Q.  Do you recognize what's been marked as Defense Exhibit 101?

15  A.  Yes, ma'am, I recognize it.

16  Q.  Who is that in the photo?

17  A.  That is me, ma'am.

18  Q.  Do you recall what year this picture was taken?

19  A.  I don't recall the year exactly, ma'am.

20  Q.  Do you recall if this was back at the time when your

21  employee was stopped by the people with the cash in the

22  backpack?

23  A.  I have a specific memory about this photograph, and the

24  moneys that are shown in this photograph.  This money was

25  prepared to be sent to Dubai to be given to the Central Bank of

1   Iran, and this had nothing to do with Russia.

2              MS. FLEMING:  Defendants would move Exhibit 101 into

3   evidence.

4              MR. KAMARAJU:  No objection.

5              THE COURT:  I'll allow it.

6              MS. FLEMING:  Can we publish it to the jury, please.

7              (Defendant's Exhibit 101 received in evidence)

8              MS. FLEMING:  May I have a minute, your Honor.

9              Take it down from the jury for one moment, and go to

10  page two of Exhibit 101.  You don't have it?

11             Can we take it down from the jury and I'd like to show

12  you 102.  Maybe 100.

13  Q.  Do you recognize the people in 100?

14  A.  Yes, ma'am, I recognize them.

15  Q.  Who are they?

16  A.  The one on the left is an individual by the name Erol who

17  worked in our exchange office at that time as a cashier.  And

18  the person to the right in the middle of the photograph is my

19  cousin, Behrouz Asadi.  And the person standing to the right of

20  that person is Sadegh Rastgard, ma'am.

21  Q.  Did he also work for you?

22  A.  He worked for me for a period of time; that is correct,

23  ma'am.

24  Q.  Was this photo taken at the same time, roughly, as your

25  photo?

HC73ATI2                        Zarrab – Cross

A.   That may be, ma'am, because we were sending cash dollars

every day.

            MS. FLEMING:  We would move Defendant's Exhibit 100

into evidence.

            THE COURT:  I'll allow it.

            MR. KAMARAJU:  No objection.

            (Defendant's Exhibit 100 received in evidence)

            (Continued on next page)

1          MS. FLEMING:  Could I ask, can you pull up the

2     government exhibit just for not the jury.  I'm sorry, I thought

3     you had already published it.  Would you publish it, please.

4          Would you pull up just for Mr. Zarrab, Government

5     Exhibit 4503, please.

6     Q.   Do you see Government Exhibit 4503?

7     A.   Yes, ma'am; I can see it.

8          MS. FLEMING:  Would you show Mr. Zarrab page 2 of

9     Government Exhibit 4503.

10    Q.   Do you recognize that?

11    A.   Yes, ma'am; I remember it.

12    Q.   Going back to Government Exhibit 4503, is that an e-mail

13    from you to you?

14    A.   It was sent from me to me, as well as to Al Nafees' e-mail,

15    ma'am.  There are two e-mails listed there.

16         MS. FLEMING:  All right.  We move Government

17    Exhibit 4503 into evidence.

18         MR. KAMARAJU:  No objection.

19         MS. FLEMING:  And ask that it be published to the

20    jury.

21         THE COURT:  I'll allow it.

22         (Government's Exhibit 4503 received in evidence)

23         MS. FLEMING:  Mr. White, could you publish it, please,

24    to the jury.

25    BY MS. FLEMING:

1   Q.  Mr. Zarrab, does that refresh your recollection as to when

2   this photo was taken?

3   A.  No, it did not remind me, ma'am, because the date that the

4   photo was taken may be different than the date the photo was

5   e-mailed out.

6   Q.  Well, the photo was certainly taken before the date it was

7   e-mailed, correct?

8   A.  That is absolutely correct, ma'am.

9   Q.  Okay.  You can take that down.

10          You spoke with us about having been charged in Turkey

11   in 2013.  Now, you also told us that -- in this court, that you

12   are, in fact, guilty of at least some of the things you were

13   charged with in Turkey; is that correct?

14   A.  That is absolutely correct, ma'am.

15   Q.  There, in Turkey, you had a police officer who attempted to

16   blackmail you; isn't that true?

17   A.  That is correct, ma'am.

18   Q.  You had an officer or police officer who was part of that

19   investigation who attempted to extort money out of you in order

20   to -- sorry, to get money out of you in order to keep from

21   giving evidence over to other people, correct?

22   A.  That is not correct, ma'am.  In other words, the reason for

23   the blackmail is not correct, ma'am.

24   Q.  There are different political factions -- withdrawn.

25          As of the end of 2013, there are different political

1   factions and political groups in Turkey, correct?

2   A.  So I'm not a political analyst, and I don't understand what

3   the question is, but I know that the administration in Turkey

4   was the same before 2012 and it was the same after 2013; so I

5   don't understand the question.

6   Q.  Have you ever heard of Gulenists?

7           MR. KAMARAJU:  Objection, your Honor.

8           THE COURT:  I'll allow it.

9   A.  Yes, ma'am; I had heard.

10  Q.  It is a political faction or political group that some

11  people in Turkey follow and believe, correct?

12  A.  This group has various names that are used by different

13  groups.  For that reason, I don't know whether they're a

14  political group, religious group or a terrorist group.  I don't

15  know that, ma'am.

16  Q.  By terrorist group, you don't mean physically terror or

17  blowing anything up, correct?  We can agree on this, please?

18  A.  There's no way that we could agree on that, ma'am, because

19  I don't know what they do.

20  Q.  When you were -- After you were charged, in fact, there was

21  an investigation done by parliament, correct?

22  A.  Are you referring to an investigation in Turkey?

23  Q.  Yes.

24  A.  Because there's also an investigation about me currently,

25  as well.  So I just want to know which one you're referring to.

1    Q.  I'm talking about the one in 2013.

2    A.  Yes, that is correct, ma'am.

3    Q.  And during 2014, the parliament of Turkey was investigating

4    some of the allegations that had been made against people that

5    had immunity, correct?

6              THE COURT:  Against what?

7              MS. FLEMING:  People who had immunity, meaning people

8    who had official positions that had immunity.

9              THE COURT:  I'm not sure I understood the question.

10   BY MS. FLEMING:

11   Q.  There was an investigation by parliament, correct?

12             THE COURT:  Of what?

13             MS. FLEMING:  Of certain persons involved in the

14   investigation.  I'm trying to keep this very simple, Judge.

15             THE COURT:  I know, but it's not very simple.  I mean,

16   there must be --

17             MS. FLEMING:  Let me withdraw it and ask a different

18   question.

19   BY MS. FLEMING:

20   Q.  Did you submit a letter, signed in connection with

21   evidence, to an investigation that was being conducted by the

22   parliament in Turkey in 2014?

23   A.  I don't remember, ma'am.

24   Q.  Do you remember signing a declaration to the parliament

25   indicating that certain allegations that you had provided

1    bribes in the form of a watch, for example, that it was not a

2    bribe?

3    A.  I don't remember, ma'am.

4    Q.  Do you remember providing a signed letter to the parliament

5    investigation commission saying that a piano that had been

6    alleged to be a bribe was, in fact, not a bribe?

7    A.  I do not remember, ma'am.

8    Q.  Mr. Zarrab, have you been charged in Turkey with --

9    withdrawn.

10            In June of 2016, did Turkey charge you with violating

11    the law of protection of cultural and natural assets for doing

12    renovations on your home on the Bosphorus?

13    A.  I do not remember the date of that, ma'am, but it is

14    correct that such a charge was made against me.

15    Q.  That's a criminal charge in your district in Turkey,

16    correct?

17    A.  I suppose so, ma'am.

18    Q.  And you were charged with that before you agreed to

19    cooperate with the United States, correct?

20    A.  That is correct, ma'am.

21    Q.  Are you familiar with a company Azra?

22    A.  I had heard of that name, ma'am.

23    Q.  Did you have connections to that, your business?

24    A.  No, ma'am.

25    Q.  Did you have connections with the business Hazer Jewelry,

1    H-a-z-e-r?

2    A.  No, ma'am.

3    Q.  Never, is that correct?  Never?

4    A.  Yes, ma'am.

5    Q.  You became a Turkish citizen in 2007; is that correct?

6    A.  Yes, ma'am, that is correct.  I don't recall the date.  It

7    could be 2006 or 2007, but that is correct, ma'am.

8    Q.  And you became a Turkish citizen under a procedure that's

9    known as exceptional status in Turkey, correct?

10   A.  I understand that is absolutely not correct, ma'am.

11   Q.  And you did not go through the ordinary channels to get a

12   citizenship, did you, sir?

13   A.  I followed very ordinary channels, ma'am, and I applied in

14   2001 and I received my citizenship in the time frame of 2006 or

15   2007.  I apologize, I need to make a correction on that one.  I

16   started it in the year 2000.  In other words, it took about six

17   to seven years for me to receive that.

18   Q.  As part of the process of becoming a Turkish citizen, you

19   have to fill out an application, correct?

20   A.  That is correct, ma'am.

21   Q.  And you have to go through an investigation, correct?

22   A.  I don't know the internal procedure, ma'am, as far as the

23   citizenship.  I don't know what the government does internally

24   about that.

25   Q.  You're aware that the tax authorities conduct an

1    investigation, correct?

2    A.  I am not aware of such an investigation with regards to my

3    citizenship application, ma'am.

4    Q.  In your application, you had to certify that your taxes

5    were correct, didn't you?

6    A.  As of that date, there was no company in my name in Turkey

7    anyway, ma'am; so there was no tax due from it.

8    Q.  Well, you told us in connection with your plea that you had

9    understated your income to the Turkish authorities from 2002

10   until 2016, correct?

11   A.  That is absolutely correct, ma'am.

12   Q.  But you did not become a citizen until 2006 or 2007,

13   correct?

14   A.  That is correct, ma'am.

15   Q.  So you were understating your income in Turkey for at least

16   a number of years while your citizenship was being processed,

17   correct?

18   A.  So in Turkey, when you make a citizenship application --

19   this may be perhaps true for the United States, but in Turkey,

20   there is no procedure as to checking on annual tax declarations

21   after you make the application.  In other words, there is no

22   need to update that information.

23   Q.  And there's no need to tell the authorities when you're

24   applying for citizenship that your taxes are understated for

25   the years that you're being investigated; is that your

1   testimony?

2   A.   That is not my testimony.  What my testimony is is this.

3   As of the year 2000, when I made the application, I did not

4   have any companies established in Turkey under my name.

5   Q.   You told us the other day that you had assets that were in

6   Turkey, your companies were in Turkey, correct?

7   A.   As of previous times, before I took the witness seat.

8   Q.   And you have investments in Iran, that's correct?

9   A.   There was, ma'am.

10  Q.   You had iron and steel factories in Iran?

11  A.   There is one iron and steel company in Iran that is owned

12  by my father, and I did have a share of that company, ma'am;

13  that is correct.

14  Q.   Is there also an auto tire factory or company that's in

15  Iran that you have a share or interest in?

16  A.   Such a company, it was owned by my father many years ago,

17  and many years ago my father transferred that company on to my

18  mother for her future, to ensure her future.  In such a

19  company, I have no interest or stocks in such a company, ma'am.

20  Q.   When you did the television interview in 2014, on

21  television you said that you had ownership of that, didn't you?

22  A.   During that 2014 interview, the company that I was

23  referring to was the iron and steel company, and what I

24  declared during that interview is that my family is a wealthy

25  family.  So on that television program, what I said was that my

1   family had been wealthy for many years.

2   Q.  And do you have a construction company in Dubai?

3   A.  I did have one, ma'am.

4   Q.  Before your plea agreement became public, did you file a

5   petition in Turkey to have your assets released?

6   A.  Ma'am, my assets were seized after I began to testify

7   against the defendant, and as of that date that you're

8   referring to, my assets were not -- they were already free, and

9   there was no seizure on them anyway.

10  Q.  Mr. Atilla, didn't move to seize your assets, did he?

11  A.  I do not believe that Mr. Atilla would have such a thing in

12  Turkey, to move in such a way in Turkey, ma'am.  And I do not

13  believe that Mr. Atilla would do such a thing himself either,

14  ma'am.

15          MS. FLEMING:  May I have a minute, your Honor?

16          (Pause)

17          MS. FLEMING:  I'm wrapping up, your Honor.

18          THE COURT:  Well, how much more do you think you have?

19          MS. FLEMING:  I have this.  I have this.  Probably

20  half an hour.

21          THE COURT:  I have no way of assessing what "this" is.

22          MS. FLEMING:  It's half an hour, unless I drop it.

23  Then it's ten minutes.

24          THE COURT:  Well, then let's go.  Are we hoping you

25  drop it?

1      MS. FLEMING:  You wouldn't be the first, Judge.

2   That's true.

3   BY MS. FLEMING:

4   Q.  Mr. Zarrab, you have told many lies in your life; isn't

5   that true?

6   A.  There are times and topics for which I have lied in my

7   life, that is correct.

8   Q.  Well, you lied in your business exchange -- you lied in

9   your money exchange business, didn't you?

10  A.  Sometimes.

11  Q.  You lied to the Turkish government every year on your tax

12  returns, correct?

13  A.  I don't know what you mean by the Turkish government.  Much

14  of the Turkish authorities actually knew what my income was

15  anyway.

16  Q.  How about the people of Turkey who benefit from taxes, did

17  they know that you were understating your income?

18      THE COURT:  I don't understand that.

19  Q.  When you filed your tax returns in Turkey, with whom do you

20  file them?

21  A.  I would think that it would be the tax director.  It's my

22  accountant that was making these declarations; so it could be

23  customs and tax, it could be tax directorate.

24  Q.  But you knew they were understated, correct?

25  A.  Absolutely so, ma'am.

HC7PATI3                          Zarrab - Cross

1    Q.   And so you were lying to the authorities when you filed

2    your false tax returns, correct?

3    A.   To those authorities that did not know, that is correct,

4    ma'am.

5    Q.   You lied to your employees at times, correct?

6             THE INTERPRETER:   Could you repeat that question,

7    please?

8    Q.   You lied to your employees at times; isn't that correct?

9    A.   I don't recall that, ma'am.

10   Q.   You told us a little earlier that you did not want Simen

11   S-i-m-e-n -- am I saying her name?

12   A.   Simen.

13   Q.   -- to know all about some of your business; you kept that

14   away from her, correct?

15   A.   For a boss to obstruct an employee from getting information

16   in an area where he or she does not have any reason or

17   authority to have that information, I don't believe that counts

18   as lying to that employee, ma'am.

19   Q.   That's a boss' prerogative, to keep away information from

20   the lower-level employees, correct?

21   A.   That is not correct for always, ma'am.

22   Q.   You lied to Halkbank employees, correct?

23   A.   Not everybody that Halkbank had detailed information about

24   my business, and to those individuals that did not know the

25   full nature of my business, there are times that I lied, ma'am;

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    that is correct.

