HC83ATI1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              S4 15 Cr. 867 RMB

MEHMET HAKAN ATILLA,

            Defendant.

------------------------------x

                               December 8, 2017
                               9:15 a.m.

Before:

               HON. RICHARD M. BERMAN,

                              District Judge
                              and a jury

                      APPEARANCES

JOON H. KIM,
        United States Attorney for the
        Southern District of New York
MICHAEL D. LOCKARD,
SIDHARDHA KAMARAJU,
DAVID W. DENTON, JR.,
DEAN C. SOVOLOS,
        Assistant United States Attorneys

HC83ATI1

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
        Attorneys for defendant Atilla
BY:   VICTOR J. ROCCO, Esq.
      THOMAS ELLIOTT THORNHILL, Esq.
      – and –
FLEMING RUVOLDT, PLLC
BY:   CATHY ANN FLEMING, Esq.
      ROBERT J. FETTWEIS, Esq.
      – and –
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:   JOSHUA LEWIS DRATEL, Esq.
                Of counsel


Also Present:
      JENNIFER McREYNOLDS, Special Agent FBI
      MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
      MS. ASIYE KAY, Turkish Interpreter
      MS. SEYHAN SIRTALAN, Turkish Interpreter

1           (In open court)

2           THE COURT:  The jury is assembled and they'll be in in

3    a minute, if we could get Mr. Cohen.

4           MR. LOCKARD:  He's on his way.

5           THE COURT:  We can bring in the jury.

6           (Jury present)

7           THE COURT:  Please be seated, everybody.  We'll

8    continue with Mr. Cohen.

9           THE DEPUTY CLERK:  Mr. Cohen, I'd like to remind you

10   that you're still under oath.

11          THE WITNESS:  Thank you.

12          THE COURT:  Just a word for the jury.  I've been

13   studying my notes, because I don't want you all to get ahead of

14   me.

15          All right.  We'll continue with Mr. Cohen.

16    DAVID COHEN,

17       called as a witness by the Government,

18       having been previously sworn, testified as follows:

19   DIRECT EXAMINATION (Continued)

20   BY MR. LOCKARD:

21   Q.  Good morning, Mr. Cohen.

22   A.  Good morning.

23   Q.  So, yesterday before the evening break, we were talking a

24   little bit about the topics that you had discussed with

25   Mr. Atilla and with others at Halkbank relating to the

HC83ATI1                          Cohen - Direct

1    sanctions against Iran.  And I think, in particular, the

2    petroleum-related sanctions.

3    A.  Right.

4    Q.  I think the topic we had ended on was the humanitarian

5    trade exception to certain other regulations on the use of

6    Iranian oil proceeds.

7    A.  Right.

8    Q.  So I'd like to now talk about a slightly different part of

9    the Iranian sanctions program.

10            Did the sanctions topics that you discussed with

11   Mr. Atilla and others at Halkbank also include sanctions

12   regulations relating to gold transactions or precious metals

13   transactions?

14   A.  Yes, it did.

15   Q.  Generally speaking, over the course of your communications

16   with Mr. Atilla and others at Halkbank, what topics did you

17   discuss related to precious metals trade?

18   A.  So, over the course of the time that I had communications

19   with Halkbank and Mr. Atilla, the sanctions relating to

20   precious metals, including gold, changed.  Initially, there was

21   a requirement in an executive order that said that no one could

22   sell gold to the government of Iran or to anyone working on

23   behalf of the government of Iran.  If you did that, you were

24   subject to sanctions.  I think that came into effect in July of

25   20 -- I think 2012 if I'm correct.

1    Then in July of 2013, that provision expanded, and the
2    sanction was that any sale of any precious metals, which
3    includes gold, to anybody in Iran was subject to sanctions.  So
4    it expanded from focused on the sale of gold to the government
5    of Iran, or anybody working on behalf of the government of
6    Iran, to the sale of gold to anybody in Iran.
7    Q.  Again, over the course of your discussions with Mr. Atilla
8    and Halkbank, what particular aspects of that did you discuss
9    in those communications?
10   A.  Well, several different aspects.  First, made sure that the
11   basic requirements were understood.  And then in particular,
12   when the provision was in effect that focused on the sale of
13   gold to Iran or anybody working on behalf of the government of
14   Iran, we spent a fair amount of time talking about how the
15   Iranian government engages in deceptive practices to try to
16   evade sanctions.

17       And our concern was not that there would be some
18   direct transaction with the Central Bank of Iran or some
19   Iranian ministry, but that the Iranian government, which we
20   knew was interested in acquiring gold, would use cutouts, would
21   use front companies, would use mechanisms to hide their
22   involvement in the purchase of gold.  And how it was essential
23   that for the sanctions to operate effectively, that Halkbank,
24   and others for that matter, needed to be cognizant of how the
25   Iranian government would try to do this, and have mechanisms in

1    place to prevent it.

2              THE COURT:  Could I ask a question.  Did you surmise

3    that they were trying to evade sanctions or you knew it?

4              THE WITNESS:  We certainly knew that the Iranians were

5    constantly trying to evade our sanctions, generally.  I think I

6    probably shouldn't say more in open court on that question on

7    gold in particular.

8              THE COURT:  Okay.

9              THE WITNESS:  Okay.

10   Q.  But in terms of specifically what it is that you

11   communicated to Mr. Atilla and to others at Halkbank, did the

12   concept of Iranian evasion techniques --

13   A.  Mr. Lockard, I'm just thinking about the judge's question.

14             We knew that the Iranian government was interested in

15   acquiring gold.  We knew that the Iranian government had for

16   many years and continuously operated in a way to try to evade

17   our sanctions.  So, there was a linkage there.  Sorry.

18   Q.  Thank you for clarifying.

19             So you just described some of the discussions you had

20   about Iranian evasion techniques and interest with respect to

21   gold trade specifically.  Is that a topic you discussed,

22   evasion issues, evasion techniques, more broadly across the

23   sanctions program?

24   A.  Absolutely.

25             MR. ROCCO:  Your Honor, may we have with whom?

HC83ATI1                        Cohen - Direct

1    Q.  Specifically in your communications with Mr. Atilla and

2    others at Halkbank.

3    A.  Yes.

4               MR. ROCCO:  May we have --

5               THE COURT:  Okay.  I got it.  So, if you could reask

6    the question so counsel is satisfied and we understand.

7               MR. LOCKARD:  Certainly, your Honor.  We'll try and

8    speed through that part of it.

9               Not speed through your answers, of course.

10   Q.  Did you discuss specifically in communications with

11   Mr. Atilla issues relating to Iranian sanctions evasion

12   interest and techniques beyond just the gold scenario?

13   A.  Yes.  Repeatedly.

14   Q.  What kinds of things did you communicate to Mr. Atilla?

15   A.  Well, we communicated both the general point that the

16   Iranians engage in deceptive practices to evade the sanctions,

17   and sanctions broadly.  And we had seen that for many, many

18   years as the sanctions on -- for instance, we were talking

19   yesterday about sanctions on the weapons proliferation, the

20   nuclear weapons proliferation.

21               We would see the Iranians set up front companies, work

22   with people who had front companies that would be purporting to

23   sell furniture, when really what they were selling was the

24   speciality steel that they needed for their centrifuges.  That

25   sort of technique.

1          We've seen the Iranians use financial institutions in

2     Iran that were sort of -- they would use a nesting technique.

3     We had banks in Iran that were subject to sanctions because

4     they were either supporting Iran's nuclear program or

5     supporting Iran's terrorist activity around the world.  Those

6     banks would be nested, their transactions would be nested

7     within other banks that were not subject to sanctions, as a way

8     to try and hide the transactions that were going on.

9          There is a whole host of different techniques that we

10    discussed with Mr. Atilla at Halkbank and we discussed with

11    other banks as well.

12    Q.  Again, over the course of your discussions with Mr. Atilla,

13    did you talk about ways that the bank could attempt to combat

14    those evasion techniques?

15    A.  We did.

16    Q.  What kinds of issues did you talk about on combating

17    evasion?

18    A.  Fundamentally, the way to combat evasion is to know who

19    you're doing business with.  If you make an effort to

20    understand if your customer or the customer that is working

21    with your customer is who they purport to be, and the goods

22    that are being transacted are what they purport to be, you can,

23    in that way, combat the effort to deceive and to engage in

24    transactions or trade that are otherwise prohibited by

25    sanctions.

1    Q.  Over the course of your discussions generally, what did

2    Mr. Atilla tell you about Halkbank's efforts to do that kind of

3    due diligence and knowing their customers?

4    A.  Mr. Atilla and others from Halkbank assured us repeatedly,

5    and this was a constant topic of conversation in my engagements

6    with Halkbank.  Assured us that they had robust compliance

7    programs in place, that they made an effort to know who their

8    customers were, actually who they were, knew what their

9    customers' business was, and were confident that the

10   transactions that Halkbank was facilitating for their customers

11   were permissible transactions under the sanctions.

12   Q.  Over the course of your discussions with Mr. Atilla, did

13   you talk about the consequences of engaging in transactions

14   that were contrary to the sanctions?

15   A.  We did.

16   Q.  What did you tell Mr. Atilla, broadly speaking, on that

17   topic?

18   A.  So, I had -- again, Halkbank was not only bank that I dealt

19   with in the world, not in Turkey and elsewhere as well.  And so

20   I had developed a relatively standard set of talking points

21   that I would use in these engagements.  They would be tailored,

22   obviously, to the particular audience, but there was a general

23   theme of my presentations.

24          So on the consequences of violating sanctions, it

25   depends a little bit what the particular sanction was that we

HC83ATI1                         Cohen - Direct

were talking about.  But, and with financial institutions in

particular, I would run through the potential consequences,

which included losing their access to the United States.

So one of the most powerful threats, essentially, that

we had to foreign banks was if you engage in transactions that

violate our sanctions, we, in some circumstances, would have

the authority to cut off your access, your bank's access to the

U.S. financial system.  That's a very powerful sanction for a

bank, because if they don't have access to the U.S. financial

system, it is very difficult for the bank to continue to

operate, even in their own jurisdiction.  So that was one, was

the potential to cut off from the U.S.

A second potential consequence was in some

circumstances we could, we, the Treasury Department, could

apply a civil monetary penalty.  So a fine, essentially, on a

financial institution that violates our sanctions.

And then the third consequence, or a third

consequence, was that the basic foundation for our sanctions

programs is a statute called IEEPA, stands for the

International Economic Emergency Powers Act, that provides the

basis both for the civil penalties that could be applied, and

also criminal penalties.  So, in my sort of standard

presentation, I would also note that, you know, at the end of

the day, there are criminal penalties that underlie our

sanctions programs.

HC83ATI1                    Cohen - Direct

1   Q.  You talked about one of the consequences or potential

2   consequences of engaging in transactions that violate the

3   secondary sanctions is the restriction or loss of a

4   correspondent account in the U.S.

5            THE COURT:  Is what?

6   Q.  Restriction or loss of U.S. banking access.

7   A.  Right.

8   Q.  Were you aware of whether Halkbank had correspondent

9   accounts in the United States?

10  A.  Yes, it did.

11           MR. LOCKARD:  So, I'd like to pull up for Mr. Cohen

12  Government's Exhibit 8020.

13           Your Honor, if I may approach, I'll hand up a hard

14  copy as well.

15           THE COURT:  Okay.

16  Q.  Have you had a chance to look at what's been displayed in

17  front of you?

18  A.  Yes, I have.

19  Q.  Is that a document that you've reviewed prior to your

20  testimony today?

21  A.  It is.

22  Q.  Is it something that would be helpful in explaining your

23  testimony to the jury?

24  A.  I think so.

25           MR. LOCKARD:  Your Honor, we'd ask to publish 8020 as

1   a demonstrative.

2              THE COURT:  Sure.

3              MR. ROCCO:  No objection, your Honor.

4   Q.  So, Mr. Cohen, we've been talking about the petroleum- and

5   gold-related sanctions involving Iran that were in effect

6   during the time period of your communications with Halkbank.

7              What's shown here on the first page of Exhibit 8020?

8   A.  Well, this is a chronology of some of the key statutes and

9   executive orders that relate to the petroleum sanctions, the

10  bilateral trade restriction, and the precious metal sanctions

11  that we were talking about earlier.

12  Q.  Rather than march through these right now, as they come up,

13  throughout your testimony, we can just stop and remind the jury

14  of what they are.

15  A.  Okay.

16  Q.  But for now let's turn to the second slide.  Directing your

17  attention to March 14 of 2012.  Did you have any communications

18  with Halkbank on that day?

19  A.  My recollection is that we met in my office in Washington

20  that day with I believe Mr. Atilla and Mr. Aslan.

21  Q.  Before we start talking about the content of that meeting,

22  had you previously met Mr. Atilla and Mr. Aslan or had previous

23  communications with them?

24  A.  I'm not certain.  I may have.  I don't --

25              MR. LOCKARD:  Mr. Chang-Frieden, if we can pull up

HC83ATI1                         Cohen - Direct

1    Government's Exhibit 7002 for Mr. Cohen.

2            THE WITNESS:  Yeah.

3    Q.  Mr. Cohen, do you recognize that?

4    A.  I do.

5    Q.  How, without telling us what it is, how is it that you

6    recognize it?

7    A.  This is a letter that I received from Mr. Aslan.

8            MR. LOCKARD:  The government offers Government Exhibit

9    7002.

10           MR. ROCCO:  No objection.

11           THE COURT:  I'll allow it.

12           (Government's Exhibit 7002 received in evidence)

13           MR. LOCKARD:  If we can publish for the jury.

14   Q.  So, in this letter dated August 18, 2011, there is a

15   reference -- can you tell us who sent this letter?

16   A.  Mr. Aslan from Halkbank.

17   Q.  Can you just describe generally what is the topic that's

18   being discussed in this letter.

19   A.  The topic is, I had sent a letter on August 5 that, as I

20   recall, we were concerned about Halkbank at that point being a

21   bank that was sort of aggregating oil payments from other

22   countries to Iran.

23           So, in this instance, India is importing oil from

24   Iran.  The payment by the Indian government to Iran for that

25   oil was going to be funneled through Halkbank.

HC83ATI1                          Cohen - Direct

1              And I'm not -- I don't recall precisely what our

2     concern was in my August 5 letter.  I would be interested to

3     see that letter.  But there was -- but we were concerned about

4     Halkbank's role in that payment chain.  And Mr. Aslan was

5     addressing the concerns that we raised.  Which, based on the

6     letter, had something to do with whether it was going to be

7     dollar-denominated transactions, if they were -- so dollar

8     denominated means they were be being paid in U.S. dollars.

9              If it is being paid in U.S. dollars, the way the

10    international financial system works, is that the payment, even

11    though it's going from India to Turkey to Iran, if it is in

12    U.S. dollars, it would go through the U.S. financial system.

13    Just that's the way it works.

14             At that time, we were concerned about the use of U.S.

15    dollars, and we were concerned about the banks in Iran that

16    might be on the other end of the transaction as well.

17    Q.  At this time, did you have an understanding of how long

18    Mr. Aslan had been general manager of Halkbank?

19    A.  I don't know that I did.  I had a sense that he was the

20    general manager running the bank.  But I didn't -- I don't

21    remember knowing for how long.

22    Q.  Do you recall whether your August 5 letter was addressed to

23    Mr. Aslan or to somebody else?

24    A.  I don't.  I suspect it was addressed to Mr. Aslan because I

25    tended to correspond with the leader of whatever the bank, the

1    CEO.  But I don't know for sure.

2           THE COURT:  Generally speaking, is that something you

3    might do if you had a concern, is write somebody a letter?

4           THE WITNESS:  Right.  Particularly if we didn't have

5    an ongoing conversation, if this was sort of an initial

6    outreach, and this was relatively soon after I became the

7    undersecretary.  I had been the undersecretary for six months

8    at this point.

9           So I don't remember whether I had met Mr. Aslan

10   previously.  I know that I had visited Halkbank in 2009 on a

11   trip to Turkey, but I just don't remember whether I met

12   Mr. Aslan at that time.

13          MR. LOCKARD:  Let's look at a slightly earlier

14   communication.  Mr. Chang-Frieden, if you can pull up

15   Government Exhibit 7001 for Mr. Cohen.

16   Q.  Just focusing down on the bottom quarter of the page.  Do

17   you recognize any of the individuals to whom this communication

18   is addressed?

19   A.  I do.

20   Q.  How do you recognize those people?

21   A.  So, at this point in September 2010, I was the assistant

22   secretary.  Daniel Lawrence Glaser was my deputy, and Colleen

23   Stack worked for Danny.

24          MR. LOCKARD:  Government offers Government Exhibit

25   7001.

1    THE COURT:  I'll allow it.

2         (Government's Exhibit 7001 received in evidence)

3    Q.  Do you recognize --

4         MR. ROCCO:  Your Honor, if I may be heard on this.

5         THE COURT:  You don't need to be.  Do you have an

6    objection?

7         MR. ROCCO:  I do, your Honor.

8         THE COURT:  Overruled.

9         MR. ROCCO:  I object.

10   Q.  Do you recognize the individual who sent the e-mail?

11   A.  I do.

12   Q.  Who is that sender?

13   A.  Mr. Atilla.

14   Q.  Generally speaking, does this e-mail concern U.S. sanctions

15   programs?

16   A.  Yes.

17   Q.  Can you remind us again what was Mr. Glaser's position in

18   September of 2010 when this was sent?

19   A.  He was the deputy assistant secretary for terrorist

20   financing.  Which is a bit of a misnomer, but that was his

21   title.

22   Q.  Let's back out to again to 8020.  So, focusing in again on

23   March 14 of 2012.  Where was the meeting held?

24   A.  In my office at the Treasury Department.

25   Q.  Who were the participants in that meeting?

1   A.  As I recall, it was Mr. Atilla and Mr. Aslan.  There were

2   certainly other people from the Treasury Department who were in

3   that meeting, because I know that I never met one on one.  But,

4   sitting here right now, I can't tell you who was with me from

5   Treasury.

6   Q.  Do you remember the circumstances under which that meeting

7   came about?

8   A.  As I recall, the Halkbank executives were in Washington for

9   a meeting, the spring meetings of the International Monetary

10  Fund and the World Bank.  They happen every spring.  Lots of

11  government officials and bank executives from around the world

12  descend on Washington for these spring meetings.  And we use

13  that as an opportunity to do meetings with government officials

14  and with bank executives that we have business to transact

15  with.

16  Q.  What were the state of the petroleum-related sanctions that

17  we were just been talking about at the time of this meeting?

18  A.  So, in December 11, 2011, the NDAA was enacted.  That was

19  the significant reduction provision that we were talking about

20  yesterday.  My recollection is that did not go into effect for

21  six months, so it was -- it was not yet effective.  It had been

22  enacted, we knew what the law was, and we knew it was going to

23  go into effect I think in late June or mid June.  So, we were

24  at that point talking with bank executives and with other

25  government officials about the requirement that would soon be

1    in place to significantly reduce oil imports from Iran, with

2    the penalty being if the country didn't significantly reduce

3    their oil imports, the bank that was involved in making the

4    payments could be cut off from the United States.

5    Q.  What were the topics that you discussed with Mr. Atilla and

6    Mr. Aslan at this meeting in March?

7    A.  So we certainly talked about that, because that was top of

8    mind at that time.  I imagine we talked about other issues

9    relating to Iran sanctions.

10            MR. ROCCO:  Objection, your Honor.  "I imagined."

11            THE COURT:  Sustained.

12            THE WITNESS:  Well --

13            THE COURT:  Best you can remember.

14   A.  As best I remember, we certainly talked about the oil

15   sanctions.  I don't recall specifically the other topics of

16   conversation.  I'm confident that there were others, because we

17   had a sort of an ongoing conversation with Halkbank about a

18   variety of sanctions, including the Iran sanctions, but also

19   our counterterrorism sanctions.  And so, I'm confident we

20   addressed other issues as well but I can't specify exactly what

21   they were.

22            THE COURT:  Do you remember how long the meeting

23   lasted?

24            THE WITNESS:  Probably a 45-minute meeting or so,

25   maybe an hour.

HC83ATI1                         Cohen - Direct

1    Q.  Mr. Cohen, is there something that I can show you that

2    would refresh your recollection about what was discussed at

3    this meeting?

4    A.  Our normal practice was to make a written record of

5    meetings, whether they were in my office in Washington or when

6    I traveled.  So if there were a document that was sort of a

7    summary record of that meeting, that would help.

