HCBPATI1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                          S4 15 Cr. 867 RMB

5   MEHMET HAKAN ATILLA,

6              Defendant.

7   ------------------------------x

8

9                                   December 11, 2017
                                    9:25 a.m.
10

11

12  Before:

13              HON. RICHARD M. BERMAN,

14                                  District Judge
                                      and a jury
15

16

17                  APPEARANCES

18  JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
    MICHAEL DENNIS LOCKARD,
20  SIDHARDHA KAMARAJU,
    DAVID WILLIAM DENTON, JR.,
21  DEAN CONSTANTINE SOVOLOS,
         Assistant United States Attorneys

22

23

24

25

HCBPATI1                    Trial

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
     Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
     THOMAS ELLIOTT THORNHILL, Esq.
     – and –
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
     ROBERT J. FETTWEIS, Esq.
     – and –
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
               Of counsel


Also Present:
     JENNIFER McREYNOLDS, Special Agent FBI
     MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
     MS. ASIYE KAY, Turkish Interpreter
     MS. SEYHAN SIRTALAN, Turkish Interpreter

1              (Trial resumed.  In open court; jury not present)

2              THE COURT:  So we have almost all the jurors, missing

3     one or two, but this is a preliminary legal matter that I

4     wanted to discuss with you.  It's a response to the letters

5     back and forth, dated December 10, first from the government

6     objecting to some of the cross-examination by Mr. Rocco and

7     then Mr. Rocco's letter in response.

8              So the ruling is as follows.  As I say, I have

9     reviewed the government and defense letters dated December 10

10    regarding Mr. Cohen's cross-examination, and while I still need

11    to review these letters against the transcripts of the

12    examination, which I've started doing but have not finished, I

13    do have some preliminary responses and concerns with the

14    cross-examination.

15             No. 1, the Court, as you know, has the principal

16    responsibility of determining and instructing the jury with

17    respect to the applicable law.  The jury has been so advised,

18    as you also know, preliminarily and the Court's views of the

19    sanctions laws applicable to this case is clearly stated in two

20    rulings, one dated October 17, 2017, with respect to

21    Mr. Zarrab's motion to dismiss, and the other dated

22    November 16, 2017, issued in response to Mr. Atilla's motion to

23    dismiss.

24             Point two, the jury takes the law as provided by the

25    Court and is not the arbiter of any counsel's disagreement with

1    the Court as to either, in this case, the law of conspiracy

2    and/or the laws relating to sanctions against Iran or any other

3    legal matter in that regard.

4            No. 3, my preliminary reaction is that the cross of

5    Mr. Cohen exceeded the Court's, I think it was, December 6th,

6    2017, ruling as to the scope of cross of Mr. Cohen and also

7    potentially of Mr. Szubin, and I think it may tend to confuse

8    the jury as to the jury's role in this matter and, also, as to

9    the applicable law that applies in this case.  You will recall

10   I so advised defense counsel of this concern at the sidebar on

11   December 8 and am reviewing the transcripts in this regard.

12           No. 4, defense counsel is hereby placed on notice that

13   while it will not do so now, the Court will likely sustain

14   objections to the cross and give an instruction to the jury as

15   to applicable legal principles along the lines of the

16   instruction proposed by the government in its December 10

17   letter if the defense proceeds along its current path with

18   respect to Mr. Cohen or Mr. Szubin or other witnesses that the

19   government may call.

20           No. 5, I would like to review also the exhibit, I

21   think it's 2010.  It was a defense exhibit, and if you have a

22   copy, I'd like you to hand it up.  As I recall, it's a detailed

23   letter or e-mail sent by Mr. Atilla to the U.S. government

24   regarding sanctions.  And I would also like to review any

25   written information or materials that the government may have

 1    been referring to in the government's letter, I think also of

 2    December 6th.  I may be off a day or two.  And that is to say,

 3    the government's letter with responsive information it may have

 4    received regarding the sanctions law or laws.

 5              And, finally, in response to an issue raised by the

 6    defense, there will be no continuance of this trial, as

 7    suggested by defense counsel or requested, perhaps, is a better

 8    way to describe it.

 9              So that's it on that issue.  I'll be back to you after

10    I've finished reviewing the transcript in this regard.  So if

11    you have exhibit, I think is it, 2010?  Oh, and the government,

12    we'd like your response, to know whether there are any such

13    written materials in connection with that letter.

14              MR. LOCKARD:  I can respond to that question now.

15    There are -- the letter describes conversations and not written

16    materials.

17              THE COURT:  Okay.  And have you, in discovery, turned

18    over -- this was an issue that's been discussed before -- any

19    other government testimony or any other materials pertinent to

20    the concerns expressed by the defense?

21              MR. LOCKARD:  So what we received from the Department

22    of Treasury and what we produced in discovery were documents

23    and communications relating to communications with Halkbank or

24    with Mr. Atilla by the Treasury Department during the time

25    period of the charged offense, and so that's what we received

1    and that's what we produced, including the prior --

2              THE COURT:  And what?

3              MR. LOCKARD:  Including any prior statements of the

4    witnesses in e-mails about their discussions with the bank.

5              THE COURT:  All right.  And --

6              MR. ROCCO:  Your --

7              THE COURT:  Well, go ahead.

8              MR. ROCCO:  Your Honor, I was just going to say there

9    was a request that we went directly to Treasury for, and we're

10   waiting for a response to that and promised that they would

11   have something to us today.

12             THE COURT:  Okay.  You mentioned something like that

13   in the materials.

14             MR. ROCCO:  We did, your Honor.

15             THE COURT:  So the next question is, who's the next

16   witness, and if that person, I had some understanding, might

17   have difficulty getting to court today, if we had somebody else

18   we could start with, even if it's somewhat out of turn?

19             MR. LOCKARD:  So our travel problems have not

20   materialized.

21             THE COURT:  Okay.

22             MR. LOCKARD:  So we are ready to proceed with

23   Mr. Joshua Kirschenbaum, who is our witness today.  We will

24   expect Mr. Cohen will return.  He was scheduled to be here

25   right after the lunch break.  We haven't yet determined whether

HCBPATI1                    Trial

1    he's going to have travel issues, but we're prepared to proceed

2    continuously whether he gets here or not.

3              THE COURT:  Okay.  I'll advise you when we have our

4    full complement of jurors.

5              So the exhibit may be Exhibit 201 instead of 2010.

6    Did I misidentify it?

7              MR. ROCCO:  It's apparently not 201 either; so I'm

8    going to take a couple of minutes to look for it.

9              THE COURT:  Okay.  Great.

10             (Pause)

11             MR. ROCCO:  Your Honor, I think we've identified the

12   document.  It's Government Exhibit 7011; so if you like....

13             THE COURT:  Yes, I'll take a look.  I'll know it when

14   I see it.  I don't know where I got the number.

15             (Pause)

16             So we have our jury and if we could call the next

17   witness.

18             (Jury present)

19             THE COURT:  Good morning, everybody.  Nice to see you.

20   So please be seated, and we will call the next government

21   witness.

22             MR. DENTON:  Your Honor, the United States calls

23   Joshua Kirschenbaum.

24             THE COURT:  And by the way, the witness, Mr. Cohen,

25   who was here on Friday, is going to come back sometime during

HCBPATI1                         Trial

1    the week for some additional questioning.  It wasn't finished,

2    and he had to go back to DC.  So he's going to be back today or

3    tomorrow.  I'm not sure.

4              THE DEPUTY CLERK:  Sir, if you could step up to the

5    stand, please remain standing for a moment, and then raise your

6    right hand.

7              Do you solemnly swear that the testimony that you

8    shall give this Court and jury in this issue now on trial shall

9    be the truth, the whole truth and nothing but the truth so help

10   you God?

11             THE WITNESS:  I do.

12             THE DEPUTY CLERK:  Could you please state your full

13   name for the record.

14             THE WITNESS:  Joshua Avi Kirschenbaum.

15             THE DEPUTY CLERK:  Could you spell your last name,

16   please.

17             THE WITNESS:  Kirschenbaum, K-i-r-s-c-h-e-n-b-a-u-m.

18             THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

19   Feel free to pull up the chair and adjust the microphone.

20             MR. DENTON:  May I proceed, your Honor?

21             THE COURT:  Yes.

22   JOSHUA KIRSCHENBAUM,

23        called as a witness by the Government,

24        having been duly sworn, testified as follows:

25   DIRECT EXAMINATION

HCBPATI1                    Kirschenbaum - Direct

BY MR. DENTON:

Q.  Morning, Mr. Kirschenbaum.

A.  Morning.

Q.  Where do you work?

A.  I work at the Treasury Department in an office called

FinCEN, the Financial Crimes Enforcement Network.

Q.  What is the Financial Crimes Enforcement Network?

A.  It is a money laundering regulator, and also, it functions

as the Financial Intelligence Unit for the United States,

meaning it collects financial reporting from financial

institutions such as banks, including suspicious activity

reports.

Q.  What is your position at FinCEN?

A.  I'm the acting director of an office at FinCEN called the

Office of Special Measures.  That office is located within the

enforcement division of FinCEN.  My office, although its an

enforcement division, does not do domestic money laundering

enforcement.  It conducts section 311 investigations, which

refers to a provision of the Patriot Act related to targeting

foreign financial institutions for money laundering activity.

Q.  When did you start work at FinCEN?

A.  I began to work in FinCEN in July of 2015.

Q.  Where did you work before then?

A.  Prior to that, I worked at a different office in Treasury

called OFAC, which stands for the Office of Foreign Assets

1  Control.

2  Q.  And how long did you work there?

3  A.  Approximately four years, beginning around June of 2011.

4  Q.  And what was your position at OFAC?

5  A.  My most recent position at OFAC, prior to my departure to

6  FinCEN, was a policy advisor in the policy and regulatory

7  affairs division.

8  Q.  And had you had other jobs at OFAC before that?

9  A.  Yes.

10 Q.  What were those jobs?

11 A.  My one job prior to working as a policy advisor was as a

12 sanctions investigator in the Office of Global Targeting at

13 OFAC.

14 Q.  As part of your work as a policy advisor at OFAC, did you

15 ever have occasion to communicate with foreign financial

16 institutions about U.S. sanctions laws?

17 A.  Yes.

18 Q.  And generally speaking, what form did those communications

19 take?

20 A.  They could be by telephone, by e-mail or writing, such as

21 letter, or they could also be in-person meetings, either with

22 bank personnel in Washington or on trips to foreign countries

23 at their offices overseas.

24 Q.  Generally speaking, what was the purpose of communicating

25 directly with foreign financial institutions about U.S.

1    sanctions laws?

2    A.   Generally, when we communicate with foreign financial

3    institutions about U.S. sanctions laws it would be to explain

4    what the rules were, and to advise them as to proper compliance

5    with those sanctions rules.

6    Q.   When you talk about rules, are you talking about sanctions

7    regulations?

8    A.   Sanctions laws, executive orders and regulations, yes.

9    Q.   Are you familiar with a Turkish bank named Halkbank?

10   A.   Yes.

11   Q.   So I'd like to direct your attention to October 29th, 2013.

12   Did you participate in any communications with Halkbank on that

13   day?

14   A.   I believe I participated in a phone call with bank

15   personnel, the phone call from Washington with bank personnel

16   that were located in Turkey.

17   Q.   Were you the only person from OFAC involved in that call?

18   A.   No.

19   Q.   Who else was involved that you can remember?

20   A.   I believe that the call was led by the director of OFAC at

21   the time, who was named Adam Szubin, and I participated as a

22   note-taker primarily, and there would have been several others

23   on the call, though I can't remember an exhaustive list.

24          MR. DENTON:  Your Honor, may I approach?

25          THE COURT:  Sure.

1    Q.  Showing you what's been marked for identification as

2    Government Exhibit 7021, just take a look at that for a moment,

3    please.

4            (Pause)

5            Mr. Kirschenbaum, do you recognize Government

6    Exhibit 7021?

7    A.  Yes.

8    Q.  What is it?

9    A.  This is a memo or what I call a read-out, meaning a

10   summary, of the October 29th phone call between Adam Szubin and

11   the deputy general manager of Halkbank, Mehmet Atilla.

12           THE COURT:  Sorry, and who?

13   A.  This is my summary memo or read-out of the phone call

14   between OFAC Director Szubin and Deputy General Manager Atilla

15   of Halkbank.

16   Q.  You just described this as your summary memo.  Did you

17   prepare Government Exhibit 7021?

18   A.  Yes.

19   Q.  Was it a regular part of OFAC's work to memorialize

20   meetings or calls in a summary or read-out?

21   A.  Yes.

22   Q.  So let's talk for a moment about the process of that

23   regular practice.  Who actually drafts the text of a read-out

24   of a call or a meeting?

25   A.  In a situation such as this, where you have the most senior

1    person at the agency leading the call, it would usually be a

2    subordinate, such as myself, or the policy advisor or someone

3    at what we would call the working level, who would take notes

4    and then draft the memo summarizing the relevant information.

5    Q.  Is it someone who actually participated in the meeting or

6    call?

7    A.  Yes, you would need to have participated.

8    Q.  So is it fair to say that a read-out or summary is prepared

9    by someone with personal knowledge of what it describes?

10   A.  Yes.

11   Q.  How long after a meeting or call is a read-out typically

12   prepared?

13   A.  Typically, as quickly as possible so that memory is fresh.

14   Q.  And in this case, how long after your call with the

15   defendant was this read-out prepared?

16   A.  This is dated the next day, and that's in keeping with my

17   memory that it was written very quickly after.

18   Q.  Is it important that the contents of a meeting or call

19   summary be accurate?

20   A.  Yes.

21   Q.  Why is that?

22   A.  For several reasons; so that we can inform more senior

23   decision makers and make available to them the necessary

24   information to make policy decisions, and also, in case the

25   information ever needs to be relied upon in any kind of action

1    the agency may take, we need to have accurate information in

2    the read-out.

3    Q.   So does Treasury maintain copies of these read-outs for use

4    in its future business?

5    A.   Yes.  We retain memos like this in our -- we, Treasury

6    Department personnel, would typically retain the memo in the

7    file after its centered or disseminated.

8    Q.   Generally speaking, what was the topic of this October 29th

9    call with Atilla?

10   A.   The topic of this phone call was several issues related to

11   Iran sanctions and primarily the status of Iranian oil funds,

12   funds derived from the proceeds of sale of Iranian oil to

13   Turkey held in accounts at Halkbank.

14   Q.   And does this read-out reflect statements that the

15   defendant made about those subjects?

16   A.   Yes.

17          MR. DENTON:  Your Honor, the government offers

18   Government Exhibit 7021.

19          THE COURT:  I'll allow it.

20          MR. ROCCO:  No objection, your Honor.

21          (Government's Exhibit 7021 received in evidence)

22          MR. DENTON:  If we could publish that starting at page

23   2.

24   BY MR. DENTON:

25   Q.   So starting with the first paragraph below the title, can

1   you read, Mr. Kirschenbaum, what the summary states about what

2   the topics were discussed on this call?

3   A.   Do you want me to read that verbatim or --

4   Q.   Yes, please.

5   A.   "OFAC director Adam Szubin" --

6           THE COURT:   Slowly.

7   A.   "OFAC Director, Adam Szubin, spoke on October 29th, 2013,

8   with Mehmet Hakan Atilla, the deputy general manager of

9   Halkbank, about Turkish gold sales to Iran, the purchase of

10  Turkish securities by Iran, and Halk's ongoing facilitation of

11  sales of humanitarian goods to Iran."

12  Q.   Did all three of those subjects implicate U.S. sanctions

13  laws, orders or regulations?

14          MR. ROCCO:   Objection, your Honor.

15          THE COURT:   Overruled.   If you know.

16  A.   Yes, they did.

17  Q.   So let's go through those as they're described in the

18  read-out.   Can you read for us the portion of the read-out

19  describing the discussion with respect to gold sales?

20  A.   "Szubin told Atilla that Turkish customs data showed a

21  significant decline in Turkish gold sales to Iran, but there

22  did seem to be some continued export of gold in July and August

23  of this year.   Atilla confirmed that Halk ceased the

24  facilitation of gold sales to Iran prior to July 1st, 2013.   In

25  light of IFCA, Szubin asked Atilla to help explain who may be

involved in facilitating that trade.  Atilla said that Halk was

not involved at all, and he speculated that any continued sale

of gold to Iran probably did not go through financial

institutions, but was instead cash-based and used jewelry

merchants."

Q.  Now, in the middle of that paragraph there's a reference to

"in light of IFCA."  What is your understanding of what that

meant?

A.  What that meant -- the implication of the text here is that

beginning July 1st, 2013, under the statute known as IFCA, it

would be sanctionable for a Turkish bank, such as Halk, to

facilitate transactions for the sale of gold to the country of

Iran beginning from that date, July 1st.

Q.  And what was the defendant's response to that question?

A.  The defendant answered Szubin and told him that Halk was

not involved in any trade involving gold between Turkey and

Iran and that his assessment was that no Turkish financial

institutions --

         THE COURT:  Could you speak more slowly.

A.  He replied to Szubin that Halkbank was not involved in any

gold trade between Turkey and Iran, and he assessed what he

believed is that no Turkish financial institution would be

involved in transactions for the exportation of gold from

Turkey to Iran at that point in time.

Q.  So let's talk next about the second area that was discussed

1    in this call with respect to securities.  Can you just read

2    what that discussion was for us?

3    A.  "Szubin also confirmed two communications that OFAC sent to

4    Halk (July 16th and August 27th, 2013) explaining that the

5    purchase of Turkish securities does not fall under the

6    bilateral trade restriction under TRA" -- or Threat Reduction

7    Act -- "section 504.  Atilla confirmed that understanding."

8    Q.  This seems to refer to an ongoing discussion.  Were you

9    part of a discussion with respect to Turkish securities related

10   to Halkbank?

11   A.  Yes.

12   Q.  Can you give us a little context of what was this

13   discussion was about?

14   A.  The conversations about questions that Halkbank had posed

15   to OFAC as to whether Iranian oil funds held in accounts at

16   Halk could be used by Iranians controlling those accounts to

17   make investments in securities, such as stocks or bonds, that

18   were listed in Turkey, whether that would be subject to

19   sanctions or whether that would be allowed under sanctions.

20   Q.  During this call, was there any similar discussion about

21   whether gold sales were permissible?

22   A.  The defendant already knew that gold sales were not

23   permissible, which is why the reference in the above paragraph

24   is that they had stopped gold sales prior to July 1st because

25   they knew they were not permitted under sanctions at that time.

1   Q.  So then let's talk about the third topic, which appears to

2   be a little more of what was discussed here.  So let's start at

3   the top.  What does the first paragraph say about the

4   discussion with respect to humanitarian trade?

5   A.  The first paragraph reads:  "Atilla informed Szubin that on

6   October 14, 2014, Halk notified third-country exporters of food

7   and medicine to Iran that the bank would cease facilitation of

8   such transactions.  Halk already implemented this change for

9   food exports and will stop financing third-country medicine

10  exports at the end of 2013.  Non-Turkish companies with a

11  physical presence in" Iran, (an affiliate or subsidiary)" --

12          THE COURT:  With a physical presence?

13  A.  Excuse me, sorry. "...with a physical presence in Turkey."

14  I misread that.  Thank you.  "With a physical presence in

15  Turkey (an affiliate or subsidiary) and an account at Halk

16  would continue to be able to use Halk for such sales, even if

17  the goods did not physically transit Turkey."

18  Q.  Again, could you give us a little context here?  What is

19  this discussion talking about?

20  A.  This discussion refers to business that Halk facilitated

21  and of which OFAC was aware, business involving those

22  aforementioned funds derived from sales of Iranian oil to Iran,

23  and the business was -- business in which Halk would facilitate

24  the use of those funds for companies outside of Turkey, such as

25  in Europe and the Middle East or Asia, to sell food or medicine

1    or medical devices or other similar goods, which were allowed

2    under sanctions.  Halk would facilitate those third-country

3    companies' sales using funds at Halkbank.

4            The exports would go from the third country, such as

5    European countries, to Iran and the Iranian importers would use

6    those funds derived from oil sales held at Halk, to pay the

7    third-country exporters, and Halk would facilitate the debiting

8    of those accounts to pay the exporters.  That was allowed under

9    sanctions.

10   Q.  Is that kind of trade sometimes referred to as transit

11   trade?

12   A.  Could you give me a little more context on the usage of

13   transit trade?  Specifically related to humanitarian?

14   Q.  Yes.  Are you familiar with the use of that expression in

15   that context?

16   A.  I think it could be referred to as transit trade if it

17   transited Turkey.

18   Q.  So who was Halkbank going to allow to continue doing this

19   sort of humanitarian trade?

20   A.  So what they communicated in this phone call was that Halk

21   would change, or was in the process of changing its business

22   practice at this time and that they had already stopped

23   allowing the accounts with Iranian oil money to be used to pay

24   non-Turkish exporters of food.

25           And, similarly, that by December 2013, they would stop

1    facilitating the use of the accounts for non-Turkish exporters

2    of medicine to export goods to Iran, and that beginning then at

3    the start of 2014, the only companies that could be paid with

4    those funds at Halkbank would be either companies based in

5    Turkey or companies with a physical -- with an entity located

6    in Turkey, such as an affiliate or subsidiary in Turkey, that

7    those companies could continue to use the money, but

8    non-Turkish companies would no longer be allowed to participate

9    in this business.

10   Q.  So going down to the next paragraph, did the defendant give

11   an explanation for why Halkbank was making those decisions?

12   A.  Yes.

13   Q.  So if you could read what he told you here in that call?

14   A.  The second paragraph reads:  "Halk took this decision after

15   the Turkish ministry of economy expressed concerns at the

16   decrease in Iranian funds held at Halk, which the Turkish

17   government believes should be prioritized for Turkish exports.

18   Atilla explained the dwindling of CBI" -- or Central Bank of

19   Iran -- "reserves as a result of several factors."

20   Q.  And if we could just continue down to the end of the page

21   with some of the discussion of some of those factors?

22   A.  The second next paragraph reads, redacted:  "Has reduced

23   purchases of Iranian oil, while Halk's prominence as a center

24   of third-country humanitarian trade with Iran has grown over

25   time, thus, draining funds from the CBI account at Halk."

1   Continue?

2   Q.   Please.

3   A.   The next paragraph reads, redacted:  "Atilla told Szubin

4   that Halk assesses that current annualized trade levels between

5   Turkey and Iran are $7 billion in imports from Iran (down from

6   $9 billion last year) and $3 billion in exports to Iran (down

7   from $9 billion), leaving a $4 billion annual balance in Iran's

8   favor."  And the final sentence is redacted.

9   Q.   What does that last phrase mean, "leaving a $4 billion

10  annual balance in Iran's favor"?

