HCC3ATI1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4                 v.                          S4 15 Cr. 867 RMB

5   MEHMET HAKAN ATILLA,

6                 Defendant.

7   ------------------------------x

8

9                                        December 12, 2017
                                         9:15 a.m.
10

11

12  Before:

13                  HON. RICHARD M. BERMAN,

14                                       District Judge
                                          and a jury
15

16

17                       APPEARANCES

18  JOON H. KIM,
         United States Attorney for the
19       Southern District of New York
    MICHAEL D. LOCKARD,
20  SIDHARDHA KAMARAJU,
    DAVID W. DENTON, JR.,
21  DEAN C. SOVOLOS,
         Assistant United States Attorneys

22

23

24

25

HCC3ATI1

1

2                     (APPEARANCES Continued)

3

4

HERRICK, FEINSTEIN LLP (NYC)
5        Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
6        THOMAS ELLIOTT THORNHILL, Esq.
         - and -
7   FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
8        ROBERT J. FETTWEIS, Esq.
         - and -
9   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
10                   Of counsel

11

12  Also Present:
         JENNIFER McREYNOLDS, Special Agent FBI
13       MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
         MS. ASIYE KAY, Turkish Interpreter
14       MS. SEYHAN SIRTALAN, Turkish Interpreter
         MR. BULENT BULUT, Turkish Interpreter
15

16

17

18

19

20

21

22

23

24

25

1              (In open court; jury present)

2              THE COURT:  We're going out of turn and have a next

3     government witness, Mr. Szubin.

4              MR. DENTON:  Your Honor, the United States calls Adam

5     Szubin.

6              THE DEPUTY CLERK:  Sir, if you could step up to the

7     witness stand, remain standing for a moment, and then raise

8     your right hand, please.  Thank you.

9              Do you solemnly swear that the testimony that you

10    shall give this court and jury in this issue now on trial shall

11    be truth, the whole truth, and nothing but the truth, so help

12    you God?

13             THE WITNESS:  I do so swear or affirm.

14             THE DEPUTY CLERK:  Could you state your name for the

15    record.

16             THE WITNESS:  Adam Szubin.  S-Z-U-B-I-N.

17     ADAM SZUBIN,

18        called as a witness by the Government,

19        having been duly sworn, testified as follows:

20    DIRECT EXAMINATION

21    BY MR. DENTON:

22    Q.  Good morning, Mr. Szubin.

23    A.  Good morning.

24    Q.  Where do you work?

25    A.  I am a professor at Johns Hopkins School of Advanced

HCC3ATI1                       Szubin - Direct

1    International studies, and I'm of counsel part-time at a law

2    firm, Sullivan & Cromwell.

3    Q.  How long have you been doing those jobs?

4    A.  Since May of this year.

5    Q.  Where did you work before that?

6    A.  At the U.S. Treasury Department.

7    Q.  What did you most recently do at the Treasury Department?

8    A.  Most recently I was the acting secretary of the Treasury

9    Department just for a few weeks until Secretary Mnuchin was

10   confirmed.

11           Before that I was the acting undersecretary overseeing

12   the Office of Terrorism and Financial Intelligence for about

13   two years.

14   Q.  So approximately when did you start your service as the

15   acting undersecretary supervising the Office of Terrorism and

16   Financial Intelligence?

17   A.  It would have been about February of 2015.

18   Q.  Did you work at the Treasury Department before you began in

19   that position?

20   A.  Yes, sir.

21   Q.  Where did you work at the Treasury Department before 2015?

22   A.  For nine years I was the director of the Office of Foreign

23   Assets Control, or as it's often known, OFAC.  Before that I

24   was a senior advisor to the former undersecretary for TFI.

25   Q.  Could you describe some of your general duties and

1    responsibilities as the director of the Office of Foreign

2    Assets Control.

3    A.    Sure.  That's the office at Treasury that is charged with

4    administering U.S. economic and financial sanctions.  So, our

5    job would be to help advise on the formulation of new

6    sanctions, to issue the regulations that set out what the

7    requirements of sanctions are, to help draft executive orders

8    for the president when it came to sanctions, and then all of

9    the nuts and bolts on implementing sanctions, such as enforcing

10   civil penalties, issuing licenses, and designating those who

11   were viewed as a threat to U.S. national security or foreign

12   policy interests.

13   Q.    During your tenure as the director of the Office of Foreign

14   Assets Control, was there a particular country that was a

15   particular focus of economic sanctions that you worked on?

16   A.    Yes.  Iran, probably more than any other country, was what

17   I spent my time on.

18   Q.    Broadly speaking, what were the economic sanctions on Iran

19   during your tenure designed to do?

20   A.    They had a number of goals.  Obviously, even when I arrived

21   at Treasury in 2004, Iran was already under sanctions because

22   of its state sponsorship of terrorism.  But in the period from

23   2005, especially late 2005 forward, there was an intense focus

24   and concern in the U.S. government about Iran's growing nuclear

25   program.  And there were a number of other concerns to the

1    development, obviously, of longer range missile programs, their

2    continued sponsorship of terrorism groups like Hezbollah, human

3    rights abuses at one point obtained its own executive order and

4    its own sanctions, and regional intervention as we've seen in

5    places like Bahrain and Syria.

6            But the point of our concern, the biggest concern from

7    2006 forward, was that Iran not develop a military nuclear

8    program.

9    Q.  How were economic sanctions supposed to help address those

10   concerns?

11   A.  The intent is to put a thumb on the scale of Iran's

12   decision-making calculus, and sometimes a very heavy thumb in

13   order to influence their behavior.  Ideally, it's a way of

14   bringing a country to the negotiating table to pursue a

15   diplomatic resolution to concerns that our government had.

16   Q.  From a more granular perspective, what is the mechanism by

17   which economic --

18           THE COURT:  Could I ask you both to slow down a little

19   bit to make it easier to interpret.

20           MR. DENTON:  Of course, your Honor.  I'm sorry.

21   Q.  From a more granular level, what is the mechanism by which

22   economic sanctions seek to exert that pressure?

23   A.  There are a number of sort of points of leverage that we

24   try to use or that the Treasury Department, the U.S.

25   government, tries to use when it comes to sanctions to apply

1     that kind of pressure.  It can be through banking sanctions, it
2     can be through trade sanctions, it can be through investment
3     sanctions.
4              But, the idea is to put pressure on, first, bad
5     actors, those who might be helping Iran try to obtain illicit
6     materials, or longer range missiles or nuclear weapons parts.
7     But also, as the program grew, to put pressure on the Iranian
8     government and its sources of revenue, so that it would see
9     very substantial costs to continuing to ignore the
10    international community when it came to its nuclear program.
11    Q.  You just referred to the program growing.  Did the economic
12    sanctions on Iran change during the time period that you were
13    the director of OFAC?
14    A.  Yes.  Quite a bit.
15    Q.  Broadly speaking, how did they change?
16    A.  So, from that period I was mentioning earlier, 2006
17    forward, there was a steady escalation in sanctions, both from
18    the U.S. and I would add the U.N. Security Council also issued
19    a series of escalating sanctions against Iran.  This was an
20    international concern.  And the European Union and other
21    countries did as well.
22             But for our part at OFAC, our sanctions continued to
23    target new entities, new individuals, who were helping Iran
24    either try to evade sanctions or try to obtain illicit
25    material.  And ultimately, we began to try to pressure Iran's

1    primary sources of revenue, such as crude oil and gas sales,

2    and try to pressure Iran's banks.

3    Q.   In addition to implementing new economic sanctions, did

4    your work at OFAC involve steps to promote compliance with

5    sanctions?

6    A.   Yes, absolutely.

7    Q.   What sort of steps did that work involve?

8    A.   So, we had, I would say, a domestically focused compliance

9    effort which entailed speaking regularly to U.S. companies,

10   U.S. banks, about their obligations, reminding them of any

11   recent changes, and ensuring that they understood clearly what

12   sanctions required and what they allowed.

13           In the Iran context, where there was such a heavy

14   international aspect to this, both because of non-U.S.

15   sanctions and because our sanctions began to have more and more

16   international effect, a large part of our role at OFAC, and my

17   role as the director, was to travel overseas and talk to

18   international companies and international banks about how U.S.

19   sanctions applied to them.

20   Q.   I want to ask you about one particular foreign institution.

21   Did you meet with representatives of the Turkish bank Halkbank

22   to discuss compliance with U.S. sanctions?

23   A.   Yes.

24   Q.   In approximately what time period did you meet with

25   representatives of Halkbank?

HCC3ATI1                    Szubin - Direct

1   A.  2013 and 2014.

2   Q.  Roughly, how many times do you think you met with

3   representatives from Halkbank?

4   A.  In person, two or three times.  But I also had phone calls

5   and there were occasional e-mails and letters.

6   Q.  Was there any one person who was the principal

7   representative of Halkbank in your communications with the

8   bank?

9   A.  More than any other, I met with a Mr. Atilla who I believe

10  was the deputy general manager.  But I also met with the

11  general manager, Mr. Aslan.

12  Q.  Why did you start meeting with Halkbank?

13  A.  By the period of late 2012, there were a decreasing number

14  of major international banks who were hosting significant

15  financial and commercial activity with Iran.  Halkbank was one

16  of them.  And Halkbank was a pretty significant player at that

17  point, relative to what we saw going on in the rest of the

18  world.  We also had specific concerns about Halkbank's behavior

19  and how careful it was being vis-a-vis international sanctions,

20  including U.S. sanctions.

21  Q.  We're going to get into specific meetings in a moment but I

22  want to ask you, across the timeline of your discussions with

23  Mr. Atilla, were there particular subjects that recurred?

24  A.  Yes.

25  Q.  What were they?

1  A.  We spoke with Mr. Atilla about the propensity that Iran had

2  shown to, for lack of a better word, defraud foreign banks.  To

3  lie and manipulate payment instructions.  And the need,

4  therefore, for any foreign bank who was still doing business

5  with Iran to exhibit very strong due diligence, to make sure

6  that the transactions they were handling were indeed what they

7  appeared to be and not something else.  That was one thread of

8  the conversation.

9       We also talked about specific sanctions developments,

10 such as the executive order that prohibited -- or I shouldn't

11 say prohibited.  The executive order that targeted sales of

12 gold first to the government of Iran and then later to any

13 Iranian person.

14      We spoke to them about handling of crude oil sale

15 revenues, in terms of what that could mean for Halkbank and its

16 exposure to secondary sanctions.

17      And then the final example that comes to mind is

18 talking to them about dealings with the Central Bank of Iran.

19 Q.  So let's take those substantive areas one by one.

20      What were the issues that you discussed with respect

21 to the gold trade?

22 A.  So, there was an executive order that President Obama

23 issued that targeted sales of gold to the government of Iran,

24 this was I believe February 2012, or came into effect in

25 February 2012.  And it authorized the U.S. government, and that

1    authority was delegated to the Treasury Department, to sanction

2    foreign companies who were helping Iran obtain gold.

3            A year later, approximately, that executive order was

4    extended to target any Iranian person who was obtaining gold,

5    because we were concerned that the Iranian government was

6    circumventing this sanction using cut outs, using front

7    companies and individuals, to obtain gold in a way that could

8    undermine our sanction.

9    Q.  What specifically about that did you discuss with

10   Mr. Atilla during your conversations?

11   A.  Well, we saw quite a bit of activity from Turkey in terms

12   of selling of gold to Iran.  And given that Halkbank was the

13   primary commercial or primary bank that Iran was using in

14   Turkey, we -- and I reminded Mr. Atilla of the importance of

15   adhering to these executive orders, not running afoul of these

16   executive orders, given the risks that that could pose for

17   Halkbank.

18   Q.  Then I think the second area you mentioned was crude oil

19   sales.  What did you discuss with Mr. Atilla with respect to

20   Iran and crude oil sales?

21   A.  So, here, too, the sanctions were tightening over time.

22   And in -- I'm sorry.  I think I had the dates wrong because

23   we're now several years out.  But, February of 2013 is when the

24   sanctions go into effect with respect to crude oil sales and

25   the need to escrow those funds.

1        Basically, in layman's terms, what this means is if

2   Turkey is purchasing crude oil from Iran, which they were at

3   the time, any revenues from those sales needed to be held in

4   Turkey, and only used for one of two allowable purposes:  The

5   first was bilateral trade, so that would be selling Turkish

6   goods or Turkish services to Iran.  The second allowable

7   purpose was humanitarian sales, such as food or medicine or

8   medical devices which didn't need to come from Turkey.  Those

9   could come from any country in the world.  But, those were the

10  only two categories that a Turkish bank would have been able to

11  do with Iran's crude oil revenues without exposing itself to a

12  risk of U.S. sanctions.

13  Q.  I think the final category you mentioned were dealings with

14  the Central Bank of Iran.  What did you discuss with Mr. Atilla

15  about dealings with the Central Bank of Iran?

16  A.  The Central Bank of Iran, pursuant to that same set of

17  sanctions, was also an area that required a lot of diligence

18  from foreign banks.  Dealings with the Central Bank of Iran's

19  moneys that didn't fit into one of those two categories could

20  also expose a foreign bank, like Halk, to U.S. sanctions.

21  Q.  Before we dive into specific meetings, I want to ask you

22  some more general questions about your meetings with

23  Mr. Atilla.

24        What language were your meetings with Mr. Atilla held

25  in?

1   A.  English.

2   Q.  Was there a translator present?

3   A.  Not that I recall.

4   Q.  Based on your meetings, what was your impression of

5   Mr. Atilla's understanding of English?

6   A.  He seemed pretty conversant.

7   Q.  Based on your meetings, what was your impression of

8   Mr. Atilla's understanding of the sanctions you discussed with

9   him?

10  A.  I would say pretty strong.  I'll say that -- I'm comparing

11  him here to other senior officials from foreign banks, and I

12  talked to many.  But Mr. Atilla had clearly studied and been

13  briefed on the latest developments in U.S. sanctions, over a

14  period where they were changing, and increasing.  And he spoke

15  with some familiarity about these individual provisions, asking

16  detailed questions.  One instance that comes to mind involved

17  this provision on handling Iran's crude oil sales, only using

18  it for bilateral trade between Turkey and Iran.  And he asked

19  me what exactly is the definition of a Turkish origin good.

20  How is that defined.  If China makes a product and it's shipped

21  through Turkey to Iran, does that count as a Turkish good.  And

22  in conversations like that, I would say he exhibited a fair

23  degree of sophistication and familiarity with U.S. sanctions at

24  the time.

25  Q.  How would you describe Mr. Atilla's demeanor in your

1    meetings with him?

2    A.  He seemed somewhat nervous.

3    Q.  Was that true across the board, across your meetings with

4    him?

5    A.  Yes.  I'll say that -- that would not have put him in a

6    unique category.  When foreign banks were dealing with U.S.

7    sanctions over this period, I wasn't always the person they

8    were most happy to see coming to visit them.  But, yes, he was,

9    he seemed to me fairly nervous over this period.

10   Q.  So let's talk about some of your specific communications

11   with Mr. Atilla.  I want to direct your attention first to

12   March 14, 2012.  Did you meet with Halkbank officials on that

13   day?

14   A.  I believe so.

15   Q.  Do you remember which Halkbank officials you met with?

16   A.  No.  It's hard for me to recall individual meetings by

17   date.

18            MR. DENTON:  Your Honor, may I approach?

19            THE COURT:  Sure.

20   Q.  I'm showing you what's been marked as 3513-002.  Read that

21   to yourself and just look up when you're done.

22            Does that help refresh your recollection about which

23   Halkbank officials you met with on that day?

24   A.  Yes.

25   Q.  Who did you meet with on March 14, 2012?

1   A.  The director general of Halkbank, Suleyman Aslan, and the

2   deputy director general, Mr. Atilla.

3   Q.  Do you remember what was discussed during that meeting?

4   A.  At the time, we were talking to them about the importance

5   of what we would have called enhanced due diligence when it

6   came to any transactions with Iran.  But, I can't recall the

7   agenda for the meeting.

8   Q.  What does "enhanced due diligence" mean?

9   A.  Due diligence, ordinary due diligence, is what banks employ

10  when handling customer accounts.  It refers to the level of

11  care that you would exhibit when a customer comes in and asks

12  to do a new transaction or asks to open a new account.

13          Enhanced due diligence is what's called for by

14  international standards, is when you're dealing with a

15  high-risk country or a high-risk customer.  If you are going to

16  handle their transactions, you need to be applying a great deal

17  of care to make sure that the transactions are legitimate.

18  Q.  Why was that an issue of concern with respect to Iran at

19  that time?

20  A.  Well, as I mentioned earlier, Iran had demonstrated its

21  willingness to basically manipulate trade documents, to falsify

22  documents, to hire people outside of Iran or inside of Iran, to

23  do transactions on Iran's behalf.  Whether to make it look like

24  the trade was going to a different country, UAE, Oman, Turkey,

25  or whether it was to disguise payments.

1    So, that was a situation that called for seriously

2    enhanced due diligence.

3    Q.  Were those concerns that you communicated to Mr. Atilla in

4    that meeting?

5    A.  As I said, it's hard for me to distinguish one meeting with

6    Mr. Atilla from another now many years later.  But certainly,

7    that was a message that ran through my conversations with

8    Mr. Atilla.

9    Q.  Focusing just on that March 14, 2012 meeting, were you the

10   only senior representative of the Treasury Department in that

11   meeting?

12   A.  No.  In fact, the principal host of the meeting was my

13   boss, Undersecretary David Cohen.

14   Q.  In meetings where the two of you were both present, who

15   would typically lead the meeting?

16   A.  Undersecretary Cohen.

17   Q.  Let's move ahead to a meeting, another meeting you were

18   involved in.  I want to direct your attention to February 2012,

19   2013.  Did you meet with Mr. Atilla on that day?

20   A.  Yes, I believe that was the date of a trip I made to

21   Turkey.

22   Q.  So where did you meet with Mr. Atilla?

23   A.  At Halkbank's headquarters I believe in Istanbul.

24   Q.  Were there other people from the Treasury Department with

25   you?

1    A.  Yes.

2    Q.  What about other people from Halkbank at that meeting?

3    A.  I don't recall the names of the people that Mr. Atilla had

4    with him, but yes, he had a number of people on his side of the

5    table as well.

6    Q.  Was Mr. Atilla the most senior Halkbank representative in

7    that meeting?

8    A.  Yes.

9    Q.  I want to talk a little bit about the process when you meet

10   with bank officials in a foreign country.  After those meetings

11   take place, are they documented in any way?

12   A.  Yes.

13   Q.  How are they typically documented?

14   A.  With a meeting in a foreign country, we would have a

15   representative from the State Department, the local embassy

16   with us, in addition to my own support staff.  My own staff

17   would be taking notes and that could be written up or would be

18   written up afterwards in a record of the meeting.

19          But the State Department for its purposes is also

20   going to write up what's known as a cable.  Sort of a formal

21   writeup of a meeting in a foreign country, to be transmitted

22   back to main State Department and the main Treasury Department

23   and any other departments that are following the issue.

24   Q.  Was it a regular practice to record meetings in those

25   cables?

1   A.  Yes.

2   Q.  Were the text of those cables written by people who

3   personally participated in the meetings?

4   A.  Yes.

5   Q.  How long after a meeting takes place is a cable typically

6   prepared?

7   A.  It could be that night.  It could be in the next day or so.

8   Q.  Was it your regular practice to review cables pertaining to

9   meetings that you participated in?

10  A.  Yes.

11          MR. DENTON:  Mr. Chang-Frieden, can we show Mr. Szubin

12  what's been marked as Government Exhibit 7020.

13  Q.  Mr. Szubin, do you recognize this?

14  A.  Yes.

15  Q.  What is it?

16  A.  This is a cable from the American Embassy in Ankara dated

17  April 12, 2013, that is summarizing meetings I had in Turkey on

18  this trip.

19  Q.  When you say "this trip," is that the February 2013 trip

20  that you were describing earlier?

21  A.  Yes.

22  Q.  How are cables like this used after your trip is completed?

23  A.  Well, it is helpful to have a writeup for us of what was

24  discussed in terms of the work at OFAC.  So that if we see

25  concerns later on, we can make sure that those were areas we

1   had discussed with our foreign interlocutors.  But they're also

2   useful to other agencies in the U.S. government so that they

3   have general awareness of what's going on in a field like Iran

4   sanctions.  That was something that not just the Treasury

5   Department was watching but also State Department, the Justice

6   Department, and others.

7   Q.  Is it important that the content of these cables be

8   accurate?

9   A.  Yes.

10  Q.  Why is that?

11  A.  Well, for all the reasons I was just saying.  If you have

12  inaccuracies in the cable, it undermines the whole purpose.

13  Q.  Does this particular cable -- withdrawn.

14          MR. DENTON:  Mr. Chang-Frieden, can we go to the next

15  page, second page.

16  Q.  Mr. Szubin, does this cable reflect statements made by

17  Mr. Atilla to you during this meeting?

18  A.  Yes.

19          MR. DENTON:  The government offers Government Exhibit

20  7020.

21          MR. ROCCO:  No objection, your Honor.

22          THE COURT:  I'll allow it.

23          (Government's Exhibit 7020 received in evidence)

24          MR. DENTON:  If we could publish that starting at page

25  two.

1    Q.  So, I'd like to start at paragraph five.  First of all,

2    Mr. Szubin, where this indicates "Halk officials noted that

3    they had been well briefed on the changes that went into effect

4    on February 6," what Halk official communicated that to you?

5    A.  That would be Mr. Atilla.

6    Q.  Is that also true with respect to the following sentence

7    indicating that "they had also closely read the recently

8    released OFAC questions and answers on the changes that went

9    into effect on that date"?

10   A.  Yes.  I don't recall any of the other Halkbank employees

11   speaking during this meeting.  So any time it says "Halk" for

12   this meeting, it would have been Mr. Atilla.

13   Q.  So then, let's talk about the last clause of that sentence

14   after the highlighting.  "Halk understands that the bank will

15   need to carefully check trade-related documents from customers

16   on any trade with Iran."

17           Does that refer to the enhanced due diligence

18   conversation you were describing earlier?

19   A.  Yes.  And in particular here, I discussed with Mr. Atilla

20   the need to look at -- I believe they're called certificates of

21   origin, which is a government-issued document when it comes to

22   an export that certifies it is what it purports to be.  So if

23   someone's exporting air conditioning units to Iran from Turkey,

24   a certificate of origin would say this is a pallet with 200 air

25   conditioners on it.

1          MR. DENTON:  Mr. Chang-Frieden, if we can could then
2     move to paragraph six.
3     Q.  Starting at the top here, where there is a reference in the
4     first sentence to "the requirements to set up a separate
5     payment channel for oil."  What did you understand Mr. Atilla
6     to be saying there?
7     A.  So when I talked earlier about the need to escrow funds,
8     this is what he's talking about.  That basically, money that
9     was made by Iran through selling its crude oil needed to be
10    treated differently, needed to be escrowed or put into a
11    special account where it could only be used for those two
12    purposes that I was describing earlier.
13    Q.  I don't want to have you read everything here.  That will
14    take us too long.  But if we can just go down to the sentence
15    in describing the mechanisms Halk is using, it says "CBI has
16    explained to Halk that it cannot just use one bank as no
17    Iranian bank has a sufficiently high credit limit to handle the
18    total amount, but must instead use six or seven non-designated
19    Iranian banks to handle the volumes."
20          What does that mean?
21    A.  So here you get into some of the intricacies of trade
22    finance.  But, basically, CBI, which refers to the Central Bank
23    of Iran, was the bank that was receiving payment for Iran's oil
24    sales because Iran was selling them out of government
25    companies.  But, the Iranian purchasers who were looking to buy

1   Turkish goods would be using different commercial banks in

2   Turkey.  I'm sorry, in Iran.  And they would use their

3   commercial bank in Iran, for example, Bank Keshavarzi, put up

4   the money in Iran in rials, and then look for Bank Keshavarzi

5   in Turkey to make a payment to a Turkish exporter of, for

6   example, air conditioners.

7           The Central Bank of Iran is the one receiving the

8   Turkish currency, and it is then apportioning it out to Bank

9   Keshavarzi and a number of other Iranian commercial banks with

10  accounts in Turkey, so that their own customers back in Iran

11  can use that to pay for Turkish goods.

12  Q.  When you said at the start that this is getting into the

13  intricacies of trade finance, again, are these statements by

14  Mr. Atilla?

15  A.  Yes.

16  Q.  So, just moving a little further down the paragraph where

17  it states "Szubin took the opportunity to review in some detail

18  the requirement that Turkish companies be selling Turkish

19  goods, rather than re-exports, from a third country."

20          What are we talking about there?

21  A.  That's the requirement that if you're using crude oil sales

22  to pay for Turkish goods, that they be true Turkish goods.

23  Goods that are -- goods or services that are of Turkish origin,

24  not just Chinese or Singaporean or Canadian goods that have

25  come to rest briefly in Turkey.

1  Q.  How did Mr. Atilla respond about how Halkbank would address

2  that concern?

3  A.  Mr. Atilla explained that Halk would check for certificates

4  of origin issued by the Turkish chamber of commerce to ensure

5  that the goods were indeed Turkish.

6        MR. DENTON:  Mr. Chang-Frieden, if we could move to

7  paragraph seven which I think is on page three.

8  Q.  What discussion did you have with Mr. Atilla about

9  third-country food and medicine exporters?

10  A.  So, this relates to the second category of uses that are --

11  that would have been consistent with our sanctions at the time.

12  So not just Turkish bilateral trade, but purchases of food or

13  medicine, here it refers to pharmaceutical exports, to Iran.

14  That could be from any country.  So it was permissible for a

15  bank like Halkbank to use these escrowed funds to buy American

16  or Brazilian or European medicine for export to Iran, even

17  though they weren't from Turkey.

18  Q.  If you go down about two-thirds of the way down there is a

19  sentence that reads "Halk said that Turkish good exporters had

20  largely completed all of their exchanges, which had also

21  reduced the totals available in Iranian accounts."

22        What does that mean, Mr. Szubin?

23  A.  This is happening during the period when our executive

24  order made sanctionable sales to the government of Iran, but

25  not to individual Iranian companies who were private or

 1    individual Iranian persons.  And here, Mr. Atilla is saying

 2    that Turkish sales to Iran of gold, which had spiked

 3    dramatically, were winding down.  But those sales had reduced

 4    the amounts of funds available in Iran's accounts at Halkbank.

 5    Q.  Let's talk a little more about that gold trade.

 6            MR. DENTON:  Mr. Chang-Frieden, if we could go to

 7    paragraph eight, please.

 8    Q.  What did Mr. Atilla ask you about the gold trade with Iran?

 9    A.  Here he's asking about what were then upcoming changes to

10    tighten the gold sanctions.  I referred to these earlier, but

11    as of July 1 of 2013, it would become sanctionable to sell gold

12    to any Iranian person, and Mr. Atilla was asking questions

13    about what that meant.  For example, does it have to be a

14    person located in Iran or could it be an Iranian person

15    visiting Turkey.

16    Q.  What, if any, admonitions did you give him about how to

17    proceed with that trade?

18    A.  Well, if Halkbank didn't want to face U.S. sanctions, it

19    would have needed to terminate that trade entirely by July 1st.

20    Q.  Down at the bottom where it says "Szubin encouraged Halk to

21    continue being extremely careful --"

22    A.  Ah.

23    Q.  "-- noting concerns in the USG that the GOI may be the

24    ultimate buyer of the gold."

25            What is that referring to?

1  A.  So, that is referring to what were already the sanctions

2  that were already then in place at the time of this meeting, I

3  was warning Mr. Atilla that the government of Iran could well

4  be using front companies or agents to purchase gold from Turkey

5  on the government of Iran's behalf, and that that was already

6  sanctionable, even before we got to the new changes, because

7  the government of Iran was the ultimate buyer.

8  Q.  Did you discuss any particular examples of things that had

9  given rise to concerns during this meeting?

10  A.  Concerns about Iranian evasion?

11  Q.  Yes.

12  A.  Yes.

13          MR. DENTON:  If we could bring up paragraph nine,

14  Mr. Chang-Frieden.

15  Q.  This indicates that you and Mr. Atilla discussed the South

16  Korea case at length.  What does the South Korea case refer to?

17  A.  So, this refers to a pretty large-scale fraud that Iran

18  perpetrated in order to evade the sanctions I've been talking

19  about today, in particular, to be able to syphon money from

20  South Korea from funds that had been set aside or escrowed

21  exclusively for South Korea-Iran bilateral trade.

22          Iran had worked out a scheme to falsify trade

23  documents to make it look like there were funds debited from

24  Iranian accounts in South Korea to pay for South Korean

25  exports, but in reality, those weren't South Korean legitimate

exports, and Iran was using either fake companies or fake

documents to take money out of South Korea for other purposes.

The ultimate alleged total here was $1 billion of fraud by

Iran.

Q.   Where it indicates that you discussed this at length, did

you communicate these particular features of the South Korea

case to Mr. Atilla?

A.   Yes.

Q.   What did Mr. Atilla tell you about how Halkbank would avoid

a similar problem?

A.   So, you can see here a number of representations by

Mr. Atilla about how diligent, how careful Halk was being and

would be.  "Halk noted it is extremely careful dealing with

trading companies and banks.  It checks carefully to see what

policies potential bank partners have with regard to foreign

transfers.  Halk wants to see tight controls on foreign

transfer, and organic ties to their customers."

          That means that Halk wouldn't do business on behalf of

an unknown strange company.  They wanted to see, they wanted to

be doing business with companies who had a history of having an

account at Halk, where Halk would have known them better and

been able to have more confidence that they were legitimate.

          "If Halk sees a lot of unexplained flows, it closes

the company's accounts.  Halk never allows transfers of dollar

accounts, nor does it allow third-country transfers without a

1    lot of checking of written records.  Halk also refuses to deal

2    with new exporters, insisting on seeing five years of

3    commercial history."

