HCDPATI1                        Trial

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                           S4 15 Cr. 867 RMB

 5   MEHMET HAKAN ATILLA,

 6              Defendant.

 7   ------------------------------x

 8

 9                                           December 13, 2017
                                             9:15 a.m.
10

11

12   Before:

13                  HON. RICHARD M. BERMAN,

14                                           District Judge
                                               and a jury
15

16

17                       APPEARANCES

18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL DENNIS LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID WILLIAM DENTON, JR.,
21   DEAN CONSTANTINE SOVOLOS,
          Assistant United States Attorneys
22

23

24

25

HCDPATI1                     Trial

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
     Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
     THOMAS ELLIOTT THORNHILL, Esq.
     - and -
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
     ROBERT J. FETTWEIS, Esq.
     - and -
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
                Of counsel


Also Present:
     JENNIFER McREYNOLDS, Special Agent FBI
     MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
     MS. ASIYE KAY, Turkish Interpreter
     MS. SEYHAN SIRTALAN, Turkish Interpreter

1          (Trial resumed; jury not present)

2          (At the side bar)

3          MR. KAMARAJU:  Morning, your Honor.

4          MS. FLEMING:  Hi, Judge.

5          THE COURT:  Hi, how are you today?

6          MS. FLEMING:  Good.

7          MR. KAMARAJU:  So I think the parties are stipulating

8    to a number of testimonial stips to trim down the trial,

9    including internet service providers with respect to e-mails,

10   bank record custodians with respect to those kinds of

11   foundational requirements, and the FDIC status of the various

12   victim banks.

13         Pursuant to those stipulations, the government intends

14   to move in the exhibits that are sort of -- the foundation is

15   laid for through those.  Defense counsel, I think, and I'll let

16   her speak for herself, but defense counsel had a question as to

17   how to sort of preserve an objection.

18         MS. FLEMING:  They put in here that, therefore, it may

19   be admitted in evidence.  We want to preserve our subject to

20   and relevance objections on certain of them.  So we can either

21   add the language "subject to" but that takes it out of your --

22   it's kind of presumptuous to say "they may be admitted subject

23   to."

24         THE COURT:  I don't mind.

25         MS. FLEMING:  As long as you didn't mind, we didn't

HCDPATI1                    Trial

1    want to be presumptuous.

2              THE COURT:  No problem.  Are you going to read them as

3    part of the direct case?

4              MR. KAMARAJU:  Yes, we're going to read the

5    stipulation.

6              THE COURT:  You can make that change.

7              MS. FLEMING:  Okay.  I just wanted to make sure that

8    we didn't waive anything, and we were preserving our

9    objections.

10             THE COURT:  Okay.  Thanks.

11             MR. KAMARAJU:  Thanks, Judge.

12             THE COURT:  We don't have all the jurors yet, that's

13   what we're waiting for.

14             MR. KAMARAJU:  Okay, thanks.

15             (In open court)

16             (Pause)

17             MR. HARRISON:  Judge, can we approach just briefly?

18             THE COURT:  Yes, sure.

19             (At the side bar)

20             MR. HARRISON:  I just sort of wanted to front

21   something briefly, Judge.  Mr. Lockard, I think with this

22   witness, and he and I have talked, is going to try to elicit

23   from this witness his recollection of what was on some

24   audiotapes that we don't have.

25             THE COURT:  Okay.

1           MR. HARRISON:  So I think he's going to try to refresh

2   his recollection from the transcripts.  This is a very

3   sensitive area for us, since we have no audio.  So we can't

4   really verify whether what he says or not, or whether the

5   transcripts that we got are true or not.  So if he's going to

6   refresh his recollection based on transcripts that we don't

7   have audio for, I'm just going to ask that he, with this

8   witness, really be held to the way --

9           THE COURT:  Refresh the recollection.

10          MR. HARRISON:  Look at the document and if it sparks a

11  real memory, he should put the document down and testify from

12  his memory.

13          THE COURT:  That's the way you refresh someone's

14  recollection.

15          MR. LOCKARD:  Yes, your Honor.

16          MR. HARRISON:  Thank you.

17          THE COURT:  Oh, just so you know, I'm going to say

18  that I've been working with you and everybody's been

19  cooperative to blah, blah, blah, and then I'm going to say,

20  from my point of view, I'm hopeful that we'll finish the trial

21  a week from today or before, not just you guys, because I know

22  they want to know.

23          MR. HARRISON:  Okay.

24          THE COURT:  But it doesn't hold you to that either; so

25  you know what I'm saying.

HCDPATI1                         Trial

 1              MR. KAMARAJU:  Absolutely, your Honor.

 2              MR. LOCKARD:  I think we're comfortable with that

 3     optimism.

 4              (Continued on next page)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (In open court)

2                    (Jury present)

3                    THE COURT:  Good morning, everybody.  So I've been

4     talking to the lawyers for both sides, and they've been very

5     cooperative.  And my goal is that we conclude the trial on or

6     before a week from today.  That is to say, all of the

7     testimony.  Maybe hopefully sooner, if possible, but that is my

8     goal.  So I just wanted to share that with all of you.  So

9     we'll continue direct examination by the government.

10                    THE DEPUTY CLERK:  Sir, before we begin, I'd like to

11    remind you that you're still under oath.

12                    THE WITNESS:  Thank you, yes.

13    HUSEYIN KORKMAZ,

14         called as a witness by the Government,

15         having been previously duly sworn, testified as follows:

16    DIRECT EXAMINATION RESUMED

17    BY MR. LOCKARD:

18    Q.  Good morning, Mr. Korkmaz.

19    A.  Good morning to you, as well.

20    Q.  So yesterday we were talking about some of the phone calls

21    gathered in your investigation relating to Mr. Atilla?

22    A.  Yes.

23    Q.  And if we could pull up Government's Exhibit 261-T.  I'm

24    sorry, it should be 295-T.  There we go.

25                    And I believe you had just been talking about

1    recognizing phone numbers from your participation in the

2    investigation?

3    A.  Yes, some of them and the last four digits of some of them.

4    Q.  And do you recognize Mr. Atilla's phone number?

5    A.  I remember it was 4545.

6    Q.  And if we could go to the next page of this exhibit.  Can

7    you remind us again who this conversation is between?

8    A.  It's between Mr. Hakan Atilla and Reza Zarrab.

9    Q.  And in the middle of the page, where Mr. Zarrab describes a

10   transaction for testing purposes, does Mr. Zarrab mention both

11   food transactions and gold transactions to Mr. Atilla?

12   A.  That is correct.

13   Q.  And if we can now go to Government's Exhibit 261-T.  What

14   is the date of this call?

15   A.  July 9th, 2013.

16   Q.  And who is it between?

17   A.  Mr. Hakan Atilla and Reza Zarrab.

18           MR. LOCKARD:  And, Mr. Chang-Frieden, if you could

19   take us to the next page.

20   Q.  And, again, looking towards the middle of the page, does

21   Mr. Atilla reference an in-coming transfer of money?

22   A.  That is correct.

23   Q.  And can you tell us what Mr. Atilla says about the field of

24   business for the company receiving the money?

25   A.  He says that the transfer was received by a company called

1    Volgam.  He's asking whether food was mentioned in the field of

2    business for Volgam with regards to these transactions.

3    Q.  And do you have an understanding of what is meant by the

4    reference to "the other side"?

5              MR. HARRISON:  Objection, your Honor.

6              THE COURT:  Overruled.  If you know.

7    A.  Yes.

8    Q.  And, in fact, what does Mr. Atilla say about what he means

9    by "the other side"?

10             MR. HARRISON:  Objection, calls for speculation.

11             THE COURT:  Overruled.  It's right in front of you on

12   the screen what he said.

13   A.  Yes, I can understand.

14   Q.  And what does Mr. Atilla say about that?

15   A.  What I understand from here is that they had used Royal

16   before and food was part of the field of business for Royal,

17   and they're talking about whether to use Royal or not.

18   Q.  And when they talk about precious assets, is that the other

19   side that Mr. Atilla is referring to?

20             MR. HARRISON:  Objection, calls for speculation.

21             THE COURT:  Overruled.  You can tell from the exhibit.

22   A.  That is correct.

23   Q.  So one side is food and the other side is gold?

24             MR. HARRISON:  Same objection.

25             THE COURT:  Overruled, for the same reason.

1    A.  That is correct.

2    Q.  So, Mr. Korkmaz, you had described early in your testimony

3    how Iranian oil proceeds were used to fund the food and the

4    gold business; do you recall that?

5    A.  That is correct.

6    Q.  Do you recall a conversation from April 14th of 2013

7    between Mr. Zarrab and Mr. Aslan about Iranian oil proceeds?

8              MR. HARRISON:  Objection to form, Judge.

9              THE COURT:  Overruled.

10   A.  That is correct.

11   Q.  Is that a call that was intercepted in the course of your

12   investigation?

13   A.  Yes.

14   Q.  Is that a recording that you were able to make a copy of

15   and keep with you?

16   A.  No.  I understand that there's no audio.

17   Q.  Do you know if there is a transcript from the Turkish

18   investigation for that call?

19   A.  Certainly.

20   Q.  Do you remember the content of that call?

21   A.  Yes.

22   Q.  Is that a call that you listened to during your

23   investigation?

24   A.  This was among the audio recordings that I had listened to

25   first as I was learning how to listen or monitor audio

1    recordings.

2    Q.  Can you describe for us generally what was discussed during

3    that phone call?

4           MR. HARRISON:  Objection, your Honor, as we discussed,

5    to any hearsay elicited about this particular call.

6           THE COURT:  That's not what he's asking.  You've got

7    to pay attention to the question.  Could you restate the

8    question, please.

9    Q.  Mr. Korkmaz, could you describe the topic that was

10   discussed between Mr. Zarrab and Mr. Aslan in that call on

11   April 14th, 2013?

12          MR. HARRISON:  Same objection, your Honor, calls for

13   hearsay.

14          THE COURT:  Overruled.

15   A.  Reza Zarrab had told Suleyman Aslan that the NIOC

16   delegation was still in Turkey for a visit and said that

17   because of this, they were not were not at their normal place.

18   He had said that there was a payment that would be -- that was

19   to be made by Tupras.

20   Q.  I'm sorry and by "he," you mean who?

21   A.  This is being said by Reza Zarrab, and he had said that

22   Tupras had payments to be made to the Central Bank of Iran

23   account at Halkbank and that these payments were being made

24   automatically.

25          However, Reza Zarrab requested that this payment not

1    be accepted by Halkbank and be put on hold and said that the

2    NIOC people would be in their normal place on Monday and that

3    they would send instructions to Tupras, and through that

4    instruction, Tupras was going to make the payment directly into

5    the NIOC account instead of going forward with the automatic

6    payment.

7    Q.  And do you recall what, if anything, Mr. Zarrab said about

8    why he wanted Tupras' payment to be made to the National

9    Iranian Oil Company instead of the Central Bank of Iran?

10             MR. HARRISON:  Objection, leading.

11             THE COURT:  Sustained.

12   Q.  So could you please remind us, according to what Mr. Zarrab

13   said on that call, how Tupras was making its payments for

14   Iranian oil?

15             MR. HARRISON:  Objection to hearsay.

16             THE COURT:  Overruled.

17   A.  Payments by Tupras were being made automatically into the

18   Central Bank of Iran account at Halkbank.  What I remember him

19   saying was that if the money could be held up, then it could be

20   provided -- that the money could be deposited directly into the

21   NIOC account, and if it were to be deposited into the account,

22   I remember him saying that all the money that would go into

23   NIOC accounts would go to my account.  And he had said, let's

24   not miss this bird up in the air, let's not mess up on this --

25             THE COURT:  Not miss what?

1      THE INTERPRETER:  Miss this bird in the air is what he

2  said.

3  A.  Let's not mess up on this opportunity to get the money in

4  our account.  So he was saying something like, let's not miss

5  this chance.

6  Q.  And, Mr. Korkmaz, do you remember a call on that same day,

7  April 14th, 2013, between Mr. Aslan and Mr. Atilla?

8  A.  Yes.

9  Q.  Is that a call that was intercepted in the course of your

10  investigation?

11  A.  That is correct.

12  Q.  And is that a call that you listened to in the course of

13  the investigation?

14  A.  That is correct.  This was one of the conversations that I

15  had listened to with other officers during the course of my

16  learning of monitoring calls.

17  Q.  And was a transcript made of that call?

18  A.  That is correct.

19  Q.  Were you able to keep a copy of that call?

20      THE COURT:  Do you mean a recording?

21      MR. LOCKARD:  Yes.

22  Q.  A copy of the recording.

23  A.  No.  I believe this is among those where I did not have

24  that.

25  Q.  And what do you recall as the topic that was discussed

1    between Mr. Atilla and Mr. Aslan in that call?

2              MR. HARRISON:  Objection to hearsay, calls for

3    speculation and opinion.

4              THE COURT:  Excuse me, the testimony is that he

5    remembers the call; so I'm going to allow it.

6    A.  Yes.

7    Q.  And what was the subject matter of the call?  What was the

8    topic that was discussed?

9    A.  It was the same topic that's related to the topic that was

10   within the preceding call.

11   Q.  And what, if anything, did Mr. Aslan tell Mr. Atilla in

12   that call?

13             MR. HARRISON:  Same objection.

14             THE COURT:  Overruled.

15   A.  He said that the NIOC delegation was in Turkey, and he said

16   that because of that, they had not had a chance to send

17   instruction to Tupras but that they would do so.  They talked

18   about the automatic payment that Tupras makes into the Central

19   Bank of Iran account at Halkbank.  And he advised that this

20   automatic payment not be made and not be deposited into the

21   account and to hold this up until the NIOC officials could

22   provide instruction to Tupras to make this payment directly

23   into the NIOC account at Halkbank.

24   Q.  And did Mr. Atilla agree to do that?

25   A.  Yes.

1  Q.  And in the call, did they discuss the amount of the

2  transfer?

3  A.  Two -- 200 is what I remember, 200 and some.

4  Q.  And 200 what?

5  A.  It's millions.  Whether that was Turkish Liras or Euros, I

6  can't remember that very well.

7  Q.  Mr. Chang-Frieden, could we please pull up Government's

8  Exhibit 1002-T, the WhatsApp chat between Mr. Zarrab and

9  Mr. Aslan?

10  A.  That is right.

11  Q.  And in this exchange of chats on April 15th, 2013, what did

12  Mr. Aslan tell Mr. Zarrab?

13          THE INTERPRETER:  You said what did Zarrab tell Aslan,

14  excuse me?

15  Q.  What did Mr. Aslan tell Mr. Zarrab.

16  A.  On the first one, what he's saying is that we are still

17  holding off the Tupras instructions.  Will a new one be

18  provided, Mr. Reza?

19  Q.  And if we could look at an exchange of chats about four

20  hours later, the time stamped 14:16:15.  What did Mr. Aslan

21  tell Mr. Zarrab at that time?

22  A.  "The NIOC business is done.  Transfer is completed as we

23  had planned."

24  Q.  Mr. Korkmaz, from your investigation, are you familiar with

25  other conversations that Mr. Atilla had about the NIOC account?

1   A.  Yes.

2   Q.  Let's look at Government's Exhibit 304-T.  Now, this is a

3   May 6th, 2013, call between Mr. Zarrab and Mr. Aslan; is that

4   right?

5   A.  That is correct.

6   Q.  And if we can go to the next page.  As we look at the

7   bottom quarter of the page, what did Mr. Aslan tell Mr. Zarrab

8   beginning in the sentence "There is no problem"?

9   A.  Excuse me, I could not hear the question fully.

10  Q.  What did Mr. Aslan tell Mr. Zarrab in the part of the

11  conversation beginning with "There is no problem over there"?

12  A.  It says with regard to the thing, Hakan Atilla has just

13  informed me that there is a 70 million transfer thing from NIOC

14  to your account, but it's a direct one.

15  Q.  And what did Mr. Zarrab say in response to that?

16  A.  He said:  "No, not direct.  No.  They made a mistake.  It

17  will go to Sarmayeh to share.  You stop it, and I will get it

18  corrected.  They are stupid.  They are retarded."

19  Q.  What did Mr. Aslan say about who had informed Mr. Aslan

20  about the fact of the 70 million transfer from NIOC to

21  Mr. Zarrab's account?

22  A.  He says that Mr. Hakan Atilla had made that.

23  Q.  And approximately how long after the 200 million

24  transferred from Tupras to NIOC?

25  A.  It's about 20, 21 days.

1    Q.  Now, when you were describing the conversations about that

2    Tupras transfer, I think you described that the NIOC people

3    were not in their home office at that time?

4    A.  That is what Reza Zarrab had said.

5    Q.  And from your investigation, did you learn where the NIOC

6    personnel were in mid-April of 2013?

7    A.  Yes.

8    Q.  And where were they?

9    A.  They had come to Turkey for a visit.

10   Q.  And who, if anyone, did they meet with while they were in

11   Turkey in April of 2013?

12   A.  They had met with Mr. Suleyman Aslan and Mr. Zafer

13   Caglayan.

14           MR. LOCKARD:  And, Mr. Chang-Frieden, if you could

15   pull Government's Exhibit 304-T back up, and if we could turn

16   to page 3.

17   Q.  So in this May 6th call, does Mr. Zarrab also describe

18   another meeting?

19   A.  Yes.

20   Q.  And if we could look down in the last half of the page, and

21   what is Mr. Zarrab describing in the sentence that says:  "You

22   know, we also went to Mr. Prime Minister"?

23   A.  I understand the visit by the delegation on May 3rd, 2013.

24   Q.  And what does Mr. Zarrab say about who were at those

25   meetings?

1   A.  So here, he's referring to going over to Mr. Taner and also

2   he's referring to going over to Mr. Prime Minister.

3   Q.  And who was Mr. Taner at that time?

4   A.  Taner Yildiz.

5   Q.  And what was his position?

6   A.  He's the minister of energy.

7   Q.  And from your investigation, did you learn who from the

8   Iranian side was at these meetings?

9   A.  Yes.

10  Q.  And who was there from the Iranian side?

11  A.  Rostam Ghasemi, the minister of oil from Iran was there,

12  the president of NICO was there, Seyfullah, Mahmoud Nikousokhan

13  from NIOC was there, and advisor Bushahri was there, and I also

14  recall Ahmet Vani and Luk Mani, also from the Iranian

15  delegation.

16          MR. LOCKARD:  Mr. Chang-Frieden, do we have

17  Government's Exhibit 137?  Just for Mr. Korkmaz for the moment.

18  Q.  Mr. Korkmaz, do you recognize that?

19  A.  Yes.

20  Q.  What is it?

21  A.  This is an identification of communication report that

22  pertains to a communication that was obtained through the

23  investigation that we were conducting.

24  Q.  Is it a text message, an SMS?

25  A.  That is correct.

1    Q.  And who is it between?

2    A.  By the last four digits, the 6666 number was the line that

3    was being used by Reza Zarrab, and up above it actually also

4    says that the user of that line was Reza Zarrab, and the 1212

5    was being used by Onur Kaya.

6    Q.  And at that time, what was Mr. Kaya's position?

7    A.  He was the executive assistant to the minister of economy,

8    Mr. Zafer Caglayan, and the phone number for the other

9    executive assistant was 9494.

10             MR. LOCKARD:  We offer Exhibit 137.

11             MR. HARRISON:  Objection, your Honor.

12             THE COURT:  I'll allow it.

13             (Government's Exhibit 137 received in evidence).

14             THE COURT:  What was the basis for the objection?

15             MR. HARRISON:  Hearsay.

16             THE COURT:  I'll allow it.

17   BY MR. LOCKARD:

18   Q.  And, Mr. Korkmaz, does this text message from Mr. Zarrab to

19   Minister Caglayan's assistant, does it describe the

20   participants to those meetings that you had just identified?

21   A.  That is correct.

22   Q.  Now, you just described some meetings in April and in early

23   May.  From your investigation, are you familiar with other

24   meetings between Halkbank officials and government of Iran

25   officials?

1    A.  That is correct.

2    Q.  And did those meetings also involve Mr. Zarrab?

3    A.  Yes.

4    Q.  Did they also involve government of Turkey officials?

5    A.  Yes.

6    Q.  And when did the other meetings take place?

7    A.  In the investigation, there was one meeting that took place

8    in early October of 2012.  I recall that to be the 4th, 5th,

9    6th of October, and I recall another visit that took place on

10   November 8th, 2012.

11   Q.  Were you able to record these meetings in your

12   investigation?

13   A.  When you mentioned recording, are you talking about audio

14   recordings or video recordings?

15   Q.  Were you able to record any aspect of the meetings

16   themselves?

