HCE3ATI1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          S4 15 Cr. 867 RMB

5    MEHMET HAKAN ATILLA,

6              Defendant.

7    ------------------------------x

8

9                                         December 14, 2017
                                          9:15 a.m.
10

11

12   Before:

13                   HON. RICHARD M. BERMAN,

14                                        District Judge
                                           and a jury
15

16

17                      APPEARANCES

18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL D. LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID W. DENTON, JR.,
21   DEAN C. SOVOLOS,
          Assistant United States Attorneys
22

23

24

25

HCE3ATI1

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
     Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
     THOMAS ELLIOTT THORNHILL, Esq.
     – and –
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
     ROBERT J. FETTWEIS, Esq.
     – and –
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
                 Of counsel
       –and–
McDERMOTT WILL & EMERY
BY:  TODD HARRISON

Also Present:
     JENNIFER McREYNOLDS, Special Agent FBI
     MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
     MS. ASIYE KAY, Turkish Interpreter
     MS. SEYHAN SIRTALAN, Turkish Interpreter
     MR. BULENT BULUT, Turkish Interpreter

1        (Discussion at the sidebar off the record)

2        (At the sidebar)

3        MS. FLEMING:  Our application is to figure out a way,

4   either at the MCC, where it is even colder than this courtroom,

5   Judge, you can see your breath it is so cold over there, to

6   work later.  Their rules only permit 7:30.  They let us stay

7   until about 10 of 8 last night.

8        THE COURT:  For you to stay there?

9        MS. FLEMING:  For us to stay there.  Or preferably,

10  frankly, to work here at the courthouse with our client.  He's

11  going on the stand.  During the course of the trial and right

12  before it, we've gotten a ton of documents in the case that he

13  doesn't have.  The method for him to be getting documents is

14  they get loaded on his laptop by the government.  And that just

15  hasn't happened in this case.  So we need to be showing him

16  things.

17       In addition, the protective order was such that we

18  couldn't give him things or leave them with him.  He was unable

19  to see or know who Korkmaz was until he took the stand.  So we

20  are way behind where we ordinarily would be with a defendant or

21  helping to prepare somebody.  So we're really handicapped by --

22  we leave court, it takes some time for him to get over there,

23  we get over there, and we only have an hour or an hour and a

24  half to meet with him and he is going to take the stand.

25       MR. LOCKARD:  We don't oppose the application.  I want

HCE3ATI1

1      to clarify for the record, because this has happened a number

2      of times, the government has not produced new documents.  We

3      have identified documents from discovery.  So the defendant

4      does have the discovery.  To the extent we produced 3500,

5      obviously that is a trial disclosure, but I wanted to clarify

6      that portion of the record.

7              THE COURT:  Two things.  One is just an observation.

8      Unlike other witnesses, your client has had the enormous

9      advantage of being present at every moment of the trial, so

10     he's heard everything and been privy to everything.  But number

11     two is I don't know the answer, so did you make an application

12     to the MCC?  That's the way it should start.

13             MR. ROCCO:  We'll do it today.

14             THE COURT:  Okay.  Then if it doesn't succeed, then

15     ask me, and in the meantime I'll do some background -- not

16     investigating, but asking what's probable, possible, whatever.

17     But I think you should do it in the first instance with them.

18             MS. FLEMING:  Every time we've made a request for

19     anything over there, it takes forever.

20             MR. ROCCO:  Josh Dratel has an associate that's very

21     helpful with this.

22             MR. LOCKARD:  Your Honor, if we may, there is one

23     other thing we wanted to raise before the jury came in.  So

24     there are a number of exhibits that have been received subject

25     to connection.  And before the jury comes in, we wanted to

HCE3ATI1

1   formally offer those to be fully admitted.

2              THE COURT:  With the statement about connection, so to

3   speak?

4              MR. LOCKARD:  Yes, your Honor.

5              THE COURT:  You want to do that now, you mean?

6              MR. LOCKARD:  Sure.  Let me see if I can get our list

7   so we can specifically identify which exhibits it is.

8              THE COURT:  Will you be able to do that more than by

9   number?

10             MR. LOCKARD:  I think we should be able --

11             THE COURT:  Some short description of what it is?

12             MR. LOCKARD:  Yes.

13             THE COURT:  Wait a minute.  Let me see if the jury is

14  here first, because maybe we can do that at a time when they're

15  not.  We'll certainly fit it in some time.

16             (In open court; jury not present)

17             THE COURT:  Counsel, the government's application with

18  respect to introducing evidence which had previously been

19  designated as subject to connection, I think that actually does

20  have to be done and should be done in front of the jury with

21  the jury present so they'll know the resolution.  How long do

22  you think that part takes?  It doesn't have to be done first

23  thing.

24             MR. LOCKARD:  So --

25             THE COURT:  If you want to get ready for that.  And

HCE3ATI1

1    then let me know at some point how long do you think it takes.

2                MR. LOCKARD:  All right.  We'll consult with defense.

3                THE COURT:  Okay.  So the jury is all here.  And we're

4    set to go.  And we'll get the witness.  Okay?

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HCE3ATI1                    Korkmaz – Cross

1              (Jury present).

2              THE COURT:  So we'll continue with cross-examination.

3              THE DEPUTY CLERK:  Sir, before we begin, I'd like to

4    remind you, you're still under oath.

5              THE WITNESS:  Thank you, yes, ma'am.

6     HUSEYIN KORKMAZ,

7    CROSS-EXAMINATION

8    BY MR. HARRISON:

9    Q.  Mr. Korkmaz, I want to just walk with you sort of through

10   the timeline as I understand it and ask you some questions as

11   we go, okay?

12   A.  Yes.

13   Q.  Your investigation that you referred to as the December 17,

14   2013, investigation, correct?

15   A.  That is correct.

16   Q.  I believe you testified that that started in September of

17   2012, correct?

18   A.  In the judicial sense, that is correct.

19   Q.  Then the next month, October of 2012, it expanded into a

20   bribery investigation, correct?

21   A.  That is correct.  There was a bribery agreement that was

22   reached between Suleyman Aslan and Reza Zarrab on October 6.

23   Thereafter on October 14, 2012, 2 million euros was sent to

24   Suleyman Aslan as bribe.

25   Q.  I'm going to ask you to restrict your answers to the

1   question that I ask though, okay?

2   A.  Yes.

3   Q.  Since you brought up bribes, you testified that Mr. Atilla

4   never received any bribes, correct?

5   A.  Yes.

6   Q.  That investigation ended, as I understand it, on

7   December 7, 2013, when your team did searches and I think made

8   some arrest --

9           THE COURT:  December 7?

10          MR. HARRISON:  December 17 I think.

11  Q.  December 17, 2013, when you carried out some searches and

12  made some arrests; is that correct?

13  A.  The investigation did not end on December 17.

14  Q.  Okay.  Well, let me just ask you this:  From the time the

15  investigation started to December 17 was about 15 months,

16  correct?

17  A.  I remember that to be 14 to 15 months.

18  Q.  I don't think I got an answer yesterday to my question of

19  during those 14 or 15 months, how many videos were taken

20  pursuant to the investigation?

21  A.  I had said that that was over 30.

22  Q.  Correct me if I'm wrong, but I believe you testified

23  yesterday that Mr. Atilla is not on any of those videos,

24  correct?

25  A.  He was not in any of those; that is correct.

1   Q.   I believe you testified that shortly after December 17, you

2   handed in -- I'm sorry, withdrawn.

3          Shortly after December 17, you were reassigned to

4   another area of Turkey, correct?  I'm sorry.  Bad question.

5          Shortly after December 17, 2013, you were reassigned

6   to the bridge unit, correct?

7   A.   That is correct.

8   Q.   Remind me how long were you assigned to the bridge unit?

9   A.   Approximately seven months.

10  Q.   Then after that, you were assigned to another area of

11  Turkey, correct?

12  A.   Yes.

13  Q.   It wasn't until nine months after you were reassigned to

14  the bridge unit in September of 2014 that you were actually

15  arrested and charged, correct?

16  A.   Yes, there were charges brought against me with regards to

17  the 25th of December investigation, and I was arrested.

18  Q.   But that was, it was nine months, approximately, between

19  the December 17, 2013, and the time that you were arrested,

20  correct?

21  A.   That is correct.

22  Q.   During that time, I believe, the Turkish Parliament did an

23  investigation of your investigation, correct?

24  A.   It had been initiated, yes.

25  Q.   The results of that investigation by the Turkish Parliament

1    were that you and others had violated Turkish law when you did

2    your investigation, correct?

3              MR. LOCKARD:  Objection.

4              THE COURT:  Overruled.  If you know.

5    A.  I don't have a complete grasp of the result of the

6    investigation, but what I understand through the media is that

7    this commission, through the votes of the AK party members of

8    the Parliament voted so that the ministers would not be sent to

9    the supreme council in the Parliament.

10   Q.  But, there was an investigation by the Turkish Parliament,

11   correct?

12   A.  Yes.

13   Q.  And one of the results of that investigation -- withdrawn.

14             One of the finding of that investigation was that you

15   and other people in the police department had violated Turkish

16   law in the course of your investigation, correct?

17             MR. LOCKARD:  Objection.

18             THE COURT:  Overruled.  If you know.

19   A.  I had answered earlier for you that I don't know that.

20             We are the ones that sent a tip to the Parliament to

21   actually initiate that investigation.  Since the Parliament is

22   the one that would carry out such an investigation over

23   ministers and a prime minister.  So what we did was on 18th of

24   December, 2013, with the direction of the prosecutor, we sent

25   the evidence that we had collected in our investigation to the

1    Parliament so that they can initiate this investigation.

2    Q.  Okay.  But your testimony is you don't know what the

3    results of Parliament's investigation was?

4    A.  I did not say that I don't know the results.  What I said

5    was that what I heard through the media was that the AK party

6    members of the Parliament had the majority of the votes to

7    decide that this issue should not be sent to the supreme

8    council in the Parliament.

9              THE COURT:  Should what?

10             THE INTERPRETER:  Should not be sent to the supreme

11   council in the Parliament.

12   Q.  Correct me if I'm wrong, but when you say -- it is the A-K

13   party or the A-K-P party?  Is that what you're referring to

14   when you say "AK party"?

15   A.  That is correct.

16   Q.  And the AKP party is the party of the current prime

17   minister, Erdogan, correct?

18             THE COURT:  Is the microphone working?

19             THE INTERPRETER:  Yes.

20   A.  Yes, he was the prime minister at the time.  And I know

21   that he's the chair of the party at the present time.

22   Q.  During this period that we're talking about, 2012 and 2013,

23   Erdogan and the Gulenists had a falling out, correct?

24   A.  No, that is not the exact timeline.  If you'd like, I can

25   explain the timeline.

1    Q.   Sure.

2    A.   Our investigation had started in September of 2012.  And

3    when it became an operation, that was the date of December 17.

4    But the fallout that you're referring to between AK party, the

5    administration, and the Jamaat, to the best of my knowledge,

6    the falling out between those two actually came about around

7    what I remember to be September or October of 2013, over a

8    dispute with the tutoring school matter.

9            Prior to this date, all the public would know that AK

10   party and the Jamaat were practically in bed.  And during this

11   time period, I was involved in this investigation, and I had

12   all the findings of the investigation that showed the moneys

13   that were going to Bilal Erdogan and Recep Tayyip Erdogan, and

14   all these things were in the investigation.

15   Q.   Let me just stop you there.

16   A.   If you'll allow me, I'll finish my answer.

17           MR. HARRISON:  I'd like to direct him.  I don't have a

18   question pending right now, Judge.  I'd like to direct him to a

19   couple things.

20           THE COURT:  You asked him and he said he could explain

21   and he was explaining.  You want him to stop?

22           MR. HARRISON:  I've given him a chance to explain, and

23   now I'd like to ask him another question.

24           THE COURT:  You think he's finished or you want him to

25   be finished wherever he is?

1           MR. HARRISON:  I'd like him to be finished now.  We

2    can return to that later perhaps.

3           THE COURT:  You can ask the next question.

4           MR. HARRISON:  Thank you, your Honor.

5           THE WITNESS:  If I may just add one sentence only,

6    your Honor?

7           THE COURT:  Okay.

8           THE WITNESS:  While the investigation was underway,

9    and I had the evidence against the ministers as well as Recep

10   Tayyip Erdogan himself, there was the plea from Recep Tayyip

11   Erdogan to Gulen himself saying we missed you so much, you're

12   in the United States, come back.  That's what he was doing

13   while I had the evidence in the investigation showing what they

14   were doing.

15   Q.  Okay.  There came a point, I think it was before you were

16   reassigned to the bridge unit, that you went into your office

17   and shredded some documents related to the investigation,

18   correct?

19   A.  No.

20   Q.  You never shredded any documents?

21   A.  I did not shred or destroy any official documents.  The

22   answer is -- and I had not gone back to the financial crimes

23   unit while I was assigned to the bridge anyway.

24          Maybe I misunderstood.  So this was prior to the

25   bridge unit.

1    Q.  Let me just ask it this way.  When was it that you shredded

2    documents?

3    A.  First of all, I did not destroy any documents.  On the

4    night of December 21, after I had learned that I was

5    reassigned, I went to my desk and I cleaned out my desk.  And I

6    took my scratch papers, other -- my own documents that were not

7    official documents, and I put them through a shredder and I

8    cleaned out my desk.  That's what I did.

9    Q.  That was after you learned that you had been reassigned

10   from that investigation?

11   A.  I had not been reassigned yet at this point.  But I heard

12   from a person who had overheard that I would be exiled for

13   taking the case summary file to the prosecutor, despite orders

14   to the contrary.

15   Q.  So at the time you went back into the office and shredded

16   the documents, you had heard that you were going to be

17   reassigned, correct?

18           THE COURT:  I don't think he said he shredded

19   documents.  So you keep saying that.

20           MR. HARRISON:  He shredded documents.

21           THE COURT:  I don't know that he said that either.

22           MR. HARRISON:  We could have readback maybe, Judge.

23           (The record was read)

24   Q.  And at that time, at any point -- withdrawn.

25           At any point after learning that you were going to be

1    reassigned from the December 17, 2013 investigation, did you

2    take any documents with you from that office relating to the

3    December 17, 2013 investigation?

4    A.  No.  I did not take anything from the financial crimes

5    unit.

