HCI3ATI1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        S4 15 Cr. 867 RMB

5    MEHMET HAKAN ATILLA,

6              Defendant.

7    ------------------------------x

8

9                                       December 18, 2017
                                        8:15 a.m.
10

11

12   Before:

13                 HON. RICHARD M. BERMAN,

14                                       District Judge
                                            and a jury
15

16

17                      APPEARANCES

18   JOON H. KIM,
          United States Attorney for the
19        Southern District of New York
     MICHAEL D. LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID W. DENTON, JR.,
21   DEAN C. SOVOLOS,
          Assistant United States Attorneys
22

23

24

25
```

HCI3ATI1

(APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
     Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
     THOMAS ELLIOTT THORNHILL, Esq.
     - and -
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
     ROBERT J. FETTWEIS, Esq.
     - and -
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
                Of counsel
     -and-
McDERMOTT WILL & EMERY
BY:  TODD HARRISON

Also Present:
     JENNIFER McREYNOLDS, Special Agent FBI
     MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
     MS. ASIYE KAY, Turkish Interpreter
     MS. SEYHAN SIRTALAN, Turkish Interpreter
     MR. BULENT BULUT, Turkish Interpreter

1          (In open court; jury not present)

2          THE COURT:  First off, thanks for those draft

3     instructions over the weekend.  That was helpful.

4          And what we're going to do is look at the non-count

5     instructions first.  And then hopefully some time today we're

6     going to give you the instructions for the six counts.

7          In going over the instructions, they're pretty complex

8     or technical, as you are aware.  And what I'm likely to do is

9     reorganize the instructions to do the following, and I will

10    advise the jury that I've done that.  I'm not going to order

11    the instructions in the order in which they appear in the

12    indictment.  I think that is very complicated to follow the

13    instructions if I do that.  So that the first count I think is

14    the Klein instruction, and immediately or soon thereafter you

15    get into the IEEPA instruction, and then if you're still

16    conscious, you get to the instructions after that.

17         So what I thought would be most understandable for the

18    jury, to instruct them but also to keep them engaged, and again

19    telling them I'm going out of order, is to give them the two

20    substantive counts first, everybody understands the substantive

21    counts, and then give them the six conspiracy counts, which one

22    will build on the other.  So, there are a lot of common

23    instructions in the each of the conspiracies that there can be

24    a conspiracy even if there is no underlying substantive act,

25    etc., etc.

1         And then we'll pick up, do Klein first, IEEPA I think

2    second, and then we'll pick up the substantive counts in the

3    conspiracies that each relate to those two substantive counts.

4    I think that is a way to instruct, to read it, and that is most

5    understandable anyway.  So, you'll see what it looks like when

6    it comes out, see if it works for you.

7         What I typically do in a charge conference is to run

8    through everything off the record, to see what we agree or

9    disagree on, and then have the court reporter take down what

10   the disagreements are.  Instead of having all the back and

11   forth, if that's okay with you.  So anybody who has an

12   objection to how an instruction works out will get to lodge

13   that objection and even the wordage, but the back and forth is

14   very hard to follow, and so is that okay with you?

15        MR. LOCKARD:  Yes, your Honor.

16        MS. FLEMING:  Yes, your Honor.

17        THE COURT:  So typically I say who has got a comment

18   on the earliest page and we can deal with it.

19        (Discussion off the record)

20        THE COURT:  The record should reflect that we've just

21   conducted an off-the-record charge conference with respect to

22   draft instructions dated December 15, 2017, and in particular,

23   pages in that draft 1 through 30, and also 60 through 71.  We

24   made some changes I think unanimously agreed to, but if there

25   are any remaining objections to the charges set forth in these

HCI3ATI1

1      pages to we hear from the defense first and then from the

2      government.

3                  MR. ROCCO:  One moment, your Honor.  None, your Honor.

4                  THE COURT:  How about the government?

5                  MR. LOCKARD:  None, your Honor.

6                  THE COURT:  So these pages at least, which are half,

7      are agreed to.  That's some progress.

8                  Now, do you have an anticipation of how much testimony

9      remains and -- first of all, with respect to the remainder of

10     the jury instructions, we, that is to say I, that is to say

11     Christine, hope to have those to you today, obviously.  And

12     they, again, will incorporate -- and I'm grateful for your

13     submissions yesterday of a revised instruction relating to the

14     IEEPA conspiracy.  The alleged IEEPA conspiracy.  Not

15     surprisingly, those respective instructions from each of you

16     are pretty different, and there probably will be some, no doubt

17     will be some objections to that.

18                 But in addition, when the new, the additional

19     instructions come, they will be in the format of the two

20     substantive counts first followed by the conspiracies with an

21     instruction to the jury that that is being done for convenience

22     or ease of understanding all the instructions.  And I will also

23     advise them and tell them that they are out of the order as set

24     forth in the indictment.

25                 Now, it is my practice to give each of the jurors a

copy or the jurors a copy of the indictment to take into the

jury room for deliberation.  And just as a heads up, where one

or both sides have asked me to read counts in the indictment, I

prefer not to do that.  But I will say, I will suggest to the

jurors that in considering each of the counts, they review

first the respective allegations in the indictment on their own

as they work through each of the counts.

So, just to discuss, I think we'll have the other

charge conference tomorrow morning at this same time.  And I

think that's it for me.

I was going to ask if you have a sense of how long

your respective examinations will take.  Obviously, I won't

hold you to any estimates, so you can present your case as you

see fit.  But it would be helpful to hear what you think the

schedule is.

MS. FLEMING:  My goal is to be done by lunch and I

promise to be done today.  I worked very hard over the weekend

to try and make it as organized and as narrow as I could,

Judge, but we have a lot of ground to cover.

THE COURT:  And I appreciate that.  And so, you should

know that even if sometimes I get a little bit impatient, I

have no intention of curtailing anything you need to present --

you or the government -- need to present with respect to your

respective cases.

So, that would leave cross by the government.  How

HCI3ATI1

1    long do you anticipate that would be?

2                MR. DENTON:  I think it will be less than two hours,

3    your Honor.

4                THE COURT:  And so there's one witness in there or

5    two?

6                MR. ROCCO:  There may be two character witnesses,

7    Judge.  So they're relatively short.  But we'll make that

8    decision after Mr. Atilla's finished testifying.  The witnesses

9    will be here.

10               THE COURT:  After the cross of Mr. Atilla?

11               MR. ROCCO:  Yes.

12               THE COURT:  You'll decide.

13               MR. ROCCO:  Yes, but the witnesses know to be here.

14               THE COURT:  Okay.  So that means, if we can hold to

15   that, that would be terrific.  Again, if you can do it, that

16   would be terrific.  So that would mean we have our charge

17   conference tomorrow morning and then we move right to

18   summations and then me giving the jury instructions.

19               MS. FLEMING:  I'm sorry.  We just have to work out, we

20   have a translator on call in case we can't work out

21   stipulations.  I'm pretty confident we'll be able to work out

22   the translator stipulation.

23               We want to move the jailhouse recording of Reza Zarrab

24   into evidence where he talks to his uncle.  We have that

25   prepared.  I would like permission to hand it up to the Court

HCI3ATI1

1   to give the Court the day to look at it and the government to

2   look at it, and we'll file it this morning.

3          THE COURT:  You'll file it on the docket.

4          MS. FLEMING:  Thank you.

5          THE COURT:  Okay.  Good.  That's good progress.  So,

6   have a cup of coffee.  I don't think the jury was asked to be

7   here before 9:15 so we've got a half hour.  Great.

8          I did want to put one more thing on the record.  I

9   appreciate very much the marshals being able to produce

10  Mr. Atilla at this early hour.  It is not the normal practice

11  and I think they did that for the benefit of this charge

12  conference.  So, thanks very much.

13         (Recess)

14         THE COURT:  We're going to bring in the jury and

15  continue with Mr. Atilla's direct examination.

16         MS. FLEMING:  Judge, at a convenient point, Mr. Denton

17  might have something to say to you about the e-mails.

18  Convenient point is fine.

19         THE COURT:  Okay.

20         (Continued on next page)

21

22

23

24

25

HCI3ATI1                         Atilla - Direct

1              (Jury present)

2              THE COURT:  We're going to continue with the direct

3     examination of Mr. Atilla.

4              THE DEPUTY CLERK:  Sir, before we begin, I'd like to

5     remind you that you're still under oath.

6              THE WITNESS:  Yes.

7              MS. FLEMING:  Thank you, your Honor.  May I proceed?

8              THE COURT:  Yes.

9      HAKAN ATILLA,

10         called as a witness by the Defendant,

11         having been previously sworn, testified as follows:

12    DIRECT EXAMINATION (Continued)

13    BY MS. FLEMING:

14    Q.  On Friday, we were just finishing up April 2013.  We had

15    talked about the April 10, 2013 call from Mr. Zarrab and then

16    you went off to Barcelona.

17             MS. FLEMING:  Your Honor, we have 15-T which is in

18    evidence, 15 is the recording, we haven't played it yet.  I'd

19    like to play the recording and bring it up for the jury.

20             THE COURT:  Sure.

21    Q.  Mr. Atilla, on April 11, 2013, where were you?

22    A.  I was in Barcelona.

23    Q.  This is a call between Reza Zarrab and Abdullah Happani on

24    April 11, 2013.  Could we play the call, please.

25             (Audio recording playing)

1      MS. FLEMING:  Mine is not up.  Could you bring the

2 transcript up, please.  15-T.  Judge, I'm sorry.

3           THE COURT:  I don't have it either.

4           MS. FLEMING:  Thank you.

5           (Audio recording playing)

6 Q.  At any point up until April 11, 2013, had you had any

7 conversations with Mr. Zarrab on how to do pro formas related

8 to Royal and food transactions?

9 A.  I did not have any conversation about preparing of the

10 invoices with him at all.  But on the day before, he had

11 explained to me the general outline of how the trade would go.

12 Q.  Did you have any knowledge that Atlantis was a company that

13 was in any way affiliated with Reza Zarrab?

14 A.  I have no information.

15           MS. FLEMING:  Would you take that down, please.

16 Q.  Let's turn to another topic.  At any point did you ever

17 instruct Reza Zarrab on what destination to put on export

18 documents?

19 A.  I did not provide any instructions to neither Reza Zarrab

20 nor to any other customer.  The bank would provide regulations

21 to -- guidance to its customers, and the customers would decide

22 what to do with it.

23 Q.  From time to time, did you speak on the telephone with Reza

24 Zarrab?

25 A.  Yes, there were times.

1   Q.  Did you ever use code words in those conversations?

2   A.  When you say "code," do you mean to conceal its meaning?

3   Q.  Yes.

4   A.  Never.

5   Q.  Did you ever say "let's talk about this face to face

6   instead of on the phone" in any phone conversation?

7   A.  No, I did not make such a point to him.

8           MS. FLEMING:  Could we pull up Government Exhibit

9   229-T, please.

10  Q.  This is a call that is in evidence on February 21, 2013.

11  And if we could scroll to the next page, please, just so you

12  can look through it to remind yourself of it.

13          Do you remember hearing this call, Mr. Atilla?

14  A.  No, I do not remember.

15  Q.  If you go back to the first page, do you see there is a

16  reference, Mr. Zarrab is saying to Mr. Happani, "I talked to

17  Hakan.  They are going to transfer soon."  Do you see that?

18  A.  Yes, I see that.

19  Q.  Then a little farther down Mr. Zarrab says "Also call that

20  Mr. Zihni and tell him that Mr. Reza had talked to Mr. Hakan

21  and that there was a problem, but it has been resolved."

22          Do you see that?

23  A.  Yes, I see that.

24  Q.  Do you have any recollection of speaking to Mr. Zarrab in

25  February of 2013?

1    A.  No, there is nothing that would pertain to this particular

2    matter, no.

3    Q.  Who is Mr. Zihni?

4    A.  Mr. Zihni is a manager at a branch, and during that period,

5    he was most likely a branch manager.  And the reason why I say

6    that is because he has a different position at the present

7    time.

8    Q.  Would you in the course of your duties speak to customers

9    of the bank, significant customers of the bank to resolve

10   issues at the branch?

11   A.  This is something that's in the nature of business with

12   banking.  Customers may call you from time to time and convey

13   to you their complaints or any issues they might have on

14   different matters.  The branches may call you at times and

15   convey to you any issues that they might have on their own or

16   with their customers.  Other departments that are not

17   necessarily affiliated with me may call and convey to you

18   issues that they have.  And the general manager or the board of

19   directors that are above me may also call to convey issues.

20            Thus, there is no need for these to be in the job

21   description.  We try and resolve or take care of any matter

22   that we may be called with during the course of our business.

23   Q.  Do you recall that Mr. Zarrab testified that he discussed

24   with a number of people at Halkbank that he had -- he and his

25   companies had withdrawn a few billion euros and Turkish lira

1     from Halkbank?

2              Do you remember he testified to that?

3              MS. FLEMING:  You can take this down, please.

4     A.  Are you referring to his conversations with Halkbank

5     employees or are you referring to whether he said billions or

6     not?

7     Q.  I'm asking whether you remember that he said that he moved

8     a few billion euros and Turkish lira where they fulfilled

9     international money orders with -- he discussed it with five

10    different Halkbank employees.

11    A.  Yes, he said that that's what he had done.  I remember

12    that.

13    Q.  He said he told you and Mr. Aslan, Hakan Aydogan, Levent

14    Balkan, Saeed Ahmed; do you remember those names?

15    A.  I remember the names.

16    Q.  He did not identify that he discussed it with Ali Fuat,

17    correct?

18    A.  That is correct.

19    Q.  Did you ever have a conversation with Mr. Zarrab in which

20    he discussed with you that he had moved a few billion euros or

21    Turkish lira fulfilling international money orders received

22    from Iranians under the disguise of gold trade?

23    A.  Neither with Reza Zarrab nor with anyone else have I had

24    any conversations such as that one.

25    Q.  Did you have any kind of relationship with Reza Zarrab

1    outside of the bank?

2    A.  I have never seen him in my life outside of the bank.

3    Q.  Did you ever have a meal with him?

4    A.  I did not have any meals with him nor have I had any tea or

5    coffee with him either.

6    Q.  Did you like him?

7    A.  I can't say that I liked him.  But I cannot approach a

8    person with that because of the relationship that I would have

9    as a customer at the bank.

10   Q.  What did you know about him in terms of who he was, prior

11   to his arrest in December of 2013, other than being a customer

12   of the bank?

13   A.  He was married to a famous singer.  It was obvious that he

14   was a wealthy person that had money, that was obvious.  I know

15   that he had trade relationship with Iranian businessmen and

16   with Iran, close relationship with them.  I know that he worked

17   at a place where jewelers do business, which is called Grand

18   Bazaar in Turkey.  There might be other things that he does,

19   such as furniture, I don't know of any other business that he

20   does such as those.

21            But, he would be seen in entertainment magazines.  He

22   had a reputation back then, it was not like now.

23   Q.  Did he have a credit line at Halkbank?

24   A.  Yes, to the best of my knowledge, he did.

25   Q.  Do you know what the size of his credit line was during the

1   time period 2012 to 2014?

2   A.   I don't recall an exact number, but I remember that it was

3   around 40 to 50 million dollars.  The bank had provided him

4   with a loan in order to be able to buy a building to open a

5   hotel.  And I believe he also had an airplane that he had

6   bought through a leasing option.  And I know that he had

7   received that loan through a Halkbank affiliate leasing

8   company.  And I know that he also had credit and credibility

9   with the other private banks as well.  He would be among major

10  customers that would have large credit limits on a credit card.

11  Q.   Did you have anything to do with credit or lending at

12  Halkbank; was that part of your job responsibility?

13  A.   No, the credit matter would be outside of my job

14  responsibilities in general.  In rare circumstances, if a

15  project comes up that needs to be funded through a consortium

16  of a number of banks, I would be assisting in conversations

17  between our bank and the other banks.

18  Q.   Did you ever meet Abdullah Happani?

19  A.   No.

20  Q.   Do you know if you ever spoke to Abdullah Happani?

21  A.   No, I do not remember.

22  Q.   Do you know, did you ever meet Ruchan Bayar?

23  A.   No.

24  Q.   Did you ever speak to Ruchan Bayar?

25  A.   No.

1   Q.  Did you ever meet Mohammed Zarrab?

2   A.  No.

3   Q.  Do you know if you ever spoke to Mohammed Zarrab?

4   A.  No, I do not believe I talked to him.

5   Q.  Did you ever meet Kamelia Jamshidy?

6   A.  No, I did not.

7   Q.  Do you know if you ever spoke to Kamelia Jamshidy?

8   A.  No, I do not believe that I did.

9   Q.  Did you ever meet Mr. Mehmet Zafer C-A-G-L-A-Y-A-N?  Sorry.

10  I can't do the Turkish.  Sorry.

11  A.  I did not meet with him specifically during that time.  He

12  was acting or he was serving as a minister.  I encountered him

13  once during a speech that he gave during an organization that

14  was put together for businessmen.  And on one occasion, I saw

15  that he was on an airplane while I was going from Ankara to

16  Istanbul.  And that was a regular flight of Turkish Airlines.

17  I did not have any specific one-on-one meetings or any other

18  meetings with him.

19  Q.  Did you have any relationship with him?

20  A.  I had no relationship.

21  Q.  Did you ever meet Huseyin, again, I'll apologize in

22  advance -- N-A-J-A-F-Z-E-D-H?

23  A.  No, I do not recall that name to be a person that I've ever

24  met.

25  Q.  Do you know if you ever spoke with him?

HCI3ATI1                    Atilla – Direct

1    A.  No, I do not.

2    Q.  Do you know a person named Ahmet Alacaci?

3    A.  Yes, I know him.  He's one of the clients of the bank.

4    Q.  Other than being a client of the bank, do you have any

5    other relationship with him?

6    A.  No, I never met with him outside of the bank.  And outside

7    of him being a client of the bank, I do not have any

8    relationship with him.

9    Q.  Was Mr. Alacaci the competitor of Mr. Zarrab that we've

10   heard about in this trial?

11   A.  Yes, this is the one.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   Q.  And having read now Mr. Aslan's chats at Government

2   Exhibit 1002 and 1002-T, are there chats that relate to

3   Mr. Alacaci in there?

4   A.  I read that there were such conversations or chats during

5   my review of the discovery.

6   Q.  Before you were arrested in this case and read the

7   discovery, did you have any knowledge that -- withdrawn.

8           Before Mr. Aslan was arrested in December 2013, did

9   you have any knowledge that Mr. Zarrab was trying to freeze out

10  Mr. Alacaci as a competitor?

11  A.  No, I did not have any information on that.

12  Q.  Did Mr. Aslan ever tell you to treat Mr. Alacaci

13  differently than he told you to treat any other customer at

14  Halkbank?

15  A.  No.  I did not have any conversations or meetings that

16  would pertain to that matter.

17  Q.  What was your relationship while you were working with

18  Mr. Aslan?  What was your relationship with Mr. Aslan?

19  A.  In terms of business relations, since he is the general

20  manager, there are many topics that we'd have to talk about,

21  and I would converse with him very often.  And, of course,

22  there were ten to 12 -- I can't remember at this point -- other

23  deputy general managers that would talk with him too as the

24  general manager, and some of these deputy general managers

25  would speak with him more often than I would and some of them
```

1    would speak with him less often than I did.

