HCJPATI1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        S4 15 Cr. 867 RMB

MEHMET HAKAN ATILLA,

              Defendant.

------------------------------x

                                        December 19, 2017
                                        9:56 a.m.


Before:

                    HON. RICHARD M. BERMAN,

                                        District Judge
                                          and a jury



                        APPEARANCES

JOON H. KIM,
     United States Attorney for the
     Southern District of New York
MICHAEL DENNIS LOCKARD,
SIDHARDHA KAMARAJU,
DAVID WILLIAM DENTON, JR.,
DEAN CONSTANTINE SOVOLOS,
     Assistant United States Attorneys

2166

HCJPATI1

        (APPEARANCES Continued)


HERRICK, FEINSTEIN LLP (NYC)
     Attorneys for defendant Atilla
BY:  VICTOR J. ROCCO, Esq.
     THOMAS ELLIOTT THORNHILL, Esq.
     – and –
FLEMING RUVOLDT, PLLC
BY:  CATHY ANN FLEMING, Esq.
     ROBERT J. FETTWEIS, Esq.
     – and –
McDERMOTT, WILL & EMERY
BY:  TODD HARRISON, Esq.
     – and –
LAW OFFICES OF JOSHUA L. DRATEL, P.C.
BY:  JOSHUA LEWIS DRATEL, Esq.
                Of counsel


Also Present:
     JENNIFER McREYNOLDS, Special Agent FBI
     MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
     MS. ASIYE KAY, Turkish Interpreter
     MS. SEYHAN SIRTALAN, Turkish Interpreter

HCJPATI1                    Atilla - Cross

1              (Trial resumed; jury not present)

2              THE COURT:  So please be seated.  While you were all

3       waiting, we were, as I say, myself and the lawyers, were

4       discussing the jury instructions in the charge conference, and

5       I think we're pretty much there.  We will have, later in this

6       proceeding, probably at a break time, we will put the issues

7       about the instructions on the record.  We did not have a court

8       reporter for the preliminary conference.

9              So with that, we will pick up with the

10      cross-examination.

11             THE DEPUTY CLERK:  Sir, before we begin, I'd like to

12      remind you that you're still under oath.

13             THE DEFENDANT:  Yes, I know.  Thank you.

14             MR. DENTON:  May I proceed, your Honor?

15             THE COURT:  Yes.

16             MR. DENTON:  Mr. Chang-Frieden, could we bring up

17      Government Exhibit 7020 and if we could go to paragraph 5.

18      MEHMET HAKAN ATILLA,

19          called as a witness by the Defendant,

20          having been previously duly sworn, testified as follows:

21      CROSS-EXAMINATION (RESUMED)

22      BY MR. DENTON:

23      Q.  Mr. Atilla, I want to talk some more about your

24      February 12th, 2013, meeting with Adam Szubin.

25      A.  Of course.  Go ahead.

HCJPATI1                          Atilla - Cross

1   Q.  You see here in paragraph 5 of Government Exhibit 7020

2   where it says:  "Halk officials noted that they had been well

3   briefed on the changes that went into effect on February 6th"?

4   A.  Yes, that's what it says here.

5   Q.  That's a reference to what's called the bilateral trade

6   restriction, right?

7   A.  So I don't know the full details of the regulations, but I

8   know that it's about the bilateral trade.

9   Q.  Well, you know that the bilateral trade restriction means

10  you can only use Iranian oil money for transactions directly

11  between Turkey and Iran, right?

12  A.  So I presume that's what it is, in its general outline.

13  Q.  You couldn't use Iranian oil money to pay for goods shipped

14  from Turkey to someplace other than Iran, right?

15  A.  So what I remember is that the goods from Turkey can only

16  be sold to Iran directly, and they could not be sold to a third

17  country.  And, also, that the bank not intermediate for

18  transactions for third countries.

19  Q.  So you couldn't use Iranian oil money to pay for goods

20  shipped from Turkey to Dubai, for example, right?

21  A.  So that's what I assume.  As I said, I don't know all the

22  details and the technical details.  There might be exceptions

23  in the goods, for example, but in its general outline, I

24  believe that's correct.

25  Q.  The bilateral trade restriction is something you discussed

HCJPATI1                    Atilla - Cross

1   with Adam Szubin on February 12th, 2013; is that right?

2   A.  So I don't recall the exact dates necessarily, but there

3   was information exchanged with the individuals that had come

4   from OFAC.

5         MR. DENTON:  Mr. Chang-Frieden, could we bring up

6   page 2 of Government Exhibit 229-T.

7   Q.  Mr. Atilla, do you see in the third or fourth box down,

8   where it says:  "Mr. Reza had talked to Mr. Hakan, and there

9   was a problem, but it has been resolved"?  Do you see that?

10  A.  Yes, I see that.

11  Q.  And two boxes below that, do you see where it says:  "For

12  the exports write 'transit to Iran through Dubai' on the

13  declarations again"?

14  A.  Yes, I see that.

15  Q.  And again, two boxes down, do you see where it says:  "That

16  is what the regulations indicate"?

17  A.  Yes, I see that.

18  Q.  And just looking at the top of this page, do you see that

19  the date of this call is February 21st, 2013?

20  A.  Yes, that's what it says here.

21  Q.  So that's nine days after you discussed the bilateral trade

22  restriction with Adam Szubin; isn't that right?

23  A.  So I don't know whether that is the case or not.  As I

24  said, I did not recall the date.

25        MR. DENTON:  Let's go back to Government Exhibit 7020,

1    Mr. Chang-Frieden, and take us to paragraph 8.

2    Q.  So, Mr. Atilla, I want to talk about the gold trade now.

3    You knew before 2013 that it was already illegal to help the

4    government of Iran buy gold, didn't you?

5    A.  No.  No, there was no such thing.  I wonder if that was

6    mistranslated.

7    Q.  Well, do you see here where it says:  "This is in contrast

8    to current regulations, which prohibit sales to the government

9    of Iran"?

10   A.  So what I understand here is that after July 1st, the sales

11   to the government would be subject to sanctions, but the

12   private entities would not be subject to sanctions.

13   Q.  Well, no, that's not what it says, does it, Mr. Atilla?

14   What you were told is that after July 1st, sales of gold to

15   anyone in Iran would be prohibited, right?

16   A.  Yes.  Yes, that is correct.  Yes, that is correct.  I was

17   focusing on the translation here, but I -- after July 1st, it

18   is saying that gold sales could not be made to anyone.

19   Q.  But you knew even before that it was already illegal to

20   sell gold to the government of Iran, right?

21   A.  Yes, we knew it.

22   Q.  Now, you know that the Central Bank of Iran is part of the

23   government of Iran, right?

24   A.  I presume that it is.

25   Q.  And you know that the National Iranian Oil Company is part

1  of the government of Iran, right?

2  A.  I'm not sure about that one, but I'd assume that it may be,

3  since it's selling the national oil for that country, but I'm

4  not sure that it's a government entity.

5  Q.  Well, you know that there are banks that the United States

6  has designated as part of the government of Iran, right?

7  A.  I don't know that they are part of the government.  I know

8  there are government banks and private banks.

9  Q.  Well, yesterday, Mr. Atilla, you testified that you were

10  very careful about those letters you kept talking about on the

11  designations about the banks; do you remember testifying about

12  that?

13  A.  So we were being careful, but it's not that we knew it in

14  advance.  We were instructed as to how we should read those.

15  We had assumed that all the banks were banned, but we were

16  instructed otherwise, and we were told this is how you should

17  read it, and that's how we learned.

18  Q.  But you checked the OFAC list, and you knew that the

19  National Iranian Oil Company was listed as part of the

20  government of Iran, right?

21  A.  I know that NIOC was on the OFAC list, but I don't know for

22  what reason it was on that list.

23  Q.  You didn't check that as carefully as the stuff you were

24  testifying about yesterday?

25  A.  Since Halkbank and, in fact, Turkey is allowed to work with

1    the Central Bank of Iran and NIOC, I did not see a need to

2    review it in any more detail.

3    Q.  Now, while we're talking about banks, we talked a little

4    bit yesterday about your responsibilities dealing with

5    correspondent banks.  You dealt with banks in the U.S. as part

6    of that, right?

7    A.  That is correct.

8    Q.  Banks like Deutsche Bank and Citibank that helped

9    correspondent accounts for Halkbank, right?

10   A.  That is correct.

11   Q.  And you know that those banks have sanctions compliance

12   procedures, don't you?

13   A.  I don't know the procedures, per se, but based on their

14   size, they would have to have the compliance units.

15   Q.  Putting aside how they get to the decision, you know that

16   those banks will not process transactions for Iran, right?

17   A.  So I assume that they might have policies to that effect,

18   but there might be exceptions to that as well.  I don't know.

19   And I say that because there were times that U.S. banks had

20   asked us to conduct the transaction for Iran also.

21   Q.  You've seen transactions that were blocked by American

22   banks because they said "Iran" in them, right?

23   A.  I don't know the details about the transactions, but I do

24   know that there were transactions that got stuck.

25   Q.  So you know what matters --

1      THE COURT:  When you say "stuck," do you mean blocked?

2      THE DEFENDANT:  No, not blocked, but some transactions

3   are put on hold or suspended in order to do more review before

4   it's processed.  And later on, the banks would correspond with

5   each other to figure out what the nature of the transaction

6   might be.  If they conclude that there was no problem, then

7   they would continue with the process, but if they conclude in a

8   different way, then the transaction would either be rejected or

9   it could be frozen if there is a bad party involved.

10      THE COURT:  He used the word "blocked."  Are you

11   familiar with any blocked transactions?

12      THE DEFENDANT:  So I do not remember the details of

13   the transactions, whether they were blocked or not.

14   BY MR. DENTON:

15   Q.  When you talked about transactions involving banned

16   parties, you're talking about entities on the SDN list, right?

17   A.  For us, that was the case, but for other banks, they would

18   not do any transaction with anyone from Iran.

19   Q.  So you know that it matters to those banks who a payment

20   instruction says it's for, right?

21   A.  Well, of course, it is important, and it should be checked

22   who the sender and the recipient are.

23   Q.  So just going back to your February meeting with Adam

24   Szubin for a second, you met at Halkbank for that meeting,

25   right?

1   A.  If it were in Turkey, yes, we would have held it at the

2   Halkbank; that is correct.

3   Q.  He came to your offices, right?

4   A.  He had come to the Halkbank headquarters, not specifically

5   to my office, but to the headquarters.

6   Q.  And you discussed a number of different topics at that

7   meeting, right?

8   A.  That is correct.

9   Q.  You talked about the bilateral trade restriction?

10  A.  So I apologize, I don't remember the details, but we did

11  talk about many topics.  I just don't remember the details of

12  the topics.

13  Q.  It was at that meeting that Adam Szubin pulled you aside

14  for a private conversation; isn't that right?

15  A.  No, I do not remember such a thing.

16  Q.  He warned you about the U.S. government's serious concerns

17  about what was going on at Halk, didn't he?

18  A.  There was no such statement made.

19  Q.  So it is your sworn testimony that you never had a private

20  meeting with Adam Szubin on February 21st, 2013; is that right?

21  I'm sorry, February 12th.

22          THE INTERPRETER:  2013?

23          MR. DENTON:  Yes.

24  A.  I'm saying this independent of any date.  There was never

25  any such private conversation or a meeting between me and the

HCJPATI1                    Atilla - Cross

1    individual, where he pulled me aside and warned me about

2    something.  That never happened on any date.

3    Q.  Never happened?

4    A.  That is correct, it never happened.  In fact, just to the

5    contrary.  During his last visit, Mr. Szubin, at the beginning

6    of 2016, stated that they were very pleased with their work

7    with Halkbank.  In fact, there are some means that they were

8    not giving to the other banks.  They actually expressed those

9    means to us and offered them to us, to Halkbank only.

10   Q.  So your testimony -- just a second, Mr. Atilla.  Your

11   testimony is that no one from the Office of Foreign Assets

12   Control for the U.S. Department of Treasury ever warned you

13   about anything that was going on at Halkbank; is that your

14   testimony?

15   A.  No, that's not what I said, and I'll repeat what I said, if

16   you want.

17   Q.  No.  Let's talk about what you were told.  You were told

18   that the U.S. Department of Treasury was worried about the gold

19   trade through Halkbank, weren't you?

20   A.  That is correct.

21   Q.  And you were told that the U.S. Department of Treasury was

22   worried about your plan to bring money for Iran into Halkbank

23   from other countries, right?

24   A.  As far as when you say concerned, there was no such concern

25   expressed to us.  What we did was we asked them if we could do

1    such a thing, and they expressed to us what they think of what

2    we were asking them about.  And what they said was doing it

3    that way may be cause for concern because it is not easy to

4    identify whether the funds that Iran would be using would be

5    oil sources.  It is not easy to identify the source, and

6    because of this, it would not be -- excuse me, correction --

7    because of this, it would be a concern possibly to do it this

8    way.

9    Q.  Now, just to be clear, Mr. Atilla, you sat here when David

10   Cohen testified, right?

11   A.  Yes.

12   Q.  You sat here when Adam Szubin testified, right?

13   A.  Yes.

14   Q.  And you sat here when Josh Kirschenbaum testified, right?

15   A.  I don't recall -- I don't recall the name of that

16   gentleman, but if you say that I was here, then I must have

17   been here.

18   Q.  Do you remember your lawyer asking you on direct

19   examination if you followed news about the gold trade in 2012?

20   A.  So I apologize, I do not recall exactly, but that might

21   have happened, especially on that topic.  I seem to remember

22   that maybe such a conversation had happened.  Yes, I do recall

23   that we had talked about us sharing with each other the news

24   that we were receiving.

25   Q.  And you said you did follow that news, right?

HCJPATI1                    Atilla - Cross

1    A.  Yes, I was following those that I was seeing.

2    Q.  You read articles that you received about the gold trade,

3    right?

4    A.  Yes.

5    Q.  So let's look at some of what you actually read about it.

6            MR. DENTON:  Could we put up what's in evidence as

7    Government's Exhibit 2018.

8            And just to be clear, your Honor, this is the original

9    exhibit.  This is not a translation.

10   BY MR. DENTON:

11   Q.  So this e-mail was sent to you and to Levent Balkan, right?

12   A.  Yes, that's what it says here.

13   Q.  And it's copied to Suleyman Aslan, right?

14   A.  That's what it appears to be, yes.

15   Q.  The three of you, together, were receiving this news about

16   the gold trade; is that right?

17   A.  For this e-mail; that is correct, it was sent to three

18   people.  And it could be that we had forwarded it to others; I

19   don't know.

20   Q.  So let's take a look at what some of this e-mail says.  If

21   we could look at, I guess, it's the second full paragraph below

22   the "by" line.  On July 13th, 2012, you received an e-mail

23   telling you that "nearly $1.4 billion worth of gold was

24   exported to Iran, accounting for 84 percent of Turkey's trade

25   with the country;" do you see that?

1    A.  That's what it says here.

2             MR. DENTON:  If we could zoom out again,

3    Mr. Chang-Frieden, and zoom in on the paragraph that starts

4    "Turkey's gold exports."

5    Q.  Again, you received news that "as TurkStat itself noted,

6    the gold exports were for 'non-monetary purpose exportation.'

7    Translation:  They were sent in place of dollars for oil."  You

8    received that, right?

9    A.  I don't know about the news that is being cited here, but

10   if it's sent to me, then that's what it says there.  But even

11   though it says it here, it doesn't mean that it's true either.

12   Q.  Hold on, Mr. Atilla.

13   A.  Because the remaining news articles about this matter --

14   Q.  So you knew what was true and what was false with the gold

15   trade with Iran; is that right?

16   A.  When you say true or false, what do you mean by that?

17   Q.  Well, you said there was false news.  You were able to tell

18   when the news about what Iran's gold was for, was false, right?

19   A.  No, I didn't say that it was false news.  What I said was

20   it does not mean that this is true.

21   Q.  Wait a second.  It doesn't mean it's true, but you don't

22   know if it's false?

23   A.  What I said was that it doesn't mean that this is true.  I

24   mean, I cannot tell whether every news bit that we read is true

25   or not.  And what I'm trying to say is that there were other

```
 1    news about gold as well.  In other words, there were three or
 2    four different opinions on this.  One of them would be that
 3    they were saying gold was being smuggled.  Some of them were
 4    saying that the gas was being paid for through gold.  Some were
 5    saying that due to differences in taxes, they were saying gold
 6    is better, and some were saying that due to the economic
 7    conditions in Iran and the exchange rates for the currency,
 8    this is why the gold was being used.
 9    Q.  Your bank was involved in a huge amount of that gold trade;
10    isn't that right, Mr. Atilla?
11    A.  That is correct.
12    Q.  And your testimony is that there were all these stories
13    swirling around about what that gold was for, right?
14    A.  That is correct.
15    Q.  And a lot of those stories dealt with illegal uses of that
16    gold, right?
17                THE INTERPRETER:  Did you say "legal" or "illegal"?
18                MR. DENTON:  Illegal.
19    A.  No, that is not the case.  There were differences.  For
20    example, some were about the currency exchange rate, some were
21    about the attractiveness of the tax pertaining to this matter.
22    Q.  Well, let's look at this one.
23    A.  I apologize.  Especially, I just want to just add one more
24    thing.  What was being put out by the chamber of jewelers,
25    their opinion was that the demand for this gold was all legal.
```

HCJ3ATI2                    Atilla - Cross

1    Q.  Let's take a look at what's here.

2               THE COURT:  Can I -- excuse me -- interrupt for

3    one second.

4               As best you remember, can you tell us what Adam Szubin

5    said to you about Turkey's sales of gold to Iran?  As best you

6    remember.

7               THE WITNESS:  I, frankly, I do not remember what was

8    discussed.  But I do remember that --

9               THE COURT:  You don't remember any discussions that he

10   had with you about sale of gold to Iran?

11              THE WITNESS:  What I recall is a conversation between

12   Mr. Cohen and Suleyman Aslan.  That's the one I remember.

13              THE COURT:  I'm talking about Szubin and you.  Did he

14   have any conversations with you about the sale of gold by

15   Turkey to Iran?

16              THE WITNESS:  No, I do not remember that.  All I

17   remember is what he had talked about in his last meeting which

18   was in 2016.

19              THE COURT:  I'm just asking, you don't have any

20   recollection of what Mr. Szubin and you, what Mr. Szubin may

21   have told you about Turkey's sale of gold to Iran?  You have no

22   recollection at all?

23              THE WITNESS:  No, your Honor, I absolutely do not

24   remember such a thing, and if I had, I definitely would have

25   explained it.

HCJ3ATI2                    Atilla - Cross

1   Q.  Let's see if we can help you, Mr. Atilla.

2            MR. DENTON:  Mr. Chang-Frieden, can we put up

3   Government Exhibit 7020.  Paragraph eight.

4   Q.  Mr. Atilla, your testimony is that you have no memory of

5   Adam Szubin telling you to be extremely careful, noting

6   concerns in the U.S. government that the government of Iran may

7   be the ultimate buyer of gold.

8            You have no memory of that; is that your testimony?

9   A.  I'm -- I do not remember word by word what he may have

10  said.  All I'm saying is I do not remember what he said.  He

11  may have said these things, but my recollection is not that I

12  just don't have a recollection --

13           THE COURT:  Wait.  Finish.

14  A.  I don't have any recollection of what he might have said.

15           THE COURT:  He may have said these things but you

16  don't remember?

17           THE WITNESS:  Yes, your Honor.  That's correct.

18           Because we talked about these matters all the time.

19  So I don't remember what was mentioned by whom specifically in

20  what meeting.  But these are topics that were generally talked

21  about.

22           THE COURT:  That's what I was asking before.  Do you

23  remember what he told you about sales of gold from Turkey to

24  Iran at any meeting?

25           THE WITNESS:  As I said, I do remember discussing the

1  topic of gold.  But I do not recall at a specific meeting what

2  Mr. Szubin might have said.

3           MR. DENTON:  Mr. Chang-Frieden, if we can go back to

4  Government Exhibit 2018 for a minute and if we can blow up the

5  last five or six lines or so.

6  Q.  Mr. Atilla, do you see where you received an e-mail saying

7  effectively Iran converted $3 billion of its reserves into gold

8  through financial operations with Turkey, bypassing sanctions?

9  A.  If that's what it says here, then yes.

10 Q.  But the news wasn't all bad, right?  This also told you

11 that Iran's woes have proved to be a boon to Turkey's current

12 accounts.  Right?

13 A.  If this is a reference to the trade deficit being lowered

14 due to the increased exports out of Turkey, then that would be

15 a correct statement.

16 Q.  That's an issue that you were tracking closely in the

17 summer of 2012, wasn't it?

18 A.  We were following the foreign trade numbers.

19          MR. DENTON:  Mr. Chang-Frieden, if we can take a look

20 at Government Exhibit 2015 and 2015-T.

21 Q.  This is an e-mail that you sent to Suleyman Aslan, right?

22 A.  Yes, that's what the e-mails show.

23 Q.  The subject of the e-mail is Turkey Iran foreign trade

24 values and gold export, right?

25 A.  That is correct.

1    Q.  This e-mail wasn't sent by anyone in the operations

2    department at Halkbank, was it?

3    A.  This has nothing to do with operations.  This is about

4    foreign trade.

5    Q.  And that was your issue, so you sent this e-mail, right?

6            THE INTERPRETER:  Could you repeat that?  Sorry.

7    Q.  This was your issue, so you sent this e-mail, right?

8    A.  Yes, I was following the foreign trade numbers, yes.

9    Q.  What this shows is that there is a huge spike in Turkey's

10   gold exports in April 2012, right?

11   A.  That is correct.

12   Q.  It basically triples in a month, right?

13   A.  Yes, that's what it appears to be.

14   Q.  And that had a big effect on Turkey's trade deficit, didn't

15   it?

16   A.  I know that it affected it positively.  I don't know to

17   what extent, but I know it was positive.

18   Q.  If we look at what you sent Mr. Aslan down below, in March,

19   Turkey was exporting a lot less to Iran than it was importing,

20   right?

21   A.  Just a minute.  Let me look at that real quick.

22           Did you say March or April?

23   Q.  In March.  We'll talk about April in a second.

24   A.  It shows that the imports for Turkey were higher in March.

25   Q.  That's bad for the country's trade deficit, right?

HCJ3ATI2                          Atilla - Cross

1   A.  So, yes, I presume having a foreign trade deficit is not

2   good for countries.

3   Q.  You know that, right?  Foreign trade is your issue at the

4   bank, isn't it?

5   A.  So, if I'm being asked about my understanding of the

6   economy and information on how this works, how these numbers

7   were affecting each other, that's a different matter that I can

8   get into.

9           But I was only following the foreign trade numbers,

10  and I was not analyzing what those numbers may affect.  I was

11  only following the trade numbers themselves.

12          In other words, I knew that this was positive.

13  Q.  But you didn't bother to look at why?

14  A.  What do you mean "why"?

15  Q.  You said you didn't analyze the numbers at all, right?  You

16  just received them?

17  A.  No, what I'm saying is I did not analyze their effect on

18  the trade deficit.  I reviewed the foreign trade numbers, of

19  course.  Because the gold transactions that were being

20  conducted through Halkbank had risen quite a bit.  And for that

21  reason, I was looking at the foreign trade numbers.

22  Q.  It was important for you to have information about the gold

23  trade through Halkbank, wasn't it?

24  A.  That is correct.

25  Q.  It was something you looked into, right?

1   A.  That is correct.

2   Q.  So then, going back to these numbers in April, the same

3   month that the gold exports triple, all of a sudden Turkey is

4   exporting more than it's importing, right?

5   A.  That is correct.

6   Q.  And you kept following these numbers all throughout the

7   summer of 2012, didn't you?

8   A.  I remember that we followed these much longer than that.

9   Q.  Because you were looking into the details of the gold trade

10  through Halkbank, right?

11  A.  So, I was looking into the numbers related to the gold

12  trade that was being conducted through Halkbank.

13           MR. DENTON:  So just briefly, Mr. Chang-Frieden, can

14  we bring up Government Exhibit 2044 and 2044-T.

15  Q.  Again, Mr. Atilla, this is an e-mail from you to Suleyman

16  Aslan, right?

17  A.  Yes, that's what the e-mails show.

18  Q.  There is no one from operations on this e-mail; is that

19  right?

20  A.  As I said, this is not the business of operations.  This is

21  all foreign trade numbers.

22  Q.  No one from the treasury department of Halkbank is on this

23  e-mail, right?

24  A.  That may be the case for this one, but similar ones like

25  this they may have been.

1   Q.  None of the other deputy general managers got this e-mail

2   from you, right?

3   A.  I don't think so.  I would have forwarded this.

4   Q.  And this shows that the gold exports from Turkey to Iran

5   kept going up; isn't that right?

6   A.  Absolutely.

7   Q.  Mr. Atilla, we've talked a lot about Reza Zarrab's

8   companies during this trial.  You knew that Royal Denizcilik

9   was his company, right?

10  A.  Yes.

11  Q.  You knew that Safir Altin was his company, right?

12  A.  Yes.

13  Q.  And you knew that Reza Zarrab was responsible for the vast

14  majority of the gold exports that you were sending Suleyman

15  Aslan numbers for, didn't you?

16  A.  Yes, the operations told us that that was the case.

17  Q.  You were paying close attention to the gold trade through

18  Halkbank, right?

19  A.  Yes, I was looking at the numbers.

20  Q.  So let's look at what's in evidence as Government Exhibit

21  2033 and 2033-T.

22          This is an e-mail that you sent to Suleyman Aslan on

23  August 6, 2012, right?

24  A.  Well, if that's what it says here it must be correct, but I

25  don't remember the date.

1   Q.  You're sending him information about the Iran gold export

2   business flow and figures, right?

3   A.  Yes, I'm forwarding to him what the operations had

4   forwarded to me.

5   Q.  What you requested from operations, right?

6   A.  That is correct.

7   Q.  After having a discussion with Suleyman Aslan about the

8   topic, right?

9   A.  That's what it says here.  I don't recall it, but that's

10  what it says here.

11  Q.  You don't remember that?

12  A.  I do not remember.  That's dated 2012.

13  Q.  If we can zoom out and just look at the whole page here.

14  The first part of this talks about the documents for the gold

15  trade, right?

16  A.  Is it possible for me to look at the Turkish side?

17          Yes, the operations is explaining the process.

18  Q.  You see where it says that the documents have to be

19  delivered within a specified time period, maximum one month?

20  A.  Yes, I see that.

21          MR. DENTON:  Mr. Chang-Frieden, if we can go to page

22  four.

23          THE INTERPRETER:  So, a question is being asked about

24  the one month section.

