UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

UNITED STATES OF AMERICA,
                             Government.

            -against-

MEHMET HAKAN ATILLA,
                            Defendant.

---------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/7/18

**DECISION AND ORDER**

15 Cr. 867 (RMB)

## I. Background

On January 3, 2018, following a three and a half week criminal jury trial, Mehmet Hakan Atilla, a Turkish national and Deputy General Manager of Turkish state-owned Halkbank (also referred to as "Halk Bank"), was convicted of five (out of six) counts contained in a Superceding Indictment, dated September 6, 2017 ("Indictment").[1] Specifically, Atilla was convicted of: i) conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (Count One); ii) conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Parts 560 and 561 (Count Two); iii) bank fraud in violation of 18 U.S.C. §§ 1344 & 2 (Count Three); iv) conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1344, 1349 (Count Four); and v) conspiracy to commit money laundering in violation of 18 U.S.C. §§ 1956(a)(2)(A), 1956(h) (Count Six). He was acquitted of the substantive money laundering count which was Count Five of the Indictment.[2]

---

[1] Atilla had been arrested at JFK airport on March 27, 2017 at the end of a Halkbank business trip to the United States. See 7/20/17 Defense Letter at 2.

[2] This Decision and Order includes background material to help avoid confusion on the part of persons interested in this highly publicized case. The Decision's principal focus is upon Defendant's Rule 29(a) motion to dismiss. See pp. 9 et seq.

Page 1

Broadly, the charges in the Indictment related to an alleged elaborate multibillion dollar scheme to evade economic sanctions which the United States had imposed against Iran during the period 2010 through 2015. At the heart of the scheme was Atilla's co-defendant, Reza Zarrab, a dual citizen of Turkey and Iran and, during the relevant time period, a significant client of Halkbank. Atilla was said to have played a critical role in devising and refining the plan to free up billions of dollars in Iranian funds which were held in "blocked" accounts at Halkbank. And, Zarrab admitted to paying millions of dollars in bribes to other codefendants, in particular Suleyman Aslan, former General Manager of Halkbank, and Zafer Caglayan, a former Economy Minister of Turkey, to further the sanctions evasion scheme.[3]

On October 26, 2017, approximately one month before Atilla's trial began, Zarrab pled guilty to each of the six counts also brought against Atilla, pursuant to a plea agreement, dated October 20, 2017 ("Plea Agreement"). Zarrab agreed to cooperate with the Government and, in fact, he was one of the Government's principal witnesses against Atilla at Atilla's trial. During his plea allocution on October 26, 2017, Zarrab summarized the sanctions evasion scheme by which he transferred Iranian proceeds held at Halkbank among numerous accounts. The end result of those transfers was that the funds became "unblocked," and were used to fund international payments on behalf of Iran. Zarrab admitted the following: "[B]etween 2010 and my arrest in 2016, I managed a money exchange business in Turkey. Among other things, as part of the money exchange business, I agreed with others to obstruct the U.S. Department of the Treasury enforcement of economic sanction laws and regulations, and to violate the International Emergency Economic Power[s] Act by engaging in commercial transactions designed to evade

---

[3]Suleyman Aslan and Zafer Caglayan are citizens of Turkey who have not been arrested or brought to trial.

U.S. sanctions against Iran. As part of that money exchange business, I agreed with others to engage in, and engaged in, a scheme to mislead United States bank[s] through the use of falsified documents and materials that omitted Iran beneficiary information in order to convince the United States banks to process financial [] transactions prohibited . . . by United States sanction[s]. As part of that money exchange business, I agreed with others . . . to engage in, and engaged in, transaction[s] that involved the movement of funds from inside the United States to places outside the United States for purpose of promoting the IEEPA violation and bank fraud I previously described and payments of bribes to Turkish officials . . . ." 10/26/17 Tr at 47:6-48:4; see also Plea Agreement.

Orally, at the close of the Government's case on December 15, 2017, and by letter motion dated the same day, Atilla moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a) ("Rule 29(a) Motion" or "Defense Letter Motion").[4] The Defense argued, among other things, that "all of the charges must be dismissed because the government has failed to prove that Mr. Atilla knew of any U.S. connection to Zarrab's scheme." Defense Letter Motion at 1. The Defense also argued that the conspiracies set forth in Counts One, Two, Four and Six of the Indictment should be dismissed because the Government has charged multiple conspiracies

_____

[4]A week later, on December 22, 2017 (after the trial had ended), the Defense also advised the Court that the Defendant sought to supplement his Rule 29(a) Motion by adding an additional "basis for [the] entry of judgment of acquittal on the so-called IEEPA count of the indictment. With regard to the IEEPA conspiracy, the government has failed to introduce any evidence on an element that the Court in its charge to the jury correctly identified as essential to the Government's burden of proof." 12/22/17 Defense Letter Motion at 5-6. The Defense stated: "The government's proof at trial failed entirely to establish that the Defendant had obtained the requisite license." Id. at 6. This supplement was withdrawn by the Defense by letter dated December 29, 2017. See 12/29/17 Defense Letter at 1 ("By means of this letter we hereby withdraw the supplemental letter dated December 22, 2017 as it relates to the Rule 29(a) motion made on December 15, 2017."); see also 12/22/17 Tr at 2502-03.

"only one of which Mr. Atilla, at best, has been shown to be a participant." Id. at 4.

