UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    Plaintiff,

        v.

MEHMET HAKAN ATILLA,

                    Defendant.

---

S4 15 Cr. 867 (RMB)

---

**SENTENCING MEMORANDUM OF MEHMET HAKAN ATILLA**

---

HERRICK, FEINSTEIN LLP
Victor J. Rocco
Thomas E. Thornhill
David M. Rosenfield
2 Park Avenue
New York, NY  10016

FLEMING RUVOLDT PLLC
Cathy Fleming
Robert Fettweis, *pro hac vice*
Jonathan Stern
1700 Broadway, 28th Floor
New York, NY  10019

McDERMOTT WILL & EMERY LLP
Todd Harrison
Joseph Evans
340 Madison Avenue
New York, New York  10173
(212) 547-5727

LAW OFFICES OF JOSHUA L. DRATEL
Joshua Dratel
29 Broadway, Suite 1412
New York, New York  10006
(212) 571-3792

*Attorneys for Defendant Mehmet Hakan Atilla*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ....................................................................................................... 2

I.     A NON-GUIDELINES SENTENCE WELL BELOW ANY CALCULATED GUIDELINES RANGE IS THE ONLY APPROPRIATE SENTENCE IN THIS CASE ........................................................................................................... 2

II.    THE SENTENCING GUIDELINES CALCULATION ................................... 7

     A.    Counts of Conviction One, Two, Three, Four, and Six Should be Grouped Into a Single Group ........................................................... 7

     B.    The Money Laundering Conspiracy Count Should Be Used to Calculate the Guidelines Range ............................................................. 8

          1.    There Was no "Actual Loss" in this Case ................................ 11

          2.    There Was No "Intended Loss" in this Case ............................ 12

          3.    "Gain" is Not an Appropriate Measure of Loss in this Case .................... 12

          4.    The Total Offense Level for the Bank Fraud Convictions is No Greater than 12 ................................................................ 14

          5.    The Proper Base Offense Level for 2S1.1 in this Case is Determined by the Total Offense Level for the Counts Involving Violations of the Iranian Sanctions Regime ............................. 14

     C.    Mitigating Role Reduction ...................................................... 15

     D.    Conspiracy Reduction ............................................................ 20

     E.    Hakan's Offense Level is Level 23 ......................................... 20

III.   THE FACTORS SET FORTH IN §3553(A) ESTABLISH THAT A NON-GUIDELINES SENTENCE IS APPROPRIATE ....................................... 20

     A.    The Court Can, and Should, Impose a Non-Guidelines Sentence ........ 20

     B.    A Consideration of the §3553(a) Factors Confirms that a Non-Guidelines Sentence is Appropriate ...................................... 21

i

1.      Section 3553(a)(1), "The Nature and Circumstances" of the
        Offense and the "Characteristics of the Defendant," Warrants a
        Non-Guidelines Sentence in this Novel Prosecution of a Banker
        and Non-U.S. Person for Violations of Sanctions ...................................21

        (a)     The Nature of the Offense.................................................................22

                (i)     Hakan's Turkish Nationality and Lack of Ties to the
                        United States Diminish his Blameworthiness for
                        Violating U.S. Sanctions....................................................23

                (ii)    That this is the First Time the United States has ever
                        Prosecuted a Banker for Violations of Sanctions is
                        also Relevant to Hakan's Blameworthiness and the
                        Seriousness of his Offense. ................................................25

        (b)     Hakan's Background and Characteristics .....................................27

                (i)     Hakan's Character................................................................29

                (ii)    Hakan Lives Modestly .......................................................31

                (iii)   The Conduct for Which Hakan was Convicted is
                        Aberrational .......................................................................32

                (iv)    Hakan is Very Close to His Family, and They
                        Strongly Support Him .........................................................33

                (v)     Hakan's Incarceration Since March 27, 2017 has
                        Completely Devastated His Family ...................................34

                (vi)    Physical and Mental Health ...............................................34

2.      Section 3553(a)(2) – A Sufficient Sentence ...............................................35

        (a)     Section 3553(a)(2)(A).....................................................................36

        (b)     Section 3553(a)(2)(B) .....................................................................38

                (i)     Specific Deterrence.............................................................38

                (ii)    General Deterrence ...........................................................41

        (c)     Section 3553(a)(2)(C) .....................................................................43

        (d)     Section 3553(a)(2)(D).....................................................................44

3.      Section 3553(a)(3) – The Kinds of Sentences Available Include a
        Lenient, Non-Guidelines Sentence ...........................................................44

4.    Section 3553(a)(4) – The Guidelines Range.............................................45

5.    Section 3553(a)(5) – Pertinent Policy Statements Issued by the Sentencing Commission.................................................................................45

6.    Section 3553(a)(6) – Sentencing Disparities .............................................45

      (a)    A Non-Guidelines Sentence Significantly Below the Guidelines Range is Needed to Avoid Unwarranted Sentencing Disparities ....................................................45

      (b)    Hakan's Conduct is Analogous to Other Cases in Which Defendants Received Below-Guidelines Range Sentences for IEEPA Violations ..........................................46

      (c)    A Substantial Prison Sentence for a Banker Like Hakan Would Represent an Unwarranted and Unfair Sentencing Disparity Because Alleged IEEPA Violations By Banks Have Previously Been Resolved Without a Prosecution of the Financial Institution With One Exception, and Always Without Prosecuting Any Bank Employees ................................51

      (d)    The Sentencing Commission's Most Recently Published Sentencing Statistics Demonstrate That a Guidelines Sentence for Hakan Would Create An Unwarranted Disparity.........................................................58

      (e)    Section 3553(a)(7) - Restitution.......................................62

      (f)    Totality of the Factors .....................................................62

CONCLUSION.........................................................................................................63

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Federal Cases</u>

*Gall v. United States*,
    552 U.S. 38 (2007)................................................................................3, 7

*Kimbrough v. United States*,
    552 U.S. 85 (2007)...................................................................................4

*Nelson v. United States*,
    555 U.S. 350 (2009)................................................................................4

*Peugh v. United States*,
    569 U.S. 530 (2013)................................................................................3

*Rita v. United States*,
    551 U.S. 338 (2007)....................................................................3, 4, 7, 22

*Sarvestani v. United States*,
    No. 13-cr-214, 2015 U.S. Dist. LEXIS 159491 (S.D.N.Y, Nov. 25, 2015) ..........45, 46, 47, 48

*U.S. v. Toohey*,
    132 F. App'x 883 (2d Cir. 2005) ............................................................46

*United States v. ABN Amro Bank N.V.*,
    No. 10-cr-124 (D.D.C.), ECF No. 1 (filed May 10, 2010) ................................52, 53

*United States v. ABN Amro Bank N.V.*,
    No. 10-cr-124 (D.D.C.), ECF No. 2, 2-1 ....................................................53

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006).......................................................42, 43

*United States v. al-Baroudi*,
    No. 15-cr-102, ECF No. 34 (E.D. Va. Jun. 13, 2016) ..........................................49

*United States v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016).....................................................................5

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011)...................................................................46, 47

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) ..................................................................38

*United States v. Banki,*
    685 F.3d 99 (2d Cir. 2011)..................................................................................46, 47, 51

*United States v. Barclays Bank PLC,*
    No. 10-cr-218 (D.D.C.), ECF No. 1 (filed August 16, 2010) ...................................54

*United States v. Barclays Bank PLC,*
    No. 10-cr-218 (D.D.C.), ECF No. 7.........................................................................54

*United States v. BNP Paribas,*
    No. 14-cr-460 (S.D.N.Y. May 1, 2015) ...................................................................57

*United States v. Boltutskiy,*
    No. 11-cr-000533 (E.D. Pa. 2013) ...........................................................................50

*United States v. Booker,*
    543 U.S. 220 (2005)........................................................................................3, 39, 60, 61

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2008)....................................................................................43

*United States v. Chen,*
    ECF No. 16-cr-11, ECF No. 38 (D. Del. Jun. 29, 2016) .........................................49

*United States v. Cheng,*
    No. 13-cr-10332 (D. Mass 2016) .............................................................................50

*United States v. Collins,*
    No. 07-cr-1170, ECF No. 244 (S.D.N.Y. July 15, 2013) .....................................5, 6

*United States v. Commerzbank AG, et al.,*
    No. 15-cr-31, ECF No. 1 (D.D.C.) (filed Mar. 12, 2015).................................54, 55

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013)....................................................................................43

*United States v. Credit Agricole,*
    15-cr-137, ECF No. 1 (D.D.C. Oct. 20, 2015)........................................................55

*United States v. Credit Agricole,*
    15-cr-137, ECF No. 12 (D.D.C. Oct. 20, 2015)......................................................55

*United States v. Credit Suisse AG,*
    No. 09-cr-352, ECF No. 4, 4-1 (D.D.C. Dec. 16, 2009)........................................56

*United States v. Dhafir (Alwahaidy),*
    No. 03-cr-64 (N.D.N.Y. 2005).................................................................................50

*United States v Dhafir (Dhafir)*,
    No. 03-cr-64 (N.D.N.Y. 2005)......................................................................50

*United States v. Dhafir (Jarwan)*,
    No. 03-cr-64 (N.D.N.Y. 2005)......................................................................50

*United States v. Dhafir*,
    No. 03-cr-64 (N.D.N.Y. 2005)......................................................................50

*United States v. Dorvee*,
    616 F.3d 174 (2d Cir. 2010)..........................................................................4

*United States v. El-Mezain*,
    664 F.3d 467 (5th Cir. 2011) .......................................................................10

*United States v. Ferreira*,
    239 F. Supp. 2d 849 (E.D. Wis. 2002).........................................................38

*United States v. Fishenko*,
    No. 12-cr-626 (E.D.N.Y. 2016) ...................................................................50

*United States v. Friedman*,
    998 F.2d 53 (2d Cir. 1993)...........................................................................15

*United States v. Gaind*,
    829 F. Supp. 669 (S.D.N.Y. 1993) ..............................................................39

*United States v. Galloway*,
    509 F.3d 1246 (10th Cir. 2007) ...................................................................13

*United States v. Gupta*,
    904 F. Supp. 2d 349 (S.D.N.Y. 2012).....................................................3, 5, 6

*United States v. Hanna*,
    661 F.3d 271 (6th Cir. 2011) ...................................................................9, 10

*United States v. Hansen*,
    701 F.2d 1078 (2d Cir 1983).......................................................................22

*United States v. HSBC Bank USA, N.A. and HSBC Holdings PLC*,
    No. 12-cr-763, ECF No. 3-2 (E.D.N.Y. Dec. 11, 2012) .............................56

*United States v. ING Bank, N.V.*,
    No. 12-cr-136, ECF No. 1 (D.D.C. June 12, 2012) .....................................57

*United States v. Lanier*,
    520 U.S. 259 (1997)....................................................................................26

*United States v. Lawrence*,
   254 F. Supp. 2d 441 (E.D.N.Y. 2017) (Weinstein, J.) ..........................................43

*United States v. Manatau*,
   647 F.3d 1048 (10th Cir. 2011) .......................................................................12

*United States v. McBride*,
   434 F.3d 470 (6th Cir. 2006) ...........................................................................39

*United States v. Mickelson*,
   433 F.3d 1050 (8th Cir. 2006) .........................................................................39

*United States v. Milikowsky*,
   65 F.3d 4 (2d Cir. 1995)..................................................................................20

*United States v. Nesbeth*,
   188 F.Supp. 3d 179 (E.D.N.Y. 2016) ...............................................................62

*United States v. Ouzhan Aydin*,
   No. 12-cr-221, ECF No. 82 (N.D. Ga. April 5, 2016) ...........................................49

*United States v. Parsa*,
   No. 14-cr-710, ECF No. 67 (S.D.N.Y. June 26, 2016)..........................................49

*United States v. Robie*,
   166 F.3d 444 (2d Cir. 1999)............................................................................13

*United States v. Sheikhzadeh*,
   No. 15-cr-182, ECF No. 41 (E.D.N.Y. Feb. 8, 2016) ...........................................48

*United States v. Singh*,
   877 F.3d 107 (2d Cir. 2017)........................................................................3, 22

*United States v. Soborski*,
   708 F. App'x 6 (2d Cir. 2017) .........................................................................16

*United States v. Speed Joyeros, S.A.*,
   204 F. Supp. 2d 412 (E.D.N.Y. 2002) ..........................................................39, 40

*United States v. Standard Chartered Bank*,
   No. 12-cr-262, ECF No. 1 (D.D.C. Dec. 10, 2012) .............................................57

*United States v. Stewart*,
   590 F.3d 93 (2d Cir. 2009).....................................................................37, 38, 62

*United States v. Zadeh*,
   No. 10-cr-309 (D.D.C. Dec. 14, 2016) ..............................................................48

*United States v. Zangari,*
    677 F.3d 86 (2d Cir. 2012)..................................................................................13

## **State Cases**

*United States v. Commerzbank AG, et al.,*
    No. 15-cr-31 (D.D.C. filed Mar. 12, 2015) . *No* ..................................................55

## **Statutes**

18 U.S.C. § 20 ..................................................................................................11

18 U.S.C. § 371 ...................................................................................................7

18 U.S.C. § 1344 ...............................................................................................11

18 U.S.C. § 1956 ..................................................................................7, 8, 9, 15

18 U.S.C. § 2381 .........................................................................................24, 25

18 U.S.C. § 3553(a) ................................................................................... passim

50 USC § 1705 ..................................................................................................14

U.S.S.G. § 2B1.1 .........................................................................................13, 23

U.S.S.G. § 2M5 series ......................................................................................23

U.S.S.G. § 3B1.3 ...............................................................................................23

U.S.S.G. § 3E1.1 ...............................................................................................23

USSG 2M5.1(a)(1) .............................................................................................14

USSG 2S1.1(a)(1) ..............................................................................................15

USSG § 1B1.5 ....................................................................................................10

USSG § 2B1.1 ............................................................................9, 10, 11, 12, 14, 15

USSG § 2B1.10 ..................................................................................................14

USSG § 2M5.1 ......................................................................................10, 14, 15

USSG § 2S1. ......................................................................................................10

USSG § 2S1.1 .............................................................................................8, 9, 10

USSG § 2S1.1(a) .................................................................................................9

USSG § 2S1.1(a)(1) ........................................................................................7, 9, 10, 11

USSG §§ 2S1.1(a)(1), (b)(2)(B) .........................................................................................9

USSG § 2S1.1(a)(2) .................................................................................................9, 10

USSG § 2S1.1, app. n. 2(A) .........................................................................................10

USSG § 2S1.1(b)(2)(B) ...........................................................................................7, 15

USSG § 2X1.1(b)(2) ..............................................................................................7, 20

USSG § 3B1.2.......................................................................................................... passim

USSG § 3B1.2(b) .....................................................................................................7, 15

USSG § 3B1.2 cmt. n. 3(C) ...........................................................................................16

USSG § 3D1.2 ...............................................................................................................8

USSG § 3D1.2(d) ......................................................................................................8, 10

USSG § 3D1.3(b) ...........................................................................................................8

**Miscellaneous**

2017 *Sourcebook*, Table N-2 ...........................................................................60, 61

