HBL5atiC1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                New York, N.Y.

4            v.                              15 Cr. 867 (RMB)

5   MEHMET HAKAN ATILLA,

6                Defendant.

7   ------------------------------x

8                                            November 21, 2017
                                             10:20 a.m.
9

10  Before:

11                    HON. RICHARD M. BERMAN,

12                                           District Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

HBL5atiC1

1                            APPEARANCES

2    JOON H. KIM
          Acting United States Attorney for the
3         Southern District of New York
     BY:   DAVID DENTON
4          MICHAEL D. LOCKARD
           Assistant United States Attorneys
5
     HERRICK FEINSTEIN, LLP
6         Attorneys for Defendant
     BY: VICTOR J. ROCCO
7        THOMAS E. THORNHILL

8    FLEMING RUVOLDT, PLLC
          Attorneys for Defendant
9    BY: CATHY A. FLEMING
         ROBERT J. FETTWEIS
10
     McDERMOTT WILL & EMERY, LLP
11        Attorneys for Defendant
     BY: TODD J. HARRISON
12       JOSEPH EVANS

13   LAW OFFICES OF JOSHUA L. DRATEL, P.C.
          Attorneys for Defendant
14   BY: JOSHUA L. DRATEL

15
     ALSO PRESENT:  ASIYE KAY, Turkish Interpreter
16                  SEYHAN SIRTALAN, Turkish Interpreter

17

18

19

20

21

22

23

24

25

1          (Case called)

2          THE COURT:  A few comments from me.  Welcome

3    Mr. Harrison.

4          MR. HARRISON:  Thank you, your Honor.

5          THE COURT:  Do I understand that Mr. Evans is with you

6    also today?

7          MR. HARRISON:  Yes, your Honor.

8          MR. EVANS:  Yes, your Honor.

9          THE COURT:  So, let me come back to that in just one

10   minute.  I just have a few comments that I thought I would

11   start with.

12         First, we have a Turkish language interpreter and I

13   just want to make sure that Mr. Atilla is able to understand

14   these proceedings with the help of the interpreter.

15         THE DEFENDANT:  Yes, I can follow it, your Honor.

16         THE COURT:  Mr. Atilla, just for my information, do

17   you follow the English, or the Turkish, or both?

18         THE DEFENDANT:  Mostly I try to follow the Turkish.

19         THE COURT:  Good.  Okay.

20         So, point number one is that this is our last

21   pre-trial conference in this case and I need to add that I am

22   not going to entertain any more eleventh or twelfth-hour calls

23   from counsel as I did this past Sunday, for example, which was

24   the precursor for yesterday's hearing in the morning.  I'm not

25   suggesting that it was inappropriate, I don't feel that way,

but that's it, until we start the trial.  And in that

connection, it's my opinion that the defense team, which

currently consists of at least five and hopefully after this

morning six and seven very experienced attorneys, as

experienced a team for Mr. Atilla as probably can be assembled.

          I am not interested, and of course you aren't either,

in me making defense suggestions but here is one that you

probably thought of already which I do want to share with you.

It's my suggestions that, if you haven't already done this,

that all defense counsel should meet and confer quickly and

select a defense quarterback for several reasons.  I am using

the word quarterback, I mean someone to coordinate,

particularly with the Court, but also to divide the work load

among yourselves.  So, for example, who cross-examines which

witness, who does the opening, who does the closing, who picks

the jury, who presents the defense case.  I think it is all

very doable if there is proper coordination.  So, I am sure

that's already in the works but I wanted to share that with

you.

          In that regard, we are going to have a conflicts

hearing this morning.  There is one among you, I think one --

yes, I think Mr. Dratel you may be the only counsel that is

fully conflict-free as it were, and even potential conflict.

I'm not suggesting -- we had Curcio hearings for everybody else

in which potential conflicts were discussed and I think you,

HBL5atiC1

who are, by the way, participating full-time now in the trial

and in the proceedings, you are the only one who has no

conflict or potential conflict; is that correct?

          MR. DRATEL:  I know I don't.  I have had Curcios with

current counsel.

          THE COURT:  So, the trial will commence immediately

after jury selection is completed and you all need to be ready

for that.  I don't have a lot of breaks during the trials

except the normal one in the morning and one in the afternoon,

particularly for the jury.  If one side or the other runs out

of continuous witness presentation then the case is over for

that side.  We work five days a week, we start at 9:15.  Likely

on Friday it depends where we are in the case, we might adjourn

at 1:00 or 2:00 in the afternoon instead of going to 4:45,

which is our usual finish.  During the case I do very few side

bars.

          So, the next point is I'm going to ask you, not

immediately but certainly during the course of today's

proceeding, what your thoughts are about an anonymous jury.  I

mention this because it is a high-profile case but also because

I have heard, I guess it is hearsay for sure, but I have heard

of people involved in the case being approached, frankly I

think inappropriately by third-parties, and that even includes

court interpreters.  So, that's the basis for my raising the

issue of an anonymous jury.

1          If it were to come to my attention that there was a

2    further inappropriate contact of anybody associated with the

3    case, you can rest assured that I would refer that to

4    appropriate authorities.

5          So, we are about to have a Curcio proceeding with

6    respect to Mr. Harrison.  Mr. Harrison is a partner at

7    McDermott Will & Emery, and without trying to foreshorten, an

8    outstanding background, considerable time spent in the Eastern

9    District of New York as a U.S. Attorney; is that a fair

10   statement?

11         MR. HARRISON:  Yes, your Honor.  Thank you.

12         THE COURT:  So, I am going to turn to the questions

13   that Mr. Harrison has actually proposed.

14         We have Mr. Lockard.  Okay.

15         MR. LOCKARD:  Your Honor, I'm so sorry to interrupt,

16   your Honor, but we had discussed with Mr. Atilla's counsel two

17   additional potential questions and with the Court's --

18         THE COURT:  If you would just hold off with that for

19   just one second?

20         MR. LOCKARD:  Yes, your Honor.

21         THE COURT:  So, I was going to say that the questions

22   cover all the topics, they are not precisely in the same format

23   as the questions that I asked Mr. Rocco, the Herrick firm also

24   represents banks, so-called victim banks and also has done work

25   for the Republic of Turkey, as does McDermott Will, as I

HBL5atiC1

1  understand it.  I am going to in a minute, Mr. Harrison, just

2  ask you about that.

3          So, the questions are not identical, they cover the

4  same topics, and if anybody does have -- well, is everybody at

5  the defense table comfortable with the questions I have

6  received from Mr. Harrison for Curcio purposes?

7          MR. ROCCO:  Yes, your Honor.

8          MR. DRATEL:  Yes, your Honor.

9          MS. FLEMING:  Yes.

10          THE COURT:  And the government, you have some

11  additions, do you?

12          MR. LOCKARD:  We had suggested a couple of questions

13  to supplement the Curcio proceedings.

14          THE DEPUTY CLERK:  You need to speak louder counsel.

15  I'm sorry.

16          MR. LOCKARD:  To address the issues raised in

17  Mr. Harrison's letter as well as discussed yesterday.  And with

18  the Court's indulgence, if I can consult briefly with

19  Mr. Dratel, Ms. Fleming, Mr. Rocco, we can hand those up,

20  assuming those are all --

21          THE COURT:  Are you going to write them out?

22          MR. LOCKARD:  We have them printed out.

23          THE COURT:  Hold on for one second.  I have one or two

24  more points to make and we will take a little break while you

25  do that.

1     So, this Curcio hearing, as I say, is occasioned by

2 Mr. Harrison's retention by Mr. Atilla, and Mr. Harrison has

3 also filed a notice of appearance to join the current defense

4 team and assist at the trial and he, as I say, you are very

5 welcome to join this group, Mr. Harrison, once we get through

6 this Curcio situation.