2    Q.  And you told us here that you lied to Binnur, correct?

3    A.  On that transcript that you had shown to me, I did lie to

4    Binnur, Ms. Binnur; that is correct.

5    Q.  You lied to Mehmet, correct -- excuse me, Mehtap, Mehtap?

6    A.  I don't recall that conversation now; so if you could

7    expand upon what you mean by lying in that context, that would

8    be good.

9    Q.  You lied to Hakkan Aydogan, correct?

10   A.  That is correct, ma'am, in the transcript of that phone

11   conversation, I did.

12   Q.  You lied to Hakan Atilla, correct?

13   A.  It is true for that phone conversation where he did not

14   know the goods were not being sent to Iran that I lied, that is

15   correct, ma'am.

16   Q.  You lied to banks and businesses by presenting false

17   documents to them, correct?

18   A.  It is correct that in making applications with the banks --

19   with some banks, initially, as we start -- as to our

20   transactions being affiliated with Iran, we concealed those

21   with some of those banks; that is correct, ma'am.

22   Q.  You lied to your wife, didn't you?

23              THE COURT:  Counsel, come up here.

24              (Continued on next page)

25

1              (At the side bar)

2              THE COURT:  So I'm a little concerned about your line

3      of questioning.  I think if you ever asked me, did I lie to my

4      wife, I may have to say yes.  I don't really get where you're

5      going.  You asked the question, you lied to banks and

6      businesses.  I don't know what that means.  You asked the

7      question, you lied to your employees, and then it turned out

8      that you were really take talking about one particular example

9      at the time, Binnur, or whatever the person's name.  I think

10     you have to be careful --

11             MS. FLEMING:  I know.

12             THE COURT:  -- in a United States court, Federal

13     Court, about what you're sort of throwing around.  Now, I'm not

14     trying to curtail --

15             MS. FLEMING:  I'll be more careful about the wife,

16     Judge.  I'm confident that you would not answer the next

17     question the way he will about prostitutes and the rest.

18             THE COURT:  I know, but you have to think a little

19     through what questions you're asking, it seems to me.

20             MS. FLEMING:  I'm leading up to the lying under oath

21     questions; so those are coming.

22             THE COURT:  Well, you know, if that's the question

23     you're really looking for, maybe that's the question you should

24     ask.

25             MS. FLEMING:  I'll be more careful in crafting them.

HC7PATI3                          Zarrab – Cross

1          THE COURT:  You should be careful on these line of

2    questions, I'm saying that.  Yes.

3               (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          MS. FLEMING:  May I proceed, your Honor?

3          THE COURT:  Yes.  Hold on one second.

4          (Pause)

5          Go ahead.

6     BY MS. FLEMING:

7     Q.  You told us that you had, in fact -- or, Mr. Zarrab, you,

8     in fact, on numbers of occasions, procured prostitutes?

9          MR. KAMARAJU:  Objection, your Honor.

10    Q.  Correct?

11         MS. FLEMING:  I was not done with the question.

12    Q.  On business purposes?

13         THE INTERPRETER:  Go with the question?

14         THE COURT:  Oh, I'm not sure I understood the

15    question.

16    BY MS. FLEMING:

17    Q.  One of the areas in your plea agreement, one of the crimes

18    that was identified, is that you were not -- that there was no

19    jurisdiction; so you were not being prosecuted for what is

20    prostitution, procuring prostitutes for others, correct?

21    A.  That is correct, ma'am.

22    Q.  After your arrest in Turkey in 2013, you lied to the

23    Turkish public by going on television and denying that you had

24    anything to do with violating sanctions, correct?

25    A.  I said that within the limits of Turkish law, ma'am.

HC7PATI3                     Zarrab - Cross

1   Q.  And, in fact, you issued a press release on March 10th,

2   2016, in which you also insisted that you have not ever done

3   any business with the money of the State of Iran, correct?

4   A.  I do not recall such a press release, ma'am.

5            MS. FLEMING:  Your Honor, may I approach?

6   Q.  I'm showing you what's been marked as Defendant's

7   Exhibit 905.  Does that refresh your recollection?

8   A.  If I may get the Turkish version, it might refresh my

9   memory.

10  Q.  We don't have a Turkish version, I'm sorry.

11           Now, you told us that when you called the police chief

12  in order to use the emergency lane on October 4th, 2012, and

13  told him that you had the oil minister in your car, that that

14  was a lie, correct?

15  A.  That is not -- that is not correct, ma'am.  That is not

16  what my statement was.  I had said that I had the oil minister

17  and the delegation with me.  An oil minister was supposed to

18  come also, but in terms of attending this meeting with

19  Halkbank, his participation was canceled by Iran at the last

20  minute.  And I'd like to underline this also, that I did not

21  need to lie in order to use the emergency lane.  I was using it

22  as I wished anyway.

23  Q.  After your arrest, you were interviewed for a number of

24  days by the Turkish prosecutors about the events that you've

25  testified about here for a number of days, correct?

1  A.  You were talking about questioning me, right, ma'am?

2  Q.  Yes.

3  A.  That is correct, ma'am.

4  Q.  And you lied to the Turkish prosecutors, correct?

5  A.  I had understood that to be U.S. prosecutors in the

6  previous -- in your question.  If you can please go back and

7  repose.

8  Q.  You lied to the Turkish prosecutors when you were

9  interviewed and arrested in 2013, correct?

10  A.  As I was arrested in Turkey in 2013, whether before I was

11  arrested or during my arrest, I did not see a Turkish

12  prosecutor.

13  Q.  When you were interviewed by the Turkish law enforcement

14  authorities, you lied to them, didn't you, sir?

15  A.  Sometimes.

16  Q.  And when you were arrested by the FBI in Miami, you lied to

17  the FBI in Miami, correct?

18  A.  There is a part where I had lied to the FBI as well, ma'am;

19  that is correct.

20  Q.  So you denied any involvement with Iranian sanctions,

21  didn't you?

22  A.  I said that I did not violate the sanctions, that is

23  correct, ma'am.

24  Q.  In fact, you said you didn't understand what an economic

25  jihad was, didn't you?

1   A.  Absolutely, and I was absolutely speaking the truth as

2   well.  I did not know, as of that day, what an economic jihad

3   meant.

4   Q.  Hadn't you sent a letter to Mahmoud Ahmadinejad about

5   economic jihad and joining the fight?

6   A.  It is true that I sent a letter to Ahmadinejad, but I

7   cannot read Farsi; so I signed a little letter that was

8   provided to me, and I have never joined the fight for jihad.

9   Q.  Could we pull up Government Exhibit 901-T, please.  901-T,

10  it's in evidence.

11          Mr. Zarrab, you identified 901-T on your direct

12  examination, didn't you, sir?

13  A.  That is correct, ma'am.  That is correct.

14  Q.  But you are saying that you did not know what it said when

15  you sent it to President Ahmadinejad?

16  A.  Certainly I knew what was in there, but I did not choose

17  any specific sentences.  This was prepared and sent to me, and

18  I knew it only globally.

19  Q.  So you did not understand the concept of economic --

20  withdrawn.

21          You did not understand what economic jihad was as of

22  the time of your arrest in March of 2016?

23  A.  That is absolutely correct, but as of today, I do know what

24  it is.

25  Q.  You can take it down, please.

1    Now, you also gave a statement to the courts in

2  Turkey, didn't you, after you were arrested and charged?

3  A.  Which statement are you talking about?

4  Q.  Didn't you give a sworn statement to the Turkish courts,

5  including saying Mr. Aslan had not received bribes?

6  A.  When I was arrested?  Yes, I did.

7  Q.  And that was under oath, wasn't it, sir, in the Turkish

8  courts?

9  A.  I don't recall whether they put me under oath or not over

10  there.

11  Q.  Didn't matter to you whether you were under oath when you

12  were giving a statement to the courts in Turkey; isn't that

13  correct?

14         THE COURT:  I don't understand the question.

15         MS. FLEMING:  I'm sorry?

16         THE COURT:  I don't understand the question.

17  Q.  You don't remember whether you were under oath when you

18  gave a statement to the courts in Turkey; is that correct?

19  A.  That is correct, ma'am.

20  Q.  During the course of your proffers -- withdrawn.

21         You made a call on September 15th, 2016, to your Uncle

22  Ahad, correct, from the jail?

23  A.  I don't recall the dates, but it is true that I had made

24  many phone calls to my uncle from the jail; that is correct,

25  ma'am.

HC7PATI3                      Zarrab - Cross

1   Q.  You told your uncle that, in this country, you have to

2   admit to something you haven't done in order to become free;

3   once you admit your guilt, you become free; isn't that correct?

4   A.  That is absolutely not correct, ma'am.

5          MS. FLEMING:  Your Honor, I'd like to play a recording

6   that's in Azeri for impeachment purposes.  I have a transcript.

7          THE COURT:  Well, you said you'd be done in a half

8   hour; so you've got about four minutes left.

9          MS. FLEMING:  I'd still like to play it.

10          MR. KAMARAJU:  We're also going to object to playing

11   the recording.

12          MS. FLEMING:  Well, maybe he'll understand it.

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

HC7PATI3                         Zarrab - Cross

1            (At the side bar)

2            MS. FLEMING:  There's a recorded phone call that we

3    got the other night.  This is the English translation of it.

4    It was in Azeri.  It was hard to get a translator.  I want to

5    play it to impeach him because the translation says exactly

6    what I just talked about.

7            THE COURT:  It's a call from him?

8            MS. FLEMING:  From him to his uncle over the jail

9    system.  It's recorded.

10           MR. KAMARAJU:  The federal rules of evidence do not

11   allow the use of extrinsic evidence to impeach a witness on

12   credibility.

13           MS. FLEMING:  It's not to impeach him.  I'm going to

14   play the recording.

15           THE COURT:  You just said on the record that you were

16   going to impeach him.  I think you can ask the court reporter

17   to -- hold on -- to go back and see.

18           (Record read)

19           MS. FLEMING:  I can't speak Azeri.  I can barely say a

20   word of it.  I can't impeach him in Azeri.

21           THE COURT:  You know, as we said at the last break,

22   and as I said, really, I think you're just flailing around a

23   little bit, you know.  You said we were getting to the end.  I

24   think you should get to the goal post.

25           MS. FLEMING:  This is what I'm getting at.  I'd like

HC7PATI3                     Zarrab - Cross

1     to show it to you.  It's a pretty -- a statement:  Once you

2     admit your guilt, you become free.  Look, there is no rule --

3              THE COURT:  We all read about it in The New York Times

4     and 90 other places, and each time it was a different version

5     of it, including your time.

6              MS. FLEMING:  Well, we used what the prosecutors gave

7     us as a summary.

8              THE COURT:  Why don't you just ask him, as best you

9     can phrase the question, whether that happened or not.

10             MS. FLEMING:  I just did.  He denied it.  I have to be

11    able to I peach him with his own statement.

12             THE COURT:  Ask him whether he spoke to his uncle and

13    what did he say.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2    BY MS. FLEMING:

3    Q.  You spoke with your uncle about how you get out of jail in

4    the United States, correct?

5    A.  That is not correct, ma'am.

6    Q.  You didn't tell him that you have to admit to something you

7    haven't done in order to get free?

8    A.  That is not correct, ma'am.

9    Q.  When you were interviewed by pretrial services, you didn't

10   give them complete answers, that's correct?  In other words,

11   you did not tell the truth to pretrial, did you, sir?

12   A.  That is correct, ma'am.

13   Q.  And what you told us at the very beginning of your

14   testimony is that if you cooperated, it was the quickest way

15   that you knew of to get out of jail, correct?

16   A.  It was through cooperation, and also through fulfilling all

17   the basic elements of the agreement, which includes telling one

18   hundred percent the truth, ma'am.

19   Q.  It also includes substantial assistance in the

20   investigation and prosecution of another, doesn't it, sir?

21   A.  Giving it by reflecting the truth and giving truthful

22   information, ma'am.

23          MS. FLEMING:  Your Honor, subject to playing some

24   recordings after we have tied them up, and I don't need the

25   witness to do that, based on stipulations, I'll pass the

HC7PATI3                    Zarrab - Cross

1    witness.

2            THE COURT:  You're finished?

3            MS. FLEMING:  At this point, yes.

4            THE COURT:  Okay.  Let's take our lunch break.  It's

5    five to 1:00.  We'll pick up at 2:00.

6            (Jury not present)

7            (At the sidebar)

8            THE COURT:  So for the record, but not in front of the

9    jury, so your question, one of the last two or three questions,

10   was not accurate.  You said that he had said that the quickest

11   way out of jail was, I think, to lie about what you did.

12           MS. FLEMING:  I said "cooperate," Judge.

13           THE COURT:  No.  We'll look back there.  Your first

14   question in that line of questioning was, I thought, that the

15   quickest way out of jail, I think you said was to lie about

16   what happened.  You did.  Let's see.

17           MS. FLEMING:  If I did, I really misspoke.  I truly

18   thought I said "cooperate."

19           THE COURT:  But that's not accurate either because the

20   quote that you're referring to was to accept responsibility,

21   and you left that out in your quote.  I'm just pointing it out

22   to you, and that's why I've been objecting.  Certainly you're

23   entitled to cross-examine, but you have to be accurate when you

24   do it, and you can't be misleading, in my opinion.  So we could

25   look.

1     MS. FLEMING:  I certainly won't try to be.

2     THE COURT:  Okay.

3     (In open court)

4     (Lunch recess)

5     (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HC73ATI4

                    AFTERNOON SESSION

                       2:00 p.m.

           (In open court; jury not present)

           THE COURT:  Before we resume, I'd like to get a handle
on where we are, where the government is, and the time frame.

           MR. DENTON:  I think Mr. Kamaraju will have somewhere
less than an hour of redirect.  And then there will be the
defendant's post-arrest video, which is already in evidence,
but we'll play that for jury.

           THE COURT:  How long is that?

           MR. DENTON:  About eight minutes.  There will be a
short law enforcement witness, probably not much more than a
half an hour, and we'll start with David Cohen.  We expect he
will not finish his direct today, but we'll finish it tomorrow,
per the schedule that we discussed.

           THE COURT:  Tomorrow you think he'll finish with you,
when?

           MR. DENTON:  Probably some time in the midmorning.
Assuming we start at 9:15, I would guess probably some time
around 10:30 or 11.  And then however long Mr. Rocco needs for
cross-examination.

           THE COURT:  Right.  And then after that, do you have
any other witnesses for tomorrow?

           MR. DENTON:  No, your Honor.  That was part of the
scheduling plan that we were discussing this morning.

HC73ATI4

1          THE COURT:  Depending on the cross, do you have any

2     idea, the jury is asking how long do they think they'll be here

3     tomorrow.

4          MR. ROCCO:  Judge, I have no idea what the direct is.

5     So it would be very hard to estimate cross.  It would be a

6     substantive cross so subject -- I apologize.