8               MR. LOCKARD:  Your Honor, may I approach?

9               THE COURT:  Sure.

10              THE WITNESS:  Thank you.

11              (Pause)

12              THE WITNESS:  Okay.

13   Q.  Have you had a chance to review that?

14   A.  I have.

15   Q.  Does that refresh your memory about the content of the

16   meeting on March 14, 2012?

17   A.  It does.

18              It may have been longer than 45 minutes, Judge.

19   Q.  Can you just describe generally what was discussed, and

20   then I'll ask you a couple of particular followup questions.

21   A.  Sure.  The various topics here are the ones that we talked

22   about at this meeting, so it was largely focused on oil

23   payments, both for Turkey and for other countries.  And what

24   could be used -- what use could be made, rather, of the

25   proceeds of the oil trade.  And then the general topic of the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    impact of sanctions on Iran.

2    Q.  Did the issue of what use was being made of Iranian oil

3    proceeds at Halkbank, did the topic of the use of those

4    proceeds come up in this meeting?

5    A.  Yes.

6    Q.  What, if anything, did Halkbank say about how those funds

7    were used?

8    A.  So generally, the Halkbank executives, Mr. Atilla and

9    Mr. Aslan and others, made the point that there was robust

10   trade between Turkey and Iran in a variety of goods.  They

11   share a long border, they're historic trading partners.  And

12   the, one of the things that Halkbank did was to facilitate

13   trade between Turkey and Iran.  But, as a large financial

14   institution that was engaged with trade with Iran, other

15   countries and other businesses outside of Turkey wanted to make

16   use, essentially, of Halkbank's access to the Iranian market.

17   So that Halkbank could help to facilitate transactions and

18   trade from other countries as well.

19        We talked about the humanitarian trade issue, which

20   was again sort of a constant theme of our conversations, was

21   sort of how as the sanctions expanded in scope, the effect of

22   that on Halkbank's facilitation of humanitarian trade.

23        Some more specific detailed questions as well, but

24   that's sort of the general topics.

25   Q.  Did Mr. Atilla or Mr. Aslan say anything about either

1    currency or gold relating to the Iranian oil proceeds?

2    A.   Yeah, as I recall -- just look at this.  Gold was a -- a

3    topic of conversation that came up again frequently in our

4    conversations with Halkbank.

5    Q.   If you look at the last half of the fourth paragraph on

6    page two, does that refresh your memory on that topic?

7    A.   Yeah, I'm looking at that.

8           (Pause)

9    A.   Right.  Right.  So, I do recall the conversation.  The

10   conversation involved both physical currency, bank notes, and

11   gold.  Because, for reasons I'm happy to explain, from the

12   Iranian perspective, that's something that they were trying to

13   acquire.  And we were sensitive to Iran trying to get both

14   physical currency, in particular dollars or euros, as well as

15   acquiring gold.

16   Q.   What, if anything, did Halkbank say on that topic?

17   A.   They told us that they would not -- were not allowing Iran

18   to acquire gold or bank notes from Halkbank, using the proceeds

19   that Halkbank was holding for Iran from the sale of oil.

20   Q.   We talked sort of globally speaking about discussions you

21   had with Halkbank about sanctions evasion techniques.  Is that

22   something that was discussed at this meeting?

23   A.   Yes.

24   Q.   What, if anything, did Mr. Atilla and Mr. Aslan tell you on

25   that point?

HC83ATI1                     Cohen - Direct

A.  So every time that that topic came up, we were assured

really of two fundamental things.  One was they knew that, they

understood that, that Iran would look to use deceptive

practices to evade sanctions.  And secondly, that they -- that

they had mechanisms in place at the bank to ensure that they

would detect and prevent Iranian efforts to evade the

sanctions.

Q.  Let's advance to the next slide.

          Directing your attention to early September of 2012.

Did you have any discussions with Halkbank representatives in

that time frame?

A.  I visited Turkey in early September of 2012 and visited

Halkbank's -- I actually don't remember if it was in Istanbul

or Ankara, but visited Halkbank at the time.

Q.  Looking at the regulatory context again, what if any recent

developments had there been in the sanctions relating to gold

or petroleum in Iran?

A.  So, the TRA, the Iran Threat Reduction and Syrian Human

Rights Act was enacted in August of 2012.  That was the

provision of law that brought into effect the bilateral trade

restriction, which, as we talked about yesterday, meant that

for countries that were purchasing oil from Iran, so long as

they were significantly reducing the amount of oil they were

purchasing over time, they could continue to pay Iran for that

oil without the bank involved being subject to sanctions.

HC83ATI1                    Cohen - Direct

1          And then on top of that, was this new requirement that

2     said they could -- they could pay Iran, so, receive into the

3     account that they held for Iran the proceeds of the oil trade,

4     but Iran could only use that money to facilitate trade between

5     that country and Iran.

6          So, in Turkey's situation and Halkbank's situation,

7     the money that Iran was earning from the sale of oil to Turkey

8     as Turkey was significantly reducing the amount of oil that it

9     was purchasing, that money would go into an account at

10    Halkbank.  Iran could use that money from the Halkbank account

11    just to buy goods from Turkey, not to buy goods from elsewhere

12    in the world.

13    Q.  Focusing in on your meeting with Halkbank, who were the

14    participants in this meeting in September?

15    A.  My recollection is that Mr. Atilla was one of the people

16    that I met with.  As I said I think I said yesterday, in all of

17    these meetings there were people on my side, people on their

18    side.  So it wasn't a one-on-one meeting, but Mr. Atilla was

19    the principal counterpart as I recall.

20    Q.  Generally speaking, what were the issues that were

21    discussed at the September meeting?

22    A.  Well, what we were just talking about on bilateral trade

23    restrictions was certainly part of it.  I think we -- also

24    talked about gold.  The -- I think we skipped over this, but

25    Executive Order 13622 had also been issued over the summer on

1  July 30, 2012.  That's the executive order that put into place

2  the sanction on the sale of precious metals and bank notes to

3  the government of Iran, though we also talked about that

4  provision.

5          Because that was a sanction on the sale of precious

6  metals or bank notes to the government of Iran or any person

7  acting on the government of Iran's behalf, we talked about

8  Iranian evasion techniques as a way to get around the

9  prohibition on the sale of precious metals or bank notes to

10 Iran.  So we talked about evasion.

11         And as I said just a minute ago, in every one of the

12 conversations that we had with Halkbank, they assured us that

13 they were -- that they understood the sanctions and they were

14 complying with the sanctions and had the processes and

15 procedures in place in the bank to detect and prevent sanctions

16 evasion.

17 Q.  What, if any, discussions do you recall specifically about

18 gold at this meeting?

19 A.  So, I remember that we talked about the new executive

20 order, about what it was focused on.  What was sanctioned under

21 this executive order.  "Sanctioned" meaning prohibited.  And

22 about our concerns that the Iranians would and were trying to

23 evade the sanctions.

24 Q.  Do you recall any other specific parts of that discussion?

25 A.  Nothing beyond what I've already testified to.

1          MR. LOCKARD:  Your Honor, if I may approach?

2          THE COURT:  Sure.

3          MR. LOCKARD:  I'm going to hand the witness what's

4    been marked for identification as 3505-005.

5          THE WITNESS:  Thank you.

6    Q.  Mr. Cohen, if you can just take a look at this document and

7    let me know when you've had a chance to review it.

8          (Pause)

9    A.  Okay.

10   Q.  Does that refresh your recollection about the specifics of

11   this meeting?

12   A.  It does.

13   Q.  So what, if anything, did you talk about specifically about

14   gold transactions at this meeting in September of 2012?

15   A.  As I recall, this was the first that we had heard that Halk

16   had been approached to assist in the acquisition in gold by the

17   government of Iran.

18         THE COURT:  To what?

19         THE WITNESS:  Assist in the acquisition of gold.  By

20   the government of Iran.

21   A.  So we talked about that.  We were assured by Halkbank that

22   they -- they told the government of Iran that they would not

23   assist.  And, you know, that sparked a relatively lengthy

24   conversation about the fact that Iran clearly continued to want

25   to acquire gold.  We knew that, that they would use whatever

1    means and mechanisms and deceptive practices they could devise

2    to try and acquire gold.  And Halkbank assuring us that they

3    understood that and would do everything they could to prevent

4    it.

5    Q.  During this meeting, what did Halkbank say about its due

6    diligence efforts?

7    A.  So in this meeting in --

8         MR. ROCCO:  Objection, your Honor.  Halkbank doesn't

9    speak.

10   Q.  What did Mr. Atilla say about Halkbank's due diligence

11   efforts?

12   A.  So in this meeting, and in I think every meeting, we were

13   told by Mr. Atilla and Mr. Aslan, for that matter, when

14   Mr. Aslan was speaking on behalf of Halkbank, that they had

15   both the capability and the intention to ensure that the bank

16   was not used for sanctions evasion.

17   Q.  Did Mr. Atilla describe anything relating to the specifics

18   of its due diligence documents or documentary research?

19   A.  So, I think in this meeting and in other meetings when we

20   were talking about whatever type of trade was the subject of

21   the sanctions, so this could be -- whether it's gold trade, or

22   to use the example that I've been using previously, the trade

23   in specialty steel for Iran's nuclear program.  The way to

24   ensure that, if you're a bank, that you're not facilitating

25   illicit trade, is to know who your customer is, understand what

1    their business practices are, make an effort to be informed

2    about the actual goods that are being sold.  So that includes

3    practices like getting copies of the bills of lading, the

4    commercial documents that describe the goods that are being

5    exported.  It includes doing spot checks on occasion,

6    particularly for large customers of the goods that are being

7    sold.  It is a whole host of ways that a well-functioning

8    compliance program operates.

9            And we talked to Halkbank, we talked -- this was part

10   of a conversation that we had with a number of financial

11   institutions around the world, that gave us similar assurances

12   of their both intention and capability to comply with the

13   sanctions.

14   Q.  Let's advance to the next slide.  Did you have a followup

15   communication with officers from Halkbank after the September

16   meeting?

17   A.  Yeah.  As I recall, I called Mr. Aslan to voice concerns

18   about the gold trade in particular in November.

19   Q.  What prompted you to reach out to Halkbank in November

20   after having just had a meeting in September?

21   A.  I must have read something that made me concerned that

22   the -- that there was -- that there was the risk that Halkbank

23   was facilitating trade that violated our sanctions.

24   Q.  Is there something that I can show you that might refresh

25   your recollection about the contents of that phone call?

HC83ATI1                         Cohen - Direct

1  A.  I suspect so.  If there were a record of that phone call,

2  that would help.

3        MR. LOCKARD:  May I approach, your Honor?

4        THE COURT:  Sure.

5        THE WITNESS:  Thank you.

6        (Pause)

7        MR. LOCKARD:  It is a poltergeist.

8  Q.  Mr. Cohen, if you can let me know when you've had a chance

9  to read that.

10  A.  Okay.

11  Q.  Okay?

12  A.  Hmm-hmm.

13  Q.  Does that refresh your recollection about the content of

14  your phone call with Mr. Aslan?

15  A.  It does.

16  Q.  Just specifically, when did that phone call take place?

17  A.  November 7, 2012.

18  Q.  What did you explain to Mr. Aslan was the purpose of your

19  calling him?

20  A.  So the purpose was to amplify the caution that I had

21  conveyed when I was there in September.  That was mostly having

22  to do with the fact that Halkbank was becoming increasingly the

23  only linkage between Turkey and Iran, and that as its role in

24  Turkish-Iranian trade became more prominent, and sort of

25  concentrated, that the risk that whatever bad transactions the

HC83ATI1                    Cohen - Direct

1    Iranians wanted to engage in would run through Halkbank was

2    increasing.

3              Your Honor asked me yesterday whether we had --

4              THE COURT:  Could you hold on for a second?  We're

5    going to take a two-minute break.  Okay?

6              MR. LOCKARD:  Yes, your Honor.

7              (Recess)

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (Jury present)

 2          THE COURT:  Okay.  Please be seated, everybody.

 3    Mr. Lockard could you go back a question or two.

 4          MR. LOCKARD:  Yes, your Honor.

 5    BY MR. LOCKARD:

 6    Q.  So, Mr. Cohen, we had just been talking about the

 7    November 7th, 2012, phone call with Mr. Aslan?

 8    A.  Yes.

 9    Q.  And you were describing what it is that you had described

10    to Mr. Aslan as the purpose of placing that phone call.  If you

11    could just remind us again what those purposes were, again to

12    put us back into the context?

13    A.  Sure.  As I was saying, we had seen a concentration of

14    banking relationships between Turkey and Iran at Halkbank.  The

15    Judge had asked me yesterday whether we dealt with other banks

16    in Turkey.  We had, and there were other banks that we had some

17    concerns about, and we persuaded some others to end their

18    transactional activity with Iran.

19          The effect of that was, as I said, to concentrate

20    Turkish-Iranian business in Halkbank, which increased the risk

21    that Halkbank would be the conduit for which Iran engaged in

22    its illicit transactional activity.  So the purpose of my call

23    was to, as I said, amplify the caution that I had given to

24    Halkbank when I was there in September.  That was the purpose

25    of the call.

1          THE COURT:  You called them?

2          THE WITNESS:  Yes.

3    BY MR. LOCKARD:

4    Q.  And in order to fulfill that purpose, what did you tell

5    Mr. Aslan during that call?

6    A.  Essentially what I just described, that Halk was becoming

7    increasingly the key conduit.  We, as I had in September,

8    talked about what was to be the soon-to-be effective bilateral

9    trade restriction; so it was enacted over the summer.  It was a

10   180-day phase-in before it became effective law.

11          On February 6th of 2013 it would come into effect, and

12   one of the points that we were making to Halkbank, and to

13   others around the world, was that was, in fact, the effective

14   date, and as of that date, they needed to have in place the

15   mechanism to ensure that they were in compliance with that

16   provision or else risk violating sanctions.

17   Q.  And that February 6th effective date, that pertains to the

18   bilateral trade requirement that had been enacted in August?

19   A.  That's right.

20   Q.  During that conversation, what, if anything, did Mr. Aslan

21   say to you specifically about gold transactions?

22   A.  As I recall, he raised the gold issue in this phone call.

23   We had had a conversation about gold when I was in Turkey

24   earlier that fall, and he raised this issue about the amount --

25   essentially, the amount of gold trade between Turkey and Iran

1    and their -- it was both a -- as I recall, both a comment on

2    the size of the trade and the assurance that they would comply

3    with the sanctions requirement.

4    Q.  And what, if anything, did Mr. Aslan say about the number

5    of Halkbank clients involved in the gold trade?

6    A.  So as I -- my recollection is what he told me was that

7    there was a lot of gold trade from Turkey to Iran.  I don't

8    remember him saying we had, you know, one customer who was

9    responsible for all of it.  The sense I had was that there

10   was -- that this was a robust trade between Turkey and Iran,

11   with lots of participants.

12   Q.  Okay.  Let's turn to the next slide, and I'd like to show

13   for Mr. Cohen Government's Exhibit 7005.  If you could let me

14   know when you've had a chance to take a look at that?

15   A.  I have.

16   Q.  Do you recognize that?

17   A.  I do.

18   Q.  And how do you recognize that?

19   A.  That's a letter that I sent to Mr. Aslan in December of

20   2012.

21           MR. LOCKARD:  The government offers 7005.

22           THE COURT:  I'll allow it.

23           MR. ROCCO:  No objection.

24           (Government's Exhibit 7005 received in evidence)

25           MR. LOCKARD:  And, Mr. Chang-Frieden, if you can just

HC8PATI2                          Cohen - Direct

1    zoom back out to the full letter, I think.  Thank you.

2    BY MR. LOCKARD:

3    Q.  What is the date on this letter?

4    A.  December 20th, 2012.

5    Q.  And is that your signature at the bottom?

6    A.  I'm afraid so.

7    Q.  You didn't mention any medical training in your background.

8    A.  You're not the first person to make that joke.

9    Q.  So could you just tell us what is the general topic of this

10   letter?

11   A.  It was gold.  The gold trade between Turkey and Iran was

12   the general topic.

13   Q.  Is there anything that had prompted you to write this

14   letter?

15   A.  Yes.

16   Q.  What had prompted you to write that letter?

17   A.  We saw a news report that Ali Babacan, who was the deputy

18   prime minister of Turkey at the time, had made some public

19   marks, I believe in the Trish parliament, though I'm not sure,

20   that indicated that Turkey was selling gold to the Iranian

21   government.  That was, obviously, highly concerning.

22            At this point in 2012, the executive order that had

23   come into effect over the summer that focused on the sale of

24   gold to the government of Iran was in effect, and we had seen

25   some evidence of an increase in the volume of gold being sold,

exported from Turkey to Iran.

          We saw this press report that quoted Deputy Prime

Minister Babacan, and as I said, we were very concerned about

it and wanted to make sure that Halk was aware of it and aware

of the implications of it.

Q.  So if you could, just please read the first paragraph of

your letter?

A.  Sure.  It says:  "Dear General Manager Aslan.  I hope this

letter finds you well.  I am writing to you regarding Turkish

sales of gold to Iran, an issue we have discussed several times

over the last few months.  Recent press reports quote Turkey's

Deputy Prime Minister Ali Babacan as stating that Turkey is

exporting billions of dollars' worth of gold to the government

of Iran in order to pay for Turkeys imports of oil from Iran.

In particular, Deputy Prime Minister Babacan is reported to

have said 'When Turkey buys Iranian oil, we pay for it in

Turkish Lira.  However, it is not possible for Iran to take

that money as dollars into its own country due to international

sanctions.  Therefore, when Iran cannot take this money back as

currency, they withdraw Turkish Lira and buy gold from our

market.'  The U.S. Department of the Treasury is troubled by

these reports.  We are concerned that Turkiye Halk Bankasi,

(Halkbank) may be facilitating these sales."

Q.  So, Mr. Cohen, what's your recollection of what Mr. Aslan,

or more specifically, what Mr. Atilla told you about Halkbank's

1   involvement in providing financing for gold sales to Iran and

2   whether it was related to the government of Iran?

3   A.  They, prior to this letter, assured me that they were not

4   doing that.

5   Q.  And what about after the letter?

6   A.  So after the letter, we had a series of additional

7   conversations.  I don't recall receiving a response from

8   Mr. Aslan to this letter, but we had -- there were a series of

9   other conversations that I had with Mr. Atilla and Mr. Aslan

10  after this letter where similar assurances were conveyed.

11  Q.  So if we could go back to Exhibit 8020 and advance to the

12  next slide.  So did there come a time when you met with

13  Mr. Aslan again?

14  A.  Yes.  In February of 2013, I was back in Turkey.

15  Q.  Okay.  And can you remind us what changes or developments

16  had there been in the regulatory landscape between December of

17  2012 and late February of 2013?

18  A.  There were two that were relevant.  The first was, on

19  January 2nd, the President signed the Iran Freedom and

20  Counter-Proliferation Act, IFCA.  One of the provisions from

21  IFCA was a requirement that the sale of precious metals be --

22  the prohibition -- the sanction on the sale of precious metals

23  be expanded so it wasn't focused just on the sale to the

24  government of Iran but to anybody in Iran altogether.  That was

25  enacted on January 2nd.  It also had a 180-day phase-in period;

1   so it was going to become effective on July 1st, but that law

2   had been enacted.

3           The second was that the bilateral trade restriction

4   that we've been talking about that was enacted over the summer

5   of 2012 went into effect on February 6th of 2013.

6   Q.  Okay.  And during this meeting in February, what were the

7   topics that you discussed?

8   A.  Certainly those two issues, and as I testified just a

9   moment ago, we were seeing, in trade statistics in particular,

10  an increase in the volume of gold being exported from Iran --

11  sorry, from Turkey to Iran.  Combined with the comments that we

12  were just talking about from the deputy prime minister and

13  other information, we were concerned that Halkbank was

14  facilitating the sale of gold to the government of Iran, and so

15  that was also a topic of conversation.

16  Q.  And do you remember the specifics of those discussions,

17  especially about the gold trade?

18  A.  Not in any more detail than I just testified.

19          MR. LOCKARD:  Your Honor, if I may approach.

20  Q.  It's a little lengthy; so just let me know when you've had

21  a chance to review it.

22  A.  Okay.

23          (Pause)

24          Okay.

25  Q.  And did that refresh your recollection about the contents

1  of the meeting?

2  A.  It does.

3  Q.  And just for starters, who do you recall being at that

4  meeting?

5  A.  I recall Mr. Atilla, others from Halkbank and then, you

6  know, from my side, again, there were people who were with me,

7  but I don't remember exactly who it was.