11  A.   What Atilla was telling Szubin is that -- and this refers

12  to the state of affairs in approximately October 2013 -- is

13  that the current trade relationship between Iran and Turkey was

14  such that Iran exported $4 billion in goods -- $4 billion more

15  in goods, it should be, than Turkey imported from Iran that was

16  primarily derived from oil and gas sales.

17          So that on an annualized basis, given the current

18  trade relationship, each year would generate a surplus in the

19  Turkish banks, such as Halk, of approximately $4 billion.  So

20  each year there should be about $4 billion building up in those

21  accounts from the bilateral trade balance between the two

22  countries.

23  Q.   If we could then go on to the next page, Mr. Chang-Frieden.

24          So let's start with the top paragraph, the

25  continuation of that discussion about imports and exports?

HCBPATI1                              Kirschenbaum – Direct

1    A.  The next paragraph reads:  "Atilla estimated that Iran's

2    imports of food (probably including agricultural commodities)

3    and medicine (probably including medical devices) total $10

4    billion and $5 billion annually.  While Halk did not state the

5    value of the third-country humanitarian trade it facilitated

6    for Iran last year, the Turkish government's expressed concern

7    -- "the Turkish government has expressed concern that

8    non-Turkish trade would overwhelm Turkish trade and eat up the"

9    balance "in the CBI," or Central Bank of Iran --

10           THE COURT:  Eat up the?

11   A.  Excuse me, "eat up the surplus."  Correction.  "Eat up the

12   surplus in the CBI account."

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  Mr. Kirschenbaum, do you have any understanding of why

2   eating up the surplus in the CBI account would be a source of

3   concern?

4   A.  My understanding of what Atilla meant by that was that the

5   Turkish government wanted to privilege these funds for exports

6   by Turkish companies to Iran, which would help the Turkish

7   economy.  And that because Halk had an existing business line

8   facilitating humanitarian trade, such as food and medicine from

9   non-Turkish businesses, the concern was that as the balance or

10  surplus dwindled over time, given the large amount of

11  third-country trade, all of the money in the accounts that --

12  at that point a $4 billion annualized surplus, that could all

13  be eaten up by European, Asian, other companies selling things

14  like food and medicine, and Turkish exporters would not -- Iran

15  would not be able to pay Turkish exporters.  The implication

16  being that Iran would choose -- without Turkish government

17  intervention, Iran would choose to privilege the third-country

18  food and medicine imports over Turkish goods.  Leading to

19  Turkish exporters missing out or having reduced business

20  because of Iranian business decisions.

21  Q.  So then let's look at the final paragraph of this document

22  and talk about what the solution was.  If you could read that

23  for us.

24  A.  "Halk proposed two options to increase liquidity in the CBI

25  account and allow it to continue to facilitate third-country

1   humanitarian exports to Iran.  The first would be to transfer

2   locked-up oil sale surpluses in [redacted] to a special purpose

3   account at Halk, which would only be used for humanitarian

4   trade."

5   Q.  If I can stop you there for a second.  What does the

6   reference to "locked-up oil sales surpluses" refer to?

7   A.  That phrase, "locked-up oil surpluses," refers to funds

8   derived from the sale of Iranian oil to some other country, not

9   Turkey, that were held in a bank located in that other third

10  country, that under the sanctions were likewise restricted for

11  certain purposes under U.S. sanctions, such as bilateral trade

12  or exports from the third country to Iran, as well as other

13  humanitarian exemptions.  So they were not under sanctions

14  allowed to be transferred to an account at Halk.

15  Q.  Why would a transfer between a third country and Halkbank

16  in Turkey be the subject of discussion with OFAC?

17  A.  Without -- without some sort of dispensation from OFAC, any

18  bank involved in a transfer -- at this time, any bank involved

19  in a transfer of funds derived from Iranian oil sales in a

20  given country to another country could be subject to sanctions

21  imposed by OFAC, including both the third-country bank

22  remitting the funds and a bank such as, in this scenario,

23  Halkbank in Turkey that were to receive such funds.

24  Q.  I'm sorry I interrupted.  If you can read the rest of the

25  paragraph, please.

1   A.  I'll ask for help.  Did I stop at "humanitarian trade"?

2   Q.  I think so.

3   A.  Okay.  See, I'm not very good at reading e-mails.

4           The paragraph continues:  "The second," the second

5   option, "the second would be to allow Halk to facilitate a

6   portion of third-country purchases of Iranian oil, which would

7   allow a larger surplus to accumulate.  Szubin told Atilla that

8   he would take back both proposals to review and would reach out

9   to Halk in the near future to continue the discussion."

10  Q.  Did that second option implicate some of the same concerns

11  that you were just describing?

12  A.  Yes.  Under sanctions rules at that time, a foreign

13  financial institution, such as Halk in Turkey, that facilitated

14  the sale of Iranian oil to buyers located in a different

15  country, a third country, not Turkey in this scenario, would

16  also be subject to sanctions under the rules at the time.

17  Again, without some sort of dispensation from OFAC, which is

18  what they sought.

19          MR. DENTON:  If I could just have a moment, your

20  Honor.  No further question, your Honor.

21          THE COURT:  Thank you.  Counsel, for

22  cross-examination.

23          MR. ROCCO:  If I may, your Honor.

24  CROSS-EXAMINATION

25  BY MR. ROCCO:

1  Q.  Good morning, Mr. Kirschenbaum.  My name is Vic Rocco and I

2  represent Mr. Atilla.  Have you ever met Mr. Atilla?

3  A.  No.

4  Q.  Have you ever spoken to Mr. Atilla?

5  A.  I've participated in phone calls in which he spoke.  I

6  don't believe I personally spoke to him on those phone calls.

7  Q.  Other than the phone call that's referenced in the memo

8  that you just read, were there any other occasions where you

9  participated in telephone calls with Mr. Atilla?

10  A.  I'm not certain.  I know that I participated in other

11  telephone calls or discussions with Halkbank officials.  I

12  don't recall if Atilla was on those other case calls.

13  Q.  So you're not familiar with Mr. Atilla's voice at all; am I

14  correct?

15  A.  I -- well, I have heard his voice from the October 29 call.

16  Q.  How do you know that it was his voice?

17        THE COURT:  How do you know it was him, do you mean?

18  Q.  And how do you know it was Mr. Atilla's voice?

19        THE COURT:  Is that the question?

20        MR. ROCCO:  That's the question, your Honor.

21        THE COURT:  Or is it how do you know it was

22  Mr. Atilla?

23        MR. ROCCO:  How do you know it was Mr. Atilla's voice.

24  I'll take how do you know it was Mr. Atilla who was speaking.

25        THE COURT:  Isn't that what you're asking?

1          MR. ROCCO:  No.  The question I'm asking is how do you

2     know it was Mr. Atilla who was speaking.

3     A.  I cannot tell you definitively that there wasn't an

4     impostor impersonating him on the call with inside knowledge of

5     the workings of Halkbank.  That is hypothetically possible,

6     yes.

7     Q.  I wouldn't have thought to be an impostor.

8          THE COURT:  We get it.  He doesn't know.

9          MR. ROCCO:  I didn't need the sarcasm, your Honor.

10    Q.  Mr. Kirschenbaum, can we bring up Government Exhibit 7021,

11    the exhibit that you were just referring to and is in evidence.

12    Can I direct your attention to the first page.  The line

13    identified as attachments, Halk readout V4.doc.

14          Can you tell me what V4 means?

15    A.  Version four.

16    Q.  Version four?

17    A.  Correct.

18    Q.  Do you know what happened to the three prior versions of

19    this document?

20    A.  Generally speaking, when a policy advisor, other official

21    of Treasury Department drafts a memo for the consumption of

22    senior decisionmakers like the agency director, we will go

23    through several working drafts and edits to make sure we've

24    represented all the information accurately.  So I believe there

25    would have been here three other versions that people would

1    have edited before the final version that I transmitted to

2    Director Szubin.

3    Q.  Would Director Szubin have reviewed this memo?

4    A.  Version four?

5    Q.  Version four, and -- let's start with version four.  Would

6    Director Szubin have reviewed version four?

7    A.  Yes.  This was actually sent to him.  I can tell from the

8    "to" line.  This was for his consumption.  He was the audience.

9    It is unlikely he would have seen the prior three versions,

10   although I couldn't say definitively at this time.

11   Q.  I'm sorry.  You said it is unlikely that he would have seen

12   the prior three versions?

13   A.  Most likely not, although I can't say for certain.

14   Q.  Do you recall who else was on that phone call with you?  I

15   see that parts of this are blocked out.  But, Michael Lieberman

16   was on the phone call; is that correct?

17   A.  I don't know that -- the answer is I'm not sure.  The fact

18   that someone is on the "to" line here wouldn't indicate that

19   they were on the call.  It means they were a recipient of my

20   memo.

21   Q.  When you are on these calls, and I think you testified on

22   direct that you were the note taker.  Am I correct?

23   A.  Yes.

24   Q.  What do you do with your notes typically when you conclude

25   a memorandum based on your notes?

1    A.  Most of the time my notes remain just in my working papers

2    in my office.  They wouldn't necessarily be filed with the

3    final memorandum.  It is unlikely they would have been.

4    Q.  It is unlikely they would have been -- I'm having a heard

5    time hearing you.  Can you speak into the microphone.

6           Did you say it's unlikely that they would go into a

7    file?

8    A.  Correct.  My understanding of your question was my working

9    notes from the call.

10   Q.  Yes.

11   A.  The general practice -- is that better volume?

12   Q.  Yes.  Thank you.

13   A.  The general practice would be when drafting of the memo was

14   completed, the memo would be disseminated to the audience and

15   filed in our folders on the computer.  My working-level

16   handwritten notes in a spiral notebook would generally stay as

17   working papers in my office.  They wouldn't typically be filed

18   away with the final memo.

19   Q.  If we can go to the second page of the memorandum.  Before

20   we get there, this is a phone call that was placed by your

21   office to Mr. Atilla's office or to Halkbank?

22   A.  In this instance I don't recall which party called the

23   other.  It was between OFAC and Halk.  I don't know who called

24   whom.

25   Q.  To the best of your recollection, who is on the telephone

1  call from Treasury, from OFAC?

2  A.  So, I know that I myself participated in it and Adam Szubin

3  led the call.  I remember there were many other people in the

4  room, but I would be hard pressed to give you an accurate

5  accounting at this point of which people were or were not in

6  the room for that particular call.

7  Q.  Aside from Mr. Atilla, do you recall who was on the phone,

8  who was on the call from Halkbank?

9  A.  No, I don't.

10 Q.  Do you recall if all the people on the Treasury side of the

11 call identified themselves during the conversation or at the

12 outset of the conversation?

13 A.  I want to clarify.  Your question is whether every Treasury

14 person in the room announced their presence on the call to

15 Mr. Atilla during the call?

16 Q.  Yes, sir.

17 A.  I don't recall definitively.  Likely not.  Oftentimes when

18 there is a large group, Director Szubin or someone in that

19 position will explain I'm here, I am the director, and here are

20 a couple other important people, and there are a number of

21 other staff in the room.

22 Q.  Do you remember how long the conversation took?

23 A.  More than a few minutes but not hours.  I couldn't tell you

24 whether it was 20 minutes or an hour.  I'm not sure at this

25 point.

HCB3ATI2                          Kirschenbaum - Cross

1   Q.  Were there any other subjects that you recall being

2   discussed during this telephone conversation?

3   A.  Beyond the topics discussed?

4   Q.  That are covered by the memo, I apologize.

5   A.  No, I don't recall any others.

6   Q.  By the way, do you have an independent recollection of this

7   conversation?  In other words, do you recall the conversation

8   aside from the memorandum?

9   A.  Yes.

10  Q.  Have you recently reviewed this memorandum?

11  A.  Prior to today?

12  Q.  Prior to your testimony today, yes.

13  A.  Yes.

14  Q.  Where did you do that?

15  A.  I reviewed this memorandum in my offices at FinCEN in

16  Washington, D.C. approximately, less than a month ago.  A

17  matter of weeks, two or three weeks ago.

18  Q.  Did you review it any other time?

19  A.  I don't believe I reviewed this exact memorandum any other

20  time.  Instances other than today and that previous time in my

21  office.

22          THE COURT:  Other than what?

23          THE WITNESS:  Other than today in the courtroom and

24  then the instance in my office about three weeks ago.  I

25  believe were the only two times.

1  Q.  When you reviewed it three weeks ago, who did you review it

2  with, if anyone?

3  A.  With U.S. government personnel, including the Assistant

4  United States Attorney David Denton.

5  Q.  This was in connection with your preparation for testimony

6  here today?

7  A.  Correct.

8  Q.  Did Mr. Denton bring this memo to your attention?

9  A.  Yes.

10  Q.  You went through the memo with Mr. Denton pretty much like

11  you went through the memorandum with Mr. Denton here today; am

12  I correct?

13  A.  More or less, yes.

14  Q.  You read it with him, correct?

15  A.  Three weeks ago?

16  Q.  Three weeks ago, yes, sir.

17  A.  Yes, I read the memo in front of him.  I read it myself and

18  then we discussed it.

19  Q.  I'm sorry.  Was this on the telephone?

20  A.  This was in person.

21  Q.  This was a meeting in person in your office?

22  A.  Correct.  Or at FinCEN offices in Washington.

23  Q.  Your former offices.

24  A.  My current office.

25  Q.  I'm sorry.  So, is that the only time that you met with the

1    prosecutors in this case in connection with your testimony here

2    today?

3    A.  In person you're asking?

4    Q.  We'll start with in person.

5    A.  In person there was that meeting at FinCEN offices less

6    than a month ago.  And then I came up here to this courthouse

7    last week, but my testimony was delayed so I had an in-person

8    interaction last Wednesday.

9    Q.  Any other times that you spoke about this memorandum to

10   anybody on the prosecution team?

11   A.  By telephone, yes.

12   Q.  How many times did that happen?

13   A.  We've discussed this memorandum by telephone probably two

14   or three times.

15   Q.  If we can, can we talk about now the substance that you

16   referenced on the second page of the memorandum, and I think

17   that you testified to an exemption regarding securities; am I

18   correct?

19   A.  Yes.

20   Q.  Can you tell me, are securities exempt from the bilateral

21   trade restriction or are they not exempt from the bilateral

22   trade restriction?

23   A.  If I may, could I suggest we talk about at the time of this

24   discussion because those -- they're no longer in effect.

25   Q.  Thank you for the correction.  Absolutely.  I'm only

1    talking about at the time of this discussion.

2    A.  So, what I communicated here, excuse me.  I summarized Adam

3    Szubin's communication, Director Szubin's communication that

4    OFAC made a interpretation that under the bilateral trade

5    exemptions of Iran sanctions which referred to the limitation

6    on the use of Iranian oil sale proceeds for importation of

7    goods from the purchasing country.  That securities did not

8    qualify as goods.

9          So in other words, we said under the sanctions, Iran

10   cannot use the money from sales of oil to Turkey to buy Turkish

11   stocks or bonds.  That was our determination, our

12   interpretation of the bilateral trade exemption of sanctions.

13   Q.  To your knowledge, had this subject been discussed before

14   with Mr. Atilla or someone else at Halkbank?

15   A.  Before when?

16   Q.  Before the conversation on October 29, 2013.

17   A.  For that I go off the memo, because I don't have personal

18   recollection of those discussions.  But my summary references

19   two earlier communications from OFAC to Halk going back to July

20   of 2013, which would have been in response to a prior question

21   from Halk.  So the discussion has to go, at least the initial

22   discussion would have had to predate July 16, 2013.

23   Q.  Directing your attention to the discussion about

24   humanitarian trade.  Am I correct in my understanding that

25   there was a fund of Iranian moneys or an account at Halkbank

1    that was being depleted as a result of humanitarian trade

2    exemption under the sanctions?

3    A.   That is what was represented to OFAC during this phone call

4    between Mr. Atilla and Mr. Szubin.   I couldn't tell you

5    factually that's what actually occurred or not.

6    Q.   Was it also discussed the reason why those funds were being

7    depleted during the telephone conversation?

8    A.   Yes.

9    Q.   The funds were being depleted because large companies were

10   using the using those funds to be paid for their transit trade

11   with Iran; is that correct?

12   A.   That is correct in what was represented, yes.

13   Q.   You also said that the large companies were European and

14   Asian based I think?

15   A.   I was using those examples.   I meant basically large

16   companies based in any country other than Turkey.

17   Q.   How about American companies, like Cargo and Bunge.   Were

18   they also mentioned during the call?

19   A.   If I could break your question up.   American companies

20   would have been allowed to use -- it would have been

21   permissible under sanctions for Iran to pay American exporters

22   of food or medicine or other humanitarian goods to Iran.   They

23   could have been paid from those accounts at Halk.   And it was

24   represented that large multinational companies from around the

25   world used these accounts.   I can also tell you from personal

1   anecdotal knowledge that I remember Halk was a major hub so

2   many companies --

3              THE COURT:  You've got to speak slowly.

4   A.  I remember being aware that many large companies had

5   accounts at Halk to be paid for their humanitarian exports.  I

6   couldn't comment on specific -- I don't know whether specific

7   companies like Cargo or Bunge or whether any particular

8   American companies did or did not get paid from the accounts.

9   Q.  Was it part of the conversation in the form of a complaint

10  that Turkish companies were being pushed out and larger

11  multinational companies were essentially using these funds?

12  A.  I wouldn't characterize it as Halk complaining.  They told

13  us that the Turkish government had instructed them to cease

14  facilitating the business of the large multinationals because

15  it was a risk of smaller Turkish exports of other types of

16  goods, besides food and medicine, being pushed out.

17             MR. ROCCO:  Thank you, Mr. Kirschenbaum.  Your Honor,

18  I'm done.

19             THE COURT:  Anything further?

20             MR. DENTON:  Nothing, your Honor.

21             THE COURT:  Thanks very much, Mr. Kirschenbaum.

22             (Witness excused)

23             THE COURT:  We'll have the next government witness.

24             MR. LOCKARD:  The United States calls Huseyin Korkmaz,

25  K-O-R-K-M-A-Z.

 1              THE DEPUTY CLERK:  Sir, if you can step up to the

 2     witness stand, remain standing for a moment.  Raise your right

 3     hand, please.

 4              Do you solemnly swear or affirm that the testimony

 5     that you shall give this court and jury in this issue now on

 6     trial shall be the truth, the whole truth and nothing but the

 7     truth?

 8              THE WITNESS:  I do.

 9              THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

10     Could you please state your full name for the record and spell

11     your first name as well as your last name.

12              THE WITNESS:  Huseyin Korkmaz, H-U-S-E-Y-I-N

13     K-O-R-K-M-A-Z.

14      HUSEYIN KORKMAZ,

15          called as a witness by the Government,

16          having been duly sworn, testified with the aid of a

17          Turkish language interpreter as follows:

18     DIRECT EXAMINATION

19     BY MR. LOCKARD:

20     Q.  Good morning, Mr. Korkmaz.

21     A.  Good morning.

22     Q.  Sir, where are you from originally?

23     A.  Turkey.

24     Q.  In what country do you reside currently?

25     A.  United States of America.

1    Q.  When you lived in Turkey, did you have a profession?

2    A.  Yes.

3    Q.  What was that profession?

4    A.  I was a deputy inspector in the police force, and I also

5    worked as a consultant for a while.

6    Q.  When you were a police officer in Turkey, is there a

7    particular city where you were principally assigned?

8    A.  Yes.

9    Q.  What city was that?

10   A.  It was Istanbul, and later it was Hakkari.

11   Q.  During what years --

12        THE COURT:  Could we get the spelling for the second

13   city?

14        MR. LOCKARD:  Yes, your Honor.

15        THE WITNESS:  (In English) H-A-K-K-A-R-I.

16   Q.  During what years were you assigned to Istanbul?

17   A.  2010 and 2014.

18        THE COURT:  2010 through 2014?

19        THE WITNESS:  That is correct, your Honor.

20        THE COURT:  Is the second city Hakkari, is that near

21   Istanbul.

22        THE WITNESS:  No, it is not close at all.

23   Q.  So we'll get to that in just a moment.  But first, while

24   you were assigned to the city of Istanbul, did you become

25   familiar with an investigation involving Reza Zarrab, Mehmet

 1   Hakan Atilla, and others?

 2             MR. HARRISON:  Objection, your Honor.

 3             THE COURT:  Overruled.

 4   A.  Yes.

 5   Q.  How was it that you were familiar with that investigation?

 6   A.  I was the lead for the team that was conducting this

 7   investigation.

 8   Q.  Who were the principal targets of that investigation?

 9   A.  The investigation had started on the organization that was

10   being led by Reza Zarrab, and then we had identified three

11   other groups that were within the umbrella of this

12   organization.

13   Q.  Who were the principal members or leaders of each of those

14   three other groups?

15   A.  For the second group, we had understood that Zafer Caglayan

16   and Suleyman Aslan were acting as leaders.  And I apologize

17   here, I was referring to the organization led by Reza Zarrab as

18   being the first group.  So this would actually be the first

19   group of the other three.

20             So then, the second group for the rest of the groups

21   was being led by Muammer Guler, and a third group --

22             THE COURT:  Could you spell the leader of the second

23   group.

24             THE WITNESS:  (In English) M-U-A-M-M-E-R G-U-L-E-R.

25             THE COURT:  Thank you.

1    A.  And the third group was being led by -- we identified that

2    person to be Taha Ahmet Alacaci, who had been identified as an

3    individual who had worked with Mr. Reza Zarrab before as a

4    partner and had severed his ways at a later time.

5              THE COURT:  Could you spell that.

6              THE WITNESS:  (In English) T-A-H-A A-H-M-E-T

7    A-L-A-C-I.

8              THE COURT:  Thank you.

9    A.  On top of these first two groups that consisted of

10   government individuals, we had identified that there was an

11   individual, head of these two groups, that was described as

12   Mr. Reza Zarrab as number one.

13   Q.  So, let's just start with the first people that you

14   mentioned.  At the time of your investigation, who was Zafer

15   Caglayan?

16   A.  Zafer Caglayan was the minister of economy during that

17   time.

18   Q.  At the time of your investigation, who was Suleyman Aslan?

19   A.  Suleyman Aslan was the general manager of Halkbank during

20   that time.

21   Q.  You also mentioned Muammer Guler.  At the time of your

22   investigation, who was Mr. Guler?

23   A.  Muammer Guler was the minister of interior during that

24   time.

25   Q.  You also mentioned an individual called number one?

1   A.   Yes.

2   Q.   Based on your investigation, did you have an understanding

3   of who number one was?

4   A.   Yes.

5   Q.   Who did you understand stand that to be?

6   A.   Recep Tayyip Erdogan.

7              THE COURT:  Could you spell that?

8              THE WITNESS:   (In English)

9   R-E-C-E-P T-A-Y-Y-I-P E-R-D-O-G-A-N.

10  Q.   At the time of your investigation, who was Mr. Erdogan?

11  A.   He was the prime minister during that time.

12  Q.   So, Mr. Korkmaz, we'll come back and discuss your

13  investigation in a little bit more detail in a few minutes.