4            So this is another aspect of diligence, not just that

5    Halk was saying it only wanted to deal with its own organic

6    customers, but that if there was a new company, ABC Export

7    Company in Turkey that sprung up, Halk was saying it would

8    refuse to do business with it because it could be a

9    fly-by-night, a disreputable company.  It wanted to deal with

10   those who had an established history.  Here five years of

11   history of doing legitimate business.

12           "Halk noted that some Turkish exporters are

13   suffering."  So this doesn't go to their due diligence.  But I

14   can continue going through it if that's helpful.

15   Q.  I think at a higher level of generality, what does the rest

16   of this paragraph talk about?

17   A.  In part as a result of the gold sales we talked about

18   earlier, Halk had less Iranian money on its books, and so,

19   there was a need to triage, in other words, a need to

20   prioritize certain payments over others.  Because Iran didn't

21   have Turkish currency to cover all of the things it would have

22   wanted to buy.  And here Mr. Atilla is commenting that Iran has

23   changed its priorities to food and pharmaceutical imports, away

24   from iron and steel.

25           MR. DENTON:  Mr. Chang-Frieden, if we can go to

1    paragraph 10 on the next page.

2    Q.  What was the topic of discussion reflected in paragraph 10,

3    Mr. Szubin?

4    A.  Here, Mr. Atilla's asking if Iranian customers at Halk

5    could use these escrowed funds to buy Turkish treasury bonds.

6    Q.  Why was that a subject of conversation?

7    A.  I assume because the Iranian customers had asked Halk to do

8    this.

9    Q.  What did you advise Mr. Atilla about that?

10   A.  I, you know, again urged that they be very careful about

11   checking the identity of the individuals, and making sure that

12   this wasn't a scheme to circumvent the sanctions we've talked

13   about earlier.  If it was a legitimate attempt to buy Turkish

14   treasury bonds, I noted there was no problem in the law.

15            MR. DENTON:  We can take that down, Mr. Chang-Frieden.

16   Q.  Mr. Szubin, during this same February 2013 trip to Turkey,

17   did you meet with any Turkish government officials?

18   A.  Yes.

19   Q.  Which Turkish government agency did you meet with?

20   A.  I met with the Turkish Ministry of Economy I believe it's

21   called.

22   Q.  Do you remember who you met with there?

23   A.  The minister.  But I have trouble pronouncing his name.

24   Q.  We don't need to get into the same level of detail that you

25   just talked about with your meeting with Mr. Atilla.  But what

HCC3ATI1                         Szubin - Direct

1    did you talk about with the Minister of the Economy in that

2    meeting?

3    A.  We covered many of these same areas, because the government

4    of Turkey was obviously keenly interested in making sure that

5    Turkish companies, especially a prominent bank like Halkbank,

6    not run afoul of U.S. sanctions.  And so, we thought it was

7    very important, we in the American government, to inform the

8    Turkish government about what the changes in sanctions were,

9    what they were -- what the upcoming changes would be, and what

10   our concerns were.

11   Q.  So you identified three general topics that we saw also

12   reflected in Government Exhibit 7020 dealing with gold sales,

13   the use of Iranian oil money, and dealings with the Central

14   Bank of Iran.  Were those three subjects also the subjects of

15   your discussions with the Minister of the Economy?

16   A.  Yes.

17   Q.  After your February 2012 meeting with Mr. Atilla and your

18   similarly timed meeting with the Minister of the Economy, did

19   you send any followup communications to Halkbank?

20   A.  Yes.  I recall forwarding to Halkbank officials a article

21   that came out about a -- another scheme, and U.S. efforts or a

22   U.S. sanctions against that network of sanctions evasion.

23          MR. DENTON:  Mr. Chang-Frieden, if we could show

24   Mr. Szubin what's been marked as Government Exhibit 7006.

25   Q.  Mr. Szubin, do you recognize this?

1   A.  Yes.

2   Q.  What is it?

3   A.  This is a copy of an e-mail that I sent on March 15 of

4   2013, so a month after the meeting we just talked about, and I

5   sent this to Mr. Aslan and Mr. Atilla at Halkbank.

6   Q.  Was anything attached to this e-mail?

7   A.  Yes.  I attached an -- a public source article about

8   sanctions that we imposed on a Greek businessman, Dimitris

9   Cambis, who was operating a very sophisticated scheme to help

10  Iran evade oil sanctions.

11          MR. DENTON:  Mr. Chang-Frieden, if we can go to the

12  second page of this exhibit.

13  Q.  Mr. Szubin, do you recognize the second page of this

14  exhibit?

15  A.  Yes.

16  Q.  What is this?

17  A.  This is a letter to the general manager of Halkbank that I

18  sent to Halk to follow up on both the meeting that I had in

19  Turkey and a meeting that my boss Undersecretary Cohen had to

20  confirm our understanding of Halkbank's posture with respect to

21  adhering to Iran sanctions.

22          MR. DENTON:  Government offers Government Exhibit

23  7006.

24          MR. ROCCO:  No objection.

25          THE COURT:  I'll allow it.

1    (Government's Exhibit 7006 received in evidence)

2    MR. DENTON:  You can publish that starting at page

3    one, Mr. Chang-Frieden.

4    Q.  First of all, Mr. Szubin, was it a common practice to send

5    letters confirming your understanding of things from meetings?

6    A.  Yes.  If it was a significant meeting.

7    Q.  Why was that something that you did?

8    A.  It greatly reduces the risk that the participants in the

9    meeting later claim that they didn't hear it, they weren't

10   aware of it, or that that's not what we discussed.

11   Q.  Before we get into the letter I want to talk a little bit

12   about this e-mail here.  Why did you include this notable

13   recent action with respect to Dimitris Cambis?

14   A.  Well, this was an example of a sanctions evasion scheme

15   that was, in our view, typical of the lengths that Iran was

16   going to, at this time, to try to evade sanctions.

17        We had discussed, as I've talked about here today,

18   Iranian sanctions evasion efforts with Halkbank, so we wanted

19   them to see this as a example of sanctions evasion.  But at the

20   same time, it was also meant to demonstrate for Halkbank the

21   Treasury Department's seriousness when it came to evasion and

22   our willingness to take action.

23   Q.  With respect to the Treasury Department's seriousness and

24   its willingness to take action, I want to go back to your

25   meeting in February of 2013 with Mr. Atilla.  During the

1    meeting, I think you indicated earlier that there were other

2    people present both from his side and from your side?

3    A.   Yes.

4    Q.   On that occasion, did you have the opportunity to have a

5    private discussion with Mr. Atilla?

6    A.   I did.

7    Q.   Tell us about that meeting.

8    A.   So this part was unusual.  We had a pretty long meeting

9    covering all of these sanctions issues that I was talking about

10   earlier.  And I felt like Mr. Atilla was nodding along and

11   saying he understood and they would do all of the right things,

12   but he didn't seem to clearly understand how serious an issue

13   this was from our perspective.  So, I asked Mr. Atilla if we

14   could speak one-on-one at the end of the meeting to have a more

15   candid discussion, and he agreed.

16   Q.   What did you discuss with him during that candid

17   discussion?

18   A.   I told Mr. Atilla that to the extent he was viewing this as

19   kind of a routine discussion or a routine visit that Treasury

20   Department officials were making across the globe, that wasn't

21   the case.  That this was a -- a very conscious visit to

22   Halkbank, by me, because of concerns that were pretty serious

23   about what was going on at Halk.  And that we viewed them in

24   sort of a category unto themselves, that I wasn't having this

25   same level of conversation with any other bank around the world

1    at this time.  To, in a sense, underscore how serious this was,

2    make sure that he wasn't in doubt.

3    Q.  How did Mr. Atilla react to that warning?

4    A.  He seemed pretty taken aback.  You know, I think sweating,

5    if I can use that term.

6    Q.  So let's go back to Government Exhibit 7006.  And I think

7    you identified Dimitris Cambis as the example of the sort of

8    serious action that Treasury takes.  What was the particular

9    mechanism of sanctions evasion described here with respect to

10   Dimitris Cambis?

11   A.  OFAC imposed sanctions on Cambis and a number of front

12   companies and vessels.  When I say "imposed sanctions," that

13   means we added him and these companies to basically OFAC's

14   blacklist, which is sometimes called the Specially Designated

15   Nationals or SDN list.  That's a public list that OFAC

16   maintains that banks in the U.S. and banks, frankly, around the

17   world consult.  It is a list of what we call designated actors,

18   and a U.S. bank or U.S. person anywhere in the world has to

19   freeze the assets of someone who is added to that list.  So by

20   adding Cambis to this list, we were directing all U.S. persons

21   worldwide to freeze any assets of Mr. Cambis or any of the

22   named companies, and prohibited any further dealings with them

23   by U.S. persons.

24   Q.  Is that generally a significant action for the person or

25   entity that is the target of that Treasury action?

1   A.  Yes.

2   Q.  So if we can move to your letter.  We can move to the next

3   page.  First of all, the letter is addressed to General Manager

4   Aslan; is that right?

5   A.  Yes.

6   Q.  Do I also remember correctly that it was transmitted in an

7   e-mail that was also sent to Mr. Atilla?

8   A.  Yes.

9   Q.  What does the first paragraph say about the overall topic

10  of this meeting?

11  A.  That this letter is to follow up on the two meetings, the

12  meeting that I had had with Mr. Atilla, the meeting that

13  Undersecretary Cohen had with Mr. Aslan, and that we wanted to

14  recount and confirm our understanding of several issues.

15  Q.  So let's goes paragraph by paragraph.  What is being

16  discussed in the first paragraph that you are confirming your

17  understanding about?

18  A.  This is the sanction that went into effect as of

19  February 6, under the NDAA, the National Defense Authorization

20  Act of 2012, that required sales of Iranian crude oil to only

21  be used for bilateral trade or humanitarian trade.  And this

22  applied also to any accounts of the Central Bank of Iran.

23  Q.  I want to focus you on one particular thing reflected here.

24  Was it your understanding, based on your conversation with

25  Mr. Atilla, that Halkbank had determined that it would not

1    allow transfers within Turkey to another financial institution

2    of the proceeds of Iranian oil sales?

3    A.   Yes.

4    Q.   What purposes were those accounts to be used for?

5    A.   Only for bilateral trade between Turkey and Iran, or

6    humanitarian exports to Iran.

7    Q.   What did you indicate in this letter was your understanding

8    of Halkbank's intention to conduct due diligence with respect

9    to bilateral Turkish exports?

10   A.   That Halk will require certificates of origin to document

11   that any bilateral exports are indeed bilateral exports.

12   Q.   This next paragraph refers to something we haven't talked

13   about as much involving accounts held in a third country.  It

14   says that "Mr. Atilla asked whether it would be potentially

15   sanctionable to allow a private non-designated Iranian bank to

16   transfer funds from an account it holds in a third country to

17   its account at Halkbank, where the account holder and nature of

18   the transaction do not have a facial link to Iran's petroleum

19   trade."

20            What is this issue, Mr. Szubin?

21   A.   So, this requirement that I've been talking about that went

22   into effect on February 6, related to any Central Bank of Iran

23   accounts, or funds that were the revenues from Iran's crude oil

24   sales.

25            Theoretically, if Iran held money in a different bank,

1    a private bank, like Bank Keshavarzi in a third country, let's

2    say Malaysia, if it wasn't -- if that money wasn't earnings

3    from their crude oil sales, this February 6 restriction didn't

4    apply.  And Halkbank, any other third-country bank, would have

5    been -- it would not have been sanctionable for them to handle

6    those funds and move them across borders.

7              That question was posed to me by Mr. Atilla, can

8    Halkbank receive such money from private banks if it doesn't

9    appear to be Iran's crude oil revenues.  My answer was,

10   technically, yes, but you have to be very careful, because the

11   bulk of Iran's money that it earns outside of Iran, in other

12   words, its foreign earnings, comes from its crude oil sales.

13   And given the pattern of evasion, there is a real likelihood

14   that Iran has taken its crude oil money in, let's say Malaysia

15   in my example, moved it into a private bank's account, and is

16   now trying to move it into Halk.

17   Q.  So then, the next paragraph refers to a discussion with

18   Undersecretary Cohen so let's move on to what follows that.

19             THE COURT:  If they did seek to move it from Malaysia

20   to Halk, how would they do that?

21             THE WITNESS:  How would the bank transaction be

22   processed?

23             THE COURT:  And how would it be described?

24             THE WITNESS:  Ah.  If it was an evasion scheme, then

25   the movement of payment would have no mention of the government

1    of Iran or crude oil.  The people involved in the scheme would

2    ostensibly say we just want to reallocate private commercial

3    funds of Iranian companies.  We have too much money in

4    Malaysia, we want some of it now to be in Turkey.  But, if

5    successful, this would be an attempt to put more money into

6    Turkey that wasn't under the escrow.

7            THE COURT:  Would they not only not say that this is

8    proceeds from the sale of oil, but would they say it's proceeds

9    from the sale of milk, for example?

10           THE WITNESS:  Sure.  Or carpets or pistachios, any

11   other Iranian export.

12           THE COURT:  Would they have to say something to get it

13   from Malaysia to Halkbank?

14           THE WITNESS:  Ordinarily, if it was the funds of a

15   different country than Iran, no.  A bank would -- ordinary due

16   diligence wouldn't require knowing where those funds came from.

17           But, in the case of Iran, they were so circumscribed

18   in terms of banks who would handle their money, that there were

19   some very extreme efforts underway to, as I said, evade

20   sanctions, and falsely document what payments were.

21           So this comes back to what I had talked about earlier

22   with Mr. Denton about what's required in enhanced due

23   diligence.  So the ordinary requirement wouldn't be to ask.

24   But in a case like this, we would urge foreign banks to ask.

25   Now, maybe not if it is $500, but if it is a substantial amount

1    of money, what's the origin of that money and how do you know

2    it's not from crude oil sales.

3    Q.  Is it fair to say across sort of the universe of

4    transactions and concerns that we've been discussing that there

5    was always an underlying concern that these were transactions

6    on behalf of the government of Iran in oil proceeds?

7    A.  That what do you mean by "these"?  I just want to be sure

8    I'm answering accurately.

9    Q.  We've talked about a variety of things involving gold sales

10   and bilateral trade and humanitarian trade.  Separate from

11   those specific restrictions, was there also an overarching set

12   of restrictions dealing with the National Iranian Oil Company

13   and the government of Iran using these funds?

14   A.  Yes.

15   Q.  So then, finally, I want to talk about this last

16   substantive paragraph with respect to the conversation of

17   Undersecretary Cohen.  In terms of how you addressed the

18   questions about U.S. sanctions related to the exports to Iran

19   of agricultural commodities, medicine or medical devices, what

20   admonitions did you give to Halkbank in this letter?

21   A.  It's right in line with what we've talked about today in

22   terms of enhanced due diligence.  But here it's particular to

23   humanitarian sales from companies that are in another country.

24        It was permissible, under our sanctions at the time,

25   for Halkbank to release money, even from a Central Bank of Iran

1    account or from crude oil sales, to buy aspirin from Bayer or

2    to buy goods from Johnson & Johnson, humanitarian goods in the

3    United States, to buy wheat from Cargill or Bunge, even though

4    those were in other countries.

5         What Halkbank had asked, and so this is now Mr. Aslan

6    had asked Undersecretary Cohen, is can Halkbank be an

7    intermediary in those types of transfers where the funds are

8    originating in escrowed funds, let's say in India or South

9    Korea, can Halkbank pass those funds along to purchase

10   humanitarian goods from a Johnson & Johnson or from a Cargill.

11        And our answer is legally, technically yes.  But it's

12   a risky situation, because Halkbank doesn't -- isn't in the

13   same country as where the funds are starting or where the funds

14   are going.  And if there is fraud going on, Halkbank can be

15   held responsible.  Halkbank can be sanctioned.

16        The example I would often give is if Iran were to set

17   up a pharmaceutical company, let's say in Greece or in

18   Argentina, we'll call it the XYZ Pharmaceutical Company, that

19   would be a very easy way for Iran to take tens or even hundreds

20   of millions of dollars out of Turkey, that should have been

21   escrowed, make payments for fake supplies of pharmaceutical

22   goods, when really, those payments were going to an Iranian

23   front actor, in that country, who was then using the money for

24   God knows what.

25        So, here, what we were saying, what I was saying in

HCC3ATI1                          Szubin - Direct

1    this letter, is relevant sanctions laws do allow for

2    humanitarian exports, but we would urge you only to work with

3    reputable and internationally known companies in these sectors

4    to mitigate the well-documented risk of Iranian fraud.

5                    (Continued on next page)

HCCPATI2                          Szubin - Direct

1   Q.  So let's move ahead from this March letter to your next

2   communication, and I want to direct your attention to May 17th,

3   2013.  Did you speak with Halkbank officials on that day?

4   A.  I believe so.

5   Q.  How did you communicate with them on that occasion?

6   A.  By telephone.

7   Q.  Who from Halkbank arranged the call?

8   A.  I don't recall.

9           MR. DENTON:  May I approach, your Honor?

10          THE COURT:  Yes.

11  Q.  Showing you what's been marked as 3513-11, does that

12  refresh your recollection about who from Halkbank arranged the

13  call on May 17, 2013?

14  A.  Yes, Mr. Atilla.

15  Q.  Do you remember who you actually spoke with from Halkbank

16  on that day?

17  A.  I believe Mr. Atilla.

18  Q.  What was discussed during that call?

19  A.  I don't recall the specific agenda.  It would have been on

20  the subjects we've been covering today.

21  Q.  Did you take notes during that call?

22  A.  Yes.

23  Q.  Would those notes help refresh your recollection about some

24  of the specifics you discussed?

25  A.  Yes.

1          MR. DENTON:  May I approach, your Honor?

2          THE COURT:  Yes.

3    Q.  I show you what's been marked as 3513-12.  Does that help

4    refresh your recollection about that call, Mr. Szubin?

5    A.  Yes.

6    Q.  What were some of the things you discussed during that

7    call?

8    A.  So, first, my recollection is this call was with

9    Mr. Atilla.  I know I wrote here Aslan, but I don't -- I think

10   that was writing quickly and in error.  The subjects that we

11   covered -- so this is recounting what Mr. Atilla told me.

12   Overall funds at Halkbank are decreasing day by day.  They

13   currently were holding less than $2 billion in the equivalent

14   of U.S. dollars.  The decrease in purchases of humanitarian

15   goods may be due to the shortage of funds and may be because of

16   metal precious payments.  So that gets back to the gold

17   purchases that had brought down the balances that we talked

18   about earlier.

19         Halkbank says, we will stop intermediation two to

20   three weeks before July 1st, which was when the new sanctions

21   would go into effect on any gold sales to any Iranian person,

22   not just the government.  And then the final line is, "Right

23   now, sales are only to privately owned companies;" so that

24   would be sales of gold, I assume.

25   Q.  And were those subjects that you had previously discussed

1    with Mr. Atilla?

2    A.  Yes.

3    Q.  So apart from the meetings and calls that you had with

4    Mr. Atilla that we've been discussing, did you also communicate

5    with him by e-mails?

6    A.  Yes.

7            MR. DENTON:  Could we show Mr. Szubin what's been

8    marked for identification as Government Exhibit 7009?

9    Q.  Mr. Szubin, do you recognize this?

10   A.  Yes.

11   Q.  What is it?

12   A.  This is an e-mail chain.  It includes an e-mail I received

13   from Mr. Atilla on July 1, which is the day that the new gold

14   sanctions went into effect.  It's Mr. Atilla saying that

15   Halkbank stopped mediating the transactions of exporters

16   related to trade in precious metals as of June 2013.  So two to

17   three weeks before July 1 is his representation.

18   Q.  And does this also reflect your response?

19   A.  Yes.  I said, thank you for this update.

20           MR. DENTON:  Your Honor, the government offers

21   Government Exhibit 7009.

22           MR. ROCCO:  No objection.

23           THE COURT:  I'll allow it.

24           (Government's Exhibit 7009 received in evidence)

25           MR. DENTON:  Publish that, please.

1    BY MR. DENTON:

2    Q.  So starting with the e-mail at the bottom, the first e-mail

3    in this chain, who sent it, Mr. Szubin?

4    A.  Mr. Atilla.

5    Q.  And who did he send it to?

6    A.  Me.

7    Q.  Was there anyone copied on this e-mail?

8    A.  Yes, Mr. Aslan.

9    Q.  What was the subject of this e-mail?

10   A.  Halkbank and NDAA, which is the National Defense

11   Authorization Act, June 2013.

12   Q.  What did Mr. Atilla represent to you in this e-mail?

13   A.  That Halkbank had stopped mediating transactions for gold,

14   precious metals, as of June 10th of that year, 2013.

15   Q.  And how did you respond?

16   A.  I thanked him for the update.

17          MR. DENTON:  Mr. Chang-Frieden, could we put up what

18   is in evidence as Government Exhibit 2511-4.

19   Q.  Mr. Szubin, have you ever seen this document before?

20   A.  I don't believe so.

21          MR. DENTON:  Mr. Chang-Frieden, if we could take some

22   examples and go down to line 3250.  If you could scroll down so

23   we could see a little more of the page, please.

24   Q.  Mr. Szubin, in his July 1st e-mail representing that

25   Halkbank had stopped transactions in gold as of June 10th,

1    2013, did Mr. Atilla inform you about the transactions for

2    Toseh Tejarat on June 11, 2013, reflected here?

3              MR. ROCCO:  Objection, your Honor.

4              THE COURT:  Overruled.  I think you need to go through

5    this chart a little before.  Actually, I'll sustain it.  I

6    think you need to go through the chart, say it's in Turkish and

7    all of that.

8    BY MR. DENTON:

9    Q.  Mr. Szubin, do you recognize language of the headers in

10   this chart?

11   A.  It looks to be in Turkish.  I don't speak Turkish.

12   Q.  So you don't understand what these mean specifically, do

13   you?

14   A.  No.

15   Q.  If you can look at the Column D, not the headers, but the

16   specific information reflected there.  Do you recognize what is

17   listed in all of the entries in that column?

18   A.  Yes, it says "Iran."

19   Q.  And then, if we could go to Column J, do you recognize the

20   symbol in parenthesis there?

21   A.  That's a Euro symbol.

22   Q.  And do you recognize the format of the numbers reflected in

23   Column J?

24   A.  It looks like a financial entry.

25   Q.  If we could go back to column A.  Mr. Szubin, have you ever

1    heard of Toseh Tejarat?

2    A.  I don't believe so.  I know of a Bank Tejarat.

3    Q.  What is Bank Tejarat?

4    A.  That is an Iranian -- a large Iranian bank.

5             THE COURT:  Private or government?

6             THE WITNESS:  I believe government.

7    Q.  So again, Director Szubin, I'll ask you.  Did Mr. Atilla's

8    July 1st e-mail indicate anything about the transactions listed

9    here dated June 11th, 2013?

10            MR. ROCCO:  Objection, your Honor.  I don't know how

11   this witness can respond to that question on the basis of this

12   document.  He doesn't know.

13            THE COURT:  Yes, I think you could rephrase the

14   question and get where you're trying to go, I think.

15   Q.  Director Szubin, based on what you can tell from this

16   document, does it reflect transactions dated, as highlighted

17   here, June 11th, 2013?

18            MR. ROCCO:  Objection, your Honor.

19            THE COURT:  Yes, sustained.

20   Q.  What do these entries appear to you to be, Director Szubin?

21            MR. ROCCO:  Objection, your Honor.

22   Q.  Director Szubin, do these appear to be financial entries?

23            MR. ROCCO:  Objection, your Honor.

24            THE COURT:  Yes, I think there's an easier way to get

25   there.

 1   Q.  Mr. Szubin, can I ask you just to read entry 3250?

 2   A.  Yes.  Toseh Tejarat, 39800, 35.41, Iran, Kulce Altin, looks

 3   like, June 11th, 2013, 2884, June 11th, 2013, 2849, 1,409,318.

 4   Q.  And then, Mr. Chang-Frieden, if we could go down the page a

 5   little bit.

 6              And, Mr. Szubin, do you see entries reflecting the

 7   dates -- the date of June 13th?

 8   A.  Yes.

 9   Q.  And what about June 25th?

10   A.  Yes.

11   Q.  Keep going down.  Are there entries for the date June 28th?

12   A.  Yes.

13   Q.  Are there entries for July 5th?

14   A.  Yes.

15   Q.  Are there entries for July 8th?

16   A.  Yes.

17   Q.  Are there entries for July 10th?

18   A.  Yes.

19   Q.  And are there entries for July 16th?

20   A.  Yes.

21   Q.  If we could go back to Government Exhibit 7009,

22   Mr. Chang-Frieden.

23              Did Mr. Atilla's e-mail to you say anything about any

24   transactions pertaining to gold after June 10th, 2013?

25   A.  No.

1   Q.  Let's talk about your next communication with Mr. Atilla,

2   and I'd like to direct your attention to October 29th, 2013.

3   Did you speak with anyone from Halkbank on that day?

4   A.  I believe so.

5   Q.  Who did you speak with?

6   A.  I believe Mr. Atilla, but again, it's hard for me to recall

7   conversations matched to dates.

8           MR. DENTON:  Mr. Chang-Frieden, if we could put up

9   what is in evidence as Government Exhibit 7021.  If we can go

10  to the next page, please.

11  Q.  Who did you speak with on that day?

12  A.  Mr. Atilla.

13  Q.  Now, starting at the top here with the subject of gold

14  sales, what did you discuss with Mr. Atilla about gold sales on

15  that day?

16  A.  I cited Turkish customs data showing that while there was a

17  significant decline in Turkish gold sales to Iran, there did

18  seem to be continued exports from Turkey to Iran in July and

19  August of this year, which would have been after the U.S.

20  sanctions went into effect that made that type of transaction

21  sanctionable.  So I was asking Mr. Atilla, is Halkbank involved

22  in those payments.

23  Q.  And what did he tell you?

24  A.  He said that Halk was not involved, that they had ceased

25  the facilitation of gold sales prior to July 1st.

HCCPATI2                      Szubin - Direct

Q.  And then, next, there's a discussion of securities

transactions.  Does this refer back to the issue that was

referenced in your earlier letter, not the purchase of Turkish

securities?

A.  Yes.

Q.  Moving down to the discussion of the humanitarian trade --

            THE COURT:  Oh, could I ask a question?

            MR. DENTON:  Of course, your Honor.

            THE COURT:  I can't find the place, but did you just

say that where the overall gold sales were decreasing, there

was evidence of gold sales?

            THE WITNESS:  Yes.

            THE COURT:  Is that evidence that you independently

collected, or how did you know that?

            THE WITNESS:  So here, I'm citing Turkish customs

data.  They publish, like many countries, openly every month

levels of trade with various countries, and Turkey had openly

published in both July and August continued level of sales,

though diminished, from Turkey to Iran.

            THE COURT:  Does it say who was involved in those

sales?

            THE WITNESS:  No.  It only goes to the level of the

good, the country of origin and the country of destination.

And so I was, here, asking is Halk involved in those sales.

            THE COURT:  I got it.

1    BY MR. DENTON:

2    Q.  Did Mr. Atilla make any representations about his

3    understanding of who was involved in those purchases?

4    A.  Yes.  He said that Halk was not involved at all, and he

5    speculated that any continued sale of gold to Iran probably

6    didn't go through banks at all but was, instead, cash based and

7    used jewelry merchants.

8    Q.  So let's go down and talk about the humanitarian trade.

9    What did Mr. Atilla tell you on October 29th about Halk's

10   involvement in humanitarian trade?

11   A.  Mr. Atilla told me that as of October 14th, Halk had told

12   third-country exporters of food and medicine that Halk would no

13   longer facilitate trade for them.  Halk had already implemented

14   this change for food and would be stopping to finance

15   third-country medicine payments at the end of 2013.

16   Non-Turkish companies with a physical presence in Turkey, an

17   affiliate or subsidiary; so if a Bayer or Johnson and Johnson

18   had a subsidiary in Turkey, Halk would continue to allow them

19   to use Halk for such sales, even if the goods weren't coming

20   through Turkey.

21   Q.  Did Mr. Atilla indicate what motivated this decision at

22   Halkbank?

23   A.  Yes.  He indicated that the Turkish ministry of economy was

24   concerned about the decreased level of Iranian funds at Halk,

25   and wanted to be sure that remaining Iranian funds were

1    prioritized for Turkish exports.

2    Q.  Mr. Szubin, are you aware of any particular relationship

3    between Halkbank and the Turkish government?

4    A.  No.

5    Q.  Moving down, what does Mr. Atilla indicate about the source

6    of the funds and their remaining value at Halkbank?

7    A.  He indicates that Halk believes current trade levels

8    between Turkey and Iran are $7 billion of imports from Iran; so

9    that's Turkish purchases, would have been primarily oil or gas,

10   and $3 billion in exports from Turkey to Iran, both down from 9

11   billion, leaving a $4 billion annual balance in Iran's favor.

12   Q.  And what was your understanding of what it meant to refer

13   to a $4 billion annual balance in Iran's favor?

14   A.  Well, those would have been additional funds left over in

15   Turkey that Turkey -- that Iran could use for bilateral trade

16   or for humanitarian purchases.

17   Q.  If we could go to the last page, Mr. Chang-Frieden.

18           And again, here, what did Mr. Atilla tell you about

19   Iran's imports and their affect on those numbers?

20   A.  Mr. Atilla estimated that Iran's imports of food and

21   medicine totaled $10 billion and $5 billion, respectively,

22   annually.  Halk did not state the value of the third-country

23   trade that it was facilitating for Iran, but the Turkish

24   government had expressed concern that this type of

25   third-country trade would overwhelm Turkish trade and eat up

1    the surplus in the CBI account.

2    Q.  Did Mr. Atilla propose any methods for addressing any

3    deficiencies in the CBI account?