17   A.  You mean the content of the meeting?

18   Q.  Yes, sir.

19   A.  No.

20   Q.  Were you able to determine one way or another whether

21   Mr. Atilla participated in any of those meetings?

22            THE COURT:  Excuse me for a minute.  Did you ask what

23   the dates were again?

24   Q.  Yes.  Mr. Korkmaz --

25   A.  What I remember is that the delegation arrived on 3rd of

1    October, and between the 4th and 6th of October 2012 they had

2    meetings, and I understand this based on the evidence that's in

3    the investigation.

4              THE COURT:  And you understand what?

5              THE INTERPRETER:  And I understand this based on the

6    evidence that is in the investigation.

7              THE COURT:  Okay.  Yes.

8              THE WITNESS:  And then in the 11th month, November, on

9    November 8th, 2013, they had a meeting.

10             THE COURT:  Oh, 2013?

11             THE WITNESS:  I apologize.  That was 2012.

12   BY MR. LOCKARD:

13   Q.  And then again, just to complete the timeline, what were

14   the dates of the meetings in April and May of 2013?

15   A.  It was April 10th, 2013; May 3rd, 2013.

16   Q.  And I think you said earlier that we know from the call

17   about the Tupras payments, that the Iranian delegation was

18   still in Turkey on the 14th of April as well?

19             MR. HARRISON:  Objection to leading, your Honor.

20             THE COURT:  Overruled.

21   A.  That is correct.  That is what was understood from me.

22   Q.  I believe I asked if you were able to determine from the

23   investigation, one way or another, whether Mr. Atilla was at

24   those meetings?

25             MR. HARRISON:  Objection, your Honor.

1       THE COURT:  Overruled.

2   A.  No.

3   Q.  So let's now turn to early July of 2013.  I believe you

4   had -- well, did your investigation develop evidence relating

5   to food transactions involving Iranian oil money during that

6   time period, July of 2013?

7   A.  Yes.  So as far food, was the question referring to any

8   real food trades?  Because that's not what I meant.

9   Q.  Did your investigation develop evidence relating to

10  purported food transactions in July of 2013?

11  A.  That is correct.

12  Q.  In your investigation, did you learn of a call on July 2nd,

13  2013, between --

14      THE COURT:  I'm sorry, I can't hear you, counsel.

15  Q.  Sorry.  Did you learn of a call on July 2nd of 2013 between

16  Mr. Zarrab and Mr. Atilla?

17  A.  There was a high volume of conversations during that time

18  with regards to food; so in terms of which specific

19  conversation you might be referring to, I don't know.

20  Q.  Do you recall there being such calls at that time?

21  A.  Yes.

22      MR. LOCKARD:  Your Honor, if I may approach?

23      THE COURT:  Yes.

24  Q.  So, Mr. Korkmaz, I'm going to hand you what's been marked

25  for identification as Government's Exhibit 115.

1           (Pause)

2           So does that refresh your recollection as to a

3   particular call between Mr. Zarrab and Mr. Atilla on July 2nd,

4   2013?

5   A.  Yes, I do recall the content of this conversation.

6   Q.  All right.  Is that a call that was intercepted in the

7   course of your investigation?

8   A.  That is correct.

9   Q.  Is that a call that you listened to during the

10  investigation?

11  A.  Yes, I remember checking this audio before the operation.

12  Q.  So --

13          THE COURT:  Is there an audio of this call?

14          MR. LOCKARD:  Yes, your Honor.

15  Q.  Were you able to keep a copy of that recording after the

16  investigation?

17  A.  No.

18  Q.  Okay.

19          THE COURT:  Then you can ask if, apart from the

20  exhibit, his recollection has been refreshed.

21          MR. LOCKARD:  Exactly, your Honor.

22  Q.  So, Mr. Korkmaz, if you could please put Exhibit 115 to the

23  side.  I'll ask you some questions about your recollection of

24  that recording.

25  A.  Mmm, hmm.

1    Q.   What was the general topic of discussion in that

2    conversation between Mr. Zarrab and Mr. Atilla?

3            MR. HARRISON:   Objection based on hearsay.

4            THE COURT:   Overruled.

5    A.   They were talking about the transit food trade that they

6    would actively get involved in during that time.

7    Q.   And was there any particular aspect of that trade that was

8    discussed in this call?

9    A.   That is correct.

10   Q.   And what was that?

11   A.   It is mentioned that a payment had been received for

12   150,000 tons of wheat, and Mr. Hakan then says that this was

13   not practically physically possible, based on what Mr. Reza had

14   told him before about transporting the goods on wooden ships

15   with 5,000 or 10,000 capacity.   And Reza Zarrab says but this

16   is how it's done over there.

17           And I recall that Mr. Hakan Atilla had said, in that

18   case, the vessel would have to go back and forth 30, 40 times.

19   And I recall that Mr. Reza had said that they made a technical

20   error in terms of the transfer amount, and I recall that early

21   in the conversation there was an explanation such as this.   And

22   Reza Zarrab says that we had already said that we cannot

23   provide bill of lading because, as I had mentioned to you

24   before, these are small vessels.   They are not like those large

25   vessels.   And I recall that Mr. Hakan had responded to that

1    when he had said that 150,000 tons is not really physically

2    practically possible.

3    Q.  Mr. Korkmaz, do you remember, or are you familiar with,

4    another call between Mr. Zarrab and Mr. Atilla that same day?

5    A.  I do remember that there was another call on that day based

6    on the investigation.

7    Q.  Another call between Mr. Zarrab and Mr. Atilla on July 2nd,

8    2013?

9    A.  That is correct.

10   Q.  And is that a call that you -- that was intercepted in the

11   course of the investigation?

12   A.  That is correct.

13   Q.  Is that a recording that you listened to during the course

14   of the investigation?

15   A.  I recall checking all the sound recordings, including Hakan

16   Atilla, that already reported the transit trade, and I've been

17   checking these calls prior to the operation.

18                (Continued on next page)

19

20

21

22

23

24

25

1    Q.  Were you able to keep a copy of that recording after the

2    investigation was over?

3    A.  No, I believe this was among those audio files that I could

4    not obtain.

5    Q.  What do you remember was the topic of that conversation?

6    A.  I remember that it was related to this conversation.  I

7    recall that --

8                MR. HARRISON:  Same objection to hearsay.

9                THE COURT:  Overruled.

10   A.  I recall in this conversation, the previous conversation,

11   Mr. Hakan Atilla said let me talk to my colleagues and get back

12   to you.

13               THE COURT:  I'm sorry.  In which conversation?

14               THE INTERPRETER:  When he says "this" he's pointing at

15   the one he has in front of him.

16               THE COURT:  You mean what you just described a few

17   minutes ago?

18               THE WITNESS:  That is correct, your Honor.

19               THE COURT:  So, start it again.

20   A.  I recall that in the conversation that we discussed

21   earlier, that Mr. Hakan Atilla had said I'm not familiar with

22   this topic, let me talk with the colleagues and get back to

23   you.  And I recall this other conversation to be a callback

24   from that call.  I recall that they talked about a problem

25   coming up, because of what Reza Zarrab's people had sent to

1   Halkbank on documents showed that origin of the goods was

2   Dubai, and that this was not necessarily related to the

3   shipment, but it was related to the origin being mentioned on

4   the document.

5   Q.  Can you remind us what were the goods?

6   A.  Wheat.

7   Q.  Mr. Korkmaz, do you remember a third call also on July 2nd

8   of 2013 between Mr. Atilla and Mr. Aslan?

9   A.  I can't recall exactly.

10          MR. LOCKARD:  Your Honor, may I approach?

11          THE COURT:  Yes.

12  Q.  Mr. Korkmaz, I'm handing you what's been marked for

13  identification as Government's Exhibit 118.

14          (Pause)

15  Q.  Mr. Korkmaz, does that refresh your recollection as to a

16  particular call on July 2nd of 2013 between Mr. Atilla and

17  Mr. Aslan?

18  A.  That is right.

19  Q.  Is that a conversation that was intercepted in the course

20  of your investigation?

21  A.  That is right.

22  Q.  Did you listen to the recording of that call during your

23  investigation?

24  A.  That is right.  I had checked it prior to the operation.

25  Q.  Were you able to keep a copy of that recording after the

1    investigation?

2    A.  I understand that this was not among the section that I had

3    obtained.

4    Q.  So Mr. Korkmaz, if you could just put the document 118 to

5    the side, I'll ask you a few questions about what you remember

6    about that call.

7         What was the topic being discussed by Mr. Atilla and

8    Mr. Aslan?

9              MR. HARRISON:  Same objection, hearsay.

10             THE COURT:  Overruled.

11   A.  Mr. Hakan Atilla had said that he had talked to Mr. Reza

12   Zarrab during that day, and there was this joke back and forth

13   between the individuals in the call --

14             THE COURT:  Between which individuals?

15             THE WITNESS:  This is between Mr. Suleyman Aslan and

16   Mr. Hakan Atilla.

17   A.  They had joked about this conversation having been done

18   with Jabbar.

19             MR. HARRISON:  Objection to speculation, Judge.

20             THE COURT:  Overruled.

21   A.  So, what I'm saying is based on that reference, I have a

22   specific recollection of this.

23             THE COURT:  Based on the reference to Jabbar?

24             THE WITNESS:  That is correct.

25             So I recall that they had said Jabbar, your Honor.

HCD3ATI2                          Korkmaz - Direct

1              THE COURT:  What does Jabbar mean?

2              THE WITNESS:  Jabbar is a name, your Honor.  This is a

3    name that is used in our region, including the Arabic region.

4    And it's a name that is understood as being used in jokes.

5    Q.  What did Mr. Atilla tell to Mr. Aslan in this conversation

6    about Mr. Atilla's conversation with Mr. Zarrab?

7              MR. HARRISON:  Same objection, Judge.

8              THE COURT:  Go ahead.

9    A.  He mentioned that the impracticality of sending --

10             THE COURT:  Who is "he."

11             THE WITNESS:  Mr. Hakan Atilla.

12   A.  Said that he had talked about the impracticality of using

13   small vessels with the tonnage capacity of 5,000 to 10,000, in

14   order to transport a load of 100 to 250,000 tons.

15             Suleyman Aslan asked whether bill of lading had been

16   provided.  And I recall Mr. Hakan saying that it had not been

17   provided.  I recall that Mr. Hakan Atilla mentioned that an

18   inspection document had been requested.

19             I recall that there was a conversation in which

20   Suleyman Aslan was asking whether the inspection document

21   should come from a private company or a company affiliated with

22   the government.

23             I recall that Mr. Hakan Atilla had mentioned that

24   obtaining this document through a private company such as SGS

25   would be better than obtaining it from a government agency.

1    And because he had also said that obtaining documentation from

2    government agencies in Dubai is very easy.

3              And I recall that he also conveyed that he had heard

4    from the other individual --

5              THE COURT:  Who is "he?"

6              THE WITNESS:  Your Honor, Mr. Hakan Atilla is talking

7    to Suleyman Aslan about Reza Zarrab.

8              THE COURT:  Okay.

9              THE WITNESS:  And I recall him saying about --

10             THE COURT:  You recall who saying?

11             THE WITNESS:  Hakan Atilla, Mr. Hakan Atilla said

12   this.

13             THE COURT:  Said what?

14   A.  What I recall Mr. Hakan Atilla saying is that he is also

15   aware about the tonnage and the loading issue, but of course,

16   to me, that's what I remember him saying.

17   Q.  Mr. Korkmaz, you mentioned a discussion about an inspection

18   report.

19   A.  Yes.

20   Q.  From your investigation, did you learn any evidence of

21   whether Mr. Zarrab provided Halkbank with inspection reports?

22             MR. HARRISON:  Objection, your Honor.

23             THE COURT:  Overruled.

24   A.  No.

25   Q.  Let's turn to Government's Exhibit 261.  This is a July 9,

1   2013 call between Mr. Zarrab and Mr. Atilla; is that right?

2   A.  That is correct.

3   Q.  So, we had looked at this call earlier, and the part of the

4   discussion about the companies and whether they were registered

5   for the food trade or the gold trade; do you remember that?

6   A.  Yes.

7          MR. LOCKARD:  If we can turn to page three of the

8   transcript.

9   Q.  Do Mr. Atilla and Mr. Zarrab also discuss bills of lading

10  again?

11  A.  That is correct.

12  Q.  And looking at the sentence beginning "Now of course with

13  regard to the vessels."  What does Mr. Atilla tell Mr. Zarrab

14  about the shipment of the purported goods?

15  A.  What I understand is that the documents submitted to the

16  bank involved large cargo ships with the tonnage capacity of

17  50,000, 80,000, 90,000.  I understand that it is also said that

18  these are not the small ships that had been mentioned before.

19  Q.  If we look on page four, at the bottom half of the

20  transcript, what does Mr. Atilla say about the quantities that

21  had been listed for the smaller ships?

22  A.  He's saying that based on the smaller vessels as well, it

23  appears that there were large loads being put on these small

24  tonnage capacity vessels.

25         MR. HARRISON:  Objection.  Move to strike based on

1    speculation, your Honor.

2              THE COURT:  Overruled.  It's what it says right on the

3    exhibit.

4              MR. HARRISON:  Judge --

5              THE COURT:  I'm not going to debate it with you, but I

6    think you have to get more precise with your objections.

7    A.  He says you should have this looked into, there are large

8    loads being placed on small tonnages.

9              MR. LOCKARD:  Mr. Chang-Frieden, if we can look just a

10   couple lines up from this portion of the conversation.

11   Q.  What did Mr. Atilla say about large ships and bills of

12   lading?

13   A.  Here's what he had said.  There are some large vessels that

14   are mentioned on the submitted documents.  We had talked about

15   this before, you were sending through small vessels and we were

16   not requiring bills of lading.  Because this was established

17   based on previous conversations that bills of lading would not

18   be required from the small vessels.  So, now it's being said

19   here, that aside from that plan, now there are larger vessels

20   being utilized.  And he's saying that I kindly request that the

21   guys take a look at this situation with the bills of lading.

22   Q.  Mr. Korkmaz, are you familiar with another call after this

23   call on July 9 of 2013 between Mr. Zarrab and Mr. Happani?

24   A.  I remember.

25   Q.  Is that a call that was intercepted in the course of your

1    investigation?

2    A.   That is correct.

3    Q.   Is that a call that you listened to as part of the

4    investigation?

5    A.   That is correct.

6    Q.   Is that a call that you were able to maintain a copy of

7    after the investigation?

8    A.   You mean of the audio?

9    Q.   The audio, yes, sir.

10   A.   So, on that date, they had more than one conversation.  And

11   I recall that there was a conversation regarding this topic,

12   but I also recall that the audio recording of that call was not

13   among the ones that I was able to obtain.

14   Q.   What did Mr. Zarrab and Mr. Happani discuss in that call

15   relating to the topic that we've just discussed in the Atilla

16   call?

17               MR. HARRISON:  Objection based on hearsay and

18   speculation, your Honor.

19               THE COURT:  Are you saying you remember the call but

20   there is no audiotape?  Do I understand that correctly?

21               THE WITNESS:  That is correct, your Honor.

22               THE COURT:  You remember what was said in the call?

23               THE WITNESS:  I'm talking about the conversation

24   that's related to this, your Honor, yes.

25               THE COURT:  "This" what?

1           THE WITNESS:  I'm referring to the callback that Reza

2    Zarrab and Abdullah Happani had, based on the call that Reza

3    Zarrab had with Hakan Atilla.

4           THE COURT:  Got it.  Okay.  And you remember what was

5    said in this call between Zarrab and Happani?

6           THE WITNESS:  I remember what was mentioned in the

7    call, but I don't remember 100 percent of the call.  So I

8    remember a summary of that call.

9           THE COURT:  What do you remember?

10          THE WITNESS:  Reza Zarrab had said this to Abdullah

11   Happani, your Honor.

12          THE COURT:  What do you mean by "this"?

13          THE INTERPRETER:  He's getting to it, sir.

14          THE COURT:  Oh.

15          THE WITNESS:  What he told Mr. Happani was that --

16          THE COURT:  Zarrab?

17          THE WITNESS:  Zarrab had told Abdullah and warned him

18   that the man had said don't stick it in our eyes, the larger

19   tonnage ships are being utilized.  And Abdullah first could not

20   grasp why there was an issue with putting small loads on larger

21   ships.  And I recall that Reza says I had told them before that

22   we cannot provide bills of lading because we're sending through

23   small vessels.  And I also recall him saying do not put large

24   loads on small vessels.  In fact, I remember something to the

25   effect of the ship has sank, related to that.  And I recall him

1   saying that the man says openly, clearly --

2          THE COURT:  The man being?

3          THE WITNESS:  Reza Zarrab here is referring to Hakan

4   Atilla.  But whether he says that in the call, I need to

5   refresh my memory.  If I can see the call here, I can tell

6   whether they have used the name Hakan Atilla or not.

7   Q.  Had Mr. Zarrab spoken to anybody else at Halkbank about

8   bills of lading that day and about the size of small ships on

9   that day?

10          MR. HARRISON:  Objection to leading.

11          THE COURT:  Overruled.

12  A.  In a preceding call he had just talked to Mr. Hakan Atilla.

13  Q.  Mr. Korkmaz, you had described during some of these

14  conversations references to the size of the transaction.

15  A.  That is correct.

16  Q.  I think you described Mr. Zarrab characterizing it as a

17  technical mistake that the amounts were so large.

18  A.  That is correct.

19          MR. LOCKARD:  Mr. Chang-Frieden, can you please show

20  Mr. Korkmaz Government's Exhibit 1004.

21  Q.  Mr. Korkmaz, do you recognize this document?

22  A.  That is correct.

23  Q.  How do you recognize it?

24  A.  I know them to be the Viber conversations that were

25  obtained from the seized phone of Reza Zarrab.

1        MR. LOCKARD:  The government offers Exhibit 1004.

2        THE COURT:  I'm going to allow it.

3        MR. HARRISON:  Objection based on foundation, hearsay,

4   authentication, your Honor.

5        (Government's Exhibit 1004 received in evidence)

6        MR. LOCKARD:  If we can take a look at some entries at

7   about time stamp 10:17:29 on the 7th of July, 2013.  I'm sorry,

8   the 10th of July, 2013.  I believe we have 1004-T also in.

9   Q.  Mr. Korkmaz, who is this Viber chat between?

10  A.  It's between Mr. Reza Zarrab and Mr. Suleyman Aslan.

11  Q.  This is one day after those July 9 conversations we just

12  talked about; is that right?

13  A.  That is correct.

14  Q.  What did Mr. Zarrab say to Mr. Aslan in this chat?

15  A.  He says that I have reduced the numbers --

16       THE COURT:  Who is "he"?

17       THE WITNESS:  Reza Zarrab.

18  A.  Says that I have reduced the numbers I'm sending by

19  dividing into pieces.  But there is a spelling error there, but

20  that's what he says.

21  Q.  What did Mr. Aslan say in response?

22  A.  He says "I noticed.  It's better like that."

23  Q.  Mr. Korkmaz, on this date, July 10 of 2013, did anything

24  else happen in your investigation?

25  A.  Yes.

1    Q.   What was that?

2    A.   A bribe was sent out to Suleyman Aslan.

3    Q.   If we can pull up Government's Exhibit 971-55.  Is this one

4    of the payments that you described in your testimony on Monday?

5    A.   That is correct.

6    Q.   If we can go back to Exhibit 1004 and 1004-T.

7         Just before we leave, Mr. Korkmaz, you had described

8    earlier issues relating to time stamps on video evidence.

9    A.   That is correct.

10   Q.   Do you recall from your investigation on what date this

11   particular surveillance took place?

12   A.   It was July 10, 2013.

13   Q.   If we can look at Government's Exhibit 1004 and 1004-T at

14   time stamp 17:47:02 and 17:48:46.  What did Mr. Zarrab ask

15   Mr. Aslan in the late afternoon of July 10?

16   A.   So, I'll respond by saying that the UTC mentioned here,

17   that's plus two or three.  So the timing of this would be in

18   the evening.

19        He's asking whether the guests had arrived.

20   Q.   What did Mr. Aslan respond?

21   A.   He says "Good evening, Mr. Reza, they came, thank you very

22   much, greetings."

23   Q.   In your investigation, have you become familiar with other

24   times when Mr. Zarrab and Mr. Aslan talk about visitors or

25   guests?

1    A.  Yes.

2    Q.  Have you been able to come to an understanding of what they

3    mean by that?

4    A.  Yes.

5    Q.  What do they mean by that?

6    A.  It refers to the couriers making the bribe deliveries to

7    the homes.