6    Q.  When you were reassigned to the bridge unit -- withdrawn.

7            What official date were you reassigned to the bridge

8    unit?

9    A.  I learned that I had been reassigned on the night of

10   December 22.  And I recall my first date of duty at the bridge

11   unit to be January 1st, 2014.

12   Q.  So just so I understand.  So we're clear.  I guess you

13   learned officially on December 22, 2013, that you were being

14   reassigned to the bridge unit, correct?

15   A.  That is correct.

16           THE COURT:  What was the date again?

17           MR. HARRISON:  December 22, Judge.

18   Q.  But you had heard the day before, unofficially, I suppose,

19   that you were going to be reassigned, correct?  Or exiled I

20   think as you put it.

21   A.  That is correct.  However, as far as that being an

22   unofficial notification, what took place was that my unit chief

23   happened to be in the room with the individual that had given

24   the order to reassign me, and the person that had made that

25   order to reassign me was saying "Get rid of this guy, exile

1     him, put him out on the bridge or something.  Get rid of him."

2     That's what he was saying.  So my unit chief came over to me

3     and told me what he had heard.  And when I heard, that was the

4     night of December 20.

5             THE COURT:  When you were reassigned, who came?  Was

6     that something done face to face by somebody?

7             THE WITNESS:  No, your Honor.  The personnel

8     department had produced the lists of reassignments for

9     everybody, and that's how they notified.  So there was no face

10    to face in terms of notifications.

11            THE COURT:  So you got that notification on December

12    what date?  22?

13            THE WITNESS:  That is correct, your Honor.  That's

14    when I learned.

15    Q.  Fair to say, though, before you got the official notice on

16    December 22, you went back into your office, and took some

17    papers and shredded some papers, correct?

18    A.  Not after December 22.  This did not happen after

19    December 22.  You had asked earlier, and I said it was

20    December 21.

21    Q.  Right.  So let me clarify.

22    A.  So, I was still on duty at the financial crimes unit as of

23    that date.  And I went in, and I knew that I would be

24    reassigned, and I did not want to go back to the unit later to

25    go through my separation process.

 1            THE INTERPRETER:  I'll do my best on that one.  I'm

 2    sorry.  That was a little long.

 3    A.  So, that was not after December 22.  After I had learned

 4    that I would be reassigned, what I did was I went back to the

 5    financial crimes unit, and there was lots of documents that had

 6    been accumulated over time, such as case law from the Supreme

 7    Court, examples from there, I had many, many wedding

 8    invitations that had accumulated over time.  I had my own

 9    scratch papers that had accumulated.

10            So I cleaned up my desk, and I just did not want to do

11    this in presence of the financial crimes unit individuals.  So

12    what I did actually was once I was reassigned, I did not even

13    go back to financial crimes unit afterwards because I didn't

14    want to face anybody there.  I just went to the narcotics unit

15    upstairs, and in the narcotics unit I signed my papers, and I

16    told them that I did not want to go with deal with anybody down

17    in the financial crimes unit where I had been fired.

18            Furthermore, I was not the one that put the shredder

19    in that office.  That shredder was provided for use, the paper

20    that would be put through the shredder would be sent out to

21    Seka, and that was our instructions.  We were all supposed to

22    shred any paper product so that it could be recycled, and our

23    only concern was to not get our ties stuck in the machine.

24            THE COURT:  Okay.

25    Q.  My only point, Mr. Korkmaz, is you went back and shredded

1    those things that you shredded before you got your official

2    notice that you were being reassigned, correct?

3    A.  Yes, I did shred my own documents that were things that I

4    downloaded from the internet, such as the open source case law

5    examples, and the wedding invitations and such.  I did shred

6    those.

7    Q.  Sorry to jump around, but going back to the process, the

8    wiretapping process that you supervised for the December 17,

9    2013 investigation.  I think you testified --

10             THE INTERPRETER:  May I?

11             MR. HARRISON:  Yes.

12   Q.  During that process, I think you testified on direct that

13   you and your officers would review the wiretap recordings, and

14   if you decided that the information in the call was not

15   evidence of someone doing a crime, then you would destroy that

16   tape, correct?

17   A.  That is not exactly the case.

18             MR. HARRISON:  Withdrawn.  I'll move on.

19   Q.  So Mr. Korkmaz, after you were reassigned from the

20   December 17, 2013 investigation, when was the first time that

21   you obtained documents or information after that, relating to

22   the December 17, 2013 investigation?

23   A.  Are you asking me for the first date that that occurred?

24   Q.  Yes.

25   A.  I remember to be the night of December 25, 2013.

1  Q.  That was after you had been reassigned from the financial

2  crimes unit to the bridge unit, correct?

3  A.  That is correct.

4  Q.  So you were no longer officially with the financial crimes

5  unit at that time, correct?

6  A.  I was working.  My severance from the financial crimes unit

7  was not until December 31.  What I recall is that I had taken

8  care of this severance, separation process to my best

9  recollection on December 31, about 10 days after the

10  reassignment.  And this was done at the narcotics office, not

11  at the financial crimes unit.

12         And for those 10 days, I had doctor's report or sick

13  leave, and I was not going to work during that time.  And my

14  separation did occur on December 31 to the best of my

15  recollection.

16  Q.  Just so since you bring it up.  It was a fake doctor's

17  note, right?  You weren't really sick, were you?

18  A.  No, I did have a real illness, I had an illness that

19  reoccurred through the -- the tiredness that I had had through

20  the process of the operation.

21  Q.  Do you remember telling the U.S. attorney's office on a

22  previous occasion that you weren't really sick during that

23  period, but that you got the doctor's note just so you could

24  delay the time that you knew you were going to get reassigned?

25  A.  It is possible that I may have said that this was

1    beneficial in some way during that time frame.  But, I never

2    said that I was not ill.  In fact I did have a real illness.

3    Q.  That was tiredness?

4    A.  No.  This note was about the reoccurrence of another

5    illness, called *basur*.

6            THE INTERPRETER:  I don't have the translation at this

7    point.

8    A.  Because of the reoccurrence of that is why I was given the

9    doctor's note, not out of tiredness.  So, I had gone through a

10   very tiring and busy four to five days, and the illness had

11   reoccurred during that time.

12   Q.  What information, what information from the December 17,

13   2013 investigation did you get on December 25?

14           THE INTERPRETER:  Please repeat that?

15   Q.  What information from the December 17, 2013 investigation

16   did you get on December 25?

17   A.  Sound recordings, audios.

18   Q.  How did you get those sound recordings at that time?

19   A.  I obtained them through making a copy at the prosecutor's

20   office.

21   Q.  Can you tell us how that came about; how did you get into

22   the prosecutor's office on December 25, to go get those audio

23   recordings?

24   A.  I had not gone there normally to obtain sound recordings.

25   But I had only gone over there to visit with the prosecutor,

1    and it is most likely that he had called me over.

2    Q.  But you don't remember how that communication was

3    initiated, whether it was by you or by the prosecutor?

4    A.  In terms of whether it was him that called me over or I

5    went over, I don't recall.  But, it is most likely that we

6    would have had that communication, and based on that I would

7    have gone.  Because I did not go to him, only once.  There was

8    also the time afterwards.

9    Q.  Let's focus on this first time on December 25.  Whoever

10   initiated the communication, what was discussed?  What was the

11   discussion that brought you over to the prosecutor's office

12   that day?

13   A.  When I went there, the best of my recollection, it was the

14   afternoon.  There was a resignation statement made by Erdogan

15   Bayraktar on TV.  And I had pointed out to the prosecutor

16   during this statement that Erdogan Bayraktar had --

17              THE COURT:  What did you say after "Erdogan"?

18              THE INTERPRETER:  Bayraktar.  That's the last name.

19              THE WITNESS:  The individual was the urban planning

20   minister during that time period, your Honor.

21              THE COURT:  And the name of that person?

22              THE INTERPRETER:  Erdogan Bayraktar.

23              THE COURT:  That's not the prime minister?

24              THE INTERPRETER:  It is not.

25   A.  In his resignation, Erdogan Bayraktar had said that

1    whatever he had done, he had done it at the direction of the

2    prime minister.  And when I heard that, I recall telling to the

3    prosecutor that this matches up with that transcript that

4    contains the number one in it.  Because there was this

5    transcript, this conversation, and it pertained to a phone

6    conversation between Suleyman Aslan and Reza Zarrab that took

7    place on December 16.

8            And then after that, the prosecutor had said why don't

9    you show me that transcript among the transcripts.  We looked

10   through, and we realized that somehow it had not been

11   transcribed.  And then the prosecutor said then I should send

12   someone to go ahead and transcribe this conversation from the

13   financial crimes unit.

14           So, during the evening time, two staff members from

15   the financial crimes unit arrived.  And when I say "evening,"

16   it could be evening or night.  It could be between 8 or 10,

17   what I remember is that it was dark.  And these two officers

18   from the financial crimes unit came over, and they found that

19   conversation from among the files on the hard disc that

20   contained all audio.  And at the prosecutor's direction they

21   transcribed that call, and then the transcription and the audio

22   file for that conversation was copied onto the first CD.  Thus,

23   the transcript and the audio of that call was added to, entered

24   into evidence.

25           And at that point, the prosecutor also had said that

HCE3ATI1                          Korkmaz — Cross

1    he'd like to have these all scanned in order to preserve the

2    evidence.  And as this was happening, I requested from him

3    whether I could preserve a copy as well, because based on the

4    conjecture of how things were going, both he and I were

5    concerned that the evidence may be destroyed, and I wanted to

6    preserve it, and he agreed.

7            So, while that CD was being copied already for that

8    transcript, I asked him whether I could get a copy for myself.

9    That was actually another copy being made to be sent to the

10   Parliament at that time as well, and he agreed, and a copy was

11   made for me at that time.

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

HCEPATI2                        Korkmaz - Cross

1    Q.  But you had been told -- excuse me.  You had been told

2    three days earlier, on December 22nd, as you testified, that

3    you were no longer with the financial crimes unit, right; that

4    you were being reassigned, correct?

5    A.  Yes.

6    Q.  And so you were no longer authorized at that time,

7    according to Turkish law and the wiretapping protocols in

8    Turkey, to have your own copy of those wiretap telephone calls,

9    correct?

10   A.  Yes, I knew that, and I still went ahead.

11   Q.  Just so I understand, I think we can agree that you were a

12   police officer who took wiretap evidence without authorization,

13   in violation of Turkish law, at that time, on December 25th,

14   correct?

15   A.  That is correct, and that is exactly related to me being a

16   police officer.  I received eight years of education in the

17   government system to be a police officer in a board school, in

18   uniform since I was 15.  And while I was on duty serving as a

19   deputy inspector, I also always worked to give the best to my

20   country.

21           As I was graduating from the police academy, I took an

22   oath for justice, and I did not agree with the possibility that

23   this evidence may be destroyed one day while I had the

24   opportunity to be able to preserve them.

25   Q.  There's no --

1        MR. HARRISON:  He answered the question.  There's no

2   question pending.

3        THE COURT:  Let it go for a brief whatever.

4        MR. HARRISON:  Okay.

5   A.  That would have caused me heartache that would last through

6   the rest of my life.  Let me just say one last thing.

7        THE COURT:  Okay.

8   A.  Throughout my education, on the cover of every textbook

9   that I read, I read something that is the address that was

10  given from Atatürk to the Turkish youth, and what I was

11  supposed to do was taught to me through these trainings.  And

12  just because a corruption investigation was touching on some

13  politicians, I could not look away from it, and I knew, of

14  course, that this was a crime, but I still went ahead with it.

15       THE COURT:  Could I just ask a question?  The

16  prosecutor, did he remain as the prosecutor?

17       THE WITNESS:  No, your Honor.

18       THE COURT:  What happened?  Where did he go?

19       THE WITNESS:  First, he was sent to another unit.

20  Then he was sent to another province, and later, I learned that

21  there was an arrest warrant for him, and he had fled out of the

22  country.

23  BY MR. HARRISON:

24  Q.  I'm sorry, I missed that last part.  The prosecutor fled

25  out of the country?

HCEPATI2                          Korkmaz – Cross

1   A.   While I was in prison, I saw it on the news, that the news

2   reporting was that he had fled out of country.

3   Q.   And the fact that you took the wiretap evidence, in

4   violation of Turkish law on December 25th, later became the

5   basis of some of the charges against you in the later

6   indictments, correct?

7   A.   No, there was never a charge against me about me obtaining

8   this evidence from any judicial body.

9   Q.   Well, as we discussed, I think yesterday, you were charged

10  in both of those indictments with illegal wiretapping or

11  stealing secret communications, correct?

12          THE COURT:  Did we discuss that yesterday?

13          MR. HARRISON:  I believe we did, Judge.  I'm pretty

14  sure.

15          THE COURT:  I know we did the wiretapping.  I may not

16  remember, but why don't we ask the question.

17          MR. HARRISON:  Sure, Judge.

18  BY MR. HARRISON:

19  Q.   Well, there were charges in both of these later indictments

20  against you for illegal wiretapping and stealing secret

21  communications, correct?

22  A.   Let me repeat.  That neither in any of those indictments or

23  in any other investigation, there was no reference to me

24  obtaining information from, or the evidence from, the

25  investigation.

1  Q.  Let me just ask you this.  What's your understanding of the

2  illegal wiretapping charges that were brought against you in

3  those two indictments?

4  A.  I'll explain it this way.  The allegations were that during

5  the investigation prior to December 17th, it was alleged that

6  the wiretaps were conducted outside of the bounds of law, which

7  was all baseless to begin with.

8          And I already mentioned to you yesterday that all of

9  the wiretaps had been conducted through court orders, through

10 the knowledge of TIB and through the approval of TIB, and that

11 everything was done in its legal manner.

12 Q.  But then when you took -- when you illegally took the

13 copies of those wiretaps on December 25th, that was in

14 violation of those court orders and the TIB protocols, correct?