2              But we did not have any relation outside of the bank,

3    in terms of a social relationship outside of the bank,

4    excluding any bank events that we might attend together.  He

5    was not an individual that I was seeing on a social basis.

6    Q.  Then -- please, go ahead, finish.

7    A.  I saw him outside of the bank only after he had been

8    separated from the bank and he was not the general manager

9    anymore.

10   Q.  And how did you see him outside the bank after he -- this

11   is after he was arrested?

12   A.  That was after he was released.

13   Q.  Did you travel with him on business at times while you were

14   working together?

15   A.  Certainly, many business travels we had together.

16   Q.  And did you like him?

17   A.  There was no feeling of liking or not liking that was

18   between us.  We respected each other's position, but we had

19   different views on life, and we just respected each other as

20   far as colleagues.

21   Q.  Did you ever meet his family?

22   A.  I had not met his family until after he had left the bank.

23   Q.  Did you meet his family after he was released from custody

24   in Turkey?

25   A.  Yes.  I did get to know his family because there is such a

1    custom in Turkey that whenever a colleague goes through an

2    issue, and when that issue is lifted, there is a custom of

3    seeing the family and talking about it.

4            So, for example, if someone loses a family member,

5    then you would visit with them.  If somebody goes in and out of

6    the prison, you would visit with them.  That's such a custom in

7    Turkey.

8    Q.  How many times did you visit with his family after he was

9    released?

10   A.  It was one time only that my wife and I went and visited

11   with them and told them to get better soon.

12   Q.  Did you ever discuss with Mr. Aslan his relationship

13   with --

14            THE INTERPRETER:  Could you please repeat the

15   question?  I'm sorry.

16   Q.  Did you ever discuss with Mr. Aslan his relationship with

17   Mr. Zarrab?

18   A.  I did not even know that he had a relation with him that I

19   would even have a conversation with him about it.

20   Q.  Prior to the arrest of Mr. Aslan and Mr. Zarrab in December

21   of 2013, did you have any knowledge that there was any money

22   exchanging hands between Mr. Zarrab and Mr. Aslan?

23   A.  No, I did not, and this was one of those things that

24   surprised me the most in my lifetime.

25   Q.  What surprised you the most in your lifetime?

1   A.  That they had a monetary relationship between them, and I

2   was surprised to see that there was money found in Suleyman

3   Aslan's residence.

4   Q.  Did you ever discuss it with him, meaning after he was

5   arrested?  Did you ever discuss that money was found at his

6   house?

7   A.  He made a statement about that later, and he had said that

8   the money had been entrusted, in a sense, for different

9   purposes and to be given to a different place.

10  Q.  And when you say made a statement, are you talking about he

11  made a statement to the courts in Turkey?

12  A.  That, and as much as also what he had said to other people.

13  Q.  I'd like to focus --

14          THE COURT:  What did he say to other people?

15          THE DEFENDANT:  He told me the same thing also, by the

16  way, to other people.  He had said that these were donations

17  that were slated for the establishment of a school and a

18  university.

19  Q.  And again, back in Turkey, in 2014, you did not have any of

20  Mr. Aslan's chats, did you?

21  A.  No, I did not have any information.

22  Q.  And you did not have and listen to the recordings that

23  you've listened to in the discovery in this case, correct?

24  A.  I listened to the recordings for the first time here.

25  Q.  And Mr. Aslan, did he ever offer you any money prior to

1    his -- at any time?  Did Mr. Aslan ever offer you any money?

2    A.  That never happened.

3    Q.  I'd like to focus on --

4              THE COURT:  I just had one quick question.  Do you

5    know what he does now, Mr. Aslan?

6              THE DEFENDANT:  I know that he's involved with a

7    consulting business, but I don't know any details about it.  So

8    I don't know with whom he works.  I don't know which companies

9    he serves.  I don't know that.

10             THE COURT:  Banks, does he consult with banks?

11             THE DEFENDANT:  No, I do not believe he consults with

12   banks because if he did, I would have knowledge of that.

13   BY MS. FLEMING:

14   Q.  I'd like to focus now on your knowledge of Halkbank's

15   policy in complying with various sanctions, and again, let's

16   focus back on the period 2010 to 2015, all right?

17             Was it Halkbank's policy to comply with the United

18   States' sanctions as a bank?  Was it their policy to comply

19   with sanctions?

20   A.  Yes, it was a bank that was trying to comply with the U.S.

21   sanctions, and I believe that it was a bank that complied with

22   them.

23   Q.  Now, I believe the other day -- and I don't want to repeat

24   the testimony.  So the other day I think you talked about the

25   various departments, sanctions and foreign operations, and how

they would generate information.  All right?  We already did

that, correct?

A.  Yes, that's correct.  These are the departments that would

deal with that matter.

Q.  Was there also a compliance department at Halkbank that had

some relationship to the U.S. sanctions?

A.  Both at Halkbank and all other Turkish banks, there is a

compliance department, and as I have mentioned previously,

these would be reporting directly to the board of directors.

Q.  Did Halkbank have computer software and computer programs

that helped it stay in touch with and comply with sanctions

programs?

A.  Yes.  To the best of my knowledge, they are using such

things.  I don't know the name of the program, but they are.

But if you'd like, I can explain to you how it works.

Q.  Please.

A.  With regards to the in-coming payment instructions which

come through the SWIFT system, and on these SWIFT instructions

would be written the parties, such as the sender and the

receiver, the type of goods involved, and the bank who's

intermediating in this transaction.  All of these would be

provided on the SWIFT.

         And also, to this, there would be some additional

information provided on the SWIFT with regard to some

individuals or institutions or entities.  So if there were to

1    be a name in there that may be banned, the filtration system

2    would work in such a way that variations of that name would

3    also be looked up.

4            For example, anything that has the word "Iran" in it

5    would be stuck there.  Anything that mentions "North Korea"

6    would be stuck there.  If it mentions "Cuba," it would get

7    stuck in there.  "Syria" would.  And also, any names that may

8    be on the sanctions list, any variations of such a name would

9    also be stuck in the filtering system.  So to provide an

10   example, say the name is "Hussein," any name that would be

11   close to that name in its variation would be stuck in that

12   filter.

13           So the system would check for these automatically, and

14   if there's any finding, then the sanctions and the compliance

15   departments would be notified.  And they would check into this,

16   and they would see if the issue that got stuck with the filter,

17   if it's problematic or not.  And they would go on accordingly

18   because there are times when things would get stuck even though

19   there's no issues.

20   Q.  You had meetings over the years with people at Treasury

21   Department of the United States and OFAC, right?

22   A.  That is correct.

23   Q.  And who did you meet with, again during this time period

24   2010 to 2014, '15?  Who do you remember meeting with on behalf

25   of Treasury or OFAC or other American representatives?

A.   In general, we would be meeting with the OFAC, the Treasury
and also with the embassy.  So there are so many names; so I
can't remember all of them, but there were names such as people
in charge of or people, who are up high in the organization,
such as David Cohen and Adam Szubin.  But these would be group
meetings, and they would not be one-on-one meetings with the
individuals.

Q.   By the way, did you recognize Adam Szubin when you saw him
in the courtroom?

A.   I could not recognize him.

Q.   Overall, how would you describe the relationship of
Halkbank with OFAC and Treasury and the embassy, from your
perception, during the years 2010 to 2015?

A.   Frankly, I believe that it was always positive, and it was
based on information sharing, because this was mentioned by
them many times, either when they came over to visit us or when
we went over to visit with them.

        At the same time, our relations with the embassy, the
U.S. embassy, were also very good.  In general, they would
invite us to their important meetings.  They would specifically
invite us over to their 4th of July event every year, and I
would try, as much as I can, to attend these.  In other words,
during these five or six years, I did not witness anything that
I would describe as being negative in our relationships with
them.

HCIPATI2                    Atilla - Direct

1   Q.  At the beginning of the relationships that you observed

2   between OFAC/Treasury and Halkbank, did there come a point

3   where some information ended up in Wikipedia -- WikiLeaks.

4   Sorry, WikiLeaks.  Would you describe what happened?

5            MR. DENTON:  Your Honor, we may need a sidebar on

6   this.

7            THE COURT:  Okay.  Hold on.

8            (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            (At the side bar)

2            MR. DENTON:  So just to be clear, what this refers to

3    is release of classified information that was published by

4    WikiLeaks.  The information is still classified.  We discussed

5    this issue with Mr. Rocco in connection with the

6    cross-examination of the Treasury witnesses, and our

7    understanding was that the defense was not planning to bring

8    this up.  I just want to make sure we don't end up in a

9    situation where information that is still classified is being

10   asked about.

11           MS. FLEMING:  I honestly didn't understand that that's

12   what it was.  It's in WikiLeaks, but all I would ask him about

13   is that they were a little sensitive about information because

14   it ended up in WikiLeaks.  I wasn't going to ask him what the

15   information was.  I was just going to go to the story about --

16   in terms of the sensitivity, about how much detail was shared.

17   I wasn't going go into it.

18           THE COURT:  Now you confused me.  What do you want to

19   do with it?

20           MS. FLEMING:  The only point is whenever they're

21   sharing information, a lot of details --

22           THE COURT:  "They" being?

23           MS. FLEMING:  Halkbank.  And some of the information

24   ended up in WikiLeaks; so they were -- both sides were just

25   more careful in terms of what they said in these meetings.  I

HCIPATI2                        Atilla - Direct

1    wasn't going to go into what was said.

2              MR. DENTON:  I think that's fine.  I just think the

3    questions need to be framed pretty carefully.

4              MS. FLEMING:  I'll lead in the area.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (In open court)

2       BY MS. FLEMING:

3       Q.  Mr. Atilla, without going into any information that was

4       contained in WikiLeaks, could you just tell the story of how it

5       happened to -- what happened with regard to WikiLeaks, but

6       don't tell us what was in WikiLeaks?  If I said it properly.

7       We're not interested in the information, just the process.

8                  THE COURT:  That's going to be some story.  Would you

9       rephrase the question.  I don't know what you mean by "tell the

10      story."  Maybe, how did it come about that there was

11      information in WikiLeaks?

12                 MS. FLEMING:  Great question.  Do you want to take

13      over?

14                 THE COURT:  No.

15                 MS. FLEMING:  Trade places?

16                 THE COURT:  I don't.

17      BY MS. FLEMING:

18      Q.  How did it come about that there was some information that

19      ended up in WikiLeaks?

20      A.  As far as I know, some information about United States

21      information had leaked out.  There were some details about our

22      meetings.  I personally did not take place in those meetings,

23      but there was some information about the Treasury and some

24      information from our meetings there.

25      Q.  All right.  Let's go back to the meeting that you attended.

1    When you attended these meetings, and let's focus on the

2    meetings -- did you attend meetings with a CEO before Mr. Aslan

3    with OFAC Treasury?

4            THE COURT:  I didn't get the question.

5    Q.  Was there a CEO before Mr. Aslan who attended OFAC and

6    Treasury meetings with you?

7    A.  I'm not sure if a CEO before Mr. Aslan attended those

8    meetings, but there were, of course, some upper-management

9    people, other people who attended those meetings.  I believe

10   the general manager before Mr. Aslan did not attend those

11   meetings because he didn't speak English.  He didn't have an

12   English education.

13   Q.  When you were at meetings with Mr. Aslan, when you -- and

14   other people, but when Mr. Aslan was at the meetings with

15   people from Halkbank and there were people from OFAC and

16   Treasury, would you describe who would speak at the meetings?

17   A.  First of all, Mr. Aslan would attend all those meetings, if

18   he had like a special excuse or something.  And there would be

19   people from the operations department and also from treasury

20   department, meaning the treasury in Halkbank.  Because thinking

21   that there could be topics that would be of interest to all

22   these parties, and on the other side, there would be

23   representatives from the Treasury and also representatives from

24   the United States embassy.

25           And usually the U.S. embassy would accompany the

1    people coming from OFAC and the Treasury.  And these meetings

2    would be directed by those who had the highest rank, and if

3    Mr. Cohen was there and Mr. Suleyman Aslan was there, the

4    meeting would be between the two of them.  And the others, the

5    others including me, we would usually contribute towards the

6    end.  If there was a question or if there was a technical

7    matter, then we would do that towards the end of the meeting.

8           And if Mr. Aslan did not attend the meeting, then I

9    would be directing the meeting, or the deputy general manager

10   who's responsible from the treasury department would direct the

11   meeting.

12   Q.  Do you remember also having meetings with people at the

13   United States embassy about the same subjects that came up with

14   OFAC and Treasury?

15   A.  Yes, I remember such meetings.  We were in close

16   relationship with the embassy.  If they had any questions about

17   the economy, they had other questions, they would want to have

18   meetings with the bank, and I had no problem giving updates to

19   them, since I was already updating the investors all the time.

20   But there would sometimes appear some problems between the

21   American embassy and the American Treasury.

22   Q.  What do you mean by that?

23   A.  As far as I remember, Mr. Suleyman Aslan would discuss some

24   issues directly with the embassy, with the Ambassador, and once

25   at the meeting, when he told Mr. Cohen that they discussed this

 1    with the Ambassador, and Mr. Cohen said, listen to what we say;

 2    not what the embassy says.  That was confusing for us.  At that

 3    time, we realized that the parties had different views.  They

 4    were different.

 5    Q.  Could we pull up Government Exhibit 748, please.  I believe

 6    it's in evidence.  And do you recognize this?

 7    A.  I remember this.

 8    Q.  What is this, Government's Exhibit 748?

 9    A.  This is the draft of a letter prepared to -- sent to

10    Mr. Cohen.

11    Q.  Now, can I direct your attention to the third paragraph

12    that starts:  "Meanwhile, we've also consulted with the U.S.

13    embassy in Ankara"?

14    A.  Yes, I see it.

15    Q.  Does that relate to the anecdote you just told us about

16    Mr. Cohen and his response about sharing things with the United

17    States embassy?

18    A.  Yes.

19              MS. FLEMING:  Take that down.

20    Q.  Now, incidentally, in these meetings, and without going

21    into what was discussed, were there topics of discussions

22    besides Iranian sanctions that were discussed with people with

23    OFAC and Treasury?

24    A.  Yes, we did discuss different topics.

25    Q.  And I think you told us the other day that Turkish banking

1    regulations prevent discussion of specific items related to

2    Turkish banking customers; isn't that correct?

3    A.   That's correct.  Within the framework of customer

4    confidentiality, we cannot discuss the details, but I believe

5    that we can give information if a certain person works with the

6    bank or not.  I don't think there is a problem with that.

7    Q.   Prior to October 2014, did anyone from OFAC or Treasury

8    ever tell you that you should stay away from Reza Zarrab?

9    A.   No, there was no such warning.  Actually, around 2012 when

10   the gold exports really went up, the American Treasury was

11   aware of it.  And in 2014, in October meeting, this topic again

12   came to the -- we discussed this topic again.

13            And at that meeting, we asked them if there was any

14   issues that we are not aware of it, if there's an issue that we

15   should know about so that, you know, if this is subject to

16   sanctions, if there's any issue sanctionable here, and they

17   said there's no such issues.  They said that they had no

18   decision to include that name in the sanctions list.

19   Q.   Which name?

20   A.   Reza Zarrab's name.

21   Q.   That was a conversation at the October 2014 meeting with

22   OFAC?

23   A.   Yes, that's how I remember it.

24   Q.   Let's go back and do earlier meetings.  Do it

25   chronologically.  Okay.  Could we pull up Government

1   Exhibit 7002, which is in evidence.  Do you recognize

2   Government Exhibit 7002?

3   A.  Yes, I do.

4   Q.  All right.  Can you explain what Government Exhibit 7002

5   is?

6   A.  Mr. Aslan is explaining to Mr. Cohen that the bank

7   intermediates the transactions to Indian petroleum companies.

8   Do we need more details?

9   Q.  Why are you advising OFAC of this?

10  A.  I believe Mr. Cohen asked about this after a news, I

11  believe either on the Bloomberg or Reuter's.  And we, as the

12  bank, actually, Mr. Suleyman Aslan, is explaining what the

13  issue is here.

14          The Indian petroleum companies wanted to make the

15  payment for petroleum they imported from Iran through

16  Halkbank —— the payments through Halkbank, and initially

17  Halkbank refused this.  Later on, the Indian Central Bank and

18  their finance ministry came into the picture, and they informed

19  us that these companies are credible and reputable companies

20  because we had no idea about these companies, them being Indian

21  companies.  When they assured us, when their guarantee again

22  came into the picture, as the bank, we said okay.

23  Q.  We'll go into Indian companies in a little bit.  You can

24  take that down.  I want to direct your attention to a

25  February 12th, 2013, meeting with Adam Szubin.  So could we

1    please pull up Government Exhibit 7020, which is in evidence.

2    It may be more helpful to go to the second page.

3          Now, do you remember Mr. Szubin testifying about

4    meeting with you on February 13 -- sorry, February 12, 2013?

5    A.  Yes, I do remember.

6    Q.  And among other things is, he said he had a private

7    pull-aside with you.  Do you remember him testifying to a

8    private pull-aside?

9    A.  Such a thing did not happen.

10   Q.  Do you remember who else was at this meeting in

11   February 2012 -- sorry, February 12, 2013?

12   A.  I don't remember all the names, but there were numerous

13   people from the bank.  Maybe Mr. Suleyman Aslan was there too.

14   Q.  And do you recall him saying that you were nervous and

15   sweating, if we could use that term?  Do you remember him

16   testifying to that?

17   A.  I do remember.

18   Q.  Are you nervous testifying at this trial?

19   A.  Yes, very much so.

20   Q.  I'd like to direct your attention to the third page of

21   Government Exhibit 7020 and, specifically, in paragraph 8.  Do

22   you see that Halk had questions about what kind of gold trade

23   would be allowed, if any, after July 1?

24   A.  Yes, I see it.

25   Q.  And do you notice, if you go further down, there's a

1    sentence that says:  "Halk explained it had great difficulty in

2    trying to determine the origin of these trades and the ultimate

3    destination"?

4    A.  Yes, I see it.

5    Q.  Do you remember this conversation?

6    A.  I remember this topic.

7    Q.  What do you remember?

8    A.  Our friend from the operations department, who is

9    responsible for the operations, brought this topic to the

10   agenda, because it didn't seem quite possible to determine the

11   origin of the gold in gold bar sales.  Because whichever

12   country stamps the goods -- stamps the gold, it looks like the

13   gold belongs to that country.