25          THE WITNESS:  I was not able to see that section in

HCJ3ATI2                    Atilla - Cross

1   the Turkish version and it might be maybe just below.  If we

2   can go back to the previous page and look at that.

3   Q.  You said you saw it, right?

4   A.  I saw the English, yes.

5   Q.  You saw where it says that, right?

6   A.  I mean, I saw the English, and I just saw it, yes.

7            MR. DENTON:  If we can go back then to the page that

8   has the transaction numbers.  We need the next page of 2033-T.

9   Maybe it is the page before.  Is it page two?

10  Q.  Let's just do it with the Turkish version, Mr. Atilla.

11  What's reflected here are the gold exports for the various

12  companies that are listed, right?

13  A.  Yes, that's what it appears to be.

14  Q.  And the bottom half of the page is the commissions that

15  were paid to Halkbank by those companies, right?

16  A.  Yes, that's what it shows here.

17  Q.  Now, on the top half, you see Reza Zarrab's two companies

18  listed at number five and six, right?

19  A.  Yes, I see that.

20  Q.  Each of them exporting more than a billion euros of gold,

21  right?

22  A.  That is correct.

23  Q.  Nobody else is even close, right?

24  A.  So there is no one else with numbers over a billion.

25  Q.  That meant that they paid most of the commissions, right,

1    if we look at the bottom half five and six there, too, right?

2    A.  Yes, they had paid one of them 21 million Turkish liras and

3    the other one had paid 16 million Turkish liras.

4    Q.  Together they are about 75 percent of the commissions that

5    Halkbank made off the gold trade, right?

6    A.  If you calculated that to be so, then I respect that it may

7    be.

8    Q.  They paid most of the commissions for the gold trade

9    through Halkbank that you were paying close attention to; isn't

10   that right?

11   A.  I was following the general trend of commissions, but I was

12   not looking at which company was paying how much.

13   Q.  Well, you got told which company got paid how much, right?

14   A.  Yes, it was told to me, but there are many things that I'm

15   told.  I'm just telling you what I was following.

16   Q.  So you're told many things but you don't pay attention to

17   them; is that what you're testifying to?

18   A.  Let me put it this way.  I receive hundreds of e-mails and

19   hundreds of bits of information from many departments in the

20   bank.  So, it was impossible for me to follow everything in its

21   full detail.  I was just trying to follow them within their

22   general outline.

23        The trend of commission amounts, that would be

24   important for me.  But, which company is paying how much is not

25   important to me.

1    Q.  So you just didn't pay attention to what wasn't important
2    to you; is that what you're saying?
3    A.  Yes, that is so, because what's important to me was --
4              THE COURT:  Yes what?
5              THE WITNESS:  Yes, that is so.
6              THE COURT:  What is so?
7              THE WITNESS:  What was important to me was the level
8    of commissions paid.
9    Q.  You remember the things that are important to you, right?
10   A.  That is correct.
11   Q.  You don't remember the things that weren't important to
12   you, right?
13   A.  Yes, that is the case in general because the memory is not
14   sufficient to remember everything.
15   Q.  So you don't remember Adam Szubin telling you that he was
16   worried that the gold sales through Halkbank were for the
17   government of Iran, because that wasn't important to you,
18   right?
19   A.  I did not say that that was not important for me.  I did
20   say that this topic had come up every time, and that we had
21   discussed this with them.  And we also provided them with
22   information about this topic.
23        What I said was I do not remember specifically that
24   Mr. Szubin had used those words in a certain meeting.
25              THE COURT:  Do you recall, do you remember telling

1    either Szubin or Cohen, do you remember assuring them that you

2    and Halkbank knew its customers very well, and had procedures

3    in place to avoid sanctions evasions with respect to sending

4    gold to Iran?

5            THE WITNESS:  What I remember is this, and I believe

6    this was a topic that was discussed with Mr. Cohen --

7            THE COURT:  Before you get to -- do you remember, in

8    answer to my question, assuring Szubin and Cohen that Halkbank

9    knew its customers very well, and that it had procedures in

10   place to avoid violating the sanctions against Iran?

11           THE WITNESS:  It was not worded exactly as was stated.

12   I believe that we had mentioned this matter in a similar way,

13   it would not be too far from the words that was just used.  And

14   I would be happy to explain to you what I remember that was

15   said, but it was not exactly as what I remember as the words

16   that was used here.

17           THE COURT:  Sure.

18           THE WITNESS:  That the companies involved in gold

19   trade were gold trade companies, and that those entities

20   importing gold from Iran, there was a check being conducted to

21   see if they were government entities or not.  And it was not

22   allowed to export gold to entities that did not have gold as

23   part of their field of activity in their business.  And it was

24   also shared that, in general, it was being checked whether any

25   other parties were on any lists.

1  Q.  You never told them that gold was being bought with money

2  from the Central Bank of Iran, did you?

3  A.  I did not understand that fully, because there is no other

4  place it could come from anyway.

5  Q.  You didn't tell them that the money to buy gold was coming

6  from NIOC, did you?

7  A.  So, U.S. Treasury already knew this, everybody knows that's

8  the case.  So, the funds are the funds that were being paid for

9  the oil imports, there is no other meaning to this anyway.

10 Q.  That's the money that belonged to the government of Iran,

11 right?

12 A.  That is correct.

13 Q.  And the government of Iran was using that money to buy

14 gold, right?

15 A.  No, not the government of Iran.  The private sector was

16 using this money.

17 Q.  It was money that belonged to the government of Iran,

18 wasn't it?

19 A.  If you look at it from that viewpoint, then one could also

20 say all the business that is being done through U.S. dollars

21 around the world is also the business of or the money of United

22 States.  And you can attribute all this business to the

23 government of United States, and that can't be done.

24         Let me put it this way.  That the Central Bank is

25 allowing other companies to use this money for gold purchases

HCJ3ATI2                         Atilla - Cross

1    does not mean that it is the government that's making the

2    purchases.

3    Q.  Hold on a second.

4    A.  In fact, if it were to be the case, then U.S. Treasury

5    would not allow it anyway.

6    Q.  Mr. Atilla, the money at Halkbank came from Tupras and

7    Botas buying oil and gas from NIOC and the NIGC, right?

8    A.  Absolutely so.

9    Q.  And that money is what was used to buy the gold, right?

10   A.  So, here's how it is.  That money would be transferred to

11   the Central Bank through the relevant companies.

12   Q.  Just to be clear, the Central Bank of Iran.

13   A.  Absolutely so.

14   Q.  At its accounts at Halkbank.

15   A.  Absolutely.

16   Q.  The money gets paid to the Central Bank of Iran for sales

17   of oil and gas, right?

18   A.  Absolutely.

19   Q.  And then the Central Bank of Iran gives that money to other

20   banks, right?

21   A.  Absolutely.

22   Q.  Money still came from oil and gas sales --

23            THE INTERPRETER:  Excuse me.

24   A.  So you mean, it gives it to other Iranian banks?

25   Q.  At Halkbank, right?

HCJ3ATI2                      Atilla - Cross

1    A.   Absolutely.

2    Q.   It is still the money from the oil and gas sales, right?

3    A.   Well, from a banker's perspective that is not the case.

4    But if that's how you want to see it, maybe.  Because if we're

5    going to attach a string to it and follow it to everywhere it

6    goes, then we have to look at where Tupras got that money in

7    the first place as well.

8    Q.   Let's start at the point where it goes from Tupras and

9    Botas to the government of Iran.  The government of Iran just

10   transferred it to those banks, right?

11   A.   The Central Bank, the Central Bank of Iran makes those

12   transfers if there is such a request.

13   Q.   It didn't buy anything with it, right?

14   A.   When you have bank-to-bank transfers, then no sale is

15   required anyway.

16   Q.   They just moved the money, right?

17   A.   In order to support the foreign trade funding, there are

18   times when the correspondent banks need to move money around.

19   And in fact, all the banks around the world do this, not just

20   Iranian banks.

21   Q.   Those banks like Bank Sarmayeh transferred it to Reza

22   Zarrab's companies, right?

23   A.   That is not exactly so, and I can explain how it is if

24   you'd like.

25   Q.   Oh, sure.

HCJ3ATI2                     Atilla - Cross

A.   The buyer in Iran would give instructions to its own bank,

whichever bank that may be.  And if that bank has an account at

Halkbank, then that bank would send instructions to Halkbank.

And Halkbank would then notify the exporter in Turkey about the

instruction.  And if there is no problem with the goods or the

services that are subject to this trade, then Halkbank would

make a payment to the customer.

Q.   And the payment is out of that money that went from Tupras

and Botas to the Central Bank of Iran to the other Iranian

banks, right?  That's what Halkbank would pay out of.

A.   I don't know where the money may be coming from.  But I

would say that that's probably the main source of the money.

Because there are other sources of money, too, such as Indian

oil money or there are times that the Central Bank transfers

money from other foreign sources as well.

Q.   It's all money from the Central Bank of Iran, right?

A.   Absolutely.

Q.   And the money that's coming from India is payments for oil

from Iran, right?

A.   Absolutely.

Q.   Oil sold by NIOC, right?

A.   Absolutely.

Q.   So that's also NIOC money, right?

A.   It's the funds from the goods that NIOC is selling.

Q.   And that money was also used to buy gold through Halkbank,

1    right?

2    A.   That is correct.

3    Q.   All right.  Let's leave gold alone for a minute and talk a

4    little bit about food.

5              I want to talk for a minute about April of 2013.

6    We've talked a lot about a call you had with Reza Zarrab on

7    April 10, 2013.  Do you remember that?

8    A.   I remember.

9    Q.   You talked about various procedures for the food trade,

10   right?

11   A.   Not procedures, but I was just trying to figure out what he

12   was trying to do.

13             MR. DENTON:  We're not going to go over every line of

14   this, but can we bring up 295-T, Mr. Chang-Frieden.

15   Q.   So this was a call you had with Mr. Zarrab at 11:45 on

16   April 10, right?

17   A.   That's what it says here.

18             MR. DENTON:  Mr. Chang-Frieden, can we go to the last

19   page of this.

20   Q.   I want to direct your attention, Mr. Atilla, to where you

21   say "I'll get back to you once I finish consulting with

22   colleagues on this matter."

23             You said that, right?

24   A.   Yes, I see it.

25   Q.   You did that, right?  You consulted with colleagues about

HCJ3ATI2                          Atilla - Cross

1    the subject you talked about Reza Zarrab, right?

2    A.  Well, there was no need, because they had already talked to

3    him about these things, but they did inform me.

4    Q.  Well, so let's talk about what happened next.  If we can

5    bring up 297-T, Mr. Chang-Frieden.

6            This is a call between Reza Zarrab and Abdullah

7    Happani on that same day, right?

8    A.  Well, it says so here.

9    Q.  Your lawyers showed you this call many times, right?

10   A.  If I could see the conversation.

11   Q.  Let's go to page four, please.  You see where Mr. Zarrab

12   says, I think it is about six or seven blocks down, "they

13   placed a roadblock today."

14   A.  Yes, I see that.

15   Q.  Do you see kind of down at the bottom where he says you

16   were the roadblock, right?  "Hakan Atilla threw a wrench in the

17   gear."  You see that, right?

18   A.  Well, that's how he describes it.  I don't believe that's

19   correct, but that's how he described it.

20   Q.  You see how he says that he had the roadblock that you

21   posed removed, right?

22   A.  What's shown or being said here is that, yes.

23   Q.  The way the roadblock got removed is that Suleyman Aslan

24   made a call, right?

25   A.  That's not how it worked, but that's how he states that how

HCJ3ATI2                       Atilla - Cross

1    it was.

2    Q.  Let's look at the next thing you were involved in.

3              MR. DENTON:  Can we bring up Defense Exhibit 331-T.

4    And 331 for the witness, too.

5    Q.  So, this is an e-mail that Hakan Aydogan sent you on the

6    next day, April 11, 2013.  Right?

7    A.  Yes, that's what it appears to be.

8    Q.  You testified that you were in Barcelona when you got this

9    e-mail, right?

10   A.  That is correct.

11   Q.  So you got it on your smartphone, right?

12   A.  That is correct.

13   Q.  And your phone can receive e-mails, right?

14   A.  Unfortunately so, yes.

15   Q.  You can get calls, right?

16   A.  Of course.

17   Q.  You can get voice mails, right?

18   A.  I did not receive any, but I would assume it can receive.

19   Q.  You can get text messages?

20   A.  Of course.

21   Q.  Let's just talk for a second about Hakan Aydogan.  He took

22   over Levent Balkan's job, right?

23   A.  Yes, after the individual had left, after a while, he had

24   come into that position.

25   Q.  He was pretty new in this position as the head of foreign

1    operations in April of 2013, right?

2    A.  So, I don't believe there was much time that had passed

3    since his appointment to that position.

4    Q.  And he wasn't a deputy general manager, right?

5    A.  No, there was a lady who served as his deputy general

6    manager.

7    Q.  So it's fair to say he didn't outrank you, right?

8    A.  No, it was not, no.

9    Q.  He certainly couldn't make you do something you didn't want

10   to do, right?

11   A.  No.  Not just him, but anyone else.  Nobody can make me do

12   something that I don't want to do.

13   Q.  Everything you did, you did because you wanted to do it,

14   right?

15   A.  No, what I said was nobody can make me do something that I

16   don't want to do.

17   Q.  Hakan Aydogan didn't report to you either, right?  He

18   wasn't in your division.

19   A.  He was not working in my section; that is correct.

20   Q.  But he still sent you this e-mail about Reza Zarrab's food

21   trade while you were on vacation.

22   A.  That is correct.

23        MR. DENTON:  Mr. Chang-Frieden, if we can look at

24   Defense Exhibit 332 and 332-T.

25   Q.  This is an e-mail that Hakan Aydogan sent you on Monday,

1    April 15, 2013.  Right?

2    A.  Yes, that's what it appears to be.

3    Q.  You had just gotten back from vacation, right?

4    A.  If I recall correctly, I probably had returned a day before

5    this.

6    Q.  And you are the only person who received this e-mail,

7    right?

8    A.  Yes, that's what it appears to be.

9    Q.  Suleyman Aslan is not copied on it.

10   A.  No.

11   Q.  The woman who you just said who Hakan Aydogan reports to,

12   she is not copied on this e-mail, right?

13   A.  No, she was not copied.

14        MR. DENTON:  And Mr. Chang-Frieden, if we can zoom out

15   on the English version and look at the last few lines.

16   Q.  Do you see at the bottom, Mr. Atilla, where Hakan Aydogan

17   says "If you find this suitable, we will meet with Royal

18   accordingly"?

19   A.  Yes, I see that.

20   Q.  He's asking for your approval, right?

21   A.  He's asking me if I have any problem with this or not.

22   Q.  Let's just fast forward and talk briefly about July of

23   2013.

24   A.  Would you like me to explain to you why he was asking me?

25   Q.  Why was he asking for your approval if he doesn't report to

1    you?

2    A.  Because correspondent banking was under me.  So, if there

3    were to be a transfer abroad, then they need to inform me about

4    it.

5    Q.  You would have to approve it, right?

6    A.  I did not approve the transaction.  But if they need to use

7    a correspondent bank, they need to ask me for it.

8    Q.  If a company is looking to set up a regular system for

9    transactions involving correspondent banking, you have to

10   approve the system, right?

11   A.  I did not understand that fully, if you could please

12   restate.

13   Q.  Companies sometimes want to do a lot of the same kind of

14   transaction, right?

15   A.  So, I understand that to be they need to do the same type

16   of transaction over and over, and, yes.

17   Q.  Those companies would come to the bank to talk about how

18   they want to do it, right?

19   A.  Sometimes.  Not always, but sometimes.

20   Q.  If it involved correspondent banking and they came to the

21   bank to talk about it, you'd be a part of that, right?

22   A.  Sometimes a customer, sometimes the branch or sometimes

23   another department, they would, yes.

24   Q.  They would come to you, right?

25   A.  Well, they could also make a phone call.

HCJ3ATI2                       Atilla - Cross

1   Q.   And you might not talk about a particular transaction, but

2   you would talk about the method that would be used for the

3   transactions, right?

4   A.   There is no such thing as a method in the banking sector,

5   sir.  There are only payments that are made, being made between

6   banks.  And the payments work in the same way, regardless of

7   which country or which company is involved.  So, there is no

8   specific method or specific way that is involved here.

9        For example, I'll provide an example.  If a customer

10  wants to transfer euros, it is established as to how you can

11  transfer euros.  Halkbank would use euro correspondent banks,

12  and would transfer the money through them.

13       With regard to that, the point at which we get

14  involved as a department is this:  We would decide which

15  correspondent banks should be used or should be contacted, or

16  we would decide which banks should not be used.

17       Outside of this, the process regarding the

18  transactions for all the customers would be based on what the

19  operations would set.

20  Q.   And the operations would ask for your approval, like Hakan

21  Aydogan did in that e-mail, right?

22  A.   So, what Hakan Aydogan was asking here is different than

23  the payment system.  What Hakan Aydogan was asking was about

24  the customer wanting to make a payment before the goods would

25  be delivered.  And therefore, he was told that this request by

1    customer was not feasible.  Therefore, they found it fit that

2    the seller in Dubai should also open an account at Halkbank.

3    And they thought that way, a complaint from the seller in Dubai

4    saying that I sent the goods without receiving the money would

5    not be appropriate.  Would not hold any water.  Because if

6    there were to be a letter of credit involved here, there would

7    not have been any need for this kind of thing.  Because then

8    the other party, when they load the goods, they would know that

9    they would be able to receive their money.

10            But since the gentleman Reza Zarrab did not want to

11   work through a letter of credit, he wanted to send money abroad

12   before the goods were delivered.  And Halkbank did not allow

13   this.  So, what Hakan Aydogan was explaining, this is that

14   matter.

15   Q.  So let's fast forward and talk about July of 2013 for a

16   moment.

17   A.  Of course.

18   Q.  Hakan Aydogan still does not report to you at this point,

19   right?

20   A.  That is correct.

21   Q.  He's still not anywhere in your department, right?

22   A.  That is correct.

23   Q.  I think you've testified just now and many times that it

24   wasn't your job to deal with what documents were required,

25   right?

HCJ3ATI2                         Atilla - Cross

1    A.  So, which documents should be required or requested is not

2    part of my job.  But as part of our routine work we do talk

3    with branches or the customers.

4    Q.  You remember your lawyer showed you yesterday a transcript

5    of a call where you were talking to Reza Zarrab about bills of

6    lading, right?

7    A.  Yes, I remember that.

8    Q.  By the way, bills of lading as a component of due diligence

9    was something you had talked about with Adam Szubin, right?

10   A.  Well, I don't remember that detail.

11   Q.  You don't remember that one either?

12   A.  Well, I'd already said that I did not remember all the

13   details about that conversation.

14   Q.  You remember you told your lawyer during your direct

15   examination that the reason why you were having that

16   conversation with Reza Zarrab was because Hakan Aydogan was

17   busy doing something with other branches?  Do you remember that

18   testimony?

19   A.  Yes.

20   Q.  So he just got the deputy general manager in charge of

21   international banking to cover his desk; is that your

22   testimony?

23   A.  No, those that worked under him informed me.  So it was a

24   lower level staff that had forwarded it to me.

25            (Continued on next page)

1    Q.  Now, Mr. Atilla, there came a time at the end of 2013 when

2    Suleyman Aslan and Reza Zarrab were arrested; isn't that right?

3    A.  It was in December, yes.

4    Q.  And that's the CEO and one of the biggest clients of the

5    bank, right?

6    A.  That is correct.

7    Q.  So after those allegations became public, did the bank do

8    an internal investigation?

9    A.  Yes, it did conduct one.

10   Q.  What did the internal investigation find?

11   A.  They checked the procedures.  In other words, let me put it

12   this way, there were two different topics; one was the review

13   that was conducted by the bank's auditors, inspectors, and the

14   other one was an independent auditor for the bank.  And neither

15   of these individuals found or said anything about the matter at

16   hand after their review --

17              THE COURT:  I'm sorry, what was that?

18              THE INTERPRETER:  After their review.

19              THE COURT:  What was the answer, neither of them found

20   what?

21              (Record read)

22              THE COURT:  What was the matter at hand?

23              THE DEFENDANT:  There were two matters.  One was

24   improper granting of loan, and the other one was the procedure

25   that was followed in foreign trade, providing privilege to Reza

HCJPATI3                      Atilla - Cross

1  Zarrab on behalf of somebody else, or in other words, providing

2  Reza Zarrab with a privilege by blocking others from trade

3  because they believed that Suleyman Aslan had -- alleged to

4  have received as bribes was related to that topic.

5            THE COURT:  Did they make a finding about whether --

6            THE INTERPRETER:  Shall I translate this?

7            THE COURT:  Yes.

8            THE DEFENDANT:  So the two issues were leaving the

9  competitors of Reza behind and providing a privilege to Reza

10 Zarrab, and the second one was --

11           THE INTERPRETER:  I forgot, maybe you could --

12           THE DEFENDANT:  It was the improper granting of loans.

13           THE COURT:  Did they make a finding about whether

14 Aslan had done anything wrong?

15           THE DEFENDANT:  They reviewed and said that the loan

16 had not been provided improperly.  And they reviewed companies

17 that did foreign trade with Iran, and they said that both, in

18 food and gold trade, even though their volumes were not as high

19 as Reza Zarrab's, that they were also able to conduct their

20 trade in those sectors.  And if I recall correctly, they even

21 said that the foreign companies were able to do more of the

22 volume.

23           And last, they said with regards to other companies

24 being blocked and Zarrab being given a privilege, there was no

25 basis that would constitute such a thing being happening.  And

HCJPATI3                         Atilla - Cross

1    the independent auditor works this way.  They do not produce a

2    report that explains how things are done this way or that way.

3    They only write it up if they find something that's negative.

4              THE COURT:  The independent?

5              THE DEFENDANT:  Yes.  The independent -- yes, the

6    independent ones conduct a review, and if they find anything

7    that is improper or derogatory, they would put that into their

8    report as a note or as an opinion.

9              THE COURT:  What did they find?

10             THE DEFENDANT:  No, they did not put anything in their

11   reports as to anything negative that they had found because, as

12   I said, they only write it up if they find something.  They do

13   not put it in their reports that they did not find something.

14             So in other words, they have a different way of

15   working.  If they find something, then they note it down, and

16   if they don't find anything, they don't write it and it's

17   assumed that there was nothing wrong.

18             But the audit committee of the bank works differently.

19   They work to find things, and they write about what they find.

20   And that committee does not work for or report to the general

21   manager.  They report to the board of directors.

22             The BDDK, which was the bank regulations entity during

23   that period, I believe that they also had run a review, but I

24   don't recall whether they found anything, or if they produced a

25   report or not.  I don't remember that.  In fact, if there had

1   been anything, it would have come up anyway.  But I don't

2   recall whether there was any report produced or not.

3   Q.  So you don't recall seeing a report from a BDDK expert

4   appointed as part of the December 17th investigation; is that

5   your testimony?

6   A.  That has nothing to do with what I said.  That's not what

7   I'm saying.  What I'm saying here is that BDDK, as an entity --

8   the review that BDDK did as an entity, I have no idea what may

9   have come of that because they had auditors that work at the

10  bank.  What you're saying is the expert that had been appointed

11  by the prosecutor and had worked with the prosecutor, that's

12  different.

13  Q.  And the expert comes from BDDK, right?

14  A.  Yes, that would be one that would be appointed from the

15  BDDK, correct.

16  Q.  And that's your bank regulator, right?

17  A.  That is correct.

18  Q.  And you saw the expert report, right?

19  A.  Yes, I saw it.

20  Q.  So you remember that the report concluded that you violated

21  the resolutions imposing sanctions on Iran, right?

22          MS. FLEMING:  Objection, Judge.

23          THE COURT:  Overruled.

24          MS. FLEMING:  That's outrageous.  May I see you at

25  sidebar, please?

HCJPATI3                          Atilla - Cross

1                    (Continued on next page)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                (At the side bar)

2                MS. FLEMING:  Judge, I have not addressed this.  First

3     of all, it's way beyond the scope of what I did on direct.

4     Second, I believe this is a report by somebody who's a

5     fugitive, and it's part of a -- it's part and parcel with this

6     Turkish report.  It is filled with hearsay.  It quotes from the

7     Turkish report.  It never entered the --

8                THE COURT:  Wait.  You're talking about what document?

9                MR. DENTON:  There was an expert auditor appointed as

10    part of a --

11               THE COURT:  Did he write a written report?

12               MR. DENTON:  Yes.

13               THE COURT:  Are you going to introduce it?

14               MR. DENTON:  Nope.

15               THE COURT:  You're not.

16               MR. DENTON:  I'm just asking him if he remembers

17    reading it.

18               THE COURT:  If it refreshes his recollection.

19               MR. DENTON:  I'm not even going to do that.  If he

20    doesn't remember it....

21               THE COURT:  Okay.

22               MS. FLEMING:  But, Judge, the question is suggesting

23    that that was the finding, which is just misleading and

24    dishonest.  And based on what's in that report, it's a

25    dishonest and misleading question.  I'm going to move to strike

HCJPATI3                        Atilla - Cross

 1    it.

 2              THE COURT:  But what does it say?

 3              MR. DENTON:  It says literally what I said.

 4              MR. HARRISON:  Can you keep your voice down; so the

 5    jury can't hear you?

 6              THE COURT:  What does it say, just so the record is

 7    clear.  Do you have it?

 8              MR. DENTON:  Yes, I have it.

 9              THE COURT:  Yes, let's have it; so we have it in the

10    record.

11              MR. DENTON:  I'll get it.

12              MS. FLEMING:  Unbelievable.

13              MR. DENTON:  So the two things that it said, at

14    different points, I can get the full report are that Suleyman

15    Aslan and the defendant violated the resolutions imposing

16    sanctions on Iran and circumvented the aforementioned

17    sanctions.

18              MS. FLEMING:  Could you get the report, please, and

19    show the report to the Court?

20              MR. DENTON:  We can.

21              MS. FLEMING:  And could you keep your voice down.

22              THE COURT:  Do you think that he's not telling the

23    truth?

24              MS. FLEMING:  I don't think that's a fair

25    representation of what the report represents.

1          THE COURT:  He didn't say that.  Does the report say

2   what he just said?

3          MS. FLEMING:  I need to check the exact words.

4          THE COURT:  Wait a minute.  How can you accuse him of

5   being --

6          MS. FLEMING:  Because --

7          THE COURT:  Just a minute.  Of not telling the truth

8   if you don't know if his statement is accurate or not?  How can

9   you say it's outrageous and you don't know?