The Government opposed the Rule 29(a) Motion orally on December 15, 2017 and by letter, dated December 16, 2017 ("Govt Rule 29(a) Opposition"). The Government contends, among other things, that the trial testimony "establishes not only that Atilla was aware that the funds being pulled from Halk Bank were being used to fund international payments, but more specifically shows that he [Atilla] was aware that the money was being transferred to Zarrab's company – a Turkish entity – to fund international payments on behalf of Iranian clients that Halk Bank itself refused to process directly." Govt Rule 29(a) Opposition at 3 (emphasis omitted). The Government also contended that the testimony "shows that Atilla (i) understood U.S. sanctions and how to make transactions look like they complied with these sanctions even though they did not, (ii) knew that U.S. regulators were concerned about the very trade with Zarrab that Atilla was helping to facilitate through his coaching of Zarrab; and (iii) Atilla had concealed material information from OFAC about the scheme." Id. at 4.

When, on December 15, 2017, the Court advised the parties of its intention to elect not to resolve the Rule 29(a) motion until the close of all the evidence, the Defense put on an affirmative case of its own. The Defense called Atilla and one other witness who testified on Atilla's behalf.[5]

On December 29, 2017, the Defense advised the Court of its intention also to file a Fed. R. Crim. P. 29(c) motion. See 12/29/17 Defense Letter at 2 ("We intend to make a Rule 29(c)

---

[5]See 12/15/17 Tr at 1972:21-1973:4 (Court: "The Court may reserve decision on the motion, proceed with the trial, where the motion is made before the close of all the evidence, submit the case to the jury, and decide the motion either before the jury returns a verdict, or after it returns a verdict of guilty, or is discharged without having returned a verdict. If the Court reserves decision, which I am doing, it must decide the motion on the basis of the evidence at the time the ruling was reserved."; see also Fed. R. Crim. P. 29.

motion based on the entirety of the evidence, post-verdict, if necessary, on the grounds set forth in the December 22, 2017 letter and any other applicable grounds."). A briefing schedule for the Rule 29(c) motion was set by the Court on January 3, 2018. However, on January 24, 2018, the Defense abandoned its intention to file such a motion and advised the Court that, "after additional consideration, Mr. Atilla does not intend to make a motion directed to the entirety of the evidence pursuant to Fed. R. Crim. P. 29(c) and maintains his claims of evidentiary sufficiency on the grounds set forth in his initial [Rule 29(a)] motion for acquittal filed at the end of the government's case-in-chief." 1/24/18 Defense Letter.

**II. Legal Standard**

When reviewing a motion under Rule 29(a), the Court is required to view the evidence "in the light most favorable to the government" and to draw all reasonable inferences in the Government's favor. United States v. Autouri, 212 F.3d 105, 114 (2d Cir. 2000). If the court concludes after a full analysis of the evidence presented in the Government's case in chief that "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." Id. (brackets and internal quotation marks omitted). If the Court reserves decision on a Rule 29(a) motion, "it must decide the motion on the basis of the evidence at the time the ruling was reserved." United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012) (internal quotation marks omitted).

"A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." United States v. Espaillet, 380 F.3d 713, 718 (2d Cir. 2004) (internal quotation marks omitted).

"Conspiracy requires proof of: (1) an agreement among the conspirators to commit an

offense; (2) specific intent to achieve the objective of the conspiracy; and (3) [regarding some conspiracies] an overt act to effect the object of the conspiracy." United States v. Pinckney, 85 F.3d 4, 8 (2d Cir. 1996). "The crime of conspiracy is complete upon the agreement to violate the law . . . and is not at all dependent upon the ultimate success or failure of the planned scheme." United States v. Trapilo, 130 F.3d 547, 553 n.9 (2d Cir. 1997) (brackets and internal quotation marks omitted) "With respect to whether there is sufficient evidence of a defendant's intent to participate in the conspiracy with knowledge of its unlawful objectives, there are two separate inquiries: the prosecution must show a) that the defendant had some knowledge of the unlawful object of the conspiracy, and b) that the defendant intended to engage in the unlawful scheme." United States v. Martinez-Sandoval, 2003 WL 1442454, at *4 (S.D.N.Y. Mar. 6, 2003). "Both inquiries may be proved by circumstantial evidence so long as that evidence successfully establishes the defendant's guilt beyond a reasonable doubt." Id.

"Where intent of the accused is an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." Morissette v. United States, 342 U.S. 246, 274 (1952).

With regard to bank fraud, the Government was required to prove the following three elements beyond a reasonable doubt: **(1)** that the Defendant (a) executed or attempted to execute a scheme or artifice to defraud a bank, or (b) executed or attempted to execute a scheme or artifice to obtain money owned by or under the custody and control of one or more of such banks by means of false or fraudulent pretenses, representations, or promises that were material to the scheme; **(2)** that the Defendant executed, attempted to execute, or participated in the scheme knowingly, willfully and with specific intent to defraud the bank or to obtain money owned or possessed by the bank, or under the bank's custody or control; and **(3)** that the banks affected

Page 6

were, at the time of the execution or attempted execution of the fraudulent scheme, federally insured financial institutions. This simply means that the banks' deposits were insured by the U.S. Federal Deposit Insurance Corporation.

With regard to money laundering, the Government was required to prove beyond a reasonable doubt: **(1)** that the Defendant transported, transmitted or transferred or attempted to transport, transmit or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and **(2)** that the Defendant did so with the intent to promote the carrying out of specified unlawful activity.[6]

## III. Jurisdiction

The issue of jurisdiction was first raised in the Defense Motion to Dismiss, dated October 9, 2017. It is also referred to in the Defense Rule 29(a) Letter Motion at 2-3 ("[E]ngaging in purely sanctionable conduct is not a crime – it may deprive the actor of access to the U.S. financial system, but it does not serve as a basis for prosecution under any statute, rule, order or regulation. . . . IEEPA and other sanctions statutes . . . do not expressly allow for any prosecution of evasion or avoidance. . . . To engage in conduct outside the United States that could merit sanctions is just that: sanctionable conduct, not a prohibition. Indeed, sanctionable conduct cannot be prohibited in any way: a foreign bank can continue to engage in that conduct with impunity.").