*Former ABN Amro Bank N.V. Agrees to Forfeit $500 Million in Connection with
    Conspiracy to Defraud the United States and with Violation of the Bank Secrecy Act*
    (May 10, 2010), https://www.justice.gov/opa/pr/former-abn-amro-bank-nv-agrees-
    forfeit-500-million-connection-conspiracy-defraud-united ...........................................53

Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An
    Analysis and Legislative History*, 35 IND. L. REV. 5, 77 (2001) .............................22

https://www.justice.gov/nsd/page/file/940591/download ...........................................50

https://www.justice.gov/opa/pr/barclays-bank-plc-agrees-forfeit-298-million-connection-
    violations-international-emergency ...........................................................................54

https://www.justice.gov/opa/pr/bnp-paribas-sentenced-conspiring-violate-international-
    emergency-economic-powers-act-and ...........................................................................57

https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-
    money-laundering-and-sanctions-violations ..................................................................56

https://www.justice.gov/usao-sdny/pr/canadian-iranian-citizen-sentenced-white-plains-
    federal-court-32-months-prison ...............................................................................49

ix

Justice, *Barclays Bank PLC Agrees to Forfeit $298 Million in Connection with Violations of the International Emergency Economic Powers Act and the Trading with the Enemy Act* (Aug. 18, 2010) ............................................................................54

Justice Press Release, *BNP Paribas Sentenced for Conspiring to Violate the International Emergency Economic Powers Act and the Trading with the Enemy Act* (May 1, 2015) ........57

Justice Press Release, *HSBC Holdings Plc. And HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012) ......................................................56

Michael J. Lynch, *Beating a dead horse: Is there any basic empirical evidence for the deterrent effect of punishment?* ......................................................42

Michael Tonry, *Purposes and Functions of Sentencing* ......................................42

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27 (2015) ..................................................................42

Sentencing Guidelines. Pre-*Booker* ....................................................................39

*U.S. Sentencing Commission's 2017 Sourcebook of Federal Sentencing Statistics* (hereinafter "*2017 Sourcebook*") ..................................................58, 59, 60

*United States Sentencing Commission Quarterly Data Report*, FY 2017, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2017_Quarterly_Report_Final.pdf ("*Quarterly Data Report, FY 2017*") ..............................60

*United States v. Lloyds TSB Bank plc*, No. 09-cr-07 ..................................................57

Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ..............42

## PRELIMINARY STATEMENT

For the reasons set forth below, defendant Mehmet Hakan Atilla ("Hakan," "Hakan Atilla" or "Mr. Atilla") believes that the United States Sentencing Guidelines (the "Sentencing Guidelines" or the "Guidelines") should not be used to determine his sentence in this case, and respectfully requests that this Court impose a non-Guidelines sentence that is fair, and substantially below any sentence suggested by the Guidelines.

This case and this defendant are unique. As an initial matter, it represents the first time ever that an individual banker – and a foreigner at that with no connection to the United States or a U.S. bank – has been prosecuted for a violation of IEEPA. And, as we discuss below, in the only instance where a banking institution itself was prosecuted, none of its employees – including American bankers – were prosecuted. A number of IEEPA violations involving large international banks – plainly as egregious as those that are the subject of this prosecution – have been the subject of deferred prosecution agreements where the banks simply paid financial penalties, and none of their employees have been prosecuted. Hakan Atilla stands alone.

At bottom, although U.S. banks were involved, the crimes covered by the verdict in this case are not economic crimes; they involve U.S. foreign policy and are anchored in the sometimes controversial U.S. sanctions regime against Iran that was rolled-back as part of the equally controversial 2015 nuclear arms treaty with Iran. Unlike prosecutions involving massive frauds and staggering victim losses, here there are no victims who suffered a financial loss. Unlike cases where a defendant profits from the crimes, there was no proven financial gain or benefit to Hakan. Unlike cases involving American citizens who breach their duty of loyalty to their country, there is no American defendant and no citizen disloyal to his country. Hakan Atilla is a Turkish national who has no connection to the United States, and who spent his entire career working in Turkey at a state-owned Turkish bank. Unlike cases involving international

terrorism, there is no hint of contemplated violence of any kind.  Unlike cases focusing upon the leader of a complex criminal scheme, the evidence at trial showed that Hakan was, at most, a functionary in someone else's mammoth plot to circumvent American economic sanctions aimed at Iran – a plot that was motivated by the greed of its mastermind, architect, and principal beneficiary, Reza Zarrab, as well as others, who, along with Zarrab, realized huge financial gains.

Apart from the criminal charges for which he now stands convicted, Hakan's only connection to the United States was his rare trips here on banking business (including the one that resulted in his arrest), for a Turkish state-owned bank. Because Hakan is not an American citizen or resident alien, he owed no allegiance or duty of loyalty to the United States, and his conduct is less culpable than that of someone who owes allegiance to the United States, and therefore warrants less severe punishment.  Finally, as a further and independent basis for a non-Guidelines sentence, as the compilation of sentences in IEEPA and similar embargo type cases which are discussed below dramatically demonstrates (*See* Exhibit B), the sentences in these cases, for U.S. citizens and foreigners alike, are usually substantially below the Guidelines range.

## <u>ARGUMENT</u>

**I.   A NON-GUIDELINES SENTENCE WELL BELOW ANY CALCULATED GUIDELINES RANGE IS THE ONLY APPROPRIATE SENTENCE IN THIS CASE**

The defense has received the draft Presentence Report dated March 2, 2018 ("PSR") in this case.  Mr. Atilla disputes its factual findings and improbable Guidelines analysis and has submitted his written objections by letter dated March 16, 2018.  While we do not repeat all of our arguments and objections to the PSR herein, we hereby incorporate those objections and arguments.  The final PSR has not been received, and upon receipt, Mr. Atilla will duly note his objections and submit them to the Court.

2

Astonishingly, the draft PSR calculates a Guidelines sentence of "life" – a sentence that is not only stupefyingly unreasonable and unjust, but so draconian as to reveal the fundamental and fatal flaws that lie at the very heart of the entire Guidelines regime.  Mr. Atilla offers his own Guidelines analysis below, but, he respectfully submits, that any Guidelines sentence in this case would be unjust, would vastly overstate the seriousness of the offense and, as importantly, Mr. Atilla's role in the offense.

While a court is required to consider the Sentencing Guidelines in sentencing a defendant, it is not bound by them.  *United States v. Booker*, 543 U.S. 220, 264 (2005); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (a district court should begin sentencing proceedings by correctly calculating the applicable Guidelines range); *Gall v. United States*, 552 U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.")*.*  Sentencing a criminal defendant "requires a court to consider with great care and sensitivity, a large complex of facts, and factors."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).

Thus, while a court still must determine the appropriate Guidelines range as a starting point – not always an easy task in itself, as this case demonstrates – the sentencing court "must consider all of the factors set forth in [18 U.S.C.] §3553(a) to guide its discretion at sentencing," *Peugh v. United States*, 569 U.S. 530, 536 (2013).  Indeed, after determining the Guidelines range, the sentencing court must "then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant,' and all the statutory factors."  *United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017) (citing *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008)).  In *Singh*, 877 F.3d at 121, the Second Circuit explained the fundamental doctrine of compassion that informs and

guides a trial court's sentencing determination:

> "Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge."   Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?,* 23 Touro L. Rev. 539, 539 (2007).  While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind."  *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion).  In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."  Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.,* 142 U. Pa. L. Rev. 513, 513 (1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), *reprinted in* 82 F.R.D. 209, 209 (1979) ("Be kind.  If we judges could possess but one attribute, it should be a kind and understanding heart.  The bench is no place for cruel or callous people regardless of their other qualities and abilities.  There is no burden more onerous than imposing sentence in criminal cases.")

The Supreme Court has also instructed sentencing courts that the Guidelines are not only just advisory, but that they are not even to be presumed reasonable.  *Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts, they are also not to be *presumed* reasonable.") (emphasis added);  *see Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (courts can vary from the Guidelines based solely on policy considerations, including disagreements with the Guidelines).  The Second Circuit has similarly held that, "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant."  *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010).  Therefore, sentencing is far from a mechanical application of the Guidelines.  Rather, "'it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometime mitigate, sometimes magnify, the crime and the punishment to ensue.'"  *Rita*, 551 U.S. at 364 (Stevens, J. and Ginsburg, J. concurring) (quoting

*Koon v. United States*, 518 U.S. 81, 113 (1996)).

In *United States v. Gupta*, for instance, although the Guidelines Range was 78-97 months, Judge Rakoff imposed a 24 month "non-guidelines" sentence, explaining, "[t]he notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense." *Gupta*, 904 F. Supp. 2d at 350.

For Hakan, allowing his sentence to be driven by a Guidelines calculation that includes a very significant "loss," as the draft PSR does, would be a prime example of why such a method is a "draconian approach to white collar crime, unsupported by any empirical data." *Id.* at 351. Especially in cases "where the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judgment to consider a non-Guidelines sentence." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). Indeed, the Second Circuit has remanded cases for resentencing to "permit the sentencing judge to consider whether the significant effect of the loss enhancement, in relation to the low offense level, should result in a non-Guidelines sentence." *Id.* Additionally, particularly where, as here, the base offense level is relatively high, and the defendant did not share in any of the illicit proceeds, courts have often imposed non-Guidelines sentences on white-collar defendants. *Id.*; *see United States v. Collins*, No. 07-cr-1170, ECF No. 244 (S.D.N.Y. July 15, 2013) (Sentencing trans.) (Guidelines Range of life; 12 months and 1 day "non-guidelines" sentence given).

In *United States v. Collins*, Chief Judge Preska issued a non-Guidelines sentence to a white-collar defendant who did not share in the illicit proceeds of the crime, and was less culpable than his co-conspirators. *Collins*, ECF No. 244. Judge Preska stated at sentencing:

"What takes this case far outside the heartland of fraud cases . . . is that Mr. Collins did not personally receive or even attempt to receive any profit from the fraud.  His lack of any intended or actual personal gain from the fraud distinguishes him from the other . . . defendants and from most other white collar offenders in this district."  *Id.* at 21.  Such is also the case here, where all parties agree that Hakan did not receive, or even attempt to receive, any bribes or any other proceeds of the crimes.

In *Gupta*, 904 F. Supp. 2d at 352, Judge Rakoff criticized the Guidelines because "the Guidelines  assess [the defendant's] punishment almost exclusively on the basis of how much money his accomplice gained by trading on the information."  Hakan similarly was convicted of being a participant in a widespread scheme, but his "role was of a different magnitude and clearly less culpable than that of the other defendants."  *Collins¸* ECF No. 244, at 21.  As such, Hakan is a prime candidate for a non-Guidelines sentence.

Non-guidelines sentences are most appropriate in cases like this, where the Guidelines Range reflects a lengthy sentence typically reserved for violent career criminals - not first time, non-violent offenders such as Hakan.  *See Collins*, ECF No. 244, at 20-21 ("As we have discussed, the guidelines calculations here are technically correct.  They result in a guidelines range that is several notches below the bottom of the guidelines chart, indicating a life sentence or 95 years if one considers the statutory maximums.  Such a prescription illustrates, 'the harm that guideline calculations can visit on human beings if not cabined by common sense.'") (citing *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (Guidelines Range of life; a non-guidelines sentence of 42 months imposed, with Judge Rakoff noting:  "Put differently, an Offense Level of 55 is a level normally only seen in cases involving major international narcotics traffickers, Mafia dons, and the like.  How could it possibly apply here? . . . [w]here, as here, the

6

calculations under the Guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences.").

A sentence within the Guidelines range calculated in the draft PSR – or even within the Guidelines range calculated by the defense – would impose an unnecessarily severe and unfair sentence, and thus, in this case only a non-Guidelines sentence is appropriate.

## II.    THE SENTENCING GUIDELINES CALCULATION

Given that a court is required to start by calculating the applicable Guidelines Range, *Rita*, 551 U.S. at 351 and *Gall*, 552 U.S. at 49, that is where our analysis also begins.   The applicable Guidelines range – after properly accounting for certain mitigating factors – is an offense level of 23, which translates to a sentencing range of 46-57 months in light of Hakan's lack of criminal history (which places him in Criminal History Category I).

| | |
|---|---|
| **Base Offense Level** (USSG §2S1.1(a)(1)) | +26 |
| **Conviction under 18 U.S.C. § 1956** (USSG §2S1.1(b)(2)(B)) | +2 |
| **Minor Role** (USSG §3B1.2(b)) | -2 |
| **Conspiracy** (USSG §2X1.1(b)(2)) | -3 |
| **Offense Level** | **23** |

### A.    Counts of Conviction One, Two, Three, Four, and Six Should be Grouped Into a Single Group

Hakan was convicted at trial of five of the six counts in the indictment, specifically:

Count One:    Conspiracy to defraud the United States, 18 U.S.C. § 371

Count Two:    Conspiracy to violate the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707, and the Iranian Transactions and Sanctions Regulations ("ITSR"), 31 C.F.R. Parts 560 and 561

7

Count Three:  Bank fraud, 18 U.S.C. §§ 1344 & 2

Count Four:  Conspiracy to commit bank fraud, 18 U.S.C. §§ 1344, 1349

Count Six:  Conspiracy to commit money laundering, 18 U.S.C. §§ 1956(a)(2)(A), 1956(h)

Hakan was acquitted of Count Five, which charged substantive money laundering under 18 U.S.C. § 1956(a).

Under USSG §3D1.2, all of the counts of which Hakan was convicted should be grouped for purposes of calculating the Guidelines range.  Section 3D1.2 reads, in pertinent part, as follows:

All counts involving *substantially the same harm* shall be grouped together into a single Group.  Counts involve substantially the same harm within the meaning of this rule:

* * *

(d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or *if the offense behavior is ongoing or continuous in nature* and the offense guideline is written to cover such behavior.

(emphasis added)

In accordance with the jury's verdict, all of the offenses of conviction should be grouped because they all relate to a single course of conduct – a scheme to defeat a sanctions regime - that, in the words of USSG §3D1.2(d), "is ongoing or continuous in nature."  Therefore, these counts should be grouped under USSG §3D1.2(d), and, pursuant to USSG §3D1.3(b), the Court should "apply the offense guideline that produces the highest offense level."

**B.    The Money Laundering Conspiracy Count Should Be Used to Calculate the Guidelines Range**

Hakan's final offense level should be calculated under the money laundering guideline, USSG §2S1.1.  This is because USSG §2S1.1 incorporates the "underlying offense from which

8

the laundered funds were derived," and adds two additional offense levels because Hakan was also convicted of 18 U.S.C. § 1956.  USSG §§2S1.1(a)(1), (b)(2)(B).

The base offense level of USSG §2S1.1(a) is calculated as follows:

(1)    The offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under subsection (a)(1)(A) of §1B1.3 (Relevant Conduct)); and (B) the offense level for that offense can be determined; or

(2)    **8** plus the number of offense levels from the table in §2B1.1 (Theft, Property Destruction, and Fraud) corresponding to the value of the laundered funds, otherwise.