7     One last point.  I hope nobody is offended by this,

8 but I am aware that there is a lot of press coverage about this

9 case and a lot of comment about the case in the media including

10 comment which is attributed to Turkish officials, some of it

11 critical of the prosecution.  I certainly believe -- I am sure

12 you all do as well, that -- in freedom of speech and so

13 officials are free to comment.  We have an expression "armchair

14 quarterback."  If one wants to, thinks they can improve on Tom

15 Brady's performance, they are free do it and lots of people do.

16     I have a suggestion, however, and that is this,

17 particularly if it's Turkish officials who want to be helpful

18 to the defense of Mr. Atilla, Mr. Zarrab.  In my opinion

19 they -- and maybe they have, so maybe this is just academic,

20 but the best way for them to have been helpful is to help the

21 defense counsel by producing, in court, any Turkish evidence or

22 witnesses that they may be aware of who could assist the

23 defense in presenting their case and that would include any

24 Halkbank employees who may have relevant evidence.

25     So, with that, I will give you a minute or two to go

1    over the questions that the government may wish to add and then

2    we will proceed with the Curcio.

3         MR. ROCCO:  We are okay with the proposed questions,

4    your Honor.

5         THE COURT:  Oh, you are?  Is everybody?

6         MR. DRATEL:  Yes.

7         MS. FLEMING:  Yes.

8         THE COURT:  Okay.  Counsel, did you say where they

9    should be inserted?  Is this, counsel, at the end or at the end

10   of a particular section?

11        MR. LOCKARD:  At the end of the section about the

12   payor conflict.

13        THE COURT:  Yes.  Those questions look perfectly fine

14   to me as well.

15        So, perhaps, Mr. Harrison, I could start with you and,

16   by the way, you were kind enough to produce a retainer

17   agreement which I have, it is dated November 14, 2017, and it's

18   on the letterhead of McDermott Will & Emery and it is addressed

19   to Mr. Atilla, and it appears to have been signed on page 2 by

20   yourself, by Mr. Atilla -- I'm not sure I can make out the

21   other names but they appear to be signatory, at least one, on

22   behalf of Halkbank.  If you look at page 2, there is a third

23   signature -- I am not sure.  Am I missing something?  One,

24   two -- there is four signatures.

25        MR. HARRISON:  Do you want me to remain seated, Judge?

1  Take the podium?  What do you want?

2         THE COURT:  Whatever you are most comfortable with.

3  If you bend that microphone toward you, you are welcome to stay

4  right there.

5         MR. HARRISON:  Okay.

6         I am just looking for the names, Judge.  The "signed

7  on behalf of Halkbank by" the current CEO Osman Arslan, which I

8  believe is A-R-S-L-A-N.

9         THE COURT:  Is that his name to the right of

10 Mr. Atilla?

11        MR. HARRISON:  I believe there is also a name there,

12 Mehmet, M-E-H-M-E-T, Sellimli, S-E-L-L-I-M-L-I.

13        My understanding, Judge, is that is sort of a notary

14 and this is the official-official signature of the bank and the

15 CEO.

16        THE COURT:  And above that, is that Mr. Atilla?

17        MR. HARRISON:  Yes, Judge.

18        THE COURT:  All right.

19        And if you could, just for the record, tell us a

20 little bit about how this representation came about and the two

21 areas of potential conflict that we need to discuss today:  One

22 having to do with your firm's representation, as was the case

23 of Mr. Rocco's firm for want of a better term, victim banks,

24 that was number one; and two, your firm has representation of,

25 which I will ask you to explain.  It appears to be of the

1  Turkish government in some fashion, of their delegation to the

2  European union.

3          MR. HARRISON:  That's correct, your Honor.

4          THE COURT:  Okay.

5          So just tell us, spend a minute and tell us how you

6  have come into the case.

7          MR. HARRISON:  First, to clarify, I just want to make

8  sure about the signatures because I just pulled my copy.

9          THE COURT:  Okay.

10          MR. HARRISON:  I think you asked if Mr. Atilla, my

11  client's signature was above the CEO.  It is below, it is the

12  last one on page 3, just to be clear.

13          THE COURT:  Ah.  Of course.  So, then there are four

14  on this page, page 4 of 8.  Or am I missing something?

15          MR. HARRISON:  No.  I think -- on page 2 there is my

16  signature over my printed name.

17          THE COURT:  Right.

18          MR. HARRISON:  Then there is Mehmet Sellimli, which I

19  believe is sort of a notary-type person.  He has his signature

20  on top and then he printed his name out below.

21          THE COURT:  I see.

22          MR. HARRISON:  And then the CEO signed his name and

23  printed his name out below, is my understanding.

24          THE COURT:  On the line "printed name," those are two

25  names; is that right?

HBL5atiC1

1          MR. HARRISON:  I'm sorry.  I didn't hear you.

2          THE COURT:  On the line that is denoted as "printed

3     name," those are two names, one is Mr. Sellimli and one is

4     Mr. Arslan; is that correct?

5          MR. HARRISON:  I'm sorry.  I have just been corrected

6     Mr. Sellimli, I guess, is better described as a legal advisor

7     for the bank rather than just a notary.

8          THE COURT:  So that's his printed name and directly

9     above his printed name is his signature?

10          MR. HARRISON:  Yes.

11          THE COURT:  And to his right is the bank's CEO, is

12     that Mr. Arslan.

13          MR. HARRISON:  That's my understanding, Judge.

14          THE COURT:  And above that is his signature as well?

15          MR. HARRISON:  Yes, Judge.

16          THE COURT:  Okay.

17          And, Mr. Atilla, we see that on the next page.  Great.

18     Okay.

19          MR. HARRISON:  So, just, your Honor, I say this for

20     three different questions.  One is sort of how I originally got

21     involved; and two about the two different conflicts related to

22     banks in the Republic of Turkey.

23          THE COURT:  I don't mean to ask you to disclose any

24     attorney-client privilege.

25          MR. HARRISON:  Yes.

1      THE COURT:  So.

2      MR. HARRISON:  I am going to try and be careful about

3 that, Judge.  And if the Court wants to inquire more, I am

4 happy to answer whatever questions the Court has, obviously.

5      So, as I understand it, Halkbank is currently

6 represented by King & Spalding and, in particular, a partner at

7 King & Spalding named Andrew Hruska.  My understanding is that

8 he was relatively recently engaged by Halkbank.  Mr. Hruska and

9 I were colleagues at the U.S. Attorney's office in the Eastern

10 District of New York.

11      Relatively recently, less than two weeks ago, Judge,

12 Mr. Hruska asked me if I would be available to assist on a

13 trial that was coming up very soon that was very complicated.

14 He didn't tell me what the trial was at that time or exactly

15 what was going on, he just asked my availability and if I would

16 be willing to do it, that it would be a relatively lengthy

17 trial, relatively complicated, there were a lot of issues and

18 documents, and if it was the kind of thing I would be willing

19 to take on in terms of joining the current defense team,

20 whoever that was -- he didn't tell me at that time.  But, he

21 indicated he had been in communication with the defense team.

22 I told him that I would be willing to do that and he said,

23 fine, I will get back to you.

24      Then, a few days, maybe a week later, so this is, I

25 guess, about a week and a half ago, your Honor, I don't have

1  the calendar in front of me, but it was a week ago from last

2  Friday he and I had a conversation either that day or perhaps

3  the day before where he called me up and asked me if I was

4  still willing to do it, gave me a little bit more detail, gave

5  me Mr. Atilla's name and gave me a very brief description of

6  the case and asked me if I would be willing to meet -- he

7  actually asked me if I would be willing to meet on that Friday,

8  Judge.  It turned out we couldn't meet on that Friday so we set

9  up a meeting for Monday at 8:00 a.m. at his office.

10         I went and met with him, he described the case in a

11  little bit more detail and his basic point was, you know, it is

12  a very complicated case, it has been put on for trial in

13  relatively short order was his opinion, and he felt like the

14  defense team needed help.  My understanding was that he had

15  been in communication with the defense team.