7          I'll be a while with him.  It's not going to be a day.

8     Hopefully I could do it in a couple of hours, but I don't want

9     to give an estimate that I'm so uncertain.

10          THE COURT:  It sounds likely we'll be done tomorrow by

11     2.  Does that sound reasonable?

12          MR. ROCCO:  It sounds reasonable.

13          THE COURT:  And then I'm trying it figure out when you

14     think you'll rest.

15          MR. DENTON:  I think it will probably be towards the

16     later end of next week, your Honor.  My guess is either

17     Wednesday or Friday.  There is one other witness who is going

18     to be somewhat lengthy on direct and I imagine somewhat lengthy

19     on cross.  That makes it a little harder to predict.  And then

20     a number of shorter witnesses at the end.  Some of the bank

21     witnesses, a summary witness.

22          THE COURT:  When you say bank, you mean OFAC?

23          MR. DENTON:  No, U.S. bank witnesses.

24          THE COURT:  U.S. bank witnesses.  Okay.  So okay.

25     Let's resume.

HC73ATI4

1          (Jury present)

2          MS. FLEMING:  Your Honor I need to move an exhibit in

3    on redirect.  I want to move in a recording.

4          THE COURT:  Okay.  You can do it first thing.

5          MR. KAMARAJU:  We can do it at sidebar.

6          THE COURT:  Ask her.  I'm not sure what she's talking

7    about.

8          MS. FLEMING:  Let's do it later.

9          MR. KAMARAJU:  Your Honor, if we can discuss it later

10   at the sidebar that would be better.

11         THE COURT:  Is that all right?

12         MS. FLEMING:  Yes, as long as I don't waive because I

13   didn't do it before redirect.

14         THE COURT:  Please be seated everybody and we'll have

15   now redirect.

16         THE DEPUTY CLERK:  Sir, before we begin, I'd like to

17   remind you you're still under oath.

18         THE WITNESS:  Yes, ma'am.

19         THE COURT:  By "redirect" we mean questions that

20   relate to the cross.

21         MR. KAMARAJU:  Yes, your Honor.  I intend to tie

22   everything to something that was on cross.

23         May I proceed?

24         THE COURT:  Yes.

25   REDIRECT EXAMINATION

HC73ATI4                        Zarrab - Redirect

1    BY MR. KAMARAJU:

2    Q.  Good afternoon, Mr. Zarrab.

3    A.  You too as well, sir.

4    Q.  Mr. Zarrab, do you remember during cross-examination

5    defense counsel asked you about public statements you had made

6    where you said you had not violated sanctions?

7    A.  Yes, sir.

8    Q.  Did you in fact plead guilty to violating U.S. sanctions?

9    A.  Yes, sir.

10   Q.  Are you guilty of violating U.S. sanctions?

11   A.  Yes, sir, I'm guilty.

12   Q.  What did you do that made you guilty?

13   A.  Within the sanctions imposed by the embargo, I assisted the

14   Iranians to be able to make their international payments by

15   going above the limits that were set.

16   Q.  Were those limits set by the United States?

17   A.  Yes, sir.

18   Q.  Did you do that with people at Halkbank?

19   A.  Yes, sir.

20   Q.  Did you do it with Levent Balkan?

21   A.  Yes, sir.

22   Q.  Did you bribe Levant Balkan?

23   A.  Absolutely not.

24   Q.  Did you do it with Hakan Aydogan?

25   A.  Yes, sir.

1   Q.  Did you bribe him?

2   A.  Absolutely not.

3   Q.  Did you do it with Ali Fuat?

4   A.  Yes, sir.

5   Q.  Did you bribe Ali Fuat?

6   A.  Absolutely not, sir.

7   Q.  Did you do it with Hakan Atilla?

8   A.  Yes, sir.

9   Q.  Is that true even though you didn't bribe Hakan Atilla?

10  A.  I have certainly not bribed Mr. Hakan Atilla, sir.

11  Q.  I know you were asked a lot of questions on cross about

12  gold shipments and documentation.  But, ultimately, whose money

13  was being used to buy the gold?

14  A.  Iranians, sir.

15  Q.  Were any of those Iranian clients owned by the government

16  of Iran?

17  A.  Some of them, sir.

18  Q.  Can you give me an example?

19  A.  NIOC.

20  Q.  What was the point of you getting NIOC's money?

21  A.  Since they did not have access to their funds due to the

22  embargoes that were put in place by the United States of

23  America, my duty was to get their money out of Halkbank, and

24  utilize it in making their financial international payments,

25  sir.

1   Q.  Did you use NIOC's money to make international financial

2   payments?

3   A.  Yes, sir.

4   Q.  Did some of those financial payments go through U.S. banks?

5   A.  Some of them did, yes, sir.

6   Q.  What would a U.S. bank had done if it knew NIOC was

7   involved?

8            MS. FLEMING:  Objection.

9            THE COURT:  Overruled.  If you know.

10  A.  It would have returned the money to the origin where the

11  sender is, sir.

12  Q.  So it wouldn't have processed the transaction; is that

13  right?

14           THE INTERPRETER:  Could you repeat that, please?

15  Q.  So it wouldn't have processed the transaction, right?

16           THE COURT:  Would not?

17  Q.  It would not have processed the transaction.

18  A.  Yes, sir.

19  Q.  I'd like to show you Government Exhibit 304-T which is in

20  evidence.  If we could pull that up for the jury as well.

21           On page two, you see near the bottom where Aslan says,

22  "Um, there is no problem over there.  However, with regard to

23  the thing, Hakan Atilla has just informed me that there is a 70

24  million transfer thing from, um, NIOC to your account."

25           Do you see that?

1    A.  Yes, sir.

2    Q.  Did Hakan Atilla know that the source of the money was

3    NIOC?

4              MS. FLEMING:  Objection.

5              THE COURT:  If you know.

6    A.  Yes, sir.  He had notified his general manager because he

7    knew.

8    Q.  I want to talk about a timing issue that came up on cross.

9    Do you remember defense counsel asking you some questions about

10   the phrase "cikonova"?

11   A.  Yes, sir, I remember.

12   Q.  Do you remember being asked whether you had ever used that

13   phrase prior to beginning to work at Halkbank?

14   A.  Yes, sir.

15   Q.  Do you remember defense counsel showed you a call and asked

16   you to read the date off the transcript?

17   A.  Yes, sir.

18   Q.  I'd like to show you that call, Government Exhibit 201-T.

19   Is this the call you were asked about on cross-examination?

20   A.  Yes, sir.

21   Q.  Do you remember defense counsel asked you about what

22   Happani says down at the bottom, where he says "I wanted to

23   send more to cikonova and so on."  Do you remember that?

24   A.  Yes, sir.

25   Q.  Do you remember being asked about the date written on the

1    transcript, which maybe we can blow back up.

2    A.  Yes, sir.

3    Q.  What's the date written at the top?

4    A.  Based on the document that's being shown to me here, it's

5    September 19, 2012.

6    Q.  Do you remember defense counsel on cross-examination asked

7    you whether you'd only started working at Halkbank in October

8    of 2012?

9    A.  Yes, sir.

10   Q.  I'd like to show you what's been marked as Government

11   Exhibit 3734.

12           MR. KAMARAJU:  This is already in evidence so if we

13   could publish it to the jury.  If we can turn to the second

14   page, please.  Flip that around.

15   Q.  So we've looked at this before.  Do you remember that,

16   Mr. Zarrab?

17   A.  Yes, sir.

18   Q.  What is it?

19   A.  This is the moneys that were paid to Mr. Zafer Caglayan,

20   sir.

21   Q.  Where did the money come from to make those payments?

22   A.  From the commissions that I was collecting based on the

23   trade that I was conducting through -- for Iran.

24   Q.  Was that trade occurring at Halkbank?

25   A.  Yes, sir.

HC73ATI4                          Zarrab – Redirect

1   Q.  What is the date of the first payment reflected on this

2   document?

3   A.  March 19, 2012, sir.

4   Q.  So that's about seven months before the call that defense

5   counsel showed you; isn't that right?

6   A.  Yes, sir.

7   Q.  Do you remember you were asked on cross-examination about a

8   lot of different contacts that you had with Hakan Atilla?  Do

9   you remember that?

10  A.  Yes, sir.

11  Q.  Do you remember being asked questions about a meeting in

12  October of 2012 at Halkbank?

13  A.  Yes, sir.

14  Q.  Do you remember being asked as to whether it was actually

15  Levant Balkan at that meeting instead of Hakan Atilla?

16  A.  Yes, sir, I remember.

17  Q.  What was the purpose of that October 2012 meeting?

18  A.  It was a meeting where myself and Halkbank had attended,

19  along with oil ministry and NIOC people from Iran.

20  Q.  Who was there from Halkbank?

21  A.  Mr. Suleyman Aslan and Mr. Hakan Atilla.

22          MR. KAMARAJU:  Can we pull up Government Exhibit

23  205-T, please.  Just blow that up.

24  Q.  Do you remember looking at this call before?

25  A.  Yes, sir, I remember.

HC73ATI4                    Zarrab - Redirect

1    Q.   Who is this call with?

2    A.   It's Ozgur Erker and myself, sir.

3    Q.   Remind us who that is?

4    A.   He's a high-level authority with the Arap Turk Bank, sir.

5    Q.   What were you talking to Erker about during this call?

6    A.   We're talking about the transfer of money that would be

7    brought from India and Italy on behalf of the Iranians over to

8    Turkey and be transferred to the Arap Turk Bank, sir.

9    Q.   Was that the subject of the October 2012 meeting?

10   A.   Yes, sir.  It was one of the topics of that meeting.

11   Q.   What was the other topic?

12   A.   The other topic was that the Iranians wanted to be able to

13   make their payments directly from Halkbank, their international

14   payments.

15   Q.   So, directly, rather than through you?

16   A.   Yes, sir.

17   Q.   Okay.  If we can go to the bottom of page 205 -- excuse me.

18   Bottom of page two on Government Exhibit 205-T.  And do you see

19   the very last line that crosses into the next page, "Brother,

20   we talked things out with Hakan and others."

21        Do you see that?

22   A.   Yes, sir.

23   Q.   In October 2012, were you dealing with Hakan Aydogan?

24   A.   No, sir.

25   Q.   So which Hakan are you talking about here?

1    A.  Hakan Atilla, sir.

2              MR. KAMARAJU:  Go to Government Exhibit 215-T, please,

3    which is also in evidence.  And can we go to page three,

4    please.

5    Q.  Down at the bottom of the page, about the fourth block

6    up -- first of all let me ask you, who is this a call with?

7    A.  It's between myself and Mr. Levent Balkan.

8    Q.  Do you see where he says "Okay.  I -- let's talk about

9    that.  I'll also ask about the thing.  I wasn't too clear about

10   this, what was that about India the other day, brother?  I

11   think I missed that when I was on leave."

12   A.  Yes, sir.

13   Q.  What is he talking about?

14   A.  He's asking about the funds that would be brought from

15   India that was mentioned in the meeting that was held with the

16   Iranians.

17   Q.  When he says "I think I missed that when I was on leave,"

18   what does that mean?

19   A.  Mr. Levent Balkan was not at that meeting, so he's asking

20   me what that India business is.

21   Q.  Did you tell him what happened at the meeting during this

22   call?

23   A.  Yes.  Yes, sir, the rest of the transcript shows.

24   Q.  You testified on cross-examination that there came a time

25   when Levant Balkan left, right?

HC73ATI4                        Zarrab - Redirect

1   A.  That is correct, sir.

2   Q.  You were asked questions on cross-examination about the

3   role that you played in Levant Balkan leaving, right?

4   A.  Yes, sir.

5   Q.  After you were released from prison in Turkey in 2014, you

6   tried to restart your business at Halkbank, right?

7   A.  Yes, sir.

8   Q.  Was Levant Balkan at Halkbank in 2014 when you tried to do

9   that?

10  A.  No, sir, he wasn't.

11  Q.  Was Suleyman Aslan there in 2014 when you tried to restart

12  your business?

13  A.  No, sir, he wasn't.

14  Q.  Was Hakan Atilla there in 2014 when you tried to restart

15  your business?

16  A.  Yes, sir.

17  Q.  You were also asked about a number of phone calls that you

18  had in the July 2013 period.  Do you remember being asked those

19  questions?

20  A.  No, I don't know what phone conversation you're talking

21  about exactly, if it could be shown to me on the screen, then

22  it might refresh my memory.

23  Q.  Let's talk about some specific ones.  Do you remember

24  having a telephone conversation on July 1st, 2013, with

25  Suleyman Aslan about the food trade?

1    A.  I don't recall it exactly by a date, sir.  I recall a

2    conversation, but I don't recall the date.

3    Q.  Do you remember specifically what was said during that

4    conversation?

5    A.  If you could please bring it up on the screen, then I could

6    give you a more accurate answer, sir.

7                MR. KAMARAJU:  Your Honor, may I approach?

8                THE COURT:  Sure.

9    Q.  I'm showing you what's been marked for identification as

10   Government Exhibit 134.  If you could just read that to

11   yourself for a moment, please.

12               MS. FLEMING:  No English.  Your Honor, I object.  I

13   don't have an English translation of this.

14               THE COURT:  Well, there is nothing to object to for

15   the moment.

16   A.  Yes, sir.

17   Q.  Does looking at Government Exhibit 134 help refresh your

18   recollection about whether you talked to Suleyman Aslan that

19   day?

20   A.  Yes, sir.  That is based on the date that is shown on the

21   document that's being shown to me.

22   Q.  What did you talk about?

23   A.  It was about the commission for food, sir.

24   Q.  You remember you also testified about conversations during

25   that time period with Abdullah Happani?  Do you remember that?

1  A.  I've had many conversations with Abdullah Happani, sir, and

2  I don't know which one specifically is being referred to here.

3  But it is true that I have talked to Abdullah Happani many

4  times.

5  Q.  Do you remember having a conversation on July 2nd, 2013,

6  with Happani about documents that Halkbank was asking for?

7  A.  I don't remember the date exactly.  But if it is possible

8  to put the transcript on the screen, that would help me.

9           MR. KAMARAJU:  Your Honor, may I approach?

10           THE COURT:  Yes.

11  Q.  I'm showing you what's been marked for identification as

12  Government Exhibit 135.

13  A.  Yes, sir, go ahead.

14  Q.  Does Government Exhibit 135 help you remember that

15  conversation with Abdullah Happani?

16  A.  Yes, sir, I remember that.

17  Q.  What did you talk about?

18  A.  I am taking with Abdullah Happani about documents that

19  needed to be submitted to Halkbank.

20  Q.  Now, do you remember you were asked on cross-examination

21  about a conversation you had with Abdullah Happani?

22  A.  Which conversation, sir?

23  Q.  The conversation that occurred prior to your July 9, 2013,

24  conversation with Hakan Atilla.

25  A.  If possible to put it on the screen.

HC73ATI4                        Zarrab - Redirect

1    Q.  I'm asking whether you remember being asked on

2    cross-examination about that conversation.