8  Q.  So turning back to gold, what, if anything, did you tell

9  Mr. Atilla about the gold issue?

10  A.  So I think this accurately reflects the conversation.  We'd

11  been having this conversation about gold now for more than a

12  year and voicing our concern and our increasing concern that

13  Iran was looking to -- was increasingly desperate, frankly, to

14  get gold, as well as get U.S. dollars as well; that the

15  Halkbank was becoming increasingly important as the conduit for

16  transactions between Turkey and Iran; that the deputy prime

17  minister had publicly proclaimed that Turkey was engaging in

18  transactions that were blatantly in violation of our sanctions;

19  that Halkbank, we knew, was -- you know, had told us that they

20  facilitated the export of gold from Turkey to Iran, assuring us

21  that it was gold sales to private Iranian purchasers, not to

22  the government of Iran.

23        We were concerned that some of these private Iranian

24  purchasers may be acting on behalf of the government of Iran;

25  that Halkbank had -- you know, Mr. Atilla and his colleagues

1  had told us that -- they were adamant about ensuring that

2  whatever transactions they were facilitating in gold to Iran

3  were to permissible purchasers and not to the government, and

4  that they had the processes in place to execute on that

5  promise.

6          So that my level of concern was quite high, and I

7  think I delivered a pretty stern warning that we were concerned

8  that the assurances that we had been provided over time were in

9  question.  I remember this meeting pretty well.

10 Q.  And what was Mr. Atilla's response to that warning?

11 A.  To reiterate the assurances that they knew who they were

12 dealing with both on the Turkish and on the Iranian side; that

13 everything they did was in compliance with our sanctions; that

14 they were committed to complying with our sanctions; and that

15 they understood -- I remember a particular discussion about the

16 increase in the volume of gold trade and being assured that it

17 was just private Iranian citizens who were buying a lot more

18 gold.  So that was sort of the substance of what Mr. Atilla

19 told us, told me.

20 Q.  Moving to another sanctions issue.  During this meeting,

21 was there discussion about the humanitarian trade, the

22 transactions for the import of food and medicine?

23 A.  Yes.

24 Q.  And what did Mr. Atilla say about humanitarian trade using

25 Halkbank funds?

1  A.  So, again, this was also a common theme in our

2  conversations, that humanitarian trade was exempt from our

3  sanctions and so trade in food, medicine, medical devices could

4  be facilitated by the bank with the funds that it had on hand,

5  whether it was trade from Turkey or from third countries; so

6  the bilateral trade restriction didn't apply to humanitarian

7  trade.

8        There was -- as part of that, there were concerns that

9  Halkbank and other banks raised about the reluctance of others

10  to engage in this trade because of fear that it was a way that

11  Iran was looking to evade sanctions by portraying something as

12  baby formula when it was some other prohibited good.  And so we

13  had some ongoing conversations about how the sanctions that

14  were in place and that were expanding intersected with the

15  carve-out for humanitarian trade.

16  Q.  And what did Mr. Atilla tell you about Halkbank's efforts

17  on that front?

18  A.  He told us that they were continuing to do this trade,

19  which I applauded them for.  It was important to me, it was

20  important to the U.S. government, more generally, that

21  humanitarian trade continue.  We were not trying to stifle

22  humanitarian trade.  So he told us that they were doing it.  He

23  raised some difficulties they were encountering in facilitating

24  that trade; again, asked questions just to make sure that he

25  understood what was permissible, what was not, but that was the

HC8PATI2                         Cohen - Direct

1    substance of it.

2    Q.  You mentioned difficulties, what were the nature of the

3    difficulties that were raised?

4    A.  So there's sort of two difficulties.  One was that the

5    amount of money that was available to facilitate humanitarian

6    trade was reducing because the funds that Halkbank was holding

7    for the Central Bank of Iran from the oil trade, that was

8    decreasing as Iran was selling less oil to Turkey.  So there

9    was less money in the Central Bank of Iran's account at

10   Halkbank.

11           That money was being used to facilitate normal trade,

12   you know, furniture and what have you from Turkey, which meant

13   that there was less money available to facilitate humanitarian

14   trade, whether from Turkey or from other countries.  So that

15   was one concern.

16           And then the other was a concern about the Iranians

17   trying to use the humanitarian trade exception as a way to

18   facilitate illicit trade, whether in steel for their nuclear

19   program, for their centrifuges, or gold or what have you.

20   Q.  And what, if anything, did Mr. Atilla say about Halkbank's

21   customers who were involved in humanitarian trade?

22   A.  He assured us that they knew who they were.  They knew the

23   goods that were being sold to Iran and that they rejected doing

24   business with businesses that they didn't feel confident that

25   they knew that it was legitimate humanitarian trade that was

1     being facilitated.

2     Q.  Now, you've also talked about discussions about sanctions

3     evasion efforts and sanction evasion techniques.  During this

4     meeting, did you have any discussions about particular

5     sanctions evasion techniques?

6     A.  Sure.  We talked about the use of front companies.  We

7     talked about the use of false shipping documents, sort of the

8     whole range, really, of the ways in which Iran would try to

9     evade sanctions.  I mean, there are only a few different

10    techniques.  There are, like, many different manifestations of

11    it, but there are only a few sort of standard techniques.

12    Q.  And in this meeting, were those examples tied to any

13    particular examples or particular factual scenarios?

14    A.  So gold trade was one of the issues where we talked about

15    these evasion techniques, and then the -- in that we were just

16    talking about humanitarian trade as well, you know, portraying

17    something as a legitimate humanitarian good when it was

18    something else entirely.

19    Q.  Are you familiar with Worri Bank and the Industrial Bank of

20    Korea?

21    A.  I am.

22              THE COURT:  What was the first bank you said?

23              MR. LOCKARD:  Worri, W-o-r-r-i, Worri Bank.

24    Q.  Did those banks come up in this conversation?

25    A.  They did.

1   Q.  And how did they come up in this conversation with

2   Mr. Atilla?

3   A.  So we were worried about Worri Bank and IBK, and we were

4   concerned about transactions that they were engaged in.  And we

5   were --

6            THE COURT:  In what country were they?

7            THE WITNESS:  South Korea.

8   A.  I'm pausing because I want to not disclose anything that's

9   classified.  We were -- we had made efforts in South Korea to

10  address our concerns with Worri Bank and IBK, and one of the

11  issues that sort of spun off from that was whether they would

12  try to use Halkbank as their entree into Iran if other

13  mechanisms and connections were cut off.

14  Q.  So if I understand your answer, there were Iran sanctions

15  evasion issues at those two South Korean banks?

16  A.  That's a more succinct way of saying it, yes.

17  Q.  So at the time of this meeting in February of 2013, had

18  there been publicly available information about what had

19  happened with those two banks?

20  A.  I don't know.  I suspect not, but I don't know for sure.

21  Q.  Were there any examples drawn from those two banks that you

22  discussed with Mr. Atilla and the other Halkbank participants

23  at this meeting?

24  A.  Yes.  As reflected here, we sort of highlighted for

25  Halkbank and Mr. Atilla, our concern that --

HC8PATI2                        Cohen - Direct

1           MR. ROCCO:  Your Honor, excuse me.  May we know if the

2    witness is reading from the document?

3           THE COURT:  Do you have an objection?

4           MR. ROCCO:  I have an objection, your Honor.

5           THE COURT:  Okay.

6           MR. ROCCO:  I object.

7           THE COURT:  Sir, his concern is that you're reading

8    from the document as opposed to remembering.

9           THE WITNESS:  Right.

10          THE COURT:  Perhaps your recollection being refreshed.

11          THE WITNESS:  Right.  The document is helping me

12   recall the conversation, which was that --

13          THE COURT:  Could you backtrack for a minute?

14          THE WITNESS:  Sure.

15          THE COURT:  I'm sure everybody understands it, except

16   me, but what was the concern about the relationship of Korea,

17   to Turkey, to Iran?

18          THE WITNESS:  We had concern that Worri Bank and the

19   Industrial Bank of Korea, IBK, were involved in transactions

20   that were violating our sanctions.

21          THE COURT:  Your sanctions against Iran.

22          THE WITNESS:  Against Iran.

23          THE COURT:  In that -- how were they doing that?

24          THE WITNESS:  I'd rather not say.

25          THE COURT:  Oh, okay.

HC8PATI2                          Cohen - Direct

1          THE WITNESS:  Okay.  I -- I'd rather not say --

2          THE COURT:  No, I understand.

3          THE WITNESS:  Okay.  But what we had accomplished,

4     essentially, was to close off the mechanism that Worri Bank and

5     IBK were using that caused us concern about the sanctions being

6     violated.  We were aware that those banks, as well as some

7     other banks around the world, seeing that Halkbank had a

8     relationship with Iran that was a robust relationship with

9     Iranian banks, would try to reestablish their relationship with

10    Iran through Halkbank.

11         THE COURT:  I see.  And Halkbank had this relationship

12    greater than other banks in Turkey?

13         THE WITNESS:  Yes.  Yes, particularly at this point.

14    As other banks in Turkey had reduced their exposure to Iran,

15    Halkbank was the principal conduit between Turkey and Iran.

16    And other banks around the world knew that, and so for Worri

17    Bank and IBK, as well as some banks in Russia and elsewhere, we

18    were concerned that they would be trying to essentially link up

19    with Halkbank as a way to get access to Iran.

20    BY MR. LOCKARD:

21    Q.  I believe that in addition to other Turkish banks stepping

22    back from the Iran business, you testified earlier that

23    Halkbank was the only bank in Turkey where the proceeds of

24    sales of Iranian oil were deposited?

25    A.  That's correct.

1    Q.  So let's return home from Turkey in February of 2013.

2    A.  Okay.

3            MR. LOCKARD:  And, Mr. Chang-Frieden, if you could

4    highlight the next line, and also if you could display for

5    Mr. Cohen Government's Exhibit 7022.

6    Q.  Okay.  Mr. Cohen, do you recognize that?

7    A.  I do.

8    Q.  And how do you recognize that?

9    A.  It's an e-mail from Mr. Atilla to me on July 1st, 2013.

10           MR. LOCKARD:  The government offers Government

11   Exhibit 7022.

12           MR. ROCCO:  No objection, your Honor.

13           THE COURT:  I'll allow it.

14           (Government's Exhibit 7022 received in evidence)

15           MR. LOCKARD:  And we ask that it be published for the

16   jury.

17           THE COURT:  Sure.

18   BY MR. LOCKARD:

19   Q.  Mr. Cohen, what's the date on this e-mail from Mr. Atilla?

20   A.  July 1, 2013.

21   Q.  And is there any significance to that date from an Iran

22   sanctions point of view?

23   A.  That's the date that IFCA, the Iran Freedom and

24   Counter-Proliferation Act, that was enacted on January 2nd,

25   went into effect.  It was 180 days later; so there were a

1    variety of provisions in that law.  One was, as I testified

2    earlier, it expanded the sanction on the sale of gold from

3    focused on sales just to the government of Iran, to the sale of

4    gold to anybody in Iran.

5    Q.  And it's a short e-mail.  If you could please read it for

6    the jury?

7    A.  "Dear Mr. Cohen.  In accordance with the related provision

8    of the National Defense Authorization Act for fiscal year 2013,

9    entered into force on 1 July 2013, we would like to inform you

10   that we, as Turkey Halk Bankasi AS, stopped mediating the

11   transactions of exporters related to the trade of precious

12   metals with Iran as of 10 June 2013.  Respectfully submitted

13   for your information.  Best regards, M. Hakan Atilla, Deputy

14   General Manager, Halkbank."

15   Q.  After this e-mail, did you have any further discussions

16   with Mr. Atilla, or anyone else at Halkbank, about gold

17   transactions with Iran?

18   A.  I believe so, yes.

19   Q.  We will leave this July 1st e-mail aside for now, and if we

20   could go back to 8020.  If we can advance one more, and also

21   display for Mr. Cohen Government's Exhibit 7011.

22          Mr. Cohen, do you recognize that?

23   A.  I do.

24   Q.  And how do you recognize this?

25   A.  It's an e-mail from Mr. Atilla to me in October 2013.

1          MR. LOCKARD:  The government offers Exhibit 7011.

2          MR. ROCCO:  No objection.

3          THE COURT:  I'll allow it.

4          (Government's Exhibit 7011 received in evidence)

5          MR. LOCKARD:  And ask that it be published to the

6     jury.

7     BY MR. LOCKARD:

8     Q.  So, Mr. Cohen, what is the date on this e-mail from

9     Mr. Atilla?

10    A.  October 26th, 2013.

11    Q.  And it's to you and cc'd to Mr. Aslan?

12    A.  That's correct.

13    Q.  So we'll talk about a couple particular parts of it, but

14    overall, what is the general topic of this e-mail from

15    Mr. Atilla?

16    A.  The oil trade with Iran and how Halk was handling the funds

17    that -- in the Central Bank of Iran account at Halkbank into

18    which the proceeds of the oil trade were deposited.

19    Q.  And what specific issues did Mr. Atilla raise with you

20    about that account that held those oil proceeds?

21    A.  Essentially, that the account was reducing in value because

22    Iran was selling less oil to Turkey.  Turkey was purchasing

23    less oil from Iran, as they were required to do by the

24    significant reduction requirements, and that as a result, Halk

25    was using those funds to facilitate trade from Turkey in

HC8PATI2                    Cohen - Direct

 1  permissible goods, which meant that there was less money

 2  available to facilitate humanitarian trade from Turkey or from

 3  elsewhere.

 4          MR. LOCKARD:  And, Mr. Chang-Frieden, if you could

 5  just highlight or call out the sentence below the first two

 6  bullet points.

 7  Q.  And, Mr. Cohen, could you tell us what Mr. Atilla says in

 8  this sentence?

 9  A.  Well, he says:  "In addition to the above-mentioned

10  decrease of funds, there has been a continuously increasing

11  transaction demand related to the sale of humanitarian need

12  items (food, medicine, medical devices and agricultural

13  commodities) to Iran."

14  Q.  And if you could please continue with the next sentence,

15  that of Mr. Atilla's e-mail?

16  A.  "As a consequence, the funds kept in special purpose

17  account of CBI became insufficient to cover all

18  humanitarian-purpose-related transactions and Halkbank needed

19  to stop mediating transactions of foreign companies

20  (established under the jurisdiction of foreign countries) on

21  14th October 2013.  This unavoidable change in Halkbank

22  internal policy caused reactions by both foreign companies,

23  including U.S. originated global-market-dominant companies and

24  Iranian civilians."

25  Q.  And so having spelled out that Halkbank is no longer

1  intermediating humanitarian trade for non-Turkish companies,

2  what did Mr. Atilla ask of you and the Treasury Department?

3  A.  They essentially wanted permission to take in additional

4  funds into this special purpose account that they had

5  established for the Central Bank of Iran from other banks

6  around the world.  So as I understood this, what they were

7  asking was if Iran is selling oil to Korea, for instance, that

8  instead of the payment for that oil being kept in a special

9  purpose account in a Korean bank and just to be used to

10 facilitate bilateral trade from Korea or humanitarian trade,

11 that the funds from Korea could be deposited into the account

12 in Turkey and that they could use those funds to facilitate

13 humanitarian trade worldwide.

14 Q.  Could we just turn briefly to the second page of this

15 e-mail.  The e-mail has a couple of footnotes.  Do you

16 recognize, not specifically, but generally what those footnotes

17 are referring to?

18 A.  Yes.

19 Q.  And what are they referring to generally?

20 A.  So the Office of Foreign Assets Control published

21 frequently asked questions and answers on its website for all

22 of our sanctions programs, including the Iran sanctions

23 programs.  The purpose of it is there were frequently asked

24 questions from banks and businesses around the world and the

25 United States that had questions about how the sanctions

1  operated.

2          They would publish the question and the answer as

3  guidance to help explain how the sanctions operated.  And so

4  the first footnote refers to FAQ No. 259, and the second one

5  referring to FAQ No. 254.  I can't tell you what those

6  questions and answers were, sitting here, but that's what those

7  refer to.

8  Q.  Did you respond to Mr. Atilla's request, or did somebody

9  else from the Treasury Department respond to Mr. Atilla's

10  request?

11  A.  I believe someone else responded.

12  Q.  Now, did there come a time after this e-mail in October of

13  2013, when you planned another trip to Turkey to meet with

14  Halkbank and others?

15  A.  Yes.

16  Q.  And when was that?

17  A.  December of 2013.

18  Q.  And did you, in fact, travel to Turkey in December of 2013?

19  A.  I did.

20  Q.  And did you meet with anybody from Halkbank during that

21  trip?

22  A.  I don't believe I did.

23  Q.  And why did you not meet with anyone from Halkbank?

24  A.  So it turned out that my travel to Turkey occurred

25  essentially on the same day that there was a major law

HC8PATI2                          Cohen - Direct

1    enforcement action in Turkey, where a number of people were

2    arrested, including Mr. Aslan.

3              That was a problem, but the bigger problem was that we

4    landed in Istanbul, and the traffic getting in from the airport

5    was so terrible that I was stuck in traffic for like four hours

6    and couldn't have made the meeting in any event.

7    Q.  Now, so during that trip that day, or any other day of that

8    trip, did you meet with anyone from Halkbank?

9    A.  I don't believe so.

10   Q.  Did there come a time after December of 2013, when

11   Mr. Aslan was no longer the general manager of Halkbank?

12   A.  Yes, as of more or less that date.

13   Q.  And did you meet with his successor?

14   A.  I did.

15             MR. LOCKARD:  Mr. Chang-Frieden, if we could pull 8020

16   back up.

17             THE COURT:  Not on that trip?

18             THE WITNESS:  Not on that trip.

19   Q.  Directing your attention to early October of 2014, did you

20   meet with anyone from Halkbank at that time?

21   A.  I did.

22   Q.  And who did you meet with?

23   A.  It was Mr. Atilla and the new CEO of Halkbank, whose name I

24   am not going to try to pronounce.

25   Q.  And where did that meeting take place?

1    A.  In my office in Washington.

2                THE COURT:  Just from Halkbank, the two of them or

3    were there more?

4                THE WITNESS:  There may have been a third person from

5    Halkbank present as well.  And, again, there were people on my

6    side in addition to it.

7    Q.  Now, yesterday afternoon we were talking about in what

8    language your communications and meetings with Halkbank

9    occurred.  In what language did this meeting take place?

10   A.  So from my side, in English.  From Halkbank's side, with

11   Mr. Atilla, in English.  With Mr. -- begins with a T, the new

12   CEO of Halkbank, as I recall, he spoke in Turkish, translated

13   by Mr. Atilla into English for me.  So that was it.

14   Q.  And what were the general topics that you discussed at this

15   October meeting with Mr. Atilla and his new general manager?

16   A.  So, in part -- it was my first meeting with the new general

17   manager of Halkbank.  So, in part, I was introducing myself,

18   did a brief overview, I think, of the depth of the relationship

19   and conversations between the Treasury Department and me and

20   Halkbank that had gone on in the several preceding years.

21               We talked about Mr. Zarrab at that meeting, and I'm

22   sure we talked generally.  So at this point, there had been, in

23   the negotiations with Iran, the interim agreement with Iran

24   having to do with its nuclear program that had some limited

25   relaxation of some sanctions.

```
 1              Part of what we were doing, in all of our engagements
 2     with foreign banks at this point, was making sure that they
 3     understood the very small number of sanctions that had been
 4     relieved and the sanctions that still remained in place.  So I
 5     think we probably talked about that as well.
 6     Q.  Now, you mentioned Mr. Zarrab.  Who did you understand
 7     Mr. Zarrab to be at that time?
 8     A.  A businessman in Turkey who, himself, had been publicly
 9     identified as someone involved in gold trades between Turkey
10     and Iran.
11     Q.  And who raised Mr. Zarrab?
12     A.  I believe Mr. Atilla raised Mr. Zarrab at that meeting.
13     Q.  What, if anything, did you ask about Mr. Zarrab?
14     A.  So we asked -- it's possible that I raised Zarrab.  I
15     actually don't recall precisely.  We wanted to know -- I wanted
16     to know what Halkbank's involvement with Mr. Zarrab was or had
17     been and was at that point, what they knew about his business
18     activity.  I was interested in learning as much as I could
19     about Mr. Zarrab.
20     Q.  And what, if anything, did Mr. Atilla tell you about
21     Mr. Zarrab and his relationship with Halkbank?
22     A.  He told us that they had a banking relationship with
23     Mr. Zarrab, that they had lent him money, that he was involved
24     in the trade of gold with Iran, and asked whether Mr. Zarrab --
25     asked or asserted that Mr. Zarrab was not a sanctioned
```

1    individual at that point and asked whether we were intending to

2    sanction him.

3    Q.   Did Mr. Atilla provide any additional details about

4    Mr. Zarrab's then-current business with the bank, in October of

5    2014?