14  I'd like first to ask you a little about your background, your

15  profession and your training.

16             Mr. Korkmaz, how far did you go in school?

17  A.   I'm a graduate of the police academy, meaning a university

18  graduate.

19  Q.   When did you get your degree from the police academy?

20  A.   It was in 2010.

21  Q.   Did you have any training or education in law enforcement

22  prior to attending the police academy?

23  A.   Yes.

24  Q.   What was that training or education?

25  A.   I also studied in the police college, which is a high

1    school.

2    Q.   Is that a high school with a law enforcement focus?

3    A.   In terms of its curriculum, that is a school that focuses

4    mostly on physical sciences, but as far as its positioning, it

5    is a high school positioned to be before the police academy, to

6    college level.  And it is a school that is established by the

7    government in order to have ranked police officers that

8    graduate from that school.

9    Q.   When you graduated from the police academy in 2010, did you

10   have any particular honors or awards as part of your degree?

11   A.   Yes.

12   Q.   Can you describe what those were.

13   A.   I had finished the school as the third student in rank.

14   Q.   That's out of a class of how many?

15   A.   It was 360 and some.

16   Q.   Where was your first assignment after graduating from the

17   police academy?

18   A.   Istanbul.

19   Q.   Were you assigned any particular unit in Istanbul?

20   A.   Yes.

21   Q.   What unit were you assigned to in 2010?

22   A.   It was the battling financial crimes unit.

23   Q.   Did you have any particular area of focus within the

24   financial crimes unit?

25   A.   Yes.

1  Q.  What was your focus when you were initially assigned to the

2  financial crimes unit?

3  A.  It was battling economic crimes.

4  Q.  Can you describe a little more about what kinds of crimes

5  are included in that definition?

6  A.  The desk that I was assigned to was dealing with major

7  fraud crimes.

8  Q.  Was that a supervisory position?

9  A.  Yes, I was a ranked officer at a deputy inspector level,

10  and I was a team lead.

11  Q.  Approximately how large was your team at that time?

12  A.  I had started with three officers, which was then expanded

13  to four officers.

14  Q.  Did there come a time when you took over a new

15  responsibility within the financial crimes unit?

16  A.  Yes.

17  Q.  When was that?

18  A.  It was in early 2012.

19  Q.  What was your new position in early 2012?

20  A.  I became the team lead for projects and corruption.

21  Q.  Before you took over that team, what had been the

22  responsibilities of that group?

23  A.  This group was in two separate desks and was the projects

24  as well as the corruption, they were working separately.  The

25  corruption desk was dealing with bribery, embezzlement, and

1    also bid interference and also crimes related to execution of

2    contracts after bids.

3            And the project desk was conducting investigations on

4    the organized aspect of the crimes being looked after by the

5    corruption desk.  So, those that were being committed as an

6    organized fashion, the project desk was investigating those.

7    Q.  When you took over responsibility for that group, what were

8    the responsibilities of that group going forward?

9    A.  So the tasks that I listed earlier basically merged.  And

10   then for all the teams within the unit, then all of their

11   organized crime tasks were combined within the corruption and

12   projects desk.

13   Q.  So what kinds of organized crime investigations would fall

14   under the projects group?

15   A.  So, the major fraud that would be looked after within the

16   entire unit, also usury and money laundering or criminal

17   proceeds laundering, so within these crimes, those that are

18   committed as an organization, the projects and corruption desk

19   would investigate those.

20   Q.  Approximately how many officers did you supervise as the

21   head of the projects and public corruption desk?

22   A.  At the time that I left, it was eight.

23   Q.  For how long were you the supervisor at that desk?

24   A.  Close to two years.

25   Q.  During your time in the financial crimes unit in Istanbul,

1  did you have additional training that you took?

2  A.  Yes.

3  Q.  Can you describe some of the additional training that you

4  received while in the financial crimes unit.

5  A.  The financial crimes unit was under the umbrella of KOM,

6  which stood for antismuggling and organized crimes directorate.

7  And within the KOM, then there was an international training

8  unit called TADOC.  And within that TADOC, I received training

9  under many titles.

10  Q.  Just to help out the record, can you explain what TADOC is,

11  including how to spell it?

12  A.  T-A-D-O-C.  TADOC is an English name that I don't remember

13  what it stood for.  But the spelling is as such, T-A-D-O-C.

14  And through this place, expert training was being provided at

15  the international level and also in fields that would fall

16  under the KOM.

17  Q.  Can you give us just a couple of examples of the kinds of

18  training you received through that program.

19  A.  I had received a two-week training that pertained to KOM

20  branch.  And I also had received training on analysis of

21  criminal data.  I had received training on an expert in

22  economic crimes.  I had received training on crimes pertaining

23  to corruption.  I also received training on operational police

24  tactics and shooting.

25  Q.  During your time in the financial crimes unit, did you

1   provide training to others?

2   A.  Yes.

3   Q.  Can you describe the training that you provided to others?

4   A.  TADOC took me as an instructor, and I provided training in

5   battling economic crimes.

6   Q.  So let's turn back to the investigation that you started

7   describing earlier.

8       When did that investigation originate?

9   A.  This investigation had started in 2013.  I'm sorry, it was

10  2012.  In September of 2012.

11  Q.  When the investigation began, who were the principal

12  suspects of the investigation?

13  A.  When the investigation initially began, it was an

14  investigation on Reza Zarrab and his organization as the

15  nucleus of the organization.

16  Q.  What was the type of conduct that was principally being

17  investigated at the outset?

18  A.  At the outset, the conducts that were being investigated

19  were smuggling, laundering of criminal proceeds or money

20  laundering, and committing these crimes as an organized crime

21  unit.

22  Q.  When you say "smuggling," smuggling of what?

23  A.  Gold.

24  Q.  When you first became involved in the investigation, did

25  you have any familiarity with Mr. Zarrab prior to that time?

1    A.   Prior to the investigation, I did not know Mr. Reza Zarrab.

2    But that may not be an objective observation because,

3    apparently, the rest of the team knew him through magazine

4    news, through entertainment news, and I was not into those

5    news, so I did not know much about Mr. Zarrab.

6    Q.   I think you said that as the investigation went on, the

7    people who were the suspects of the investigation changed; is

8    that right?

9    A.   That is correct.

10   Q.   And grew to include Mr. Caglayan, Mr. Aslan, Mr. Guler,

11   Mr. Alacaci, Mr. Erdogan, and others; is that right?

12            MR. HARRISON:  Objection to form, your Honor.

13            THE COURT:  I'll allow it.

14   A.   I actually did not understand the question fully.

15   Q.   I'll ask a different question to get us there.

16            Did the type of conduct being investigated change as

17   the investigation went along?

18   A.   Yes.

19   Q.   What additional types of conduct came to be under the scope

20   of the investigation?

21   A.   Bribery and document forgery.

22   Q.   As the types of conduct that were being investigated grew,

23   did additional individuals come within the scope of the

24   investigation as well?

25   A.   Yes.

1   Q.  What additional individuals became within the scope of the

2   investigation?

3   A.  Suleyman Aslan, Muammer Guler, Salih Khan Caglayan, Ozgur

4   Ozdemir, Hikmet Tuner, Onur Kaya, Mustafa Behcet Kaynar.

5   Q.  Is it fair to say a number of individuals came within the

6   scope of the investigation?

7             MR. HARRISON:  Objection, your Honor.

8             THE COURT:  Overruled.

9   A.  It's actually many more.  If I had more time, I would

10  probably count more names.

11            THE COURT:  Do you know how many people were

12  investigated or who were subject of the investigation, all

13  together?

14            THE WITNESS:  Your Honor, what I remember as the count

15  of suspects that were listed within the scope of an operation

16  that was conducted on December 17, that was about 32 to the

17  best of my recollection.  But as far as individuals that were

18  suspects within the investigation itself, that was between 50

19  and 100.

20  A.  Shall I continue with other names that I remember?

21  Q.  I think we can try and draw out particular people as they

22  come up.  I think one of the people you mentioned earlier was

23  Suleyman Aslan.

24  A.  Yes.

25  Q.  The general manager of Halkbank at the time?

1   A.   Yes.

2   Q.   For what type of conduct was Mr. Aslan being investigated?

3   A.   Leading an organization, bribery, document forgery, and

4   also laundering, money laundering.

5   Q.   Were there others at Halkbank whose conduct was also within

6   the scope of the investigation?

7              MR. HARRISON:  Objection, your Honor.

8              THE COURT:  Overruled.

9   A.   Yes.

10  Q.   Who were those other individuals?

11  A.   Mr. Hakan Atilla, Levent Balkan, Hakan Aydogan.

12  Q.   You described one of the offenses being investigated was

13  bribery.

14  A.   Yes.

15  Q.   What, if anything, did your investigation show about

16  whether Mr. Aslan was receiving bribes?

17  A.   It was very high and it was in various ways.

18  Q.   What, if anything, did your investigation show about

19  whether Mr. Atilla was receiving bribes?

20  A.   That was not something that had come up.

21  Q.   What, if anything, did your investigation show about

22  whether Mr. Balkan was receiving bribes?

23  A.   No.  No, in fact the individual had refused a matter that

24  could be construed as bribery.

25  Q.   What do you mean by that?

HCB3ATI2                          Korkmaz - Direct

1   A.  It was in relation to a transaction that was conducted, and

2   an individual named Nesteren Zarei Deniz had wanted to send him

3   some boxes of sweets.

4             THE COURT:  To who?

5             THE INTERPRETER:  Send to him.

6             THE COURT:  Who is "him"?

7             THE WITNESS:  To Levent Balkan.

8             MR. HARRISON:  I'm going to object based on foundation

9   and hearsay.

10            THE COURT:  Thanks.  Overruled.

11  A.  So, Nesteren offered to give boxes of sweets in return for

12  the transaction that was being conducted by the individual

13  named Levent Balkan, and Balkan took care of the transaction

14  anyway, but said that receiving the sweets would not be

15  appropriate and refused it.

16  Q.  Lastly, Mr. Aydogan.  What, if anything, did your

17  investigation show about whether Mr. Aydogan was receiving

18  bribes?

19            MR. HARRISON:  Objection to foundation and hearsay.

20            THE COURT:  Overruled, counsel.

21  A.  We had suspicions on that matter.  Taha Ahmet Alacaci, who

22  was one of the suspects in the investigation, invited this

23  individual out to the restaurant to meet with him.  And the

24  person that had made this reservation for this restaurant was

25  this individual named Taha Ahmet Alacaci.

HCB3ATI2                        Korkmaz - Direct

Q.  Did you develop any further evidence that Mr. Aydogan had

received bribes besides the restaurant invitation?

          MR. HARRISON:  Objection to foundation and hearsay and

lack of personal knowledge.

          THE COURT:  Overruled.

A.  I'm not that sure about this, but I believe there was

something about moving a house also, but I'm not sure about

this one.

Q.  I'd like to talk a little bit about what was received in

exchange for the bribes.  Before we do that, let me just ask

you a few questions generally about how the investigation was

conducted.

          MR. HARRISON:  Objection to form.

          THE COURT:  Overruled.

          (Continued on next page)

1  Q.  What were the principal investigative techniques that you

2  used in your investigation?

3  A.  Identification of communications and interception of such

4  communications, surveillance through technical tools, physical

5  surveillance, security camera footage, analysis of mails,

6  documents that were obtained through institutions, auditor and

7  expert reports, pieces of evidence that were seized during the

8  searches within the operation, and also the digital evidence

9  that were seized during the operation.

10         THE COURT:  Did you say digital?

11         THE INTERPRETER:  Digital evidence.

12  Q.  And when you talk about things that you learned from the

13  investigation, are you describing things that you learned from

14  these investigative techniques?

15  A.  Yes.

16  Q.  And from that evidence, what did it show about what types

17  of benefits were provided in exchange for payments that were

18  made?

19         MR. HARRISON:  Objection, your Honor.

20         THE COURT:  Overruled.

21         MR. HARRISON:  Foundation, hearsay.

22         THE COURT:  I'm sorry?

23         MR. HARRISON:  Foundation, hearsay, lack of personal

24  knowledge.

25         THE COURT:  Oh, okay.  Overruled.

1    THE INTERPRETER:  Could you please repeat that

2    question?  I'm sorry.

3    BY MR. LOCKARD:

4    Q.  Could you describe, at a general level, what the evidence

5    indicated about the benefits provided in exchange for the

6    payments?

7    A.  It was the oil and gas payment reserves of Iran being

8    utilized in gold trade and establishing and supporting such a

9    system in doing so and within the system, making Mr. Zarrab

10   into a cartel for doing these things.

11         And, also, the use of the Iranian oil and gas funds in

12   the fake transit trade system establishment, and support of

13   such a system and having Reza Zarrab become a cartel within the

14   Halkbank, in terms of using this transit trade method.

15         And also, providing of reference letters for the front

16   companies that were utilized in transferring the Iranian oil

17   money that was kept in China also.  So providing loan to Reza

18   Zarrab for a hotel investment.

19         And also, with regards to 1.5-tons of gold that was

20   brought over from Ghana with completely fake documents and in

21   terms of letting this shipment come in and go out of the

22   country without confiscation and allowing that shipment to go

23   out to Dubai.

24         THE COURT:  And which country is he talking about, the

25   gold came from Ghana to where?

1      THE WITNESS:  Turkey, your Honor.

2      THE COURT:  And you mentioned a loan a few minutes

3  ago, a loan from who to who?

4      THE WITNESS:  It was from Halkbank to the Arkla Hotel

5  Company that was Reza Zarrab's company.

6      Also, the gold trade method restarting during a time

7  when gold trade had been banned and the transit trade was being

8  utilized.

9      THE COURT:  And when was that?

10      THE WITNESS:  This is after July, starting from

11  September, sir.

12      THE COURT:  Of what year?

13      THE WITNESS:  2013.

14      Also, providing Turkish citizenship to family members

15  and members of his organization, of Reza Zarrab.

16      And also, taking over of Sarkuysan Corporation by Reza

17  Zarrab and his friends by using powers in the government,

18  providing an official guard to Mr. Reza Zarrab, the exile of a

19  police chief, who was not on good terms with Reza Zarrab.

20  BY MR. LOCKARD:

21  Q.  So, Mr. Korkmaz, I'd like to, if we can, talk about a

22  little bit of the evidence relating to the payment of bribes

23  that you developed in your investigation.

24      And, Mr. Chang-Frieden, if you could show for

25  Mr. Korkmaz Government's Exhibit 106.

1          Mr. Korkmaz, do you see what's shown before you?

2    A.  Yes.

3    Q.  And how is it that you're able to recognize Government's

4    Exhibit 106?

5    A.  This is an image of the funds that had been sent in

6    shoeboxes, what we identified as had been sent by Reza Zarrab

7    in the past, and these were found in the house of Suleyman

8    Aslan during a search that was conducted on December 17th,

9    2013.

10          MR. HARRISON:  Judge, I object and move to strike

11   based on foundation, lack of foundation --

12          THE COURT:  Just out of curiosity, what does the

13   foundation objection mean?

14          MR. HARRISON:  Judge, I don't believe that we have the

15   underlying evidence in this case, and I believe under 403, it

16   is unfair to allow images of it in.  I think he's --

17          THE COURT:  I'm trying to understand what you mean by

18   foundation.

19          MR. HARRISON:  Sure.  Judge, I don't think he's --

20          THE COURT:  Well, if you could just explain what's

21   wrong with the foundation that has been established.

22          MR. HARRISON:  Sure.  Judge, I don't think he has any

23   personal knowledge of the images in this picture.

24          THE COURT:  As the investigator in this investigation,

25   he does not --

1           MR. HARRISON:  Yes, I don't think he was --

2           THE COURT:  Overruled.

3  BY MR. LOCKARD:

4  Q.  So, Mr. Korkmaz, is this an image that was obtained in the

5  course of the investigation?

6  A.  Yes.

7  Q.  And when did you obtain the image that's shown?

8  A.  We obtained it during the operation that was conducted, and

9  also on the same day, during the deposition of an individual

10  named Fatma Aslan we utilized these images.

11  Q.  And just focusing on when you obtained the image, from whom

12  did you obtain the image?

13  A.  The teams that went out to conduct the searches, they had

14  utilized video and images also on site.  So they had brought

15  these back to the unit.

16  Q.  And what, if any, instructions did you provide to the team

17  that had provided you with this image before the operation

18  began?

19  A.  I had instructed them that there might be large amounts of

20  money that is being kept in the house of Suleyman Aslan, either

21  in shoeboxes or in other ways, and I reminded them that these

22  monies may be subject to the investigation, the criminal

23  proceeds that are mentioned in the investigation; that these

24  may be related to those funds, and that if found, that they

25  should be seized and that there was also a court order to that

1    effect anyway, to confiscate any item that may be identified

2    during the searches.

3    Q.  And then when did you obtain this image from the team that

4    had been assigned to the Suleyman Aslan search?

5              THE INTERPRETER:  Could you please repeat that again,

6    please.

7    Q.  And then when did you first obtain the image that had

8    been -- when did you first obtain the image from the team that

9    you had assigned to search Mr. Aslan's home?

10   A.  It was first sent to my unit chief and most likely it was

11   on WhatsApp.  In addition to that, the team that had gone to do

12   the search at Suleyman Aslan's, a part of that team that

13   conducted the search, I saw them coming in during the evening.

14   And during the evening time, I recall watching some of the

15   images, the video that had been brought in.

16   Q.  And what, if anything else, did the team assigned to the

17   Suleyman Aslan search bring back that relates to the image

18   shown in this picture?

19   A.  There were documents that were seized.  There were

20   notebooks, digital evidence.  There was an image that had been

21   obtained on site, but as far as the image or the images that

22   were obtained on site, I recall that those images were brought

23   in at night, actually, because the teams that had conducted the

24   search at Suleyman Aslan's home had gone to the Halkbank office

25   after that search, and after that, they brought the images

1    over.

2    Q.  Mr. Korkmaz, focusing just on what's shown in Government

3    Exhibit 106, did the team bring back anything that relates to

4    that image?

5    A.  So here, there is a white box shown on the bottom.  This

6    white box is a shoebox with the Inci brand.  This was a bribery

7    payment that we had identified during our investigation that

8    had been sent to Suleyman Aslan's home previously, and the

9    images, as well as the shoeboxes mentioned, were brought into

10   our unit.

11   Q.  What about money?

12   A.  That came.

13            MR. LOCKARD:  Your Honor, the government offers 106

14   and ask that it be published to the jury.

15            MR. HARRISON:  Same objection, Judge.

16            THE COURT:  Okay.  I'm going to allow it.

17            (Government's Exhibit 106 received in evidence)

18            THE WITNESS:  Can we get water, please?  Thank you.

19            MR. LOCKARD:  Thank you, Mr. Chang-Frieden.

20   BY MR. LOCKARD:

21   Q.  And, Mr. Korkmaz, can you remind us, when was the

22   operation -- on what date was the operation during which this

23   photograph was taken?

24   A.  It was December 17th, 2013.

25   Q.  Can we also show for Mr. Korkmaz Government's Exhibit 105.

1          Mr. Korkmaz, do you recognize that photograph?

2   A.   Yes.

3   Q.   And how do you recognize that photograph?

4   A.   Likewise, this was an image that was taken during the 17th

5   of December 2013 operation at Suleyman Aslan's home and, again,

6   likewise, the image was utilized in Fatma Aslan's deposition

7   later.

8          MR. LOCKARD:   I offer Government's Exhibit 105 and ask

9   that it be published.

10          MR. HARRISON:   Same objection.

11          THE COURT:   I'll allow it.

12          (Government's Exhibit 105 received in evidence)

13          THE COURT:   It's a little difficult to make out the

14   image.  Could you inquire, counsel, about what's in that photo?

15   BY MR. LOCKARD:

16   Q.   And, Mr. Korkmaz, can you describe what's depicted in

17   Government's Exhibit 105?

18   A.   It's stacks of 100-dollar bank notes, also stacks of Euro

19   bank notes at 500 Euros each, also stacks of 100 Turkish Lira

20   bank notes.

21   Q.   And this photograph was taken where?

22   A.   At the home of Suleyman Aslan.

23   Q.   Now, you also mentioned that the investigation related to

24   bribe payments paid to Mr. Caglayan?

25   A.   Yes.

1    Q.  Mr. Chang-Frieden, could you please show for

2    Mr. Korkmaz Government's Exhibit 971-16.

3            Mr. Korkmaz, do you recognize that?

4    A.  Yes.

5    Q.  And how is it that you're able to recognize that?

6    A.  It's an image that was taken during the technical

7    surveillance that was conducted on the bribery transportation

8    at the airport on August 30th of 2013 within our investigation.

9    Q.  And from whom did you obtain the image that's shown in this

10   exhibit?

11   A.  This image was taken out of video footage and the team, the

12   surveillance staff, that had gone on site to participate in

13   this had obtained it and brought it into the unit.  So as soon

14   as it had arrived at the unit, I had watched it, and I had also

15   watched it when the surveillance team brought over the CD that

16   contained their reports on this technical surveillance

17   activity.

18   Q.  And what, if any, instructions had you given to the

19   surveillance team before they had gone out on the surveillance?

20   A.  We had discussed this with the surveillance team lead, as

21   well as the assistant director for the unit and my supervisor

22   of the unit, and we had discussed that it would be appropriate

23   to open up and look at the monies that were in there.

24   Q.  And approximately how much time passed between when you

25   gave those instructions and you got the image that's shown in

1   Government's Exhibit 971-16 number?

2   A.   It was all on that same day.  So I apologize, the

3   surveillance had been decided upon a few days before, and we

4   had decided on that day, during the day of the operation, that

5   the bags should be opened.

6   Q.   And what's the day when you got the images?

7   A.   It's August 30th, 2013.

8            MR. LOCKARD:  The government offers 971-16.

9            MR. HARRISON:  Same objection, Judge.

10           THE COURT:  I'll allow it.

11           (Government's Exhibit 971-16 received in evidence)

12   BY MR. LOCKARD:

13   Q.   Mr. Korkmaz, do you recognize the individuals that are

14   shown in 971-16?

15   A.   I recognize two of them.

16   Q.   And who are the two men that you recognize?

17   A.   The one on the left in white clothes with glasses, that is

18   Ahmet Murat Ozis.  He was one of the suspects in our

19   investigation.  Also, to the far right of the photograph is an

20   individual that is known as Sadegh, and an individual that we

21   also refer to in our investigation is Sadegh.  He's an Iranian

22   individual named Mohammadsadegh Rastgarshishegh.