4    A.  Yes.  He proposed two possibilities.  One was to move

5    escrowed funds, which here are referred to as locked-up sale

6    surpluses, to a special purpose account at Halk to be used for

7    humanitarian trade.

8         The second would be to allow for Halk to facilitate

9    third-country purchases of Iranian oil to allow for more money

10   to come into the Iranian accounts at Halk.

11   Q.  And what did you indicate you would do with respect to

12   those proposals?

13   A.  I would take them back for review and get back to Halk to

14   continue the discussion.

15   Q.  Did you, in fact, have further communications with

16   Mr. Atilla about that subject?

17   A.  I believe so.

18        MR. DENTON:  Mr. Chang-Frieden, if we could show

19   Mr. Szubin what's been marked for identification as Government

20   Exhibit 7015.

21   Q.  Mr. Szubin, do you recognize this?

22   A.  Yes.

23   Q.  Without getting into the content, what is it?

24   A.  An e-mail chain between Mr. Atilla and myself.

25   Q.  And generally, what does it pertain to?

1    A.   Indian oil purchases from Iran.

2              MR. DENTON:  Your Honor, the government offers

3    Government Exhibit 7015.

4              MR. ROCCO:  No objection, your Honor.

5              THE COURT:  I'll allow it.

6              (Government's Exhibit 7015 received in evidence)

7    BY MR. DENTON:

8    Q.   So let's start with the first e-mail in the chain.  What is

9    this e-mail, Mr. Szubin?

10   A.   This is an e-mail from Mr. Atilla to me dated

11   November 13th, 2013.

12   Q.   And what is he telling you in this e-mail?

13   A.   He's attaching a wire story, a news story that reports that

14   Iran was asking Indian refiners to pay for Iran's oil in Euros

15   via Halkbank.

16   Q.   And was that an issue that was a source of concern for

17   OFAC?

18   A.   If true, it would have been, and the article asserts that

19   the National Iranian Oil Company said Halkbank was ready to

20   restart oil payments for India.

21   Q.   And what did Mr. Atilla tell you about that representation

22   in the article?

23   A.   He says it's not true.  He says:  We have seen the news

24   today.  We would like to inform you that Halkbank did not take

25   any decision to accept Indian payments.

1   Q.  If we could go to the e-mail above that and show how you

2   responded.

3           How did you respond to Mr. Atilla?

4   A.  I said:  Thank you for your note.  That is good to know.

5   Q.  And did you discuss other issues that you had previously

6   raised with him?

7   A.  Yes.  So I said, thank you for your patience on the

8   questions he had posed to me in our telephone call.  I said

9   that, as a general matter, U.S. government policy supports the

10  export of food, medicine and medical devices to Iran.  In the

11  course of recent negotiations -- so that refers to U.S.

12  discussions with Iran -- we, the U.S. government, have received

13  input from the government of Iran about their financing of

14  humanitarian transactions.  We expect to learn more over the

15  coming week and would hope to get back to you once we have more

16  information.

17  Q.  And you noted here that the sanctions do not generally

18  prohibit transactions in support of legitimate trade in these

19  goods; is that right?

20  A.  That's right.

21  Q.  So just to close the loop, if we can look at the top e-mail

22  and see how Mr. Atilla responded to you.  And what was the date

23  of this e-mail chain, Mr. Szubin?

24  A.  December 5, 2013.

25  Q.  That's a little more an a month after your phone call?

1    A.  I believe the phone call was in October; so yes.

2    Q.  Continuing in the same vein, I'd like to show you what's

3    been marked for identification as Government Exhibit 7016.  Do

4    you recognize that?

5    A.  Yes.

6    Q.  What is it?

7    A.  This is an e-mail from Mr. Atilla to me dated April 30th,

8    2014.

9    Q.  And generally speaking, what does it pertain to?

10   A.  Iranian-Indian payments.

11   Q.  Is that the same subject that was discussed in Government

12   Exhibit 7015?

13   A.  Is that the previous chain we were looking at?

14   Q.  Yes.

15   A.  Yes.

16           MR. DENTON:  The government offers Government

17   Exhibit 7016.

18           MR. ROCCO:  No objection, your Honor.

19           THE COURT:  I'll allow it.

20           (Government's Exhibit 7016 received in evidence)

21   BY MR. DENTON:

22   Q.  Mr. Szubin, can you tell us what Mr. Atilla is informing

23   you about in this message?

24   A.  He says that Indian and Iranian parties have approached

25   Halkbank asking Halk to intermediate humanitarian payments, but

1    that Halk had sent an e-mail to the Indian parties that he

2    wanted me to see.

3    Q.  And what did that message say?

4    A.  So Halkbank's quoted e-mail to the Indian party said Halk

5    had been receiving inquiries requesting to mediate, I guess

6    intermediate, humanitarian -- I'm sorry, crude oil payments

7    made by India to Iran.  However, due to the current

8    international sanctions, we are unable to mediate financial

9    transactions related to the crude oil purchase of third

10   countries from Iran.

11          Therefore, we are not in a position to receive funds

12   from the accounts of Indian oil companies to the accounts of

13   the Central Bank of Iran held with us.  On the other hand, we

14   are glad -- this is Halk still talking -- to state that we are

15   ready to accept the already accumulated funds of Iran held at

16   your counters, into the accounts of CBI at Halkbank.  Those

17   funds will be available to be used just for the payments of

18   transactions related to the sales of humanitarian need items,

19   i.e. food, medicine, medical devices and agricultural products

20   to Iran.

21   Q.  Just to be clear, what was the date that Mr. Atilla sent

22   you this e-mail?

23   A.  April 30th.

24   Q.  Was this issue of bringing Iranian funds into Halkbank

25   still a concern in April of 2014?

HCCPATI2                           Szubin - Direct

1  A.  Yes.

2  Q.  And, again, why was that?

3  A.  Because the U.S. had sanctions that pertained to the

4  movement of Iranian oil funds, or Central Bank of Iran funds,

5  internationally.

6  Q.  You mentioned earlier that some of your initial discussions

7  with Mr. Atilla were motivated by concerns about Halkbank; is

8  that right?

9  A.  Yes.

10  Q.  What did it indicate to you, in light of those concerns,

11  that Mr. Atilla was raising this prospect of bringing Iranian

12  funds into Halkbank?

13            MR. ROCCO:  Objection, your Honor.

14            THE COURT:  I'll allow it.

15            MR. ROCCO:  "Indicate to you."

16            THE COURT:  I'll allow it.

17  A.  So the baseline level of concern that we had vis-a-vis

18  Halkbank, was still in place, and we approached any

19  conversation with Halkbank officials through that light.

20  Q.  And specifically, how did that effect your view of this

21  particular proposal with respect to third-country funds coming

22  into Halkbank?

23  A.  We were skeptical about whether this is something that

24  should be allowed.

25            THE COURT:  Why?

1          THE WITNESS:  Because we had concerns that Halkbank

2    might not be taking the appropriate precautions such that they

3    would verify these were indeed going for humanitarian

4    transactions only.

5    BY MR. DENTON:

6    Q.  And you've discussed a number of representations that

7    Mr. Atilla made to you about the precautions that Halkbank was

8    going to take.  In view of those representations, what led you

9    to have this ongoing concern?

10   A.  Of course, there's always the risk that a foreign party

11   isn't dealing with you in good faith and that they're saying

12   they're going to take special precautions but, in reality,

13   they're not.

14          MR. DENTON:  Nothing further, your Honor.

15          THE COURT:  Do you want to take a five-minute break,

16   and then we'll go to the cross?

17          (Jury not present)

18          (Recess)

19          (Jury present)

20          THE COURT:  Please be seated.  We're trying to warm

21   the place up a little.  Not possible.  I mean, we're trying.

22          THE DEPUTY CLERK:  I'd just like to remind you that

23   you're still under oath.

24          THE WITNESS:  Thank you.

25          MR. ROCCO:  Your Honor, may I proceed?

1          THE COURT:  Yes.

2     CROSS-EXAMINATION

3     BY MR. ROCCO:

4     Q.  Good morning, Mr. Szubin.

5     A.  Good morning.

6     Q.  My name is Victor Rocco.  I represent Hakan Atilla.

7          Is it correct, Mr. Szubin, that prior to your

8     testimony here today, you met with representatives of the U.S.

9     Attorney's Office in preparation for your testimony?

10    A.  Yes.

11    Q.  And how many meetings did you have with the prosecutors?

12    A.  I believe four or five.

13    Q.  And where did those meetings take place?

14    A.  Two took place at the Department of Justice office

15    building, and two took place in the offices of the law firm I

16    work with in Washington.

17    Q.  Okay.  So the government came on -- I'm sorry.  There were

18    four meetings in total?

19    A.  That's what I recall, yes.

20    Q.  How about telephone conferences?

21    A.  Yes, a few short telephone calls as well.

22    Q.  And how long did your meetings last, each meeting?

23    A.  Typically, about an hour.

24    Q.  And your telephone conferences?

25    A.  Those could be a few minutes or ten minutes, sometimes

1    something like travel, how I was getting up here, making sure

2    the logistics were covered.

3    Q.  When you say the Department of Justice building, you mean

4    the Department of Justice building in DC, correct?

5    A.  Yes, but they have several office buildings in DC.

6    Q.  Right.  And your office is in DC, as well?

7    A.  Yes, sir.

8    Q.  So the prosecutors came to meet with you; am I correct?

9    A.  Yes.

10   Q.  And when you met with the prosecutors, you discussed the

11   transactions that have been the subject of your testimony here

12   today; is that correct?

13   A.  The conversations?

14   Q.  The conversations and -- well, conversations can be

15   transactions.  If it's conversations -- yes, the conversations

16   that you've testified to today?

17   A.  Yes.

18   Q.  And the e-mails, the letters, the cables or memoranda of

19   meetings; am I correct?

20   A.  Yes, exactly.

21   Q.  Those are all documents that you reviewed with the

22   government in the course of the four meetings that you had and

23   the few telephone conferences that you had; am I correct?

24   A.  Yes.

25   Q.  Now, when you refer to certain of the documents that have

1  been identified and moved into evidence here this morning, you

2  were familiar with them and you had reviewed them?  Those are

3  documents that you had reviewed in the course of your

4  preparation for your testimony here today, correct?

5  A.  Yes.

6  Q.  And you and I have never met before; is that correct?

7  A.  Yes.

8  Q.  We never had any conversations about this case, correct?

9  A.  Correct.

10  Q.  So when OFAC -- and you were the director of OFAC, I think

11  you testified, before you became acting undersecretary and

12  acting secretary?  You were director of OFAC for nine years; am

13  I correct in that?

14  A.  Yes.

15  Q.  So when OFAC representatives interact with foreign banks, I

16  believe you testified that there were some records made of

17  those interactions, correct?

18  A.  Yes.

19  Q.  And by the way, prior to your meetings with foreign bank

20  officials, is it fair that you prepare for the meetings?

21  A.  Yes.

22  Q.  And tell me, what steps would you take, typically, in

23  preparation for a meeting with a foreign bank?

24  A.  I would typically talk with my staff about what we wanted

25  to cover, what were the key points we wanted to deliver, how

1   we'd respond to anticipated questions that could come up.

2   Q.  Now, your dealings over the years with Halkbank,

3   specifically, how would you prepare for those meetings?

4   A.  In that same way.

5   Q.  Would you talk to Mr. Cohen, who was your superior at

6   Treasury at that time?

7   A.  Yes.

8   Q.  Did you talk to him before every meeting that you had with

9   representatives of Halkbank?

10  A.  Probably, but I can't remember now, with accuracy, to say

11  for sure.

12  Q.  Well, there was a -- is it fair to say that there was a

13  continuing dialogue between you and Mr. Cohen about Halkbank?

14  A.  Yes.

15  Q.  And that went on for a number of years?

16  A.  Yes.

17  Q.  And can you tell me when that continuing dialogue started,

18  roughly what year?

19  A.  Probably 2011.

20  Q.  And lasted until you and/or Mr. Cohen left Treasury?

21  A.  At some point, we get to the Iran deal, the joint

22  comprehensive plan of action, which renders a lot of these

23  issues moot because the secondary sanctions are lifted.

24  Q.  And that, the secondary sanctions, were lifted effectively

25  when?

1   A.  That would be the implementation day of the agreement; so I

2   don't want to get the dates wrong, but that happens before I

3   leave Treasury.  So that's about 2016, January 2016.

4   Q.  And in your ongoing dialogue with Mr. Cohen, did you

5   discuss the problems that I believe you say you were having

6   with Halkbank over the years?

7   A.  Yes.

8   Q.  And did you discuss the specifics of the problems with

9   Mr. Cohen?

10  A.  Yes.

11  Q.  Now, are you familiar with the structure of Halkbank?

12  A.  No, not in any detail.

13  Q.  Are you familiar with the ownership of Halkbank?

14  A.  No.

15  Q.  Do you know that it's a state-owned bank, 51 percent owned

16  by the Turkish government?

17  A.  I don't know that.

18  Q.  And in the course of your preparation for meetings with

19  Halkbank, did you ever discuss the structure of the bank, the

20  way the bank is organized?

21  A.  No.

22  Q.  Did you ever discuss the management structure of the bank?

23  A.  I'm not sure I'm following, I'm sorry.

24  Q.  I'll rephrase it, sorry.

25          So did you ever discuss who held what position with

1    Halkbank?

2    A.  We were doing regular calls and meetings, as I was talking

3    about earlier, with the director general, the deputy director

4    general.  So in that sense, it would come up, but I don't

5    recall a meeting specifically about their org chart or

6    structure.

7    Q.  Do you know how many -- do you know who the general manager

8    of Halkbank was in the period that you were dealing with the

9    bank between 2009 and, let's say, 2015?  Let me be specific.

10   A.  I believe it's the Mr. Aslan that we were talking about

11   earlier.

12   Q.  And did you ever meet with anyone other than Mr. Aslan who

13   identified himself or herself as the general manager of the

14   bank?

15   A.  No.

16   Q.  You had meetings with Mr. Aslan?

17   A.  Yes.

18   Q.  And how about Mr. Atilla, how many times -- in your

19   meetings with Mr. Atilla, you understood him to be the deputy

20   general manager of the bank?

21   A.  Yes.

22   Q.  Do you know if there's more than one deputy general manager

23   of the bank?

24   A.  I don't believe there is or was.

25   Q.  I'm sorry?

1    A.  I did not, at the time, believe that there was a second or

2    a third deputy general manager.

3    Q.  If I told you that there were eight deputy general managers

4    of the bank, would that surprise you?

5            MR. DENTON:  Objection.

6    A.  As I said at the outset, I was not conversant with the org

7    structure of Halkbank.  He was the deputy that we dealt with.

8    Q.  And is it fair to say that you made no effort to

9    familiarize yourself with the structure or organization of

10   Halkbank; is that correct?

11   A.  I suppose.  I mean, we would have made sure that we were

12   dealing with responsible officials who could speak for the

13   bank.

14   Q.  So let's go back to the discussion we were having about

15   memos.  Am I correct that when you contact the bank, you or

16   someone under -- in your charge at OFAC, that a memorandum is

17   made of that contact?

18   A.  Yes.

19   Q.  And the memorandum is based on notes that are taken at the

20   time of the contact; am I correct?

21   A.  Also, the fresh recollections of the conversation by the

22   participants.

23   Q.  Well, the memoranda are a combination of notes and

24   recollection; am I correct?

25   A.  Yes.

1   Q.   And the memoranda are prepared roughly at the time that the

2   meetings occur?

3   A.   Yes.

4   Q.   And the memoranda –– it's important that the memoranda be

5   accurate and complete; am I correct?

6   A.   Yes.

7   Q.   And I think you testified that in the course of your

8   duties, that you would receive memoranda of meetings or

9   telephone conferences, and you would review them; am I correct?

10  A.   Yes.  I think those questions went to a formal cable coming

11  back from the embassy, and I said I do generally review those.

12  Memoranda of meetings that I participated in, yes, I had the

13  practice of generally reviewing those.

14  Q.   And does that include the cables, as well?

15  A.   Yes.

16  Q.   And you reviewed them for accuracy?

17  A.   Yes.

18  Q.   And you reviewed them for completeness, correct?

19  A.   Yes.

20  Q.   And would you make changes to the memoranda or the cable?

21  A.   Sometimes, yes.

22  Q.   And the cable or memoranda would be corrected to reflect

23  those changes; am I correct?

24  A.   Yes.

25  Q.   And in the course of your meetings with representatives

1    from Halkbank, is it fair to say that you took notes?

2    A.  Yes.

3    Q.  If you were the meeting leader, would you take notes?

4    A.  Usually, but those notes were not typically the best record

5    of what would happen in a meeting where I was the main

6    participant from the U.S. government because it's hard to take

7    notes carefully while you're also talking and listening.

8    Q.  Would you designate someone at the meeting to take notes?

9    A.  Yes.

10   Q.  And so there would be, it would be fair to say, a

11   designated note taker at all the meetings that you had with

12   Halkbank; am I correct?

13   A.  Yes.

14   Q.  And the designated note taker would take -- would that

15   person also be the person that was responsible for drafting the

16   cable or the memorandum of the meeting?

17   A.  Generally.

18   Q.  And that would be based, as you said earlier, in part on

19   the notes that were taken by the designated note taker and the

20   designated note taker's recollection of the conversation,

21   correct?

22   A.  That's right.

23   Q.  And when you were at a meeting and you took notes and there

24   was a designated note taker at the meeting, did you give your

25   notes to the designated note taker as he was preparing or she

1    was preparing the memoranda?

2    A.  No.

3    Q.  So that you would receive the memorandum that would be

4    based on the notes and the recollection of the designated note

5    taker; am I correct?

6    A.  Yes.

7    Q.  And you would review it, and you would compare that

8    memorandum with your notes of the meeting; is that correct?

9    A.  And my recollection, yes.

10   Q.  And then you would make -- if necessary, you would make

11   changes?

12   A.  Yes.

13   Q.  So, again, the question is, is it fair to say that the

14   notes and the memoranda -- I'm sorry, the memoranda of your

15   meetings with foreign banks, foreign financial institutions,

16   were important to be accurate; am I correct?

17   A.  Yes.

18   Q.  And to the best of your recollection, is it fair to say

19   that those memoranda are accurate?

20   A.  That seems a little open ended, but --

21   Q.  It is actually intended to be open ended.  To the best of

22   your knowledge, as you sit here today?

23          MR. DENTON:  Your Honor --

24   A.  You're asking about all records of all meetings that I had

25   at Treasury, are they correct?

1   Q.  No.  I'm asking specifically about the meetings with

2   Halkbank.

3   A.  Oh.

4             THE COURT:  That he was involved in?

5             MR. ROCCO:  Absolutely, your Honor.

6   A.  Yes, yes.

7   Q.  Now, if there is an important matter that's not in a

8   memorandum, is it fair to say that it didn't occur so that if

9   there is a significant omission -- that's a terrible question.

10  I'll withdraw it.

11            MR. ROCCO:  Thank you, your Honor.  It's the unwritten

12  record.

13            THE COURT:  Well, you're learning.

14            MR. ROCCO:  Now, I keep plugging at it, Judge.

15  Q.  Let's talk a little bit about Mr. Atilla and your

16  interactions with him over the years.  What's your earliest

17  recollection of meeting Mr. Atilla?  When did you first meet

18  him?

19  A.  I believe towards the end of 2011.

20  Q.  And I believe your testimony on direct was that you met him

21  two or three times over the years; is that correct?

22  A.  In person, yes.

23  Q.  In person.  And these meetings, they were, again, where?

24  Where did your meetings with Mr. Atilla occur?  And you can do

25  it one by one if it was different locations.

1  A.  Yes, so it would have been either in Washington at the

2  Treasury Department offices, or in Turkey at Halkbank's

3  offices.

4  Q.  Do you have a specific recollection of ever meeting with

5  Mr. Atilla in Washington?

6  A.  I believe so.

7  Q.  And do you have a specific recollection of meeting with

8  Mr. Atilla at Halkbank?

9  A.  Yes.

10  Q.  And do you have a specific recollection of meeting

11  Mr. Atilla at the U.S. embassy in Istanbul?

12  A.  No.

13  Q.  Did you meet with him in the Turkish embassy here in the

14  United States?

15  A.  No.

16  Q.  So the meetings were at Halkbank or at Treasury?

17  A.  Yes.

18  Q.  And when you met with Mr. Atilla, these were group

19  meetings?

20  A.  Yes.

21  Q.  Aside from the pull-aside that you referenced earlier, did

22  you ever meet with Mr. Atilla one-on-one, where it was just you

23  and Mr. Atilla at a meeting?

24  A.  Just that one time.

25  Q.  Did you socialize with him ever?

1    A.  No.

2    Q.  Did you ever have, aside from that one one-on-one

3    discussion that you had -- you testified earlier that you had

4    with Mr. Atilla, did you ever engage him in any kind of social

5    dialogue?

6    A.  No.

7    Q.  So your exposure to Mr. Atilla was on two or three

8    occasions; am I correct?

9              THE COURT:  Face-to-face?

10   A.  In person.

11   Q.  Face-to-face?

12   A.  Yes.

13             MR. ROCCO:  Thank you, Judge.  As I say, I'm still

14   trying.

15   Q.  And these meetings lasted how long?

16   A.  Typically an hour or more; so it could be 90 minutes, it

17   could be two hours.

18   Q.  And in these meetings that ran an hour or more, 90 minutes

19   or two hours, it's fair to say that other people were present,

20   correct?

21   A.  Yes.

22   Q.  And in these meetings, did other people speak?

23   A.  Other than the two principals?

24   Q.  Other than yourself and Mr. Atilla.

25   A.  Perhaps.  The primary people talking would have been myself

1    and Mr. Atilla.

2    Q.   Do you recall meetings that you attended with Mr. Atilla

3    and with Mr. Aslan?

4    A.   Yes.

5    Q.   And in meetings that Mr. Atilla attended with Mr. Aslan,

6    did Mr. Aslan speak?

7    A.   Yes.

8    Q.   In those meetings, is it fair to say that Mr. Aslan was the

9    principal participant?

10   A.   Yes.

11   Q.   And how many times did you meet with Mr. Aslan and

12   Mr. Atilla both?

13   A.   I believe twice.

14   Q.   Okay.  So there's only one occasion, then, where

15   Mr. Aslan -- where Mr. Atilla was present with you and

16   Mr. Aslan was not, correct?

17   A.   I believe so.  It's certainly true for the meeting I had

18   with him in Turkey.

19   Q.   Would it be fair to say that you don't know Mr. Atilla very

20   well?

21   A.   At a personal level, no, I don't know him.

22   Q.   At all, is that fair to say, on a personal level?

23   A.   I don't know him at all on a personal level, yes.

24   Q.   So is it also fair to say that you can't tell, or you don't

25   know, whether Mr. Atilla is a nervous-type person; am I

1    correct?

2    A.  Correct.

3    Q.  So when you say that Mr. Atilla exhibited nervous

4    characteristics during meetings with you, how do you know that

5    Mr. Atilla was nervous?

6    A.  That could -- he could have those nervous characteristics

7    all the time, I wouldn't know.

8    Q.  Right.  And you said it was not -- it was not unusual for

9    banking officials, and I'm sure you don't take it personally,

10   to be nervous in your presence; is that correct?

11   A.  That's correct.

12   Q.  That's because when you had these meetings, in part, you

13   were the principal focus of the meeting, correct?

14   A.  Yes.

15   Q.  You were imparting information about U.S. sanctions,

16   correct?

17   A.  Yes.

18   Q.  You were imparting information about what is, in fact, a

19   pretty complicated set of rules; am I correct?

20   A.  Yes.

21   Q.  And these rules are important to the banks that you would

22   meet with, banking officials that you would meet with; am I

23   correct?

24   A.  Yes.

25   Q.  Because the banking people that you would meet with wanted

1    to access –– continued access to the U.S. financial system; am

2    I correct?

3    A.  Correct.

4    Q.  It was very important to them, correct?

5    A.  Yes.

6    Q.  And if they were cutoff from the U.S. financial system, it

7    would be pretty much the equivalent of a death sentence to a

8    foreign financial institution in these days; is that correct?

9    A.  Depending on the institution but, yes, for instance ––

10   Q.  How about for Halkbank?

11   A.  For Halk, yes.

12   Q.  So these were important meetings, correct?

13   A.  Yes.

14   Q.  And is it fair to say that Halkbank was important to the

15   sanctions enforcement effort of the U.S., Iranian sanctions

16   enforcement to the U.S.?

17   A.  I'm sorry, what do you mean by "important"?

18   Q.  Important in the sense that U.S. officials, Treasury

19   officials like yourself, were looking for Halkbank's

20   cooperation?

21   A.  It was viewed as a significant concern by Treasury

22   Department officials with respect to Iran sanctions.

23   Q.  And is it fair to say that you made that imperative or that

24   need clear to the people that you meet with at Halkbank?

25   A.  No, I'm not following you again.

HCCPATI2                       Szubin – Cross

1    Q.  I'll put the question differently, or maybe move to a

2    different question.

3         So in your meetings with Halkbank, when you met with

4    Mr. Atilla and Mr. Aslan, you would discuss matters that

5    Treasury was particularly interested in with respect to the

6    sanctions regime; is that correct?

7    A.  Yes.

8         (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   Q.  You would discuss changes in the sanctions regime as the

2   sanctions changed from time to time; is that correct?

3   A.  Yes.

4   Q.  By the way, is it fair to say that Mr. Aslan spoke English

5   as well as Mr. Atilla?

6   A.  I don't recall the level of Mr. Aslan's English as well.

7   But the meetings we had with him were also done in English,

8   yes.

9   Q.  Is it fair to say that both Mr. Aslan and Mr. Atilla speak

10  with heavy accents?  Speak English with heavy accents?

11  A.  I was able to understand Mr. Atilla fairly well.

12  Q.  Did he speak with a heavy Turkish accent?

13  A.  So, I would say with a Turkish accent, but not heavy.

14  Q.  So, let's talk about some of the meetings that you had --

15  before I leave Halkbank.

16          Did you ever speak to a legal representative of

17  Halkbank?  Did you ever speak to a lawyer who represented

18  Halkbank?

19  A.  In other words, was there a lawyer at the group meetings

20  that I had with Halkbank?

21  Q.  I'll start with that question.  My question was a little

22  broader, but that's a good question.  Did you -- was a lawyer

23  present at the meetings that you had with Halkbank?

24  A.  I don't know.

25  Q.  Were you, did you ever talk to someone who identified

1   himself or herself as a lawyer for Halkbank?

2   A.  It could be.  I don't know.  In other words, at the

3   beginning of those meetings, people would introduce themselves

4   and often hand over business cards.  But my focus would have

5   been on Mr. Atilla or Mr. Aslan.

6   Q.  My question is --

7               THE COURT:  Do you know if either of them is a lawyer?

8               THE WITNESS:  I don't know.

9               MR. ROCCO:  That's a good question, thank you.  I was

10  getting there, Judge.

11              THE COURT:  Has to say it is a good question if I ask

12  it.

13              MR. ROCCO:  Of course.

14  Q.  My question was, did anybody identify themselves as a

15  lawyer?  As you sit here now, do you recall anybody identifying

16  himself or herself as a lawyer?

17  A.  I don't recall that.  But what I'm also telling you is I

18  don't recall the jobs that people identified themselves as

19  having.

20  Q.  In the course of your dealings with Halkbank, did you ever

21  come to learn whether Halkbank has a legal department?

22  A.  Not that I recall.

23  Q.  Let's talk about some of the meetings that you had with

24  Mr. Atilla.  And if I can direct you to, ask Mr. White to pull

25  up Government Exhibit 7020.

HCC3ATI3                          Szubin - Cross

1              By the way, when you testified earlier to Mr. Atilla's

2    nervousness at meetings with you, was that at one meeting that

3    you have a distinct recollection of him being nervous or was it

4    at more than one meeting?

5    A.   That recollection pertains primarily to the February 2013

6    meeting that I had with him.  And then in sort of heightened

7    nervousness in our pull aside meeting that was one-on-one.  But

8    that's on the same day.

9    Q.   Right.  Those both were February 12, 2013, correct?

10   A.   Correct.

11   Q.   You don't recall Mr. Atilla being nervous prior to that

12   February 12, 2013 meeting, do you?

13   A.   That's what stands out for me is the February 2013 meeting.

14   Q.   Let's talk about that meeting.  Can I ask you, this is in

15   evidence, so why don't we publish it to the jury.  I'm going to

16   direct your attention to the first page of the document.

17             So, what is this?

18   A.   This is a State Department writeup or cable from my

19   meetings in Turkey.

20   Q.   We know that it is a State Department cable how?

21   A.   The headers where it says from American Embassy Ankara.

22   Q.   Is it fair to say when we see a document like this with

23   that kind of a header, we can assume that it is a State

24   Department document, in this instance a State Department

25   document from the American Embassy in Ankara?

1    A.   Yes.

2    Q.   Do you know who prepared this document?

3    A.   Typically it would be the control officer assigned to my

4    delegation, so it would be a foreign service officer in our

5    embassy in Ankara who worked for either the political or the

6    economic section.

7              MR. ROCCO:   Mr. White, if we can go to the first page

8    of the document.

9    Q.   And I'll ask you to just, if you will, skim it or read it,

10   and tell me if Mr. Atilla's name appears anyplace on that page.

11   In fact, I'm going to ask you do it for the entire document.

12   Point out if you can find it where Mr. Atilla's name appears.

13   A.   I don't see Mr. Atilla's name.

14   Q.   Can we go to the second page.

15   A.   I don't see his name.

16   Q.   Can we go to the third page.

17   A.   Again, I don't see his name.

18   Q.   Can we go to the end.

19   A.   I don't see his name.

20   Q.   So it is fair to say his name is not mentioned there at

21   all; am I correct?