8    Q.  We just went through a number of calls and communications

9    in early July of 2013 about Mr. Zarrab becoming involved in

10   purportedly selling food using Iranian oil proceeds.

11          In the investigation -- sorry.

12   A.  Yes.

13   Q.  In your investigation, were there communications about the

14   purpose of starting the food business in July 2013?

15   A.  So, they had switched to transit food export method due to

16   what I understand to be changes in the embargo rules on

17   July 1st, and this was a change from the previous method of

18   gold exports that they had been using.

19          MR. HARRISON:  Objection.  Move to strike.

20   Speculation and opinion.

21          THE COURT:  Overruled.

22          MR. LOCKARD:  If we can look at Government's Exhibit

23   1002-T on February 5, 2013.

24   Q.  Is this a communication from Mr. Aslan to Mr. Zarrab that

25   we had looked at earlier?

1    A.  That is correct.

2    Q.  Is this a reference to a change in the sanctions on

3    February 6?

4              MR. HARRISON:  Objection, your Honor.  Calls for

5    speculation.

6              THE COURT:  Overruled.

7    A.  That is correct.

8    Q.  If we look down at an exchange on time stamp 21:05:52.

9              MR. LOCKARD:  Just about four chats down.

10   Q.  What does Mr. Aslan say that that change becomes effective?

11   A.  It says it's not stopped right now, there is time until the

12   beginning of July.

13   Q.  And after July, what is the only option to channelize oil

14   money?

15   A.  It says we can only channelize into food and medication.

16   Q.  Mr. Korkmaz, in your investigation, did you learn whether,

17   despite this July deadline, gold in fact continued to be

18   exported after July of 2013?

19   A.  You're referring to gold trade?

20   Q.  Yes.

21   A.  They had restarted the gold trade.  Gold export, excuse me.

22   Q.  In your investigation, did you develop evidence about why

23   the gold trade was restarted after July 2013?

24   A.  Correct.

25   Q.  Let's turn back to Government's Exhibit 1004-T.

1    MR. LOCKARD:  If we can go to September 12 of 2013 at

2    time stamp 15:40:26.

3    Q.  Mr. Korkmaz, what is it that Mr. Aslan tells to Mr. Zarrab

4    in September 12 of 2013?

5    A.  Exports are being wanted, Mr. Reza.  They're saying that

6    some money should be allowed to come in so that some funds

7    could be created.  We should come together.

8    Q.  Do you have an understanding of who Mr. Aslan is referring

9    to when he says "exports are being wanted"?

10   A.  I understand who is being referenced here, but in the

11   Turkish section that I'm being shown here that is not shown.

12   In the latter part of this conversation I know that it's

13   mentioned.

14   Q.  Are we in that portion of the conversation now on the

15   screen in front of you?

16   A.  That is correct.

17   Q.  What does Mr. Aslan say about that?

18   A.  It says yes, no problems, it went very well, we spoke with

19   Mr. ZC.  We have to meet.  When are you coming back.

20        And what he's saying here is that he didn't just speak

21   to Mr. ZC, but that he had spoken together with Mr. ZC.

22   Q.  Based on other evidence in the investigation, did you learn

23   who the others were at that meeting?

24   A.  Yes.

25   Q.  What types of evidence is that understanding based on?

1   A.  Phone conversations.

2   Q.  Who else was at that meeting?

3   A.  Prime minister.

4   Q.  In your testimony on Monday, you had described a meeting

5   that Mr. Zarrab had with Mr. Caglayan in mid July of 2013.  Do

6   you remember that?

7   A.  Yes.

8   Q.  Was that meeting between Mr. Zarrab and Mr. Caglayan, was

9   that recorded?

10  A.  The content of the meeting was not recorded.

11  Q.  Do you know where that meeting took place?

12  A.  Yes.

13  Q.  Where was it held?

14  A.  It was on the plane of Reza Zarrab.

15  Q.  Did you learn what happened after that meeting in mid July,

16  2013?

17  A.  Yes.

18  Q.  Were any payments made after that meeting?

19  A.  Yes.

20  Q.  What payments were made?

21          MR. HARRISON:  Objection.  There is no foundation for

22  how he knows.

23          THE COURT:  Overruled.

24  A.  There were payments in the amounts of 2 million and 1

25  million made to Turgev.

1        MR. LOCKARD:  If we can pull up Government's Exhibit

2   970-14.

3   Q.  Is this the surveillance of one of those payments that you

4   testified about on Monday?

5   A.  That is correct.

6   Q.  After that meeting between Mr. Zarrab and Mr. Caglayan,

7   were there any discussions about gold exports?

8   A.  Yes.

9   Q.  Who did Mr. Zarrab have those discussions with?

10  A.  With Abdullah Happani.

11  Q.  Mr. Korkmaz, are you familiar with a conversation between

12  Mr. Zarrab and Mr. Happani on July 14 of 2013?

13  A.  Not 100 percent, but there are parts that I remember in

14  summary.

15  Q.  Is that a recording that was intercepted in the course of

16  your investigation?

17  A.  Yes.

18  Q.  Is that a recording that you listened to in the course of

19  your investigation?

20  A.  Yes, I had checked this one also prior to the operation.

21  Q.  Is that a recording that you were able to keep a copy of

22  after the investigation?

23  A.  No, I understand that was not among the ones that I was

24  able to obtain.

25  Q.  What do you remember about that phone call between

 1   Mr. Happani and Mr. Zarrab on July 14?

 2            MR. HARRISON:  Objection.  Hearsay, your Honor.

 3            THE COURT:  Overruled.

 4   A.  He had given the instruction to find a formula in order to

 5   increase the gold exports.

 6            THE COURT:  Who "he"?

 7            THE WITNESS:  Reza Zarrab had given this instruction

 8   to Abdullah Happani, your Honor.

 9   Q.  Let's turn back to, turn back again to September of 2013.

10   I'd like to direct your attention to Government's Exhibit 268.

11   Who are the participants in this September 16, 2013, phone

12   call?

13   A.  It was Reza Zarrab and Suleyman Aslan.

14            MR. LOCKARD:  If we can turn to page two.

15   Q.  Towards the bottom of this page, Mr. Aslan references a

16   meeting.

17   A.  Yes.

18   Q.  Do you recall in his September 12 Viber chat Mr. Aslan had

19   also referred to a meeting that he had with Mr. Caglayan and

20   the prime minister?

21   A.  Yes.

22   Q.  What does Mr. Aslan say was requested at that meeting?

23   A.  That the request was made for doing exports.

24   Q.  When Mr. Aslan says last year they exported 11 million

25   dollars in gold --

1      THE COURT:  It says 11 billion on mine.

2      MR. LOCKARD:  I thought I said billion.

3      THE COURT:  Maybe I misheard.

4   Q.  11 billion dollars in gold.

5   A.  Yes.

6   Q.  What does Mr. Zarrab respond?

7   A.  In response to what is mentioned as exports of 11 billion

8   dollars had been made previously, he says that "They're asking

9   for the same to be done again, aren't they."

10      MR. LOCKARD:  If we can turn to the next page.

11  Q.  What does Mr. Aslan say?

12  A.  He says, "Um, I mean, they're saying do something, whatever

13  the method is, but help us out, take care of this job, you

14  know.  I said it would not be through Iran, but we will find a

15  way.  Don't you worry.  And he said if you can find a way, do

16  it."

17  Q.  In your investigation, did you learn how the gold exports

18  were paid for when they started up again after July of 2013?

19  A.  There was planning on two separate methods.  One of them

20  was transit trade, and during that time period they were

21  already doing transit trade.  And they planned to use the money

22  that would be sent to Dubai through transit trade in the gold

23  trade.

24  Q.  What do you mean by that?

25  A.  During that period, money was being sent from Halkbank

HCD3ATI2                         Korkmaz - Direct

1   under the guise of fake food transit trade to a company called

2   Atlantis that was located in Dubai.  And they had planned to

3   use this money to get gold out of Turkey in terms of doing gold

4   exports.

5          MR. HARRISON:  Objection.  Speculation.

6          THE COURT:  Overruled.

7   Q.  What types of evidence is your understanding based on about

8   how that process worked?

9   A.  Phone conversations from that -- phone conversations from

10  that time period, and then I looked at the evidence that was

11  seized during the operation, I also understood that this had

12  happened.

13  Q.  Does that evidence include financial records?

14  A.  You mean financial documents?

15  Q.  Yes, sir.

16  A.  Yes.

17  Q.  Does it include shipping and other transaction records as

18  well?

19          THE INTERPRETER:  Could you repeat that, please.

20  Q.  Does it also include shipping and other transactional

21  records?

22  A.  That is correct.

23  Q.  So if I understand, the Iranian oil money would go to Dubai

24  through the fake food trade first; is that correct?

25  A.  That is correct, that is through Halkbank.

HCD3ATI2                          Korkmaz – Direct

1    Q.  Then would come back into Turkey to buy gold?

2    A.  That is correct.

3          MR. HARRISON:  Objection to speculation and hearsay.

4          THE COURT:  Overruled.

5    Q.  What would happen to that gold that had been purchased from

6    the Iranian money coming back into Turkey?

7          MR. HARRISON:  Same objection.

8    A.  There was instruction given from Reza Zarrab to Abdullah

9    Happani about this gold to sell off as much as possible.  And

10   there was also cikonova gold happening during that time as

11   well.

12   Q.  Sell it off where?

13   A.  In Dubai.

14         THE COURT:  We'll take a five-minute break.

15         (Jury excused)

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1           THE COURT:  Mr. Lockard, how far along are you?

2           MR. LOCKARD:  We're making good progress, your Honor.

3           THE COURT:  I know.  Specifically, how far along?

4           MR. LOCKARD:  Specifically, I think we have less than

5    an hour.

6           THE COURT:  Okay.

7           THE DEPUTY CLERK:  You're welcome to step down, if you

8    need a few minutes.

9           THE WITNESS:  Thank you.

10          (Recess)

11          (Jury present)

12          THE COURT:  Please be seated, everybody.

13          THE DEPUTY CLERK:  Again, sir, I'd like to remind you

14   that you're still under oath.

15          THE WITNESS:  Yes.

16   BY MR. LOCKARD:

17   Q.  So, Mr. Korkmaz, I'd like us to turn back to the

18   September 16th, 2013, call between Mr. Zarrab and Mr. Aslan.

19   This is the phone call that we talked about a few minutes ago,

20   where Mr. Aslan describes his meeting with Mr. Caglayan and the

21   prime minister.

22          If we can turn to page 3 of the transcript, and down

23   towards the bottom third of the page, Mr. Aslan describes some

24   international transit companies.  Could you please read for us

25   what it is that Mr. Aslan says?

1    A.  It says:  "Also, of course, there are these, umm, I mean,

2    Mr. Reza the amounts have started to go up.  You know those

3    international transit companies.  Those -- those Cargill's and

4    Bunge's and so on."

5    Q.  And from your investigation, do you have an understanding

6    of what Mr. Aslan is referring to?

7    A.  That is correct, yes.

8    Q.  And what is it that Mr. Aslan is talking about when he

9    says:  "Those international transit companies, their numbers

10   have gone up"?

11              MR. HARRISON:  Objection, calls for speculation.

12              THE COURT:  Overruled.

13   A.  So it's understood that some international companies were

14   using the transit trade that is also used by Reza Zarrab as

15   fake transit trade.

16              THE COURT:  I don't understand.

17              THE INTERPRETER:  Would you like me to repeat or ask?

18              THE COURT:  If you could explain it.

19              THE WITNESS:  So, your Honor, Reza Zarrab was not the

20   only one that was doing this type of trade at Halkbank.

21              THE COURT:  Okay.

22              THE WITNESS:  So these Iranian funds that were at

23   Halkbank were also being utilized by other traders in their

24   trade as well.

25              THE COURT:  And the other traders are?

1          THE WITNESS:  And here, they're counting Cargill and

2     Bunge.

3          THE COURT:  And are those companies, Cargill and

4     Bunge, said to be doing actual trades?

5          THE WITNESS:  So I know through open source

6     information that these are large companies, but I did not look

7     into their transactions.

8     BY MR. LOCKARD:

9     Q.  And how were those transactions paid for?  What was the

10    source of funds?

11    A.  It's the same funds that Reza Zarrab was also using.

12         MR. HARRISON:  Judge, objection, move to strike.

13    Maybe I misunderstood, but I thought he just said he didn't

14    look into those other companies.

15         THE COURT:  Overruled.  I think you misunderstood.

16    Q.  Let's look at what Mr. Aslan says.  Well, first, what does

17    Mr. Zarrab say after Aslan describes the numbers going up for

18    Cargill and Bunge?

19    A.  "Reduce those."

20    Q.  And what does Mr. Aslan say?

21    A.  It says:  "They have their things.  As for the method, need

22    to reduce -- we can certainly reduce, and we will, but how do

23    we do that, as a method or through pricing?  When it is done

24    that way, these guys shift things completely to."

25    Q.  And how does he continue?

1    A.  Zarrab repeats that a reduction should be made.  Then Aslan

2    says:  "And then they shift things to Dubai, and then they

3    don't get out of there at all."

4            Then Zarrab says:  "Let's get together and talk in

5    person.  Let's come up with a formula."

6            And then Aslan says:  "Let's talk about these in

7    detail.  Okay?"

8    Q.  And then what does Mr. Zarrab say next about why they

9    should reduce Cargill and Bunge?

10   A.  He says:  "Of course, let's reduce that because that has no

11   benefit.  It's hurting us too.  It's undermining us."

12   Q.  If we could turn back to Government's Exhibit 1004-T, the

13   Viber chats between Mr. Aslan and Mr. Zarrab, and in

14   particular, an exchange on September 27th of 2013.

15           What did Mr. Aslan tell Mr. Zarrab on September 27th?

16   A.  Who to whom?  Is it Aslan to Zarrab?

17   Q.  What did Mr. Aslan tell Mr. Zarrab on September 27th of

18   2013?

19   A.  Aslan says to Zarrab:  "We had already notified the related

20   companies that we will not let transit trade to be done by

21   companies that are not resident in Turkey.  And we had

22   indicated that the last day would be October 14th.  And the

23   Iranians were very upset.  They are making the applications at

24   every level and indicating that this is a legitimate trade and

25   should be continuing for humanitarian reasons."

1    Q.  And if we can scroll down to Mr. Zarrab's response.

2    Actually, let's finish Mr. Aslan's comments.  What does

3    Mr. Aslan continue to say here?

4    A.  He says that:  "We will stand erect.  And we will emphasize

5    that we are a commercial bank, and we will not take a step

6    back, for your information."

7    Q.  And let's continue.  So Mr. Aslan then refers to an

8    official letter from Bank Markazi addressed to Mr. Aslan.  What

9    is Bank Markazi?

10   A.  I understand that to be the Central Bank of Iran, sir.

11   Q.  And what does Mr. Zarrab respond?

12   A.  It says, it was evident that they will get upset.  I

13   explained in every level this transaction would not benefit our

14   country and they agreed with me.  Further, I indicated that if

15   we don't apply this restriction, we will never reach the goal

16   that had been placed.  I explained to the gentleman that in

17   order to reach the goal, that this was the way to reach that

18   goal.  Not only that, but furthermore, all other countries, the

19   neighboring country that does business with apply the same

20   restriction.

21        And it continues after that by saying, please keep

22   your heart content in this matter.  Transactions with

23   humanitarian basis will never be let down.  I can guarantee

24   that to you.

25   Q.  When Mr. Zarrab refers to the neighboring country, is that

1    a reference that you've seen elsewhere in your investigation?

2    A.   Yes, it is mentioned in general.

3    Q.   And what is that a reference to?

4    A.   It's a term that is used for Iran.

5    Q.   There's also some discussions of the goal, the goal that

6    was placed?

7    A.   Yes.

8    Q.   Was there also discussion of some goals in the

9    September 16th phone call between Mr. Aslan and Mr. Zarrab?

10   A.   That is correct.

11   Q.   And what goals were those?

12   A.   That gold exports for last year amounted to $11 billion,

13   and that same amount was being requested.

14   Q.   Now, Mr. Korkmaz, yesterday we had discussed some of the

15   evidence that had been obtained from the searches that were

16   conducted on December 17th of 2017 -- 2013, I'm sorry.

17   A.   Yes.

18              MR. LOCKARD:  Sorry.  Just one moment, your Honor.

19              (Pause)

20              May I approach?

21              THE COURT:  Yes.

22              MR. LOCKARD:  I'm handing Mr. Korkmaz what's been

23   marked for identification as Government's Exhibit 2000-1.

24   BY MR. LOCKARD:

25   Q.   Mr. Korkmaz, do you recognize that disk?

1    A.  Yes.

2    Q.  For the benefit of the record, that is a disk that contains

3    electronic copies of Government's Exhibits 2006 through 2054.

4          Mr. Korkmaz, did you have an opportunity to review the

5    contents of that disk before your testimony today?

6    A.  Yes.

7    Q.  And are you familiar with their contents?

8    A.  That is correct.

9    Q.  And what do you recognize those exhibits to consist of?

10   A.  I understand it -- the content involves additional evidence

11   that had been obtained from Mr. Suleyman Aslan.

12   Q.  And during the search of Mr. Aslan's office, were e-mail

13   archive files obtained?

14   A.  That is correct.

15   Q.  And are those e-mails from one of those e-mail archives?

16   A.  That is correct.

17   Q.  And what was the name of that archive file?

18   A.  S. Aslan 2012.

19          MR. LOCKARD:  The government offers Exhibits 2006

20   through 2054.

21          MR. HARRISON:  Judge, the same objection as yesterday.

22   I can make my record, if you don't mind.

23          THE COURT:  Yes.

24          MR. HARRISON:  Based on relevance, lack of foundation,

25   chain of custody, authentication, hearsay, rule 403 and subject

1    to connection.

2              THE COURT:  Okay.  Overruled except for subject to

3    connection.

4              (Government's Exhibits 2006 through 2054 received in

5    evidence)

6    BY MR. LOCKARD:

7    Q.  Mr. Chang-Frieden, could you please pull up Government's

8    Exhibit 2051.

9              All right.  Mr. Korkmaz, do you recognize who is the

10   sender on this e-mail?

11   A.  It's understood here as it was Mr. Mehmet Hakan Atilla.

12   Q.  And who is the recipient?

13   A.  It's understood to be Suleyman Aslan.

14   Q.  And what is the date?

15   A.  If I were to read this in the dates used in Turkey, it

16   would read as the 9th of March, 2012.  And since it says p.m.

17   here, it is also possible that this was not written in the

18   Turkish format; so it may also be September 3rd.

19   Q.  In the Turkish format, how would 1:22 in the afternoon, how

20   would that appear?  Sorry.

21   A.  It would say 1312.

22   Q.  And if we could just scroll down a little bit.  This is in

23   English, so I won't ask you very many questions about it.  But

24   in general, what are the topics that are described in this

25   e-mail?

1    A.  You're asking me this question?

2    Q.  That's fine.  That's fine.

3    A.  I apologize.  It says:  My dear general manager, I have

4    explained the current circumstance with its topics below, as

5    you can see.

6            THE COURT:  Up at the top, where it says "subject,"

7    what does that mean in English?

8            THE WITNESS:  Information note.

9    BY MR. LOCKARD:

10   Q.  Let's turn to some other exhibits that are entered in

11   evidence.  Government's Exhibit 721.  Actually, let's turn to

12   Government's Exhibit 827 and the corresponding 827-T.

13           Mr. Korkmaz, do you recognize where this was obtained

14   from?

15   A.  Yes.

16   Q.  And where was it obtained from?

17   A.  It was among the documents that were seized at Suleyman

18   Aslan's residence.

19   Q.  And what is the underlined header at the top?

20   A.  There is an addressing of the person as "My dear general

21   manager," and underneath that it says, the standard steps for

22   transit food trade.

23   Q.  And what is the underlined header towards the middle of the

24   page?

25   A.  It says:  "Royal group's transit food trade operation

1    steps."

2    Q.  And if we look under point No. 2 in the top, under

3    "standard steps of transit food trade" --

4    A.  Yes.

5    Q.  -- describing the documents being requested from the bank's

6    customer?

7    A.  That is correct.

8    Q.  What are the second and third documents labeled B and C?

9    A.  It says the bill of lading showing that the goods have been

10   transported to Iran and certified by the Turkish consulate.

11            And as C, it says:  "Bill of lading showing that the

12   goods were under observation at the loading port, certified by

13   the Turkish consulate."

14   Q.  Are those documents described in the Royal group transit

15   food trade operation steps?

16   A.  No.

17   Q.  And, again, turning to the steps of the standard transit

18   food trade, what are steps No. 3 and 4?