15 A.  No, that would have nothing to do with TIB because me

16 obtaining these recordings at that time would not mean that

17 I -- would not mean that this evidence had been collected

18 through illegal means.  So just because I had obtained this

19 information does not change, and it does not make it into an

20 illegal wiretap issue.

21 Q.  But it was in violation of the court order, correct?

22 A.  I don't understand what you're referring to because the

23 court order was for the collection of the recordings, and it

24 had already been served and the sounds had already been

25 collected.

1   Q.  You testified that when you took those wiretap calls on

2   December 25th, it was in violation of Turkish law, correct?

3   A.  Yes.  Yes, I did.  That is correct, and I've been saying it

4   from the beginning.

5   Q.  Okay.  Which Turkish laws did it violate?

6           THE COURT:  If you know.

7   A.  I don't know what Turkish law it violates as it pertains to

8   me, but I know which law it violates with regards to the

9   prosecutor himself.

10  Q.  Which law was that?

11  A.  The crime that was committed by the prosecutor?

12  Q.  Correct.

13  A.  It was violation of privacy.

14  Q.  And you knew, at the time that you were assisting him to do

15  that, that you were in violation of that law as well, correct?

16  A.  No.  He allowed it to happen.  I requested it, and he

17  approved it and gave it to me; so I just took it.

18  Q.  Mr. Korkmaz, you were a police officer who stole evidence

19  of wiretap calls, correct?  You stole police evidence, didn't

20  you?

21          MR. LOCKARD:  Objection.

22          THE COURT:  Overruled.

23  A.  Sir, I have been saying from the very beginning that this

24  was actually part of me being a police officer.  I have not

25  been hiding anything.  I've been saying this openly from the

1   beginning, that this was part of my training.  I did this

2   knowingly.  I did not agree with these pieces of evidence to be

3   taken away from justice being served, and I was afraid that

4   this evidence would be altered or destroyed.

5           MR. HARRISON:  Can we have the witness stop and have a

6   sidebar, Judge?

7           THE COURT:  Yes, sure.

8           (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HCEPATI2                        Korkmaz – Cross

1                    (At the side bar)

2                    THE COURT:  I think you've established a pretty clear

3       record on this point.

4                    MR. HARRISON:  Okay.

5                    THE COURT:  We've been going over it.  I don't think

6       you're going to get any further.

7                    MR. HARRISON:  I think that's right, Judge.

8                    THE COURT:  All right.

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HCEPATI2                        Korkmaz - Cross

1              (In open court)

2              MR. HARRISON:  May I proceed, Judge?

3              THE COURT:  Sure.

4   BY MR. HARRISON:

5   Q.  Mr. Korkmaz, at the time that you took that evidence on

6   December 25th, as far as you know, no one from the government

7   had destroyed or taken away any of that wiretap evidence,

8   correct?

9   A.  The illegal orders that had been made by the new leaders

10  that had been brought to the unit on December 19th, 2013, and

11  December 20th, 2013, are ones that I had mentioned here before.

12  Q.  Okay.  But you decided that those orders were illegal,

13  right?  Nobody else?  No court decided those orders were

14  illegal.  You decided that on your own, didn't you?

15  A.  Sir, I was a police officer.  I am a police officer, and I

16  was part of the law enforcement force, and the order that had

17  been issued was given by the deputy provincial police chief at

18  that time, who had just been assigned to that position, and

19  this person is not part of the law enforcement branch.  And the

20  person in charge of the law enforcement branch of the process

21  is the prosecutor.  This person, who is not in the law

22  enforcement branch cannot legally give me any orders in my law

23  enforcement duties.

24             MR. HARRISON:  I'm going to ask the witness be

25  directed to answer my question.

1    Q.  My question is, Mr. Korkmaz, you decided yourself that the

2    order was illegal; no court made that decision, correct?

3            THE COURT:  Maybe take it in two pieces.

4            MR. HARRISON:  Sure.

5    BY MR. HARRISON:

6    Q.  Mr. Korkmaz, for that -- withdrawn.

7    A.  (Speaking in Turkish).

8    Q.  Let me go back to my original question.  Mr. Korkmaz, on

9    December 25th, 2013, when you made the decision to violate

10   Turkish law, as far as you know, no evidence had been destroyed

11   or taken away, correct?

12   A.  There was an attempt to do so, and you had asked a question

13   about whether there was a court order deciding this.  What I

14   want to say is that in the Turkish criminal procedure code

15   there is a mention of a law enforcement officer, if he/she were

16   to be obstructed in the discharge of his duties, then he is, in

17   his own right, to use force, if needed, to do what he needs to

18   do.  So, in other words, the law does not require that there

19   needs to be an order for me to be able to do this.

20   Q.  All right.  One last question on this, then I'm going to

21   move on, Mr. Korkmaz.  We agree that when you took that wiretap

22   evidence on December 25th, it was in violation of Turkish law,

23   correct?

24   A.  I knew it.  I took initiative.  I did it knowingly.

25   Q.  When was the next time after December 25th, 2013, that you

1    took evidence related to the December 17th, 2013,

2    investigation?

3    A.   I obtained more on two occasions in January, but I don't

4    recall the exact dates on those.

5    Q.   January of what year?

6    A.   2014, I apologize.

7    Q.   And let's take those one at a time.  The first time that

8    you obtained more evidence of the December 17th, 2013,

9    investigation in January, how did that happen?

10   A.   What I recall is that I had stopped by to visit with the

11   prosecutor on the way from my duty on the bridge unit, and on

12   that date, on this first occasion, I obtained the scanned

13   documents.

14   Q.   What type of scanned document?

15   A.   This consisted of many types of documents that were in the

16   possession of the prosecutor at that time, and this was the

17   many types of documents that were in the case file as of that

18   date.  And among these were documents such as the case summary

19   file, the transcripts, the reports that were brought back from

20   the physical surveillance activities, any communications, any

21   expert reports that were issued, court orders and many other

22   documents that had been presented to the prosecutor's office

23   over time.

24   Q.   And at that time, in January, you were assigned to the

25   bridge unit, correct?

1    A.  Yes.

2    Q.  And you no longer had any authority to have documents from

3    the financial crimes unit, correct?

4    A.  Yes.  Whether during this particular time or any other

5    times that I obtained information, I did not have

6    authorization, and I took them.

7    Q.  And when you took the documents on that first date in

8    January, that was in violation of Turkish law as well, correct?

9    A.  Yes.  Whatever was applicable to the December 25th occasion

10   applied to this particular occasion, and any other times it

11   might have occurred, it was still applicable.

12   Q.  And on this date that we're talking about in January that

13   you got the documents from the prosecutor, was that from the

14   same prosecutor that you had gotten the wiretap recordings from

15   on December 25th or a different prosecutor?

16           THE INTERPRETER:  I'm sorry, it's cutting out.

17           MR. HARRISON:  I can't hear it.  It's cutting out.

18           THE INTERPRETER:  I'm speaking Turkish anyway, but, I

19   don't know, maybe I'll just stand here so maybe it will have a

20   better site connection.

21   A.  It was the same prosecutor.  In fact, I had told you that

22   on the 25th, the individual had told me that he was going to

23   get everything scanned, and I wanted to get copies of

24   everything; so this is part of that.

25   Q.  This was part of the same plan, correct?

1    A.  No, this was just my thought, that it's not a plan.  He

2    wanted to scan these into the case anyway.

3    Q.  And when was the next time in January of 2014 that you got

4    more information from the December 17th, 2013, investigation?

5    A.  That was towards the end of January as well.  Both of these

6    occasions were at the end of January.

7    Q.  What --

8    A.  I don't recall the exact date, but it was in January.

9    Q.  On that second date in January, what did you get from the

10   prosecutor at that time?

11   A.  The photographs of what had been seized during the

12   searches.  In fact, during that meeting, here's what the

13   prosecutor told me --

14   Q.  Well, I'm going to ask that --

15             THE COURT:  Wait, wait, wait.

16             MR. HARRISON:  That's not responsive to my question.

17   A.  He said if --

18             THE COURT:  No, hold on.  He just wanted to know what

19   he got.

20   A.  Well, I took them and that's what the prosecutor said.

21   Q.  And, again, like the first two times, I think we can agree

22   that that was not authorized, when you took the documents on

23   that second date in January, and it was in violation of Turkish

24   law, correct?

25   A.  As I had mentioned in previous questions, yes.

1   Q.  When was the next time that you got evidence or documents

2   from the December 17th, 2013, investigation?

3   A.  It was in the month of February.

4   Q.  How did that happen?

5   A.  The prosecutor had been removed from his present duty and

6   was in a new office, and I had come to that new office to see

7   him.  And on that occasion, I obtained some other scanned

8   documents that I had not received earlier and also digital

9   formats of certain evidence, and these consisted mostly of the

10  digital versions of the expert reports and the scanned versions

11  of such expert reports.

12  Q.  Again, when you took that information in February, that

13  was, again, without authorization and in violation of Turkish

14  law, correct?

15  A.  Yes.

16  Q.  When was the next time that you got information that you

17  took information relating to the December 17th, 2013,

18  investigation?

19  A.  It was in 2014, and I remember it to be the month of July.

20  What I know is that it was the period of Ramadan, and I had

21  visited the prosecutor in his home.  On that occasion, I

22  obtained many of the things that I had obtained before from

23  him, but also I obtained some additional documents, and among

24  those was the report that had been produced by the BDDK

25  auditor, and there were digital documents pertaining to some of

1   the depositions, and there were digital files pertaining to the

2   reports and summary files, and I had obtained those.

3   Q.  Again, when you obtained that information, it was without

4   authorization and in violation of Turkish law, correct?

5   A.  Yes.

6   Q.  When was the next time that you obtained information from

7   the December 17th, 2013, investigation?

8   A.  It was after I was released from the prison.  It was in

9   June of 2016.

10  Q.  And what types of information did you obtain at that time?

11  A.  The digital files for the digital analysis reports, and I

12  mean, all of them that I had not obtained from the prosecutor

13  in the past because I had already obtained some of them from

14  the prosecutor before and the exports.

15  Q.  And who did you obtain -- excuse me.  Who did you obtain

16  that information from in June of 2016?

17  A.  From a forensic expert officer that had taken part in the

18  investigation.

19  Q.  And he gave you that in June of 2016, after you had been

20  charged and in jail and then released, correct?

21  A.  Yes.

22  Q.  And, again, when you got that information from that

23  forensic officer, that was without authorization and in

24  violation of Turkish law, correct?

25  A.  I'm not sure about that one.  I'm not sure whether this was

1  against the law or not.

2  Q.  Well, at this point, in June 2016, you were no longer a

3  police officer, correct?

4  A.  Yes.

5  Q.  So it was illegal for you, was it not, to receive police

6  evidence from the forensic expert officer when you were not a

7  police officer, right, and you had just been released from

8  prison?

9  A.  Sir, the reason why I'm not sure here is because it's -- I

10  have a legal reason to be not sure about this because during

11  that time period, there was an investigation that had been

12  opened against me about December 17th.

13          And during my deposition, the prosecutor that was

14  present at my deposition, I asked him the following, and this

15  is taking place in December 2015.  What the prosecutor told me

16  was that they had put the exhibits about December 17th into the

17  case that was against me, but I don't know what was entered

18  into that case or what wasn't.  But within the Turkish law, as

19  a person implicated in an investigation, I have the right to

20  collect evidence that's in my favor and to use that evidence in

21  any way I need to use it.

22  Q.  Well, you had the right to collect evidence through the

23  legal process, right?  But this police officer, this officer

24  didn't give you --

25  A.  (Speaking in Turkish).

1    Q.  Let me finish.  That officer didn't give you that

2    information as part of your court proceedings, correct?

3    A.  There's no need for me to have a court order to collect

4    information -- sorry, collect evidence in my favor, and what

5    I'm not sure about is whether this breaches any law, and I'm

6    under oath here.

7            Since I don't know what the answer to that is, that's

8    why I'm saying I don't know whether this is against the law or

9    not.  I just don't know.  So I told you what I knew about the

10   previous times I had obtained information.  I'm telling you

11   what I know about this time that I obtained information.  I'm

12   just telling you everything as is.

13   Q.  Let me go back to -- let me ask you a question about the

14   evidence that you received on, I believe, the four different

15   occasions prior to the time that you went to prison.  On what

16   sort of medium, or in what form, did you receive the evidence

17   that you got on December 25th, the two dates in January and the

18   date in February?  How did you receive that?  Was it on a flash

19   drive?

20   A.  On December 25th, I had obtained a copy of a CD, and then I

21   had copied that then onto my password protected flash disc and

22   to my hard disc.

23   Q.  Okay.  What about the two dates in January?

24   A.  In January, the prosecutor copied personally the files onto

25   a CD for these scanned documents; so I received that in CD

1  format.

2  Q.  What about the second date in January?

3  A.  The photographs had come from the Police Department on a CD

4  on that date -- for that date, I'm sorry, and I had copied it,

5  copied this information onto my flash memory.  On that date, I

6  had copied from the CD to the computer and from the computer

7  down to my flash drive.

8  Q.  What about on the date in February, on what medium did you

9  receive the information on the date in February?

10  A.  The prosecutor had the information on a CD, and in the same

11  manner as I described with the previous occasion, I copied that

12  onto my flash drive.

13  Q.  And then you went to prison from September of 2014 until

14  February 9th of 2016, correct?

15  A.  Yes.

16  Q.  Where were all of those CDs and flash drives from the

17  December, January and February dates that you had collected

18  while you were in prison?

19  A.  I was destroying the CDs after I would copy the information

20  onto my flash drive and onto my hard disc anyway.  And this

21  flash drive and the hard disc of mine were both password

22  protected.  I had left them in my home in Istanbul when I went

23  to Hakkari.  During that time, my mother had gone to Istanbul,

24  where my wife was, and I had told my mother to preserve these

25  two flash drives and the hard disc.

1    Q.  Okay.  So fair to say that you did not have custody of that

2    information while you were in prison, correct?

3    A.  They were in the custody of my mother, yes.

4             MR. HARRISON:  Judge, this would be a good place for

5    the mid-morning break, if that's what your Honor wants.