14           Normally, the gold is processed as its origin is from

15   Switzerland or from Turkey, but for gold, it wasn't quite

16   possible to make an analysis and determine what part of the

17   gold belongs to Switzerland, what part belongs to Turkey.  It

18   was difficult to determine the origin.  That's why it was

19   assumed that if there is a Turkey stamp on it, its origin was

20   from Turkey.

21   Q.  Do you remember that Mr. Szubin testified that every time

22   it said "Halk" in this memo, that meant Mr. Atilla?  Do you

23   remember he testified that way?

24   A.  I do remember.  May I also add another detail regarding the

25   previous question, please?

1   Q.  Sure.

2   A.  Because I couldn't explain the parts regarding to the

3   destination.

4   Q.  I'm sorry.  Please.

5   A.  Regarding the final destination, because gold a material, a

6   good that can be carried easily, it's not very easy to

7   determine the ultimate destination, the final destination

8   because it's easily transportable.

9   Q.  And, in fact, didn't Halkbank require, at least at some

10  point, that gold sellers provide boarding passes for the people

11  carrying gold to Iran to Halkbank as part of the documentation?

12  A.  That's correct, but I'm not sure if it was required all the

13  time, or it was required from time to time to make some, like,

14  checks, controls.

15  Q.  By the way, these documentation requirements that Halkbank

16  put in place, were they required by regulation, or were they

17  required by Halkbank?

18  A.  It's a very detailed subject area, but let me try to

19  summarize it.  As far as I know, normally it doesn't say it --

20  it is not written anywhere which documents a bank should

21  require.  It's not written in the Turkish legislation, and I

22  don't think in the American Treasury it's not written anywhere.

23          However, in international trade, there are three or

24  four different types of payments.  One of them is called a

25  letter of credit, and the meaning of this is the bank

1    functioning as a bridge between the exporter and importer.  If

2    the importer wants to complete the transaction without trusting

3    in the exporter, through the letter of credit he could -- the

4    company could make a request to require certain documents to

5    complete the transaction.

6           For example, let's say they're trying to export cell

7    phones -- import a cell phone.  With loading the shipment, they

8    could show us the loading, the invoice, and the quality of the

9    goods, and it would check the insurance of the loading and the

10   goods, and they could include all of this through the letter of

11   credit.  Therefore, the importer's bank cannot do the payment

12   without controlling all these documents that listed, and this

13   request of the completion of the documents would come from the

14   importer.

15          If there is no letter of credit between the importers

16   and exporters, and if the importer made the payment directly

17   and didn't request anything from the bank, at that point, it

18   would be up to the bank which documents the bank would request.

19          THE COURT:  Does the government of Turkey have a

20   banking department?

21          THE DEFENDANT:  There is an organization that will

22   control the legislation of the banking.

23          THE COURT:  No, but is there a department in the

24   Turkish government that is in charge of banking, like the

25   Treasury Department?

1            THE DEFENDANT:  There is the Turkish Treasury.  There

2       is the Turkish Treasury, but there is another organization

3       called the EDDK that would control the banking.  This is an

4       independent organization.  It's not controlled by the

5       government.

6            THE COURT:  But in the Treasury Department, there's no

7       banking function?

8            THE DEFENDANT:  No, there isn't any.  But this

9       organization that I mentioned is very effective, and it's very

10      detailed, and this is the organization that will establish the

11      legislation about banking.

12           THE COURT:  And the regulations for banks in Turkey?

13           THE DEFENDANT:  Yes, they are the ones.  They have the

14      power of closing the banks or punishing the banks for certain

15      activities.  And usually the American Treasury personnel would

16      have meetings with them as well.  And I know that in some of

17      the meetings, Mr. Cohen had a carbon copy of the agenda of the

18      meeting through that organization.

19           THE COURT:  And that organization would issue

20      regulations that Turkish banks have to comply with or no?

21           THE DEFENDANT:  Yes, and that regulations would be

22      very detailed and broad.  Of course, there is a Central Bank in

23      Turkey as well and, of course, they have some effects on

24      regulations as well, but this other organization is more

25      active.

1    BY MS. FLEMING:

2    Q.  Let's go back to Government Exhibit 7020.  Okay?

3              THE COURT:  Is that this one that's on the screen?

4              MS. FLEMING:  Yes.  But can we take down the emphasis

5    here so I can go to another paragraph.

6    Q.  What I had said before we got off on the regulations was,

7    were you the only person who spoke at the meeting on

8    February 12th, 2013?

9    A.  I don't remember exactly who spoke, what or how much they

10   spoke.  Of course, if somebody wants to say something, you

11   cannot prevent them, but I'm sure there were many people who

12   had conversation at that meeting.

13   Q.  Could we focus on the middle of paragraph 9, please.

14   There's a line that says:  "Halk also never allows transfer of

15   dollar accounts;" do you see that?

16   A.  Yes, I see it.

17   Q.  Can you explain what -- does Halk allow transfer of dollar

18   amounts in connection with Iranian transactions?

19   A.  No, there is no transfers to Iranian organizations or

20   Iranian people through Halk.  We don't allow that.  One or two

21   different exceptions.  If American company wants to sell food

22   to Iran, and if they want to do that through Halkbank, we could

23   give exemptions to those companies.

24   Q.  Okay.  At the top of paragraph 9, it said:  "Halk and

25   Szubin discussed the South Korea case at length"?

1    A.  Yes, I see it.

2    Q.  And then it says:  "Halk noted that South Korean banks had

3    asked Halk to set up a relationship, likely driven by the

4    accumulating Iranian deposits.  Halk turned them down."  Do you

5    see that?

6    A.  Yes, I see it.

7    Q.  Do you remember what that's about?

8    A.  At times, there are requests from other banks to Halkbank

9    about a transferring the funds between countries and the

10   accounts.  Then Halkbank would talk in between themselves about

11   this request, and if they don't see actual corresponding bank

12   or actual reason to do this, they would turn them down.

13   Q.  You can take that down.

14        Now, this meeting was in February of 2013, right?

15   A.  That's what it says in this document.

16   Q.  And that's before your trip to Barcelona, correct?

17   A.  Yes, according to this date, that's correct.

18        THE COURT:  Counsel, I just have a quick question on

19   the document before -- the letter from Aslan to OFAC, Cohen.

20   Could you pop that up?

21        MS. FLEMING:  The draft?  Sure.  It's 748.

22        THE COURT:  Can you be a little clearer with that, or

23   no?

24        MS. FLEMING:  Is this the one you wanted, Judge?

25        THE COURT:  I just wanted to know the date.  What was

1    the date of that letter?

2                THE DEFENDANT:  21st of December, 2012.

3                THE COURT:  And if you could go back to the letter

4    that was -- is this the letter you did immediately before this?

5    I thought it was in April.

6                MS. FLEMING:  2002?

7                THE COURT:  2011 was it?  Yes, that's the one you were

8    talking about immediately before this, right?

9                THE DEFENDANT:  Yes.  This is dated August 18, 2011.

10               MS. FLEMING:  And, Judge, I'm going to come to an

11   Indian section.

12               THE COURT:  No, I just had a question.

13               MS. FLEMING:  Okay.

14               THE COURT:  So you see down there, this is 2011, and

15   it was -- Aslan was the GM at the time of the bank?

16               THE DEFENDANT:  I remember that he was just assigned.

17               THE COURT:  Okay.  So if you could just, the

18   second-to-the-last paragraph says:  "Needless to say."  It says

19   that:  "We confirm that no oil payments from India, or

20   elsewhere, do flow to or through U.S.-designated individuals or

21   entities."  Do you see that?

22               THE DEFENDANT:  Yes, I see it.

23               THE COURT:  What does he mean by that, "Do flow to or

24   through U.S.-designated individuals or entities"?  These are

25   payments he's talking about?

1              THE DEFENDANT:  Absolutely.  Payments -- and the

2       payments were being done by Euro currency.  Therefore, all the

3       funds that were sent from Iranian -- from Indians were being

4       through Euro currency and through Halkbank.  There were no

5       allowance of any U.S. dollars to be used as transfers.

6              THE COURT:  And that says "is per longstanding

7       discussions regarding Halkbank's commitment to international

8       sanctions against Iran;" is that --

9              THE DEFENDANT:  That's correct.  There was a

10      discussion and there was a decision about not making any

11      payments to individuals or entities who were related to Iran.

12             THE COURT:  And no oil payments would throw to or

13      through any U.S. designated individuals or entities?

14             THE DEFENDANT:  That's correct.

15             THE COURT:  Entities, would that include U.S. banks?

16             THE DEFENDANT:  Correct.

17             THE COURT:  Thanks.

18             MS. FLEMING:  All right.  And since his Honor gave me

19      time to look back at my notes, could we pull 7020 back up?

20             THE COURT:  Sure.

21             MS. FLEMING:  And go to the fourth page, please.

22      BY MS. FLEMING:

23      Q.  Looking at paragraph 10, there's a paragraph which asks

24      about whether Iranians could buy Turkish Treasury bonds.  Do

25      you see that?

1    A.  Yes, I see that.

2    Q.  Do you remember this conversation?

3    A.  I remember the subject.

4    Q.  All right.  Could you describe what you remember about this

5    subject?

6    A.  We are asking about Iranian entities or individuals being

7    able to invest in Turkish Treasury bonds because the banks can

8    intermediate the Turkish Treasury bonds as sales, and sometimes

9    there are requests from the Iranian sides to invest on these

10   Treasury bonds.  Sometimes the investment is attractive.

11   That's what we are asking to them.

12   Q.  And at that point, Adam Szubin noted there was no problem

13   in law; do you see that?

14   A.  Yes, that's what he stated, but I'm not in agreement with

15   him.

16   Q.  Did Halkbank, in fact, sell Treasury bonds to Iranians at

17   this time?

18   A.  Even Mr. Szubin announced that there is no problem in law

19   for this.  I did not agree with him, and we did not sell any

20   Treasury bonds because I didn't think it would go with the

21   rules.  After that, a month later, when the subject came up

22   again, there was a different opinions in the bank -- there were

23   different opinions in the bank.

24          I was at the side that was thinking that we wouldn't

25   sell these bonds.  Therefore, we asked to OFAC again.  We asked

HCIPATI2                    Atilla - Direct

1   through an official e-mail.  At that time, they said the sale

2   of these bonds were not available or wouldn't be allowed.

3   Q.  Do you remember when that was?

4   A.  I don't remember the exact date, but ...

5   Q.  Do you remember how long it took between the time you asked

6   the question and the time you got the answer from OFAC?

7   A.  The times of the answers differs.  Sometimes there is no

8   answer for months.  Sometimes there is answer immediately.

9             MS. FLEMING:  Can we pull up, I believe just for the

10  witness -- I don't know if this is in evidence -- Government

11  Exhibit 7003.  Just a minute, please.

12            THE COURT:  Sure.  We'll take a five-minute break.

13            (Jury not present)

14            Great.  Okay.  See you in five.

15            (Recess)

16            (Continued on next page)

17

18

19

20

21

22

23

24

25

HCI3ATI3                      Atilla - Direct

1              (In open court; jury not present)

2              THE COURT:  Ms. Fleming, how we doing?

3              MS. FLEMING:  I'm moving well.

4              (Jury present)

5              THE DEPUTY CLERK:  Sir, just to remind you, you're

6     still under oath.

7              MS. FLEMING:  Your Honor, may I proceed?

8              THE COURT:  Yes.

9              MS. FLEMING:  Could you show just Mr. Atilla, please,

10    Government Exhibit 703 and 704.  7003 and 7004.

11             Could you show him one at a time, 7003 the whole thing

12    and 7,004 the whole thing.

13             MR. DENTON:  Your Honor, we have no objection to these

14    if they want to offer them.

15             MS. FLEMING:  Move Government Exhibit 7003 and 7004

16    into evidence.

17             (Government's Exhibit 7003, 7004 received in evidence)

18    Q.  Showing you what's been marked as Government Exhibit 7,003

19    which you can show the jury, please.  Which is an e-mail from a

20    woman named Selin -- I won't try her last name -- at Halkbank

21    to Dennis Wood on June 20, 2012.

22             Do you see that?

23    A.  Yes, I see it.

24    Q.  Who is Selin?

25    A.  Selin is the department head that works at the financial

HCI3ATI3                    Atilla - Direct

1    institutions department.

2    Q.  Who is Dennis Wood?

3          THE INTERPRETER:  The answer was continuing here,

4    sorry.  I did not hear what you just said.

5    Q.  I'm sorry.

6    A.  She was just under the department head level.

7    Q.  Who is Dennis Wood?

8    A.  I presumed he works at the U.S. Treasury but I don't know.

9    Q.  Could we please put up 7004 which is in evidence.  These

10   are e-mails that relate to -- these are June 2012 e-mails

11   relating to SACE.  Do you see that?

12   A.  Yes, I see that.

13   Q.  Could you just explain briefly what is going on here with

14   regard to SACE, Halkbank, and Treasury?

15   A.  SACE is an Italian XM organization.  In other words, it is

16   an organization that provides funding for those companies that

17   are buying the goods that Italian companies are exporting.

18         To the best of my recollection, they had provided

19   funding to the Iranian companies that had bought Italian

20   products.  And they wanted to get the repayment or payment for

21   these funds that they had given out.  That's what I remember,

22   and based on this matter, they're asking Halkbank to assist.

23         That this Italian organization needed assistance was

24   conveyed on to me.  And I requested that OFAC be consulted with

25   regards to this matter.  Because this was not a matter that

HCI3ATI3                        Atilla - Direct

1   directly involved Turkey or Halkbank.  So, I said that we could

2   assist, but the OFAC would need to clear it up or clarify.

3   Because I did not know how they had financed -- or what the

4   financial terms were.

5           MS. FLEMING:  Could we pull up Government Exhibit 7108

6   for the witness, unless -- could I show page two, please.

7           MR. DENTON:  We have no objection to this one either.

8           MS. FLEMING:  Your Honor, we move 7108 into evidence.

9   Government Exhibit.

10          THE COURT:  Sure, I'll allow it.

11          (Government's Exhibit 7109 received in evidence)

12  Q.  Do you see that Government Exhibit 7108 is a letter dated

13  August 16, 2012, from the Department of the Treasury to

14  Mr. Alessandro Castellano and it's copied to Halkbank.  Do you

15  see that from OFAC?

16  A.  Yes, I see that.

17  Q.  Is this letter a response to an inquiry to OFAC as to

18  whether Halkbank can help process the transactions that were

19  described in the e-mails that were just shown to the jury?

20  A.  Yes.

21  Q.  Do you recall having --

22          MS. FLEMING:  You can take that down, please.

23  Q.  Do you recall having a meeting with David Cohen in

24  September 2012?

25  A.  I apologize but I don't recall the date.

1          MS. FLEMING:  Could we put up for Mr. Atilla Defense

2     Exhibit 319.

3     Q.  Do you remember having a meeting at some point with David

4     Cohen?

5     A.  I had many meetings with Mr. Cohen, but if your question is

6     specifically on this one, then if you will allow me I'd like

7     into this to know.

8          MS. FLEMING:  I'm advised it is already in evidence as

9     GX 7028 in evidence if you can pull it up.

10         Michael, can you pull it up for us?

11         Just go ahead and publish that one.  You can publish

12    that to the jury.

13    Q.  I'm interested particularly in paragraph five and six.  Do

14    you see that -- do you see in a conversation about some private

15    Iranian banks may be abusing their access to Halk in order to

16    facilitate proliferation related transactions?  Do you see that

17    in paragraph five?

18    A.  Yes, I see that.

19    Q.  Right after that, Halk said that they would be pleased to

20    immediately suspend their correspondent or trading relations

21    with any entities that Treasury could name that might be

22    engaging in activities of concern.

23         Do you see that?

24    A.  Yes, I see that.

25    Q.  Did anyone from OFAC or Treasury give you any names of

HCI3ATI3                    Atilla - Direct

1    people that they would suggest were of concern that you should

2    suspend trading with?

3    A.   That was provided in the year of 2010.  During a visit in

4    2010, they mentioned that some banks had certain other labels

5    associated with them, and they explained to us what these

6    labels meant.  And during that period, the banks that they had

7    provided us with names for, we ended our relationships with

8    those banks.

9            But during this meeting they did not provide any

10   names.

11   Q.   So, if I understand you correctly, at a prior meeting in

12   2010, OFAC representatives provided with you names of banks

13   that they were concerned about, and you stopped having

14   relationships with those banks?

15   A.   Yes, I personally went ahead and told them that we would

16   not be working with those banks.

17   Q.   In 2010.

18   A.   Yes.  In 2010, and I don't know how many, but it could have

19   been five or six or perhaps seven or eight banks.

20   Q.   In this meeting in September 2012, if I can direct your

21   attention to paragraph six, Halk offered that they had been

22   approached roughly a year ago informally by the CBI to help

23   facilitate its acquisition of gold, but Halk refused.

24           Do you see that?

25   A.   Yes, I see that.

1   Q.  Do you remember this conversation specifically?

2   A.  I apologize but I cannot recall any conversation

3   specifically.

4   Q.  Is it fair to say that it's difficult to remember who

5   specifically is at what meeting?

6   A.  Yes, that would be fair.  And frankly, unless there was any

7   specific reference, recollection or topic, when you consider

8   the meetings that a banker attends on an annual basis, it is

9   very difficult to recall who was at what meeting.  Even in

10  those years where we could say that there weren't that many

11  meetings, I would surmise that I might have attended 500 to 600

12  meetings in that year.

13  Q.  It helps if there are notes that say who was where; is that

14  correct?

15  A.  Absolutely.

16          MS. FLEMING:  Could we pull up Government Exhibit

17  7006, please.

18  Q.  I'd like to show you the second page of Government Exhibit

19  7006.  This is in evidence so the jury can see it.

20          Do you see where, if you look at the third page, this

21  is signed by Adam Szubin.  Do you see that?

22  A.  Yes, I see that.

23  Q.  Do you see that Adam Szubin says this is a follow up on my

24  meeting last week, your meeting last week with Undersecretary

25  Cohen and my February 12 meeting with Deputy General Manager

1    Atilla.

2              You see that?

3    A.  Yes.

4    Q.  Does that help you at all as to whether Mr. Aslan was in

5    fact at the February 12 meeting with Adam Szubin and yourself?

6    A.  Not necessarily.  But as I said previously, unless there

7    was a major reason why Suleyman Aslan could not attend a

8    meeting, he would be present at all meetings.

9    Q.  If you look down --

10             THE COURT:  I don't understand your question.  What

11   was your question?