10          MS. FLEMING:  Because I'm familiar enough with the

11   report to know what --

12          THE COURT:  No, you're not.  I'm just asking you if

13   the statement he quoted is in the report.

14          MS. FLEMING:  I don't know if those exact words are in

15   it.  It is out of context.

16          THE COURT:  But you jumped up and said it's

17   outrageous.

18          MS. FLEMING:  Judge, the way he did that and the way

19   he suggested, given what the context and given what this report

20   is, the way he did it in front of the jury is really

21   inappropriate.

22          THE COURT:  I'm trying to figure out how --

23          MR. ROCCO:  Well, your Honor --

24          THE COURT:  -- if it's an accurate statement.

25          MR. ROCCO:  I didn't want to jump in, but I think

1    Mr. Denton by asking the question basically broadcast what the
2    result of that hearsay report is.  That's what I reacted to.
3              THE COURT:  That's what you lawyers do.  You ask a
4    question.
5              MR. ROCCO:  Not quite.
6              THE COURT:  You ask a question:  Didn't Mr. Gulen try
7    to get you released from jail?  Right?  And because you're
8    trying to say that the witness is a Gulenist and -- you know.
9              MR. ROCCO:  That's not asking a hearsay.  That's not
10   asking or publishing to the jury what's pure hearsay or
11   speculation, and that's what this report is.  And that's what
12   was improper about what he said.
13             THE COURT:  But he's saying there's a quote.
14             MR. ROCCO:  But it's still hearsay, your Honor.
15   There's a way to do it, and that's not the way to do it.
16             MR. HARRISON:  The question goes to the ultimate issue
17   of fact in this case.
18             MR. ROCCO:  That's precisely right, precisely right.
19             THE DEPUTY CLERK:  Excuse me, do you want to give the
20   jurors five minutes?
21             THE COURT:  Where are you?
22             MR. DENTON:  Very close to the end.  I'm happy to move
23   on from this, your Honor.  I just want to know if he remembers
24   it.
25             THE COURT:  Yes, let's take five minutes.

1            (Jury not present)

2            MR. ROCCO:  Todd is right, you may as well send the

3    jury home.  Todd is absolutely right.  That's precisely what

4    this case is about.

5            THE COURT:  But why can't he ask the question?

6            MR. ROCCO:  Because, one --

7            THE COURT:  She asked the question.  Incidentally,

8    Ms. Fleming asked the question four times:  Did you violate any

9    sanctions?  Did you engage in any conspiracy?  Did you meet

10   with so and so?  Did you ever do this?  How is that any

11   different?

12           MR. ROCCO:  Well, I think it doesn't call for hearsay,

13   and basically, I think she's entitled to ask a defendant, who's

14   on the witness stand, whether he's guilty of the crimes that

15   he's charged with.

16           THE COURT:  Isn't he entitled to ask the defendant if

17   he remembers that conclusion?

18           MR. ROCCO:  No.  I think, your Honor --

19           THE COURT:  So here's what I think, I think, you know,

20   candidly, it sounded like he was quite evasive about the

21   results of these various reports, the audit report, the

22   internal report, the external report and now this third report,

23   right?  So what rule is he violating by asking that question,

24   if it's an accurate quote?

25           MR. ROCCO:  Basically, he has no right putting that

1    kind of hearsay regarding the ultimate issues in this.  It

2    calls for hearsay.  It calls for conclusions with respect to

3    the ultimate issues that need to be decided by the jury in this

4    case.  That's what's improper about it, your Honor, and that's

5    not asking the defendant whether he committed a crime, whether

6    he lied, whether he cheated doesn't call for hearsay.

7              It's asking a question that's directly apposite to the

8    issues that's presented in this case.  We're not asking for

9    somebody's conclusions who's not here to be cross-examined.  I

10   think this violates his 6th Amendment right.

11             THE COURT:  It violates which?

12             MR. ROCCO:  His 6th Amendment rights, his right to

13   confront the person who came to those conclusions that

14   Mr. Denton just broadcast to the jury.  I think it's very

15   problematic, and I'm not trying to be melodramatic about it.

16             THE COURT:  No, I get it.  I'm trying to understand

17   it, though.

18             MR. ROCCO:  I'm not objecting to the cross.

19             THE COURT:  I know why you don't like it, of course,

20   but I'm just trying to figure out what's improper about it, or

21   whether it is proper.

22             MR. ROCCO:  It implicates the hearsay and 6th

23   Amendment issue, confrontation issues.  Whoever wrote that

24   report --

25             MS. FLEMING:  Canitez.

1          MR. ROCCO:  Canitez is not here to be cross-examined.

2     He just testified from the witness stand -- I'm sorry, from the

3     podium, where the prosecutor asked the question, that was

4     testimony.

5          MR. DENTON:  Your Honor, if I may, just for a minute,

6     a couple of things here.  First of all, no hearsay is being

7     introduced.  There's no document that's being introduced.

8     There's no witness who's being asked questions that are

9     hearsay.

10          I'm asking him whether he remembers this, which goes

11    directly to the culpability of his state of mind in dealing

12    with Reza Zarrab from 2014 onwards.  His claim is that all of

13    these investigations were about whether loans were proper or

14    whether there were certain advantages.  The fact that he

15    knew --

16          THE COURT:  And, as I heard it, is that they were all

17    exonerated, everybody in the bank, all of the studies and

18    reports that were done, three -- I mean, I don't know all.

19          MR. ROCCO:  But that's not the issue.  We can all have

20    our views, your Honor, about those reports.

21          THE COURT:  Okay.

22          MR. ROCCO:  I mean, it's not the United States, but he

23    didn't author those reports.

24          THE COURT:  He, the witness?

25          MR. ROCCO:  He did not author those reports.  The fact

```
 1    of the matter is, because the reports came to conclusions that
 2    you and I might not agree with, that doesn't -- he's not
 3    implicated in that, Mr. Atilla is not implicated in that.  And
 4    what was improper about this, really, is the hearsay and in the
 5    conclusions.
 6              How do we challenge that?  How do we challenge those
 7    statements that were just made to the jury in the form of a
 8    question?  It was improper that Mr. Denton was actually
 9    testifying.  It was improper that he was testifying to hearsay.
10    It was improper that he was testifying to conclusions by
11    somebody who's not here.
12              MS. FLEMING:  And an expert.
13              MR. ROCCO:  And a so-called expert.  Framed, by the
14    way, in the context of an expert report.
15              MR. DENTON:  He testified to a bunch of conclusions
16    from a bunch of reports that were favorable to him.  He brought
17    up this report.  I'm entitled to ask him about it.
18              MR. ROCCO:  No, he didn't.
19              THE COURT:  Take a couple of minutes and look at the
20    rules and tell me what rules did he violate.
21              MR. ROCCO:  Thank you, Judge.
22              THE COURT:  You tell me that he can't ask it, and you
23    tell me that you can.
24              (In open court)
25              (Recess)
```

HCJPATI3                           Atilla - Cross

1                 THE COURT:  So....

2                 THE DEPUTY CLERK:  Counsel, if you could approach,

3      please.

4                 (At the side bar)

5                 THE COURT:  So let's first hear on behalf of the

6      objector.

7                 MR. ROCCO:  Your Honor, we have actually quoted

8      language from the report.  We're able to bring it up, which

9      basically --

10                THE COURT:  From the report itself?

11                MR. ROCCO:  From the report that Mr. Denton just

12     referenced.  And it's qualified.  It says:  In this context,

13     assuming that the documents that the companies belonging to

14     Reza submitted for payment of the costs related to the transit

15     trade transactions they were making to Iran, using the system

16     set up by Halkbank, were fictitious, assuming the documents

17     were fictitious, the following conclusions can be reached about

18     Halkbank.  And essentially they go on to state what Mr. Denton

19     stated in front of the jury.

20                THE COURT:  Okay.

21                MR. ROCCO:  So that's the context.  And what we're

22     saying is --

23                THE COURT:  Can he ask that, about that?

24                MR. ROCCO:  No, he cannot.

25                THE COURT:  He can't even use that?

1            MR. ROCCO:  Because he's essentially publishing the

2       conclusions of the report.

3            THE COURT:  Okay.

4            MR. ROCCO:  Or the assumptions that led to the

5       conclusions in the report, and we say the following, that

6       essentially the question was testimonial, put before, and

7       highly prejudicial, and interjected basically the conclusions

8       of an expert, Canitez, who is the author of this report.  The

9       jury is being told, in that question, what this expert found,

10      right?  The expert is not here to be cross-examined.

11           THE COURT:  Okay.  So?

12           MR. ROCCO:  And, therefore, is hearsay.  So we say

13      that it violates Federal Rules of Evidence 702 because no

14      proper foundation was laid; Federal Rule of Evidence 704B, it's

15      an expert conclusion in a criminal case as to an ultimate fact;

16      the 6th Amendment right to confront and cross-examine Canitez,

17      which is basically articulated best in Crawford.

18           THE COURT:  Okay.

19           MR. ROCCO:  And I have one more.

20           MS. FLEMING:  Relevance.

21           MR. ROCCO:  And relevance, under 401 and 403 because

22      it's highly prejudicial.

23           THE COURT:  Okay.  In response?

24           MR. DENTON:  First of all, with respect to relevance,

25      it is obviously relevant, like I said, to his state of mind,

1    his knowledge about what was alleged with respect to Reza

2    Zarrab, and his continuing business with him after that point.

3             It's highly probative in light of the fact that he

4    volunteered similar expert conclusions about auditor reports

5    that he claimed were exonerating; so it's highly relevant.

6    With respect to --

7             THE COURT:  Well, wait.  Hold on one second.

8             MR. ROCCO:  He wasn't asked that, and I disagree with

9    that.  He wasn't asked that question, and he didn't offer any

10   testimony about exonerative reports.  You asked him questions

11   on cross-examination about reports and what the results of the

12   reports were.

13            THE COURT:  Okay.  All right.

14            MR. DENTON:  And he volunteered the results of

15   auditor's reports --

16            THE COURT:  Okay.  He just answered questions.  What

17   else?

18            MR. DENTON:  With respect to the expert objections,

19   he's obviously not testifying as an expert.  I'm asking him

20   whether he remembers reading it.  That is not something that

21   goes to the fact or the expert's conclusion.  It goes to his

22   state of mind.

23            MR. ROCCO:  Your Honor --

24            THE COURT:  Wait, wait.

25            MR. ROCCO:  I'm sorry.

1          THE COURT:  Anything else?

2          MR. DENTON:  In this respect, your Honor, it's no

3    different than asking him if he read a textbook on banking that

4    talks about something.

5          THE COURT:  I think it is.

6          MR. DENTON:  But in terms of his reliance on expert

7    information --

8          THE COURT:  Okay.  So, you know, I could give you a

9    more authoritative decision later, but I think it's a not

10   proper question.  I'm not going to require him to answer it,

11   and I think I'm going to strike the question from the record.

12   I think, at core, it's prejudicial, but it's other things too.

13   It is hearsay, and I think we should move on.

14         MR. DENTON:  That's fine, your Honor.

15         MR. ROCCO:  Your Honor, really, I don't think we have

16   any alternative but to move for a mistrial.

17         THE COURT:  Oh, okay.  You have to do that, as the

18   last one, on papers.

19         MR. ROCCO:  We will do it.  We will do it.

20         THE COURT:  So where are we, though.

21         MR. DENTON:  Not even ten minutes.

22         THE COURT:  And then you're done.  And then you want

23   redirect?

24         MS. FLEMING:  Yes, and I'm going to stay off this

25   area, but I think the damage is done.

1           THE COURT:  How long?

2           MS. FLEMING:  Not long.  Seriously, not long.

3           THE COURT:  Okay.  So I'd rather do that all before

4   lunch because if we miss this afternoon with summations, we're

5   going to be in big trouble.

6           MR. DENTON:  Judge, just with respect to the concern

7   about mistrial or whatever, if your Honor is not going to allow

8   the question, it may be worthwhile to give a limiting

9   instruction that questions are not evidence, the report

10  referenced is not in evidence, it is only the witness' answers

11  that are in evidence.

12          THE COURT:  Yes, I think I'll leave it for now.  We

13  can always supplement the record later.  I'm just going to

14  strike it, and say that the witness doesn't have to answer.

15          MR. DENTON:  Okay.

16          THE COURT:  I don't think he did, did he?

17          MR. DENTON:  No.

18          THE COURT:  He didn't answer the question, did he?

19          MS. FLEMING:  No.

20          MR. ROCCO:  No.

21          THE COURT:  I think that's adequate.

22          (Continued on next page)

23

24

25

1              (In open court)

2              THE COURT:  Okay.

3              (Jury present)

4              THE COURT:  So please be seated.

5              THE DEPUTY CLERK:  Sir, again, I'd like to remind you

6     that you're still under oath.

7              THE DEFENDANT:  (In English)  Thank you.

8              THE COURT:  So with respect to the last question, I'm

9     directing Mr. Atilla not to answer it, and I'm going to order

10    the question stricken from the record.  And let's move on to

11    the next question.

12    BY MR. DENTON:

13    Q.  Mr. Atilla, we were talking about what happened after --

14             THE COURT:  Do you need to interpret that?

15             THE INTERPRETER:  I was just asking him, and it

16    appeared, no.  We're good.

17    BY MR. DENTON:

18    Q.  We were talking about what happened after the arrests on

19    December 17th, 2013.  Do you remember that?

20    A.  Yes, I remember.

21    Q.  Now, in 2014, Halkbank continued to work with Reza Zarrab,

22    right?

23    A.  That is correct.

24    Q.  Even though you knew about the allegations against him?

25    A.  The allegations had been rejected, and the indictment had

1    been dismissed during the period that covered --

2              THE COURT:  I didn't hear you.  The allegations you

3    were saying?

4              THE DEFENDANT:  The allegations were rejected, and the

5    indictment was dismissed, but during the time --

6              THE COURT:  Hold on one second.  Was that against

7    Mr. Zarrab, right?

8              THE DEFENDANT:  I believe it was Suleyman Aslan and

9    Reza Zarrab.

10             THE COURT:  Okay.

11             THE DEFENDANT:  And possibly others as well.

12   BY MR. DENTON:

13   Q.  Now, during that time period --

14             THE INTERPRETER:  I have not finished the answer.

15             THE COURT:  Go ahead.

16   Q.  Sorry.

17   A.  And the indictment was dismissed, but during the time the

18   indictment was in effect and there was an investigation going

19   on, there was no business done with Mr. Zarrab.  His

20   transactions had been suspended.

21             THE COURT:  Do you remember what time period that was?

22             THE DEFENDANT:  I don't recall the exact dates, but I

23   can give you an estimation.

24             THE COURT:  Okay.  As best you can remember.

25             THE DEFENDANT:  In my estimation, maybe between

HCJPATI3                         Atilla - Cross

1    December to February or March.  I don't recall the exact dates,

2    but...

3    BY MR. DENTON:

4    Q.  And he was still doing Iran trade business when he started

5    up again, right?

6    A.  Apparently, he had come to the bank and discussed the

7    restarting of his business, but as I had said before, I did not

8    meet with him on this matter.  I did not talk to him, and I had

9    no involvement.

10   Q.  Now, Suleyman Aslan was no longer at the bank then, right?

11   A.  That is correct.  He resigned.

12   Q.  Levent Balkan had left the bank in 2013, right?

13   A.  Yes, I believe it was the beginning of 2013.

14   Q.  But you were still the deputy general manager in charge of

15   international banking, weren't you?

16   A.  Of course.  There's no need for me to not continue in that.

17   So why wouldn't I?

18            THE COURT:  And did Aslan ever come back after he was

19   arrested, or he never came back again?

20            THE DEFENDANT:  He never returned, your Honor.

21   Q.  Now, Mr. Atilla, you've sat here through this entire trial,

22   haven't you?

23   A.  Yes.

24   Q.  And watched every witness, right?

25   A.  Correct.

HCJPATI3                    Atilla - Cross

1   Q.  Looked at every exhibit, right?

2   A.  Supposedly.  I don't remember if I looked at every single

3   one of them, but that's very possible, yes.

4   Q.  No other witness sat through this whole trial, did they?

5   A.  Are you talking about a defendant or a witness?  Are you

6   asking as far as me or --

7   Q.  No other witness watched any other witness testify in this

8   trial, right?

9   A.  I believe that is correct.

10  Q.  Now, when you were sitting here, you heard Special Agent

11  Rob Tringale testify that you told him that he should talk to

12  David Cohen after you were arrested.  Do you remember him

13  saying that from the witness stand?

14  A.  Yes.  Apparently, that's what I had said, and I assumed

15  they could gather information from him about this matter.

16  Q.  But your testimony on direct examination, when your lawyer

17  asked you, was that you don't remember that ever happening; do

18  you remember testifying to that?

19  A.  Well, when a person is arrested, it's hard for the

20  individual to remember everything that comes after that.

21  Q.  Well, right after you were arrested, you met with Special

22  Agent McReynolds; do you remember that?

23  A.  Yes, I remember that lady.

24  Q.  And you remember watching the video where she showed you

25  the transcripts of the wiretaps?  Do you remember that?

1   A.  I don't recall that I was shown any transcripts.

2   Q.  You don't remember that you said:  "No, you don't have

3   that"?

4   A.  I recall that, but what I meant was when the individual

5   said that they had this, what I was saying was it's not

6   something that you had done as far as an intercept.  It may be

7   something that you had been given.

8   Q.  You heard Reza Zarrab testify that you were at a meeting in

9   October 2012 with Iranian bank and oil officials to discuss the

10  system for fulfilling payment orders; do you remember him

11  saying that?

12  A.  Yes, I remember.

13  Q.  And you've testified now many times that you were never at

14  such a meeting, right?

15  A.  What I had said was I do not recall the dates.  I don't

16  have any information on the date of such a meeting, and I'd

17  also said that I did not attend any meeting where the

18  establishment of a system or providing direction regarding a

19  system involving Reza Zarrab, I had not attended any such

20  meeting.  But I had been many meetings -- I've been in many

21  meetings with NIOC and the Central Bank.

22  Q.  What you're saying is the meeting Reza Zarrab described

23  with you and people from NIOC and people from Iranian banks to

24  talk about the system for making payments, that that meeting,

25  you say, never happened?

1    A.  What I'm saying is that there is no meeting where the

2    system was discussed, or what Reza Zarrab may have referred to

3    as the establishment of a system, there was no such meeting.

4    Q.  You saw text messages from Suleyman Aslan asking Reza

5    Zarrab if he was okay with the method proposed by Hakan Atilla

6    for food payments; do you remember those messages?

7    A.  I remember that there was such a message, and I saw it

8    here.

9    Q.  But your testimony on Friday was that you never proposed

10   any method; isn't that right?

11   A.  That is correct.

12   Q.  And you heard Adam Szubin testify that he pulled you aside

13   for a private meeting to warn you that the U.S. government was

14   concerned that Halkbank was violating sanctions.  You remember

15   him saying that, right?

16   A.  I remember.

17   Q.  But your testimony here today is that that never happened,

18   right?

19   A.  That is absolutely the case.  Had there been such a thing,

20   we would have actually stopped those transactions right away as

21   of that date because our relationship with them was not such a

22   relationship anyway.  The relationship that we had built up

23   between us was one that involved close exchange of information

24   and opinions on the matters.

25           If Mr. Szubin had such a concern, a serious concern

1  about me or the bank, then he wouldn't have said in 2016 that

2  Halkbank could open dollar accounts for Iranian banks.  It is

3  true that in our relationship, the U.S. Treasury and the OFAC

4  did warn Halkbank about Iran's efforts in violating the

5  sanctions, and it is true that they had provided examples of

6  this.

7          And it is also true that we reviewed these examples in

8  detail and provided them with feedback.  And it is also true

9  that we provided them with detailed information that they did

10  not have on their own.  But they never made any statement

11  regarding them having any serious concerns about Halkbank or

12  that they would possibly take any action or do anything.  That

13  was never brought up.  I apologize.  I can stop here, if you

14  like.

15  Q.  Let's just stick to the basic facts.  Your testimony is you

16  never had a private meeting with Adam Szubin, right?

17  A.  Yes.

18          MR. DENTON:  No further questions, your Honor.

19          THE COURT:  Okay.  Thanks.

20          Ms. Fleming for redirect?

21          MS. FLEMING:  Yes, your Honor.  Thank you, briefly,

22  and I really do mean briefly.

23          THE COURT:  I have a stopwatch out.

24          MS. FLEMING:  Okay.  Got it.  I'm a little older now,

25  but I can still move.

1          THE COURT:  Don't feel any pressure, though.

2    REDIRECT EXAMINATION

3    BY MS. FLEMING:

4    Q.  Mr. Atilla, do you remember Mr. Denton just asked you some

5    questions about are you sure, sure, sure, about this meeting in

6    October with -- that you were never at any meeting with the

7    Iranians and Reza Zarrab?  Do you remember those questions?

8    A.  Yes, I remember.

9          (Continued on next page)

HCJ3ATI4                         Atilla - Redirect

Q.  Regardless of the date, do you ever remember being in a
meeting with Suleyman Aslan, Iranians and Reza Zarrab, where
Suleyman Aslan said, pointing to Reza Zarrab, we can just keep
doing the existing system, referring to violating sanctions?

        THE COURT:  That's a long question.  You're
comfortable with it?

Q.  Do you understand the question and can you answer it yes or
no?

A.  Madam, I'm 47 years old, and up until this point,
throughout my life, I have never been in a meeting or anywhere
where violating the sanction was discussed, anybody had pointed
to Reza Zarrab or that I had pointed to Reza Zarrab, and there
was never any point where I had reached an agreement with
Mr. Reza Zarrab about anything about these things.

        And this does not involve the United States, either,
but I did not have any meetings with anybody with regards to
violating any Turkish laws either.

Q.  And do you recall there were a lot of questions by
Mr. Denton about these e-mails that went back and forth in
August of 2012 from Mr. Balkan to you and to Mr. Aslan; do you
remember those questions?

A.  Yes.

Q.  Those e-mails are all in 2012, and they're before the
April 10, 2013 call where Reza Zarrab is still lying to you;
isn't that correct?

HCJ3ATI4                        Atilla - Redirect

1    A.  That is correct.

2              MS. FLEMING:  Could we please bring up Government

3    Exhibit 922, which is in evidence.  The jury can see it.

4    Q.  Do you remember Mr. Denton asking you some questions about

5    bills of lading?

6    A.  Yes.

7    Q.  Do you recall Reza Zarrab identifying Government Exhibit

8    922 as a bill of lading?

9    A.  I remember.

10   Q.  Is this a bill of lading to your knowledge, Government

11   Exhibit 922?

12   A.  To the best of my understanding, this is a customs

13   declaration.

14   Q.  This is a document that's given to the customs officers

15   when exports are going out of the country; is that correct?

16   A.  Well, I don't have any information about how customs in

17   Dubai work, but a declaration would be one that the customer

18   would prepare, and would submit to the customs as a customs

19   declaration and would submit to them.  And then the customs

20   would do their own inquiries and reviews on this, but I don't

21   know what type of procedure that they would follow.

22             And in Turkey, the bank would be able to look up the

23   documents that are submitted to the customs, but they would not

24   be able to look up any documents from other countries that were

25   submitted in other countries.

 1   Q.   Thank you.

 2            MS. FLEMING:  You can take that down.

 3   Q.   Do you remember being asked questions about various

 4   accounts at various banks through Halkbank?

 5   A.   Yes, I remember.

 6   Q.   Mr. Denton asked you some questions about wasn't it true

 7   that sometimes Halkbank actually had transactions involving

 8   dollars that got stopped or blocked or suspended.  Do you

 9   remember those questions?

10   A.   Yes, I remember.

11            MS. FLEMING:  Would you pull up just for Mr. Atilla,

12   please, Defendant's Exhibit 320 and 320-T on the screen.

13   Q.   Mr. Atilla, do you recognize Defendant's Exhibit 320?

14   A.   Yes, I recognize it.

15   Q.   Is that an e-mail that you sent during the course of

16   business at Halkbank to various other people at Halkbank on

17   May 16, 2013?

18   A.   Yes, it is an e-mail, and it's one that I am mentioning

19   that no transactions should be sent to the U.S. banks, it's an

20   electronic message that contains that information.

21            MS. FLEMING:  Your Honor, we'd move Government Exhibit

22   320 and 320-T into evidence.

23            MR. DENTON:  No objection.

24            THE COURT:  I'll allow it.

25            (Defendant's Exhibit 320, 320-T received in evidence)

1            MS. FLEMING:  Would you publish to the jury, please.

2     Q.  Will you explain briefly what happened in this transaction

3     that caused you to send the e-mail to your colleagues.

4     A.  Of course.  I will.

5            A U.S. company had sold food to Iran.  And Halkbank is

6     sending the payment for this to the U.S. company.  And I'm

7     saying that even though the seller is a U.S. company, still do

8     not do this.

9     Q.  Do not do what?

10    A.  I'm telling them that they should not use American dollars

11    or the American banking system.

12    Q.  Why?

13    A.  Because I did not want the U.S. banks to be a party to

14    anything that involves Iran.  But in this transaction there, is

15    nothing that's violating the sanctions anyway.  But it is our

16    policy at our bank that U.S. dollars or the U.S. financial

17    system should not be used in anything that involves Iran.

18    Sometimes the operations may conduct a transaction assuming

19    that this is -- this transaction is not subject to sanctions,

20    because the seller is a U.S. company.  And I'm saying that even

21    if that's the case, do not use this.

22    Q.  The transaction reflected in 320 and 320-T, that has

23    nothing to do with Reza Zarrab or any of his companies, does

24    it?

25    A.  That is correct.  Yes, that is correct.  It's a company

1    called PS International.  And the company in Turkey is

2    Turiakyi.

3              MS. FLEMING:  Could we please pull up Government

4    Exhibit 2018 for the jury.

5    Q.  Mr. Denton showed you Government Exhibit 2018 and asked you

6    questions about a lot of news articles that were out talking

7    about trade with various -- with the gold trade in Iran.  Do

8    you remember that?

9    A.  Yes, I remember.

10   Q.  He also, this is in July 2012, this is also before

11   April 10, 2013, correct?

12   A.  That is correct.

13   Q.  And date of this e-mail to you and Mr. Aslan and Mr. Levent

14   Balkan is dated July 13, 2012, right?

15   A.  That's what it says here, yes.

16             MS. FLEMING:  Can we pull up, please, Government

17   Exhibit 2026 and 2026-T, I believe they're both in evidence.

18   Q.  Do you see this Reuters article that the same person from

19   Halkbank forwarded to you Mr. Balkan and Mr. Aslan a couple of

20   weeks later on July 31, 2012?