In denying the October 9, 2017 Defense Motion to Dismiss, the Court determined, among other things, that the Indictment "reflects the elements of each count . . . and establishes a

---

[6]As noted at page 1 supra, Atilla was acquitted by the jury of the money laundering count.

sufficient nexus between Mr. Atilla and his coconspirators' conduct and the United States. And, therefore, the question of whether the IEEPA and the ITSR . . . apply extraterritorially, need not be reached." 11/16/17 Tr at 20:24-21:9. The Court also found that the "Indictment here alleges a domestic nexus between the defendant [Atilla] and his co-conspirators' conduct and the United States," id. at 19:15-17, and agrees with the Government's contention that: "by its plain language and pursuant to well established canons of construction, the IEEPA criminalizes conspiracies to violate the regulations and executive orders adopted to implement the American embargo against Iran, including regulations and orders that prohibit transactions intended to 'evade' and 'avoid' the prohibitions set forth in those regulations and orders." Govt Rule 29(a) Opposition at 5.[7] The Court reaffirms its earlier jurisdictional rulings and incorporates them here by reference.

The Court also points out that during the Government's case in chief in Atilla's trial, it became clear that there was substantial additional support (nexus) for the Court's jurisdiction, including significant meetings and discussions between and among Atilla and other Halkbank officials on the one hand, and high ranking U.S. officials charged with implementation of the U.S. sanctions against Iran on the other hand. See, e.g., 12/7/17 Tr, 12/8/17 Tr, 12/11/17 Tr, and 12/12/17 Tr (Trial Testimony of Adam Szubin, former Director of United States Office of Foreign Assets Control ("OFAC") and of David Cohen, former U.S. Undersecretary of the Treasury for Terrorism and Financial Intelligence). Some of those discussions, in which Atilla was directly involved, occurred in the United States. In fact, several of these meetings occurred

---

[7]The Court denied Defendant Zarrab's motion to dismiss, dated July 18, 2016, for substantially similar reasons. See United States v. Zarrab, 2016 WL 6820737, at *8 (S.D.N.Y. Oct. 17, 2016) ("The Court finds that the Indictment alleges a domestic nexus between Zarrab and his co-conspirators' conduct and the United States . . . . [T]he question of whether the IEEPA and the ITSR apply extraterritorially need not be reached.").

at the U.S. Treasury Department Offices in Washington, D.C. See, e.g., 12/7/17 Tr at 1082; id. at 1083:17-19 (AUSA Lockard: "Did Mr. Atilla participate in some of those meetings in your office in Washington, D.C.?" Mr. Cohen: "Yes.").

Adam Szubin testified that he also met with Atilla in Washington, D.C. (and in Turkey). See, e.g., 12/12/17 Tr at 1474:16-17 (Defense Counsel Rocco: "So the meetings were at Halkbank or at Treasury?" Szubin: "Yes."); Id. at 1413:6-10 (AUSA Denton: "Was there any one person who was the principal representative of Halkbank in your communications with the bank?" Szubin: "More than any other, I met with a Mr. Atilla who I believe was the deputy manager."); see also United States v. Mostafa, 965 F.Supp.2d 451, 469 (S.D.N.Y. 2013) ("[T]here is a sufficient domestic nexus between the allegations . . . to avoid the question of extraterritorial application altogether. Overt acts occurred in the United States."); see also pp. 17-22 infra.[8]

## IV. Rule 29(a) Motion Analysis

Atilla's Rule 29(a) motion, respectfully, is unpersuasive for several reasons, including among them that it is somewhat difficult to decipher. For example, at page 2 of the Defense Letter Motion, the Defense seems to concede weakness of its (own) argument by stating the following: "In discussing both of the [G]overnment's [sanctions against Iran] theories, we will assume that the [G]overnment has offered sufficient proof to survive a Rule 29 motion that Mr. Atilla caused inaccurate information to be sent to OFAC." The Defense goes on to say that: "We vigorously contest the adequacy of that proof, but assume its truth for the following discussion

---

[8] As noted above, Atilla was arrested in New York (in this case) on March 27, 2017 at the conclusion of a Halkbank business trip to the United States.

of the law – a discussion that demonstrates that that proof does not make out a chargeable violation of law." Defense Letter Motion at 2.

Another example is the Defense's seemingly inconsistent position(s) which, among other places, appear at page 3 of the Rule 29(a) Motion. The Defense states: "[W]ith respect to the application of 18 U.S.C § 371 (the *Klein* doctrine) to conduct taken to evade the imposition of sanctions, we acknowledge that the government has a better argument. Although we continue to believe that the application of *Klein* to a foreigner is legally unjustifiable and unprecedented, if the Court disagrees, then, as a matter of law, *Klein* could theoretically apply to what Mr. Atilla has been accused of doing."

Notwithstanding, any of the above mentioned difficulties with the Defense Letter Motion, the Court has undertaken a full and careful review of the trial record of (only) the Government's case against Atilla, against the backdrop of the legal standards at pp. 5-7 above.[9] And, having viewed the evidence in the light most favorable to the Government and having drawn all reasonable inferences in the Government's favor at the conclusion of the Government's case, the Court finds that the evidence presented was clearly sufficient for a reasonable jury to find Atilla's guilt beyond a reasonable doubt with respect to each element of the six (6) crimes with which Atilla was charged. Accordingly, the Court denies the Defense Rule 29(a) motion.[10]

---

[9]The Government's case included 13 witnesses (in person) and hundreds of exhibits.

[10] Any arguments raised by the parties but not specifically addressed herein have been considered by the Court and rejected.

(i) **Testimony of Reza Zarrab.** Zarrab testified that he pled guilty to each of the six counts with which both he and Atilla were charged, i.e., conspiracy to defraud the United States, conspiracy to violate IEEPA sanctions against Iran, money laundering, conspiracy to money launder, bank fraud, and conspiracy to commit bank fraud. Zarrab identified Atilla as one of the coconspirators.