There are two underlying offenses for the money laundering conspiracy – the violation of the Iranian sanctions regime (IEEPA) alleged in Count Two, and the bank fraud and bank fraud conspiracy alleged in Counts Three and Four.  As long as an offense level for either of these underlying offenses "can be determined," then the base offense level for USSG §2S1.1 is to be calculated under USSG §2S1.1(a)(1), and *not* under USSG §2S1.1(a)(2).  This is important because it means that, so long as an offense level can be determined for either underlying offense, a court may not employ the method set out in §2S1.1(a)(2) of enhancing the defendant's offense level by plugging the amount of laundered funds into the loss table of §2B1.1.

The sentencing court *must* use the base offense level of the underlying offense, so long as it can be determined.  This precise issue was decided in *United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011), a case on all fours with Hakan's.  There, the defendant was convicted of violating sanctions against Iraq and of money laundering in connection with those violations.  In *Hanna*, the trial court sentenced the defendant under USSG §2S1.1(a)(2) and enhanced his Guidelines Range by plugging the amount laundered into the USSG §2B1.1 loss table.  The Sixth Circuit found that to be error because the offense level of the crime underlying money

laundering could be determined.  The appellate court determined that the defendant should have been sentenced under §2S1.1(a)(1).  (*Hanna* nonetheless upheld the trial court's sentencing on the ground that the defendant insisted on being sentenced under USSG §2S1.1(a)(2), and thus the trial court's error was "invited."  Hakan specifically repudiates any effort to calculate his sentencing Guidelines range pursuant to USSG §2S1.1(a)(2)).  *See also United States v. El-Mezain*, 664 F.3d 467, 572 (5th Cir. 2011).

In this case, the offense levels of both the sanctions violations and the bank frauds "can be determined."  That being so, pursuant to USSG §2S1.1, app. Note 2(A), and USSG §1B1.5, app. Note 3, the base offense level for USSG §2S1.1 is the offense level "for the most serious such offense."  *See* USSG §2S.1., app. Note 2(A) ("in cases in which subsection (a)(1) applies and there is more than one underlying offense, the offense level for the underlying offense is to be determined under the procedures set forth in Application Note 3 of the Commentary to §1B1.5 (Interpretation of References to Other Offense Guidelines)"); USSG §1B1.5, app. Note 3 ("Where there is more than one such other offense, the most serious such offense (or group of closely related offenses in the case of offenses that would be grouped together under USSG §3D1.2(d)) is to be used").  Therefore, to determine which count to use as the "underlying offense from which the laundered funds were derived" (USSG §2S1.1(a)(1)), the Court must determine which underlying offense has the highest offense level.

Bank fraud carries a base offense level of 7, which is increased by the amount of "loss."  USSG §2B1.1(a)(1).  Conspiracy to violate IEEPA has a base offense level of 26, without reference to "loss."  USSG §2M5.1(a).  Since, as described below, there is no "loss" in this case, Count Two, the conspiracy to commit an IEEPA violation, is the "most serious" offense because it contains the highest offense level.  Therefore, Count Two should be applied as "[t]he offense

level for the underlying offense from which the laundered funds were derived."   USSG §2S1.1(a)(1).

### 1.     There Was no "Actual Loss" in this Case

"Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  USSG §2B1.1, app. Note 3(A)(i).  "Pecuniary harm" is a harm that is "monetary or that otherwise is readily measurable in money."   USSG §2B1.1, n.3(A)(iii).   The Guidelines commentary is clear that "non-economic harm" does not count.   USSG §2B1.1, n.3(A)(iii). Accordingly, in order for a loss enhancement to be assessed, the government must show, and be able to quantify, an economic harm caused by the bank fraud.  The government cannot make such a showing in this case.  The fact that this particular set of bank frauds may have caused injury to American foreign policy objectives or interests simply does not generate a loss under USSG §2B1.1.

Indeed, there is no evidence of any "actual loss" of the pecuniary kind.  First, the "victims" of the criminal conduct alleged in Counts Three and Four were a number of American banks that qualify as "financial institutions."  Bank fraud under 18 U.S.C. §1344 covers only offenses against a "financial institution," which is defined under 18 U.S.C. §20 to include (essentially) federally insured domestic banks and U.S. branches of foreign banks.  It does not cover foreign banks.

Second, the bank fraud in this case was that the "victim" U.S. banks were induced by express or implied misrepresentations or omissions to process transactions that were prohibited under the Iranian sanctions regime.  Those transactions, in the main, were currency exchange transactions where foreign currency was converted into dollars.  There is no allegation, and certainly no proof, that any alleged "victim" bank lost any money on those transactions, or that they lost any money at all as a result of Hakan's conduct or the conduct of his co-conspirators.

11

Indeed, so far as is known, all of the banks made money in the form of commissions on all the subject transactions.

Accordingly, the Court should find that there was no "actual loss" in this case.

### 2.      There Was No "Intended Loss" in this Case

Nor is there any evidence in this case of an "intended loss."  An intended loss can only be found if there is sufficient evidence to show that the defendant subjectively and purposefully intended to cause a specific pecuniary harm.  The leading case on the subject is *United States v. Manatau*, 647 F.3d 1048 (10th Cir. 2011), in which the court expressly repudiated the notion that intended loss means anything other than "a loss the defendant *purposely* sought to inflict."  *Id.* at 1050 (emphasis in original).  The Tenth Circuit went on to observe that, "'[i]ntended loss' does not mean a result that the defendant merely *knew* would result from his scheme or a loss he might have *possibly and potentially* contemplated." *Id.* (emphasis in original).  Indeed, in its Reason for Amendment, the Commission expressly adopted the Tenth Circuit's approach in *Manatau*. U.S. Sentencing Commission, Amendments to the Guidelines 27 (April 30, 2015). Accordingly, the USSG now provides that, "intended loss means the pecuniary harm that the defendant purposely sought to inflict."  USSG §2B1.1, app. Note 3(A)(iii) (2015).  In other words, "intended loss" is limited to economic harm the defendant subjectively desired to cause.

Taking the evidence in the light most favorable to the government, it can be read to show that Hakan and others involved in the scheme intended U.S. banks to process funds that, because they derived from Iranian sources, the banks could not have legally processed.  But all of those transactions would be undertaken by the alleged "victim" U.S. banks with the expectation of earning money by facilitating them, and the intention of Hakan would therefore necessarily have been that the U.S. banks *gain* and not lose money.

### 3.      "Gain" is Not an Appropriate Measure of Loss in this Case

In some cases, "gain" to the defendant can be used as a measurement of "loss." However, the Guidelines are explicit in declaring that gain may be used as an alternative measure of loss "*only if there is a loss* but it reasonably cannot be measured." U.S.S.G. §2B1.1, app. Note 3(B) (emphasis added).  In short, unless there was an "actual loss," meaning a pecuniary harm suffered by a victim which was specifically caused by the defendant, gain may not be substituted for loss.  Many opinions have affirmed this point.  *See, e.g.*, *United States v. Zangari*, 677 F.3d 86, 90 (2d Cir. 2012) ("Application Note 3(B) to Guideline 2B1.1, . . . allows a sentencing court to 'use to gain that resulted from the offenses as an alternative measure of loss only if there is a loss, but it cannot be reasonably determined,'"): *United States v. Robie*, 166 F.3d 444, 455 (2d Cir. 1999) (in a prosecution for stealing U.S. Postal Service property, the defendant argued that the U.S. Postal Service "suffered no economic loss because it would have destroyed" the property had the defendant not stolen it.  The district court applied the value of the stolen property as a "loss."  The Second Circuit remanded for resentencing, holding that, "if there was no economic loss to the Postal Service, there was no 'loss' for Guidelines purposes," "'[g]ain is only an alternative measure of some actual, probable, or intended loss; it is not a proxy for loss where there is none,'" and "'where there is no evidence of financial loss, sentencing enhancement based on defendant's gain is not appropriate.'") (internal citations omitted); *see also United States v. Galloway*, 509 F.3d 1246, 1253 (10th Cir. 2007).

Inasmuch as there is no evidence of an actual loss in this case, "gain" may not be substituted as a measure of loss.  Moreover, the evidence at trial conclusively confirmed that Hakan did not receive any monetary gain from the conduct that formed the basis of his conviction.

13

4.   **The Total Offense Level for the Bank Fraud Convictions is No Greater than 12**

Because there is no evidence of an actual or intended pecuniary loss in this case, the total offense level for the bank fraud counts (Counts Three and Four) is, at most, 12.  The base offense level for these offenses under USSG §2B1.1(a)(1) is 7, because these offenses carry statutory maximum sentences of 20 years or more.  Absent a loss enhancement under USSG §2B1.1(b), the only other possible enhancing specific offense characteristic would be USSG §2B1.10, customarily referred to as the "sophisticated means" enhancement.  Hakan disputes the applicability of this enhancement, but even if applied, it would merely increase the base offense level of 7 to 12.  Therefore, the proper total offense level for the bank fraud counts in this case is either 7 or 12, but in any event, it is less than the offense level for Count Two, the conspiracy to violate IEEPA, which has a base offense level of 26.

5.   **The Proper Base Offense Level for 2S1.1 in this Case is Determined by the Total Offense Level for the Counts Involving Violations of the Iranian Sanctions Regime**

Counts One and Two, the *Klein* conspiracy and the conspiracy to violate IEEPA, are the counts with the highest offense levels.  The *Klein* conspiracy is merely a more general charge of violating the sanctions regime, and both should therefore be calculated under USSG §2M5.1.

The proper Guidelines calculation for these offenses is as follows.  Per the Guidelines offense table, U.S.S.G. App. A, violations of IEEPA, 50 USC §1705 (the penalty section) are to be sentenced under the most factually applicable of the following guidelines – USSG §2M5.1, §2M5.2, or §2M5.3.  Section 2M5.1 deals expressly with "Financial Transactions with Countries Supporting International Terrorism."  (The other two 2M5 sections are inapplicable.)  USSG 2M5.1(a)(1) specifies a base offense level of 26 in a case involving "a financial transaction with a country supporting international terrorism" (a designation received by Iran).  There are no

14

specific offense characteristics that can produce a total offense level higher than 26. Hence, the total offense level for Counts One and Two is 26.

Because the offense level for the conspiracy to violate IEEPA under USSG §2M5.1 is 26, and the offense level for the bank fraud counts under USSG §2B1.1 is, at most, 12, the "underlying offense from which the laundered funds were derived" should be the IEEPA count. USSG 2S1.1(a)(1). Therefore, the base offense level for the money laundering count (Count Six) under 2S1.1(a)(1) is **26**. Finally, because the money laundering conspiracy conviction was under 18 U.S.C. §1956, 2 levels are added to the base offense level of 26, resulting in an offense level of 28. *See* USSG §2S1.1(b)(2)(B).

### C.    Mitigating Role Reduction

The government's evidence demonstrated that Hakan was, at best, a "minor" participant. As such, a two point reduction in the offense level under USSG §3B1.2 is warranted.

Under USSG §3B1.2, the Court may reduce the offense level by two levels for "minor" participants in criminal conduct. USSG §3B1.2. The Guidelines provide that "[i]f the defendant was a minor participant in any criminal activity, decrease by 2 levels." USSG §3B1.2(b). A "minor participant" is "any participant who is less culpable than most other participants, but whose role could not be described as 'minimal.'" *United States v. Friedman*, 998 F.2d 53, 60 (2d Cir. 1993) (citing USSG §3B1.2(b)). "Minor participants fall somewhere between minimal participants and ordinary ones." *Id.*

The level of mitigation under this subsection is based "on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular cases," and the commentary sets forth a variety of factors to consider in determining whether a defendant is entitled to a mitigating role reduction. USSG §3B1.2, Practice Commentary, n. 3(C). The Court is required to consider the factors contained in USSG §3B1.2,

Practice Commentary, n. 3(C).  *United States v. Soborski*, 708 F. App'x 6, 14 (2d Cir. 2017) (reversing and remanding for consideration of the mitigating role reduction factors).  "A defendant with an essential or indispensable role may still receive a role reduction if he or she was 'substantially less culpable than the average participant in the criminal activity.'"  *Id.* at 11. Following a Circuit split as to whether the "substantially less culpable" factor was to be compared to co-conspirators or other unrelated defendants convicted of similar crimes, in 2015 the Sentencing Commission determined that the culpability metric should be compared to co-conspirators.  *Id.* at 11 (citing USSG. App. C, amend. 794 (amending USSG §3B1.2 cmt. n.3(C)).  "The Commission stated that it added the words 'in the criminal activity' because it favored the . . . interpretation, under which 'the defendant's relative culpability is determined only by reference to his or her co-participants in the case at hand.'"  *Id.*  Therefore, Hakan's relatively minor role should be compared to the roles played by the other participants, including Zarrab.

Hakan's minor role was a recurring evidentiary theme at trial, especially throughout the testimony of the government's two principal witnesses – Reza Zarrab and Huseyin Korkmaz. Hakan may have been one of the Deputy General Managers at the Bank, but his role in this scheme could only be considered minor, especially in comparison to the other participants.

Hakan never asked for any bribes, received any bribes, knew of anyone being bribed, paid any bribes, or shared in any of the fruits of the scheme.  *See* USSG §3B1.2, Practice Commentary, n. 3(C)(v) ("the degree to which the defendant stands to benefit from the criminal activity"); (12/13/17 Tr. at 1748 (Korkmaz cross) ("He did not receive any bribes."); 12/5/17 Tr. at 778 (Zarrab cross) ("I have never paid bribes to Mr. Hakan Atilla, ever . . . Hakan Atilla has

never requested any money from me, ever."); 12/19/17 Tr. at 2333-34 (government rebuttal summation acknowledging that Hakan did not receive bribes).

Importantly, Hakan also had very little exposure, knowledge or participation in Zarrab's overarching scheme. *See* USSG §3B1.2, Practice Commentary, n. 3(C)(i) ("the degree to which defendant understood the scope and structure of the criminal activity"); (USSG §3B1.2, Practice Commentary, n. 3(C)(iv) ("nature and extent of the defendant's participation in the commission of the criminal activity"). Hakan was only on a tiny number of telephone calls with Zarrab compared to the huge number of text messages, calls and overall level of interaction between Zarrab and Hakan's supervisor, the General Manager at the Bank, as well as between Zarrab and the other participants. There was only *one* email between Hakan and Zarrab, with no response and no evidence it was ever read. There is no evidence that Hakan ever directed Zarrab, or anyone else involved in the scheme.

Similarly, Zarrab testified that he never told Hakan about "the procedure that happens within Iran," or about the commercial relationships between entities like Sarmayeh Bank and the Government of Iran. 12/6/17 Tr. at 884 (Zarrab cross). Zarrab also testified that he repeatedly lied to Hakan about the scheme. 12/6/17 Tr. at 895, 12/7/17 Tr. at 1002 (Zarrab cross). Former Turkish police officer Huseyin Korkmaz testified that his lengthy and far-reaching investigation had found very little evidence of Hakan's involvement. 12/15/17 Tr. at 1967 (Court's ruling denying mistrial motion). Korkmaz "never saw or spoke to Mr. Atilla," "photos from surveillance did not include Mr. Atilla, and . . . money depicted in other photos did not come from or go to Mr. Atilla." 12/15/17 Tr. at 1968 (Court's ruling denying mistrial motion); 12/13/17 Tr. at 1739-42, 1745-46 (Korkmaz cross) (asking Korkmaz about a series of pictures of cash and surveillance photos shown to him during his direct examination, and Korkmaz

17

testifying that Hakan had not paid or received any of the cash depicted, nor was he in any of the surveillance photos (GX 105, 106, 970-14, 971-15, 971-16, 971-71, 971-78, 971-79)); 12/13/17 Tr. at 1746 (Korkmaz cross) (agreeing that "there are no surveillance photos or videos that depict Mr. Atilla at all."); 12/14/17 Tr. at 1776 (Korkmaz cross) (there were over thirty videos taken during the course of the investigation and Hakan was not in any of them); 12/13/17 Tr. at 1747-48 (no evidence from Korkmaz' investigation that Hakan had met with Zarrab or Zarrab's right-hand man Abdullah Happani).