16         So, he asked me if I would join the defense team and I

17  told him I was willing to try and look into it.  And he also

18  indicated to me that it was his understanding that, from

19  speaking to people at the Bank and relatives, apparently, of

20  Mr. Atilla, that he was also interested in having another

21  lawyer join the team.  So I said, well, I've got to talk to him

22  myself and determine that for myself.  I was, I suppose, a

23  little bit weary.  I don't know much about Turkey itself or

24  Turkish politics but I do read the papers and I knew that there

25  was some heated political battles going on, that there had

1    recently been a coup in Turkey --

2            THE COURT:  Excuse me.  I think an unsuccessful coup.

3            MR. HARRISON:  I'm sorry.  Attempted coup.  Just what

4    I read in the papers, I am not a Turkish follower.

5            THE COURT:  Me too.

6            MR. HARRISON:  So it is a little bit -- I didn't

7    know -- it is not that I didn't believe Mr. Hruska, he is a

8    trusted colleague who I think has a lot of integrity, but I

9    wanted to see for myself and I told him I had to talk to

10   Mr. Atilla for myself.

11           So, I and Mr. Evans, my associate, after talking

12   internally to our ethics people, doing a little bit of ethics

13   research and making sure that it was okay for me to talk to

14   Mr. Atilla, went down the next morning and talked to Mr. Atilla

15   at the MCC.  That's how I originally met with him.

16           THE COURT:  And just a minute on the, these potential

17   conflicts.

18           MR. HARRISON:  Sorry, Judge.

19           THE COURT:  And I take nothing in your work at the

20   U.S. Attorney's office poses any conflict to this case?

21           MR. HARRISON:  No, Judge.

22           THE COURT:  Right.

23           So, there is two issues.  Tell us first about the

24   delegation, the Turkish delegation to the European Union.

25           MR. HARRISON:  So, I did a conflicts check, Judge, in

HBL5atiC1

1    our system, and it came back with the only thing that our firm

2    does in relation to the Republic of Turkey is we have a partner

3    in our office in Belgium in Europe who advises some delegations

4    on commercial matters, as I understand it, mostly trade-type

5    issues.  He occasionally advises the Republic of Turkey

6    delegation to the European Union on commercial-related issues.

7    It is a relatively minor matter but it is an ongoing

8    representation.

9              THE COURT:  And as for the banks, there are these

10   so-called victim banks in this case.  You are probably familiar

11   with the list.  You represent some or all -- not you but your

12   firm represents some or all of those banks?

13             MR. HARRISON:  Yes, Judge.

14             So, there are a couple different lists in the docket

15   and so we took the most expansive list of banks that we saw and

16   I have ran conflicts checks on those things and talked to all

17   the relationship partners who deal with those banks and let me

18   just quickly break it down, as follows.

19             So, of the list of banks that we saw, at some point in

20   time our firm, which is a big firm, has done work for --

21   unrelated work, nothing related to this case in any way, for

22   all of those banks.  Currently, I believe there is one or two

23   of those banks that we are not currently engaged with but the

24   rest of them we do have current representations, nothing that

25   is related any in any way to Mr. Atilla or this trial or the

HBL5atiC1

1    allegations from the government at this trial.  It is things

2    like employee benefits and contracts work and corporate work,

3    things like that.  So, we have done all of that, all of that

4    checking.

5         There is one matter for one of the banks that is not

6    public that I think I need to talk to the Court a in a little

7    bit more detail about to clarify.  I don't think it is an issue

8    but I would like to bring it to the Court's attention but I

9    cannot do that in open court.

10        THE COURT:  Okay.  I am happy to do that with you at

11   some point.  In your opinion, is that going to preclude your

12   representation, in your opinion, in this matter?

13        MR. HARRISON:  No, Judge.  It is an unrelated matter

14   but it is a matter that I am involved in which is why I wanted

15   to bring it to the Court's attention.

16        THE COURT:  Okay.  So I can either do it now or later.

17        MR. HARRISON:  At the Court's pleasure.

18        THE COURT:  If you think it is -- well, let's do it a

19   little bit later on then.

20        MR. HARRISON:  Sounds good, Judge.  Thank you.

21        THE COURT:  Okay.  That's great.

22        So I am going to make the retainer agreement a Court

23   exhibit to this proceeding and let's turn to some of these

24   Curcio questions.

25        So, Mr. Atilla, we will need to swear you in.  You

1    have some experience already with these Curcio proceedings.

2    The questions, I don't know if you have seen the list of

3    questions that I have, they're similar and not exactly the same

4    form as previous questions.

5              Here is Mr. Lockard again.

6              MR. LOCKARD:  I'm sorry, your Honor.

7              THE COURT:  Yes.

8              MR. LOCKARD:  Just with respect to the last nonpublic

9    representation that Mr. Harrison had discussed?

10             THE COURT:  Yes.

11             MR. LOCKARD:  I think even if it is to be addressed

12   with the Court later, just to confirm that Mr. Harrison had

13   discussed it with Mr. Atilla before he answers the questions?

14             THE COURT:  Fair point.

15             MR. HARRISON:  That's an excellent point, Judge.

16             I went back in my notes to check and make sure that I

17   had referenced this with Mr. Atilla because my memory is that I

18   did.  I don't see it in my notes so I think we should be

19   extra -- we should --

20             THE COURT:  Oh.  All right.  So, you know what?  We

21   will do two things.  We will deal with it now.  Why don't you

22   and I spend a moment with the court reporter in the robing

23   room -- well, why don't you and Mr. Atilla, actually, spend a

24   couple of minutes first and with Mr. Dratel helping in that

25   regard, and then we will talk.  Okay?

1        MR. HARRISON:  Thank you.

2        THE COURT:  So we will go off the record for a moment.

3        If you want to go into the holding area that might be

4   better, and the interpreter could perhaps go with you.

5        (Recess)

6        THE COURT:   I take it you have had an opportunity to

7   talk to Mr. Atilla?

8        MR. HARRISON:  Yes, your Honor.

9        THE COURT:  And if you want to come up and talk to me,

10  I am happy to.

11        (Pages 20-21 SEALED by order of the Court)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (In open court)

2                  THE COURT:  So, the questions, we will swear in -- did

3      I do that?

4                  THE DEPUTY CLERK:  No, Judge.

5                  THE COURT:  Mr. Atilla, we need to swear you in.

6                  THE DEPUTY CLERK:  Sir, if you could stand for a

7      moment, please, and raise your right hand?

8                  THE DEFENDANT:  I don't want to raise my hand.

9                  THE DEPUTY CLERK:  Understood.

10                 (Defendant sworn)

11                 THE DEFENDANT:  Yes, I swear that I will answer all

12     the questions truthfully.

13                 THE DEPUTY CLERK:  Thank you, sir.  You may be seated.

14                 THE COURT:  Thank you.

15                 Now, Mr. Atilla, you understand what this -- the

16     purpose of today's Curcio proceeding and questions that I am

17     about to ask you?

18                 THE DEFENDANT:  Yes, your Honor, I know.

19                 THE COURT:  Okay.

20                 So, I am just doing this to have a complete record and

21     until we finish, you realize that I have not yet determined

22     whether McDermott Will & Emery should represent you as counsel

23     in this matter?  You realize that?

24                 THE DEFENDANT:  Yes, I understand, your Honor.

25                 THE COURT:  I should add that based on other

1  proceedings in this case, it seems very likely that there will

2  be no problem with Mr. Harrison's representation but let's wait

3  until we get to the end.

4          So, if I may ask you your age?

5          THE DEFENDANT:  47.

6          THE COURT:  And your education, how far you went in

7  school?

8          THE DEFENDANT:  I studied economy.  I finished

9  university, bachelors degree.

10          THE COURT:  And whether you are taking current

11  medications?  You don't have to tell me what they are but if

12  you are.

13          THE DEFENDANT:  No, I'm not taking anything.

14          THE COURT:  And, have you had any medications,

15  alcohol, drugs, within the past 24 hours?

16          THE DEFENDANT:  I didn't use anything.

17          THE COURT:  And, is there anything including language

18  differences that interferes with your ability to understand

19  what's happening in court here today?

20          THE DEFENDANT:  There isn't anything at the moment.

21          THE COURT:  So, the next series of questions relates

22  to the fact that the legal fees of Mr. Harrison and his firm

23  are being paid by your employer Halkbank, and the first

24  question is are you aware that your employer, Halkbank, is

25  paying for your legal fees and expenses in this matter of

1  Mr. Harrison and his firm?

2            THE DEFENDANT:  Yes, I am aware of that.

3            THE COURT:  And are you also aware that Halkbank is

4  paying legal fees and expenses for other attorneys at

5  McDermott -- at the McDermott firm?

6            That would include, I guess, Mr. Evans; is that right?

7            MR. HARRISON:  Yes, your Honor.

8            THE DEFENDANT:  Yes, I know.

9            THE COURT:  And, the fact that Halkbank is the paying

10 party of your McDermott legal fees and expenses was set forth

11 in the retainer agreement that I referred to a few minutes ago,

12 and both you and Halkbank signed the retainer agreement?  I

13 will just ask you about yourself, that was your signature on

14 that agreement; is that right?