3    A.  Yes, sir.

4    Q.  Do you remember talking to Abdullah Happani after talking

5    to Hakan Atilla?

6    A.  Afterward, after I had talked to Hakan Atilla, I would have

7    called -- I would have talked to Abdullah Happani; that would

8    be correct, sir.

9    Q.  Do you remember exactly what was said?

10   A.  No.  I cannot remember the entire thing, no.

11              MR. KAMARAJU:  Your Honor, may I approach?  Last one.

12   Q.  I am showing you what's been marked for identification as

13   Government Exhibit 126.

14   A.  Is it possible to scroll down a bit?

15   Q.  It may also be easier to look on the document.

16   A.  Yes, sir, go ahead.

17   Q.  Does that help you remember what you talked about during

18   that call?

19   A.  Yes, sir.

20   Q.  What did you talk about?

21   A.  I'm telling Mr. Abdullah Happani, based on the phone call

22   that I had received from Mr. Hakan Atilla, about them being

23   careful about the loading and the tonnage matter.  And I'm

24   saying that he had said don't do it so apparently.

25   Q.  What do you mean?

HC73ATI4                       Zarrab - Redirect

```
1   A.  I mean, he's saying that since not everybody knows at the
2   bank, don't make such mistakes.
3   Q.  Now, after July 2013, you were arrested in December; is
4   that right?
5   A.  Yes, sir.
6   Q.  Do you remember being asked on cross-examination some
7   questions about that?
8   A.  Yes, sir.
9   Q.  You were one of a number of people who were charged, right?
10  A.  Yes, sir.
11  Q.  One of the things you were charged with was bribery, right?
12  A.  Yes, sir.
13  Q.  You were charged with bribing Turkish officials, right?
14  A.  Yes, sir.
15  Q.  Did you in fact bribe Turkish officials?
16  A.  Yes, sir.
17  Q.  Do you remember defense counsel asked you on
18  cross-examination about a watch you gave Zafer Caglayan?  Do
19  you remember that?
20  A.  Yes, sir.
21  Q.  Was that a bribe?
22  A.  Yes, sir.
23  Q.  Do you remember you were asked about a piano that you gave
24  Zafer Caglayan?  Do you remember that?
25  A.  Yes, sir.
```

HC73ATI4                    Zarrab - Redirect

1    Q.  Was that a bribe?

2    A.  Yes, sir.

3    Q.  And do you remember you were asked some questions about the

4    investigation of that, that led to your arrest?  Do you

5    remember that?

6    A.  Yes, sir.

7    Q.  We've listened to a number of recordings during this trial.

8    I'm sure you remember that, right?

9    A.  Yes, sir.

10   Q.  Do those recordings capture real conversations?

11   A.  Yes, sir.

12   Q.  Do they capture actual things that were said?

13   A.  The ones that I listened to, yes, sir.

14          MR. KAMARAJU:  Can we pull up Government Exhibit

15   261-T, please.

16   Q.  Do you remember this?

17   A.  Yes, sir.

18   Q.  This was a call you had with Hakan Atilla, right?

19   A.  Yes, sir.

20   Q.  If you go to page three, you see where Atilla says "Then,

21   there is the matter with the bills of lading as you know, we

22   had talked about this with you previously."

23   A.  Yes, sir.

24   Q.  Are those real words?  Did Hakan Atilla say that?

25   A.  Based on the recording that I listened to, it is certainly

1   correct, sir.

2   Q.  Had you talked about the bill of lading issue with Hakan

3   Atilla before this call?

4   A.  Yes, sir.

5   Q.  What was the bill of lading issue that you talked about?

6   A.  It was the matter about the bills of lading related to

7   large vessels being traceable, sir.

8   Q.  Who said those bills of lading were traceable?

9   A.  Mr. Hakan Atilla.

10          MR. KAMARAJU:  Could we pull up Government Exhibit

11  1002-T and 1002.

12  Q.  Do you remember testifying about these before?

13  A.  Yes, sir.

14  Q.  Are these actual WhatsApp communications you exchanged with

15  Suleyman Aslan?

16  A.  Yes, sir.

17  Q.  Did you prepare these documents during your preparation for

18  your testimony?

19  A.  No, sir.

20  Q.  Did you actually receive a message from Suleyman Aslan

21  where he says "No we don't have a problem in the food.  Do you

22  have a problem with the method proposed by Hakan Atilla?"

23  A.  Yes, sir.

24  Q.  Is that a real WhatsApp message you received at the time?

25  A.  Yes, sir.

HC73ATI4                    Zarrab - Redirect

1  Q.  Were you cooperating in any way with the U.S. government at

2  the time you received this message?

3  A.  No, sir.

4  Q.  Is the method proposed by Hakan Atilla what you stood up

5  there and drew on that board?

6  A.  What I had drawn on the board is the method in its

7  entirety.  That included the additions that were made by Hakan

8  Atilla, sir.

9          THE COURT:  Counsel, does that have a document number

10 or an exhibit number?

11         MR. KAMARAJU:  I should identify it.  Thank you, your

12 Honor.  I was referring specifically to Government Exhibit

13 9503, which we can pull up.

14 Q.  To be clear, does Government Exhibit 9503 reflect Hakan

15 Atilla's contributions to the method?

16 A.  Yes, sir.

17 Q.  Did you ever talk with the method with Hakan Atilla?

18         THE COURT:  I'm sorry, what?

19 Q.  Did you ever discuss the method with Hakan Atilla?

20         MR. KAMARAJU:  That was a bad question, I'm sorry,

21 your Honor.

22 A.  Mr. Suleyman, Mr. Hakan and myself, yes, sir.

23 Q.  Do you remember also being asked some questions about being

24 publicly exonerated in connection with the December 2013

25 arrest?

HC73ATI4                          Zarrab - Redirect

1   A.  Yes, sir.

2   Q.  You testified that you did actually bribe Turkish officials

3   though, right?

4   A.  Yes, sir.

5   Q.  So how did you get out of those charges?

6   A.  I made payments, and partially they were bribes.

7   Q.  After you were arrested, do you remember being asked some

8   questions -- withdrawn.

9          Do you remember being asked some questions about

10  restarting your business in Turkey after you were arrested?

11  A.  Yes, sir.

12  Q.  Was Atilla at the bank at the time?

13  A.  Yes, sir.

14  Q.  Do you remember being asked on cross-examination whether

15  you had reached out to the Hakan Atilla about restarting your

16  business?  Do you remember that?

17  A.  Yes, sir.

18  Q.  Why didn't you reach out to Hakan Atilla?

19  A.  It's -- I got in contact with people that were above Hakan

20  Atilla, sir.

21          (Continued on next page)

22

23

24

25

1  Q.  And why did you do that?

2  A.  In order to start to trade again.

3  Q.  I'd like to show you what's been previously entered into

4  evidence as Government Exhibits 1270 through 1280 and the

5  corresponding translations, and I'll just hand you a hard copy.

6         MR. KAMARAJU:  If we can bring up 1270 and 12070-T on

7  the screen, that would be great.

8         Your Honor, if it's helpful, I'll provide the Court a

9  copy.

10        THE COURT:  Thank you.

11 Q.  Now, remind us, what are these?

12 A.  They are phone messaging.  They are messages.

13 Q.  And who are they with?

14 A.  These are between myself and my lawyer.

15 Q.  Okay.  And what was the general purpose of the exhibits

16 that I put in front of you?  What was the topic of

17 conversation?

18 A.  They're about starting the trade up again at Halkbank.

19 Q.  And approximately when did this occur, this conversation --

20 these conversations?

21 A.  Possibly in 2014.

22 Q.  Okay.  Do you see the sentence that starts -- I'll do it in

23 Turkish to make sure -- it starts "Damat"?

24        THE COURT:  Where are you, counsel?

25        MR. KAMARAJU:  I'm on 1270 and 1270-T.  I think it's

1    also highlighted on the screen.

2              THE INTERPRETER:  The answer was, "Yes, sir."

3    Q.  And is this a message from your lawyer?

4    A.  Yes, sir.

5    Q.  And what do you understand him to be saying here?

6    A.  He says this job should definitely be done, that someone

7    said, "This job should definitely be done."

8    Q.  Okay.  And who is the someone?

9    A.  Berat Albayrak.

10   Q.  Who is that?

11   A.  It's a minister of energy in Turkey.  During that time

12   frame, he was not the minister of energy.

13   Q.  Okay.  Do you see 1270-T?

14   A.  Yes, sir.

15   Q.  Do you know what "Damat" means in English?

16   A.  I don't know, sir.

17   Q.  Can we go to Government Exhibit 1271 and 1271-T.  Is this a

18   continuation of the private conversation?

19   A.  Yes, sir.

20   Q.  And do you see near the bottom on the English it says:

21   "...and he would meet with BB and would also summon the general

22   manager"?

23   A.  Yes, sir.

24   Q.  What do you understand him to be saying there?

25   A.  He is saying that he would meet with the prime minister and

1    that, upon calling the general manager over, that the order to

2    start would be given.

3    Q.  And who is the general manager?

4    A.  Ali Fuat Taskinoglu.

5    Q.  And if we go to the next exhibit, 1272, 1272-T, do you see

6    at the top where it says:  "The meeting and the situation will

7    be explained to BB on Saturday;" do you see that part?

8    A.  Yes, sir.

9    Q.  What did you understand him to mean by that?

10   A.  That the individual would be told on Saturday, and your old

11   system would be restarted again.

12            THE COURT:  Counsel, I know you went over this a

13   minute ago.  Who is the individual?  Who is BB?

14   A.  The prime minister, sir.

15   Q.  Now, was Ali Fuat originally resistant to the idea of you

16   restarting the business?

17   A.  Well, Mr. Ali Fuat sent me to the lower rank, and the

18   documentation that was requested by the lower rank was not

19   something that was feasible.

20   Q.  Okay.  And what kind of documentation was that?

21   A.  It was a letter of credit and many other things.  The list

22   was so long, I cannot even remember.

23   Q.  And do you remember you were asked about -- withdrawn.

24            Is that what prompted you to contact your lawyer?

25   A.  No.  I had already talked with the lawyer, and when this

```
1    turned out to be the matter, then I talked with the lawyer

2    again.

3    Q.  And what were you hoping for when you spoke with your

4    lawyer?

5    A.  I mentioned the problems that were there so that these

6    problems could be removed.

7    Q.  Okay.  Now, do you remember being asked some questions on

8    cross-examination about inspection reports?

9    A.  Yes, sir, I remember.

10   Q.  Do you remember those being raised in a -- or do you

11   remember discussing those with Suleyman Aslan in 2013?

12   A.  I don't recall the date exactly.  The exact dates, I don't

13   remember, but I do remember that I had had that conversation.

14   Q.  Now, I'd like to show -- could you please take a look at

15   what's been marked as Government Exhibit 1278.

16          And can we also bring up 1278-T.

17          Okay.  Do you see where you say -- well, let's be

18   clear.  The green messages are things that you say?

19   A.  Yes, sir.

20   Q.  Do you see where you say:  "He is lying.  He is playing

21   both sides.  He is slowly but surely coming out with the lower

22   staff as well"?

23   A.  Yes, sir.

24   Q.  What did you mean there?

25   A.  I'm explaining that Mr. Ali Fuat was saying, okay, we're
```

1    doing it, we're doing this, but he was causing this to be

2    jammed up at the lower ranks.

3    Q.  And if we could go to 1279 -- well, no, if we could stay

4    there for one second.  Do you see there where you say:  "I will

5    also submit the inspection document that he wanted"?

6    A.  Yes, sir.  I see that.

7    Q.  What inspection document were you referring to?

8    A.  I'm referring to the inspection document that would be

9    presented to the bank that Mr. Hakan Atilla had mentioned in

10   the meeting.

11   Q.  Okay.  And that meeting occurred in 2014?

12   A.  To the best of my recollection, yes, sir.

13   Q.  So even though the prospect of an inspection report had

14   been raised in 2013, Atilla was still asking for it in 2014?

15   A.  Yes, sir.

16   Q.  And if we could go to 1279 and 1279-T?

17   A.  Yes, sir.

18   Q.  And do you see at the top where it says -- where you say:

19   "Wanted an inspection document.  I will submit that as well"?

20   A.  Yes, sir.

21   Q.  And what were you referring to there?

22   A.  It's an inspection document like the one I just testified

23   about, sir.

24   Q.  Okay.  And do you see where your lawyer sends you a message

25   that says:  "But you will prevail against GM and his team, God

1    willing"?

2    A.  Yes, sir.

3    Q.  What did you understand him to mean?

4    A.  He's saying that it will get resolved.

5    Q.  And do you see --

6             THE COURT:  What does GM stand for?

7             THE WITNESS:  General manager, sir.

8             THE COURT:  And that would be who?

9             THE WITNESS:  The general manager of Halkbank, your

10   Honor.

11            THE COURT:  And who was that at this time?

12            THE WITNESS:  Ali Fuat Taskinoglu, sir.

13   BY MR. KAMARAJU:

14   Q.  And do you see further down where it says:  "His team is on

15   our side"?

16   A.  Yes, sir.

17   Q.  Who was working with Ali Fuat on restarting your business

18   from Halkbank?

19   A.  It was Mr. Hakkan Aydogan, Mr. Hakan Atilla was there,

20   Mr. Seyit Ahmet was there.

21   Q.  Do you also remember on cross-examination you were asked

22   some questions about your cooperation agreement?

23   A.  Yes, sir, I remember.

24   Q.  And I believe it was entered into evidence as a defense

25   exhibit, but not published; so could we please publish for the

```
 1    jury DX-12.  Okay.  Can we go to the last page first, please.

 2              Is that your signature there?

 3    A.  Yes, sir.

 4              MR. KAMARAJU:  Okay.  And could we turn to page 4, and

 5    the paragraph at the very bottom, the one that starts:  "It is

 6    understood that the defendant's truthful cooperation with this

 7    office."  I think actually it's the paragraph below that,

 8    Mr. Chang-Frieden.

 9              THE COURT:  It is the what?

10              MR. KAMARAJU:  And if we could go to the next page and

11    just blow up the rest of that paragraph.

12    Q.  Now, Mr. Zarrab, did you review your cooperation agreement

13    before you signed it?

14    A.  Yes, sir.

15    Q.  And what's your understanding of the government's

16    obligations with respect to your safety?

17    A.  What I understood is to ensure my safety.

18    Q.  Okay.  And does that include making an application to the

19    witness security program?

20    A.  Based on my request, if I were to make such a request, yes,

21    but I have not made such a request.

22    Q.  And has anyone promised you what types of steps would be

23    taken to ensure your safety?

24    A.  No, sir.

25    Q.  Has anyone promised you that you're going to be released
```

HC7PATI5                     Zarrab - Redirect

1    from jail after you testify?

2    A.  No, sir.

3    Q.  And do you remember you were asked some questions about --

4    withdrawn.