6    A.   As I recall, he mentioned that they had a loan for some

7    properties that Mr. Zarrab owned.  It was -- my recollection is

8    it was a relatively small relationship but that it was ongoing.

9    Q.   What, if any, additional information did you ask for about

10   the relationship between Halkbank and Mr. Zarrab?

11   A.   I wanted to know what they were willing to tell me about

12   their relationship with Zarrab; so I -- you know, I -- it

13   was -- I asked a few follow-up questions.

14          Ultimately, I think the conversation got shut down by

15   the -- and I actually don't remember if it was Mr. Atilla or

16   his new general manager who essentially said, you know, if he's

17   not -- they asked if we were going to sanction Mr. Zarrab.  We

18   told them, I told them, which is a standard response to a

19   question like that, that we don't forecast our enforcement

20   actions.  So even if the next day we were planning to sanction

21   somebody, we wouldn't say so.  It undermines the effectiveness

22   of the sanctions.

23          So they asked whether we were intending to sanction

24   Zarrab.  I told them I wouldn't answer that question, and that

25   was sort of -- that was essentially the end of the

1   conversation.

2   Q.  What, if anything, did Mr. Atilla say about the bank's

3   willingness or ability to share additional information?

4   A.  I was told that -- they told us everything they were

5   intending to tell us about Mr. Zarrab.

6   Q.  Now, in describing these series of meetings and

7   communications with Halkbank, I think you expressed, in

8   particular, concerns that manifested in the February 2013

9   meeting in Turkey about the nature of the gold trade that was

10  being facilitated by Halkbank?

11  A.  Right.

12  Q.  Did you ever receive satisfactory answers to those

13  concerns?

14  A.  Not really, I think is the answer to that question.  I

15  pause because the answers that we were given were reassuring in

16  that we were told repeatedly, yes, we're aware of your

17  concerns; yes, we're aware of the specific information that

18  you're citing as a basis for your concern.

19          My recollection is that the conversation that we had

20  about Zarrab in 2014 was not the first time that Zarrab had

21  come up in our conversations, that there was, at some point, it

22  may have been in that February '13 meeting or spring '13

23  meeting, where there was some discussion about Zarrab in

24  particular at that meeting.  Regardless, we were told:  We

25  understand your concern.  We are -- you know, we have it under

HC8PATI2                         Cohen - Direct

1    control.

2              But I was never fully satisfied that it was completely

3    under control, which is why we kept oncoming back to this, in

4    part, because we kept getting information that raised concerns

5    that it wasn't completely under control.

6              So the answer to your question was, was I fully

7    satisfied with the response?  No.  What I was being told was

8    sort of what -- I was being assured that everything was okay

9    but I had reason to question whether, in fact, everything was

10   okay.

11   Q.  Did Mr. Atilla, or anyone else in Halkbank, ever tell you

12   that the Iranian importers or buyers of the gold that was being

13   facilitated by Halkbank were Iranian banks or companies

14   affiliated with Iranian banks?

15   A.  Well, when you say -- can I take that in two parts?

16   Q.  Yes.

17   A.  I don't remember him saying that the Iranian banks were

18   purchasing the gold.  That would have, I think, led to a number

19   of questions that I would have had.  Businesses affiliated with

20   Iranian banks, the purchasers presumably had accounts at the

21   banks; so there was an affiliation in that respect, but not the

22   bank itself.

23   Q.  So by "affiliated," did anyone -- did Mr. Atilla or anyone

24   else at Halkbank ever suggest or tell you that the importers or

25   buyers of the gold being facilitated by Halkbank were companies

1    owned or controlled by Iranian banks?

2    A.  Not that I recall.

3    Q.  And did Mr. Atilla, or anyone else at Halkbank, ever tell

4    you that the Halkbank customer -- that there was predominantly

5    one Halkbank customer responsible for the majority of the gold

6    being exported to Iran?

7    A.  So as I just testified, I do recall there being a

8    conversation about Mr. Zarrab that predated the October 2014

9    conversation, and Mr. Zarrab being an important gold trader.

10   Whether he was responsible for the majority, I don't recall.  I

11   do recall that Mr. Zarrab was a significant player in the gold

12   trade, as I said.

13   Q.  Did Mr. Atilla, or anyone else at Halkbank, ever tell you

14   that the Iranian purchasers or importers of gold after July of

15   2013 became importers or purchasers of food and medical

16   products?

17   A.  No, that -- no.

18   Q.  Did Mr. Atilla, or anyone else at Halkbank, ever tell you

19   that after July of 2013, Mr. Zarrab became an individual

20   involved in importing food and medical products to Iran?

21   A.  Not to my recollection.

22           MR. LOCKARD:  One moment, your Honor.

23           (Pause)

24           No further questions.  Thank you.

25           THE COURT:  Okay.  Do you all want to take a break at

1   this time, or do you want to continue?  So we'll continue with

2   cross-examination.

3           MR. ROCCO:  If I may, your Honor?

4           THE COURT:  Sure.

5   CROSS-EXAMINATION

6   BY MR. ROCCO:

7   Q.  Mr. Cohen, good morning.  My name is Vic Rocco.

8   A.  Good morning.

9   Q.  And with my team, we represent Hakan Atilla.  By the way,

10  for the record, you met Mr. Atilla on a number of occasions; am

11  I correct?

12  A.  Yes.

13  Q.  And you recognize him sitting in the courtroom here today?

14  A.  Yes.

15  Q.  That's the Hakan Atilla you've been talking about while

16  you've been testifying?

17  A.  Yes, sir.

18  Q.  Am I correct?

19  A.  Yes.

20  Q.  Mr. Cohen, today you are an attorney in private practice?

21  A.  That's right.

22  Q.  You're at WilmerHale?

23  A.  Right.

24  Q.  And you've been there since the change in the

25  administration, roughly?

1  A.  I actually didn't start back up until September.  I took a

2  little break.

3  Q.  Good for you.  In private practice, and you've been in

4  private practice before, correct?

5  A.  Yes.

6  Q.  You started back -- practicing back in the early 1990s?

7  A.  1990.

8  Q.  And you have -- over the years, you have represented banks

9  and financial institutions?

10  A.  Yes.

11  Q.  And over the years, with your government work, you've

12  acquired some formidable knowledge about the American sanction

13  regimes, and I think -- is that correct?

14  A.  I think so, yes.

15  Q.  And the advise you give clients basically relates to that

16  expertise; am I correct?

17  A.  To some extent that's right, yes.

18  Q.  So that you represent financial institutions in private

19  practice?

20  A.  I do.

21  Q.  And you represent financial institutions all over the

22  world; am I correct?

23  A.  As I say, I've only been back to practice for a couple of

24  months now; so I'm slowly building up my client base.  But --

25  so I wish I could say I represented financial institutions all

1   over the world.  I'm working towards that.

2   Q.  So your portfolio includes large financial institutions,

3   correct?

4   A.  Yes.

5   Q.  And these financial institutions, by and large, especially

6   American financial institutions, have legal departments,

7   correct?

8   A.  Yes.

9   Q.  And when you interact with these large financial

10  transactions -- institutions, you often deal with these large

11  legal departments; am I correct?

12  A.  Yes.

13  Q.  Now, yesterday I think you testified that you believed that

14  Halkbank had access or had advice of counsel in its dealings

15  with the Treasury Department; am I correct?

16  A.  Yes.

17  Q.  Did you ever go to a meeting where you were introduced to a

18  lawyer who represented Halkbank?

19  A.  No.

20  Q.  Would it be fair to say that it's common, in meetings where

21  lawyers are in attendance, that lawyers identify themselves as

22  lawyers?

23  A.  I think that's common, yes.

24  Q.  And in your dealings with Halkbank over the years, do you

25  have any recollection of ever dealing with a lawyer who

1    purported to represent Halkbank?

2    A.  No one who identified himself or herself as a lawyer, no.

3    Q.  Well, let's talk a little bit about these meetings, if we

4    can, and you can help me understand --

5    A.  Sure.

6    Q.  -- a little bit better.  How many times would you say, over

7    the four years, I think your testimony was, that you interacted

8    with Halkbank, how many times did you meet with Mr. Atilla?

9    A.  I would say about a half dozen times.

10   Q.  And those meetings that you testified were here in

11   Washington, D.C. at your office, correct?

12   A.  Some were, yes.

13   Q.  And some of those meetings were in Ankara or Istanbul?

14   A.  That's right.

15   Q.  Did you ever meet one-on-one with Mr. Atilla?

16   A.  I don't believe so.

17   Q.  Did you, in your meetings here in the United States, in

18   your office, when you met with Mr. Atilla, you met with him

19   with other people from Treasury; am I correct?

20   A.  Yes.

21   Q.  And at these meetings, Mr. Atilla was accompanied by or

22   accompanied someone else from Halkbank, correct?

23   A.  That's my recollection, that's right.

24   Q.  In your office, how large were these meetings, how large

25   were the groups?

1    A.  You know, three on my side, three on his side, sort of that

2    size.

3    Q.  Was there ever a translator or interpreter?

4    A.  Just that last meeting, where Mr. Atilla translated for the

5    new general manager, but not a separate interpreter, as I

6    recall.

7    Q.  So let me just see if I have it right.  In the meeting that

8    you're referencing, where Mr. Atilla translated for the new

9    general manager, that was in October of 2014; am I correct?

10   A.  Yes.

11   Q.  So in the meetings in Turkey, did those meetings occur at

12   Halkbank?

13   A.  Yes.

14   Q.  And, again, was there interpreter at any of those meetings?

15   A.  I don't recall there being one.

16   Q.  And do you remember how large the group was?

17   A.  Essentially the same size, three or four on either side.

18   Q.  And during these meetings, there was a note taker from

19   Treasury?

20   A.  Right.

21   Q.  And the notes were ultimately transformed into a memorandum

22   of some sort?

23   A.  So it differed whether we were in the United States or in

24   Turkey.

25   Q.  Okay.  So let's talk about -- since we were in Turkey,

1    let's stick with Turkey, and then we'll come back to

2    Washington.

3    A.  Sure.

4    Q.  So in Turkey, was there a note taker?

5    A.  There was, it was sometimes someone from the Treasury,

6    sometimes someone from the State Department.

7    Q.  And so that in your meetings, then, there would be

8    representatives from Halkbank?

9    A.  Mmm, hmm.

10   Q.  There would be representatives from the Department of

11   Treasury?

12   A.  Yes.

13   Q.  And because it was overseas, you had a State Department

14   representative there as well?

15   A.  Sometimes.

16   Q.  Was the State Department representative a member of the

17   consul, the American embassy?

18   A.  Typically -- now, it would be someone from the -- either

19   from the embassy or the consulate, depending on whether we were

20   in Ankara or Istanbul.  I hesitate because, again, there's a

21   lot of interesse U.S. government activity.

22           When we met with banks, we tended to not bring State

23   Department people with us.  We would bring State Department

24   people with us when we met with foreign governments but not

25   with financial institutions.  The record of the meeting in a

HC8PATI2                          Cohen - Cross

1    foreign country would always be -- would come out as a State

2    Department cable.  It wouldn't be a Treasury Department

3    document.  It would be a State Department document.

4            I just don't remember whether in every, single one of

5    these meetings we were successful in not having the State

6    Department attend the meeting.  I think we were.  In which

7    case, the note taker was someone from Treasury, and then they

8    would work with someone from State to do the cable, the record

9    of the meeting.

10   Q.  And ultimately, you would receive the cable and read it and

11   approve it?

12   A.  Yes.

13   Q.  So in DC, when you had these meetings -- by the way, before

14   we leave Turkey, how long did these meetings typically last at

15   Halkbank?

16   A.  As I testified earlier, between, I would say, 45 minutes

17   and an hour and a half or so, maybe two hours.

18   Q.  Do you have a recollection of meetings going that long,

19   Mr. Cohen?

20   A.  In that vicinity.  I mean, I don't know.  One of the nice

21   things about not being in private practice, I wasn't recording

22   my time.

23   Q.  We know what that's about.

24   A.  Yes.

25   Q.  So in your meetings in DC, is it fair to say that there

1   were just Treasury representatives, no bother with anybody from

2   State?

3   A.  Yes.

4   Q.  And representatives of Halkbank?

5   A.  Right.

6   Q.  And at those meetings, were notes taken?

7   A.  Yes.

8   Q.  And, again, were the notes reduced to memorandum form?

9   A.  Yes, typically e-mail rather than a formal State Department

10  cable.

11  Q.  By the way, what would happen to the original notes of

12  those meetings?

13  A.  I have no idea.

14  Q.  You don't know if they were retained or discarded?

15  A.  I don't know.

16  Q.  But these were important meetings and the note taking was

17  important; am I correct?

18  A.  Yeah.

19  Q.  And the idea behind the note taking was to try to capture

20  all the significant discussions; am I correct?

21  A.  That is right.

22  Q.  And there would be times that you would read a memorandum

23  and make corrections and return it to the author; am I correct?

24  A.  That is right, for the cables of foreign -- of meetings in

25  Turkey.  I don't believe I had a practice of reviewing the

1   e-mail summaries for meetings in Washington.

2   Q.  Let's return to Halkbank and lawyers just for a moment.  Do

3   you have any idea of whether Halkbank has a legal department?

4   A.  I believe they do.

5   Q.  Do you know, as opposed to believe?

6   A.  I don't recall ever interacting with anyone from Halkbank's

7   legal departments, but it is my understanding a bank of

8   Halkbank's size and prominence would have a legal department.

9   That's my experience.

10  Q.  Well, in the United States, certainly a bank of Halkbank's

11  size would have a legal department, correct?

12  A.  Yes.

13  Q.  And it would have a substantial legal department?

14  A.  I would assume so.

15  Q.  But we're a nation of laws?

16  A.  I agree with that.

17  Q.  And sanctions and regulations; am I correct?

18  A.  I think that's fair.

19  Q.  American institutions tend to lawyer up much more so than

20  foreign institutions; isn't that correct, Mr. Cohen?

21  A.  I mean, generally speaking, I think that's probably a fair

22  statement.

23  Q.  In America, almost everything gets run by a lawyer; isn't

24  that correct?

25  A.  No.

HC8PATI2                          Cohen - Cross

1   Q.  Almost everything at a large institution gets run by a

2   lawyer?

3   A.  I don't think that's right either.

4   Q.  How about dealing with sanctions, do American institutions

5   rely on their lawyers to advise them as to sanctions?

6   A.  They do.  They also have large compliance departments that

7   are not run by lawyers.

8   Q.  But lawyers interact with those compliance departments,

9   correct?

10  A.  I assume so, yes.

11  Q.  So let's talk about some of the statements that the

12  Treasury makes, or OFAC makes, with respect to the sanctions

13  and sanctions enforcement.  It's true, isn't it, that when

14  public statements are made by someone from Treasury or

15  officials from OFAC, and people like you, that they're thought

16  out and reviewed; am I correct?

17  A.  I think that's a little bit of an overstatement.

18  Q.  Which part, thought out or --

19  A.  I think it depends on what the statement is.  You know, if

20  it's a prepared speech, more so than, you know, something that

21  is an interview.  So I mean, there are different kinds of

22  statements that come out, some more formal than others.  The

23  more formal, the more likely it was subject to review before it

24  came out.

25  Q.  Well, in dealing with foreign banks and the importance of

1    the American sanction regime, generally, it is important that

2    representatives of the government speak accurately; am I

3    correct?

4    A.  Certainly.

5    Q.  So that the foreign bankers or foreigners have come to rely

6    on the word of what Americans tell them; am I correct?

7    A.  We certainly try to be clear in our communications, yes.

8    Q.  Well, when you're dealing with foreign institutions, you

9    don't speak off-the-cuff, is basically my point?

10   A.  Well, again, I think it depends a little bit on what the

11   nature of the communication was.  In my ongoing conversations

12   with Halkbank, you know, we had lengthy meetings.  They were

13   not scripted.  I wasn't reading from a -- you know, if we're

14   talking for an hour-long meeting, I'm not reading a speech for

15   an hour to Halkbank, right?

16   Q.  I'm sorry, yes.  But you're in the sweet spot when you're

17   talking to foreign institutions about the American sanction

18   regime; am I correct?

19              MR. LOCKARD:  Objection.

20              THE COURT:  Sustained.  I'm not sure I understand.

21   Q.  Well, it's an area that you're comfortable talking to

22   foreign institutions about?

23   A.  That was part of my job, yes.

24   Q.  And excuse me.  That's what I meant by "sweet spot."

25              MR. ROCCO:  And, thank you, Judge.

1    Q.  But this was -- in terms of foreign institutions

2    understanding the sanctions regime, part of your purpose was to

3    enlist their cooperation; am I correct?

4    A.  Yes.

5    Q.  And that was because, really, to make the sanctions program

6    work, American government needs the cooperation of countries

7    all over the world?

8    A.  Much more effective the more cooperation we have from

9    foreign governments and foreign financial institutions.

10   Q.  And you would agree with me that the American sanctions

11   regime, let's -- when I talk about sanctions regime here, we're

12   talking about Iran, not one of the other, what is it, 30 or so?

13   A.  Right.

14   Q.  Just for the record.  So the American sanctions regime, the

15   Iranian sanctions, it's fair to say, do not regulate the

16   conduct of foreign banks; am I correct?

17   A.  So that's a complicated question, Mr. Rocco.  I think that

18   is -- as a civil matter, sort of in the -- what the Treasury

19   Department, our jurisdiction, what we -- sort of the

20   enforcement actions that we could take, we did not directly

21   regulate foreign financial institutions, but there's more to

22   the sanctions, and the Iran sanctions in particular, than just

23   what the U.S. Treasury Department had jurisdiction over.

24   Q.  Well, certainly the Treasury Department has jurisdiction

25   over American banks, correct?

HC8PATI2                    Cohen - Cross

1   A.  Yes.

2   Q.  And I think, is it fair to say, that you have stated

3   publicly that the American sanctions do not apply

4   extraterritorially; am I correct?

5           MR. LOCKARD:  Objection.

6           THE COURT:  Overruled.  If you did.

7   A.  So I don't believe that's a hundred percent accurate, and

8   by that, I mean, American sanctions is a -- is a broad topic.

9   I'm sure I have made comments that the secondary sanctions,

10  particularly in what's known as CISADA, the Comprehensive Iran

11  Sanctions and Divestment Act, I think is what it stands for,

12  that those do not, as a technical legal matter, apply

13  extraterritorially.

14  Q.  Let me see if we can help you with this.

15          MR. ROCCO:  So, Mr. White, can you bring up DX200?

16  And this, we're not showing it to the jury.  Can we go to the

17  second page, please.

18  Q.  Do you recall this item?  You can read it to yourself.

19  A.  I remember the event.

20  Q.  Okay.  And do you remember what you said at the event?

21  A.  Not everything, no.

22  Q.  Okay.  Well, let me see if we can specifically address your

23  attention to statements that you made.  It starts with, right

24  there, "Yeah, right."

25          THE COURT:  That's a legal expression.

1      MR. ROCCO:  It's the first one I learned, your Honor.

2  Q.  Now, those are --

3  A.  Can I just finish reading this?

4  Q.  Oh, I'm sorry.  Tell me when you're ready.

5      (Pause)

6  A.  Can I see the question that preceded this?

7  Q.  Sure.  Can we scroll?

8  A.  Yeah, that's not --

9  Q.  Do you have it?

10 A.  No.

11 Q.  Okay.  Can you scroll back a little bit further?

12 A.  Right, this is it.

13 Q.  Does that help?  Thank you.

14     (Pause)

15 A.  Mmm, hmm.  Okay.

16 Q.  So does that -- you have something particular on your mind

17 when you made those statements, and I'm talking here now about

18 extraterritoriality?

19 A.  Right.

20 Q.  In the sense that you were using it on that occasion.  It's

21 fair to say that you don't -- you regulate U.S. banks, meaning

22 OFAC and Treasury don't regulate foreign banks; am I correct?

23 A.  That's -- so what we are were talking about here was this

24 law CISADA, which I mentioned, which was a new and -- I'm

25 sorry, I forget the day.  I think this was the spring of --

HC8PATI2                    Cohen - Cross

1   When was this, spring of '12?

2   Q.   This is spring of -- I'm sorry.  This is the spring of '12,

3   May 10th.

4   A.   So over the, I think, six months earlier or so, this new

5   law went into effect that established these secondary

6   sanctions.  They were controversial.  It's the first time that

7   we had employed what are called secondary sanctions and --

8   Q.   Can you just take a moment, I'm sorry to interrupt you, but

9   because you're talking about secondary sanctions, can you take

10  a moment just to remind us the difference between primary and

11  secondary sanctions?