23   Q.   What did you learn from the investigation about who

24   Mr. Ozis and Mr. Sadegh were?

25           MR. HARRISON:  Objection, calls for hearsay.

1    THE COURT:  Overruled.

2    A.  Ahmet Murat Ozis was someone in the organization who was a

3    reliable courier to be utilized in bribery deliveries.  Aside

4    from that, he was also an individual within the organization

5    that was dealing with the passenger list that was needed in

6    order to be able to do the gold exports.  And he was also the

7    official administrator of a company called Tasbasi, which was

8    also under the control of Mr. Reza Zarrab.  And he was also

9    responsible for the import of gold that would be brought back

10   from Dubai that had been sent through this company, as well as

11   the Duru Company.

12   Q.  And when you said Mr. Ozis did those things, who did he do

13   them for?

14       THE INTERPRETER:  I'm sorry, you're going to have to

15   repeat that again.

16   Q.  When you said that Mr. Ozis did those things that you

17   described, who did he do them for?

18   A.  For the leader of the organization, Reza Zarrab.

19   Q.  And did Mr. Sadegh also work for Mr. Zarrab?

20   A.  Yes.

21   Q.  And what is shown in Government's Exhibit 971, where was

22   that taken?

23   A.  This is at the Turk airport.  This was an image that was

24   taken inside a domestic terminal, at the entrance, and the

25   individuals were stopped by undercover police officers that

1    were tasked at the airport, and their suitcases and bags were

2    open.

3    Q.  And did you have an understanding of where Mr. Ozis and

4    Mr. Sadegh were traveling?

5    A.  Yes.

6    Q.  And on what kinds of evidence was your understanding based?

7    A.  Based on phone conversations.

8    Q.  And where were Mr. Sadegh or Mr. Ozis going?

9    A.  They went to the province of Ankara, to the house of Salih

10   Kaan Caglayan.

11   Q.  And who is Mr. Salih Kaan Caglayan?

12   A.  He is the son of Zafer Caglayan, who was the minister of

13   economy at that time.

14   Q.  And other than the individuals in 971-16, what else is

15   shown in that picture?

16   A.  Monies that were inside the backpack.

17           MR. LOCKARD:  And, Mr. Chang-Frieden, if you could

18   please show Mr. Korkmaz Government's Exhibit 971-15.

19   Q.  Do you recognize that?

20   A.  Yes.

21   Q.  Is that from the same surveillance?

22   A.  Yes.

23           MR. LOCKARD:  We offer 971-15.

24           MR. HARRISON:  Same objection, sir.

25           THE COURT:  I'll allow it.

1          (Government's Exhibit 971-15 received in evidence)

2     BY MR. LOCKARD:

3     Q.   And, Mr. Korkmaz, could you please describe what's shown in

4     this photograph?

5     A.   That's stacks of money that's inside a suitcase.

6     Q.   Now, Mr. Korkmaz, you said that this delivery was on

7     August 30th of 2013?

8     A.   Yes.

9     Q.   Is there any particular significance to that date?

10    A.   Yes.

11    Q.   And what is the significance of August 30th, 2013?

12    A.   The date of August 30th is the holiday of Victory Day in

13    Turkey.

14    Q.   And what is the word for "victory" in Turkish?

15    A.   It's "zafer."

16    Q.   Mr. Chang-Frieden, if you could please now show Mr. Korkmaz

17    Government's Exhibit 971-78.

18          Mr. Korkmaz, do you recognize this?

19    A.   Yes.

20    Q.   And is this also obtained from your investigation?

21    A.   Yes.

22    Q.   And how did you obtain what's shown in 971-78?

23    A.   This was obtained through technical surveillance on

24    April 19th, 2013, by the surveillance teams.  It was brought in

25    on the same day when I watched it, as it was brought in, and

1    then the surveillance team later provided their report, as well

2    as a CD for this activity, and I remember watching it also when

3    they brought those.

4              MR. LOCKARD:  The government offers 971-78 and ask

5    that it be published to the jury.

6              MR. HARRISON:  Same objections, your Honor.

7              THE COURT:  I'll allow it.

8              (Government's Exhibit 971-78 received in evidence)

9    BY MR. LOCKARD:

10   Q.  Mr. Korkmaz, can you remind us on what date this image was

11   taken?

12   A.  This is a frame taken from a video that had been shot on

13   April 19th, 2013.

14   Q.  And who is shown in this photograph?

15   A.  Reza Zarrab.  And the individual that is marked as the

16   guard of Mr. Reza Zarrab.  I believe on that day that that

17   individual may be Yucel Ozcil, and then also an individual that

18   is marked here as the driver of Mr. Reza Zarrab.

19   Q.  And where is this photograph taken?

20   A.  In Ikitelli in Istanbul, at the Istanbul office at the

21   Ministry of European Union.

22   Q.  And when this photograph was taken, or when this image was

23   taken, at that time, did you have an understanding of the

24   purpose of Mr. Zarrab's visit to the EU ministry?

25   A.  Yes.

1  Q.  And on what types of evidence was that understanding based?

2  A.  Phone conversations.

3          MR. HARRISON:  Objection, to form, your Honor.  Calls

4  for hearsay.

5          THE COURT:  I'll allow it.

6  A.  Phone conversations.

7  Q.  Phone conversations from intercepts conducted in your

8  investigation?

9  A.  Yes.

10 Q.  And what was the purpose of Mr. Zarrab's visit?

11 A.  Before this visit, he had talked to Abdullah Happani and

12 had instructed Happani to prepare $500,000 in a shoebox to be

13 delivered in Ikitelli, and that this would be a payment about

14 Aktif Bank, which they in the organization referred to as

15 "Active."

16 Q.  A payment to who?

17 A.  Not based on the phone conversation that I just referred

18 to, but based on other phone conversations, we understood that

19 to be Mr. Egemen Bagis.

20 Q.  Remind us, who was Mr. Bagis at the time of the

21 investigation?

22 A.  He was the minister of European Union during that time.

23          MR. HARRISON:  Objection, Judge.  Move to strike.

24          THE COURT:  Overruled.

25          MR. LOCKARD:  Mr. Chang-Frieden, if you could please

1    show Mr. Korkmaz Government's Exhibit 9 --

2                THE COURT:  Excuse me.  Could you spell his name

3    again?  I missed it the last time.

4                THE WITNESS:  (In English)  E-d-e-m-e-n, B-a-g-i-s.

5                THE COURT:  And his title or his position, pursuant to

6    your investigation, was what on this day?

7                THE WITNESS:  He was the minister of European Union,

8    sir, during that time.

9                THE COURT:  So that minister of European Union was a

10   Turkish citizen or a citizen of some other country?

11               THE WITNESS:  Your Honor, the European ministry is a

12   ministry within the Turkish government, and he was serving in

13   that capacity, and he's a Turkish citizen.  I also know that he

14   does have other citizenships, but as far as this ministry, this

15   is a Turkish government ministry.

16               THE COURT:  Very good.  That was my question.  Do you

17   want to take a five-minute break or wait until lunch?  Take

18   five minutes.

19               (Jury not present)

20               Okay.  We'll see you in five.  Counsel, is someone

21   going to show the witness out?

22               (Witness temporarily excused)

23               (Recess)

24               (Continued on next page)

25

1      (In open court; jury not present)

2      THE COURT:  Counsel, you have an application?  If so,

3  we should do it at sidebar because we have the witness on the

4  witness stand.

5      (At the sidebar)

6      MR. HARRISON:  Judge, the defense is moving for a

7  mistrial at this time based on what we believe to be the

8  extreme prejudice that's coming from this witness, who is

9  essentially testifying, as far as we can tell, to the contents

10 of the police file.  The police file --

11     THE COURT:  The Turkish police file?

12     MR. HARRISON:  Of which we only have partial stuff,

13 which was stolen from Turkey.

14     THE COURT:  How do you know that?  How do you know it

15 was stolen from Turkey?

16     MR. HARRISON:  That's I believe what the witness is

17 going to testify to.

18     THE COURT:  How do you know that?  You're making an

19 application.

20     MR. HARRISON:  We've seen it in 3500 material.

21     THE COURT:  That it's stolen?

22     MR. HARRISON:  Yes, Judge.  He's essentially

23 testifying to things that -- to recordings and things that have

24 not been authenticated, have not been -- there has been no

25 showing of chain of custody.  He is essentially testifying as

1   both a summary witness and as an opinion witness as to his

2   opinion of what is contained in the police file.  I don't

3   believe he has any personal knowledge of the surveillance that

4   he's talking about, of the seizures that he's talking about.  I

5   think he testified he was a supervising officer who didn't do

6   those things.

7          In addition to the fact that he's referred to our

8   client as a suspect in a totally separate investigation.  We

9   think is overly prejudicial.

10          THE COURT:  He referred to your client I think one

11   occasion.  That's the basis of the mistrial?

12          MR. HARRISON:  All the things I just said.

13          THE COURT:  But you also said they don't pertain to

14   your client.  Nevertheless, that is the basis for your

15   mistrial, your client's mistrial?

16          MR. HARRISON:  All of the things I said are the basis.

17   There's been a reference to my client a couple of times as a

18   suspect.  And then there has been a description of all this

19   other evidence that, frankly, we don't think is directly

20   relevant to him.  That's also prejudicial.

21          THE COURT:  I don't think you moved on relevance.

22   Mostly foundation and hearsay.

23          The motion for a mistrial is pretty serious stuff.

24   You're going to have to put it in writing.

25          MR. HARRISON:  Okay.

1   THE COURT:  And tell me when you want to do that by.

2   In the meantime, I'm going to go forward.

3        MR. HARRISON:  Okay.  9 o'clock this evening, Judge.

4        THE COURT:  Nine?  Okay.  And when is the government

5   able to respond?

6        MR. LOCKARD:  I assume -- would the Court like it by

7   the morning or would it like it by --

8        THE COURT:  Do we think that the witness will still be

9   testifying?

10       MR. LOCKARD:  Yes.

11       THE COURT:  Into tomorrow?

12       MR. ROCCO:  If I may.  I think perhaps it might be

13  better to do this at the end of the witness's direct testimony.

14       THE COURT:  Do what?

15       MR. ROCCO:  Make this formal application.  We'll renew

16  our application for a mistrial and perhaps do the submissions

17  then.  So we've heard at least what this witness has had to say

18  on direct.

19       THE COURT:  You tell me when you want to make the

20  motion.

21       MR. ROCCO:  We're happy to do it now.  We thought it

22  best --

23       THE COURT:  The writing.  You don't have that

24  available now, do you?

25       MR. ROCCO:  No.

1      THE COURT:  I want the motion in writing.

2      MR. ROCCO:  What we're saying, your Honor, what I'm

3 saying is perhaps -- and I'm only suggesting this to the Court.

4 Mr. Harrison said we can do it by 9 o'clock this evening.

5 That's fine.  It may be better, since you are allowing the

6 testimony to go forward, it may be better to do it at the end

7 of the direct testimony.

8      MR. HARRISON:  That's our request then.

9      MR. ROCCO:  That would be our request.

10     THE COURT:  Is what?

11     MR. ROCCO:  To make the formal motion in writing at

12 the end of the witness's testimony.

13     THE COURT:  When is that likely to be, in your

14 estimation?

15     MR. LOCKARD:  I think we're going to be interrupted

16 this afternoon by the remainder of Mr. Cohen.  Then we're going

17 to be interrupted tomorrow morning by Mr. Szubin.  So I expect

18 this witness probably will finish up some time during the day

19 on Wednesday.

20     THE COURT:  With his direct?

21     MR. LOCKARD:  Yes.

22     THE COURT:  Giving them more time.  So is that okay

23 with you?

24     MR. ROCCO:  That's fine.

25     MR. HARRISON:  Yes, thank you.

1           THE COURT:  Why don't we, when it is finished,

2    reconvene so to speak and set a date for both the moving brief

3    and the opposition brief.  How that's?

4           MR. ROCCO:  That's fine.  I don't think I'm going to

5    be more than an hour this afternoon with Cohen.  So you think

6    you are going to put him back on the stand I assume, correct?

7           MR. LOCKARD:  Mr. Korkmaz?  We'll have time.

8           THE COURT:  With respect to Cohen, I have no objection

9    to meeting his schedule.  I'm sure that's okay with you.

10          MR. ROCCO:  Sure.

11          THE COURT:  So when he shows up, we'll stop his

12   direct, try and finish up with Mr. Cohen, and then bring him

13   back.  Depending on where we are on time for direct, or did you

14   say Szubin?

15          MR. LOCKARD:  We expect Mr. Cohen will be here after

16   the lunch break, so we anticipate we'll finish out the morning

17   with Mr. Korkmaz, start and finish Mr. Cohen after lunch, and

18   we can resume with Mr. Korkmaz until tomorrow morning.  As we

19   had discussed last week, because of the end of the week

20   scheduling problems, Mr. Szubin will start first thing

21   tomorrow.  And then when he concludes his testimony, we'll

22   resume Mr. Korkmaz and go to the end of his direct.

23          THE COURT:  I got it.

24          MR. LOCKARD:  It is a little choppy.

25          THE COURT:  That works.  It was a little unclear to me

1    at first, but Szubin is the first witness tomorrow morning.

2              MR. LOCKARD:  Yes, your Honor.

3              (In open court; jury present)

4              THE COURT:  We'll resume with the direct examination.

5              THE DEPUTY CLERK:  Sir, before we begin, I'd like to

6    remind you that you're still under oath.

7              THE WITNESS:  Okay.

8    BY MR. LOCKARD:

9    Q.  Mr. Korkmaz, good afternoon.

10   A.  You too as well.

11   Q.  Before the break we had been looking at a surveillance

12   photograph of Mr. Zarrab.  Just to clarify, are Reza Zarrab and

13   Riza Sarraf the same person?

14   A.  Yes.

15   Q.  We've been looking at a surveillance photograph taken

16   during Mr. Zarrab's visit to the office of the Ministry of E.U.

17   Affairs.

18   A.  Yes.

19             MR. LOCKARD:  Mr. Chang-Frieden, if you can please

20   show Mr. Korkmaz Government Exhibit 971-79.

21   Q.  Mr. Korkmaz, do you recognize that image?

22   A.  Yes.

23   Q.  Is that taken from the same surveillance?

24   A.  That is correct.

25             MR. LOCKARD:  The government offers 971-79 and ask

1    that it be shown to the jury.

2              THE COURT:  I'll allow it.

3              MR. HARRISON:  Same objection.

4              (Government's Exhibit 971-79 received in evidence)

5    Q.  Mr. Korkmaz, since we did have the break in between, can

6    you remind us on what date this is taken.

7    A.  This is an image taken on 19th of April, 2013.  If I may

8    explain something that I saw in the image.

9    Q.  Okay.

10   A.  So in this image and in other surveillance images, there

11   were times when the time or the date shown on the image may go

12   off a bit.  And the individuals who are at the surveillance

13   would note this in the report as to what the actual date and

14   time the images were taken.

15             MR. HARRISON:  Objection.  Move to strike based on

16   hearsay, Judge.

17             THE COURT:  Overruled.

18   Q.  What date did you receive the video that contained this

19   image?

20   A.  Same day.

21   Q.  That day being April 19, 2013?

22   A.  Yes.

23   Q.  Can you tell us what's shown on the sign on the top of the

24   building in the mid- to right-hand area of the image.

25   A.  It says European Union, but what it says afterwards I can't

1    read, maybe because of the resolution of this image here.  But

2    it says European Union.  But on the line below it, it does say

3    in English Ministry and Europe.

4              MR. LOCKARD:  Mr. Chang-Frieden, if you can please

5    show Mr. Korkmaz Government's Exhibit 971-71.

6    Q.  Mr. Korkmaz, do you recognize that image?

7    A.  Yes.

8    Q.  How is it that you recognize this image?

9    A.  It is an image that was among the images that were

10   delivered to me by the technical physical surveillance team

11   that had obtained this image.

12   Q.  Just to clarify, you've used the phrases "physical

13   surveillance" and "technical surveillance."  Can you explain

14   the difference between those two things.

15   A.  Certainly.  The technical surveillance refers to images or

16   audio or images and audio being obtained from an individual

17   through use of technical devices.  And this would be done in

18   public places, and it would exclude office and home

19   surveillance, inside the home surveillance.  And it would be

20   pursuant to the Article 140 of the penal code of -- the penal

21   code, and it would be based on a court order each time.  So,

22   and again, it would be outside of home.

23              And the physical surveillance, on the other hand,

24   does not require any court order, and it consists of the

25   officer following the target and making reports about what he

1    is observing without taking any imagery of the surveillance.

2    Q.  I think you said what's shown before you as Government

3    Exhibit's 971-71 is from technical surveillance; is that

4    correct?

5    A.  Yes.

6    Q.  Do you recognize where that image was taken?

7    A.  Yes.

8    Q.  Where was it taken?

9    A.  This is the rear entrance, exit door of the business plaza

10   where Orient Bazaar is located which is in Nuruosmaniye, and

11   this is where Mr. Reza Zarrab's company is located.  It's the

12   entrance and exit.

13   Q.  Do you recognize the individuals who are depicted?

14   A.  Yes.

15        MR. LOCKARD:  The government offers Exhibit 971-71 and

16   ask that it be published.

17        MR. HARRISON:  I've objected on relevance a number of

18   times, but relevance is one of the grounds.

19        THE COURT:  Okay.  I'll admit it.

20        (Government's Exhibit 971-71 received in evidence)

21   Q.  Mr. Korkmaz, when was this image taken?

22   A.  I recall it to be September 13, 2013.

23   Q.  Who are the individuals who are shown?

24   A.  The one on right-hand side with the bag in his hand is

25   Ozgur Ozdemir.  And the individual on the left in white

1    clothing is Husamettin Altinbas.

2    Q.  Did you have an understanding from your investigation of

3    the purpose of Mr. Altinbas and Mr. Ozdemir's visit to the

4    Orient Bazaar on that day?

5            MR. HARRISON:  Objection to opinion and calls for

6    hearsay, Judge.

7            THE COURT:  Overruled.

8    A.  Yes.

9    Q.  On what types of evidence was your understanding based?

10   A.  I'll say this for Ozgur Ozdemir, it was based on phone

11   conversations.

12   Q.  In those conversations did Mr. Ozdemir say what his purpose

13   was?

14           MR. HARRISON:  Objection.

15           THE COURT:  Overruled.

16   A.  I don't know and I don't recall whether he had mentioned it

17   in phone conversations on that day.  But based on other phone

18   conversations, to the best of my recollection, he had come in

19   to receive a payment of about $200,000.

20   Q.  Based on those telephone conversations, did you have an

21   understanding of who that payment was intended for?

22   A.  Yes.

23           MR. HARRISON:  Objection to opinion and relevance,

24   Judge.

25           THE COURT:  Overruled.

1   Q.  Who was the $200,000 payment intended for?

2   A.  This payment and all other payments delivered through Ozgur

3   Ozdemir were payments being made to Muammer Guler through

4   Muammer Guler's son.

5   Q.  Can you remind us at the time of the investigation, who was

6   Muammer Guler?

7   A.  Muammer Guler was the Minister of Interior during that

8   time.

9   Q.  What are the responsibilities of the Ministry of the

10  Interior in Turkey?

11  A.  All the governorates that are within Turkey are under the

12  Ministry of Interior.  The Turkish National Police is also

13  under the Ministry of Interior.  And the Office of Vital

14  Records and Citizenship is also under the Ministry of Interior.

15  Q.  When you say that the Turkish National Police is under the

16  Minister of the Interior, does that include the financial

17  crimes unit in Istanbul where you were working and conducting

18  this investigation?

19  A.  Yes, we were staff of the Ministry of the Interior too.

20          MR. LOCKARD:  Mr. Chang-Frieden, if you can please

21  show for Mr. Korkmaz Government Exhibit 970-14.

22  Q.  Mr. Korkmaz, do you recognize that?

23  A.  Yes.

24  Q.  How do you recognize that?

25  A.  This is a frame that was taken from the video obtained by

1    our teams on July 17 of 2013.  And it is among the evidence

2    that was in our investigation.

3    Q.  How soon after the surveillance date did you receive the

4    image that's shown in Government's Exhibit 970-14?

5    A.  I recall that I saw it on that day.  But I don't recall

6    whether the reports and the CD pertaining to this were also

7    submitted on the same day.  It was my recollection that they

8    were provided a few days later, and I recall viewing it again

9    when those were turned in.

10   Q.  Do you recognize the location shown in this image?

11   A.  This is an area that I know really well.

12   Q.  Do you recognize the individual who is shown in the image?

13   A.  Yes.

14   Q.  Who is the individual shown?

15   A.  Ahmet Murat Ozis.

16              MR. LOCKARD:  The government offers Government Exhibit

17   970-14.

18              MR. HARRISON:  Same objection.

19              THE COURT:  I'll allow it.

20              (Government's Exhibit 970-14 received in evidence)

21   Q.  Mr. Korkmaz, you said that you recognize the location where

22   this image is?

23   A.  Yes.

24   Q.  Where is that?

25   A.  This is in Fatih, Istanbul.  And it and is within 50 to

1  70 meters of my old home.  It is on the inside section of Vatan

2  Avenue, and it's in close proximity to my former home.

3  Q.  What, if any, business is located in that area?

4  A.  The provincial police station complex that also houses the

5  financial crimes unit where I worked is also located in this

6  area.  It is approximately 200 to 250 meters from this

7  location.

8  Q.  What business is located in the entrance that's shown in

9  this photograph or this image?

10  A.  This is the entrance to the building that houses the Turgev

11  Foundation.

12  Q.  Generally speaking, what is the Turgev Foundation?

13  A.  I don't know what it stands for.  But I believe it's

14  something to the effect of Turkey and youth, and the previous

15  acronym for it was Isgev, and Isgev, to the best of my

16  knowledge, was a foundation that was established by then-mayor

17  Mr. Recep Tayyip Erdogan in the '90s.  In between 2010 and

18  2012, the name was changed to Turgev.  And during that time,

19  Bilal Erdogan was the administrator for the foundation.  That's

20  all I know about it.

21  Q.  In July of 2013, what, if any, relationship between Turgev

22  and any of the individuals whose conduct was involved in your

23  investigation.

24      MR. HARRISON:  Objection.  Calls for speculation, your

25  Honor.

1           THE COURT:  Overruled.

2   A.  So, during the time frame after July, while the gold ban

3   was in effect, in terms of bringing back the method of gold

4   export again, Reza Zarrab had utilized this relation in order

5   to bring that method back with Mr. Suleyman Aslan.

6   Q.  What, if any, affiliation was there between Turgev

7   Foundation and any of the individuals whose conduct was within

8   the scope of your investigation?

9           MR. HARRISON:  Objection to form, relevance, calls for

10  speculation.