22   A.   In the unredacted sections, that's correct.

23   Q.   We don't know what's in the redacted sections.

24   A.   Correct.

25   Q.   And we don't know why the sections are redacted.  Do you?

1    A.  I don't.  I wasn't responsible for these redactions.

2    Q.  By the way, at the end of the cable, there is a name

3    Ricciardone?

4    A.  Yes.

5    Q.  That is the United States embassador?

6    A.  It was at the time, yes.

7    Q.  Let's go back into the document if we can.  Now, we agree

8    that this is an important document, correct?

9    A.  I had said that I agreed that this would be a reliable

10   record of the meeting.

11   Q.  With whom?

12   A.  With Mr. Atilla and Halkbank.

13   Q.  But Mr. Atilla's not referenced here; is that correct?

14   A.  Yes.

15   Q.  This is a meeting where you had the pull aside with

16   Mr. Atilla; am I correct?

17   A.  Yes.

18   Q.  Do we need to go through it line by line, page by page, to

19   find a reference to the pull aside?

20        Is the pull aside, in other words, is the pull aside

21   referenced in this document in any place?

22   A.  No, it is not.

23   Q.  Is there any document that you are aware of that references

24   the pull aside, Mr. Szubin?

25   A.  I don't think so.  No.

1    Q.  Is there any other document that as you sit here today

2    relates to this meeting on February 12, 2013, with Halkbank?

3    A.  I'm sure there are handwritten notes from that meeting from

4    various participants.

5    Q.  Did you do handwritten notes of that meeting?

6    A.  Yes.

7    Q.  Did you give the handwritten notes of that meeting to the

8    government?  To the prosecutor, the prosecution team?

9    A.  Yes.

10   Q.  And you did that during one of your prep sessions?

11   A.  Yes.

12          MR. ROCCO:  Mr. White, can you pull up Defense Exhibit

13   220 not for the jury.

14   Q.  I'm going to ask you to take a look at that document if you

15   will, Mr. Szubin.  And I want to ask you if you can identify

16   it.

17   A.  Yes.

18   Q.  Is it a document that you've seen before?

19   A.  Yes.

20   Q.  Is it a document that you saw in preparation for your

21   testimony here today?

22   A.  I believe so, yes.

23   Q.  Is it a document that you discussed with prosecutors in

24   this case in preparation for your testimony here today?

25   A.  I believe so.

1    Q.  Now, you're familiar with the document?

2    A.  Yes.

3    Q.  Is what the document says, is it accurate?

4    A.  This would generally be an accurate record.  This is a

5    record of a two-hour meeting with Halk that I did, done by my

6    senior advisor at the time.

7              MR. ROCCO:  Your Honor, I move Defendant's Exhibit 220

8    into evidence.

9              MR. DENTON:  No objection, your Honor.

10             THE COURT:  I'll allow it.

11             (Defendant's Exhibit 220 received in evidence)

12             MR. ROCCO:  Can we publish it for the jury.

13   Q.  Can you tell us what the document is.

14   A.  This is a record done by my senior advisor of the meeting

15   we've talked about at Halkbank.  Done that day.  And it, it's

16   basically the notes from the meeting.

17   Q.  Right.  And I'm going to ask you, is this document fresh in

18   your mind?  If it's not, take a moment and why don't you go

19   through it.  Peruse it and we can talk about it.

20   A.  Okay.

21   Q.  So, by the way, who is John Smith?

22   A.  He was another senior official at OFAC at the time.

23   Q.  The people that are copied on this document, Dennis Wood,

24   Michael Dondarski, Yamam Fadl, and Susan Demske, David Tessler

25   you already told us who he is.

1    Are those other named individuals people who work or

2    worked for OFAC at the time?

3    A.  Yes.

4    Q.  Can I ask you, does this memorandum in any way refer to the

5    pull aside that you say you had with Mr. Atilla on February 12,

6    2013?

7    A.  No.

8    Q.  It does not.  And these are notes, whose notes?  This

9    reflects whose notes did you say?

10   A.  David Tessler.

11   Q.  At the time at the bottom of the memo, the last paragraph

12   which is the sentence that says "Will write a more detailed

13   readout when we get home.  Not on BB but hopefully this is

14   helpful."

15          Was there, did Mr. Tessler or anyone else prepare a

16   more detailed readout of this meeting?

17   A.  I don't know.  But, typically, Mr. Tessler or others who

18   are on my delegation would work with the embassy staff and to

19   get the formal readout cable that we talked about earlier and

20   that we looked at earlier.

21   Q.  I didn't mean to interrupt you.

22   A.  That's fine.

23   Q.  So, it would be fair to say that to the best of your

24   recollection that the formal readout is what in effect has been

25   referenced in Government Exhibit 7020, right; is that correct?

 1    A.  I'm sorry.  You'll have to help me with the numbers.

 2              MR. ROCCO:  We can go back to 7020.

 3    A.  If that's the American Embassy cable, yes.

 4    Q.  That's the American Embassy cable that you and I just

 5    reviewed where I referenced Mr. Ricciardone's name at the end.

 6    A.  Yes, that would be the formal writeup of our meeting.

 7    There might be another more detailed Treasury readout, but I

 8    haven't seen it or at least not recently.

 9    Q.  So, as far as you know, on the two documents that we've

10    reviewed here today, there is no reference at all to either

11    Mr. Atilla or to the pull aside; am I correct?

12    A.  Correct.

13    Q.  This pull aside occurred, as you say, now approaching five

14    years ago, correct?

15    A.  Yes.

16    Q.  Fifth anniversary would be on 12 -- 2/12/2018.  And in that

17    time period, you obviously had more important meetings with

18    Halkbank, correct?  With representatives from Halkbank; am I

19    correct?

20    A.  More important than this?

21    Q.  No.  Additional important meetings.  Not more important

22    meetings.  Thank you.  Additional important meetings.

23    A.  Yes.

24    Q.  And you've met with, literally, I imagine, in that

25    five-year period, hundreds of foreign financial institutions,

HCC3ATI3                          Szubin - Cross

1    correct?

2    A.   Probably more than 100, yes.

3    Q.   Last time you met with representatives from Halkbank was

4    when?

5    A.   2013, maybe the beginning of 2014.

6    Q.   Do you recall meeting with representatives of Halkbank in

7    2016 in January, February of 2016?

8    A.   I don't.

9    Q.   We'll come back to that.

10            Your last meeting with Mr. Atilla, is it fair to say

11   then, as you sit here today, is in February of 2013; is that

12   correct?

13   A.   I don't think that's the last time we spoke.

14   Q.   How about the last time you saw him?

15   A.   Yes, it could be.

16   Q.   In preparation for your testimony here today, you met with

17   representatives of the United States attorney's office,

18   correct?

19   A.   Yes.

20   Q.   And I think you said that you reviewed documents with them,

21   including the cables and Mr. Tessler's notes; am I correct?

22   A.   Yes.

23   Q.   In the course of the meeting that you had with the

24   prosecutors in August of 2017, of this year, do you have a

25   recollection of talking to them about the pull aside?

HCC3ATI3                    Szubin – Cross

1    A.  You know, as with before, it's hard for me to remember

2    which meetings with them I discussed it.  But I did raise the

3    pull aside with them, yes.

4    Q.  Is it fair to say that you discussed the pull aside with

5    them more than once?

6    A.  Yes.

7    Q.  Did you discuss the pull aside with them at each meeting

8    that you had, each of the four meetings, face-to-face meetings

9    that you had?

10   A.  I don't think so, no.

11   Q.  Did you discuss it with them on more than one occasion?

12   A.  Yes.

13   Q.  In the course of your discussing the pull aside, were you

14   asked about who you pulled aside?

15   A.  Yes.

16   Q.  Do you recall saying that you pulled aside the chief

17   executive officer of Halkbank in one of the prep sessions that

18   you had with the prosecutors?

19   A.  I don't recall saying that, but it's possible.

20           MR. ROCCO:  Can we bring up government tab 2, 3513-24.

21   Q.  Can you see it, Mr. Szubin?

22   A.  Yes.

23   Q.  Can you read it?

24           MR. DENTON:  Objection.

25   Q.  Not aloud.  To yourself.

1          MR. ROCCO:  Thank you, Mr. Denton.

2     Q.  Directing your attention specifically to page two of these

3     handwritten notes.  We'll highlight a portion of it just in one

4     moment.  It is the last item on page two.

5          MR. ROCCO:  Can we highlight that, Mr. White?

6     Q.  Do you recognize, before we go to that specific topic, do

7     you recognize the handwriting?

8     A.  No.

9     Q.  It's fair to say you never saw this before?

10    A.  Yes.

11    Q.  Can you read those roughly two lines in that memorandum or

12    those -- in those notes?

13    A.  I'm sorry, I've got five.

14    Q.  Okay.  So just direct your attention to the first two lines

15    in the blow up.

16         MR. DENTON:  To himself?

17         MR. ROCCO:  To himself, of course.

18    A.  Yes.

19    Q.  Does that refresh your recollection that on August 3, 2017,

20    you told the prosecution team here that the pull aside was with

21    the CEO of Halkbank, not the deputy general manager of

22    Halkbank?

23    A.  So, this is what's recorded in the notes and that could

24    well be what I said to them at the meeting.

25    Q.  So, I'm asking you, do you recall telling the prosecutors

1   that, saying that it was the CEO, not the deputy general

2   manager that you had the pull aside with?

3   A.  No.

4   Q.  Do you have any recollection of correcting -- you have no

5   recollection of making that mistake; am I correct?

6   A.  Correct.

7   Q.  And it's fair to say that you have no recollection of ever

8   having to correct that misrecollection for lack of a better

9   word?

10          MR. DENTON:  Objection.

11          THE COURT:  Overruled.

12  A.  I'm happy to address this.

13  Q.  I just asked you a simple question.

14          THE COURT:  What was the question?

15  Q.  Do you have a recollection of making that statement to

16  members of the prosecution team.

17  A.  So, given that I had numerous --

18  Q.  Just a yes or no.

19          THE COURT:  He just wants to know if you remember

20  saying that.

21  Q.  Yes or no.

22          THE WITNESS:  But I think he's also asking do I

23  remember correcting it.

24          THE COURT:  Trust me, I know what he's asking.  He

25  really would like you to say yes or no, whether you remember

1    saying that.

2    A.  So, I remember at meetings with the assistant --

3    Q.  Just yes or no, Mr. Szubin.

4         THE COURT:  I know him very well.

5    A.  I know.  But I need to make sure that what I'm saying is

6    accurate.  And I want to give you an accurate answer.

7    Q.  And I appreciate that.  That's why I am asking for a simple

8    yes or no.  It is not a trick question.

9    A.  So --

10   Q.  Do you recall -- here's the question.  Do you recall

11   telling the prosecutors in this case that you had a pull aside

12   on February 12, actually, this says February 13, 2013, with the

13   CEO of Halkbank.  Yes or no.  You either remember it or you

14   don't.

15   A.  I remember telling them about a pull aside with a senior

16   Halkbank official.  I don't recall --

17   Q.  That's not yes or no, Mr. Szubin.

18   A.  Well, it doesn't --

19   Q.  This doesn't say senior official from Halkbank.  This says

20   the CEO.

21        MR. DENTON:  Objection, your Honor.  He's reading from

22   the document.

23        THE COURT:  We got it.  Just take it easy.

24        MR. ROCCO:  Thank you, Judge.

25        THE COURT:  We can probably get by this.

1          MR. ROCCO:  I think we're done with it.  You can take

2     it down, Mr. White.  Thank you.

3     Q.  By the way, the pull aside that you say took place in the

4     February 12, 2013 meeting with Halkbank, do you recall using

5     the words "pull the trigger"?

6     A.  I don't recall how I framed the prospect of applying

7     sanctions and whether I would have used that in the meeting.

8     It sounds more informal than I would have used in a foreign

9     bank meeting.

10    Q.  Let's talk a little bit if we can about Reza Zarrab.

11    You're familiar with Mr. Zarrab; am I correct?

12    A.  I know of him, yes.

13    Q.  In the course of your dealings with anyone from Halkbank,

14    did you ever discuss Mr. Zarrab with anyone from Halkbank?

15    A.  Not that I recall.

16    Q.  Were you aware of the fact that Mr. Zarrab was associated

17    with something known as Al Nafees Exchange?

18    A.  Yes.

19    Q.  Is it fair to say that you knew that Mr. Zarrab had an

20    ownership interest in Al Nafees Exchange?

21    A.  I believe so.

22    Q.  Is it fair to say that Mr. Zarrab -- that Al Nafees

23    Exchange was sanctioned?

24    A.  Yes.

25    Q.  Do you have a recollection of that?  Do you have a

1   recollection of that happening in 2012?

2   A.  I don't recall the date.

3   Q.  Do you recall why Al Nafees Exchange was sanctioned?

4   A.  I believe for helping Iran evade sanctions.

5   Q.  Do you recall if it was fined as well as part of the

6   sanction, whether a fine was levied against Al Nafees Exchange?

7   A.  By the U.S. government?

8   Q.  By the U.S. government.

9   A.  I don't believe so.

10  Q.  Are you aware of any fine being assessed against Al Nafees

11  Exchange by any government?

12  A.  No.

13  Q.  Do you have a recollection of a fine being assessed and not

14  being paid?

15  A.  I don't recall.

16  Q.  In your role as director of OFAC, were you aware of the

17  fact that Reza Zarrab was investigated by Treasury Department

18  at any time?

19  A.  I'm not following the question.

20  Q.  Well, are you aware of any Treasury Department

21  investigation of Reza Zarrab?

22  A.  Yes.

23  Q.  When did you become aware of the fact that Reza Zarrab was

24  under investigation by the Treasury Department?

25  A.  I don't know the date for that.

HCC3ATI3                        Szubin - Cross

1    Q.  Is it fair to say -- can you give me an approximate date,

2    roughly 2012, 2013?

3    A.  Yes, that's fair.

4    Q.  Are you aware of the fact that Mr. Reza was arrested in

5    Turkey in 2013?

6    A.  Yes.

7    Q.  Are you aware that Mr. Reza was arrested in 2013 with

8    Suleyman Aslan, who was the general manager of Halkbank?

9    A.  I believe so.

10   Q.  And are you familiar with what they were arrested for?

11   A.  By the Turkish authorities?

12   Q.  By the Turkish authorities.

13   A.  I believe it's relating to a sanctions evasion scheme.

14   Q.  When did you first become aware of the fact that Mr. Aslan

15   and Mr. Zarrab were arrested by the Turkish authorities?

16   A.  Reading the newspapers.

17   Q.  That was back in roughly the time that the arrests

18   occurred?

19   A.  Yes.

20   Q.  Would you think of that -- withdrawn.

21        At the time that you became aware of the fact that

22   Mr. Aslan and Mr. Zarrab were arrested, did you have occasion

23   to discuss the arrests or their prosecution by Turkish

24   authorities with anybody else at Treasury Department?

25   A.  I'm sure that I did.

1   Q.  Do you have a specific recollection of talking to David

2   Cohen about it?

3   A.  No, but it's very likely that I did.

4   Q.  Because that was a pretty significant event; am I correct?

5   A.  Yes, yes.

6   Q.  Tell me, what did you learn about the Turkish

7   investigation?

8           MR. DENTON:  Objection.

9           THE COURT:  When?

10          MR. ROCCO:  Back in 2013.

11  Q.  The arrests in 2013.  What did you learn?

12  A.  I just recall learning about it through public reporting.

13  I didn't have any behind-the-scenes conversation with Turkish

14  authorities about their investigation.

15  Q.  Did you talk to any American authorities about an

16  investigation?

17          MR. DENTON:  Objection.

18          THE COURT:  Overruled.

19  A.  In other words, did I talk to colleagues in the U.S.

20  government about these arrests in the news?  Yes.

21  Q.  Who were the colleagues that you spoke with?

22          MR. DENTON:  Objection.

23          THE COURT:  Overruled.

24  A.  I can't recall.

25  Q.  You'll agree with me David Cohen was one of them; am I

1    correct?

2    A.  What I said is I believe it's likely that I would have

3    talked to him about it.

4    Q.  So you have no specific recollection of that?

5    A.  Correct.

6    Q.  Do you have a recollection as you sit here today of having

7    a conversation with anybody in the U.S. government about the

8    arrest of Suleyman Aslan and/or Reza Zarrab in 2013?

9    A.  I don't have a specific recollection.

10   Q.  Well, it's significant, it was significant if they were

11   arrested for sanctions evasion; am I correct?

12   A.  Yes.

13   Q.  And it would have been significant to OFAC's enforcement

14   efforts here if Suleyman Aslan was arrested in 2013, am I

15   correct, for sanctions evasion?

16   A.  Yes.

17   Q.  So what I'm trying to get to is what did OFAC do, if

18   anything, following Mr. Aslan's arrest, following Mr. Zarrab's

19   arrest, about contacting Halkbank, we'll start with, to discuss

20   the arrests.

21   A.  I don't recall what OFAC's response was to the arrests in a

22   formal way.

23   Q.  Did you have any response to it in a formal way?

24   A.  No.

25   Q.  As director of OFAC, would you have had a response to it in

1  a formal way?

2           THE COURT:  What does that mean?

3           MR. ROCCO:  I'm using his words, "formal way."

4           THE COURT:  No.  What did your question just say?

5           MR. ROCCO:  I'll restate it, your Honor, or reframe

6  it.

7  Q.  Did you do anything as director of OFAC to learn about,

8  aside from reading newspaper reports, did you do anything to

9  actually learn about what happened in connection with

10 Mr. Aslan's arrest in 2013?

11 A.  So, the other sources I would have consulted about that

12 would have been classified sources, which I'm not free to

13 discuss.

14 Q.  Well, did you contact -- let's stay away from classified

15 sources.  And just for the remainder of my questions, you can

16 assume I have no interest in your contact with classified

17 sources.

18           I want to know, if you can help me, what did you do in

19 reference to the arrests?  Did you contact Halkbank?

20 A.  I don't believe so, no.

21 Q.  Did you ever ask anyone at Halkbank what happened?

22 A.  No.

23 Q.  Did you ask anybody at Halkbank -- by the way, to speak a

24 little more broadly, to your knowledge, did anybody from

25 Treasury contact Halkbank and ask what happened?

1    A.  I don't know.

2    Q.  Did you direct anyone to do it?

3    A.  No.

4    Q.  So it's fair to say you did nothing to contact Halkbank,

5    and you directed no one to contact Halkbank?

6    A.  Correct.

7    Q.  And any effort that you made to learn what happened you're

8    saying would be, would involve contacting classified sources in

9    government, correct?

10            THE COURT:  I thought you were going to stay away from

11   that.

12   Q.  I'm not asking what the contact was.  I'm not asking about

13   any information that you learned.

14   A.  Typically in a case where there is an ongoing law

15   enforcement action, we're very sensitive about not getting in

16   the way.

17   Q.  Well, you mean an ongoing law enforcement action by U.S.

18   authorities or an ongoing law enforcement action by Turkish

19   authorities?

20   A.  In this case Turkish authorities.

21   Q.  So, what you're saying is that the United States stepped

22   back to let Turkey proceed with an investigation in a matter

23   that may have involved the United States' interests?

24   A.  No.  What I said is we at OFAC, that's the sanctions

25   implementing office, would not in a situation like this, where

1    a foreign government is stepping in through criminal means to

2    investigate a case, we would not be calling the bank's

3    officials to ask about it.

4    Q.  Okay.  So, did there come a time that you learned that the

5    criminal case in Turkey was dismissed?

6    A.  Yes.

7    Q.  How long after Mr. Aslan's arrest did you learn that?

8    A.  When I read about it in the newspaper.

9    Q.  It would be fair to say that was in the spring, February or

10   March of 2014?

11   A.  I don't recall the date.

12   Q.  When you learned that the case against Mr. Aslan and

13   Mr. Zarrab was dismissed, what, if anything, did you do about

14   pursuing with Halkbank the fact that Mr. Aslan had been

15   arrested?  What did you do to learn about what the

16   circumstances were?

17        THE COURT:  I don't understand the question.

18   Q.  The question is, did you contact Halkbank to inquire into

19   the circumstances surrounding Mr. Aslan's arrest?

20        THE COURT:  After --

21   Q.  After the case was dismissed.  And after there was no --

22   after the case was dismissed.

23   A.  I did not.

24   Q.  Did you ask anybody at Halkbank or did you contact anybody

25   at the Turkish government to ask them about what was involved

1   in the arrests?

2   A.  I did not.

3   Q.  Did anybody to your knowledge who -- anybody at your

4   direction contact Turkish government?

5   A.  No one at my direction.

6   Q.  Was -- to your knowledge, was there any effort on the part

7   of anyone at Treasury after the case was dismissed in Turkey to

8   find out what happened?

9   A.  In -- it would be likely that our embassy would be

10  discussing the case with the Turkish government, and

11  potentially law enforcement to law enforcement.  But neither of

12  those are under my supervision or were under my supervision.

13  Q.  But you have access, do you not, to information from law

14  enforcement at OFAC?

15  A.  Not -- not as a general matter, no.

16  Q.  But if you need information, can you go to -- doesn't OFAC

17  have the ability and doesn't OFAC interact with other

18  government agencies and will speak about -- I'm talking about

19  United States government agencies.

20  A.  Very definitely they interact.  OFAC interacts with other

21  government agencies.  But OFAC does not have open access to

22  criminal files.

23  Q.  I didn't ask for open access and I didn't ask anything

24  about criminal files.  I'm asking what, if anything, was done

25  after Mr. Aslan was arrested to find out what happened, what

HCC3ATI3                        Szubin - Cross

1   was involved in the alleged sanctions violations.

2              MR. DENTON:  Objection.

3              THE COURT:  Sustained.

4   Q.  Did you make any effort to contact Halkbank and ask anybody

5   at Halkbank what happened?

6   A.  No.

7   Q.  When did you first hear about Reza Zarrab, by the way,

8   Mr. Szubin?  When did you first learn about him?

9   A.  I would have first read about him through information I'm

10  not free to discuss.

11  Q.  Did you learn about him -- how about this.  What year was

12  it?

13  A.  I don't recall.

14  Q.  Is it fair to say it was as early as 2012?

15             MR. DENTON:  Objection.

16             THE COURT:  If you remember.

17             MR. DENTON:  Your Honor, he said it was from sources

18  he can't discuss.

19             MR. ROCCO:  I think we have the right to ask a more

20  specific question.

21             THE COURT:  If you remember.

22  A.  Around that period.

23  Q.  In the course of your -- so around that period you're

24  saying, around the period of 2012?

25  A.  Yes.

1  Q.  From 2012 until through 2014, do you have any recollection

2  of ever discussing with anybody from Halkbank Reza Zarrab?

3  A.  No.

4  Q.  Do you recall ever discussing with -- did you ever have a

5  conversation with Halkbank -- I'm sorry, with David Cohen about

6  Reza Zarrab?

7  A.  Yes.

8  Q.  Did you discuss with Mr. Cohen Reza Zarrab's relationship

9  with Halkbank?

10  A.  Probably.

11  Q.  Can you tell me what those conversations -- what did you

12  discuss?

13           MR. DENTON:  Objection.

14  A.  I can't.

15           THE COURT:  Overruled.  If you recall.

16  A.  We would have been discussing information that I can't talk

17  about in open court.

18           MR. ROCCO:  Your Honor, I'm going to need some

19  guidance from you on this.  Can we come to the sidebar?

20           THE COURT:  Sure.

21           (Continued on next page)

22

23

24

25

1        (At the sidebar)

2        MR. ROCCO:  Judge, this is critical stuff.  Fact of

3   the matter is, that there were discussions going on regularly

4   obviously at this point about Reza Zarrab.  And nobody is going

5   to the bank and telling them not to deal with Reza Zarrab.

6        THE COURT:  You made that point.

7        MR. DENTON:  It was classified.

8        MR. ROCCO:  Not everything is classified.

9        THE COURT:  Just wait a minute.  Relax.  You already

10  made that point about seven times.

11       MR. ROCCO:  Thank you, Judge.  I am very happy.  I

12  quite frankly would like to know.

13       THE COURT:  I get what you are saying and you said it.

14       MR. ROCCO:  Judge, I think it's worse than that.

15       THE COURT:  You asked him, I know you think it's

16  terrible that it happened.  I get that.  But it is not you on

17  the witness stand.  You asked him, I promise you, four times,

18  five times, six times.

19       MR. ROCCO:  I did.

20       THE COURT:  Did you or did you direct anybody to find

21  out.  And he said no.  What do you want him to say, yes?

22       MR. ROCCO:  No, but what I'm interested specifically

23  in is he says he had discussions with Mr. Cohen about this.

24       THE COURT:  Okay.

25       MR. ROCCO:  Mr. Cohen, after the arrests of Reza

1   Zarrab, yesterday testified that he didn't discuss this with

2   anyone.  He didn't have any recollection of this.

3              THE COURT:  Okay.  So if I'm the defense lawyer, okay,

4   and I already have a contradiction, why I would want to improve

5   on that?

6              MR. ROCCO:  Because --

7              THE COURT:  If you think that's valuable.  And you're

8   going to use it.  You already have it.

9              MR. ROCCO:  Your Honor, I do not want to impinge --

10  I'm not interested in any confidential information.  I am

11  interested in --

12             THE COURT:  How about the question I just asked?

13             MR. ROCCO:  That gives me one argument.  I think there

14  are other arguments.  I think the fact -- what I want to

15  impress on the jury is the fact that OFAC had all this

16  information available to it, and it never warned -- Mr. Szubin,

17  who had principal responsibility for dealing with Halkbank,

18  never warned them off of Reza Zarrab.

19             THE COURT:  You made that point.

20             MR. DRATEL:  One second.  Your Honor, with respect to

21  the classified aspect, if it's --

22             THE COURT:  What difference does it make, is the

23  point.  I know what he's trying to pursue.  You've said it now

24  three times.  He asked that -- take a look at the transcript

25  and see.  So when you get to your summation, it's in the

1    transcript.

2              MR. DRATEL:  I just want to make the point that the

3    fact that it's classified doesn't make it off limits.  If it is

4    Brady material it has to be disclosed and then we work it out

5    through CIPA.

6              THE COURT:  It is a very sensitive area for the

7    government.  And it doesn't matter.  Because the point he's

8    trying to make, whether it's classified or whatever, he's

9    already made.  He just doesn't know when he is ahead.

10             MR. ROCCO:  Well, with all due respect, your Honor,

11   this is -- I think this is -- I understand it is a sensitive

12   area but I think it's important to the defense.

13             There were detailed discussions about Reza Zarrab's

14   activities, and none of those activities were brought to the

15   attention of Halkbank.  And we have a situation where we have

16   testimony that Halkbank is a bad player under suspicion by the

17   government and by OFAC, specifically by OFAC, for years.  And

18   they never tell Halkbank stop dealing with Reza Zarrab.  It is

19   almost like OFAC is playing gotcha.  It is basically like

20   they're being --

21             THE COURT:  Okay.  Who do you think knows Reza Zarrab

22   better, this guy from Washington, who doesn't know that

23   Halkbank is 51 percent owned by the State of Turkey, or

24   Mr. Atilla who lives around the corner from him?  Who do you

25   think?

1      MR. ROCCO:  I will tell you that I'm not sure how much

2   my client knew about Mr. Atilla, and we may find out -- I'm

3   sorry.  Mr. Zarrab.

4      THE COURT:  Whatever, listen.  I don't think it is

5   worth going into.

6      MR. ROCCO:  All right.

7      THE COURT:  If I thought -- seriously, if I thought

8   you were being hurt in some way in the point you're trying to

9   make, because I don't really know how to deal with classified

10  information either, to be honest with you.  You do.  Okay.

11     MR. ROCCO:  I'm going to ask Mr. Dratel for a primer.

12     THE COURT:  Like I said, if I thought you were being

13  hurt, your client was being hurt in some way, then I'd say it's

14  worth pursuing.  But I don't think it is.

15     MR. DRATEL:  Your Honor, the only point I was trying

16  to make, if the content of the conversations would be helpful

17  to make Mr. Rocco's point and helpful to Mr. Atilla, then the

18  government couldn't hide behind that.  They would have to --

19     THE COURT:  Just being helpful is not the issue.  I

20  know enough to know that.

21     MR. DRATEL:  It actually is a lower standard for

22  discovery purposes for admissibility.  The Court would have

23  to -- but we should get that material.  I have clearance.  We

24  could work out a substitution for purposes -- that's the way

25  it's done through the Classified Information Procedures Act.

1  But so all I'm saying is the government can't hide behind it as

2  a way to make it off limits entirely.

3          MR. DENTON:  Just for the sake of the record on that,

4  I will note that the Court has our CIPA briefing which

5  addresses all of the applicable legal standards and the

6  products at issue.

7          THE COURT:  I think we should move on.

8          MR. ROCCO:  Thank you, Judge, and I thank you for your

9  patience.

10          THE COURT:  Are we almost done?  Not to be rude to all

11  of you.  But it's now, we're now three hours in.

12          MR. ROCCO:  Well, your Honor.

13          THE COURT:  To what in my opinion is a one-hour

14  witness, direct and cross.

15          MR. ROCCO:  The government had him for an hour and a

16  half.

17          THE COURT:  I don't mean to be rude and it is easy for

18  a judge to say, because I don't have to be in the trenches like

19  you guys.

20          MR. ROCCO:  I would never join in that statement,

21  Judge.

22          THE COURT:  But I think you've stretched the one-hour

23  witness into three, three now going on three and a half hours.

24          MR. ROCCO:  We collectively.

25          THE COURT:  Yes.

1            MR. DENTON:  Sorry for that, your Honor.

2            THE COURT:  No, no, I don't say it that way.  I'd say

3    it would have been better for you and for you, it is harder to

4    be short than to be long.

5            MR. DENTON:  That's certainly true.

6            MR. ROCCO:  Especially when you haven't seen the

7    witness before.  That's right.

8            MR. DRATEL:  Lincoln's old line "If I had more time I

9    would have written a shorter letter."