19   A.  Three says:  "Once the documents are reviewed and found to

20   be acceptable, the funds received can be credited to the

21   customer's account."

22            And four says:  "When our customer wishes to transfer

23   the funds to the supplier that's out of the country, the

24   transfer will take place through the correspondent banks that

25   our directorate will determine."

1   Q.  And what is step No. 3 in the Royal group's transit food

2   trade?

3   A.  "The documents our customer presented are reviewed

4   concurrently.  The credit of the funds into the customer's

5   account, as well as the transfer to the supplier out of the

6   country, is approved.

7   Q.  Does step No. 3 under the Royal group's transit food trade

8   include the requirement that the documents be reviewed and

9   found to be acceptable before the funds are received and

10  credited?

11  A.  I did not understand this very well.

12  Q.  So Item No. 3, under standard steps, says that once the

13  documents are reviewed and found to be acceptable, the funds

14  received can be credited?

15  A.  Correct.

16  Q.  Does Item No. 3 under Royal group describe finding the

17  documents acceptable before the funds can be credited?

18  A.  That is correct.

19  Q.  Let's turn to Government's Exhibit 745, which is already in

20  evidence.  Mr. Korkmaz, do you know where this was found?

21  A.  Yes.

22  Q.  And where was it found?

23  A.  It was seized during the search that was conducted at

24  Suleyman Aslan's office.

25  Q.  And do you see on the left-hand side, in the bottom third,

1   there's a box around the word Royal?

2   A.   Yes.

3   Q.   Who owns the Royal companies?

4   A.   Reza Zarrab.

5   Q.   Let's look at Government's Exhibit 753, which is in

6   evidence, and where was this document found?

7   A.   I recall this to be one that was found at Suleyman Aslan's

8   office.

9   Q.   Now, this document, as well as several others we've looked

10  at, appear to have two sets of initials handwritten on the

11  paper?

12  A.   Yes.

13  Q.   What is the significance of those two sets of initials?

14  A.   During the searches, our teams would have witnesses

15  present, and in order to ensure the secure documentation of the

16  evidence that is being seized, there are teams that will have

17  the witnesses initial these documents.

18  Q.   And then the handwritten number, circled, that says 56?

19  A.   That's right.

20  Q.   Is that also part of the search procedure?

21  A.   That is correct.  The stacks of documents get enumerated.

22  Q.   And are the initials and numbering some of the things that

23  help you to recognize these as evidence obtained from a search?

24  A.   Yes.

25  Q.   Let's turn to Government's Exhibit 811.  Mr. Korkmaz, do

1    you recognize where this was obtained from?

2    A.   Yes.

3    Q.   And from where was it obtained?

4    A.   In the residence of Suleyman Aslan.

5    Q.   And can you read the title of this document?

6    A.   It says:  Information note, transactions that are related

7    to Iran prior to February 6th, 2013, and after February 6th,

8    2013.

9    Q.   Can we turn now to Government's Exhibit 815.  So where was

10   this document obtained from?

11   A.   This was also seized during the search that was conducted

12   at Suleyman Aslan's residence.

13   Q.   And can you tell us what the title of the paragraph 254 is?

14   A.   What is contained in TRA's section 504.

15   Q.   And if we could page ahead to Exhibit 818 and 818-T.  Where

16   was Exhibit 818 obtained from?

17   A.   Residence of Suleyman Aslan.

18   Q.   Let's go now to Government's Exhibit 748.  And I believe we

19   looked at this during your testimony yesterday?

20   A.   Yes.

21   Q.   And where was this obtained from?

22   A.   From the office of Suleyman Aslan.

23   Q.   And can you remind us the date of this e-mail from

24   Mr. Atilla to Mr. Aslan?

25   A.   It's December 21st, 2012.

 1   Q.  And the subject matter of the e-mail?

 2   A.  The response text that is on hold right now in response to

 3   the meeting that had been held with the embassy.

 4   Q.  Can we turn also to Government's Exhibit 746.  Where was

 5   this document obtained from?

 6   A.  From the office of Suleyman Aslan.

 7   Q.  And what is the date of this e-mail?

 8   A.  December 21st, 2012.

 9   Q.  And what is the subject line?

10   A.  Template letter -- or letter template.

11          THE INTERPRETER:  Sorry.

12   Q.  And can we look at Government's Exhibit 749.  Where was

13   this document obtained from?

14   A.  From the office of Suleyman Aslan.

15   Q.  And what is the date on this e-mail?

16   A.  January 15th, 2013.

17   Q.  And who is it from?

18   A.  From Mr. Mehmet Hakan Atilla.

19   Q.  And who was it to?

20   A.  Suleyman Aslan.

21   Q.  Can we also pull up Government's Exhibit 749-T.

22   Mr. Korkmaz, what is the header of the first section of this

23   e-mail?

24   A.  It says that, by our bank, as of -- effective as of

25   July 1st, 2013, the following is banned.

1   Q.  And what are numbers one and two?

2   A.  One says, mediating precious metal trade, purchase or

3   sales, with Iran.

4         It says, including NIOC, NITC and IRISL mediating

5   trade of goods and services related to Iran's energy, sea

6   freight and ship building sector.

7   Q.  And in the exceptions that are described, what is the first

8   listed exception?

9   A.  The trade of medicine, food, medical equipment and

10  agricultural products.

11        MR. LOCKARD:  So, your Honor, this may be a good time

12  for the lunch break, if you're so inclined.

13        THE COURT:  I'd like to go and finish it up.

14        MR. LOCKARD:  Certainly.  May I approach?

15        THE COURT:  Yes.

16        MR. LOCKARD:  Handing Mr. Korkmaz what has been

17  identified as Government's Exhibit 8051 and 8054.

18  BY MR. LOCKARD:

19  Q.  Mr. Korkmaz, do you recognize Government's Exhibit 8051 and

20  8054?

21  A.  Yes.

22  Q.  And are those Excel spreadsheets?

23  A.  That is correct.

24  Q.  And who prepared those?

25  A.  I did.

1    Q.  And generally speaking, what is contained in Government's

2    Exhibit 8051?

3    A.  It covers the topic of gold exports.

4    Q.  And on what materials is Government's Exhibit 8051 based?

5    A.  I used phone conversations while I was preparing this Excel

6    spreadsheet, and I have also used digital evidence.  I also

7    used expert reports that were in digital format, and I've used

8    documents that were seized.

9              THE COURT:  And when did you prepare that?

10             THE WITNESS:  I prepared it while in the United

11   States, your Honor.

12             THE COURT:  When?

13             THE INTERPRETER:  I prepared it while I was in the

14   United States.

15             THE COURT:  No, I understand.  I asked when.

16             THE WITNESS:  So I can say it this way, your Honor.  I

17   started working on this and gradually I kept working on it.  As

18   I recall, I had completed it in the 10th month, October.

19             THE COURT:  Of this year?

20             THE WITNESS:  That is correct.

21             THE COURT:  Okay.

22   BY MR. LOCKARD:

23   Q.  And are the materials that you described, the telephone

24   intercepts, the digital evidence, the search evidence and the

25   expert reports, are all those materials that were obtained in

1    the course of your investigation?

2    A.   That is correct.

3    Q.   And generally speaking, what is itemized in the

4    Government's Exhibit 8051?

5    A.   So I compared the evidence that I had with regards to the

6    gold exports that Reza Zarrab had done through his gold export

7    system.

8    Q.   And for each gold export, did you list the evidence

9    relating to that export?

10   A.   Yes.

11   Q.   And what is the time period of exports that is covered in

12   Government's Exhibit 8051?

13   A.   So I started from the beginning of our investigation.

14   Because of that, the listing starts from September 19th of

15   2012, and I listed all those that I could find up until the

16   date of December 17th, 2013.

17   Q.   And what is the date of the last export listed in your

18   spreadsheet?

19   A.   December 10th, 2013.

20   Q.   And have you calculated the volume of gold that was

21   exported after July 1st, 2013?

22   A.   I had added them together roughly.  It was between

23   approximately nine and 10,000 tons -- I'm sorry.  It was said

24   as kilograms first.  So 9,000 kilograms or approximately nine

25   to ten tons.

```
 1   Q.  And from your investigation, were you familiar with the
 2   approximate price of gold during that timeframe?
 3   A.  As of the beginning of 2013, I remember the price of gold
 4   per ton to be approximately 45 to $50 million.
 5   Q.  And if there were additional gold exports after
 6   December 17th, 2013, would your investigation have identified
 7   those?
 8             MR. HARRISON:  Objection, calls for speculation.
 9   A.  You mean after December 17th?
10   Q.  Yes, sir.
11   A.  First of all, yes, if I had not been removed from my duty
12   and, second, the evidence that we have here covers only up
13   until that date.
14   Q.  So let's turn now to Exhibit 8054.
15             THE COURT:  Mr. Lockard, is this in the nature of what
16   we call a summary chart?
17             MR. LOCKARD:  It is, your Honor.
18   Q.  So, Mr. Korkmaz, you also prepared 8054; is that right?
19   A.  Yes.
20   Q.  And what types of materials is 8054 based on?
21   A.  Again, I took samples from the phone conversations.  I also
22   used digital evidence.  I also utilized evidence that had been
23   seized during searches.  In general, it was digital evidence.
24   Q.  And is that all evidence that was gathered in the course of
25   your investigation?
```

1  A.  That is correct.

2  Q.  And what is itemized in the spreadsheet Government's

3  Exhibit 8054?

4  A.  It contains the transactions that Reza Zarrab had conducted

5  as transit trade through Halkbank.

6  Q.  And does your spreadsheet identify the evidence that you

7  had found related to each purported transit trade transaction?

8  A.  That is correct.

9  Q.  And does it identify both transactions that you believe

10 were completed and those you believe were not completed?

11 A.  That is correct.

12 Q.  And, Mr. Korkmaz, have you tabulated the total amount of

13 monies transferred as part of the fake food transactions

14 identified in this exhibit?

15 A.  Yes, I have calculated.

16 Q.  And what is that calculation?

17 A.  In total, it is over 700 million Euros and over 900 million

18 Turkish Liras.

19 Q.  And, Mr. Korkmaz, would you have been able to identify any

20 fake food transactions after December 17th, 2013?

21             MR. HARRISON:  Objection.

22             THE COURT:  Sorry.

23             MR. HARRISON:  Objection, speculation, your Honor.

24             THE COURT:  You really think that?

25             MR. HARRISON:  I do, Judge.

1   　　　　　THE COURT:  That's when he was checking on the

2   bridges, you know?

3   　　　　　MR. HARRISON:  But I think the question was --

4   　　　　　THE COURT:  So the question is, did he think he could

5   do any more investigation at that point?

6   Q.  Were you able to identify --

7   　　　　　THE COURT:  And you're saying that's speculation?

8   　　　　　MR. HARRISON:  If he could have found out about more

9   transactions?  I believe so, Judge, yes.

10  　　　　　THE COURT:  Okay.  Overruled.

11  BY MR. LOCKARD:

12  Q.  Mr. Korkmaz, where were you assigned on December 25th,

13  2013?

14  A.  I had been assigned to the bridge.

15  　　　　　MR. LOCKARD:  Just one moment, your Honor.

16  　　　　　No further questions.

17  　　　　　THE COURT:  Okay.  So we'll take a lunch break.  It's

18  just a couple minutes before 1:00.  Let's start up again at

19  2:00.

20  　　　　　(Jury not present)

21  　　　　　THE COURT:  So at 2:00 do we have the banking person?

22  　　　　　MR. LOCKARD:  Yes, your Honor.

23  　　　　　THE COURT:  Okay, great.  See you then.

24  　　　　　MS. FLEMING:  Your Honor?

25  　　　　　THE COURT:  Yes.

1    MS. FLEMING:  We are about to electronically file what

2    we have prepared and hand up the brief, and to give to the

3    government a written submission based on the first two days of

4    Mr. Korkmaz, a motion for mistrial.

5            THE COURT:  I don't know what you're talking about.

6            MS. FLEMING:  At sidebar, we discussed that we would

7    give you a written submission based on the first two days of

8    testimony on the motion for a mistrial.  We are about to file

9    based on the first two days.  We, obviously -- we said we would

10   provide it at the end of direct; so we couldn't do today's.

11           THE COURT:  Well, I'm not having two.  So if you have

12   a basis, you tell me when you want to make it.  That's the only

13   document I'm going to look at.  So I'm not talking about

14   supplements and, you know, addenda.  If this document is what

15   you want to rely on, that's your business.

16           MS. FLEMING:  I'll hand this up, your Honor.

17           THE COURT:  And you are going to respond to that

18   document?

19           MR. KAMARAJU:  Yes, your Honor.

20           MR. LOCKARD:  We will, your Honor.

21           THE COURT:  Okay.  Great.  See you at 2:00.

22           (Luncheon recess)

23

24

25

HCD3ATI4

```
                              AFTERNOON SESSION

                                 2:00 p.m.

           (At the sidebar)

           THE COURT:  So, one of the jurors, who is actually the

last alternate, said to Christine that he's developed a

terrible back problem, and I don't really know what to do.  I

got a bad back too.

           MR. HARRISON:  That's what I was going to say.

           THE COURT:  But I don't think we should offer him

solutions or relief or that sort of stuff.  Subject to your

okay, I would like to ask him if he wants to be excused.  He's

in terrible pain.

           MS. FLEMING:  Do you think he's told other people?

Are we going to have a rash of bad backs?

           THE COURT:  Oh.  I imagine -- I didn't see it, but I

think everybody back there knows about it now.  What are you

going to do.

           MS. FLEMING:  If it is the last juror, I think we have

enough alternates.

           THE COURT:  It's all in your hands.  Joking aside,

what else are we going to say?

           MR. ROCCO:  I would offer him -- I would give him his

choice.

           THE COURT:  I mean, yes.  I'm not saying you should go

home, but I'm saying I would like that to be an option.  If it
```

HCD3ATI4

1     is really that painful I won't force, I would rather not say --

2          MR. ROCCO:  I would rather not force him either.

3          THE COURT:  That's what I mean.  So, I'm looking for

4     authority to tell Christine that we can say, listen, if it is

5     so bad, you have the option to go without feeling bad.  Not

6     going to make him --

7          MR. ROCCO:  You okay with that?

8          MR. HARRISON:  I'm fine with that.

9          MR. LOCKARD:  That's fine.

10         THE COURT:  All right.

11         (Pause)

12         THE COURT:  He's going to be here.  Counsel, he's

13    going to be here.

14         (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

HCD3ATI4

1        (Jury present)

2        THE COURT:  Please be seated.  We'll have the next

3   government witness.

4        MR. SOVOLOS:  Good afternoon, your Honor.  We have

5   three stipulations to read into the record before calling our

6   witness.

7        THE COURT:  Okay.  So, I may have said it earlier, but

8   a stipulation is something that both sides agree to.  It is not

9   in dispute.  And the practice is that the government wants to

10  include it as part of its case, and so they will read the

11  stipulation to you and into the record at the same time.

12       MR. SOVOLOS:  Thank you, Judge.

13       In the matter of United States of America v. Mehmet

14  Hakan Atilla, defendant, Docket No. S4 15 CR 867, it is hereby

15  stipulated and agreed by and between the United States of

16  America, by Joon H. Kim, Acting United States Attorney,

17  Assistant United States Attorneys Michael D. Lockard, Sidhardha

18  Kamaraju, David W. Denton, Jr., and Dean C. Sovolos, Special

19  Assistant United States Attorney, of counsel, and Mehmet Hakan

20  Atilla, defendant, by his counsel Victor Rocco and Cathy

21  Fleming that:

22       If called as a witness, a representative of the

23  Federal Deposit Insurance Corporation would testify that,

24  during the time period between 2010 and '15, HSBC Bank U.S.A.,

25  Deutsche Bank Trust Company Americas, UBS Bank U.S.A., BNY

1   Mellon, Citibank, JPMorgan Chase, Bank of America, and Wells

2   Fargo Bank, were all banks the deposits of which were insured

3   by the FDIC.

4           It is further stipulated and agreed that this

5   stipulation, which is Government Exhibit 9701, may be received

6   into evidence at trial, subject to the defendant's objections

7   based on relevance and connection.

8           Dated New York, New York December 13, 2017.

9           THE COURT:  So that, by the way, is called a

10  stipulation of testimony.  Because it started by saying that if

11  a person were called as a witness, this is what they would say.

12  There's also stipulations of fact may be included in this

13  stipulation or no?

14          MR. SOVOLOS:  I don't believe so, Judge.

15          THE COURT:  Okay.

16          MR. SOVOLOS:  Judge, the second stipulation, it is

17  hereby stipulated and agreed by and between the United States

18  of America, by Joon H. Kim, Acting United States Attorney,

19  Assistant U.S. Attorneys Michael D. Lockard --

20          THE COURT:  We can jump to the text understanding it

21  is between both sides.

22          MR. SOVOLOS:  Sure, Judge.

23          If called as a witness, a representative of Bank of

24  America would testify that GX 8101-1 contains true and correct

25  copies of records of financial transfers maintained by Bank of

HCD3ATI4

1    America in the regular course of its business and which were

2    produced to the Federal Bureau of Investigation pursuant to a

3    subpoena.

4           If called as a witness, a representative of BNY Mellon

5    would testify that GX 8101-2 contains true and correct copies

6    of financial transfers maintained by BNY Mellon in the regular

7    course of its business, and which were produced to the FBI

8    pursuant to a subpoena.

9           If called as a witness, a representative of Citibank

10   would testify that GX 8101-3 contains true and correct copies

11   of records of financial transfers maintained by Citibank in the

12   regular course of its business, and which were produced to the

13   FBI pursuant to a subpoena.

14          If called as a witness, a representative of Deutsche

15   Bank Trust Company Americas would testify that GX 8101-4

16   contains true and correct copies of financial transfers

17   maintained by Deutsche Bank Trust Company Americas in the

18   regular course of its business and which were produced to the

19   FBI pursuant to a subpoena.

20          If called as a witness, a representative of HSBC Bank

21   U.S.A. would testify that GX 8101-5 contains true and correct

22   copies of records of financial transfers maintained by HSBC

23   Bank U.S.A. in the regular course of its business and which

24   were produced to the FBI pursuant to a subpoena.

25          If called as a witness, a representative of JPMorgan

HCD3ATI4

Chase Bank NA would testify that GX 8101-6 contains true and correct copies of records of financial transfers maintained by JPMorgan Chase Bank in the regular course of its business and which were produced to the FBI pursuant to a subpoena.

If called as a witness, a representative of Standard Chartered Bank would testify that GX 8101-7 contains true and correct copies of records of financial transfers maintained by Standard Chartered Bank in the regular course of its business and which were produced to the FBI pursuant to a subpoena.

If called as a witness, a representative of UBS Group AG would testify that GX 8101-8 contains true and correct copies of records of financial transfers maintained by UBS Group AG in the regular course of its business and which were produced to the FBI pursuant to a subpoena.

If called as a witness, a representative of Wells Fargo Bank NA would testify that GX 8101-9 contains true and correct copies of records of financial transfers maintained by Wells Fargo Bank NA in the regular course of its business, and which were produced to the FBI pursuant to a subpoena.

If called as a witness, a representative of Banca Intesa would testify that GX 8101-10 contains true and correct copies of records of financial transfers maintained by Banca Intesa in the regular course of its business and which were produced to the FBI pursuant to a subpoena.

It is further stipulated and agreed that GX 8101-1,

HCD3ATI4

8101-2, 8101-3, 8101-4, 8101-5, 8101-6, 8101-7, 8101-8, 8101-9 and 8101-10 may be received in evidence at trial subject to the defendant's objections based on relevance and connection.

It is further stipulated and agreed that this stipulation, which is Government Exhibit 9703, may be received into evidence at trial, subject to the defendant's objections based on relevance and connection.  Dated December 13, 2017.

Finally, Judge, the final stipulation.  It is hereby stipulated and agreed that if called as a witness, a representative of Trapp Technology, Inc, formerly Brinkster Communications Corp, also known as Trapp, with knowledge of the matter, would testify that Trapp Technology was served with a search warrant by Federal Bureau of Investigation, and that GX 2501 through GX 2529 are true and correct copies of e-mails and attachments produced by Trapp to the FBI, maintained by Trapp on its servers and which were stored by Trapp in the ordinary course of its business.

If called as a witness, a representative of Google Incorporated with knowledge of the matter would testify that Google was served with a search warrant by the FBI and that GX 3001 through GX 3329 are true and correct copies of the e-mails and attachments produced by Google to the FBI maintained by Google on its servers and which were stored by Google in the ordinary course of its business.