6             THE COURT:  Okay.  About how much more do you think?

7             MR. HARRISON:  If I can have a few minutes at the

8    break, Judge, to check, I can let you know better.

9             THE COURT:  Okay.  Let's take five minutes.

10            (Jury not present)

11            (Recess)

12            THE COURT:  So, Mr. Harrison, what's your best

13   estimate?

14            MR. HARRISON:  Judge, I think I'll be done before

15   lunch, but how far before lunch depends on how long his answers

16   are.

17            (Continued on next page)

18

19

20

21

22

23

24

25

1        (Jury present)

2            THE DEPUTY CLERK:  Sir, I'd like to remind you, you're

3    still under oath.

4            THE WITNESS:  Yes.

5            MR. HARRISON:  May I proceed, your Honor?

6            THE COURT:  Yes.

7    BY MR. HARRISON:

8    Q.  Mr. Korkmaz, when you were in prison and you left the

9    evidence with your mother, some of that evidence was encrypted

10   I think you said, correct?

11   A.  Yes.

12   Q.  But some of it was not encrypted, correct?

13   A.  That's the one that I had, anyway.  And there was no

14   evidence in it, anyway.

15   Q.  Well, at some point, some of the files that you ended up

16   giving to the prosecutor's office were altered, correct?

17   A.  I did not understand.

18   Q.  For instance, the prosecutor removed some information from

19   the documents, like signatures and other things, before he gave

20   them to you, correct?

21   A.  I don't know what you're referring to exactly.  I don't

22   understand the question.

23   Q.  Well, do you remember telling members of the U.S.

24   attorney's office in one of your prep sessions on November 3 of

25   2017, this year, that the prosecutor had deleted the signature

1    block from some reports before giving them to you?

2    A.  No.  What I understand is there might be an error in

3    recording that.  The person that had done so was the expert,

4    not the prosecutor.

5    Q.  The expert had changed the document?

6    A.  So here's how it was.  The expert told me that in the

7    export -- the expert analysis report, not in the export, that

8    he had made changes and he had removed the signature block or

9    the name block from those expert reports.

10   Q.  Do you know what metadata is for electronic documents?

11   A.  Yeah, I don't know what the term "meta" means.

12   Q.  Well, the electronic profile of a document.

13           Do you recall telling members of the U.S. attorney's

14   office in that same proffer session on November 3 of this year

15   that some of the metadata details, the author and other things,

16   had been changed on some of the documents that you gave to

17   them?

18   A.  That is correct.  That's what the expert said as well.

19   Q.  Since we're talking about the U.S. attorney's office.  When

20   was the first time, Mr. Korkmaz, that you or anyone on your

21   behalf, had contact or communications with the United States

22   government?

23   A.  To the best of my recollection, in April of 2016, my lawyer

24   had informed me about this.  And he had said that he had been

25   contacted.

1   Q.  By whom?

2   A.  The prosecutor's office that you had referred to.

3   Q.  By the U.S. attorney's office in New York?

4   A.  Well, I don't know the names but from that place, yes.

5   Q.  Who was your attorney at that time?

6           MR. LOCKARD:  Objection.

7           MR. HARRISON:  Can we approach for one second, Judge?

8           THE COURT:  Yes.

9           MR. HARRISON:  Judge, it's okay.  I'll withdraw it.

10          THE COURT:  Okay.

11  Q.  Mr. Korkmaz, do you know what the U.S. attorney's office

12  said to your lawyer at that time?

13  A.  I don't know to what types of conversations they may have

14  had.  It's my lawyer just informed me about it.  And he had

15  said that he was contacted, and I don't recall whether there

16  was anything mentioned in those conversations about being a

17  witness, for example, but I believe that there might have been

18  some reference to whether being a witness might be a

19  possibility.

20  Q.  Okay.  And this was in April of 2016, which was about two

21  months after you had gotten out of prison, correct?

22  A.  That is correct.

23  Q.  About two months before the second indictment was going to

24  be served on you, correct?

25  A.  That is correct.  And that investigation was already

HCE3ATI3                         Korkmaz - Cross

1    ongoing.  And I had already provided a statement for that

2    investigation at that time.

3    Q.  So April 2016, that was about three months before the armed

4    coup attempt happened in Turkey, correct?

5              MR. LOCKARD:  Objection.

6              THE COURT:  If you know.

7    A.  As far as timeline, that is the case.  But it has nothing

8    to do with this.

9    Q.  Did your lawyer communicate to you at that time why the

10   U.S. attorney's office in New York was reaching out to you in

11   particular?

12   A.  It was a preliminary conversation that was had, and there

13   was nothing that had materialized about becoming a witness.

14   What I understand is that there was a conversation about

15   whether I knew the information, whether I had taken part in the

16   investigation and such.

17   Q.  If you know, did --

18             THE COURT:  Could I just see you for a minute.

19             (Page 1814 SEALED by order of the Court)

20             (Continued on next page)

21

22

23

24

25

1           (In open court)

2               MR. HARRISON:  May I proceed?

3               THE COURT:  Yes.

4    BY MR. HARRISON:

5    Q.  Mr. Korkmaz, did you communicate in any way at that time to

6    the U.S. attorney's office that you were in possession of

7    evidence from the December 17, 2013, or materials from the

8    December 17, 2013 investigation?

9    A.  I did not communicate with them during that time at all.  I

10   only talked with my lawyer.

11   Q.  Okay.  Well, do you know whether it was communicated in any

12   fashion at that time to the U.S. attorney's office that you in

13   fact were in possession of materials related to the

14   December 17, 2013 investigation?

15   A.  This is only a guess, but I would guess that my lawyer may

16   have said something.

17   Q.  When was the -- that was April 2016 --

18   A.  Excuse me.  Just based as a response to your previous

19   question again.  I am speaking particularly about that first

20   contact in April.  I know that my lawyer told them afterwards,

21   but I'm speaking only to that first contact that you were

22   asking me about.  Just so that there is no misunderstanding.

23   Q.  When was the next time after April 2016 that you or anyone

24   on your behalf had communications with the U.S. attorney's

25   office or anyone from the U.S. government?

HCE3ATI3                          Korkmaz - Cross

1   A.   I know of one conversation my lawyer had in July.

2   Q.   With the U.S. attorney's office in New York?

3   A.   With the individuals from the prosecutor's office.

4   Q.   Do you know the subject matter of that communication?

5   A.   My lawyer had then informed me that during this

6   conversation, there was more material --

7              THE COURT:   Could you hold on for one second.

8              (Pages 1817-1821 SEALED by order of the Court)

9              (Continued on next page)

1           (In open court)

2               MR. HARRISON:  Judge, if I could just have one minute.

3               THE COURT:  Sure.

4    BY MR. HARRISON:

5    Q.  Mr. Korkmaz, there came a time -- you were released from

6    prison on February 9, 2016, correct?

7    A.  Yes.

8    Q.  You were released from jail on bail conditions, essentially

9    at that time, correct?

10   A.  So, there were conditions.  Not necessarily bail as far as

11   a bail amount, but there were conditions.

12   Q.  What were the conditions at that time of your release?

13   A.  International travel ban.

14   Q.  That's it?

15   A.  And I was also obligated to attend the hearings.

16               THE COURT:  To attend what hearings?

17               THE WITNESS:  So the court proceedings are stretched

18   out over time, in our system, your Honor.  And there are one-

19   or two-day hearings, and there are one month, two months or

20   five, six months in between each of those hearings.  And I was

21   obligated to attend each of those hearings regarding that court

22   procedure.

23               THE COURT:  Are these hearings related to what has

24   been referred to as the first indictment or the second

25   indictment?

1      THE WITNESS:  The first indictment, your Honor.

2  Q.  And then you did stay in Turkey from February 9 of 2016

3  until August of that year, correct?

4  A.  Yes.

5  Q.  It was in August that you violated the international travel

6  ban that you had, and smuggled yourself out of the country,

7  correct?

8  A.  Yes.

9  Q.  You left in August close in time to the end of the failed

10  coup attempt which ended on July 21 of 2016, correct?

11  A.  First of all, I don't have any information as to whether

12  there was an end to anything on July 21.  And second, I'm not a

13  coup analyst.  I'm not one that was participating in a coup.  I

14  was not taking part in a coup investigation.  So, I don't know

15  whether there was any sort of controlled coup attempt anywhere.

16  Q.  Let's clarify what we're talking about.  So the coup was an

17  attempt by military officers in the Turkish military who were

18  part of the Gulenist movement to the overthrow the Erdogan

19  Turkish government, correct?

20  A.  Can you translate the question one more time, please?

21  Q.  So, the coup attempt in July of 2016, in Turkey, happened

22  when some military officers who were part of the Gulenist

23  movement tried to overthrow the Turkish government, run by

24  Mr. Erdogan.  Correct?

25      THE COURT:  If you know the answer to that.

1    A.  So I don't have any information about the judgments that

2    are in your question.

3    Q.  Well, the coup started on July 15 and it centered around

4    Istanbul, Turkey, correct?  The coup attempt?

5    A.  I don't know about it being centered in Istanbul.  But I

6    know that there was an incident in Istanbul.

7    Q.  You were in Istanbul, you testified previously, on July 15

8    when that coup attempt started, correct?

9    A.  Yes, I was there along with 15 million other people.

10   Q.  And the coup was done by military, folks in the military,

11   Turkish military with tanks and guns and helicopters, correct?

12              MR. LOCKARD:  Objection.

13              THE COURT:  If you know that.

14   A.  With regards to this attempted coup, I don't have any

15   information as to whether it was a coup attempt, whether it was

16   a controlled coup, I was not a witness to it.  I was not a

17   person that took part in its investigation.  I have no

18   information as to this coup attempt.

19   Q.  During that coup attempt, there were tanks that were

20   shooting at the Turkish Parliament building, correct?

21              MR. LOCKARD:  Objection.

22              THE COURT:  If you know.

23   A.  I don't know that there was any shooting that took place

24   from a tank at that time.  I don't know.

25   Q.  So you are not aware, is it your testimony that you're not

1   aware of this coup attempt that happened in Turkey between

2   July 15 of 2016 and July 21 of 2016?

3              MR. LOCKARD:  Objection.  Objection, your Honor.

4              THE COURT:  Sorry?

5              MR. LOCKARD:  Sorry.  Objection.

6              THE COURT:  If you know the answer.

7   A.  First of all, I don't know if this event ended on July 21.

8   I know that there was an incident that took place on the night

9   of July 15.  According to the media, this was a coup, some

10  media says this was a controlled coup.  But I was not part of

11  any of the individuals involved.  So, I don't know about -- I

12  don't have any information about this coup.

13             But with regards to this coup that is reported as a

14  coup, as a controlled coup, what I regard as event, actually,

15  is a coup that was against my rights, my personal rights in

16  terms of being able to defend myself.  I take this as a coup

17  that actually affected me personally.

18             MR. HARRISON:  Judge, there is no question pending at

19  this point.

20             THE COURT:  We're in a sort of a geopolitical

21  discussion here.

22             MR. HARRISON:  I'll ask another question so we can

23  narrow the focus.

24  Q.  Mr. Korkmaz, after you were released from prison on

25  February 9, 2016, you stayed in Turkey for the month of

1    February, correct?

2    A.  Yes.

3    Q.  You stayed in Turkey for the month of March, correct?

4    A.  Yes.

5    Q.  You stayed in Turkey for the month of April, correct?

6    A.  Yes.

7    Q.  You stayed in Turkey for the month of May, correct?

8    A.  Yes.

9    Q.  And you stayed in Turkey for the month of June, correct?

10   A.  Yes.

11   Q.  Even though you learned in June of 2016, as you've

12   testified previously, that a second indictment was going to be

13   handed down on you, correct?

14   A.  I had not learned of that indictment in June of 2016 at

15   that date.  During that time, actually.

16   Q.  On what date did you first learn about the second

17   indictment?

18   A.  It was in early August, and I was in Turkey.

19   Q.  That indictment is dated June 29 of 2016, correct, the

20   second indictment?

21   A.  I recall that date to be so, yes.

22   Q.  You didn't leave in July -- withdrawn.

23        You stayed in Turkey for the month of July also,

24   correct?

25   A.  Yes.

1    Q.  It wasn't until shortly after the coup ended that you left

2    in August, correct?  That you left Turkey in August?

3              MR. LOCKARD:  Objection.

4    A.  Yes.  Yes, I had made contact with a smuggler on July 13,

5    and he had told me he would get back to me, and he got back to

6    me in August, and that's how it all occurred.

7    Q.  Let me take you back.  Although you were released on

8    February 9 of 2016, a judge had previously -- a judge in Turkey

9    named Judge Bazer had previously ordered your release in an

10   order dated April 26 of 2015.  Correct?

11             THE COURT:  I'm sorry?  Could you do the whole

12   question again.

13             MR. HARRISON:  Sure, Judge.

14   Q.  You were released from prison on February 9 of 2016,

15   correct?

16   A.  Yes.

17   Q.  But previously, a judge in Turkey named Judge Bazer had

18   issued an order for your release from prison on April 26, 2015,

19   correct?

20   A.  You said 26th of April?

21   Q.  Of 2015.  Yes.

22   A.  Yes.

23             MR. HARRISON:  Mr. White, can you bring up Defense

24   Exhibit 5007, please.  Just for the witness, please, Mr. White.

25   Q.  Mr. Korkmaz, do you recognize Defense Exhibit 5007?  Take a

1   minute if you want.

2   A.  I have not received such a decree in my hand before.  I had

3   learned of that whole process through my lawyer.

4   Q.  Okay.  Do you see your name on that document?

5   A.  Yes.

6   Q.  It's I guess listed on the first line of names there.

7           THE COURT:  How about a date?

8   Q.  Do you see the date on there, Mr. Korkmaz?

9   A.  I can't see a date here.

10          MR. HARRISON:  Can we go to page four, Mr. White.

11  Four of four.

12          I have a paper copy.  If you don't mind, I'll

13  approach.