12             MS. FLEMING:  I basically asked if it changed whether

13   Mr. Aslan was at the meeting.

14             THE COURT:  I think this talks about two meetings.

15             MS. FLEMING:  Right.  I was asking whether --

16             THE COURT:  Could you highlight that again.  Right.

17   So there is one meeting last week.

18             MS. FLEMING:  It is addressed to Mr. Aslan, the

19   letter.

20             THE COURT:  Right.  So one meeting would be in March;

21   is that correct?

22             MS. FLEMING:  Right.

23             THE COURT:  And another meeting in February 12.

24             MS. FLEMING:  Right.

25             THE COURT:  And your question covered both meetings or

1   what?

2            MS. FLEMING:  My question was whether the reference to

3   the February 12 meeting with Deputy General Manager Atilla,

4   whether that meant anything in terms of whether Mr. Aslan was

5   in fact at that February 12 meeting or not.

6            THE COURT:  And the answer?

7            THE WITNESS:  Unfortunately, it did not refresh my

8   mind.

9            THE COURT:  I see.  Okay.  You were just asking about

10  February 12, not about the meeting in March.

11           MS. FLEMING:  Right.

12  Q.  If we go down to the third paragraph.  Can you explain what

13  a certificate of origin for bilateral Turkish exports to Iran

14  before processing the related payments means?

15  A.  Based on the regulation that was put in effect on

16  February 6, 2013, there was a clause in there that said that

17  the trade between the two countries would need to be bilateral.

18  And because of that, the bank had started checking whether the

19  goods being sold from Turkey were -- or had the origin of

20  Turkey.  Because we had stopped intermediating the buying and

21  selling of goods by other countries.

22           In other words, there was no intermediation for third

23  countries' buying and selling activities.  And in terms of

24  whether the goods being sold from Turkey were made in Turkey or

25  not, the chamber of commerce could verify that.  And of course

1    this applies to industrial goods.

2    Q.  In the paragraph above, there is also a reference to after

3    talking about the narrowing of the law, the Department of the

4    Treasury says our understanding is these restrictions include

5    no cash withdrawals or check writing, and no transfers within

6    Turkey to another financial institution.  Can you explain that?

7    A.  Yes, I see that.

8    Q.  What does that mean?

9    A.  It basically says that alternative payment methods such as

10   cash withdrawals or check writing could not be used either.  Or

11   in short, it is saying that any Iranian company or Iranian

12   individual cannot withdraw cash.

13   Q.  The sentence above it says that these are restrictions that

14   have been imposed on Central Bank of Iran accounts and all

15   private non-designated Iranian bank accounts that it hosts.

16   Correct?

17   A.  Yes, I see that.

18   Q.  This didn't apply to all accounts at Halkbank, did it?

19   A.  If you'll please let me read it.

20              (Pause)

21   A.  I could not understand what it is saying here exactly.  So,

22   I need interpretation help.

23              (Pause)

24   Q.  I'll withdraw it.  It's all right.  I'll withdraw the

25   question.

1           If you look down at the fourth paragraph in the

2    letter, it specifically says Mr. Atilla asked.  Do you see

3    that?

4    A.  Yes, I see that.

5    Q.  It describes that Mr. Atilla asked whether it would be

6    potentially sanctionable to allow a private non-designated

7    Iranian bank to transfer funds from an account it holds in a

8    third country to its account at Halkbank and then goes on.

9           Do you see that?

10   A.  Yes, I see that.

11   Q.  If you go down to the next paragraph in this letter

12   addressed to Mr. Aslan, it says you also asked Secretary Cohen

13   whether it would be potentially sanctionable to transfer oil

14   revenue held in a third country, etc., etc.  Do you see that?

15   A.  Yes, I see that.

16   Q.  Does this letter and the way it's phrased help you identify

17   what you specifically said as opposed to what any of your

18   colleagues or Mr. Aslan said in any of these meetings?

19   A.  I do recall this topic.  I don't know whether it was

20   brought up by me or by someone else, but I do recall that it

21   was brought up and it was also discussed in ongoing

22   conversations afterwards.  It was actually a simple matter.

23   And if you'd like, I can explain it.

24   Q.  Please.

25   A.  The countries that do trade with Iran may have funds that

1    are not necessarily Iranian oil funds.  For example, Turkey

2    might sell furniture or textile products.  And any payments

3    that are made with Iran with regards to these goods are kept in

4    different accounts.  Likewise, there are other products that

5    are purchased by Turkey from Iran, other than petroleum

6    products.  And these funds were being maintained in different

7    accounts, as I had said.  And these funds would not be subject

8    to many of the sanctions because they're not related to

9    petroleum proceeds.

10              So, what I'm asking was that whether there would be

11   any problem with transferring money that is not related to oil

12   proceeds from any other countries.  Or, if possible, whether

13   the payments for global companies with regards to humanitarian

14   trade may be paid or not.

15   Q.  Without going through a lot of examples, were there

16   other -- and putting aside what we've talked about in the

17   trial, were there other banks from other countries --

18   withdrawn.  I'll do it differently later.

19              Going back to Mr. Zarrab's testimony about the

20   October 4 meeting that he said you attended with three

21   Iranians, Mr. Aslan, and himself; do you remember his testimony

22   about that?

23   A.  Yes.

24   Q.  I believe you already told us that you did not attend any

25   such meeting with those three Iranians, including

1  Mr. Nikousokhan, on October 4, correct?

2  A.  Yes, I did not attend such a meeting where Mr. Reza Zarrab

3  was saying that certain statements were made.

4  Q.  We've already talked about one half of what was discussed,

5  according to Mr. Zarrab, at the meeting.  Do you remember him

6  testifying that the second issue that was discussed at the

7  meeting was transferring to Halkbank the money that had

8  accumulated in India from the proceeds of NIOC oil sales to

9  India?

10  A.  I recall that he talked about that matter.

11  Q.  Do you recall that he testified that there was a system

12  that was discussed in terms of how we would bring the money

13  from India into Turkey, and it was a very complicated system;

14  do you remember him testifying to that?

15  A.  I remember.

16  Q.  This meeting was supposed to have taken place on October 4,

17  2012, according to Mr. Zarrab, right?

18  A.  Correct.

19  Q.  As of October 4, 2012, was Halkbank already receiving

20  Indian proceeds of oil purchases from Iran?

21  A.  Yes, to best of my knowledge, it was being received because

22  this was a matter that had been discussed in 2011.  And the

23  letters and correspondence with Mr. Cohen here also indicates

24  that.  So this was a topic that had already been out since

25  2011, and it involved Indians making these payments through

1    Halkbank.  In fact, as it is mentioned in the letter, we had

2    discussed this with the Indian Central Bank as well as Indian

3    Treasury -- excuse me.  Indian Ministry of Finance.

4              MS. FLEMING:  Could we pull up, please, Defense

5    Exhibit 321.  Just to Mr. Atilla.

6    Q.  Mr. Atilla, do you recognize Defendant's Exhibit 321?

7    A.  Yes, I have seen it before.

8    Q.  What is it?

9    A.  This is a request for information about the payments made

10   by -- the request made by the Indian Embassy.

11   Q.  Is that two e-mails dated in July 18, 2012, and are you in

12   the e-mail chain on Halkbank e-mails?

13   A.  So the Indian Embassy had inquired about the matter with

14   our general manager, and I sent to him the information about

15   the payments that I had obtained from the relevant department.

16   Q.  Is this a business record that you kept at Halkbank?

17   A.  Yes.

18             MS. FLEMING:  We move Defendant's Exhibit 321 into

19   evidence.

20             MR. DENTON:  No objection.

21             THE COURT:  I'll allow it.

22             (Defendant's Exhibit 321 received in evidence)

23             MS. FLEMING:  Can we publish to the jury, please.

24   Q.  Could you explain please just what this is.

25   A.  If I recall correctly, there were four or five Indian

petroleum companies, in conversations that we had with the

Indian Central Bank and with their ministry, and we had

discussed that the Indian companies can make their payments for

oil through euro payments that they can send over.  And here,

they had already started making those payments, and the Indian

Embassy is following these payments based on the conversations

that had been had.  So they're checking in whether or not the

payments had been made, and if they were being received or not.

Q.  Let's see if I get it right and break it down.  According

to sanctions against Iran, each country needed to, if they

bought oil from India, petroleum products from Iran, they

needed to keep the proceeds in their own country, right?

           MR. DENTON:  Objection to form.

Q.  Would you please explain how it works.

           THE COURT:  Why don't you ask the question.  That

would be better.

           MS. FLEMING:  I hope we all get it right, Judge.

Q.  There are rules about -- at this time, in 2012, July 2012,

about what you can do once you buy petroleum products from

Iran, correct?

A.  That is correct.  In my recollection, from any country --

but let me just explain this way instead.

           There was some specific exemptions that were provided

by the U.S. Department of State for certain countries.  I don't

recall the exact countries in this, but Turkey was one of them

1    and India was one of them as well.

2             The Indian oil companies wanted to use euros in making

3    their payments and they wanted to utilize Halkbank in making

4    the payments.  So, this request came from them.  I don't know

5    the reason behind this.  It's likely because the Iranian side

6    did not want to maintain rupees.  Rupee is the Indian currency.

7    Therefore, there was no problem with such countries in

8    purchasing petroleum products and making payments for this.  In

9    other words, it was not subject to any sanctions.

10   Q.  So, India had already been purchasing petroleum products

11   from Iran, accumulating the funds, and then sending money to

12   Halkbank prior to October 2012, correct?

13   A.  That is correct.

14   Q.  And this Defendant's Exhibit 321 in evidence are e-mails

15   from July 2012 checking on the status of certain transactions

16   related to Iranian oil purchases by Indian companies, right?

17   Iranian oil sales by Indian companies using Halkbank, correct?

18   A.  That is correct.  In fact, by the date of this

19   communication, the business through Halkbank for this

20   transactions were already happening.

21   Q.  At some point, the rules changed, and Halkbank could no

22   longer mediate, accept payments for petroleum products from

23   India, correct?  I'm short-handing, forgive me.  But isn't that

24   correct?

25   A.  That is correct.  With the regulations dated February 6 as

1    a bank we stopped intermediating the oil transactions by third

2    countries.

3            MS. FLEMING:  Could we pull up Government Exhibit

4    7013, which I believe is in evidence.  Let me make sure.  It is

5    in evidence.  You can publish to the jury.  Can you put both

6    pages up at the same time.

7    Q.  Mr. Atilla, this is an e-mail from you to Adam Szubin which

8    is dated November 13, 2013.  This is November -- you just said

9    the sanctions changed in February 2013, right?

10   A.  That is correct.

11   Q.  And that Halkbank had stopped mediating third-party country

12   oil payments as of that February 6 date, 2013, correct?

13   A.  That is correct.

14   Q.  Now, could we go to the body of your e-mail, please, to

15   Mr. Szubin.  And would you please, you say to him:  Dear

16   Mr. Szubin, we have seen the news below today, and we would

17   like to inform you that we as Halkbank did not take any

18   decision to accept Indian payments.  We are still waiting for

19   your response and please let us know about your view on my

20   previous e-mail.

21           Do you see that?

22   A.  Yes, I see that.

23   Q.  Can you tell us what's going on here?

24           MS. FLEMING:  Take the highlight down, please,

25   Mr. white.

1    A.  So, this is about the following.  The regulation affected

2    the purchase of new petroleum products.  But there were

3    payments that were pending in accounts pertaining to purchases

4    that had already been made in the past.  And by that I mean,

5    the purchases that had been made prior to February 6 for which

6    the payments had been in accounts and they were pending.  In

7    other words, the funds that were about the transactions that

8    had been made prior to the regulations or the ban were pending

9    in the accounts.

10          So, what we were asking was whether there was any

11   issue with regards to the use of these funds.

12   Q.  By the way, when a bank does transactions such as you were

13   describing doing back in the summer of 2012, and you were

14   handling payments for the Indian oil companies so that they

15   could pay their bills to the Iranian petroleum companies in

16   euros, how does Halkbank make money?

17          Why does Halkbank do those transactions?

18   A.  There were two types of proceeds that it would get.  These

19   petroleum companies would be paying commissions to Halkbank in

20   order to be able to make these payments.  Because this would

21   apply to a Turkish oil company as well, they would also pay

22   commissions.

23          The second option where Halkbank would be making

24   revenue here was that with these funds being maintained at

25   Halkbank, it gave them the opportunity to have inexpensive fund

HCI3ATI3                          Atilla - Direct

1    sourcing.  Because that is actually the purpose of banks

2    anyway, that they would try and collect funds.  And therefore,

3    if you're not paying interest on such funds, that means this is

4    an inexpensive type of fund for you.

5                (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  Q.  When you say you're not paying interest, are you talking

2  about what we, in America, call the float; meaning, you can use

3  other people's money for your investments?

4  A.  That's what banking is.

5  Q.  And --

6  A.  However, we do pay interest to our customers in Turkey.  I

7  don't know how it is in the U.S. but we pay interest to our

8  customers.

9  Q.  And 49 percent of your investors are privately held; isn't

10  that right, at Halkbank?

11  A.  That's correct.

12  Q.  Now, during the time frame of 2012 and 2013, were there

13  articles published concerning the large amounts of gold that

14  were going from Turkey to Iran?

15  A.  Yes, there were such articles being published.

16  Q.  And did you discuss the demand for gold with people at

17  Halk -- I'm sorry, with people at OFAC?

18  A.  Yes, I had discussed.

19  Q.  Do you remember with whom at OFAC you discussed it?

20  A.  I don't -- I don't recall whether it was Mr. Cohen or

21  Mr. Szubin, but most likely it might be Mr. Cohen.  But our

22  understanding was pretty much the same.

23         So should I keep explaining?  I'm going on here,

24  but...

25  Q.  Okay.

1    A.  Because during that time period, there was a blow to the

2    Iranian economy due to the sanctions, and the Iranian currency

3    had lost its value to the tune of about 70 to 80 percent and,

4    therefore, individuals were seeking new fields to be able to

5    make their investments.

6           And, therefore, gold remains a medium for investment

7    in Islamic countries such as India, Turkey, Iran, Iraq or even

8    Saudi Arabia.  And, therefore, it didn't seem illogical for us

9    to see that people were demanding gold as an investment, and

10   there were a couple more reasons for this.

11          The first one was that due to the status of the rial

12   in Iran, the Iranian Central Bank had gone into a different

13   type of currency stabilization, and through this it was

14   providing Iranian importers a lower currency exchange rate to

15   be able to do their importing activities.  And through this, if

16   you are able to take advantage of this and have the goods and

17   sell them domestically through the arbitrage of the currency

18   change, you were able to make some money in your business.  In

19   other words, there was a large variation between the Central

20   Bank currency exchange rates and what was available out in the

21   market.

22          And the Iranian businessmen were able to do their

23   import based on the currency value as provided by the Iranian

24   Central Bank, and then sell this at the market rate

25   domestically.  And they were making a serious amount of money

1   based on the difference between those two.

2   Q.  And did you believe that to be true?

3   A.  Certainly.

4   Q.  Did you have discussions with the people in your foreign

5   operations group about it?

6   A.  Of course, there was information flow between the

7   departments involved in this matter.  Whoever would get

8   information would convey it to the other departments, but since

9   they were closer to the transactions themselves, that's what

10  they were conveying unto us.  We were practically just looking

11  into the news articles and conveying those.

12  Q.  And you did discuss this with people at OFAC, correct?

13  A.  Yes, I remember that we did.

14  Q.  There was a -- there came a time in July of 2013 where the

15  sanctions changed and no longer could gold be exported to Iran,

16  correct, out of oil proceeds?

17  A.  That is correct.

18  Q.  Now, there was a difference in the regulations between

19  petroleum products and natural gas out of Iran; isn't that

20  correct?

21  A.  That is correct, but this difference came about based on

22  what the U.S. Treasury had decided.  It had nothing to do with

23  us.

24  Q.  Do you remember Reza Zarrab testifying that he learned that

25  there was a loophole in the regulation of the embargo, which he

HCIPATI4                     Atilla - Direct

1    learned in a meeting from Mr. Suleyman because Mr. Suleyman

2    said that you had worked on the regulation and found this

3    weakness in the verbiage?  Do you remember hearing him testify

4    to that?

5    A.   I remember.

6    Q.   Did you identify a loophole in the regulations and discuss

7    that with Mr. Aslan?

8    A.   I did not do a specific review to find any loophole.  We

9    just went by with whatever the regulations indicated; so I did

10   not have a conversation with anyone with regards to finding any

11   loopholes in the regulations.

12         The operations department conveyed to us that the

13   funds between petroleum and natural gas were different, and

14   this is something that could be noticed by anyone that may be

15   looking into this matter.

16   Q.   Now, going to the gold transactions after July 2013, do you

17   have knowledge at this point as to how a gold transaction would

18   be processed financially through Halkbank?

19   A.   So I know how the payments would be made in terms of its

20   outline.  I knew that.  So, first, the Iranian buyer would send

21   instructions to its bank in Iran, and the Iranian bank would

22   send its instructions to Halkbank, and Halkbank would make a

23   payment to the exporter in Turkey.

24         Halkbank requested that while it was making a request

25   to get the instruction from the other bank, that it should

1    specify that this was about a gold transaction.  So it was

2    requesting that on the SWIFT, it should be indicated that this

3    was about a gold transaction, and then it would convey this

4    in-coming instruction to the exporter in Turkey.

5            And after the payment is made into the exporter's

6    account within a specific period of time, then the exporter

7    would submit to the bank any sales documentation or delivery

8    documentation that it might have with regards to this

9    transaction.

10           This would apply to all other kinds of trade as well,

11   not just in gold, but this would be the type of transaction

12   that would occur with the sale of any type of good.

13   Q.  Okay.  Do you remember who it was who was responsible for

14   determining what documents would be checked by Halkbank at

15   Halkbank in or about, let's say, August of 2012?

16   A.  As I had said previously, it would be the operations, and

17   if it were related to foreign transactions, then it would be

18   the foreign operations.  If it were a transaction that involved

19   Turkish Liras, it would be the branch operations, but in this

20   case, since it was foreign transactions, it would be the

21   foreign operations department.

22   Q.  I'd like to show you what's been marked -- these are not in

23   evidence yet, I don't think, 2031, Government Exhibit.

24           MS. FLEMING:  Is that in?  2031?  Could we pull up

25   just for Mr. Atilla, Government Exhibit 2031.  It's in?  Okay.