21   A.  Yes, I see that.

22   Q.  If you look down a little further, at least on 2026-T in

23   the English, it says "No findings are reached confirming that

24   gold exportation to Iran is used as payment tool for the

25   importation of raw petroleum or natural gas."  Do you see that?

HCJ3ATI4                    Atilla - Redirect

1   A.  Yes, I see that.

2   Q.  Would you remind the jury, please, who the author of this

3   e-mail is, again I'm going to apologize for murdering names,

4   but Murat Uysal.  Who is that person?

5   A.  This individual was the deputy general manager responsible

6   for treasury at that time.

7   Q.  Was that person over foreign operations at that time?

8   A.  No, he had no connection to that.

9   Q.  Was the discussion of what was going on with regard to the

10  economy, exports, imports in Turkey, during all of these years,

11  important to all of you as bankers in various departments?

12              THE COURT:  If you have just a second.

13              (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1                    (At the sidebar)

2                    MS. FLEMING:  Two minutes.

3                    THE COURT:  I know.  I sensed you were almost done.

4                    MS. FLEMING:  Two minutes.

5                    THE COURT:  Just for a heads up for all of you.  So,

6     when you're finished we're going to take the lunch break.  And

7     then we're going to do summations after the lunch break.  And

8     they're not going to go over until tomorrow.  So, just so you

9     understand.

10                    MR. ROCCO:  We got it.

11                    THE COURT:  Rebuttal, everything is going to happen

12    this afternoon.  Okay.

13                    (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           MS. FLEMING:  You can take that down, Mr. White, thank

3    you.

4    Q.  Mr. Denton asked you some questions --

5           THE INTERPRETER:  There was an answer pending.  I

6    don't know if you'd like it translated.

7           THE COURT:  Sorry.  Do you want to read back the

8    question.

9           THE WITNESS:  There is no need for the question, I

10   know what the question is.

11          MS. FLEMING:  The jury may not.

12          (The record was read)

13   A.  Yes, because as a bank, since we talk with the investors

14   and we do provide them with updates on the developments in the

15   economy, and in foreign trade, as well as any developments with

16   the bank, this was a topic that we would discuss and that we

17   would exchange with each other on a routine basis.  And we

18   would also send to each other other topics of interest as well.

19   And that may include inflation, or policies regarding money, or

20   it could be the interest rate decision by the Fed.  So it could

21   be anything related.

22   Q.  Mr. Atilla, you were never charged or you were never

23   arrested or charged in Turkey, were you?

24   A.  That is correct.

25   Q.  When you were arrested in the United States, and Mr. Denton

HCJ3ATI4                    Atilla - Redirect

1   asked you some questions about your arrest, do you remember

2   that the agent, one of the agents who arrested you told you

3   that they would be happy and willing to discuss and possibly

4   overcome these issues if you cared to talk and cooperate with

5   them?

6   A.  Yes, I remember.

7   Q.  One very final area.  Could we pull up government --

8           THE COURT:  Was that area or question?

9           MS. FLEMING:  Area.  But very briefly, Judge, promise.

10  Can we pull up Government Exhibit 2019 and 2019-T, please.  For

11  the jury.  It's in evidence.

12  Q.  Mr. Denton started his questioning on cross-examination by

13  raising issues about whether Halkbank could do business with a

14  number of banks that were on the SDN list.  Do you remember

15  those questions?

16  A.  Yes, I remember.

17  Q.  He showed you the front page of Government Exhibit 2019 and

18  2019-T, correct?

19  A.  Yes, I remember.

20  Q.  You explained that there are certain tags that are on the

21  SDN list, right?

22  A.  Yes.

23          MS. FLEMING:  Could we turn to page four, please, of

24  Government Exhibit 2019 and 2019-T.

25          MR. WHITE:  I only have page one.

1          MS. FLEMING:  You only have page one.  All right.

2     Q.  You told us that there are tags.  Right?

3     A.  Yes.

4     Q.  And if a tag says Iran in brackets next to the name of a

5     bank, what does that mean for Halkbank?

6     A.  Well, it doesn't mean much for Halkbank.  It is something

7     that's written there to advise the U.S. banks that this was an

8     Iranian bank, and that they should use caution if they're going

9     to conduct any transaction with this bank.

10    Q.  Could you turn to the page that has the bank that is

11    spelled E-G-H-T-E-S-A-D, please.

12    A.  And the tags I had mentioned are seen here.  Like NPW.

13         MS. FLEMING:  I would like to start with a page

14    earlier.  It's going to be on page four.

15    Q.  Do you see on page four, do you see the bank Eghtesad?

16    That's one of the banks you were asked about yesterday, right?

17    A.  Possibly, but I do know this bank.  It is the Eghtesad

18    Novin Bank.

19    Q.  That has the tag "Iran" next to it?

20    A.  Correct.

21    Q.  Right above it is Digital Media Lab.  Do you see that?

22    A.  Yes, I see it.

23    Q.  That has a different tag, right, NPWMD?

24    A.  That is correct.

25    Q.  And incidentally, so, Halkbank would not do business with

HCJ3ATI4                    Atilla - Redirect

1    Digital Media Lab; is that fair to say?

2    A.   Absolutely so.

3    Q.   Mr. Denton said, gee, you said you're not an expert on

4    sanctions, right?

5    A.   Yes.

6    Q.   This is pretty basic for a foreign bank, isn't it?

7              THE COURT:   Ms. Fleming, you're just about out of

8    time.

9    A.   To my knowledge, that is the case.  The operations would be

10   looking at this.

11   Q.   One last question.  Is Bank Sarmayeh an Iranian

12   government-owned bank or a private bank?

13   A.   Ma'am, what I know is that it's a private bank.  And the

14   U.S. Treasury officials that had come to visit us told us that

15   it was a private bank.

16             MS. FLEMING:   Thank you.  Nothing further, your Honor.

17   Thank you.

18             THE COURT:   That's it.  So, we're going to take a

19   short lunch break to 1:30.  And this afternoon, between 1:30

20   and quarter to 5, we're going to complete the summations.

21   Which means that tomorrow morning at 9:15, if you're all here

22   or as soon as you are assembled, I'm going to give you the

23   instructions and then I'm going to give you the case.  So, see

24   you at 1:30.

25             (Witness Excused)

HCJ3ATI4

1              (Jury excused)

2              THE COURT:  Counsel, Ms. Fleming?  I want to give you

3     the plan.  Time frame.  We're going to start summations at

4     1:30.

5              MS. FLEMING:  I'm done, Judge.  This is Vic.

6              THE COURT:  Oh.

7              MS. FLEMING:  I'm done.

8              THE COURT:  I'm going to give you each an hour and a

9     half.  That takes you to 4.  30 and then I'm going to give the

10    government another 15 minutes for rebuttal.  If you want to

11    move your time around within that, it is up to you.  You don't

12    have to take it, but I will cut you off at 4:45.

13             MR. ROCCO:  Got it.

14             THE COURT:  I don't think you will.  But stay within

15    those lanes.

16             MR. ROCCO:  I got it.

17             MR. DENTON:  Your Honor, when do you want to put

18    charge objections on the record?

19             THE COURT:  So we could do that at a conference

20    tomorrow morning, and you have to also finish, give me the

21    names of the bank, the bribery, you probably have that.  Do

22    that all tomorrow morning at 8 o'clock.  Thanks a lot.

23             (Recess)

24             (Continued on next page)

25

1             (At the sidebar)

2             MR. ROCCO:  We're going to put the stip on the record.

3             THE COURT:  We have a couple of open pieces of

4    business.  So from my point of view, the jury instructions are

5    done virtually.  So you don't get tripped up, I'm going to deny

6    the application for a consciousness of innocence.  So please

7    don't sum on that.

8             And the other open items are administrative I think

9    from what I understand.  You have an agreement on the bribery

10   issue and you're going to have fill in the bank names, etc.  So

11   what I'm trying to say is I don't think there is anything

12   undone that could harm your summations in any way.

13            MR. ROCCO:  In my narrative in my summation I am going

14   to argue that Mr. Atilla spoke to the FBI -- I'm going to make

15   it up.  If you -- or testified, that's not the act of a guilty

16   man.  I don't get the aid of a consciousness of innocence --

17            THE COURT:  If you want to argue it, yeah.  The other

18   thing is, hardly ever do I interrupt in a summation.  There are

19   one or two times that things got out of control.

20            MR. ROCCO:  I'll tell you a story about Judge Knapp

21   one day.  You'd laugh about it.

22            THE COURT:  But I don't anticipate doing it.  The only

23   thing if you bumping up against the 4:45 in any way without

24   giving them the rebuttal, as I say, I did promise two jurors

25   that they could be out at 4:45.

HCJ3ATI4

1          And the last thing is I thought what I would do about

2     the Juror Number 10 is to ask him to stay behind tonight, and

3     not make him come in tomorrow morning, hear my jury

4     instruction, and then say oh, by the way, you're out.  So I

5     might as well save him, if that's okay.

6          MR. DENTON:  Seems totally fine.

7          THE COURT:  And resting.  What do we need to have the

8     defense rest.

9          MR. DENTON:  I think rather than spend the time

10    reading the stipulation and the translations, the government

11    will withdraw its objection to the translations, previously

12    offered subject to connection.  And so those will be fully

13    admitted.

14          MS. FLEMING:  I think we've admitted everything in

15    evidence.  I think we moved them all in.  There were a couple,

16    the one on the -- we had all the ones where I had to tell them

17    what the redactions were.  You said you noted the objection,

18    I'm not sure you moved them into evidence.

19          THE COURT:  If I didn't, then I do.  They're in

20    evidence.

21          MS. FLEMING:  I think everything is in evidence on

22    both sides.

23          THE COURT:  Okay.  And are you able to rest?

24          MR. ROCCO:  We're able to rest.  Tonight we'll rest.

25          THE COURT:  You need it.

1            MR. DENTON:  The government has no rebuttal case.

2            (In open court; jury present)

3            THE COURT:  Both the government and the defense have

4    rested their case, and we're ready for summations.  We start

5    with the government, then we go to the defense, and it is our

6    practice to give the government a short rebuttal following.  We

7    will end promptly at 4:45.

8            MR. LOCKARD:  May I proceed, your Honor?

9            THE COURT:  Mr. Lockard.

10           MR. LOCKARD:  This is a case about lies.  That was so

11   when my colleague Mr. Denton delivered his opening statements

12   three, almost three and a half weeks ago, and after several

13   days of the defendant's testimony, that is even more so.

14           This is a case about the lies that Mr. Atilla told to

15   cover up a multibillion dollar sanctions busting scheme

16   operating out of his bank, Halkbank, a bank owned by the

17   government of Turkey.  Lies that Mr. Atilla told to U.S.

18   Treasury officials.  Lies that he told to protect an agreement

19   to provide services to the government of Iran in violation of

20   sanctions that were enacted because of the unusual and

21   extraordinary threat that that government poses to our nation's

22   national security foreign policy and economy.  Lies that were

23   built into the very architecture of the method that Mr. Atilla

24   devised to further that agreement, and to further that scheme

25   into the documents that he and his bank knowingly accepted from

1    their co-conspirator, Reza Zarrab.  Lies that Mr. Atilla told

2    you during his testimony over these past two days.

3          Why did Mr. Atilla tell all those lies?  For simple

4    reasons.  To help his bank, to help his bank's customers,

5    customers like Mr. Zarrab, customers like the government of

6    Iran, the Central Bank of Iran, the National Iranian Oil

7    Company, lies that he told to keep his bank from being

8    blacklisted from the American financial system, a blacklisting

9    that would have been a deathblow to his employer, a

10   blacklisting that would have cost him his position, his

11   prestige, his job.

12         Now, you've heard a lot about what those schemes were.

13   Those schemes to help the government of Iran take huge pools of

14   restricted oil money that were locked up at Halkbank and to

15   funnel that money to Dubai where Iran could use it.  So we

16   don't need to go through all that again in detail, but you've

17   seen the elaborate, the complicated system that was devised and

18   that was executed within Halkbank both to use gold exports, to

19   carry that money down to Dubai in cargo planes and in gold

20   bricks, loaded into carry-on luggage, and carried onto

21   passenger airplanes.  And through fake food transactions,

22   papered over with fraudulent documents, to simply wire the

23   money to Dubai for Iran's benefit.

24         So let's touch briefly on what were Mr. Atilla's lies

25   to Treasury.  And we'll come back to this because this is an

HCJ3ATI4                    Summation - Mr. Lockard

1    important point.

2             He lied about Halkbank's due diligence.  He lied about

3    the nature of the gold business, how it worked and what he knew

4    about who the customers were.  He lied about the fake food

5    trade.  And what it is that he told Treasury about the bank's

6    policies and practices when it came to foreign trade, the kinds

7    of customers that they dealt with.

8             What did Mr. Atilla tell Treasury about the due

9    diligence at the bank?  He said that it was rigorous.  It was

10   careful.  They demand documents to understand every part of a

11   transaction, the relationship between commercial entities, in

12   order to minimize the risk that they were unwittingly involved

13   in financing sanctioned activities.

14            But what did you see actually happened at this trial?

15   You saw that Mr. Atilla and the bank exempted Reza Zarrab from

16   exactly these requirements.

17            He told Treasury that their due diligence efforts

18   included getting copies of the bills of lading, commercial

19   documents that describe the goods that are being exported.

20   Spot checks.  A whole host of ways that a well-functioning

21   compliance program operates.  And you saw that none of that

22   happened with Reza Zarrab.

23            He lied about the gold business when Treasury

24   Department became aware, because it was impossible not to be

25   aware, of the massive gold exports going from Turkey to Dubai

HCJ3ATI4                    Summation - Mr. Lockard

1   and to Iran, that it was private Iranian citizens who are

2   buying a lot more gold.  But Mr. Atilla knew that these gold

3   exports were actually for the government of Iran, and for the

4   National Iranian Oil Company.

5        You saw that not only in what it is that David Cohen

6   testified, but in Mr. Atilla's draft response to a letter that

7   the general manager of the bank had received from David Cohen

8   about the gold trade, where again, he says carried on between

9   privately owned companies dealing in jewelry business.

10        And he lied about the fake food trade.  Mr. Atilla

11   told Treasury officials that Halk refuses to deal with new

12   exporters, insisting on seeing five years of commercial

13   history.

14        The bank emphasized, and Mr. Atilla emphasized, that

15   only large, well-known customers were permitted to transact

16   business through Halkbank.

17        Mr. Zarrab was not large, he was not well known, his

18   history at the bank was approximately a year when he began the

19   food business, but he quickly became one of the biggest

20   purported food traders at the bank.

21        And of course Mr. Atilla never told the Treasury

22   officials that the same Iranian financial institutions, the

23   same Iranian banks that were the receivers of the gold exports

24   were suddenly the buyers of the food trade.  Banks like the

25   Credit Institution for Development, Bank Pasargad, Bank

1    Sarmayeh, Bank Parsian.

2              Now, Mr. Atilla also lied during his testimony.  Some

3    of those lies were small, some of them were medium, some of

4    them were whoppers.

5              He said, for example, his English language is good,

6    but not that great.  Why did he tell that you?  Why did he tell

7    you that?  He told you that because he knows that his meetings

8    with the Treasury Department are important, and he wants to

9    preserve the ability to tell you that he didn't understand what

10   they told him.  Or maybe they didn't understand what he told

11   them.  So he told you I speak English, I'm comfortable with

12   financial language, but when we get to legal language, I'm not

13   so comfortable.  When we talk about sanctions, I'm not so

14   comfortable.

15             You know that that's not true.  You know it because

16   you watched him testify.  You watched him answer questions

17   before they were translated.  You watched him correct the

18   interpreters' translations.  You watched him answer in English.

19   And you watched him correct translations on documents.

20             And all of that is consistent with what you heard from

21   the Treasury witnesses.  David Cohen told you that Mr. Atilla

22   spoke English perfectly well, and in fact, translated for other

23   officials at the bank who did not speak English.  Mr. Szubin

24   told you that.  Mr. Kirschenbaum told you that.

25             Mr. Atilla's sanction expertise.  He tried to persuade

HCJ3ATI4                    Summation - Mr. Lockard

1    you he's got enough expertise to get by, but certainly not what

2    he would call an expert.

3           You know that that's not true.  You know that first,

4    again, because you watched him testify.  You watched him give

5    extremely sophisticated answers to questions about sanctions.

6    Extremely sophisticated answers.  And you know that he has

7    sanctions expertise based on his history.  There is no one at

8    Halkbank who has been in more meetings with more high-level

9    Treasury officials about sanctions than Mr. Atilla.

10          Starting in September of 2010, before Mr. Suleyman

11   Aslan was the general manager, Mr. Atilla is meeting with

12   Daniel Glaser from Treasury to talk about the sanctions.  And

13   who was Mr. Glaser?  Mr. Cohen told you that he was the head of

14   one of the offices within the Treasury Department's Office of

15   Terrorism and Financial Intelligence.  A senior Treasury

16   official.

17          You know that Mr. Atilla met with both Mr. Cohen and

18   Mr. Szubin in March of 2012 to talk about the importance of

19   enhanced due diligence when it came to transactions with Iran.

20          Mr. Atilla met again with Mr. Cohen in September of

21   2012, to talk about a whole host of issues under the sanctions.

22   To reaffirm its strong commitment to do nothing that would

23   violate the sanctions.  To tout its due diligence.  And it was

24   Mr. Atilla who said those things.  It was Mr. Atilla who was

25   the principal counterpart at these meetings.

1           When Treasury Department was concerned about the gold

2    going from Turkey to Iran and the UAE, Mr. Cohen wrote a letter

3    to the general manager Mr. Aslan.  And it was Mr. Atilla who

4    drafted a proposed response.

5           In February of 2013, Mr. Atilla was at two important

6    meetings with Treasury officials to talk about the new

7    sanctions coming into effect on February 6, that bilateral

8    trade restriction that you heard about and that we'll talk

9    about a little bit more.  And confirmed that he had read it and

10   he understood it.  And again, that was Mr. Atilla.

11          Again in February with Mr. Cohen, again committing

12   that the bank is not in the business of ensuring that the

13   government of Iran has access to its profits.  Mr. Atilla.

14          And then there's more.  Mr. Atilla e-mails in July of

15   2013 to confirm that the bank purportedly has stopped the gold

16   trade as of the 10th of June.  Another e-mail in October of

17   2013, asking for Treasury's green light to transfer oil

18   proceeds from other countries to the bank.  A phone call on

19   October 30 with then-OFAC director Adam Szubin about

20   humanitarian trade, the sale of food and medicine to Iran.

21   Mr. Atilla.

22          He is an expert.  He showed you he's an expert.  His

23   ability to understand the sanctions and to comply with the

24   sanctions is not in issue in this case.

25          Now let's talk about some of the whoppers that Mr.

1    Atilla told you on the stand.

2            He told you that the bank no longer facilitated gold

3    exports to Iran or Iranians after July of 2013.  In fact, he

4    said June 10 of 2013.

5            Ladies and gentlemen, Mr. Zarrab told you that he was

6    still exporting gold for Iranians after July 2013.

7    Mr. Korkmaz, who ran the investigation in Turkey, he told you

8    that Mr. Zarrab was still exporting gold after July of 2013.

9    He calculated almost a half a billion dollars' worth of gold

10   between July and December of 2013 alone.

11           And how do you know that they are both right?  Not

12   only because Mr. Zarrab is the one who did it and Mr. Korkmaz

13   is the one who investigated it?  Because Halkbank's own records

14   show you that gold went out after July of 2013.  At least as

15   late as October, according to the customs declarations, to the

16   Credit Institute for Development, an Iranian bank.

17           How else do you know that the gold went out, because

18   they were directed to send gold out?  You remember the meeting

19   that Mr. Aslan had in September of 2016, with the minister of

20   the economy and the prime minister, where he was directed to

21   boost the exports.  And he talked about that with Mr. Zarrab.

22   And they boosted it with gold.  And you can see in the

23   evidence, the other evidence that's in the record, here is an

24   invoice from April of 2014, 40 kilograms of gold being exported

25   by Mr. Zarrab's company.  Safir Altin.

1          Now a quick segue on this export.  This goes to the

2     UAE.  As you know, Mr. Zarrab always sent his gold for Iranians

3     to Dubai.  Sometimes he said it was going to Iran, sometimes he

4     said it was going to Dubai, but it was always going to Dubai.

5     And he told you why that was.  Because gold in Iran is not that

6     much use.  Gold in Dubai can be sold, and it can be spent.  And

7     that is what the Iranians wanted and Mr. Atilla knew that.

8          You saw that in Government's Exhibit 229 a call in

9     February of 2013, where Mr. Zarrab is talking to his business

10    partner, Mr. Happani.  And what are they talking about?

11    Mr. Zarrab's conversation with Mr. Hakan.  Hakan Atilla.  And

12    what do they talk about?  How to do the documents for the gold

13    exports.  And what did Mr. Atilla tell Zarrab?  To write it

14    down as transit to Iran through Dubai.

15         We may have to go back to using passengers.  You know

16    what that means, that means couriers.  Happani is not happy

17    about that.  He says oh, that would be bad.  It is more

18    expensive to send it by couriers.  If it is more expensive,

19    then what's the reason for doing it?  The regulations.  In

20    February of 2013, the bilateral trade requirement meant that if

21    Iranian oil proceeds are going to be used to buy gold, the gold

22    has to go to Iran.  So they have to make it look on the

23    documents like the gold is going to Iran, and that is what

24    Mr. Atilla is telling Mr. Zarrab.  Mr. Atilla knows exactly how

25    the gold business works.

1          You can see that that gets carried out again at

2     Halkbank's own records.  Where in February of 2013, it all

3     switches.  It switches from BAE, which are the Turkish acronyms

4     for the United Arab Emirates, to Iran on Mr. Atilla's

5     instructions.

6          Another whopper:  Halkbank complied with the

7     sanctions.  That literally cannot be true.  It cannot be true.

8     You heard from Mr. Zarrab for several days telling you exactly

9     how he violated the sanctions and how he did it with Halkbank.

10    Mr. Atilla sat there through all that testimony, and then still

11    took the stand and told you Halkbank never violated the

12    sanctions.

13         Now, Mr. Atilla is going to argue that he didn't know,

14    that he wasn't involved, and we'll get to that pretty soon, but

15    he cannot possibly tell you that Halkbank didn't violate the

16    sanctions.

17         Mr. Atilla told you that he didn't know what

18    Mr. Zarrab's business was in 2014 and 2015.  You remember this

19    is after Mr. Zarrab's arrest in Turkey in December of 2013.

20    And despite the fact that Mr. Zarrab was arrested, despite the

21    fact that these allegations of document forgery and gold

22    exports to Iran and bribery were all publicly aired, business

23    went right back to usual in the middle of 2014.  Mr. Atilla

24    knew that.  But he stood here, or sat here in the courtroom,

25    and told you he didn't know what Zarrab's business was.  You

HCJ3ATI4                    Summation - Mr. Lockard

1    know that's a lie.  It is a lie because he knew what it was in

2    2013.  He was at the meetings where the business restarted in

3    2014.

4            Let's talk about a couple more aspects of Mr. Atilla's

5    meetings with the U.S. Treasury Department.  What happened at

6    those meetings?  The sanctions laws were explained in detail,

7    at length, up to date, up to the minute with the gold

8    restrictions and the oil restrictions.  So just very briefly,

9    let's talk about what those restrictions were.

10           First, as you know, in July of 2012, any foreign bank

11   that facilitated the export of gold for the government of Iran

12   could be sanctioned.

13           Now, what does that mean?  It means they could lose

14   their access to the U.S. financial system.  They could lose

15   their ability to have the correspondent accounts that are

16   critical for the bank to be able to do U.S. dollar

17   transactions.  Critical for a bank that does international

18   business.  Critical for Mr. Atilla's bank.

19           As you also know, Halkbank's ability to do

20   transactions involving Iranian oil and Iranian gas proceeds

21   also got more restricted.

22           First, they could only deal with the Central Bank of

23   Iran or the National Iranian Oil Company if Turkey was reducing

24   its oil imports.  Then, by February of 2013, those funds could

25   only be used for two things:  To buy goods from Turkey, or to

1  buy food or medicine.  And as you also know, by July of 2013,

2  the gold ban became even tighter and Halkbank was no longer

3  able to facilitate gold to Iran period, whether for private or

4  public purchasers.

5          What else did Treasury and Mr. Atilla talk about at

6  these meetings?  They talked about how Iran was trying to avoid

7  those restrictions by acquiring gold, by engaging in

8  transactions with fake documents.  In other words, about

9  exactly what was happening at Halkbank.

10         What else happened at these meetings?  Treasury warned

11 Mr. Atilla, warned him that his bank was being watched, warned

12 him that his bank was at risk.  And you heard Mr. Atilla lie

13 about that, too.  He described an always positive relationship.

14 It was a friendly, information-sharing atmosphere.

15         Ladies and gentlemen, that was not true.  Halkbank was

16 under heat.  You heard that from Mr. Cohen and you heard that

17 from Mr. Szubin, and you see it in the documents.

18         The first shot was from December 20 of 2012.  Again,

19 this is after the public reports about the massive gold exports

20 to Iran became public.  And Mr. Cohen wrote a letter to the

21 general manager of the bank warning the U.S. Treasury

22 Department is troubled by these reports.  That is a polite way

23 of saying we are watching you and we want to know what's going

24 on.

25         In February 2012 it got a little bit less polite.

1    This is the pull aside.  The pull aside that Mr. Atilla denies

2    ever happened.  What did Mr. Szubin do in February of 2013 in

3    Turkey?  He had a one-on-one meeting with Mr. Atilla and warned

4    him that Halkbank was in a category of one.  Mr. Atilla's

5    response?  Was sweaty, as it should have been.

6            Now, Mr. Atilla says this meeting never happened.  Not

7    sure what you're supposed to make of that.  Maybe he says that

8    that meeting was actually with Mr. Aslan.  I'm pretty sure that

9    Mr. Szubin would not mistake Suleyman Aslan for Hakan Atilla.

10   And Mr. Szubin is sure he wouldn't mistake Mr. Aslan for

11   Mr. Atilla.  As he told you, he has done this sort of thing

12   maybe twice in his whole career.

13           It happened, and Mr. Atilla lied to you about it.  Why

14   did he lie to you about it?  Because he knows that if Treasury

15   is clearly and pointedly and explicitly looking at his bank, he

16   should have done something different.  He told you himself, if

17   I had been warned about these things, I would have stopped.  He

18   has to admit that.  He has to admit that he would comply with

19   the law if he knew what was going on.

20           This meeting proves that he was warned, that he should

21   have known, and that he did know.  And that's why he's denying

22   that it ever happened.