In court, Zarrab also diagrammed the sanctions avoidance scheme for the jury. Govt Demonstratives 9502 & 9503 are attached hereto as Exhibit A. And, he described the scheme as follows: "The funds of Iranians [including Iranian Government agencies such as National Iranian Oil Company or "NIOC"] which accumulated [from] gas and oil sales, and on the other side the Iranians had the international payment orders [obligations]. I received those orders, and I made their [Iran's] international financial payments. Their income from gas and oil sales was accumulated in [accounts at] Halkbank. Taking those moneys out of Halkbank, I made the international payments [with the blocked Iranian funds]." 11/29/17 Tr at 267:15-20.

In the course of his testimony, Zarrab explained that Atilla "is the most knowledgeable person about the sanction rules [at Halkbank]. He [Atilla] made contributions to make our scheme look like it's complying with the American sanctions [when, in fact, according to Zarrab, it wasn't]." Id. at 269:11-13.

Zarrab also testified that he approached Atilla's boss, Suleyman Aslan, General Manager Halkbank, in 2012 about brokering gold trades with Iran through Halkbank. Id. at 299. According to Zarrab, Suleyman Aslan was the person "with the highest authority [at Halkbank]." 11/30/17 Tr at 465:8-9. Zarrab said he was "turned down" initially, that is until he (Zarrab) spoke to Zafer Caglayan, a former Economy Minister of Turkey. 11/29/17 Tr at 299-300. Zarrab testified that Caglayan agreed that Halkbank could be used to broker the gold trade with

Iran if the profits were split between him (Caglayan) and Zarrab. Zarrab said he paid over time approximately 45 to 50 million euros; 7 million in US dollars; and 2,465,000 in Turkish lira to Caglayan in connection with the gold trade brokering. Id. at 309. Zarrab also testified that he bribed Suleyman Aslan. Zarrab mentioned specifically one bribe to Aslan in the amount of two million euros. See 11/30/17 Tr at 448:14. Zarrab also testified that he paid no bribes to Atilla. See, e.g., id. at 448:15-21.

The Government's case also included conversations between Atilla and Zarrab in which Atilla advised Zarrab how best to structure transactions on behalf of Iran so as to avoid detection or suspicion. See, e.g., 12/6/17 Tr at 885:2-5 (Zarrab: **"What I'm saying is at the beginning of the food trade, where the method and the system was developed at Halkbank, Mr. Hakan Atilla had his contributions into that."** (emphasis added)).

Zarrab testified in detail about how the scheme to violate U.S. sanctions against Iran was developed and how it worked, including falsification of documents that were received by Halkbank. He explained Atilla's important involvement in the scheme. Zarrab testified about a complex sanctions avoidance method proposed by Atilla, among others, that resulted in freeing up blocked Iranian proceeds held at Halkbank. Zarrab reflected the scheme in the demonstrative(s) which he drew for the jury in the courtroom. Govt Demonstratives 9502 & 9503. As explained by Zarrab, "[t]he first leg of this transaction [] begins with Iran selling crude oil and gas to Turkey. Tupras [a petroleum refinery company located in Turkey] buys crude oil from NIOC [National Iranian Oil Company], and Botas [a petroleum refinery company located in Turkey] buys natural gas from NIOC . . . . NIOC sends the product to Tupras and Botas and, after that, Tupras and Botas make their payments to NIOC. . . . These payments [all] take place within Halkbank [accounts]. . . . NIOC would not be able to make the international payments

. . . . [d]ue to regulations of the U.S. embargo and also due to international sanctions. . . . NIOC would transfer the money to the account of Sarmayeh Bank within Halkbank. . . . Toseh Tejarat was a company that was established by Sarmayeh Exchange. That [according to Zarrab] is a front company that makes the[] transactions appear as if they are commercial transactions. . . . NIOC would send payment[s] instructions to Sarmayeh Exchange. . . . [And, with regard to food] Volgam Gida is the food company that I own. It's the company through which I run the food business. . . . Centrica Company is a company in Dubai that is owned by my group in Dubai. . . . **There was -- within the food trade, there was never an instance where food was ever sent to Iran. This was all a system that was developed in order to be able to make international payments that were instructed. So the purpose of this was to get the money out of Halkbank, where it had accumulated.** So it's the food version of the gold [transactions]. . . . Sarmayeh Bank would send a message to Halkbank. . . . As a result of that, money would be transferred from Sarmayeh's account [Toseh Tejarat] to Volgam. . . . [T]his money would [then] be transferred into the Centrica account within Halkbank." 12/1/17 Tr at 560:3-563:22 (emphasis added).

From the Centrica account in Halkbank, Zarrab explained, the money would then be transferred to another account controlled by Zarrab (such as Centrica or Atlantis in Dubai). The money was then transferred out of the Zarrab controlled accounts through the Rostamani Exchange. Id. at 564.

Zarrab explained: "[I]f this were a U.S. dollars exchange, [we] would use [Centrica's] accounts at Standard Charter in the U.S.A." Id. at 566:15-18.

In Government Exhibit 1002-T at 23 Zarrab states: "My esteemed general manager hopefully we don't have a problem in the food subject do we?" Aslan responds: "No we don't

have a problem in the food[.] [D]o you have a problem with the methods proposed by Hakan Atilla? Related to the food sector payments[?]" Zarrab: "No absolutely [it] is a very correct method."