Ultimately, Zarrab and others were the leaders, organizers and decision-makers, not Hakan.   USSG §3B1.2, Practice Commentary, n. 3(C)(iv) ("decision-making authority"). Korkmaz described his investigation as "an investigation on Reza Zarrab and his organization as the nucleus of the organization."  12/11/17 Tr. at 1287 (Korkmaz direct); *see also* 12/11/17 Tr. at 1280 (Korkmaz direct) (identifying five other people (but not Hakan) as "principal members or leaders" of groups under investigation).

Hakan's involvement in the scheme was also relatively short lived, particularly compared to the many years of Zarrab's involvement.   There is no evidence that Hakan ever ordered anyone to do anything; by contrast, Zarrab testified (and the government argued in summation) that Hakan's General Manager had ordered him to "do this job."  11/30/17 Tr. at 512 (Zarrab direct).

Even crediting the evidence presented by the government at trial, and drawing all inferences in its favor, the evidence as a whole establishes that Hakan was only a "minor" participant in Zarrab's scheme for the following additional reasons:

1.    Although Indictment S4 alleges that the conspiracies and substantive crimes occurred "[f]rom at least in or about 2010, up to and including in or about 2015" (Indict. S4, ¶¶ 86, 89, 92, 94 and 99), Hakan did not join the scheme until much later than 2010, and certainly not before October 2012.

2.  The evidence showed that, in sharp contrast to Zarrab's voluminous contacts with other conspirators, Zarrab had almost no contact with Hakan.  Other than his colleagues at the Bank, Hakan had virtually no contact with any other conspirators.  There were thousands of text messages between Zarrab and his cohorts; there were NONE between Zarrab and Hakan.  *See* 12/5/17 Tr. at 780-81; GX 1002-T, GX 1004-T.  There were many emails between and among Zarrab and the other conspirators, but none with Hakan (except one, unanswered, that was never shown to have been opened or read).

3.  Zarrab clearly did not think of Hakan as a significant participant, illustrated by the fact that he repeatedly lied to Hakan,  including on April 10, 2013 in a recorded call.  12/6/17 Tr. at 895.

4.  There were no payments or bribes to Hakan.  12/5/17 Tr. at 778.

5.  A July 9, 2013 recording between Zarrab and Happani makes it clear that Hakan was an outsider.  12/7/17 Tr. at 981-82 (Zarrab cross) (discussion about not telling Hakan that they had spoken with the General Manager because they did not want Hakan to know they had someone on the inside at the Bank).

6.  Hakan gave no orders or directions to anyone in these schemes.

7.  Hakan did not act on his own to help carry out the scheme.  Rather, as the Government theorized from both the recordings and testimony, Hakan took instructions directly from the General Manager.  In fact, there is evidence that Hakan was an obstacle to Zarrab's plans.  GX 297-T (4/10/13 call in which Zarrab tells Happani that Atilla "threw a wrench in the gears"); 11/30/17 Tr. at 512 ("Hakan Atilla was not open to this idea for it to be conducted.") (Zarrab direct); 12/1/17 Tr. at 554 ("I'm telling Abdullah Happani that Hakan Atilla was blocking this, he was throwing a wrench in the gears.").

8.  Zarrab did not have Hakan's phone numbers or contact information in his phones or on his contact lists.  12/5/17 Tr. at 779.  Conversely, Hakan did not have Zarrab's information in his phone either.

9.  Hakan never met with Zarrab outside of the Bank.  12/18/17 Tr. at 2039-40.  Zarrab testified that he met Hakan perhaps a "handful" of times.  12/5/17 Tr. at 786.  They did not socialize at all.  Zarrab even testified that he knew Hakan did not like him.  12/5/17 Tr. at 778-79.

10. When Zarrab was released from prison in March 2014, he did not reach out for Hakan - rather, he approached the new General Manager at the bank, someone previously unknown to him.

For the foregoing reasons, Hakan is entitled to  a two point offense level reduction because he was a "minor" participant under USSG §3B1.2.

19

### D.     Conspiracy Reduction

Under USSG §2X1.1(b)(2), "if a conspiracy, decrease by 3 levels, unless the defendant or a co-conspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense . . ." Hakan was acquitted of the substantive money laundering count, and the Guidelines Range is calculated under the conspiracy to commit money laundering count. It thus appears that the jury's verdict reflects that Hakan had not "completed all the acts" necessary for the substantive count of money laundering. Therefore, a three offense level reduction under USSG §2X1.1(b)(2) is appropriate.

### E.     Hakan's Offense Level is Level 23

Based upon the foregoing analysis, Hakan's offense level should be 23, resulting in a Guidelines Range of 46 to 57 months.

## III.    THE FACTORS SET FORTH IN §3553(A) ESTABLISH THAT A NON-GUIDELINES SENTENCE IS APPROPRIATE

### A.     The Court Can, and Should, Impose a Non-Guidelines Sentence

The law is clear that this Court, in making its "individualized assessment" of the defendant, must consider all the facts and circumstances in fashioning a sentence which meets §3553(a)'s express mandate of imposing a sentence that is "sufficient, but not greater than necessary" to meet the purposes imposed by law. These facts and circumstances include: Hakan's arrest and incarceration; his alien status and resultant disparate treatment by the Bureau of Prisons while in custody; and his prior good life and exemplary conduct. We submit that these §3553(a) factors militate heavily in favor of a non-Guidelines sentence. The Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995).

The Sentencing Guidelines calculation for Hakan in the draft PSR of "life" is not only draconian, it is barbaric.  Even the Guidelines Range that we have determined is correct – 46 to 57 months – overstates Hakan's culpability given his minor role in Zarrab's schemes.  Therefore, as explained in Section I above, and, in particular, when considering the factors set forth in §3553(a), without question, a non-Guidelines sentence is the appropriate sentence for Hakan.

**B.     A Consideration of the §3553(a) Factors Confirms that a Non-Guidelines Sentence is Appropriate**

Section 3553(a), entitled "Factors to be Considered in Imposing a Sentence" provides, in pertinent part, as follows:

(a)     The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.

                                    * * *

(2)     the need for the sentence imposed –

(A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)     to afford adequate deterrence to criminal conduct;

(C)     to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

Section 3553(a) continues by stating that, "[t]he court, in determining the particular sentence to be imposed, shall consider" seven separate factors, including those set forth above in §3553(a)(2).  When the Court considers these §3553(a) factors, it is evident that a non-Guidelines sentence is appropriate.

**1.     Section 3553(a)(1), "The Nature and Circumstances" of the Offense and the "Characteristics of the Defendant," Warrants a Non-**

**Guidelines Sentence in this Novel Prosecution of a Banker and Non-U.S. Person for Violations of Sanctions**

**(a)      The Nature of the Offense**

Section 3553(a) instructs sentencing courts to consider a number of factors.  Perhaps the most fundamental are the "nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. §3553(a)(1).   The statute also insists that courts consider "the need for the sentence to reflect the seriousness of the offense" and "to provide just punishment for the offense." 18 U.S.C. §3553(a)(2)(A).   This language embodies a cardinal principle of criminal punishment, that requires proportionality between offense seriousness and the sentence imposed.   *See United States v. Hansen*, 701 F.2d 1078, 1083 (2d Cir 1983) (recognizing that harsh punishment should not be imposed where moral culpability is lacking), cited in *United States v. Singh*, 877 F.3d at 120.   In grading the seriousness of offenses, the criminal law customarily considers two general factors: the harm caused by the offense and the defendant's individual blameworthiness.   JOSHUA DRESSLER, UNDERSTANDING CRIMINAL LAW 112-113, 140 (7th ed. 2015); Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35 IND. L. REV. 5, 77 (2001) ("act, mental state, cause, and harm – are relevant both to the threshold question of criminal liability and to assessing offense seriousness for purposes of assigning appropriate punishment…criminal law is preeminently concerned with blameworthiness.").

The primary factor in grading individual blameworthiness is a defendant's state of mind. *See, e.g., Singh,* 877 F.3d at 120 (remanding for resentencing and holding that "a defendant's motivation for engaging in criminal conduct is unquestionably a proper consideration at sentencing.") (quoting *United States v. Stewart*, 590 F.3d 93, 140-41 (2d Cir. 2009)); *Rita,* 551 U.S. at 364 (describing sentencing as a "unique study" into "human failings").   The simplest

example of the importance of state of mind to the determination of the seriousness of the offense is American homicide law, which is subdivided into multiple degrees of culpability, from first degree murder to criminally negligent homicide, based on differences in the defendant's state of mind. For crimes like fraud, money laundering, or sanctions violations, the relation of a defendant's state of mind to his blameworthiness, and thus to the seriousness of his offense, is more subtle because the statutes governing these offenses do not make formal distinctions between differing states of mind. Nonetheless, the defendant's mental state remains an important consideration in determining his blameworthiness, and thus the seriousness of his offense.

The Sentencing Commission has included some proxy measurements for mental state for white collar offenses (*e.g.*, the sophisticated planning enhancement of the fraud guideline, U.S.S.G. §2B1.1(b)(10); the upward adjustment for abuse of trust, U.S.S.G. §3B1.3; and the downward adjustment for acceptance of responsibility, U.S.S.G. §3E1.1). However, the Guidelines do not capture or quantify all of the factors important in assessing the relevant features of a defendant's state of mind. And some Guidelines, notably those in the U.S.S.G. §2M5 series involving export controls, have no specific offense characteristics relating to mental state. These Guidelines set their offense seriousness score solely in relation to a one-size-fits-all assessment of harm to U.S. foreign policy objectives. In this case, the Court should consider two particular factors bearing on Hakan's state of mind that strongly mitigate his individual blameworthiness, and thus the seriousness of his offense.

> **(i)      Hakan's Turkish Nationality and Lack of Ties to the United States Diminish his Blameworthiness for Violating U.S. Sanctions**

Despite the presence of bank fraud charges among the counts for which Hakan was found guilty, this is not an economic crime case. As previously noted, none of Hakan's activities caused any pecuniary loss to any financial institution or person protected by U.S. bank fraud

statutes.  Rather, the essence of the case is the violation of United States economic sanctions against Iran.  Consequently, any harm caused by Hakan's activities is strictly to U.S. foreign policy objectives.  This fact matters in assessing Hakan's state of mind.

Had this case been one, for example, in which Hakan stole money from others, his behavior would be both morally indefensible and legally prohibited in every country of the world.  As the Latin phrase suggests, it would be *malum in se* – conduct that is bad in itself. However, thwarting the foreign policy objectives of the United States is not self-evidently wrong, at least unless one is a U.S. citizen, lawful resident or other person who has sworn allegiance to the United States.  The law can fairly treat U.S. citizens and others who by birth or conscious choice have aligned themselves with the United States as owing allegiance to this country, or at least owing obedience to its laws.  When persons who owe such allegiance betray it by both breaking the law and undermining U.S. policy, that betrayal renders the offender more culpable and justifies a harsher sentence.  That is why, for example, treason as a crime is chargeable only against someone "owing allegiance to the United States," and carries such a severe sentence.  (18 U.S.C. § 2381)

By contrast, a defendant who is a foreign national and has no ties to the United States through citizenship, residency, or even regular physical presence, cannot fairly be said to owe any allegiance to the U.S.  Thus, in violating laws designed to promote U.S. foreign policy interests, such a person cannot be accused of any betrayal of the allegiance owed to his own country, or even of whatever moral obligation that may arise from the status of guest.  Therefore, a judge assessing the seriousness of the offense committed by such a person should, in fairness, recognize that his mental state is less blameworthy, and that his punishment should therefore be less severe.

It should also be noted that, unlike Zarrab, Hakan is not an Iranian Citizen and had no ties or allegiance to Iran.  The fact is that Hakan was a Turkish banker, living and working in Turkey, who transacted business with banks throughout the world.

> **(ii)    That this is the First Time the United States has ever Prosecuted a Banker for Violations of Sanctions is also Relevant to Hakan's Blameworthiness and the Seriousness of his Offense.**

So far as the defense is aware, this is the first case in which the government has pursued criminal prosecution of a foreign banker for evading or avoiding sanctions.  In a December 6, 2017, letter to the Court, the government admitted that it was prosecuting Hakan including by employing a novel theory of criminal liability involving secondary sanctions that even OFAC had never "confronted," and that runs contrary to OFAC's "historical position."  *United States v. Atilla*, No. 15-cr-867, ECF No. 370. "As such, OFAC has not previously evaluated the applicability of the avoidance prohibitions in the secondary sanctions to the kind of conduct described in the Superseding Indictment."  *Id.*  The government further admitted that "OFAC has told the Government that it has historically taken the position that the prohibitions contemplated by the secondary sanctions – including implementing enforcement actions, levying fines, or taking other punitive measures for violating the prohibitions – attach only after a foreign financial institution has been sanctioned by the Secretary of the Treasury."  (*Id.* at 1-2.)

In short, the government admitted that at least part of its theory of prosecution here is a novel interpretation of the law.  Thus, OFAC's historical practice could not have possibly provided Hakan with any notice that his alleged conduct might constitute an offense subjecting him to personal criminal liability under U.S. law.  Even assuming *arguendo* that the government's unprecedented application of sanctions law in the present case is correct, the

conceded novelty of its theory is relevant to Hakan's mental state, his blameworthiness, and thus, the seriousness of his offense.

The Supreme Court has said that, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Even if the novelty of the government's theory of prosecution does not raise a due process bar to Hakan's conviction, it is certainly relevant to the appropriate quantum of punishment. A court ought to view defendants who are convicted on the basis of novel legal theories never before articulated by the United States as less blameworthy than those given unambiguous notice of the criminality of their proposed conduct. This is especially so where the laws which form the basis for this novel prosecution never have been enforced against a similarly situated U.S. national before, to say nothing of a foreigner who has virtually no contacts with the U.S. Given the lack of notice here, the "nature and circumstances" of the offense, as well as Hakan's status as an alien, warrant a sentence well below the Guidelines Range.

Finally, this Court heard the testimony and is familiar with the evidence introduced at trial. Thus, the Court is aware of Hakan's minor role in Zarrab's schemes, as is discussed above in the "minor role" adjustment section of the Guidelines analysis. He did not benefit; he was not motivated by greed or personal gain. It is undisputed that he was not paid any bribes, and he did not ask for any. He was not motivated by ideology or any allegiance to Iran. He was not part of an "Economic Jihad." Hakan had never even heard that phrase before the charges in this case. 12/15/17 Tr. at 1900-1901. In fact, despite the government's insistence in pleadings and its arguments that this was a case of "Economic Jihad," even Reza Zarrab, the organizer, leader,

architect, and principal beneficiary of the scheme -- as well as the person who admittedly signed the letter which forms the basis of the government's Economic Jihad claim -- testified that he had never heard that term until he was arrested in Florida.  12/7/17 Tr. at 1007-08.