15            THE DEFENDANT:  Yes, your Honor.

16            THE COURT:  And you are also aware that Halkbank is

17 majority-owned by the Republic of Turkey?

18            THE DEFENDANT:  Yes, I'm aware of that.

19            THE COURT:  And are you aware that, what is referred

20 to as the permanent delegation to the European Union of the

21 Republic of Turkey, is also a client of the McDermott firm?

22            THE DEFENDANT:  Yes.

23            THE COURT:  And, do you understand that the reasons

24 for this Curcio proceeding, in principal part, are because of

25 the fee arrangement as well as the representation of the

1 permanent delegation and other banks by McDermott might cause

2 them -- potentially could cause McDermott to take positions in

3 this case before trial, during the trial, at sentencing if that

4 were ever to come about or on appeal if that ever eventuated,

5 that are critical of Halkbank even if criticizing the bank

6 might help you in your defense?  So, the potential conflict

7 that could arise between the bank and McDermott's

8 representation of you.

9          You're aware of that issue?

10          THE DEFENDANT:  Yes, I'm aware of it.

11          THE COURT:  And, I should point out that the retainer

12 agreement with McDermott also provides that you are McDermott's

13 only client in this matter, meaning in the case here in court

14 and therefore McDermott is not representing either Halkbank or

15 the permanent delegation to the European Union of the Republic

16 of Turkey or any other bank in this matter.

17          Do you realize that?

18          THE DEFENDANT:  I understand and I confirmed that with

19 him.

20          THE COURT:  Then did you understand that since you are

21 McDermott's only client in this matter, McDermott has expressed

22 that it owes you a duty of undivided loyalty in this matter?

23          Do you realize that?

24          THE DEFENDANT:  Yes.  I'm aware of that and he

25 promised me that.

1          THE COURT:  And, do you recognize that your interests

2     in a public trial of the charges in this case, upon which we

3     are about to embark, may be different from the interests of

4     Halkbank?  Do you realize that?

5          THE DEFENDANT:  Yes.  Of course I'm aware of that.

6          THE COURT:  And I think it's also fair to add that

7     it's conceivable that they may be different than the interests

8     of the Republic of Turkey as well.  Is that a fair statement?

9          THE DEFENDANT:  We would be able to say that, your

10    Honor.

11         THE COURT:  And have you consulted with Mr. Dratel,

12    who was originally retained to help us work through these

13    conflict issues and now has taken on the role of representing

14    you full-time during the course of this trial, have you

15    consulted with him about Halkbank's paying McDermott's legal

16    fees and expenses?

17         THE DEFENDANT:  Your Honor, I discussed this with

18    Attorney Dratel without mentioning the name.

19         THE COURT:  Okay.  Without mentioning the name of the

20    firm?  The law firm?  Or?

21         THE DEFENDANT:  Yes, your Honor.  I did not disclose

22    the name of the firm, but I asked him if there was another firm

23    that I would want to represent, would there be any issue or

24    not.

25         THE COURT:  I got it.

1           And, Mr. Dratel, are you now -- of course the names

2     are public.  Are you okay, from your point of view, with

3     Mr. Harrison's joining the defense team in this case?

4           MR. DRATEL:  Yes, your Honor.  Based on Mr. Atilla's

5     answers, yes.

6           THE COURT:  Correct.

7           MR. DRATEL:  Just one correction, your Honor?  I'm

8     appointed, not retained.  I think the Court said retained but

9     I'm appointed.

10          THE COURT:  Ah.  Oh, correct.  That is correct.

11          INTERPRETER:  I'm sorry, your Honor.

12          Could you please repeat that?

13          MR. DRATEL:  Sorry.  That I am appointed by the Court,

14    not retained by Mr. Atilla.

15          THE COURT:  Do you understand also, Mr. Atilla, that

16    if Halkbank were to stop or cease paying your legal fees and

17    expenses and if you are unable to pay them yourself, then

18    McDermott could potentially seek to withdraw -- they would seek

19    permission to withdraw as your attorneys in this case?

20          You realize that that's a possibility?

21          THE DEFENDANT:  I did discuss this matter with the

22    firm and they told me that they will continue to represent me

23    if there are any issues arise like that.

24          THE COURT:  Good.

25          So, after considering what has been said today about

1  Halkbank's payment of McDermott's legal fees and expenses, and

2  also knowing that Halkbank is majority owned by the Republic of

3  Turkey, and also knowing that McDermott represents the

4  permanent delegation of the European Union of the Republic of

5  Turkey, and also having discussed with me in these questions

6  back and forth the ways in which this representation could

7  potentially adversely affect your defense, do you believe that

8  it's in your best interest to continue or to have me allow into

9  the case the McDermott firm and Mr. Harrison and Mr. Evans on

10 your behalf?

11           THE DEFENDANT:  Yes, your Honor.

12           THE COURT:  And that is what you want to have happen;

13 is that correct?

14           THE DEFENDANT:  Yes, your Honor.

15           With your permission, I would like to explain one

16 point.

17           THE COURT:  Sure.

18           THE DEFENDANT:  First of all, I would like to say that

19 the suggestion about adding the firm of McDermott to my defense

20 case was suggested by Halkbank.  That has nothing to do with my

21 satisfaction of my defense attorneys.  And, I agreed with them

22 to have an additional help as we are getting closer to the

23 trial date.  Therefore, I agree with the strategy, but I would

24 like to include that the suggestions came from Halkbank.

25           THE COURT:  I appreciate that.  Thank you.

HBL5atiC3

1        So, let's talk a minute about the potential conflict

2   that results from McDermott's representation of the banks.  I

3   forget already.  Do we have a list of which of the banks are

4   those you approve?

5        MR. HARRISON:  I have a list that we got from the past

6   filings, Judge, that I can hand up.

7        THE COURT:  Okay.  Mr. Dratel, are you familiar with

8   the list?

9        MR. DRATEL:  No, your Honor.

10       THE COURT:  Do you want to take a look, off the

11  record, with Mr. Atilla?

12       (Defendant and counsel conferring)

13       MR. DRATEL:  Does the Court have the list?

14       THE COURT:  I haven't seen it yet.

15       MR. DRATEL:  Okay.

16       THE COURT:  Yep, I do now.  It includes:  Bank of New

17  York Mellon, Deutsche Bank, Wells Fargo, Standard Charter, UBS,

18  Bank of America, HSBC, JP Morgan Chase, Bank of Tokyo

19  Mitsubishi New York, Banca Intesa, and Citibank.  So that's, I

20  think, actually several names more than the so-called victim

21  banks in our case.

22       Am I right about that, Mr. Lockard?

23       MR. LOCKARD:  Yes, your Honor.

24       THE COURT:  So, okay.

25       MR. HARRISON:  We took the most expansive approach.

HBL5atiC3

1              THE COURT:  I appreciate that.  I gotcha.

2              So, you have it now in front of you, right?  And I am

3    going to make this list of banks Exhibit B to today's

4    proceeding.

5              MR. HARRISON:  Thank you, your Honor.

6              THE COURT:  Mr. Lockard, will you tell us which of

7    these are greater than or in excess of the so-called victim

8    banks?

9              MR. LOCKARD:  Banca Intesa and Bank of Mitsubishi New

10   York are banks that have not been previously identified as

11   victim banks but are relevant banks in the discovery and

12   evidence.

13             THE COURT:  You know, I didn't think to ask you this

14   and let me ask you this, Mr. Harrison.

15             So, has McDermott made any structural arrangements to

16   avoid any overlap between your representation of Mr. Atilla in

17   this case and your firm's or your representation of the banks

18   on Court Exhibit B?  Or will you, if you haven't?

19             MR. HARRISON:  Yes, Judge.

20             We either have or we are in the process of doing so,

21   with the exception of the issue that we talked about in the

22   back.