5          Do you remember you were asked some questions about

6    substantial assistance?

7    A.  Yes, sir.

8    Q.  Okay.  Now, what's your understanding of what it means for

9    you to give substantial assistance?

10   A.  That is giving truthful information that does not contain

11   any lies.

12   Q.  Okay.  Can we turn to page 5 of the agreement, please, and

13   it's the second full paragraph.

14          And do you see the sentence that begins:  "In

15   addition, if this office determines that the defendant has

16   provided substantial assistance..."?

17   A.  Yes, sir.

18   Q.  Do you see where it goes on to say "... and if he has fully

19   complied with the understandings specified in this agreement,

20   this office will file a motion pursuant to Section 5K1.1 of the

21   sentencing guidelines...."?

22   A.  Yes, sir.

23   Q.  What's your understanding of what this means?

24   A.  That if I fulfill all my responsibilities under the

25   cooperation, there is a letter called 5K1 will be sent to the

HC7PATI5                     Zarrab - Redirect

1      Court.

2      Q.  And what are those responsibilities?

3      A.  To tell the truth, to cooperate, and to -- and not to

4      commit any more crimes.

5      Q.  And if you do those things, what do you understand is going

6      to be in your 5K letter?

7      A.  The crimes that I have committed, the assistance that I

8      have provided, everything, good and the bad.

9      Q.  Now, is it your understanding that your 5K letter is tied

10     in any way to the outcome of this proceeding?

11     A.  Absolutely not.

12     Q.  And what's your understanding of what would happen if you

13     made up something bad about Hakan Atilla on the stand?

14     A.  That would be the worst thing that could happen in my life,

15     I think.

16     Q.  Why is that?

17     A.  I wouldn't be able to get a 5K1 letter.

18     Q.  And why is that important?

19     A.  Along with the crimes that I have committed and all the

20     good and the bad, the 5K letter would give me a chance for a

21     reasonable sentence.  And if I were to lie here, then that

22     would come as an addition to the crimes that I have committed,

23     as lying and obstruction of justice as well.

24     Q.  Now, do you remember you were asked on cross-examination

25     about when your lawyers first approached the government about

1    cooperating versus when you actually started cooperating?  Do

2    you remember that?

3              THE INTERPRETER:  Could you repeat that question,

4    please.

5    Q.  Of course.  Do you remember you were asked on

6    cross-examination about when your lawyers first approached the

7    government about you cooperating and when you actually began to

8    cooperate?

9    A.  Yes, sir.

10   Q.  Okay.  And your lawyers first approached the government

11   about cooperating in around August of 2016 or so; is that

12   right?

13   A.  I do not remember clearly that, maybe.

14   Q.  Do you remember that your lawyers first approached the

15   government about cooperating in 2016?

16   A.  Yes, sir.

17   Q.  And when did you actually begin to cooperate with the

18   government?

19   A.  So I started a few months ago.

20   Q.  And did you start after Hakan Atilla had already been

21   arrested?

22   A.  I began long after Mr. Hakan Atilla had been arrested.

23   Q.  And is Hakan Atilla the only individual you provided the

24   government with information about?

25   A.  Can we get the question one more time, please?

HC7PATI5                        Zarrab - Redirect

1   Q.  Sure.  Is Hakan Atilla the only person you provided the

2   government with information about?

3   A.  No, sir.

4   Q.  Why was there a delay in you actually beginning your

5   cooperation?

6   A.  There were two reasons, main topics.  One was that the

7   political attempts that were being made in order to come to a

8   resolution between the two countries through my lawyers, within

9   the bounds of law and justice.  And, two, is, of course, the

10  difficulties related to cooperation were obvious.

11  Q.  And what do you mean by that?

12  A.  The risks of cooperation.

13  Q.  And were those risks created because of the information --

14  some of the information you've testified about today?

15  A.  I mean, through the course of my testimony overall.

16  Q.  Now, have some of your fears been realized?

17  A.  Yes, sir.

18  Q.  Do you remember defense counsel asked you questions about

19  yachts that you owned?

20  A.  Yes, sir.

21  Q.  Do you remember she asked you questions about a luxury

22  house you owned?

23  A.  Yes, sir.

24  Q.  Do you remember she showed you pictures of you standing

25  next to large stacks of cash?

1    A.  Yes, sir.

2    Q.  To your knowledge, do you still have any of those things?

3    A.  No, sir.  They've all been seized.

4    Q.  What do you mean, they've been seized?

5    A.  All my assets were seized by the Republic of Turkey, and

6    also there were 18 or 19 people whose assets were all seized as

7    well.  And these are individuals that, some of them, I had not

8    met or I did not even know in my life.  And I mean, there are

9    some individuals there that I did not even know existed on

10   earth.  There are some individuals that I don't even know.  So

11   put me aside, there are 18 people out there whose assets were

12   all seized and all their lives.

13   Q.  What was the basis for the seizure?

14   A.  That was because of the investigation that had been

15   conducted about me.

16   Q.  What investigation?

17   A.  An espionage investigation has been opened about me.  So

18   what I'm doing here is being assessed as espionage, and it is

19   as if I had obtained all these assets based on my cooperation

20   here, and that's being projected as espionage.  I didn't

21   understand that all that well myself.

22   Q.  When did the asset seizure happen?

23   A.  The day after I showed up in court, and I mean the day

24   after I took the witness seat.

25   Q.  Do you remember defense counsel asked you questions about

```
1    how you'd been removed from the MDC and how your life was
2    better now in America?  Do you remember that?
3    A.  Yes, sir.
4    Q.  Why did that happen?
5    A.  Do you mean my removal from MDC?
6    Q.  Why were you taken out of the MDC?
7    A.  I came face to face with an individual who was trying to
8    take my life, and he had pulled a knife on me, and I was about
9    to lose my life.
10   Q.  And did that individual tell you why they pulled a knife on
11   you?
12   A.  Yes, because I was cooperating, because he said that he had
13   heard that I was cooperating, that's why he was doing it.  He
14   said that he had received instructions to kill because I was
15   cooperating.
16   Q.  Did you ask to be removed from the MDC?
17   A.  No, just to the contrary.  Up until that event, I had been
18   asking to be left at the MDC.
19   Q.  Why did you want to stay at the MDC?
20   A.  There were a few friends at MDC that I had made over time.
21   There were a few Turkish friends.  At least there were people
22   that I could speak the same language with over there.  I had
23   gotten used to that.
24   Q.  And are you concerned for your safety?
25   A.  You mean after I was threatened?
```

HC7PATI5                          Zarrab - Redirect

1    Q.   Yes.

2    A.   Of course.

3    Q.   Are you concerned about the safety of any others?

4    A.   Of course.

5    Q.   Who are you concerned about?

6    A.   My family.

7    Q.   And where are they?

8    A.   You mean right now?

9    Q.   What country are they in?

10   A.   In Turkey.

11   Q.   Do you think there's anything you could do to get the

12   threats to stop?

13   A.   It's possible that if I had not been a witness, there would

14   not have been any threats.

15   Q.   But did you choose to be a witness anyway?

16   A.   I'm here now.  Yes, sir.

17             MR. KAMARAJU:  May I have one moment, your Honor?

18             (Pause)

19             No further questions at this time, your Honor.

20             THE COURT:  Ms. Fleming, do you have any questions on

21   recross?

22             MS. FLEMING:  I do, your Honor, and there's one area I

23   think I need to clear with you before I raise it.

24             THE COURT:  Up here.  We'll take a two-minute break.

25             (Jury not present)(Continued on next page)

1            (At the side bar)

2            THE COURT:  And before you start, I think it was

3     before the lunch break you mentioned you wanted to put

4     something on the record sometime today.  It doesn't have to be

5     now, but I didn't forget and you certainly can.

6            MS. FLEMING:  We can do it later, Judge, that's fine.

7            Yes, I think that the government has just opened the

8     door to an area that I wanted to clear with the Court in terms

9     of the safety.  I've expressed to the Court before my

10    scepticism on the story about the shank, and it differs from

11    what we have in the 3500 material a little bit.  But today, in

12    the newspaper, it was reported that his cellmate of six months

13    has filed a civil lawsuit against him for repeated sexual

14    assault and abuse, which certainly would be another area and

15    mode of -- now, in the 3500 --

16            THE COURT:  Another what?

17            MS. FLEMING:  Another area or mode of be getting out

18    of the MDC, if you had, in fact, had an encounter or been

19    sexually assaulting someone.  In the 3500 material, we have

20    references to he was asked about sexual assault, which means

21    the government was aware of the allegations, didn't go into any

22    detail, and that he denied it.

23            Now, we have a lawsuit that's been filed as of today,

24    publicly about it.  We, obviously, don't have any time to

25    investigate it, and we had accepted the 3500 material.  And I'm

1    certainly not suggesting that the government didn't -- hid

2    anything, I'm not.  But I do think it's an area that they've

3    opened up now with all of these threats and why he's out of

4    jail, and I do think that --

5             THE COURT:  Whoa, whoa.  Specifically, what opened

6    what?

7             MS. FLEMING:  I think that the idea --

8             THE COURT:  What statement of the prosecution --

9             MS. FLEMING:  I think --

10            THE COURT:  Just a minute.

11            MS. FLEMING:  Okay.

12            THE COURT:  What statement of the prosecutor opens the

13   door for you to raise this topic?

14            MS. FLEMING:  I think the question of his fear in the

15   jail because somebody pulled a knife on him, and he relates it

16   to the fact that it's from Turkey, as opposed to --

17            THE COURT:  What's from Turkey?

18            MS. FLEMING:  That the threat --

19            MR. ROCCO:  The threat.

20            MS. FLEMING:  -- emanates from Turkey, as opposed to

21   perhaps the fact that somebody in jail, who's now accused him

22   of sexual abuse for six months, off and on in jail, I think

23   they --

24            MR. KAMARAJU:  First of all, a civil lawsuit filed is

25   nothing but allegations.  More importantly, the sexual assault

1    allegations happened at the MCC, prior to him being moved to

2    the MDC.  This is months ago, at this point.  So the idea that

3    there is a motive for him to get away from this person that he

4    supposedly had been sexually abusing for some period of time,

5    he was already away.  He was in a totally different jail.

6           He had been put into the SHU, which is reflected in

7    the 3500 materials, at the MCC, transferred to another facility

8    because of the bribery allegations that he has since admitted

9    to and been cross-examined about.

10          This has nothing to do with credibility.  You know,

11   it's not a determination.  If they insist on asking about it,

12   they're not allowed to bring in extrinsic evidence.  I just

13   think it's totally irrelevant, your Honor.

14          THE COURT:  I'll have to give it some thought.

15          MS. FLEMING:  And the reason I say --

16          THE COURT:  I'm skeptical.  I haven't read the

17   article.  It just was put on my desk.

18          MS. FLEMING:  And the reason I bring it up is because

19   the reference in the 3500 material to the fellow who brought

20   out the shank, and we don't have his name or information, but

21   it says he's a member of a gang.  And if somebody is sexually

22   abusing someone who is also a member of the gang, the same kind

23   of effects go where they stick up from each other.

24          THE COURT:  Where does that come from?

25          MS. FLEMING:  Judge, I don't have the allegations.  I

1     don't know.

2              THE COURT:  No, but you're making something up here.

3     That's a pretty good story.  I don't know where it comes from.

4              MS. FLEMING:  I'm an amateur today.

5              MR. ROCCO:  It might be a fantasy, your Honor, but

6     quite frankly, I think that -- and we haven't made any

7     decisions about whether we'll even do a recross.  But I think

8     it goes essentially to his motive to testify the way he's

9     testified.  Who knows who's responsible for an assault.  I

10    think we're entitled to raise --

11             THE COURT:  Now, you're confusing me because I'm not

12    following you.

13             MR. ROCCO:  The question really is what the source of

14    the threat is to him, whether the source of the threat to him

15    is emanating from Turkey or from his sexual -- his misbehavior,

16    his miss-sexual behavior in jail.

17             MR. KAMARAJU:  There's no basis to sort of tie the

18    sexual allegations that occurred in the MCC to the threat that

19    occurred in the MDC.  If you want to say, that didn't happen,

20    you didn't get threatened and ask him that question, he'll give

21    you whatever his answer is.  There's no way to say -- There's

22    no good faith basis to bring that --

23             THE COURT:  I'll think about it.

24             MR. ROCCO:  With all due respect, while we still have

25    you, your Honor, with all due respect, I think you can make

1    that argument to the jury, just like we can make our argument

2    to the jury.

3            MR. KAMARAJU:  But you still have to have a good-faith

4    basis to ask the question.

5            MR. ROCCO:  Well, I think we do.

6            THE COURT:  Okay.  Well, I'm very skeptical, frankly,

7    about this topic.  I didn't even have a chance to read the

8    article.  I don't know what it's about.  It sounds to me like

9    Page Six stuff.

10           MR. DRATEL:  Well --

11           THE COURT:  I don't want to hear anybody else on it.

12   That's what I'm thinking.  I'll look at it and give you a

13   decision.

14           MR. ROCCO:  Thank you, Judge.

15           THE COURT:  Did you want to say --

16           MS. FLEMING:  Okay.  Let me just -- I just wanted to

17   tell the Court --

18           MR. KAMARAJU:  We're going to get out, just because I

19   know you wanted to bring the jury back.  I think there's going

20   to be some discussion about this exhibit they want to enter.

21           THE COURT:  What?

22           MR. KAMARAJU:  What she was talking about introducing

23   before.

24           THE COURT:  That's something different.

25           MR. KAMARAJU:  I'm sorry.  I thought that's what you

1       were referring to.

2                   MS. FLEMING:  That's something different.  We can do

3       that after they leave.  I don't care about that because we're

4       not going to do it with him anyway; so that doesn't matter.

5                   No, what I was going to say, you said before you had

6       heard me say, I think, that I asked him a question about the

7       only way to get out of jail was to lie.  I went back and

8       checked the record with the court reporter.  I did say

9       "cooperation," not "lie" and I think when your Honor went back

10      and looked at the original transcript, what he originally said

11      on direct was that he accepted responsibility and cooperated

12      was his way to get out of jail.

13                  I think a proper question on cross-examination is to

14      say:  You wanted to get out of jail and the way to do it was to

15      cooperate.  But I did not say "lie" and I said the question

16      more artfully than I just reported it.

17                  THE COURT:  If I'm wrong, I stand corrected.

18                  MS. FLEMING:  No, no.  I just wanted to make sure

19      because, your Honor, honestly, I would never intentionally

20      misrepresent on a court, and I wanted to make sure you knew

21      that.

22                  THE COURT:  I know that.  So what I was referring to,

23      I looked at the lunch break, was this.  This is an article that

24      refers to your letter to me about the jailhouse recording,

25      which says:  "In America, in order to make it out of prison,

1  you need to admit to something you haven't committed," and the

2  attachment -- that's not your letter.  That's a news account of

3  your letter.