12  A.   Sure.

13  Q.   I apologize for interrupting you, but I can't imagine

14  anybody better equipped to do that than you.

15  A.   I don't know about that.  So the idea of the primary

16  sanction is -- so the gold sanctions are a good example of a

17  primary sanction.  That is, if you sell gold to the government

18  of Iran or to Iran generally, that is subject to sanctions.

19  That's a sanction that is put in place under a different

20  statute than the secondary sanctions statute.  That statute is

21  IEEPA, which we I think talked about earlier.

22          THE COURT:  Which one is which?

23  A.   Sorry, the gold sanctions -- so let me try and do this.

24  The gold sanctions were originally under IEEPA, the

25  International Economic -- sorry, International Emergency

HC8PATI2                    Cohen - Cross

Economic Powers Act.  That's sort of the foundational statute

for primary sanctions.  It gives the President and then the

Treasury Department the authority to define sanctionable

conduct and to enforce against those who violate the sanctions.

It has both civil provisions that the Treasury Department can

apply, and it has criminal provisions that the Justice

Department can apply.  That's primary sanctions.

        Secondary sanctions, which this new law, CISADA, put

into place, say essentially to a foreign bank, if you engage in

conduct with a third party -- so just to give a concrete

example.  If you, Halkbank, engage in transactions with an

Iranian bank that we have designated under our primary

sanctions authority for violating our sanctions, we can cut off

you, Halkbank, from the United States.

        It's a secondary sanction because the primary sanction

is against the Iranian bank.  The secondary sanction is against

the Turkish bank.  And the consequence of that in what I was

talking about here in this event, was in a secondary sanctions

context, the penalty is that the bank gets cut off from the

United States.

Q.  And that's essentially -- if you can return then to the

document that I'm showing you, that's what your comments --

your comments were directed towards secondary sanctions,

correct?

A.  That's correct.

1   Q.  And talking about secondary sanctions, as opposed to

2   primary sanctions, you were saying that the remedy is if a

3   foreign entity violates U.S. sanctions, it itself can be

4   sanctioned; am I correct?

5   A.  Right, and the issue here is, on extraterritoriality, if we

6   cut off, you know, in this instance Halkbank from the United

7   States, are we acting extraterritorially by regulating Halkbank

8   or are we regulating U.S. institutions?  And my point, which is

9   a pretty technical legal point, is that the way that you go

10  about cutting off Halkbank from the United States is by telling

11  U.S. institutions they can't deal with Halkbank.  So it's not

12  extraterritorial because we are telling U.S. institutions what

13  they can or cannot do.

14  Q.  That's precisely right, and you're not telling Halkbank

15  what it can do or what it cannot do; am I correct?

16  A.  Well, so the enforcement action is against Halkbank.  The

17  application is against U.S. banks.

18  Q.  Right.  Which means that Halkbank -- and by the way, we'll

19  come back to this later, but Halkbank has never been

20  designated; am I correct?

21  A.  That's correct.

22  Q.  Halkbank has not been sanctioned, correct?

23  A.  I'm just using that as an example.

24  Q.  I got it, but I think it needs to be clear for the jury.

25  A.  Yes.

HC8PATI2                        Cohen - Cross

```
 1   Q.  And certainly back at this time, there were no sanctions

 2   leveled against Halkbank; am I correct?

 3   A.  That's right.

 4   Q.  And Halkbank, in fact, it's one -- in interacting with

 5   Halkbank, it's something that you would remind Halkbank of?  In

 6   other words, that if Halkbank engaged in certain activity, it

 7   could be sanctioned, correct?

 8   A.  Yes.

 9   Q.  So and your comment here is -- is it fair to say it's

10   something that you frequently had to say about secondary

11   sanctions?

12   A.  Yeah, I made this point more than once.

13   Q.  Well, there was an interview, do you recall, with the Wall

14   Street Journal back in 2014, you spoke about secondary

15   sanctions?

16   A.  I don't recall offhand.

17   Q.  Maybe I should show it to you because I think it's

18   important.

19           MR. ROCCO:  Can we bring up Exhibit 201 and show it to

20   Mr. Cohen.  By the way, before we move off of Exhibit 200, I

21   move Exhibit 200 into evidence.

22           MR. LOCKARD:  Objection.

23           THE COURT:  I'll allow it.

24           (Defendant's Exhibit 200 received in evidence)

25           MR. ROCCO:  Thank you, your Honor.
```

HC8PATI2                        Cohen - Cross

1    BY MR. ROCCO:

2    Q.  Let's go to 201.  Can you take a look at that, Mr. Cohen.

3    A.  I can't.  All I see is the cover page.

4    Q.  You have to move it to page 3 of 4.  I apologize.

5    A.  If you don't mind, could you go to page 2, please, first so

6    I can see.

7    Q.  Sure.  Page 2 is the beginning of the text; so please go to

8    page 2.

9    A.  Okay.

10   Q.  Got it.  Tell me when you're ready.

11   A.  I will.

12   Q.  Move it.

13   A.  Okay.  Next page?

14            (Pause)

15            Mmm, hmm.

16            (Pause)

17            okay.

18   Q.  Okay.  Do you want to go to the third page?

19   A.  I've read the third page.

20   Q.  Okay.  And let me just direct your attention to the

21   language that starts "None of our authorities"?

22   A.  Right.

23   Q.  Did you read that?

24   A.  I did.

25   Q.  Do you recall making those statements?

 1    A.   I recall making statements in this context, yes.

 2    Q.   Precisely, but can we -- do you recall making that

 3    statement?  You read it, and that accurately captures what you

 4    said on that occasion?

 5    A.   I assume it accurately captures what I said.  I don't

 6    remember this interview.  I have no doubt that the Wall Street

 7    Journal accurately quoted me in this; so....

 8              MR. ROCCO:  Your Honor, I move Exhibit 201 into

 9    evidence.

10              MR. LOCKARD:  Objection, your Honor.

11              THE COURT:  What is it, exactly?

12              MR. ROCCO:  It is exactly the language --

13              THE COURT:  No, no, I mean, what is the --

14              MR. ROCCO:  This is an article from the Wall Street

15    Journal.  It's a news wire from the Wall Street Journal.

16              THE COURT:  In its entirety?

17              MR. ROCCO:  In its entirety, but it's very short.  And

18    specifically --

19              THE COURT:  I'll allow it.

20              MR. ROCCO:  Thank you, Judge.

21              (Defendant's Exhibit 201 received in evidence)

22    BY MR. ROCCO:

23    Q.   And can we just -- I misplayed this for the jury,

24    Exhibit 200.  So I'm going to correct it with 201.  Can we

25    display now Exhibit 201 to the jury.

1    So, now, directing your attention -- the part of the

2    article we were referencing was the one that refers to "None of

3    our authorities are extraterritorial," correct?

4    A.  Yes.

5    Q.  And that's the portion of the article that I specifically

6    want you to -- I'm asking you about, and to the best of your

7    recollection, that's what you said on that occasion; am I

8    correct?

9    A.  Well, we were talking about, just before this, the

10   enforcement actions that had been taken against foreign banks

11   for violating U.S. sanctions, which were controversial, again,

12   because we were acting against foreign banks.

13       And the point that I was making here was that the

14   basis for those actions, which were both civil actions by the

15   banking regulators, by OFAC, and as well as criminal

16   dispositions, was that the transactions involved -- the conduct

17   involved the United States in some fashion.

18   Q.  Sure.  And if it doesn't involve the United States, it's

19   fair to say that OFAC, the Department of Treasury, has no

20   jurisdiction over it; am I correct?

21       MR. LOCKARD:  Objection.

22       THE COURT:  If you know, I'll allow it.

23   A.  So, again, this is -- this is a legal issue here we're

24   talking about.  The civil enforcement authority of the Treasury

25   Department is over U.S. institutions and U.S. persons.  For

HC8PATI2                        Cohen - Cross

1    some of our sanctions programs, it's U.S. persons anywhere in

2    the world.  For others, it's within the territory of the United

3    States.

4           But that's not the entirety of how the sanctions --

5    the entire scope of the sanctions programs are enforced.

6    Q.  Well, we're talking about -- I'm talking about secondary

7    sanctions, just to make --

8    A.  That's not what this is about.

9    Q.  But when you're talking about activities of foreign

10   financial institutions outside the United States --

11          THE COURT:  Such as Halkbank?

12          MR. ROCCO:  Such as Halkbank, I'm sorry, Judge.

13   Q.  -- such as Halkbank, Halkbank, certainly there's nothing

14   wrong with Halkbank dealing with Iran on a day-to-day basis,

15   correct?

16          MR. LOCKARD:  Objection.

17   Q.  U.S. --

18          THE COURT:  If you know.

19   A.  I don't know what you mean by "nothing wrong."

20   Q.  I think it's fair to say that Halkbank can deal with third

21   nations, businesses or banks in third nations, without the U.S.

22   having any interest in those activities?

23          THE COURT:  I don't understand.

24   Q.  Am I correct?

25          THE COURT:  I don't understand your question.

1    Q.  Well, in a typical commercial transaction, the United

2    States would have no interest in a transaction between Halkbank

3    and an entity -- and a bank in South Africa; am I correct?

4    A.  Generally, yes, unless it had -- that transaction was

5    somehow, somehow implicates one of our sanctions programs.

6    Q.  Well, if that transaction does not implicate a sanctions

7    program, the United States has no interest in it, correct?

8    A.  I don't want to quibble with you about the reach of U.S.

9    criminal jurisdiction and other laws.  If you just want to talk

10   about sanctions programs --

11   Q.  I mostly -- sorry.

12   A.  Right.  If you just want to talk about sanctions programs,

13   if it doesn't implicate one of our sanctions program like

14   Iran -- in your example, if that transaction between the

15   Halkbank and the South African bank is someone who's financing

16   a terrorist organization, we would be interested in it.  If

17   it's just a normal commercial transaction for the sale of

18   furniture between Turkey and South Africa and nobody involved

19   in that transaction is otherwise subject to our sanctions, then

20   we would not be interested in it.

21   Q.  Okay.  You can take that down.  So let's talk a little bit,

22   if we can -- and I'd like to come back to this topic later on,

23   but let's move on to talk about OFAC specifically, and OFAC's

24   ability to investigate or to learn facts.  Am I correct?  So it

25   certainly is -- it certainly is true, is it not, that OFAC has

HC8PATI2                          Cohen - Cross

1    the ability to seek information and verify information?

2              MR. LOCKARD:  Objection.

3    Q.  I had --

4              THE COURT:  Just generally?

5              MR. ROCCO:  Sure, just generally.

6    Q.  You have the right?

7    A.  It has subpoena authority.

8    Q.  It has subpoena authority.  You can conduct investigations?

9    A.  Yes.

10   Q.  You interact with, you mentioned yesterday, something

11   called OIA, I believe?

12   A.  Yes.

13   Q.  That's an intelligence arm of Treasury; is it not?

14   A.  It is an analytic intelligence agency, which the

15   distinction is important.  It doesn't collect intelligence.  It

16   relies on other intelligence that's collected by others

17   collected in the analysis; so it produces an analysis so it

18   doesn't itself collect information.

19   Q.  It analyzes information that it doesn't --

20   A.  It doesn't --

21   Q.  If I may.  If I finish the question, I may get it right.

22             It's information that it's collected or collected for

23   it by other agencies, such as the CIA or FBI?

24   A.  Right.

25   Q.  NSA?

HC8PATI2                          Cohen - Cross

1   A.  Right.

2   Q.  They, essentially, feed information to OIA and OIA analyzes

3   that information?

4   A.  Generally speaking, that's right.

5   Q.  And how about the Commerce Department, does Treasury

6   interact with Commerce Department so that, let's say, there's a

7   commerce official in Dubai who has -- inspects -- has the

8   authority to inspect shipments and the like; am I correct?

9   A.  I believe that's right.

10  Q.  OFAC interfaces with foreign country intelligence agencies

11  and foreign regulators, correct, something called the Egmont

12  Pact?

13  A.  So OFAC will not interact with foreign intelligence

14  agencies.  It does interact with foreign -- with counterpart

15  regulatory agencies.

16  Q.  And how about foreign governments, foreign bank regulators?

17  A.  Right.

18  Q.  In the instance of Halkbank, the Turkish bank regulator, I

19  think it's called BRSA.

20  A.  BRSA.

21  Q.  Or BDDK?

22  A.  Right.

23  Q.  And OFAC, or Treasury, interacts with that regulator as

24  well?

25  A.  It does.

HC8PATI2                          Cohen - Cross

Q.  Okay.  And you mentioned -- I think you mentioned in your

testimony earlier the SWIFT system, and if you didn't, I

apologize.  But SWIFT is also a way of collecting information;

am I correct?

A.  Not for these purposes.

Q.  Well, is it used for transparency?

A.  I don't know what you mean.

Q.  Is it a way of allowing OFAC or the Department of Treasury

to look at transactions that occur all over the world?

A.  No.

Q.  Well, does OFAC interact with -- does it have access to

SWIFT?

        MR. LOCKARD:  Objection.

A.  No.

Q.  Well --

        THE COURT:  I'll allow this.  I don't know what you

mean.

Q.  Well, can you take a moment, Mr. Cohen --

A.  Yes.

Q.  -- and explain what the SWIFT system is?

A.  Sure.  SWIFT is a private company that is the means by

which banks communicate with one another with respect to the

transmission -- essentially of wire transfers.

        So the way I think the best way to understand what

SWIFT does is it's basically a big e-mail system where, if you

1    want to send money from bank A to bank B, bank A sends a

2    message to a bank B saying, my customer, Mr. Rocco, wants to

3    make money available to your customer, Mr. Cohen, and that

4    message goes across the SWIFT system.

5          SWIFT is a secured messaging system that facilitates

6    those communications between and among banks.

7    Q.  And does SWIFT also facilitate communications within the

8    bank so that intra-bank transactions are accessible through the

9    SWIFT system?

10   A.  I don't -- so if, for instance, if we both have an account

11   at bank A and I want to make money available to you, we're both

12   within the same bank, I don't believe SWIFT handles an

13   intra-bank transaction like that.  My understanding is it

14   inter-bank, not intra-bank, but I may not be right about that.

15   Q.  I like the fact that you're making money available to me.

16   A.  I think it was the other way around, actually.

17   Q.  Well, it's all in the eye of the beholder, I suppose.

18   There certainly is nothing that stops OFAC itself from asking

19   banks questions; am I correct?

20   A.  Nothing that stops them from asking questions, right.

21   Q.  And in dealing with foreign banks, like Halkbank, is it

22   fair to say that Halkbank is not under any obligation to

23   provide information to OFAC with the Department of Treasury; am

24   I correct?

25   A.  I think the answer to that question depends on the context,

1   Mr. Rocco.

2   Q.  Well, can you give me a context where it would be required

3   to?

4   A.  Sure.  If Halk -- if OFAC were investigating a transaction

5   that ran through the United States, okay?  So Halk's -- so a

6   U.S. dollar transaction, for instance, my understanding -- and

7   it's just that -- is that if there is a transaction that runs

8   through a U.S. institution to Halk, running money through

9   Citibank here in New York, that Halk -- sorry, that OFAC could

10  request from Halk information related to that transaction.

11  Q.  Well, in that instance, you're not saying more than could?

12  You're saying Halk would be required to provide the

13  information?

14  A.  So I believe so, Mr. Rocco, but I am not a -- I was never

15  an OFAC enforcement lawyer.

16  Q.  Well, how about a transaction that occurred purely outside

17  the United States, the transaction between Halkbank and a bank

18  in South Africa?

19  A.  And is the question could OFAC demand --

20  Q.  Could it require -- well, the question is, would Halk be

21  required to answer a question that Treasury or OFAC has with

22  respect to that transaction?

23  A.  So again, I do think the context could matter, but I think

24  as a general matter, if there's no -- if there isn't any

25  jurisdiction within the U.S. over the transaction, I don't

1    believe OFAC has the authority to demand a response.

2    Q.  Let me see if I can put this into some better context and

3    make it easier on myself.

4    A.  Okay.

5    Q.  You don't have any problem.  I'm the one that has the

6    problem.  So let's say that part of secondary sanctions -- and

7    the sanction program, we agree, are essentially part of

8    Treasury's mission is to get other countries, financial

9    institutions from other countries to cooperate with the

10   American sanctions program; am I correct?

11   A.  Yes.

12   Q.  And it would be fair to say that OFAC, or people within

13   Treasury, including yourself, take proactive role -- proactive

14   steps to educate foreign financial institutions; am I correct?

15   A.  Yes.

16   Q.  And I think you described your meetings with -- certainly

17   with Halkbank?

18             THE COURT:  You described your?

19             MR. ROCCO:  Meetings.  I apologize.

20   Q.  With Halkbank.  And the purpose of those meetings was, is

21   it fair to say, to educate banks, foreign financial

22   institutions?  Was the purpose of these meetings, when you met

23   in Washington or when you met in Turkey, was the purpose of

24   that -- those meetings to investigate?

25   A.  So it involved both education of the institution that we

1    were meeting with, as well as gathering information for our

2    purposes as well.

3    Q.  Well, when you met with foreign institutions, did you tell

4    people -- did you tell Halkbank, for instance, representatives

5    from Halkbank, including Mr. Atilla, that you were conducting

6    an investigation?

7    A.  I was not conducting an investigation.

8    Q.  I'm sorry?

9    A.  I was not conducting an investigation in any sort of law

10   enforcement sense.

11   Q.  Sure.  So it's fair to say that in these meetings with

12   Halkbank, which were educational, that you never told anyone

13   that you were conducting an investigation because you weren't

14   conducting an investigation, correct?

15   A.  So in the sense of it being a OFAC enforcement action, an

16   investigation in support of an enforcement action, that's

17   correct.  I was, quite clearly, seeking to elicit information

18   so that we understood better, you know, in the context of the

19   Halkbank meetings, what Halkbank was doing with whom and how.

20   Q.  And you were -- in that context, you were free to ask

21   whatever questions you wanted to ask of Halkbank; am I correct?

22   A.  I felt free to ask whatever I wanted to ask, yes.

23   Q.  And you did ask whatever you wanted to ask; am I correct?

24   A.  Sure.

25   Q.  And, obviously, these meetings weren't long meetings, you

1    would meet for 45 -- I think you said 45 minutes to as long as

2    an hour and a half; so there wasn't time constraints, right?

3    A.  Right.

4            THE COURT:  He said two hours.

5            MR. ROCCO:  Thank you, your Honor, two hours.

6    A.  That was about the length of these meetings, yes.

7    Q.  And let me ask you, has there ever been a prosecution, that

8    you're aware of, or a Treasury enforcement action for a bank

9    engaging in purely -- what activity is purely sanctionable?

10           MR. LOCKARD:  Objection.

11   Q.  I mean, just sanctionable?

12           THE COURT:  I'll allow it, if you know.

13   A.  Yes.

14   Q.  And can you give me an example of that?

15   A.  Well, BNP Paribas, a large French bank, was prosecuted,

16   pled guilty for sanctions violations.

17   Q.  And the sanctions violation, what was the nature of the

18   sanctions violation?

19   A.  As I recall, it involved violations of the Iran, Cuba and

20   Sudan sanctions.

21   Q.  Was this a primary sanctions violation or a secondary

22   sanctions violation?

23   A.  I believe primary sanctions violations.

24   Q.  How about a secondary violations sanctions, are you aware

25   of any criminal prosecution of a secondary sanctions violation?

1    A.  I'm not.

2    Q.  And you've read the indictment in this case; am I correct?

3    A.  I have not.

4    Q.  Has anybody described the indictment to you in this case?

5    A.  No.

6    Q.  Do you have an understanding of what the nature of the

7    sanctions violation here is?

8            MR. LOCKARD:  Objection.

9    Q.  Primary or secondary?

10           THE COURT:  I'll allow it.

11   A.  No.

12   Q.  There was a Greek businessman by the name of Dimitris

13   Cambis, name sound familiar to you?

14   A.  Yes.

15   Q.  And Dimitris Cambis was sanctioned; am I correct?

16   A.  I believe that's right.

17   Q.  And he was sanctioned, do you recall for what?

18   A.  Something having to do with Iran sanctions, although I do

19   not recall precisely what.