11          THE COURT:  Overruled.

12  A.  Excuse me but I did not understand your question fully.

13  Could you --

14  Q.  I'll ask it a different way.

15          You said that Bilal Erdogan was the administrator of

16  the foundation in 2012?

17  A.  Yes.

18  Q.  Who was the administrator of the foundation in 2013?

19  A.  Salih Koc.

20  Q.  Based on your participation in the investigation, did you

21  have an understanding of the purpose of Mr. Ozis's visit to

22  Turgev in mid July of 2013?

23          MR. HARRISON:  Objection.  I'm waiting for the

24  interpreter to go before making my objection.  I don't want to

25  talk over him.

1          THE COURT:  That's a good idea.

2          MR. HARRISON:  Objection to relevance and calls for

3   hearsay, your Honor, and speculation.

4          THE COURT:  Overruled.

5   A.  Yes.

6   Q.  What kinds of evidence was your understanding about

7   Mr. Ozis's purpose was that based?

8   A.  Based on phone conversations and based on additional

9   evidence that we were hoping to find based on the operation.

10  Q.  Focusing on the intercepted telephone conversations that

11  you are aware of in July of 2013.  What did those conversations

12  show about the purpose of Mr. Ozis's visit to Turgev?

13         MR. HARRISON:  Objection, your Honor.  Calls for

14  speculation, lack of foundation.

15         THE COURT:  Overruled.

16  A.  In 2014, excuse me, on July 14 of 2013, Zafer Caglayan and

17  Reza Zarrab held a meeting on an airplane in order to discuss

18  two matters.  Based on other phone conversations, these two

19  matters were the money to be delivered to Turgev to be given to

20  Bilal Erdogan, and also the restart of gold trade in this time

21  frame, after July, while the gold ban was in effect.

22  Q.  So how does that relate to Mr. Ozis's visit to Turgev?

23         MR. HARRISON:  Same objection, your Honor.

24         THE COURT:  Keep going.  Overruled.

25  A.  Reza --

1          MR. HARRISON:  Before he answers, I'm going to object.

2          THE COURT:  I thought you were going to wait for the

3     interpretation.

4          MR. HARRISON:  I was going to wait until the

5     interpretation went to the witness first and then I was going

6     to object.

7          THE COURT:  Okay.

8          MR. HARRISON:  For the reasons I've objected before,

9     Judge, based on relevance and lack of foundation.

10         THE COURT:  You can't have the whole potpourri of the

11    Federal Rules of Criminal Procedure.  You've got to have

12    specific objections for each question.  And what is your

13    specific objection to this question?

14         MR. HARRISON:  I do have those for this question.

15         THE COURT:  You do have which?

16         MR. HARRISON:  Sure.  In addition --

17         THE COURT:  I mean, in addition to what?  What is the

18    basis for the objection?

19         MR. HARRISON:  I believe he's testified based on

20    recordings that we do not have.

21         THE COURT:  Okay.  Fair enough.  So we're going to

22    take our lunch break.  And we'll pick up -- it is about five to

23    1.  We'll pick up at 2 o'clock.  And we'll see you then.

24              (Jury excused)

25              (Continued on next page)

| | |
|---|---|
| 1 | THE COURT:  If counsel could remain.  Please be |
| 2 | seated.  The others are welcome to stay if they'd like or not. |
| 3 | MR. LOCKARD:  Should we excuse the witness, your |
| 4 | Honor? |
| 5 | THE COURT:  Yes. |
| 6 | (Witness temporarily excused) |
| 7 | THE COURT:  We're going to take a two-minute break and |
| 8 | then I will have something to discuss with you. |
| 9 | (Recess) |
| 10 | (In open court; jury not present) |
| 11 | THE COURT:  As counsel is aware, and this is primarily |
| 12 | directed at the government.  During one of the sidebars, |
| 13 | defense counsel have indicated their intention at the close of |
| 14 | the direct examination of this witness of moving for a mistrial |
| 15 | on several bases which include, one -- there may be more, but |
| 16 | these are the ones that I remember.  The relevance of this |
| 17 | testimony to Mr. Atilla, and also, well, you've heard the other |
| 18 | complaints by defense counsel. |
| 19 | My principal concern has to do with the relationship |
| 20 | to Mr. Atilla's case and also knowing in a little bit more |
| 21 | detail where this information came from, literally, and |
| 22 | relatedly, where it was utilized. |
| 23 | So by that I mean, were these documents or photos, |
| 24 | this evidence, were they actually admitted in a Turkish |
| 25 | proceeding?  And if so, does this witness know about that?  And |

HCB3ATI4

1   if there are tape recordings, the witness mentioned that there

2   were court orders secured in advance of wiretaps.  We would

3   have to know a little bit more about that.  And we'd have to

4   know a little bit more -- I'm not sure how significant this

5   is -- but how these materials wind up in this court.  We should

6   hear a little bit more about that.

7        So, before we continue with further testimony, I think

8   that these issues need to be addressed through the witness.  If

9   you need to or want to make a proffer before he resumes the

10  witness stand, that's fine.  If not, we can just bring these

11  issues out before he continues his testimony.

12        MR. LOCKARD:  Sure.  And your Honor, you've

13  actually -- I don't think you're reading the outline of the

14  testimony, but that's exactly where we're headed next.

15        So, I think the witness has been describing the

16  investigation, and this is partly in response to certain

17  arguments that were made in opening statements about the nature

18  of this evidence and the nature of this witness.

19        The witness is going to go on to describe I think in

20  very short order how the investigation concluded, how he

21  obtained copies of the evidence that we've been talking about

22  and will continue to talk about, and this is laying the

23  groundwork for how it is that the investigation concluded the

24  way that it did and how it is --

25        THE COURT:  This is the investigation in Turkey?

HCB3ATI4

1          MR. LOCKARD:  That's correct, your Honor.

2          THE COURT:  I would start, though, before we resume

3    testimony, with the positioning or the relevance of this

4    information to the case brought against Mr. Atilla.

5          MR. LOCKARD:  Yes, your Honor.  I think he sort of

6    broadly described how these payments relate to the Iranian oil

7    proceeds.  And that's what we're going to focus in throughout

8    the rest of the testimony.

9          THE COURT:  My other understanding is that when we

10   resume after the lunch break it will be with Mr. Cohen, is that

11   right?  Is he on the premises so to speak?

12         MR. LOCKARD:  I think he's not quite on the premises,

13   but we expect him to be on the premises within the hour.

14         THE COURT:  Okay.  All right.  So, we'll see you at

15   2 o'clock.

16              (Luncheon Recess)

17              (Continued on next page)

18

19

20

21

22

23

24

25

1                    A F T E R N O O N   S E S S I O N

2                             2:08 P.M.

3             (In open court; jury present)

4             THE COURT:  So be seated, everybody.  We have

5    Mr. Cohen back to conclude his examination.

6             THE DEPUTY CLERK:  Sir, before we continue, I'd like

7    to remind you that you're still under oath.

8             THE WITNESS:  Thank you.

9             THE COURT:  We will continue with the

10   cross-examination by Mr. Rocco.

11            MR. ROCCO:  May I proceed, your Honor?

12            THE COURT:  Yes.

13   DAVID COHEN,

14        called as a witness by the Government,

15        having been previously duly sworn, testified as follows:

16   CROSS-EXAMINATION RESUMED

17   BY MR. ROCCO:

18   Q.  Mr. Cohen, good afternoon.

19   A.  Good afternoon.

20   Q.  Welcome back.

21   A.  Thank you.

22   Q.  So, Mr. Cohen, you met with representatives of the U.S.

23   Attorney's Office in preparation for your testimony in this

24   case; am I right?

25   A.  That's correct.

HCBPATI5                          Cohen - Cross

1    Q.  And how often did you meet with them?

2    A.  I would say about a half dozen times.

3    Q.  And in that half-dozen times, where did you meet with them?

4    A.  I met with them in Washington, D.C. and here in New York.

5    Q.  Okay.  And where, at your office in Washington, D.C.?

6    A.  At the U.S. Attorney's Office in Washington.

7    Q.  And at the U.S. Attorney's Office here in New York; am I

8    correct?

9    A.  Correct.

10   Q.  How long did these meetings take, on average?

11   A.  The first couple of meetings were probably two hours long

12   or so, in that vicinity, one to two hours each one.

13   Q.  I'm sorry, did you say there was a half-dozen meetings,

14   six?

15   A.  That's about it, yes.

16   Q.  And at those six meetings, you were shown documents?

17   A.  I was.

18   Q.  And the documents you were shown during those meetings,

19   include the documents that you have been shown here during your

20   testimony on direct examination?

21   A.  Yes.

22   Q.  And so when you were asked, had you reviewed those

23   documents, you were referring to the times that you reviewed

24   the documents with the prosecutors in connection with your

25   pretrial preparation; am I correct?

1   A.  I'm sorry, Mr. Rocco, when I was asked by whom?

2   Q.  When you were on the stand and you were asked whether you

3   had reviewed the documents --

4   A.  Right.

5   Q.  -- you answered the question, as I recall, that you had?

6   A.  Yes.  Sorry, I didn't understand your question.

7   Q.  I'm referring to the fact that you had -- are you saying

8   that you viewed those documents in preparation for your

9   testimony here?

10  A.  Yes.

11  Q.  Correct?

12  A.  Yes; uh-huh.

13  Q.  Now, it is correct, is it not, Mr. Cohen, that you and I

14  have never met before?

15  A.  It is correct that I made the offer to meet with you twice

16  and you declined.

17  Q.  You did, and I thank you for that opportunity.  I wasn't

18  accusing of you of refusing to meet with me.  That wasn't my

19  question.  My question was, you and I had not met before,

20  right?

21  A.  No, we had not.  I had made myself available twice to meet

22  with you.

23  Q.  Yes, I understand that.

24              THE COURT:  We got it.  The answer is no.

25              MR. ROCCO:  I think we got it.

1        THE COURT:  Right?

2        MR. ROCCO:  Yes, the answer is no.

3   BY MR. ROCCO:

4   Q.  And I didn't have the opportunity to review with you

5   documents that --

6   A.  You did have the opportunity.  You didn't take it.

7   Q.  Excuse me, if I may?

8   A.  Yes.

9   Q.  Let me finish the question, you can --

10  A.  Sure.

11  Q.  But you and I did not review documents before you

12  testified; is that correct?

13  A.  That's correct.

14  Q.  That was my only point.  So now, when we broke last, we

15  were talking about Reza Zarrab.  You testified, I believe, that

16  you had heard at some point that Mr. Zarrab was an important

17  gold trader --

18        THE COURT:  Hold on one second.  I think your client

19  is having trouble with the sound system.

20        THE INTERPRETER:  Your Honor?

21        THE COURT:  Do you need another one?

22        THE INTERPRETER:  We need new batteries.

23        THE COURT:  Oh, okay.

24        (Pause)

25        Okay.

HCBPATI5                        Cohen - Cross

 1              MR. ROCCO:  Thank you, your Honor.

 2              THE COURT:  We're good.

 3  BY MR. ROCCO:

 4  Q.  I believe you had testified that you had heard that

 5  Mr. Zarrab was an important gold trader; am I correct?

 6  A.  That's right.

 7  Q.  And am I correct that you heard that sometime in or before

 8  2013?

 9  A.  I think that is correct.

10  Q.  And do you recall -- and you also testified to the fact

11  that you had discussed Mr. Zarrab at a meeting at Halkbank

12  sometime in the spring of 2013; am I correct?

13  A.  That is my best recollection.

14  Q.  And do you recall the date that you discussed -- had this

15  discussion with Mr. Atilla?

16  A.  So I believe I only met with Halkbank once in the spring of

17  2013.  I think it was the end of February of 2013; so it would

18  have been at that meeting.

19  Q.  And that meeting took place in Istanbul?

20  A.  Either in Istanbul or Ankara but I don't recall.

21  Q.  In any event, it was in Turkey?

22  A.  Yes.

23  Q.  So can we bring up 3505-006 for Mr. Cohen.  I think this is

24  a document that was shown to you on direct examination.  I

25  would direct your attention to the date of the document, and

1    then in the body of the document there's a date, and I'm going

2    to ask you if that date refreshes your recollection as to the

3    date that you met with Mr. Atilla or with representatives of

4    Halkbank?

5    A.  This is the meeting I was referring to.

6    Q.  Okay.  And does it refresh your recollection that the

7    meeting occurred on February 28th, 2013?

8    A.  My recollection is that it was in the early-ish spring of

9    2013; so it seems likely that's the right date.

10   Q.  Close enough.

11   A.  Yes.

12   Q.  And that's -- by the way, that's a document that you were

13   shown on direct examination, if I recall?

14   A.  I think that's right.

15   Q.  And I think you said that that meeting looked like it

16   lasted more than your -- longer than your average meeting?

17   A.  Yeah, my recollection is this meeting was at least an hour

18   long.

19   Q.  And just take a moment, if you will, I know you recently

20   reviewed the document, but tell us, if you take a moment and

21   look at it, if there's anything in the document that refreshes

22   your recollection as to the substance of what was discussed in

23   your meeting regarding Mr. Zarrab?

24        (Pause)

25   A.  Can we flip to the next page.

1  Q.  Sure.  Please keep scrolling.

2           Does that document help contextualize your comments

3  about -- and what was discussed, if anything, about Mr. Zarrab

4  at that meeting?

5  A.  So my recollection is in the course of this meeting, when

6  we were discussing gold trade with Iran and discussing the fact

7  that the July to come, or the July of 2013, that the sanctions

8  would change and it would be, at that point, sanctionable to

9  trade gold with Iran altogether.

10           And in the course of that conversation, I discussed

11  the fact that there had been a significant increase in the

12  amount of gold that was being exported from Turkey to Iran.

13  And I think in the course of that conversation is where the --

14  as best I recall, Mr. Zarrab came up in the course of that

15  conversation.

16  Q.  And do you remember what was said about Mr. Zarrab, by

17  either you or Mr. Atilla, at that meeting?

18  A.  So I don't recall whether I brought him up or whether

19  Mr. Atilla brought him up, but I think the substance of the

20  conversation was that there was a significant gold trader,

21  Mr. Zarrab, that, as was reflected in this document and as I

22  recall, that they had -- they, Halkbank, had in place the

23  mechanisms to ensure that that trade was, at that point,

24  permissible gold trade to private Iranian purchasers, not to

25  the government of Iran; and that one of the reasons that they

1    were comfortable with that was that they knew Mr. Zarrab's

2    business and knew with whom he was trading.

3    Q.   Okay.  And do you recall anything else about Mr. Zarrab?

4    Did you, in that conversation, tell Mr. Atilla that Mr. Zarrab

5    was under investigation by any United States authorities?

6    A.   I don't believe so.

7    Q.   Did you tell Mr. Zarrab that Halkbank should not be dealing

8    with Mr. -- I'm sorry, Mr. Atilla, did you tell Mr. Atilla that

9    Halkbank shouldn't be dealing with Mr. Zarrab?

10   A.   No.

11   Q.   Did you tell Mr. Atilla in that meeting that Halkbank

12   should be careful of its dealings with Mr. Zarrab --

13   A.   Yes.

14   Q.   -- particularly?  Particularly, did you say that about

15   Mr. Zarrab?

16   A.   So I think as I testified last Friday, I don't recall the

17   precise words that I used, but the tenor of that conversation,

18   I'm sure, was that they needed to be careful of Mr. Zarrab, as

19   well as anyone else who they were -- who was a customer of

20   Halkbank who was selling gold to Iran.

21   Q.   Let's move on.  You say that you were in Istanbul on

22   December 17th, 2013; am I correct?

23   A.   I believe that's the date.

24   Q.   And that you had a scheduled meeting with Suleyman Aslan at

25   Halkbank; am I correct?

1    A.  I believe that's correct.

2    Q.  And I think that you testified that Mr. Aslan was arrested

3    that day; am I correct?

4    A.  Yes.

5    Q.  And that because he was arrested and because you were stuck

6    in traffic, the meeting was canceled?

7    A.  More the traffic.  I mean, I don't recall actually if it

8    was the day before or the day of that I arrived that the arrest

9    occurred, but in any event, my planned meetings with Halkbank,

10   as well as I think others in the Turkish private sector, were

11   canceled because I was stuck in traffic getting in from the

12   airport.

13   Q.  And do you remember when you learned that Mr. Aslan was

14   arrested?

15   A.  Not precisely.

16   Q.  And do you remember what he was arrested for?

17   A.  I remember he was arrested as part of a corruption sweep,

18   essentially, that occurred and that he was arrested at home

19   with at least the reports that I read, public media reports,

20   where he was arrested at home with shoeboxes full of cash.

21   Q.  And were these reports that you were reading at or about

22   the time that Mr. Aslan had been arrested?

23   A.  Yes.

24   Q.  Did you learn that Mr. Zarrab had been arrested with

25   Mr. Aslan?

1   A.  I believe so.

2   Q.  Did you learn that at the time that you learned of

3   Mr. Aslan's arrest, or did you learn that subsequently?

4   A.  I believe I learned it at the same time, although, my -- I

5   was more focused on Mr. Aslan than Mr. Zarrab because that was

6   with whom I was planning to meet.

7   Q.  Did you discuss with anyone at Treasury Mr. Aslan's arrest?

8   A.  I'm sure I did.

9   Q.  Do you have a recollection of who that was with?

10  A.  I don't precisely.  The folks who were traveling with me,

11  I'm sure I talked to them about it.  I think one of my senior

12  advisors was with me.

13  Q.  So it's fair to say that you learned of the arrests while

14  you were still abroad, while you were still in Turkey?

15  A.  Yeah, I actually don't know if I learned about the arrests

16  before I arrived in Turkey or after I arrived in Turkey, but I

17  was definitely abroad when I learned of it.

18  Q.  Subsequent to the arrest -- or learning of the fact that

19  Mr. Aslan was arrested, in the days or weeks that follow, were

20  you or, to the best of your knowledge, anybody at Treasury, in

21  touch with Halkbank to find out what had happened?

22  A.  I was not, and I imagine others at Treasury were, but I was

23  not.

24  Q.  You imagine?

25  A.  I don't know for sure.

1    Q.   Okay.  And do you have a recollection of ever discussing it

2    with anyone?

3    A.   Discussing why Mr. Aslan was arrested?

4    Q.   No.  Just the fact of the arrest and contacting Halkbank as

5    a result of the arrest.  And I'm limiting my time period here

6    to the immediate aftermath of the arrest, within a couple of

7    weeks or a month or so.

8    A.   Yeah, my recollection, Mr. Rocco, because my trip to Turkey

9    was aborted, and I didn't get to do the meetings that I was

10   planning to do, that early in the next year we had tried to

11   essentially reschedule the trip to Turkey.  And one of the

12   things that I wanted to do on that trip was to meet with the

13   new CEO of Halkbank.  So I know there was communications that I

14   had with my staff and with the embassy in Ankara to tie to set

15   that up.  So in that context, I think there were conversations

16   about Mr. Aslan's arrest and who was succeeding him at

17   Halkbank.

18   Q.   To the best of your recollection, when were you next in

19   touch with anyone at Halkbank?

20   A.   I don't believe that I was next in touch with anyone at

21   Halkbank -- that was December '13 -- until the fall of '14.

22   Q.   And in the fall of '14 you had a meeting with the new

23   general manager?

24   A.   Correct.

25   Q.   Am I correct?  And this was at your office here in DC,

1    correct?

2    A.   That's right.

3    Q.   And with the new general manager was Mr. Atilla; am I

4    correct?

5    A.   No, the new general manager --

6    Q.   No, with the new general manager.

7    A.   Yes.  Was Mr. Atilla?  Yes.

8    Q.   And Mr. Atilla, if I recall your direct examination, served

9    as an interpreter; am I correct, or at least helped

10   translate --

11   A.   Right.

12   Q.   -- some conversation with the new general manager?

13   A.   Right.  A portion of that meeting, where I was trying to

14   converse with the new general manager, Mr. Atilla served as his

15   translator.

16   Q.   I'm going to ask to bring up Defendant's Exhibit 212, and

17   I'm going to ask you to look at that document, read it to

18   yourself, if you will, Mr. Cohen.

19   A.   Mmm, hmm.

20            (Pause)

21   Q.   Tell us when you want us to scroll to the second page.

22   It's up.

23   A.   Yes, thank you.

24            (Pause)

25            Okay.

HCBPATI5                        Cohen - Cross

1    Q.  And can you tell us what that document is?

2    A.  That's an e-mail summary prepared by someone on my staff of

3    my meeting with Mr. Atilla and the new general manager and a

4    third person from Halk.

5    Q.  Have you reviewed that document before?

6    A.  I have.

7    Q.  Is that document accurate?  Does it accurately reflect what

8    happened at that meeting?

9    A.  It's consistent with my recollection.

10             MR. ROCCO:  Your Honor, I move Defendant's Exhibit 212

11   in evidence.

12             THE COURT:  Sure.

13             (Defendant's Exhibit 212 received in evidence)

14   BY MR. ROCCO:

15   Q.  Now, let's talk about the document, if we can, and go

16   through it with the jury.

17             MR. ROCCO:  Can we bring it up for the jury.

18   Mr. White?

19             THE COURT:  How about making it a little bigger?

20             MR. ROCCO:  I have my glasses on.

21             THE COURT:  I'm at that age, Mr. Rocco, do you know

22   what I mean?

23             MR. ROCCO:  Indeed, I do, your Honor.

24             THE COURT:  Can we get it bigger?

25             MR. ROCCO:  Oh, to be young, Mr. White.  You can't do

1  better than that?

2          THE COURT:  I was going to say that.

3          MR. WHITE:  Is there a certain paragraph you want to

4  read?

5          MR. ROCCO:  Sure.  Let's go down to the last paragraph

6  on the page.  That makes it easier.  Excellent.

7  BY MR. ROCCO:

8  Q.  So now directing your attention to what, in effect, is the

9  last paragraph on that page, starting U/S Cohen?

10  A.  Yes.

11  Q.  It says that you noted that Mr. Zarrab transacted

12  essentially business through Halkbank, and in the first line

13  there's a reference to Mr. Zarrab having been accused of

14  leading efforts to evade sanctions on Iran; am I correct?

15  A.  That's what it says.

16  Q.  And can you tell me, is that what you said during that

17  meeting?

18  A.  So just to be clear, I didn't write this document.  It was

19  written by Michael Lieberman, who worked for me, and so far as

20  I know, I never edit -- I didn't edit it or review it before he

21  sent it out.  I don't have any doubt that I said something

22  along those lines, but I don't know that I said precisely that.