10           MR. ROCCO:  Your Honor, if you want to break now.

11           THE COURT:  No, I want to get it over with.

12           MR. ROCCO:  I might be able to end it, but I can't

13   say.  I want to look at my notes.

14           THE COURT:  So you'll say for now.

15           MR. ROCCO:  Oh no.  No.  Thank you, Judge.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

1              (In open court)

2              MR. ROCCO:  I'm sorry, your Honor.  I'm actually

3    seeing if I can shorten this.

4              THE COURT:  Take your time.

5    BY MR. ROCCO:

6    Q.  Mr. Szubin, I'm not interested in any classified

7    information.  We're not going there.

8              Did you know that Reza Zarrab was a gold trader?

9    A.  Yes.

10   Q.  Back in -- let me give you some context.  Back in 2012,

11   2013?

12   A.  I believe so.

13   Q.  Did you know that he was a significant gold trader?

14   A.  I don't know.  How do you define "significant"?

15   Q.  Let me ask you if you regarded him as a significant gold

16   trader, and we'll use your definition of significant.

17   A.  We would have viewed him as notable because of his

18   activity, not because of the scale.

19   Q.  His activities were suspected violations of sanctions?

20   A.  Yes.

21   Q.  And you were aware of the fact that Mr. Zarrab was doing

22   business with Halkbank; am I correct, in 2012, 2013?

23   A.  I don't know the dates on which I would have been aware of

24   that, but that most likely is right.

25   Q.  Were you aware of the fact that Mr. Cohen spoke to Halkbank

1    representatives on at least one occasion, perhaps two, at

2    length about Reza Zarrab?

3    A.  That sounds correct.

4    Q.  Is it fair to say that Mr. Cohen told you about those

5    discussions?

6    A.  Yes.

7    Q.  Can you tell us what Mr. Cohen told you about those

8    discussions?

9                MR. DENTON:  Objection.

10               THE COURT:  If he can.

11   A.  I can't recall.

12   Q.  You don't recall anything that he told you?

13   A.  No.  Other than the fact that he would have talked to

14   Halkbank about Mr. Zarrab.

15   Q.  Was it, was that because Mr. Zarrab was a significant

16   customer of Halkbank?

17   A.  Is that why I can't recall?

18   Q.  No.  Did you have your discussion with -- in your

19   discussions with Mr. Cohen, did he tell you that Reza Zarrab

20   was a significant customer of Halkbank?

21   A.  I don't recall.

22   Q.  Did you have an understanding that Mr. Zarrab was a

23   significant customer of Halkbank?

24   A.  I don't recall.

25   Q.  Would you regard Mr. Zarrab as a red flag in 2012, 2013

1    when it comes to sanctions violations?

2    A.  We regarded him as a subject of concern, yes.

3    Q.  Subject of concern, it's fair to say, is a red flag,

4    correct?

5    A.  Yes.

6    Q.  So, I wanted to go back, if we can, to the meeting on

7    February 12, 2013.  Maybe, let me ask you first some broader

8    questions.  You testified that --

9              MR. ROCCO:  I'm trying to find the document.

10   One second.  Can we bring up, Mr. White, Government Exhibit

11   7009.  I believe it's in evidence.  If it is, please publish it

12   to the jury.

13   Q.  This is an e-mail, actually an e-mail string, an

14   interaction with Mr. Atilla back on July 10, 2013.

15   A.  It looks like it's from July 1st.

16   Q.  Oh.  My dyslexia.  July 1st.  In that e-mail, Mr. Atilla is

17   advising you directly that Halkbank stopped mediating the

18   transactions of exporters related to the trade of special

19   metals; am I correct?

20   A.  He says precious metals.

21   Q.  And he says mediating, correct, he uses that --

22   A.  Correct.

23   Q.  Can you tell me what the word "mediating" means in that

24   context?

25   A.  Facilitating or processing.

1   Q.  Well, can you explain what facilitating or processing a

2   metal, a precious metal trade is; what does it consist of?

3   A.  For a bank, it would mean releasing funds from one of their

4   customer accounts to make payment or receiving payment into one

5   of their customer's accounts in payment for trade in precious

6   metals.

7   Q.  Is that the only meaning that "mediating" has?

8   A.  I'm not following your question.

9   Q.  In this context, "mediating" relates only to the receipt of

10  payment or the making of a payment?

11  A.  It theoretically could also mean being a pass through on a

12  payment.

13  Q.  What do you mean by pass through?

14  A.  Well, for example, major clearing house banks, Deutsche

15  Bank, for example, acts as an intermediary on international

16  payments between typically two smaller banks.  But, this isn't

17  that context.  So I would have read it as meaning issuing or

18  receiving payment.

19          MR. ROCCO:  Mr. White, can we go to Government Exhibit

20  7021.  You can publish this to the jury as well.

21  Q.  Page two.  In that e-mail this is a readout; am I correct?

22  A.  Correct.

23  Q.  You testified to earlier.

24          This is a readout not of a meeting but a readout of a

25  telephone conversation you had with Mr. Atilla?

1    A.  Correct.

2    Q.  Am I correct?  And this was a followup to a telephone call

3    that you had with Mr. Atilla on -- was it October 28,

4    October 29, 2013?

5    A.  This is a readout of a telephone call from that date.

6    Q.  In that call you discussed with Mr. Atilla a number of

7    topics, including the sale of gold?

8    A.  Correct.

9    Q.  And directing your attention to the second sentence under

10   "gold sales".

11          MR. ROCCO:  Can we highlight the second sentence.

12   "Atilla confirmed."

13   Q.  To the best of your recollection, what did Mr. Atilla say?

14   Did he say in that conversation that he ceased intermediation

15   or did he say in that conversation that he ceased facilitation

16   of gold sales?

17   A.  I can't recall the word that he used in 2013.

18   Q.  And this doesn't help refresh your recollection?

19   A.  No, this is a summary of the call.  So we would have used

20   what we believed to be the most accurate term.

21   Q.  So can you tell me what you recall Mr. Atilla said about

22   gold in that conversation, independent of this, if you have a

23   recollection?  You may not.

24   A.  Yeah, that Halk was no longer going to be making payments

25   or receiving payments for gold sales involving Iran.

1    Q.  Did he go to that level of detail that he would neither

2    make payment or --

3              THE COURT:  Whoa, wait.  You asked him and that was

4    the answer.

5              MR. ROCCO:  All right, your Honor.  I won't press it

6    any further at this point.  Or maybe ever.

7    Q.  You testified earlier that the last meeting you had at

8    Halkbank you believe was in 2013; am I correct?

9    A.  Yes.

10   Q.  I asked you if you remember any subsequent meetings with

11   anyone at Halkbank after 2013.  Do you have a recollection as

12   you sit here now of a later meeting with representatives of

13   Halkbank?

14   A.  I recall a call in 2014, an in-person meeting I don't

15   recall.

16             MR. ROCCO:  Mr. White, can we bring up 3513-031.  Just

17   for Mr. Szubin, not for the jury.

18   Q.  Just take a look at that document and read it to yourself.

19   A.  I'm at the bottom of page one.

20   Q.  We'll scroll to page two.

21   A.  Okay.

22   Q.  Does that refresh your recollection that you had a meeting

23   with representatives of Halkbank in Turkey in 2016?

24   A.  Yes.

25   Q.  Do you recall who you met with?

1   A.  Ali Fuat Taskesenlioglu.  My apologies for the

2   pronunciation.

3   Q.  Anyone else?  Was anyone else at the meeting?

4   A.  Officials from the Ministry of Economy.

5   Q.  Was there any other representative of Halkbank at the

6   meeting?

7   A.  It suggests yes, but I can't tell you who.

8   Q.  You don't recall meeting with Mr. Atilla that day, do you?

9   A.  No.

10  Q.  Then do you recall what the discussion involved?

11  A.  The discussion involved how U.S. sanctions had changed in

12  light of the joint comprehensive plan of action and the

13  lessening of U.S. sanctions, but the fact that there were still

14  considerable sanctions to guard against.

15  Q.  How long was that meeting?

16  A.  I don't know.

17  Q.  You don't know?

18  A.  I don't know.  Typically those meetings would be about 45

19  minutes to an hour.

20  Q.  You testified on direct examination about a series of

21  notes.  We're going to bring it up.  This is 3513-12.  These

22  are your notes; am I correct?

23  A.  Yes.

24  Q.  These notes were in connection with a conversation you had;

25  is that correct?

1    A.  Yes.

2    Q.  And that conversation took place, when was that; do you

3    recall?

4    A.  This is May I believe of 2013.

5    Q.  This was before gold sales to anyone in Iran to Iran or

6    anyone in Iran were obligated to cease; am I correct, by

7    July 1st?

8    A.  Yes.

9    Q.  In this conversation, where you indicate that you had a

10   telephone conversation, is that Halk?

11   A.  Yes.

12   Q.  And your notes indicate, these are contemporaneous notes,

13   that the conversation was with Mr. Aslan; is that correct?

14   A.  Yes.

15   Q.  And your testimony here today is that your conversation was

16   not with Mr. Aslan, it was with Mr. Atilla, and that was an

17   error?

18   A.  Correct.

19   Q.  You distinctly recall that that conversation was with

20   Mr. Atilla and not with Mr. Aslan; am I correct?

21   A.  Yes.

22   Q.  When did you first realize that, Mr. Szubin, realize that

23   error?  Was it when you were preparing for your testimony here

24   today with prosecutors?

25   A.  Yes.  That's when I would have looked back at my

1    handwritten notes.

2    Q.  This was in the past couple of months that you met with the

3    prosecutors and you recall that a conversation that you had

4    back in 2013 was not with Mr. Aslan, but was with Mr. Atilla?

5    A.  Correct.

6    Q.  You recall that these notes are incorrect; am I correct?

7    A.  Yes.

8    Q.  Is it fair to say that in your dealings with Halkbank over

9    the years, that Halkbank was responsive to inquiries that were

10   made of it by OFAC?

11   A.  Yes.

12   Q.  And that is inquiries that were made to Mr. Atilla or to

13   members of -- other members of management at Halkbank; am I

14   correct?

15   A.  Mr. Atilla was responsive.  Mr. Aslan was responsive.  I

16   can't comment on other levels.

17   Q.  In the course of your dealings, again, these are more

18   general questions, did you ever or to your knowledge did anyone

19   from Treasury ever ask Halkbank or Mr. Atilla to stop mediating

20   gold trade?  Just stop it?

21   A.  We did point out to Mr. Atilla that to continue to

22   facilitate gold sales to any Iranian person, after the new

23   sanctions went into effect, so that's June of 2013, or July 1st

24   of 2013, could expose Halkbank to sanctions.  And we had

25   pointed out previously that selling gold, facilitating the

1    sales of gold to the Iranian government as of June, July 2012,

2    could expose Halkbank to sanctions.

3    Q.  You knew that Halkbank was dealing with Reza Zarrab,

4    correct, at some point starting as early as 2012 or 2013.  You

5    knew that Halkbank was dealing with Reza Zarrab; am I correct?

6    A.  I had testified earlier that I can't recall when I learned

7    about Zarrab and his dealings with Halkbank.

8              MR. ROCCO:  I have four questions, Judge.  I'm

9    wrapping it up.

10   Q.  But at some point you learned that Halkbank was dealing

11   with Mr. Zarrab?

12             THE COURT:  That's been established now three or four

13   times.

14             MR. ROCCO:  It is a basis for a question, Judge.

15             THE COURT:  Three or four times this has already been

16   answered.

17   Q.  Did you ever tell Halkbank to stop selling --

18             THE COURT:  That's the question you've asked probably

19   four times.

20             MR. ROCCO:  I won't ask it again, your Honor.

21   Q.  Did you tell -- did you discuss with Halkbank the food

22   trade?

23   A.  Yes.

24   Q.  With Iran?

25   A.  Yes.

HCC3ATI3                          Szubin - Redirect

1    Q.  And humanitarian exceptions.  Did you have suspicions in

2    the course of your dealing with Halkbank that Halkbank was not

3    properly following the humanitarian exception in its trade

4    facilitating or intermediating trade with Iran?

5               MR. DENTON:  Objection to form, your Honor.

6               THE COURT:  If you understand that.

7               THE WITNESS:  Were we suspicious -- the question is

8    were we suspicious of Halkbank and whether it was appropriately

9    ascertaining that humanitarian trade was indeed legitimate?

10              THE COURT:  That was the question.

11              THE WITNESS:  Yes.  We were suspicious.

12   Q.  Did you discuss it with Mr. Atilla, or anyone else at

13   Halkbank?

14   A.  Yes.

15   Q.  Did you tell them to stop dealing in humanitarian -- trade

16   of humanitarian goods with Iran?

17   A.  No, we told them they needed to be extremely careful.  And

18   that if they weren't careful, they could face various

19   consequences.

20              MR. ROCCO:  One moment.  No further questions.

21              THE COURT:  Any redirect?

22              MR. DENTON:  Very briefly, your Honor.

23   REDIRECT EXAMINATION

24   BY MR. DENTON:

25   Q.  Mr. Szubin, Mr. Rocco asked you some questions about your

1   one-on-one pull aside meeting with Mr. Atilla.  Do you remember

2   that?

3   A.  Yes.

4   Q.  There was something more you wanted to explain that he

5   wouldn't let you in order to be accurate.

6            MR. ROCCO:  Objection.

7            THE COURT:  Well, yes.

8   Q.  Why don't you give us the explanation you wanted to give,

9   Mr. Szubin.

10  A.  I'm sorry.  At this point I'm not remembering.

11           THE COURT:  You can be forgiven.

12  Q.  Mr. Szubin, do you have any doubt in your mind as you sit

13  here that that pull aside in fact occurred?

14  A.  I have no doubt.  I would request a pull aside extremely

15  rarely.  So, while it is difficult for me sitting here today,

16  as you can see, to remember the contents of different meetings

17  on different dates, this might have been one of two times in my

18  13 years at Treasury that I asked to see somebody one-on-one

19  after a larger meeting.

20  Q.  Just to be clear, that pull aside meeting was with

21  Mr. Atilla; is that right?

22  A.  Correct.

23           MR. DENTON:  Mr. Chang-Frieden, if we could very

24  briefly put up Government Exhibit 7020.  If we can just go the

25  to second page.

1   Q.  Mr. Szubin, do you remember Mr. Rocco asked you some

2   questions about whether Mr. Atilla's name appeared in this

3   document?

4   A.  Yes.

5   Q.  I don't want to go through every instance where it appears,

6   but where this document reflects representations made by

7   Halkbank in this meeting, who is the person at Halkbank who

8   made those representations?

9   A.  Mr. Atilla.

10  Q.  Then finally, do you remember Mr. Rocco asked you some

11  questions about actions taken by the Treasury Department in

12  2014 after the arrest of Reza Zarrab and Suleyman Aslan?

13  A.  Yes.

14  Q.  I want to direct your attention to October 10, 2014.  Do

15  you know if David Cohen had a meeting with Mr. Atilla on that

16  day?

17  A.  I don't know the date, but I know that he had meetings

18  around that period.

19          MR. DENTON:  Just a moment, your Honor.  Nothing

20  further, your Honor.

21          THE COURT:  Okay.  We are going to excuse the witness.

22  Thank you.

23          (Witness excused)

24          THE COURT:  And we're going to -- I think I can't

25  decide if we're having lunch or we're going to go to the bar.

HCC3ATI3                          Szubin – Redirect

1    But it's 12:55.  If you can be back at 2 o'clock.  We'll break

2    for lunch.

3                (Recess)

4                (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HCCPATI4

```
 1                A F T E R N O O N   S E S S I O N

 2                          2:00 P.M.

 3          (In open court; jury not present)

 4          THE COURT:  She went to see if the jury is all here

 5  yet.  Yes?  Okay.  So we'll bring in the jury, and the witness,

 6  I take it, is --

 7          MR. DENTON:  Outside.

 8          THE COURT:  Okay, great.

 9          (Jury present)

10          THE COURT:  Please be seated, everybody.  Let's call

11  the next government witness.

12          MR. DENTON:  Thank you, your Honor.  The United States

13  calls Douglas Sloan.

14          THE DEPUTY CLERK:  Sir, you can step up here by the

15  witness stand.  Remain standing for a moment, and then raise

16  your right hand, please.

17          THE COURT:  Come on around.

18          THE DEPUTY CLERK:  If you could raise your right hand,

19  please.  Do you solemnly swear or affirm that the testimony you

20  shall give this Court and jury in this issue now on trial shall

21  be the truth, the whole truth and nothing but the truth.

22          THE WITNESS:  Yes, I do.

23          THE DEPUTY CLERK:  Thank you, sir.  Could you please

24  state your full name for the record.

25          THE WITNESS:  My full name is Douglas Andrew Sloan.
```

1          THE DEPUTY CLERK:  Could you spell your last name,

2     please.

3          THE WITNESS:  S-l-o-a-n.

4          THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

5          THE WITNESS:  Thank you.

6          THE DEPUTY CLERK:  Feel free to move up your chair and

7     adjust the microphone.

8          THE WITNESS:  Thank you.

9          MR. DENTON:  May I proceed, your Honor?

10          THE COURT:  Yes.

11     DOUGLAS SLOAN,

12          called as a witness by the Government,

13          having been duly sworn, testified as follows:

14     DIRECT EXAMINATION

15     BY MR. DENTON:

16     Q.  Good afternoon, Mr. Sloan.

17     A.  Good afternoon.

18     Q.  Where do you work?

19     A.  I work for Deutsche Bank Trust Company Americas here in New

20     York City.

21     Q.  How long have you worked at Deutsche Bank?

22     A.  I've worked for Deutsche Bank for a little over eleven

23     years.

24     Q.  What is your current position at Deutsche Bank?

25     A.  Currently, I serve as the director and global coordinator

1    of the anti-financial crimes special investigations unit.

2    Q.  How long have you had that position?

3    A.  I was only recently assigned to globally coordinate.

4    Before that, I had -- since April of 2014, I was responsible

5    for special investigations in the Americas.

6    Q.  And did you work at Deutsche Bank prior to that, as well?

7    A.  Yes, sir, I did.

8    Q.  Generally speaking, in what field did you work at Deutsche

9    Bank?

10   A.  I spent my entire career at Deutsche Bank within the

11   anti-financial crime or anti-money laundering department.

12   primarily responsible for covering the anti-money laundering in

13   OFAC or sanctions risks attributable to the customers and

14   activities facilitated by Deutsche Bank in the United States

15   for our global transaction banking business.  That would cover

16   correspondent banking, commercial corporate activity, trust and

17   securities services and trade finance.

18   Q.  So you mentioned correspondent banking, Mr. Sloan.  What is

19   correspondent banking?

20   A.  Correspondent banking is the process by which dollar

21   payments or payments denominated in any currency are

22   facilitated and moved from one corner of the world to another

23   corner of the world.

24           In the banking industry, everything, of course, works

25   on contracts and agreements, documented agreements, to move the

1     value of banks' customers.

2              So if you would imagine, perhaps a customer in France

3     with a bank in France, and they need to purchase goods from,

4     let's say, China, the bank in France has no direct relationship

5     with the bank in China, and so in order to move the dollars to

6     buy the goods from, let's say, Paris to Beijing, you would need

7     to have contractual relationships amongst the banks.

8              So that the payment literally travels bank to bank to

9     bank until it reaches its final destination in China to pay the

10    manufacturer for the goods that the Frenchman purchased.

11    Q.  So what role does Deutsche Bank play in correspondent

12    banking?

13    A.  Deutsche Bank is one of the, what they term, money center

14    banks, the large financial institutions that are often banks to

15    other banks throughout the world.  Because of their size and

16    sophistication and, therefore, the size of their correspondent

17    banking business, they are a financial institution that other

18    banks will often go to to facilitate the global payments that

19    move throughout the world.  Other well-known names, in addition

20    to Deutsche Bank, would be JP Morgan, Citibank, Bank of

21    America, and the like.

22    Q.  Now, in the example you just gave, you referred to a dollar

23    transaction.  What role does the currency of a particular

24    transaction play in the correspondent banking relationships

25    you've described?

1    A.  Well, the currency is largely dependent upon the needs of

2    the customer.  Right?  Here we are in the United States.  We

3    probably don't have a large demand or need for Russian ruples

4    or Swiss francs.

5              However, if we have counterparties, maybe family or

6    business interests, that were located in one of those foreign

7    countries, we might well have a need for that denomination.

8    Well, in order to -- well, we would need two things.  One, we

9    would need a special bank account that's denominated in Swiss

10   francs, which would be maybe different -- which would be

11   different from my U.S. dollar account, and then I would need a

12   means of being able to send my Swiss francs to my relative or

13   business interests in Switzerland, or anywhere else in the

14   world that utilizes those currencies, and then also receive

15   them.

16   Q.  And does the currency that a particular transaction is in

17   determine which banks are involved in the correspondent banking

18   chain that you've described?

19   A.  Yes, very often because some banks will specialize in,

20   let's say, U.S. dollar correspondent banking services.  Others

21   may specialize in Euro correspondent banking services or Swiss

22   franc or a pound sterling.

23             Many of the big money center banks will offer a

24   variety of these, what they call the base currencies, that is

25   those currencies in the world that are most important, in

1   particular, United States dollar and the Euro.

2   Q.  Is the Turkish Lira an important currency for correspondent

3   banking transactions?

4   A.  It would not be an important currency for international

5   payment information or used in banking.  Although, it would be

6   important for people in Turkey and their business interests.

7   Q.  What about a Iranian rials?

8   A.  Again, it is not a currency widely utilized in the world,

9   particularly because of sanctions.  Although, it is important

10  for the people and the business interests within Iran.

11  Q.  So can you tell us a little more about how Deutsche Bank

12  would process a U.S. dollar transaction that it receives as

13  part of one of these correspondent banking chains?

14  A.  Certainly.  So in correspondent banking, right, if Deutsche

15  Bank is a correspondent banking provider, our customers are not

16  the average Tom, Dick or Harry.  They're not the General

17  Electrics or the mom and pop store around the corner.

18          In correspondent banking, our customers are other

19  banks, and it is their customers, the Toms, the Dicks, the

20  Harrys and the stores and the commercial enterprises, that are

21  customers of our customer.  So we're often talking about our

22  customers' customer.  In some instances, you can have a

23  customers' customers' customer.

24          So to facilitate the global trade in the global

25  economy, these people and enterprises need to move, let's say,

 1  dollars or Euros, and Deutsche Banks, as in other providers,

 2  will sell or offer dollar-correspondent accounts for these

 3  different banks in the world.  We would also offer

 4  Euro-correspondent accounts for these banks throughout the

 5  world.  Right?

 6          These banks that are our customers will then turn

 7  around to their customers and offer dollar services.  So let's

 8  say maybe somebody in the courtroom has a relative that's

 9  serving in the U.S. Armed Forces overseas, and that person

10  wants to send money home.  That person could send money home by

11  going to a local money service business.  That local money

12  service business is taking the dollars from the service person,

13  right, and because it's dollars, right, they would have to have

14  a dollar account with their local bank, which turns around and

15  has a dollar-correspondent relationship, let's say, with

16  Deutsche Bank in New York.

17          So that Deutsche Bank can receive those dollars, give

18  it to maybe a local retail bank here in the United States for

19  credit to the service person's family.

20  Q.  You mentioned Deutsche Bank in New York.  Where does

21  Deutsche Bank process U.S. dollar-denominated correspondent

22  bank transactions?

23  A.  We process our U.S. dollar-correspondent payments here in

24  New York.

25  Q.  And where specifically?

1    A.  We are physically located at 60 Wall Street.

2    Q.  Does Deutsche Bank keep records of those correspondent

3    banking transactions?

4    A.  Yes, sir, we do.

5    Q.  What sort of system are those maintained in?

6    A.  The system, we have an automated payment system, our own

7    proprietary payment platform, that receives all payment orders

8    and, of course, processes them and sends them out.  Those

9    payments are also then stored in an archive system.

10   Q.  And does that process happen automatically?

11   A.  The archiving or the processing?

12   Q.  Both, I guess.

13   A.  Yes.  It's an automated processes.  In fact, there's an

14   industry term called STP, straight through processing.  As the

15   payments are received, most payments -- and I gave a couple of

16   examples in a very basic flow.  When we look at the global

17   payment system, we're talking about millions of payments that

18   are processed every day, and any of the major money center

19   banks are processing millions of their own, which are

20   facilitated in microseconds.  Okay?

21        So these payments, a vast majority of them, the

22   computer systems process them automatically.  There are

23   triggers built into the system that will stop a payment if

24   there's something wrong with the payment or any tags that they

25   might place on a payment for watch.

1           MR. DENTON:  Mr. Chang-Frieden, could we show

2     Mr. Sloan a portion of Government Exhibit 8101-4, with

3     Centrica.

4     Q.  Mr. Sloan, do you recognize what this is?

5     A.  Yes, sir.

6     Q.  What is it?

7     A.  This is an Excel spreadsheet that is a reflection of the

8     results generated from Deutsche Bank's anti-money laundering

9     software.  We utilize our anti-money laundering software to

10    capture payment data that we processed from our payment system.

11    Right?

12          So I described how we have our payment platform that

13    processes these payments, and these are archived.  Well, if we

14    were to search our records, let's say, for John Doe in a given

15    date range, January 1, 2010, to the present, right?  Well, our

16    payment system platform is not technically developed to conduct

17    that search.  What we do is we use our AML monitoring software

18    that is capable of that, which then reaches into our archives

19    to pick out those payments involving John Doe for that period

20    of time.

21          Those are then -- on this spreadsheet, you see four

22    different tabs.  The query details tab, just to the left of the

23    formatted, those will indicate what our analyst inputted as the

24    parameters of what we want to look at.  The results, right, are

25    what did we find out?  We put in our text and here come the

1    results back, but very often it's messy computer jargon.  It's

2    not so kind to the eyes to look at.

3           What we do then is format it, clean up those matches.

4    We take those false positives out.  Right?  Let's say it's John

5    Doe, and it's Doe is spelled D-o-u-g-h and I'm interested in

6    D-o-e.  Well, John Dough, D-o-u-g-h, is improper, and we can

7    cull that out.  Those might be our matches, and then we clean

8    it up a little bit further to format it, to allow it to analyze

9    the database better.

10          Each row on this Excel spreadsheet represents a

11   separate payment.  So in this particular spreadsheet, we're

12   looking at two payments, one initiated on January 9th, 2015,

13   and one initiated on November 21st, 2014.

14   Q.  And did Deutsche Bank produce records like this spreadsheet

15   to the U.S. government in connection with this case?

16   A.  Yes, sir, we did.

17   Q.  And is it fair to say that there was a large volume of

18   those records?

19   A.  Yes, sir, there was.

20   Q.  Are those records that are provided to the U.S. government,

21   are they copies of records that Deutsche Bank maintains in the

22   regular course of its business?

23   A.  Yes, sir, they are.

24   Q.  And are they records that are created as a result of an

25   automated process?

1   A.  Yes, sir, they are.

2              MR. DENTON:  Your Honor, the government offers

3   Government Exhibit 8101-4.

4              MS. FLEMING:  Judge, we object on relevance grounds

5   and subject to connection, but otherwise, we acknowledge the

6   business record.

7              THE COURT:  Okay.  So I will allow it.

8              (Government's Exhibit 8101-4 received in evidence)

9              MR. DENTON:  If we could publish that,

10  Mr. Chang-Frieden.

11             THE COURT:  So, counsel, I think it would be easier

12  for the translators if both you and the witness spoke slower.

13             MR. DENTON:  I'm sorry, your Honor.  I'll try to

14  remember this time.

15  BY MR. DENTON:

16  Q.  So, Mr. Sloan, I think the easiest thing would be for you

17  to essentially tell us the story of the first transaction

18  reflected here in row 3, dated January 9th, 2015, and if you

19  could explain as you go what's reflected in the various

20  columns?

21  A.  Yes.  So essentially, this payment is telling us that on

22  the 9th of January, 2015, and you look over this cinq ID is

23  basically an internal Deutsche Bank identifier of the payment.

24             When you scroll across from left to right, on

25  January 9, 2015, the originator who initiated this payment, the

company Centrica General Trading, instructed its bank to pay

$1.3 million.  You need to scroll across.  Originator account

is typically the bank account ID or a bank account number at

the customer's originating bank.

          So as we scroll across, we see the address of Centrica

General Trading.  Please scroll to the right.  Please scroll to

the right a bit more.  Okay, Dubai.  Please go to the original

bank field.  Stop, please.  So Centrica General Trading

initiated this $1.3 million payment from its originator bank,

from its bank, TV Ziraat Bankasi located in Turkey.  You see

the address there.

          Scroll to the right.  The payment traveled

ultimately -- please keep on to W; stop, please.  The payment

ultimately was for the benefit of, the beneficiary, of Centrica

General Trading.  And in this case -- we'll scroll to the right

a bit more -- we realize that Centrica General Trading as

beneficiary received it -- stop, please -- at the Bank of

Baroda, a specific business location in the United Arab

Emirates.

          So essentially, as I described before, a correspondent

payment is almost like an electrical circuit turning on a

light, and you've got contractual relationships from bank, to

bank, to bank to make it work.  If you don't have the

contractual relationship, the payment can't travel.  It must

find another bank in order to complete the circuit.  I don't

1    know if when you were a kid and you played hot potato, you had

2    to move it from person, to person, to person.  The payment

3    method is no different.

4           In this example, the originator, Centrica, started its

5    payment at Ziraat Bank in Turkey.  It then traveled to Deutsche

6    Bank.  We then -- Why?  We have a contractual relationship with

7    Ziraat Bank.  We then pass it on to the Bank of Baroda in

8    Dubai.  Why?  We have a contractual relationship.  So that they

9    could credit the account of Centrica in Dubai, and then

10   essentially one company moving money from its bank account in

11   Turkey to its bank account in the UAE.

12   Q.  And where did that money pass through Deutsche Bank?

13   A.  It passed -- it's a U.S. dollar payment that passed through

14   Deutsche Bank Trust Company Americas here in New York.

15   Q.  And is that a entity that is insured by the Federal Deposit

16   Insurance Corporation?

17   A.  Yes, it is.

18   Q.  If we could scroll back to the start.

19          How can you tell that this transaction was denominated

20   in dollars?