If called as a witness, a representative of Microsoft

HCD3ATI4

1    Corporation with knowledge of the matter would testify that

2    Microsoft was served with a search warrant by the FBI, and that

3    GX 3501 through 3815 contain true and correct copies of the

4    data from Microsoft produced to the FBI from that search

5    warrant, including subscriber information, e-mail, documents,

6    and files associated with certain accounts maintained by

7    Microsoft, and which were stored by Microsoft in the ordinary

8    course of its business.

9         If called as a witness, a representative of Apple

10   Incorporated with knowledge of the matter would testify that

11   Apple was served with a search warrant by the FBI, and that GX

12   4001 is a true and correct copy of an e-mail produced by Apple

13   to the FBI, maintained by Apple on its servers and which was

14   stored by Apple in the ordinary course of its business.

15        If called as a witness, a representative of Yahoo

16   Incorporated with knowledge of matter would testify that Yahoo

17   was served with a search warrant by the FBI, and that GX 4501

18   through GX 6094 are true and correct copies of e-mails produced

19   by Yahoo to the FBI maintained by Yahoo on its servers and

20   which were stored by the Yahoo in the ordinary course of

21   business.

22        It is further stipulated and agreed that GX 2501

23   through GX 2529, GX 3331 through GX 3329, and GX 3501 through

24   3815, GX 4001, GX 4501 through 6904, and this stipulation,

25   which is marked as GX 9702, may be admitted as evidence at

HCD3ATI4

1    trial subject to the defendant's objections based on

2    connection.  Dated December 13, 2013.

3           Your Honor, the government would ask that we move

4    these stipulations and relevant exhibits into evidence.

5           THE COURT:  I'll allow it.

6           (Government's Exhibit 9701, 9702, 9703 received in

7    evidence)

8           (Government's Exhibit 8101-1 through 8101-10 received

9    in evidence)

10          (Government's Exhibit 2501 through 2529, 3001 through

11   3329 received in evidence)

12          (Government's Exhibit 3501 through 3815, 4001 received

13   in evidence)

14          (Government's Exhibit 4501 through 6904 received in

15   evidence)

16          MR. SOVOLOS:  Thank you, Judge.  Judge, at this time

17   the United States calls Robert Peri.

18          THE COURT:  Peri with a P?

19          MR. SOVOLOS:  P-E-R-I.

20          THE DEPUTY CLERK:  Sir, if you can step up here to the

21   witness stand.  Remain standing for a moment and then raise

22   your right hand, please.

23          Do you solemnly swear or affirm that the testimony

24   that you shall give this court and jury in this issue now on

25   trial shall be the truth, the whole truth, and nothing but the

HCD3ATI4                              Peri - Direct

1    truth, so help you God?

2              THE WITNESS:  I do.

3              THE DEPUTY CLERK:  Could you please state your full

4    name for the record.

5              THE WITNESS:  Robert Michael Peri.  P-E-R-I.

6              THE DEPUTY CLERK:  You may be seated.

7     ROBERT M. PERI,

8          called as a witness by the Government,

9          having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. SOVOLOS:

12   Q.  Good afternoon, Mr. Peri.

13   A.  Hi.

14   Q.  Sir, where do you currently work?

15   A.  Citibank.

16   Q.  When did you join Citibank?

17   A.  I joined Citibank in September of 2015.

18   Q.  What is your current title?

19   A.  My current title is director of OFAC compliance and

20   investigations.

21   Q.  How long have you been serving as director of OFAC

22   compliance and investigations?

23   A.  Since April of this year.

24   Q.  What title did you have before your role as director of

25   OFAC compliance?

1    A.  I was a senior vice president in OFAC compliance.

2    Q.  That's within Citibank, correct?

3    A.  Correct.

4    Q.  Thank you.  Who was your employer before Citibank?

5    A.  The U.S. Department of the Treasury.

6    Q.  When did you begin working at the U.S. Department of the

7    Treasury?

8    A.  In January of 2012.

9    Q.  When you were hired in January of 2012, what was your

10   title?

11   A.  I was a policy advisor.

12   Q.  What were your principal responsibilities and duties as a

13   policy advisor?

14   A.  I worked in the Office of Terrorism and Financial

15   Intelligence, I supported the undersecretary providing policy

16   advice on issues related to illicit finance, money laundering,

17   and sanctions evasion.

18   Q.  Thank you.  Did you oversee any programs in the Office of

19   Terrorism Financing?

20   A.  Eventually, yes.  I, after a year as a policy advisor, I

21   became the assistant director for Asia and Africa.  So I

22   oversaw all of the Treasury programs in that area.  Eventually

23   became the director of global affairs overseeing the global

24   relations of that part of the Treasury Department.

25   Q.  That definitely sounds like a promotion.  It was?

HCD3ATI4                          Peri - Direct

```
 1   A.  It was.

 2   Q.  Okay.  Are there any other additional duties and

 3   responsibilities you had in that position?

 4   A.  No.  It was managing a team of about 25 policy advisors.

 5   That was the position in which I started.  But in supporting

 6   the undersecretary for terrorism and financial intelligence,

 7   and other senior staff in their work on sanctions and money

 8   laundering and terrorist financing.

 9   Q.  Was that the highest professional title you attained?

10   A.  Yes, that's correct, it was a senior executive service

11   position.

12   Q.  When did your tenure at the U.S. Department of the Treasury

13   come to an end?

14   A.  In September of 2015 when I joined Citibank.

15   Q.  Thank you.  So, before we get into the details of your role

16   at Citibank, can you give us an overview of what type of bank

17   Citibank is?

18   A.  Sure.  Citibank is a U.S. bank but with a large global

19   footprint.  Citi has physical operations in over 90 countries

20   around the world.  It is one of the largest U.S. banks by

21   assets and by asset measure, and the largest by geographic

22   footprint.  But it is headquartered here in the United States.

23   Q.  Do you have an estimate of how many transactions are

24   processed by Citibank on a daily basis?

25   A.  In terms of value, the estimate that's generally given is
```

HCD3ATI4                          Peri - Direct

1    that Citibank processes $4 trillion in transactions a day.

2    Q.  Does Citibank process transactions for correspondent banks?

3    A.  Yes.

4    Q.  Mr. Peri, can you explain what a correspondent bank is?

5    A.  Sure.  A correspondent bank is a bank that has a

6    relationship, an agreement with Citibank, or with any other

7    bank, to provide mutual financial services.  So that can be the

8    transmission of wires, wiring of money, it can be other

9    services as well, including check clearing.  And other things

10   of that nature.

11   Q.  Can you give us a little bit of a sense of Citibank's

12   correspondent banking space globally?

13   A.  Sure.  Citibank has a number of foreign correspondent banks

14   that it holds relationships with.  I'm not sure of the exact

15   count, but it's well over 1,000.

16   Q.  How does Citibank rank as a correspondent bank in United

17   States dollar currency banking?

18   A.  I wouldn't be able to give you the exact ranking.  But it's

19   in the top two or three.

20   Q.  What, if any, relationship is there between correspondent

21   banking and payments in foreign currencies?

22   A.  Well, payments in foreign currencies are a fundamental part

23   of correspondent banking.  When you think that correspondent

24   bank -- one of the main roles of correspondent banking is to

25   move money from one country to another.  The remitter of that

money may be holding it in one currency, and the person who is

receiving the money on the other end may want to receive it in

a different currency.  If that's the case, then during that

transaction, a foreign exchange transaction will occur.

Q.  Based on your experience, do you have a sense of how likely

it is foreign transactions denominated in U.S. dollars would be

cleared through a U.S. bank?

A.  It's highly likely.  I think most, but not all, would be

processed through a U.S. bank.

Q.  With Citibank, where specifically does Citibank process

U.S. dollar denominated correspondent transactions?

A.  I would say that the majority of those are processed

through New York.

Q.  Are some or all of those through Manhattan?

A.  A significant portion are.  I'm not sure that all of them

are, but a significant portion would pass through New York.

Q.  Going back to your employment with Citibank.  You testified

that your first position was senior vice president?

A.  Correct.

Q.  What were your principal duties and responsibilities as

senior vice president?

A.  I managed a small team that was responsible largely for

investigations within the sanctions compliance program.  So

understanding particular vulnerabilities or particular areas of

concern related to sanctions, and then also responding to

1    administrative subpoenas from the Department of the Treasury,

2    primarily.

3    Q.  Can you describe for us what the sanctions investigations

4    team does.

5    A.  Sure.  So one of those is that when we receive an

6    administrative subpoena, the Office of Foreign Assets Control,

7    which is responsible for sanctions, may send Citibank a

8    subpoena asking for certain bank records.

9           My team was responsible not for pulling those records,

10   but for analyzing them and providing a comprehensive response

11   to the Office of Foreign Assets Control on the transactions in

12   question.

13   Q.  So, you're promoted out of the position of senior vice

14   president, correct?

15   A.  Correct.

16   Q.  That was directly to the director of OFAC compliance?

17   A.  Correct.

18   Q.  Tell us a little bit about what the OFAC compliance unit

19   does, please.

20   A.  Sure.  So now, we do two things.  I manage that team that I

21   had previously which was responsible for investigations, but

22   now I've been given responsibility for a team that does what we

23   would call level three transaction review.  Which essentially

24   means that in the $4 trillion of transactions that are

25   processed every day, those are screened for sanctions concerns.

1    And if one of -- if there is a flag, if a sanctions hit occurs,

2    it may be escalated ultimately to my team, and we are the

3    ultimate decisionmakers whether or not a transaction is

4    permissible or would violate sanctions, and then we instruct

5    the operations of Citibank either to process that transaction

6    or to block it.

7    Q.   So you said level three.  Is that correct?

8    A.   Correct.

9    Q.   Which begs the question, is there a level one and two?

10   A.   Sure.  Of course.  So the way that it works is when a

11   transaction passes through Citi, it is screened against

12   sanctions lists.  Lists that give names of individuals,

13   companies, or governments or countries in certain cases.  If

14   there is a match, if something in that transaction matches

15   against something in one of those lists, it stops for review.

16   First it stops at level one.

17           And to give you a basic example, what level one is

18   able to do, because keep in mind this is millions and millions

19   of transactions a day, is they can say the targeted party that

20   designated party is named Maria.  In the payment we've just

21   received Maria is a vessel, is a boat.  Therefore, that can't

22   be the same Maria.  This is okay to process.

23           Beyond that, they have to send it to level two.  Level

24   two has a similar process with a bit more ability to try to

25   investigate whether the name Maria on the list is the same as

1    the one in the transaction.  And if not, it comes to my team,

2    and my team has greater bandwidth to analyze the transaction

3    and make the ultimate determination.

4    Q.  So you say greater bandwidth.  How many people work under

5    you?

6    A.  Sanctions compliance at Citibank is a function of over 200

7    people now.  On my team, all told, we have just over 20.

8    Q.  So, you talked about your team.  Are there other teams?

9    A.  Sure.  There is -- sanctions compliance is complex, so we

10   have people who work in Citi's various lines of business to

11   help implement sanctions compliance.  We have people who work

12   in the various regions in which Citi is present to help

13   implement sanctions compliance.  And then we have my team.

14   Q.  You testified earlier that you mentioned OFAC.  Just to be

15   clear, is OFAC administering the sanctions regimes?

16   A.  That's right.  So OFAC stands for the Office of Foreign

17   Assets Control.  It is a division within the Department of the

18   U.S. Treasury that administers as the primary administrator of

19   U.S. sanctions programs.

20   Q.  Would you describe sanctions regimes as strict liability?

21   A.  Yes.  They are strict liability, and this is a unique

22   feature of sanctions compared to other areas of compliance.

23   Q.  What is strict liability?

24   A.  Strict liability essentially means that Citibank, or any

25   U.S. person, is responsible for complying with the sanctions

HCD3ATI4                        Peri - Direct

1    and can be held responsible, whether they are witting or not.

2    So in other words, if there is a violation of the sanctions

3    committed, it doesn't matter whether the bank in question knew

4    that they were violating sanctions or intended to violate

5    sanctions.  They are liable regardless.

6              MS. FLEMING:  Objection.  Legal issue.

7              THE COURT:  Yes.

8              MS. FLEMING:  Move to strike.

9              THE COURT:  Sustained.

10   Q.  In the context of the job that you do, can you describe

11   what your understanding of sanctions compliance is.

12   A.  Sure.  It is the efforts that the bank undergoes as a U.S.

13   bank to comply with what -- we comply with U.S. sanctions, we

14   also comply with international sanctions.  U.S. is not the only

15   country to have sanctions.  But it's the efforts that the bank

16   undertakes to ensure that we don't violate any of those

17   sanctions.

18   Q.  In your position, are there countries that are of

19   particular focus in sanctions compliance?

20   A.  Sure.  There are countries that we would deem

21   comprehensively sanctioned.  Those include Iran, Syria, North

22   Korea.

23   Q.  Are there financial entities that are particular focused in

24   sanctions compliance at Citibank?

25   A.  Absolutely.  There may be financial institutions in other

HCD3ATI4                          Peri - Direct

1   countries that are designated, but in countries such as the

2   ones I've just named, Iran, Syria, North Korea, any financial

3   institution is of concern to Citi.

4   Q.  So in your work, what are some common measures that you've

5   encountered that are taken to evade sanctions?

6   A.  Well, the most typical one is what we would call wire

7   stripping.  So wiring money is the most common way to move

8   money overseas and to evade sanctions controls.  Wire stripping

9   basically means that whatever that reference is, whether it's

10  Iran or Maria, whatever the reference is that would hit upon a

11  sanctions list, is omitted, is removed from the transaction.

12  So that it won't create a hit and would simply pass through the

13  bank unnoticed.

14  Q.  So does Citibank compliance check for resubmissions of

15  blocked or rejected transactions?

16  A.  Sure.  Citibank compliance, this is not -- yes.  Citibank

17  compliance does check for resubmissions.

18            THE COURT:  I missed it.  Could you say it again?

19            THE WITNESS:  Absolutely.  Excuse me, your Honor.

20  Citibank compliance checks for resubmitted transactions.

21  A.  So to give you an example, a transaction may be attempted

22  by a counterparty in which they included a sanctions reference.

23  Say Iran.  And that transaction may be blocked.  The same

24  parties may attempt the same transaction, stripping out that

25  term "Iran" to try in an attempt to get it through the bank.

HCD3ATI4                        Peri - Direct

1           So Citibank has a program whereby we can detect the

2   same counterparties, similar amounts of transaction, even if it

3   no longer has the reference that made it flag in our system, we

4   should be able to catch it the next time it comes through.  And

5   we do catch things that way.

6           THE COURT:  By program, do you mean a computer program

7   that does that?

8           THE WITNESS:  Yes, it's computer driven at its base.

9   The computer is the one that would detect the parameters,

10  similar value, same counterparties, and then would flag that

11  for an operator who would analyze it.

12  Q.  Sir, I want to add some context to the sanctions compliance

13  and ask you about some terms that may be used at Citibank.

14  What does KYC stand for?

15  A.  KYC stands for "Know Your Customer."  That is sort of the

16  fundamental -- I would characterize it as fundamental building

17  block on which a sound compliance program is based.  Knowing

18  who your customer is, what their business is, what they intend

19  to use your bank for, and who the ultimate beneficial owner who

20  controls, if it is an entity, if it is a company, who controls

21  that company and ultimately stands to benefit from it.

22  Q.  Does KYC apply to correspondent bank relationships?

23  A.  Absolutely.  A correspondent bank is considered a client of

24  the bank.  So there is a KYC process, a rigorous KYC process

25  that happens for correspondent banks.

1    Q.  You described some screening measures taken earlier.  How

2    does transaction screening work at Citibank?

3    A.  How does transactions screening work at Citibank.  Well, I

4    guess I've given you a taste of what the various levels of

5    review.  Essentially when a transaction is initiated, when it

6    comes to Citibank, there is a message that's created that

7    includes a lot of data.  That message is screened by a

8    computer.  And if any of that data creates a hit to any of the

9    lists that we have entered and that we monitor, including the

10   OFAC sanctions list, then it is flagged, and then that's when

11   we initiate this three levels of review process.

12   Q.  You also mentioned programs earlier.  Does screening get

13   broken up into programs at Citibank?

14   A.  Yeah, it does.  By programs we mean different types of

15   sanctions programs, because different types of sanctions

16   programs have different prohibitions that go along with them.

17   There are U.S. sanctions programs, and within those there are

18   obviously different -- Iran and North Korea, various programs.

19   Citi screens all U.S. sanctions programs no matter where Citi

20   operates in the world, because we're a primarily U.S. bank.

21   But we also screen against other programs, the U.N. sanctions

22   programs and other countries' sanctions programs where they may

23   be applicable.

24   Q.  Can you elaborate a little bit on country sanctions

25   programs?

HCD3ATI4                          Peri - Direct

A.   Sure.  Within the context of U.S. sanctions, when we talk
about country sanctions program, it gets back to the country of
concern that you asked me about previously.  A country
sanctions program is what we would call -- it generally
consists of two parts, sort of the most robust sanction that
the U.S. generally applies.

         It consists of a blocking of the government in
question, so, for example, blocking of the government of Iran
or blocking of the government of North Korea and then a trade
embargo.  When you have those two things together, we in
compliance we call that a country program or a comprehensive
sanctions program.

Q.   You've mentioned the blocked or blocking of transactions.
You've also mentioned I believe a rejecting of transactions.
Is there a difference between those two?

A.   Yeah.  So, blocking a transaction essentially means -- and
this is an obligation under most OFAC U.S. programs -- is that
when funds come into the possession of a U.S. person, be an
individual, but in this case of Citibank, and they pertain to a
sanctioned party or have a nexus to a sanctioned party, Citi
has an obligation to book those funds and, basically,
technically what that means is the sanctioned party doesn't
lose possession of those funds, but they lose control of those
funds.  They're placed in an omnibus account at Citi, an
interest-bearing account, but they no longer -- that sanctioned

1    person, until they are removed from that list, cannot access
2    those funds.
3            Rejecting a transaction in some cases is possible as
4    well, depending on what the regulation says.  Rejecting a
5    transaction basically consists of sending it back to the
6    remitter, but with the added step of that needs to be reported
7    to OFAC if there was a potential OFAC sanctions issue.
8    Q.  So if a transaction is blocked, is there a reporting
9    requirement to OFAC?
10   A.  Absolutely.  We provide a weekly blocked property report to
11   OFAC.  That's a requirement.  As well as an annual blocked
12   property report.
13   Q.  If a transaction is rejected, is there a reporting
14   requirement to OFAC?
15   A.  Yeah.  Citi -- there is a third element.  Citi will cancel
16   transactions where it is unable to determine if the sanctioned
17   party is involved, but where it seems to be a transaction of
18   concern.  A simple cancellation does not require reporting to
19   OFAC, but where we truly believe there was a sanctioned party
20   involved, that's what we call a reject, and that is sent back
21   but then reported to OFAC for informational purposes.
22   Q.  I also wanted to ask you about what it means to say a
23   transaction is flagged.
24   A.  Sure.  To say a transaction is flagged is just a way that
25   within the bank to say that it hit on something.  So like I was

1  describing there are these lists, if it is flagged, that means

2  that something looked amiss and therefore it started into this

3  level one, two, three review process where a human being

4  looking at it to ensure it's a permissible transaction.

5  Q.  So are there ever changes in the screening methods you

6  described in OFAC compliance?

7  A.  Sure.  I mean, so, OFAC changes its lists very regularly.

8  I would say, you know, I would estimate a couple of times a

9  week individuals may be added to that list, and every time that

10 occurs, we have to update our list to ensure that we're staying

11 up to date.  The same applies with other international foreign

12 sanctions programs.

13        But otherwise, the sort the basic structure of the

14 three levels of review has been in place for a very long time

15 and is fundamental to what we do.  As you might imagine, it's

16 huge, it requires a lot of manpower, and so therefore that is

17 not changed very much.  Very frequently.

18 Q.  Does the OFAC compliance unit have any anti-money

19 laundering responsibilities?

20 A.  It does not.  No, that resides elsewhere within Citibank.

21 The fundamentals of the two overlap in many ways, but we are

22 only responsible for sanctions.

23 Q.  Can you please generally describe what anti-money

24 laundering is.

25 A.  Sure.  I guess the easiest way is to say what money

1    laundering is, money laundering is taking funds that are the

2    proceeds of crime, money that is gained illicitly, and passing

3    it through a number of -- through -- attempting to disguise the

4    illicit nature of those funds, and make them appear to be gains

5    that were acquired in a licit manner.

6            MS. FLEMING:  Objection.  I think, A, he's not in the

7    anti-money laundering area, and B, I think we are getting into

8    legal areas again.

9            THE COURT:  He's giving his lay understanding of those

10   terms.  So I'll allow that to go forward.