14          MR. LOCKARD:  Page five is on the screen.

15          MR. HARRISON:  Can I just approach with a paper copy,

16  Judge?

17          THE COURT:  Sure.

18  Q.  Mr. Korkmaz, just take a look at that page there, four of

19  four at the bottom, and see if you see a date there, sir.

20  A.  I see it.

21  Q.  That's April 26 of 2015, correct?

22  A.  No.

23  Q.  What's the date there?

24  A.  25th of April, 2015.

25  Q.  April 25 of 2015, my apologies.

1           This is the order where Judge Bazer ordered your

2      release from prison, correct?

3           MR. LOCKARD:  Objection.  I believe the testimony is

4      he hasn't seen it.

5           THE COURT:  Overruled.  If you know.

6      A.  I'm not aware of this particular decree, but I know that

7      there was a decree made on my behalf for me to be released.

8           MR. HARRISON:  Judge, defense moves Defense Exhibit

9      5015 into evidence.

10          MR. LOCKARD:  Objection.

11          MR. HARRISON:  Sorry.  5007.

12          THE COURT:  What are you saying that this is?

13          MR. HARRISON:  An order by a judge in Turkey ordering

14     Mr. Korkmaz released on April 25 of 2015.

15          THE COURT:  It is in Turkish.

16          MR. HARRISON:  Yes, Judge.

17          MR. LOCKARD:  The witness has not seen it.

18          THE COURT:  So, I'll allow it subject to connection.

19     I don't know what to make of it because I don't speak Turkish.

20          MR. LOCKARD:  Your Honor, I think there are also some

21     redactions that would be required to this document.

22          (Defendant's Exhibit 5007 received in evidence)

23     Q.  Mr. Korkmaz, Judge Bazer entered that order to release you

24     from prison on April 25 of 2015, because he had received a

25     letter from Fethullah Gulen, the leader of the Gulenist

1    movement, five days before, requesting that you and others be

2    released from prison, correct?

3    A.   This sounds very illogical to me.  I don't know Fethullah

4    Gulen.  I don't know Judge Bazer.  I don't know any of these

5    individuals and it just doesn't make any sense to me.  I don't

6    know them.

7    Q.   But it sounds logical to you?

8              THE COURT:  Is the translation --

9              THE INTERPRETER:  Illogical.

10             MR. HARRISON:  Sorry.

11             Mr. White, can you bring up Defense Exhibit 5015,

12   please.

13   Q.   Mr. Korkmaz, do you see a letter dated April 19, 2015 in

14   there?  That's Exhibit 5015.

15             THE COURT:  Your question was what?  Do you see this?

16   Q.   Do you see the letter dated April 19 of 2015.

17   A.   So, I see the date of April 19 on there.

18   Q.   That's a letter from Fethullah Gulen to Judge Bazer

19   requesting the release of certain -- of a number of prisoners,

20   correct?

21             MR. LOCKARD:  Objection.

22             THE COURT:  If you know.

23   A.   This is a ridiculous thing that I had heard about the first

24   time here today from you.

25   Q.   You've seen that letter before, haven't you, Mr. Korkmaz?

 1  A.  No, I have not seen it.  This is the first time ever that

 2  I'm hearing such a thing from you today.

 3  Q.  Okay.  But you are aware of Judge Bazer's order five days

 4  later, excuse me, six days later, ordering you released from

 5  jail, correct?

 6  A.  But in your question, you're alleging that the date of this

 7  is correct, and I have no idea whether this is legit or not.

 8  Q.  Okay.  But my question is, you testified previously, just a

 9  couple of minutes ago, that you were aware, through your

10  lawyer, of the order that Judge Bazer issued six days later,

11  ordering your release along with a number of other prisoners,

12  correct?

13  A.  Yeah, I didn't say Judge Bazer.  I just said that I had

14  heard that there was a decree for release.  But I don't know

15  him.

16          MR. HARRISON:  I have no further questions, your

17  Honor.

18          THE COURT:  All right.  Is there going to be redirect?

19          MR. LOCKARD:  There will be, your Honor.

20  REDIRECT EXAMINATION

21  BY MR. LOCKARD:

22  Q.  Mr. Korkmaz, are you now or have you ever been a member of

23  the Gulen organization?

24  A.  No, never.

25  Q.  Okay.  So, from the cross-examination, if I understand

1  correctly, I gather that you took some copies of evidence from

2  your investigation, and that maybe you weren't supposed to do

3  that; is that correct?

4  A.  Yes.

5  Q.  We've seen some of that evidence that you collected and

6  preserved during your testimony in this court.  Was any of that

7  evidence fabricated?

8  A.  No.

9  Q.  Were the wiretaps fabricated?

10  A.  No.  They're all real.

11  Q.  Were the e-mails fabricated?

12  A.  Everything that I brought over is real.

13  Q.  What about the surveillance images and the search

14  documents, were any of those fabricated?

15  A.  No, they're all real.

16  Q.  Mr. Harrison asked you about some digital copies of expert

17  reports from digital evidence that you had received in June of

18  2016.  Do you remember those questions?

19  A.  Yes.

20  Q.  And he asked you if those had been altered by removing the

21  signature blocks from those reports.  Do you remember those

22  questions?

23  A.  Yes.

24  Q.  Why were the signature blocks removed?

25  A.  The expert had told me that he was concerned about his name

1    being included, and he had told me that he had removed these at

2    an earlier date.

3    Q.  Were there also scanned copies of the original expert

4    reports in the documents that you took copies of in

5    December 2013 and January of 2014?

6    A.  Yes.

7    Q.  Were those altered in any way?

8    A.  No.

9    Q.  Was any information lost?

10   A.  No.

11   Q.  You described a coordinated law enforcement action on

12   December 17 of 2013 that you had planned and supervised.  Do

13   you remember that?

14   A.  Yes.

15   Q.  After that operation was completed, what did you direct to

16   be done with the wiretap recordings, the surveillance, the

17   search material, and the other evidence that you had collected

18   in your investigation?

19   A.  I did not understand the question completely.  If you can

20   please repeat.

21   Q.  After the operation was complete, did you direct that

22   anything be done with the evidence that had been gathered in

23   the investigation?

24   A.  Yes.

25   Q.  What did you direct be done with it?

1    A.  For example, for all the evidence that had been gathered, I

2    instructed that pictures to be taken of every piece of

3    evidence, and this is not something that's in the regular

4    procedure, but I'd asked them to take pictures of every single

5    one.

6    Q.  Did you direct that the evidence be delivered to anyone?

7    A.  Of course.

8    Q.  To whom?

9    A.  To the prosecutor.

10   Q.  Why did you direct that?

11   A.  Because I was concerned that the evidence may be destroyed

12   within the police department.  Because I had not seen any good

13   will from any of the new administrators that had come in, and

14   illegal orders were being made during that time by them.

15   Q.  You later took steps to preserve copies of that evidence;

16   is that right?

17   A.  Absolutely.

18   Q.  Mr. Harrison had asked if any of the evidence had been

19   destroyed before you started making copies; do you remember

20   that?

21   A.  Yes.

22   Q.  Should you have waited until after the evidence was

23   destroyed to try to preserve it?

24           THE INTERPRETER:  Repeat that, please?

25   Q.  Should you have waited until after evidence was destroyed

HCE3ATI3                        Korkmaz - Redirect

1    before you started taking steps to preserve it?

2    A.  Of course I wouldn't have waited, and I didn't anyway.

3    Q.  Mr. Harrison also asked you some questions about an

4    attempted military coup in Turkey in July of 2016.  Do you

5    remember those questions?

6    A.  Yes.

7    Q.  I think your testimony was that you and 15 million other

8    people were in Istanbul when that occurred; is that right?

9    A.  Yes.

10   Q.  Did you have anything to do with the coup?

11   A.  No, absolutely not.

12   Q.  Were you charged in Turkey with participating in an

13   attempted coup based on a corruption investigation that's known

14   as the December 25 operation?

15   A.  Yes, there were such ridiculous slanderous charges or

16   allegations against me; that is right.

17   Q.  Did you even have anything to do with the December 25

18   investigation?

19   A.  No.

20   Q.  Again, where were you assigned on December 25, 2013?

21   A.  I had been reassigned to the bridge on December 22.

22   Q.  Were you also charged in Turkey with participating in an

23   attempted coup based on a corruption investigation known as the

24   December 17 investigation?

25   A.  Yes.

1    Q.  Did you in fact have something to do with that

2    investigation?

3    A.  Yes.

4    Q.  Did your investigation involve any attempts at armed

5    takeover of the government?

6    A.  No, that would be one of the most ridiculous allegations in

7    the world.

8    Q.  Did your investigation involve tanks or helicopters?

9    A.  No.

10   Q.  Did your investigation involve court-authorized wiretaps?

11   A.  Yes.

12   Q.  Did it involve court-authorized technical surveillance?

13   A.  Yes.

14   Q.  Did it involve court-authorized searches?

15   A.  Yes.

16   Q.  You described early in your testimony that in the aftermath

17   of that operation on December 17, 2013, the prosecutor

18   responsible for the investigation and a number of supervisors

19   in the financial crimes unit, including yourself, were

20   reassigned.  Do you remember that?

21   A.  Yes.

22   Q.  Before the operation, did you and the others have

23   discussions about what could happen to the investigators after

24   the investigation was made public?

25   A.  You mean before the operation?

HCE3ATI3                          Korkmaz - Redirect

1    Q.  Before the operation.

2    A.  Yeah, we would have been exiled.

3    Q.  Did you personally believe that that might happen?

4    A.  I want to understand the question fully.  You mean before

5    17th of December?

6    Q.  Before you -- before the operation took place.  Did you and

7    the other investigators discuss the likelihood that you would

8    be exiled after the operation?

9    A.  Yes, I understand.

10            Yes.

11   Q.  In fact, I understand from your earlier testimony that the

12   chief of the financial crimes unit was reassigned the day that

13   the operation happened; is that right?

14   A.  Yes.  It was within a day of the operation.

15   Q.  Did he, like you, clean out his office?

16   A.  He had cleaned it out the day before the operation.

17   Q.  Why did you go forward with the operation with the

18   expectation that you would be exiled after it was completed?

19   A.  Because we believed in the work that we did.  This was a

20   corruption investigation, and we were the financial crime

21   police officers for the government.

22   Q.  Now, Mr. Harrison asked you some additional questions about

23   the charges that you're facing in Turkey.

24   A.  Yes.

25   Q.  Do any of those charges relate to the actions that you took

1    to preserve copies of the evidence from the investigation?

2    A.  No.

3    Q.  Before your testimony in this trial, do you believe that

4    the government of Turkey knew that you took those steps?

5           MR. HARRISON:  Objection, your Honor.

6           THE COURT:  Overruled.

7    A.  No.  No.

8    Q.  Do you think they know now?

9    A.  Of course.

10   Q.  Do you think you might face additional charges in Turkey

11   because of that?

12   A.  Of course.

13   Q.  Yesterday Mr. Harrison asked you some questions about your

14   recollections of certain things that took place in the

15   investigation.  Do you remember those questions?

16   A.  Yes.

17   Q.  During your time as a deputy inspector in the financial

18   crimes unit, approximately how many operations did you conduct?

19   A.  As I had mentioned, there were 10 or 15 operations such as

20   this one that I had taken part in.

21   Q.  What was your last operation?

22   A.  It was an investigation, it was indeed this investigation,

23   that involved the bribes that were given to ministers and the

24   prime minister of the country by an organization led by Reza

25   Zarrab.

 1    Q.  What operation involved the highest-ranking public

 2    officials that you've conducted?

 3              THE INTERPRETER:  Could you repeat that, please?

 4              THE COURT:  What investigation?

 5    Q.  What investigation that you personally have conducted

 6    involved the highest-ranking Turkish government officials?

 7    A.  This investigation.

 8    Q.  Did any other operation result in your being reassigned?

 9    A.  No.  I had not been reassigned after any of them, and I

10    have not been called a member of the Jamaat after any of them.

11    Q.  Did any other --

12              THE COURT:  Excuse me.  You've not been called a

13    member of the what?

14              THE WITNESS:  FETO.  FETO, the Gulen movement, or

15    Jamaat.

16              THE COURT:  Jamaat is spelled how?

17              THE INTERPRETER:  J-A-M-A-A-T.  Jamaat.

18              THE COURT:  Are those the same?

19              THE WITNESS:  That is correct, your Honor.  This is

20    what's used for all -- for the same in Turkey, all of these.

21    Q.  Did any other operation result in you and your colleagues

22    being criminally charged?

23    A.  No, we were honored and we were awarded.

24    Q.  Is this investigation particularly memorable for you?

25    A.  Yes.  Of course.

1   Q.  Yesterday Mr. Harrison also asked you some questions about

2   whether Mr. Atilla was the subject of any of the technical

3   surveillance that was conducted in the operation.  Do you

4   remember that?

5               MR. HARRISON:  Objection.

6               THE COURT:  Overruled.

7               MR. HARRISON:  My question was about physical

8   surveillance.

9               THE COURT:  That's all right.  Overruled.

10              THE INTERPRETER:  I will repeat the question.

11  A.  Yes, he had asked whether he was in any of the images or

12  not.

13              MR. LOCKARD:  Can we pull up Government's Exhibit 106,

14  please.

15  Q.  Mr. Harrison asked you if this money was for Mr. Atilla.

16  Do you remember that?

17  A.  Yes.

18  Q.  Where was this money found?

19  A.  In the residence of Suleyman Aslan.

20  Q.  What was Mr. Aslan's position at Halkbank?

21  A.  He was the general manager of Halkbank during that time.

22  Q.  To whom did Mr. Atilla report at that time?

23  A.  It was Suleyman Aslan.

24  Q.  Who paid this money to Suleyman Aslan?

25  A.  Reza Zarrab.

HCE3ATI3                          Korkmaz - Redirect

1    Q.  Was he a customer at Halkbank?

2    A.  That is correct.

3    Q.  Is he someone that Mr. Atilla dealt with?

4    A.  That is correct.

5          MR. LOCKARD:  Can we pull up Government's Exhibit 276.

6    If we can go to the next page.

7          MR. HARRISON:  Object.  Beyond the scope of cross,

8    Judge.

9          THE COURT:  You should relate your redirect to the

10   cross-examination.