HCIPATI4                    Atilla - Direct

```
 1    Can we put that up for the jury?

 2    Q.  Government Exhibit 2031 is a SWIFT, isn't it?  An e-mail

 3    attaching a SWIFT; do you see that?

 4           JUROR:  Excuse me, we can't see.

 5    A.  Yes, I see the one that's here.

 6    Q.  Could you please explain briefly what these SWIFT

 7    documents --

 8           THE COURT:  Do you have it?

 9           JUROR:  Not on this one.

10           JUROR:  That happens sometimes.  Turn it off and turn

11    it back on.

12           THE COURT:  Got it?

13           JUROR:  Yes.

14           THE COURT:  Okay.

15    BY MS. FLEMING:

16    Q.  Could you just explain briefly what information is

17    contained on a SWIFT?

18    A.  I did not work in operations, but I can give you an idea

19    about the outline of what I see here.  There might be areas

20    where I don't have detailed information.

21    Q.  Please.

22    A.  There's information about the sender of the funds.  There's

23    information about the sender's bank.  There's the information

24    for the bank of the recipient, and then also information about

25    the recipient.  And, also, it has information about the
```

HCIPATI4                    Atilla - Direct

1   currency that is being utilized for this transaction and the

2   amount of that currency.  Here, it looks like the transaction

3   was based on the currency of Euro.

4   Q.  Okay.  Now, this, Government Exhibit 2031, is an e-mail

5   from Levent Balkan to Mr. Aslan; is that correct?

6   A.  That's what it appears to be, yes.

7   Q.  You were not copied; is that correct?  Do you see the

8   phrase --

9   A.  No.

10  Q.  Do you see the phrase that starts B-i-l-g-i-l?  What does

11  that mean?

12  A.  So you want this in English?

13  Q.  Yes, please?

14  A.  (In English) for your information.

15         For your information.

16  Q.  Could you pull up -- could we pull up 203 -- sorry -- 2035.

17  2035.  Let's pull up 2035-T.  This is also an e-mail from

18  Levent Balkan to Suleyman Aslan dated August 8th, 2012.  Do you

19  see that?

20  A.  Yes, I see it.

21  Q.  And, again, you are not copied on it, are you?

22  A.  It appears he did not see a need for that.

23  Q.  And if we look through 2035-T, Mr. Balkan is telling

24  Mr. Aslan what documents are being required; is that correct?

25  A.  Yes, that's what I understand from the English version

1    here.  If you had a Turkish version, maybe I could look at that

2    and give you more information.  But based on that, that's what

3    I understand.

4              MS. FLEMING:  Your Honor, may I approach and give the

5    Turkish version?

6              THE COURT:  Sure.

7    A.  Yes, he's explaining the procedures pertaining to the

8    transaction, and he's also explaining what types of documents

9    they would require.

10   Q.  Let's go to page 2 of 2035-T, for us speaking English.  It

11   continues to explain when the payment is made.  Do you see that

12   at the top?

13   A.  Yes.

14   Q.  And then underneath that it says:  "The documents being" --

15   Can you put the highlight down, please, Mr. White -- "the

16   documents being requested as being stated above as a condition

17   for money transfer obtained within specified periods and

18   investigated by us."  Do you see that?

19   A.  Yes, I see that.

20   Q.  And then underneath that, Mr. Balkan is identifying

21   companies that realize gold transactions and their partnership

22   structures; do you see that?

23   A.  Yes, I see that.

24   Q.  Could we scroll through, please, the document.

25             And if we look through the document, Atlantis is not

1   named on here, is it?

2   A.  No, I don't see it.

3   Q.  Then on page 5, it talks about the total gold exports being

4   realized as per companies in both Euros and Turkish Liras,

5   correct?

6   A.  That is correct.

7   Q.  And then on the last page, it talks about the commission

8   amounts being obtained from these gold exports in Turkish Lira,

9   right?

10  A.  Yes, that's what it says here.

11  Q.  And is that commissions to Halkbank?

12  A.  Yes.

13  Q.  Now, if we could put up Defense Exhibit 324, I don't

14  believe this is in evidence yet; so just for Mr. Atilla.

15          And do you recognize Defendant's Exhibit 324?

16  A.  Yes, I recognize it.

17  Q.  Is Defendant's Exhibit 324 an e-mail string to you and then

18  from you to Suleyman Aslan, dated August 6th, 2012?

19  A.  Yes.

20          MS. FLEMING:  Your Honor, I'm told this is already in

21  evidence as Government Exhibit 2.  So we'll move it in as

22  Defendant's Exhibit 324, as well, and straighten it out.

23          THE COURT:  Okay.

24          (Defendant's Exhibit 324 received in evidence)

25          MS. FLEMING:  Could we put up 324.

1        THE COURT:  Ms. Fleming, are you towards the end or

2    no?

3        MS. FLEMING:  I've got this area and one area in

4    wrap-up.

5        THE COURT:  So it's five to 1:00.

6        MS. FLEMING:  If you want to break now, that would be

7    fine, Judge, and I'll tidy up and really try with one hour

8    after that and be done.

9        THE COURT:  Okay.  So let's take our lunch break then.

10        (Jury not present)

11        THE COURT:  So we'll see everybody at 2:00.

12        MR. KAMARAJU:  Your Honor, just one quick question.  I

13    believe defense filed a letter about an exhibit they want to

14    move.

15        THE COURT:  I heard about it, but I didn't see it.

16        MR. KAMARAJU:  They filed it this morning, but would

17    the Court like us to respond in writing?

18        THE COURT:  Is there an objection?

19        MR. KAMARAJU:  Yes.

20        THE COURT:  Yes, I guess so.

21        MR. KAMARAJU:  We'll make it very short.

22        MS. FLEMING:  And could Mr. Denton and I have the

23    court reporter and you for one minute?  Not controversial.  We

24    just need to put it on the --

25        THE COURT:  Sure.

1                    (Continued on next page)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1              (At the side bar)

2              MS. FLEMING:  I looked at what was redacted on the

3    e-mails.

4              THE COURT:  Oh, from Friday?

5              MS. FLEMING:  Right.  And what it was, Judge, is it

6    was -- I won't use the names, but I have provided the names to

7    Mr. Denton.

8              THE COURT:  Okay.

9              MS. FLEMING:  It was from somebody in Turkey who sent

10   it to our Turkish counsel, and to somebody -- I provided to who

11   it is, and we have redacted that, out of concern that if that

12   became public, it would be a problem for them.

13             THE COURT:  I forget what the documents were now.

14             MS. FLEMING:  E-mails.

15             THE COURT:  I know, but the topic, was it a sensitive

16   subject matter?

17             MS. FLEMING:  No.

18             MR. DENTON:  No.

19             MS. FLEMING:  But they were Halkbank documents, and we

20   have not -- we have not gotten Halkbank documents; so....

21             THE COURT:  Oh, okay.  Got it.  Okay.

22             MS. FLEMING:  So I have provided it to Mr. Denton.  I

23   do not want to cause an issue for anyone in Turkey who got it

24   to us, and I know he may want to cross on it.  And I think

25   we've agreed that he can certainly cross on it, just not using

```
1   the name, trying to be sensitive, the way we were on their
2   witnesses.
3           MR. DENTON:  That's perfectly fine.  I think the issue
4   is that the reason why this is a sensitive subject is that
5   these were -- to use Ms. Fleming's words on Friday -- swiped,
6   which, obviously, was an issue that was explored at length by
7   defense counsel.  So to the extent we go into it, I'm happy to
8   observe limits about by whom, but if there is an issue there,
9   we would expect that they would be willing to stipulate to the
10  fact that they were obtained without authorization.
11          MS. FLEMING:  It was a former employee who had it.
12          THE COURT:  I get it.
13          MS. FLEMING:  And that's the issue.  Mr. Atilla has
14  been in jail; so he gets whatever anybody is nice enough to
15  send to his counsel.
16          THE COURT:  Okay.  So what's the letter about that's
17  objected to or going to be?
18          MS. FLEMING:  We want to move into evidence the
19  recording in jail that we had translated of him saying to his
20  uncle, you know, you have to -- I don't remember the exact
21  words, but basically you have to admit your guilt in order to
22  be free, and you have to tell them you committed crimes you
23  didn't commit in order to be free.
24          THE COURT:  And you're opposed?
25          MR. DENTON:  The law plainly prohibits extrinsic
```

1    evidence to impeach a witness' credibility.  There also was a

2    totally improper foundation laid during Ms. Fleming's cross; so

3    we don't think there's any basis for its admission.

4                THE COURT:  All right.

5                MS. FLEMING:  I'm not surprised he disagrees.

6                THE COURT:  So 2:00, all right?  And then you figure,

7    what, you'll need less than an hour?

8                MS. FLEMING:  I hope so.  I haven't gotten to food,

9    but I'm going to try to skip through it.  What I'm trying to

10   do, Judge, is put context on this stuff.

11               THE COURT:  I think if you did, then he would finish

12   today probably.

13               MS. FLEMING:  Right.  I'll try to move it faster.

14               THE COURT:  Okay.  We will have for you at the end of

15   the day the additional jury instructions that we didn't give

16   you yet.  Okay?  Thanks.

17               MR. DENTON:  Thank you, Judge.

18               THE COURT:  Yes.

19               (Luncheon recess)

20               (Continued on next page)

21

22

23

24

25

1                     AFTERNOON SESSION

2                          2:15 p.m.

3               THE COURT:  We'll call back the jury.

4               (Jury present)

5               THE COURT:  I say with some modest confidence that

6        we're heading for the homestretch here.  So please be seated

7        and we'll continue with Mr. Atilla.

8               MS. FLEMING:  Mr. Atilla, you and I are both going to

9        speak faster.

10              THE DEPUTY CLERK:  Sir, I'd like to remind you, you're

11       still under oath.

12              THE WITNESS:  Thank you.

13       BY MS. FLEMING:

14       Q.  I'm going to cut out exhibits and just ask you for the

15       whole period of 2010 through 2015, did you receive information

16       from foreign operations that was the basis of your knowledge of

17       the sanctions?

18       A.  Yes.  Yes, they continuously updated us.

19       Q.  There came a point in July of 2013 when there were no

20       longer any -- Halkbank could no longer mediate gold

21       transactions, gold sales, to Iranian purchasers, period,

22       correct?

23       A.  Yes, correct, the bank had stopped the payments.

24       Q.  In fact, the bank had notified customers earlier that it

25       was going to stop even earlier than July 1st mediating such

1    transactions, right?

2    A.  Yes, they were informed that it was going to be stopped and

3    this information was given before July 1st.

4           MS. FLEMING:  Can we pull up Government Exhibit 7009.

5    It's in evidence, please.  Mr. White.

6           MR. WHITE:  The system is not displaying it out to the

7    courtroom like it's supposed to.  It's on my screen.

8    Q.  Let me come back to that.

9           THE COURT:  That was not intentional on my part

10   Ms. Fleming.

11          MS. FLEMING:  I didn't touch it.

12   Q.  We heard in the trial that Mr. Zarrab and his companies

13   switched from gold to food transactions, correct?

14   A.  When the bank stopped the payments for gold trade, they

15   started food trade; that's correct.

16   Q.  We've already gone through April, so I'm going to skip over

17   April since we did it on Friday.

18          Just as a cutoff point, you recall April -- just

19   remind everyone, April is when you had the conversation that

20   Mr. Zarrab said he lied to you in the morning of April 10; do

21   you remember that?

22   A.  Yes.

23   Q.  Then you went to Barcelona that afternoon, correct?

24   A.  Yes.

25   Q.  After you came back, were you in any meetings with

1    Mr. Zarrab in which you discussed with him that there was any

2    fake food system?

3    A.  Not after I came, not ever, did I talk about such a topic

4    with Zarrab.

5    Q.  Did you ever have a meeting with Mr. Zarrab in which the

6    idea of transferring the money from Volgam to Centrica within

7    Halkbank was from you?

8    A.  No, we haven't.

9    Q.  Do you recall that he, Mr. Zarrab, said you asked whether

10   he could supply bills of lading because it was difficult to

11   trace whether shipments actually occurred or not from bills of

12   lading?

13   A.  We talked about bills of lading, but we didn't discuss the

14   traceability of the bills of lading.

15   Q.  You anticipated my question.  Did you ever discuss with him

16   in any manner whether bills of lading were traceable in any

17   way?

18   A.  No, I did not, because I didn't even myself know that they

19   could be traceable.

20   Q.  Moving from April, there are several calls in July that you

21   have with Mr. Aslan -- with Mr. Zarrab.  Is that correct?

22   A.  That's correct.  Some of them we have the recordings, and

23   for some we have transcripts.

24   Q.  Do you remember these calls?

25   A.  I don't remember all the contents of those telephone calls,

1   but like a broad general base I remember those phone calls.

2            MS. FLEMING:  Could we bring up, please, Government

3   Exhibit 316-T.  Oh, we can't.

4   Q.  Do you recall if I can refresh your recollection, do you

5   recall having a conversation where -- withdrawn.

6            Do you recall hearing played in this courtroom a

7   conversation between Mr. Aslan and Mr. Zarrab where Mr. Zarrab

8   is complaining about the people at the bank requesting

9   different documents all the time?

10  A.  Yes, I remember that.  Actually the bank asks for the same

11  documents all the time, but because Mr. Zarrab wasn't happy

12  with that, that was the way he was conveying it.

13  Q.  This is July 2, 2013, so it's right after the change in the

14  regulations, correct?

15  A.  Yes, that's right, after we stopped the gold trade.

16  Q.  Do you recall that one of the things that Mr. Zarrab is

17  complaining about is that the bank is asking for the

18  certificate of origin?

19  A.  I remember that.

20  Q.  Then Mr. Zarrab says so we agreed to provide the

21  certificate of origin, and then two hours later, they called

22  back and said no, we want the document and the invoice from the

23  company that sold to the company that then sold to you.

24  A.  I do remember it.

25            MS. FLEMING:  I'm not going to read the whole call,

1    Judge, trying to save some time.

2    Q.  But do you remember that Mr. Zarrab says, and I'm reading

3    what's in evidence Government Exhibit 316-T, at the bottom of

4    page three, Mr. Zarrab says:  So once the company that sold us

5    the goods cuts the final invoice, we can make the transfer to

6    them.  Then Mr. Hakan said that this might cause problems in

7    the future.  He said that the goods should be sent by the

8    person, and then we should make the transfer into the person's

9    account.

10              THE COURT:  It's now on.

11              A JUROR:  And it's gone.

12              MS. FLEMING:  I didn't touch it.

13              Page three.

14   A.  Yes, I remember that.

15   Q.  Then if we can move forward to page six, do you see that

16   Mr. Zarrab and Mr. Aslan, if you recall Mr. Zarrab testifying

17   that they kind of talked over each other, but Mr. Zarrab says

18   it does not get stuck at Mr. Hakan so much.  Do you see that?

19   A.  Yes, I remember.

20   Q.  And the conversation goes on, and at page eight, Mr. Zarrab

21   says, down toward the bottom, so we get stuck in the lower

22   ranks, it is not related to Mr. Hakan.  Do you see that?

23   A.  Yes, I remember.

24              Would you like me to explain?

25   Q.  Please.  What was going on in this call?

1   A.  I will first explain about getting stuck in lower ranks.

2   Since Mr. Zarrab doesn't know who does what in the bank, he

3   thinks that all the international transactions are related to

4   my job duty.  The operations work separately.  They have

5   different principals.  As I explained before, they are not

6   reporting me either.  And therefore, there is no situation that

7   it would get stuck at my desk.  Because I don't look at the

8   transaction, I don't apply the transactions or I don't give

9   permission for the transaction.

10          The other subject that he's talking about, at the

11  beginning he apparently said that he wants to transfer the

12  money before the goods reach their destination, and this

13  doesn't exist.  This transaction would not exist in existing

14  system, because if the money goes to the purchaser without the

15  goods and there is any issue between the purchaser and seller,

16  Halkbank has no way of getting the money back.

17  Q.  Do you remember having additional conversations with

18  Mr. Zarrab about documentation in that time period?

19  A.  I remember.

20  Q.  I'm going to direct your attention to a WhatsApp chat

21  Government Exhibit 1002-T with an entry on 9/7/2013 at 8:36.

22          MS. FLEMING:  Sorry, I don't have the page written

23  down.  It's July 9.  I had read it as 9/7 but it's July 9.

24  Page 50.

25  Q.  Do you see in the middle of the page an entry that says

1   good morning Mr. Reza, Mr. Hakan will probably call you today,

2   there are two subjects.  The company whose name starts with the

3   letter V, its business line is not compatible.  If possible

4   please change that.  (B)  There is another incompatibility

5   related to the capacity of the ships that do the

6   transportation.

7   A.  Yes, I saw the Turkish version of these.

8   Q.  Back in July of 2013, you did not see this WhatsApp chat,

9   did you?

10  A.  No, I did not see it.

11  Q.  Did Mr. Suleyman tell you that he was going to give a heads

12  up to -- or did he tell you he was going to contact Mr. Zarrab?

13  A.  No, he did not say anything.

14  Q.  Do you recall Mr. Zarrab testifying in this court that

15  after this WhatsApp chat, and before he spoke with you, he had

16  two phone calls with Mr. Happani?

17  A.  Yes, I remember.

18  Q.  Do you remember Mr. Zarrab testifying that he said to

19  Mr. Happani that there was an issue with the documents for

20  Volgam, and Mr. Happani said he is sending to the bank right

21  away?

22  A.  Yes.

23  Q.  And do you remember Mr. Zarrab saying he told him no, wait,

24  let Hakan Atilla call first, because it shouldn't be understood

25  that Mr. Suleyman has contacted us?

HCI3ATI5                        Atilla - Direct

1   A.  Yes, I remember.  I think they spoke between us.  They

2   didn't want me to have the information.

3   Q.  Do you remember Mr. Zarrab and Mr. Happani -- Mr. Zarrab

4   also testifying that he and Mr. Happani also spoke about how

5   was -- how were they going to explain the problems with the

6   tonnage?

7   A.  Yes, I remember.

8   Q.  And then there is a call with you on July 9, correct?

9   A.  That's correct.

10  Q.  So could we pull up, please, 261-T.

11          Mr. Atilla, you didn't know about these two calls

12  between Mr. Happani and Mr. Zarrab, did you?

13  A.  Of course I didn't have any idea.

14  Q.  Could we please turn to the next page.  Now, in this call,

15  you're talking -- the first part of the call you're talking

16  about since the field of business does not match the nature of

17  those things that we are doing, can you change this to the

18  other side.

19  A.  Yes, I see it.

20  Q.  Mr. Zarrab says why does it not match, Mr. Hakan?

21  A.  Yes, I see it.

22  Q.  And then you explain it to him, correct?

23  A.  Yes, the operation usually looks at the fields of activity

24  off the company's bylaws documents.  Actually, at that time,

25  this was not necessary.  And even then, they looked at it and

1    they saw that it didn't exist.  That's why on the food had to

2    be entered to the fields of activity of the main contract of

3    the company.  You could write 10 to 8 different fields of

4    activities in the company's director, even more.  In the main

5    contract.  Because the traders could buy many different things

6    in many numbers.