23           That wasn't the last of the warnings.  Mr. Cohen

24   warned him again at another February meeting saying our level

25   of concern is high, and our ability to overlook issues is low.

1    What did Mr. Atilla say?  Mr. Atilla assured Mr. Cohen that the

2    bank intends to continue fully complying with U.S. sanctions

3    and explained that the bank is not in the business to profit

4    Iran.

5              As you know, that is exactly what the bank was in the

6    business of doing for Iran.

7              One more warning.  This time in an e-mail from

8    Mr. Szubin writing a letter to respond to the meetings and

9    conversations that they had just had in February.  He includes

10   a warning about another individual that OFAC had sanctioned

11   under the very same sanctions programs that were being

12   discussed with Halkbank for helping Iran evade international

13   oil sanctions through front companies.  Why did Mr. Szubin

14   bring Mr. Cambis to Halkbank's attention?  To warn them.  We

15   have done this.  It could happen to you.

16             So let's talk about how it is that Mr. Atilla and his

17   bank did get into the business of giving Iran access to its

18   profits.  We're going to start with the meetings that happened

19   in October of 2012.  The meetings where the head of the

20   National Iranian Oil Company, its finance director, the head of

21   NICO, the company that operates for NIOC internationally, and

22   as you heard later, the director of the Central Bank later

23   joined in those meetings as well.

24             These are the meetings that were held with Mr. Aslan,

25   Mr. Atilla, Mr. Zarrab, and these oil officials, to talk about

HCJ3ATI4                    Summation - Mr. Lockard

1    bringing other Iranian oil money held at other banks in other

2    countries, into Halkbank.

3                (Continued on next page)

1              MR. LOCKARD:  And as you heard from Mr. Zarrab,

2    Halkbank was willing to go through with that plan, as long as

3    there wasn't any publicity about it.  Unfortunately for the

4    bank, there was publicity about it and the bank backed out.  So

5    these meetings are about a deal that never happened.

6              So why are we going to spend so much time talking

7    about it, and why did Mr. Atilla try so hard to deny that he

8    was at these meetings?  The answer is because even though the

9    deal didn't happen, some very important things did happen at

10   these meeting to tell you exactly what Mr. Atilla knew, exactly

11   what his purpose was, and those things tell you exactly why he

12   lied repeatedly and adamantly that he was not at these

13   meetings.

14             Here's what Mr. Zarrab described about the purpose of

15   the meetings.  The purpose was, No. 1, to bring the money in

16   from India into Halkbank, but also, No. 2, to send it back out

17   again, to do the wire transfers.  And when the Iranians asked

18   Halkbank to do those wire transfers, Mr. Aslan said no,

19   Halkbank is not going to do those wire transfers.  There is

20   already a system for doing those wire transfers, and that

21   system's name is Reza Zarrab.  And Mr. Atilla said the same

22   thing at that same meeting.

23             Now, this is important.  The purpose of this meeting

24   was not just to transfer oil money.  What good does it do Iran

25   to transfer oil money from one restricted account to another

1    restricted account?  They're no better off.  What's different

2    between India and Turkey?  The difference is Halkbank, and the

3    difference is Reza Zarrab.

4            The purpose of this is not just to move the money,

5    it's to use the money, and Mr. Zarrab was the way that Iranians

6    could use the money, the system to use gold exports to move

7    NIOC's money to Dubai, so that NIOC could direct how and where

8    it gets spent.  And you heard Mr. Atilla deny that he was a

9    part of those discussions again and again and again.

10           Now, how do you know that Mr. Atilla really was at

11   these meetings?  First of all, it was his business to be at

12   these meetings.  You heard him testify about the bank's

13   discussions in August of 2011 about trying to process payments

14   by foreign companies to buy Iranian oil, and you heard him

15   testify that he was familiar with this issue.  You know that he

16   had meetings about it in March of 2012 with the Treasury

17   Department, and one of the things that they talked about was

18   other countries wanting to use Halkbank.

19           In October of 2013, Mr. Atilla is still talking about

20   it, and he asks the Treasury Department to greenlight

21   Halkbank's desire to bring pooled Iranian oil money into the

22   bank.  This is an issue that Mr. Atilla is familiar with and

23   that he deals with.

24           It's also his business because the Central Bank of

25   Iran is his business and NIOC is his business.  As you know

1    from the evidence, up until about 2013, the way that Turkey

2    paid for oil was to make deposits into the Central Bank of Iran

3    account at Halkbank, the account that Mr. Atilla is responsible

4    for managing that relationship.  Which means if you're

5    responsible for the Central Bank of Iran relationship, you're

6    responsible for the NIOC relationship because that's where all

7    of NIOC's money is, and that is almost everything that's in the

8    Central Bank of Iran account.

9            That changed.  That changed in April of 2013 because

10   NIOC wanted the payments to go to its own account, not to the

11   Central Bank account.  Why did NIOC want to do that?  You heard

12   that from the testimony and from the evidence.  So that

13   Mr. Zarrab would have sole access to those funds.  You see,

14   when the payments were going to the Central Bank of Iran

15   account, Mr. Zarrab's competitors were in the running to be

16   able to do transactions with that money, and Mr. Zarrab and

17   NIOC agreed that those payments were going to go to NIOC alone

18   so that they could be almost all used in Mr. Zarrab's system.

19           The problem was, after they made that decision, there

20   was a payment coming in, and it was going to go to the Central

21   Bank of Iran account.  So Halkbank had to hold that payment up

22   long enough for the instructions to come in and something like

23   200 million Turkish Lira would go to NIOC instead of the

24   Central Bank of Iran.  And the person who held up that payment

25   was Mr. Atilla.  All right?  So that's one reason why you know

HCIPATI5                    Summation - Mr. Lockard

1   that Mr. Atilla was at these meetings with NIOC in October of

2   2012.

3          You also know that these meetings did, in fact,

4   happen.  Sorry, before we go there, this is another call about

5   Mr. Atilla's involvement in the NIOC relationship.  So shortly

6   after Mr. Atilla holds up that Tupras payment so it will go to

7   NIOC instead of the Central Bank of Iran, he calls Mr. Aslan

8   because he needs to tell Mr. Aslan that NIOC has tried to

9   transfer 70 million Lira directly into Reza's account.

10  Mr. Atilla is the one who learns that information, and

11  Mr. Atilla is the one who shares it with the general manager of

12  the bank.

13         Now, why is that a problem?  Because this is against

14  the system.  The system is not for NIOC to give money directly

15  to Reza Zarrab.  That is a problem.  That is a big problem

16  under the sanctions.  The system is to send the money to

17  private Iranian banks, and then the private Iranian banks send

18  it to Mr. Zarrab.

19         Now, how else do you know that Mr. Atilla was at this

20  meeting?  Because Mr. Zarrab talks about it.  So part of the

21  proposal was that when the money came in from India, it would

22  go to Mr. Zarrab, and he would transfer it to a second bank.

23  Remember, Halkbank was not going to do the wire transfers

24  itself.  Mr. Zarrab was going to handle that part at a

25  different bank.  So Mr. Zarrab was talking to a high official

1    at another Turkish bank about this proposal.  He's describing

2    the agreement that they reached at these meetings.

3           Now, this is 2012, Mr. Zarrab doesn't know he's being

4    wire tapped.  He has no reason to lie to his bank official

5    friend.  And what does he say?  He's waiting on Suleyman to

6    wrap things up, but he's already talked it out with Hakan and

7    Hakan's colleagues.  Hakan knows about this.  Hakan is okay

8    with this.  Suleyman is the only person they're waiting on.

9           Mr. Aslan talks about these meetings.  He tells

10   Mr. Zarrab that he had described it to Turkish government

11   officials, and he describes exactly what Mr. Zarrab told you

12   happened.  Halkbank is not going to directly do these

13   transfers.  We are not opening accounts for every company, but

14   Mr. Zarrab is there for the existing system.  Mr. Zarrab can

15   make the payments through the methods they have already been

16   using.

17          Now, what does that tell you?  Well, it tells you that

18   the system works exactly the way they talked about in these

19   meetings, and Mr. Atilla is still describing the system, in

20   part, to Treasury when he's describing the restrictions that

21   they have inside the banks so that they don't get in trouble

22   under the sanctions.  No transfers within Turkey to another

23   financial institution.  What does that mean?  That means that

24   all these transfers are happening inside of Halkbank, where

25   nobody except for Halkbank can see what's happening.

1          All right?  That is the Halkbank part of the system

2     where it goes from being government of Iran oil money to

3     private Iranian bank money, to Reza Zarrab money, on paper.

4     What this meeting shows is that Mr. Atilla knows the other part

5     of the system.  The whole purpose of this is not for Mr. Zarrab

6     to have the money.  It's for NIOC to have the money, and

7     Mr. Atilla knows it.  The whole purpose of this is to get that

8     money to Dubai.  That is the payment system.

9          That is the agreement that Mr. Atilla and Mr. Aslan

10    and the others have reached with NIOC and with Reza Zarrab, for

11    that money to go to Dubai, to be sent out by Dubai trading

12    companies and exchange houses in Euro and dollar and other

13    currency payments all over the world at the direction of the

14    government of Iran and of the Iranian banks.  Mr. Atilla knows

15    this.  Mr. Atilla knows what this meeting means, and Mr. Atilla

16    lied about it.

17         What this means is every time Reza Zarrab's companies

18    do a U.S. dollar transaction that goes through United States

19    banks, who unwittingly process it because they don't know it's

20    for Iran, Mr. Atilla knows that that's happening.  He agreed

21    that it was going to happen that way.  So that's why we spent

22    so much time on that October 2012 meeting.

23         There's another important series of calls and

24    transactions that happens in the middle of 2013.  You know

25    extremely well by now what happened and why it happened.  What

1   happened is the sanctions changed.  What does Halkbank do when

2   the sanctions change?  They give Mr. Zarrab instructions about

3   how to change his business.  So, first, Mr. Aslan informs

4   Mr. Zarrab in February when they know the change is coming but

5   it hasn't taken effect yet.

6           First, the famous date, the bilateral trade date has

7   arrived.  That's the reason why Mr. Atilla calls Mr. Zarrab,

8   change the documents on your gold exports.  That date is here.

9   We can't use oil money for gold anymore.  The amount is

10  limited.  We can only channelize the oil money to food and

11  medication.  He's talking about that exception to the bilateral

12  trade requirement.

13          And he tells Reza Zarrab, the gold trader, to get into

14  the food business.  And as you know, it's a bumpy ride.

15  Mr. Zarrab may have done a little bit of tea trading in his

16  teenage days, but he's not a food trader.  He doesn't know how

17  this business works.  It's not as easy as he thought it was

18  going to be, and it takes some time to get the documents, to

19  forge the stamps, to figure out how this is going to work, and

20  he needs some help along the way.

21          Now, we're going to focus right in on what it is that

22  Mr. Atilla has tried to tell you about his role and his

23  involvement in this scheme.  So we're going to go straight to

24  that call on April 10th between Mr. Zarrab and Mr. Happani,

25  where Mr. Zarrab describes his meeting at Halkbank, when

1    they're trying to get the food trade started, when they're

2    running into roadblocks and Mr. Zarrab goes to the general

3    manager to get it removed.

4              "Hakan Atilla threw a wrench in the gears; so

5    Mr. Aslan made the call in my presence and said 'You will do

6    the job.'"  This is how Mr. Atilla is removed as a roadblock,

7    and that's exactly what Mr. Zarrab told to Mr. Happani in a

8    call from 2013, again, when Mr. Zarrab has no idea he's being

9    wiretapped.  He has no reason to lie to Mr. Happani.  In fact,

10   he speaks very openly with Mr. Happani about all kinds of

11   things, including forging documents and cikinova and bribing

12   public officials.  He describes this phone call happening to

13   Mr. Atilla, and he described it to you when he testified.

14             Now, why did Mr. Atilla throw that wrench?  Because he

15   had spoken to Mr. Zarrab earlier that day, on April 10th, and

16   at this time, it is clear from the call, and as Mr. Zarrab

17   candidly told you, Mr. Atilla did not yet know exactly how bad

18   this was going to be.  First, Mr. Zarrab tells Atilla, we're

19   starting the food transactions, and what's Mr. Atilla's

20   response?  I know.  I'm aware of it.  This isn't a surprise to

21   Mr. Atilla.  He knew that this was happening, but he didn't

22   know the way that Mr. Zarrab was going to do it.

23             And when he learns about it, he's troubled because it

24   is obvious that what Mr. Zarrab is describing is not real.

25   "The structure is not what I thought it was going to be.  It

1   makes no sense for this payment to be coming in to Turkey.

2   This is a strange structure."

3          Now, why does Mr. Atilla react that way?  Because this

4   is not the first time he has been involved in the food

5   business.  He had just recently been at Treasury meetings where

6   he described the kinds of food business that Halkbank does, and

7   they do it with big companies, with international companies,

8   companies like Cargill, companies like Bunge, companies who do

9   this professionally, companies who get bills of lading and use

10  letters of credit and ship food from the place where it's

11  produced to the place where it's going to be consumed.

12         Mr. Zarrab is describing none of those things.

13  Mr. Zarrab is describing sending hundreds or thousands or

14  hundreds of thousands of tons of food from South America or

15  from Ukraine not to Iran.  They're going to send it to Dubai.

16  They're going to take these huge ships of food, send them to a

17  weigh station, unload them, store them.  I suppose, at some

18  point, reload them onto these small wooden ships and ferry them

19  one by one across the Persian Gulf into Iran.  That doesn't

20  make any sense.  It doesn't make any sense, and Mr. Atilla

21  knows it, and he's taken aback by it, and he talks to Mr. Aslan

22  about it.

23         Now, Mr. Atilla wants you to believe that this call

24  that Mr. Zarrab described didn't happen, and he's gone through

25  this elaborate effort to construct some airtight timeline

1    showing that he couldn't possibly have received a phone call.

2    You should take that for whatever it's worth.

3              I think you can conclude a couple of things from this

4    timeline.  The first is Mr. Atilla is, in fact, on the ground

5    in Barcelona for about an hour before Mr. Zarrab describes this

6    phone call to Mr. Happani.  I think the other thing that you

7    can conclude is that Mr. Atilla has a cell phone.  It does have

8    a voicemail function.  But the most important thing that you

9    should conclude is Mr. Atilla was removed as a roadblock, and

10   that is the most important way that you know that that call

11   happened.  On April 10th, he's a roadblock.  On April 22nd,

12   he's the author of the method.  That's less than two weeks

13   later.

14             Now, Mr. Atilla, again, has said, I don't know what

15   Mr. Aslan is talking about.  There's no such thing as a method.

16   I don't know why he would say that.  Right?  Was Mr. Atilla

17   lying?  Is he lying to Mr. Zarrab in these 2013 chats?  Does he

18   have any reason to lie to Mr. Zarrab?  No, of course not.  Is

19   Mr. Aslan mistaken?  Well, in June they're saying exactly the

20   same thing.  This time, Mr. Zarrab is the one who says we spoke

21   with Mr. Hakan, and we have no problems related to the methods

22   and the documentation.  This is not a mistake.  This is a

23   thing.  This is a thing that Mr. Atilla did to help the fake

24   food transactions happen, after he knows what they really are.

25             Of course, Mr. Aslan gives Mr. Zarrab a warning, don't

1    start too fast.  That was an impression because Mr. Zarrab does

2    start too fast, and it causes a lot of problems.  And we'll

3    talk about that in a second, but in the meantime, let's look at

4    what is the method.

5         What is it that Mr. Atilla did?  So one day after the

6    roadblock is removed, Mr. Atilla gets an e-mail from

7    Mr. Aydogan describing the list of documents and the

8    transaction sequence for how Mr. Aydogan proposes for these

9    food transactions to work.  There's a big problem here.

10   Mr. Aydogan is proposing a transportation document, that's a

11   bill of lading, and he's proposing an inspection certificate,

12   two things that Mr. Zarrab doesn't want to provide and can't

13   provide.

14        So Mr. Aydogan tries again.  Four days later

15   Mr. Atilla is back from vacation.  There's no dispute that he's

16   able to have these discussions now.  And Mr. Aydogan presents a

17   revised proposal for Mr. Atilla's approval.  The problem is it

18   still requires a transportation document.  That's a bill of

19   lading.  That's the thing that Mr. Zarrab can't provide.  He

20   can't provide it because Mr. Atilla told him those things can

21   be tracked.  It's like a Fed Ex number.  You can check and see

22   if it is gone, where it came from, where it was going.

23        So what is the method?  You saw it in the documents

24   that were recovered from the search of Mr. Aslan's office.  An

25   invoice from Turkey, an invoice from Dubai and a customs

document.  That's it.  No inspection, no bill of lading.  None
of the things that Mr. Atilla has repeatedly and for months
been emphasizing to Treasury is part of their rigorous due
diligence to guard against sanctions evasion.

When does the money go out?  Instantly, there is no
waiting.  What is the standard process?  What is it that
Mr. Zarrab has been exempted from?  Bills of lading, inspection
certificates and documents certified by the local consulate.
When does the money go out?  After all of those documents have
been received by the bank and after all of them have been
reviewed and approved.  That, ladies and gentlemen, is Atilla's
method.  The method to avoid the very same due diligence
process that he has been describing to Treasury.

Now, when things really get rolling in early July,
there's a little bit of the "Gang can't shoot straight" problem
here, and there are a lot of problems, a lot of big problems
that come up right away, and Mr. Atilla deems with all of them.

The first one is the documents say that 150,000 tons
of wheat are being carried on 5,000-ton ships, and Mr. Atilla
does some quick math in his head and realizes it's going to
take 30 or 40 of these purported shipments to get 150,000 tons
of wheat from Dubai to Iran, and that is a problem.

Mr. Zarrab apologizes.  He describes it as a technical
error.  What does he mean it is a technical error?  How can it
be a technical error to ship 150,000 tons of wheat?  It's a

1   technical error because this is not driven by the amount of

2   wheat.  It's driven by the amount of money, and the way that

3   you get to the amount of wheat is to take the money you want to

4   send, divide it by the price of wheat, and that tells you what

5   to write down on the documents, and Mr. Atilla knows that.

6   This is plain as day.

7           So why doesn't Mr. Zarrab use bigger ships?  Because

8   he can't use bigger ships because then he would have to give a

9   bill of lading.  But that's not it.  There's another problem

10  the very same day.  The wheat is coming from Dubai, and

11  Mr. Atilla has to remind Mr. Zarrab that wheat doesn't grow in

12  Dubai.  If you're going to say that you're shipping wheat,

13  you've got to say it came from somewhere else.

14          So what did Mr. Atilla do after these two pretty big

15  problems?  He reports to his boss, Mr. Aslan.  He explains the

16  impracticality of the system that Mr. Zarrab was describing.

17  He confirms that he still can't provide a bill of lading.  They

18  talk about whether they should get another document.

19  Mr. Atilla says maybe we should get an inspection report

20  because, in Dubai, you can get anything.  Right?

21          Mr. Atilla knows that these are not legitimate

22  documents, and he's worrying about papering the file at

23  Halkbank so that they don't get in trouble for not having

24  requested the right kinds of documents.  But what happens?

25  They don't request inspection reports.  They just plow right

1   ahead.

2          And on July 9th, Atilla has to practically coach

3   Mr. Zarrab through this process to keep these problems from

4   happening again.  First, the bills of lading.  Remember, they

5   have talked about this a number of times now.  If you're using

6   big ships, you're going to have to give me a bill of lading.

7   What is he saying?  He's saying, don't use big ships.  If you

8   use small ships, don't overload them.  Tell your guys to make

9   sure the numbers match.

10          Now, remember, these are numbers that are showing up

11  on customs documents, and Mr. Atilla explained to you earlier

12  today his understanding of how customs documents work, which is

13  that the customs office checks them to make sure that they're

14  accurate.  So if there are problems in the customs documents,

15  the customs office should be fixing it.  Mr. Atilla knows that

16  Mr. Zarrab's people need to fix this.

17          Now, is this due diligence?  Is any of this

18  investigating?  There's been a huge red flag, after a huge red

19  flag, after a huge red flag thrown at Mr. Atilla.  Does he do

20  anything like what a good-faith compliance officer would do,

21  what somebody who takes sanctions seriously would do, what

22  somebody who honestly believes these to be real transactions

23  do?  No, he doesn't investigate.  He doesn't have to

24  investigate.  He knows what's happening.  He doesn't have to

25  ask for more documents.  He knows he can't get them.  He just

1    tells Mr. Zarrab to fix the mistakes, and Mr. Zarrab knows

2    exactly what Mr. Atilla is telling him, and so does

3    Mr. Happani.

4            And when Mr. Zarrab describes this conversation with

5    Mr. Atilla, Mr. Atilla said:  "Don't stick it in our eyes,

6    don't sink the ships," and Mr. Happani said:  "May God be

7    pleased with that man."  Thank God for Mr. Atilla.

8            Now, they hit another bump in this business in

9    December of 2013.  As you know, Mr. Zarrab, Mr. Aslan and a

10   whole bunch of other folks were arrested.  Mr. Aslan leaves the

11   bank, and Mr. Zarrab restarts his business with the bank.  Now,

12   this is a problem for Mr. Atilla.  This is a big problem.

13           To the extent that he was trying to pretend before

14   that he didn't know what was going on, it's very hard to

15   pretend now that he doesn't know what's going on.  But he still

16   took that stand, and he still lied to you, and he still told

17   you, I didn't know what Mr. Zarrab was doing.  I wasn't at

18   those meetings.

19           How do you know that he was at those meetings?  Again,

20   contemporaneous communications.  Mr. Zarrab is talking to

21   people about what's going on, and you have some of those

22   communications.  All right?  Here's an electronic communication

23   where Mr. Zarrab is describing some of the problems he's

24   encountering starting the business again, and you heard

25   Mr. Zarrab talk about this.

1          The new general manager, Ali Fuat Taskinoglu, did not
2    want to do it; so Mr. Zarrab had to go higher.  He had to go
3    much higher.  Remember, Halkbank is a government-owned bank.
4    The shares are majority owned by the government of Turkey.  The
5    general manager and the deputy general manager are nominated by
6    the Treasury Department.  And Mr. Zarrab goes to the Turkish
7    government.

8          And he has support from the team.  The general manager
9    was against it, but his team was for it.  You know who his team
10   was because you've heard the evidence.  You know what
11   Mr. Atilla's role was at the bank.  You know that Mr. Atilla is
12   part of that team, and you know it because Mr. Zarrab told you
13   that Mr. Atilla was part of that team.

14         Now, I want to say a word about just a couple of
15   things before we move on to what it is that Mr. Atilla then
16   tells the Treasury Department in October of 2014.  The first is
17   this.  I've spoken to you a lot about Mr. Atilla's testimony,
18   and one thing I want to make clear is that the fact that
19   Mr. Atilla testified does not change the government's burden in
20   this case.  The burden remains with the government at all
21   times, but the fact that Mr. Atilla testified means that you
22   can evaluate his testimony just like you would any other
23   witness' testimony, and you're entitled to ask yourself:  Do I
24   find him credible?  Do I think he's being honest with me?  Do I
25   think he's being straight with me?  Do I think that his

1    testimony is consistent with other witnesses' and with other

2    evidence?  And you should do that.

3          The other thing that I want to say is that there is --

4    I think the evidence makes it extremely clear that Mr. Atilla

5    was under no mistake at any time during his relationship with

6    Mr. Zarrab about what was happening, what the purpose was of

7    these relationships, what the purpose was of the food system

8    and the gold system.

9          Now, Mr. Atilla has argued to you that he didn't

10   actually know, and you're going to get an instruction from

11   Judge Berman about something called willful blindness or

12   conscious avoidance, which is a concept basically that you

13   can't ignore what's obvious in an effort to avoid confirming

14   what it is you already deep down know is going on.

15         To the extent that you credit Mr. Atilla's testimony

16   at all, I submit to you that this is a clearcut case of doing

17   exactly that.  I also submit to you that it is impossible to

18   believe that that's what actually happened.  It is impossible

19   to believe from the evidence that you've seen, and from the

20   testimony that you've heard, that Mr. Atilla had any doubt

21   whatsoever about what was happening at his bank.

22         Now, you also heard some testimony earlier today about

23   what did the bank do after Mr. Zarrab's arrest and Mr. Aslan's

24   arrest?  You heard some testimony about some auditor reports.

25   You heard some testimony about some kind of internal

1    investigation, and I fully expect that Mr. Atilla is going to

2    argue to you that that was his attempt to investigate, but I

3    think there are two things you should keep in mind about that

4    argument.

5         The first is, what is the kind of investigation that

6    you heard about?  Did you hear any investigation about

7    Mr. Zarrab's gold business?  Did you hear about any

8    investigation at the bank about Mr. Zarrab's food business?

9    No, no.  What you heard about was the bank investigating was

10   there an attempt to block other people from being able to do

11   exactly what Mr. Zarrab was doing, was there some effort to

12   obtain an improper loan.

13        These are investigations that are entirely beside the

14   point.  They have nothing to do with figuring out what actually

15   happened, were these real transactions, was gold being exported

16   to Dubai for the National Iranian Oil Company?  Those questions

17   were not asked.  Why weren't they asked?  Because this was

18   being directed from the top.  Of course it's not going to be

19   asked.

20        That leads us into Mr. Atilla's meeting with the

21   Treasury Department in October of 2014.  In some ways, this is

22   a simple meeting because they didn't talk about very much.

23   They mostly talked about Mr. Zarrab.  In another way, it's a

24   more complicated meeting because of the different things that

25   Mr. Atilla has tried to tell you about it throughout the course

1   of this trial.

2           He told you at one point, I think during opening

3   statements, that Mr. Atilla actually suggested to Mr. Cohen

4   that Mr. Zarrab should be put on the Specially Designated

5   Nationals list, that Mr. Atilla tried to tell the Treasury

6   Department to blacklist Reza Zarrab.  Well, you see how quickly

7   Mr. Cohen shot that down.  What did Mr. Cohen say?  Mr. Cohen

8   said, well, Mr. Atilla had changed his tune about Reza Zarrab.

9           When Mr. Atilla was asked about the bank's

10  relationship with Mr. Zarrab, a relationship that had now been

11  going on since early 2012, what did Mr. Atilla say?  He

12  described him like an ordinary bank customer.  He's got some

13  construction loans.  He has an airplane loan.  He does a little

14  bit of foreign trade.  Is that very much to say about somebody

15  who's been doing, far and away, the biggest gold export

16  business at the bank, who's been doing huge food or purported

17  food transactions at the bank?