Zarrab testified that he spoke to Aslan about the proposed food transactions and that he discussed with Aslan **"the method that Mr. Hakan Atilla had also provided guidance in and made additions to**." 12/1/17 Tr at 549:23-24. Zarrab also testified about a meeting held prior to April 2013 that he attended with Atilla and Suleyman Aslan at Halkbank in which the "system," presumably for getting Iranian money out of Halkbank, was finalized. See 2/1/17 Tr at 558:10-13 (Zarrab: **"the meeting that was held between me and Mr. Suleyman and Mr. Hakan[. I]n that meeting we finalized this final version of how this method would work and how the system would be implemented**." (emphasis added); id. at 569:5-7 (Zarrab: **"[T]he idea of transferring the money from Volgam to Centrica within Halkbank was from Mr. Hakan Atilla**." (emphasis added)). **Zarrab also explained that there was never any food physically exported and that false documents were submitted to Halkbank which (falsely) reflected food exports.** See, e.g., id. at 549:8-11 (AUSA Kamaraju: "[W]ere you actively sending food?" Zarrab: "You mean physically, food?" AUSA Kamaraju: "Yes." Zarrab: "No, I never sent food, physically."); id. at 564:13-24 (AUSA Kamaraju: "What is Atlantis General?" Zarrab: "It's a food supplier. In other words, for a certain period of time we used Atlantis General, and we would be using Centrica Dubai for a certain period of time." AUSA Kamaraju: "Who controlled Atlantis General?" Zarrab: "It was a Royal Group, which was me." AUSA Kamaraju: "And when you say Atlantis was a food supplier, do you mean that it supplied real, physical food?" Zarrab: **"None of the companies that I'm drawing on this diagram here would ever be involved in sending actual food because there was no actual**

Page 14

**trade out there. This was just an accessory in order to carry out the money orders.**"
(emphasis added)).

Zarrab also testified that he was advised by Atilla to be careful about the documentation submitted to Halkbank. See, e.g., 12/4/17 Tr at 666:11-13 (Zarrab: "[Atilla] is saying that the documents should be prepared more carefully and that the staff members should [take] care to ensure that the loading amounts match up with the capacities [of the ships].") Zarrab also testified about a conversation he had with Atilla about wheat shipment documentation which showed that the origin of the wheat was Dubai. Atilla told Zarrab that "that draws a lot of attention within the bank" because wheat does not grow in Dubai. Id. at 659:5. Zarrab also testified about a conversation he had with Suleyman Aslan in which Aslan advised Zarrab that Atilla would be calling him to suggest additional changes to documentation that was submitted to Halkbank with regard to the business of a particular company. The documentation reflected incorrect product and it also reflected incompatibility related to the capacity of ships. 12/4/17 Tr at 660-61; see, e.g., GX 1002-T at 50: (Aslan: "Good morning Mr. Reza[.] Mr. Hakan will probably call you today, there are two subjects. [1] the company whose name starts with the letter V[.] [I]ts business line is not compatible. [I]f possible please change that[;] [2] there is another incompatibility related to the capacity of the ships that do the transportation[]. Just listen to him[,] then we will talk again.").

Zarrab testified about the subsequent conversation he had with Atilla in which Atilla advised him that the cargo weight reflected on the documentation far surpassed the capacity of the ship(s). See, e.g., GX 261-T (phone conversation transcript between Zarrab and Atilla on July 9, 2013 in which Atilla states: "As for the small ones [ships], the relatively smaller ones, such as vessels with capacities between thirteen thousand and fourteen thousand tons; when [the

documents reflect that] their loads are twenty thousand [tons], then, that - - - becomes different and odd." Atilla states: "Since the field of business does not match the nature of those things that we are doing, can you change this to the other side?" And, "with regard to the vessels named in there regarding the loads, their loads need to comply with their capacities." "I would kindly ask that the guys take a look at compliance between the loads and the tonnages").

(ii) **Testimony of Joshua Kirschenbaum.** Kirschenbaum is a former policy advisor to the U.S. Office of Foreign Assets Control who interacted with Atilla and with Halkbank. He testified regarding Atilla's knowledge of the United States sanctions regulations against Iran. For example, Kirschenbaum testified about an October 29, 2013 phone call between Atilla and Adam Szubin (a former Director of OFAC) during which Kirschenbaum was the note taker. The topic of the phone call was Iran sanctions and the status of blocked Iranian oil funds, i.e., funds derived from the proceeds of the sale of Iranian oil to Turkey which were held in blocked accounts at Halkbank. GX 7021 was entered into evidence reflecting, among other things, Atilla's representations to Adam Szubin that Halkbank had ceased the facilitation of gold sales to Iran prior to July 1, 2013. "Atilla confirmed that Halk ceased the facilitation of gold sales to Iran prior to July 1, 2013. In light of IFCA [Iran Freedom and Counter-Proliferation Act], Szubin asked Atilla to help explain who may be involved in facilitating that trade. Atilla said that Halk[bank] was not involved at all, and he speculated that any continued sale of gold to Iran probably did not go through financial institutions, but was instead cash-based and used jewelry merchants." 12/11/17 at 1256:23-1257:1-5. Kirschenbaum explained that "under the statute known as IFCA, it would be sanctionable for a Turkish bank, such as Halk[bank], to facilitate transactions for the sale of gold to the country of Iran beginning . . . July 1[, 2013]." Id. at

1257:10-13. Kirschenbaum also testified that "without some sort of dispensation from OFAC, any bank involved in a transfer . . . [i.e.], any bank involved in a transfer of funds derived from Iranian oil sales in a given country to another country could be subject to sanctions imposed by OFAC, including both the third-country bank remitting the funds and a bank such, as in this scenario, Halkbank in Turkey, that were to receive such funds." Id. at 17-23. And, he testified, that "[u]nder sanctions rules at that time, a foreign financial institution, such as Halk in Turkey, that facilitated the sale of Iranian oil to buyers located in a different country, a third country, not Turkey in this scenario, would also be subject to sanctions under the rules at the time." Id. at 1266:12-16.