### (b)      Hakan's Background and Characteristics

Hakan Atilla is a devoted family man who, as a result of years of hard work and dedication, rose to a senior executive position at one of Turkey's largest banks.  The conduct that forms the basis for the verdict in this case represents an aberration in an otherwise honest, law-abiding and honorable life and career, lived entirely in Turkey.  The many letters submitted to the Court in support of Hakan paint him as the man he really is: a modest, decent person with genuine compassion for others, an exemplary leader, and a good friend.

Before retiring, both of Hakan's parents worked as civil servants for the Turkish Ministry of Youth & Sports ("TYS"), which is where they met. Hakan was a happy child whose family was close and loving. He often spent time playing outside with friends, many of whom, according to his mother, are still his friends. "He had a wonderful family growing up and that he was a respectful young man who was aware of his responsibilities to his family and to those around him." (letter Orsan Basciftci).  "Hakan was honest, was a leader, was helpful towards others and was a true friend." (letter Murat Atasoy).

Hakan was a very good student, and received many honors certificates in high school. "Hakan was a hardworking and bright student and he was always well-liked both by his teachers and his friends owing to his friendly and calm nature." (letter Ferit Komesli).  Hakan was also very active in sports, playing handball on his high school team, as well as playing handball and basketball on club teams. While in high school, Hakan became a certified lifeguard and a handball referee. "Not only did Hakan finish school with honors, he also earned bronze, silver

and gold lifeguard badges, I saw him save multiple people from drowning, even at the risk of endangering his own life." (letter Harun Sevinc).

After high school, Hakan took the central exam given to all Turkish college applicants which determines where a student matriculates.   Hakan attended Gazi University in Ankara from 1989 to 1993, and he earned a Bachelor's degree in Economics.

In Turkey, banks give written exams to those college graduates seeking a job at the institution. Those who pass the written exams are brought in for interviews, and, if they do well, they are selected for a position. It is not easy to earn such a position.  That is how Hakan was first hired.  Hakan has spent his entire career at Halkbank, starting there in July 1995 as an Assistant Specialist. Hakan's promotions were well deserved and based on merit. "Hakan was promoted because of his motivation, his accumulated knowledge and his strong work ethic." (letter Aycelen Oral Cinici) "He is a living example of the importance of hard work, ambition, honesty and decency in the way of climbing up the career ladder." (letter Asli Erbay).

Hakan is also one of the two managers of the Bank's sports club, which has participated in international events according to Halkbank senior executive Ergin Kaya. The club's primary activity is volleyball and "Hakan played an important role in the successes of the team." (letter Ergin Kaya).

Hakan has strong interests in both nature and animals. "He feeds animals and waters fruit trees so birds can feed on the fruit." (letter Bekir Nejat Taslitepe).  He is also interested in the arts, and one of his favorite hobbies is oil painting. Hakan's paintings decorate his family's apartment. "He loves art and likes to visit the museums, art galleries, art exhibits both on his international and domestic trips. His own paintings decorate our walls and they are worth seeing." (letter Burçin Atilla). "Since my mother is an art teacher and Hakan paints wonderful

pictures, they exchange ideas and share their paintings with each other." (letter Burak Yasun).
He enjoys gardening at his modest summer house near the coast, as well as fishing. "Sometimes
our son or I accompany him in our small row boat and we all enjoy the peaceful time we spend
fishing. Hakan loves gardening, watering the lawn and the flower beds and trimming and taking
care of our trees." (letter Burçin Atilla).

**(i)     Hakan's Character**

Hakan was born on October 25, 1970, in Ankara, Turkey, to Mehmet Işik Atilla, now
aged 74, and Ayse (Alptekin) Atilla, age 70.  Hakan's parents have been married for 49 years;
they are retired and now live in a small village in Turkey. Hakan has a 39-year-old sister, Arzu
Eralp, who lives in a large Turkish city with her husband, Devrim, and young daughter. Arzu is a
primary school teacher.

Hakan has been married to Burçin (Yasun) Atilla, age 46, since September 3, 1995.  They
met as students at Gazi University in Ankara, and have been together for 26 years.  They have
one child, Burkan, who is 20-years-old and attends one of the finest and most prestigious private
universities in Turkey, on a one-half scholarship.  Burkan is in his third year and is majoring in
International Relations. Hakan lives with his wife and son in a modest 3-bedroom apartment,
which they own, in the Atasehir District of Istanbul.  Hakan has never before been charged with
a crime, a bank regulatory violation, or any ethical lapse of any sort.

As the letters to the Court which accompany this submission amply demonstrate, Hakan
is beloved and esteemed both within and outside of his immediate family. He is a soulmate for
his wife, a role model for his son, a second father to his younger sister, and a source of immense
pride and support for his elderly parents. The letters from the people who are closest to him

29

reveal in heartbreaking detail how Hakan's continuing absence from their lives over the past year has devastated them.

Hakan's wife Burçin sums up Hakan as a husband and father in a few loving words. He is someone who has consistently made her "feel beautiful and special," and "would think of us even more than we thought of ourselves and would do what is best for us." The letter from Burkan echoes his mother's love and admiration for Hakan. His father, says Burkan, is his "mentor and role model." He has "never seen a more kind-hearted, honest, faithful, gentle, intelligent, honorable, and successful man than him." Burkan emphasizes that his father has instilled in him "a strong[ ] sense of social consciousness." For these reasons and many others, Burkan says, "[m]y dad is my hero." In like fashion, Hakan's sister Arzu calls him "the most special person in my life," and reminisces about how, when the two of them were little, Hakan "would save up some of his pocket money . . . to buy me presents."

Hakan's proud parents also tell how important Hakan has been in their lives. His father Mehmet Işik writes of how Hakan "has never once disrespected or been unhelpful towards us, he has a loyal personality." His mother Ayse, a 70-year-old cancer survivor, says that her friends and acquaintances tell her that they "wish [they] had children like yours rather than wealth." Both of his parents lament his continuing absence from their lives, with his mother reporting that, with Hakan in jail in the United States, "I am also alone … in my own prison here in Turkey."

The letters to the Court also speak of Hakan's unfailing sense of social responsibility and altruism. Hakan is someone who, during evening walks in London, "would always give money to every person sleeping rough on the streets" [Letter of Taner Akcesme]; who always treated lower-level employees at the Bank with "respect and love" [Letter of Ismail Sami Zengin]; who,

when a cousin's father underwent a 13-hour operation in Istanbul, "stayed with us throughout the process . . ." and "even gave us the keys to his apartment in case we needed it" [Letter of Okan Atilla]; who is "both financially and emotionally active in organizations that support the homeless children, the elderly and the weak" [Letter of Nurettin Turgay Tamer]; who helped his cleaning lady financially by "contributing to her family's heating and kitchen expenses" and buying "school stationery for her children who were at school" [Letter of Fatma Cicek Utku]; who, on the day of the funeral of a close friend's father, "stayed and comforted [the friend] from the early hours of the morning till the day's end" [Letter of Bulent Sezgin]; who persuaded the Bank to transfer a fellow worker to its Cologne office when the worker's son contracted a pediatric cancer that could best be treated there [Letter of Arzu Ozisbakan]; who provided critical support to a destitute food services worker at the Bank when her husband was incarcerated [Letter of Saadet Demircan]; who was consistently attentive to and sensitive of the needs of children; and who performed the many other acts of kindness and charity enumerated in the letters submitted to the Court.

The Mehmet Hakan Atilla depicted in these letters is the same person who was on trial before the Court. His humanity and his goodness, which the letters describe in detail, may be extraneous to the question of his guilt or innocence. They are, nonetheless, a critical factor in his sentencing, where the Court is required to consider his entire person, including his character and background, in fashioning an appropriate sentence.

### (ii)      Hakan Lives Modestly

In spite of his senior position at the Bank, Hakan is modestly compensated and lives quite modestly.  He is a simple man.  As his colleague Nazmi Bagdinli notes, "[t]he family has a modest lifestyle, they are moderate people.  I have never seen them living a luxurious life."

Hakan's colleague Recep Gülec confirms his "humble life style."   Moreover, Halk Invest
General Manager Serdar Sürer explains that,

> He had established his stance in society with the respect that he gets and his
> beliefs rather than his position, money or other materialistic values.  It is well
> known that he is devoted to his family.  He leads a modest life which is contrary
> to his status at work and he indicates that he is content with his life at every
> opportunity.

Even Hakan's plans for retirement are modest.  As his wife Burçin explains, "[w]e all
have dreams, after seeing our son graduate from the university, we would have liked to settle
down in a small village and raise chicken, goats, have fruit trees, grow vegetables; we would
have liked to gather our whole family around a big table in our small village house."

### (iii)    The Conduct for Which Hakan was Convicted is Aberrational

That the conduct for which Hakan was convicted in this case was an aberration in an
otherwise honest, law-abiding and successful life is echoed by many: in his family, by his friends
and by colleagues.

Hakan's close friend Murat Atasoy sums it up well: "Everyone who knows him is very
sad about the situation he is in…everyone he knew never imagined that such a thing would
happen to him… [T]his situation is neither a reflection on his past life nor his future life."
Hakan's colleague Taner Akcesme, while acknowledging Hakan's conviction, notes that, "I
simply cannot imagine that Hakan is capable of committing any crime at all.  It is not in his
character to do such a thing."  Hakan's colleague Huri Dilara Sayin put it another way: "The
accusations against Mr. Atilla have shocked us, as well as anyone else who knows him."  As his
colleague Mustafa Özkan explains, "[s]eeing M. Hakan Atilla's name together with some
concepts of crime has been a source of great sadness not only for me but for many people.  The
word crime and M. Hakan Atilla's name certainly do not go together and their use in the same
sentence in fact seems unreal."   Finally, Hakan's assistant Elif Aydin also finds what has

happened to Hakan to be incomprehensible: "How could a person who is so kind, so benevolent and honest ever be in such a situation?  I cannot wrap my head around it."

### (iv)    Hakan is Very Close to His Family, and They Strongly Support Him

Hakan is extremely close with both his immediate and his extended family, including his wife, son, parents, sister and in-laws.  Hakan's wife Burçin describes in her letter why he has been, and always will be, the love of her life.  Additionally, as Burkan says, no one can replace Hakan as Burkan's father: "If I were given the chance to choose my father all over again I would have."

Hakan is not only close to his parents, as they explain in their letters.  He is also close to his other relatives.  As his mother writes, he cares about his relatives and visits them.  Hakan visits his uncle in Izmir who is paralyzed; visits his nephew at his school in Izmir; and he helps his uncle in Alanya.

Hakan's mother-in-law Bilge Yasun also describes him in glowing terms:

Hakan Atilla is a very precious member and part of our family.  There is no difference whatsoever between him and my own son.  He is extremely respectful and affectionate towards us.  He never neglected celebrating all our special days; in which we celebrate them almost all together.

Hakan is a very caring person.  He has always helped those in need.

One of Hakan's brother-in-laws, Burak Yasun, describes him as being "closer to me than my own brother," explains that "everyone in our family relies on him," and indicates that he is the "'backbone of our family.'"  Mr. Yasun notes that, "Hakan…is the source of joy and liveliness to our family.  He is loved by young and old, by everyone in our family."  Mr. Yasun also explains that Hakan has been his role model for the last 27 years, and why.  Hakan taught Mr. Yasun how to swim.  He also helped Mr. Yasun pass his macro and micro-economics courses, which were very difficult for him to understand, by tutoring him.

> **(v)      Hakan's Incarceration Since March 27, 2017 has Completely Devastated His Family**

Hakan has been incarcerated since his arrest on March 27, 2017.  The effect that Hakan's incarceration has had on his family is both profound and devastating.

Since Hakan's detention, his wife has been able to come to the United States only twice, and during those visits she was able to see him at the MCC only a few times, as there is only one social visiting period each week for one hour, (which can be extended by permission by managers for up to another two hours), and even those few opportunities have been plagued by lockdowns and weather-related issues at the MCC that have forced cancellation of some social visits.  Hakan's son was able to come to the United States only once, in October 2017, and could see his father only once during his short 2-day visit.  Hakan's elderly and frail parents, and his sister, have not been able to visit him at all.

Hakan tries to read and stay physically active, but there are limited opportunities for mental or physical engagement at the MCC, and his situation is compounded because he does not share a common language with almost all of the people with whom he interacts.  Nevertheless, Hakan has been a model prisoner.  As noted in ¶13 of the draft PSR,

> According to a BOP SENTRY report dated January 30, 2018, the defendant has incurred no disciplinary action while in their custody.  He has received a positive progress report from his unit team leader, which states that he is a diligent worker and shows positive leadership among his peers.

Hakan has also received "outstanding" performance reviews for his work as a unit orderly.  (*Id.*, ¶111).

> **(vi)     Physical and Mental Health**

Hakan has Type 2 diabetes, for which he takes daily medication, and he has modified his diet.

# REDACTED

### 2.    Section 3553(a)(2) – A Sufficient Sentence

As noted, §3553(a)(2) requires that the sentence be "sufficient, but not greater than necessary":

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

A non-Guidelines sentence meets these standards; lenghty incarceration is simply not necessary to further these goals.

**(a)     Section 3553(a)(2)(A)**

Section 3553(a)(2)(A) requires that the sentence reflect how serious the offense is, promote respect for lawful conduct, and result in a "just punishment."  A non-Guidelines sentence will further these goals in this admittedly serious matter.

Hakan has now spent 12 months in detention, more than 5,000 miles from his wife, his only son, his aging parents, his family and friends.  The life he has built over the last 47 years is behind him.  The Court is no doubt aware of the serious difficulties imposed on every defendant preparing for trial, as well as the generally difficult circumstances of incarceration.  Detention is painful for every prisoner, but the past 12 months have been especially difficult for Hakan.

His life, as he knew it before March 27, 2017, is over.  His career lies in ruins.  Like all prisoners, he is separated from family and friends; he has lost any sense of privacy and even his sense of personal dignity has suffered as everything he does every day and every moment of the day is ruled by others; every day is filled with uncertainly and anxiety about his fate.  To make matters worse, Hakan is a Turkish citizen without family, friends or peers in a strange and foreign country with a different language and culture.

While Hakan has a working knowledge of English, he is still isolated by language and culture.  The American legal system has been a mystery to him.  Except for the few family visits described above, he has had virtually no visitors except lawyers.  The absence of family has been especially difficult.  Hakan's family lacks the resources to travel regularly back and forth between Turkey and the United States.  His parents are elderly, which makes travel improbable if not impossible.  As the Court knows and can see from the letters, Hakan is devoted to his family.  He has seen his 20-year-old son only once since his arrest, for one two and a half hour visit at the MCC (which had been extended by the MCC).  He was not able to see his wife at all for the first ten months of his detention.  She has been here twice.  As noted, visits at MCC are permitted

only once a week for one hour (with possible extensions by managers up to two hours), and two of her planned weekly visits with Hakan were cancelled while she was here due to the weather. Hakan has not seen his parents or sister at all.  His friends and colleagues are all in Turkey. <sup>REDACTED</sup>

REDACTED

REDACTED

REDACTED

Despite these struggles, Hakan has been a model inmate, causing no problems and not breaking any rules.  (Draft PSR ¶¶13, 111, noting that Hakan has not been subject to any disciplinary action, and received a positive progress report from his unit team manager.)