23             THE COURT:  Which is your representation.

24             MR. HARRISON:  Correct, your Honor.

25             THE COURT:  Okay.

1          And do you have any, in very general terms if you

2   know, what kind of arrangements are made or will be made?

3          MR. HARRISON:  Well, since Mr. Evans and I don't have

4   anything to do with any of these other representations of any

5   of these other banks, again, with the exception of the one that

6   I talked to your Honor in the back about and talked to

7   Mr. Atilla about today, we are just making sure that we don't

8   have anything to do with those representations or talk about

9   this case to the partners that represent those clients.

10         THE COURT:  And that would be vice versa as well?

11         MR. HARRISON:  Yes, your Honor.

12         THE COURT:  Okay.

13         Mr. Atilla, the next question is whether the

14  McDermott -- Mr. Harrison has, and/or Mr. Dratel have discussed

15  with you this list of banks that are clients of McDermott firm

16  and which includes some of what we have called the victim banks

17  in this proceeding of which I think there were nine,

18  Mr. Lockard; is that correct?

19         MR. LOCKARD:  Yes, your Honor.

20         THE COURT:  So, have you taken -- had a chance to take

21  a look at this list?

22         THE DEFENDANT:  I just looked at it.

23         THE COURT:  And, has Mr. Harrison informed you that

24  even though they personally may not participate in the

25  representation of these banks on the list with one exception

1　which would be no. 9, they nevertheless they, that is to say

2　the McDermott firm, have ethical obligations owed to the banks

3　because they are clients of the law firm that Mr. Harrison

4　works for?

5　　　　　Did you have that discussion with him?

6　　　　　THE DEFENDANT:  Yes, we talked about it.

7　　　　　THE COURT:  And, have you also discussed that with

8　Mr. Dratel as well?

9　　　　　THE DEFENDANT:  Yes, we talked about it.

10　　　　　THE COURT:  And, you understand the fact that your

11　McDermott lawyers -- Mr. Harrison and Mr. Evans -- that they

12　represent you and their firm simultaneously represents these

13　bank clients and may lead them to have loyalties divided as a

14　firm divided between yourself and the bank client?

15　　　　　You understand that?

16　　　　　THE DEFENDANT:  Yes, I understand.

17　　　　　THE COURT:  And you understand that even though the

18　McDermott attorneys may have these divided loyalties you,

19　nevertheless, are entitled to have counsel who have no divided

20　loyalties who are loyal only to you?

21　　　　　You understand that?

22　　　　　THE DEFENDANT:  I understand.

23　　　　　THE COURT:  And, do you understand that because of

24　these, what I am calling divided loyalties, your McDermott

25　lawyers might have an incentive, in some instances, to put the

HBL5atiC3

1  interests of the bank clients before yours?

2        Do you realize that?

3        THE DEFENDANT:  I hope it won't happen but I do

4  understand.

5        THE COURT:  Okay.

6        And so, I am going to give you some examples of the

7  ways in which it could happen, that is to say ways in which the

8  McDermott lawyers' representation of these banks could

9  adversely affect their representation of you.

10        So, for example, it could impact whether and when they

11  recommend or don't recommend that you plead guilty in this

12  case.

13        Do you realize that?

14        THE DEFENDANT:  Yes, I understand.

15        THE COURT:  And, do you understand that it might come

16  into play at such time that you should seek or not to seek to

17  cooperate with the U.S. government in this case?  Do you

18  realize that?

19        THE DEFENDANT:  I understand.

20        THE COURT:  And, do you realize that these potential

21  conflicts could come into play in their advising you what

22  defenses you should raise in this case?  You realize that?

23        THE DEFENDANT:  I understand.

24        THE COURT:  And, do you also realize that it could

25  impact their advice as to whether you should proceed to trial

1     in this case including any interests on the part of the bank

2     clients to avoid the public trial?  Do you realize that?

3              THE DEFENDANT:  Yes, I understand.

4              THE COURT:  And, do you understand that it could also

5     include their advice to you as to whether you should testify at

6     trial?

7              THE DEFENDANT:  Yes, I understand.

8              THE COURT:  And, if it came to that, it might also

9     impact the advice they give you as to which, if any, bank

10    client witnesses should be cross-examined and what questions

11    they should be asked upon cross-examination?

12             You realize that?

13             THE DEFENDANT:  I understand.

14             THE COURT:  And, do you understand that it might

15    impact which, if any, bank client witnesses should be

16    subpoenaed and called to testify and what other evidence, if

17    any, should be sought concerning the banks?

18             THE DEFENDANT:  I understand.

19             THE COURT:  And, this relationship could also impact

20    their advice to you as to what arguments to make on your behalf

21    to the jury at trial?

22             THE DEFENDANT:  Yes, I understand.

23             THE COURT:  And, do you also understand it could

24    impact their advice to you as to what arguments to make to the

25    Court and what facts to bring to the Court's attention before

1    trial, during trial, and if it should happen, at your

2    sentencing if you were to be convicted?

3              Do you understand that?

4              THE DEFENDANT:  Yes, I understand.

5              THE COURT:  Just hold on for one second.

6              (Pause)

7              THE COURT:  So, counsel have asked me to present to

8    you also some examples of potential conflicts and to run them

9    by you, as follows:

10             Do you understand that your McDermott attorneys may

11   not wish to take positions in this case before trial or during

12   trial, or at sentencing or on appeal, if those events were to

13   happen, that are critical of the bank clients even if

14   criticizing those banks might help your defense?

15             Do you realize that?

16             THE DEFENDANT:  Yes, I'm aware of that.

17             THE COURT:  Are you also aware that your McDermott

18   attorneys may have access to or may have learned confidential

19   information from bank clients that they represent but that they

20   would absolutely be prohibited from providing this information

21   to you or members of your defense team for use in your defense,

22   even if that information could be helpful in your defense

23   because of such things as attorney-client privilege?

24             Do you realize that?

25             THE DEFENDANT:  I understand.

1          THE COURT:  And, do you understand that the McDermott

2     attorneys may be limited in making arguments about your level

3     of involvement or non-involvement in the offense or the crimes

4     which are alleged in this case to have occurred or your role,

5     if any, in those offenses, or concerning your culpability?

6          Are you, potentially, of the limitations of that

7     nature?

8          THE DEFENDANT:  Yes, I understand.

9          THE COURT:  Are you aware that you have other counsel,

10    including Mr. Dratel, for example, apart from the McDermott

11    attorneys who, if necessary, would decide with you whether or

12    not to engage in the following activities on your behalf and,

13    in fact, will engage in these activities, if appropriate?  One

14    is to use or advise you on the use of Court process to compel

15    the production of documents from the bank clients or to compel

16    the attendance of witnesses who are employees or agents of the

17    bank clients.

18          Do you realize that?  That advice will be available to

19    you?

20          THE DEFENDANT:  Yes, I'm aware of it.

21          THE COURT:  And are you also aware that counsel, other

22    than the McDermott attorneys, will be available to help you get

23    through or undertake cross-examining witnesses who are

24    employees of the bank clients should they be called to testify

25    at your trial?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And, are you also aware that you will have

3   other counsel apart from the McDermott attorneys who, upon

4   consultation with you, might accuse the bank clients of knowing

5   about or being complicit in, or otherwise not being a victim of

6   the alleged illegal transactions that you are charged with?

7          Do you realize that?

8          THE DEFENDANT:  I am aware of that.

9          THE COURT:  Do you think then that you understand

10  these examples of potential problems and potential resolutions

11  that I have been explaining to you with respect to the banks

12  and the bank clients of McDermott?

13         THE DEFENDANT:  Yes, I understood, your Honor.

14         THE COURT:  Then could you tell me, in your own words,

15  what that understanding is, that is to say, what is your

16  understanding of potential conflicts of interest related to the

17  bank clients of the McDermott firm in this situation?

18         THE DEFENDANT:  Of course.

19         I understand that this company, when they're

20  representing with bank relationship or the issues that will

21  arise, they will act on my behalf and they will protect my

22  benefits.

23         THE COURT:  But they may not -- those lawyers who may

24  do that may not be the McDermott lawyers, they may be one of

25  your other counsel.