4          MS. FLEMING:  Right, right.

5          THE COURT:  In your attachment to the letter to me is

6  this.  This seems to be some sort of summary that the jail

7  officials made of the incident, and it says:  "Reza says, 'in

8  such a country, in order to get out -- in order to get out or

9  get a reduced sentence, you need to admit to crimes you haven't

10 committed.'"  It goes on to say:  "He once again mentions that,

11 in America, in order to make it out of prison, you need to

12 admit to something you haven't committed."

13         MS. FLEMING:  Right.

14         THE COURT:  So --

15         MS. FLEMING:  At first --

16         THE COURT:  I'm going to make those court exhibits; so

17 that's what I was referring to.

18         MS. FLEMING:  Right, but I was referring to his actual

19 testimony in the courtroom.  The trial and the press coverage

20 in this is the last thing I would be quoting from because it's

21 wild, but even our letter, we attached the actual exhibit for

22 the Court.

23         THE COURT:  And that's what I'm referring to, is the

24 exhibit that you submitted with your letter.

25         MS. FLEMING:  But that wasn't what my question was

1   based on.

2              THE COURT:  Wait, if you don't mind.

3              MS. FLEMING:  Sorry, I apologize.

4              THE COURT:  And the article that I found referred to

5   this attachment, or the substance of this attachment, and has

6   the sentence in it that says:  "In the letter, Atilla's lawyers

7   told Berman that Zarrab said on the jailhouse recording 'in

8   America, in order to make it out of prison, you need to admit

9   to something you haven't committed.'"  That's what I was

10  referring to.  If I'm wrong in the record, you have my

11  apologies, but that is what I was talking about.

12             MS. FLEMING:  I certainly don't need your apologies,

13  nor ask for them, your Honor.  I understand that.  We all --

14  but I really was looking at what his original direct

15  examination was.

16             THE COURT:  Okay.

17             MS. FLEMING:  And his direct line was -- I can pull it

18  out.  I have it on the desk.  It was -- it was something almost

19  like, I agreed to accept responsibility and cooperate to get

20  out of jail at once.  Those are almost his verbatim words, and

21  that's what I was using.

22             THE COURT:  Did your question mention that accept

23  responsibility?

24             MS. FLEMING:  No.  It's cross-examination.

25             THE COURT:  You didn't.

1          MS. FLEMING:  I said "jail" but I also didn't say "at

2    once."  I said "get out of jail."

3          THE COURT:  So now you're refreshing my recollection.

4    Remember, I said I thought the phrase, before I looked, had two

5    aspects, one was accept responsibility and the other was

6    cooperation or --

7          MS. FLEMING:  Cooperate.

8          THE COURT:  Yes.  So that is what I was referring to

9    before.  I thought you made it seem as if there was only one

10   aspect and, in fact, there was two.  And, you know, acceptance

11   of responsibility is markedly different, is pretty significant,

12   in my opinion, if that's part of the statement, so that's all.

13         MS. FLEMING:  I will note he said "yes."

14         THE COURT:  He what?

15         MS. FLEMING:  He answered it "yes."

16         THE COURT:  So okay.  Anyway, that's it.

17         MS. FLEMING:  Thank you.

18         THE COURT:  If you want to add anything to the

19   transcript, feel free.

20         MS. FLEMING:  No.

21         THE COURT:  Great.  So did you have another line of

22   inquiry that you wanted to pursue?

23         MR. ROCCO:  We're going to speak for a moment.

24         MS. FLEMING:  We're going to talk about whether I do

25   any, and if I do, it's going to be very limited.

HC7PATI5                         Zarrab - Redirect

1           The Azeri tape, we want to offer that as a prior

2      inconsistent statement and move it into evidence, but we can do

3      that later.

4           MR. DENTON:  Just to be clear, Judge, it's not a sworn

5      statement; so there is no basis for its admission.

6           THE COURT:  We're going to discuss that after the jury

7      goes home, but wait.  So you're going to meet and confer or

8      confer and tell me whether you want to do any --

9           MS. FLEMING:  Recross.

10          THE COURT:  -- recross, yes.  If you don't, we would

11     excuse the witness and who would come next?

12          MR. LOCKARD:  So then we would play about eight

13     minutes of the post-arrest video, and then Special Agent Rob

14     Tringale.

15          THE COURT:  Is that okay with you?

16          MR. ROCCO:  I think if you're going to play a portion

17     of the post-arrest video, they should play the entire thing.

18          MR. LOCKARD:  I don't think the Court wants us to.

19          THE COURT:  How long is it?

20          MR. LOCKARD:  The actual post-arrest is about eight

21     minutes, but then the tape keeps rolling while there's some

22     processing going on and trying to get the fingerprint machines

23     working.  It's 40 minutes of wasted jury time.  The actual

24     statements and questions last about eight minutes.

25          MR. ROCCO:  I think, just for the record, I think

1    that -- you want to play his demeanor.  I think the jury gets a

2    sense of who he is and what's going on, and I think in order

3    for them to really understand it, we would like the whole tape

4    played.  Play the whole thing.

5                MR. LOCKARD:  It's a lot of dead air, your Honor.

6                MR. ROCCO:  It might be.

7                THE COURT:  We don't have to do that today.  Can we

8    get the live witness, and do this on another day when maybe

9    it's raining or snowing.

10               MR. LOCKARD:  We can do that.

11               MS. FLEMING:  Probably snowing.

12               THE COURT:  All right.  Thanks.  So you're going to

13   let me know?

14               MS. FLEMING:  Give us two minutes.

15               THE COURT:  All right.

16               (Continued on next page)

17

18

19

20

21

22

23

24

25

HC7PATI5                           Zarrab - Redirect

 1              (In open court)

 2              (Recess)

 3              MS. FLEMING:  Your Honor, we're not going to go into

 4    it.  We're going to do very brief redirect, and we are not

 5    going to go into it.

 6              THE COURT:  Oh, you have recross?

 7              MS. FLEMING:  I'm sorry, recross, yes, briefly.

 8              (Jury present)

 9              THE COURT:  Okay.  Please be seated.  So Ms. Fleming

10    gets a chance to recross.  That means cross-examine based on

11    the redirect that you just heard.  So it's limited to what

12    you've just heard from government's counsel.

13              THE DEPUTY CLERK:  And, sir, before we begin again,

14    I'd like to remind you that you're still under oath.

15              THE WITNESS:  (In English)  Yes.

16              (Continued on next page)

17

18

19

20

21

22

23

24

25

1    MS. FLEMING:  May I proceed, your Honor?

2    THE COURT:  Yes.

3    RECROSS EXAMINATION

4    BY MS. FLEMING:

5    Q.  Mr. Zarrab, you were asked a question about whether on

6    cross you were asked about when you started working with

7    Halkbank.  Do you remember that question?

8    A.  Yes, ma'am.

9    Q.  Do you remember that on cross, the question was, did you

10   meet Mr. Atilla at the end of 2012?  Do you remember that?

11   A.  Yes, ma'am.

12   Q.  You also were asked about the call following -- see if I

13   can break it down.

14       You were asked about calls that you had with

15   Mr. Happani on July 9 with Mr. Atilla right before you spoke to

16   him; do you remember that?

17   A.  So, do you mean I had talked with Mr. Hakan and then I

18   talked with Mr. Happani?  Is that what you mean?

19   Q.  You had a call with Mr. Happani in which you said how are

20   we going to explain this, and then had a call with Mr. Atilla

21   right after that; do you remember that?

22   A.  Yes, ma'am, I remember that.

23   Q.  Now, the prosecutor put the transcript of Exhibit 261 up,

24   and showed you Mr. Atilla's words and your words.  Do you

25   recall that?  That was your conversation with Mr. Atilla?

Hc73ati6                        Zarrab - Recross

 1            MS. FLEMING:  Can you pull up 261, please.

 2   A.  Yes, ma'am.

 3   Q.  And he asked you what it meant.  Do you recall that?

 4   A.  What I remember is that question was not related to this.

 5   It was related to what I had said to Mr. Happani.

 6   Q.  So you told Mr. Happani not -- withdrawn.  I misunderstood.

 7   Withdrawn.

 8            You also talked about the fact that the government of

 9   Turkey has now seized your assets in Turkey, correct?

10   A.  Yes, myself, and 18 more individuals; that is correct,

11   ma'am.

12            THE INTERPRETER:  Excuse me.  I'm being given a

13   correction, so sorry.

14   A.  These 18 individuals were not people that I even knew.

15   Q.  Your testimony here is the first time that the truth that

16   you have said about what you did with Turkey and Iran has been

17   publicly aired; isn't that true?

18   A.  I did not understand the full nature of that question.

19   Q.  The first time that you have admitted in open court or in a

20   public place what you actually did and the crimes you

21   committed, was during your testimony that started last week in

22   this courtroom, correct?

23   A.  Yes, ma'am.

24   Q.  Prior to that --

25            THE COURT:  I think the record probably should reflect

1    that it occurred at the time of his plea.

2              MS. FLEMING:  It was sealed, your Honor.  My question

3    was public.

4              THE COURT:  I'm just saying.

5    Q.  So, when you pleaded guilty, you understand that that was a

6    sealed proceeding and it was not available to the public until

7    it was opened during your testimony last week, correct?

8    A.  Yes, ma'am.

9    Q.  Under your plea agreement with the United States, you had

10   already agreed to forfeit any proceeds that you had from any of

11   these crimes that you have committed, correct?

12   A.  Yes, ma'am.

13   Q.  To be clear, you are not concerned in any way about your

14   safety from Mr. Atilla, are you, sir?

15   A.  I wouldn't know what's inside Mr. Atilla's mind.  And I

16   would hope that that would not be the case.

17   Q.  You told the prosecutor on redirect that you had somebody

18   who came -- that somebody pulled a knife on you when you were

19   at the MDC and you were afraid; is that correct?

20   A.  Yes, ma'am.

21   Q.  This is at the same MDC where you had made -- withdrawn.

22              While you were in the jail, MCC or MDC, you had

23   arranged to pay for protection from other prisoners, hadn't

24   you?

25   A.  That is absolutely incorrect information.

Hc73ati6                          Zarrab - Recross

1   Q.   You paid for prisoners to sell you their telephone time,

2   correct?

3   A.   Yes, ma'am.

4   Q.   It's true that you paid for some prisoners' private lawyers

5   instead of their publicly appointed lawyers; isn't that

6   correct?

7   A.   During the time that I was in jail, during the time that I

8   was in jail, it is true that I had made a friend, and during

9   certain times that I had made payments so that this individual

10   could retain a lawyer because his legal process was hung up.

11   In order to help this individual to go on with the process, I

12   did give a loan to this person as a debt for this person to

13   pay.  He had already paid his own lawyer, and there was some

14   missing amount, and he asked me for it, and I gave that to him

15   as a loan.

16              THE COURT:  Hold on a second.  Could I just see you

17   for a minute.

18              (Continued on next page)

19

20

21

22

23

24

25

Hc73ati6                    Zarrab - Recross

1              (At the sidebar)

2              THE COURT:  This is not the individual referred to in

3    the newspaper article?

4              MS. FLEMING:  No.

5              THE COURT:  Is this somebody else?

6              MS. FLEMING:  In fact, there are a number of

7    individuals.  He only admits to one.  And I'm not going there,

8    Judge.

9              THE COURT:  I didn't think you were.

10             MS. FLEMING:  No, I'm not.

11             (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hc73ati6                         Zarrab - Recross

1              (In open court)

2     BY MS. FLEMING:

3     Q.  In addition, you had actually bribed a guard at the MCC,

4     correct?

5     A.  Yes, as I had testified earlier, it is true that I bribed a

6     guard at MCC, ma'am.

7     Q.  When you told us a few minutes ago that one of the inmates

8     at the MDC came and pulled a knife on you, you told a different

9     version of that story in the past; isn't that true, sir?

10    A.  No, there is only one version and that's the true version

11    and that's what I said.

12    Q.  Did you tell the prosecutors and the FBI on November 7 that

13    an individual had come in, he had sat down and talked to you,

14    and told you he had been contracted, that he was supposed to

15    kill you, but that you had --

16             THE COURT:  You know what?  We're now getting so far

17    in the weeds, I don't think this is helpful at all.

18             MS. FLEMING:  One last question on it.

19    Q.  You are aware, sir, that the inmate has denied that this

20    happened, correct?

21    A.  I'm just hearing about it, but that would not be a surprise

22    for me.  Of course he's going to deny it.

23    Q.  As a result of that, you were put in FBI custody, correct?

24    A.  Whether I be placed in FBI custody or custody of someone

25    else, that is all up to the government, it's not something that

Hc73ati6                         Zarrab - Recross

1    I can decide.

2    Q.  You're not in jail, are you, sir?

3              THE COURT:  Thanks very much.  Okay.  We're going to

4    excuse the witness and have the next government witness.

5              (Witness excused)

6              MR. LOCKARD:  The United States calls Special Agent

7    Robert Tringale.

8              THE DEPUTY CLERK:  Sir, if you can step up here,

9    remain standing for a moment and then raise your right hand,

10   please.

11             Do you solemnly swear that the testimony that you

12   shall give this court and jury in this issue now on trial shall

13   be the truth, the whole truth, and nothing but the truth, so

14   help you God?

15             THE WITNESS:  Yes.

16             THE DEPUTY CLERK:  Could you please state your full

17   name for the record.

18             THE WITNESS:  Robert Tringale.

19             THE DEPUTY CLERK:  Spell your last name, please.

20             THE WITNESS:  T-R-I-N-G-A-L-E.

21             THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

22   Feel free to pull up the chair and adjust the microphone.

23    ROBERT TRINGALE,

24        called as a witness by the Government,

25        having been duly sworn, testified as follows:

Hc73ati6                          Tringale – Direct

 1   DIRECT EXAMINATION

 2   BY MR. LOCKARD:

 3   Q.  Good afternoon, sir.

 4   A.  Good afternoon.

 5   Q.  Who is your employer?

 6   A.  The Federal Bureau of Investigation.

 7   Q.  What is your title?

 8   A.  Special agent.

 9   Q.  For how long have you been a special agent with the FBI?

10   A.  Just under three years.

11   Q.  Are you currently assigned to any particular squad?

12   A.  Yes.

13   Q.  What squad is that?

14   A.  The Joint Terrorism Task Force.

15   Q.  For how long have you been assigned to the Joint Terrorism

16   Task Force?

17   A.  Since April of this year.

18   Q.  Where were you assigned prior to that?

19   A.  In Iranian Counterintelligence Squad.

20   Q.  For how long were you assigned to that Iranian

21   Counterintelligence Squad?

22   A.  Approximately a year and a half.

23   Q.  What types of matters did you principally investigate while

24   you were a member of that squad?

25   A.  I worked on traditional counterintelligence investigations

1   and counterproliferation investigations.

2   Q.  In the course of your duties as special agent in the

3   Counterintelligence Squad, did you become familiar with an

4   investigation relating to the defendant, Hakan Atilla?