20   Q.  Engaging in sanctionable activity?

21   A.  Yes.

22   Q.  Am I correct?

23   A.  Yes.

24   Q.  Do you remember telling people at Halkbank about Dimitris

25   Cambis?

HC8PATI2                    Cohen - Cross

1   A.  Not offhand I do not.

2   Q.  And do you know if Dimitris Cambis was ever prosecuted?

3           MR. LOCKARD:  Objection.

4           THE COURT:  If you know.

5   A.  I think he was; although, I'm not certain of that.

6   Q.  What makes you say you think he was?

7   A.  That's my best recollection.  But just to be clear,

8   Mr. Rocco, I don't know for sure.

9   Q.  So the answer is?

10  A.  I believe so, but I don't know for sure.

11  Q.  But you don't know; am I correct?

12          MR. ROCCO:  I'm not trying to put words in the

13  witness' mouth, your Honor.

14          THE COURT:  No, he said what he said.

15  A.  I believe so.  I don't know for sure.

16  Q.  All right.  So well, by the way, if activity is

17  sanctionable, am I right, that it doesn't mean that it is

18  unlawful or illegal?  Am I correct?

19          MR. LOCKARD:  Objection.

20  Q.  In itself?

21          THE COURT:  If you know.  If you know.

22  A.  I believe -- I've always thought that activity that is

23  sanctionable is unlawful.

24  Q.  Well, have you, in your public statements to that, do you

25  say that -- do you recall saying that sanctionable activity is

HC8PATI2                        Cohen - Cross

1    unlawful or illegal?

2    A.  I don't recall one way or the other addressing that

3    publicly.

4    Q.  And how about in your conversations with Halkbank, did you

5    tell Halkbank ever that sanctionable activity was unlawful or

6    illegal or criminal?

7    A.  Yes.

8    Q.  And when did you do that?

9    A.  So let me be precise.  I think I testified earlier part of

10   the standard presentation that I would make to and did make to

11   Halkbank, as well as other banks around the world, was to

12   describe our sanctions programs in a comprehensive fashion.

13   That includes, for most of our sanctions programs are based on

14   the statute we were talking about, IEEPA.

15           IEEPA has, as part of the potential consequences of

16   violating a sanction program that's based on IEEPA, a criminal

17   prosecution.  So as part of my standard presentation about our

18   sanctions programs, one of the things that I would say is, you

19   know, and if you violate the sanctions, it is potentially a

20   criminal violation under U.S. law.

21   Q.  And that's primary sanctions, IEEPA; is it not?

22   A.  Yes.

23   Q.  Okay.  It's not secondary sanctions; am I correct?

24   A.  That is correct.

25           MR. LOCKARD:  Objection.

1    Q.  So, Mr. White, can you bring up Tab 10?

2    A.  I'm sorry, Mr. Rocco.  I've actually never really parsed

3    IEEPA that way.  I'm not sure that you can't do secondary

4    sanctions under IEEPA, but that's -- but as we were talking

5    earlier, there is CISADA, which is a different statute than

6    IEEPA, and that's where the secondary sanctions first arose.

7    So I'm just trying to be precise.

8    Q.  Thank you.  And I appreciate that.  And I'm not trying

9    to -- I'm trying to draw a distinction about IEEPA, which

10   apparently is the foundational sanctions legislation and

11   CISADA, which came later and modified it, and CISADA deals

12   specifically with secondary sanctions; am I correct?

13   A.  Yes.

14           MR. LOCKARD:  Objection.

15           THE COURT:  I'll allow it.

16   Q.  So can I direct your attention to the document that's in

17   front of you.

18           MR. ROCCO:  This is already in evidence, Judge.  It's

19   Government Exhibit 7005.  So can we display this to the jury.

20   Q.  And I want to direct your attention to the second

21   paragraph.

22   A.  Mmm, hmm.

23   Q.  And your language in the last sentence of that paragraph

24   that starts:  "Any Turkish sales" --

25           MR. ROCCO:  I'm sorry, Judge?

1     THE COURT:  No, I was still reading the other --

2     MR. ROCCO:  Sorry, sorry.

3     THE COURT:  Just roll it back for a minute.

4     MR. ROCCO:  I apologize.

5     (Pause)

6  BY MR. ROCCO:

7  Q.  Do you recall that -- obviously, you recalled the letter?

8  A.  I did.

9  Q.  Obviously, you testified earlier you recalled the letter?

10  A.  Yes.

11  Q.  And just directing your attention to the last sentence of

12  the second paragraph.  Can we bring that up?  In that sentence

13  you're telling Mr. Aslan that there are circumstances in which

14  any Turkish sales of gold to the government of Iran, as part of

15  a payment mechanism for the purchase of Iranian petroleum,

16  could expose those involved to U.S. sanctions.  There you're

17  telling, again Mr. Aslan, about the sanctions, correct?

18  A.  Yup.

19  Q.  And you're not telling him that it would subject anyone to

20  a criminal prosecution; am I correct?

21  A.  That's what that says, yes.

22  Q.  And there are typically, when you were dealing with foreign

23  banking institutions -- let's talk about Halkbank.  When you

24  spoke to Halkbank about the consequences of engaging in

25  activity that violated U.S. sanctions, you would tell the bank

1   that the activity was potentially sanctionable; am I correct?

2   A.  That's typically the description, yes.

3   Q.  Well, is there an instance where you told -- that comes to

4   your mind, as you sit here today, where you told Halkbank or

5   anyone at Halkbank they could be criminally prosecuted for

6   violating U.S. sanctions?

7   A.  As I testified just a moment ago, part of my standard

8   presentation on U.S. sanctions programs was that IEEPA-based

9   sanctions, which includes executive order 13622, which was in

10  this letter, that the violation of IEEPA-based sanctions can

11  expose the violator to sanctions or potentially criminal

12  prosecution.

13  Q.  Well, what I'm trying to do is understand what the context

14  was that you made that your general presentation.  Did you make

15  the general presentation every time you met with somebody from

16  Halkbank?

17  A.  No.

18  Q.  And is it fair to say that when you were dealing with

19  specific issues such as this, right, there's a specific concern

20  that you're addressing?

21  A.  Right.

22  Q.  Do you have a recollection of ever telling anyone at

23  Halkbank, that Halkbank or anyone associated with Halkbank

24  could be criminally prosecuted, as opposed to exposing the bank

25  to U.S. sanctions and being blocked from the U.S. financial

1    system?

2    A.  So I don't have a specific recollection of telling anyone

3    at Halkbank, including Mr. Atilla, that specifically if you

4    violate the gold sanctions, that that itself could lead to

5    criminal prosecution.  That's what we're talking about here,

6    though, isn't exposing Halkbank to secondary sanctions.  We're

7    talking about exposing the persons involved -- could expose

8    those involved; so the bank, or the individuals, to U.S.

9    sanctions that's a primary sanction under Executive Order

10   13622.

11   Q.  Thank you for that clarification.  I'm more interested in

12   knowing -- there was a mantra, there was a -- when you met with

13   banks and your principal concern was discouraging banks from

14   engaging in sanctionable activity; am I correct?

15   A.  Yes.

16   Q.  And you would -- and essentially, the hammer you used, if I

17   can use a metaphor, in trying to communicate that to banks was

18   that they would be blocked from the U.S. financial system; am I

19   correct?

20   A.  So it varied depending on the sanctions that we were

21   talking about, but that's right.  For banks, the hammer, to use

22   your phrase, was that they could be blocked from the U.S.

23   financial system.

24   Q.  Well, I want to talk -- I'm sorry, because I just want to

25   make it clear that I'm talking about Halkbank, and do you have

1   a specific recollection of telling Halkbank, using a threat of

2   criminal prosecution in your conversations with Halkbank?

3   A.  As I've tried to be clear, I don't recall the specific

4   instance where I did that general overview of the U.S.

5   sanctions regime for Halkbank or for Mr. Atilla specifically.

6           It was part of my normal presentation, particularly

7   sort of early on in the -- if it was a bank with which we had

8   ongoing conversations, it would be something I would have done

9   early on.  If it's a bank that I only had a one-off

10  conversation with, it would be in that one-off conversation.

11  But I don't have a specific recollection of doing -- of talking

12  about potential criminal prosecution with Mr. Atilla or

13  Halkbank, but I also don't have any doubt that, at some point,

14  I did that.

15  Q.  Well, you mean, in a more general discussion of --

16  A.  Correct.

17  Q.  -- of potential --

18  A.  Go ahead.

19  Q.  No, I'm sorry.  You started to say?

20  A.  And I think I testified just a moment ago, I don't have any

21  specific recollection of having a conversation specifically

22  with respect to gold transactions themselves, that -- where I

23  said, you know, if you do gold transactions or violate our

24  sanctions, that you can be criminally prosecuted.  I don't have

25  a recollection of that specific conversation.

HC8PATI2                          Cohen - Cross

1    Q.  Let's turn, if we can, just to sanctions evasion?

2    A.  Mmm, hmm.

3    Q.  There were --

4              THE COURT:  Could I interrupt you just for one minute

5    and ask you a question at sidebar.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At the side bar)

2    THE COURT:  I'm trying to figure out the timing and

3    lunch, and I think I told them 2:30.

4    MR. ROCCO:  You did.  I'm not sure, Judge.  I'm not

5    sure how much longer I'm going to be with him.  I actually

6    thought that the direct was going to be shorter than it was.

7    So it's 12:30.  I think I can be another two hours with him.

8    MR. LOCKARD:  Your Honor, I think the government wants

9    to renew its objection.  Mr. Rocco has gone on probably a half

10   hour of cross about strictly legal opinion in a way that I

11   think is both not correct to the law and very confusing to the

12   jury.  And we would ask that any further questioning about

13   legal opinions be precluded, and I think the record that has

14   been created is going to be so confusing to the jury.

15   THE COURT:  Well, you'll straighten them out on

16   redirect.

17   MR. ROCCO:  Your Honor, if I may.  What I'm trying to

18   do is --

19   THE COURT:  I don't --

20   MR. ROCCO:  I'm sorry.

21   THE COURT:  I did rule, and I said limited beyond --

22   MR. ROCCO:  I'm trying what I --

23   THE COURT:  Wait.  The other thing is, you know, and

24   rightly so, everybody is an advocate, but you have asked the

25   same question maybe five times now.

HC8PATI2                        Cohen - Cross

1                MR. ROCCO:  Well, what I'm trying to do is really get

2       to the statements.

3                THE COURT:  You're trying to get the answer you

4       want --

5                MR. ROCCO:  Thank you, your Honor.  You're being kind.

6                THE COURT:  -- instead of the answer that you've

7       gotten, and I understand that.  So you are overdoing some parts

8       of it.

9                MR. ROCCO:  What I'm trying to do, really, is get to

10      the statements that he made to the bank and/or Mr. Atilla.

11               MR. LOCKARD:  I think that's --

12               MR. ROCCO:  Excuse me, Mr. Lockard.  That's what I'm

13      trying to do.

14               THE COURT:  Okay.

15               MR. ROCCO:  I'm not trying to elicit a legal opinion.

16               MR. LOCKARD:  But we haven't gotten that.  We've been

17      spending a lot of time talking about things that are just

18      Mr. Cohen's legal opinions.

19               MR. ROCCO:  Thank you.

20               THE COURT:  So I think what I'm going to do, do you

21      think it's smarter to break now or later?  Do you think you're

22      going to go two more hours?  Maybe I'll take a half-hour break

23      and let them eat something.

24               MR. ROCCO:  I think you should do that.

25               THE COURT:  I'll do that now.

```
 1              MR. ROCCO:  That's fine.

 2              THE COURT:  Sure, sure.

 3              MR. ROCCO:  Because, quite frankly, Judge, I don't

 4    want you to break the promise to them.

 5              THE COURT:  No, no.  We'll just have to bring him back

 6    on Monday.

 7              MR. ROCCO:  Thank you.  Thank you.

 8              MR. DENTON:  We can't do that.

 9              MR. LOCKARD:  Your Honor --

10              THE COURT:  I'm sorry?

11              MR. LOCKARD:  Just in terms of timing, we sort of

12    rearranged everybody's schedule so that Mr. Cohen would be done

13    today, and we strongly want that to happen.

14              THE COURT:  I know, but this is trial and stuff

15    happens.

16              MR. LOCKARD:  We did start him yesterday afternoon,

17    and this goes to our objection about the irrelevant legal

18    opinion in his testimony, but it has delayed Mr. Cohen being

19    able to go home and is also not legally relevant testimony for

20    the jury, we think.

21              THE COURT:  Yes.  There's also a question about his

22    accuracy, to be perfectly honest with you, but we could debate

23    that.

24              MR. ROCCO:  We could, your Honor, and also, just for

25    the record, I mean, Mr. Atilla's life is at stake here.  I'm
```

HC8PATI2                        Cohen – Cross

1    not so concerned about Mr. Cohen's schedule.

2              THE COURT:  And that's why I wanted to give you

3    latitude on your cross-examination.

4              MR. ROCCO:  Sure, Judge.

5              THE COURT:  And the ruling.

6              MR. ROCCO:  Thank you, Judge.  I appreciate it.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HC8PATI2                          Cohen – Cross

 1              (In open court)

 2              THE COURT:  So I think we'll take a short lunch break.

 3     There is some snack material, so to speak, for you in the jury

 4     room.  If you want something else, you're certainly free to go

 5     to the cafeteria or whatever.  So why don't we say, I think

 6     we'll do 45 minutes.  Can you handle that?  So let's pick up

 7     again at 1:15.  It's 12:30 now.

 8              (Jury not present)

 9              (Luncheon recess)

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                          AFTERNOON SESSION

1                              1:15 p.m.

2

3              (In open court; jury present)

4              MR. ROCCO:  With your Honor's permission?

5              THE COURT:  Go ahead, Mr. Rocco.  Continue with the

6    cross-examination by Mr. Rocco.

7    BY MR. ROCCO:

8    Q.  Hello again, Mr. Cohen.

9    A.  Hello.

10   Q.  Maybe I should say Dr. Cohen with that signature.

11   A.  Thank you.

12   Q.  So, we were talking about the meetings that you had with

13   Halkbank in the four years that you were undersecretary.  And

14   there were communications between Halkbank also that we looked

15   at quickly, we'll come back to them, you did on direct

16   examination, e-mails and letters and such.

17              In communications --

18              THE COURT:  Is there a question coming?

19              MR. ROCCO:  Yes.

20   Q.  In the communications there was --

21              MR. ROCCO:  Thank you, your Honor.  You're always a

22   couple of steps ahead of me.

23              THE COURT:  Well.

24   Q.  In the communications with the bank, there were times

25   where, is it fair to say, that the bank was -- Halkbank, we're

1    talking about -- was praised by OFAC for its cooperation and

2    transparency?  Do you have a recollection of that?

3    A.  I don't have a specific recollection of that.  I think we

4    had -- we had, I thought, a good and open communication with

5    Halkbank.  But I don't know of OFAC praising them.  I just

6    don't know.

7    Q.  Let's see if we can refresh your recollection.

8           MR. ROCCO:  So can we bring up tab 15 and not for the

9    jury.  This is Government Exhibit 701-A.  I believe this is

10   already in evidence.

11          MR. DENTON:  It's not.

12          MR. ROCCO:  We'll put it in evidence, thank you.

13   Q.  Can you read that letter to yourself.

14          (Pause)

15   A.  Can I see the second page?

16          Okay.

17   Q.  Do you recognize that document?

18   A.  I don't recognize it as a document that I've ever seen

19   before.

20   Q.  Do you know who Barbara Hammerle was?

21   A.  She was the deputy director of OFAC at the time.

22   Q.  In looking at that letter, does that refresh your

23   recollection about an Italian bank called Sace?

24          MR. LOCKARD:  Objection for failure of recollection.

25          MR. ROCCO:  I just asked if it refreshed his

1   recollection.

2   A.   I'm familiar with the issue here.  I'm not familiar with

3   this document.

4   Q.   So, do you recall that Halkbank provided the Department of

5   Treasury or OFAC specifically with information about an Italian

6   bank and an Iranian transaction?

7   A.   I don't recall that.

8            MR. LOCKARD:  I don't object to the introduction of

9   this document.

10           MR. ROCCO:  I'll move it in evidence, your Honor.

11           THE COURT:  He said he did not recall the transaction.

12           MR. ROCCO:  I believe -- I'm sorry, Judge.  I don't

13   want --

14           THE COURT:  Why don't we have a readback.  Everybody's

15   talking at the same time.  Could you read the question and the

16   answer.

17           (The record was read)

18   Q.   I thought you said that you recalled the transaction.  Do

19   you recall the transaction?

20   A.   What I recall is there being an issue with Sace, which is

21   the Italian export support agency, and a repayment issue on

22   loans that they had extended that Iran owed back to Sace.  I

23   don't recall Halkbank's involvement in that issue.

24   Q.   Then we'll move on.  Thank you.

25           MR. ROCCO:  Can we bring up tab 18.  We marked it as

 1   Defendant Exhibit 211 not for the jury.  I thought I asked for

 2   tab 16.  I apologize if I misspoke.

 3            Can you bring it up on the screen for Mr. Cohen.

 4   Q.  Do you recall that document?

 5   A.  Yes, I do.

 6   Q.  Does it refresh your recollection about a transaction --

 7            MR. LOCKARD:  Objection.

 8   Q.  -- advice?

 9   A.  I'm sorry, your question?

10   Q.  This memorializes a conversation that you had with

11   Mr. Suleyman?

12   A.  That's correct.

13   Q.  This was back on November 8, 2012?

14   A.  Right.

15   Q.  This is a telephone conversation?

16   A.  Yes.

17   Q.  Who is Eytan Fisch?

18   A.  "Eytan."

19   Q.  Thank you.

20   A.  That's okay.  He was a -- he was in OFAC at the time.  I

21   don't know precisely his title.

22   Q.  Can you walk us through what this is about, Mr. Cohen.

23            MR. LOCKARD:  Objection.

24            THE COURT:  This is a document?

25            MR. ROCCO:  This is a document that memorializes a

1    conversation that Mr. Cohen had with -- this is an OFAC

2    document.

3         THE COURT:  You can ask him about his current

4    recollection.

5         MR. ROCCO:  I'm going to ask him about his current

6    recollection of the events that are discussed in this

7    memorandum.  I am asking him to walk us through the events.

8    A.  I think I testified about this on direct.  This was a call

9    that I placed to Mr. Aslan as we saw other banks in Turkey

10   exiting their business with Iranian counterparties.  And given

11   Halk's role as the designated bank in Turkey to handle the oil

12   payments, I called Mr. Aslan to raise and to sort of reinforce

13   the concern we had that the Iranians would try to use Halkbank

14   and its services to evade sanctions.

15        So that was the purpose of the call.  There was -- at

16   this time, it was in the runup to the February 6, 2013,

17   effective date of the bilateral trade restriction, so I raised

18   that issue as well.  And Mr. Aslan raised the issue of gold

19   sales with me.

20   Q.  Just directing your attention to that the portion of the

21   e-mail -- I'm sorry.  The portion of the document that speaks

22   about Halk's sanctions compliance as being significant.  Can we

23   highlight that.

24        You're talking about your conversation with

25   Mr. Suleyman, and in fact you're telling Mr. Suleyman that OFAC

1    appreciates, am I correct, the significant compliance efforts

2    with international sanctions.  Did you commend him on that in

3    that conversation?

4    A.  I wouldn't say I commended him.  I would say that they

5    had -- "they" being Halkbank, so Mr. Aslan, Mr. Atilla -- had

6    described to us what they -- what they presented as their

7    significant efforts to comply with U.S. and there were a whole

8    set of international sanctions as well from the E.U. and from

9    the U.N.

10            So that's what I was referencing here.

11   Q.  By the way, while we're on the subject, do you know if

12   Turkey has ever ascribed or agreed with U.S. sanctions against

13   Iran?

14           MR. LOCKARD:  Objection.

15           THE COURT:  I don't understand the question.

16   Q.  Has Turkey ever agreed to comply with U.S. sanctions with

17   Iran?

18           THE COURT:  If you know.

19   A.  So, that is a very complicated question, Mr. Rocco.  I've

20   had senior Turkish government officials who have told me that

21   they, back in this time period, were fully in favor of the

22   efforts that we were undertaking to put pressure on Iran to try

23   to bring about a diplomatic negotiation.  I know there are

24   other Turkish official who at times have taken -- have said

25   things to the contrary.

1        But, I can, if you'd like, I can give you a longer

2   answer on the number of different Turkish officials who have

3   told me that they were fully in favor of what we were doing on

4   the sanctions front.

5   Q.  So, it would be fair to say -- and I don't want to put

6   words in your mouth.  Would it be fair to say that you got

7   mixed messages?

8   A.  I did not.  I got a consistent message from the Turkish

9   officials that I dealt with that they were supportive of our

10  efforts.

11  Q.  Did you hear from others then that they -- that Turkish,

12  there were Turkish officials that were not supportive of it?