23  So I just want to be precise.

24  Q.  Okay.  So give me sum and substance of what you recall

25  say --

HCBPATI5                           Cohen - Cross

1   A.   So -- I'm sorry.

2   Q.   Perhaps I can make it a little easier, at least try to make

3   it a little easier.  Do you recall if, during the meeting --

4   does this refresh your recollection as to who brought up

5   Mr. Zarrab?  It would appear that you did --

6   A.   Yeah.

7   Q.   -- because it says "U/S Cohen noted that Iranian national"?

8   A.   Right; so my recollection is I brought up Zarrab.  I don't

9   know that I -- precisely how I phrased it.  Although, I'm not

10  going to dispute the way that Mr. Lieberman described it here,

11  but I brought up Mr. Zarrab, expressed concern that he had been

12  accused of being -- violating the Iran sanctions, that he had

13  done so through Halkbank.

14         And I was interested in learning from Mr. Atilla and

15  from the new general manager whatever they were prepared to

16  share with me about Mr. Zarrab's activity.

17  Q.   What I want to direct your attention to is the word

18  "accused."  Because, can you tell me, at that point, who had

19  accused Mr. Zarrab of efforts to evade sanctions?

20  A.   I don't know anyone who had accused him at that point.

21  Q.   And do you recall whether you said that or not?

22  A.   I suspect I did not use the word "accused."

23  Q.   And it's fair to say that, to your knowledge, as of the

24  date of this meeting, Mr. Zarrab had not been charged with

25  evading sanctions by any -- at least here in the United States;

HCBPATI5                         Cohen - Cross

1    am I correct?

2    A.  I think that's correct.

3    Q.  And certainly, he hadn't been charged in this case; am I

4    correct?

5    A.  Yes, I believe that's right.

6    Q.  And I think it would be a little bit unorthodox for Turkey

7    to charge him with your sanctions, correct?

8    A.  I don't know whether Turkey would --

9    Q.  I'll ask the correct question differently.

10           To your knowledge, at that point, had Turkey charged

11   Mr. Zarrab with violating your sanctions?

12   A.  I don't know.  I don't think so.  You know, I think he had

13   been accused in Turkey of some -- or at least investigated in

14   Turkey related to the corruption investigation.  I don't know

15   if he had been formally charged, and I don't know what the

16   charges were, if there were.

17   Q.  So it's fair to say that this memorandum is inaccurate, at

18   least in terms of recounting whether Mr. Zarrab had been

19   accused of leading efforts to evade sanctions?

20   A.  I think Mr. Lieberman might have been referring to press

21   reports about Mr. Zarrab and using the word "accused" a little

22   loosely there, but as a matter of U.S. accusations, U.S.

23   charges, I think it's correct that he had not been charged with

24   a crime here in the United States.

25   Q.  Okay.  Thank you.  Let's go on.

1      And you used the phrase "facilitated trade for

2   Halkbank."  Can you tell us what you meant by that term

3   "facilitated trade"?

4   A.  I don't see that, Mr. Rocco.

5   Q.  You have to go back.

6          Mr. White, can we go back to the earlier.  I got it.

7   Do you see at the end -- it's the following page.  I'm sorry.

8   I got ahead of myself.

9   A.  I believe that is recounting what -- I'm sorry to make you

10  do this, but I think the sentence is recounting what Halkbank

11  representatives said to me.  If you wouldn't mind going back to

12  the preceding page.  It says:  Atilla responded that Zarrab

13  received a loan from Halk to finance the acquisition and

14  redesign of a building in tourist district, as well as

15  financing loan to lease a plane, Halk also dealt with Zarrab to

16  facilitate foreign trade.

17  Q.  Well, it's not clear to me.  Perhaps it's clear to you.

18  The words "Halk also dealt with Zarrab to facilitate foreign

19  trade," you're saying that's something Mr. Atilla said, to the

20  best of your recollection, correct?

21  A.  Yes.

22  Q.  What did you understand Mr. Atilla to be saying in that

23  regard?

24  A.  That Halk had been the trade finance bank, essentially, for

25  Zarrab in his export business to Iran, and I'm sure we were

HCBPATI5                            Cohen - Cross

1    talking about gold at this point.

2    Q.   That was going to be my next question; so thank you.   And

3    you think that this discussion is in the context of gold trade;

4    am I correct?

5    A.   I believe so.

6    Q.   Okay.  And the memo goes on to say that -- I'm sorry, you

7    asked earlier whether Halkbank continued to deal with

8    Mr. Zarrab, and in response Mr. Atilla told you, in the

9    following respects; am I correct?  And that includes a loan, a

10   financing loan, and it also included dealing with Mr. Zarrab to

11   facilitate foreign trade.  And you're saying that the foreign

12   trade, as you recall it, referred to gold trade?

13   A.   Correct.

14   Q.   And did you have -- was there any discussion about the

15   volume of gold trade at that point?

16   A.   Not that I recall.

17   Q.   Now, the conversation goes on to say:  "Mr. Atilla noted

18   that Zarrab was not on the U.S. Specially Designated Nationals

19   List," and what was that in response to?  Was that something --

20   that wasn't something that Mr. Atilla volunteered, is it?

21   A.   Yes, it is, as I recall.

22   Q.   It is?  There was nothing in the conversation to that

23   point, to the best of your recollection, that suggested that

24   Halkbank should not be dealing with Mr. Zarrab?

25   A.   So as I recall the conversation, and this is a summary of

1   the conversation, I raised the question of Zarrab and what

2   Halkbank's business was with Zarrab.  Mr. Atilla explained that

3   they had this loan for the building, for the airplane, and as

4   well as facilitating foreign trade.

5          And then Mr. Atilla said that Zarrab's not on the

6   Specially Designated Nationals List.  That's the list of people

7   who have been sanctioned by the Treasury Department.  And as I

8   recall in the conversation, said essentially, what do you want

9   us to do; you haven't imposed sanctions on him, so how can we

10  not do business with him?  So that was the -- as I recall, what

11  the conversation essentially centered around.

12  Q.  And your response -- well, was it your understanding that

13  Mr. Atilla was asking you to add Mr. Zarrab to the Specially

14  Designated Persons List?  Because in the earlier -- in the

15  immediately preceding unredacted sentence --

16  A.  Mmm, hmm.

17  Q.  -- it seems Mr. Atilla says:  "And that, as a result, there

18  was not much that Halk could do"?

19  A.  Right.

20  Q.  So was he, in that conversation, asking you to add

21  Mr. Zarrab to the Specially Designated Nationals List?

22  A.  That's not how I understood it.  I think what I understood

23  was that he was saying he's not on the Specially Designated

24  Nationals List.  If he were on that list, that's the list of

25  people who have been sanctioned, they would not have done

HCBPATI5                          Cohen - Cross

1   business with him.

2          But what I took from this was that Mr. Atilla's tune

3   had changed with respect to Mr. Zarrab, which was to say, gee,

4   if you have designated Zarrab, then we wouldn't do business

5   with him, but otherwise, there's nothing we can do.  Whereas,

6   in my previous meetings with Mr. Atilla, he had said, we

7   understand U.S. sanctions.  We intend to comply with U.S.

8   sanctions, and we will not allow anyone, including Mr. Zarrab,

9   who's violating U.S. sanctions to make use of Halkbank's

10  facilitation of trade.

11  Q.  Well, at this point, Mr. Zarrab was under investigation by

12  the United States; am I correct?  This is October 2014.

13  A.  By the Treasury Department or by the Justice Department?

14  Q.  By --

15  A.  I have no --

16  Q.  We'll start with the Treasury Department?

17  A.  I assume so; although, I don't have a specific recollection

18  that he was.  But I can't imagine that he wouldn't have been.

19  Q.  I'm sorry, and I don't want to put words in your mouth, but

20  do you recall testifying on direct that as early as 2013, your

21  meeting with Halkbank in February of 2013, that you thought

22  Mr. Zarrab was under investigation at that point?

23  A.  I don't think that's what I testified.

24  Q.  So tell me --

25  A.  Yeah.

1    Q.  -- do you recall him being under investigation at the time

2    that you met with Halkbank in February of 2013?

3    A.  So I don't -- I don't specifically know, and I don't know

4    whether he was under investigation in the sense that OFAC would

5    have opened a formal case with respect to Mr. Zarrab.  It seems

6    likely that Mr. Zarrab was a significant enough player in the

7    gold trade with Iran that, at that point, someone in OFAC, I

8    imagine, was focused on Mr. Zarrab.  Whether that constituted a

9    formal investigation or not, I just don't know.  And, likewise,

10   by -- this meeting was in October of '14.

11   Q.  October 2014?

12   A.  Yeah, by October 2014, as I said, I can't imagine that he

13   wasn't under investigation.  I was not, you know, monitoring

14   OFAC's investigations.

15   Q.  Well, let's go back.  Let's go to the next sentence in the

16   memorandum:  "U/S Cohen noted, however, that Treasury did need

17   to investigate Zarrab's activities."  Do you remember saying

18   that?

19   A.  I think the whole purpose of this line of inquiry in this

20   meeting was we were interested in learning more about

21   Mr. Zarrab --

22   Q.  Excuse me, Mr. Cohen.  Sorry.  My question was, do you

23   recall saying that Treasury did need to investigate Zarrab's

24   activities, yes or no?

25   A.  So I don't recall saying that verbatim, Mr. Rocco.  I think

```
1    what I told Mr. Atilla and his new general manager was that we

2    needed to learn as much as we could about Mr. Zarrab.  Whether

3    I used the word "investigate" or not, I don't know.  I doubt it

4    because my job wasn't to be an investigator.

5    Q.  And, again, this is a memo that you say was written by Mike

6    Lieberman; am I correct?

7    A.  Yes.

8    Q.  It's a memo that you didn't review at the time; am I

9    correct?

10   A.  That's correct.

11   Q.  And you're saying that the memo is inaccurate?

12   A.  No.

13   Q.  Imprecise?

14   A.  I'm saying it's a summary of the conversation.

15   Q.  Okay.  And to the extent that -- you don't have any

16   recollection of saying that Treasury needed to investigate

17   Mr. Zarrab's activities, in those words; am I correct?

18   A.  I don't have a recollection saying those precise words,

19   that's correct.

20   Q.  And you also -- again, in this summary of conversation,

21   says that you asked Halk if it could provide any information;

22   am I correct?

23   A.  Yes, I'm sure I did.

24   Q.  Do you recall making that request?

25   A.  Yes.
```

1  Q.  Do you recall that, saying that, asking if Halk could

2  provide you with any information; am I correct?

3  A.  Yes.

4  Q.  And the response you got from that is that, apparently -- I

5  won't even try to pronounce the name, Taskinoglu -- I'll call

6  him "Mr. T" -- Mr. T replied that Turkish regulations prevent

7  such information sharing, especially in these days.  Do you

8  recall Mr. T saying that to you?

9  A.  In substance, yes.

10  Q.  Yes.  And did the Treasury Department ever follow up and

11  request any information from Halkbank about Reza Zarrab?

12  A.  I don't know.

13  Q.  So is it fair to say, to your knowledge, it did not?

14  A.  I don't -- again, I don't have personal knowledge of that.

15  I just don't know.

16  Q.  Do you have a recollection that during this discussion with

17  the new general manager of the bank and Mr. Atilla, having a

18  discussion about ISIS?

19          MR. LOCKARD:  Objection.

20          THE COURT:  I'll allow it, if you remember.

21  A.  I suspect we did, yeah.

22  Q.  You expect we did?

23  A.  Yeah.

24  Q.  But that's not reflected in the memorandum, correct?

25  A.  So there's aspects of this memorandum that are redacted.

HCBPATI5                         Cohen - Cross

1    Q.  That's true.  Can you tell us why the portions of the

2    memorandum were redacted?

3              MR. LOCKARD:  Objection, your Honor.

4              THE COURT:  Sustained.

5              MR. ROCCO:  I asked him why he --

6              THE COURT:  Sustained.

7              MR. ROCCO:  Thank you.

8    BY MR. ROCCO:

9    Q.  You testified last week about your standard presentation.

10   You referred to something --

11   A.  I'm sorry, I missed that.  My what presentation?

12   Q.  Your standard presentation.

13   A.  Standard.  Yes, I'm with you.  Thank you.

14   Q.  And can you tell us what your standard presentation was?

15   Was it a document?  Was it a power point?  You're shaking your

16   head.  The reporter needs --

17   A.  I'm waiting for you to finish your question.

18   Q.  A first.  Was it a written statement?

19   A.  No.

20   Q.  Was it a power point presentation?

21   A.  No.

22   Q.  Was it ever committed to writing?

23   A.  Not in -- not something that's labeled David Cohen's

24   standard presentation.  I had talking points that were prepared

25   for these various meetings that would sort of lay out, usually,

1    the -- in specifics what I was going to cover.  They were

2    sometimes followed, sometimes not, and there may have been some

3    reference to sort of my general schpeel in those talking

4    points, but I didn't have a document that I handed over.

5    Q.  You used the word, and I'm sorry if I'm misquoting you,

6    these presentations or these situations, what do you mean by

7    that?

8    A.  Meetings with foreign banks or foreign regulators or

9    foreign government officials.

10   Q.  So essentially it was a template of something that you

11   would use for your remarks when you met with foreign --

12   representatives of foreign banks?

13   A.  Right.

14   Q.  And that would change from time to time because the

15   sanctions changed from time to time; am I correct?

16   A.  Some of the details of the sanctions changed from time to

17   time.  The sort of the foundation of them didn't.

18   Q.  Okay.  So, to your knowledge, did you or anyone from

19   Treasury ever tell Halkbank to stop trading gold?

20   A.  To outright stop trading gold?

21   Q.  To outright stop trading gold.

22   A.  With Iran?

23   Q.  To outright stop trading gold.

24   A.  I think we certainly told them that, post July 2013, that

25   any sale of gold to Iran, to anybody in Iran, was potentially

1   sanctionable.

2   Q.   But prior to July 2013, there were private sales that were

3   allowed; am I correct?

4   A.   Correct.

5   Q.   As long -- as of February of 2013, Halkbank abided with the

6   bilateral trade restrictions; am I correct?

7   A.   That is correct.

8   Q.   And, in fact, up until July 1st of 2017 -- 2013, no one had

9   told Halkbank that it could not intermediate gold transactions

10  for anyone, correct?

11  A.   That's -- I did not tell them that they could not do that.

12  Q.   Did you or anyone from Treasury, to your knowledge, ever

13  tell anyone at Halkbank, specifically Mr. Atilla, to stop

14  trading food or medicine?

15  A.   No.

16  Q.   Did anybody from Treasury -- did you or anyone from

17  Treasury ever tell Mr. Atilla or Halkbank to stop dealing with

18  Reza Zarrab?

19  A.   No.

20  Q.   Did you or anyone from Treasury, to your knowledge, ever

21  tell Mr. Atilla about Al Nafees Exchange?

22  A.   I don't -- I think as we talked about last Friday, I don't

23  have a particularly crisp recollection of the discussions about

24  Al Nafees Exchange.  So I would refer back to my testimony

25  there.

```
 1              I just don't remember exactly what we talked about
 2      with Al Nafees Exchange, but I can't imagine -- well, I don't
 3      know whether Al Nafees Exchange was designated.  If it were
 4      designated, then I think we probably would told them not to
 5      deal with Al Nafees Exchange.
 6      Q.  And if it hadn't been designated, you would not?
 7      A.  No.
 8              MR. ROCCO:  Your Honor, no further questions.
 9              THE COURT:  Any redirect?
10              MR. LOCKARD:  Yes, your Honor.
11              THE COURT:  Okay.
12      REDIRECT EXAMINATION
13      BY MR. LOCKARD:
14      Q.  Good afternoon, Mr. Cohen.
15      A.  Good afternoon.
16      Q.  So Mr. Rocco ended his cross-examination by asking you some
17      questions about what you had or had not told Halkbank.  Do you
18      recall him asking you if you, or anyone from Treasury, had told
19      Halkbank not to deal with Reza Zarrab?
20      A.  Yes.
21      Q.  And whether you or anyone from Treasury had told Halkbank
22      not to intermediate gold transactions?
23      A.  Yes.
24      Q.  Is the United States Treasury Department a compliance unit
25      for Halkbank?
```

1  A.  No.

2  Q.  I'd like to turn to Defense Exhibit 201, which you looked

3  at yesterday.  If we could go to, I believe, page 3 of that

4  exhibit.  So Mr. Rocco had asked you about a statement in this

5  article about the extraterritorial affect of sanctions?

6  A.  Yes.

7  Q.  Now, remind us, what was the context of these statements?

8  A.  I think this was an interview that was conducted by a Wall

9  Street Journal reporter.

10  Q.  Was Mr. Atilla present at that interview?

11  A.  No.

12  Q.  So when you're talking about the extraterritorial affect of

13  U.S. sanctions, in what context is that statement made?

14          MR. ROCCO:  Your Honor, I'm going to object in light

15  of what occurred this morning.

16          THE COURT:  It's redirect.

17          MR. ROCCO:  I understand.  Only in light of your

18  Honor's direction.

19          MR. LOCKARD:  It was raised.

20          THE COURT:  It's redirect.

21          THE WITNESS:  I'm sorry, can you ask the question

22  again.

23  BY MR. LOCKARD:

24  Q.  In what context -- in what sanctions context was the

25  question of extraterritoriality raised?

 1   A.  So my recollection is that this was a -- the question that

 2   I was responding to here, or the one just before it, had to do

 3   with these significant criminal and civil actions that had been

 4   taken by Treasury and by bank regulators and by the Justice

 5   Department against foreign banks for violating U.S. sanctions.

 6           One of the critiques was -- and so one of the

 7   critiques was we were exercising extraterritorial jurisdiction.

 8   My point was that the banks that were involved in these

 9   settlements had transacted through the United States and had

10   effected the United States, and that the actions that we were

11   taking, as a result, were not extraterritorial.  I think that

12   is what I was referring to here.

13   Q.  And is the answer specifically in response to a question

14   regarding blocking transactions?

15   A.  Yes.

16   Q.  And can you describe what blocking is?

17   A.  So blocking is the technical term that applies to when an

18   entity is sanctioned, is designated.  The assets of that person

19   or entity are blocked, which means that they can't be

20   withdrawn, they can't be traded.  And so if a person had a bank

21   account in the United States and their assets were blocked,

22   those assets are frozen, no U.S. person can engage in any

23   business involving that person or that person's assets.

24   Q.  Can blocking ever take place outside the United States?

25   A.  Not outside of a U.S. institution.

1   Q.  So a U.S. institution acting outside the United States can

2   block a transaction?

3   A.  In certain contexts, yes.

4   Q.  Are there other sanctions, penalties and remedies besides

5   blocking?

6   A.  Yes.

7   Q.  Do any of those penalties and remedies focus on conduct

8   outside the United States?

9   A.  Yes.

10  Q.  And do they focus on entities and persons outside the

11  United States?

12  A.  Yes.

13  Q.  And is sanctioning one of those remedies?

14  A.  Yes.

15  Q.  Can a sanction have a significant impact on a foreign

16  entity or individual?

17  A.  Yes.

18  Q.  If we can turn to the next page of Defense Exhibit 201.

19          Mr. Chang-Frieden, if you can bring up first the

20  second paragraph on that page.

21          In this article, did you describe being sanctioned as

22  possibly a mortal wound?

23  A.  Apparently so.

24  Q.  Is that something that's true even if the entity is not in

25  the United States and is engaging in transactions that are not

1    in the United States?

2    A.  Yes.

3    Q.  If we could look at Defense Exhibit 200.

4         So this is another -- I suppose this is an article

5    that Mr. Rocco asked you about yesterday?

6    A.  It's an interview.

7         MR. ROCCO:  Friday.

8         MR. LOCKARD:  On Friday.  I'm sorry.  It feels like

9    yesterday.

10        THE COURT:  Not to me.

11        MR. LOCKARD:  Every day feels like yesterday right

12   now.

13   BY MR. LOCKARD:

14   Q.  If we could turn to page 7 -- actually, I'm sorry.  If we

15   could turn to page 9.

16        So is this a discussion about the Treasury

17   Department's sanctioning authorities, and specifically focusing

18   on the paragraph that says:  "Now, what we have been doing"?

19   A.  Yeah, just give me one second.

20        (Pause)

21        Right.  This was -- at this point, we were discussing

22   the serious sanctions.

23   Q.  And are the serious sanctions a secondary sanction, a

24   primary sanction, or both?

25   A.  I think principally primary sanctions.  I actually don't

1    recall as I sit here.  I don't believe we had secondary

2    sanctions in this series context.

3    Q.  If you look at the clause of the first sentence, where you

4    describe certain actions that have been taken under those

5    authorities?

6    A.  Yes.

7    Q.  You're talking about close to 50 entities and individuals

8    being designated under the new authorities?

9    A.  Yes.

10   Q.  Do you recall whether those entities or individuals were

11   principally U.S. based or principally foreign?

12   A.  I suspect every one of them was foreign, and those would

13   have been primary sanctions designations.

14   Q.  And, Mr. Chang-Frieden, if we can look at the

15   second-to-last paragraph on this page.

16        All right.  Here, you have a reference to the Lebanese

17   Canadian Bank action?

18   A.  Yes.

19   Q.  Is that something that you're somewhat familiar with?

20   A.  I am.

21   Q.  And is the Lebanese Canadian Bank a U.S. bank or a foreign

22   bank?

23   A.  It's a foreign bank.

24   Q.  And did Treasury take certain actions targeting Lebanese

25   Canadian Bank?

HCBPATI5                         Cohen – Redirect

1  A.  We did.

2  Q.  And what did Treasury do?

3  A.  I think we exercised a different authority under section

4  311, under the Patriot Act, to essentially cut off Lebanese

5  Canadian Bank in the U.S.

6  Q.  And were there other U.S. agencies also involved in actions

7  against the Lebanese Canadian Bank?

8  A.  Yes, I believe the Justice Department was also involved in

9  that.

10  Q.  And is it your understanding that the Justice Department

11  action had the same basis or a different basis than the

12  Treasury's action?

13  A.  Different.

14  Q.  And do you have an understanding of whether

15  extraterritorial jurisdiction principles that apply to Treasury

16  apply to actions by other U.S. agencies?

17  A.  I think there are different principles that apply.

18  Q.  Now, Mr. Rocco also asked about some Congressional

19  testimony that you had given.  I believe it's Defense Exhibit

20  229.

21          If we could turn to page 41 of that record.  Maybe

22  numerical page 41.

23          And there was a question about whether Turkey was

24  paying Iran for natural gas using gold?

25  A.  Right.

HCBPATI5                        Cohen - Redirect

1    Q.  So first, as a clarifying question, were there distinctions

2    between the way sanctions applied to natural gas sales versus

3    oil sales?

4    A.  There were at one point in time.

5    Q.  And we had talked about your letter to Halkbank in December

6    of 2012, about public statements that had been made by Turkish

7    government officials, about buying oil with gold; do you recall

8    that?

9    A.  Yes.

10   Q.  Is buying oil with gold a different issue than buying

11   natural gas with gold?