21   A.  Column D, base amount includes the base amount plus the

22   currency.  Right?  If -- and one could also go to the SWIFT

23   payment message and identify it as a U.S. dollar payment.  But

24   as this is a reflection of the payment message, one, I know

25   that it's dollar, U.S. dollar; and two, Deutsche Bank Trust

1    Company Americas only offers correspondent services denominated

2    in U.S. dollars, no other currency.

3    Q.  So was any other currency involved in this transaction?

4    A.  Not in this particular payment to the extent that DBTCA,

5    Deutsche Bank Trust Company Americas, is involved.  We often

6    just call it DBTCA, or sometimes we just refer to ourselves as

7    Deutsche Bank.

8           MR. DENTON:  Mr. Chang-Frieden, if we could take

9    another example.  Could you go to the portion of Government

10   Exhibit 8101-4 dealing with Atlantis Capital General Trading.

11   Q.  And so again, Mr. Sloan, if you could just take one example

12   here from row 3 and walk us through this transaction and help

13   us understand how this transaction was processed?

14   A.  Right.  This is a little bit more complicated from the

15   first example in that we have another bank involved.  Again,

16   kind of like the hot potato, where you can only pass the hot

17   potato where there's a contractual relationship bank to bank.

18          So in this row 3, on the 12th of April, 2013, there

19   was, column D, a payment in the amount of $228,180 initiated

20   by -- the next column -- Mofabos.  We scroll across, we have

21   its address in Cyprus.  We continue to scroll across and stop.

22   And we see in column N that Mofabos maintains its U.S. dollar

23   account at PPF Banka, located in the Czech Republic.

24          And so they instructed PPF Banka to send this money --

25   please scroll to the right to column W, stop, please -- to a

1    company named Atlantis Capital General Trading Company as the

2    beneficiary.  And Atlantis Capital General Trading -- oh, so

3    interesting.  PPF Banka maintains a correspondent relationship

4    with Deutsche Bank Trust Company, DBTCA, in New York.  So they

5    hand -- PPF Banka hands the payment to Deutsche Bank.

6         In this particular transaction -- and please scroll

7    well over to the right; keep going, please; stop.  In this

8    particular payment, we handed the $228,000 to JP Morgan Chase

9    here in New York.  We did this through the New York

10   Clearinghouse.

11        So what do we have?  From PPF to Deutsche, from

12   Deutsche to JP Morgan.  Please scroll back to the left, to

13   column AF, please.  JP Morgan then credited the amount to Bank

14   of Baroda, located in Dubai, United Arab Emirates.  And then

15   scroll to the left again, please.  Stop.  And provided the

16   money to their customer, Atlantis Capital General Trading.

17   Q.  And so in that instance, is it fair to say there are two

18   correspondent banks involved?

19   A.  That's correct, Deutsche Bank and JP Morgan Chase.

20   Q.  You mentioned the New York Clearinghouse, what is that?

21   A.  The New York Clearinghouse is essentially a consortium, a

22   club of the big money center banks that offer U.S. dollar

23   clearing services, physically located here in the United

24   States.  They've been around -- I don't have the exact year --

25   maybe 200 years, or a very long period of time, where the big

1    banks of New York and the big banks of America would hand over

2    and receive monies for their business interests, and the

3    business interests of their customers.

4            It was the way, back in the old days, how they, you

5    know, ensured that the books were properly reconciled and that

6    people were getting paid.  It still exists today, in its

7    technological form, facilitating payments amongst the big banks

8    that are physically located here in the United States, right,

9    that are members of the clearinghouse.

10           So as members, it's cheaper for Deutsche to pass it to

11   another member of this organization, or for Citibank to pass it

12   to Bank of America, than it would be to use, let's say, fed

13   funds.  Federal Reserve system also has a domestic wire trading

14   platform.  Right?  So in the United States, if you have a U.S.

15   money center bank, we receive the money, let's say from PPF

16   Banka, but we don't have the relationship with the beneficiary

17   bank in the other part of the world.  We have to find another

18   bank in the United States who does.

19           We could search either the fed wire system, or we

20   could go to the clearinghouse.  Right?  And our friends at the

21   clearinghouse find out that JP Morgan has a relationship; so we

22   give it to JP Morgan and say, JP, please hand this over to your

23   customer, Bank of Baroda, so they can credit the beneficiary,

24   Atlantis Capital.

25   Q.  Again, where is the clearinghouse located?

1  A.  They are located in midtown Manhattan.

2  Q.  I just want to go back to Deutsche Bank for a moment.  You

3  mentioned working on OFAC and sanctions issues --

4  A.  Yes.

5  Q.  -- at Deutsche Bank.  Generally speaking, at a very high

6  level, can you describe for us how Deutsche Bank's sanctions

7  compliance program works?

8  A.  Sure.  Deutsche, not unlike many institutions here in the

9  United States, has a multipronged sanctions compliance program.

10  Certainly we -- when we collect information about a customer to

11  open up a bank account, we look at the name of the customer.

12  We look at the names of its owners.

13       We look at the name of its primary owners.  In other

14  words, if it's a low- or medium-risk client, 25 percent, or if

15  it's a high-risk, ten percent or more owner.  We look at the

16  members of the board of directors and control persons in the

17  company, and we check those names against the names that have

18  been put forward by the Office of Foreign Asset Control, or the

19  U.S. Treasury Department.  Right?

20       Those entities are persons with whom one should not,

21  directly or indirectly, conduct any business with or facilitate

22  any transactions.  We will also check that against the lists

23  provided by the European Union, as well as the United Nations,

24  as well as the government of the United Kingdom.

25  Q.  You mentioned --

1    A.  No, excuse me.  So that was for the adoption of a customer.

2    Q.  Excuse me.

3    A.  On a periodic basis, depending on the risk of the customer,

4    we're going to go back and check the customer to make sure that

5    the customer and its owners and directors have not since been

6    added to the list.

7         And then, of course, any updates to those lists,

8    right, of names, if OFAC added names to those lists, we would

9    immediately take those names and check it against our customer

10   databases.

11        And then the last point that we would use in our

12   processes is we add those names to our payment filters.  So we

13   talked about the processing of U.S. dollars here in the United

14   States.  We take those names, and they could, by the way, also

15   be names of the countries under the sanctions programs of the

16   countries, add them to our filters.  I mentioned tags and

17   straight-through processing, right?  The computer systems

18   process most of the payments for us.  Well, these are some of

19   the tags that would cause a payment to stop.  Right?

20        That payment would stop and it must be reviewed.  We

21   have a complicated control structure of different levels of

22   individuals who would stop, review the payment and make a

23   determination is this permissible under OFAC, assuming that

24   it's a political sanctions program.  First, why it did it stop.

25   If we assume it was OFAC, second, is this permissible under

HCCPATI4                        Sloan - Direct

1   OFAC sanctions or not permissible?  If it is not permissible,

2   which sanctions program?  And why is it important to know that?

3   Well, it would --

4            THE COURT:  Excuse me one second.  Could I just see

5   you for a second at the side.  Mr. Rocco, you're welcome to

6   join us.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          THE COURT:  Could you give me a sense of where this

3  guy is going, what point you want him to make?  Because he

4  speaks very fast, and I don't think anybody is understanding a

5  word he's saying.

6          MR. DENTON:  So I think we just need to establish for

7  purposes of the bank fraud count the significance of sanctions

8  violations to the U.S. insured banks.  He's, obviously, giving

9  a little more detail than I intended him to; so I'm going to

10  redirect him.

11          THE COURT:  That's not something that can be

12  stipulated?  Not to put you --

13          MS. FLEMING:  What we wanted to do was put a couple of

14  custodians, get some questions out, as well, and then we're

15  going to stipulate to a bunch of the custodians.  But we think

16  it's useful to have some of them.

17          THE COURT:  You think this is useful?

18          MR. ROCCO:  We didn't know there would be this level

19  of detail.

20          MR. DENTON:  I didn't either.

21          MS. FLEMING:  I think it's very useful.  I have the

22  bank witnesses, your Honor, because of the Curcio issue.

23          THE COURT:  No, but I mean this guy --

24          MS. FLEMING:  Yes.

25          THE COURT:  Are you going to cross him?

HCCPATI4                       Sloan - Direct

1              MS. FLEMING:  Yes, but it won't be long, but it's --

2              THE COURT:  Okay.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2     BY MR. DENTON:

3     Q.  Again, Mr. Sloan, just at a very high level, you talked

4     about entities that are listed.  Are there sanctions compliance

5     concerns, other than just not dealing with listed entities?

6     A.  Sanctions compliance concerns other than not dealing with

7     sanctions entities?

8     Q.  That was a bad question.  Are you familiar with sanctions

9     that prohibit dealing with people acting on behalf of

10    designated entities?

11    A.  Yes.  You've got sanctions programs that forbid the direct

12    or indirect facilitation of any prohibited party under the

13    sanctions regulations.  So what's interesting, I suppose in my

14    profession, is the moment that those matters include both

15    sanctions issues but also anti-money laundering or money

16    laundering issues.

17         To the extent that you have a company, a front company

18    perhaps or a third company, that is actually conducting

19    business on behalf of a sanctioned party, with the intent to

20    disguise or conceal or otherwise help make sure that the dollar

21    flows and, in our case, in Deutsche New York's case, are

22    facilitated.

23    Q.  And, again, without getting into the nuts and bolts, does

24    Deutsche Bank take steps in order to avoid that kind of

25    sanctions evasion?

1    A.  Yes, we do.

2    Q.  Focusing on a particular sanctions program, specifically

3    the sanctions with respect to Iran, are there particular

4    concerns for Deutsche Bank that that sanctions program

5    implicates?

6    A.  Absolutely.  We are forbidden to directly or indirectly

7    facilitate any transaction involving Iran, the government of

8    Iran, the persons and entities of Iran, to the extent that they

9    are in accordance with the Iranian transaction regulations and

10   other related political sanctions.

11   Q.  And do transactions involving, or potentially involving,

12   Iran implicate any particular concerns for detecting sanctions

13   evasion?

14   A.  Could you repeat the question, sir?

15   Q.  Are there particular difficulties in detecting sanctions

16   evasion, as focused on Iran specifically?

17   A.  Absolutely.  Look, the Iranian economy is predominantly

18   petroleum based.  The petroleum industry is predominantly U.S.

19   dollar based.  In order for the Iranian economy to function,

20   it, therefore, must conduct a lot of its business in U.S.

21   dollars.

22           Because of the prohibitions involving trading

23   transaction facilitating on behalf of Iranians and Iranian

24   persons, and because their economy is dependent on U.S.

25   dollar-denominated transactions because of the oil, third

1    parties are often utilized to disguise the transactions.

2              Deutsche Bank is a correspondent banking provider.

3    We're not talking about our customers.  We're talking about our

4    customers' customers.  Right?  We don't know our customers'

5    customer on the other side of the planet.  We have to -- and,

6    therefore, it becomes extremely difficult for us, in our

7    capacity, to make a determination, is this customer on the

8    other side of the world truly engaging in business for its own

9    behalf, or is it also engaging in business that, were we to

10   know, we would be prohibited under U.S. law from facilitating

11   it.

12   Q.  Is it fair to say that you depend on your customer banks to

13   provide you with information about that?

14   A.  It is absolutely critical.

15              MR. DENTON:  No further questions, your Honor.

16              MS. FLEMING:  Briefly, your Honor.

17   May I proceed?

18              THE COURT:  Sure.

19   CROSS-EXAMINATION

20   BY MS. FLEMING:

21   Q.  Good afternoon, Mr. Sloan.

22   A.  Good afternoon.

23   Q.  My name is Cathy Fleming, and we met very briefly over the

24   lunch break, correct?

25   A.  Yes, ma'am.

1    Q.   Now, you've told us your background at Deutsche Bank.  You

2    worked there for a number of years, correct?

3    A.   Yes, ma'am.

4    Q.   Deutsche Bank is a very large bank, correct?

5    A.   Yes, ma'am.

6    Q.   Has lots and lots of employees, correct?

7    A.   Yes, ma'am.

8    Q.   And there are many departments within Deutsche Bank?

9    A.   Yes.

10   Q.   Isn't that also true?

11   A.   Yes, ma'am.

12   Q.   So Deutsche Bank has not only an employment department, it

13   has a compliance department, correct?

14   A.   Yes, ma'am.

15   Q.   And it has a sanctions group, doesn't it, sir?

16   A.   Yes.

17   Q.   And it has a Treasury Department that also deals with some

18   of the operations you've described; isn't that true?

19   A.   Yes, ma'am.

20   Q.   And does Deutsche Bank have a SWIFT room that takes these

21   SWIFT memos that come in to Deutsche Bank with instructions on

22   SWIFT memoranda?

23   A.   Yes.

24   Q.   And you told us earlier that there are millions of

25   transactions that come in, did you say, on a daily basis to

1    Deutsche Bank?

2    A.   Globally, there are millions of payments that are

3    facilitated throughout the world.  I don't have the exact

4    figure or the average running rate for Deutsche Bank here in

5    New York.

6    Q.   Do you happen to know how many people, for example, work in

7    the New York headquarters SWIFT room, just getting these SWIFT

8    messages at Deutsche Bank every day?

9    A.   I do not know the exact number.  It would certainly be

10   dozens, at least.

11   Q.   And you talked about some of the anti-money laundering

12   programs that Deutsche Bank employs to help it in making sure

13   that it is complying with numerous sanction programs, correct?

14   A.   Yes.

15   Q.   And to be clear, it's not only United States' sanctions

16   programs; there are other sanctions programs globally, correct?

17   A.   Yes.

18   Q.   So the UN has sanctions programs, correct?

19   A.   Yes.

20   Q.   And the United Kingdom has sanctions programs, correct?

21   A.   Yes.

22   Q.   And I think Canada has sanctions programs, correct?

23   A.   I believe so.

24   Q.   And fair to say the United States is far more complex than

25   any of the rest of them?

1           THE COURT:  I don't get the question.

2           MS. FLEMING:  All right.  I'll withdraw.

3    Q.  More difficult to read and understand than the rest of

4    them?

5           THE COURT:  What, the United States?

6           MS. FLEMING:  Withdrawn.  Bad question, your Honor.

7    I'll move on.

8           THE COURT:  I mean, I'd love to help you.  I just

9    didn't understand.

10          MS. FLEMING:  Judge, I'll take all the help I can get.

11   BY MS. FLEMING:

12   Q.  Is it fair to say that the United States' sanctions regime

13   is more complex in terms of its instructions than, for example,

14   the UK sanctions regime?

15          THE COURT:  If you know.

16   A.  Thank you.  To the extent that I have been engaged in the

17   various sanctions requirements that have come across -- that

18   have come to my attention, I would tend to agree that the U.S.

19   sanctions regime tends to have a lot of technical elements to

20   it that increase its complexity relative to those that I have

21   seen in the European union, the United Kingdom, the United

22   Nations.

23   Q.  And when you talked about the various procedures and tools

24   that are used by Deutsche Bank to help it prevent being in

25   violation of these various sanctions, you used the term that

1    there are some blocked transactions, correct?

2    A.  If I said blocked, that is a term.  We would have to define

3    it.

4    Q.  A blocked transaction is when a transaction comes in that

5    one of the tools, one of the systems in place picks up that's a

6    prohibited transaction?  That's at least one kind of a blocked

7    transaction, correct?

8    A.  I think I used the word stopped or tagged.  Okay?

9    Transaction, we have various names and variations of the names

10   on our systems.  When a payment comes in, if there's any

11   similarity to a name or a series of characters on the payment

12   message, right, the SWIFT message, that comes close to -- what

13   do I mean by that?  I mean there is an algorithm.  There are

14   different algorithms in the computer system that determines

15   with what degree of probability a name in the payment message

16   matches up to a name on any of the sanctions list, that payment

17   will stopped.  The payment is essentially held in suspense,

18   right, until such time it's been reviewed by a series of

19   individuals, right, in different control functions, in the

20   payments department, the dedicated team, as well as the

21   sanctions compliance department, to the extent that there's any

22   escalation to it.  Right?

23          A block can mean just stop the payment and kick it

24   back.  In OFAC, specific OFAC technical jargon, it will mean

25   seize it, seize the funds.  Now, there are some sanctions

1    programs where you reject the payment, send it back.  Whereas,

2    there are other sanctions where you must seize the funds, i.e.

3    block.  So that's kind of why we have to --

4    Q.  And in none of the scenarios you just described does the

5    money that comes in and hits one of those tools go into the

6    customer's account, does it, sir?

7    A.  Could you repeat the question?

8    Q.  The money does not go into a customer's account when it is

9    blocked or stopped, does it, sir?

10   A.  The payment comes to Deutsche Bank and is filtered from our

11   sanctions filters.  Right?  If it violates a sanctions program,

12   then either it's rejected or kicked back, or it's frozen, which

13   means it's transferred to what we call a blocked account, a

14   frozen account.

15         If there is a situation where we're not sure, right,

16   the payment stays in suspense.  We hold it, and we send through

17   the SWIFT payment system what we call an inquiry, a field

18   inquiry, right, where we're seeking -- we might ask a few

19   questions, where we're seeking information.  The answers to

20   which would allow us to make a determination, sanctions issue

21   or no sanctions issue.

22   Q.  All right.

23   A.  Does the payment hit the account of our correspondent

24   provider?  I believe the answer to that is no.

25   Q.  Now, you talked about some of the tools.  What you've

1   described is that the Deutsche Bank uses software programs to

2   help it catch potential violations of the various programs,

3   correct?

4   A.  I'm sorry, repeat that question.  I was still thinking

5   about my answer to the last one.  I'm thinking --

6   Q.  Among the tools --

7   A.  Yes.

8   Q.  We're moving on.

9   A.  Yes.

10  Q.  Among the tools that the Deutsche Bank uses to prevent

11  having inappropriate transactions --

12  A.  Okay.

13  Q.  -- are software programs, correct?

14  A.  Yes.

15  Q.  And among the software programs are programs that will

16  actually have identified on them persons and entities that are

17  on OFAC's SDN list; isn't that correct?

18  A.  That is correct.

19          THE COURT:  One second.  So what you've been talking

20  about up until now, you've used the word "program" a lot.  You

21  mean computer software programs?

22          THE WITNESS:  No, sir.  A sanctions program is not a

23  computer program.  It's the set of requirements, right, sort of

24  the book of rules, the rule book, right, that OFAC writes and

25  gives to us to ensure that we are not facilitating payments

HCCPATI4                        Sloan - Cross

1   that we would otherwise not be allowed to touch.  Okay?  That

2   is a sanctions program.

3              THE COURT:  No, but you've been saying programs within

4   the bank, and I understood that those are computer programs

5   that you've been discussing, the techniques for determining

6   whether a payment is blocked or not blocked.  Those are all

7   computer programs you're talking about, right?

8              THE WITNESS:  In that context, yes.

9              THE COURT:  Well, is there any other context?

10             THE WITNESS:  There is the sanctions program, which is

11  the book of rules and regulations.  How we fulfill our

12  compliance with the sanctions program are computer programs.

13             THE COURT:  Right.

14             THE WITNESS:  Sorry about that.

15             THE COURT:  Exactly.

16             THE WITNESS:  Thanks for the clarification.

17             THE COURT:  Right.

18  BY MS. FLEMING:

19  Q.  Now, the transactions that we looked at at the government

20  exhibit that's in, that starts with the order that comes from

21  Centrica Bank, correct?

22  A.  I think it was a company.  I don't think Centrica was a

23  bank.

24  Q.  I'm sorry.  Centrica was a company.  That was the customer,

25  correct?

HCCPATI4                        Sloan - Cross

1    A.   That was an originator, yes.

2    Q.   And that was the first piece of whatever the transaction is

3    that Deutsche Bank sees, correct?

4    A.   Deutsche Bank received a payment order from its customer,

5    Ziraat Bank.

6    Q.   Okay.

7    A.   In other words, we received -- Ziraat Bank in Turkey sent

8    us payment instructions.  Think of it as a mailbox, or in the

9    old days, in fact, it's called a wire payment or a wire

10   transaction.  In fact, the word comes from the old days as a

11   telegraph, where you'd send a wire to somebody.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  And that is the first transaction that Deutsche Bank sees,

2  correct?

3  A.  The first --

4  Q.  That payment instruction?

5  A.  The payment instruction has the entire story.

6  Q.  Well, it has the story as to who is asking -- the Ziraat

7  Bank is asking you to pay its customer, correct?

8  A.  Ziraat Bank is giving us instructions from -- with all the

9  parties involved, from who it starts to and who it ends to and

10 the originating bank and the beni bank, and according to the

11 SWIFT rules of what is required to be -- there are rules that

12 SWIFT puts out as to what the minimum requirements in every

13 payment message would have to have.  If it fails a SWIFT

14 regulation, regardless of sanctions, regardless of money

15 laundering, that payment should not be processed.  It should be

16 stopped and corrected or rejected and returned, so it could be

17 corrected by the appropriate party.

18 Q.  By the way, SWIFT -- SWIFT messages are able to be viewed

19 by American regulatory authorities; isn't that correct?

20            MR. DENTON:  Objection, your Honor.

21            THE COURT:  If you know.

22            THE WITNESS:  Is the question if I know?

23            THE COURT:  If you know.  She's asking all SWIFT

24 messages, if I understand the question, can be viewed by

25 American authorities.

1    THE WITNESS:  I do not believe that's true, unless

2    they've been subpoenaed, SWIFT has been subpoenaed, and they've

3    complied with the subpoena.

4    Q.  If SWIFT is subpoenaed, SWIFT is in the United States,

5    correct?

6    A.  I believe they still have their offices on the Eastern

7    Seaboard, yes.

8    Q.  In the United States.  On the Eastern Seaboard?

9    A.  Yes, ma'am.  There was a debate after 9/11 whether they

10   would leave the United States.  Because of --

11   Q.  I'm sorry to direct you.  I'm trying to focus, all right?

12   A.  Okay.

13        THE COURT:  But where are you leading, is the

14   question.  You want to focus him.

15        MS. FLEMING:  Your Honor, my question was is they're

16   in the United States, correct.

17        THE WITNESS:  I believe they are.

18   Q.  Thank you.  Now, with the transaction that we saw before,

19   with the transaction that we saw -- could I impose on you to

20   bring up the exhibit again with Centrica.

21        This is Centrica General Trading.  I don't know the

22   exhibit number.  I'm sorry.  101-4.  This is the transaction

23   that you went through on direct examination.  Do you recall

24   that?

25   A.  Yes, ma'am.

1    Q.  This is a dollar transaction, correct?

2    A.  Yes, ma'am.

3    Q.  It started out in a dollar account, correct?

4    A.  It started as a dollar denominated account at the

5    originating bank according to this.

6    Q.  And the originating bank is?

7    A.  Ziraat Bank.  That would be further to the right column J,

8    perhaps.  I'm not exactly sure which column.  It is Ziraat

9    Bankasi.

10   Q.  Ziraat Bankasi in Turkey, correct?

11   A.  Yes.

12   Q.  Ziraat Bankasi had a dollar account, correct?

13   A.  They, they -- Ziraat Bankasi offered a dollar account,

14   dollar denominated account for Centrica General Trading, and

15   Ziraat Bankasi maintains a dollar denominated account at

16   Deutsche Bank Trust Company Americas, and possibly other U.S.

17   money center banks.

18   Q.  You talked about all of the procedures and tools that

19   Deutsche Bank uses to try to prevent any kind of violations of

20   sanctions and other rules, correct?

21   A.  Yes.

22   Q.  But even despite all of that, Deutsche Bank has had its

23   violations of sanctions and other rules, hasn't it?

24   A.  Yes it has.

25   Q.  In fact, Deutsche bank had a $7.2 billion settlement with

1   the Department of Justice within the last several years,

2   correct, for violations?

3   A.   Not for sanctions.

4   Q.   Didn't they have a $630 million sanctions settlement

5   related to Russian money laundering within the last two years?

6               MR. DENTON:  Objection.

7               THE COURT:  Sustained.

8               Relevance.  Foundation.

9               MS. FLEMING:  Subject to connection?  Opinion?

10              Nothing further, your Honor.  Thank you.

11              MR. DENTON:  Nothing further, your Honor.

12              THE COURT:  Thanks a lot, Mr. Sloan.

13              THE WITNESS:  Thank you, your Honor.

14              (Witness excused)

15              THE COURT:  Next witness would be who?

16              MR. LOCKARD:  We're going to resume with Mr. Korkmaz.

17              THE DEPUTY CLERK:  Sir, before we begin, I'd like to

18   remind you that you're still under oath.

19              THE WITNESS:  Yes.

20              THE DEPUTY CLERK:  Thank you.

21    HUSEYIN KORKMAZ,

22        called as a witness by the Government,

23        having been previously sworn, testified as follows:

24   DIRECT EXAMINATION (Continued)

25   BY MR. LOCKARD:

1    Q.  Good afternoon, Mr. Korkmaz.

2    A.  You too as well, sir.

3    Q.  So, yesterday you testified about your arrest in Turkey in

4    September of 2014.

5    A.  Yes.

6    Q.  Could you briefly describe the basis of that arrest in

7    September of 2014.

8    A.  Certainly.  Apparently there was another investigation that

9    is known by the public as the December 25 investigation.  That

10   was conducted by the Financial Crimes Unit also, but that was

11   not related to the investigation that I was conducting on

12   Mr. Reza Zarrab.

13        And apparently, this investigation known as the 25th

14   of December investigation, involved corruption by certain

15   individuals including the then prime minister Recep Tayyip

16   Erdogan, also Bilal Erdogan, and other ministers, such as

17   Binali Yildirim, and this was somewhat like the corruption case

18   in Reza Zarrab.

19   Q.  Were you arrested as part of an operation against the

20   investigators who had conducted that December 25 investigation?

21   A.  Yes, exactly so.

22        THE COURT:  Counsel, could you repeat the question or

23   could we have a readback.

24        (The record was read).

25   Q.  So in other words --

1          THE COURT:  There was a third investigation?  Is that

2     what that means?

3          MR. LOCKARD:  Depending on whether you count the

4     investigation against the investigation.

5          I'll ask a couple additional questions to clarify.

6          THE COURT:  I am trying to get it straight.

7     Q.  Mr. Korkmaz, you had described another investigation,

8     another corruption investigation known as the December 25

9     investigation; is that right?

10    A.  Yes.

11    Q.  Could you just explain why was it called the December 25

12    operation or the December 25 investigation?

13    A.  After we were removed from duty, the prosecutor for that

14    investigation had given the go ahead to conduct an operation

15    for that investigation.  And the go ahead was given on

16    December 25, hence it was called the December 25 investigation.

17    Q.  That was on December 25 of 2013?

18    A.  Yes, sir.

19    Q.  On the date that you were arrested, were there a number of

20    additional arrests of investigators who had participated in the

21    investigation known as the December 25 investigation?

22    A.  Yes, sir.

23    Q.  Had you participated in any way in that December 25

24    investigation or the operation on December 25 of 2013?

25    A.  No.

1   Q.  Can you just remind us in fact where you were assigned on

2   December 25 of 2013?

3   A.  I had been assigned to the Bridge Protection Unit

4   Directorate.

5   Q.  Did there come a time when you were also charged with

6   crimes allegedly arising out of your participation in the

7   investigation that you conducted that resulted in the operation

8   on December 17 of 2013?

9   A.  Later on I did, yes.

10  Q.  Just to be clear, are both sets of charges still pending?

11  A.  Yes.

12  Q.  Also yesterday you had talked about some supervisors in the

13  Financial Crimes Unit who were reassigned in the days following

14  the December 17 operation; do you recall that?

15  A.  Yes, sir.

16  Q.  What about in the prosecutor's office?  Were there any

17  reassignments following the December 17 operation?

18  A.  Yes.

19  Q.  And can you describe who was reassigned and when that

20  happened?

21  A.  On December 18, the day after the operation, two other

22  prosecutors were added to the prosecutor that had been assigned

23  to the investigation.

24  Q.  Was the original prosecutor at some point reassigned from

25  the case?

1    A.  Yes, sir.

2    Q.  Are criminal charges also pending against that prosecutor

3    and other investigators who, along with you, participated in

4    that investigation?

5    A.  That is correct.

6    Q.  So, Mr. Korkmaz, just a couple more questions before we

7    turn back to the evidence that you gathered.

8            Since you've come to the United States, have you been

9    employed?

10   A.  No.

11   Q.  Since you have come to the United States, have you applied

12   for work authorization?

13   A.  Yes.

14   Q.  Have you received it?

15   A.  Yes, I received a response recently, yes.

16   Q.  When did you receive the work authorization?

17   A.  It's about two weeks, maybe a few days more than two weeks.

18   I received it about that time.

19   Q.  Since you've come to the United States, have you received

20   assistance with living expenses?

21   A.  Yes.

22   Q.  Can you briefly describe what that assistance has been.

23   A.  The prosecutor's office has provided $300 on three

24   occasions for a total of $900.  And the FBI has provided

25   $50,000.

1   Q.  Have you also received assistance with rent?

2   A.  Yes.

3   Q.  Can you briefly describe that?

4   A.  The apartment that I live in was leased by the prosecutor's

5   office, and the prosecutor's office is paying for it.

6   Q.  Mr. Korkmaz, did you ask for any of that assistance?

7   A.  No.

8   Q.  So let's turn back to your investigation in Turkey in the

9   2012-2013 time frame.

10          So, yesterday at the end of the day you were

11  describing the procedure according to which you planned and

12  supervised the coordinated law enforcement action that took

13  place on December 17 of 2013.