11   Q.  What is the significance of layering to either anti-money

12   laundering or sanctions compliance at Citibank?

13   A.  So layering is the practice of moving money through various

14   accounts or various monetary vehicles or other things, as I

15   said, to disguise it its original origin.  It's a fundamental

16   tool of money launderers.  It is also a frequent practice in

17   cases of sanctions evasion.

18   Q.  Thank you, sir.  Just a few more questions.  Generally,

19   from your experience since you joined Citibank, what are the

20   consequences of a U.S. bank for failing to properly control

21   sanctions compliance?

22   A.  They're significant.  They can be monetary in the form of

23   civil monetary penalties of fines.  And if you look over the

24   course of the last decade, we're well over I believe

25   $15 billion in fines that have been handed down to financial

 1   institutions for not properly enforcing sanctions regulation.

 2   I'll note that Citibank has paid $200,000 of those billions of

 3   dollars, so not .00001 percent.  Then there are also

 4   reputational, as sanctions are a tool of U.S. foreign policy,

 5   they're incredibly important.  As a U.S. bank, we take that

 6   obligation very seriously.

 7               MR. SOVOLOS:  Nothing further, Judge.

 8               THE COURT:  Ms. Fleming.

 9               MS. FLEMING:  Thank you, your Honor.

10   CROSS-EXAMINATION

11   BY MS. FLEMING:

12   Q.  Good afternoon, Mr. Peri.  My name is Cathy Fleming and I

13   represent Mr. Atilla.  You talked about just now that Citi --

14               THE COURT:  If both of you could slow down a little

15   bit.  It will make it easier for the interpreters.

16   Q.  You talked about just now that Citi has in fact been

17   sanctioned, correct?

18   A.  Citi has paid a one-time monetary penalty related to

19   sanctions, yes.

20   Q.  That was in 2014 and that related to Iranian sanctions

21   violations, correct?

22   A.  I was not at the bank at the time, so I don't have the

23   details on what it related to.  But that sounds about right.

24   Q.  That was despite very robust compliance and ant-money

25   laundering programs in place, correct?

HCD3ATI4                         Peri - Cross

1   A.   That's correct.

2   Q.   After any time there is a problem, your group and other

3   groups would look to see how you can improve the compliance

4   programs, correct?

5   A.   We're constantly doing that, not just when there is a

6   problem.   Because we're regulated and monitored annually, so

7   we're constantly looking to improve.

8   Q.   So, you will look and try to plug whatever holes or

9   whatever weaknesses you find as problems become apparent to you

10  or your group, correct?

11  A.   Sure.

12  Q.   Now, you gave your testimony as a U.S. person, that is the

13  one of the terms you used here, correct?

14  A.   That's correct.

15  Q.   You are aware based on your experience that it is different

16  for a non-U.S. person, correct?

17  A.   I'm sorry.   I'm not sure what it refers to.

18  Q.   When you talked about some of the regulations you are aware

19  that, for example, foreign banks have slightly different

20  regulations than U.S. banks, correct?

21  A.   Absolutely, but it very much depends on the program.

22  Certain programs apply and certain programs do not.   But yes,

23  generally U.S. sanctions apply to U.S. persons.

24  Q.   For example, U.S. banks also have lots more regulations

25  that don't apply to foreign banks, correct?

HCD3ATI4                          Peri - Cross

1    A.  I don't know what regulations apply to foreign banks, and I

2    assume it's different from jurisdiction to jurisdiction.  U.S.

3    banks are highly regulated.

4    Q.  But for example, the Bank Secrecy Act, that's a uniquely

5    United States --

6               MR. SOVOLOS:  Objection.

7               THE COURT:  Now we're get into the legal again.

8    Q.  Do you have a layperson understanding of that based upon

9    your compliance background?

10   A.  What I would say is I believe that banking laws are unique

11   in every jurisdiction.

12   Q.  When you talked about the various kinds of screening

13   programs that are in place, and by the way, you lead up a team

14   you said of some 25 people; is that accurate?

15   A.  20 I believe is what I said.

16   Q.  In Citi, are you located in Washington, D.C.?

17   A.  That's correct.

18   Q.  In Washington, D.C., is that the center sanctions group for

19   Citi?

20   A.  That's -- we're spread in a number of places.  The head of

21   sanctions is based in Miami.  We have a number of people in

22   Washington as well as in a couple of other locations, and then

23   overseas.

24   Q.  Do you know what the total number of people that specialize

25   simply in sanctions there are that work for Citi?

HCD3ATI4                          Peri - Cross

1    A.  Over 200.

2    Q.  Now, sanctions are separate from compliance at Citi,

3    correct?

4    A.  Sanctions is separate from anti-money laundering.

5    Sanctions is a part of compliance.

6    Q.  Do you know how many people work for anti-money laundering

7    at Citi?

8    A.  I don't.

9    Q.  Do you know, is there a separate Treasury Department that

10   also deals with some of these regulations at Citi?

11   A.  At Citi?

12   Q.  Yes.

13   A.  I'm not sure I understand the question.  Could you repeat

14   it?

15   Q.  There are other departments that also deal with the

16   sanctions regulations in addition to compliance and in addition

17   to sanctions, correct?

18   A.  There are other departments at Citi that deal in banking

19   regulation?

20   Q.  The sanctions regulations.  They have responsibilities that

21   overlap for looking at sanctions and making sure there is

22   compliance?

23   A.  Ultimately that responsibility lies with sanctions

24   compliance.  The bank has integrated functions, so there are

25   other groups that may execute, but sanctions policy resides in

HCD3ATI4                          Peri - Cross

1    sanctions compliance.

2    Q.  Are there people on your team who are trained as lawyers?

3    A.  Yes.

4    Q.  Out of the some -- the number that you have, how many are

5    actually trained as legal counsel?

6    A.  I wouldn't -- I don't know off the top of my head.

7    Several.

8    Q.  Are you trained as a lawyer?

9    A.  I'm not.

10   Q.  The fellow who negotiated Miami, is he trained as a lawyer?

11   A.  I don't believe he is either.  There are several there.

12   There are lawyers there as well.

13   Q.  You talked about Citi globally processes $4 trillion worth

14   of transactions daily?

15   A.  That's the estimate.

16   Q.  Do you have any idea how that breaks down in terms of the

17   volume on numbers in any general sense?

18           THE COURT:  Oh.  You want the breakdown on

19   $4 trillion?

20           MS. FLEMING:  Just a general number.

21   A.  No, I don't think so.  But I'm not quite sure what you're

22   asking either.

23   Q.  When you talked about the compliance programs, the term

24   SDN -- you talked about lists that are done, correct?

25   A.  Correct.

1    Q.  What's an SDN list?

2    A.  SDN list stands for the Specially Designated Nationals

3    list.  It is the list that's put out by the Office of Foreign

4    Assets Control that basically names all of the individuals and

5    entities that are subject to U.S. sanctions.

6    Q.  And that is the list that you talked about that gets

7    updated at least a couple times a week in general, correct?

8    A.  The SDN list, yes, by Treasury.  It's irregular, but on

9    average it could be up to several times a week.

10   Q.  In fact people get put on and even occasionally people and

11   entities get taken off, correct?

12   A.  Absolutely, correct.

13   Q.  There are software programs designed specially that will

14   help entities and banks and financial institutions with their

15   reviews and their compliance programs to see if people are up

16   on the SDN list, correct?

17   A.  Yes.

18   Q.  And does Citi use software to --

19   A.  Absolutely.

20   Q.  -- their SDN obligations?

21   A.  Absolutely.  A bank can't operate without software.  So

22   sure we do.  As I said, there are three levels of human review,

23   but there is a lot of software involved.

24          MS. FLEMING:  Thank you for coming, Mr. Peri.

25          THE COURT:  We'll excuse the witness.  Thank you very

HCD3ATI4

1   much.

2              (Witness excused)

3              THE COURT:  Does the government have any more

4   witnesses?

5              MR. SOVOLOS:  Your Honor we have one witness tomorrow

6   after Mr. Korkmaz.  And I understand that there is the

7   cross-examination of Mr. Korkmaz is going to occur.

8              THE COURT:  So you don't have anybody else today?

9              MR. SOVOLOS:  Not today.  We anticipated that

10  Mr. Korkmaz would be cross-examined by the defense.

11             THE COURT:  Okay.

12             (At the sidebar)

13             THE COURT:  Who is the remaining witness?

14             MR. SOVOLOS:  Jonathan Schanzer from the Foundation

15  for the Defense of Democracies.

16             THE COURT:  How long a witness is that?

17             MR. SOVOLOS:  Probably about 35 or 40 minutes.

18             THE COURT:  He's going to be here when?

19             MR. SOVOLOS:  In the morning.

20             THE COURT:  So we'll start Jonathan Schanzer?

21             MR. ROCCO:  I thought you weren't calling Schanzer.

22  We must have misunderstood.

23             MR. LOCKARD:  We were considering it, but given

24  Mr. Korkmaz finished this morning.  And Mr. Schanzer --

25             THE COURT:  Is that the expert?

HCD3ATI4

1          MR. LOCKARD:  Yes.  And we've trimmed it down to about

2    a half hour.

3          THE COURT:  I thought you were not calling him either.

4    What do we need him for?

5          MR. SOVOLOS:  I thought it was an open question at the

6    end of the day yesterday, and we gave you the slides this

7    morning.  Expecting --

8          THE COURT:  What do we need him for the merits.  We

9    could call 100 more witnesses.

10         MR. SOVOLOS:  Understood, Judge.

11         THE COURT:  God forbid.

12         MS. FLEMING:  We didn't cross the other guy on the

13   Freedom for Democratic Democracy or whatever it is.

14         THE COURT:  Right.

15         MR. SOVOLOS:  He provides a context in Turkey of the

16   effect that the gold transactions had on export numbers.

17         THE COURT:  Does he know anything about Mr. Atilla?

18   That's really the issue here.

19         MR. SOVOLOS:  Understood.

20         THE COURT:  No, I'm not being critical.  I'm just

21   saying, is he going to talk about Mr. Atilla?  We've got a huge

22   amount of background now.

23         MR. LOCKARD:  As an expert, no.  He wouldn't testify

24   about Mr. Atilla.  We anticipated him as a very short directed

25   expert testimony as Mr.  --

HCD3ATI4

1          THE COURT:  How about a proffer, what is he going to

2     say?

3          MR. LOCKARD:  So there has been other evidence about

4     statements by the co-conspirators or by Mr. Atilla about export

5     figures or intended economic impacts of various transactions,

6     and Mr. Schanzer would provide some short direct testimony

7     about what that means, and the context of what those statements

8     are to help the jury understand what they're talking about.

9          THE COURT:  I think the jury's got enough info.  I

10     really do.  So, we can talk about it at the close today, too,

11     but my inclination is we should turn now to the

12     cross-examination of Mr. Korkmaz.  Who is going to do that?

13          MR. HARRISON:  Me, Judge.

14          THE COURT:  Good.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

HCDPATI5

1              THE COURT:  So we're going to re-call the prior

2     witness and continue with his cross-examination.

3              MR. HARRISON:  Judge, just one more.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HCDPATI5

```
 1              (At the side bar)
 2              MR. HARRISON:  So I'm going to do the cross of
 3   Mr. Korkmaz.  Mr. Lockard had a concern about asking this
 4   witness questions about people that, I guess, helped him after
 5   he got out of Turkey.
 6              MR. LOCKARD:  Yes.  So, basically, Mr. Korkmaz's
 7   communications with the U.S. government were indirect, and he
 8   is concerned about their safety and their family's safety if
 9   they were going to be identified.
10              THE COURT:  I think we had motion practice on this.
11              MR. ROCCO:  I think we did.  We made an application.
12              THE COURT:  I don't really want to involve other
13   people.
14              MR. ROCCO:  Your Honor, I would think not, but if -- I
15   think the question will always be context; so the fact of the
16   matter is that I don't think Mr. Harrison has any intentions of
17   going into the identities of specific people.
18              MR. HARRISON:  No, Judge.  I do want to know, because
19   it's unclear to me, how he got to the U.S., how he made -- I
20   don't need to know who, but how it happened.
21              THE COURT:  We don't need to talk about countries.
22              MR. HARRISON:  Sure.
23              THE COURT:  And we don't need to talk about people
24   because I don't think it would help.  We sort of generally know
25   the story.  I would be concerned about security issues that
```

HCDPATI5

```
 1   don't really help Mr. Atilla, as far as I can see.

 2            MR. HARRISON:  I got it.  I was sort of assuming,

 3   though, that I could ask him generally, without eliciting

 4   identification or names of people, like how did it happen.

 5            THE COURT:  How about this for a novelty, how about

 6   asking him what he knows about Mr. Atilla?  How about that?

 7            MR. HARRISON:  Absolutely, I will do that.

 8            THE COURT:  All right.

 9            MR. ROCCO:  Your Honor, if I may?  The government

10   didn't ask many questions about Mr. Atilla; so I think that --

11            MR. LOCKARD:  I asked a few.

12            THE COURT:  What's good for the goose is good for the

13   gander, there's no question, but I don't want to look backwards

14   at the moment.

15            MR. HARRISON:  I'm only going into his direct.  I'm

16   only going on his direct.

17            THE COURT:  Okay.  Let's talk about this.

18            (Continued on next page)

19

20

21

22

23

24

25
```

1       (In open court)

2              THE DEPUTY CLERK:  Sir, before we begin, I'd like to

3       again remind you that you're still under oath.

4              THE WITNESS:  Thank you.

5              MR. HARRISON:  May I proceed, your Honor?

6              THE COURT:  Sure.

7              MR. HARRISON:  Thank you.

8       CROSS-EXAMINATION

9       BY MR. HARRISON:

10      Q.  Mr. Korkmaz, my name is Todd Harrison, and I represent

11      Mr. Atilla.

12      A.  Nice to meet you.

13      Q.  I'm going to be asking you some questions today, and my

14      first question is, you've never actually seen or met Mr. Atilla

15      in person before you came to this courtroom, correct?

16      A.  That is correct.

17      Q.  And I want to talk a little bit about direct examination

18      that you've had with Mr. Lockard for the last few days.

19      A.  Yes.

20      Q.  My first question is, do you remember testifying earlier

21      today about the contents of a couple of phone calls that you no

22      longer have the audio for?

23      A.  Are you referring to the conversations that were on

24      April 14th?

25      Q.  Yes.  Do you remember how many conversations you testified

HCDPATI5                      Korkmaz - Cross

1    about this morning that you did not have audio for that you no

2    longer have audio for?

3    A.   I don't recall any question about how many there were this

4    morning.

5             THE COURT:  No, no.  He's just asking if he remembers

6    the questions that were asked this morning, generally.

7    A.   I recall that there were two that I was questioned about

8    from April 14th.

9    Q.   And when you testified this morning, you testified that you

10   had your own specific recollection of what the participants in

11   those calls said when you listened to them back in 2013,

12   correct?

13   A.   That is correct.

14   Q.   And you testified earlier that in the course of that -- the

15   investigation that you were the supervisor for, there were

16   thousands of telephone calls that were recorded, correct?

17   A.   That is correct.

18   Q.   And you testified previously that you listened to most of

19   them, or at least a lot of them, correct?

20   A.   That is correct.

21   Q.   And I think you said that it was -- the number of calls

22   that you listened to was probably between 250 and 1,000,

23   correct?

24   A.   That is correct and, in fact, in answering that question,

25   I'd also mention that it was in the hundreds.  But, yes, that

 1   is correct.

 2   Q.  Yes, you did say that.  And you also said, but it could

 3   also be 2,000, I can't really set a certain number.  Do you

 4   remember saying that earlier –– I'm sorry, yesterday?

 5   A.  That is correct, yes.

 6   Q.  So I just want to be clear about what we're talking about.

 7   You're saying for those calls that you no longer had audio for,

 8   those two calls that you testified about this morning, you're

 9   saying that you have an independent recollection of what was

10   said on those calls from when you listened to them back in

11   2013, correct?

12   A.  That is correct.

13   Q.  Because you haven't listened to any of those recordings

14   recently, right?  Because, according to you, those recordings

15   never made it out of Turkey, correct?

16   A.  I did not listen to the sound recordings of these, but I

17   did read the transcripts of them and that helped me refresh my

18   mind about the calls.

19   Q.  Okay.  But I'm talking about when you're back in Turkey,

20   did you ever actually listen to the audio of those two calls

21   that you testified about this morning, or did you just read

22   transcripts back in 2013?

23   A.  I remember very well that I had listened to those

24   conversations that are in question because those intercepts

25   were among the first that I had got to listen to as I had

1    received the authorization to be able to monitor intercepts.

2              My supervisors had me sit down with monitoring

3    officers and had me work on the KDM system and to learn to

4    listen to intercepts, and these conversations were among the

5    very first that I had listened to from that time.

6    Q.  So these two were among the first out of the hundreds or

7    perhaps thousands that you listened to?

8    A.  I would put it this way, they were among the very first

9    that I began to listen to through the KDM system.

10   Q.  And a lot has happened to you since you listened to those

11   tapes in Turkey in 2013, correct?

12   A.  That is correct.

13   Q.  You resigned from the police force, correct?

14             THE COURT:  You know, we got the answer to your

15   question.

16   A.  I did not resign.  I was fired.

17   Q.  Well, do you recall telling the U.S. Attorney's Office on a

18   previous occasion, when you met with them, that you actually

19   resigned from the police force?

20   A.  No, I've never said that I resigned.

21   Q.  And then after you left the police force, you were actually

22   charged with crimes in Turkey about nine months later, correct?

23   A.  That is correct, but there might have been an error in the

24   question, if you can please repeat.  When you say after you had

25   separated from the police force, what do you mean by that part

1    of that question?

2    Q.  It wasn't a trick question.  Sometime after you left the

3    police force, about nine months after, you were charged with

4    crimes in Turkey, correct?

5    A.  It is correct that I received such charges, but I'd like to

6    exclude the first part of your question because that was while

7    I was still with the police force, and I was not out of the

8    police force yet.

9    Q.  Okay.  But sometime after you were out of the police force,

10   you were charged with crimes, correct?

11          THE COURT:  Maybe I could help you a little.  So when

12   were you charged with crimes in Turkey?

13          THE WITNESS:  It was September 1st, 2014.

14   Q.  And you left the police force at the end of 2013, correct?

15   A.  No, sir.  As I said here for two days now, I was exiled to

16   the bridge unit, that I was exiled out to the province of

17   Hakkari.  So at the time that I was arrested, I was still

18   within the police force.

19   Q.  You're right.  My mistake.  So at the end of 2013, you left

20   your post in Istanbul, correct?

21   A.  That is correct, I was reassigned.

22   Q.  It was nine months after that that you were first charged

23   with crimes in Turkey, correct?

24   A.  Judicially, that is correct.

25   Q.  And then you spent some time in prison, correct; about 17

1    months, I think you testified on direct?

2    A.  That is correct.

3    Q.  And then you were released from prison on February 9th of

4    2016, correct?

5    A.  That is correct.

6    Q.  And then, at some point, you mentioned on your direct

7    examination that you were charged again, or were going to be

8    charged again was your understanding in Turkey?

9            THE COURT:  Now, wait a minute.  Are you saying

10   charged again?

11           MR. HARRISON:  That's my understanding of his direct

12   testimony, your Honor.

13           THE COURT:  That he was charged twice?

14           MR. HARRISON:  Or he was going to.

15           THE COURT:  Maybe you could ask that.

16           MR. HARRISON:  Sure.

17   BY MR. HARRISON:

18   Q.  Were you charged with crimes in Turkey after you were

19   released from prison in February of 2016?

20   A.  Yes.

21   Q.  When was that?

22   A.  I remember that to be at the end of June.

23   Q.  Of 2016, correct?

24   A.  That is correct.

25   Q.  And then in July of 2016, there was a coup attempt in

HCDPATI5                        Korkmaz - Cross

1    Turkey, correct?

2              THE COURT:  Excuse me, just one second.  Could I ask

3    one thing?  Were you charged with crimes before you went to

4    prison?

5              THE WITNESS:  There were many investigations that were

6    conducted about me between the disciplinary ones.

7              THE COURT:  Disciplinary ones?

8              THE WITNESS:  As well as other judicial ones.

9              THE COURT:  But were you charged with any crimes

10   before you went to prison?

11             THE WITNESS:  So based on our legal system -- shall I

12   understand your question to be whether I was indicted?

13             THE COURT:  Well, the technical term, I'm just trying

14   to figure out why you went to prison, for what?