11   Q.  Mr. Korkmaz, Mr. Atilla was not captured in any of the

12   images from the surveillance.  Was he captured on the

13   intercepts?

14         MR. HARRISON:  Objection, your Honor.

15         THE COURT:  I'll allow it.

16   A.  That is correct.

17   Q.  Were others intercepted talking about Mr. Atilla?

18   A.  That is correct.

19   Q.  Did Mr. Zarrab and Mr. Happani discuss Mr. Atilla on

20   December 20 of 2012?

21         MR. HARRISON:  Objection to hearsay and scope, your

22   Honor.

23         THE COURT:  Overruled.

24   A.  I seem to recall a conversation about opening an account

25   for Duru Exchange on December 20, but if I were to see

1    something to refresh my memory that would be better.

2    Q.  On page six of the transcript.

3    A.  Yes.

4    Q.  Did Mr. Atilla speak with Mr. Zarrab on February 6 of 2013?

5             THE INTERPRETER:  Could you give me the year again,

6    sorry.

7    Q.  February 6 of 2013.

8    A.  Between Hakan Atilla and Reza Zarrab.

9    Q.  Can we pull up Government Exhibit 226, please.

10   A.  I remember such a conversation.

11   Q.  Was this conversation about Mr. Zarrab's matters relating

12   to Mr. Zarrab's gold business?

13   A.  That is correct.

14   Q.  If we look at Government's Exhibit 229.  Did Mr. Zarrab and

15   Mr. Happani discuss Mr. Atilla on February 21 of 2013?

16   A.  That is correct.

17   Q.  If we go to Government's Exhibit 261.  Did Mr. Atilla and

18   Mr. Zarrab speak on July 9, 2013?

19   A.  Yes, I remember.

20   Q.  In this call are both Mr. Zarrab's food business and his

21   gold business mentioned?

22   A.  That is correct.

23   Q.  You testified earlier about a July 9, 2013, phone call

24   between Mr. Zarrab and Mr. Happani where they discussed

25   Mr. Atilla; do you remember that?

1    A.  Yes, there was a conversation about, after this

2    conversation, regarding this topic.

3    Q.  Was that about Mr. Zarrab's food business?

4            MR. HARRISON:  Can I have a continuing objection to

5    hearsay, Judge, and scope?

6            THE COURT:  Okay.  I think you better make it whenever

7    you think there is hearsay.

8            MR. HARRISON:  Okay.

9    Q.  Was that conversation between Mr. Zarrab and Mr. Happani

10   also about Mr. Zarrab's food business?

11   A.  It was about the fake food trade.

12   Q.  What did Mr. Happani say about Mr. Atilla in that call?

13           MR. HARRISON:  Objection.  Hearsay, your Honor.

14           THE COURT:  Overruled.

15   A.  He had said "May God be pleased with him."

16   Q.  Now, you testified yesterday about your efforts to compile

17   Mr. Zarrab's gold transactions from September of 2012 to

18   December of 2013.  Do you remember that?

19   A.  That is correct.

20   Q.  Can you remind us what was the approximate value of gold

21   that Mr. Zarrab exported after July 1st, 2013 until December of

22   2013?

23   A.  Based on --

24           MR. HARRISON:  Objection, your Honor.

25           THE COURT:  Overruled.

1   A.  Based on my own determination, that was between nine to

2   10 tons of gold.

3   Q.  You also compiled Mr. Zarrab's fake food transactions from

4   April of 2013 through December of 2013?

5   A.  That is correct.

6   Q.  Can you remind us the approximate value of those

7   transactions.

8             MR. HARRISON:  Objection to summary, Judge.

9             THE COURT:  Overruled.

10  A.  Based on my assessment, the amount was about 900 and some

11  million Turkish liras and 700 and some million euros.  And at

12  that time I had run a quick calculation on what that comes to,

13  and based on the exchange rates of that time, that was about

14  one and a half billion dollars.

15  Q.  Were any of the Iranian gold importers the same as the

16  Iranian food importers?

17  A.  Based on the documents, I saw that those that appeared to

18  be gold exporters for Iran had become -- prior to July 1st, had

19  become food traders after July 1st.

20  Q.  Were those gold exports and those fake food transactions

21  funded with Iranian oil money?

22            MR. HARRISON:  Objection, hearsay.

23            THE COURT:  Overruled.

24  A.  That is correct.

25            MR. LOCKARD:  If we can turn to Government's Exhibit

304-T.

Q.  On May 6 of 2013, on page two, please.  Did Mr. Zarrab and Mr. Aslan discuss Mr. Atilla?

A.  That is correct.

          MR. LOCKARD:  Just a moment, your Honor.

          Nothing further, your Honor.

          MR. HARRISON:  Just two or three quick questions, Judge.

          THE COURT:  Go ahead.

RECROSS EXAMINATION

BY MR. HARRISON:

Q.  Mr. Korkmaz, you say the evidence against you in the two indictments in Turkey was collected by the Turkish police, correct?

          THE COURT:  Is this based on the redirect?

          MR. HARRISON:  Yes.

A.  You did not ask such a question before so -- but that is correct, yes.

Q.  And you say that the evidence -- withdrawn.

          The evidence against you in those two indictments in Turkey was also pursuant to court order, correct?

A.  In one of them, no.  And in one of them, a part of the evidence was based on court order.

Q.  But that was done within the judicial system in Turkey, supervised by the court system, correct?

1    A.  I saw that there was a process that involved errors.

2    That's what I noticed.

3    Q.  And you say that case against you, those two cases against

4    you were false, correct?

5    A.  I can say clearly that the allegations are baseless, and

6    there is no evidence that is based on reality.

7    Q.  And yet you stole evidence from the Turkish judicial system

8    and you want to use it against my client here in this case,

9    correct?

10   A.  These are pieces of evidence that had been collected

11   legally within the investigation that I ran.  And I brought

12   them, yes.

13   Q.  Stolen by you in violation of Turkish law, correct?

14   A.  Yes, I had already said so.

15          MR. HARRISON:  No further questions.

16          THE COURT:  Let's excuse the witness.

17          (Witness excused)

18          THE COURT:  We're going to excuse the jury for lunch.

19   And ask you to be back at 2 o'clock.  It is about five -- that

20   clock says 10 minutes to 1 now.  So see you at 2 o'clock.

21          (Jury excused)

22          (Continued on next page)

23

24

25

HCE3ATI3

```
 1              THE COURT:  Over the lunch break it is my complete
 2      expectation that the matter we had discussed before will be
 3      resolved by stipulation.  I can't imagine any set of
 4      circumstances where it would not be the case.  So, if you need
 5      an extra 10 minutes over lunch, you should take it.  That's
 6      what I think needs to happen.
 7              So who is the next witness?  The government is
 8      finished I think, right?
 9              MR. LOCKARD:  We are, subject to the readmitting the
10      exhibits we intend to offer.  If we can resolve that over the
11      lunch break also and we can rest when we come back.
12              THE COURT:  Okay.  But I think we need to do that or
13      at least advise the jury that that was done, agreed to,
14      stipulated to or whatever in some fashion.
15              MR. LOCKARD:  We've given a list and we want to make
16      sure everybody agrees on the final list.
17              THE COURT:  Right.
18              MR. ROCCO:  It is going to take us a little bit.
19      Really, Judge.  There are a lot of exhibits.
20              THE COURT:  All right.
21              MR. LOCKARD:  A lot of them are groups of exhibits.
22              THE COURT:  Wait.  So do you mind if that happens
23      later?
24              MR. ROCCO:  I don't mind.
25              THE COURT:  In other words --
```

HCE3ATI3

1              MR. ROCCO:  No, we have no intention of slowing down

2       the progress.

3              THE COURT:  I understand.  But I'm concerned about the

4       other stipulation for now.  Because that would be a stipulation

5       of testimony or whatever.

6              MR. ROCCO:  We'll work on it, Judge.

7              MR. LOCKARD:  I'm not certain we can do it later.  So

8       we'll do as much as we can by lunch, and if it is not by

9       agreement, we'll move and they can object.  But we have to make

10      the motion.

11             THE COURT:  Which motion?

12             MR. LOCKARD:  To admit the evidence that is still

13      subject to connection.

14             THE COURT:  Oh.  Okay.

15             MS. FLEMING:  Judge, it is pages of exhibits.  It is

16      pages of exhibits.

17             THE COURT:  I get it.  So then who is your first

18      witness?

19             MS. FLEMING:  Mr. Atilla.

20             THE COURT:  And he would be ready to start this

21      afternoon?

22             MS. FLEMING:  He'll be ready to start.

23             THE COURT:  See you then.

24             (Recess)

25             (Continued on next page)

HCEPATI4                    Trial

```
 1               A F T E R N O O N   S E S S I O N

 2                          2:00 P.M.

 3          (Trial resumed; jury not present)

 4          THE COURT:  Counsel, we have the jury here.  We're

 5   ready to proceed.  What have you accomplished?

 6          MR. ROCCO:  Judge, we're trying to work out the

 7   stipulation.

 8          (Pause)

 9          THE COURT:  Okay.  So we're about to start.  Where are

10   you?

11          MR. LOCKARD:  So, your Honor, on the matter that we

12   had discussed prior to the break, I think we have a proposed --

13   some proposed language that we're going to review and see if we

14   can nail that issue down.

15          THE COURT:  I thought that was the point of the break?

16          MR. ROCCO:  We worked mightily to get it done, your

17   Honor.

18          THE COURT:  But didn't?

19          MR. ROCCO:  Well, we think we did, but we put it in

20   writing, and we want the government to look at it.

21          THE COURT:  So what would be the timing of that

22   process?

23          MR. ROCCO:  Now, your Honor.

24          THE COURT:  No, no, we're not going to wait for now.

25          MR. ROCCO:  I've gone as far --
```

1     THE COURT:  We have witnesses.  We're going to move

2  forward with the trial.

3     MR. ROCCO:  Yes, your Honor.  We understand that.

4     MR. LOCKARD:  My proposal would be -- I just got

5  e-mailed to me the draft language.  There are a couple of

6  things that we need to do, and I can step out or review it at

7  the table, but there are a couple of things that the government

8  needs to do before we rest.

9     THE COURT:  Can somebody else do that while you're

10  doing that?

11     MR. DENTON:  I can do that.

12     MR. LOCKARD:  I think it falls to Mr. Denton.

13     THE COURT:  That would be the evidence?

14     MR. DENTON:  Yes, your Honor.  I guess there are two

15  issues with respect to the evidence.  There are the

16  government's exhibits that are subject to connection, and then

17  there's one thing we wanted to raise with respect to some new

18  defense exhibits that were produced last night.

19     But with respect to the exhibits that are subject to

20  connection, my understanding is that defense counsel has not

21  had an opportunity to review this.  There are essentially

22  categories of exhibits which were offered subject to

23  connection.  There were objections to connections, more of

24  them, which the Court overruled at the time and received

25  exhibits in their entirety.

1            But with respect to the exhibits that are still

2    subject to connection, they principally fall in a couple of

3    different categories.  There are calls, which were offered

4    subject to connection.  We think that Officer Korkmaz was able

5    to both authenticate and connect, through his testimony, about

6    their relevance in the investigation.

7            THE COURT:  Right.

8            MR. DENTON:  The same is true with respect to the

9    various search exhibits.  We think, again, his testimony

10   elucidated what the connection was there.

11           And then, finally, there were some e-mails, which were

12   offered subject to connection based on their connection to the

13   conspiracy.  We think that, again, the evidence of the

14   conspiracy has been amply established and the identity of those

15   people.

16           THE COURT:  Okay.  So both of these things relate to

17   aspects of the government's case, right?

18           MR. DENTON:  That's correct, your Honor.

19           THE COURT:  And the witness we're about to have is a

20   defense witness; so is it agreeable to reopen the government's

21   case for the purpose of doing these two issues?

22           MS. FLEMING:  For that limited purpose, no, there's no

23   problem.

24           MR. ROCCO:  It's okay.

25           THE COURT:  Okay.

HCEPATI4                     Trial

1         MR. DENTON:  That's fine, your Honor.  We can deal

2   with that then.  Then the only other issue deals with defense

3   exhibit --

4         THE COURT:  Do you want to do the evidentiary issues

5   when we call in the jury and get that out of the way?  Oh, you

6   haven't have reviewed it yet.  Okay.  All right.

7         MR. DENTON:  We're happy to make the motion and move

8   them into evidence and they would object.

9         MR. ROCCO:  And we'd object.

10        THE COURT:  No need.  I think it's more orderly to

11  reopen the government's case for the purpose of resolving the

12  stipulation.  Is it a stipulation of testimony or fact or?

13        MR. ROCCO:  It's a stipulation of exhibits, basically,

14  your Honor.

15        MS. FLEMING:  That's testimony.

16        THE COURT:  So there will be a written stipulation of

17  that testimony presumably be read into the record?

18        MR. ROCCO:  Yes.

19        THE COURT:  And then on the issue of the documents,

20  they'll present, you may have still some remaining objections,

21  but we'll do that also in front of the jury --

22        MR. ROCCO:  Yes.

23        THE COURT:  -- tomorrow?  And those are the items that

24  are on the government's reopened portion of the case.  It's

25  okay with you?

1          MR. ROCCO:  Those are the only portions of the

2     government's case we agree to reopen.

3          THE COURT:  Okay.  So I'm going to probably tell the

4     jury where we are.  The government is finished except for those

5     two things, which we'll do tomorrow.  Is that fair?

6          MR. DENTON:  Yes, your Honor.

7          THE COURT:  Okay.  So, okay.

8          MR. DENTON:  And then the only other thing we wanted

9     to flag before the jury comes in, the defense produced a series

10    of exhibits to us for the first time last night.  A large

11    portion of them consist of various forms of statements made by

12    the defendant.  It is, obviously, black letter law that the

13    defendant testifying cannot self bolster by offering his own

14    prior statements.

15         So I don't know if they intend to use these only for

16    purposes of refreshing his recollection, but we wanted to flag

17    for the Court that we don't see any basis for admitting the

18    defendant's own prior statements.  He's, obviously, not a party

19    opponent.