7    Q.  Mr. Zarrab tells you no, we changed it and we resubmitted

8    it months ago, correct?

9    A.  Yes, I didn't know when I called, apparently it was so.

10          MS. FLEMING:  Can we go to the next page, please, and

11   don't highlight.  Just leave the whole page up, please.

12   Q.  So then you go on to talk about with regard to the vessels

13   named in there regarding the loads.  Then you talk about some

14   of these are very large vessels.  And these are not small

15   vessels.

16   A.  Yes.

17   Q.  Can you explain what you're talking about there.

18   A.  In the previous conversations he stated that the sea road

19   between Dubai and Iran was very close, and he mentioned that

20   the big ships didn't work in this road.  And he stated that

21   because the road was short, all these transactions were

22   happening with smaller vessels.  And he stated that these

23   vessels belong to small business owners, and they weren't

24   belonging to big shipping companies.  That's why he couldn't

25   give bills of lading, but he said that all the necessary

1    details were being controlled by the customs and those

2    documents would show all the details.  And then the operations

3    so that the documents that he gave showed that the tonnage of

4    the vessels were big.  Apparently they thought that the excuse

5    for the small ships not having bills of lading were not

6    excusable anymore.  So, they indicated that if the ships are

7    big, then there should be a bills of lading.

8    Q.  Can we go to the next page, please.  So, you are telling,

9    you say to him, I would kindly ask that the guys take a look.

10   Withdrawn.

11        Before that, when you said the road between Dubai and

12   Iran, do you mean the route?

13   A.  Yes, I was talking about the route.

14   Q.  These are ships, they're on water?

15   A.  As far as I know, that's a gulf.  That's a gulf and the

16   small vessels that goes between Dubai and Iran.  It's obvious

17   that the distance between two countries is close, but I didn't

18   go and do checks in that area.

19   Q.  Are you telling Mr. Zarrab in this call how to do fake

20   documentation?

21   A.  Never.

22   Q.  Are you telling him how to fix documentation so you can

23   help him with a fake food scheme?

24   A.  No, absolutely not.  Here I'm talking about examples, I'm

25   giving examples about possible transactions.  It's not actual

transactions.  Actually, this conversation took place after his

questions.  And then he asked if they should look at the bigger

vessels.  I said look both small vessels and big vessels.  I'm

giving examples here because of their submissions of the

documents, what was showing big and small vessels, so I was

just giving examples for the tonnage.  The documents that they

gave was their submissions.  That was their submissions.

Declarations.  They were declarations.  That's why I asked them

to control their declarations.

Q.  Does it happen in the bank that customers get their

documentation mixed up or wrong when they submit documentation

for transactions?

A.  Of course.

Q.  Would you talk about that, please, with regard to other

customers.

A.  There are many examples and many numbers.  There is not one

exactly matches to this example but I can give another example.

For example, there are customers who would give forms that

related to their old transactions, but they would give those

documents for their new transactions.  And usually they will

blame it on the accountants.  They would usually say the

company's accounting department made a mistake.

        There are sometimes mixed up in submitting documents

and bringing paper documents to bank and submitting them.

Sometimes there are issues or problems between banks also.

This is named discrepancy, as discrepancy.  Usually there are

many problems at the submissions of the documents and accepting

documents.

         And there are always complaints about -- or exceptions

about mix of the colors, quality, or the value of the goods

that are being sent.  And the banks try to solve this by

corresponding with each other, and if they cannot solve it,

they call the customers.

         In here there is no letter of credit, therefore, we

talk to the customer.

Q.  Do you happen to know why you're involved in these

conversations between July 2nd and July 9, 2013?

A.  If I'm not mistaken, on the 2nd of July, Reza Zarrab called

me.  And at this conversation the operations ask me to relay

the message.  I believe Hakan Aydogan was not at the bank at

that time.  He was still working with the bank but he may not

be at the office in Istanbul at that time.  I think he was

traveling for another -- other branches for Anatolia and he was

not at the bank.

Q.  Do you recall whether Hakan Aydogan was helping to

consolidate branches into the headquarters in Istanbul during

that week?

A.  Yes, because they deal with many branches, they have to go

to the field and they have to see them and work with them.

Their position is a little bit different than ours.

1    Q.  Go back to where we stopped before.  Could you pull up,

2    please, Government Exhibit 7009 which is in evidence.  This is

3    Government Exhibit 7009 in evidence.  This is a July 1st, 2013

4    e-mail from you to Adam Szubin.

5         Do you recall that?

6    A.  Yes, I do remember this.

7    Q.  And you informed Mr. Szubin that as of June 10, 2013,

8    Halkbank stopped mediating the transactions of exporters

9    related to the trade of precious metals with Iran.  Correct?

10   A.  Yes.

11        MS. FLEMING:  Can we please pull up GX 2511.

12   Q.  Do you remember that Mr. Szubin was shown 2511 and its

13   attachments during his testimony?

14   A.  I do remember.

15        MS. FLEMING:  Your Honor, may I approach?  We can do

16   this quickly.

17   Q.  Do you remember that -- withdrawn.

18        Government Exhibit 2511 has four attachments to it,

19   correct?

20   A.  Yes, that's how it's shown here.

21   Q.  And the document is in Turkish, correct?

22   A.  Correct.

23   Q.  Could you please translate what the four attachments

24   translate to.

25   A.  The first one is incoming payments to Royal Company.  The

HCI3ATI5                         Atilla - Direct

1    second one is company documents to close the file.  Third one

2    incoming payments to Safir.  And last one is closing documents

3    for Safir.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              MS. FLEMING:  Now, would you please pull up,

2   Mr. White, 2511-4.

3   Q.  Do you remember, Mr. Atilla, that the prosecutors asked

4   Mr. Szubin questions showing this spreadsheet and asking

5   whether Halkbank did any gold transactions after June 10th,

6   2013?

7   A.  Yes.

8   Q.  In fact, did Halkbank mediate any gold transactions for

9   customers after June 10th, 2013?

10             THE INTERPRETER:  Excuse me.  Interpreter's question.

11  Is it 2012 or 2013?

12             MS. FLEMING:  2013.

13  A.  As far as I know, as far as the information given to me,

14  no.

15  Q.  Could we scroll down to line 3250, please, and highlight

16  that.

17             Do you remember that Mr. Szubin testified about this

18  line during his testimony?

19  A.  Yes.

20  Q.  Okay.  Does this line in this Excel spreadsheet indicate

21  that Halkbank mediated gold transactions after June 10th, 2013?

22  A.  No, it doesn't mean that.

23  Q.  What does it mean?

24  A.  This shows the date the company completed its documents and

25  hand over its documents to the bank.

HCIPATI6                          Atilla - Direct

1    Q.  Can we scroll up to the stop, please.

2            What does E-v-r-a-k-l-a-r-i mean in English?

3    A.  Documents.

4    Q.  And right underneath sort of the F and the G on the top,

5    where it says Ticari Fatura?

6    A.  It means commercial invoice.

7    Q.  What does GB Tarihi mean?

8    A.  It means date of customs declaration.

9    Q.  Okay.  Is there -- in this exhibit, is there one of the

10   Excel spreadsheets that would show when the payments were

11   mediated through Halkbank?

12   A.  No, it doesn't show it.

13   Q.  Thank you.

14   A.  I believe the payments might be in another file.

15   Q.  Thank you.  And to be clear, what does "mediate" mean?

16   A.  It means paying a fund or releasing a fund.

17   Q.  And if we pull 7009, Government Exhibit 7009, back up, the

18   language that you used was that Halkbank stopped mediating the

19   transactions of exporters, correct?

20   A.  Correct.

21   Q.  I'm sorry, could we go back quickly to GX2511 and go to the

22   first attachment.

23            What does the third attachment in GX2511 show?

24   A.  It shows the payment dates.

25   Q.  Okay.  And which column shows the payment dates?

1    A.  Second column.

2    Q.  So can we scroll down that column, please.  Okay.

3            So the line 132 stops at June 3rd, 2013, correct?

4    A.  Correct.

5    Q.  Okay.  Continue to scroll down.  It starts again in 2012.

6    Just keep scrolling.

7            You've had an opportunity to review 2511.  Are there

8    any dates after June 10th, 2013?

9    A.  When I looked through this document, I couldn't see it.

10   Q.  Thank you.  There came a point when -- in December 2013,

11   when Mr. Suleyman was arrested; is that correct?  Withdrawn.

12   Very quickly before I get to that.

13           Did you have any knowledge of what Mr. Zarrab was

14   doing with the Chinese banks?

15   A.  Before I came here, no.

16   Q.  Did you, at Halkbank, have any relationship with the bank

17   of Kunlun, K-u-n-l-u-n?

18   A.  No.

19   Q.  Okay.  There came a point when Mr. Aslan and Mr. Zarrab

20   were arrested in mid-December 2013; is that correct?

21   A.  Yes, that's correct.

22   Q.  And you've already told us that you were really very

23   surprised about Mr. Aslan, correct?

24   A.  Yes.

25   Q.  Were you also surprised about Mr. Zarrab?

1  A.  To tell the truth, actually, I wasn't surprised as about

2  Aslan's case because there were many other businessmen who were

3  arrested on the same day.  I was having breakfast with my wife.

4  I saw it in the morning news, and they were mentioning that

5  some businessmen were arrested.  They weren't talking about

6  Suleyman Aslan.

7         When I heard that many businessmen were arrested at

8  the same time, I thought it was a matter related to taxes

9  because when businessmen work in big volumes, trade in big

10  volumes, there could be some issues with taxes.  Later on, I

11  heard, I learned that Suleyman Aslan was one of those who were

12  arrested, and I was very surprised.

13  Q.  In the beginning part of your answer, you said you heard it

14  was Suleyman Aslan who was arrested, if I heard correctly.  Did

15  you mean Suleyman Aslan on the TV?  Did I mishear?

16  A.  Let me explain it this way.  In the morning news they were

17  talking about many businessmen being arrested.  They didn't

18  talk about Suleyman Aslan.  Later on, when I went to the bank,

19  I had heard that Suleyman Aslan was arrested too, and that was

20  later on explained or explained in the news.

21  Q.  Did you meet with police at the bank that day?

22  A.  Yes, a policeman came to the bank that day.

23  Q.  And did you do anything with regard to documents at the

24  bank that day?

25  A.  Yes.  They asked for help from me.  They said that they

1    needed to look at some documents with the court's order or the

2    prosecutor's order, and then I had them meet with the legal

3    counsel at the bank.  Then they prepared to -- they started

4    preparing the documents and giving them the documents.

5    Q.  Did there come a time --

6             THE COURT:  Did the counsel approve it?

7             THE DEFENDANT:  As far as I remember, I think if there

8    is a court order, he has to.  I mean we have to.

9    Q.  Did there come a time, within a couple of weeks, when you

10   were interviewed by the Turkish police?

11   A.  Yes, it was the end of the year.  It was December 31st.

12   They asked me to get my opinion about the subject matter, and I

13   told them that I had plans because the end of the year and it

14   was New Year's Eve.  I asked if we could talk another day, but

15   they requested the meeting immediately and I accepted.

16   Q.  Did you have the right to refuse to be interviewed?

17   A.  I didn't even think about it.

18   Q.  And did you -- were you interviewed?

19   A.  Of course.

20             THE COURT:  Did you consult with the bank's counsel?

21             THE DEFENDANT:  Yes, I informed them.

22   Q.  Did you have bank counsel with you when you were

23   interviewed?

24   A.  We didn't go together, but he came later.

25   Q.  And did you -- at a later point, did you realize you had

HCIPATI6                    Atilla - Direct

made a mistake in what you had told the Turkish police?

A.  Yes, I realized, but I didn't know if the mistake was mine

or someone else's.  That's a little complicated.

Q.  And as a result of realizing you made a mistake, what did

you do to correct it?

A.  I didn't realize about the mistake because I didn't pay

attention to the dates.  After I came to my house and talked to

my wife, my wife mentioned about the mistake.  So a couple of

days later, I went back and I tried to correct that mistake.

Ladies have better memories about traveling times.

Q.  Did you send a letter to the prosecutor?

A.  Yes.

Q.  And did you send travel documents to the prosecutor to show

where you were on certain dates?

A.  Yes, I sent them.

Q.  Within a couple of months, what happened to the charges

against Mr. Zarrab and Mr. Aslan and others in Turkey?

A.  I don't exactly know the legal process, but a couple of

months later, they were released.

Q.  Do you know whether all of the charges were dismissed?

A.  That's what I assume, since there was no problem after that

point.  That's what I assumed.

Q.  Now, Mr. Zarrab, in his testimony, described that he had a

meeting with you and Mr. Fuat and Mr. Aydogan sometime at the

end of 2014?

A.  His memory is tricking him again.  Such a thing didn't

happen.  After he was dismissed from the jail, I did not meet

with him.  I saw him at the end of 2015, perhaps beginning of

2016.  I saw him once at the general manager's room, and they

were discussing about a credit limit at that meeting.  I did

not include to that conversation, nor I spoke with him.  And

this took place about two years after he was dismissed from the

jail.

Q.  Do you remember that Mr. Zarrab testified that in this, the

meeting he alleged you attended in the end of 2014, that you

brought up the name of SGS as to get an inspection report; do

you remember that testimony?

A.  I remember that that testimony that he did, but I don't

think he's right.  I did not have such a conversation with him,

and I am pretty sure because I have reasons to believe that I

didn't have that conversation with him.  I'm sure.

Q.  Had you brought up SGS in conversations in February of

2013?

A.  I -- I don't remember exactly if it was February or July,

but in 2013, the subject came up.  This was about the time they

started the food business.

Q.  And the one meeting where you saw him after he was released

from jail was at the end of 2015 or early 2016; is that what

you said?

A.  I can't exactly remember if it was at the end of 2015 or

1    beginning of 2016, but yes, he was meeting with the general

2    manager to talk about the credit limits.  He wanted to increase

3    his credit limits, and the general manager refused that

4    request.  They weren't talking about neither Iran business or

5    any food business or any trading.

6    Q.  They were not or were?

7             THE INTERPRETER:  They were not.

8    Q.  In October 2014, did you and others from Halkbank travel to

9    Washington, D.C.?

10   A.  Yes.  We were going to IMF meetings in October 2014, and

11   during that time, we wanted to have a meeting with just to say

12   "hi" to OFAC because both offices were in Washington, and while

13   we were there, we wanted to stop by.

14   Q.  Who's "we" from Halkbank?

15   A.  General Manager Ali Fuat, Deputy General Manager Murat

16   Uysal and I was there.

17   Q.  And who did you meet with at Treasury?

18   A.  David Cohen and his team.

19   Q.  Now, Ali Fuat -- and I don't mean to be disrespectful, but

20   there's no way I can even spell his last name.  Mr. Ali Fuat,

21   did he speak English?

22   A.  No, he didn't.

23             MS. FLEMING:  Could we pull up, please, Defense

24   Exhibit 212.  I'm trying to check if it's in evidence.  Defense

25   Exhibit 212.  Pull it up not for the jury yet, please.  Is that

1    in?  All right.  It's in.  We can put it in front of the jury.

2    All right.

3           Showing you what's in evidence as Defendant's

4    Exhibit 212, do you recognize Defendant's Exhibit 212 as a

5    read-out from Treasury related to the meeting that you all had

6    on October 4th -- October 10th, I guess, October 10th, 2014?

7    A.  This does not contain all that was discussed there, but,

8    yes, this is it.

9    Q.  Well, there is some under the black, but we're not going to

10   go into whatever is under the black.  Okay?

11   A.  That's no problem for me.

12   Q.  Do you see that starting on the bottom of the first page,

13   that starts "Zarrab.  Under Secretary Cohen noted that Iranian

14   national Reza Zarrab, accused of leading efforts to evade

15   sanctions of Iran, appeared to have transacted through Halkbank

16   and asked if Halk continued to do business with Zarrab"?

17   A.  Yes, I see that.

18   Q.  "Atilla responded that Zarrab had received a loan from Halk

19   to finance the acquisition and redesign of a building in a

20   tourist district of Istanbul, as well as a financing loan to

21   lease a plane"?

22   A.  That sentence is correct.  The one before that is not.

23   Q.  What is incorrect about it?

24          THE COURT:  Which statement is incorrect?

25          THE DEFENDANT:  What I remember is that the first --

HCIPATI6                          Atilla - Direct

```
 1               THE COURT:  Which statement?
 2               THE DEFENDANT:  The first two lines do not reflect
 3     what had happened.
 4               THE COURT:  Which two?
 5               THE DEFENDANT:  (In English) "Cohen noted that Iran
 6     national Reza Zarrab, accused of leading efforts to evade
 7     sanctions on Iran, appeared to have transacted through Halkbank
 8     and asked if Halk continued to do business with Zarrab."
 9               THE COURT:  Was that correct or not?
10               THE DEFENDANT:  What I remember was a little different
11     version of this, and if you'd like, I can share that with you.
12               THE COURT:  Sure.
13               THE DEFENDANT:  What I remember was that here Halkbank
14     and Zarrab were reversed, and the question was asked whether
15     Zarrab was still doing business with Halkbank.
16               And as far as what's mentioned in the beginning of
17     this, I don't recall anything like that being said.  It was
18     mentioned by Mr. Cohen, and this was a candid, informal
19     meeting, and in that setting he had asked whether Zarrab was
20     still doing business with Halkbank.
21               So this was not the theme or the purpose of this
22     meeting; so I won't mention here there were other topics that
23     were discussed, other details, and at the end of that meeting,
24     this was the detail that came up.
25     BY MS. FLEMING:
```

1    Q.  Do you remember anything else specifically related to

2    Zarrab, for example?

3    A.  Yes.  Mr. Cohen had said that he did not have a good or

4    positive feeling about Zarrab, and I had explained to him why

5    the individual was still working with the bank, because he had

6    a pending loan in process.  And I'd also said that he was doing

7    foreign trade, but since I was not in touch with Zarrab, I did

8    not know what he was doing.

9    Q.  Did you say anything about him being on the U.S. Specially

10   Designated Nationals' list?

11   A.  Yes, I did, and I said that because I thought if Cohen did

12   not feel good, then the individual should be added to the

13   sanctions list.

14   Q.  And what did Mr. Cohen say?

15   A.  He said that they did not have such a decision.

16   Q.  Is there anything --

17            MS. FLEMING:  Can we take down the -- no, no.  Take

18   down the highlighting and leave the document up, please.

19   Q.  Is there anything reflected concerning the discussions --

20   I'm focusing on the second page, which says:  "Halk also dealt

21   with Zarrab to facilitate foreign trade."

22            Is there anything reflected --

23            MS. FLEMING:  No, please, don't highlight.  Just leave

24   it up, the whole document.  Don't highlight.

25   Q.  Is there anything in Defendant's Exhibit 212 that indicates

1    that you or anyone from Halkbank discussed due diligence with

2    anyone from OFAC or Treasury?