18          So Mr. Atilla has changed his tune about this meeting

19  here in this trial as well.  Mr. Atilla's changed his tune

20  about a lot of things.  Before his arrest, he's an important

21  man.  He's got a staff of 30 people at the bank.  He's a deputy

22  general manager.  He is the lead person on the two biggest IPOs

23  in the history of Turkey.  He's the leadman in Halkbank's

24  relationships with the highest level government officials at

25  Treasury.  He is important.

1           At this trial, he's tried to tell you he's not that

2      important.  There are eight other deputy general managers.  IT

3      has a deputy general manager.  HR has a deputy general manager,

4      tomato, tomato.  He's tried to tell you that he's peripheral.

5      He's tried to tell you that his involvement was by coincidence,

6      by happenstance, by accident.  If there's a letter of credit,

7      they might call me in.  If it involves a correspondent account,

8      they might call me in.  You know that none of that is true.

9           Mr. Atilla had some of the most significant

10     responsibilities at Halkbank.  The Central Bank of Iran account

11     is a significant responsibility.  It is an account that held

12     billions of dollars, billions of dollars.  The National Iranian

13     Oil Company is a significant relationship for that bank.

14     Mr. Atilla was deeply responsible for that relationship.  Reza

15     Zarrab was an important relationship for that bank, and

16     Mr. Atilla was deeply involved in that relationship.  The

17     bank's relationship with the U.S. Treasury Department was an

18     extremely important relationship.  It's a relationship that if

19     it went poorly, could result in the death of the bank.

20     Mr. Atilla was the lead person in that relationship.

21          Now, Mr. Atilla's a smart man.  I think that's clear.

22     Mr. Atilla knows how to lie.  I think that's also clear.  He's

23     had a lot of practice with it in his meetings with Treasury,

24     and he tried to do it here with you, ladies and gentlemen,

25     during this trial.  The problem with his lies isn't that he's

1    not smart, and it's not that his lies aren't good.  It's that

2    you have seen the evidence.

3          You have seen the evidence that the Treasury

4    Department did not know.  You have the evidence that proves

5    that Mr. Atilla knew that billions of dollars in gold exports

6    were for the government of Iran and for the National Iranian

7    Oil Company.  You have seen the evidence that proves that

8    Mr. Atilla knew that the purpose of that was for NIOC and the

9    government of Iran to be able to access that money, to be able

10   to send it out into the international financial system, to be

11   able to send it through the U.S. financial system.

12         And you know that he's not just a part of the crowd.

13   In October of 2012, at that meeting with the oil officials and

14   the Indian bankers, Mr. Atilla was a deputy general manager.

15   Levent Balkan, who you heard a little bit about, is a step

16   lower.  He's a department head.  Suleyman Aslan is the general

17   manager.  When the food trade starts, Mr. Balkan is gone.  He's

18   been replaced by Hakan Aydogan, who's also a department head.

19   Mr. Aslan, who's the general manager, and Mr. Atilla, who is

20   still the deputy general manager.

21         When Mr. Zarrab is arrested, Mr. Aslan exits the

22   picture, and when the food business starts up again, Mr. Aslan

23   is gone.  There's a new general manager with no history with

24   Mr. Zarrab, with no history with the gold exports, with no

25   history with the fake food trade, and Mr. Atilla and

1    Mr. Aydogan.  The only person who has been there the entire

2    time, the only person who's been involved at every step is

3    Mr. Atilla.

4          So let me give you just a brief word about the charges

5    before I wrap up.  Now, the charges against Mr. Atilla are

6    going to be described to you by Judge Berman, and it's his

7    description of the law that controls.  It's his description of

8    the law that you are obligated and sworn to follow in your

9    deliberations; so I'm just going to share a couple of

10   observations about them in an effort to be helpful during your

11   deliberations.

12         One of the charges you're going to hear about is that

13   Mr. Atilla is charged with conspiring to obstruct, impede or

14   impair the functions of the U.S. Department of the Treasury and

15   the Office of Foreign Assets Control.  He's also charged with

16   conspiring to violate the International Emergency Economic

17   Powers Act, and the prohibitions, licenses and regulations that

18   are adopted under that statute.

19         Both of these charges have to do with Mr. Atilla's

20   lies.  He lied to Treasury so that they would not be able to

21   investigate the sanctions evasion that they were concerned

22   about, to obstruct them from being able to enforce and

23   administer those sanctions regulations.

24         He conspired with others to violate the IEEPA in two

25   ways.  The first way is to avoid being penalized by the

1   Treasury Department, to avoid the prohibitions that come with

2   being blacklisted, the prohibitions on being able to maintain

3   access to the U.S. financial system.  That is one part of that

4   conspiracy.

5            There is a second part, and that is the agreement to

6   make money available for Mr. Zarrab to send out on behalf of

7   Iran and the government of Iran.  All that money that gets

8   sucked down into Dubai, all those billions and billions of

9   dollars in gold and fake food transfers went to Dubai for a

10  reason.  It went to Dubai so that Iran could use it and could

11  use it through the U.S. financial system.  That's the second

12  piece of the IEEPA charge.  Either one is enough.  They both

13  happened, but you don't have to find both.

14           You're going to hear the charges with respect to bank

15  fraud and bank fraud conspiracy and money laundering and money

16  laundering conspiracy.  That also relates to the Dubai part of

17  the system.  Mr. Atilla's knowledge and his agreement that that

18  money would go from Halkbank to Dubai, would go through the

19  United States, where U.S. banks unwittingly would process

20  financial transfers on behalf of Iran, the government of Iran,

21  and money would be sent from outside the United States into the

22  United States to promote that bank fraud and to promote those

23  sanctions violations.

24           All right.  So I'm minutes away from wrapping up, but

25  before I do that, just a couple more words.  You're going to

1    hear from defense counsel, who's going to present some

2    arguments to you.  After that, Mr. Kamaraju is going to have a

3    little bit of time to share a few more thoughts with you, and

4    then probably tomorrow morning Judge Berman is going to charge

5    you on the law.

6              So before I sit down, I want to remind you of

7    something.  I want to remind you of something Mr. Denton, my

8    colleague, asked you to do at the beginning of this trial when

9    he delivered his opening statement.  The first thing Mr. Denton

10   asked you to do was to pay close attention to the evidence, and

11   that you absolutely have done.  I can tell by the number of

12   notebooks that I see in everyone's laps.

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

 1              MR. LOCKARD:  Mr. Denton asked you to follow Judge

 2     Berman's instructions, and I'll ask you to do that as well.

 3     And Mr. Denton asked you to use your common sense.  The same

 4     common sense that you use every day in your own lives.

 5              If you do those things, if you continue to pay close

 6     attention to the evidence, if you continue to use your common

 7     sense, and if you follow Judge Berman's instructions on the

 8     law, Mr. Atilla will get the fair trial that he deserves.  And

 9     if you do those things, you will reach the only verdict that is

10     consistent with the evidence in this case, which is that

11     Mr. Atilla is guilty of the offenses that he's charged with.

12     Thank you.

13              THE COURT:  Thank you, Mr. Lockard.

14              Mr. Rocco is up next.

15              MR. ROCCO:  I have to cut myself down to size.

16              Your Honor, may I proceed?

17              THE COURT:  Yes, sure.

18              MR. ROCCO:  Judge Berman, ladies and gentlemen of the

19     jury, good afternoon.

20              On behalf of Mr. Atilla, on behalf of the other

21     members of our defense team, I'd like to thank you, each and

22     every one of you, for the time, the energy, and the attention

23     that you've paid for the past three weeks.  Thank you also for

24     your patience.  I suspect that you now know why we refer to

25     practicing law.  Because it seems no matter how long you do it,

1    no matter how hard you practice, no one ever gets it right.

2            This has been in my mind, and obviously it's your

3    minds, your collective minds that make all the difference in

4    the world, the Reza Zarrab show.  For the past three weeks,

5    witnesses have been paraded before you, you've been inundated

6    with documents, physical evidence, recorded conversations,

7    transcripts, most of which involve the government's principal

8    witness in this case, Reza Zarrab, and his vast criminal

9    enterprise.

10           The staggering trail of lies and deception and

11   corruption that he's left behind on three continents while he

12   amassed an unimaginable fortune in the process, I think he said

13   when he testified here that he made something like 100 or 150

14   million dollars.  $50 million here or there.

15           That same master criminal who joined Iran's economic

16   jihad against the United States is now embraced by our

17   government, as he tries to earn his way out of jail, earn his

18   freedom by bartering the fate of another human being.  And that

19   human being is Hakan Atilla.

20           Ironically, paradoxically, maybe, the man who

21   relentlessly pursued Reza Zarrab, his personal Inspector

22   Jarvet, and who punched a huge hole in Zarrab's vast criminal

23   enterprise, and was removed from his job for his zealotry,

24   Huseyin Korkmaz has fled Turkey, leaving it in political

25   turmoil, and he's found asylum here in the United States.  He,

HCJ3ATI6                    Summation - Mr. Rocco

1    too, is being embraced by the government for taking the law in

2    his own hands and stealing evidence that he says he developed

3    during his investigation.

4           He gets safe passage to the United States, $50,000

5    from the FBI, $900 from the prosecutor's office, free rent, and

6    employment -- and work papers, employment papers.

7           Lastly, there is a Hakan Atilla the lone defendant in

8    this case.  He comes to the United States on a routine business

9    trip in March of this year, and is locked up now for nine

10   months and facing criminal charges that have devastated him and

11   his family.  His crime was doing his job.

12          Hakan Atilla is a blameless pawn, collateral damage in

13   a story that belongs in the Twilight Zone, not in an American

14   courtroom.

15          Indeed, until Hakan Atilla took the stand last Friday

16   and testified, this case was almost exclusively about Reza

17   Zarrab and his worldwide conspiracy money laundering and

18   sanctions evasion.

19          When we stood here two weeks ago -- three weeks ago

20   now, actually more than three weeks ago, in our opening

21   statements to you, Mr. Denton promised what this case would

22   show.  Mr. Denton made a contract with you that he was bound to

23   keep.  The government has broken that promise to you in very

24   important and significant ways.  Most importantly, it's failed

25   to prove Hakan Atilla's guilt beyond a reasonable doubt.

1            You might remember that the government promised you

2       that it was going to prove that Hakan Atilla was the architect

3       of this economic jihad.  This economic sanction evasion scheme.

4            Did it?  The evidence that was submitted in the court

5       in the course of this trial, piles of it, showed I think one

6       person was the architect of this scheme, and that was Reza

7       Zarrab.  He sat in that witness stand, actually, came out of

8       the witness stand, walked into the well of the court, and you

9       might remember drew for you his floor plan.  Should I say floor

10      plans.  Basically, his scheme for evading sanctions.  The

11      scheme that made him a mega millionaire, maybe a billionaire.

12           The government also promised in its opening statement,

13      told you, that this was all part and parcel of the economic

14      jihad that was declared by Iran in a holy year, I believe 2011,

15      2012.  And for that jihad, for that holy economic war, Iran

16      didn't need soldiers.  It needed bankers.  And that banker,

17      Mr. Denton told you, was Hakan Atilla.

18           Well, that's not what the evidence showed.  The

19      evidence showed that Iran needed a banker, and that banker was

20      Suleyman Aslan.  That banker was the man who Reza Zarrab

21      bought, and bought for millions and millions and millions of

22      dollars in bribes.

23           Now, the government has failed to prove that

24      Mr. Atilla committed the crimes that he's charged with.  He's

25      not corrupt, he's never been bribed.  He is an honest,

1    hardworking man who goes to work every day, and has a

2    responsible position at a major bank in Turkey.  A state-owned

3    bank in Turkey.  How did he get that position?  He worked for

4    it.  He spent the past 22 years of his life toiling at the bank

5    and he started at the bottom of the bank and worked his way to

6    near the top.

7            The government told you, and just now again, spoke

8    about the important position that Mr. Atilla occupied at the

9    bank as a deputy general manager.  In his opening statement

10   Mr. Denton told you that Mr. Atilla was the deputy general

11   manager of the bank.  And what we've learned here is that in

12   2012 and 2013, the core of the period that's involved in the

13   crimes that allegedly were committed, or that were committed by

14   Mr. Zarrab, there were as many as 12 other deputy general

15   managers at Halkbank.

16           And Mr. Atilla's responsibilities, Mr. Atilla's job

17   was basically to manage the bank's relationship with other

18   banking institutions and investors.  And that's where he spent

19   the bulk of his time.  That's where he spent 25 percent of his

20   time, dealing with other banks and dealing with investors.

21   Going on roadshows, trying to raise money for the bank, and did

22   twice apparently in 2012 initially with a public offering, the

23   first public offering that the bank did, and the second public

24   offering that the bank did a couple of years later.

25           His responsibility wasn't to monitor transactions,

HCJ3ATI6                    Summation - Mr. Rocco

1    ordinary commercial transactions, even if those transactions

2    took place internationally.  Even if counterparties to these

3    transactions were located in different parts of the world.

4    Those transactions were handled by a department within the bank

5    called the foreign operations department.  And the foreign

6    operations department had a head, actually we heard of two of

7    them.  The first was Levent Balkan and the second was someone

8    by the name of Hakan Aydogan.  They reported not to Mr. Atilla,

9    but to another deputy general manager.

10          That was not Mr. Atilla's area of responsibility, and

11   no one has suggested to you in the course of the trial, and

12   certainly not in the course of Mr. Atilla's testimony, that he

13   was cabined someplace away from other transactions in the bank

14   or he was not knowledgeable of what was happening at other

15   parts of the bank.  Of course he knew what was happening, but

16   not in great detail.

17          Halkbank, bear in mind, is a large bank.  It is the

18   sixth or eighth largest bank in Turkey.  There are 17,000

19   employees.  I believe 1,000 branches.  And management in the

20   bank is very diffuse.  Mr. Atilla doesn't get up in the morning

21   and worry about a specific transaction, a specific banking

22   transaction.  He has other responsibilities.  That doesn't mean

23   that he doesn't learn of them, and because of his experience in

24   the bank, long experience in the bank, obviously, his knowledge

25   is important.  He's got institutional knowledge, he's got a

1    sense of how the bank does its business.  He has a sense of the

2    bank's important customers.  He wants to do his job and he

3    wants to do his job well.

4         Now, when we're talking, when we were talking about

5    what Mr. Atilla's role allegedly was in this conspiracy, and

6    you were told that he was the architect of this plan, this

7    sanctions evasion plan, that I'm sure created in your mind some

8    idea or some thoughts about, well, what was he doing?  What was

9    he planning?  How was the plan executed?

10        Well, we have a description of what the plan was, and

11   how it worked, and as I said, that was a plan that was

12   conceived of and drawn by in great detail by Reza Zarrab.  That

13   was his floor plan.  Mr. Atilla's role here, as I heard the

14   testimony, and it is your -- not my -- recollection that

15   controls, it is your collective recollection that controls.

16   But the evidence here, and the government's theory is that

17   Mr. Atilla helped Reza Zarrab falsify documents and falsify

18   documents that were used in connection with bogus food

19   shipments.

20        Well, as I said to you in my opening statement, and I

21   think as the evidence here suggests, did Reza Zarrab need

22   somebody to teach him how to cheat?  Did Reza Zarrab need

23   somebody to teach him how to falsify documents?

24        Let's stop there for a minute and I'm sorry for my

25   low-tech presentation, but I'm old school, and I do better

1    talking than I do having a running commentary.  But I'll remind
2    you of some things that may help refresh your recollection as
3    you deliberate.  And our request is, just like the
4    government's, you'll take the law from Judge Berman, but it's
5    your recollection of the facts that control, and our request to
6    you, Mr. Atilla's request to you, is that you determine his
7    fate on the basis of the evidence that you have before you.
8    The evidence that's been produced in this courtroom.  The
9    evidence that he gave you when he testified and subjected
10   himself to cross-examination earlier today.

11         Did Mr. Atilla help Reza Zarrab design a secret system
12   for laundering money?  Did Reza Zarrab need Mr. Atilla to help
13   him design that system?

14         So let's talk about some of the conversations that you
15   heard about in the course of this trial, the conversations that
16   were recorded, secretly recorded, and were played for you.
17   Let's talk about Reza Zarrab and Reza Zarrab's associates
18   Abdullah Happani and Ruchan Bayar.  You might remember that in
19   the early part of 2013, before that famous October 10 -- I'm
20   sorry -- April 10 date that we'll come back to, April 10 was
21   the day that Mr. Zarrab tells you he stopped, he stopped, lying
22   to Mr. Atilla.

23         But, prior to that date, what was Mr. Zarrab doing?
24   He was off in China trying to bribe his way into a commercial
25   relationship with Chinese banks, and trying to basically get

1    involved in another sanctions scheme in China.

2              He didn't have Mr. Atilla in his back pocket.  He

3    didn't have Mr. Atilla to consult with to ask how to phony up

4    documents.  He and Ruchan Bayar had everything under control.

5    They knew just what they needed to do to cheat.

6              And Mr. Zarrab's solution or his approach, and this

7    was his approach all over the world, was basically if I don't

8    have you, I can buy you.  And you might remember that there was

9    a conversation where he was saying every man has a price.

10   There was somebody who was a monkey wrench or a wrench in the

11   gears like Mr. Atilla was, and Mr. Zarrab's solution to that

12   was go around him.  Go above him.  Go to his boss.  If he's

13   going to give you a hard time, you don't need to deal with him.

14   You can go right to his boss.

15             That's precisely what he did when he dealt with

16   Mr. Atilla at Halkbank.  What did he do?  He bought Suleyman

17   Aslan.  And you'll remember the conversation that he had with

18   Suleyman Aslan and -- I'm sorry, with Abdullah Happani in

19   October of 2012.  You might recall that they spoke about how

20   they were going -- he spoke about his reasons for bribing

21   Suleyman Aslan.  And he told him and said he was the important

22   man, he was the man to get it done, he was the man, Mr. fixit

23   man.  If you needed -- if you had a problem, who did you get go

24   to?  You went to Suleyman Aslan.

25             And in the course of the schemes that the government

1    has offered evidence of in this case, the gold scheme, and in

2    connection with the food scheme, who did Reza Zarrab go to?

3    Who did he go to constantly?  Who did he go to endlessly?  Who

4    did he go to without reprieve?  Suleyman Aslan.  If he couldn't

5    get him on the phone, he chatted with him.  He used WhatsApp

6    and Viber messages.

7              And as I said to you in my opening statement to you,

8    they were like two young lovers.  There are thousands of back

9    and forths, any time there was a problem, any time that Reza

10   Zarrab needed something done, he didn't go to Hakan Atilla.  He

11   went directly to the man.  He went directly to the guy he

12   bought.  He went directly to the person he owned.  And he did

13   it shamelessly, and he did it continuously.

14             And you'll see in the conversations, in the telephone

15   conversations, in April of 2013, when there is a discussion

16   about Mr. Atilla being a wrench in the works in slowing Zarrab

17   down, Zarrab doesn't go to Hakan Atilla and work it out with

18   Hakan Atilla.  Zarrab goes directly to Suleyman Aslan.  And

19   we'll come back to this in a little bit.

20             For the gold trade, and setting up meetings in October

21   of 2012, who is the man that Reza Zarrab goes to?  Suleyman

22   Aslan.

23             In July of 2013, when there are problems in the food

24   business, who does Reza Zarrab go to?  He doesn't go to Hakan

25   Atilla.  When the problems start, and there are questions about

1    documents, the question -- the questions are raised, and who

2    does Zarrab go to?  He goes to the guy he bought.  He goes

3    directly to Suleyman Aslan.

4             The predicate for the government's theory of its case

5    against Hakan Atilla is the testimony that you heard from Reza

6    Zarrab.  That's the lynchpin.  If you believe Reza Zarrab, then

7    Mr. Atilla is guilty.  The question is, should you believe Reza

8    Zarrab?

9             Let's talk about him.  He is what he is.  He is what

10   he told you he is.  He's the king of bribes.  On the witness

11   stand, he was pretty much what one would expect of somebody

12   like Reza Zarrab.  In the courtroom, he was polite and

13   deferential and cautious.

14            On the recorded conversations that you have, and you

15   heard him on, he's something quite different.  He's a bully and

16   he's blustering and he's insistent and he's crude.  And he knew

17   how to get his way.

18            You'll hear him in conversations, and that's why it's

19   important to listen to the conversations, even though they're

20   in Turkish, and even though the transcripts that capture the

21   conversations, knowing his tone and his bluster is very

22   important to interpret the dynamic, what was going on between

23   him and his confidantes, and I think actually help identify for

24   you who are his confidantes and who were not.

25            If you listen to the conversations, and there is a

 1    problem, you can hear him on some occasions sweet talking

 2    Suleyman Aslan.  The chats sound like sweet talk.  When Reza

 3    Zarrab wants to get something from someone, he knows how to be

 4    charming.  When Reza Zarrab wants his own way and is getting

 5    some resistance though, he will talk over people and through

 6    people and insist that they talk about what he wants to talk

 7    about.  As I say, listen to the tapes, read the transcripts of

 8    the tapes -- of the recordings.  I'm dating myself by talking

 9    about tapes.  But read the transcripts and read the transcripts

10    in the context of listening to some of these recordings because

11    they're very enlightening.

12            Much of what the government has to say comes from not

13    only what Reza Zarrab has to say, and Reza Zarrab looks at

14    Hakan Atilla as his EZ Pass.  A way to shorten his jail

15    sentence if he's sentenced to jail, a way of perhaps avoiding

16    jail completely, because Reza Zarrab, when Reza Zarrab was

17    arrested, and languished in jail for a year, he tried his

18    darndest to get out.  Tried to retain powerful lawyers, had

19    lawyers in touch with people outside the United States.  It

20    didn't work.

21            But, a year into his jail, what happens is Hakan

22    Atilla comes to the United States, Hakan Atilla is arrested,

23    and the rest is, as they say, history.  Because at that point,

24    Reza Zarrab realizes that there is a way that he can barter

25    himself out of jail.  Reza Zarrab, who is the king of deals,

1    who is the deal master extraordinaire, understands something he

2    can now barter with.  He can barter with somebody who he knew

3    with Halkbank.  Who he dealt with at Halkbank.  Despite the

4    fact that he had no relationship with Hakan Atilla.  Despite

5    the fact that they rarely spoke.  Despite the fact that they

6    rarely met.

7           I think Mr. Atilla testified to one meeting or two

8    meetings with Mr. Zarrab.  And Mr. Zarrab's testimony, if I

9    recall, is they met a handful of times, and when he was

10   cross-examined, a handful became two handfuls.  But they don't

11   know each other.  Their relationship was incidental.  Their

12   relationship was casual in the sense that it was incidental.

13   But their relationship was driven primarily by Mr. Zarrab's

14   relationship with Halkbank, and his corrupt relationship with

15   Suleyman Aslan.

16          As I say, when you think of Reza Zarrab, you think of

17   him as the Bernie Madoff of bribes.  Guy who has everything,

18   and he's shown himself time and again to get what he wants and

19   to pay whatever price he has to pay to get what he wants.

20          And that comes true especially when it comes to Hakan

21   Atilla.  Because as I say, it becomes an easy way for

22   Mr. Zarrab to make his way, to earn his way, to strike a deal

23   with the government and get himself released from jail and free

24   to return to his lifestyle of the rich and famous.

25          So, let's talk a little bit, though, about the

1    government's recordings, because they do tell an amazing story

2    of corruption, they tell an amazing story about many, many

3    people.  But, when they come to Hakan Atilla, they tell us

4    virtually nothing.  When they come to Hakan Atilla, I think

5    there are eight recordings in all that involve Mr. Atilla,

6    either Hakan is on the phone I think six times with Reza

7    Zarrab.  The conversations in total are 22 minutes and

8    51 seconds long.  They average less than four minutes a

9    conversation, less than five minutes a conversation.

10            By listening to them, you get a sense of the

11   relationships, the relationship that Zarrab had with different

12   people.  As I say, the embracing way he talks to Suleyman

13   Aslan, the familiar way he talks to Abdullah Happani, the very

14   formal and direct way that he talks to Hakan Atilla.  The

15   conversations with Hakan Atilla are short, to the point,

16   they're directed.

17            And think of this, ladies and gentlemen.  If these

18   conversations were conversations between people who are

19   colleagues in crimes, confederates in crime, why do they

20   talk -- why don't they speak directly?  Why don't they, if

21   they're talking about things that are illegal, the way Zarrab

22   talks to Happani, when he's talking about forging documents, he

23   has no problem in saying that documents are being forged.  Why

24   doesn't he do the same when he talks to Hakan Atilla?  When

25   these conversations that the government is urging you to

HCJ3ATI6                    Summation - Mr. Rocco

1    consider as corroborative of Mr. Zarrab's testimony on the

2    witness stand, Zarrab's testimony on the witness stand, there

3    is nothing in those conversations that corroborate a criminal

4    enterprise or knowledge on the part of Hakan Atilla that he's

5    involved in wrongdoing.  Knowledge on the part of Hakan Atilla

6    that there is wrongdoing going on around him.  Knowledge on the

7    part of Hakan Atilla that even Suleyman Aslan is involved in

8    wrongdoing.

9            There is no doubt, no evidence in this case, that

10   suggests to you that Hakan Atilla knew that Suleyman Aslan was

11   being bribed by Zarrab.  There is no reason for Suleyman Aslan

12   to compromise himself with Hakan Atilla or anyone else.  That

13   was a well-guarded secret between Zarrab and Suleyman Aslan.

14           So, what is it in the evidence here that would suggest

15   that Hakan Atilla should know of a corrupt relationship, or

16   should know that Zarrab is involved in a gold, in a bogus gold

17   scheme to avoid sanctions and a bogus food scheme to avoid U.S.

18   sanctions?  There is no reason at all.

19           That comes back, again, in part to the way that

20   Halkbank is organized, and it comes back to the fact that it is

21   not Mr. Atilla's responsibility to examine transactions.

22   Mr. Atilla relies on people who work for him.  And Mr. Atilla

23   relies on people in the foreign operations department and the

24   sanctions group or sanctions team in the foreign operations

25   department that deal with these problems every day.  That flag

HCJ3ATI6                    Summation - Mr. Rocco

1    the problems.  That bring the problems to the attention of

2    their supervisors, and ultimately, to people in the bank who

3    are responsible for dealing with problems like this.

4           Mr. Atilla was asked, obviously, asked by people, and

5    I think he testified this morning to the fact, that people on

6    staff came to him with problems and documents, in July of 2013,

7    to discuss with him these problems.  And he treated it like he

8    would treat any other problem that percolated from below.  He

9    looked into it, he gave instructions, and he sent the matter

10   back on its way, and asked the people who worked for him to

11   follow through with the transactions, to process them.