(iii) **Testimony of David Cohen.** Cohen is a former U.S. Undersecretary of the Treasury for Terrorism and Financial Intelligence who interacted with Atilla and Halkbank. Cohen testified, among other things, as to Atilla's extensive knowledge of the U.S. sanctions regulations.

Cohen also testified that, on the one hand, he thought he had a cooperative relationship with Halkbank. See, e.g., 12/8/17 Tr at 1200:3-5 (Cohen: "I think we had -- we had, I thought, a good and open communication with Halkbank."). But, on the other hand, Cohen also questioned Halkbank's sincerity. See, e.g., id. at 1152: 8-10 (Cohen: **"I was being assured that everything was okay but I had reason to question whether, in fact, everything was okay."**).

Cohen also testified about his meetings and conversations with Atilla that occurred in Washington D.C. and in Turkey. See, e.g., 12/7/17 Tr at 1082; at 1083:17-19 (AUSA Lockard: "Did Mr. Atilla participate in some of those meetings in your office in Washington, D.C.?" Mr. Cohen: "Yes."); 12/8/17 Tr at 1108:16-20 (AUSA Lockard: "Directing your attention to March 14 of 2012. Did you have any communications with Halkbank on that day?" Mr. Cohen: "My

recollection is that we met in my office in Washington that day with I believe Mr. Atilla and Mr. Aslan."). Cohen also testified that, at the March 14, 2012 meeting, he discussed with Atilla and Aslan the NDAA [National Defense Authorization Act] and the requirement that would soon be in place to reduce oil imports from Iran with the penalty being that if the oil imports were not significantly reduced, the Bank could be cut off from the United States financial market. During this meeting, the Halkbank officials told Cohen that the Bank was "not allowing Iran to acquire gold or bank notes from Halkbank, using the proceeds that Halkbank was holding for Iran from the sale of oil." 12/8/17 Tr at 1117:17-19. Cohen also testified that Atilla and Aslan assured him that "they knew that, they understood that, that Iran would look to use deceptive practices to evade sanctions. And secondly, that they -- that they had mechanisms in place at the Bank to ensure that they would detect and prevent Iranian efforts to evade the sanctions." Id. at 1118:2-7.

Cohen testified that Halkbank was advised that post July 2013 any sale(s) of gold to Iran, to anybody in Iran, was potentially sanctionable. Cohen testified about another meeting in October of 2014 in Washington D.C. in which he met with Atilla and the (new) general manager of Halkbank. During that meeting, Cohen stated that they discussed the arrest in Turkey of Zarrab. Cohen wanted to know what they (Atilla and the new Halkbank General Manager) could share with Cohen about Zarrab. Cohen testified that Atilla told Cohen that Halkbank had a banking relationship with Zarrab and that it was a relatively small relationship but that it was ongoing. Id. at 1149-50. Cohen also testified that he recalled "Atilla assur[ing] us [Treasury officials] that there was nothing to be concerned about," presumably with regard to Halkbank's dealings with Zarrab. Id. at 1235:6-7.

During cross examination by Defense counsel Victor Rocco, Cohen described in further detail the conversations he had with Atilla and Halkbank about sanctions. See id. at 1214:22-23,

1215:1-7 (Defense counsel: "What was Mr. Atilla's response to you, as best as you can recall?"

Cohen: "That they were also aware of the increase in the gold trade, that they had customers that

sold gold to private parties in Iran, that they had the means to ensure that their customers were

selling to private individuals in Iran, not to the government of Iran, that they understood what the

sanctions permitted and forbade, and that they were committed to complying."). See id. at

1216:11-14 where Cohen testified that Atilla told Cohen: "they [Halkbank] had a robust

compliance function, so that they knew who their customers were, and were confident that their

customers understood what the sanctions were, and that their customers were selling to

permissible purchasers in Iran."

See id. at 1187:4-7 where the following exchange occurred: Defense counsel Rocco:

**"And how about in your conversations with Halkbank, did you tell Halkbank ever that**

**sanctionable activity was unlawful or illegal or criminal?"** Cohen: **"Yes."** (emphasis added).

And, at 1190:7-11 where this exchange occurred: Cohen: **"As I testified just a moment ago,**

**part of my standard presentation on U.S. sanctions programs was that IEEPA-based**

**sanctions, which includes executive order 13622, which was in this letter, that the violation**

**of IEEPA-based sanctions can expose the violator to sanctions or potentially criminal**

**prosecution."** (emphasis added).

(iv) **Testimony of Adam Szubin.** Szubin is a former Director of OFAC (United States Office of

Foreign Assets Control) who testified about meetings he had with Atilla and other

representatives of Halkbank in Washington, D.C. and in Turkey. The purpose of the meetings

generally was to discuss compliance by Turkey with U.S. sanctions against Iran. Szubin

explained that there were only two categories of trades that a Turkish bank such as Halkbank

Page 19

could lawfully undertake with Iran's crude oil revenues without exposing itself to a risk of U.S. sanctions. Those two categories were: 1) bilateral trade; and 2) humanitarian (e.g. food and medicine) sales. Szubin testified that he had in-person meetings as well as phone calls, emails, and letters with Atilla and Halkbank and that he met with Atilla and Suleyman Aslan – but mostly with Atilla – regarding the Iran sanctions regime. See 12/12/17 Tr at 1413:6-11 (AUSA Denton: **"Was there any one person who was the principal representative of Halkbank in your communications with the bank?"** Szubin: **"More than any other, I met with a Mr. Atilla who I believe was the deputy manager.** But I also met with the general manager, Mr. Aslan." (emphasis added)).