Hakan has been punished in yet other ways.  There is also no doubt that the banking world recognizes that this is a serious matter.  This case has received worldwide publicity. Hakan's post-arrest video containing sensitive personal information was made public as a trial exhibit and was thereafter posted on YouTube, resulting in harassing calls to his wife at their home in Turkey.  Hakan was a well-known, respected international banker.  Hakan's arrest, detention and present circumstances certainly have sent shock waves to bankers overseas that they are at risk of prosecution by the U.S. government.  That message has already been heard loud and clear.

The Court should also consider that Hakan has effectively lost his career and will likely lose his income, with the attendant problems of supporting his family.  In the Second Circuit, these "collateral consequences" are appropriate to consider at sentencing.  *See U.S. v. Stewart*, 590 F.3d 93 (2d Cir. 2009), where the Second Circuit affirmed a sentence of 20 months given by the district court, despite a Guidelines range of 78 to 97 months, because, in part, the "conviction made it doubtful that the defendant could pursue his career as an academic or translator, and

therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." *Id*. at 141; *see also United States v. Anderson*, 533 F.3d 623, 633-34 (8th Cir. 2008) (affirming downward variance based on "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system"); *see also United States v. Ferreira*, 239 F. Supp. 2d 849, 857 (E.D. Wis. 2002).

### (b)      Section 3553(a)(2)(B)

### (i)      Specific Deterrence

Section 3553(a)(2)(B) requires that a sentence adequately deter criminal conduct.  A lenient sentence would still satisfy the considerations of specific and general deterrence.  First, Hakan will never commit any other crime.  Plainly, he will never be in a position to commit another crime involving banking or the foreign policy interests of the United States.  Until the time Hakan was arrested here in the United States, he was a highly respected member of his community, the banking community in Istanbul, and indeed, the international banking community.  His prior record is unblemished; he has never been charged with a crime or disciplined by a regulator. That has all changed; his reputation is in shatters, and he is a pariah in the banking community.

Following his release from custody, Hakan will be deported immediately to Turkey where there is virtually no prospect of Hakan ever again working in international banking.  He will never be permitted to return to the United States.  As a result of his conviction, he doubtlessly will be subject to American sanctions, effectively precluding him from working for any large bank.  He will either have no job in the banking sector or one that involves strictly

local banking. The prospect that he could commit the kind of crime for which he stands convicted, or any comparable crime, is nonexistent.

Even prior to the Supreme Court's landmark decision in *United States v. Booker*, 543 U.S. 220 (2005), the destruction of a defendant's livelihood was an element to be considered in determining whether the defendant was entitled to a downward departure under the Sentencing Guidelines. Pre-*Booker*, a court could depart downward where a defendant's business had been destroyed, preventing re-entry into criminal life. *See United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993) (downward departure where defendant EPA tester's livelihood was destroyed and he could not re-enter the testing profession, preventing him from possibly engaging in additional criminal activity). The *Gaind* court further declared:

> Because of the destruction of the defendant's . . . business, the necessity for achieving the purposes of sentencing through sentencing itself [i.e., prison time] has been reduced."

*Id.* Post-*Booker*, many of the factors that used to be possible grounds for a departure under the Guidelines can now be considered by the district court, with greater latitude, under 18 U.S.C. §3553(a). *See, e.g., United States v. McBride*, 434 F.3d 470, 476-77 (6th Cir. 2006); *United States v. Mickelson*, 433 F.3d 1050, 1055 (8th Cir. 2006).

Hakan's shattered career and consequent bleak economic prospects constitute an important factor in this Court's 18 U.S.C. § 3553(a)(2)(B) analysis of the adequacy of deterrence. *United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412 (E.D.N.Y. 2002), is a pre-*Booker* case decided by Judge Weinstein. There, the defendant, who had been in the jewelry and rare metals business in Panama before her conviction for money laundering, had seen her business seized and her assets forfeited pursuant to her plea agreement. The court's sentence of the defendant, a citizen of Israel and domiciliary of Panama, prohibited her from engaging in the

jewelry or rare metals business during her term of supervised release, which she was allowed to serve abroad.

Judge Weinstein found that the economic wreckage in which the defendant was mired entitled her to a downward departure under the Guidelines, because "[t]he purposes of the Guidelines, protection of the public and deterrence of crime, are independently met through the destruction of the defendant's business," even though she was "not barred permanently by a licensing or other like inhibition as was the Gaind defendant." *Speed Joyeros*, 204 F. Supp. 2d at 440. Furthermore, Judge Weinstein noted the condition of the defendant's supervised release barring her from engaging in the trading of precious metals, despite the fact that she faced prompt deportation upon her release from incarceration. Citing the future prohibition against her conduct of that business, he declared:

> This sufficiently prevents future criminal activity which depended in the past on her large international financial transactions. The fact that she will probably be promptly deported and thus unsupervised during her term of "supervised release" does not lift the court imposed inhibitions; the court may consider the defendant's background in concluding that she is unlikely to violate her supervised release terms.

*Speed Joyeros*, 204 F. Supp. 2d at 440-441.

Here, Hakan's financial prospects in the only line of work he has ever known similarly lie in tatters. His career as an international banker is finished. His future opportunity to violate American sanctions on Iran, if any such sanctions still exist (or are reinstated by the time of his release), is nonexistent. Regardless of whether this Court requires that he refrain from such banking endeavors, as a condition of supervised release, there is no reasonable likelihood he could ever do so again. His arrest and conviction have created circumstances that will effectively preclude him from future criminal activity in connection with violating U.S.

sanctions, even if there was any indication (and we submit there is none) that he would be involved in any such future criminal activity.

### (ii)   General Deterrence

As for general deterrence, the fact that the United States government has brought this prosecution – a case of first impression against a foreign banker whose entire business career was centered in Turkey – has been heard around the world.  The prosecution, in itself, will doubtless have a substantial impact on foreign bankers who will be deterred from misconduct by Hakan's sudden arrest and detention, and the obvious long-arm of U.S. law enforcement authorities.  Similarly, any American banker contemplating violating U.S. sanctions will be deterred because, unlike in the past, a banker has now been prosecuted for sanctions violations.  As discussed *supra*, no longer can any banker anywhere, U.S. or foreign, believe that any sanctions violations will result merely in turning the other cheek with a financial penalty or a deferred prosecution agreement with the U.S. government.  A criminal prosecution against an individual banker is now certainly possible.

As with many white-collar defendants, the specter of deterrence arises primarily from the prospect of being caught in itself, not from the harshness of the resultant sentence.  As noted, Hakan's arrest video was widely broadcast, and his trial was not only reported on television, radio and the press, it was live-tweeted, and the harsh circumstances of his incarceration are well known.  If these events will not deter others like Hakan from violating U.S. sanctions against countries like Iran, nothing will.

Thus, if at this stage this Court treats Hakan leniently in terms of his sentence, that treatment will not lessen the deterrence value of this prosecution. Similarly situated bankers will doubtless look to the fact of his prosecution, not to the sentence, in calculating whether to engage in criminal activity, such as sanctions violations, impacting the United States.

This is not a novel idea.  We are unaware of any research or clinical evidence that justifies enhancing a particular defendant's sentence based on general deterrence.  Instead, research in the area of general deterrence has shown that, while the specter of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).  *See also* Michael J. Lynch, *Beating a dead horse:  Is there any basic empirical evidence for the deterrent effect of punishment?*, 31 Crime, Law & Social Change 347 (1999).

This is particularly true for white collar offenders.  As law school professor Peter Henning has noted,

> [i]t is certainly questionable whether a punishment imposed on one white-collar criminal has an impact on others because the violations are usually the product of a unique set of circumstances that allowed the crime to occur, and the offenders often do not believe they engaged in wrongdoing that needs to be deterred.

Peter J. Henning, *Is Deterrence Relevant in Sentencing White-Collar Criminals?*, 61 Wayne L. Rev. 27 (2015), at 31.  *See also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("certainty of punishment is empirically known to be a far better deterrent than its severity"); *United States v. Adelson*, 441 F. Supp. 2d 506, 514 (discussing the "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders.")  As Judge Rakoff observed in *Adelson*,

> the Government at no time here presented any evidence or cited to any studies indicating that a sentence of more than three-and-a-half years was necessary to achieve the retributive and general deterrence objectives applicable to a case like this one.  And "necessary" is the operative word, for section 3553(a) expressly dictates that "[t]he court shall impose a sentence sufficient, *but not greater than*

*necessary*, to comply with the purposes set forth in paragraph (2) of this subsection".

(emphasis supplied)  *Id.*

Additionally, the Second Circuit has discussed and cautioned against placing too much emphasis on deterrence as a sole or determinant factor in sentencing.  *See United States v. Corsey*, 723 F.3d 366, 381 (2d Cir. 2013) (Underhill, J. concurring); *see also United States v. Cavera*, 550 F.3d at 191; *United States v. Lawrence*, 254 F. Supp. 2d 441 (E.D.N.Y. 2017) (Weinstein, J.)

The fact of and extent of publicity surrounding Hakan's arrest, trial and conviction in these unique circumstances – particularly in a case of first impression – is particularly noteworthy.  What was a daily news story for months has now abated.  This case has already had a significant deterrent effect on others.  Lengthy incarceration is unlikely to add to that impact. Consequently, a Guidelines sentence for Mr. Atilla, in contrast to one significantly below that, likely would not achieve any additional general deterrence.

### (c)      Section 3553(a)(2)(C)

Section 3553(a)(2)(C) requires that, in fashioning a sentence, a court consider protecting the public from any additional crimes by the defendant.  There can be no doubt that Hakan poses no threat to the public, American or Turkish.  As already noted, other than this one aberrational episode, Hakan has led an exemplary, law-abiding, and productive life.  The fact that Hakan will be deported to Turkey immediately upon his release (with no ability to re-enter the United States) further assures the Court of no further involvement by him in the United States.  Finally, as already noted, there is no prospect of Hakan working in the international banking field, which is a further assurance that the public will be protected.

43

(d)      **Section 3553(a)(2)(D)**

Hakan certainly does not need education or vocational training.  REDACTED

REDACTED                                                    .

3.      **Section 3553(a)(3) – The Kinds of Sentences Available Include a Lenient, Non-Guidelines Sentence**

Section 3553(a)(3) requires the Court to consider, in determining a sentence, "the kinds of sentences available."   As set forth above, this Court is able to fashion any sentence it concludes is reasonable if it performs the appropriate analyses: (1) determine the appropriate Guideline range, and (2) analyze and apply the §3553(a) factors.   There are no mandatory minimums for these offenses.   This Court has no restriction which would prevent a non-Guidelines sentence for the reasons discussed above.

4.      **Section 3553(a)(4) – The Guidelines Range**

Section 3553(a)(4) requires that the Court consider the appropriate Guidelines range, and we have already discussed this issue above.  As discussed, we submit a non-Guidelines sentence is the only appropriate sentence in this case, particularly when considering the other §3553(a) factors.

5.      **Section 3553(a)(5) – Pertinent Policy Statements Issued by the Sentencing Commission**

We are unaware of any such pertinent policy statements.

6.      **Section 3553(a)(6) – Sentencing Disparities**

Section 3553(a)(6) requires a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

(a)      **A Non-Guidelines Sentence Significantly Below the Guidelines Range is Needed to Avoid Unwarranted Sentencing Disparities**

Courts routinely review "case law submitted by defense counsel demonstrating that many similarly situated defendants had received sentences shorter than the guidelines range applicable here," and then impose sentences below the Guidelines range.  *Sarvestani v. United States*, No. 13-cr-214, 2015 U.S. Dist. LEXIS 159491 (S.D.N.Y, Nov. 25, 2015) (Guidelines range of 57-67 months; sentence of 30 months).

With that in mind, we have attached as Exhibit B a compilation of relevant sentences imposed in federal courts in IEEPA, embargo, and international trade regulations-related cases. This compilation, although not an exhaustive collection, demonstrates that district courts routinely grant downward departures from the sentencing Guidelines range in such cases. Although violations of IEEPA, embargos or international regulations are serious offenses, our review of the sentences in these cases establishes that a high proportion of defendants have been

sentenced to probation or time served, and that the sentences, with a few outliers, almost universally range from zero to five years.  *See* Exhibit B.

In light of the vast majority of below Guidelines sentences handed down around the country for the offenses of which Hakan is convicted, a rigid application of the Guidelines in this case is inappropriate where, as here, such a sentence would constitute an unwarranted sentencing disparity with other similarly situated defendants.  In the interests of justice then, this Court should sentence Hakan to a non-Guidelines sentence that is substantially below the Guidelines range to bring Hakan's sentence in line with similarly situated defendants.  18 U.S.C. § 3553(a)(6); *see also U.S. v. Toohey*, 132 F. App'x 883, 886 (2d Cir. 2005) (vacating sentence where district court "did not properly satisfy its statutory obligations under 3553(a)(6) to consider sentencing disparity by reference to similarly situated defendants nationwide").

> **(b)     Hakan's Conduct is Analogous to Other Cases in Which Defendants Received Below-Guidelines Range Sentences for IEEPA Violations**

Many of the IEEPA defendants with cases most directly analogous to Hakan have received significant downward variances from the applicable Guidelines range.  *See United States v. Banki*, 685 F.3d 99 (2d Cir. 2011) (63-78 month Guidelines Range; 30 month sentence); *Sarvestani*, No. 13-cr-214, 2015 U.S. Dist. LEXIS 159491 (S.D.N.Y, Nov. 25, 2015) (57-71 month Guidelines Range; 30 month sentence); *United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011) (97-121 month Guidelines Range; 48 month sentence).  Hakan should also be given a non-Guidelines sentence well below the Guidelines Range.

In *Amirnazmi,* the defendant, a dual citizen of the U.S. and Iran, was convicted of multiple violations of IEEPA with respect to the Iran sanctions regime.  There, the defendant engaged in illegal business transactions with the Government of Iran, including at least three separate agreements to transfer to the Government of Iran a software program developed to

optimize the efficient purchase of chemicals and chemical processes, with the intent to turn Iran into a "chemical powerhouse." *Id.* at 593. After trial, Amirnazmi was found guilty of conspiracy to violate IEEPA, three substantive violations of IEEPA, and making false statements to federal officials. *Id.* at 571. The government sought a sentence within the Guidelines range of 97-121 months. Despite Amirnazmi's principal role in the offense, his substantial involvement in the crime and his blatant obstruction of law enforcement's investigation, he nevertheless was sentenced significantly below the Guidelines range to 48 months (on each count, but to run concurrently). *Id.* at 571. If even Amirnamzi – who played the principal role in the scheme – received a substantial downward variance, then Hakan, who played a comparatively much lesser role than others in Zarrab's scheme, should receive a non-Guidelines sentence well below the Guidelines Range.