1          Do you realize that?

2          THE DEFENDANT:  Yes, I know that, and I am aware of

3     that, your Honor.

4          THE COURT:  Do you understand that perhaps the

5     greatest danger is our inability to foresee all of the possible

6     potential conflicts that might arise because of McDermott's

7     simultaneous representation of the bank clients and you?

8          Do you realize that?

9          THE DEFENDANT:  I'm really aware of it, yes.

10          THE COURT:  And, is my understanding correct that

11     there are no bank waivers with respect to the McDermott list of

12     banks, that is to say waivers that they've signed that say, in

13     effect, that it is okay for you, Mr. Harrison and Mr. Evans, to

14     represent Mr. Atilla?

15          MR. HARRISON:  Judge, we have had conversations with

16     most, if not all of the banks on the list.  We haven't gotten

17     any indication that they have a problem with it.  They have

18     indicated that they would -- most of them have indicated that

19     they would submit waiver letters as they have previously in

20     this case already for other firms, if necessary.

21          THE COURT:  I would appreciate just if you would

22     follow up and say we would like to have them, if possible.

23          MR. HARRISON:  Sure.  Will do.

24          THE COURT:  Okay.

25          So, let's now turn to this other topic of potential

1  conflicts posed by McDermott's representation of the permanent

2  delegation to the European Union of the Republic of Turkey.

3         Have the attorneys from McDermott, including

4  Mr. Harrison and Mr. Evans, advised you that their law firm

5  also represents the permanent delegation to the European Union

6  of the Republic of Turkey?

7         THE DEFENDANT:  Yes.  They told me.

8         THE COURT:  And, have they informed you that even

9  though they personally may not participate in representing the

10  permanent delegation to the European Union of the Republic of

11  Turkey that they nevertheless, as a part of McDermott firm,

12  have ethical obligations to the permanent delegation to the

13  European Union of the Republic of Turkey because that is a

14  client of their law firm?

15         THE DEFENDANT:  Yes.  They informed me.

16         THE COURT:  And, do you understand that the fact that

17  your attorneys from McDermott simultaneously represent you and

18  the permanent delegation to the European Union of the Republic

19  of Turkey, may lead to divided loyalties between yourself and

20  that permanent delegation, not unlike the situation involving

21  their representation of the banks?

22         THE DEFENDANT:  Yes, I understand.

23         THE COURT:  Do you realize that that divided loyalty,

24  in some instances, could cause your lawyers from -- potentially

25  from McDermott, to have some incentive to put the interests of

1    the permanent delegation over yours or before yours?

2              Do you realize that?

3              THE DEFENDANT:  Yes, I understand.

4              THE COURT:  And here are those similar examples that I

5    gave with respect to the banks that could impact or could

6    eventuate from this dual representation, so it could cause some

7    impact upon your attorneys' advice to you as to whether and

8    when you should plead guilty in this case.

9              Do you realize that?

10             THE DEFENDANT:  Yes, I understand.

11             THE COURT:  And also as to whether or not you should

12   seek to cooperate with the government, it could impact that

13   advice?

14             Do you realize that?

15             THE DEFENDANT:  Yes, I understand.

16             THE COURT:  Do you also realize that it could impact

17   the defenses that they recommend that you raise?

18             Do you realize that?

19             THE DEFENDANT:  Yes, I understand.

20             THE COURT:  And it also could impact whether you,

21   their advice as to whether or not you should testify at trial?

22   Do you realize that?

23             THE DEFENDANT:  Yes, I understand.

24             THE COURT:  And, do you also realize that it could

25   impact which witnesses should be cross-examined and what

1   questions they should be asked?

2           Do you realize that?

3           THE DEFENDANT:  Yes, I understand.

4           THE COURT:  Do you realize it could impact which

5   witnesses should be called and what other evidence might be

6   offered on your behalf?

7           THE DEFENDANT:  Yes, I understand.

8           THE COURT:  And do you realize it could also impact

9   the arguments that -- their advice to you as to what arguments

10  should be made, on your behalf, to the jury?

11          THE DEFENDANT:  Yes.

12          THE COURT:  And, also, it could impact what arguments

13  to make -- what advice they give you as to what arguments to

14  make to the Court and what facts to bring to the Court's

15  attention before trial, during trial, and at your sentencing?

16          Do you realize that?

17          THE DEFENDANT:  Yes, I understand.

18          THE COURT:  And so just to be -- to leave no stone

19  unturned, let me expand on these examples as I did with respect

20  to the bank's.

21          First of all, do you understand that your interest in

22  a public trial of the charges in this case may be different

23  from the interests of the permanent delegation to the European

24  Union of the Republic of Turkey?

25          Do you realize that?

1      THE DEFENDANT:  I understand.

2      THE COURT:  And, do you realize that your attorneys

3  from McDermott cannot advise you to proceed to trial in a

4  manner that would be adverse to the interests, if there were

5  such a possibility, of the permanent delegation to the European

6  Union of the Republic of Turkey?

7      Do you realize that?

8      THE DEFENDANT:  I understand.

9      THE COURT:  And, another example, do you understand

10  that your attorneys from McDermott may advise you not to take

11  positions in this case, either before trial, during trial, or

12  at sentencing if that were to come about, that are critical of

13  the permanent delegation to the European Union of the Republic

14  of Turkey, even if criticizing them might help your defense?

15      Do you realize that?

16      THE DEFENDANT:  Yes, I understand.

17      THE COURT:  And, another example, do you understand

18  that your attorneys from McDermott may advise you not to seek

19  to admit certain evidence in this case that they view as

20  adverse to the interests of the permanent delegation to the

21  European Union of the Republic of Turkey even if by admitting

22  that evidence, that would help your defense?

23      Do you realize that?

24      THE DEFENDANT:  Yes.

25      THE COURT:  And, do you also realize or understand

1   that your attorneys from McDermott, that is to say Mr. Harrison

2   and Mr. Evans, cannot negotiate on your behalf in a manner that

3   would be adverse to the interests of the permanent delegation

4   to the European Union of the Republic of Turkey?

5          Do you realize that?

6          THE DEFENDANT:  I understand.

7          THE COURT:  And, do you understand that, relatedly,

8   they could not use any confidential information they may have

9   learned pursuant to their representation of the permanent

10  delegation to the European Union of the Republic of Turkey upon

11  your behalf?

12         THE DEFENDANT:  I understand.

13         THE COURT:  And, do you understand also that the

14  McDermott attorneys cannot counsel or advise you to accept a

15  disposition of this case that harms or is adverse to the

16  interests of the permanent delegation to the European Union of

17  the Republic of Turkey?

18         THE DEFENDANT:  I understand.

19         THE COURT:  You think then you also understand all

20  these examples that I have posed to you?

21         THE DEFENDANT:  I understood, your Honor.

22         THE COURT:  So, you know, I have a thought, and

23  correct me if I am wrong, but in talking about the permanent

24  delegation, we are in fact talking about a form of

25  representation of the Republic of Turkey, right, whether it is

1    called delegation or whatever but it is really a representation

2    of Turkey.

3            MR. HARRISON:  Yeah.  My understanding, it is a

4    specific government body of the Republic of Turkey.

5            THE COURT:  Fair enough.

6            So, then, Mr. Atilla, could you tell me, in your own

7    words, how you understand this potential conflict of interest

8    related to the permanent delegation to the European Union of

9    the Republic of Turkey?

10           THE DEFENDANT:  Your Honor, I don't know if the

11   permanent delegation to the European Union organization has any

12   conflict with my interest but if there are any issues that

13   arises like that, I understand the position of my defense

14   lawyers.

15           THE COURT:  Thank you.

16           And finally on this topic, you understand that the

17   greatest difficulty or danger to you is the inability of any of

18   us to foresee all of the possible conflicts that might arise

19   because McDermott simultaneously represents you and the

20   permanent delegation to the European Union of the Republic of

21   Turkey?

22           Do you realize that?

23           THE DEFENDANT:  I understand.

24           THE COURT:  Okay.  We are getting to the end.  Let me

25   talk to you now about the right for you to have conflict-free

1    representation.