5   A.  Yes.

6   Q.  When did that investigation begin?

7   A.  The spring of 2013.

8   Q.  I'd like to draw your attention to March 27, 2017.  Was the

9   defendant arrested on that date?

10  A.  Yes.

11  Q.  Were you present during that arrest?

12  A.  I was, yes, I was there.

13  Q.  Were you on duty the following day, on March 28?

14  A.  Yes.

15  Q.  What were your duties on that date?

16  A.  The morning of the 28th, I assisted with taking Mr. Atilla

17  from the MCC to pretrial services for his initial appearance.

18  Q.  Specifically, where is pretrial services located?

19  A.  Here in the courthouse.

20  Q.  Were you working with anyone else on that day?

21  A.  I was, yes.

22  Q.  With whom were you working?

23  A.  Another FBI agent.

24  Q.  Can you generally describe the process of bringing an

25  arrestee to the courthouse for pretrial processing.

1    A.  Yes.  We go to the MCC and take custody of the arrested

2    person and we bring them to the courthouse here, and then we

3    check in with pretrial services and for the subject to have

4    their interview with them.

5    Q.  For approximately how long were you with the defendant at

6    the courthouse on March 28?

7    A.  It was several hours.  We had to wait a while for a

8    translator.  I'm not sure exactly how long it was.  But it was

9    pretty much most of the day.

10   Q.  During that time, did you question the defendant about his

11   offense?

12   A.  No.

13   Q.  Did the defendant say anything about his offense or his

14   arrest?

15   A.  Yes.

16   Q.  What, if anything, did he say about his arrest?

17   A.  It was general comments about how the whole thing was a

18   misunderstanding, that it wasn't possible that he had committed

19   any offenses.  Things like that.

20   Q.  Did he mention anyone?

21   A.  He asked if we knew David Cohen.

22   Q.  At that time, did you know who David Cohen was?

23   A.  No.

24   Q.  Did you have an understanding of why the defendant asked if

25   you knew David Cohen?

1   A.  It seemed that --

2               MR. ROCCO:  Objection.

3               THE COURT:  Sustained.

4               MR. LOCKARD:  Just a moment, your Honor.  No further

5   questions, your Honor.

6               THE COURT:  Any cross?

7               MR. ROCCO:  One second, your Honor.  We have no cross.

8               THE COURT:  Thanks very much.

9               (Witness excused)

10              THE COURT:  And we have another government witness, do

11  we not?

12              MR. LOCKARD:  Your Honor, the United States calls

13  David Cohen.

14              THE DEPUTY CLERK:  Sir, if you can step up here and

15  remain standing for a moment and then raise your right hand,

16  please.

17              Do you solemnly swear that the testimony that you

18  shall give this court and jury in this issue now on trial shall

19  being the truth, the whole truth, and nothing but the truth, so

20  help you God?

21              THE WITNESS:  I do.

22              THE DEPUTY CLERK:  Could you please state your full

23  name for the record.

24              THE WITNESS:  David Cohen, C-O-H-E-N.

25              THE DEPUTY CLERK:  Thank you, sir, you may be seated.

1  Feel free to pull up the chair and adjust the microphone as

2  needed.

3   DAVID COHEN,

4       called as a witness by the Government,

5       having been duly sworn, testified as follows:

6  DIRECT EXAMINATION

7  BY MR. LOCKARD:

8  Q.  Good afternoon, sir.

9  A.  Good afternoon.

10  Q.  Can I ask what is your profession?

11  A.  I'm an attorney.

12  Q.  Where do you currently work?

13  A.  The law firm of Wilmer Hale.

14  Q.  For how long have you been with Wilmer Hale?

15  A.  About three months, most recently.

16  Q.  Before most recently joining Wilmer Hale, where did you

17  work before that?

18  A.  Immediately before that, I was the deputy director of the

19  Central Intelligence Agency.

20  Q.  Generally speaking, what were your duties and

21  responsibilities as the deputy director of the CIA?

22  A.  I helped to oversee all of the agency's operations, the

23  collection, analysis, support of all the agency did.

24  Q.  For how long did you hold that position at the CIA?

25  A.  About two years.

Hc73ati6                          Cohen - Direct

1   Q.  So that puts us in approximately what time frame?

2   A.  I began in early February of 2015, and ended at the end of

3   the Obama administration, so January 20 of 2017.

4   Q.  Prior to joining the CIA in February of 2015, where did you

5   work before that?

6   A.  The Department of the Treasury.

7   Q.  During what time period did you work with the Department of

8   the Treasury on that occasion?

9   A.  So I started in March of 2009, and was there through

10  January of 2015.

11  Q.  When you started with the Treasury Department, what was

12  your first position in March of 2009?

13  A.  I was initially a nominee and then was confirmed to be the

14  assistant secretary for terrorist financing.

15  Q.  When you ended your tenure at the Treasury Department in

16  early 2015, what was your title at that point?

17  A.  At that point I was the undersecretary for terrorism and

18  financial intelligence.

19  Q.  In your role as the undersecretary for the Office of

20  Terrorism and Financial Intelligence, did you come to be

21  familiar with Halkbank?

22  A.  I did.

23  Q.  What's your understanding of what Halkbank is?

24  A.  Halkbank is a large Turkish state-owned financial

25  institution, like one of the largest banks in Turkey.

1  Q.  In your role as undersecretary for the Office of Terrorism

2  and the Financial Intelligence, did you personally communicate

3  with anyone at Halkbank?

4  A.  I did.

5  Q.  With whom did you communicate?

6  A.  I communicated with the then-CEO, essentially, Mr. Aslan; I

7  communicated with Mr. Atilla, who was the, at least at some

8  point during the time I was communicating with Halkbank,

9  essentially the deputy CEO.  Towards the end, after Mr. Aslan

10 left, there was a new CEO, and I met with him as well.

11 Q.  Before we get into those communications specifically, I'd

12 like to ask you just a little bit more about the Office of

13 Terrorism and Financial Intelligence.

14 A.  Okay.

15 Q.  Generally speaking, what does that office do?

16 A.  So that office is one of sort of three major components of

17 the Treasury Department.  Setting aside the IRS, which is

18 entirely separate.

19         Our responsibility, their responsibility, is to

20 oversee the national security portfolio of the Treasury

21 Department.  That includes all of our anti-money laundering,

22 regulatory, enforcement work, as well as our financial

23 sanctions, regulatory, and enforcement work.

24         There is also a small intelligence unit in that part

25 of Treasury, in TFI, in terrorist and financial intelligence,

1    that's an analytic unit.  They don't collect intelligence.

2    They analyze and produce financial intelligence.

3    Q.   Does the Office of Terrorism and Financial Intelligence

4    encompass any other agencies or offices, in addition to the

5    office of intelligence analysis you just mentioned?

6    A.   Yeah.  So there are four components that make up TFI.

7    There is the Office of Intelligence and Analysis that I

8    described, there is a policy office, which was the job that I

9    first had as assistant secretary was overseeing the policy

10   office.  And then there were two administrative agencies,

11   there's the Financial Crimes Enforcement Network, which is the

12   administrative agency for the anti-money laundering work, and

13   then the Office of Foreign Assets Control, or OFAC, which

14   oversees the financial sanctions programs.

15   Q.   Just to unpack that a little bit.  You said you initially

16   started out in the policy office?

17   A.   Right.

18   Q.   What do you mean by that?

19   A.   So, the job of the assistant secretary for terrorist

20   financing is to help develop the policies that the other

21   components of that part of Treasury implement.  So I would, I

22   was working on anti-money laundering policy issues that would

23   then be reflected in some of the regulations that FinCEN would

24   implement.  I worked on sanction policy issues that were then

25   reflected in some of the sanctions programs that OFAC would

1   implement.

2   Q.  Let's talk just for a second about OFAC as well.  What is

3   that agency?

4   A.  So OFAC, the Office of Foreign Assets Control, is an agency

5   that is responsible for implementing financial sanctions

6   programs.  So, all of the government's -- virtually all of the

7   government, the U.S. government financial sanctions programs

8   are created by a statute and then by executive order from the

9   president, which then gets delegated down to the Office of

10  Foreign Assets Control, to develop the regulations, to

11  investigate potential violations, and to implement as the

12  government agency of those programs.  Whether it is the Cuba

13  sanctions, the Russia sanctions, the sanctions against

14  terrorist financing, or the Iran sanctions, there is actually I

15  think as we sit here today 30 different sanctions programs that

16  OFAC implements.

17  Q.  Just to be clear, all of those agencies were within your

18  area of responsibility during the time that you were the

19  undersecretary for the Office of Terrorism and Financial

20  Intelligence?

21  A.  That's right, that's right.

22  Q.  What were your principal personal duties as the

23  undersecretary?

24  A.  There were several.  Part was to oversee the operation of

25  these administrative agencies, the FinCEN and OFAC.  The

1    directors of both FinCEN and OFAC reported to me.  So I oversaw

2    their work, I oversaw the work of the Office of Intelligence

3    and Analysis, oversaw the work of the policy shop.

4            I was the principal Treasury representative in the

5    interagency committees that would discuss and debate national

6    security policy.  So I spent a fair amount of time representing

7    the Treasury Department in meetings at the White House with

8    other national security agencies as we were working on various

9    problems around the world.

10           I spent a fair amount of time also traveling overseas

11   meeting with counterparts in other governments, as well as in

12   the private sector, particularly with other -- with banks

13   around the world, to explain to them what U.S. policy was, to

14   encourage them to work with us on the various problems that we

15   were addressing.

16   Q.  Speaking of the topic of banks, what is the principal issue

17   that you would address with foreign banks when you went out on

18   these meetings?

19   A.  Well, it varied, depending on where I was and what we, you

20   know, whether we had any concerns, essentially, with what the

21   bank was engaged in.

22           But essentially what we were trying to do was to

23   explain what our sanctions programs were, explain what our

24   anti-money laundering programs were, to encourage the foreign

25   banks to work with us, and to comply with the U.S. law,

Hc73ati6                            Cohen - Direct

1    comply -- there is also some international law that comes into

2    play here.

3            And on occasion, if we had concerns that a financial

4    institution was engaged in transactions, had account holders or

5    was otherwise operating in a way that may conflict with our

6    sanctions programs, we would raise concerns, we would make sure

7    that they understood what the laws were that we were

8    implementing.  And to the best that we could, we would share

9    with them information about the basis of our concern.

10   Q.  Among the sanctions programs that were administered and

11   implemented by the agencies within your office, was the Iran

12   sanctions program one of those sanctions programs?

13   A.  Yes, it was.

14   Q.  Is that among the sanctions programs that you would discuss

15   on these international trips?

16   A.  It was -- it was often the feature of the conversations on

17   these trips.

18   Q.  Are the Iran sanctions among the topics that you discussed

19   with Mr. Aslan, Mr. Atilla, and the other general manager that

20   you mentioned at the Halkbank?

21   A.  Yes.

22   Q.  During approximately what time period did you have

23   communications with Halkbank?

24   A.  Essentially throughout my tenure as undersecretary.  I

25   don't believe that I met with Halkbank, Halkbank executives

1   while I was assistant secretary.  I became the undersecretary

2   in early 2011, and I think essentially throughout the period

3   from 2011 through 2015, I had sort of an ongoing conversation

4   with Halkbank executives.

5   Q.  Are there a set of Iran sanctions issues that were a

6   principal focus of your discussions?

7   A.  Well, the sanctions, yeah.  By and large what we were doing

8   during that four-year period was increasing the intensity and

9   the scope of the sanctions as part of our effort to encourage

10   the Iranians to come to a negotiating table about the nuclear

11   program.  So over time, the sanctions ramped up and expanded.

12          So, we would, as we would meet with whether it was

13   Halkbank executives or other financial institutions, explain

14   what the law was.  To the extent we knew where the law was

15   heading, we would forecast things to come.

16          But we were -- depending on where we were in that

17   chronology, describing to the counterparts at these financial

18   institutions and at Halkbank, what the, you know, what the Iran

19   sanctions programs entailed at that time.

20          THE COURT:  That four-year period was when to when?

21          THE WITNESS:  For me it began in early 2011 through

22   January of 2015.

23          THE COURT:  Okay.

24   Q.  You described the sanctions as increasing in both intensity

25   and scope during that time frame.

 1   A.   Yes.

 2   Q.   Did that apply to any particular aspect of the sanctions

 3   program?

 4   A.   Sure.  I think the easiest way to describe it is in the

 5   early years of the sanctions program, what we were focused on

 6   was transactions and material going to Iran that were -- that

 7   would help them build their nuclear program.  So we were

 8   focused on making sure that, you know, the particular type of

 9   steel that is used in the centrifuge didn't go to Iran, and any

10   financial transactions that would support the trade in that

11   kind of steel was being cut off.

12          Over time, we focused more on isolating Iran and the

13   Iranian economy from the international financial sector and

14   international economy.  So then we started to focus on some of

15   the Iranian banks that were involved in facilitating some of

16   this illicit trade.

17          And over time, sort of as another step up in the

18   sanctions, focused on Iranian trade in oil, which was their

19   principal export and the principal source of revenue for the

20   Iranian government, and other -- other ways in which the

21   Iranians were trying to protect their economy essentially from

22   the efforts we were undertaking to put pressure on the Iranian

23   government as part of this -- part of what was called the

24   dual-track strategy, to put pressure on the Iranian government

25   while offering the opportunity for a negotiation over their

Hc73ati6                    Cohen - Direct

1    nuclear program.

2    Q.   During this time period you were discussing these

3    increasingly intense sanctions with Halkbank, you mentioned

4    three principal individuals that you dealt with.

5    A.   Yes.

6    Q.   Is there any one person that you dealt with most

7    frequently?

8            THE COURT:   Did you say mostly of the three?

9    Q.   Any one person that you dealt with most frequently.

10   A.   I think I dealt most frequently with Mr. Atilla.

11   Q.   How did these communications with Halkbank officers occur?

12   A.   To some extent in person.  We met in Turkey, we met on

13   occasion in Washington.  I think there were some phone calls

14   and there was also some correspondence, both by letter and by

15   e-mail.

16   Q.   In what language did your communications take place?

17   A.   English.

18           THE COURT:   English?

19           THE WITNESS:   English.

20   Q.   When you communicated in English with Halkbank officers,

21   were there Turkish translators present?

22   A.   Not typically.  I think the last meeting with the new CEO

23   took over after Mr. Aslan, my recollection is that he did not

24   speak English or didn't speak English well.  And I think

25   Mr. Atilla translated for him.  So to some extent, that

1    conversation occurred in Turkish, although not by me.  But, the

2    other -- all the other communications with Halkbank, both from

3    my side and from their side, was in English.

4              THE COURT:  Excuse me for interrupting.  Did you deal

5    with any other Turkish banks?