13        MR. LOCKARD:  Objection.

14  A.  I read press accounts of other officials taking a different

15  position.

16        THE COURT:  We're talking about this case.

17        MR. ROCCO:  We're talking about this case.  U.S.

18  sanctions, I'm sorry.  Your Honor, I don't want to make a

19  speech.  Thank you.

20        Relax, David.

21        THE COURT:  In this case, dealing with you, did

22  Halkbank ever say "No, we're not going to deal with you because

23  we don't believe in sanctions against Iran"?

24        THE WITNESS:  Not at all, your Honor.

25  Q.  Let me direct your attention to Government Exhibit 7010.  I

 1    believe this is already in evidence.

 2                MR. LOCKARD:  No.

 3                MR. ROCCO:  Okay.

 4    Q.  Can you bring it up just for Mr. Cohen.

 5                Have you seen this document before, are you familiar

 6    with it?  Take a moment and read it to yourself.

 7    A.  I've never -- I don't think I've ever seen this document

 8    before.

 9    Q.  Are you familiar with the transaction that it references?

10    A.  No.

11                MR. ROCCO:  We'll pass it and go on.  Thank you.

12    Q.  Is it fair to say that over the years that Halkbank

13    provided intelligence information to the Department of Treasury

14    on certain transactions involving Iran?  Do you have a

15    recollection of that?

16    A.  I do not believe Halk provided intelligence information.

17    Q.  Do you recall, are you familiar with an individual by the

18    name of Hossein Tanideh?

19    A.  Does not ring a bell.

20                MR. ROCCO:  Can we bring up tab 19, Government Exhibit

21    7017.

22    Q.  Directing your attention to this document and ask you if

23    you are familiar with it.  You're not copied on it.

24    A.  Yeah.

25                I don't believe I ever saw this document, and I'm not

1   familiar with the transaction.

2   Q.  Then we'll pass on it.  Thank you.

3           Do you have any recollection, Mr. Cohen, of Halkbank

4   seeking guidance on transactions, whether transactions were

5   permitted or not permitted under secondary sanctions, or more

6   generally, U.S. Iranian sanctions from time to time?

7   A.  Yes.

8   Q.  Was that a frequent occurrence, would you say?

9   A.  I mean, it was -- I mean, they asked questions.  I don't

10  know frequent, I don't know what you mean by "frequent."  But

11  there was a stream of questions from Halkbank I would say.

12  Q.  I'm not trying to be difficult.

13  A.  I'm not trying to be difficult either, I'm trying to be

14  precise.  They asked questions from time to time that we tried

15  to answer.

16  Q.  When you say from time to time, was it -- I hate to use --

17  was it a regular occurrence?  I mean, did it happen on a

18  monthly basis, an annual basis?

19          THE COURT:  As best you can recall.

20  A.  Yeah.  My best recollection is that when in the meetings

21  that I had with Halkbank executives, there were certainly

22  questions about compliance issues.

23          My understanding is that outside of those meetings,

24  some of the folks who worked in Treasury and OFAC also had

25  meetings with Halkbank, and that there were also some

1  communications with Halkbank during which there were also some

2  questions asked in those communications.

3  Q.  What I'm trying to get at is were there times when Halkbank

4  was seeking guidance on particular transactions, and what, if

5  anything, sanctions allowed or did not allow?

6  A.  Sure.

7  Q.  And typically, I understand your testimony to be, and

8  again, I don't want to put words in your mouth, is these

9  transactions would be handled by people at lower levels at

10  OFAC; am I correct?

11  A.  Yeah.  Just to be clear, Mr. Rocco.

12         THE COURT:  Hold on a second.  I didn't get the

13  question.

14         MR. ROCCO:  I was asking is it clear that these

15  transactions would be run by people at lower levels at OFAC.

16         THE COURT:  You mean from the bank?

17         MR. ROCCO:  From the bank to OFAC.

18         THE COURT:  If this is okay or not okay or

19  interpretations, that kind of thing?

20         MR. ROCCO:  Yes, sir.

21         THE COURT:  Okay.

22  A.  Yeah.  Just I want to be clear.  My understanding is that

23  they asked broader questions about the application of the

24  sanctions, not "here's a particular transaction with these

25  parties, can we do this or can we not do this."  It was a

1    broader -- it tended to be broader conversations.

2    Q.  Can we bring up -- I was going to show you a document but

3    in the interest of time I'm not, because I see that you're not

4    copied on it.

5           So can we bring up tab 26 and show it to Mr. Cohen.

6    To take a moment.  This is Government Exhibit 7013.  I'm going

7    to ask if you're familiar with the transaction, with the

8    document or with the transaction that's discussed.

9           THE COURT:  Could we do that in two separate

10   questions?

11          MR. ROCCO:  Yes, your Honor.  I'm asking him to bear

12   it in mind while he looks at the document.

13   A.  I don't believe I've ever seen this document before.

14   Q.  The second question is are you familiar with the events

15   that it discusses?

16   A.  I have a vague recollection of the events.  But not this

17   specific episode.

18   Q.  Then we'll spare everyone and we'll move on.

19   A.  Okay.

20   Q.  7015.  I'm going to show you what's been marked Government

21   Exhibit 7015.  Can we bring it up for Mr. Cohen.  Again, can

22   you look at the document, and I am just going to ask you one

23   question.  Are you familiar with the events that that document

24   discusses?

25   A.  I will give you the same answer.  This is just a follow-on

1   to the e-mail exchange from the prior document.  I'm vaguely

2   familiar with the general topic, but not the specific episode.

3   Q.  Do you know if OFAC ever responded to these inquiries?

4   A.  I see here there is an e-mail --

5          I don't know.  Sorry, I don't.

6          THE COURT:  That's fine.

7   Q.  You don't, okay.  So that takes care of that.  Thank you.

8          In terms of Treasury's dealings with Mr. Atilla

9   specifically, do you recall times where Mr. Atilla would make

10  inquiries of Treasury and with respect to the particular

11  transaction?

12  A.  Again, in my interaction with Mr. Atilla, it was not

13  transaction specific.  It was on broader principles of the

14  sanctions.  And I just don't know whether he had conversations

15  with others on a more transaction-specific basis.

16  Q.  Well, did you ever discuss or have discussions with

17  Mr. Atilla about -- or anybody at the bank -- about the bank

18  seeking guidance and OFAC being dilatory in its responses?

19  A.  I don't recall that.

20  Q.  When you met with the bank and there would be these, I

21  suspect, higher-level discussions, meaning more policies?  Is

22  that what you were saying, your discussions were more policy

23  oriented?

24  A.  Principle oriented.  The legal principles involved.

25  Q.  Right.  And did it ever come up that the bank had

1    complaints that it registered with OFAC or with you?

2    A.   Not that I recall.

3    Q.   It was clear, was it not, in your discussions with Halkbank

4    that Halkbank played a major role in the economic relationship

5    between Turkey and Iran; am I correct?

6    A.   Absolutely.

7    Q.   That's something that the Department -- that DOT and

8    yourself were very mindful of; am I correct?

9    A.   Yes.

10   Q.   It was part and parcel of the dialogue, for lack of a

11   better word, between Treasury and between Halkbank.  So it was,

12   so to speak, out there that you would have discussions about

13   the economic relations and the importance of Halkbank to the

14   economic relations between Turkey and Iran, correct?

15            THE COURT:  Hold it.  I think there's two questions.

16            MR. ROCCO:  It was a horrible question.  I withdraw

17   it.  It was horrible.

18            THE COURT:  Sure.  I didn't say that.

19            MR. ROCCO:  I did.  I'm happy to admit it.

20   Q.   So, you in particular had an understanding that Halkbank

21   was very important in the relationship between the economic

22   relationship between Turkey and Iran?

23   A.   I did.

24            MR. ROCCO:  That was a little better, your Honor.

25   Q.   So to speak, it was not something that was concealed.  It

1   was conspicuous; am I correct?

2   A.  Absolutely.

3   Q.  And it was for that, in part, one of the reasons that

4   Treasury was so concerned about what Halkbank was doing,

5   correct?

6   A.  Yes.

7   Q.  Treasury knew that Halkbank in Turkey were major

8   economic -- had a major economic relationship, correct?

9   A.  With Iran?

10  Q.  Yes.  I'm sorry.

11  A.  Yes.

12  Q.  I apologize.  I may have misspoken.  Another bad question.

13  But, it was self-corrected.

14          THE COURT:  We're here to help.

15          MR. ROCCO:  Thank you.  Your Honor, it's pretty

16  obvious I need all the help I can get.

17  Q.  It's because they're neighbors, they share a common border,

18  correct?  And they share a common culture and they share a

19  common faith; am I correct?

20  A.  I would say border, yes.  Culture, eh.  Faith, depends.

21  Q.  Fair enough.  I shouldn't have wondered out of my lane.

22  You mentioned that there were times that there were

23  conversations between OFAC and Halkbank about gold trade.

24  Correct?

25  A.  There were conversations between myself and Halkbank about

1    the gold trade.  I believe there were also conversations that

2    people in OFAC had, in particular Mr. Szubin, with Halkbank

3    regarding gold trade.

4    Q.  Well, I think you -- again, I don't want to mischaracterize

5    anything that you've said.  But it sounds -- I believe that

6    your testimony this morning was that Treasury had significant

7    concerns about what was going on with respect to the gold trade

8    between Turkey and Iran, correct?

9    A.  That's right.

10   Q.  Did you ever articulate those suspicions to Halkbank?

11   A.  I did.

12   Q.  Did you say that you were suspicious of what was going on?

13   A.  I don't know if I used the word "suspicious," but I

14   certainly raised with Halkbank concerns that we had about the

15   gold trade between Turkey and Iran and Halkbank's role in it.

16   Q.  I understand that.  To the best of your recollection, and

17   certainly you're not going to remember what you said to them

18   verbatim, but words, you know, are very important.

19          So can I ask you to the best of your recollection what

20   did you say, what do you recall saying?

21          THE COURT:  At any particular meeting?

22   Q.  At any or all.  If you have a specific recollection, I'll

23   start by saying do you have a specific recollection on any

24   occasion of what you said and in terms as precise as you can

25   recall.

1   A.  So you're right, I do not recall anything I said verbatim.

2   I -- so to take it back from that spring of '13 meeting that we

3   were talking about earlier, in sum and substance what I said to

4   Mr. Atilla was, we've seen an increase in the gold exports from

5   Turkey to Iran, we are concerned that that reflects an effort

6   by the Iranian government to acquire gold and not simply

7   purchases by truly private Iranian parties.  My recollection is

8   that I -- I told him we had other reasons to be concerned that

9   I was not prepared to share with him.

10          And I inquired into the -- a couple of things.  One

11  was their willingness to adhere to U.S. sanctions, and assuming

12  the answer to that was "yes," their means for ensuring that

13  they were complying with U.S. sanctions.

14  Q.  And you recall specifically having conversations, a

15  conversation with Mr. Atilla about this very subject; am I

16  correct?  As opposed to anyone else at Halkbank?

17  A.  Correct.

18  Q.  But you don't recall at what particular meeting you had

19  this discussion; am I correct?

20  A.  No.  I think that -- I do recall in the spring of '13 the

21  meeting in Turkey, having this conversation with Mr. Atilla.

22  Q.  What was Mr. Atilla's response to you, as best as you can

23  recall?

24  A.  Again, I don't remember verbatim.

25  Q.  As close as you can to what he said.

1    A.   That they were also aware of the increase in the gold

2    trade, that they had customers that sold gold to private

3    parties in Iran, that they had the means to ensure that their

4    customers were selling to private individuals in Iran, not to

5    the government of Iran, that they understood what the sanctions

6    permitted and forbade, and that they were committed to

7    complying.

8    Q.   Do you recall asking Mr. Atilla whether or what means they

9    had of verifying who the customer was?

10   A.   Yes.

11   Q.   I think who the seller was, if I understood your question

12   correctly.

13            THE COURT:   Do you mean the bank customer?

14            MR. ROCCO:   Yes, sir.

15   Q.   Who the bank customer was, yes.

16   A.   So both the bank's customer and the customer of the bank's

17   customer.

18            So what was important to us was not necessarily who

19   was selling the gold.  It was who was purchasing the gold.  And

20   a compliance program that is geared to ensuring that the

21   purchaser of a good is someone who is not -- is someone who is

22   permissible, needs to have within its scope the ability to sort

23   of inquire into the bank's customer and to get comfortable that

24   the bank's customer knows who they're dealing with on the other

25   end, which is not an easy thing to do.  Right.  Because it's

 1   not your customer.  It is your customer's customer.

 2            I had conversations with Mr. Atilla about how they can

 3   be confident that as they are intermediating substantial

 4   amounts of gold to Iran, they can be confident that the

 5   purchaser is in fact a private Iranian individual and not the

 6   government or someone acting on behalf of the government.

 7   Q.  What did Mr. Atilla say?  How did Mr. Atilla address your

 8   concern?

 9   A.  So, again, in sum and substance, what he told us was that

10   we should be assured that they had the compliance function,

11   they had a robust compliance function, so that they knew who

12   their customers were, and were confident that their customers

13   understood what the sanctions were, and that their customers

14   were selling to permissible purchasers in Iran.

15   Q.  I'm sorry, but that's what my question is.  Did he explain

16   what that robust compliance function was or did you ask him

17   what that robust compliance function was?  Did you drill down?

18   A.  Yeah.  Not all the way down to bedrock.  But we did ask, I

19   asked how can you be confident.  And as I recall, the response

20   was we know who we are dealing with as customers of Halkbank,

21   and we make an effort to not just know our customer, but to

22   also do spot checks on goods that are leaving Turkey for Iran,

23   in sort of a range of ways in which a bank can assure itself

24   that it knows the type of trade that it's intermediating.

25   Q.  Did Mr. Atilla explain to you how they did that?  How they

1  confirmed those transactions, whether they used -- the kind of

2  documentation that they used?

3  A.  So as I recall, there was discussion about looking at bills

4  of lading, which are the forms that describe what is being

5  exported.  And as I recall some spot checks at the dock

6  essentially, the port where things are being exported.

7        But, as I say, I didn't spend an enormous amount of

8  time doing a compliance review of Halkbank's compliance

9  program.

10       What I was interested in was ensuring that they

11 understood what the sanctions were, and trying to understand

12 whether they both had the willingness and the capability to

13 comply with the sanctions.

14 Q.  Were you asking these questions in reference to the gold

15 trade?

16 A.  Yes.

17 Q.  You're saying it's your recollection that that's what

18 Mr. Atilla himself said, that they were checking bills of

19 lading and loading documents at ports; am I correct?

20 A.  Yeah.  Not that he was doing it, but that people working

21 for the bank were doing that.

22 Q.  So, by the way, I think that's an important point worth

23 asking.  Did Mr. Atilla tell you that he was doing it?

24 A.  No.

25 Q.  You certainly didn't believe that he was doing it?

HC83ATI3                      Cohen - Cross

1  A.  I would not have expected that he would be doing that

2  himself.

3  Q.  You would expect that someone at the lower level of the

4  bank was doing it?

5  A.  Correct.

6  Q.  Did you know whether Halkbank had a compliance department?

7  A.  I had an understanding that it did, based on my

8  conversations with Mr. Atilla.

9  Q.  Do you know how large that department was?

10  A.  No.

11  Q.  You are you aware of whether their software programs and

12  the like that the bank subscribed to that would help them, the

13  bank, that is, comply with U.S. sanctions?

14  A.  I believe that they had a screening, software screening

15  program so that they were able to identify if a counter party

16  in a transaction was someone for whom sanctions had been

17  applied.  But we did not discuss what program they used.

18  Q.  That program would be consistent with the representations

19  you say Mr. Atilla made to you about what their compliance

20  efforts were; am I correct?

21  A.  Yes.

22  Q.  By the way, just for sake of clarity, you said before, you

23  mentioned international sanctions.  And again, this is not a

24  trick question.  But is it fair to say that U.S. sanctions are

25  a bit more complicated than international sanctions with

HC83ATI3                          Cohen - Cross

1    respect to Iran?

2    A.  Yes.

3    Q.  Would it be fair to say that U.S. sanctions have been

4    changing pretty regularly -- strike "pretty regularly."

5            That there have been changes in the U.S. sanction

6    regime since 2010, 2011?

7    A.  Yes.

8    Q.  It's all been part of your meetings with the bank in terms

9    of trying to update the bank and keep the bank informed as to

10   those changes, correct?

11   A.  Yes.

12   Q.  Because those changes have been significant?

13   A.  Yes.

14   Q.  Correct?

15           And the changes, by and large, until 2015, the

16   sanctions regime was I believe you testified to kind of

17   tightened?

18   A.  Yeah.

19   Q.  Am I correct?

20   A.  Yes.

21   Q.  By the way, did you know that Mr. Atilla directed that

22   there should be no transactions involving Iran that be sent

23   through New York -- U.S. banks at Halkbank, that he issued a

24   directive to that effect?

25           MR. LOCKARD:  Objection.

1    THE COURT:  I'll allow it, if you know.

2    A.  I don't know that.

3    Q.  Did OFAC ever tell Halkbank that it was violating U.S.

4    sanctions?

5    A.  I can speak to what I did.  You know, there's –– as I think

6    I testified, there were other people in OFAC who had –– there

7    are people in OFAC, rather, who had communications with

8    Halkbank.

9            To the best of my recollection, I never made the

10   declarative statement to Halkbank that they are violating U.S.

11   sanctions.

12   Q.  In meeting with Halkbank, in the meetings that you had with

13   Mr. Atilla and others at Halkbank, did you ever tell them they

14   were doing something wrong?  I don't mean illegally or unlawful

15   or even sanctionable.  But as how they were approaching

16   transactions, it wasn't the right way to do it?

17           THE COURT:  I don't get that.

18           MR. ROCCO:  Withdrawn, your Honor.  It was another one

19   of my bad questions.

20   Q.  We spoke about diligence and representations that you had

21   that the bank was doing diligence on customers, on bank

22   customers.

23           In your conversations with Mr. Atilla, did you ever

24   make specific recommendations to him as to what the bank could

25   be doing to improve diligence?

HC83ATI3                              Cohen - Cross

```
 1   A.  So I don't recall any significant step that I recall
 2   telling them, "you need to start doing this, you're not doing
 3   it."
 4            I'm sure in the course of our conversation about their
 5   compliance program, we talked about, you know, how well they
 6   were doing it.  But I don't remember me saying, for instance,
 7   you've got to screen names against the OFAC list or some
 8   significant hole in their compliance program.
 9   Q.  That's an interesting point.  Did you get assurances from
10   anyone at Halkbank that they were screening names against the
11   sanctions list?
12   A.  Yes.
13   Q.  And those are things that Mr. Atilla told you?
14   A.  I believe so, yes.
15   Q.  So, am I correct that in 2012, OFAC had considerable
16   concerns about what was happening in gold trade between Iran
17   and Turkey?
18   A.  Mr. Rocco, I don't mean to be difficult here.  So in my
19   role, I was at the Treasury.  I wasn't in OFAC.  OFAC reported
20   to me.  So you keep on asking me about OFAC.
21   Q.  Withdrawn, and I'll make a rule, I'll only talk about
22   Treasury.
23   A.  Thank you.
24   Q.  Can we amend my question to say is it fair to say that
25   Treasury had significant concerns about the extent of gold
```

 1   trade between Turkey and Iran in 2012 and into 2013?

 2   A.  Yes.

 3   Q.  As I believe you've testified, this was the subject of

 4   dialogue between Halkbank specifically and Treasury?

 5   A.  Yes.

 6   Q.  Do you remember testifying in front of Congress in May of

 7   2013?

 8   A.  I'm sure I did.

 9   Q.  Okay.  So can we bring up tab 47 just for Mr. Cohen.  Let's

10   go to page 39.

11          I'm going to ask you to read, we'll blow it up for you

12   and ask you to read it to yourself.

13          (Pause)

14   Q.  That's the question and your answer.

15   A.  Yes.

16          MR. ROCCO:  Can we highlight it?

17          (Pause)

18   A.  Okay.

19   Q.  Do you recall being asked that question and giving that

20   answer, Mr. Cohen?

21   A.  I don't actually recall it, but it is entirely consistent

22   with my general recollection of my interaction with Congress.

23   Q.  Is it fair to say that you recall being asked questions

24   about the gold trade with Iran?

25   A.  Generally, yes.

1    Q.  Let me do this a little bit differently.  Maybe we can make

2    it easier.