12   A.  Yes, it's different.  I mean, natural gas is different than

13   oil.  As I recall, at one point, mostly because of a drafting

14   error in the legislation, natural gas and oil were treated

15   differently.  That got fixed at some point in the legislation.

16   I don't recall exactly when natural gas and oil ended up being

17   treated the same, but there was a point in time when they were

18   treated differently.

19   Q.  At this time, when you're talking about buying either

20   natural gas or oil from Iran, when we're talking about Turkey

21   buying natural gas or oil from Iran, what is the bank that we

22   would be talking about?

23   A.  Halkbank.

24   Q.  And to what extent would your statements to Congress about

25   how Halkbank is paying for natural gas or oil, to what extent

1    would that be based on representations from Halkbank?

2    A.  To some extent.

3    Q.  Would your statements to Congress in 2013 have been based

4    on any of the evidence that has been introduced at this trial?

5           MR. ROCCO:  Objection.

6    A.  I can't possibly answer that question.

7           MR. ROCCO:  Thank you.

8    Q.  Do you have any idea what evidence has been introduced at

9    this trial?

10   A.  I don't.

11   Q.  If we could turn now to Defense Exhibit 211.  So this is a

12   summary of a November 2012 phone call with Mr. Aslan, the

13   then-general manager of Halkbank; is that right?

14   A.  Yes.

15   Q.  Now, Mr. Rocco had asked you about a reference in the first

16   paragraph to Halkbank's significant efforts to comply with

17   international sanctions, towards the bottom of that paragraph?

18   A.  Yes.

19   Q.  At that time, what had Halkbank told you about the

20   significance of its efforts to comply with international

21   sanctions?

22   A.  I think, as I testified, at every occasion where I spoke

23   with, met with or had communications from Halkbank, I was

24   assured that Halkbank was making significant efforts to comply

25   with international sanctions and with our sanctions, in

1    particular.

2            We had, you know, at these various meetings that I

3    testified about, had relatively lengthy conversations where

4    Halkbank would describe both their commitment to complying with

5    the sanctions and the ways in which they would go about

6    ensuring that they could.  And so that was sort of the basis

7    for my belief that Halk was making significant efforts to

8    comply.

9    Q.  And in your discussions with Halkbank, let's take gold

10   exports specifically, did Mr. Atilla ask you questions relating

11   to guidance about gold exports to Iran?

12   A.  That's my recollection, yes.

13   Q.  Did Mr. Atilla ask you questions for guidance about

14   financing gold exports to Iranian banks?

15   A.  I don't recall the distinction between Iranian banks versus

16   others in the Iranian private sector versus the Iranian

17   government.  I don't recall Iranian banks coming up

18   specifically in the gold trade context.

19   Q.  And at the time, to you, as the Undersecretary for the

20   Office of Terror Finance and Intelligence, would it have made a

21   difference if the gold exports had been to Iranian banks as

22   opposed to Iranian jewelers?

23   A.  It would have -- it would have piqued my interest, because

24   if the purchaser -- I think we talked about this on direct.  If

25   the purchaser was the bank, rather than the bank being the

1  intermediary for the jeweler being the purchaser, but if the

2  purchaser were actually the bank, I would be concerned because

3  of what I knew about the Iranian banking sector and how closely

4  it was tied to the government of Iran.

5          MR. LOCKARD:  Your Honor, if I may approach?

6          THE COURT:  Yes.

7  Q.  I'm going to hand you what has been marked as Government's

8  Exhibit 701 and 702.

9  A.  Thank you.

10 Q.  And these are marked only for identification.

11         (Pause)

12         Do you recognize those?

13 A.  I do.

14 Q.  Okay.  So let's start with 7031.

15 A.  Okay.

16 Q.  Now, on Friday Mr. Rocco had asked you some questions about

17 which sanctions were authorized under which statute?

18 A.  Yes.

19 Q.  So I want to start by asking you about the July 2012

20 executive order that we had talked about during your direct,

21 13622.  Do you recall what that order did with respect to

22 sanctions and gold transactions?

23 A.  Yes, I do.

24 Q.  And at a very basic level, what did that July 2012 order

25 do?

HCBPATI5                        Cohen - Redirect

1   A.   It made sanctionable any sales of precious metals, which I

2   think in the definition section, I think probably includes --

3   certainly it includes gold, to the government of Iran or any

4   entity working on its behalf.

5   Q.   And is that order promulgated pursuant to the authority of

6   the International Emergency Economic Powers Act?

7   A.   Yes.

8   Q.   Now, we talked about how the gold sanctions changed between

9   this 2012 order and enactment of the Iran Freedom and

10  Counter-Proliferation Act, the IFCA?

11  A.   Yes.

12  Q.   And when did the IFCA come about?

13  A.   As I recall, it was enacted on January 2nd and became

14  effective July 1st, 2013.

15  Q.   And what is the difference between the gold sanctions in

16  the July 2012 order and the IFCA passed in January of 2013?

17  A.   That expanded the prohibition on -- the prohibition on the

18  sale of gold, and it made sanctionable the sale of gold to

19  anybody in Iran, not just the government of Iran, or those

20  working on its behalf.

21  Q.   And why was that sanction broadened?

22  A.   Well, it was broadened because Congress legislated a

23  broadening of the sanction.  I think the intent of the

24  expansion by Congress was to address what Congress felt was a

25  loophole, for lack of a better word, in the sanctions that

HCBPATI5                    Cohen - Redirect

1    allowed gold to be sold to Iran purportedly to private

2    purchasers but, in fact, on behalf of the government of Iran.

3    Q.  Is that a loophole in the sense that indirectly supplying

4    gold to the government of Iran would not violate the sanctions,

5    or a loophole in the sense that it's hard to detect?

6    A.  The latter; it's hard to detect.

7    Q.  Are you aware of any factual examples that motivated that

8    concern about the existence of a loophole?

9              MR. ROCCO:  Objection, your Honor, relevance.

10             THE COURT:  I think you're almost done, right?

11             MR. LOCKARD:  We're almost done.

12             MR. ROCCO:  Goes beyond my cross-examination.

13             THE COURT:  Go ahead.

14   A.  I don't recall any specific factual examples, sitting here

15   today, and I just don't remember whether there had been some

16   sort of reference at the time.

17   Q.  So just a few more questions about your discussions with

18   Mr. Atilla.  In those discussions, did Mr. Atilla ever express

19   any lack of knowledge about Halkbank's own sanctions compliance

20   programs?

21   A.  No.

22   Q.  Did Mr. Atilla ever express a lack of knowledge about

23   Halkbank's clients?

24   A.  No.

25   Q.  Did Mr. Atilla ever express a lack of knowledge about

1      Halkbank's clients' clients?

2      A.  Not in the sense that it was raised in terms of a

3      compliance concern on his behalf.

4      Q.  And Mr. Rocco asked you a few questions about the

5      discussion with Mr. Atilla and his new general manager in

6      October of 2014?

7      A.  Yes.

8      Q.  And Mr. Atilla's questioning about whether Mr. Zarrab was a

9      specially designated national on the blacklist, for lack of a

10     better word?

11     A.  Right.

12     Q.  In your prior discussions with Mr. Atilla, was an entity or

13     a person, their being on the SDN List, ever the only factor

14     relevant to a sanctions compliance?

15     A.  No.

16             MR. LOCKARD:  One moment, your Honor.

17             (Pause)

18             So, your Honor, various summaries and read-outs of the

19     meeting that Mr. Cohen has just talked about have been moved

20     into evidence.  We would offer the remaining read-outs,

21     Government's Exhibit 7028 and 7029, which are the

22     September 2012 and February 2013 tables.

23             THE COURT:  It's okay with me.

24             MR. ROCCO:  I'd like to see them, your Honor.

25             MR. LOCKARD:  They're also marked as 3505-005 and

HCBPATI5                      Cohen - Redirect

1    3505-006.

2           MR. ROCCO:  Your Honor, I'm going to object based on

3    the basis of the discussion this morning.  I'd like you to see

4    the exhibits.

5           THE COURT:  Take a look.

6           MR. ROCCO:  No, I have them.

7           THE COURT:  Oh.

8           MR. ROCCO:  I thought your Honor would like to see

9    what they are.

10          THE COURT:  Why don't you all come up.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. ROCCO:  Judge, this is it, if I may.

3          THE COURT:  Yes, I saw that on the screen.

4          MR. ROCCO:  These are fulsome discussions of the law,

5     and what I tried to do, perhaps unartfully, was elicit

6     statements that Mr. Cohen made to people at Halkbank only

7     because it went to Mr. Atilla's state of mind.  These are legal

8     opinions and invade the province of the Court and go precisely

9     to the objection that the government imposed over the weekend

10    to my line of cross-examination.

11         MR. LOCKARD:  These are summaries of discussions with

12    Mr. Atilla.  These are not legal documents.  These are

13    recordings of meetings and, in fact, Mr. Rocco has offered and

14    moved into evidence two e-mail summaries written by somebody

15    else.  These are cables that were reviewed and cleared by the

16    witness, Mr. Cohen.

17         THE COURT:  I think I'm going to allow it.

18         MR. ROCCO:  Your Honor, you've been --

19         THE COURT:  He's just trying to tip the balance back,

20    so to speak.  So this is what happens, you know.

21         MR. ROCCO:  That's why we should let you charge on the

22    law and not go into these issues, but I think it's very

23    confusing, but...

24         THE COURT:  Are you going to ask him any questions

25    about it, or just move it into the record?

1           MR. LOCKARD:  That's it.

2           MR. ROCCO:  Thank you.

3           THE COURT:  I'll note the objection, though.  All

4   right.

5           (Continued on next page)

1        (In open court)

2        THE COURT:  I'll allow that.

3        (Government's Exhibits 7028 and 7029 received in

4   evidence)

5        MR. LOCKARD:  Your Honor, just very two quick

6   questions to complete the record on these exhibits, and if I

7   may approach?

8        THE COURT:  Yes.

9   BY MR. LOCKARD:

10  Q.  Okay.

11  A.  Yes.

12  Q.  So, Mr. Cohen, we had looked at those on Friday, I believe;

13  is that right?

14  A.  Yes.

15  Q.  And do you recognize what those are?

16  A.  I do.

17  Q.  And what are they?

18  A.  These are State Department cables that are summaries of

19  meetings that I had in Turkey on two different trips.

20  Q.  And did you review and approve those summaries before they

21  were published?

22  A.  I did.

23       MR. LOCKARD:  No further questions, your Honor.

24       THE COURT:  Okay.  I will allow them, and thank you

25  very much, Mr. Cohen.  You're excused.

HCBPATI5                    Korkmaz - Direct

1              THE WITNESS:  Thank you, your Honor.

2              THE COURT:  We'll ask for the government's next

3      witness.

4              (Witness excused)

5              THE DEPUTY CLERK:  Sir, before you begin, I'd like to

6      remind you that you're still under oath.

7              THE WITNESS:  Yes.

8              THE DEPUTY CLERK:  Thank you.  You may be seated.

9      HUSEYIN KORKMAZ,

10           called as a witness by the Government,

11           having previously been duly sworn, testified as follows:

12     DIRECT EXAMINATION (Resumed)

13     BY MR. LOCKARD:

14     Q.  Good afternoon, Mr. Korkmaz.

15     A.  You too, as well.

16     Q.  So before the lunch break, we had been talking about your

17     investigation in 2012 and 2013?

18     A.  Yes.

19     Q.  And you'd been describing some of the evidence gathered in

20     your investigation about bribery payments made to various

21     government officials and bank officials?

22     A.  Yes.

23     Q.  Now, you had also described something that you referred to

24     as "the operation" on December 17th, 2013?

25     A.  Yes.

1    Q.  Can you describe what you mean by an operation?

2    A.  Yes.  An operation is a judicial process through which

3    searches are conducted in homes or business places of suspects,

4    and also it pertains to the capture and detention of suspects,

5    and these suspects may be, in part or in whole, part of the

6    investigation.

7    Q.  And approximately how many locations were searched as part

8    of the operation?

9    A.  I can't remember the exact total count of the searches that

10   were conducted that day, but if you'll allow me, I can count

11   them one by one as to my recollection of all the searches that

12   were conducted.

13   Q.  If you can give us an approximate number, if not an exact

14   number?

15   A.  I recall that to be approximately 20.

16   Q.  And were there individuals who were questioned as part of

17   the operation?

18   A.  Yes.

19   Q.  And did the searches and the individuals questioned, did

20   any of those people have family or professional relationships

21   with some of the ministers that you had described earlier?

22            MR. HARRISON:  Objection, relevancy.

23            THE COURT:  Overruled.

24   A.  Yes.

25   Q.  So the operation was on December 17th, 2013?

1    A.   That is correct.

2    Q.   Did there come a time when your duties were reassigned?

3    A.   Yes.

4    Q.   When was that?

5    A.   It was in the evening of December 22nd, 2013, that's when I

6    learned that I was reassigned.

7    Q.   Approximately five days after the operation?

8    A.   Yes.

9    Q.   Were there any other personnel changes in the financial

10   crimes unit between December 17th and December 23rd?

11   A.   Yes.

12   Q.   What was the first such personnel change?

13   A.   It was the unit chief and the deputy provincial chief of

14   police that was over the unit, and they had been changed.

15   Q.   And when did that happen?

16   A.   It was the day after the operation, on December 18th.

17           THE COURT:   What do you mean changed?

18           THE WITNESS:   The unit chief that had been assigned or

19   worked with the operation, your Honor, was reassigned somewhere

20   else, and in his place, someone else had been placed.

21           THE COURT:   And the same -- what about the deputy

22   chief?

23           THE WITNESS:   The deputy provincial police chief was

24   also reassigned somewhere else, and somebody else was brought

25   in his place.

1   BY MR. LOCKARD:

2   Q.  And in the organizational hierarchy, where is the deputy

3   provincial chief position?

4   A.  He would be just below the provincial chief of police.

5   Q.  Were there any other supervisory reassignments in the

6   financial crimes unit between December 17th and December 23rd?

7   A.  Yes.

8   Q.  What were those?

9   A.  The two unit chiefs of other units were also reassigned.  I

10  believe they had learned about their assignments on the evening

11  of the 18th of December, and they said their farewells on the

12  morning of the 19th of December.

13  Q.  Did you receive any instructions from the supervisors

14  appointed to replace those individuals?

15  A.  Yes.

16  Q.  And what instructions did you receive with respect to the

17  investigation?

18          MR. HARRISON:  Objection, relevance, hearsay.

19          THE COURT:  Overruled.

20  A.  First of all, they asked for detailed information about the

21  investigation, and I continually provided this information to

22  them, particularly my unit chief was informing them also.  But

23  among the new leaders that had come in, such as the assistant

24  director over the unit, as well as the unit chief and other

25  ranked officer were giving inappropriate and unlawful

1    instructions --

2              THE INTERPRETER:  I'm sorry, I'm going to have to

3    correct what I just said.  I'm going to start over.

4              Within the new personnel that were assigned,

5    particularly the assistant director over the unit, they were

6    giving inappropriate and illegal or unlawful instructions to

7    the unit chief and to another ranked officer, as well as

8    myself.

9              MR. HARRISON:  I'm going to object and move to strike

10   based on relevance, hearsay and legal opinion.

11             THE COURT:  So you're going to explore that, right,

12   counsel?

13             MR. HARRISON:  Thank you, your Honor.

14             THE COURT:  I mean Mr. Lockard.

15             MR. LOCKARD:  Yes, your Honor.

16   BY MR. LOCKARD:

17   Q.  Mr. Korkmaz, can you tell us specifically what instructions

18   you received with respect to the investigation?

19   A.  Certainly.  For example, the interview questions that would

20   be utilized during the interview of Baris Guler and the

21   template of such questions were requested by the deputy

22   provincial police chief, Selami Yildiz.  And Selami Yildiz

23   provided instructions to not ask questions to Baris Guler with

24   regard to any allegations of bribery.

25   Q.  Did you receive any other instructions from the new

1    supervisors?

2    A.   Yes.   The same person, Selami Yildiz also instructed that

3    evidence be removed from the questions regarding the delivery

4    that was made by Reza Zarrab to Egemen Bagis on 19 of

5    April 2013.

6           THE COURT:   I'm not sure I understood that.

7           THE INTERPRETER:   Again, by the same person Selami

8    Yildiz, an instruction was given to remove evidence from the

9    questioning with regards to the delivery that was made by Reza

10   Zarrab to Egemen Bagis on April 19th, 2013.

11   BY MR. LOCKARD:

12   Q.   The delivery of money that you had testified about this

13   morning?

14   A.   Yes.

15          THE COURT:   What does it mean to remove evidence of

16   the questioning?

17          THE WITNESS:   They were saying that -- the instruction

18   included that these questions should not be asked, remove this

19   evidence from the questioning and do not ask these questions.

20   Q.   Mr. Korkmaz, did you prepare anything between

21   December 17th, the operation date, and December 23rd?

22   A.   Yes.

23   Q.   What did you prepare?

24   A.   First, I prepared the report that was a tip being sent to

25   the parliament, and second, I had prepared the case summary for

1  the Police Departments, to be given to the prosecutor on

2  December 20th.

3  Q.  And can you explain what you mean by a tip for the

4  parliament?

5  A.  Yes.  We did not have authority to investigate the three

6  ministers that had been named within this investigation and,

7  also, about the prime minister, and the prosecutor over the

8  investigation had requested that a report be prepared in terms

9  of a tip to be provided to the parliament with regard to these

10 three ministers and the prime minister.

11 Q.  And just to clarify, is that an informal or a formal

12 document?

13 A.  It's an official document.

14 Q.  And you also described a second report that you prepared?

15 A.  Yes.

16 Q.  And what was the purpose of preparing that report?

17 A.  It's a police report that is sent to the prosecutor's

18 office that explains the investigation that led up to the

19 operation.

20           MR. LOCKARD:  May I approach, your Honor?

21           THE COURT:  Yes.

22 Q.  I show you what's been marked for identification as

23 Government's Exhibit 101.  All right.  Mr. Korkmaz, do you

24 recognize that?

25 A.  Yes.

1   Q.  And what is it?

2              MR. HARRISON:  Objection, your Honor.

3              THE COURT:  Overruled.

4   A.   This is the case summary that includes the operational

5   summary that we had sent to the prosecutor on December 20th,

6   2013.

7   Q.  And did you receive any instructions from your new

8   supervisors concerning that report?

9              MR. HARRISON:  Objection, relevance, hearsay, your

10  Honor.

11             THE COURT:  Overruled.

12  A.  Yes.

13  Q.  And what were those instructions?

14  A.  I was instructed to not deliver this report to the

15  prosecutor's office, while I was on my way to the prosecutor's

16  office to deliver this report, and that is despite the fact

17  that this was a signed report with the cover page also signed

18  for it to be delivered.

19  Q.  And did you follow that instruction?

20  A.  No.

21  Q.  And what date did that happen?

22  A.  It's December 20th, 2013.

23             THE COURT:  And what does it mean that you did not

24  follow the instruction?  Did you deliver the report anyway?

25             THE WITNESS:  That is correct, your Honor.  I

1    delivered it to the prosecutor.

2             THE COURT:  Personally, or to the office, or what?

3             THE WITNESS:  I presented it or delivered it in person

4    over there but, of course, it was his clerk that received it

5    from me.

6    BY MR. LOCKARD:

7    Q.  And when you were reassigned after December 23rd, what was

8    your next assignment?

9    A.  I was sent to the bridge protection unit directorate.

10   Q.  And what were your duties and responsibilities at the

11   bridge protectorate unit?

12   A.  It was to protect the bridge.  I'm not sure how to expand

13   that any further than that.  It might include -- so the

14   pedestrians did not go on the bridge.  So there are police

15   checkpoints, and if a pedestrian were to approach the bridge to

16   cross it at those checkpoints, they would be stopped.

17            THE COURT:  Excuse me.  And what about the report to

18   the parliament, did you do that, too?  Did you prepare one?

19            THE WITNESS:  Yes, your Honor, I prepared it.

20            THE COURT:  And what did you do with that?

21            THE WITNESS:  Your Honor, the morning of

22   December 18th, we did send that to the prosecutor's office.

23            THE COURT:  No, I asked about the parliament.

24            THE WITNESS:  That is correct, your Honor.  This

25   report that was prepared for the parliament was dated the 18th

1   of December, and it was delivered to the prosecutor's office on

2   that date, and later it was delivered to the chief prosecutor's

3   office for it to then be delivered to the parliament.

4              THE COURT:  Okay.

5   BY MR. LOCKARD:

6   Q.  So, Mr. Korkmaz, for how long were you assigned to the

7   bridge protection unit?

8   A.  Six to seven months.

9   Q.  And did there come a time when you were again reassigned?

10  A.  Yes.

11  Q.  And when did that reassignment happen?

12  A.  I recall that to be in July of 2014.

13  Q.  And what was your next assignment?

14  A.  I was assigned to the Cukurca district of the province of

15  Hakkari.

16  Q.  And, Mr. Chang-Frieden, if you could show Mr. Korkmaz

17  Government Exhibit 52.

18              Mr. Korkmaz, does that show where Hakkari is?

19  A.  Yes, that's correct.

20              MR. LOCKARD:  The government offers Exhibit 52.

21              THE COURT:  I'll allow it.

22              MR. HARRISON:  No objection, your Honor.

23              MR. LOCKARD:  I ask that it be published?

24              THE COURT:  Yes, I'm going to allow it, and you can

25  publish it to the jury.

1          (Government's Exhibit 52 received in evidence)

2          THE COURT:  Is that the circled piece in the lower

3     right?

4          THE WITNESS:  Yes.

5          MR. LOCKARD:  And, Mr. Chang-Frieden, if you could

6     also draw a circle around Istanbul.

7     BY MR. LOCKARD:

8     Q.  So, Mr. Korkmaz, you were reassigned to Hakkari, I believe

9     you said, in July of 2014?

10    A.  That is correct.  I went to Hakkari as of July 2014.

11    Q.  And I'd like to direct your attention to early September of

12    2014?

13    A.  Yes.

14    Q.  Where were you in early December of 2014?

15    A.  I was in prison.

16    Q.  Did I say December or September?

17         THE INTERPRETER:  You said September first and then

18    December next.

19    Q.  So in September of 2014, you were in prison?

20    A.  Yes.

21    Q.  And when were you arrested?

22    A.  I was detained on September 1st, 2014, and I was arrested

23    on September 4th, 2014.

24    Q.  And where were you when you were detained?

25    A.  I was in Istanbul at that time.

1    Q.  And if you were assigned to the Hakkari province, why were

2    you in Istanbul on September 1st, 2014?

3    A.  I was unable to move my family over to Hakkari, and an

4    operation had been carried out against members of other police

5    units in Istanbul on July 22nd, and we were expecting an

6    operation to be carried out against the former members of the

7    financial crimes units around that time also.