14  A.  Yes.

15          MR. LOCKARD:  Your Honor, may I approach?

16          THE COURT:  Sure.

17          MR. LOCKARD:  I've handed the witness what has been

18  marked for identification as Government's Exhibit 151, which is

19  a disc containing electronic copies of Government Exhibits 701

20  through 832.

21  Q.  Mr. Korkmaz, do you recognize that disc?

22  A.  Yes.

23  Q.  Have you reviewed it prior to your testimony this

24  afternoon?

25  A.  Yes.

1   Q.  Did you recognize the contents of that disc when you

2   reviewed it?

3   A.  Yes.

4   Q.  What did you recognize the contents to be?

5   A.  I saw that it was the same content as the evidence that I

6   had presented to you.

7   Q.  Did that evidence come from a particular source?

8   A.  I did not understand the question completely.

9          MR. LOCKARD:  Mr. Chang-Frieden, perhaps you can show

10   for the witness Government Exhibit 701.

11   Q.  Mr. Korkmaz, did you recognize where the evidence contained

12   on the disc marked 151, where that evidence originally was

13   obtained from as part of your investigation?

14   A.  Yes, I remember.

15   Q.  Where did it come from?

16   A.  From the searches that were conducted at Suleyman Aslan's

17   residence and business place.

18          MR. LOCKARD:  The government offers Exhibits 701

19   through 832.

20          MR. HARRISON:  I'm objecting based on relevance, lack

21   of foundation, chain of custody, authentication, 403.

22          THE COURT:  I'm going to allow it.  Overruled.

23          (Government's Exhibit 701-832 received in evidence)

24          MR. LOCKARD:  Mr. Chang-Frieden, if you can pull up

25   Government Exhibit 748 and I ask that it be published for the

1    jury.

2    Q.  Mr. Korkmaz, is that a photograph of a document that was

3    found in the search of Mr. Aslan's home and business office?

4    A.  That is correct.

5             MR. HARRISON:  I forgot to say hearsay as well as one

6    of the grounds.

7             THE COURT:  To the other one or this one?

8             MR. HARRISON:  To this one and the other ones as well,

9    your Honor.  All of them, all of the ones on the disc.

10            MR. LOCKARD:  We understand the objection to be

11   global.

12            THE COURT:  All of the above.

13   Q.  So, Mr. Korkmaz, what kind of document does this appear to

14   be?

15   A.  It is understood to be a printout of an e-mail.

16   Q.  From who does the printout say the e-mail was written from?

17   A.  It's understood it was from Mr. Mehmet Hakan Atilla.

18   Q.  What is the date of the e-mail?

19   A.  December 21, 2012.

20   Q.  Who is it addressed to?

21   A.  It's to Suleyman Aslan.

22   Q.  What is the subject of the e-mail?

23   A.  It says that this is the response letter with regards to

24   the conversation that was held with the embassy and it was

25   placed on hold.

1  Q.  So, it appears the rest of the e-mail is in English, so I

2  won't ask you any further questions about this document right

3  now.

4        MR. LOCKARD:  Your Honor, if I may approach again?

5        THE COURT:  Sure.

6        MR. LOCKARD:  I'm going to hand Mr. Korkmaz discs that

7  have been marked for identification as Government's Exhibit

8  152, 601 through 604, 606, 608, 609, and 611 through 614.

9        For the benefit of the record, Government's Exhibit

10 152 contains electronic copies of Government's Exhibits 901

11 through 930.

12       And Mr. Chang-Frieden, if you can please show

13 Mr. Korkmaz Government's Exhibit 901.

14 Q.  Okay, Mr. Korkmaz, do you recognize the discs that I just

15 identified for the record and placed before you?

16 A.  Yes.

17 Q.  Have you reviewed the contents of those discs before your

18 testimony this afternoon?

19 A.  Yes.

20 Q.  Did you recognize their contents?

21 A.  Yes.

22 Q.  What do they consist of, generally speaking?

23 A.  They are the same as the evidence that I presented to you.

24 Q.  Did that evidence come from any particular search or

25 location?

1    A.   They had come from the search that was conducted at Orient

2    Bazaar.

3    Q.   Can you remind us what activity took place at the Orient

4    Bazaar relating to your investigation?

5    A.   One of the central locations that Reza Zarrab and his

6    organization conducted its business was at Orient Bazaar.

7                MR. LOCKARD:  The government offers Exhibits 901

8    through 930, Government's Exhibit 601 through 604, Government's

9    Exhibit 606, 608, 609, and 611 through 614.

10               MR. HARRISON:  Judge, I have the same objections.

11   Relevancy, lack of foundation, change of custody,

12   authentication, 403, and hearsay, and also on opinion

13   testimony.

14               THE COURT:  Something else?

15               MR. HARRISON:  Yes.

16               THE COURT:  Is what?

17               MR. HARRISON:  On opinion testimony.

18               THE COURT:  I don't understand that.

19               MR. HARRISON:  As to his last answer.  As to his last

20   answer.

21               THE COURT:  Okay.  So, overruled.  And I am allowing

22   these as exhibits.

23               (Government's Exhibit 901-930, 601-604, 606, 608, 609,

24   611-614 received in evidence)

25               MR. LOCKARD:  Mr. Chang-Frieden, I'd ask if you can

1    pull up Government Exhibit 614-1, which is contained within

2    Government Exhibit 614.

3    Q.  Mr. Korkmaz, do you recognize this document?

4    A.  Yes.

5    Q.  Is this a document from one of the electronic devices that

6    was recovered from the Orient Bazaar office?

7    A.  Yes.

8    Q.  What does this document purport to be?

9    A.  It appears to be a declaration from Dubai Customs with a

10   seal.

11   Q.  According to this document, who was the exporter of the

12   documents -- of the goods described in this customs document?

13   A.  Atlantis -- the company named Atlantis Capital General

14   Trading.

15   Q.  According to this document, who are the goods being

16   exported to?

17   A.  To Bank Pasargad.

18   Q.  That's described as being the ultimate destination being in

19   Iran; is that right?

20   A.  That is correct.

21   Q.  Do you see a date on this document?

22   A.  Yes.

23   Q.  What is it dated?

24   A.  The way it would be read in Turkey it says 9th of April,

25   2013.

1          MR. LOCKARD:  Mr. Chang-Frieden, if we can zoom back

2     out.

3     Q.  Mr. Korkmaz, do you see what is purportedly being exported?

4     What the goods are?

5     A.  Sugar.  Raw brown sugar.

6     Q.  Mr. Korkmaz, you described there was a seal on this

7     document.

8          MR. LOCKARD:  Mr. Chang-Frieden, if you can direct our

9     attention to the bottom third.

10    A.  Yes.

11    Q.  Mr. Korkmaz, are you able to read what in English is

12    written in the top of that seal or stamp?

13    A.  Well, I don't know if there is such a word.  But it says

14    "Operetations Admin."

15         MR. LOCKARD:  Thank you, Mr. Chang-Frieden.  If you

16    can please pull up Government Exhibit 614-2, which is also from

17    Government Exhibit 614.

18    Q.  Mr. Korkmaz, do you also recognize this document labeled

19    Dubai Customs?

20    A.  Yes.

21    Q.  Does this declaration of export also relate to a purported

22    shipment of raw brown sugar by Atlantis Capital General

23    Trading?

24    A.  That is correct.

25    Q.  Does this Dubai customs form also bear a stamp?

1    A.  Yes.

2    Q.  Can you tell us what the date is in this stamp?

3    A.  It is in Turkish, and it says 00 January 2013.

4    Q.  Mr. Korkmaz, are you familiar with whether Turkish is used

5    on official Dubai customs documents?

6    A.  It doesn't make sense to me, I don't think it's possible.

7            MR. LOCKARD:  Mr. Chang-Frieden, if you can now please

8    show us Government Exhibit 922.

9    Q.  Mr. Korkmaz, can you remind us where this came from?

10   A.  It is one of the pieces of evidence that was seized at

11   Orient Bazaar.  During the search at Orient Bazaar.

12   Q.  Can you describe it for us generally?

13   A.  It appears to be an export declaration from Dubai Customs.

14   This is just a blank printed version of this document that is

15   not filled out.

16           MR. LOCKARD:  Mr. Chang-Frieden, if you can pull up

17   924, please.

18   Q.  Mr. Korkmaz, where did this come from?

19   A.  This is among the evidence that had been seized at the

20   Orient Bazaar search.

21   Q.  What does this appear to be?

22   A.  This is just the stacks of the document that was shown

23   earlier.

24           MR. LOCKARD:  Mr. Chang-Frieden, can you please show

25   us Government's Exhibit 903.

1   Q.  Mr. Korkmaz, where was this found?

2   A.  Also was seized during the search at Orient Bazaar.

3   Q.  What's shown in this photograph?

4   A.  The one on top is the customs seal that we had seen on the

5   documents that were shown.  And the one on the bottom is a seal

6   that is for a company in Dubai that's called Grand Mark.

7               MR. LOCKARD:  Your Honor, if I may approach?

8               THE COURT:  Yes.

9               MR. LOCKARD:  So I'm handing Mr. Korkmaz what's been

10  marked for identification as Government's Exhibit 153, as well

11  as discs marked for identification as 950, Government's Exhibit

12  605, and Government's Exhibit 607.

13  Q.  So Mr. Korkmaz, beginning with the disc marked Government's

14  Exhibit 153, which for the benefit of the record contains

15  electronic copies of Government's Exhibits 960 through 964,

16  have you reviewed the contents of that disc before your

17  testimony this afternoon?

18  A.  Yes, sir.

19  Q.  And do you recognize the contents?

20  A.  Yes, sir.

21  Q.  What is contained on disc 153?

22              MR. LOCKARD:  Mr. Chang-Frieden, if you can show

23  Mr. Korkmaz, please, Government Exhibit 963.

24  A.  153 was the documents that were seized during a search that

25  was conducted at Duru Doviz.

1   Q.  Can you remind us what was the Duru Doviz office as it

2   relates to your investigation?

3   A.  Duru Doviz was a company that was owned by Reza Zarrab and

4   it was a company that was used in exchange and currency

5   exchange and gold business.

6           MR. LOCKARD:  Your Honor, the government offers

7   Government Exhibits 960 through 964.

8           MR. HARRISON:  Objection.

9           THE COURT:  We're going to allow them.

10          MR. HARRISON:  For the record, just same objection as

11  to the prior discs and its contents.

12          THE COURT:  Right.  I got it.

13          (Government's Exhibit 960-964 received in evidence)

14          MR. LOCKARD:  Mr. Chang-Frieden, if we can publish

15  960, please.

16  Q.  Mr. Korkmaz, can you just describe what's shown in

17  Government's 960.

18  A.  It is an invoice that belongs to the company by the name of

19  Duru Doviz.

20  Q.  An invoice for what goods or commodity?

21  A.  Precious metal.

22  Q.  Mr. Korkmaz, I'd like to direct your attention to the other

23  discs that I handed you just a few minutes ago which are marked

24  as government's Exhibit 950, as well as Government Exhibit 605

25  and 607.  Did you have an opportunity to review those discs,

1   the contents of those discs before your testimony this

2   afternoon?

3   A.  Yes.

4   Q.  Did you recognize their contents?

5   A.  Yes.

6   Q.  Generally speaking, what are the contents of those discs?

7   A.  They are the evidence that I presented to you.

8   Q.  Do those discs contain evidence collected from a particular

9   search or location?

10  A.  Yes.

11  Q.  Where were they obtained from?

12  A.  They are the evidence that were seized during the search

13  conducted at Reza Zarrab's residence.

14          MR. LOCKARD:  The government offers 950, 605, and 607.

15          MR. HARRISON:  Same objection as to the prior discs

16  and their contents, your Honor.

17          THE COURT:  Counsel, included in your objections is

18  there a subject to connection objection too?

19          MR. HARRISON:  Yes, your Honor.

20          THE COURT:  So, I didn't hear that before.  It must be

21  my mistake.  But I will grant that application subject to

22  connection and overrule the other objections.

23          MR. HARRISON:  Thank you, your Honor.

24          (Government's Exhibit 950, 605, 607 received in

25  evidence)

1          MR. LOCKARD:  Mr. Chang-Frieden, if we can please pull

2     up Government Exhibit 950.

3     Q.  Mr. Zarrab -- I'm sorry, Mr. Korkmaz, do you recognize what

4     this document is?

5     A.  Yes.

6     Q.  What is this document; what does this document appear to

7     be?

8     A.  It is an account statement.

9     Q.  Do you recognize the account name?

10    A.  Yes.

11    Q.  What is that account?

12    A.  It is the account written as CAG.

13    Q.  From your investigation, did you learn what this account is

14    for?

15    A.  Yes.

16    Q.  What was it for?

17    A.  This was the account where the bribes sent to Zafer

18    Caglayan were logged.

19         MR. LOCKARD:  Mr. Chang-Frieden, if you can point us

20    to page six of Government's Exhibit 950.

21    Q.  Mr. Korkmaz, do you see an entry on approximately August 31

22    of 2013?

23    A.  That's correct.

24    Q.  For $2 million U.S.?

25    A.  Yes.

1          MR. LOCKARD:  Mr. Chang-Frieden, if you can send us to

2     page 10.

3     Q.  Mr. Korkmaz, do you see an entry for August 31 of 2013?

4     A.  I apologize for not waiting first, but yes, the answer is

5     yes.

6     Q.  For 1.5 million Turkish lira?

7     A.  That is correct.

8     Q.  If we could look at page 15.  Do you see another entry for

9     August 31 of 2013?

10    A.  Yes.

11    Q.  How much is that for?

12    A.  It is 2 million euros.

13    Q.  Mr. Korkmaz, yesterday you had described a delivery of

14    money on August 30 of 2013.  Do you recall that?

15    A.  Yes, sir.

16    Q.  The victory day delivery?

17    A.  That is correct.

18    Q.  How do those three entries that we just looked at compare

19    to the money that was delivered on that day?

20         MR. HARRISON:  Objection to form.  I don't think I

21    understand the question.

22         THE COURT:  I don't either.  Could you rephrase.

23         MR. LOCKARD:  Yes.

24    Q.  Mr. Korkmaz, what was the amount of the money delivered on

25    August 30, 2013?

1    A.  It was $2 million, 2 million euros, and one and a half

2    million Turkish liras.

3    Q.  Who were the individuals who delivered the money?

4    A.  It was Mohammed Sadik Rastgarshishegh, with the code name

5    Sadik, and also it was Ahmet Murat Ozis.

6    Q.  Mr. Korkmaz, in describing your investigation, you also

7    talked about intercepted telephone communications as part of

8    that investigation; is that right?

9    A.  Yes.

10   Q.  What types of telephone communications were intercepted?

11   A.  I'm sorry, you mean regarding this particular topic?

12   Q.  No, not about any particular subject matter.  Let me ask a

13   slightly different question.

14        Did the intercepts include electronic communication as

15   well as voice calls?

16   A.  That is correct.

17   Q.  Did it include electronic communications by app such as

18   WhatsApp or Viber?

19   A.  No.

20   Q.  Earlier you had described the approximate number of

21   telephone lines that were intercepted during the course of the

22   investigation; is that right?

23   A.  Yes.

24   Q.  Were any Halkbank office numbers subject to interception?

25   A.  No, we did not intercept any landlines as a target there.

1    Q.  Would a telephone call placed to or from a Halkbank office

2    be intercepted if they were placed to or from another telephone

3    that was being intercepted?

4    A.  Yes.

5    Q.  During the course of the investigation, did you listen to

6    recordings of audio that had been intercepted from the

7    wiretaps?

8    A.  Yes.

9    Q.  Did you review transcripts of calls that had been

10   intercepted?

11   A.  Yes.

12   Q.  Approximately how many telephone calls and transcripts did

13   you review during the entire course of the investigation,

14   approximately?

15   A.  I would say that it was probably between 250 and 1,000.

16   But, the more correct way to say that might be to say hundreds

17   of them.  But it could also be 2,000.  I can't really set a

18   certain number.

19   Q.  Fair to say it was a lot?

20             Withdrawn.

21   A.  It was a lot based on the -- the audio recordings that

22   constituted an element of crime within the investigation.

23             MR. LOCKARD:  Your Honor, if I may approach?

24             THE COURT:  Sure.

25             MR. LOCKARD:  I'm handing the witness two discs that

1    have been marked for identification as Government's Exhibit 150

2    and 200.

3    Q.  Mr. Korkmaz, do you recognize those two discs?

4    A.  Yes.

5    Q.  What's contained on Government's Exhibit 150?

6    A.  I couldn't remember the contents of 150 at this point.  But

7    when you had given them to me, I had compared it to the

8    evidence that I had.

9    Q.  It's been a lot of discs.  Do you remember the contents of

10   Government's Exhibit 200?

11   A.  Yes.

12   Q.  What is contained on Government's Exhibit 200?

13   A.  It had audio recordings and transcripts.

14   Q.  Were they audio recordings of telephone calls intercepted

15   as part of the investigation that you had conducted?

16   A.  Yes.

17   Q.  Did you review the transcripts that had been provided to

18   you relating to those calls?

19   A.  That is right.

20   Q.  Did those transcripts include both Turkish language

21   transcription and English language translation?

22   A.  That is correct.

23   Q.  Did you compare the Turkish language transcription against

24   the audio?

25   A.  Yes.

HCC3ATI5                        Korkmaz - Direct

1    Q.  Were the transcriptions accurate?

2    A.  Yes.

3            MR. LOCKARD:  Your Honor, at this time we offer the

4    contents of Government's Exhibit 200, as well as the

5    corresponding exhibits 200-T, which consist of Government's

6    Exhibit 201-A and -T through 274-A and -T, 276-A and -T through

7    283-A and -T, 285-A and -T through 291-A and -T, 293-A and -T

8    through 306-A and -T, 308-A and -T through 310-A and -T, 313-A

9    and 313-T, 316-A and -T, 319-A and -T, 323-A and -T, 326-A and

10   -T, 330 and 331-A and -T, 336-A and -T through 357-A and -T,

11   and 359-A and -T through 368-A and -T, 371-A and -T through

12   375-A and -T, 377-A and -T, 379 through 381-A and -T.

13           THE COURT:  I had a question, counsel.  Do I

14   understand that there is a written transcript that corresponds

15   with each audio recording?

16           THE WITNESS:  That is correct for the content of the

17   CD 200.

18           (Continued on next page)

19

20

21

22

23

24

25

1           THE COURT:  Of CD200.

2           MR. HARRISON:  Judge, I'm going to ask to approach and

3    maybe this would be a good time to take our afternoon break, if

4    your Honor wants to do that.

5           THE COURT:  Sure.  We'll take five minutes.

6           (Jury not present)

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the side bar)

2          MR. HARRISON:  First of all, Judge, I'm just going to

3   need a minute to check those numbers and check the list unless

4   the government, maybe they can give us a quick proffer of what

5   those are.  My biggest concern, obviously, Judge, and the

6   defense's biggest concerns, is transcripts that don't have

7   underlying audiotapes at all.  I'm not sure, without checking

8   the numbers, whether there any included in that.

9          MR. LOCKARD:  There should not --

10          THE COURT:  Wait.  That was the question I thought I

11   had asked because I had the same concern.

12          MR. HARRISON:  I didn't understand that.

13          THE COURT:  I asked if they were written transcripts

14   that corresponded to each of the audio recordings.

15          MR. ROCCO:  I think that is the question, and I think

16   the answer is yes.

17          THE COURT:  He said yes.

18          MR. ROCCO:  But I think that doesn't capture -- the

19   question doesn't capture whether there are transcripts that

20   don't have corresponding recordings.  So he has transcripts for

21   each of the recordings, but there are, in addition to that,

22   transcripts that don't have recordings.

23          MR. LOCKARD:  Not in those exhibits.

24          MR. ROCCO:  Okay.

25          THE COURT:  There are not in those exhibits?

1           MR. LOCKARD:  Correct.  It should be a one-to-one

2     match.

3           MR. HARRISON:  Just so I understand, everything in

4     there has an audio and an English and Turkish translation?

5           MR. LOCKARD:  There should be a dash A and a dash T

6     for each.

7           MR. HARRISON:  Okay.

8           MS. FLEMING:  And they are voice identified for those

9     reasons.

10          THE COURT:  Okay.  Thanks.

11          MR. ROCCO:  Thank you, Judge.

12          (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          (Jury present)

3          THE COURT:  Mr. Lockard, I think you can make clear

4    the conversation we had at sidebar, the question as to whether

5    there is a transcript for each audio.

6          MR. LOCKARD:  Yes, your Honor.

7          THE COURT:  Okay.  Please be seated, everybody.

8          MR. LOCKARD:  So I will again identify for the record

9    the audio and transcripts for which there are both, and correct

10   a couple of errors in the list that I previously recited.

11         So for the following government's exhibits, the

12   government offers both the underlying audio and the --

13         THE COURT:  Corresponding?

14         MR. LOCKARD:  -- corresponding translated

15   transcription, and those numbers are:  Government's Exhibit 201

16   through 269-A and -T, 273 and 274-A and -T, 276 through 279-A

17   and -T, 288-A and -T, 291-A and -T, 293 through 295-A and -T,

18   297 through 298-A and -T, 300 and 301-A and -T, 304 through

19   306-A and -T, 308 and 309-A and -T, 316-A and -T, 326-A and -T,

20   336 through 357-A and -T, 359-A and -T, and 380 and 381-A and

21   -T.

22         Again, that is both the audio and the transcript for

23   each of those government's exhibit numbers.

24         THE COURT:  And you had moved them into evidence, did

25   you not?

1          MR. LOCKARD:  Yes, we offer each of those now.

2          THE COURT:  And, counsel, did you want to comment?

3          MR. HARRISON:  Yes, Judge.  I just wanted to make a

4    record of our objections based on relevance, lack of

5    foundation, chain of custody, authentication, hearsay, lack of

6    personal knowledge, and the subject to connection and 403, your

7    Honor.

8          THE COURT:  Is authentication, did you add that or has

9    that been in there before?

10         MR. HARRISON:  That's been in there, Judge.

11         THE COURT:  Okay.  So I'm going to overrule the

12   objection with the exception of subject to connection.

13         (Government's Exhibits 201 through 269-A and -T, 273

14   and 274-A and -T, 276 through 279-A and -T, 288-A and -T, 291-A

15   and -T, 293 through 295-A and -T, 297 through 298-A and -T, 300

16   and 301-A and -T, 304 through 306-A and -T, 308 and 309-A and

17   -T, 316-A and -T, 326-A and -T, 336 through 357-A and -T, 359-A

18   and -T, and 380 and 381-A and -T received in evidence)

19         MR. LOCKARD:  Your Honor, if I may approach the court

20   reporter?

21         THE COURT:  Yes.

22   BY MR. LOCKARD:

23   Q.  Now, Mr. Korkmaz, the transcripts that you reviewed had

24   cover pages; is that right?

25   A.  That is correct.

1    Q.  And did those cover pages have identifying information?

2    A.  That is correct.

3    Q.  And including the phone numbers involved, the date, time

4    and duration of the calls and the Turkish call identification

5    number?

6    A.  Yes.

7    Q.  And did you compare that information against the evidence

8    from your investigation to confirm its accuracy?

9    A.  Yes.

10   Q.  So if we could pull up Government's Exhibit 261-T, the

11   first page, and just highlight the identifying information.

12            So, Mr. Korkmaz, how were you able to confirm the

13   information listed here for the date, time and duration, call

14   ID number and the telephone numbers?

15   A.  On the documents there is information pertaining to the

16   date, the time, duration and the conversation ID, as well as

17   the phone numbers that are involved in the conversation.  By

18   using this information, I confirmed.

19   Q.  And which documents are you referring to?

20   A.  I'm referring to the transcripts that we referred to as

21   tapes that are in the investigation file.

22   Q.  And how is that information entered into the transcripts

23   from your investigation?

24   A.  The module that is used by TIB, known as KDM during these

25   intercepts, would populate this information.

```
 1   Q.  And just to help us understand a couple of the terms you
 2   used there, could you briefly describe what is TIB and what
 3   role it plays in law enforcement interception in Turkey?
 4   A.  TIB is an agency that is also called the telecommunications
 5   and communications directorate.  This agency holds the
 6   responsibility for the auditing, controlling and organizing the
 7   intercept activities in Turkey.
 8   Q.  And you described the KDM module?
 9   A.  KDM stands for the legal intercept module, and this is the
10   module that TIB uses to convey the intercepts to the police
11   officer that is to surveil that recording, and it would also
12   send the data along with the conversation.
13   Q.  And when you say module, are you describing essentially a
14   program or an interface?
15   A.  That is correct.  It's a web-based module.  This is the
16   module that is used through a secure connection on Polnet in
17   order to get the information to the police officer.
18   Q.  Okay.  And so then just turning back to your original
19   answer, do I understand that that interface, that module
20   automatically populates the call identifying information into
21   the transcripts?
22   A.  That is correct.  It would assign these automatically.
23   Q.  Now, Mr. Korkmaz, during your testimony yesterday, you
24   described the initial focus of your investigation as potential
25   gold smuggling; is that right?
```

1    A.   Yes.

2    Q.   Was Mr. Zarrab involved in the gold business?

3    A.   Yes.

4    Q.   And what bank did he principally use for his gold business?

5    A.   Halkbank.

6    Q.   And yesterday you also testified that one of the benefits

7    that you were investigating was being provided in exchange for

8    bribes was related to using Iranian oil and gas proceeds as

9    part of the gold trade; is that right?

10            THE INTERPRETER:  Could you repeat that question?

11   Q.   I think you testified yesterday that part of the bribery

12   investigation related to the use of Iranian oil and gas

13   proceeds as part of the gold trade; is that right?

14            MR. HARRISON:  Objection.

15   A.   Yes.

16            MR. HARRISON:  I'm just going to object to the form of

17   the question.  I think it calls for speculation.

18            THE COURT:  Overruled.

19            So the question was whether gold was traded for oil

20   and gas, is that the gist of the question?

21            MR. LOCKARD:  Just referring back to the witness'

22   testimony yesterday that that was involved in the bribery

23   investigation.

24            THE COURT:  So before we get to that, so was the

25   bribery investigation part of your original gold smuggling

1    investigation?

2              THE WITNESS:  That is correct, your Honor.

3              THE COURT:  So that was your original -- describe your

4    original investigation.  I may have missed it.

5              THE WITNESS:  Your Honor, our investigation had

6    started with gold smuggling, laundering of criminal proceeds,

7    and committing these crimes as an organization, and later on,

8    our investigation then included bribery and document forgery.

9    All of these were part of an ongoing single investigation.

10             THE COURT:  I guess my question is this.  So did it

11   start with gold smuggling, and did it later expand to these

12   other topics or what?

13             THE WITNESS:  That is correct, your Honor.  That's how

14   it was.

15             THE COURT:  And, again, what did it start with?

16             THE WITNESS:  Your Honor, when it started, it had

17   included three crimes, one was gold smuggling, the other one

18   was laundering of criminal proceeds, and the third one was

19   committing these crimes as an organization.

20             THE COURT:  Okay.  And it later expanded to include,

21   you said, what, bribery and forgery?

22             THE WITNESS:  That is correct, your Honor.

23             THE COURT:  Thank you.

24   BY MR. LOCKARD:

25   Q.  So, Mr. Korkmaz, I'll ask if you could look --

1          MR. LOCKARD:  Mr. Chang-Frieden, could you please pull

2     up Government's Exhibit 102-T and -- sorry, 1002-T and 1002, to

3     entries on 05.02.2013, beginning with the entry time stamped

4     21:00:21.

5     Q.  So, Mr. Korkmaz, before we turn to the specific

6     communications here, do you recognize Government's

7     Exhibit 1002, generally speaking?

8     A.  That is correct.

9     Q.  And how is it that you recognize Government's Exhibit 1002?

10    A.  I just happened to remember it on the CD that you had given

11    to me that's marked 150.  It contained the Exhibits 1001, 1002,

12    1003 and 1004.

13    Q.  And what are those exhibits?

14    A.  I saw that among these there were WhatsApp and Viber

15    communications that were among the digital evidence.

16    Q.  And where were those WhatsApp and Viber communications

17    obtained from?

18    A.  From the telephone of Reza Zarrab.

19    Q.  And just one or two, really, clarifying questions.  Looking

20    at the date and the time format, what does the date 05.02.2013

21    correspond to?

22    A.  That would be February 5th, 2013.

23    Q.  And how does the time zone reflected in the time stamp, how

24    does that relate to the local time in Turkey?

25    A.  Based on the season of the year, the difference would be

1    two hours to three hours in times.

2    Q.  And the time in Turkey would be two to three hours earlier

3    than the time stamp shown in the document or later than the

4    time?

5    A.  It would be before; so it would be plus two or plus three,

6    sir.

7    Q.  Okay.  So the local time in the first entry would be

8    approximately 2300 hours?

9    A.  It would be 11:00 p.m. or midnight, sir; that is correct.

10   Q.  So turning to the communications shown in front of us, who

11   sent these communications?

12   A.  The sender is shown in the third box; so here it is

13   understood as being Suleyman Aslan.

14   Q.  And if we look at the middle entry, the one at 21:01:21,

15   what did Mr. Aslan say in that text?

16   A.  He marked it as No. 1.  "The famous date of February 6th

17   has arrived.  Oil income cannot be used for the trade of

18   valuable metals."

19   Q.  And at this time, from your investigation, had you learned

20   whether Mr. Zarrab was, in fact, using Iranian oil income for

21   the trade of gold?

22            MR. HARRISON:  Objection.

23            THE COURT:  Overruled.

24   A.  That is correct.

25   Q.  And there's a reference to the famous date of February 6th.

1    Do you have an understanding of what that's a reference to?

2    A.  Yes.

3    Q.  And what is --

4           MR. HARRISON:  Sorry, objection, your Honor.  Calls

5    for speculation.