15             THE WITNESS:  Okay.  Then I'll explain that.  In our

16   criminal law system, we have two phases.  One is the

17   investigation.  The next one is prosecution, and with

18   indictment, the investigation phase ends and the prosecution

19   phase begins, but the arrest can happen during the

20   investigation phase.  For example, I was arrested on

21   September 1st.

22             THE COURT:  Of what year?

23             THE WITNESS:  In 2014.  This was an investigation, and

24   this becoming a charge against me or the indictment actually

25   happened about a year after -- after I was arrested.

1        So with relation to that, then back to the question

2   that was asked of me earlier.  What happened is while I was

3   incarcerated, there was an investigation against me, and by the

4   time I received the charges from that investigation, that

5   happened after I was released.  What I understand is that after

6   I was relieved from duty, there were many investigations about

7   me that were conducted during that period.

8   Q.  And just so we're clear, what were the charges in that

9   first indictment?

10  A.  My reason for arrest was a coup.

11  Q.  Well, the first time you were arrested was in

12  September 1st -- the first time you were detained was

13  September 1st of 2014, correct?

14  A.  Yes.

15  Q.  And there were a number of specific charges in the

16  indictment that -- the charging instrument that you were

17  eventually charged with, correct?

18  A.  Referring to the indictment that was put out against me

19  about a year later?  Yes, that is correct.

20  Q.  How many different charges against you were there in that

21  indictment?

22  A.  Those included a coup, it included terrorist organization,

23  espionage and misuse of authority.

24  Q.  And the misuse of authority was for performing illegal

25  wiretaps, correct, in violation of Turkish law?

1   A.  Yes.

2   Q.  We'll come back to that.  What were the charges, if you

3   remember them, from the second indictment that you have

4   referred to that came down in June of 2016?

5   A.  I did not have a good chance to look thoroughly at that

6   indictment, but -- so I can't remember the charges section very

7   well, but I remember terrorist organization was one of them,

8   and coup again was one of them, violation of secrecy, as well

9   as misuse of authority were also among them, I believe.

10  Q.  And so again, in that second indictment, you were also

11  charged with illegal wiretapping, just like you were in the

12  first indictment, correct?

13  A.  Yes.

14  Q.  And when you refer to a charge of a coup in both of those

15  indictments, you mean that you were trying to perform a coup or

16  trying to overthrow the Turkish government, correct?

17  A.  That is correct.  There were such allegations, and all of

18  these allegations were baseless and they were slanders.

19  Q.  And after you were released from prison in July of 2016,

20  one month after that second indictment, there actually was a

21  coup in Turkey, wasn't there?

22  A.  It was not one month later.

23  Q.  It started on July 15th of 2016, didn't it, Mr. Korkmaz?

24  A.  That is correct, on July 15, 2016, there was a calamity

25  that happened in Turkey.

HCDPATI5                          Korkmaz - Cross

1   Q.  And that was about a month after you got the second

2   indictment in June of 2016, correct?

3   A.  It occurred after the indictment was written up, but I had

4   not received a copy of the indictment at that time.

5   Q.  And then in that coup attempt in July of 2016, a group of

6   military officers tried to overthrow the Turkish government,

7   correct?

8            MR. LOCKARD:  Objection.

9            THE COURT:  I'll allow it.

10  A.  That's what it appeared to be, and since I'm not a coup

11  investigation expert, I don't know what the details behind that

12  may have been.

13  Q.  But you were in Turkey at the time, correct?

14  A.  Yes.

15  Q.  Where were you in Turkey during the -- from July 15th of

16  2016 to July 21st of 2016, when the coup ended?

17           THE INTERPRETER:  Could you repeat the dates again,

18  please?

19           THE COURT:  It went to the 21st?

20           MR. HARRISON:  Yes, sir, of July.

21  A.  I was in Istanbul on July 15th.

22  Q.  And that was the -- sorry.  Go ahead.

23  A.  And I went to Afyon on July 16th.

24           THE COURT:  What is that, a place?

25           THE WITNESS:  It's a city.

```
 1   Q.  Just so the record reflects it, you had to pause there for
 2   a while.  Are you having a hard time remembering where you were
 3   during the coup?
 4            THE COURT:  Counsel, this is not Law and Order.  Just
 5   ask the questions.  All right?
 6   A.  What happened is I wanted to ensure whether the date was
 7   the 16th or the 17th of July.
 8   Q.  And it was shortly after that coup attempt that you left
 9   Turkey, correct?
10   A.  Yes.
11   Q.  I think you testified on direct that it was in August of
12   2016, approximately two weeks after the end of the coup
13   attempt, that you left Turkey, right?
14   A.  That is correct.
15   Q.  And the coup attempt was by a group called the Gulenists,
16   correct?
17   A.  In order for me to verify that, I'd have to have taken part
18   in those investigations.
19   Q.  We'll come back to that.  After you left Turkey, I think
20   you testified on direct that you went to several other
21   countries, correct?
22   A.  Yes.
23   Q.  How many other countries did you go to before you came to
24   the United States?
25   A.  It was three plus one.
```

1  Q.  I'm not sure what that means.  Is it four countries in

2  between the time you left Turkey and got to the United States,

3  or are you counting Turkey and the United States?

4  A.  I went to three countries, and what I meant by the plus one

5  was on my way to the United States, I was on a transit flight.

6  Q.  And what was the time period between the time that you left

7  Turkey and the time that you entered the United States; how

8  long was that?

9  A.  Seven months.

10  Q.  And then how long have you been in the United States?

11  A.  Ten months, maybe a little more than ten months, but ten

12  months.  Ten months.

13  Q.  And it's still your testimony to this jury that you have

14  your own independent recollection of listening to those two

15  phone calls from back in 2013; is that correct?

16  A.  Yes, that is so, and because I have many reasons for that.

17  Q.  And how many times did you meet with or talk to the members

18  of the prosecution team from the government to prepare to

19  testify in court before you appeared?

20  A.  Many times.

21  Q.  More than 40, correct?

22  A.  I would estimate that to be the case.  It would be more

23  than that.

24  Q.  And how long -- approximately how long were each of those

25  more than 40 sessions preparing with the U.S. Attorney's

1   Office?

2   A.  It varied based on the day, sometimes two hours, sometimes

3   four hours, sometimes longer than that.

4   Q.  Mr. Korkmaz, let me turn to another area.  You testified on

5   your direct examination about physical surveillance that people

6   on your team did in Turkey when you were conducting this

7   investigation that you've been talking about, correct?

8   A.  That is correct.  There are physical surveillance teams,

9   and I would get in contact with the chief of the physical

10  surveillance teams and, yes.

11  Q.  Okay.  And just so I understand how it worked, you,

12  yourself, it sounds like -- as I understand it, you, yourself,

13  were not going out and doing surveillance on people, correct?

14  A.  That is correct.

15  Q.  You were already relatively high up when you were running

16  this investigation, right?  You were supervisor?

17  A.  I was the lead for the team that was conducting the

18  investigation.

19  Q.  And just so I understand one of your previous answers, it

20  sounds like the person who was supervising the physical

21  surveillance was beneath you, correct?

22  A.  No.

23  Q.  Can you explain that?  Were you guys equal, or how did it

24  work?

25  A.  No.  He was ranked higher than me, and he was chief over a

1   section.

2   Q.  So there was a whole separate surveillance section; is that

3   right?

4   A.  Correct.

5   Q.  And as part of your investigation, there was a lot of

6   physical surveillance done of the people that you're talking

7   about that were suspects, correct?

8   A.  That is correct.

9   Q.  And there were a lot of surveillance photos taken like the

10  ones you went through on direct with Mr. Lockard, correct?

11  A.  That is correct.

12  Q.  And as the supervisor of the unit, can you tell us, please,

13  how many surveillance photos were taken as part of your

14  investigation?

15  A.  Are you asking about photographs or videos?

16  Q.  Let's start with photographs.

17  A.  I already said the photographs are frames taken out of

18  videos.

19  Q.  So all of these photographs are taken from videos?

20  A.  Yes, those that belong to the technical surveillance

21  activities.  That's the case all the time.

22  Q.  Okay.  There were no still photos taken, only videos, is

23  that what you're saying?

24  A.  Some of our cameras had the ability to be able to take

25  still pictures, along with taking the video, but whether that

1    feature was utilized or not, I don't know.

2    Q.   Okay.  So is it fair to say you don't remember whether any

3    still photographs were taken?

4    A.   Yes.

5    Q.   How many videos were taken as part of the surveillance, the

6    physical surveillance, for your investigation?

7    A.   There would be no videos in a physical surveillance.

8    Q.   Well, maybe I'm misunderstanding what you mean by physical

9    surveillance.  Why don't you tell us, when were the videos

10   taken?

11   A.   The videos were shot during the activities of surveillance

12   through technical tools and, also, the security camera footage.

13   Q.   And can you give us some sense, or can you tell us the

14   number of security -- videos of security camera footage and

15   videos of surveillance that was taken by your teams as part of

16   the investigation?

17   A.   What I remember is that in our investigation there were

18   about four security camera recordings, and the videos that

19   would have been shot through the technical tools there during

20   those surveillance activities would have been over 30, I

21   believe.

22   Q.   Let me turn your attention to --

23        MR. HARRISON:  Mr. White, can you bring up Government

24   Exhibit 106, please.

25   Q.   Do you remember seeing this, Government's Exhibit 106, on

1    your direct examination?

2    A.  Yes.

3    Q.  Okay.  And Mr. Atilla, my client, is not depicted anywhere

4    in that photograph, correct?

5    A.  That is correct.

6    Q.  And this money that's depicted in the photograph did not go

7    to Mr. Atilla, correct?

8    A.  Yes.

9    Q.  And it did not come from Mr. Atilla, correct?

10   A.  Yes.

11           MR. HARRISON:  Mr. White, 105, please.

12   Q.  Mr. Korkmaz, do you remember testifying about Government's

13   Exhibit 105 on direct?

14   A.  Yes.

15   Q.  Mr. Atilla is not depicted in this photo, correct?

16   A.  Yes.

17   Q.  And the money depicted in 105 neither came from or went to

18   Mr. Atilla, correct?

19   A.  Yes.

20           MR. HARRISON:  Mr. White, 970-14, please.

21   Q.  Mr. Korkmaz, do you remember testifying about 970-14 on

22   direct?

23   A.  Yes.

24   Q.  And Mr. Atilla is not depicted anywhere in this photograph

25   either, correct?

```
 1    A.  That is correct.

 2    Q.  And you talked a lot on direct about this location Turgev,

 3    do you remember that?

 4    A.  I did say that I know this place, yes.

 5    Q.  And Mr. Atilla has never been there either, correct?

 6    A.  I don't know.

 7              MR. HARRISON:  Mr. White, 971-16, please.

 8    Q.  Do you remember testifying about 971-16 on direct

 9    examination, Mr. Korkmaz?

10    A.  Yes.

11    Q.  And Mr. Atilla is not directed -- excuse me, Mr. Atilla is

12    not depicted anywhere in 971-16 either, correct?

13    A.  That is correct.

14    Q.  Okay.  And the money that's depicted in 971-16 neither came

15    from nor went to Mr. Atilla, correct?

16    A.  Yes.

17              MR. HARRISON:  Mr. White 971-15, please.

18    Q.  Mr. Korkmaz, do you remember testifying on direct about

19    971-15?

20    A.  Yes.

21    Q.  And Mr. Atilla is not depicted in 971-15 either, is he?

22    A.  I just want to make sure there's no translation error.

23    He's not there.

24    Q.  Yes, that's the question.

25              THE INTERPRETER:  Yes, that is what he said.  He said
```

1    "he's not there."

2    Q.  Okay.  And the money depicted in 971-15, that neither came

3    from Mr. Atilla nor went to Mr. Atilla, correct?

4    A.  Yes.

5          MR. HARRISON:  Mr. White, 971-78, please.

6    Q.  Mr. Korkmaz, do you remember testifying on direct about

7    971-78?

8    A.  Yes.

9    Q.  And Mr. Atilla, my client, is not depicted in 971-78,

10   either, correct?

11   A.  Yes.

12         MR. HARRISON:  Mr. White, 971-79, please.

13   Q.  Mr. Korkmaz, do you remember testifying on direct about

14   971-79?

15   A.  Yes.

16   Q.  And Mr. Atilla is not depicted in 971-79 either, correct?

17   A.  Yes.

18   Q.  And you testified on direct about this location.  It has

19   something to do with the European Union ministry; is that

20   right?

21   A.  Yes.

22   Q.  And Mr. Atilla has never been there either, has he?

23   A.  I don't know whether he did.

24   Q.  And, Mr. Korkmaz, I'm going to direct your attention to the

25   date and time stamp on the bottom of that photo in Government's

1   Exhibit 971-79.  Do you see that date and time stamp?

2   A.  Yes.

3   Q.  You can correct me if I'm wrong.  This is not a trick

4   question, but I think you testified on direct that that date

5   and time stamp on that photo was not correct.  Is that what you

6   said?

7   A.  I didn't say that the date was wrong, but I had said that

8   during our surveillance activities, due to device errors that

9   there were times where the times or time stamps may be

10  incorrect or sometimes the dates may be incorrect and that such

11  variations would be mentioned on the activity reports

12  afterwards.  That's what I had said.

13  Q.  And just so I understand, why on some of the photographs

14  the date and time stamps not correct?

15  A.  Because we were using more than one device.  Some of these

16  devices have this error, and we can't go away from that error.

17  And some devices show the correct time -- or the correct stamp,

18  excuse me.

19  Q.  Okay.  Thank you.  So just so I understand, it's your

20  understanding and it's your testimony that some of the video

21  recording devices that were used in these surveillance

22  pictures, the date and time were incorrect, right?

23  A.  That is correct.  However, we were indicating this on our

24  own as well.

25  Q.  On these other reports that you're talking about, correct?

HCDPATI5                    Korkmaz - Cross

1    A.  That is correct, the reports that are attached to these

2    videos.

3    Q.  But you can't tell just from looking at this picture, or

4    any particular picture, which video date and time stamp is

5    right and which ones are wrong, just from looking at the

6    picture, right?

7    A.  You can tell.

8    Q.  You can tell just from looking at the picture?

9    A.  For example, here it's obvious.  Does it appear to be 10:00

10   in the evening here?

11   Q.  Oh, so your point is -- I'm not trying to trick you.  I'm

12   just trying to figure it out.  Your point is because it's

13   daylight out, so it doesn't look like it's almost 10:00 at

14   night; is that right?

15   A.  Yes.

16   Q.  So by looking at this, can you tell us what time and date

17   this actually did happen?

18   A.  Just by looking at the image?  I can tell, but somebody

19   else may not be able to.

20   Q.  Okay.  So what date and time was this video actually done?

21   A.  That would be on April 19th, 2013, between the hours of

22   3:00 and 500 in the afternoon.

23   Q.  And how do you know that?

24   A.  Because I was on active duty during this activity at the

25   unit.

1   Q.  In the office, correct?

2   A.  Yes.  I was working while the intercept was going on, and

3   when the video was brought in, I watched it.

4   Q.  Okay.  But you weren't the one who actually took the video,

5   correct?

6   A.  That was not me, no.

7   Q.  So but how do you know, as you sit here today, that this

8   photograph, taken from a video, was between 3:00 and 5:00 and

9   not at 9:55 at night?

10  A.  That's because there was another camera that was taking

11  footage from a different angle during that time.

12  Q.  Okay.  So the other camera you think was correct?

13  A.  I recall that to be correct.

14  Q.  So what time did that other camera say?

15  A.  What I remember is that that would be between the hours

16  that I mentioned.  If I could see the report that I had written

17  up, I can look at it and it would refresh my mind, and I could

18  tell you exactly what time it was.

19          MR. HARRISON:  Mr. White, 971-71, please.

20  Q.  Mr. Korkmaz, do you remember testifying on direct about

21  971-71?

22  A.  Yes.

23  Q.  And Mr. Atilla is not depicted in this picture either,

24  correct?

25  A.  Yes.

1    Q.  And, in fact, there are no surveillance photos or videos

2    that depict Mr. Atilla at all, correct?

3    A.  Yes.

4              MR. HARRISON:  You can take down 971-71.  Thank you,

5    Mr. White.

6    Q.  And Reza Zarrab is in these surveillance pictures a lot,

7    correct?

8    A.  That is correct.

9    Q.  And I think, and correct me if I'm wrong, you testified on

10   direct about his plane and people meeting on his plane,

11   correct?

12   A.  That is correct.

13   Q.  And Mr. Atilla has never been on Mr. Zarrab's plane,

14   correct?

15   A.  I don't know.  I don't have any information that it might

16   have happened.

17   Q.  In fact, Mr. Atilla has never met Mr. Zarrab in person, as

18   far as you know, correct?

19             MR. HARRISON:  Let me withdraw, and I'll rephrase it,

20   Judge.

21   Q.  Mr. Atilla never met personally, face to face, with

22   Mr. Zarrab, correct?

23   A.  I -- I don't recall such an occurrence.

24   Q.  So as far as you know, from your surveillance, all the

25   surveillance that you did and the investigation that you did,

HCDPATI5                          Korkmaz – Cross

1   my client, Mr. Atilla, never met face to face with Mr. Zarrab,

2   correct?

3   A.   There's nothing that I remember pertaining to whether he

4   had met with him.

5   Q.   And on your direct examination, you referred a couple of

6   times to a Mr. Happani that works for Mr. Zarrab, correct?

7           THE INTERPRETER:   Could you please repeat that

8   question?   I'm sorry.

9   Q.   Sure.   On your direct examination with Mr. Lockard, you

10  testified -- you discussed a couple of times a Mr. Happani, who

11  works for Mr. Zarrab, correct?

12  A.   I don't recall how many times I brought him up, but I

13  remember talking about Abdullah Happani, yes.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

HCD3ATI6                          Korkmaz - Cross

1    Q.  My client, Mr. Atilla, has never met face to face with

2    Mr. Happani either, correct?

3    A.  I don't believe that he did.

4    Q.  With all the surveillance, you never saw anybody else who

5    you considered a suspect in this investigation going to

6    Mr. Atilla's home, correct?

7    A.  That is correct.

8    Q.  You testified on direct that you are -- withdrawn.

9             You testified on direct, I believe, that Mr. Atilla

10   was never given any money as part of the scheme or never took

11   any bribes, correct?

12   A.  He did not receive any bribes.  There is not such a thing.

13   Q.  Let me direct your attention to April 10 of 2013.

14   A.  Yes.

15   Q.  As part of your team's surveillance on that day, there was

16   a photo, photos taken of Mr. Reza Zarrab going into Halkbank,

17   at approximately 4:10 and then leaving again at approximately

18   5:15, correct?

19             p.m. in the afternoon, evening.

20   A.  Yes, I remember that and I remember the vehicle to be a

21   large vehicle.

22   Q.  I just want to ask you a couple questions about --

23   withdrawn.

24             As part of your direct, you testified that there were

25   a lot of wiretaps done, right?  A lot of recording of people's

HCD3ATI6                         Korkmaz - Cross

1    phone calls, right?

2    A.  Yes.

3    Q.  Can you describe for us, because I didn't really understand

4    it from direct, the process by which you would record people's

5    phone calls?  How did it actually work?

6              THE COURT:  The equipment?

7              MR. HARRISON:  What, Judge?

8              THE COURT:  Do you mean the equipment?

9              MR. HARRISON:  The process.  Who actually did the

10   recording, who monitored it, things like that.

11   A.  Certainly.  The intercepts would be requested by the

12   prosecutor from a court, and the judge would make a decision on

13   that petition.  And after receiving that order, then the

14   prosecutor would provide a tasking --

15             THE COURT:  What?

16             THE INTERPRETER:  Tasking.  Tasking of such activity.

17             And so the sentence was continuing, Judge, I will just

18   add to that.

19   A.  So then the prosecutor would issue a tasking in terms of

20   who would carry out this activity.  After that, this decision

21   as well as the instruction would then be sent by the technical

22   office within the financial crimes unit to KOM in Ankara.  And

23   the KOM directorate would then send the instructions, as well

24   as the order, the decision, to TIB.  So TIB has a law office,

25   and they would review the details of this order.  After that,

the TIB fulfills that order.  And after that, once TIB fulfills

that order, then the police officer would be able to see what

TIB provides through a secure line and through the KDM, what's

been intercepted.

So, at this point, the audios are not downloaded, they

are maintained by TIB.  So, the staff who is doing the

monitoring would select the recordings that constitute an

element of crime.  And they would also select ones that would

not be used in witnessing.  And with any developments, the

officer would inform his supervisor, so that the prosecutor's

office could be notified.  And these recordings containing

elements of crime would then be transcribed through the system.

Then these tapes or transcripts get printed out, and then the

audio files would get downloaded as all audio as well as audio

that contains elements of crime.