20         MR. ROCCO:  I think we'll offer them on an evidentiary

21    basis at the time that we offer the documents.  Some of the

22    documents may be used to refresh his recollection.  Other

23    documents may be admissible for reasons other than

24    self-bolstering the witness' testimony.

25         THE COURT:  Okay.  So then we are prepared to start

HCEPATI4                    Trial

1    with Mr. Atilla.  Your expectation, just so everybody is aware,

2    his direct will be, rough?  I won't hold you to it.

3               MS. FLEMING:  Through tomorrow.

4               THE COURT:  So the remainder of today and tomorrow?

5               MS. FLEMING:  Yes.  And we'll be interrupting in the

6    morning, we have a custodian of records coming in in the

7    morning.  I asked them to come at 9:15, if it's okay with the

8    Court.  We'll just interrupt.

9               THE COURT:  Yes, that's fine.  And that's for the

10   direct, and then the cross would follow probably Monday, right?

11              MS. FLEMING:  I would think so.

12              MR. DENTON:  Whenever they finish, your Honor.

13              THE COURT:  So we're looking for a conclusion around

14   Tuesday, I would say, right, for the case?

15              MR. ROCCO:  Likely Tuesday, your Honor.

16              THE COURT:  Okay.

17              MR. ROCCO:  Likely.

18              THE COURT:  Subject to contingencies, whatever they

19   might be.  Okay.  Good.  So let's have Mr. Atilla.

20              MR. DENTON:  Your Honor, I just think --

21              THE COURT:  Wait.  Hold on, hold on.

22              MR. DENTON:  Just before Mr. Atilla takes the stand,

23   there's one last government exhibit, which is the post-arrest

24   video, and so I think we'd like to play that and then rest and

25   then Mr. Atilla can take the stand.

1           MR. ROCCO:  If it's his statement, your Honor, we have

2     no objection.

3           MS. FLEMING:  We also have an application.  The

4     Department of Justice denied our Touhy request to call the case

5     agent for limited purposes.  We're going to request that the

6     Court order her to testify in limited areas during trial on our

7     case.

8           MR. DENTON:  Your Honor, we filed a motion to quash

9     the request.  Obviously, it was denied by the Department of

10    Justice, and so we don't think that Special Agent --

11          THE COURT:  You filed that me motion when?  I must

12    have missed it.

13          MR. DENTON:  I think this was actually before trial

14    started, your Honor.  It came in during the flurry of filings

15    around Thanksgiving.

16          MR. ROCCO:  There was a time before this trial

17    started.

18          THE COURT:  I honestly don't recall; so I'll have to

19    review that before that witness.

20          MS. FLEMING:  I think we may see it -- after you watch

21    the next video, I think we'll renew our motion anyway.

22          MR. ROCCO:  Your Honor, we also have a -- your Honor

23    wanted our rule 29 motion.  We're also prepared to file our

24    rule 29 motion.

25          THE COURT:  We still have the mistrial motion.

```
 1              MR. ROCCO:  I understand that.  I'm happy to file the
 2     rule 29 motion as well.
 3              THE COURT:  Well, I mean, it's up to you.  It's your
 4     motion.
 5              MR. ROCCO:  But they're your rules, Judge.  I think we
 6     should make the motion --
 7              THE COURT:  Yes, absolutely.
 8              MR. ROCCO:  -- on your Honor's schedule.  It's not
 9     going to be on my schedule.
10              THE COURT:  I'm just trying to get if that's going to
11     be a written motion.
12              MR. ROCCO:  It's written.  It's written.
13              THE COURT:  And it's ready already?
14              MR. ROCCO:  It's ready.  I can give a copy to the
15     government.
16              THE COURT:  So for good order's sake, it should come
17     after we know that the government's case is signed, sealed and
18     delivered, so to speak.  Okay.  So your planning would be
19     tomorrow, I think?
20              MR. ROCCO:  Okay, your Honor.
21              MR. DENTON:  I suppose, your Honor, that should come
22     after the limited reopening that we discussed.
23              THE COURT:  That's what I'm saying, yes.
24              MR. ROCCO:  Yes, that's an important point.  And
25     Ms. Fleming just reminds me, the fact is that we made the
```

HCEPATI4                    Trial

1    motion so that the record, for purposes of the rule 29 motion,

2    is frozen prior to Mr. Atilla's taking the stand.

3              MS. FLEMING:  We have a quandary.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the side bar)

2            THE COURT:  Go ahead.

3            MR. ROCCO:  This is the quandary.  We want to preserve

4    our right in calling Mr. Atilla, not to supplement the

5    government's case.  So that we want the record frozen for

6    purposes of the rule 29 motion as of right now, or as of --

7            THE COURT:  At the close.

8            MR. ROCCO:  -- once they've closed their case

9    completely.  The problem that Mr. Denton is having, and I think

10   it's a legitimate issue, is if we put him on the witness stand,

11   how can we do that?  If we put Mr. Atilla on the witness stand,

12   how can we do that?  How can we freeze the record?

13           THE COURT:  So you're saying we can't?

14           MR. ROCCO:  Well, I think it's a legitimate concern.

15           THE COURT:  Because you can't artificially say this

16   motion --

17           MR. ROCCO:  He didn't testify.  I mean, in theory, the

18   jury can make a finding of based on Mr. Atilla's testimony,

19   right?  Which would go to curing any insufficiencies in the

20   government's case.  That's what I think Mr. Denton's concern

21   is.

22           MR. DENTON:  I think the particular --

23           THE COURT:  Okay.  So what's your scenario?  How do

24   you see it?

25           MR. DENTON:  I think this is a function of the fact

HCEPATI4                         Trial

1      that we have to do this process of reopening the government's

2      case to offer exhibits, which are part of the government's case

3      in chief and which would go to the sufficiency of the evidence

4      on a rule 29 motion.

5                 THE COURT:  Okay.

6                 MR. DENTON:  So because that evidence is not coming in

7      at this moment, because defense counsel has not reviewed the

8      list yet --

9                 THE COURT:  Right.

10                MR. DENTON:  -- we can't freeze the record at this

11     moment in time because that evidence is not in yet.

12                THE COURT:  No, correct.  You can only freeze it when

13     those two both issues are resolved, which is part of the

14     government's case.

15                MR. DENTON:  Right.

16                THE COURT:  And you're saying you can't start

17     Mr. Atilla in the meantime?

18                MR. DENTON:  I mean, from the government's

19     perspective, we can.  That's their choice.

20                MR. ROCCO:  That's not much of a choice, Judge.

21                THE COURT:  You don't want to do that?

22                MR. ROCCO:  I do not want to do that.

23                MS. FLEMING:  We can't.

24                MR. ROCCO:  I do not want to do that.

25                THE COURT:  Because?

1           MR. ROCCO:  Because I do not want to supplement the

2     record in this case with Mr. Atilla's testimony.  Essentially,

3     once he takes the stand, he's waived the privilege.

4           THE COURT:  I see.

5           MR. ROCCO:  Right?

6           THE COURT:  I see.  I see.  You wouldn't consider a

7     rule 29 motion at the close of your case, too, or is that not

8     what you're going to accomplish?

9           MS. FLEMING:  Then our client and our testimony counts

10    as part of it.

11          THE COURT:  That's right.  Oh, and it would.

12          MR. ROCCO:  And that's the problem.

13          THE COURT:  Oh, you don't want --

14          MR. ROCCO:  We do not want to do that, your Honor.

15          THE COURT:  So --

16          MR. ROCCO:  I don't have a solution.  You can move.

17    Your Honor can admit.

18          THE COURT:  So there's three options on the rule 29

19    motion.  I can either grant it, deny it, or I can defer it, if

20    I were so inclined, that is to say not rule on it at all.

21    Would that solve your problem?

22          MR. ROCCO:  I'm not sure it addresses Mr. Denton's.

23          MR. DENTON:  I don't think so, your Honor, because

24    it's as of the time the motion is made that the record is

25    closed, and so if they make the motion --

1      THE COURT:  What if he just makes it -- oh, you're

2    saying you can't do business this afternoon.

3      MR. DENTON:  Right.

4      MR. LOCKARD:  Either our evidence isn't in, or his

5    client's testimony is in.

6      THE COURT:  I got it.  I see.  I see.  Well, then

7    there is no option.  We have to just close the record; so we

8    can't have Mr. Atilla, I think, until we close the record.  So

9    to close the record, you have to figure out that stipulation

10   and your evidentiary thing and the video.  It seems to me that

11   that's the only way to do it.  Right?

12     MR. DENTON:  I will say, with respect to the

13   stipulation, I don't think we would have any problem with that

14   being offered as part of the defense case.

15     THE COURT:  I think it would be cleaner, if everybody

16   is comfortable with the procedure, which means do whatever we

17   need to do to close the government's case, then you make your

18   motion, and then depending on the outcome of that motion, you

19   either call him or --

20     MR. ROCCO:  Not.

21     THE COURT:  -- go home or whatever you do.

22     MS. FLEMING:  There's an incentive, there.

23     MR. ROCCO:  A nice smile, your Honor.

24     THE COURT:  Okay.  That means this afternoon -- so can

25   you look at the exhibits, or you can't even do that?

1     MR. ROCCO:  We cannot do it.  I had somebody start

2     doing it.  It's not going to happen, your Honor.

3          THE COURT:  So we can do your piece, anyway, and then

4     we'll do --

5          MR. LOCKARD:  I mean, just on the exhibits, your

6     Honor, we're talking about exhibits that have been offered

7     throughout the course of this trial, that we've provided on

8     exhibit lists for weeks now.

9          THE COURT:  Right.  No, he wants to be --

10          MR. LOCKARD:  I understand, but I think maybe we could

11     agree that the extent that the subject to connection is based

12     on relevance or authenticity grounds, that the Court has

13     already overruled, we could agree that your objections are

14     preserved in that respect.

15          MR. ROCCO:  I do not --

16          THE COURT:  I'd rather him do it.  I'd rather have him

17     look through the documents --

18          MR. ROCCO:  So would we, your Honor.

19          THE COURT:  -- so there's nothing artificial about any

20     of it.  We just have to take another day, it looks like.

21     Whatever it takes.

22          MR. ROCCO:  Thank you, your Honor.

23          MS. FLEMING:  Maybe the jurors can look at their

24     notes.

25          THE COURT:  Well, I could send them home.  Is anything

HCEPATI4                        Trial

1   going to be accomplished?

2           MS. FLEMING:  They're going to play a tape, the video.

3           THE COURT:  Oh, but then you want to call somebody

4   about that?

5           MR. ROCCO:  No.

6           MS. FLEMING:  Yes -- well, no, I said we made an

7   application, a motion to call the FBI agent on our case, on our

8   case.

9           MR. ROCCO:  That's got nothing to do with the

10  government's case.

11          MR. LOCKARD:  Good.

12          THE COURT:  So we could play the tape, and then I'll

13  send them home.  Now, when would I tell them to come back?

14          MR. ROCCO:  Tomorrow at 9:15.

15          MS. FLEMING:  We need time to go over the exhibits, I

16  think.

17          THE COURT:  Well, you'll be done with that, and you'll

18  have your stipulation, presumably.

19          MR. LOCKARD:  I think the stipulation is a matter of

20  minutes.  We can resolve the exhibits --

21          THE COURT:  Then I will say 9:15.

22          MS. FLEMING:  I think that's fine.

23          MR. ROCCO:  I think we can do it because there will be

24  more people looking at the exhibits, your Honor.

25          THE COURT:  Okay.  All right.  So are we missing

HCEPATI4                        Trial

1    anything?

2              MR. DENTON:  I don't know that we need all afternoon

3    to do this, but if that's what everyone seems to think --

4              THE COURT:  We don't, but I don't see any alternative.

5    That's fine.

6              MR. ROCCO:  Thank you, your Honor.

7              THE COURT:  So okay.  That's our procedure.  We're

8    just going to do the video, then, now, which is like nine

9    minutes?

10             MR. LOCKARD:  About eight, yes.

11             THE COURT:  Well, I guess they'll be happy to go home

12   and come back at 9:15.

13             MS. FLEMING:  And we have a witness ready.  They're

14   going to be here -- our custodian is going to be here at 9:15.

15             MR. ROCCO:  So Mr. Atilla would be the second witness.

16   This is a custodian.  I think it's a 20-minute witness.

17             THE COURT:  So again, then when are you going to make

18   your motion, tomorrow morning?

19             MS. FLEMING:  Right, as soon as they close their case,

20   we'll make our motion.

21             THE COURT:  And does that please the record?

22             MS. FLEMING:  Yes.

23             THE COURT:  As soon as it's filed.

24             MS. FLEMING:  As soon as it's filed, and then if you

25   reserve, that's fine.

1        THE COURT:  So it doesn't matter.  So there is no

2   delay.

3        MS. FLEMING:  Right.

4        MR. ROCCO:  Right.  We'll go right to the end.

5        THE COURT:  I think that will work.

6        MR. ROCCO:  Thank you, your Honor.  Thanks.

7        THE COURT:  All right.

8        (In open court)

9        THE COURT:  Could you come up again?

10       (At the side bar)

11       THE COURT:  So Christine makes a good point.  What is

12  this going to do to the trial calendar?  This could push us

13  into the new year for deliberations, I think.

14       MS. FLEMING:  I don't think so, Judge.

15       THE COURT:  Well, work it through in your head first.

16  See what you think, when you think.

17       MR. ROCCO:  Well, nobody -- just to put it on the

18  record, your Honor, nobody wants to be out of here more than I

19  do for Christmas.

20       THE COURT:  You have to do whatever you have to do on

21  behalf of Mr. Atilla, of course, but we have to think of what

22  is the probable calendar of this arrangement that we've agreed

23  to make?

24       MR. LOCKARD:  Are there additional witnesses after the

25  two?

1            MR. ROCCO:  No.  We may put on a couple of character

2     witnesses, but it's going to be character evidence.

3            THE COURT:  So when do you think you're going to rest

4     and have cross-examination?