3    A.  So I'm not sure.  I don't recall whether the word due

4    diligence was used in there, but here's what I do remember.  I

5    recall that we had talked about the parties that were on the

6    trade transactions, whether they were on any lists or not.

7    Thus, I remember that we had talked about whether the bank was

8    checking whether these individuals, who are importing and

9    exporting, were on any banned list -- lists, and this could be

10   persons or companies.

11   Q.  And did you specifically identify who those people and

12   banks were?

13   A.  No.  There was no names mentioned by us.  I remember that

14   we talked about Halkbank checking in to whether any parties in

15   the transaction were on any banned lists or any of the -- the

16   transaction would involve any banned trade and whether the

17   transactions might be -- whether the lists might be applicable

18   to any of these transactions.

19   Q.  When did you learn about Mr. Zarrab's March 2016 arrest by

20   the United States authorities?

21   A.  I would think that it was either right away or possibly

22   within a day of the arrest because there was a stock price drop

23   for Halkbank right after, and I recall that.  So I would guess

24   that it was either right away for the next day.

25   Q.  Where were you?

1    A.  I was in Singapore.  I was trying to lease an office in

2    Singapore.  I was dealing with that.

3    Q.  And as a result of his arrest, did you take any steps to

4    check out who was named in the indictment with regard to

5    Halkbank?

6    A.  Of course, we did look into which companies that may be in

7    the indictment, not necessarily from Halkbank, but from any

8    companies that may be on the indictment that was looked into.

9    Q.  And were there any transactions referenced in the

10   indictment that involved -- that had been transactions with

11   Halkbank?

12   A.  To the best of my recollection, they were not.  If I recall

13   correctly, the compliance department checked on those

14   companies, and I recall that I'd also asked the operations

15   department for it, whether there was any ties between those.

16   And I recall that when I had first heard about this, I remember

17   sending back and forth e-mails about whether there would be a

18   statement made because of the drop in the stock price.

19   Q.  Was Mr. Zarrab's arrest in the United States publicized in

20   Turkey?

21   A.  Of course, everybody knew, sure.

22   Q.  And he was arrested in March 2016, correct?

23   A.  I don't recall the exact date, but it was in the beginning

24   of 2016, maybe March.

25   Q.  Did you travel to the United States in September of 2016 on

HCIPATI6                    Atilla - Direct

1    business?

2    A.  Yes, I did come.

3    Q.  How long were you in the United States in September 2016?

4    A.  I recall it to be not that long because I had come for

5    another investor meeting, and I don't believe it was like a

6    week-long stay.  It was a short stay.

7    Q.  And you came -- this was after Reza Zarrab had been

8    arrested, and there had been a lot of publicity in Turkey; is

9    that correct?

10   A.  Of course.

11   Q.  And then you traveled again to the United States in March

12   of 2017, correct?

13   A.  That's correct, and as I had explained previously, on that

14   occasion I had come for the bond matter.

15   Q.  Where were you on that trip in the United States, where did

16   you visit?

17   A.  So do you want me to tell you every place that I went to,

18   because I'd been to meetings, and I had been to an antique

19   place.  I had been to many places.

20   Q.  Absolutely not.  Just the cities.

21   A.  First, I came to Boston from London.  Of course, I was not

22   alone.  There were those that were accompanying me from the

23   bank and also from a U.S. bank.  And after completing the

24   meetings in Boston, then I came over to New York.  I believe

25   that I passed the weekend here, and then I had meetings on

1    Monday.  And then we went to the airport, and I believe it was

2    Monday evening at that time, and we were to go to London.  And

3    I was arrested at the airport, and I could not go.

4    Q.  When you came in to Boston, were you interviewed by customs

5    when you came in on your trip in March 2017?

6    A.  Yes, and I found that to be somewhat odd because it seemed

7    to me that it was outside of the scope of the ordinary

8    procedure because the customs officer took my business card and

9    such, and he asked many questions that I thought were not

10   really related to customs, but I did not dwell on it later.

11   Q.  But you stayed in the United States and continued with your

12   business meetings anyway, correct?

13   A.  Yes, that is correct.

14   Q.  Mr. Atilla, did you conspire with Reza Zarrab or anyone

15   else to evade sanctions?

16   A.  I did not conspire with anyone during any part of my life

17   on that.

18   Q.  Did you intend to break any laws?

19   A.  Never.

20   Q.  Are you guilty of any of the crimes that have been charged

21   in this indictment?

22   A.  I'm not, absolutely not.

23             MS. FLEMING:  Thank you.  No further questions.

24             THE COURT:  So let's take a five-minute break, and

25   then we'll have cross-examination.

HCIPATI6                          Atilla - Direct

1              (Jury not present)

2              THE COURT:  So, counsel, come on up for just a minute.

3              (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              MS. FLEMING:  I went longer because you took 15 of my

3    minutes.

4              THE COURT:  I did?

5              MS. FLEMING:  Just kidding, Judge.  Your prerogative,

6    obviously.

7              THE COURT:  So here's something to think about that we

8    have to decide about tomorrow.  One of the jurors has a trip

9    planned for January and told us that during voir dire.  And we,

10   I did for sure, but I think collectively said that, oh, it's

11   okay to go.  So that means that I don't think we can have that

12   juror begin deliberating.

13             Let's say deliberation starts tomorrow, or whenever,

14   because we don't know how long it's going to go and if it were

15   to go over, he wouldn't be able to be here.  So that's just

16   something you should think about overnight, and we should

17   decide in the morning.  My guess is we need to have another

18   juror, one of the alternates, go fill in.  He's in group one to

19   12.

20             MR. ROCCO:  We'd ask him if he wanted to stay before

21   we released him, right, your Honor?  We would ask the juror?

22             THE COURT:  Oh, if he was willing to or wanted to?

23   Sure.

24             MR. ROCCO:  Sure.  They're pretty invested.

25             THE COURT:  So that's a good thought.  I didn't even

1     think about that.

2               MR. KAMARAJU:  Do you know which one it was?

3               THE COURT:  I don't remember which one it was.  Let's

4     see, maybe we'll ask him and maybe it will be moot.  Okay.

5               So you are going to need how much?  You'll take

6     whatever you need.

7               MR. DENTON:  I mean, at this point, I'll definitely

8     get to the end of the day.  We're a far cry from after lunch.

9               THE COURT:  Right.  So, if you have to go over, you'll

10    go over.  Don't rush.  How long do you think?

11              MR. DENTON:  Probably, you know, an hour and a half,

12    maybe a little more.  I don't know.  If your Honor wants to

13    press hard tonight, we can try and do that, but frankly, given

14    that there's going to be redirect, I don't see the point.

15              THE COURT:  Are you still intent on other witnesses,

16    or no?

17              MR. ROCCO:  Let's see how the cross goes, your Honor.

18    I think we're less inclined, but...

19              THE COURT:  All right.  Let's see.  So we'll call them

20    back in a minute.  Thanks.

21              MR. DENTON:  How late does your Honor want to go

22    tonight?

23              THE COURT:  I'm not sure.  Let me think about that.

24              MR. DENTON:  I'll go until you stop me.

25              THE COURT:  And, you know, don't be influenced by our

HCIPATI6                    Atilla - Direct

1    discussion.  Do what you need to do.

2              MR. DENTON:  No, no.

3                  (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          (Jury present)

3          THE COURT:  So please be seated.  My guess, my

4     educated guess, is that we're going to have cross-examination

5     this evening, probably continue it a little bit tomorrow

6     morning.  There may be some redirect after that.

7          Following that, the lawyers are going to make

8     summations tomorrow, and I'm going to give you, the jury,

9     instructions, and it's going to take a good part of the day.

10    We may get to your beginning of deliberations.  If not, the

11    deliberations will begin Wednesday morning.  So that's pretty

12    much the schedule.  I think that's pretty accurate.

13         Counsel.

14         MR. DENTON:  May I proceed, your Honor?

15         THE DEPUTY CLERK:  Just to remind you, you're still

16    under oath.

17    CROSS-EXAMINATION

18    BY MR. DENTON:

19    Q.  Mr. Atilla, do you remember on Friday your lawyer asked you

20    some questions about the business with Iranian banks at

21    Halkbank after the merger with another bank?

22    A.  Yes, I remember that.

23    Q.  Your lawyer asked you, in 2009, what department at Halkbank

24    was responsible for assimilating the Iranian accounts and

25    offices into Halkbank proper, and you said:  The financial

1    institution and investor relations, this department, was in

2    charge with relations with those banks.  At that time, the

3    treasury and foreign relations were acting under the same

4    deputy manager.  Do you remember that?

5              THE INTERPRETER:  I'm going to ask you to please slow

6    down and repeat that.

7              MR. DENTON:  Sorry.

8              THE INTERPRETER:  I'm sorry, I tried to catch up,

9    but....  I can go with the first part, but then you won't know

10   where I stopped.

11             THE COURT:  Do it again.

12             THE INTERPRETER:  Yes, would you?

13             THE COURT:  Just start over.

14             (Continued on next page)

1    Q.  Do you remember that you said that the department

2    responsible for assimilating the Iranian accounts was the

3    financial institutions and investor relations department?

4    A.  I don't know what the word "assimilate" means.

5              THE COURT:  Combine.

6    A.  With regards to the bank, now I understand what it means.

7    Q.  Do you remember that you said at that time the treasury and

8    foreign relations were acting under the same deputy manager; do

9    you remember that?

10             THE INTERPRETER:  Treasury and what relations?

11   Q.  Treasury and foreign relations.

12   A.  That was in 2009.

13   Q.  Your lawyer asked you --

14   A.  But the merger was in 2005.

15   Q.  The questions were about 2009.  I'm asking you if you

16   remember what you said.

17             Your lawyer asked you was that you at that time when

18   the Iranian banks came in to Halkbank.

19   A.  Yes, so the financial institutions and investor relations,

20   I was responsible for that.

21   Q.  You were the head of that department, right?

22   A.  That is correct, yes.

23   Q.  You were the one responsible for bringing the Iranian

24   accounts into Halkbank, right?

25   A.  The accounts were transferred automatically.  There was

1  nothing that was required from me, but the relations after

2  that, that was under me, yes.

3  Q.  And the deputy general manager you reported to at that time

4  was Suleyman Aslan, right?

5  A.  At first it was Murat Cetinkaya, and after that it was

6  Suleyman Aslan.

7  Q.  In 2009, you and Suleyman Aslan were personally involved in

8  building up the Iranian business at Halkbank; isn't that right?

9  A.  Yes, that is correct.

10         MR. DENTON:  Mr. Chang-Frieden, can we show Mr. Atilla

11  Government Exhibit 2003.

12  Q.  Mr. Atilla, this is an e-mail that you sent Suleyman Aslan

13  on March 24, 2009; isn't it?

14  A.  That is correct.

15  Q.  The subject of the e-mail is "foreign trade operations in

16  Iran;" isn't that right?

17  A.  That is correct.

18         MR. DENTON:  Government offers Government Exhibit 2003

19  and 2003-T.

20         MS. FLEMING:  No objection.

21         THE COURT:  I'll allow it.

22         (Government's Exhibit 2003, 2003-T received in

23  evidence)

24         MR. DENTON:  If we can publish both of those,

25  Mr. Chang-Frieden.

1   Q.  Let's look at what this e-mail is.

2               MR. DENTON:  If we can zoom out for a second.

3   Q.  You're forwarding to Suleyman Aslan an e-mail that you sent

4   to a whole bunch of Halkbank branch employees; isn't that

5   right?

6   A.  This was to their specific branches, not to all branches.

7   Q.  Very specific people you wanted to help you bring in more

8   Iranian business, right?

9   A.  No, there was no effort to specify any of these

10  individuals.  These are the commercial and institutional

11  departments.  That -- branches that have the authority to do

12  foreign trade.  Not every branch has the authority to do

13  foreign trade.

14  Q.  I want to direct your attention to the first paragraph of

15  your e-mail to those managers.  Do you see the second sentence

16  of the first paragraph where you write "Pricing should be

17  performed at a higher level than normal operations"?

18  A.  Yes, I see that.

19  Q.  You go on to say "Because there is no other bank that can

20  provide this service at our scale, due to the existence of some

21  sanctions related to Iran."

22          Do you see that?

23  A.  I believe there is a translation error here.  Can I correct

24  that?  I'd like to say it this way.

25          Since there is no other bank in our country that works

1   with Iran, and since there are sanctions against Iran, so it

2   does not mean that these banks are not doing business with Iran

3   because there are sanction against Iran.  It just means there

4   are no banks that are doing this business at the level that we

5   are.  And separately, that there are sanctions against Iran.

6              So, where it says "due to the existence of some

7   sanctions" here would be a mistranslation on this document.

8   So, as it shows on the Turkish side, this refers to since there

9   is no other bank that could provide this service, and the

10  sanctions mention is separate from that.  That's what we see.

11  Q.  So Mr. Atilla, you're confident that the expert translator

12  translated this wrong?

13  A.  Yes, I'm confident.

14  Q.  Let's look --

15  A.  And that's because I know what I do in my job.

16  Q.  If we can look at the second full paragraph.  You see where

17  you said "Our target is to include companies who can make

18  contribution to us at all times to our portfolio"?

19  A.  Yes, I see that.

20  Q.  You continue to say "And to generate important commission

21  income instead of just providing mediation for each

22  transaction"?

23  A.  Yes, I see that.

24  Q.  You wanted to make more money, right?

25  A.  As a bank, yes.

1    Q.  And part of what let you do that was the sanctions, right?

2    A.  So, I cannot draw parallel between this and the sanctions,

3    but, so is this because we are receiving higher commissions?

4    Q.  You said you could receive higher commissions because of

5    sanctions, right?

6    A.  So I'll explain it this way.  This is how that topic may

7    come up.  Pricing is made or established based on the risk from

8    a certain country.  If you do not have to involve additional

9    controls, additional individuals, additional teams, with

10   regards to a transaction, then the pricing would be at a more

11   reasonable level.  But if you need to review the transactions

12   in detail and you have to employ many individuals, and in order

13   to follow up on matters that pertain to this area, if you need

14   to spend a lot of manhours and employ more people, then we have

15   to charge a higher commission.

16        So, what I'm trying to say is this, and I'm sorry, I

17   don't mean to make this go any longer.  So, we're not just

18   getting commissions because of the sanctions.  It is because of

19   the extra workload that the sanctions put on the bank, that's

20   why we're getting the extra commissions.

21   Q.  And the work you're talking about is the work to perform

22   due diligence on transactions, right?

23   A.  That is correct.  In terms of following the rules and

24   obtaining updates and such, yes.

25   Q.  It means things like checking documents, right?

1   A.  Of course they would be included.

2   Q.  Doing things to check that none of the banks involved were

3   on a sanctions list, right?

4   A.  That is correct.

5         MR. DENTON:  Mr. Chang-Frieden, we can take that down.

6   Q.  Let's talk about some of those banks.  You continued to

7   work with Iranian banks after you became the deputy general

8   manager in charge of international banking; isn't that right?

9   A.  That is correct, yes.

10  Q.  One of the major things you worked with Iranian banks on

11  was managing Iranian oil money, right?

12  A.  Not the management of that, because the management would be

13  up to the Treasury, but as far as gaining these funds for the

14  bank was, yes.

15  Q.  Bringing more Iranian oil money into the bank was part of

16  your job, right?

17  A.  Yes, it was included in there.

18  Q.  Once the money was at Halkbank, it was in accounts that

19  belonged to a number of different Iranian banks, right?

20  A.  So it was like this.  The gas payment would be made into a

21  bank account and the oil money would be paid to the Central

22  Bank account.

23  Q.  Then the Central Bank would use accounts of other private

24  Iranian banks to control that money, right?

25  A.  No, as soon as it gets into its accounts, it already had

1    the control.  But it was transferring the money to other banks

2    that needed the money.  Because in order to do foreign trade

3    transactions, these banks needed to have funds in their

4    accounts.

5    Q.  Let's talk about what some of those banks were.

6              Parsian Bank was one of them, right?

7    A.  Yes.

8    Q.  Pasargad Bank was one of them, right?

9    A.  Yes.

10   Q.  Sarmayeh Bank was one of them, right?

11   A.  Yes.

12   Q.  Saman Bank was one of them, right?

13   A.  Correct.

14   Q.  We've talked a little bit at various points during this

15   trial about the SDN list.  Do you remember that, Mr. Atilla?

16   A.  Of course.

17   Q.  That's the list where entities are designated, right?

18   A.  Absolutely true.

19   Q.  It is very important for you not to deal with entities on

20   that list, right?

21   A.  That is wrong.

22             MR. DENTON:  Can we bring up Government Exhibit 7028

23   at page two, please.

24   Q.  Do you see at the bottom here where it says "Halk still

25   deals with some Iranian non-sanctioned banks, although it

1    carefully monitors OFAC's list"?

2    A.  I see that.

3    Q.  You were there when Suleyman Aslan said that to David Cohen

4    on September 4, 2012, weren't you?

5    A.  I don't recall whether he said such a thing or not.  And I

6    don't remember such details from that meeting, but I'm speaking

7    from what is written here.

8              MR. DENTON:  Let's try Government Exhibit 7020.  Could

9    we bring that up also at page two.  If we can go to the middle

10   of paragraph six.

11   Q.  Do you remember telling Adam Szubin that the Central Bank

12   of Iran must instead use six or seven non-designated Iranian

13   banks to handle the volumes?

14   A.  I don't recall that, but I can go on with your question.

15   Go ahead.

16   Q.  Mr. Atilla, the banks that you're talking about there are

17   the banks that we just named like Parsian and Pasargad, right?

18   A.  So I don't know, but the bank works with Parsian and

19   Pasargad, if that's what you wanted to understand.

20   Q.  You told Adam Szubin that you were working with

21   non-designated Iranian banks, right?

22   A.  I think we need to make an explanation here if it's wanted,

23   and if it is not wanted, I'll just go on.

24   Q.  Let's start with if you remember saying that to Adam Szubin

25   before you explain something.

1          Do you remember telling him that you were dealing with

2   non-designated Iranian banks?

3   A.   I say this because not working with a designated bank from

4   the point of view of Halkbank means something else to us.

5   That's why I have this.

6   Q.   It doesn't mean --

7   A.   So, when we talk about designated banks, we don't talk

8   about or we don't mean Parsian, Pasargad or Sarmayeh.

9   Q.   Hold on, Mr. Atilla.  You mean something other than banks

10  listed on the SDN list; is that your testimony?

11  A.   So, here's what I have to say about this.  Next to the

12  banks that are listed on the designated list, there are certain

13  descriptions placed next to the banks' names.  So, I'm

14  explaining this in a way that Mr. Cohen had explained it to us.

15          Next to some of these bank, there will be three

16  different tags.