12          There is no evidence here to suggest that Mr. Atilla

13   was the one who defined what documents accompanied food

14   transactions.  That wasn't his call.  He would -- if he

15   discussed documents, he would say, and I think the evidence is

16   plain that it was people in lower levels of staff who had the

17   responsibility of following up with proper documentation.  It

18   was people on staff who were responsible for deciding whether

19   the documentation of these transactions was appropriate or

20   proper.  It was not Mr. Atilla who made the final decision as

21   to what appropriate documentation was.

22          And in the conversation that the government referenced

23   on July 9, you heard about it, where Mr. Atilla is talking

24   about these little boats that go back and forth between Iran

25   and Dubai, across the Persian Gulf.  Which, by the way, if you

1     look at the map, isn't such a long distance.  It's certainly

2     feasible that in transit trade, that these boats would take

3     produce across the Persian Gulf.  I think there is no testimony

4     in the record, but you can see from the map that it is not a

5     long distance.

6            If the food was delivered in Iran, or if the food was

7     delivered in Dubai, there isn't much of a difference.  The food

8     still crosses the Persian Gulf and it is not a long or

9     hazardous trip.

10           So, when you put into context the evidence that you've

11    heard here, and when you put into context where it comes from,

12    when you put into context the gloss that the government wants

13    you to put on the evidence here is really unwarranted and

14    unsupported by the facts, and is predicated in the end on the

15    testimony of someone like Reza Zarrab, you have to ask

16    yourself, has the government sustained the burden, the high

17    burden that's required for a conviction in a court of law,

18    guilt beyond a reasonable doubt.

19           If we can talk just a second about Mr. Atilla's

20    testimony.  Judge Berman will tell you on his instruction on

21    the law that Mr. Atilla, the defendant in this case, has no

22    burden.  The burden of proof is on the prosecution, it is on

23    the prosecution at the beginning of the case, and it never

24    leaves the prosecution's table.  The burden of proof remains

25    constant, guilt must be proved beyond a reasonable doubt to

1    your satisfaction, and the presumption of innocence, that

2    that's the foundation of the burden of proof.  And that high

3    standard of evidence remains with the defendant unless or until

4    you decide to the contrary.

5         A defendant needn't waive his privilege against

6    self-incrimination.  He needn't testify.  He's got no burden in

7    the case to do anything.

8         Here, Hakan Atilla decided that he would testify,

9    waived his privilege against self-incrimination, took the

10   witness stand, and testified for roughly two days and subjected

11   himself to cross-examination.

12        The decision to take the witness stand by a defendant

13   in a criminal case isn't the act of a guilty man.  It certainly

14   is consistent with the mindset of someone who is innocent.  It

15   is the act of a man who believes he's innocent, and wants to

16   proclaim his innocence to the entire world.  He does so because

17   he believes he's innocent.

18        Would a guilty man come to the United States like

19   Hakan Atilla did earlier this year knowing, as he did, that

20   Reza Zarrab had been arrested a year before and charged with

21   violating sanctions and was languishing in jail?  When Zarrab

22   came to the United States, he didn't know what he was exposing

23   himself to, he didn't know that he would be arrested.  He

24   didn't know that the United States was on to his sanctions

25   evasion scheme.

1          By contrast, when Hakan Atilla came to the United

2     States, a year later, he knew that Zarrab had already been

3     arrested.  In fact, he first came to the United States in

4     September of 2016, six, roughly six months after Zarrab had

5     been originally arrested.  He didn't come to the United States

6     once.  He came to the United States twice.  And when he came to

7     the United States the second time is when he was arrested.

8          But would a man who is guilty of a crime expose

9     himself to arrest by coming to the United States?  Why wouldn't

10    he have stayed outside the United States?  That's not the act

11    of a guilty man.  It is the act of an innocent man.

12         And, you might remember, after he was arrested, and he

13    was at the FBI office out at J.F.K., the case agent Jennifer

14    McReynolds confronted him, offered him the opportunity to

15    cooperate.  Said that the government had evidence against him,

16    and that he could help himself, essentially help himself with

17    his problem.  That he could work his way -- there were people

18    that were more involved and he could help himself with his

19    problem.

20         Hakan Atilla didn't say yes, didn't pop up and didn't

21    say in a heartbeat that he was ready to cooperate.  And the

22    reason he didn't, and the reason he chose not to cooperate, is

23    because he had nothing to cooperate about because he had

24    nothing, done nothing wrong.  He believed in his innocence.

25    That's, again, the act of an innocent man.

1      And, by the way, you can look at the recording of his

2  arrest.  We played roughly eight minutes of it.  You can look

3  at it and ask yourself, does he look like a guilty man?  Is he

4  nervous?  Is he sweating the way Adam Szubin said that Hakan

5  was sweating when he spoke to him when he did his pull aside in

6  Istanbul back in 2013?  We'll come back to that in a bit.  No.

7  He's calm, cool and collected.  Just as he was when he

8  testified in this courtroom in front of you, not only on direct

9  examination, but when he was subject to a rigorous and

10  hard-pressing cross-examination by Mr. Denton.  You didn't see

11  him break a sweat.  You didn't see him start acting nervously.

12  He answered the questions, he answered all of Mr. Denton's

13  questions just like he'd answered the questions on direct

14  examination.

15      Let's talk about a couple of the specifics of the

16  evidence that you heard here about Mr. Atilla's role and how it

17  was that, as late as April 10, 2013, that Reza Zarrab admits

18  that he was lying to Mr. Atilla.

19      He admits that when he spoke to Mr. Atilla on the

20  morning of April 10, 2013, you might remember Mr. Atilla was on

21  his way to the airport, Mr. Atilla was in his car on the way to

22  the airport, leaving with his family for Barcelona.  In the

23  conversation, Mr. Atilla speaks to Mr. Zarrab about the food,

24  the food trade.  And they have a discussion about what's

25  involved in the food trade.  And they discuss what Mr. Zarrab's

1    plans are.

2              And in that conversation there is no discussion of

3    forging documents or bogus food shipments.  Mr. Zarrab is

4    telling Mr. Atilla that he's shipping food and they're talking

5    about what the food, what the process is going to be, what the

6    payment is going to be.  And Zarrab tells Mr. Atilla that the

7    payment is going to be not handled by letter of credit, as food

8    transactions commonly are, but this was different.  It was

9    going to be advance payment.  This is something that Mr. Atilla

10   has not wrapped his head around, doesn't understand it.

11             Well, the conversation is brief, Mr. Atilla goes off

12   to Barcelona to return on the 14th of April, and in the

13   interim, we know that that's the day that Zarrab goes to

14   Suleyman Aslan, to the man he bought, and says to him Atilla's

15   throwing a wrench into our arrangement.  He needs to be

16   straightened out.

17             And you remember Mr. Zarrab testified that right in

18   front of him, that Suleyman Aslan picked up the phone, called

19   Hakan Atilla, and told him get with the program.  You're going

20   to go ahead and you are going to do it.  And apparently, he was

21   so proud of it, that after the conversation, you might

22   remember, Zarrab called call his buddy Abdullah Happani and

23   says right in front of me Suleyman called, made a phone call to

24   Hakan and straightened him out.

25             Well, it was tough.  It was a tough thing to do

HCJ3ATI6                    Summation - Mr. Rocco

1    because Mr. Atilla, Hakan Atilla, was still on an airplane.

2              Now, in his closing remarks to you, Mr. Lockard just

3    told you that Mr. Atilla got off the plane at 4:48 p.m. and we

4    know that it may have been 4:48, but it was 4:48 p.m. in

5    Barcelona.  That was 5:48 in Istanbul.  And that hour makes a

6    big difference because that day there is surveillance,

7    Mr. Korkmaz's surveillance has Mr. Zarrab showing up at the

8    bank at roughly 4 and leaving at 5:15.  Now we're talking

9    Istanbul time.  That's, by my calculation, a half hour before

10   this alleged phone call was made to Hakan Atilla.

11             But there's better evidence, I think, of who

12   Mr. Suleyman called that day.  Because at 8:02 p.m., after the

13   meeting, and after the call that Zarrab made to Happani, at

14   8:02, Zarrab calls another Hakan, but it is not, as I say,

15   Hakan Atilla, it is Hakan Aydogan.  And in that conversation,

16   that conversation is similar to the conversation that he had

17   with Mr. Atilla earlier in the day.  And he's talking to him

18   about the food shipment.  As I recall, the food shipments and

19   what he's going to do, as I recall the testimony -- again, it's

20   your recollection that controls, not mine -- Mr. Zarrab

21   testified that he was lying to Hakan Aydogan as well when he

22   spoke to him about the food shipment.

23             (Continued on next page)

24

25

1             MR. ROCCO:  So here we have, it's April, and six

2      months earlier, we have Zarrab testifying, that's six months

3      later, in October, on October 4th, 2012, there was a meeting

4      with Iranians at Halkbank, where the plot to continue gold and

5      the plot to continue to divert money out of Turkey and into

6      Dubai, so that Iran could use the money to make international

7      payments is hatched, where Zarrab initially testified that

8      Hakan Atilla was recruited to be part of the conspiracy.

9             You might remember, they were talking about the

10     Iranians wanted to access their funds directly, and the bank

11     did not want that to happen.  This is according to Zarrab.  And

12     Zarrab's testimony is he pointed to Mr. Suleyman Aslan, was

13     asked:  How are we going to do this?  And Aslan refused to make

14     payments directly, and he pointed to Zarrab, and he said:

15     We'll continue to use Zarrab.  We'll use the old system.  And

16     apparently in the same meeting, the same question was asked of

17     Hakan Atilla, and Hakan Atilla did the same thing, he pointed

18     to Reza Zarrab and said:  We will continue to use the old

19     system.

20             Well, if, in fact, that was the case, if, in fact, in

21     October of 2012 Hakan Atilla was part of the conspiracy, a

22     conspiracy with Zarrab, why is Zarrab lying to him six months

23     later?  Why is he lying to him in April of 2010?  Why does he

24     admit that he was lying to him on April 10th, 2010?  He tries

25     to put -- he says things were corrected that day, but we know

1    they couldn't have been corrected that day because they

2    couldn't have had a conversation.

3            So we go to option three, which is the period between

4    April 10th and April 22nd, and you might remember that on

5    April 22nd there was allegedly a chat, where Suleyman Aslan

6    asks Zarrab if he's satisfied with the method.  The method, the

7    method.  We've heard repeatedly about the method, and the

8    method sounds very sinister.  And the method, as the government

9    would spin it, is something that's sinister, but the answer is

10   much simpler than that.

11           These were advance payments for food.  The payment was

12   coming in to the bank.  Zarrab went to Hakan Atilla and said

13   that he wanted the money released from the banks and sent to

14   Dubai immediately.  Hakan Atilla was not comfortable doing

15   that; so he suggested to Zarrab that if the supplier of the

16   food wanted to be paid immediately, that's not a problem, but

17   the money is not going to leave Turkey.  The money is not going

18   to leave Halkbank until the proper documentation arrives at the

19   bank.  And says that the food supplier, the company called

20   Atlantis, if it wants to be paid immediately, there's no

21   problem with that, but Atlantis has to open an account at

22   Halkbank, and that the money will be deposited into Atlantis'

23   account at Halkbank.  This way, the money does not leave the

24   bank.  This way, the money does not leave Turkey until proper

25   documentation is presented for the transactions.

1          That's the system that is put into place.  That's the

2     so-called method.  That's the discussion that Hakan Atilla has

3     with Reza Zarrab sometime in April of 2010, and it's in direct

4     response and follows naturally from the fact that on

5     April 10th, there's a whole new notion introduced to Hakan

6     Atilla that these payments are going to be made in advance.

7     There are no letters of credit.  There's no security.  There's

8     no way of securitizing the shipment or the bank.

9          So the simple solution is if we get paid, the money

10    goes into an account and stays at Halkbank.  If we get paid in

11    advance, the money stays at Halkbank until we get satisfactory

12    proof that the goods are delivered, and we receive notification

13    or documentation that the goods have been delivered.  That's

14    not a sinister method.  There's nothing illegal or sinister

15    about it.  It's Hakan Atilla doing what Hakan Atilla is paid to

16    do, which essentially is protect the interests of the bank.

17         And it's important that we understand that that

18    distinction is drawn and you understand that that's what was

19    going on here and nothing more sinister because everything, as

20    I said earlier, everything in the government's case is

21    predicated on the fact that Reza Zarrab is telling the truth

22    and that, more importantly, that Hakan Atilla knew that there

23    were sanctions violations going on in the sale of gold and

24    later knew that there were sanctions violations going on with

25    the sale of food.

1              Let's talk, if we can, about OFAC and Mr. Atilla's

2     conversations with the people from OFAC.  There were three, as

3     I recall.  There were three witnesses from OFAC, three fact

4     witnesses, Adam Szubin, David Cohen and Joshua --

5              THE COURT:  I think it was Kirschenbaum.

6              MR. ROCCO:  I apologize, your Honor.  A Joshua

7     Kirschenbaum.  There was a fourth witness by the name of Lisa

8     Palluconi.  None of those witnesses, none of the fact witnesses

9     testified that they were familiar with the Halkbank or how

10    Halkbank was organized.  They weren't familiar with Halkbank.

11    They weren't familiar with how it's organized.  They weren't

12    familiar with Hakan Atilla's role at the bank.  They knew him

13    to be someone important, called him, referred to him as the

14    deputy general manager, as the government did in its opening.

15    But we know that he was not the deputy general manager.  He was

16    one of, at the time, 12 deputy general managers.

17             As I say, they certainly had no idea that it was Hakan

18    Atilla's job to oversee the kinds of transactions that are

19    involved in this case.  None of the witnesses testified about

20    the foreign operations department or what the department does

21    or the sanctions team or the so-called -- the compliance

22    department.  Hakan Atilla met regularly, twice a year it seems

23    like, with people from OFAC, whether it was David Cohen

24    sometimes; other times it was Adam Szubin.  They met in

25    Washington, D.C. when Hakan Atilla was here to attend IMF

1    meetings.  They met in Istanbul, at Halkbank, when apparently

2    members of Treasury would go to Turkey.

3         You might remember that David Cohen and Adam Szubin

4    testified, and I don't think there's any dispute, so did

5    Mr. Atilla, that representatives from Treasury tried to impress

6    on Halkbank how important it was to understand that Iran was

7    working overtime to evade U.S. sanctions.

8         And there is testimony about two meetings, where in

9    one meeting, on February 12th, 2013, Adam Szubin took

10   Mr. Atilla aside and, what did he call, a pull-aside and warned

11   him, and that Treasury was about to take some drastic actions

12   against Halkbank.  Described it, I think, as, in substance,

13   OFAC was prepared to pull -- was getting prepared to pull a

14   trigger.

15        And a meeting a couple of weeks later with David

16   Cohen, where David Cohen said that he gave representatives of

17   Halkbank a stern warning about sanctions violations,

18   essentially telling Halkbank that it was being watched

19   carefully.

20        Now, when Mr. Szubin testified, we asked Mr. Szubin

21   about his so-called pull-aside and what happened at the

22   pull-aside and how the pull-aside was documented, and you might

23   remember that there are two memoranda that documented this

24   meeting, a short memoranda that made no mention at all of the

25   pull-aside, and a longer memorandum, a State Department cable

1   that similarly made no mention of the pull-aside.

2           Now, David Cohen and Adam Szubin are, obviously,

3   important people.  At the time that Szubin did his pull-aside,

4   he was the director of OFAC, and here, we haven't set the scene

5   for you.  We have the director of OFAC meeting with senior

6   representatives of Halkbank, including certainly Mr. Atilla,

7   and warning Mr. Atilla that OFAC is prepared to pull a trigger,

8   but doesn't document that warning in a memorandum or in notes,

9   or actually in two memorandum.

10          Now, it doesn't take long to figure out that Adam

11  Szubin is a very cautious, meticulous, well-trained lawyer,

12  somebody that knows that it's important to document

13  communications like this, especially between high-level

14  government officials and high-level banking authorities in a

15  foreign country.  This wasn't a casual, well, you know, why

16  don't we have a little chat.  This was serious, serious

17  business.

18          In fact, it's serious enough where not only would it

19  be documented, one would think that if you had that kind of a

20  complaint against a foreign state-owned bank, that you would

21  take it to the highest levels of that bank, and you would take

22  it directly to the government.  Mr. Szubin didn't do that.

23  Mr. Szubin didn't document the pull-aside.  Mr. Szubin didn't

24  go to anybody in Turkish government and say we have a problem

25  here.

1              Same with Mr. Cohen.  Mr. Cohen says that he gave a

2    stern warning to Halkbank.  Now, look, stern warnings may be in

3    the eye of the beholder, and we are dealing with cultural

4    differences.  And by the way, you've not heard from me today,

5    and you haven't heard from the defense in this case, that

6    Mr. Atilla doesn't understand English or that he's hiding from

7    speaking English -- I'm sorry, that he doesn't understand

8    English and that there was some confusion between him and the

9    people in Treasury when he spoke to them, or there was some

10   confusion when he met the FBI agents and was arrested by the

11   FBI agents and didn't understand what was going on, or that he

12   didn't understand something that was going on in this

13   courtroom.

14             He's not hiding under a language difference, and I'm

15   not saying that language has anything to do with what happened

16   here, in terms of what these stern warnings are.  But I really

17   urge you to consider if this really happened, if there was a

18   pull-aside, and if there was a stern warning to a high-level

19   official of a foreign bank by a high-level official of the

20   United States government, wouldn't that be documented?

21   Wouldn't it be meticulously documented?  Wouldn't it be

22   something that would be brought to the attention of a foreign

23   official, a state official, as opposed to simply a bank

24   official?

25             Now, this is serious stuff, and there's no doubt, no

HCIPATI7                    Summation - Mr. Rocco

1    doubt that OFAC and the United States Treasury was concerned

2    about what was going on in 2011, 2012, 2013 with Iran and

3    Iranian sanctions.  There's no question that Iranian sanctions

4    were changing; that the sanctions were becoming more vigorous;

5    that Iran was feeling the heat; that Iran was straining under

6    the impact of these sanctions.

7              And it wouldn't be surprising at all that there was a

8    discussion, but the question is a stern warning and in talking

9    about this stern warning and in talking about the interaction

10   between Halkbank and OFAC, bear in mind that in the same

11   February 12th meeting with Adam Szubin, when he met with

12   Mr. Atilla, Mr. Atilla brought to his attention the fact -- in

13   talking about gold, the fact that Halkbank was having a hard

14   time determining the origin and the ultimate destination of the

15   gold shipments.  That's documented.

16             That's documented in the cable of that meeting, and

17   that's memorialized in the cable of that meeting.  And the

18   reason he did it is because he wasn't trying to hide things

19   from OFAC.  His testimony this morning was the conversations

20   that he felt that he had an open and free exchange with the

21   Treasury Department, with representatives of the Treasury

22   Department.  And, in fact, there's an odd fact here that

23   corroborates that because when he is arrested in 2017, who does

24   Mr. Atilla ask for on his way to MCC with Special Agent

25   Tringale, but David Cohen.

1          Now, if Hakan Atilla has spent years lying to David

2     Cohen and knows that he's been arrested for violating U.S.

3     sanctions, why would the first name that comes to mind be David

4     Cohen?  Why would he be asking for him unless he trusted him,

5     unless he felt that he never misled him?  And that's what that

6     demonstrates, and it's consistent with other things that

7     Halkbank did for years.

8          Halkbank would bring to U.S. Treasury, or to OFAC,

9     problems with potential sanctions violations, give information

10    to OFAC, serve as a conduit for information to OFAC.  There was

11    some reason that Mr. Atilla believed that he had a trusting and

12    trustful relationship with OFAC and the Department of Treasury,

13    something supporting the reason that he said that he would ask

14    for David Cohen at the time that he was arrested.  And it was

15    precisely that.

16         And that raises another issue, and it's the issue of

17    Reza Zarrab.  The fact of the matter is that OFAC never told

18    Halkbank that it had information or was investigating Reza

19    Zarrab.  Reza Zarrab was arrested in December of 2013, arrested

20    with the president of the bank in a broad-ranging criminal

21    investigation that was being conducted in Turkey.  He was

22    arrested, and there is no contact.

23         OFAC learns of an arrest of Reza Zarrab, who is a

24    customer of the bank, and David Cohen knew that Reza Zarrab was

25    a customer of the bank.  And Zarrab and Suleyman Aslan, who was

1    then the general manager of the bank, are arrested in an

2    investigation and OFAC doesn't contact the bank?  Has no

3    questions to ask the bank?  Has no questions to ask what

4    happened, to inquire into the circumstances of the arrest or

5    the facts that led to the arrest?

6          Now, OFAC knows precisely who Reza Zarrab is.  OFAC

7    had been investigating him, or was investigating him, and if

8    they weren't investigating him at the end of 2013 when he was

9    arrested, Mr. Cohen admitted that they would have started or

10   did start an investigation of him almost immediately.  What's

11   the reason that the bank is not contacted?  There is no

12   meeting, no meeting between the bank and OFAC from February of

13   2013 until October of 2014.  That's over 18 months.

14         And why?  Why does OFAC stay away from Halkbank?  Why

15   isn't there follow up?  Why isn't there discussion?  This

16   trusting relationship that Mr. Atilla had with OFAC, obviously,

17   wasn't reciprocated, and Mr. Atilla is no fool.  What led

18   Mr. Atilla to believe that he could trust David Cohen, that he

19   could trust Adam Szubin, and apparently they didn't trust him?

20         So I think you have to think about the so-called --

21   the dynamic of what was going on here.  I think you have to

22   think about what was driving OFAC to behave the way it did and

23   what was driving Mr. Atilla to believe that he could confide in

24   people from OFAC, telling them about problems with things like

25   gold shipments, determining origin and destination?  Why would

1    he invite scrutiny by OFAC if, in fact, what he was doing was

2    trying to hide things from them?

3           Why would -- and we'll go to the October 10th, 2014,

4    meeting with Mr. Cohen, where Mr. Atilla discusses with

5    Mr. Cohen the relationship that Zarrab had with Halkbank.  He's

6    asked the question:  Are you still doing business with Reza

7    Zarrab?  Mr. Atilla answers the question and answers the

8    question directly.  They're doing foreign business, and you can

9    look at the memo of the meeting.  They're involved in foreign

10   transactions, not some, not a little, not a tiny bit.

11          The memo, the cable that memorializes that meeting,

12   speaks about they're doing foreign transactions, intermediating

13   foreign transactions.  Reza Zarrab has loans with the bank.

14   And Mr. Atilla, in reading that memorandum and reading the

15   cable, Mr. Atilla essentially says to Cohen, if Zarrab is a bad

16   guy and you don't want us dealing with him, tell us about him

17   and we'll stop dealing with him.  Put him on the sanctions

18   list.  That's clear in the memo.

19          Mr. Cohen spins it, for some reason, when he testifies

20   and suggests that's not really what Mr. Atilla was asking.

21   Well, what else could he be asking?  Put him on the sanctions

22   list, then we can't deal with him.  It didn't happen.  Instead,

23   Mr. Cohen asks for information that Halkbank has about Zarrab

24   when, in fact, OFAC is sitting on a ton of information about

25   Zarrab that it's not sharing with Halkbank.  Why didn't it do

1    it?  Why didn't it shut down the relationship in October of

2    2014?  Why did the relationship continue from October 2014

3    until March or -- March of 2016, when Zarrab is arrested here

4    in the United States, roughly a year and a half later?

5              As I said, Hakan Atilla took the witness stand here,

6    testified, told you he's done none of the things that he's

7    charged with.  He told you that he never accepted a bribe.  He

8    said that Zarrab never bribed him, and he did not know whether

9    Zarrab had bribed Suleyman Aslan.  Hakan Atilla had no motive

10   to break the law or do anything wrong.  To say that he did it,

11   that he committed serious crimes that the government has

12   charged him with because prestige reasons or because he wanted

13   to keep his job is pure speculation.  There's no evidence in

14   the record to support it.

15             The only evidence in the record that you've heard is

16   that he was not corrupted, that he did his job.  That's what

17   we've heard here, ladies and gentlemen.  We haven't heard

18   anything about a motive.  Why would Hakan Atilla take a 22-year

19   career and throw it in the garbage?  Why would he take a risk

20   of ruining his career, ruining his life by doing something as

21   crazy as what happened here?

22             We know why Suleyman Aslan did it.  We know why other

23   people -- we know how Zarrab was able to corrupt other people.

24   The linchpin is motive.  Ask yourself, in this case, where is

25   the motive for Hakan Atilla to do any of the things that the

1   government suggests he did?  What does the government tell you?

2   Where is it said in the evidence, the conversations, the

3   recordings that the government references, the testimony of

4   Reza Zarrab, the exhibits, the testimony of the people from

5   OFAC?

6          I say to you, don't support the fact that Hakan Atilla

7   did what he's charged with.  I think it's easy to put Mr. Cohen

8   and Mr. Szubin up as pillars of what is correct and what is

9   right and what is truthful, and to believe that Hakan Atilla

10  lied to them.  You have to first come to the conclusion that

11  Hakan Atilla knew what was going on at Halkbank, and there is

12  nothing to support that fact in the evidence that you've heard

13  in the course of this trial over the past three weeks.

14         To believe Reza Zarrab, the person who has lived a

15  life of lies, who lies so much that when he tells you he's

16  lying, you don't want to believe him, who basically corrupts

17  people, who knows how to buy his way out of any situation.  The

18  more desperate he is, the more likely he is to lie and to

19  finagle and to weasel his way out of a bad situation, just like

20  he's doing here.

21         I'd like to close by saying, reminding you, members of

22  the jury, a quote from Daniel Webster that I mentioned in my

23  opening statement that "Justice is man's greatest enterprise on

24  earth."  It truly is.  You've heard all of the evidence these

25  past three weeks, the testimony, the recordings, the documents,

1    the photographs.

2              On Hakan Atilla's behalf, I'm asking each and every

3    one of you to look closely at the evidence, to look at all the

4    evidence that bears on the question of Mr. Atilla's guilt or

5    innocence.  Scrutinize it, scrutinize it closely.  Scrutinize

6    it under the brightest of all lights.  Do this, and while you

7    do it, while you are analyzing this evidence, bear in mind that

8    the prosecution always has the burden of proof, the burden of

9    overcoming the presumption of innocence and proving guilt

10   beyond a reasonable doubt.

11             When you're done, I'm confident that you'll do this,

12   and that when you're done, you'll say that the government has

13   failed to carry its heavy burden in this case to prove Hakan

14   Atilla's guilt beyond a reasonable doubt.  You will return a

15   verdict, I'm sure, of not guilty and allow this innocent man,

16   this pawn in a cosmic game of chess, to return to his wife and

17   his son and his home in Turkey.  Thank you.