See also the email from Atilla to Szubin, dated July 1, 2013, in which Atilla states: "[W]e would like to inform you that we as Türkiye Halk Bankasi A.S. [Halkbank] stopped mediating the transactions of exporters related to the trade of precious metals with Iran as of 10 June 2013." GX 7009; and the email dated December 5, 2013, in which Szubin states: "As you know, U.S. Government policy supports the export of food, medicine, and medical devices to Iran, and our sanctions do not generally prohibit transactions in support of legitimate trade in these goods." Although Szubin said he had received assurances from Atilla and Halkbank that Halkbank was in compliance with the sanctions regime, Szubin also testified that he had ongoing concerns about Halkbank which remained because "there's always the risk that a foreign party isn't dealing with you in good faith and that they're saying they're going to take special precautions but, in reality, they're not." 12/12/17 Tr at 1462:10-13.

Szubin also testified that it appeared to him that Atilla had a strong understanding of U.S. sanctions as he (Atilla) spoke to Szubin with familiarity about individual provisions and he (Atilla) also asked detailed questions about them.

Szubin testified: "We also had specific concerns about Halkbank's behavior and how careful it was being vis-a-vis international sanctions, including U.S. sanctions." Id. at 1413:18-20. Szubin said: "We spoke with Mr. Atilla about the propensity that Iran had shown to, for lack of a better word, defraud foreign banks. To lie and manipulate payment instructions. And the need, therefore, for any foreign bank who was still doing business with Iran to exhibit very strong due diligence, to make sure that the transactions they were handling were indeed what they appeared to be and not something else." Id. at 1414:1-7. Szubin testified: "[W]e saw quite a bit of activity from Turkey in terms of selling of gold to Iran. **And given that Halkbank was the primary commercial or primary bank that Iran was using in Turkey, we - - and I reminded Mr. Atilla of the importance of adhering to these [U.S.] executive orders, not running afoul of these executive orders, given the risks that that could pose for Halkbank**." Id. at 1415:11-17 (emphasis added).

Szubin also testified about several meetings with Halkbank representatives, including a meeting in March 2012 with Atilla and Aslan during which the topic was the need for enhanced due diligence because Szubin and other members of OFAC were concerned about Iran's willingness to falsify trade documents. See 12/12/17 Tr at 1419:13-1420:2 (Szubin: "Enchanced due diligence is what's called for by international standards, is when you're dealing with a high-risk country or a high-risk customer. If you are going to handle their transactions, you need to be applying a great deal of care to make sure that the transactions are legitimate. . . . Iran had demonstrated its willingness to basically manipulate trade documents, to falsify documents, to hire people outside of Iran or inside of Iran, to do transactions on Iran's behalf. Whether to make it look like the trade was going to a different country, UAE, Oman, Turkey or whether it was to disguise payments. So, that was a situation that called for seriously enhanced due

diligence."). Szubin also testified that these meetings were memorialized in the form of cables. These cables were also admitted into evidence at Atilla's trial. See, e.g., GX 7020.

Szubin also testified about a **particular meeting he had in February 2013 with Atilla and other Halkbank officials at Halkbank's headquarters in Istanbul, Turkey during which he also had a private conversation, i.e. a one-on-one pull aside with Atilla, specifically to express the serious concerns the U.S. had about Iranian sanctions evasion efforts involving Halkbank.** See 12/12/17 Tr at 1436:10-15 (Szubin: **"So, I asked Mr. Atilla if we could speak one-on-one at the end of the meeting to have a more candid discussion, and he agreed."** (emphasis added)). **Szubin testified that at the pull aside, he "told Mr. Atilla that to the extent he was viewing this as kind of a routine discussion or a routine visit that Treasury Department officials were making across the globe, that wasn't the case. That this was a -- a very conscious visit to Halkbank, by me, because of concerns that were pretty serious about what was going on at Halk. And that we viewed them in sort of a category unto themselves, that I wasn't having this same level of conversation with any other bank around the world at this time. To, in a sense, underscore how serious this was, make sure that he wasn't in doubt."** Id. at 1436:18-1437:2 (emphasis added).

Szubin also testified that he had a discussion with Atilla regarding humanitarian trade with Iran, specifically inquiring whether Halkbank was ascertaining whether or not such trade was legitimate. Szubin testified that he told Atilla that Halkbank needed to be extremely careful and that if they were not careful, they could face consequences. Szubin testified: "[The] question was posed to me by Mr. Atilla, ['C]an Halkbank receive such money from private banks if it doesn't appear to be Iran's crude oil revenues[?']  My answer was, technically, yes, but you have to be very careful, because the bulk of Iran's money that it earns outside of Iran, in other words,

its foreign earnings, comes from its crude oil sales. And given the pattern of evasion, there is a real likelihood that Iran has taken its crude oil money in, let's say Malaysia in my example, moved it into a private bank's account, and is now trying to move it into Halk." Id. at 1440:7-16.

(v) **Testimony of Douglas Sloan.** Sloan is Director and Global Coordinator of the anti-financial crimes special investigations unit of Deutsche Bank. He testified, among other things, that with regard to the U.S. sanctions against Iran, Deutsche Bank is "forbidden to directly or indirectly facilitate any transaction involving Iran, the Government of Iran, the persons and entities of Iran, to the extent that they are in accordance with the Iranian transactions regulations and other related political sanctions." Id. at 1547:6-10. **Sloan explained: "the Iranian economy is primarily petroleum based. The petroleum industry is predominantly U.S. dollar based. In order for the Iranian economy to function, it, therefore, must conduct a lot of its business in U.S. dollars.** Because of the prohibitions involving trading transaction facilitation on behalf of Iran and Iranian persons, and because their economy is dependent on U.S. dollar-denominated transactions because of the oil, third parties are often utilized to disguise the transactions." Id. at 1547:17-1548:1. Sloan continued: "Deutsche Bank is a correspondent banking provider. We're not talking about our customers. We're talking about our customers' customers." Id. at 1548:2-4. Sloan explained that Deutsche Bank must rely on the representations of its customer banks that they are not facilitating business that is prohibited by U.S. sanctions. Id. at 1548.