In *Banki* – the seminal IEEPA case in the Second Circuit - the defendant, a naturalized U.S. citizen, was convicted of multiple violations of IEEPA related to the transfer of a large amount of currency to Iran. *United States v. Banki*, 685 F.3d 99 (2d Cir. 2011). Banki used a "Hawala" system to receive and send large transfers of currency from family members living abroad, and made corresponding transfers to Iran. *Id.* at 103. Banki also obtained a personal benefit from this scheme, including a $2.4 million apartment in New York City. *Id.* at 104. Banki was convicted of five counts that included violating the Iranian Transactions and Sanctions Regulations ("ITSR"), conspiracy to violate the ITSR, and making false statements to federal officials. *Id.* at 102. Banki faced a Guidelines Range of 63-78 months, but was sentenced to only 30 months. *Id.*

In *Sarvestani*, the defendant was involved in the export of satellite material to Iran in violation of the sanctions regime. *Sarvestani v. United States*, No. 13-cr-214, 2015 U.S. Dist.

LEXIS 159491 at *1 (S.D.N.Y, Nov. 25, 2015) (Gardephe, J.).  Sarvestani operated multiple companies that procured U.S.-made goods for Iranian companies by transshipping the goods through third countries to obscure the destination of the goods.  *Id.*  In imposing sentence, the court cited "the level of deception employed by [Sarvestani], the intentional nature of his acts, his central role in the offense, the fact that he engaged in the charged criminal activity for seven years" as well as the defendants' high level of sophistication.  *Id.* at *13-14.  The court also categorized the activity as "extremely serious criminal conduct," noting that "intentional criminal conduct of this sort, committed by a highly sophisticated businessman, cannot be condoned."  *Id.* at *15.  After weighing the criminal conduct, the level of sophistication and the necessity for a sentence to promote both specific and general deterrence, the court determined that a 30 month sentence was appropriate.  *Id.* at *17.   The plea agreement contained a Guidelines Range of 57 to 71 months, and the court's decision to sentence Sarvestani to 30 months was "based on case law submitted by defense counsel demonstrating that many similarly situated defendants had received sentences 'shorter than the guidelines range applicable here.'"  *Id.* at *17.

Other recent IEEPA sentences also support a non-Guidelines sentence far below the Guidelines Range for Hakan in order to avoid "unwarranted disparity."  Many of the most recent IEEPA sentences were within the one to five year range, or even less.  *See United States v. Zadeh*, No. 10-cr-309 (D.D.C. Dec. 14, 2016) (the Government and the PSR calculated a 46-57 month Guidelines Range, but the court imposed an 18 month sentence on an Iranian citizen for taking part in a conspiracy involving the purchase and shipment of products, including aviation parts, to Iran); *United States v. Sheikhzadeh*, No. 15-cr-182, ECF No. 41 (E.D.N.Y. Feb. 8, 2016) (the Government requested a Guidelines Range of 46-57 months, but the Court imposed a three month sentence for the defendant, an American citizen of Iranian descent, who was paid a cash

salary from Iran's Permanent Mission to the United Nations, and who provided hawala services to co-conspirators in the U.S. to facilitate investments in Iran and to direct disbursements from Iranian accounts); *United States v. Chen*, ECF No. 16-cr-11, ECF No. 38 (D. Del. Jun. 29, 2016) (Guidelines range of 30-37 months, but the court sentenced the defendant, a Chinese national, to 30 months for IEEPA violations and other crimes which directly undermined America's security interests - the illegal export of military grade "weapons of war"- night vision and thermal scopes for mounting on automatic weapons); *United States v. al-Baroudi*, No. 15-cr-102, ECF No. 34 (E.D. Va. Jun. 13, 2016) (Government requested a Guidelines Range of 46 to 57 months, but the court imposed a 32 month sentence for a decade-long scheme in which the defendant, a Syrian-born naturalized U.S. citizen, and his co-conspirators exported U.S. tactical equipment to Syria for the purpose of supplying and arming Ahrar al-Sham and other insurgent groups whose stated goal was to overthrow the Assad government and install an Islamic state); *United States v. Parsa*, No. 14-cr-710, ECF No. 67 (S.D.N.Y. June 26, 2016) (36 month sentence for a six-year scheme in which the defendant conspired to obtain high-tech electronic components from American companies for transshipment to Iran and other countries for defendant's Iranian clients, in violation of U.S. economic sanctions); *United States v. Ouzhan Aydin*, No. 12-cr-221, ECF No. 82 (N.D. Ga. April 5, 2016) (30 month sentence for exporting munitions and money laundering for procuring aircraft parts for the F-14 fighter jet and other aircraft, for shipment from the U.S. to Iran, and for the purchase and export of microcircuits designed for use on F-14 fighter jets and other aircraft, for shipment from the U.S. through Turkey to Iran.); *United States v. Ali Soofi*, DOJ Press Release, (S.D.N.Y. Dec. 15, 2017), https://www.justice.gov/usao-sdny/pr/canadian-iranian-citizen-sentenced-white-plains-federal-court-32-months-prison (32 month sentence for a dual Canadian-Iranian citizen for conspiring to export military items from

the United States to Iran and the Iranian Revolutionary Guard Corps, including high-tech machine gun parts, tank parts, and military vehicles).

Indeed, many of the most recent cases concern conduct much more egregious and dangerous than the conduct for which Hakan was found guilty, such as shipments of military grade materials to, or links to, violent organizations – none of which is present in this case.  In January 2018, the Department of Justice ("DOJ") released a memorandum outlining a summary of its recent export and embargo-related criminal cases.  Department of Justice, *Summary of Major U.S. Export Enforcement, Economic Espionage, Trade Secret and Embargo-Related Criminal Cases (January 2015 to the present: updated January 19, 2018)*, https://www.justice.gov/nsd/page/file/940591/download (attached as Exhibit C).  As set forth in the sentencing table in Exhibit B and the DOJ release in Exhibit C, the vast majority of cases fall within the zero to five year sentencing range, with only a few outliers.  *See id.*  These outliers are clearly distinguishable from this case because they involve conduct such as supplying materials that could be used for nuclear weapons, supplying high-technology military products and supporting factions opposed to the United States' intervention in Iraq.  *See United States v. Cheng,* No. 13-cr-10332 (D. Mass 2016) (108 months); *United States v. Fishenko,* No. 12-cr-626 (E.D.N.Y. 2016) (120 months); *United States v. Boltutskiy*, No. 11-cr-000533 (E.D. Pa. 2013) (180 months); *United States v. Dhafir,* No. 03-cr-64 (N.D.N.Y. 2005) (264 months).  These outlier cases are also distinguishable from this case because in those cases it was the kingpin or ringleader who received the lengthy sentence, and lesser co-conspirators, like Hakan, received significantly lower sentences.  *Compare United States v Dhafir (Dhafir)*, No. 03-cr-64 (N.D.N.Y. 2005) (264 months) with *United States v. Dhafir (Jarwan)*, No. 03-cr-64 (N.D.N.Y. 2005) (co-conspirator received 18 months), and *United States v. Dhafir (Alwahaidy)*, No. 03-cr-

64 (N.D.N.Y. 2005) (co-conspirator received probation).  This case is much more in line with the cases identified above where co-conspirators who played lesser roles were given non-Guidelines sentences or significant downward variances. Therefore, a non-Guidelines sentence that is well-below the Guidelines range is appropriate for Hakan in order to avoid an unwarranted disparity from similar defendants.

Hakan should be sentenced consistent with the sentences handed down in *Banki*, *Amirnazmi, Sarvestani* and other similar cases, to a non-Guidelines sentence well below the Guidelines range.

> **(c)    A Substantial Prison Sentence for a Banker Like Hakan Would Represent an Unwarranted and Unfair Sentencing Disparity Because Alleged IEEPA Violations By Banks Have Previously Been Resolved Without a Prosecution of the Financial Institution With One Exception, and Always Without Prosecuting Any Bank Employees**

As described above, many of the sentences of incarceration in IEEPA cases have involved individuals who engaged in import and export violations, while providing direct military support to Iran (or other similarly sanctioned countries) and/or to terrorist organizations. In contrast, Hakan is a bank employee whose counts of conviction relate to financial transactions passing through the Bank.  In many ways, a more appropriate outcome for this case would be a result similar to the deferred prosecution agreements ("DPAs") imposed on many large international banks in the past 10 years for their large-scale IEEPA violations.  In those cases, none of the individual bankers were ever charged criminally, much less imprisoned.  Although this Court cannot change the charging decision of the U.S. Attorneys' Office in this case, it can ensure that Hakan is sentenced fairly in light of those prosecutorial decisions concerning banks and bankers in other cases.

Attached as Exhibit D is a chart identifying banks that were recently accused by the Department of Justice and other law enforcement agencies of violating sanctions. As reflected in Exhibit D, a survey of the publicly available information regarding banks which have been accused by the United States of violating IEEPA, or of otherwise violating sanctions, reveals that all of those banks – with one lone exception - were allowed to simply pay a significant fine or forfeit money, and enter into DPAs, and that none of their individual employees were ever prosecuted - even in the one case where the bank itself was prosecuted. Therefore, a significant prison sentence for Hakan – a solitary banking figure in the long history of U.S. economic sanctions enforcement - would represent an "unwarranted disparity" under §3553(a)(6) compared to the many situations described below where banks were accused of serious IEEPA violations, but simply paid money, entered into DPAs, and continued doing business without any of those banks' employees being charged criminally, detained, tried, convicted or sentenced to prison time.

The banks which escaped prosecution and jail did not simply have compliance problems or minor technical violations. Rather, these banks were accused of very large-scale and pervasive violations of IEEPA, yet, no individual bank employees were ever prosecuted. For example, ABN Amro Bank N.V. (now known as The Royal Bank of Scotland N.V.), was accused of engaging in a 12-year conspiracy to "defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of [OFAC], in the application and enforcement of sanctions and embargo regulations against Iran, Libya, the Sudan, and Cuba, and entities affiliated with [such countries]." *United States v. ABN Amro Bank N.V.*, No. 10-cr-124 (D.D.C.), ECF No. 1 (filed May 10, 2010) (Information). The government accused ABN Amro of seeking to "profit financially by undertaking a variety of financial transactions," to "conceal

the movement of the co-conspirators' property and assets throughout the United States" and to "circumvent United States sanctions by manipulating material information concerning entities sanctioned by the United States." *Id.* ABN Amro was also accused of actively drafting payment messages in a manner designed to avoid detection by law enforcement by removing names and references to co-conspirators, altering the names of and references to co-conspirators, using code names, creating a special processing queue to alter U.S. dollar ("USD") message payments, and causing "its United States affiliates to submit materially false and misleading reports or statements" to OFAC. *Id.*, ¶¶ 7-15. Among the deceptive activity cited by the government, ABN Amro allegedly included in the "Special Conditions" section of its payment procedures manual the following provision: "Payments by order of Iranian Banks . . . maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings 'Iran' etc. are not mentioned in the payment due to OFAC regulations." *Id.* ¶ 16(f).

ABN Amro resolved the criminal investigation by forfeiting $500,000,000. ***Not a single bank employee was ever charged with a crime, convicted, or imprisoned***. *See* Department of Justice, *Former ABN Amro Bank N.V. Agrees to Forfeit $500 Million in Connection with Conspiracy to Defraud the United States and with Violation of the Bank Secrecy Act* (May 10, 2010), https://www.justice.gov/opa/pr/former-abn-amro-bank-nv-agrees-forfeit-500-million-connection-conspiracy-defraud-united. In exchange for the forfeiture payment, the government entered into a deferred prosecution agreement, which the court approved. *United States v. ABN Amro Bank N.V.*, No. 10-cr-124 (D.D.C.), ECF No. 2, 2-1, 2-2, 5. At the end of 2011, the court dismissed the case with prejudice. *Id.* ECF No. 17.

Similarly, in 2010 the government accused Barclays Bank of engaging in more than a decade of criminal conduct to evade sanctions placed by the United States on a number of

different countries.  *See United States v. Barclays Bank PLC*, No. 10-cr-218 (D.D.C.), ECF No. 1 (filed August 16, 2010) (Information).  In an Information filed in 2010, the government accused Barclays of hiding Cuban, Iranian, Libyan, Sudanese and Burmese bank names from USD payment messages to avoid detection of the connections of sanctioned countries (or entities) to USD denominated transactions passing through the United States.  *Id.* ¶ 5; Department of Justice, *Barclays Bank PLC Agrees to Forfeit $298 Million in Connection with Violations of the International Emergency Economic Powers Act and the Trading with the Enemy Act* (Aug. 18, 2010),  https://www.justice.gov/opa/pr/barclays-bank-plc-agrees-forfeit-298-million-connection-violations-international-emergency (*Barclays Press Release*) ("Not just once, but numerous times over more than a decade, Barclays stripped vital information out of payment messages that would have alerted U.S. financial institutions about the true origins of the funds.").  "Barclays Bank has admitted a decade-long pattern of violating U.S. banking laws, and in taking certain steps to conceal prohibited transactions," said FBI Assistant Director-in-Charge Janice K. Fedarcyk.  *Id.*

Nevertheless, like ABN Amro, Barclays simply forfeited money, and **no individual Barclays employee was ever charged with a crime, convicted, or imprisoned**.  *See United States v. Barclays Bank PLC*, No. 10-cr-218 (D.D.C.), ECF No. 7 (Order Granting Joint Motion for Approval of the Deferred Prosecution Agreement).  After a few status reports, the Indictment was dismissed.  *Id.* ECF No. 28.

In 2015, Commerzbank was similarly accused of "using a non-transparent method of payment messages, known as cover payments, to conceal the involvement of Sanctioned Entities and SDNs."  *United States v. Commerzbank AG, et al.*, No. 15-cr-31, ECF No. 1 (D.D.C.) (filed Mar. 12, 2015) (Information).  The government alleged that Commerzbank engaged in a series of

surreptitious activities to avoid detection of its execution of transactions on behalf of sanctioned entities. *Id.* ¶¶ 27(a)-(e). Commerzbank was also accused of processing "payments on behalf of entities that it knew to be owned or controlled by an Iranian company that had been designated on or about September 10, 2008, as an SDN by OFAC for its involvement in weapons of mass destruction proliferation." *Id.* ¶ 27(d). Commerzbank also entered into a settlement with the government (which included forfeiture, a fine, and a DPA) which fully resolved the criminal allegations. *United States v. Commerzbank AG, et al.*, No. 15-cr-31 (D.D.C. filed Mar. 12, 2015) (Deferred prosecution agreement). ***No Commerzbank employee was ever charged with a crime, let alone convicted or imprisoned***.

Also in 2015, Credit Agricole was accused of similar conduct. *United States v. Credit Agricole*, 15-cr-137, ECF No. 1 (D.D.C. Oct. 20, 2015) (Information). Like the other banks described above, Credit Agricole "eliminated payment data that would have revealed the involvement of Sanctioned Entities with the specific intent to evade U.S. sanctions." *Id.* ¶ 30(b). Credit Agricole was also accused of using "structured payments to mask the involvement of sanctioned entities, including using two payment messages – one that was sent through the United States and one that was not sent through the United States – for no purpose other than to conceal the involvement of Sanctioned Entities and SDNs in USD transactions." *Id.* ¶ 30(c). These allegations were resolved with forfeiture, civil penalties, a DPA and the installation of a corporate compliance program. *United States v. Credit Agricole*, 15-cr-137, ECF No. 12 (D.D.C. Oct. 20, 2015) (Order Approving Deferred Prosecution Agreement). As with the other cases referenced above, ***no Credit Agricole employee was ever prosecuted, convicted or sent to prison***.