2           Do you understand that in every criminal case,

3    including this one, the defendant is entitled to the assistance

4    of counsel whose loyalty to him is undivided, who is not

5    subject to any factor that might in any way intrude upon an

6    attorney's loyalty to your interests, in other words you

7    understand that you are entitled to attorneys who have only

8    your interests in mind and not the interests of any other

9    client?

10          Do you realize that?

11          THE DEFENDANT:  I understand.

12          THE COURT:  And correct me if I am wrong, we had

13   Curcio proceedings earlier that now, in addition to the one

14   today, Mr. Dratel, as counsel, has no such other interests.  Is

15   that right, Mr. Dratel?

16          MR. DRATEL:  That's correct, your Honor.

17          THE COURT:  And again, just so it is clear -- I think

18   it is abundantly clear -- have you agreed to represent

19   Mr. Atilla throughout the trial?

20          MR. DRATEL:  Yes, your Honor.

21          THE COURT:  Mr. Atilla, have you received any

22   inducements, promises or threats with regard to your choice of

23   counsel in this case?

24          THE DEFENDANT:  Nothing like that.

25          THE COURT:  And you mentioned that McDermott was

HBL5atiC3

1  recommended to you by Halkbank but are you in fact the person

2  or the one who decided to have them represent you in this case?

3       THE DEFENDANT:  It happened like this first.  I wanted

4  to look at the division and the contract between the bank and

5  McDermott.  After I reviewed that, I decided that it is

6  appropriate.

7       THE COURT:  Thank you.

8       And you understand that you have a right to consult

9  with an attorney free from any conflicts of interest about this

10 particular issue?

11      THE DEFENDANT:  Yes, I understand.

12      THE COURT:  For that purpose you certainly have had

13 the right and have the right to consult with Mr. Dratel who is

14 conflict-free and has been appointed as your independent

15 counsel and have had the opportunity to consult with him about

16 this aspect and today's proceeding as well?

17      THE DEFENDANT:  Yes; and I used his help very often.

18      THE COURT:  And you have also discussed this issue

19 with Mr. Harrison, have you not?

20      THE DEFENDANT:  Yes, I have discussed it with him.

21      THE COURT:  Do you feel you need any more time to

22 discuss it with him or with Mr. Dratel, for that matter?

23      THE DEFENDANT:  No.  I believe that we agreed on the

24 general terms.

25      THE COURT:  Okay.

1          And so, after considering all that I have said today

2     and that you have responded to me about the ways in which

3     McDermott's representation of the bank clients may adversely

4     affect your defense, do you nevertheless believe that it is in

5     your best interest to continue with McDermott as one of the law

6     firms representing you in this case?

7               THE DEFENDANT:  That's what I think, yes.

8               THE COURT:  And also, after considering what I have

9     advised you and what you know about the possibility that

10    Halkbank, who is paying for the McDermott firm's

11    representation, considering that they may have an interest in

12    positions different from ones that you may wish to take, do you

13    believe that it is in your best interest to continue with

14    McDermott who are counsel being paid by Halkbank?

15              THE DEFENDANT:  Yes.

16              THE COURT:  And that's your wish, to continue with the

17    McDermott firm?

18              THE DEFENDANT:  Yes.

19              THE COURT:  And two more questions and then I think we

20    are -- well, no, a few more questions.

21              After considering all that I have said today about the

22    ways in which the McDermott firm represents the permanent

23    delegation to the European Union of the Republic of Turkey may

24    adversely affect your defense, do you believe that it is in

25    your best interest to nevertheless continue with the McDermott

1    firm as counsel in this case, or as one of the counsel in this

2    case?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Do you understand that by choosing to

5    continue with the McDermott firm in this case you are waiving

6    your right to be represented exclusively by attorneys who have

7    no potential conflict of interest?

8           Do you realize that?

9           THE DEFENDANT:  I understand.

10           THE COURT:  And are you knowingly and voluntarily

11    waiving your right to conflict-free representation by taking on

12    the McDermott firm as part of your team?

13           THE DEFENDANT:  I do.

14           THE COURT:  And if, and only if, you were to be

15    convicted in this case, do you waive any post-conviction

16    argument, on appeal or otherwise, that by virtue of the

17    McDermott firm representation of the bank clients or the

18    permanent delegation to the European Union of the Republic of

19    Turkey, do you waive arguments that you were denied effective

20    assistance of counsel?

21           THE DEFENDANT:  Yes.

22           THE COURT:  And, after considering what I have said

23    and what you have said and how you advised me, do you feel that

24    you are able to knowingly and voluntarily make decisions about

25    your defense in these proceedings in this court?

1          THE DEFENDANT:  Yes.

2          THE COURT:  And then, finally, is there anything that

3    I have said or mentioned that you wish to have either me or

4    Mr. Dratel or any of your other counsel explain further?

5          THE DEFENDANT:  I believe I understood it all.  Thank

6    you very much.

7          THE COURT:  Any counsel, either for the government or

8    defense counsel, have anything that they wish me to pose to

9    Mr. Atilla that I have not?

10          MR. LOCKARD:  No, your Honor.

11          MR. DRATEL:  No, your Honor.

12          MR. ROCCO:  No, your Honor.

13          THE COURT:  Okay.

14          So, I think that concludes our work for today and I am

15    pleased to have the appearance in this case of Mr. Harrison and

16    Mr. Evans, and we look forward to working with you over the

17    weeks ahead.

18          MR. HARRISON:  Thank you, Judge.  Likewise.

19          Sorry.  Just one question?

20          THE COURT:  Sure.

21          MR. HARRISON:  If you are going to attach the list we

22    handed up, that's fine.  Can we do it under seal based on the

23    issued we discussed in the back, please?

24          THE COURT:  With respect to one of the banks?

25          MR. HARRISON:  Yes; so I would like to have the whole

1    list sealed.

2            THE COURT:  I have no problem.  Does anybody have a

3    problem with that?

4            MR. ROCCO:  I have no problem.

5            MR. HARRISON:  Michael, I can explain why.

6            MR. LOCKARD:  Okay.

7            THE COURT:  My suggestion, unless you don't want one,

8    I would like to take a two-minute break and then I would like

9    to hear your thoughts about the issue I raised earlier about

10   the anonymous jury.  You may want to consult among yourselves.

11           (Recess)

12           THE COURT:  So, the only remaining issue that I am

13   aware of is the issue of an anonymous jury which I suggested

14   earlier.

15           Do you have any thoughts about that?

16           MR. ROCCO:  Well, your Honor, in principle we, as a

17   group, defense lawyers oppose it, think it is certainly

18   unnecessary here and it is highly prejudicial.  This is not an

19   organized crime case.  There may be concerns but, quite

20   frankly, I don't think that there is concerns for the safety of

21   jurors and jurors are very, very sensitive to these things.

22           And if I may, your Honor, with all due respect to the

23   press pool, I can't imagine that this won't wind up in the

24   press, just the fact that we are talking about an anonymous

25   jury.  And that is very disturbing to me because I think it is

1  very prejudicial to Mr. Atilla.  It is very unusual, there have

2  been no witness threats that I'm aware of, and certainly

3  nothing has anything to do with Mr. Atilla in terms of threats.

4  And, jurors invariably draw inferences and I just think that an

5  anonymous jury is pregnant with the notion that jurors are in

6  danger or there is danger associated with the case and we

7  haven't seen that, your Honor.

8        MR. LOCKARD:  Your Honor, I think the government

9  agrees that the full anonymous jury procedures in this case are

10  unnecessary and would have certain drawbacks to them, but we

11  did discuss with Mr. Rocco over the break some suggestions of

12  sort of interim measures that would not raise some concerns

13  that Mr. Rocco has raised, but at the same time would provide a

14  degree of confidentiality of the identities of the jurors.

15  And, again, putting aside the issue of juror safety, I think

16  Mr. Rocco highlighted one reason why it may be appropriate

17  because of the press coverage, selecting a jury, and ensuring

18  free and fair deliberations by the jury would be facilitated by

19  some of those measures in a way that would not suggest that the

20  defendant or individuals associated with the defendant are a

21  threat to their safety.

22        And, I think perhaps with a little more discussion

23  with defense counsel, we may come up with some proposals that

24  we can submit Court, either jointly or separately.