6              THE WITNESS:  Yes.

7              THE COURT:  You did?

8              THE WITNESS:  Oh, yeah.

9    Q.  You mentioned some meetings.  Do you recall where those

10   meetings would take place?

11   A.  So, I went to Turkey on several occasions.  And I think we

12   met both in Ankara and in Istanbul with Halkbank.  And I met

13   with other Turkish banks principally in Ankara.  But, for

14   instance the Turkish Bankers Association would meet in Istanbul

15   generally.  So it was a mix of Istanbul and Ankara.  There were

16   also meetings in Washington in my office with Halkbank.

17   Q.  Did Mr. Atilla participate in some of those meetings in

18   your office in Washington, D.C.?

19   A.  Yes.

20   Q.  In those meetings, were there other individuals from the

21   Treasury Department present as well?

22   A.  Yes.

23   Q.  During the time period that you were having the

24   communications, the meetings, the e-mails, the phone calls that

25   you were participating in, were there others at Treasury also

1   communicating with Halkbank about sanctions issues?

2   A.  Yes.

3   Q.  Do you know who principally was involved in those other

4   additional conversations?

5   A.  I think, principally, the director of OFAC, a gentleman

6   named Adam Szubin had some communications with Halkbank.

7               THE COURT:  How do you spell that?

8               THE WITNESS:  His last name is S-Z-U-B-I-N.

9   A.  And I think my deputy in the policy shop in TFI, Daniel

10  Glaser, also had some communications with Halkbank.

11              THE COURT:  Glaser?

12              THE WITNESS:  G-L-A-S-E-R.

13  Q.  In these meetings and communications you had with Halkbank

14  and in particular with Mr. Atilla, did you develop an

15  understanding of Mr. Atilla's level of understanding of

16  sanctions?

17  A.  I did.

18  Q.  Without telling us what your understanding was, what was

19  that understanding based on?

20  A.  Based on the conversations that I had with Mr. Atilla,

21  principally, I mean, there was also, as I said, some written

22  correspondence back and forth.  But the -- but the bulk of our

23  interaction was in face-to-face meetings.

24  Q.  During those meetings, would Mr. Atilla ask questions?

25  A.  Yes.

Hc73ati6                        Cohen - Direct

```
 1   Q.  And what were the nature of those questions?
 2   A.  They were typically clarifying, you know, probing
 3   questions.  You know, what these meetings often entailed was I
 4   would describe in, you know, five, 10 minutes or so, what the
 5   relevant sanctions program was that we were, you know, meeting
 6   about at that time.  If we had concerns, I would express what
 7   the concerns were.  We would share information to the extent we
 8   could about the basis for our concerns.  And then, then there
 9   was back and forth where Mr. Atilla would ask clarifying
10   questions, and he would have a conversation about the
11   sanctions.
12   Q.  Were those questions relevant to the conversation that you
13   had been having?
14   A.  Yes.
15   Q.  Did they demonstrate an understanding of the sanctions
16   issues that you had been discussing?
17   A.  I thought they did, yes.
18   Q.  Were there occasions during these discussions, these
19   meetings and phone calls, when you would ask questions of
20   Mr. Atilla?
21   A.  Yes.
22   Q.  Were his answers relevant to the questions that you had
23   asked?
24   A.  Yes.  If they weren't, I would follow up.  But they were.
25   Q.  During these meetings and communications, were there ever
```

1    attorneys present representing Halkbank?

2    A.  Not that I know of.  I mean, so just -- my meetings with

3    Mr. Atilla were not one-on-one meetings.  As I mentioned, there

4    were people from Treasury who were with me, and there was

5    always at least one or two other people from Halkbank who were

6    there.  I don't know whether they were or were not lawyers.

7    They were not introduced to me as lawyers.

8    Q.  Would it be unusual in these kinds of meetings for the bank

9    not to have legal counsel or an outside law firm present?

10   A.  Yeah, well, for -- let me, if I can break that down.

11          For a bank like Halkbank, where it was a large

12   financial institution and we had this sort of ongoing

13   relatively detailed conversation about sanctions, my

14   expectation and my belief was that they had legal counsel that

15   assisted them as they were working, as I thought, to comply

16   with the sanctions programs.

17          There were other banks that I dealt with where it was

18   pretty clear they did not have legal counsel.  But Halkbank I

19   thought did.

20   Q.  I'd like to turn to some of the topics you addressed in

21   these meetings.  Then after we go through the topics, we'll

22   start to go through some particular communications that you had

23   with the bank.

24   A.  Okay.

25   Q.  Now, one of the evolving or intensifying areas of sanctions

Hc73ati6                          Cohen - Direct

1    that you had mentioned earlier concerned the Iranian petroleum

2    industry.

3    A.  Yes.

4    Q.  Is that one of the topics you discussed with Mr. Atilla and

5    Halkbank?

6    A.  Yes.

7    Q.  Principally, what are the issues relating to the

8    petroleum-focused sanctions that you discussed with the bank in

9    your meetings?

10   A.  Well, we discussed how that sanction program developed over

11   time.  Which, you know, essentially, sort of in broad outline,

12   we put in place a regime where Iran could sell oil to a

13   purchaser, for the purchaser to be able to essentially pay for

14   that oil to Iran without the bank involved being subject to

15   U.S. sanctions.

16          The purchaser, so in this case Turkey, needed to

17   significantly reduce the amount of oil that they were

18   purchasing over time.  So essentially, the way it worked was

19   every six months, the Secretary of State would have to certify

20   that the country in question was significantly reducing the

21   amount of oil that they were purchasing from Iran.  If he did,

22   then the bank that was involved, in Turkey's case it was

23   Halkbank, that was paying Iran for that oil, could do so

24   without being subject to U.S. sanctions.

25          If the bank was not significantly re -- if the

1    country, rather, was not significantly reducing their oil

2    imports, we had then the authority to cut off that bank from

3    the United States.  That was sort of step one.

4           Step two was, and this sort of phased in over time,

5    the -- assuming all of those conditions were met and the bank

6    could pay Iran for the oil purchases without getting

7    sanctioned, the second step was the money that Iran was earning

8    for selling oil to that country could only be used to purchase

9    goods from the country to which it was selling oil.

10          So in Turkey's case, Iran selling oil to Turkey,

11   Turkey is significantly reducing over time the amount of oil

12   that it's buying.  So, the Turkish government would make

13   payments to Iran through an account at Halkbank.  The money

14   that went into the account at Halkbank for Iran could only be

15   used to buy goods from Turkey.  So they couldn't facilitate

16   trade from third countries.  It could just be trade from

17   Turkey.

18          There was some other limitations that were also part

19   of it, but that was sort of the heart of how the oil sanctions

20   worked.

21   Q.  During the time period that you were having these

22   communications with Halkbank, 2011 until about early 2015, what

23   banks in Turkey held Iranian -- the proceeds of sales of

24   Iranian oil?

25   A.  Just Halkbank.  It was the, as I understood it, the

1  designated bank by the government of Turkey to facilitate the

2  oil trade with Iran.

3          THE COURT:  When you say "significantly reduce," do

4  you mean -- were there measurements per six months in terms of

5  gallons?

6          THE WITNESS:  Yes.

7          THE COURT:  Could you give us an example?

8          THE WITNESS:  Well, the over all -- so I don't

9  remember the statistics for Turkey in particular.  But over

10  all, when we started this, Iran was exporting about two and a

11  half million barrels of oil every month.  By about a year into

12  it, they were exporting about a million barrels of oil.  So it

13  was a pretty significant reduction overall.

14  Q.  You mentioned that one of the requirements for the use of

15  the proceeds of sales of Iranian oil held at Halkbank at one

16  point involved a requirement that the money be used only to

17  purchase goods produced within Turkey?

18  A.  That's right.

19  Q.  Is that sometimes referred to as a bilateral trade

20  requirement?

21  A.  Right.

22  Q.  Did you develop an understanding of what role Halkbank

23  played in the financing of trade with Iran?

24  A.  Yeah.  So, Halkbank, because it was the bank where the

25  account was held for the payment of Iranian oil, had a

relatively sizable amount of Iranian funds.  Iran would use

that money to facilitate trade between Iran and Turkey.  And so

it was -- "it" being Halkbank, was the bank that was sort of

principally involved in the trade between Turkey and Iran.

Q.  In the sanctions that we're talking about, especially the

petroleum-focused sanctions, is there a concept known as

humanitarian trade?

A.  Yes.

Q.  What does that refer to?

A.  So, separate and apart from all of the sanction programs,

there is an exception that says, you know, we can put in

whatever sanctions we want, but humanitarian trade is exempt.

So trade in food, in medicine, and in medical devices.  There

is a Congressional statute that says trade in those categories

of goods, food, medicine and medical devices, is exempt from

the sanctions.

        So, for instance, in what I was describing before

about the bilateral trade restriction, that didn't apply to

trade in food, medicine, and medical devices.  Halkbank could

facilitate trade from a third country in baby formula going to

Turkey -- going to Iran, rather.  Could come from another

country through Turkey, to Iran.

Q.  Is that humanitarian trade exception one of the issues that

you discussed with Mr. Atilla and the other Halkbank officers?

A.  Yes.

Hc73ati6

1            MR. LOCKARD:  Your Honor, I know we're close to the

2    end of the day.  This is a relatively convenient breaking

3    point, if you're so inclined.

4            THE COURT:  Sure.  Can we impose on you to come back

5    tomorrow morning?

6            THE WITNESS:  Happy to do it.

7            THE COURT:  See you all at 9:15.  Let me talk to the

8    jury for a minute.  Thank you very much, Mr. Cohen.

9            THE WITNESS:  Thank you.

10           (Witness not present)

11           THE COURT:  We're obviously breaking for the day.

12   Long term I think the government is going to use up most of

13   next week, to the end of the week in any event.  Not all the

14   days are going to be full days because people, witnesses are

15   traveling, so some are from out of town.  It is hard to get

16   them all here so they can be one after the other.

17           I think that's going to happen tomorrow also.  So I

18   don't think we're going to have a full day tomorrow.  I don't

19   exactly know when we're going to stop, but I can't imagine that

20   it would be later than 2:30 let's say.  Somewhere around, give

21   or take five or 10 minutes.  But it won't be -- I don't think

22   it will be much more than that.  In fact, it won't be.

23           So, and there will be, I don't know exactly now which

24   days next week might be abbreviated somewhat, but as soon as I

25   have a realistic understanding of what they might be, I'll

1   share them with you.

2           So, in terms of the over all, we are very much on or

3   ahead of schedule.  So we're doing well.  And that's about it.

4           So, please don't talk to each other about the case or

5   about anyone who has anything to do with it until the end of

6   the case when you go to the jury room to deliberate.

7           Second, please don't talk with anyone else about the

8   case or about anyone who has anything to do with it until the

9   trial has ended and you've been discharged as jurors.

10          Third, please don't let anyone talk to you about the

11  case or about anyone who has anything to do with it, and if

12  someone should try and talk to you about the case, please

13  report that to Christine or me immediately.

14          You may know tomorrow Christine won't be here.

15  Someone else, Chelsea, who works for me, will fill in for her

16  just for tomorrow.

17          Fourth, don't read any news or internet stories or

18  articles or blogs or listen to any radio or TV or cable or

19  internet reports about the case or about anyone who has

20  anything to do with it.

21          And fifth, please don't do any type of research or

22  investigation about the case on your own.

23          So, thanks very much for your attentiveness, and I'll

24  see you at 9:15 tomorrow.

25          (Jury excused)

Hc73ati6

1          MS. FLEMING:  Judge, the document that we're offering,

2     let me look at the transcript tonight and I'll do it in the

3     morning.

4          THE COURT:  Is there a dispute about it?

5          MS. FLEMING:  We were going to offer it as a prior

6     inconsistent statement.  The government is going to oppose it.

7     Let me pull it all together and that will be easier.  They can

8     look at it too.

9          THE COURT:  All right.  What about that recording.

10    Are we going to do that tomorrow?

11         MS. FLEMING:  That's what I'm talking about.  Oh, I'm

12    sorry.  Different one.  Different recording.

13         THE COURT:  The video I guess.

14         MR. DENTON:  Our position is it is entirely pointless

15    to waste the jury's time.  So the government does not intend to

16    play the entire recording.  If the defense then wants to make

17    some sort of application under the rule of completeness and

18    they waste the jury's time, that's how we can proceed.

19         THE COURT:  How long is your section and how long is

20    the whole thing?

21         MR. DENTON:  The actual post-arrest interview is about

22    eight minutes of a tape that's about I think 42 minutes in

23    length.

24         THE COURT:  Great.  Okay.  So we'll talk about it in

25    the morning.

Hc73ati6

1   MS. FLEMING:  One other thing to put on the record.

2   It is not a dispute.  Which is today we agreed there are some

3   transcripts that we produced that the government wants a chance

4   to look at.  We're fine with it.  If we have disputes we'll try

5   to work them out.  But we agreed that at this point the

6   transcripts all go into evidence subject to working out -- not

7   the transcripts, the underlying recordings go in without having

8   to have played the recordings to Mr. Reza Zarrab so he could

9   identify them in front of the jury and in the other language.

10  And we'll work out with the transcripts.  I want to make sure

11  that was on the record.

12          THE COURT:  Was my assessment of the next stages and

13  days in the trial relatively accurate, based on what your

14  understanding is?

15          MR. LOCKARD:  Yes, your Honor.  I think as Mr. Denton

16  explained earlier today, I think we are on track, we think at

17  the current pace, to rest towards the middle to late of next

18  week.

19          THE COURT:  You definitely think there will be shorter

20  days next week?  All I'm saying, if it is possible to fill in

21  and finish sooner, I would much prefer that if that's feasible.

22          MR. LOCKARD:  I think tomorrow is the only scheduling

23  issue we had, and I think we worked out our other scheduling

24  issues, so we should be going continuously.

25          THE COURT:  I appreciate that.  Thanks very much.

Hc73ati6

1          MS. FLEMING:  Thank you.

2          THE COURT:  Good night.

3          (Adjourned until December 8, 2017, at 9:15 a.m.)

1                          INDEX OF EXAMINATION

2      Examination of:                               Page

3       REZA ZARRAB

4      Cross By Ms. Fleming . . . . . . . . . . . . . 971

5      Redirect By Mr. Kamaraju . . . . . . . . . .1019

6      Recross By Ms. Fleming . . . . . . . . . . .1062

7       ROBERT TRINGALE

8      Direct By Mr. Lockard . . . . . . . . . . .1069

9       DAVID COHEN

10     Direct By Mr. Lockard . . . . . . . . . . .1073

11                        GOVERNMENT EXHIBITS

12     Exhibit No.                               Received

13      4503   . . . . . . . . . . . . . . . . . . 991

14                        DEFENDANT EXHIBITS

15     Exhibit No.                               Received

16      101   . . . . . . . . . . . . . . . . . . 989

17      100   . . . . . . . . . . . . . . . . . . 990

18

19

20

21

22

23

24

25