3    A.  Sure.

4    Q.  This is a transcript.  Do you recall testifying before the

5    Senate Committee on -- I'm sorry.  The House Committee on

6    Foreign Relations back in May of 2015?

7    A.  So I testified before the House Foreign Relations Committee

8    on several occasions.  I have no doubt at all that I testified

9    in May of 2013 and about this.  I just, you know, couldn't tell

10   you that I did that on that date.

11              MR. ROCCO:  Your Honor, I'd like to move this into

12   evidence.

13              THE COURT:  I'll allow it.

14              MR. ROCCO:  Defendant's Exhibit 229.

15              (Defendant's Exhibit 229 received in evidence)

16              MR. ROCCO:  Can we highlight chairman Royce's -- why

17   don't we go to the cover page so the jury can see where

18   Mr. Cohen was that day.

19              This is the Committee on Foreign Affairs in the House

20   of Representatives and the date.  Can we highlight it, please,

21   Mr. White.

22              And we have the date.  And now we can go to page 39.

23   And the question is from Chairman Royce.  And directing your

24   attention to that last paragraph of Chairman Royce's question.

25              Just to make this clear for the jury, the first part

1      of that is the end of Chairman Royce's question to Mr. Cohen.

2      And the question is:  There have been reports that there has

3      been a pickup in gold sales, and that is the question that I

4      want to ask you.

5              Who specifically have you sanctioned for gold or

6      related transactions with the government of Iran, and given

7      that the transfer of any precious metals or gold to Iran will

8      be in violation of U.S. law after the 1st of July, what is the

9      Obama administration going to do before July 1st to prohibit

10     transfer of gold to Iran?

11             And your answer is, can we scroll down a little bit.

12     Let's go a little bit further and let's highlight and "I can

13     assure you."

14             We're obviously aware of those reports and we're

15     tracking very closely the sale of gold to Iran, because as you

16     note, as of last July, the executive order adopted by the

17     president makes sanctionable the sale of gold to the government

18     of Iran.  We've been very clear with our counterparts around

19     the world -- just stopping there.

20     Q.  Can you tell us what you mean by counterparts?

21     A.  Government, governments.

22             MR. ROCCO:  Counterparts around the world and with the

23     private sector actors, that this provision is one that we take

24     very seriously and that we intend to enforce, and I can assure

25     you that we are looking very, very carefully at any evidence

1    that anyone outside of Iran is selling gold to the government

2    of Iran.

3    Q.  You recall making remarks like that?

4    A.  Yes.

5          MR. ROCCO:  Can we move down and scroll down a little

6    bit further.  I apologize.  Can you go to 41.

7    Q.  Can you read that to yourself.

8    A.  Hmm-hmm.

9          (Pause)

10   Q.  Do you recall making -- do you recall testifying to that

11   effect when you appeared before the House?

12   A.  I have no doubt that I said this.

13   Q.  Thank you.

14         MR. ROCCO:  Can we go a little bit beyond that.

15   Q.  With respect to whether Turkey is paying Iran, this is

16   still your testimony, for its gas imports in gold.

17         This is natural gas we're talking about, correct?

18   A.  Yes.

19   Q.  We can go into this in greater detail in the closed

20   session, but I think the short answer is what we do not see

21   this occurring.

22         Can you tell me what you meant by that?  We're talking

23   about using proceeds for natural gas to purchase gold.  Am I

24   correct?

25   A.  Yes.

1   Q.  Here you've been specifically asked gold imports and how

2   gold imports are being paid for by Iran.  Correct?

3   A.  I don't see the question here, but I think that's generally

4   right.

5   Q.  Can you tell me what you had in mind when you made this

6   statement that you made here:  But I think the short answer is

7   that we do not see that occurring.

8   A.  The question as I recall and --

9   Q.  If you want, we can go back to it, if you want?

10  A.  Just right above the highlighted portion here.  So, what

11  Congressman Engel was asking, was whether Turkey was paying for

12  natural gas imports from Iran by with gold.

13  Q.  Right.  Do you mean directly or indirectly?  In answering

14  the question, well, in answering the question, did you have in

15  mind whether it was direct, whether the payments were direct or

16  indirect?

17  A.  I don't know that I had a view on direct or indirect.  I'm

18  not sure I know what the question that you are asking me means.

19  Q.  You made a statement, as I read this, the short answer is

20  that we do not see that Turkey -- that Iran is paying for its

21  natural gas imports in gold.  Am I correct?

22  A.  Yes.

23  Q.  You made that statement based on something.  Am I correct?

24  A.  Yes.

25  Q.  Can you tell the jury what that statement was based on?

HC83ATI3                        Cohen - Cross

1     A.   The whole collection of information available to me at that

2     time.

3     Q.   What was that information?  Was that information based on

4     investigations that were being -- that intelligence agencies

5     were gathering and provided to you?

6               MR. LOCKARD:  Objection.

7               THE COURT:  I'll allow it.  In part or in whole?

8     A.   Yeah.  So my information base at that point consisted of

9     what I had been told, what people who were working for me were

10    told and they conveyed to me, and I suspect, although I don't

11    have a specific recollection, what our intelligence agencies

12    were able to collect.

13    Q.   Would you agree with me that that's a pretty broad

14    statement, and in effect are you not saying that to the best of

15    your knowledge at that point that sanctions weren't being

16    violated in connection with the sale of natural gas?

17    A.   I'm sorry, Mr. Rocco.  Was it my recollection that at that

18    point I did not believe that sanctions were being violated?

19    Q.   Yes.  With respect to whether Turkey is paying Iran, this

20    is your statement.  "With respect to whether Turkey is paying

21    Iran for its gas imports in gold, we can go into this in

22    greater detail in the closed session."  And we're not asking

23    about what happened in the closed session.  "But I think the

24    short answer to that is that we do not see that occurring."

25    A.   I think that's right.  I think at that point, with respect

HC83ATI3                        Cohen - Cross

1   to gas imports into Turkey, we -- I did not have reason to

2   think that the gas that Turkey was importing from Iran, that

3   Turkey was paying Iran for that gas with gold.

4   Q.  At that point, was Iran allowed to pay for gold in natural

5   gas?

6   A.  Other way around?  Gas --

7   Q.  Yes.

8   A.  No.

9   Q.  And how about the other way around, petroleum products?

10  A.  Natural gas and oil were handled the same way.

11            (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1   Q.  At that point, there was a gap, was there not, for --

 2   A.  Yeah.

 3   Q.  -- roughly six months or so, where they were not handled

 4   the same way?

 5   A.  I think that's right.

 6   Q.  Thank you on that.  By the way, do you know the Iranian

 7   entity that's responsible for selling natural gas?  Is it NICO

 8   or NIOC?  Are you aware of the --

 9   A.  I was.  It was -- NIOC was the entity that was responsible

10   for selling --

11   Q.  Natural gas?

12   A.  I believe that's right.

13           MR. ROCCO:  I'm sorry, your Honor, may I?

14           (Pause)

15   Q.  You testified earlier about the rial being devalued at this

16   point --

17           THE COURT:  I'm not sure he did.  I think it came from

18   the transcript.

19   A.  Yes.

20   Q.  Yes.  Can we bring it back up just for a moment?

21   A.  You don't need to.

22   Q.  Can you bring it back up, or can you tell us what you had

23   in mind at the time you testified to that?

24   A.  Sure.  One of the metrics that we were tracking very

25   closely as we were trying to assess how effective our sanctions

1    were was the value of the rial, the Iranian currency.

2            As it was devaluing against the dollar, that was an

3    indication that we were putting economic pressure on Iran, and

4    in the spring, as I recall, the spring of 2013 -- and

5    consistently over this period of time, you could see the rial

6    weakening.  One of the reasons that we were focused on precious

7    metals, and gold in particular, was that one way that the

8    Iranian government can support the value of the rial, try to

9    prevent it from devaluing, is by acquiring gold, selling gold

10   into the market in Iran and purchasing rials off the market.

11   That tends to support the value of the rial.

12           That's why we were trying to cut off the gold trade to

13   the government of Iran.  So at this point, in the spring of

14   2013, you could see the rial weakening, devaluing against the

15   dollar, and we were, like I said, intent on trying to prevent

16   the Iranians from preventing that devaluation.

17   Q.  And the devaluation was the result of the sanctions program

18   being somewhat successful; am I correct?

19   A.  Yes.

20   Q.  Let's turn to another point, Reza Zarrab.  To the best of

21   your recollection, were you aware of Reza Zarrab as early as

22   2013?

23   A.  To the best of my recollection, I was.

24   Q.  I think you testified on direct that you were actually in

25   Istanbul the day that there were some arrests, December 17th,

1   2013?

2   A.  Correct.

3   Q.  And I believe you testified that Suleyman Aslan, the former

4   general manager of Halkbank, was arrested that day?

5   A.  Yes.

6   Q.  Am I correct?

7   A.  Yes.

8   Q.  And were you aware of the fact that Reza Zarrab had also

9   been arrested that day?

10  A.  So I don't recall that, but I believe that's right.

11  Q.  At or about the time that you learned of Mr. Aslan's

12  arrest, did you know that Reza Zarrab was a customer of

13  Halkbank?

14  A.  To the best of my recollection, Mr. Rocco, I knew that in

15  the spring.  I believe that the conversation that I'd had when

16  I was at Halkbank in the spring of '13 and we were discussing

17  the gold trade, that Mr. Zarrab came up in that conversation.

18  Q.  And -- I'm sorry.

19  A.  Yeah, so my best recollection is that I knew of Mr. Zarrab

20  by the spring of '13.

21  Q.  And you knew that he was a gold trader; am I correct?

22  A.  Yes.

23  Q.  And you knew that he was a large gold trader; am I correct?

24  A.  Yes.

25  Q.  And do you recall what it was that brought Reza Zarrab into

```
 1   that conversation in the spring of 2013?

 2   A.  I don't.

 3   Q.  And do you recall whether that meeting was with Mr. Atilla

 4   or with Mr. Aslan?

 5   A.  So my recollection is it was with Mr. Atilla.

 6   Q.  And do you recall -- when is the first time that you

 7   associated -- well, withdrawn.

 8           Mr. Zarrab had a history with OFAC; am I correct?  Do

 9   you recall something called Al Nafees Exchange?

10   A.  I'm sorry, which?

11   Q.  Al Nafees.

12   A.  I do recall vaguely Al Nafees Exchange, yes.

13   Q.  Do you recall Mr. Zarrab having anything to do with Al

14   Nafees?

15   A.  I don't.

16   Q.  Do you recall Al Nafees Exchange having come under

17   enforcement proceedings by Treasury or OFAC?

18   A.  I remember the name Al Nafees Exchange.  The only reason

19   that I would have ever heard of Al Nafees Exchange is because

20   it somehow came to my attention as a business that we were

21   concerned about, but beyond that, I don't recall any specifics.

22   Q.  Do you recall Al Nafees Exchange -- let me see if I can

23   refresh your recollection.

24           Do you recall Al Nafees Exchange coming to your

25   attention as a result of violations of the ITSR?
```

HC8PATI4                        Cohen - Cross

1    A.   Again, I think the only reason I would have heard about

2    Al Nafees Exchange is likely because of some potential issue

3    with compliance with the Iran sanctions, but I just don't

4    remember that with any specificity.

5    Q.   Do you recall a penalty being imposed on Al Nafees Exchange

6    and the penalty not being paid?

7    A.   I don't.

8    Q.   Do you remember -- do you recall any connection between

9    Reza Zarrab and Al Nafees Exchange -- I'm sorry, Al Nafees

10   Exchange?

11   A.   I do not.

12   Q.   Can you place a year on your vague recollection of

13   Al Nafees Exchange?  Was it 2012?

14            THE COURT:  Sorry, I can't.

15   Q.   What I'm trying to posit is, at the time that you spoke

16   about Al Nafees Exchange -- about Reza Zarrab and Mr. -- with

17   Mr. Atilla in March of 2013, did you have Mr. Zarrab in mind

18   because of what occurred with Al Nafees Exchange in 2012?

19            MR. LOCKARD:  Objection.

20            THE COURT:  I'll allow it.

21   A.   Yeah, I just don't know, Mr. Rocco.  It's possible.  I just

22   don't recall.

23   Q.   Were you aware of Mr. Zarrab being investigated by the FBI

24   in 2013?

25   A.   I don't believe so.

1    Q.  When did you first -- did you know at any time that

2    Mr. Zarrab was under investigation by the American authorities?

3    A.  By the FBI or by any American --

4    Q.  By anyone.

5             MR. LOCKARD:  Objection.

6             THE COURT:  I'll allow it.

7    A.  So can I take this in parts?  So by 2014, so post the

8    arrests and heading into that meeting in the fall of '14, where

9    we asked Mr. Atilla and the new general manager of Halkbank

10   about Mr. Zarrab, I expect that -- let me rephrase that.

11             My best recollection is that within Treasury folks,

12   were looking at -- and within OFAC, in particular folks were

13   looking at Zarrab.  So on the Treasury side of things, I think

14   by 2014, post those December 13 arrests, at least by then we

15   were looking at Zarrab.  I think it may have predated that, and

16   if we had a conversation the spring of 2013 with Halkbank about

17   Mr. Zarrab, we may have been also conducting something of an

18   investigation into Mr. Zarrab within the Treasury Department.

19             The FBI and law enforcement interest in Mr. Zarrab, I

20   don't think I knew about until I read in the papers that he had

21   been arrested and indicted.

22   Q.  Was there -- when you spoke to Mr. Atilla in the spring of

23   2013, did you tell Mr. Atilla to stop dealing with Mr. Zarrab?

24   A.  I don't believe I did, no.

25   Q.  Did you warn him about dealing with Mr. Zarrab?

1   A.  You know, I think that -- I mean, did I say:  Be careful,

2   don't deal with that guy?  I don't believe so.  I think I asked

3   questions about what the nature of the relationship was between

4   Zarrab and Halkbank.  As I recall, we didn't, to use your

5   phrase, I don't think we drilled down on it very hard at the

6   time.  I think Mr. Atilla assured us that there was nothing to

7   be concerned about.

8   Q.  Well, at that point, did you know that Mr. Zarrab was a

9   gold trader?

10  A.  I believe so, yes.

11  Q.  And did you know that he was a significant gold trader?

12  A.  I believe we had suspicions that he was a large gold

13  trader.  I just can't say with precision exactly what we knew

14  at that point.

15              THE COURT:  Mr. Rocco, how much time?

16              MR. ROCCO:  Judge, maybe an hour.

17              THE COURT:  Well, then I'll see you at the side.

18              (Continued on next page)

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  So given my commitment to the jury, I'm

3     going to stop now, but I have to say this, so in the rulings

4     that I made with respect to the motion in limine, in particular

5     with respect to this witness and others, I think we considered,

6     on two separate occasions, and the government's view was that

7     your cross should be related to the direct and you said,

8     particularly on the second occasion, that you thought you

9     needed to go beyond the direct and to go into other topics,

10    which I have to say -- well, I agreed that you could do that on

11    a limited basis, go beyond the direct.

12          I think you've gone so way beyond what I ever imagined

13    would be that limited basis, but I still I haven't stopped you.

14    But I am going to say that when we resume with this witness,

15    that you need to come back to the direct.  Now, I'm giving you

16    so much latitude, and you've been going all over the place,

17    that I think it's time to come back.

18          MR. ROCCO:  Well, your Honor, I would never disagree

19    with you.

20          THE COURT:  No, you can, you absolutely can.

21          MR. ROCCO:  I'm trying my best to stay within the

22    parameters of this witness' direct testimony and, quite

23    frankly --

24          THE COURT:  Let me give you an example.

25          MR. LOCKARD:  I think that is demonstratively not the

HC8PATI4                         Cohen - Cross

 1   case.

 2              MR. ROCCO:  Oh, give me a break.  Come on.

 3              THE COURT:  No.

 4              MR. ROCCO:  Stop the side.  Yes, sir.

 5              THE COURT:  Not in front of the jury.  So -- well,

 6   never mind.

 7              MR. ROCCO:  Thank you, Judge.

 8              THE COURT:  You don't need an example from me.

 9              MR. ROCCO:  You're more tolerant than Mr. Lockard.

10   I'm glad you're the judge.

11              THE COURT:  But we are going to break.  We're going to

12   have to have him come back.  I hope he can come.  If he can't

13   come first thing Monday, we'll fit him in during the week at

14   his convenience, and then he'll finish, and you'll be able to

15   do redirect.

16              MR. ROCCO:  And I have no objection to that, your

17   Honor.

18              THE COURT:  Okay.

19              MR. LOCKARD:  So since he is still on cross, we'll

20   only discuss timing logistics of when he can come back with his

21   counsel.

22              MR. ROCCO:  I have no objection to that, Judge.

23              THE COURT:  Yes.

24              MR. ROCCO:  Thank you.

25              (Continued on next page)

1          (In open court)

2          THE COURT:  So we're going to stop.  It's 2:30.  I

3     said we were going to go to 2:30, and it's 2:30; so I'll see

4     you on Monday at 9:15.

5          In the interim, please remember not to talk to each

6     other about this case or about anyone who has anything to do

7     with it until the end of the case when you go to the jury room

8     to deliberate.

9          Second, please do not talk with anyone else about this

10    case or about anyone who has anything to do with it until the

11    trial has ended and you have been discharged as jurors.

12         Third, do not let anyone talk to you about the case or

13    about anyone who has anything to do with it.  If someone should

14    try to talk to you about the case, please report that to myself

15    or Chelsea or Christine, who will be back on Monday.

16         And, fourth, do not read any news or internet stories

17    or articles or blogs or listen to any radio or TV or cable or

18    internet reports about the case or about anyone who has

19    anything to do with it.

20         And, fifth, do not do any type of research or any type

21    of investigation about the case on your own.

22         So we're making good progress.  My anticipation is

23    that the government will conclude its case sometime next week.

24    The defense has no obligation to put on a case or not, and so

25    we don't ask until we get to that point, whether they wish to

1    do that or not.  So there we are.  I think we're very much on

2    schedule.  So great to work with you, and I'll see you all 9:15

3    on Monday.

4              (Jury not present)

5              THE COURT:  So we have to impose upon you, Mr. Cohen,

6    to have you back, and you'll talk with the government counsel

7    and we'll try and make something that's convenient for you.

8              THE WITNESS:  I appreciate that.

9              THE COURT:  It doesn't necessarily have to be first

10   thing Monday.  The parties have agreed to fit you in, you know,

11   when it's convenient next week.  So I anticipate that there's

12   further cross, and then there's probably some redirect after

13   that.  I think if I had to guess, somewhere between an hour and

14   two hours still to go.

15             THE WITNESS:  Okay.

16             THE COURT:  Okay.

17             THE WITNESS:  Thank you.

18             THE COURT:  Thank you very much.  You're excused,

19   thank you.

20             THE WITNESS:  Well, not really.

21             THE COURT:  That's true.  That's true.

22             THE WITNESS:  Thank you, your Honor.

23             (Witness temporarily excused)

24             THE COURT:  So I think I'll ask you all to sit down

25   because there's often a groan at this point.  I'm anticipating

HC8PATI4                         Cohen - Cross

 1   that we're heading to the end of, as I said to the jury, the

 2   government's case next week and perhaps the whole case or

 3   perhaps not.  But just as a heads up, so if there are any rule

 4   29 motions, in my practice, there's no gap in time between

 5   whenever the government ends or whenever.

 6           So if you all need to, you should have one of you --

 7   well, however you have to deal with that, that's up to you.

 8   But you might have somebody thinking about that starting maybe

 9   this weekend or whatever so that there will be no

10   discontinuity.  So your motion will be there whenever, assuming

11   there is one, and I would rule pretty instantaneously.  Okay?

12   Okay.  Good to see you all.

13           MR. ROCCO:  Thank you, Judge.

14           MS. FLEMING:  Thank you, your Honor.

15           (Adjourned to Monday, December 11, 2017, at 9:15 a.m.)

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

 DAVID COHEN

Direct By Mr. Lockard . . . . . . . . . . .1099

Cross By Mr. Rocco . . . . . . . . . . . . .1154

                    GOVERNMENT EXHIBITS

Exhibit No.                                    Received

 7002    . . . . . . . . . . . . . . . . . .1109

 7001    . . . . . . . . . . . . . . . . . .1112

 7005    . . . . . . . . . . . . . . . . . .1128

 7022    . . . . . . . . . . . . . . . . . .1141

 7011    . . . . . . . . . . . . . . . . . .1143

                    DEFENDANT EXHIBITS

Exhibit No.                                    Received

 200    . . . . . . . . . . . . . . . . . .1171

 201    . . . . . . . . . . . . . . . . . .1173

 229    . . . . . . . . . . . . . . . . . .1223