8          MR. HARRISON:  Objection, move to strike, Judge, based

9    on relevance and hearsay.

10         THE COURT:  Overruled.

11   A.  I wanted to spend time with my family, that's why.

12   Q.  Did there come a time when you were bailed?

13   A.  Yes.

14   Q.  And when was that?

15   A.  Excuse me.  So when you mean bail, you mean conditional

16   release?

17   Q.  I mean, did there come a time when you were released from

18   the custody of the prison?

19   A.  Yes, I was released.

20   Q.  And when was that?

21   A.  It was February of 2016.  It was February 9th.

22   Q.  And what were the conditions of your release?

23   A.  I was banned from international travel.

24   Q.  Were you allowed to keep your passport?

25   A.  No.  It was requested from me; so I had surrendered it.

1   Q.  Did there come a time when you left Turkey?

2   A.  Yes.

3   Q.  When was that?

4   A.  It was in the August of 2016.

5   Q.  And why did you leave Turkey in August of 2016?

6   A.  I did not feel legally secure in any way for myself.

7   During that time, the prosecutor had requested an order for

8   arrest for myself based on a different investigation.  I

9   understood this time to be a time where rights to defend one's

10  own and freedoms of an individual and freedoms as a human were

11  taken away.  So I took my wife and my daughter, and I left the

12  country that I dearly love.

13  Q.  Now, Mr. Korkmaz, before your arrest in September of 2014,

14  had you expected to be arrested?

15  A.  Yes.

16  Q.  At that time, did you have your passport?

17  A.  Yes.

18  Q.  At that time, did you leave the country?

19  A.  No.

20          MR. LOCKARD:  Your Honor, I don't know if you intend

21  to take an afternoon break, but this might be a good place to

22  do it.

23          THE COURT:  Okay.  Take five minutes.

24          (Jury not present)

25          THE COURT:  Okay.  We're going to take a five-minute

1    break.

2                (Recess)

3                (Jury present)

4                THE COURT:  Please be seated, everybody.

5                THE DEPUTY CLERK:  Sir, again, I'd like to remind you

6    that you're still under oath.

7                THE WITNESS:  Yes.

8                MR. LOCKARD:  Should I continue, your Honor?

9                THE COURT:  Yes.

10   BY MR. LOCKARD:

11   Q.  So, Mr. Korkmaz, you were describing your decision in

12   August of 2016 to leave Turkey?

13   A.  Yes.

14   Q.  What, if anything, did you bring with you when you left

15   Turkey?

16   A.  I brought the evidence that I could obtain with regards to

17   the December 17th investigation, and I brought those.

18   Q.  And how were you able to obtain that information, that

19   evidence?

20   A.  Some of them from the prosecutor of the investigation and

21   the other part from an expert employee who was working in the

22   investigation.

23   Q.  Could you describe generally what it is, what types of

24   evidence it is that you obtained from the prosecutor who had

25   been assigned to the investigation?

1       MR. HARRISON:  Objection, your Honor, relevance,

2   hearsay.

3       THE COURT:  Overruled.

4   A.  Yes.  Audio that constituted criminal elements and the

5   scanned version of the investigative file that was available at

6   the courthouse, photographs of the evidence that were seized

7   during the operation, digital and scanned versions of some of

8   the expert's reports, and some digital versions of evidence

9   such as statements and such.

10  Q.  Were you able to make a copy of the entire investigative

11  file?

12  A.  No.  I was able to get only what had been scanned as of

13  that time, and I had thought that I had picked up all the

14  audio, but turns out I was able to get only the first CD.

15  Q.  And did the scanned investigative file also include

16  transcripts of the audio intercepts?

17  A.  Yes.  Yes, but I noticed that some of the suspects'

18  transcripts had not been scanned at that time and, also, there

19  was one more suspect in the investigation whose transcripts had

20  not been scanned that I realized later.

21  Q.  So if there are portions of the investigative file that had

22  not been scanned, you were not able to get a copy of that

23  portion of the file?

24  A.  That is correct, exactly.

25  Q.  And you were able to obtain a copy of one CD of audio

1    intercepts; is that right?

2    A.  That is correct.

3    Q.  And how many other disks were there?

4    A.  There were two CDs.  I thought that I picked up both of

5    them.  I understand that I had not picked up the second one.

6    Q.  You also described obtaining some evidence from an

7    individual who worked at the digital evidence lab; is that

8    right?

9    A.  Yes.

10   Q.  And when did you obtain that digital evidence?

11   A.  After I was released from jail.

12   Q.  And were you able to compare that digital evidence to the

13   other investigative records that you had obtained from the

14   prosecutor?

15          MR. HARRISON:  Objection, Judge, lack of foundation,

16   403.

17          THE COURT:  Overruled.

18   A.  Yes.

19   Q.  And what did that comparison show?

20   A.  I understood that they matched.

21   Q.  And generally speaking, what was contained in the digital

22   evidence that you obtained from the digital evidence lab

23   person?

24   A.  These were the reports that forensic experts had prepared

25   on the digital evidence, and also what they prepared as exports

1   after these reports.

2   Q.  And what do you mean by exports?

3   A.  Export is a process through which the computer files that

4   are obtained through the image are sorted by their file

5   extensions.

6   Q.  Mr. Korkmaz, why did you obtain copies of the investigative

7   file and other evidence from the prosecutor?

8   A.  Both the prosecutor and I believed that the evidence would

9   never be brought up in court, and that they would be damaged or

10  destroyed; so I took initiative in order to preserve the

11  evidence.

12          MR. HARRISON:  Judge, I'm just going to object and

13  move to strike based on relevance, hearsay and opinion

14  testimony.

15          THE COURT:  You got it.  And foundation, probably,

16  right?

17          MR. HARRISON:  Yes, your Honor.

18          THE COURT:  Okay.  Overruled.

19  BY MR. LOCKARD:

20  Q.  So, Mr. Korkmaz, when you left Turkey without a passport,

21  can you describe for us generally how you were able to

22  accomplish that?

23          THE COURT:  Counsel, we do have a prior discussion of

24  this, right?  And ruling on this issue?

25          MR. LOCKARD:  We do, and so --

1           THE COURT:  Okay.

2   BY MR. LOCKARD:

3   Q.  So generally, Mr. Korkmaz, could you describe for us the

4   method by which you were able to leave the country?

5   A.  Yes.

6   Q.  And what is that method?

7   A.  I found a smuggler, and I asked him to smuggle me out, and

8   I fled through a border crossing.

9   Q.  Now, did there come a time when you were able to obtain

10  another passport?

11  A.  Yes.

12  Q.  And how was it that you were able to obtain another

13  passport?

14  A.  It was not possible in the first country that I had

15  entered, and then I went on to another country, and then I went

16  on to another country.  And the reason why I actually went to

17  that third country was because there was a loophole, legally,

18  that would give me this opportunity.

19  Q.  And so did there come a time when you actually did obtain a

20  passport in that country?

21  A.  Yes.

22  Q.  Was that passport in your true name?

23  A.  No.

24  Q.  So if you obtained a passport in a name other than your

25  actual name, what do you mean by legally obtaining a passport?

1   A.  Not necessarily legal, but through a legal or through a

2   loophole in the legal system.

3   Q.  Was it actually issued by the government authority?

4   A.  Yes.

5   Q.  Now, did there come a time when you began communicating

6   with United States law enforcement?

7   A.  Yes.

8   Q.  And what did you come to understand from those

9   communications?

10  A.  I understood that I cannot come to the United States

11  without a passport.

12  Q.  Now, what, if any, concerns did you have about not having a

13  passport, other than ability to travel to the United States?

14          MR. HARRISON:  Objection.

15  A.  I was afraid of extradition.  Turkey had -- the Turkish

16  government had good relations with these countries, and the

17  extradition was a possibility.  At higher levels, it could have

18  happened.

19  Q.  Now, you testified earlier about the concerns that you had

20  that had motivated you to leave Turkey in August of 2016?

21  A.  Yes.

22  Q.  Concerns for your, I think, freedom and safety?

23  A.  Yes.

24  Q.  How, if at all, did the steps that you took after leaving

25  Turkey, including bringing the evidence with you, how would

1    that affect the risks that you thought you would face if you
2    were returned to Turkey?
3                MR. HARRISON:  Objection, relevance and 403, your
4    Honor.
5                THE COURT:  Overruled.
6                THE INTERPRETER:  Could you please repeat that
7    question.
8    Q.  How, if at all, did the risks that you perceived from
9    returning to Turkey change as a result of the additional steps
10   you took by leaving Turkey and by bringing the evidence with
11   you?
12   A.  During that time, in the public arena, in the press, there
13   were news published about individuals in custody who were being
14   tortured.  I was aware of the bad treatments that I would be
15   subject to, and I could call that torture, actually.  The high
16   risks that I would face if I were to be extradited, even
17   through official channels, if I were to be extradited, I knew
18   what I would face.  But what made me really uneasy in these
19   countries was anything that could be done against me through
20   unofficial means, and for that reason, I was not going out of
21   the house much in these countries.
22   Q.  Did there come a time when you traveled to the United
23   States?
24   A.  Yes.
25   Q.  Was that with the assistance of U.S. law enforcement?

1    A.   Yes.

2    Q.   And what, if anything, did you bring with you?

3    A.   I brought the evidence that I had mentioned.

4    Q.   And what did you do with it when you arrived?

5    A.   I delivered them at the airport.

6    Q.   All right.  So let's talk a little bit about what that

7    evidence is.  Can you remind us again what some of the

8    investigative techniques were that were employed in your

9    investigation?

10   A.   Yes, identification of communications and surveillance of

11   such communications, surveillance through technical tools,

12   physical surveillance, security camera footage, and analysis of

13   mails and obtaining of documents from entities, and also, the

14   evidence and documents and additional evidence that were

15   collected during the operation.

16   Q.   So let's start with the evidence that was obtained through

17   the searches.

18   A.   Yes.

19   Q.   And I think we've touched on that just a little bit

20   already.  When did the searches take place?

21   A.   On December 17th, 2013.

22   Q.   And who was principally responsible for organizing the

23   searches?

24   A.   As the team lead, it was me.

25   Q.   And who was principally responsible for choosing the search

1    teams?

2    A.  As an organizer, I was the one responsible in listing them.

3    Q.  And how many, approximately, search teams were there?

4    A.  I recall that we had sent at least two and -- between two

5    and five teams to each of the addresses involved.

6    Q.  And who chose the team leaders of each of those teams?

7    A.  I had selected them, but I made the selection based on the

8    lists that were brought to me from my unit and from other

9    units.

10   Q.  So let's talk about a typical search.

11   A.  Yes.

12   Q.  In fact, before we talk about these searches, approximately

13   how many operations have you participated in as a Turkish -- as

14   an officer with the financial crimes unit?

15   A.  Are you referring to the ones that I have conducted, or

16   ones that I may have joined doing their searches for

17   investigations that were conducted by other units?

18   Q.  Let's do both.  How many operations did you personally plan

19   and organize?

20   A.  Prior to December 17th, during a three to three-and-a-half

21   year period, I led ten to 15 such operations, simultaneous

22   operations, that I took part in as a team lead.

23          And as far as other operations that were conducted by

24   our unit or other units, the number of that is very high, and I

25   cannot remember exactly how many.

1           THE COURT:  Approximately?

2           THE WITNESS:  Your Honor, I would guess it would be

3    between 25 and 50.

4    Q.  And so what information or instructions would you give to

5    the search team leaders prior to the operation being carried

6    out?

7    A.  First of all, I selected individuals that would be leading

8    the teams going to important addresses, and I had selected them

9    to be from our unit.  I told them about the identification of

10   any evidence that may be found at any of the addresses.  I told

11   them to have at least two witnesses at each address during any

12   search.  And I also went over the search warrant, and I

13   explained to them the things that were mentioned in there as to

14   the items that should be seized, and I gave them information

15   about what these particulars were about every address.

16   Q.  And where would you be during the operation itself, when

17   the teams went out to conduct the searches?

18   A.  I'd be at the unit.

19   Q.  And what would be your duties and responsibilities

20   throughout the day as the operation was being carried out?

21   A.  Since I'm the coordinator, all the information about the

22   operation would flow to me, and I would inform both the

23   prosecutor, as well as my own supervisor about the information

24   that was coming in.

25   Q.  And how would you learn that information throughout the

1  day?

2  A.  Sometimes they'd call on the phone, the teams would, and

3  sometimes they would write through WhatsApp, and sometimes they

4  would call through KakaoTalk.

5  Q.  And can you just explain what that is, for the benefit of

6  those of us who don't use that app?

7  A.  You mean the KakaoTalk one?

8  Q.  Yes, sir.

9  A.  KakaoTalk is another communications application just like

10  WhatsApp is, and it's available through Google Play.  What I

11  recall is WhatsApp did not allow voice calls at that time, and

12  for this application what I recall is it had good audio

13  transmission.  It was a fast application, and it worked.

14  Q.  And what procedure was there for teams to collect and

15  maintain evidence?

16  A.  So, first of all, we make sure that there are at least two

17  witnesses during any search, as a search begins, and all the

18  evidence identified during a search would then be listed in a

19  meaningful way on the search report.  And then these witnesses

20  would sign under this report, and they would put their

21  signatures on it and show that they were there.

22  Q.  And what is the -- at the end of the search, where is the

23  evidence taken?

24  A.  They would be taken to the room where the team is located

25  that is conducting the operation.  In this case, they were

1   brought to the room where our team is, in our office.

2   Q.  And what is the procedure for receiving evidence when it's

3   brought back to the team room?

4   A.  I would task an officer, as I would do with any operation,

5   in this operation too, I would task an officer.  These would be

6   the officers to greet the incoming teams, and the teams

7   returning from the searches would come in with their evidence

8   bags and their reports, and this officer would greet them,

9   would compare each and every piece of evidence with the reports

10  that it's listed on, and another officer would receive the

11  suspects brought in.

12  Q.  And did that process happen on the December 17th operation?

13  A.  Yes.

14  Q.  And where were you when the search teams came back to the

15  office with their evidence?

16  A.  I was at the unit.  I was sometimes in that room, and

17  sometimes I was with my supervisors in other rooms, and then

18  there was also another office where I could use to type up the

19  case summary report.  So in order to do that, I was in that

20  room sometimes.

21              (Continued on next page)

22

23

24

25

1    Q.  How, if at all, would evidence from each search location be

2    kept separate from evidence from other search locations?

3    A.  Every suspect, whether it's the suspect's home or business

4    place, would have an evidence bag, and on this bag there would

5    be a label placed.  And some teams may be more sensitive on

6    this and may place a label on every single piece of evidence as

7    well.

8    Q.  When, if at all, would you begin to review the evidence

9    brought back from the searches?

10   A.  Primarily I would inform the prosecutor, and after that,

11   that could happen on the first day, but it could also happen

12   gradually, because it is not possible to review all of them at

13   once.  So the review that takes place during the operation is

14   the one where it's just a quick browse of the evidence so that

15   anything that should be included in the case summary report

16   that is being prepared, they could be included in that report.

17   Q.  Did you in fact include some of the evidence brought back

18   on December 17 as part of your report?

19   A.  Yes, I included some, those pieces of evidence that I found

20   to be important, or of or immediate use, I took pictures of

21   such evidence, and I included in my report.

22       I apologize.  I apologize.  I'd like to make a

23   correction.  I'm under oath here.  I want to be precise in what

24   I say.

25       I was not the one taking the pictures of the pieces of

1    evidence.  I had tasked an officer to do so.  He would take the

2    pictures, he would give them to me, and I would include those

3    pictures in the report.

4    Q.  Where was your office located physically compared to the

5    room where the evidence was held?

6    A.  So, my current office at that time was actually in the same

7    room.  And then as for the room that I was using to type up the

8    case summary report, that was at a room that I rarely used

9    during the operation.  And I don't know how to give you a

10   measure on that, but it was on the same aisle, same corridor,

11   and it was maybe a little more of a distance of the distance

12   between that corner and this corner.

13              MR. LOCKARD:  I don't know how to estimate that, your

14   Honor, but I would guess maybe 20 yards.  10 yards.

15              THE COURT:  That is probably a fair estimate.  I think

16   we get the picture though.

17              So, I think we're going to stop for today.  I take it

18   you have some more questions to ask of Mr. Korkmaz?

19              MR. LOCKARD:  Yes, your Honor.

20              THE COURT:  I just have one question that I wanted to

21   ask.  Perhaps we asked it before.  How old are you?

22              THE WITNESS:  30, your Honor.

23              THE COURT:  So we'll pick up tomorrow.  The witness is

24   excused for today.

25              (Witness not present)

1399

HCB3ATI6

```
1        THE COURT:  Remember, please don't talk to each other
2   about this case, or about anyone who has anything to do with it
3   until the end of the case when you go to the jury room to
4   deliberate on your verdict.
5        Second, do not talk with anyone else about this case
6   or anyone who has anything to do with it until the trial has
7   ended, and you have been discharged as jurors.
8        Third, do not let anyone talk to you about the case,
9   or about anyone who has anything to do with it.  And if someone
10  should try and talk to you about the case, please report that
11  to Christine or me immediately.
12       Fourth, do not read any news or internet stories or
13  articles or blogs, etc., or listen to any radio or TV or cable
14  TV or internet reports about the case or about anyone who has
15  anything to do with the case.
16       And fifth, do not do any type of research or any type
17  of investigation about the case on your own.
18       So, another productive day and I'll see you at 9:15
19  tomorrow morning.  Thanks a lot.
20       (Jury excused)
21       THE COURT:  Mr. Lockard, remind me again what is left
22  in terms of the government's case, number of witnesses, etc.
23       MR. LOCKARD:  I think we have about five witnesses
24  left.  That does not include potential custodial witnesses
25  which we are still hoping to avoid calling, but may not be able
```

HCB3ATI6

1    to avoid calling.

2          And I think the batting order is, as we had discussed,

3    Mr. Szubin who had scheduling issues last week will start

4    tomorrow morning.  We are also working to solve another

5    scheduling problem, and we may be calling a second witness out

6    of turn after Mr. Szubin who would be a compliance expert from

7    Deutsche Bank.  At that point we would then resume with

8    Mr. Korkmaz and we would expect to finish his direct

9    continuously from there.  And then after that, I think we would

10   have, again, not counting potential custodial witnesses, about

11   two additional witnesses and then a summary witness.

12         THE COURT:  So, Mr. Szubin you estimate to be what

13   kind of length to his testimony?

14         MR. LOCKARD:  We expect his direct to be somewhere

15   around an hour and a half and two hours.

16         THE COURT:  And the other witnesses would be longer or

17   shorter?

18         MR. LOCKARD:  I think the rest would be in that range

19   or maybe a little shorter.

20         THE COURT:  How much do you think you have left with

21   Mr. Korkmaz?

22         MR. LOCKARD:  I think we're likely to finish direct

23   with Mr. Korkmaz on Wednesday.

24         THE COURT:  Oh really?  You'd have you think all of

25   tomorrow?  Well, no, I guess we have the other witnesses.

1          MR. LOCKARD:  Because tomorrow is less than a half day

2     for him probably.

3          THE COURT:  All right.

4          MS. FLEMING:  I'd like to raise an issue with regard

5     to the summary witness which is somebody named Hinton.  We were

6     advised of him I believe for the first time last week.  Maybe

7     Friday.  I don't remember the days, I don't want to get pinned

8     down on it.  And we received the 3500 material and the

9     government's exhibits, which are rather thick, and we're

10    putting together -- we're compiling for the Court the number of

11    pages, because they're considerable.  And that's on top of the

12    thousands of Turkish pages we have gotten, both in response to

13    a subpoena we served, which is our issue, but also that we

14    received from the government.

15         We are going to object to the summary witness on many

16    grounds, but among others, it really is, this is just trial by

17    ambush yet again.  And even in terms of notice, one of the

18    first things that jumped out is he's been working two years --

19    two years -- and on one of the first pages of this, and we get

20    this like last Thursday, or Friday, or Saturday.  It's really

21    pretty unbelievable, Judge.

22         THE COURT:  So just remind me, what is the function of

23    a summary witness?

24         MR. LOCKARD:  So, as your Honor knows, this was a

25    heavily document-intensive investigation with hundreds of

HCB3ATI6

1    thousands of e-mails and an even larger number of bank records

2    as part of the investigation.

3            So the summary witness is our effort to condense and

4    streamline all of that into a short summary presentation as

5    opposed to a whole stack of documents.

6            THE COURT:  How does that contrast to your summation?

7    I thought that's what you do.

8            MS. FLEMING:  Better organized.

9            THE COURT:  Well --

10           MR. LOCKARD:  The difference is that I think it's

11   somebody who can, as a fact witness, summarize things and

12   compile things in a way that I think might just sound like

13   argument coming from closing.

14           THE COURT:  We'll continue the discussion of the

15   summary issue witness issue.

16           MS. FLEMING:  Perhaps you'd like to look at this

17   overnight?

18           THE COURT:  Thanks.  I have to read one of the

19   transcripts overnight, so I'll pass.

20           We'll see you tomorrow at 9:15.

21           MS. FLEMING:  Thank you, your Honor.

22           (Adjourned until December 12, 2017, at 9:15 a.m.)

23

24

25

```
 1                     INDEX OF EXAMINATION
 2    Examination of:                          Page
 3    JOSHUA KIRSCHENBAUM
 4    Direct By Mr. Denton . . . . . . . . . . . .1250
 5    Cross By Mr. Rocco . . . . . . . . . . . . .1266
 6     HUSEYIN KORKMAZ
 7    Direct By Mr. Lockard . . . . . . . . . . .1278
 8    DAVID COHEN
 9    Cross (Resumed) By Mr. Rocco . . . . . . . .1328
10    Redirect By Mr. Lockard . . . . . . . . . .1354
11    HUSEYIN KORKMAZ
12    Direct (Resumed) By Mr. Lockard  . . . . . .1372
13                     GOVERNMENT EXHIBITS
14    Exhibit No.                           Received
15     7021    . . . . . . . . . . . . . . . . . .1255
16     106    . . . . . . . . . . . . . . . . . .1299
17     105    . . . . . . . . . . . . . . . . . .1300
18     971-16    . . . . . . . . . . . . . . . .1302
19     971-15    . . . . . . . . . . . . . . . .1305
20     971-78    . . . . . . . . . . . . . . . .1306
21     971-79    . . . . . . . . . . . . . . . .1315
22     971-71    . . . . . . . . . . . . . . . .1317
23     970-14    . . . . . . . . . . . . . . . .1320
24     7028 and 7029  . . . . . . . . . . . . . .1371
25     52    . . . . . . . . . . . . . . . . . .1382
```

1                              DEFENDANT EXHIBITS

2    Exhibit No.                                    Received

3     212    . . . . . . . . . . . . . . . . . .1340

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25