6           THE COURT:  Overruled.

7    Q.  And what is February 6th a reference to here?

8    A.  I know the date of February 6th, 2013, as a date where some

9    regulations in the sanctions had changed.

10          THE COURT:  Some what?

11          THE INTERPRETER:  Some regulations in the sanctions

12   had been changed.

13   Q.  And based on your investigation, did you learn whether

14   Mr. Atilla was familiar with Mr. Zarrab's gold-trading

15   business?

16          MR. HARRISON:  Objection, your Honor.  Calls for

17   speculation.

18          THE COURT:  Overruled.  He asked if he learned; so I

19   don't know how you could even argue speculation.  You might hit

20   one of the other ones on the list, but it's certainly not

21   speculation.  Go ahead.

22   A.  Yes.

23          MR. LOCKARD:  Mr. Chang-Frieden, could you please pull

24   up Government's Exhibit 276-T.

25   Q.  And, Mr. Korkmaz, can you tell us the participants in this

1    phone call?

2    A.   Reza Zarrab and Abdullah Happani.

3    Q.   And on what date was this phone call?

4    A.   December 20th, 2012.

5    Q.   And if we could turn to Page 6 of the transcript.

6    Mr. Korkmaz, do you see a discussion about a bank account for

7    Duru Doviz?

8    A.   That is correct.

9    Q.   And what, if anything, does Mr. Happani tell to Mr. Zarrab

10   about the Duru Doviz account?

11   A.   He says that they were unable to open the Duru Doviz

12   account yet.

13   Q.   And if you could look in the middle of the page, what does

14   Mr. Zarrab say about the Duru Doviz account?

15   A.   He's saying that Sali Pazari branch is under Hakan Atilla

16   and that he would talk to Hakan Atilla.

17   Q.   And was Duru Doviz a company that was involved in

18   Mr. Zarrab's gold business?

19   A.   That is correct.

20            MR. LOCKARD:  Mr. Chang-Frieden, if we could look at

21   Government's Exhibit 229-T.

22   Q.   Mr. Korkmaz, who is this phone call between?

23   A.   It's between Reza Zarrab and Abdullah Happani.

24   Q.   And what is the date that this call took place?

25   A.   February 21st, 2013.

 1   Q.  And if we could turn to the second page of the transcript.

 2           Mr. Korkmaz, could you look at what it is that

 3   Mr. Zarrab first says in this phone call?

 4   A.  Yes.

 5   Q.  And what does Mr. Zarrab say?

 6   A.  He says:  "I talked to Hakan.  They are going to transfer

 7   soon.  Also, call that Mr. -- Mr. Zihni and tell him that

 8   Mr. Reza had talked to Mr. Hakan, and that there was a problem,

 9   but it has been resolved.  Have them follow up on that in ten

10   minutes."

11   Q.  And then what does Mr. Zarrab say about exports?

12   A.  He is saying that the cargo method that was being used in

13   the exports would be put on hold and that there would be a need

14   to go back to the passenger method.

15   Q.  And based on your participation in the investigation, did

16   you learn what Mr. Zarrab is referring to here?

17           MR. HARRISON:  Objection, your Honor.

18           THE COURT:  Overruled.

19   A.  I was unable to understand this part about Mr. Zihni, but I

20   understood what this going back to the passenger method meant.

21   Q.  And what did that mean?

22   A.  The reason why they used the cargo system for a while in

23   gold trade was because that was less costly, and sending

24   couriers was more costly for the organization.  To the best of

25   my understanding, this is related to the exports being made to

1    Iran via Dubai.  More correctly, this is about the gold not

2    entering Iran.

3    Q.  And can you explain --

4              MR. HARRISON:  Judge, I'm going to object and move to

5    strike.  I don't think they've laid a basis to ask this witness

6    because he doesn't have personal knowledge of what he's

7    testifying about.  I mean, he's speculating and it's opinion.

8              THE COURT:  Overruled.

9    Q.  And, Mr. Korkmaz, just to be clear, on what kinds of

10   evidence is your understanding are the cargo and passenger

11   system -- on what kinds of evidence is that based?

12   A.  It's based on the phone conversations that we had seen

13   during that period, and is also understood from the documents

14   that have been seized during the operation.

15   Q.  And so can you explain what you mean about the difference

16   between the passenger system and the cargo system and, in

17   particular, what you mean about whether the cargo, in fact,

18   went to Dubai -- I mean, in fact, went to Iran?

19             MR. HARRISON:  Same objection.

20             THE COURT:  Overruled.  I don't think there's any

21   basis for the objection.

22   A.  There is no transit in the cargo system.  So it would show

23   that the goods were being sent to Dubai because there was no

24   transit to Iran when you send via cargo.

25             But when you send via passengers, the courier can

1   declare -- at the Turkish customs, he can declare that he was

2   going to Iran, transit through Dubai and, yet, he could go to

3   Dubai instead.

4   Q.  I think you said that you learned through investigation

5   that the passenger system is a more expensive way to transport

6   cargo; is that right?

7   A.  Yes, it was more costly.

8   Q.  And what kind of cargo was Mr. Zarrab shipping to Dubai?

9   A.  Gold.

10  Q.  Now, if we could turn to Government's Exhibit 295-T.

11  Mr. Korkmaz, who are the participants in this telephone call?

12  A.  Reza Zarrab and Mr. Hakan Atilla.

13  Q.  And what is the date of this conversation?

14  A.  April 10th, 2013.

15  Q.  And if you look at the phone numbers, through your

16  participation in the investigation, did you become familiar

17  with the telephone numbers used by various individuals?

18  A.  I had familiarity with numbers that were double numbers or

19  similar numbers within the phone number.  I had that

20  familiarity.

21  Q.  And do you --

22          THE COURT:  Counsel, this might be a good time, it's

23  4:45, for us to stop.  Is there going to be several questions

24  or --

25          MR. LOCKARD:  I'm just going to ask him if he

1   recognizes these two phone numbers, and then we can take a

2   break.

3         THE COURT:  Okay.  Go ahead.

4   Q.  So, Mr. Korkmaz, do you recognize the first number?

5   A.  That is correct.

6   Q.  And --

7   A.  What I would remember would be the last four digits.  So

8   that it is not misunderstood, and what I said earlier, was also

9   pertaining to the last four digits.

10  Q.  And based on the last four digits, do you recognize whose

11  phone number that was?

12  A.  That is correct.

13  Q.  And whose was it?

14  A.  It was owned by Reza Zarrab.

15  Q.  And for the second number, do you recognize the last four

16  digits of that number?

17  A.  That is correct.

18  Q.  And whose phone number was that?

19  A.  This was owned by Mr. Hakan Atilla.

20        MR. LOCKARD:  All right.  We can break there, your

21  Honor.

22        THE COURT:  Yes.  So I'm going to excuse the witness

23  and ask you to be back at 9:15 tomorrow, and then I'm going to

24  excuse the jury as well and ask you the same thing, if you can

25  be back at 9:15.

1           So with my normal instructions that you know by heart

2   by now, and hopefully in the morning I'll have a schedule for

3   you about where I think the case is headed, time-wise.  Thanks

4   a lot.

5           (Jury not present)

6           (Witness temporarily excused)

7           THE COURT:  So if we could spend a minute or two on

8   the timeline of the case, and particularly, my e-mail to you

9   this morning, where I thought you would be and will be

10  tomorrow.

11          MR. LOCKARD:  So, I can address that from the

12  government's perspective.

13          MR. HARRISON:  I'm sorry, I couldn't hear you when

14  you're speaking, which is why I moved forward.

15          THE COURT:  I asked him to address the timeline of the

16  case.

17          MR. HARRISON:  Okay.

18          MR. LOCKARD:  So, your Honor, we, of course, are

19  mindful of the time line and also mindful of the Court's

20  instructions this morning.  I think we are, I think, not going

21  to be in a position to rest by the end of the day tomorrow, but

22  I think that we are likely to be in a position to rest by

23  Friday.

24          THE COURT:  I don't think that's going to work.

25          MR. LOCKARD:  So I can just sort of lay out why it is

1     and, of course --

2                THE COURT:  Well, I mean, you know, we could make

3     alterations too.

4                MR. LOCKARD:  And we have been, your Honor.  We have

5     been.  I think we have been, throughout the trial and

6     especially this week, been working to streamline the remainder

7     of the government's presentation, including today.  We have

8     taken additional steps to streamline that presentation.

9                We are exploring whether there are witnesses that we

10    do not need to call, and I think there are one or two witnesses

11    that we currently anticipate that we probably will not call in

12    order to be able to rest sooner.  There are a couple of issues

13    with respect to the timeline that I'll just lay out for the

14    Court.

15               THE COURT:  Who are the witnesses that you do need to

16    call?

17               MR. LOCKARD:  I'm sorry, your Honor?

18               THE COURT:  I say, who are the witnesses that you

19    still need to call beyond the current witness?

20               MR. LOCKARD:  So there are -- our biggest witness

21    hurdle right now are custodial witnesses.  We have been

22    working, I think, very diligently and in good faith with

23    defense counsel to reach custodial witness stipulations.  There

24    are a large number of custodial witnesses that we would have to

25    call absent a stipulation.

1           There are eight remaining banks who produced bank

2    records that are part of the government's evidence.  There are

3    internet service providers who provided e-mails that are part

4    of the government's evidence.

5           THE COURT:  Yes, I get that.  What's the problem with

6    the stipulations?

7           MS. FLEMING:  We stipulated to the FDIC custodian.  I

8    just signed it.  We've earlier told them we stipulated to all

9    the e-mail providers, and what we said is we wanted to put one

10   or two of the bank custodians on to explain what these records

11   were, but we would stipulate to the rest of them.

12          MR. ROCCO:  And, your Honor --

13          THE COURT:  Wait.  Can we have one?

14          MR. ROCCO:  I'm only going to amplify that I'm in the

15   process of signing the stipulation on the Internet witnesses

16   right now, Judge.

17          THE COURT:  Okay.  So there we have it.

18          MR. LOCKARD:  Well, that's good.  So --

19          THE COURT:  So, no, I don't mean to put you on the

20   spot.  I guess you didn't realize where they were, but it

21   strikes me that that is the kind of thing that stipulations are

22   usually employed for.  So maybe you could go off the record for

23   a minute, and you can meet and confer, and I could get more

24   timely -- not more timely, but a clearer update of what's left.

25          MR. LOCKARD:  Sure.  And just to help, just to spell

1    out a couple of additional things, we, of course, will continue

2    to work with defense counsel and will work to streamline the

3    remaining case as much as possible.  I think one of the reasons

4    why we are behind where he had originally forecast we would be

5    is because I think we did not forecast as much

6    cross-examination as there has been, which of course is their

7    right, and it's not a complaint.  It's just to explain why it

8    is our forecast --

9           THE COURT:  And they will probably say they did not

10   anticipate as much direct as there was.

11          MR. LOCKARD:  They may say that.

12          THE COURT:  That's not really -- I don't think that --

13   well --

14          MR. LOCKARD:  I think we were on pace to where we

15   expected to be until this week, and this week has been

16   significantly off of our forecast base.

17          THE COURT:  Today is only Tuesday, I think, or is it

18   Wednesday?

19          MR. LOCKARD:  I guess in the last five or six days.

20          THE COURT:  No.  So let's go off the record.  Why

21   don't you talk to them further, and then we'll talk some more.

22          MR. LOCKARD:  Yes, your Honor.

23          (Pause)

24          MS. FLEMING:  Can we come up there?

25          THE COURT:  Yes, sure.

HCCPATI6                        Korkmaz – Direct

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1          (At the side bar)

 2          MR. LOCKARD:  Okay.  So I'll start with the progress

 3   we've made.  So I think that we are in a position where we're

 4   likely to be able to stipulate to the remaining purely

 5   custodial witnesses.  We do anticipate calling one more bank

 6   witness, who we believe will be able to serve as both a brief

 7   sanctions compliance witness and custodial witness for the

 8   purposes that Ms. Fleming described wanting to be able to

 9   inquire about, and I think that that --

10          THE COURT:  Honestly, I didn't understand the purpose

11   of today's bank witness, the Deutsche Bank person, and I mean,

12   I'm not suggesting that there's no rationale.  I'm sure there's

13   rationale, but what are two needed for now?

14          MR. LOCKARD:  So there are -- as the Court knows,

15   there are nine U.S. financial institutions that were involved

16   in the U.S. portion of the financial transfers that we've been

17   putting on evidence about.  Nine certainly is completely

18   unnecessary, but we've pared it down to two of them to explain

19   to the jury in a very, we hope, concise and pithy way what they

20   have in terms of sanctions compliance programs and how

21   transactions like this can slip through those programs, and

22   that's, in an extreme nutshell, the point of the testimony.

23          THE COURT:  Did the guy from Deutsche Bank do that?

24          MR. LOCKARD:  He did that.  He also educated the jury

25   about a lot of other details that were not necessary, but that

1     is part of what he testified about.  And I think the Citibank

2     witness will be a more targeted version of that, I think less

3     than I think 30 minutes.

4                MR. SOVOLOS:  We're talking about 30 minutes.

5                MS. FLEMING:  Of course, it's kind of interesting to

6     bring in an American sanctions person to talk about what

7     Halkbank has to do.  That's why I think it's relevant.

8     Deutsche Bank --

9                THE COURT:  What's relevant?

10               MS. FLEMING:  It's relevant to bring up, with all of

11    their fancy sanctions things, that they've been sanctioned a

12    whole bunch of times.

13               THE COURT:  I know that part, but to me, that was

14    totally off the rails.  I mean, you can certainly make the

15    point, and you have, but why do you need eight, nine or --

16               MR. ROCCO:  We're not suggesting that, Judge.

17               THE COURT:  Why do you need more than one?

18               MS. FLEMING:  We thought they were a pure custodian.

19    I didn't know that they had substantive testimony until he took

20    the stand.  I thought he was a pure custodian.

21               THE COURT:  Okay.  Why do we think there should be

22    more custodians?

23               MS. FLEMING:  The only reason we thought they should

24    have two custodians is because some of the records are

25    different, they look different.

1    THE COURT:  So why can't you stipulate to that?

2    MR. ROCCO:  Well, your Honor, I think, candidly, I

3    wanted to hear the testimony because I didn't quite understand

4    the exhibits and the transactions.  And the witness today,

5    whether he was focused or not, I think did a good job

6    explaining, at least to me and I think the jury, what the

7    American end of this case is supposed to be.

8    We took the position, and we still take the position,

9    it's an entirely separate conspiracy.  It's nothing to do with

10   what happened to American banks.

11   THE COURT:  And you think that witness proved that?

12   MR. ROCCO:  Oh, no, I don't.  I think that that's --

13   THE COURT:  I'm neutral as to the defense.

14   MR. ROCCO:  So --

15   THE COURT:  Whoa, whoa.  But I'm not neutral as to

16   wasting time.

17   MR. ROCCO:  I don't want to --

18   THE COURT:  I'm not being a wiseguy.  I really didn't

19   understand almost a word he said, the witness.  What I did

20   gather is that Deutsche Bank and, as others probably, have

21   mostly computer programs designed to catch sanctioning

22   missteps.  That was my takeaway from his testimony.

23   MS. FLEMING:  As does Halkbank.

24   THE COURT:  Okay.  But they don't have to call

25   Halkbank.

1    MS. FLEMING:  Right, and --

2    THE COURT:  No, no, wait, please.  So I don't

3    understand.

4    MR. ROCCO:  I didn't call the witness, your Honor.

5    The government did.

6    THE COURT:  No, I get that.  I still don't understand

7    why another person has to say that.  It couldn't be more

8    obvious, for one thing, by the way.  They either do or don't

9    have a system, and this guy from Deutsche Bank has a system.

10   So what?

11   MR. LOCKARD:  And so the purpose of calling one other

12   is just because there are nine.  We didn't want the jury to

13   feel like they had to rely on one bank witness to represent the

14   entire financial community.

15   THE COURT:  I'm missing that point.  I don't know what

16   that means.  I mean, why are two standing in for nine and one

17   doesn't stand for nine?  I mean, tell me.  If there's something

18   different with this other witness, say it.

19   MR. LOCKARD:  There's no magic to it.  It's really

20   just to have another bank witness, it's corroborative, and we

21   view that as more than enough corroboration on that point.  And

22   that's why we thought two was sufficient and not more than

23   necessary.

24   THE COURT:  Without feeling pressure from me, but

25   would you stipulate that, if called, another bank custodian

1    would testify that they have the program or whatever --

2              MR. ROCCO:  I would like to see that set of documents

3    as well, Judge, and go through the same exercise.  But we

4    certainly can do it overnight.  I mean, we certainly don't have

5    to do it in front of the jury.

6              MS. FLEMING:  What this witness did is, over lunch, is

7    he walked us through the documents because we seriously did not

8    understand them.

9              THE COURT:  Well, I had no idea.  That's not on the

10   record or anything.

11             MS. FLEMING:  Right.  No.  No.

12             MR. DRATEL:  They just made him available.

13             MS. FLEMING:  They made him available.  He walked us

14   through the documents.  We had been trying to do it in court.

15             MR. ROCCO:  We did it in 15 minutes.

16             THE COURT:  Can you do that?

17             MR. ROCCO:  We can do it tomorrow morning before court

18   starts.

19             MS. FLEMING:  Or at lunch or something.

20             MR. ROCCO:  Or lunch makes more sense.

21             MR. DRATEL:  Lunch makes more sense.

22             THE COURT:  I'm not bullying anybody because the

23   information that was useful to you, you're saying, wasn't even

24   in the testimony.

25             MR. ROCCO:  No.

1          MS. FLEMING:  I thought it was.

2          MR. ROCCO:  Well, the information was useful that he

3    provided was useful in connecting -- in showing that these

4    transactions were completely American based.  And the

5    government's theory here is that this is how the banks suffered

6    their loss, this is how the bank -- U.S. banks were deceived

7    into providing dollar transactions.  Am I correct, Mr. Lockard?

8    I mean, this is the American end.

9          MR. LOCKARD:  That's a rough summary, yes.

10         MR. ROCCO:  Well, we knew we weren't going to get that

11   this was a fine summary.

12         THE COURT:  Is that what you got from that witness,

13   you think?

14         MR. LOCKARD:  So I think what we established is that

15   they said sanctions compliance is an issue of concern for the

16   banks, that they have programs in place to try and catch

17   violative conduct, and then there are ways that transactions

18   can be designed to slip through those systems, and those are

19   the three points that are ultimately --

20         THE COURT:  Okay.  All right.  So that's it?  One more

21   witness to do that?

22         MR. LOCKARD:  Yes, one more bank witness to do that,

23   finishing up Mr. Korkmaz's direct, and however much time

24   defense needs for the cross of Mr. Korkmaz, and we have cut the

25   summary witness.

1              MS. FLEMING:  You didn't cut him.

2              THE COURT:  No, I just said that I never had one.

3              MR. ROCCO:  Powers of persuasion.

4              THE COURT:  Okay.

5              MR. LOCKARD:  We thought the Court's advice was good

6      advice.  So there's one remaining proposed expert, who we have

7      whittled down to about, I think, another half hour of direct

8      testimony.

9              THE COURT:  To say what?

10             MR. LOCKARD:  We're evaluating whether or not to cut

11     that person also.

12             THE COURT:  So then you've really got nothing left, or

13     not much left except the further direct of this witness.  And

14     how much time?

15             MR. LOCKARD:  I think he's probably about another half

16     day, and then we'll be done with his direct.

17             THE COURT:  Oh, God.  Why a half day?

18             MR. LOCKARD:  Because he did introduce a whole lot of

19     evidence today, and we're not certainly going to walk through

20     all of it, but we wanted to walk through parts of it so that

21     the jury doesn't hear it for the very first time in summation

22     and have to make summations much longer to make up for the

23     absence of fact testimony about it.

24             THE COURT:  Well, it's hard to imagine that would take

25     a half a day, honestly, you know.

 1                  MR. LOCKARD:  It may be less.  We've been working on

 2      cutting his direct as well.

 3                  THE COURT:  All right.  So let's say that -- so do I

 4      understand correctly, then, there's likely to be one more bank

 5      custodian.  Can you get one that is comprehensible?  There's no

 6      point in bringing him --

 7                  MR. LOCKARD:  I think Mr. Perry is a little bit more

 8      plain spoken than Mr. Sloan.

 9                  MR. ROCCO:  I actually liked him.

10                  THE COURT:  And you're going to endeavor to shorten up

11      the further direct of this witness?

12                  MR. LOCKARD:  He already has been shortened, and we'll

13      see if we can shorten him more.

14                  THE COURT:  So then that would be the end of the

15      direct?

16                  MR. ROCCO:  Right.

17                  THE COURT:  So that could happen tomorrow.

18                  MR. LOCKARD:  So we hope to have no further direct

19      examination -- well, you know, the bank witness will have to go

20      on when Mr. Korkmaz is done, but we expect the total amount of

21      direct --

22                  THE COURT:  You could bring him up?

23                  MS. FLEMING:  You could interrupt, sure.

24                  THE COURT:  You could interrupt and take him out of

25      order.

1          MR. LOCKARD:  I feel so bad for interrupting

2     Mr. Korkmaz again, but if necessary, I think we could do

3     something.

4          THE COURT:  I think he's game for that.  I think he's

5     game.

6          MR. LOCKARD:  Over the course of two days, he's been

7     on for maybe two-and-a-half hours, but that's life.

8          THE COURT:  All right.  No, I mean, everybody is being

9     courteous to him and all.  It's an important topic.  I don't

10    see that as a problem.  I think if you could get that other

11    witness in here, and then we have more control over our destiny

12    here.  It doesn't have to be in the morning.  It could be in

13    the afternoon.

14          MR. SOVOLOS:  I think we could get him in the

15    afternoon.

16          THE COURT:  We could have it at 1:45 or something like

17    that.

18          MR. LOCKARD:  He's traveling in from Washington.

19          THE COURT:  Whatever.  So let's get him done tomorrow.

20          MR. SOVOLOS:  Have we settled the expert issue, Judge?

21          MR. LOCKARD:  I think we can consult internally.  We

22    take the Court's point.

23          MS. FLEMING:  And, Judge, we are going to file a

24    mistrial motion tomorrow based on particularly this witness

25    testimony.

1              THE COURT:  Okay.  So you're going to file a written?

2              MS. FLEMING:  Yes.

3              MR. ROCCO:  Yes.

4              THE COURT:  Okay.  And then you have somebody -- we'll

5     have to see it first.  Okay, that's fine.

6              MS. FLEMING:  United States v. Garcia.

7              MR. ROCCO:  Right.

8              MS. FLEMING:  It's a good case for you to start with.

9              MR. ROCCO:  The question is, which Garcia?

10             THE COURT:  I would say I've had a enough.

11             MR. ROCCO:  Robert.

12             THE COURT:  Okay.  So we'll see you at 9:15.

13             MS. FLEMING:  Thanks, Judge.

14             MR. ROCCO:  All right.  Have a nice evening.

15             MR. LOCKARD:  Thank you, Judge.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

HCCPATI6                         Korkmaz – Direct

1          (In open court)

2          THE COURT:  Is it Mr -- I don't want to

3   mispronounce -- Canikligil, is that a correct pronunciation?

4          MR. CANIKLIGIL:  Yes.

5          THE COURT:  So I've arranged for you, if you are

6   interested and available, to see the district executive

7   tomorrow morning.  He suggested 9:00.  You go in this building

8   on the eighth floor, and I told him the issues that we talked

9   about, and he's the one that's in charge of that.

10         MR. CANIKLIGIL:  Very good.  Thank you.

11         THE COURT:  All right.  See everybody tomorrow.  Oh,

12  can I see counsel again for a minute.

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  The reference I just made, I was

3   addressing one of the Turkish reporters who wrote a letter

4   complaining that, notwithstanding there are 75 Turkish

5   reporters in the courtroom, that they are having access issues.

6   And you know, I thought we had actually -- by the way, in

7   addition to them being in the main courtroom here, and

8   virtually everybody there is a Turkish reporter, there is an

9   overflow courtroom, and for the in-house media there is a media

10  room, people like The New York Times, etc., who have been here

11  for a long time, and they're able to watch in the convenience

12  of the media, where, they have a little office here.

13          So, he was complaining that they're not allowed to

14  bring phones, and they aren't.  Nobody is supposed to except if

15  you have a pass.  And the outside press doesn't, not even NBC

16  if they're not in the in-house press, so phones was an issue.

17  Because he said that he's under pressure to tweet the case to

18  Turkey.  That's the way I understood it.  But people are saying

19  how come Ben Weiser is tweeting and you're not.  Something like

20  that.  By the way, I don't think that is what Ben Weiser, for

21  example, is doing.

22          But anyway, so, I spoke to the district executive who

23  is Ed Friedland, to see if there is any way to provide further

24  accommodations for the Turkish press, since he was speaking on

25  behalf of them only, and Friedland mentioned that across the

HCC3ATI7

1    alley in 40 Foley, there is a room that is used -- you know

2    where the cafeteria is over there.  So instead of walking

3    straight into the cafeteria, there is a media room, they could

4    arrange to put a screen there and possibly internet access.  So

5    that is something that hasn't happened before, but that's why I

6    said he should go and speak to him.

7          So that would enable someone to view the trial, write

8    about the trial, and if you wanted to go outside and use your

9    cell phone, you could go out, the door is very close to where

10   the room is, and presumably, use your cell phone.  So, I just

11   wanted you to know.

12         Somebody said I think they talked to you.  Did they,

13   they have displayed in Turkey --

14         MR. ROCCO:  A video of the post-arrest.

15         MR. HARRISON:  We objected to YouTube.

16         MR. ROCCO:  We objected to YouTube posting it.  And

17   displaying it.

18         THE COURT:  They did.

19         MR. ROCCO:  We learned about it only after YouTube had

20   already had it.

21         THE COURT:  I see.

22         MS. FLEMING:  I think I mentioned it to the government

23   and I believe they took it down as an exhibit.  It had all his

24   personal information on the post-arrest statement.

25         THE COURT:  That's what I understood.  So I would

HCC3ATI7

1    never have approved it.  But I guess it happened.

2              MR. ROCCO:  Mr. Atilla's wife is getting phone calls

3    and that's what brought it to our attention.  We had no idea

4    that they had accessed it and YouTube had it and played it.

5              THE COURT:  Okay.  I thought he was suggesting that

6    you said it was okay.

7              MS. FLEMING:  No.

8              THE COURT:  But you did not.

9              MS. FLEMING:  No.

10             THE COURT:  That's good to know.  So now they're

11   asking for the same for Zarrab, which I don't think is in

12   evidence.

13             MS. FLEMING:  That's right.

14             THE COURT:  Either in the case.  So, but I may ask you

15   to comment on that.  Do you feel that they should have that?

16             MR. LOCKARD:  No.  So I can explain my understanding

17   of what happened with the post-arrest video for Mr. Atilla.

18             THE COURT:  Let's do it at another time.  I'll come

19   back to you if I need a comment or if you want -- do you have a

20   thought about that?

21             MR. ROCCO:  No.

22             MS. FLEMING:  We didn't think anything was

23   intentional.  We thought it was an inadvertent unfortunate

24   problem.

25             THE COURT:  In your opinion, it should not have

HCC3ATI7

1    happened.

2              MR. ROCCO:  It absolutely should not have happened.

3              THE COURT:  Just shorthand, are you for it or against

4    it, so to speak?

5              MR. LOCKARD:  So I'm not sure if we are talking about

6    Mr. Atilla's or Mr. Zarrab's.

7              THE COURT:  Well, Atilla's -- I would be against both

8    as well.  So okay.  Good.  All right.  There you go.

9              MS. FLEMING:  While we're off the record.

10             THE COURT:  That was on record.

11             MS. FLEMING:  While we're off.

12             (Discussion off the record)

13             (Adjourned until December 13, 2017, at 9:15 a.m.)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination of:                             Page

 3    ADAM SZUBIN

 4   Direct By Mr. Denton . . . . . . . . . . . .1407

 5   Cross By Mr. Rocco . . . . . . . . . . . . .1463

 6   Redirect By Mr. Denton . . . . . . . . . . .1521

 7   DOUGLAS SLOAN

 8   Direct By Mr. Denton . . . . . . . . . . . .1526

 9   Cross By Ms. Fleming . . . . . . . . . . . .1548

10    HUSEYIN KORKMAZ

11   Direct By Mr. Lockard . . . . . . . . . . .1560

12                        GOVERNMENT EXHIBITS

13   Exhibit No.                             Received

14   7020     . . . . . . . . . . . . . . . . . .1423

15   7006     . . . . . . . . . . . . . . . . . .1435

16   7009     . . . . . . . . . . . . . . . . . .1447

17   7015     . . . . . . . . . . . . . . . . . .1457

18   7016     . . . . . . . . . . . . . . . . . .1459

19   8101-4   . . . . . . . . . . . . . . . . . .1535

20   701-832  . . . . . . . . . . . . . . . . . .1566

21   901-930, 601-604, 606, 608, 609, 611-614   .1569

22   960-964  . . . . . . . . . . . . . . . . . .1574

23   950, 605, 607  . . . . . . . . . . . . . . .1575

24

25
```

```
1       201 through 269-A and -T, 273 and 274-A . . .1586

2               and -T, 276 through 279-A and

3               -T, 288-A and -T, 291-A and

4               -T, 293 through 295-A and -T,

5               297 through 298-A and -T, 300

6               and 301-A and -T, 304 through

7               306-A and -T, 308 and 309-A

8               and -T, 316-A and -T, 326-A

9               and -T, 336 through 357-A and

10              -T, 359-A and -T, and 380 and

11              381-A and -T

12                      DEFENDANT EXHIBITS

13      Exhibit No.                             Received

14       220  . . . . . . . . . . . . . . . . .1486

15

16

17

18

19

20

21

22

23

24

25
```