So, after the sound is downloaded to these data media,

the administrator would order that all the sound recordings on

the system be erased.  And at this point we would have the

transcripts, all the sound files, and sound files that contain

elements of crime.

For the one containing all sound files, that one would

exclude any sound bites that were marked as not for witnessing.

In other words, those would get erased.  And so then you could

monitor these sound recordings on this data media that you

have.

1              In fact, within the knowledge of the prosecutor, it is

2       also possible to use these sound bites in the all sounds data

3       media, and to identify any crime, elements of crime that may

4       not have been identified earlier.

5              No intercepts or no monitoring could be done without a

6       court order in any way.  And a review of the court order gets

7       done by TIB anyway.  And the system itself is one that is

8       designed by TIB, all in compliance with the applicable law.

9       All intercepts within our investigation were carried out based

10      on court orders.  Within the investigation of December 17,

11      there are more than 30 court orders and judge orders that were

12      in that investigation.

13             Thus, when you were referring to the charges against

14      me and one of them being illegal intercepts, all these

15      allegations were baseless and they are slanders and all the

16      intercepts were done with court orders.

17      Q.  Okay.  In relation to that, Mr. Korkmaz, those charges, as

18      you mentioned on direct, are still open against you in Turkey,

19      correct?

20      A.  Yes.

21             THE COURT:  Could I just ask a question.  So, were you

22      ever put on trial?

23             THE WITNESS:  Yes, your Honor.  I did, and I was

24      released.  Because in that 25th of December investigation for

25      which I had been arrested --

1          THE COURT:  2013?

2          THE WITNESS:  That is correct, your Honor.

3              In which I was arrested, I had not even taken part in

4      that investigation at all.  In other words, for an

5      investigation, the 25th of December investigation, which is one

6      that I had learned through the media just like everyone else,

7      an investigation where I had not taken part or investigation

8      that I had not even provided a single signature, I was

9      prosecuted, and I was given charges such as a coup or illegal

10     intercepts and such in this very investigation where I had not

11     taken part.

12             So, sir, you mentioned terrorist, you mentioned coup,

13     you mentioned illegal intercepts.  I'm a police officer, I

14     studied eight years for it.  And in order to give back the

15     value of the salary that I was receiving from the government, I

16     did my job, and just like all the police officers, I did what I

17     was supposed to do as a police officer.

18             And you mentioned that there was some charges against

19     me, nine months after the December 17.  No, these charges were

20     being brought against me as of December 18.  The politicians

21     and other higher ups that had been implicated in this

22     corruption, the only way that they could find was to call the

23     police officers members of the Jamaat, also terrorists and

24     agents.  And that's what I've been facing since December 18,

25     sir.

1        And in fact, the courthouses that are operating at the

2   direction of these politicians, these allegations or these

3   charges against are still being -- are still ongoing, and it's

4   been four years, and there has been no indication of terrorism

5   or coup or anything with regards to these cases that are still

6   ongoing against us.  Inasmuch as corruption is so immoral, it

7   is also --

8            THE COURT:  I think we should go back to the question.

9            MR. HARRISON:  Thank you, your Honor.

10            THE WITNESS:  I apologize, your Honor.

11            THE COURT:  That's all right.

12   Q.  Mr. Korkmaz, let me go over a couple things you just said.

13   As part of both set of indictments against you, you were

14   actually charged with being a member of the Gulenist

15   Organization, correct, also known as FETO, F-E-T-O, which is

16   designated as a terrorist organization in Turkey, correct?

17   A.  With regards to that organization, whether you call it the

18   Gulen organization, the terror organization, or Jamaat

19   organization, I have no connection with them or no information

20   about them.  I'm not a member of that organization.  I am a

21   police officer.

22   Q.  Let me ask you some questions about that.  You said on

23   direct examination that you graduated from the police academy I

24   believe in 2010; is that correct?

25   A.  Yes.

```
 1   Q.  You said you graduated I think number three in your class;

 2   is that right?

 3   A.  Yes.

 4   Q.  It's been widely reported in Turkey that during that

 5   period, the Gulenist organization had stolen the answers to the

 6   national police exam, and given it to their members in order to

 7   promote them through the police organization.  Correct?

 8           MR. LOCKARD:  Objection.

 9           THE COURT:  Sustained.

10           MR. HARRISON:  If he knows, Judge.

11           THE COURT:  Sustained.

12   Q.  You are aware, are you not, Mr. Korkmaz, that the Gulenist

13   organization did have as a goal to promote their people up

14   through the national police force in Turkey, correct?

15           MR. LOCKARD:  Objection.

16           THE COURT:  If you know.

17   A.  These are things that were all written up and mentioned and

18   talked about.  But I did not witness this personally myself.

19   Q.  It wasn't just written up and talked about, there was

20   actually a criminal case in Turkey in 2012 that determined that

21   members of the Gulenist organization had in fact stolen the

22   answers to the national police exam, correct?

23           MR. LOCKARD:  Objection.

24           THE COURT:  If you know.

25   A.  I don't have information on such a case, truly.
```

1  Q.  After you graduated from the police academy and joined the

2  Turkish police force, you had a pretty rapid rise in the police

3  department, correct?

4  A.  I still had the same rank.

5  Q.  Well, when, after you graduated -- withdrawn.

6          When you graduated from the police force, from the

7  police academy, how old were you?

8  A.  I was about a year older than my classmates, and I was 23

9  years old.

10 Q.  I think you said, you testified on direct that you

11 immediately were a ranked officer and were in charge of

12 supervising three other people, correct?

13 A.  That is correct, three police officers.

14 Q.  And then relatively quickly you got a promotion, correct?

15 A.  A year and a half later, my desk where I was working was

16 changed to another.

17 Q.  And that was a promotion that put you in charge of more

18 people, correct?

19 A.  Yes, my unit chief had found me to be very successful.

20 Q.  Okay.  And that was within a year and a half of getting

21 there, correct?

22 A.  That is correct.

23 Q.  At that time you were put in charge of eight people if I

24 recall your testimony correctly; is that right?

25 A.  No, what I had said was at the time that I left that post,

1    I had eight people under me.

2    Q.  I'm sorry, you had what?

3         THE INTERPRETER:  Eight people working for me at the

4    time I left the post.

5    A.  In other words, in other words it was three and a half

6    years later, that I was leading a group of eight police

7    officers.

8    Q.  At that time, you were the head of the financial crimes

9    unit in the police department in Istanbul, correct?

10   A.  No, I was not the person in charge of the financial crimes

11   unit, no.  That would be someone at a rank of superintendent.

12   I would have to wait another 16 years to be able to get that

13   position.

14   Q.  But within three years of getting out of the police

15   academy, you were running an investigation into the prime

16   minister of Turkey, and a billionaire named Reza Zarrab who was

17   very well known, correct?

18   A.  We did not have any information, nor any evidence, that

19   would indicate at the outset of the investigation that Reza

20   Zarrab may have had any connection to a politician.  For

21   example, the first bribe that was sent to Suleyman Aslan

22   occurred during our investigation.  And likewise, other bribes

23   that were given to other individuals, also happened during the

24   course of the investigation such as the bribe that was sent to

25   Egeman Bagis and also --

```
 1             THE COURT:  Could you spell that last name?

 2             THE INTERPRETER:  B-AG-I-S.

 3   A.  And also the bribe that was sent to Muammer Guler, who was

 4   not the minister of interior at that time but was made the

 5   minister of interior later on.  Same with Recep Tayyip Erdogan.

 6   So as of the outset of the investigation --

 7             THE COURT:  As of the what?

 8             THE INTERPRETER:  As of the outset.

 9   A.  Of the investigation in September 2012, I'm not a fortune

10   teller, and I had no clue that these individuals would get

11   involved in a bribery scheme.

12        Those that may have listened to it yesterday might

13   remember the judge had asked whether this investigation had

14   included bribery in the beginning, and my answer was that no,

15   it was not an investigation with bribery in the beginning, but

16   that was added later.  But, in the very end, I do feel the

17   pride of being able to have conducted such an investigation.

18   And I thank God for being able to have had the opportunity to

19   take part in such an investigation.

20   Q.  From pretty early on, Mr. Korkmaz, you were steering the

21   investigation towards bribery though, correct?

22   A.  The first identification of such had been made in October

23   with the first bribe that had been sent to Suleyman Aslan.

24             THE COURT:  October of what year?

25             THE WITNESS:  It's 2012, your Honor.
```

HCD3ATI6                          Korkmaz - Cross

1    Q.  And that's one month or less, I think that you testified on

2    direct, after the investigation began, correct?

3    A.  That is correct.

4    Q.  Correct me if I'm wrong, but I believe you testified on

5    direct about some -- I didn't fully understand it -- some

6    method of communication that you used as a police officer, I

7    think it was called the Spark system or something like that?

8    A.  Yes, we were using the application called Spark.

9            THE INTERPRETER:  Excuse me.  I'm not sure that I

10   heard the pronunciation correctly.  Can I just ask.

11           THE WITNESS:  Yes, we were using the system called

12   Spark.

13   Q.  At some point on that Spark system -- well, withdrawn.

14           In one of your indictments, in Turkey, there was an

15   intercept from your communications on that Spark system,

16   correct?

17   A.  Sir, I'd like to thank you very much for asking me this

18   question first.

19           MR. HARRISON:  Judge, I'm going to ask the witness to

20   be directed to answer my question.

21           THE COURT:  If you could just answer his question.

22           THE WITNESS:  Right.  I do want to provide an answer

23   for this question very much.

24           I have always dreamed of an independent judicial body

25   that would allow me to be able to make or give an answer to

1    this question.

2                  THE COURT:  Whoa.

3                  MR. HARRISON:  Move to strike and have him directed to

4    answer the question.

5                  THE COURT:  He just asked you, I think there was an

6    attachment -- is this right, counsel -- to one of the two

7    indictments that included a Spark intercept.

8                  MR. HARRISON:  Yes, your Honor.

9                  THE COURT:  That's all he's asking for now.

10                 THE WITNESS:  I apologize for me getting excited, your

11   Honor.

12                 THE COURT:  Incidentally, the lawyer for the

13   government have a chance to exam you when he's finished.

14                 THE WITNESS:  I understand.

15                 Yes, there was such a slander, a fake one that was put

16   out against me.  And because of that, I ended up under arrest

17   for a year and a half, related to an investigation that I had

18   never taken part in.

19   Q.  Okay.  The fake one, the fake spark message, according to

20   you, read in part as follows:  You said this will be a good

21   subject.  And the reply was --

22                 THE COURT:  Do you have it?

23                 MR. HARRISON:  I'm asking him if this is correct.

24                 THE COURT:  If this is what it says or are you going

25   to give him an opportunity?

1        MR. HARRISON:  I was going to ask him first, Judge, if

2    he remembers this.

3        THE COURT:  Well, why don't you just ask him does he

4    remember the content of the Spark.

5        MR. HARRISON:  I'd like to direct him to the

6    communication.

7        THE COURT:  Then maybe you should show it to him.

8        MR. HARRISON:  I want to see if he knows

9    independently.

10        THE COURT:  That's why I said why don't you just ask

11    him if he knows what's in the message.

12        MR. HARRISON:  Okay.

13   Q.  In the Spark communication, Mr. Korkmaz, did you say "We

14   will gather the council of ministers here"?  Do you remember

15   saying that?

16   A.  What date is there for that communication, sir?

17   Q.  Do you remember -- do you remember the date?  Do you know

18   the date of that Spark communication?  You are the one that

19   sent it.

20        THE COURT:  You're asking the questions.  He's asking

21   do you have a date.

22        MR. HARRISON:  All I'm asking him so far, your Honor,

23   is does he remember from the indictment that a Spark message

24   that says the following --

25        THE COURT:  From which indictment?

1      MR. HARRISON:  The first indictment.

2      THE COURT:  Okay.

3  A.  Sir, that indictment would have a date along with it.  And

4  if you were able to give me that full information, it would be

5  easier for me to remember.

6  Q.  All I'm asking you right now, Mr. Korkmaz, is do you

7  remember that the indictment included a Spark message that said

8  "We will put them under constant pressure, we will gather the

9  council of ministers here."

10      Do you remember that first indictment having that

11  information in it?

12  A.  I did not write such a communication.  And this is a

13  complete slander against me that was put in the indictment.

14  And I can prove with documentation that this is a fake one.

15      MR. HARRISON:  Judge, may I approach?

16      THE COURT:  Sure.

17  Q.  Mr. Korkmaz, I have what's marked there as Defense Exhibit

18  5010.  Take a look at that, please, and take as much time as

19  you need and let me know if you recognize that.

20  A.  Yes.

21  Q.  Mr. Korkmaz, do you recognize Defense Exhibit 5010?

22  A.  That is correct.

23  Q.  All I asked, is that the indictment, the first indictment

24  that was brought against you?

25  A.  That is correct.

HCD3ATI6

1  Q.  There was an attachment to that indictment as well,

2  correct?

3  A.  So this is actually just the introduction to the

4  indictment.  The indictment itself is not even here.

5          THE COURT:  I think we'll take our break.  It is 20 to

6  5.  So we'll excuse the witness, ask you to come back at 9:15

7  tomorrow.

8          THE WITNESS:  I understand, sir.  Thank you.

9          (Witness temporarily excused)

10         THE COURT:  And we'll excuse the jury with these

11 instructions as usual.  First, do not talk to each other about

12 this case or about anyone who has anything to do with it until

13 the end of the case, when you go to the jury room to deliberate

14 on your verdict.

15         Second, do not talk with anyone else about this case

16 or about anyone who has anything to do with it until the trial

17 has ended, and you have been discharged as jurors.

18         Third, do not let anyone talk to you about the case or

19 about anyone who has anything to do with it, and if someone

20 should try and talk to you about the case, please report that

21 to Christine or me immediately.

22         Fourth, do not read any news or internet stories or

23 articles or blogs or tweets or listen to any radio or

24 television or internet reports or cable reports about the case

25 or about anyone who has anything to do with it.

HCD3ATI6

1           And fifth, do not do any type of research or any type

2      of investigation about the case on your own.

3           So, we are making very good progress, I think.  And

4      I'll see you tomorrow at 9:15.

5           (Jury excused)

6           THE COURT:  We need to talk a little bit further about

7      the defense motion for a mistrial.  So I'm not going to accept

8      it at this time.  I'm going to give it back to you, because it

9      has some portions of it that says you're going to add to it or

10     supplement it or whatever.  So I'm really looking for the

11     definitive non-abridged or -- there is not going to be any

12     replies or anything to in this procedure.

13          So, whenever you want or even if you want this same

14     one, just indicate or take out the language that says we're

15     going to supplement or add or whatever.  Or else wait, if you

16     want, until that time and submit it as of then.  I'd like a

17     document that just supports your position.

18          MR. ROCCO:  Sure.

19          THE COURT:  And also, you say in here, which is

20     perfectly fine, that you're not seeking any kind of instruction

21     I take it.  So, that's what I'm reading from your position

22     also.

23          MS. FLEMING:  What we think is the curative

24     instruction doesn't cure it, Judge.

25          THE COURT:  I get it.  I read it.  So that's fine.

HCD3ATI6

1    And that's your position.  I think that's just fine.

2            Now, so, I think the government could probably get

3    going on its response in before, but when can we first have the

4    revision?

5            MS. FLEMING:  We'll take out the language, your Honor,

6    and we'll have it to you tomorrow by 10 o'clock.

7            THE COURT:  So I'll deny this motion without

8    prejudice.  10 o'clock tomorrow you'll have --

9            MS. FLEMING:  Let me just say my secretary has been

10   working late.  Let me give her until noon.

11           THE COURT:  All right.  Noon.  When will you be able

12   to submit a response?

13           MR. LOCKARD:  I think if the Court wants the motion

14   fully submitted by the end of the week we could do it --

15           THE COURT:  No.  The end of the week is like an

16   eternity.  We're talking tomorrow at some time.

17           MR. LOCKARD:  Tomorrow by --

18           THE COURT:  Let's say 5 o'clock.

19           MR. LOCKARD:  Okay.

20           THE COURT:  Okay.  So, all right.  Great.  Nice to see

21   you all.

22           MS. FLEMING:  Thank you, your Honor.  Could I just

23   talk about scheduling so we know what we're doing tomorrow?

24           THE COURT:  I think you might control the schedule.

25           MR. ROCCO:  Yes, your Honor.  Thank you.

HCD3ATI6

 1              THE COURT:  Is that right?

 2              MS. FLEMING:  We think they control it.

 3              MR. LOCKARD:  We think, you know, barring -- we think

 4    we're going to rest tomorrow.

 5              THE COURT:  I thought you already had.

 6              MR. LOCKARD:  So we hadn't rested.  We still have

 7    redirect of Mr. Korkmaz and I think we've discussed we still

 8    had one very short witness that we were mentioning earlier.

 9              THE COURT:  I think more experts really just clutter

10    it up.

11              MR. LOCKARD:  But even if we did call that expert,

12    still tomorrow we would be resting.

13              THE COURT:  So we're going to continue with the cross,

14    how long do you think?

15              MR. HARRISON:  Not a ton, Judge.  Let me talk to

16    counsel and figure it out, but it is not going to be too

17    lengthy.

18              THE COURT:  So some time tomorrow morning you think?

19              MR. HARRISON:  Don't hold me to it.  But probably yes.

20              THE COURT:  Okay.

21              MS. FLEMING:  Should we plan to start our case if

22    we're putting one on on Friday morning?

23              THE COURT:  No, I think tomorrow.

24              MS. FLEMING:  Hope springs eternal for Rule 29 or

25    mistrial.

1          THE COURT:  But you just said when.

2          MS. FLEMING:  I said if we put one on.

3          THE COURT:  No, I think meet and confer with

4   Mr. Harrison and figure out when you think he'll be finished

5   and then I know the government won't be long on redirect.  So,

6   I think we could have more witnesses tomorrow.

7          MS. FLEMING:  If they're calling the person that we

8   talked about at sidebar, that will be a sizable cross.  We

9   didn't do the first one.  We're going to do the second one.

10          THE COURT:  No.  I don't think they -- well, you know,

11   do you want to decide that now?  I think you should think that

12   over, overnight.

13          MR. LOCKARD:  I don't think that the defense has

14   anticipated cross should prejudice our ability to put someone

15   on.

16          THE COURT:  It doesn't impact me at all.  I took the

17   position even before I heard her say there was going to be any

18   cross.

19          MR. LOCKARD:  I think the government would also

20   appreciate some level of heads up on who is going to be called

21   and what if any exhibits are going to be introduced through

22   those people.

23          MS. FLEMING:  We're happy to.  That's what I'm trying

24   to figure out when it will be, because it depends.

25          THE COURT:  I think tomorrow.  They should be

HCD3ATI6

1    available tomorrow.  I don't know about "they."  I don't know

2    how many you have.  I remembered two from the motion practice.

3              MS. FLEMING:  We will have to see who is here.

4              THE COURT:  No.

5              MS. FLEMING:  We'll see who is here.

6              THE COURT:  Oh.

7              MS. FLEMING:  We'll check.

8              THE COURT:  Whatever.  But anyway, see if you can get

9    somebody ready, available tomorrow.  Because I think there is

10   going to be -- and here's what I'm really saying.  It would be

11   so much better if we could get this thing done this week in

12   fact.  And maybe that's even possible.  But I don't know how

13   long your witnesses will be.

14             Let me say it another way.  I want two full trial

15   days, one tomorrow, and one Friday.  No short days.  So, figure

16   out how to fill that time.  And that's the best guide I can

17   give you.

18             All right?  Thanks.  All right.  Thanks a lot.

19             (Adjourned until December 14, 2017, at 9:15 a.m.)

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                           Page

3    HUSEYIN KORKMAZ

4    Direct (Resumed) By Mr. Lockard . . . . . . .1627

5     ROBERT M. PERI

6    Direct By Mr. Sovolos . . . . . . . . . . .1697

7    Cross By Ms. Fleming . . . . . . . . . . . .1713

8    Cross By Mr. Harrison . . . . . . . . . . .1725

9                    GOVERNMENT EXHIBITS

10   Exhibit No.                          Received

11    137  . . . . . . . . . . . . . . . . . .1639

12    1004   . . . . . . . . . . . . . . . . .1656

13    2006 through 2054  . . . . . . . . . . .1674

14    9701, 9702, 9703  . . . . . . . . . . .1696

15    8101-1 through 8101-10  . . . . . . . .1696

16    2501 through 2529, 3001 through 3329   . . .1696

17    3501 through 3815, 4001  . . . . . . . .1696

18    4501 through 6904  . . . . . . . . . . .1696

19

20

21

22

23

24

25
```