5            MR. ROCCO:  Well, I think we'll be done with our

6     cross-examination, hopefully, by the close of business

7     tomorrow.

8            MS. FLEMING:  Our direct.

9            MR. ROCCO:  Did I say cross?

10           MS. FLEMING:  Yes, you did.

11           MR. ROCCO:  Yes, our examination.

12           THE COURT:  But think it through.

13           MR. ROCCO:  I think it will take you guys by the end

14     of Tuesday.

15           MR. DENTON:  You think you'll be done with him at the

16     close of business tomorrow?

17           MR. ROCCO:  I think so.  If it spills over into the

18     new week, it will be only a couple of hours.

19           THE COURT:  Wait a minute.  So then what happens, you

20     finish tomorrow theoretically, and you --

21           MR. DENTON:  You know, it's probably a couple of hours

22     of cross, your Honor.

23           THE COURT:  So Monday.  So you think there could be a

24     charge conference when?

25           MR. DENTON:  I guess it depends on character

HCEPATI4                          Trial

1    witnesses.  If they're going to call character witnesses on

2    Monday afternoon --

3              THE COURT:  It's awfully close.

4              MR. DENTON:  Yes, there might actually --

5              MR. ROCCO:  You think so?

6              THE COURT:  So when do you think the charge conference

7    could be?

8              MR. ROCCO:  I would think Monday afternoon or Tuesday

9    morning.  No?

10             MS. FLEMING:  No, no.  Tuesday.

11             MR. ROCCO:  Tuesday, Tuesday.  Tuesday afternoon.

12             THE COURT:  So if it's Tuesday, and then summations

13   and charge.  The charges are like, you know.  So wait a minute.

14   So that's Wednesday.  When is the holiday?

15             MR. LOCKARD:  Friday is the last day before the

16   holiday.

17             THE COURT:  So does that leave them one day of

18   deliberation, at most?

19             MS. FLEMING:  Two, at least Thursday and Friday,

20   right?

21             MR. ROCCO:  That's what I thought.

22             MS. FLEMING:  It's two.

23             THE COURT:  Thursday and Friday?  I think one of them

24   are --

25             MS. FLEMING:  It's better than an Allen charge.

HCEPATI4                    Trial

1          MR. DENTON:  It might be a long day to try and get

2   through all the closings and the charge on a single day.

3          THE COURT:  Well, the closings, we didn't get to that,

4   are not going to be as long as you think they are.

5          MR. ROCCO:  I expected that.

6          MS. FLEMING:  We already had a couple of them.

7          THE COURT:  I mean, I'm not thinking of long closings.

8   You know, maybe an hour each, something like that.

9          MR. ROCCO:  We'll have to have Cathy do the summation.

10          THE COURT:  But, seriously, when is the last hour you

11   think we can have trial?  The day before -- what, Christmas is?

12          MR. ROCCO:  Friday.

13          MR. LOCKARD:  Christmas is Monday.

14          MR. ROCCO:  Monday, Monday.

15          MR. DENTON:  I think your Honor had told them that we

16   would break from --

17          THE COURT:  Thursday.

18          MR. DENTON:  Yes.

19          THE COURT:  Because I think somebody has tickets.

20          MR. LOCKARD:  That's right.

21          MR. ROCCO:  That's right.  Yes, yes.

22          THE COURT:  Right?  On the 22nd.

23          MR. ROCCO:  Yes, yes.

24          THE COURT:  Somebody has tickets.

25          MR. DENTON:  It may make sense, your Honor, at this

1    point, for the government to just move on its exhibits.  They

2    can make their objection, and we can close the record in the

3    next 20 minutes, and then they can start with their case.

4              MS. FLEMING:  I don't --

5              THE COURT:  You mean, and make their motion?

6              MR. DENTON:  Yes.

7              MR. ROCCO:  We can make our motion, but we haven't

8    gone with our objection to their exhibits.

9              THE COURT:  Yes, maybe that does make sense.

10             MR. ROCCO:  Really?  You think that this -- this half

11   day -- we're working all day tomorrow, you think this half day

12   is going to --

13             THE COURT:  I think the half day is going to be

14   crucial actually in the next, given the next week, I do.

15             MS. FLEMING:  You know, it's already 2:30.  They're

16   going to put on another video.

17             THE COURT:  Let's do that.  I think they're right.

18   Did you agree on the stipulation about --

19             MR. LOCKARD:  Did you have a chance to look at it?

20             MR. ROCCO:  I did not.  I started to, but I did not.

21             MR. LOCKARD:  I think Mr. Rocco has to review and

22   approve the proposed language.  So if we do that, we might be

23   done in the next ten minutes with the stipulation.  We could

24   publish the post-arrest, and the government could rest.

25             MS. FLEMING:  I just don't think it's appropriate for

1    us to be objecting to wholesale six pages' worth of exhibits

2    without the chance of reviewing them.

3              MR. ROCCO:  It's more than six pages.

4              MR. LOCKARD:  You've had a chance to review them for

5    the entire trial.

6              MR. ROCCO:  What you're missing is I don't walk around

7    with your exhibit list in my brain; so I may have seen the

8    document.

9              THE COURT:  All right.

10             MR. ROCCO:  That's the problem.

11             THE COURT:  So here's the $64, then suppose we can't

12   finish next week?  Then you're into the new year.

13             MS. FLEMING:  Then we come back.

14             THE COURT:  Well, you come back.  I don't know what

15   their expectation is.

16             MS. FLEMING:  Judge, honestly, and I'm sorry about

17   this, but we care about the guy who's on trial.

18             THE COURT:  So do I.

19             MS. FLEMING:  And I know you do too, and I didn't mean

20   that to suggest otherwise.

21             MR. LOCKARD:  I don't think defense counsel is

22   prejudiced --

23             MR. ROCCO:  My experience is these are the kind of

24   problems that people can deal with as they occur.  I'm not sure

25   that we are going to get to the point where we have to worry

HCEPATI4                    Trial

1    about coming back.

2              THE COURT:  Yes, but the jurors want to know in

3    advance.

4              MR. ROCCO:  We can only do the best we can.

5              THE COURT:  I know.

6              MR. LOCKARD:  I'm not sure that the defense counsel is

7    prejudiced by maintaining an objecting to the government's

8    exhibits.

9              THE COURT:  Yes, why is that a problem?

10             MR. ROCCO:  I don't think -- I think it's a solution

11   to the problem.  We object.  That's it.

12             THE COURT:  That's what he's saying.

13             MR. ROCCO:  Sure.  No.  It's not the best way.  It's

14   much cleaner and easier for us to go through the documents, and

15   what we're saying is, we'll do it by tomorrow morning, and

16   we're ready to start tomorrow morning and put our witnesses on.

17   And we don't think the defense case is going to be long.  We

18   think we're going to call, at most, four, perhaps five,

19   witnesses and some of those are going to be character

20   witnesses.

21             THE COURT:  I'd rather wait until tomorrow.  I mean, I

22   don't, it's not ideal, but I want to give the defense every

23   opportunity to review the documents.

24             MR. ROCCO:  I appreciate it.

25             THE COURT:  And do whatever they need to do.  I don't

1    know where it will lead.

2              MR. ROCCO:  We'll talk faster.

3              THE COURT:  All right.  So now, do you want a break

4    for now to finalize that stipulation?

5              MR. LOCKARD:  I think we should, and then we would

6    also suggest, just to make sure that we do hit the ground

7    running tomorrow morning, if maybe the Court wants to impose a

8    deadline by which to raise specific objections to exhibits

9    tonight; so that we don't walk in tomorrow morning with

10   additional objections that need to be resolved that haven't

11   been raised.

12             MR. ROCCO:  We'll do the best we can so you'll hit the

13   ground running.  Look --

14             THE COURT:  Okay.

15             MR. ROCCO:  Your Honor, I'd like to preserve my

16   credibility with the Court.  I'm not looking to put anybody

17   behind the eight ball.

18             THE COURT:  Fair enough.  Okay.

19             MR. ROCCO:  Thank you.

20             THE COURT:  So we're going to do the video -- no,

21   we'll take a little break for the moment, while you finish that

22   stipulation, and then I'm going to send the jury home -- well,

23   then I'm going to show the video and send the jury home.

24             MR. ROCCO:  Thank you.  That's fine.

25             (In open court)

HCEPATI4                    Trial

 1              THE COURT:  Okay.  Do you have any objection to my

 2     telling the jurors that the defense will put on a case starting

 3     tomorrow?

 4              MR. ROCCO:  Your Honor, that always troubles me until

 5     the defendant raises his hand and starts to answer questions,

 6     who knows?

 7              THE COURT:  I don't mean him.  I mean a case.

 8              MS. FLEMING:  No, because --

 9              MR. ROCCO:  Because if we don't put him on, I'm not

10     sure we're putting anybody on.

11              MS. FLEMING:  Yes, we're putting on the Turkish

12     airlines --

13              MR. ROCCO:  Yes.

14              MS. FLEMING:  Yes, you can say.

15              THE COURT:  So it will be tomorrow?

16              MS. FLEMING:  It will be tomorrow morning at 9:15.

17              THE COURT:  Got it.

18              (Pause)

19              So just so everybody knows what's going on.  We're in

20     a short recess while the parties are working on a stipulation,

21     which we need to have before we take the next step.

22              (Recess)

23              MR. LOCKARD:  Your Honor, I think we are set on that

24     stipulation.

25              THE COURT:  And you're going to read it?

1           MR. LOCKARD:  I'll read it.

2           THE COURT:  How long do you think it will take?

3           MR. LOCKARD:  45 seconds to a minute.

4           THE COURT:  Oh, all right.  So then I'm going to call

5    in the jury.  We're going to play your video, enter that

6    stipulation, and then I'm going to excuse the jury until

7    tomorrow morning; is that right?

8           MR. LOCKARD:  Yes.

9           MS. FLEMING:  Mmm, hmm.

10          THE COURT:  All right.

11          (Jury present)

12          THE COURT:  Please be seated.  So let me tell you,

13   members of the jury, exactly where we are, and I should say,

14   first off, that the parties have been working in good faith to

15   resolve some evidentiary issues, most of which are resolved,

16   one of which will be resolved, but will carry over to tomorrow

17   morning.

18          So for the rest of today, it's not going to be as long

19   a day as I thought.  The government is going to present a

20   relatively short video, which goes into evidence as part of

21   their case.  They're also going to read a short stipulation

22   that they've agreed to, which goes into evidence.

23          And as soon as we deal, which we will do first thing

24   in the morning, with an exhibit issue, that will be the close

25   of the government's case.  And that will be followed by a

1    presentation of defense witnesses.  So that's where we are,

2    just so you know.

3            I thought we might have concluded the issue that's

4    going to be dealt with in the morning this afternoon, but it

5    didn't happen, and as I say, it didn't happen, but everybody

6    has been pursuing it as diligently as they could.  So with

7    that, did you want to do the stipulation first or the video

8    first?

9            MR. LOCKARD:  We'll do the stipulation, your Honor,

10   and then publish the video.

11           THE COURT:  And you'll recall, ladies and gentlemen, a

12   stipulation, as I've said before, is something that's agreed to

13   by both sides.

14           MR. LOCKARD:  In the matter of the United States v.

15   Mehmet Hakan Atilla, 15 CR 867, it is stipulated between the

16   parties, the United States and Mr. Atilla, by his defense

17   counsel, that:  If called to testify, Huseyin Korkmaz would

18   testify that a representative of his was in contact with

19   representatives of the United States Attorney's Office for the

20   Southern District of New York beginning in approximately

21   April 2016;

22           And that prior to his departure from Turkey,

23   Mr. Korkmaz knew that the representative discussed the

24   possibility of Mr. Korkmaz bringing to the United States

25   investigative files and materials, which Mr. Korkmaz has

1  acknowledged were stolen from the Turkish police investigation

2  files.

3          THE COURT:  Okay.

4          MR. LOCKARD:  And with that, the government asks for

5  permission to publish a portion of Government's Exhibit 70.

6          THE COURT:  And could you just preview what this is

7  for everybody, and particularly the jury, what this video is

8  going to be?

9          MR. LOCKARD:  It is a portion of a video dated the

10  27th of March, 2017, reflecting statements of Mr. Atilla.

11          THE COURT:  Okay.  Does everybody see it on their

12  screen?

13          JUROR:  Yes.

14          (Videotape played)

15          MR. LOCKARD:  And that's the end of the portion of the

16  tape that we'll publish, your Honor.

17          THE COURT:  Did you all hear it?  All right.  Then

18  that concludes the government's case, with the exception of

19  those exhibit issues that we're going to deal with in the

20  morning; is that correct?

21          MR. LOCKARD:  That's correct, your Honor.

22          THE COURT:  Is that your understanding, as well,

23  counsel?

24          MR. ROCCO:  Yes.  It is, your Honor.

25          THE COURT:  Okay.  Then you're excused for today.

1    We'll see you at 9:15 tomorrow morning.  Thanks a lot.

2              (Jury not present)

3              THE COURT:  Okay.  So would it be helpful,

4    Mr. Rocco -- well, no, I take it back.  So we'll see you at

5    9:15 tomorrow morning.

6              MS. FLEMING:  Judge, I can address the issue of the

7    FBI agent right now, and I would ask that she step out of the

8    room.

9              THE COURT:  We don't have to deal with it right now.

10   It would be part of your case?

11             MS. FLEMING:  Yes.

12             MR. LOCKARD:  It's been briefed, your Honor.

13             THE COURT:  I'll take a look at that.  We don't need

14   to do that now.

15             (Adjourned to December 15, 2017, at 9:15 a.m.)

16

17

18

19

20

21

22

23

24

25

1                         INDEX OF EXAMINATION

2    Examination of:                                    Page

3     HUSEYIN KORKMAZ

4    Cross By Mr. Harrison  . . . . . . . . . . .1775

5    Redirect By Mr. Lockard  . . . . . . . . . .1831

6    Recross By Mr. Harrison  . . . . . . . . . .1845

7                         DEFENDANT EXHIBITS

8    Exhibit No.                                    Received

9     5007     . . . . . . . . . . . . . . . . . .1829

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25