17          THE COURT:  Three different?

18          THE INTERPRETER:  Tags.

19          THE WITNESS:  Tags.  Definitions.

20  A.   For example, Bank Mellat, there would be three different

21  definitions next to Bank Mellat.  One of them would be, if I

22  recall correctly, the code of IFSR, another one would be NWP,

23  if I recall correctly.  And in one of them it would say simply

24  Iran.

25          If it says only Iran next to the bank's name, here's

HCI3ATI7                    Atilla - Cross

1    what that means.  It's a message to the U.S. banks saying this

2    is an Iranian bank, do not work with this bank.  So in order to

3    define this bank as an Iranian bank, there would be an Iran tag

4    added in there.  With these banks there is no issue, foreign

5    banks such as Halkbank, for them to be working with them.

6            Those that pose a problem to us, and those that

7    Mr. Cohen also had advised us to not work with, are those that

8    have the IFSR or the NWP or the NPW tags next to them.  I know

9    this is very technical but I have to explain this.

10           Because Bank Mellat and Bank Melli, and Bank

11   Keshavarzi, and there are some other banks as well, and since

12   they have different tags with their names, Mr. Cohen had

13   advised us we should not be working with these banks.  But if

14   it only had a tag showing Iran next to their name, and this

15   would be Pasargad, Sarmayeh, and Parsian, there would be no

16   obstacle for Halkbank to be able to work with these banks.

17           In summary, what I'm trying to say is the designated

18   banks do not mean it is a bank that Halkbank cannot work with.

19   The U.S. banks cannot work with the entire list of banks that

20   are there.

21   Q.  Mr. Atilla, I thought you testified yesterday you were not

22   a sanctions expert.

23   A.  Sir, you don't need to be an expert to know this.

24   Mr. Cohen had shown us the way and taught us this.  We did not

25   know this was the case either.  And we learned this as he

1   taught us.

2   Q.  Let's take a look at Government Exhibit 2019-T which is in

3   evidence.

4   A.  It appears that I'm an expert when I talk like this, but

5   I'm not an expert.

6   Q.  This is an e-mail that was sent to you and Levent Balkan,

7   right, Mr. Atilla?

8   A.  I presume it's correct.  It appears that these are the

9   normal addresses used by the bank.

10  Q.  That's your e-mail address, right?

11  A.  I couldn't see the full address, but I see it now, and yes,

12  it is mine.

13  Q.  It's Levent Balkan's e-mail address, right?

14  A.  Correct.

15  Q.  And Suleyman Aslan is copied on this, right?

16  A.  Correct.

17  Q.  You were the three people receiving information about new

18  sanctions, right?

19  A.  Yes, that is correct.  The deputy general manager

20  responsible for the Treasury is sending it to the three of us;

21  that is correct.

22  Q.  He's telling you that the banks we just talked about have

23  been put on the Specially Designated Nationals list, right?

24  A.  Correct, but we already knew that.

25  Q.  You knew that before OFAC put them on the list?

1    A.  No, we knew it before Murat Uysal knew it.

2    Q.  You must have been following pretty closely to know it

3    before then, weren't you?

4    A.  Since we were subscribers on the OFAC's page, whenever

5    there is a change to the list, you are automatically notified

6    through an e-mail.  And also, the compliance team would send

7    that information as well.  And Murat had sent this

8    notification.  Thanks to him, we got it too.

9    Q.  The time you got this e-mail in July of 2012, you were

10   working on a second IPO that your lawyer asked you a bunch of

11   questions about on Friday; isn't that right?

12   A.  I don't recall the date, but yeah, there were questions

13   about the IPO.

14   Q.  You were working on it in the summer of 2012, right?

15   A.  Like I said, I don't recall the date, but in 2012, we were

16   working on it.

17   Q.  There are a lot of different things that go into the

18   pricing of an IPO, right?

19   A.  Absolutely.

20   Q.  And the goal of an IPO is to raise as much money as

21   possible for the bank, right?

22   A.  The main purpose is not just that.  But let's just say it

23   is one of the purposes.

24   Q.  Fair to say that you want the share price to be as high as

25   possible, right?

 1   A.  Absolutely.

 2   Q.  One of the big things that affects that is how profitable

 3   the bank is, right?

 4   A.  It's -- I could say it is one of the most important ones,

 5   yes.

 6   Q.  One of the things that affects that is how much money the

 7   bank is holding.  You testified about that earlier, remember

 8   that?

 9   A.  I had mentioned that it would be important to have

10   inexpensive funds; that's what I said, yes.

11   Q.  One of the other things that affects that is revenue from

12   things like commissions, right?

13   A.  That is correct, absolutely.

14   Q.  Those are things that matter to investors in an IPO, right?

15   A.  They would pay attention to it only if the profitability

16   and the business model is sustainable.  If it's just for one

17   time or a couple of times, they will not pay attention to it

18   that.  But if it is sustainable, then yes, they would pay

19   attention to it.

20   Q.  Fair to say this IPO was very important to you, right?

21   A.  Absolutely.

22   Q.  Something you remember well?

23   A.  So, I would remember the results and the outcome, if that's

24   what you're asking.

25   Q.  Before we get to the outcome, it wasn't just important to

1  you personally; it was important to the bank as a whole, right?

2  A.  Of course it is important.

3  Q.  It wasn't just important to the bank, it was part of a

4  government privatization, right?

5  A.  I'm not sure about that side.  Sometimes there are

6  different opinions.  Because there are those that would say do

7  not privatize a state bank, leave it as it is.  And then there

8  are those that would say go ahead and privatize it.  So I'm not

9  sure.

10  Q.  But the government decided that Halkbank should sell more

11  shares, right?

12  A.  That is correct.

13  Q.  The IPO closed on November 16, 2012; isn't that right?

14  A.  Well, I don't remember the date.  But if you looked it up

15  and that's what you're referring to, then I would respectfully

16  accept that.

17  Q.  You were still working on it in the fall, weren't you?

18  A.  Like I said, I cannot recall, but it's possible that we

19  were working on it.

20  Q.  It was very important to you, Mr. Atilla.  Do you not

21  remember when in 2012 you were working on it?

22  A.  I apologize.  I have a hard time even remembering the house

23  phone number for my wife.  Of course this is something from

24  five years ago, and I'm proud about this, but I apologize.  I

25  cannot remember.

1    Q.  You remembered a lot of things very certainly today,

2    Mr. Atilla, haven't you?

3    A.  If there is a reason for it to stick in my memory, then

4    those things I do remember.

5    Q.  Something that's important to you would stick in your

6    memory, right?

7    A.  Sometimes important things and sometimes it could be those

8    things that are not so important.

9    Q.  Things that your lawyers have prepared you to talk about

10   stick in your memory, right?

11   A.  Well, they've not been very successful in that, because I

12   can't really keep things in my mind.

13   Q.  Mr. Atilla, let's try and ballpark it by seasons.  Were you

14   working on the IPO in the fall of 2012?

15   A.  So I'm forcing my memory, but I really cannot remember.  I

16   don't know what else to say.

17   Q.  Let's talk about that process more generally.  You

18   testified on Friday that while you were meeting with investors

19   for an IPO, it is important for you to know everything going on

20   everywhere in the bank; do you remember saying that?

21   A.  Absolutely, yes.

22   Q.  So during this time period, it was important for you to

23   know everything going on everywhere at the bank, right?

24   A.  It's never possible to know everything, but you try to get

25   enough information about as many things as you possibly can.

1   Q.  It is especially true with respect to big deals that the

2   bank is working on at the time, right?

3   A.  Of course.  And I do remember the IPO, I do remember the

4   issuance of euro bonds, I do remember the consortium of banks

5   in terms of years.

6   Q.  Do you remember also testifying on Friday that the part of

7   your job that involves meeting with foreign banks involved a

8   lot of face-to-face meetings?

9   A.  Yes, there is a need to meet with the banks face to face.

10  Q.  When they had proposals, you wanted to evaluate them in

11  person, right?

12  A.  When you refer to proposals, what do you mean from these

13  banks?

14  Q.  If an important bank wanted to do a certain kind of

15  business with Halkbank, you'd want to evaluate that in person,

16  right?

17  A.  That's not always the case, but I can summarize it this

18  way.  For example, if they want to do something related to the

19  Treasury, then they would talk with the Treasury Department.

20  If they want to fund a project, then they would talk to the

21  Loans Department.  And if they want to establish a

22  correspondent relationship, then they would be talking to me.

23  Q.  Do you remember being asked questions both on Friday and

24  today about a meeting with Iranian oil and bank officials in

25  October of 2012?

1    A.  I remember.

2    Q.  You heard Reza Zarrab testify that one of the subjects of

3    that meeting was bringing more Iranian oil money into Halkbank,

4    right?

5    A.  I remember with regards to the Indian money.

6    Q.  And the second thing that was discussed at that meeting was

7    that the Iranians wanted to use correspondent banking

8    relationships to fulfill payment orders; do you remember that?

9    A.  No, I do not remember, because the Iranian oil people have

10   nothing to do with correspondent banking.

11   Q.  Do you remember that that's what Mr. Zarrab said was

12   discussed at the meeting with both banking and oil officials?

13   A.  I don't recall.  But if you say that's what it is, then it

14   must be what it is.

15   Q.  Those two subjects are part of your job responsibilities,

16   right, Mr. Atilla?

17   A.  It is true that I have had much correspondence with the

18   Central Bank.  That is correct.

19   Q.  This meeting in October of 2012 happened at a time when it

20   was important for you to know everything going on everywhere at

21   the bank, right?

22   A.  So if you're referring to the IPO, and it happens to be at

23   the same time, I don't know.  And of course I'd want to know

24   everything in general in the bank as much as possible.

25   Q.  But despite it being your job, and despite you wanting to

1  know as much as possible about what was going on at the bank,

2  it is your sworn testimony here that you were not at that

3  meeting; is that right?

4  A.  What I said was I do not have a memory of such a meeting on

5  October 10, and I had not said anything about Zarrab having

6  transactions with the names mentioned in that meeting and any

7  transactions that may be conducted that may be against the

8  sanctions.

9          And as far as when I said October 10, I don't know if

10  it is October 10 or 4.  I may have mixed those up.

11  Q.  Just be very clear.  It is your testimony under oath that

12  you were not at the meeting that Mr. Zarrab described.  Is that

13  right?

14  A.  I did not take part in a meeting as described by Mr. Zarrab

15  at all.  I have had many meetings with the Central Bank, and I

16  recall that there were individuals that would come and go from

17  NIOC as well, although these names are different, they're not

18  these name, I know some other names.

19          But I did not take part in any meeting where it was

20  mentioned or it could have been mentioned that Reza Zarrab

21  should be doing this or that Reza Zarrab should be the one

22  intermediating with these international payments.  I did not

23  attend any such meeting.

24          I talked about the Indian oil.  I talked about the

25  funds in Japan.  We may have talked about funds in other

1   countries.  But I did not talk about a system with regards to

2   international payments to be made by Reza Zarrab, and I did not

3   attend any such meeting, ever.

4   Q.  You didn't talk about these subjects with Reza Zarrab at

5   all; is that your testimony?

6   A.  Yes.  That's what it is.

7              THE COURT:  This is a good place to stop, Mr. Denton,

8   for the evening.  It is quarter to five.  Pick up first thing

9   in the morning.  Ask the jury to be back at 9:15.  And please

10  remember not to talk with each other about the case or about

11  anyone who has anything to do with it until the end of the case

12  when you go to the jury room to deliberate.

13             Second, do not talk with anyone else about the case or

14  about anyone who has anything to do with it until the trial has

15  ended and you've been discharged as jurors.

16             Third, do not let anyone talk to you about the case or

17  about anyone who has anything to do with it, and if someone

18  should try and talk to you about the case, please report that

19  to Christine or me immediately.

20             Fourth, do not read any news or internet stories or

21  articles or blogs or listen to any radio or TV or internet or

22  cable TV reports about the case or about anyone who has

23  anything to do with it.

24             Fifth, do not do any type of research online or

25  elsewhere or any type of investigation about the case on your

 1    own.

 2              So thanks, see you first thing tomorrow.

 3              (Jury excused)

 4              THE COURT:  Tomorrow we're going to have to start a

 5    little bit even earlier that be today.  7:45 we'll pick up with

 6    the instructions.  We'll give you before you leave tonight most

 7    all of the instructions, not quite.  But I'll have the rest for

 8    you in the morning.  And the ones I don't have, I won't call

 9    them boilerplate, but they're toward the back end of my normal

10    instructions and they're mostly of that nature.

11              The one that probably requires a little more

12    discussion is the conscious avoidance charge.  But, the rest

13    are pretty mechanical.

14              So we'll see you in the morning.  I need to see

15    counsel for a moment up at the sidebar.

16              (At the sidebar)

17              THE COURT:  We don't have to resolve it today but we

18    will tomorrow.  That juror doesn't want to be -- is prepared to

19    show you his tickets and his plans and bring in everybody to

20    demonstrate that he was --

21              MS. FLEMING:  Which one is it?

22              THE COURT:  I think it's 10.  Number 10.

23              MS. FLEMING:  That's a bad seat I think.

24              THE COURT:  I don't think there is much we can do

25    about it except let him go.  So anyway.  But we'll pick up

HCI3ATI7

1    tomorrow morning at 9:15.

2          MR. LOCKARD:  Your Honor, given that we're likely

3    going to summations tomorrow, I wanted to talk a little bit

4    about timing.  You touched on it a couple days ago.

5          THE COURT:  Length or when it is going to start?

6          MR. LOCKARD:  Especially length I think.  I know your

7    Honor had mentioned something in the neighborhood of an hour.

8          THE COURT:  I'm a big less is more.

9          MR. LOCKARD:  I ask for a little bit of leeway because

10   it has been a slightly longer than three-week trial with a

11   couple days of defense testimony.  I think the Court noted

12   there are a number of charges that they're going to be

13   considering.

14         THE COURT:  You also get rebuttal, right?  Or whatever

15   it's called.

16         MR. KAMARAJU:  I'll come up with something.

17         THE COURT:  What are you thinking?

18         MR. LOCKARD:  Ordinarily I would expect something in

19   the neighborhood of about two hours.  But even if it is more

20   like an hour and a half, I think it would be a big help to the

21   jury to be able to organize the evidence and the charges.

22         THE COURT:  I'll do an hour and a half if you each

23   want it.  Try and keep it down, but sure.

24         MS. FLEMING:  Are we going to start at zero on

25   Wednesday?

1          THE COURT:  We're going to give you up to conscious

2     avoidance, so that's got all the substantive charges now in it

3     and everything we did before.

4          Oh, there is one other thing that will be in this

5     draft that you didn't see before, but we moved it up.  There is

6     an aiding and abetting charge that relates to the substantive

7     charges so I thought it was most logical to put it right after

8     the two substantive charges.  So, that's in there, you haven't

9     seen that before.  Well, you've seen it before.  Otherwise,

10    it's pretty much as we discussed.

11         The discussion tomorrow is going to probably be a

12    little more detailed than it was today.  It is not that easy to

13    do a charge conference in Times Square as we did this morning.

14    Normally I do it in the robing room.  So maybe we'll try that

15    tomorrow.

16         MR. ROCCO:  The robing room?  I've never had one in

17    open court.

18         THE COURT:  Either have I.  I didn't think anybody

19    would be here at 8 o'clock.

20         MR. ROCCO:  I think Ben was here.

21         THE COURT:  He was.

22         MR. DENTON:  We might want to give the marshals a

23    heads up if they're going to need the defendant back there.

24         THE DEPUTY CLERK:  They're going to try to do the best

25    they can.

HCI3ATI7

1          MS. FLEMING:  I forgot to ask him if we can waive his

2     presence.

3          THE COURT:  There is one other thing.  There is a

4     charge there that includes me opining on foreign law.  And I

5     don't really see how that happens or works.  It is not law that

6     I have any experience with or know about.  And so, I would ask

7     those of you who are propounding that instruction to see if

8     there is some alternative.  You will not see it in the draft

9     that we send you.

10         MR. ROCCO:  Your Honor, to change the subject just for

11    one second.

12         THE COURT:  Sure.

13         MR. ROCCO:  Since it is your practice to give the jury

14    the indictment, this indictment is loaded with law.  It is a

15    primer and I won't comment on whether it is an accurate primer

16    or not.

17         THE COURT:  But the good thing about it, Mr. Rocco, is

18    you can't understand it anyway.  It won't be a problem.  I'm

19    just joking.

20         MR. ROCCO:  Just that in mind, I could see the jurors

21    sitting educating themselves reading that indictment.  And

22    there are also factual errors.

23         MS. FLEMING:  Lots of them.

24         MR. ROCCO:  Yes.

25         THE COURT:  What?

HCI3ATI7

1        MR. ROCCO:  There are factual errors, and Ms. Fleming

2   reminded me there are lots of them.  It is not --

3        THE COURT:  I'm making a face.  This is an awkward

4   time to be telling me there are errors in the indictment.  It

5   is 5 o'clock the night before summations.

6        MR. ROCCO:  Well --

7        THE COURT:  I don't know what I can do.  I always give

8   them indictment.

9        MR. ROCCO:  There are errors.  I was thinking perhaps

10  we could talk to the government about it because there are, for

11  instance --

12       THE COURT:  If you --

13       MR. ROCCO:  -- on transcriptions where you have, I

14  think one of the July conversations you had a sentence, it is

15  in the indictment but it is not in your current version of the

16  transcripts that are in front of jury.  Those are the --

17       THE COURT:  If you can work something out.

18       MR. KAMARAJU:  We can't really get a new indictment.

19       MR. ROCCO:  You can redact things.

20       MR. KAMARAJU:  If you want to send us a version that

21  you think is redacted.

22       MR. ROCCO:  We'll send you something.  We'll do our

23  best.

24       THE COURT:  All right.

25       MR. ROCCO:  Thank you, Judge.

HCI3ATI7

1                    THE COURT:  You bet.

2                    MR. KAMARAJU:  Thank you, your Honor.

3                    (Adjourned until December 19, 2017, at 7:45 a.m.)

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                            Page

 3     HAKAN ATILLA

 4    Direct By Ms. Fleming . . . . . . . . . . .2035

 5    Cross By Mr. Denton  . . . . . . . . . . . .2137

 6                      GOVERNMENT EXHIBITS

 7    Exhibit No.                             Received

 8     7003, 7004   . . . . . . . . . . . . . .2072

 9     7109    . . . . . . . . . . . . . . . . .2074

10     2003, 2003-T   . . . . . . . . . . . . .2140

11                       DEFENDANT EXHIBITS

12    Exhibit No.                             Received

13     321   . . . . . . . . . . . . . . . . . .2084

14     324   . . . . . . . . . . . . . . . . . .2098

15

16

17

18

19

20

21

22

23

24

25
```