18             THE COURT:  Thank you, Mr. Rocco.

19             Let's take five minutes, and then we'll have a brief

20   rebuttal.

21             (Jury not present)

22             (Recess)

23             (Jury present)

24             THE COURT:  Okay.  Please be seated, everybody.  The

25   government has a brief rebuttal.

1              MR. KAMARAJU:  Thank you, your Honor.  May I proceed,

2      your Honor?

3              THE COURT:  Yes, sure.

4              MR. KAMARAJU:  Thank you.  I'd like to pick up right

5      where defense counsel left off, with the idea of reasonable

6      doubt.  Reasonable doubt is one of the cornerstones of our

7      country's justice system.  It's what separates us from those

8      countries that don't have the rule of law.  Reasonable doubt is

9      critical.  It is a standard, and it is a hallowed standard, but

10     it is not a mystical one or a magical one.  It's one that's

11     applied in courtrooms all around this country, and we embrace

12     that burden.  It is ours to prove to you, and we submit that we

13     have.

14             But even though it's our burden, when the defense

15     chooses to make arguments to you, you should think about them

16     carefully.  You should scrutinize them.  You should pay

17     attention.  You should ask yourself the fundamental question:

18     Do they make any sense?  And I think what you're going to see

19     is, in this case, what you just heard makes no sense, and the

20     primary reason why it makes no sense is because while defense

21     counsel stood up here and argued a number of things to you,

22     they were totally inconsistent with what the defendant has been

23     saying since the moment he got arrested, all the way through

24     when he took that stand.  They can't get their stories

25     straight.

HCJ3ATI8                       Rebuttal - Mr. Kamaraju

1              MR. KAMARAJU:  Because you can't fake the truth.  And

2      that's what you saw.  And we're going to go through examples of

3      that.  That's what I'd like to focus my rebuttal on, so you can

4      see exactly what's happened.

5              So let's go right to it.  Let's go right to defense

6      counsel's invitation for you to ask who is Hakan Atilla.  Hakan

7      Atilla is an important person.  Make no doubt about that.  They

8      showed you pictures during his testimony about his house, and

9      how much money he made and his family.  I'm not going to

10     quibble with any of that.  But that's not what this case is

11     about.  This case isn't about what happened at Hakan Atilla's

12     home.  This case is about what happened at Halkbank.

13             And at Halkbank, Hakan Atilla was an important and

14     powerful man.  He was a deputy general manager of international

15     banking.

16             Now, something that the defense has said over and over

17     and over again is, well, there were other deputy general

18     managers.  You're right, there were sometimes as many as I

19     guess 13.  So what does that mean?  That, at the most, Hakan

20     Atilla was one of the most 13 powerful employees at a bank that

21     employed thousands of people?  That's a powerful man.

22             And those deputy general managers, they are not all

23     created equal.  No.  Some of them, and take a look at the org

24     charts that the defense counsel put in through Mr. Atilla's

25     testimony.  Some of them are responsible for HR.  Some of them

1    are responsible for IT.  Important positions, don't get me

2    wrong, but not the position that you put the man who claims to

3    have been responsible for the two biggest IPOs in Turkey's

4    history.  You put that man at a job that you care about.  And

5    they did.  They put him in an incredibly important job.  A job

6    to protect the bank's lifeblood, to protect its relationships

7    with foreign banks.  The very thing that an international bank

8    needs to survive.  He told you that.  That's where Hakan Atilla

9    was during all this.

10         And you know what threatens a bank's ability to do

11   that?  You heard it over and over again from multiple

12   witnesses.  Violating sanctions.  And that's why this "I'm not

13   an expert at sanctions," that's why he was in every major

14   meeting with the Department of Treasury to talk about what?

15   Sanctions.  To talk about OFAC's concerns with the way Halkbank

16   was doing things.  To talk about OFAC's concerns that Halkbank

17   was violating sanctions.  And Hakan Atilla was there to calm

18   OFAC down.  Because you want to know how important Hakan Atilla

19   is?  Hakan Atilla is Halkbank's sanctions fixer.  That's what

20   he did.  And you saw it in meeting after meeting, and in call

21   after call, and with witness after witness.

22         And he couldn't help himself.  This so-called guy who

23   has a little bit of knowledge about sanctions testified for

24   hours about his nuanced appreciation for sanctions.  He even

25   told you at one point that Adam Szubin, who is the

1    undersecretary for the Department of Treasury, got a sanctions

2    issue wrong, but he got it right because he knew better.  But

3    no, he's not an expert.  He's a fixer.  And that's what he is.

4    And when there is a problem, he fixed it.

5           And whatever it took, whether it was OFAC's asking

6    questions, let's shut that down, call Hakan Atilla.  When it

7    was Reza Zarrab -- and we'll talk about Reza Zarrab -- but when

8    it was Reza Zarrab has an issue, let's get Hakan Atilla.

9    Because his job was protecting Halkbank from losing its access

10   to the world's financial system.  And that meant sanctions was

11   very much his business.

12          Now, something else that defense counsel did near the

13   end was he talked about the acts of an innocent man.  And he

14   said, well, an innocent man wouldn't have flown to the United

15   States if he thought that he was going to get arrested, if he

16   had done anything wrong.  An innocent man wouldn't have done

17   that.

18          Again, that's not what Hakan Atilla said.  That's not

19   what Hakan Atilla said on the stand and that's not what Hakan

20   Atilla said to the FBI.

21          What did Hakan Atilla say?  Well, on the stand, he

22   told you that when Reza Zarrab got arrested, people at Halkbank

23   took a look at the indictment.  They scoped it out.  That's

24   another way of saying they checked if the coast was clear.  And

25   they figured it out.  They figured that the indictment didn't

HCJ3ATI8                     Rebuttal - Mr. Kamaraju

1    talk about them.  They were okay.  And Hakan Atilla had a very

2    important job.  He had to get to the United States.  Because he

3    told you, or he told the FBI, and you, there was a huge bond

4    offering that he was responsible for.

5            What do you say to your boss then?  I can't go to the

6    United States to do that big thing because I'm worried I'm

7    going to get arrested?  No.  You hope.

8            But there was another reason and Hakan Atilla told

9    that reason when it served him to the FBI.  And you saw his

10   post-arrest video.  When he learned that he was under arrest,

11   what did he do?  He dared the FBI.  He said do your best.  I'm

12   a government official.  The Turkish government's going to

13   follow this case.  It's going to be an international incident.

14   That's what he told the FBI.  Because he thought that was the

15   way that he was going to get out.

16           Hakan Atilla did not come to the United States because

17   he thought he was innocent.  No, backed by a powerful bank and

18   an even more powerful government, Hakan Atilla came to the

19   United States because he thought he was too big to jail.  And

20   he was wrong.

21           Now, something that defense counsel spent a lot of

22   time on is the idea that this is the Reza Zarrab show.  Right?

23   We are going to talk a little bit how you know you can believe

24   Reza Zarrab.

25           But one of the things that defense counsel talked

HCJ3ATI8                    Rebuttal - Mr. Kamaraju

1    about was the different roles that people played.  Judge Berman

2    will instruct you on the law, but I expect what you're going to

3    hear is that the roles people played in a conspiracy is

4    irrelevant to their guilt.  What matters is they joined the

5    conspiracy.  And Hakan Atilla did.

6           Now, again, when it suits him, Hakan Atilla is more

7    than willing to play the I'm-a-big-shot card.  But then here,

8    when he needs you to believe that he's not that big a deal,

9    what happens?  Well, Mr. International Incident then wants you

10   to believe that he's just another Who from Whoville.  That he

11   doesn't matter.

12          You know that's not true.  Because people who don't

13   matter don't meet with David Cohen.  They don't meet with Adam

14   Szubin.  They don't meet with one of Halkbank's biggest

15   customers, Reza Zarrab.  That's not what happens.

16          But let's be clear.  Reza Zarrab was incredibly

17   important to this scheme.  There is no doubt about that.  Reza

18   Zarrab was not just the Turkish businessman.  He was basically

19   a business.  When he walked in, he gave Halkbank and Hakan

20   Atilla the opportunity to realize millions of dollars' worth of

21   commissions on money that was basically dead, because the

22   Iranians couldn't do anything with it, and they wanted to do

23   things with it.  They wanted to do exactly what they wanted to

24   do.  And so they needed to get it out.  And yes, Reza Zarrab

25   was part of a system.  He told you that himself.

1              But you know the other thing you heard, and you might
2       not have paid a lot of attention to it at the time, but Reza
3       Zarrab wasn't the only person doing this.  He had competitors.
4       There were other people extracting the oil money from Halkbank.
5       You see, Reza Zarrab was important, but he wasn't
6       irreplaceable.

7              Now, on the other hand, let's talk about Hakan Atilla
8       and his role.  Now, you heard David Cohen tell you that there
9       were only a little more than a handful of banks that were
10      allowed to receive this money, these Iranian oil proceeds,
11      without running afoul of U.S. sanctions.  Right.  It was
12      like -- I think the number was around eight.  Right.  Halkbank
13      was one of them.  And there were some in other countries, too.

14             But, at every one of those banks, the Iranians
15      couldn't do what they wanted to do with the money, which was
16      make the payments they wanted to make.  And the reason why they
17      couldn't do that is because of sanctions.  U.S. sanctions, E.U.
18      sanctions, U.N. sanctions, but sanctions that cut Iran off from
19      the world's financial system.  That's what the Iranians wanted,
20      but they couldn't do it.  They needed somebody at a bank to
21      help them, to help them figure out how am I going to get this
22      out.

23             Now, there was a lot of discussion about Reza Zarrab
24      being the architect.  Reza Zarrab's never worked at a bank.
25      Reza Zarrab started tea trading at 16.  He didn't have the same

HCJ3ATI8                    Rebuttal - Mr. Kamaraju

1   education as Hakan Atilla.  He hadn't started from the ground
2   up at Halkbank.  How would he know what banking regulations
3   would be?  How would he know?  No, because Reza Zarrab needed
4   somebody at the bank.
5        And Mr. Rocco, he alluded to the idea that Reza Zarrab
6   had gone off to China to do this sanctions evasions work over
7   there and that he didn't have a Hakan Atilla in his pocket,
8   right.  So he was trying to bribe people there, but he didn't
9   have Hakan Atilla in his pocket.  And he's right.  There was no
10  Hakan Atilla in China.  But Reza Zarrab sure wished there was.
11  Because you know what happened?  Within months of the Chinese
12  banks learning of the Iranian connection to this trade,
13  learning what was happening, that was the exact same as what
14  happened at Halkbank, within months, the Chinese banks shut the
15  business down.
16       But not Halkbank.  Not Halkbank with Hakan Atilla.
17  And that's because at Halkbank, the Iranians, Reza Zarrab, and
18  people at Halkbank, including Hakan Atilla, had figured out a
19  way around it.  They had figured out a way to get that money
20  out.  They had figured out the system and the method.  Reza
21  Zarrab was the system, and Hakan Atilla was the method.
22       And the thing about it is, while you could replace
23  Reza Zarrab, while he was valuable, Hakan Atilla was
24  indispensable.  Because you needed somebody who knew what was
25  going on at the bank, and could understand it.  But you also

1    needed somebody who could sit in meetings with some of the most

2    senior people at OFAC and the Department of Treasury and could

3    deflect their concerns.  Could hide the truth.  That's what you

4    needed.

5              And they conceded that there was this sanctions

6    evasion scheme going on at Halkbank, though we'll come back to

7    the fact that Atilla didn't.  His lawyer did.  But they

8    conceded that it was happening.  So, for it to work, you needed

9    somebody at the bank to be able to devise a method.

10             Now, defense counsel said, look, Reza Zarrab, he

11   doesn't need anybody's help faking documents.  That might be

12   right.  Reza Zarrab might know how to Photoshop all day long.

13   But you know what he doesn't know?  What he doesn't know is

14   what's the important information that needs to be faked.

15   Because that information is what OFAC cares about.  That's what

16   OFAC is looking at.  That's what Halkbank is trying to guard

17   itself in, to protect itself when OFAC comes knocking.  But you

18   know who did know that?  The guy who went to all those

19   meetings, the guy who told OFAC, over and over again, we got

20   you.  We're looking at all this stuff.  We're requiring all

21   these documents.  We're requiring due diligence.  He knew what

22   OFAC needed, and he knew what the scheme needed, and what would

23   be best for documents to be faked.

24             Reza Zarrab didn't know that.  Reza Zarrab had no way

25   of knowing that.  Because you know what?  Reza Zarrab has never

1    met David Cohen.  He's never met Adam Szubin.  He's never met

2    Joshua Kirschenbaum.  He's never had a conversation with an

3    OFAC person.

4           But he did.  And he talked about these exact same

5    subjects.  Look at the evidence.  Look at the facts.  Take, for

6    example, February 2013.  In February of 2013, you will find

7    Hakan Atilla talks to OFAC on one day about bilateral trade

8    requirements, essentially the fact that you got to go from

9    Turkey to Iran.  You can't route this stuff all over the world.

10   Within a matter of days, he's then talking to Reza Zarrab, and

11   you know that because Reza Zarrab is describing the

12   conversation.  He's telling Abdullah Happani, look, I talked to

13   Hakan, this is the way we got to do it.  We got to switch it.

14   We got to write Iran one day, or we got to write Dubai one day.

15   Maybe we got to write Iran through Dubai.  That's all a matter

16   of days.

17          You know then that it happened, because you saw

18   Government Exhibit 2511, you saw these gold spreadsheets where

19   you can run down the list, and I encourage you to do it, look

20   at the dates.  As soon as Hakan Atilla told him what needed to

21   happen, it happened.  And next thing you know, now the gold

22   looks like it's being shipped to Dubai.  It looks like it's

23   being shipped to Iran.  On his instruction.  Because he's the

24   one who knew what OFAC cared about.

25          Now, most of defense counsel's summation was focused

HCJ3ATI8                        Rebuttal – Mr. Kamaraju

1    on Reza Zarrab.  Because they want you to believe that our case

2    is entirely Reza Zarrab.  Ladies and gentlemen, you would not

3    have sat here for three-plus weeks if we only had Reza Zarrab.

4    You heard from all kinds of different witnesses.

5          You saw evidence, not that was tainted by some

6    Gulenist plot as you remember them cross examining Huseyin

7    Korkmaz about.  But evidence of the FBI, evidence of the

8    scheme, e-mails showing bribes paid, e-mails showing the flow

9    of money, e-mails showing important communications that were

10   part of the scheme.  You saw bank records that showed that as

11   part of the activity that was happening out of Halkbank,

12   hundreds of millions of dollars flowed through U.S. banks, and

13   they flowed through U.S. banks right here in New York.  And you

14   heard that those were transactions that would have never, ever

15   been approved had the banks known that they were really for the

16   benefit of Iran.

17         You know who else knew that?  Hakan Atilla.  He knew

18   that, too.

19         Now, the other thing that's interesting about

20   Mr. Atilla's post-arrest is when confronted with the evidence,

21   he doesn't say I was in Barcelona, I don't know what you're

22   talking about.  He says you don't have that.  Someone gave it

23   to you.  And he was right.  Someone did give it to us, Huseyin

24   Korkmaz gave it to us.  And you heard about how he traveled

25   here to do that.  And you heard how they cross-examined Huseyin

HCJ3ATI8                    Rebuttal - Mr. Kamaraju

1    Korkmaz to try to discredit him as a member of some sort of

2    Turkish cult.  They walked away from that argument in closing,

3    you didn't hear them talk about that.  What they said instead

4    was Huseyin Korkmaz shouldn't be believed because he stole this

5    evidence.

6         Well, what difference does that make?  Ask yourself,

7    does a tape recording change because it came to you through

8    Huseyin Korkmaz?  Of course not.  And the way you know that is

9    because the main target of that investigation, Reza Zarrab,

10   told you all those conversations happened.  He told you I had

11   those communications through WhatsApp with Aslan.

12        The guy with the biggest incentive to say those things

13   were false, told you under oath that they were true.

14        So, you have the FBI evidence, and you have the

15   Turkish evidence, and now, you have Reza Zarrab.  Reza Zarrab

16   testified at this trial for a long time.  But, what's

17   interesting, and I don't know if you heard it, but in defense

18   counsel's closing, he said, essentially, if you believe Reza

19   Zarrab's testimony, if you believe what he said, my client's

20   guilty.  That's what he said.  And there are plenty of reasons

21   for you to believe what Reza Zarrab told you.

22        First of all, you watched him.  You saw him testify.

23   You were able to evaluate for yourself.  Was he evasive?  Did

24   he appear to be lying?

25        Second, you saw that everything that Reza Zarrab told

1    you was corroborated, it was backed up by something that was

2    totally independent of Reza Zarrab.  If Reza Zarrab told you

3    that a meeting happened, you saw a phone call that described

4    the meeting.  If Reza Zarrab told that you bribes were paid,

5    you saw accounting spreadsheets that showed you the bribes.  If

6    Reza Zarrab told you that this scheme happened, you saw the

7    documents that walked through every aspect of it from the top,

8    in Iran, with the payment instructions, all the way down to the

9    bottom, with the transaction through a U.S. bank.  You saw

10   that.

11          You know this scheme happened and, frankly, they don't

12   even really contest that the scheme happened.  Except that's

13   another instance in which defense counsel and the defendant

14   just can't get their stories straight.  Because while defense

15   counsel tells you, well, there was a sanctions evasion scheme

16   but it's really all about Reza Zarrab.  It is really all about

17   Suleyman Aslan.  Hakan Atilla took the stand and told you my

18   bank complied with sanctions.  My bank did what we were

19   supposed to do.  You know that's not true.

20          Now, the other thing about Reza Zarrab, besides the

21   fact that you watched him, besides the fact that he's

22   corroborated, you saw him testify and you saw him get

23   cross-examined.  You watched him stripped of all the power and

24   wealth that defense counsel threw at you.  You watched him tell

25   you why he was testifying forthrightly.  He told you that.  It

1     didn't have to be drawn out of him.  He told you that.

2              So think about this, ladies and gentlemen.  If Reza

3     Zarrab thought that he was going to get free by giving Hakan

4     Atilla as a down payment, I think the phrase that Mr. Rocco

5     used in his closing was an EZ Pass.  If that's what Reza Zarrab

6     thought, I'm going to get back to my wife and my family and

7     those riches by testifying against Hakan Atilla, by making that

8     testimony as valuable as possible, then think about why he told

9     you some of the things that he did.

10             First of all, remember that April 10 phone call that

11    we've talked about a lot.  April 10, 2013?  If Reza Zarrab

12    wanted to tell you that Hakan Atilla was in it right from the

13    start, why didn't he testify to that?  He could have.  There

14    was just two men on the phone.  He could have told you, yeah,

15    he knew everything.  He didn't.  He told you, honestly, that

16    Hakan Atilla didn't know that the food was fake at that time.

17    He told you that.

18             And if Reza Zarrab wanted to stick the knife in Hakan

19    Atilla as deeply as he could, why would he say that he never

20    bribed him?  These are events that are occurring across an

21    ocean in Turkey with shoeboxes stuffed with cash.  How hard

22    would it have been for Reza Zarrab in that moment to say, yeah,

23    you know, there was this meeting once, and afterwards I pulled

24    Hakan aside and I said here's $100,000 for your good works.

25    Nobody would have known.  No one could have disproven that as a

1    lie.  But he didn't.  He answered that on direct and

2    cross-examination the exact same way.

3           Because Reza Zarrab was doing everything he could to

4    make sure he told you the truth.  Because he understood that

5    that was the way that he got the relief that he wanted.  Not

6    making up lies.  Because if he was going to make them up,

7    ladies and gentlemen, he would have made up a lot better ones

8    than the ones he told.  He would have not said I didn't bribe

9    the guy.

10          THE COURT:  Mr. Kamaraju, you've got five minutes

11   left.

12          MR. KAMARAJU:  Thank you, your Honor.

13          I want to talk specifically about the idea of bribes

14   and motive.  You're going to hear Judge Berman tell you about

15   the elements of the crime.  I suspect you're not going to hear

16   him say motive is an element of the crime.  I don't think

17   you're going to hear that.

18          But the interesting thing about that argument is

19   throughout this trial, Hakan Atilla has tried to lay the blame

20   for what happened at everybody else's feet.  So now it's

21   Suleyman Aslan, but during the trial you also heard about

22   Levent Balkan.  You also heard about Hakan Aydogan.  You heard

23   about all of those people who supposedly were part of this

24   sanctions evasion scheme that happened.  And you also heard

25   that none of them got bribed.  And that's because being bribed

1    was not a prerequisite to joining this conspiracy.  Being

2    bribed was not a membership card to the Iranian sanctions club.

3    That's not the way it worked.

4          Because everybody at Halkbank who was involved, only

5    one got bribed, and Reza Zarrab told you why he did that.

6    Because you buy the top.

7          And I only have a couple minutes left, so I want you

8    to think hard about the explanations that defense counsel gave

9    you.  I want you to think hard about some of the testimony that

10   Hakan Atilla gave you.  Right.  When defense counsel gave you a

11   whole explanation about what the method was.  Right.  Hakan

12   Atilla took that stand and told you I don't know what Suleyman

13   Aslan is talking about.  I have no idea.  But now all of a

14   sudden, defense counsel knows what the method is.  Hakan Atilla

15   didn't know just a few days ago.

16         The only way this makes any sense, ladies and

17   gentlemen, is if Hakan Atilla was somehow the unluckiest person

18   in the world.  If right under his nose at Halkbank, one of the

19   world's largest sanctions evasion schemes was going on, rivers

20   of Iranian oil money flowing out of the bank, under his nose,

21   and surprisingly, for a guy that everybody tried to keep out,

22   keep in the dark, they kept contacting him.  He was involved.

23   He is talking in the July 9 call, he is talking about tonnages

24   on customs documents.  Why is the deputy general manager

25   talking about that?

1      And think about how much worse it gets.  Because all
2 those communications in 2012 and 2013, where Suleyman Aslan and
3 Reza Zarrab are describing actions taken by Hakan Atilla, they
4 had no reason to lie then.  To believe the story is to believe
5 that way back then they concocted a plan to frame him.
6      And to believe Hakan Atilla's story is to believe that
7 David Cohen and Adam Szubin, men who have no interest in this,
8 deliberately decided to perjure themselves to set up Hakan
9 Atilla.  That makes no sense.
10      What makes sense, ladies and gentlemen, is that Hakan
11 Atilla made a choice.  Conspiracies aren't measured by minutes
12 on a phone or a period of time.  They're not measured by roles.
13 You are guilty or not guilty.  And Hakan Atilla made a choice
14 to join these conspiracies.  He made a choice when he lied to
15 OFAC.  He made a choice when he helped design the system.  He
16 made a choice when he coached Reza Zarrab.  Those were his
17 choices.
18      And now the time has come for you to make a choice.
19 And when you go back and when you deliberate, when you look at
20 all of the evidence, when you look at all those tape
21 recordings, when you look at the testimony, when you think
22 about what he told you, when you go through all of that, we
23 would submit that there is only one right choice here, ladies
24 and gentlemen.  And that is that Hakan Atilla is guilty as
25 charged beyond a reasonable doubt.  Thank you.

HCJ3ATI8

1              THE COURT:  Thank you, Mr. Kamaraju.

2              Okay, ladies and gentlemen, so here's what's left.

3    Tomorrow, 9:15, and I will give you the jury instructions.

4    They're long and they're complicated.  It will take me probably

5    an hour and a half to do it.  I know you're big note takers and

6    you're welcome to take notes, but I'm also going to give you a

7    verbatim copy of all of the instructions that I read for you to

8    take into the jury room.  So you'll have every instruction in

9    there to consider.

10             So, good day.

11             First, do not talk to each other about this case or

12   about anyone who has anything to do with it until the end of

13   the case when you go to the jury room to deliberate.  That

14   should be tomorrow around 11 o'clock or so.  And we'll order

15   for you an early lunch.

16             Second, do not talk with anyone else about this case

17   or about anyone who has anything to do with it until the trial

18   has ended, and you've been discharged as jurors.

19             Third, do not let anyone talk to you about the case,

20   or about anyone who has anything to do with it, and if someone

21   should try and talk to you about the case, please report that

22   to me or Christine immediately.

23             Fourth, do not read any news or internet stories or

24   articles or blogs or listen to any radio or TV or internet

25   reports about the case or about anyone who has anything to do

HCJ3ATI8

1    with it.

2           And fifth, do not do any type of research or any type

3    of investigation about the case on your own.

4           So, see you tomorrow morning.  Thanks a lot.

5           (Jury excused)

6           THE COURT:  I'll see the lawyers tomorrow at 8.  We

7    should be able to wrap up quick the jury instructions, we're

8    looking for some names of banks and one instruction or so, so I

9    think we'll very much be on schedule.  8 o'clock tomorrow.

10          MR. DENTON:  If we work out that one issue, would you

11   like us to e-mail that to chambers?

12          THE COURT:  That would be great.  Then it will take us

13   less than --

14          MS. FLEMING:  I think you have to put on the record at

15   least orally your ruling on our request to put in the

16   inconsistent statement of the recording.  We did it in the

17   robing room but you didn't put it on the record.

18          THE COURT:  I'm happy to do it.  Do you want to do it

19   now or tomorrow morning?

20          MS. FLEMING:  Whatever your Honor wants.

21          THE COURT:  Let's do it in the morning.

22          MS. FLEMING:  Fine.

23          (In the robing room; The Court and Juror No. 10

24   present)

25          THE COURT:  I spoke to the lawyers, they agree, both

HCJ3ATI8

1    sides, and we'll just bring in one of the alternates.  And on

2    their behalf, I express our gratitude for you to sit patiently

3    and observe the trial.

4              JUROR NO. 10:  My pleasure.

5              THE COURT:  And we hope you have a good trip.

6              JUROR NO. 10:  It's busy.

7              THE COURT:  I think that's all I can think of.  Thanks

8    so much for your service.

9              JUROR NO. 10:  Thank you, your Honor.  Like I said,

10   it's been a pleasure.  It's been interesting to see this in

11   action.

12             THE DEPUTY CLERK:  Juror Number 10 for the record.

13             THE COURT:  You are Juror number 10.  That's great.

14   Thanks a lot.  Christine will show you out.

15             (adjourned until December 20, 2017, at 8 a.m.)

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3    MEHMET HAKAN ATILLA

4    Cross (Resumed) By Mr. Denton  . . . . . . . .2167

5    Redirect By Ms. Fleming  . . . . . . . . . .2230

6                   DEFENDANT EXHIBITS

7    Exhibit No.                        Received

8     320, 320-T   . . . . . . . . . . . . . . .2233
```