Sloan also testified that Deutsche Bank is insured by the Federal Deposit Insurance Corporation. It "process[es] [its] U.S. dollar-correspondent payments here in New York" at 60 Wall Street. Id. at 1531:23-1532:1; 1537:15-17. And, using GX 8101-4, an excel spreadsheet

that was based upon Deutsche Bank's anti-money laundering software, Sloan described a U.S. dollar based transaction that began in a Centrica General Trading account in a Turkish bank account and that went through Deutsche Bank, New York and then on to a Centrica General Trading account in Bank of Baroda, Dubai, United Arab Emirates.

(vi) **Testimony of Lisa Palluconi.** Palluconi is the Sanctions Coordinator at OFAC. Ms. Palluconi was called as an expert witness, i.e. expert in the Iranian Sanctions Program. Among other things, Ms. Palluconi testified about records maintained by OFAC which include individuals and entities that have applied for or received licenses to provide goods or services to Iran or the Government of Iran. GX 8041 reflected these records and was admitted into evidence. Ms. Palluconi also testified, among other things, that neither Suleyman Aslan nor Atlantis Capital General Trading ever applied for or received such a license. 11/28/17 Tr at 137.

(vii) **Bank Stipulations and Bank Records.** Stipulations were entered into evidence reflecting the fact that between 2010 and 2015, HSBC Bank U.S.A., Deutsche Bank Trust Company Americas, UBS Bank U.S.A., BNY Mellon, Citibank, JPMorgan Chase, Bank of America, and Wells Fargo Bank were all banks the deposits of which were insured by the FDIC. See GX 9701. Additionally, records of financial transfers of those banking institutions were admitted into evidence. See, e.g., GX 8101-1,8101-2, 8101-3, 8101-4, 8101-5, 8101-6, 8101-7, 8101-8, 8101-9, 8101-10. These bank records traced the flow of international payments through New York. As noted, at least one of those transactions began in a Centrica General Trading in Turkey; went to Deutsche Bank, New York; and then went to Centrica General Trading account in Bank of Baroda, Dubai, United Arab Emirates. See, e.g., 12/12/17 Tr at 1536-37.

## IV. Conclusion and Order

Based upon the foregoing, and having reviewed the Defendant's Letter Motion, dated December 15, 2017, and the Government's Opposition, dated December 16, 2017, the Court concludes that the evidence presented during the Government's case in chief against Atilla, when viewed in the light most favorable to the Government and drawing all reasonable inferences in the Government's favor, supports a reasonable jury's finding of guilt with respect to each of (the elements of) the six counts in the Superceding Indictment.

Accordingly, the Atilla Rule 29(a) Motion to Dismiss is respectfully denied.

Dated: New York, New York
February 7, 2018

PMB

**RICHARD M. BERMAN, U.S.D.J.**

# EXHIBIT A



"IRANIN GOLD TRANSACTION" — PAYMENT
INSTRUCTION

IRAN
NIOC

SARMAYEH BANK
SAMAYEH EXCHANGE
TOOSE TESARET

TELEX

OiL   GAS

TURKEY
HALK BANK

TURKEY
TUPRAS   BOTAS   NIOC        SARMAYER BANK
OIL       GAS

- 50,000,000 EUR        + 2,000,000 EUR
- 2,000,000 EUR         - 2,000,000 EUR
  3,000,000 EURO

RONA                    SAFIR ACTIN

2,000,000 EUR
- 2,000,000 EUR         2,000,000 EURO
                        - 2,000,000 EURO

PAYMENT ORDER MESTAGN

TURKISH BANK
DENIZ BANK
RONA
+ 2,000,000 EURO
OFIS
INSTRUCTION   RONA                    OFIS
50,000,000 DHS  - 200 KG              ROYAL
                  2 00 KG             + 200 KG
DUBAI                                 - 2 0 KG

ROSTAMANI
EXCHANGE        DUBAI                 DUBAI       IRAN
                BINSABT
USA             + 200 KG             ATLANTIS
STANDARD                             + 200 KG
CUARTERED                            - 2 00 KG
ROSTAMANI                            + 50,000,000 DHS
                10,000,000 $

BANK OF
CHINA

X CU
4,000,000 $

GOVERNMENT
EXHIBIT
9502
15 Cr. 867 (RMB)



« IRANIAN FOOD METHOD »                    — MONEY
                                           — PAYMENT ORDER

IRAN
NIOC

SARMAYE BANK
SERMAYEH EXCHANGE
BUYER
TUASE TEJARET

O
i      GAS
L

TÜPRAŞ   BOTAŞ   NIOC              SERMAYE
                                   BANK

1 - PROFORMA INVOICE
2 - FINAL INVOICE        SELLER
3 - CUSTOM DECLARATION   VOLGAM          + 20,000,000 EUR
4 - SHIPPING DOCUMENT     FOOD    CENTIRICA
5 - SUPPLIOR INVOICE             DUBAI
6 - INSTRUCTION          20,000,000 EURO
                         - 20,000,000            + 20,000,000 EUR

HALK BANK

TELEX

SWift

ATLANTIS
GENERAL

DUBAI
BANK OF BARODA

ATLANTIS   CENTIRICA
           DUBAI

20,000,000 EURO

TORKIYE FINANS
CENTRICA   ATLANTIS
20,000,000

ROYAL GROUP

DUBAI
ATLANTIS - CENTIRICA
20,000,000 EURO
X DHS

DUBAI

ROSTAMAN EXCHANGE
20,000,000 EURO — DHS
DHS USA

STANDAR CHARTERED

ORDER

BANK OF CHINA

X CO

GOVERNMENT
EXHIBIT
9503
15 Cr. 867 (RMB)