Other well-known banks have also resolved criminal IEEPA allegations with forfeitures, other monetary penalties, and deferred prosecution agreements.  For example, Credit Suisse was accused of "systematically violat[ing]" sanctions by "removing Iranian names and references from payment messages" and using code words, and other criminal conduct spanning more than a decade.  Credit Suisse resolved all of the allegations by paying a fine, entering into a DPA, training their employees and employing new compliance procedures – *no employee was ever prosecuted, convicted or sent to prison*.  *See United States v. Credit Suisse AG*, No. 09-cr-352, ECF No. 4, 4-1 (D.D.C. Dec. 16, 2009) (Deferred prosecution agreement).  Similarly, in 2012, HSBC was accused of both violating sanctions and facilitating funds for drug traffickers.  Department of Justice Press Release, *HSBC Holdings Plc. And HSBC Bank USA N.A. Admit to Anti-Money Laundering and Sanctions Violations, Forfeit $1.256 Billion in Deferred Prosecution Agreement* (Dec. 11, 2012), https://www.justice.gov/opa/pr/hsbc-holdings-plc-and-hsbc-bank-usa-na-admit-anti-money-laundering-and-sanctions-violations.  The government stated that "HSBC is being held accountable for stunning failures of oversight – and worse – that led the bank to permit narcotics traffickers and others to launder hundreds of millions of dollars through HSBC subsidiaries, and to facilitate hundreds of millions more in transactions with sanctioned countries."  *Id.*  The government also accused HSBC of purposefully stripping references to sanctioned entities in its payment messages.  *Id.*  HSBC also forfeited money and entered into a DPA, but *no individual employees were ever prosecuted, convicted or imprisoned*.  *United States v. HSBC Bank USA, N.A. and HSBC Holdings PLC*, No. 12-cr-763, ECF No. 3-2 (E.D.N.Y. Dec. 11, 2012) (Deferred Prosecution Agreement).

A number of other banks have been accused of flagrantly violating IEEPA by purposefully hiding information linked to sanctioned entities, and other criminal conduct.  *See*

*United States v. ING Bank, N.V.*, No. 12-cr-136, ECF No. 1 (D.D.C. June 12, 2012) (Information alleging a decade-long scheme to violate sanctions); *United States v. Lloyds TSB Bank plc*, No. 09-cr-07, ECF No. 2-3 (D.D.C. Jan. 9, 2009) (same); *United States v. Standard Chartered Bank*, No. 12-cr-262, ECF No. 1 (D.D.C. Dec. 10, 2012) (same).  However, all of those banks simply paid money and entered into deferred prosecution agreements.  Despite these numerous violations of financial sanctions, ***not a single employee of any of these banks was ever prosecuted, convicted or imprisoned***.

We have identified only one bank – BNP Paribas – which was actually indicted and convicted for IEEPA sanctions violations.  *United States v. BNP Paribas*, No. 14-cr-460 (S.D.N.Y. May 1, 2015).  After a settlement, which included a guilty plea, the government lauded the "conviction" in 2015 as "the first time a financial institution has been convicted and sentenced for violations of U.S. economic sanctions."  Department of Justice Press Release, *BNP Paribas Sentenced for Conspiring to Violate the International Emergency Economic Powers Act and the Trading with the Enemy Act* (May 1, 2015), https://www.justice.gov/opa/pr/bnp-paribas-sentenced-conspiring-violate-international-emergency-economic-powers-act-and.  The government accused BNP of "deliberately disregard[ing] the law and provid[ing] rogue nations, and Sudan in particular, with vital access to the global financial system, helping that country's lawless government to harbor and support terrorists and to persecute its own people."  *Id.*  But even in that case, ***no employee of BNP was prosecuted, convicted or imprisoned***.

The government's prosecution of Hakan is a notable departure from the long line of cases in which banks and bankers accused of violating IEEPA, or otherwise engaging in activities designed to avoid sanctions, were not prosecuted.  Hakan – a foreign national – has apparently been singled out, and is being treated differently than all of the other bankers who engaged in

similar conduct.  To seek or impose a sentence that is substantially longer than the average IEEPA sentences referenced above would be particularly harsh and unfair given these circumstances.  This is exactly the type of disparate treatment that §3553(a)(6) is designed to ensure is avoided.

The crimes for which Hakan stands convicted are certainly no worse, and are perhaps less serious, than the crimes these other banks committed.  Given that no employees from those banks were ever prosecuted or imprisoned related to those crimes, it would be an "unwarranted disparity" to impose a significant prison term upon Hakan.  It also violates notions of comity and principles of fairness for the United States criminal justice system consistently to offer deferred prosecution agreements and fines to large international banks for failing to comply with United States sanctions, and not prosecute a single bank employee, and then throw a foreign bank employee in prison for a significant sentence for similar non-compliance.

      **(d)  The Sentencing Commission's Most Recently Published Sentencing Statistics Demonstrate That a Guidelines Sentence for Hakan Would Create An Unwarranted Disparity**

In the Southern District of New York, sentences below the Guidelines range have become the rule and not the exception.  The United States Sentencing Commission (hereinafter "the Sentencing Commission") publishes each year a Sourcebook of Federal Sentencing Statistics. The most recent figures are contained in the *U.S. Sentencing Commission's 2017 Sourcebook of Federal Sentencing Statistics* (hereinafter "*2017 Sourcebook*"), which covers sentences imposed between October 1, 2016 and September 30, 2017 – Fiscal Year 2017 (hereinafter "FY 2017"). The *2017 Sourcebook* demonstrates that 67.3% of sentences handed down in the Second Circuit have been below the Guidelines range calculated by the court.  In short, the Guidelines no longer constitute the predominant factor in setting the majority of sentences in the Southern or Eastern

58

Districts of New York.[1]  Hakan's sentence should be below the Guidelines range, in accord with similarly situated defendants prosecuted and convicted in this District.

More specifically, the *2017 Sourcebook* shows that in FY 2017, 67.3% of sentences were *below* the calculated Guidelines range for all sentences rendered in the district courts that comprise the Second Circuit.  *See 2017 Sourcebook*, Table N-2.[2]  In FY 2017, for all sentences in the Southern District of New York, only 24.7% of sentences fell within the prescribed Guidelines range,[3] while nearly three-fourths of all sentences (74%) were below the Guidelines range.  *Id.,* Appendix, New York, Southern.  Thus, in the Southern District of New York, a sentence *below* the Guidelines range is the overriding *norm*, and *not* the exception.  By contrast, only a small fraction – 1.3% – of all Southern District of New York sentences were *above* the Guidelines range.  *See id.*

The sentences rendered in the Southern District of New York are typically below the Guidelines range even if one excludes the below-Guidelines sentences based on government-sponsored motions, such as §5K motions for cooperation.  In FY 2017, only 21.1% of below-Guideline sentences in the Southern District of New York were due to government-sponsored motions for such reduced sentences, including motions pursuant to §5K1.1 and §5K3.1.  Below Guidelines sentences based on non-government sponsored factors, including §3553(a) factors,

---

[1]  The *2017 Sourcebook* is available at https://www.ussc.gov/research/sourcebook-2017.
Prior *Quarterly Data Reports* are also available on the Sentencing Commission's web site, www.ussc.gov.

[2]  Nationally, for FY 2017, only 49.1% of sentences were *within* the Guidelines range.
*2017 Sourcebook*, Table N-2.  Of those sentences nationally *outside* the Guidelines, only 2.9% were above the Guidelines, while 47.9% were below.  *Id.*

[3]  The only other districts with a lower percentage of sentences within the Guidelines range were the Eastern District of New York, at 23.4%, the District of Vermont, at 21.3%, the District of Rhode Island, at 19.2%, the Eastern District of Wisconsin, at 15%, and the Southern District of California, at 15%.  *See Preliminary Data Report 2017*, at 12-14.

Guidelines downward departures, and/or a combination thereof, were responsible for 52.9% of sentences in the Southern District of New York.  *See 2017 Sourcebook*, Appendix, New York, Southern.

Therefore, of all the below-Guidelines sentences imposed in the Southern District of New York in FY 2017, more than two thirds (approximately 71%) were imposed based on non-government sponsored factors.  Indeed, the Southern District of New York is the only district in the country in which the percentage of sentences attributable to non-government sponsored factors exceeds 50%.  *United States Sentencing Commission Quarterly Data Report*, FY 2017, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-2017_Quarterly_Report_Final.pdf ("*Quarterly Data Report, FY 2017*").

In FY 2017, only 30.9% of sentences in the Second Circuit were within the Guidelines range, and only 1.8% of sentences were above the Guidelines range.  That leaves 67.3% of all sentences in the Second Circuit below the calculated Guidelines range, with more than half (57.9%) of *all below-Guidelines* sentences attributable to *Booker* factors alone.    2017 *Sourcebook*, Table N-2.

Therefore, even excluding below-Guidelines sentences attributable to government-sponsored motions, the chances of a below-Guidelines sentence in the Southern District of New York (52.9% for FY 2017) was over double the number of within-Guidelines sentences (24.7%) in this District.

Also, Table 13 of the *2017 Sourcebook*, entitled "Sentence Length In Each Primary Offense Category," provides the mean and median sentence nationally in each offense category for all of FY 2017.  Sanctions-evading offenses are not delineated separately.  However, a

Guidelines sentence for Hakan would be dramatically longer than either the mean or median for his offenses of conviction.

For example, for fraud sentences in FY 2017, the national mean sentence was 26 months and the median sentence 15 months (covering 6,029 offenders).  *Id*.  For money laundering, the national mean sentence was 33 months and the median sentence 18 months (covering 679 offenders).  *Id*.  Even if sanctions-evading offenses are considered in the category of "national defense," the national mean sentence was 56 months, and the median sentence 27 months (covering 89 offenders).  *Id*.

Moreover, the reduction from the Guidelines for those below-range sentences is dramatic in each category.  For FY 2017, as set forth in Table 17 of the *Quarterly Data Report, FY 2017*, entitled "Non-Government Sponsored Below Range Cases:  Degree of Decrease for Offenders In Each Primary Offense Category" [footnote omitted], for the 1,618 defendants sentenced below the Guidelines for fraud cases, the median percentage decrease was 47.8%.  *Id*., at 26 (Table 17).  For money laundering, the median percentage decreases (for 200 defendants) was 50.9%, and for national defense (32 defendants), the median percentage decrease was 55.9%.  *Id*.[4]

These collective statistics demonstrate that across the country, and especially within the Second Circuit and the Southern District of New York, imposing a sentence within the Guidelines range is no longer the norm.  Increasingly, below Guidelines sentences are rendered by judges based on the factors outlined in *Booker* and 18 U.S.C. § 3553(a).

As a result, the Guidelines do not represent a sentence "sufficient, but not greater than necessary" to accomplish 18 U.S.C. §3553(a)'s stated objectives of sentencing with respect to

---

[4]  For FY 2017, 42.8% of fraud sentences were within the Guidelines (5,967 defendants total), 25.1% of money laundering sentences were within the Guidelines (676 defendants total), and 26.1% of national defense sentences were within the Guidelines (88 defendants total).  *2017 Sourcebook*, Table 27.

Hakan.  Therefore, a sentence dramatically below the advisory Guidelines range will more than adequately serve that purpose in this case.

**(e)      Section 3553(a)(7) - Restitution**

Finally, §3553(a)(7) provides that another sentencing factor is "the need to provide restitution to any victims of the offense."  Restitution is not an issue in this case, as the U.S. bank "victims" sustained no losses.

**(f)      Totality of the Factors**

This Court has great latitude to grant a non-Guidelines sentence based on the totality of the circumstances.  In addition to the statutory factors, the Court can and should consider the collateral consequences of conviction, which one court has noted accurately "can be devastating."  *United States v. Nesbeth*, 188 F.Supp. 3d 179 (E.D.N.Y. 2016).  The Second Circuit has approved consideration of collateral consequences by a sentencing court.  *See United States v. Stewart*, 590 F.3d 93, 139 (2d Cir. 2009) (affirming a 20 month sentence despite a Guidelines range of 78 to 97 months, commenting "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."  *Id*. at 141-142.

Here, the collateral consequences are enormous.  Hakan is a household name among international bankers, and his conviction effectively ends his career – in Turkey and elsewhere. The YouTube video of his arrest will live forever online – it already led to harassing calls to his wife and spread his personal details worldwide.  His trial was live tweeted.  Hakan's case, through no fault of or involvement of Hakan, became a political football between the United States and Turkey, especially as Reza Zarrab attempted to broker a deal for himself between the

62

countries for his release.  Hakan's incarceration has been more difficult than for others.  He has suffered physically and emotionally.  These circumstances are unique, and they are awful.

As a foreigner, Hakan is ineligible for certain programs which have the potential to reduce his time (*e.g.*, the RDAP program) and he is ineligible for a camp facility.  In addition, the fact the he has spent more than 12 months in jail and will not receive credit for good time for that incarceration should also be considered.

Despite all of these very difficult circumstances, Hakan has at all times comported himself as the gentleman he is, showing respect for the Court and the parties.

## **CONCLUSION**

We appreciate that the Court will consider all of the favorable facts and the letters which have been provided to it on Hakan's behalf, and will also consider the events underlying his conviction.  We ask that the Court consider how unusual this case truly is: that it is not an economic crime, nor is it a crime of American disloyalty.  We ask that the Court consider all the other sentences given under IEEPA. We also ask that the Court consider that for Hakan, who will not see his family very often due to obstacles and distance, incarceration in the United States will be harsher than for the vast majority of inmates.

We ask for the Court to "temper justice with mercy" (Portia, The Merchant of Venice), and impose a "sentence sufficient, but not greater than necessary" to meet the directives of 18 U.S.C. §3553(a), which, we submit, is a non-Guidelines sentence significantly below the Guidelines range.

Dated:  New York, New York
          March 26, 2018

                          Respectfully submitted,


HERRICK, FEINSTEIN LLP                    FLEMING RUVOLDT PLLC


By:    s/Victor J. Rocco                  By:    s/Cathy Fleming

Victor J. Rocco                           Cathy Fleming
Thomas E. Thornhill                       Robert Fettweis, *pro hac vice*
David M. Rosenfield                       Jonathan Stern
2 Park Avenue                             1700 Broadway, 28th Floor
New York, NY  10016                       New York, NY  10019
212-592-1400                              (212) 706-1850
212-592-1500 (fax)                        (212) 706-1855 (fax)


McDERMOTT WILL & EMERY LLP                LAW OFFICES OF JOSHUA L. DRATEL


By:    /s/ Todd Harrison                  By:    /s/ Joshua L. Dratel

Todd Harrison                             Joshua Dratel
Joseph Evans                              29 Broadway, Suite 1412
340 Madison Avenue                        New York, New York  10006
New York, New York  10173                 (212) 571-3792
(212) 547-5727


                *Attorneys for Defendant Mehmet Hakan Atilla*

HF 12036308v.3