25        THE COURT:  Yes.

1          So, just so you understand, safety wasn't even on my

2     radar.  I am concerned with the integrity of the proceedings,

3     and I am not only concerned with the privacy of particularly --

4     and I think jurors would appreciate, and if you come up with an

5     instruction, joint instruction, what I had in mind was just not

6     disclosing their names in court.

7          MR. ROCCO:  I don't think that's a problem.

8          THE COURT:  Oh.  That's all I had in mind.

9          MR. ROCCO:  Sure.  I don't have a problem with that.

10         THE COURT:  I would rather have jurors identify

11    themselves by number.

12         MR. ROCCO:  Yes, sure.

13         THE COURT:  That is really the extent of what I had in

14    mind.

15         MR. DRATEL:  Your Honor, having done this a number of

16    different ways including the way that is being discussed now,

17    it is important that the jurors know that the parties know who

18    they are, because that way they don't get the sense that the

19    threat to the integrity of the process comes from Mr. Atilla.

20         THE COURT:  Right.

21         MR. DRATEL:  That it comes from outside, that is what

22    the court is concerned about.

23         THE COURT:  Yes.

24         MR. DRATEL:  As long as that is done in a firm and

25    declarative way, that can protect the jurors from outside

HBL5atiC3

1    influences.

2          THE COURT:  I think we have agreement, actually, but

3    why don't you come up with the least restrictive measures and

4    whatever you think is needed to ensure that there is no

5    negative inference drawn against Mr. Atilla which is

6    certainly -- I would agree with that.

7          So, frankly, as I said before, all I had in mind is

8    them identifying themselves by number as opposed to by name.

9    Nothing more restrictive than that.  But, I will see what you

10   come up with.  Hopefully you come one a joint proposal and a

11   joint instruction, if you want me to give one in relation

12   thereto.

13         Okay.  Great to see you all.  Thank you very much.

14         MS. FLEMING:  Judge, not so fast, please?  I have a

15   couple I have to raise.  You don't want us to have suspicions.

16         We had a denial of Touhy.  May I please make a

17   submission of why we need Touhy subpoenas?

18         The FBI said we weren't sufficiently clear in our

19   request for certain things of the case agent.  I think we made

20   an application to the Court and we are going to have to do a

21   submission for that.

22         THE COURT:  All right.

23         MS. FLEMING:  Secondly, on some of the discovery and

24   Jencks materials that we got, which it is just an enormous

25   volume of it and Mr. Rocco can give you the numbers, but there

1    was a lot of redacted materials.  We think the unredacted

2    materials -- we don't have them, they should at least be an

3    exhibit to the Court so that if there is an appeal that that's

4    there, that's what the mechanism should be.  And, there are at

5    least one witness, maybe more, that, and we agree with the

6    government on this, that we are not even allowed to share the

7    name of the witness with our client.  Again, just not anything

8    to do with him, just the general integrity of the proceedings.

9    But, of course, it handicaps us in terms of doing any

10   investigation for cross-examination.  And we can't even raise

11   the name innocently because we're, candidly, we're afraid if we

12   even suggest the name to anybody, it is going to end up in the

13   press some way or another.

14           So, we alerted the government to this.  We intend to

15   recall whoever these witnesses are.

16           THE COURT:  To what?

17           MS. FLEMING:  We are going to recall them so that we

18   have time, once their identities are public after they've

19   testified, to do some investigation and at that point the

20   concerns about whatever the concerns are will be lifted but it

21   will give us the time do investigation in other places and I

22   wanted to make sure that the Court was aware of that.

23           Mr. Rocco wants to make it clear, we don't want to

24   give the name to an investigator, we don't want to give the

25   name to anybody and we have been scrupulous about observing

1   that and I think -- the fact that nothing has appeared shows

2   that and we want it to continue that way.

3           And just finally, Judge, there are certain redactions.

4           THE COURT:  So far I am in agreement with what you are

5   suggesting.

6           MS. FLEMING:  That is wonderful, Judge.

7           Judge, there are some redactions, we are still going

8   through the materials, there really is a lot of it.  There are

9   some redactions that we really believe we are entitled to see

10  what is there and these are things that are covered by the

11  protective order so I can't raise them here.

12          THE COURT:  So, raise them in the first instance with

13  the government, see if you can't --

14          MS. FLEMING:  I have.  We don't agree.  Should I --

15  what should I do?

16          THE COURT:  Raise them again.  They tend to get more

17  reasonable as you get closer to trial.

18          MS. FLEMING:  So, here is one of my reasonableness.

19          We have gotten more reasonable on stipulations.  We

20  have asked that and I think that they have agreed they're going

21  to give us the heads up the day before a witness and which

22  exhibits are going to be used, but our exhibit list is up to 69

23  pages, small spaces.  69 pages and there are 6,000 exhibits.

24          You know, this is a compressed trial.  We haven't

25  gotten an adjournment.  We have asked them please let us know

1    what exhibits they're really using and it is really time for us

2    to know which exhibits they're really going to use at trial.

3              THE COURT:  I think that's a fair point, so.

4              MS. FLEMING:  And a witness list.  We do have the 3500

5    material which, of course, gives us a hint, but it really would

6    be fair to know these things at this point.

7              THE COURT:  You might be able to narrow that down for

8    everybody's sake.

9              MR. DRATEL:  And, your Honor, I think if Mr. Harrison

10   and I are to meaningfully assist, one day in advance for

11   witnesses just doesn't -- I can't -- and none of us can absorb

12   anything in a meaningful way one day in advance to be of

13   assistance to Mr. Rocco.  So, I think that -- and that we

14   should have a week's worth of witnesses so that we can

15   participate in some way in a way that makes sense.

16             THE COURT:  Mr. Lockard?

17             MR. LOCKARD:  So, obviously by trying to identify

18   government's exhibits we are making them available more than a

19   week in advance of trial.  We have agreed to commit to, at the

20   least, identifying witnesses and exhibits that we anticipate

21   using the following day, the day before.  If we can do better

22   than that, we will.

23             THE COURT:  He is saying, and I think, in fact, given

24   the fact that particularly Mr. Harrison is new to the case, you

25   could enhance that somewhat.

1          MR. LOCKARD:  He is joining an entrenched team.  We

2     are not trying to hide the ball.  We will do what we can to try

3     and facilitate this.  I think there are somewhat less than

4     6,000 exhibits, in total.

5          THE COURT:  I hope so.

6          MR. LOCKARD:  Some of them are -- you know, there are

7     bank transactions, there are documents.  Some things are in

8     bulk that don't need to be considered individually but are all

9     nonetheless collectively relevant.  But, we will continue to

10    work with defense counsel on these matters and we are happy to

11    provide -- we have provided 3500 material.  We will provide a

12    witness list, that's not a problem.  I think there are, just

13    from the government's point of view, a couple of -- a couple --

14    there are a number of remaining motions *in limine* outstanding

15    that would affect the trial, and specifically the first couple

16    days and first week of trial.  I think in discussions with

17    Mr. Rocco and Ms. Flemming in particular, we have made progress

18    on some of those issues, but there are still motions to

19    preclude a number of expert witnesses and to limit expert

20    testimony and to limit cross-examination of various witnesses.

21         THE COURT:  I get you.

22         So, today is Tuesday.  Why don't you, by noon

23    tomorrow, send me a joint letter of what's still open and

24    hopefully with some reasoned discussion between now and then,

25    that can be a short letter.

HBL5atiC3

1          So, how it is left is you are going to spend some time

2     with each other meeting and conferring and winnowing down

3     whatever both sides think is left for the Court to resolve and

4     that you will present to me by noon tomorrow.

5          MR. LOCKARD:  Yes, your Honor.  We have had several

6     rounds, we will have some more rounds.

7          THE COURT:  Great.

8          MR. LOCKARD:  And I think the government would just

9     ask if the Court, whenever the Court has a version of the voir

10    dire that it intends to use on Monday, we would just

11    respectfully request a copy of that prior to Monday.

12         THE COURT:  Yes.  I think I am going to make that

13    public as well.

14         MR. LOCKARD:  Thank you, your Honor.

15         THE COURT:  I am close to having that done.

16         Thanks.  Good to see you.

17                              o0o

18

19

20

21

22

23

24

25