UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                              :

UNITED STATES OF AMERICA         :
                                              :

    - v. -                            :          S4 15 Cr. 867 (RMB)
                                              :

MEHMET HAKAN ATILLA,         :
                                              :

            Defendant.      :

                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

 

**GOVERNMENT'S SENTENCING MEMORANDUM**

 

                                      GEOFFREY S. BERMAN
                                        United States Attorney
                                        Southern District of New York

Michael D. Lockard,
Sidhardha Kamaraju,
David W. Denton, Jr.,
      Assistant United States Attorneys,
Dean C. Sovolos,
      Special Assistant United States Attorney,
*- Of counsel -*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ................................................................................................................... 3

    A. The U.S. Sanctions Regime ..................................................................................... 3

    B. Atilla's Participation in the Sanctions Evasion Scheme ........................................ 5

        1. The Gold Scheme ............................................................................................. 6

        2. The Fake Food Scheme .................................................................................... 9

        3. Misrepresentations to U.S. Treasury Officials ............................................. 12

        4. Atilla's Arrest ................................................................................................. 18

        5. Trial ................................................................................................................ 18

    C. Atilla's Objections to the PSR ............................................................................. 20

        1. Atilla's "General Objection" Has Already Been Rejected by the Court ..... 20

        2. Atilla's Remaining Objections Are Also Meritless ..................................... 20

DISCUSSION ...................................................................................................................... 32

    I. The Correctly Calculated Guidelines Sentencing Range ..................................... 32

        A. The Base Offense Level Is Determined Pursuant to Section 2S1.1(a)(2).................. 32

        B. An Adjustment for Atilla's Managerial Role Should Be Applied, and
            No Adjustment for a Mitigating Role Is Warranted ..................................... 35

        C. The Obstruction of Justice Enhancement Applies ...................................... 39

        D. No Reduction Under § 2X1.1(b)(2) Is Appropriate ..................................... 41

        E. Criminal History Category ............................................................................ 41

        F. Applicable Sentencing Range ....................................................................... 41

        G. Alternative Sentencing Range ...................................................................... 42

    II. A Significant Incarceratory Sentence and Fine Are Warranted .......................... 44

        A. The Seriousness of the Offense and Need to Promote Respect for the Law ............. 45

        B. Atilla Willfully Violated U.S. National Security Controls, Defrauded U.S. Banks,
            and Laundered Money Through the United States ....................................... 48

        C. Atilla's Sentencing Arguments Do Not Warrant a Reduced Sentence ...................... 49

            1. Comparable Sentences ............................................................................ 50

            2. Atilla's Remaining Arguments Are Unpersuasive ................................ 62

CONCLUSION .................................................................................................................... 63

**Cases**

*United States v. ABN Amro Bank N.V.*, 10 Cr. 124 (CKK) (D.D.C.) ............................................. 55

*United States v. Amirnazmi*, 08 Cr. 429 (CMR) (E.D. Pa.) ......................................................... 60

*United States v. Amirnazmi*, 645 F.3d 564 (3d Cir. 2011)......................................................... 60

*United States v. Banki*, 685 F.3d 99 (2d Cir. 2012) .................................................................. 60

*United States v. Barclays Bank PLC*, 10 Cr. 218 (EGS) (D.D.C.) ............................................... 56

*United States v. Bennett*, 05 Cr. 1192 (NRB) (S.D.N.Y.)............................................................. 62

*United States v. Blount*, 291 F.3d 201 (2d Cir. 2002).............................................................. 41

*United States v. BNP Paribas S.A.*, 14 Cr. 460 (LGS) (S.D.N.Y.)........................................... 57, 58

*United States v. Bonds*, 933 F.2d 152 (2d Cir. 1991) ........................................................ 43, 44, 45

*United States v. Burgos*, 324 F.3d 88 (2d Cir. 2003)................................................................ 41

*United States v. Commerzbank AG*, 15 Cr. 31 (BAH) (D.D.C.).................................................. 57

*United States v. Credit Agricole Corporate and Investment Bank*, 15 Cr. 137 (CKK) (D.D.C.) ... 56

*United States v. Credit Suisse AG*, 09 Cr. 352 (RCL) (D.D.C.) .................................................. 56

*United States v. DeRiggi*, 72 F.3d 7 (2d Cir. 1995) .................................................................. 40

*United States v. Dhafir*, 03 Cr. 64 (NAM) (N.D.N.Y.) ........................................................... 62, 63

*United States v. Dhafir*, 511 F. App'x 74 (2d Cir. 2013) .......................................................... 47

*United States v. Dhafir*, 577 F.3d 411 (2d Cir. 2009).................................................... 7, 46, 62, 63

*United States v. Ebbers*, 02 Cr. 1144 (BSJ) (S.D.N.Y.) ............................................................ 62

*United States v. Garza-Gonzalez*, 12-647, 2012 WL 3782644 (2d Cir. 2012)........................ 63, 64

*United States v. Greer*, 285 F.3d 158 (2d Cir. 2002)................................................................ 41

*United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011) ............................................................. 38

*United States v. Hertular*, 562 F.3d 433 (2d Cir. 2009) ........................................................... 40

*United States v. HSBC Bank USA, N.A.*, 12 Cr. 763 (ILG) (E.D.N.Y.)........................................ 56

*United States v. ING Bank N.V.*, 12 Cr. 136 (PLF) (D.D.C.) ...................................................... 55

*United States v. Jolly*, 102 F.3d 46 (2d Cir. 1996).................................................................... 42

*United States v. Laljie*, 184 F.3d 180 (2d Cir. 1999) ............................................................... 43

*United States v. Lloyds Bank TSB*, 09 Cr. 7 (ESH) (D.D.C.) ..................................................... 57

*United States v. Madoff*, 09 Cr. 213 (DC) (S.D.N.Y.).............................................................. 62

*United States v. Martoma,* 12 Cr. 973 (PGG) (S.D.N.Y.) ........................................................ 62

*United States v. Mazer and Aronshtein,* 11 Cr. 121 (GBD) (S.D.N.Y.)....................................... 62

*United States v. Mazer*, 631 Fed. Appx. 57 (2d Cir. 2015) .............................................................. 65

*United States v. Morissett,* 49 F. App'x 334 (2d Cir. 2002) ............................................................. 43

*United States v. Mylett*, 97 F.3d 663 (2d Cir. 1996) ......................................................................... 44

*United States v. Nemazee,* 09 Cr. 902 (SHS) (S.D.N.Y.) ................................................................. 62

*United States v. Rajaratnam,* 09 Cr. 1184 (LAP) (S.D.N.Y.) ......................................................... 62

*United States v. Sarvestani*, 13 Cr. 214 (PGG) (S.D.N.Y.) ............................................................. 61

*United States v. Shonubi*, 998 F.2d 84 (2d Cir.1993) ....................................................................... 43

*United States v. Singh*. 877 F.3d 107 (2d Cir. 2017) ........................................................................ 65

*United States v. Standard Chartered Bank*, 12 Cr. 262 (JEB) (D.D.C.) ........................................ 57

*United States v. Stewart*, 686 F.3d 156 (2d Cir. 2012) ..................................................................... 44

*United States v. Viola*, 35 F.3d 37 (2d Cir.1994) ............................................................................. 43

*United States v. Wright*, 160 F.3d 905 (2d Cir. 1998) ...................................................................... 42

## **Statutes**

18 U.S.C. § 2 ...................................................................................................................................... 22

18 U.S.C. § 371 .................................................................................................................................. 22

18 U.S.C. § 1344 ................................................................................................................................ 22

18 U.S.C. § 1349 ................................................................................................................................ 22

18 U.S.C. § 1956 ................................................................................................................................ 22

18 U.S.C. § 1956(a)(1) ...................................................................................................................... 37

18 U.S.C. § 1956(a)(1)(A)(i) ............................................................................................................ 38

18 U.S.C. § 1956(a)(2)(A) ............................................................................................................ 37, 38

18 U.S.C. § 1956(a)(2)(B) ............................................................................................................ 37, 38

18 U.S.C. § 1956(c)(9) ...................................................................................................................... 37

18 U.S.C. § 1957 ................................................................................................................................ 38

50 U.S.C. § 1701 .................................................................................................................................. 7

50 U.S.C. § 1705 ................................................................................................................................ 22

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum in connection with the sentencing of defendant Mehmet Hakan Atilla ("Atilla" or the "defendant"), scheduled for April 11, 2018 at 11:00 a.m.

The correctly calculated sentencing range pursuant to the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") is 105 years' imprisonment. The Government recognizes that the advisory Guidelines range is effectively a life sentence, which has but rarely been imposed in cases most analogous to this one. However, the defendant's offenses are in some respects without parallel, and the immense risks that he and his co-conspirators created to the national security of the United States and to the safety and stability of the entire globe are similarly without ready comparison. At a time when the United States and the community of nations were engaged in the momentous undertaking of depriving the Government of Iran of funding for its malign and deadly activities—including its pursuit of nuclear weapons, and ballistic missiles capable of delivering those weapons throughout the region and around the world; and its financial, logistical, and military support for terrorist organizations and acts of terrorism—Atilla was a key player in massively undermining those efforts. Atilla's offenses simultaneously opened a multi-billion-dollar channel of illicit funding for the Government of Iran and relieved crucial financial pressure on Iran during negotiations to limit its nuclear program. The effects of these crimes did not fall particularly on any victim or class of victims, but instead are suffered by every single citizen and resident of this nation and, indeed, the world, whose safety and security were compromised by Atilla's emboldening of, and support for, Iran during the critical phases of the nuclear negotiations.

Moreover, Atilla's lies during his trial testimony and the arguments advanced in his sentencing memorandum demonstrate an unapologetic rejection of responsibility. At trial, Atilla

repeatedly and adamantly denied making statements, and even his participation in meetings and discussions, clearly proven by multiple witnesses' testimony, telephone wiretaps, contemporaneous notes, and emails. In his sentencing submission, he first invokes comparatively lenient treatment afforded major financial institutions which, among other things, accepted responsibility for their sanctions-violating conduct, in some cases self-reporting to the Government, and cooperated with law enforcement. Atilla and his bank employer are not similarly situated to those financial institutions. Indeed, their actions after their conduct came to light fall on the opposite end of the spectrum.

Atilla minimizes the national security dimensions of his offenses. He attempts to cast the United States' sanctions against Iran as "sometimes controversial" when, in fact, they were part of a vigorous international effort to combat Iran's nuclear and other illicit ambitions. He falsely asserts that his actions would no longer be criminal following the implementation of the nuclear agreement; in fact, Atilla's conspiracy to bend the U.S. financial system to the service of the Government of Iran and Iranian entities, and his sustained course of lies and deceit against the U.S. Department of the Treasury ("Treasury") to conceal his bank's and co-conspirators' activities, would still be the same serious national security crimes if committed today.

Atilla also minimizes his own role and responsibility, wrongly attempting to portray himself as a "functionary" when the evidence clearly shows that he was an individual of significant status and responsibility at his bank who was entrusted with designing, and successfully carrying out, the methods by which the scheme was executed and with deceiving U.S. officials in order to conceal the scheme.

A significant sentence is thus necessary to reflect the seriousness of the offense, to promote respect for the law, and to deter others who would also seek to hide behind Atilla's self-

justifications to excuse their crimes against national security. Accordingly, as discussed more fully below, the Government asks the Court to impose a sentence greater than 188 months' imprisonment—which would be the low end of the Guidelines sentencing range if the Court were to follow the "flexible approach" to the money laundering Guidelines authorized by the Second Circuit in *United States v. Dhafir*, 577 F.3d 411 (2d Cir. 2009)—and one comparable to sentences in the range of approximately 20 years imposed in cases that are most analogous to this one. The Government also respectfully requests that the Court impose a substantial fine within the Guidelines range of $50,000 to $500,000.

## BACKGROUND

The factual summary recited here is based on the evidence introduced at the defendant's trial and the United States Probation Department's presentence investigation report.[1]

### A.    The U.S. Sanctions Regime

In 1995 and 1997, pursuant to the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701 et seq., the President declared a national emergency with respect to the threats posed by the Government of Iran to the United States' national security, economy, and foreign policy, and directed certain measures to respond to that emergency. Pursuant to these declarations and directives, Treasury's Office of Foreign Assets Control ("OFAC") adopted the Iranian Transactions and Sanctions Regulations (the "ITSR"), which were intended to be a comprehensive trade embargo on Iran. (Tr. 99-100, GX8040). With certain exceptions, these regulations generally prohibit the export of goods, services, or technology from the United States

---

[1] In this memorandum, "Probation" or "USPO" refers to the United States Probation Office; "PSR" refers to Probation's presentence investigation report; "Tr. __" refers to the trial transcript; "GX__" refers to the Government's trial exhibits; "Atilla Mem." refers to Atilla's sentencing memorandum dated March 26, 2018; and "[Case title], [docket number], (D.E. __)" refers to documents filed in the identified docket.

or by a United States person, directly or indirectly, to Iran or the Government of Iran unless specifically licensed by OFAC. (Tr. 101, 123). Thus, these prohibitions prevent U.S. banks from providing banking services and processing correspondent banking transactions that are for the benefit of Iranian persons or the Government of Iran. (Tr. 103, 107).

Beginning in the early 2010s, U.S. and international economic sanctions against Iran grew increasingly restrictive in an effort to combat Iran's development of its nuclear and ballistic missiles programs and support for international terrorism, as well as to cause Iran to begin to negotiate an end to these peace- and stability-threatening activities. These sanctions in particular targeted Iran's petroleum industry, which had become tied to the Islamic Revolutionary Guard Corps (the "IRGC") and was Iran's principal source of trade and national income, as well as Iran's Central Bank and financial sector. These measures largely had their intended effect—by 2012, Iran was facing a significant financial crisis due to, among other things, its inability to access and use the proceeds from sales of its petroleum from around the world. (Tr. 192).

The relevant U.S. sanctions imposed during this period fell into two principal categories: (i) sanctions targeted at the precious metal and U.S. banknote trade (the "gold sanctions") and (ii) sanctions focused on financial transactions involving Iranian oil proceeds (the "oil sanctions"). The gold sanctions prohibited materially assisting the purchase or acquisition of U.S. bank notes or precious metals by the Government of Iran, including banks and businesses owned by the Government of Iran. (Tr. 125-26; *see* Executive Order 13622, 77 Fed. Reg. 45897 (Jul. 30, 2012)). Effective July 1, 2013, any person determined to have participated in the sale, supply, or transfer of gold or other precious metals to or from Iran – whether or not to the Government of Iran – would also have all property and interests in property in the United States blocked. (Tr. 129).

The oil sanctions empowered the Secretary of the Treasury to cut off access to the U.S. financial system for any foreign financial institution that dealt with, among others, the Central Bank of Iran ("CBI"); designated Iranian financial institutions; or the National Iranian Oil Company ("NIOC") or its affiliate, Naftiran Intertrade Company ("NICO"). (Tr. 122-24).

Of course, transactions designed to evade or avoid any of these prohibitions also were barred. (Tr. 126, 131).

## B. Atilla's Participation in the Sanctions Evasion Scheme

As described in more detail below, Atilla participated in a multi-year scheme to help Iran violate the ITSR, the gold sanctions, and the oil sanctions. Atilla and others used his employer, the Turkish bank Türkiye Halk Bankasi A.Ş. ("Halk Bank") to launder billions of dollars-worth of Iranian oil proceeds, ultimately creating a slush fund for Iran to use however it wished—the very harm that U.S. sanctions were put in place to avoid. Atilla, as a senior executive at Halk Bank, furthered the scheme by, among other things, helping to devise the method by which these funds would be laundered and by lying to U.S. regulators to conceal the scheme.

Halk Bank is majority-owned by the Government of Turkey and, between 2010 and 2015, acted as the principal financial channel for trade between Turkey and Iran, including by maintaining accounts held by CBI and NIOC used to accept payments from Turkey's state-owned oil company, Tupras, for Iranian petroleum products. (Tr. 1074, 1088-90).

Atilla began working at Halk Bank in 1995. (Tr. 1916). After joining the bank, he worked in several different positions. As of 2012, Atilla was a deputy general manager (one of the most senior executives at the bank, reporting directly to the general manager) responsible for international banking, which included maintaining the bank's correspondent banking relationships. (Tr. 1935-36). Atilla was also the principal bank officer responsible for communicating with Treasury about economic sanctions. (*E.g.*, Tr. 1082, 1119, 1413),

As noted, Halk Bank served as the repository for the proceeds of oil sales by NIOC to, among others, Tupras. OFAC identifies NIOC as an agent or affiliate of the IRGC, which is both a military body and a major player in the Iranian economy through its formal and informal control of companies in the energy, construction, and defense industries. (Tr. 118-19, 165-67). The Qods Force is the IRGC's overseas arm through which it conducts the majority of Iran's state-sponsored terrorist activities. (Tr. 165).

As a result of the gold and oil sanctions described above, Halk Bank faced a choice, it could either restrict the way in which NIOC's oil proceeds could be used or risk losing its access to the U.S. financial systems. Between 2012 and March 2016, Atilla and others devised and executed a scheme by which these Iranian oil proceeds could be transferred out of Halk Bank through transactions that concealed their true Iranian beneficiaries, and then used in international financial transactions through, among other places, the United States, in violation of IEEPA and the ITSR. The scheme was comprised of two ploys: the "gold scheme" and the "fake food scheme."

### 1. The Gold Scheme

Reza Zarrab is a Turkish-Iranian gold trader and exchange-house operator who lived in Istanbul, Turkey. In 2010, Zarrab began conducting international financial transactions on behalf of Iranian financial institutions, especially the CBI and the Iranian Bank Mellat's financial exchange, Mellat Exchange. (Tr. 277-81). Due to U.S. sanctions, these entities could not directly conduct financial transactions through the U.S. banking system. (Tr. 277-81).

In early 2012, Zarrab began working with Halk Bank to transfer Iranian oil proceeds out of the bank for Mellat Exchange, Sarmayeh Exchange (another Iranian bank-owned exchange company), NIOC, NICO, and others. (Tr. 291-95, 297, 316-19). Halk Bank initially resisted, so Zarrab approached co-defendant Zafer Caglayan, then the Turkish Minister of the Economy, for

his influence and assistance. Zarrab explained his plan to extract the Iranian oil proceeds through gold transactions, using the funds to buy gold for export to Dubai, where it would be sold and the proceeds used to execute international payment requests for Iranian banks. (Tr. 299-302). Caglayan agreed to direct Halk Bank to allow Zarrab to conduct the business in exchange for a 50% share of Zarrab's profits. (Tr. 302-09).

In sum, the gold scheme worked as follows. (*See* Tr. 324-335; GX9502). NIOC or the CBI would transfer the Iranian oil proceeds on deposit at Halk Bank to the account of a private Iranian bank, like Sarmayeh, also held at Halk Bank. The intermediary Iranian bank would then further transfer the funds to the account of one of Zarrab's companies at Halk Bank, which would use the funds to buy gold from a Turkish gold supplier by transferring the money to the supplier's account, also at Halk Bank. In this way, the connection between the funds and NIOC or the CBI would be concealed from outside banks.

The gold supplier would then provide Zarrab's company with gold in Turkey, which Zarrab's company would export to Dubai, sometimes using human couriers with suitcases, to be sold for cash. These funds would be deposited into accounts held by Zarrab's companies at banks in Dubai, and those companies would transfer the funds around the world to fulfill payment instructions from Zarrab's clients, often for the ultimate benefit of NIOC. Because the companies initiating the transfers were Dubai companies, the fact that the funds were being transferred on behalf of Iranian banks and NIOC was concealed from the banks processing the payments. When the transfers were in U.S. dollars, they typically went through correspondent accounts at banks in the United States.

Atilla instructed Zarrab as to how to mask his transactions to conceal their illicit connection to Iran. With respect to Zarrab's gold exports using Iranian oil funds, Atilla coached

Zarrab on how to document these exports as sanctions against Iranian oil sales and the supply of gold to Iran tightened. In approximately July 2012, tightened gold sanctions would have permitted Treasury to block Halk Bank's property (including its correspondent accounts) in the United States for knowingly facilitating the supply of gold to the Government of Iran; accordingly, Zarrab—at Atilla's direction—identified the ultimate destination of Turkish gold exports on customs documents as the United Arab Emirates ("UAE") instead of Iran. When the oil sanctions were tightened in February 2013 to require that Iranian oil proceeds held in Turkey be used only for bilateral trade—that is, to buy Turkish commodities for export to Iran—Zarrab, again at Atilla's instruction, documented the gold's destination as Iran instead of the U.A.E. (GX229-T, GX2523-2, GX2523-4).

In October 2012, a group of CBI, NIOC, NICO, and Bank Sarmayeh officials discussed ways to boost the amount of Iranian oil proceeds held at Halk Bank. (Tr. 384-86, 390-91, 420-21, 430). At one meeting at Halk Bank, Zarrab, Atilla, Suleyman Aslan (Halk Bank's general manager and Atilla's direct supervisor), and representatives of NIOC and Bank Sarmayeh attended, the attendees explored ways to bring the proceeds of Iranian oil sales from other countries, like India, to Halk Bank (thus boosting the amount of Iranian oil proceeds available for the scheme), and the Iranians' request that Halk Bank conduct international payments for NIOC. (Tr. 386-88, 393-94).

Atilla and Aslan, however, rejected the Iranians' request for Halk Bank to conduct their international payments, arguing that the Iranians already were conducting these payments through Zarrab and his companies (Tr. 396-97, 423-32; GX208-T), who by that time were already using Iranian oil funds to export tons of gold from Turkey to Dubai (and had also generated millions of dollars' worth of commission for Halk Bank). (*See, e.g.*, GX2033 & 2033-

T). Atilla and Aslan agreed to accept foreign payments for Iranian oil, but only on the condition that the arrangement not be leaked to the public (Tr. 394-96, 401-07, 416- 23; GX205-T & 207-T) because of concerns about questions from Treasury. (See, e.g., Tr. 1109-10, 1443; GX7002 & 7006). In subsequent meetings, Aslan demanded that Zarrab pay bribes to continue the scheme, which Zarrab agreed to do. (Tr. 417).

The dramatic increase in Turkey's gold exports to Iran and then to Dubai as a result of the scheme drew intense attention from Treasury, which was rightly concerned that the exports were being used to evade or violate the sanctions. In May 2013, Atilla falsely told officials at Treasury that Halk Bank would stop mediating gold transactions as of June 1, 2013, one month in advance of the July 1, 2013 effective date for the sanctions against the direct or indirect sale or supply of gold to Iran. (Tr. 1446).

Despite Atilla's misrepresentations, Halk Bank continued to mediate gold exports by Zarrab and his companies to Iranian entities in Dubai as part of the gold scheme. (GX2523-2 & 2523- 4). The continuation of the gold trade was due in large part to pressure from the Government of Turkey, including Caglayan and then-Prime Minister Recep Tayyip Erdogan, who insisted that Zarrab and Halk Bank do whatever they could to inflate Turkey's export statistics. (Tr. 1659-66; GX1002-T at 29 & 49, GX1004-T at 6, GX268-T).

### 2. The Fake Food Scheme

After the tightened oil and gold restrictions were adopted, but before they were effective, Halk Bank and Zarrab began exploring how to continue the system for allowing Iran access to the oil revenues on deposit at Halk Bank using the humanitarian exception to the oil sanctions.

In electronic communications and meetings in February and March 2013, Aslan informed Zarrab that, because of U.S. sanctions, they would no longer be able to use the gold system to extract NIOC's oil revenues from the bank. (*See, e.g.*, GX1002-T). Aslan instructed Zarrab to

switch to food transactions, pretending to supply food to Iran from wherever he could obtain documents. (GX1002-T; Tr. 493-494). To that end, Zarrab—with Atilla's help—used falsified documents to make it appear Halk Bank was facilitating non-existent transactions that would have qualified for a humanitarian exception to the oil sanctions. NIOC would transfer funds to Zarrab's companies in Turkey as payment for the purported food sales; Zarrab's companies in Turkey would then transfer the funds to Zarrab's companies in Dubai, which posed as the suppliers of the commodities. The funds in Dubai were then used to fulfill Zarrab's Iranian clients' international payment requests.

In a recorded phone call on April 10, 2013, Zarrab explained to Atilla how he envisioned the system would work. (GX295-T). At the time of the call, Atilla was unaware that Zarrab's food business would be completely fictitious. (Tr. 506-07). Atilla, who was very familiar with legitimate food transactions from the bank's work with major international agribusinesses, recognized that Zarrab's cover story made little sense. Zarrab met later that day with Aslan and explained the trouble he had encountered in his discussion with Atilla. Aslan therefore instructed Atilla to go through with the scheme.

Atilla thus worked with others at the bank to devise a method for Zarrab's fake food transactions that would require minimal documentation and avoid requiring records that Zarrab could not buy or forge. For example, Zarrab initially told Atilla that he could provide a bill of lading from the shipping companies to document the purported transport of the pretend commodities to Iran. After Atilla reminded Zarrab that bills of lading were traceable,— thereby exposing that no food shipments existed—they agreed that Zarrab would not be required to provide bills of lading. (Compare GX721-25 with GX727-33; see also GX827-32).

In a subsequent electronic communication between Zarrab and Aslan, Aslan confirmed that there was no "problem with the method proposed by Hakan Atilla? Related to the food trade payments." Zarrab answered, "No. That is absolutely a very correct method." (GX1002-T at 23).

Pursuant to Aslan and Atilla's instructions, Zarrab began conducting the fake food scheme in July 2013, making several mistakes in early transactions. Atilla instructed Zarrab how to correct those mistakes. First, Atilla told Zarrab that the transaction volumes were too high. Zarrab was attempting to extract too much oil revenue at once, requiring him to claim to be sending dozens of ships to complete a single transaction, or sending the same ship on dozens of round trip voyages between Dubai and Iran. Second, the tonnage of the commodities reported as having been shipped were sometimes higher than the capacities of the ships purportedly being used. Third, the documents showed that Zarrab was using ships big enough to be able to supply a bill of lading—which Atilla knew that Zarrab could not provide because they were traceable.

In a series of intercepted phone calls in early July 2013, Atilla discussed these problems with Zarrab and helped him correct them. Atilla told Zarrab to look at using smaller ships, consistent with Zarrab's inability to forge bills of lading. Atilla told Zarrab to make sure the tonnage of the commodities purportedly being shipped matched the capacities of the ships purportedly being used, ensuring the fraud was not obvious on the face of the documents. And Atilla instructed Zarrab to reduce the transaction volumes to previously agreed-upon levels, ensuring the forged documents would remain plausible. (Tr. 649-55, 1627-30, 1650-56; GX261 T). After the errors in the system were corrected, Zarrab and Halk Bank transferred approximately $1.5 billion worth of currency from Halk Bank to Dubai using fake food transactions between July and December 2013. (Tr. 1684-85).

On December 17, 2013, Zarrab, Aslan, and several other individuals were arrested by Turkish authorities based on a corruption investigation into Zarrab's payment of bribes to Caglayan, Aslan, and other senior Turkish government officials. Zarrab and Aslan were initially held without bail. In exchange for bribes from Zarrab, he and the other individuals were released in February 2014 and the investigation was closed in October 2014. (Tr. 696, 702).

After Zarrab's release from prison, he wanted to restart the business of extracting Iranian oil proceeds with Halk Bank. (Tr. 696-97). Zarrab met with Atilla, Ali Fuat Taskesenlioglu—who had taken over as the new General Manager—and others at Halk Bank, to discuss restarting the fake food trade. Because of the public allegation that Zarrab had forged documents, Atilla and the other bank officials initially asked Zarrab to provide a number of documents that they had not previously required from him, including letters of credit for the purported transactions and inspection certificates. (Id.; Tr. 700-03). With respect to inspection certificates, Atilla identified for Zarrab various inspection companies that Halk Bank's Iranian clients had used in their dealings with the bank. Zarrab approached these companies and found that he could obtain false inspection reports from their agents. Zarrab never told Atilla or anyone else at Halk Bank that he intended to actually send food to Iran. (Tr. 704-705).

### 3.    Misrepresentations to U.S. Treasury Officials

From approximately 2010 through 2016, Halk Bank had regular communications with Treasury officials about U.S. economic sanctions, especially those pertaining to Iran. Atilla was the principal official from Halk Bank involved in these communications (Tr. 1082, 1119, 1413), and on other occasions assisted the General Manager in his discussions with Treasury officials. (*See, e.g.*, GX746-49). For example, in 2010 Atilla met with the Deputy Assistant Secretary of the Treasury and other Treasury officials to discuss the Weapons of Mass Destruction Non-Proliferation Sanctions Regulations, Iranian Financial Sanctions Regulations, and EU sanctions

concerning Iran. (Tr. 1111-12, GX7001). In August 2011, then-Under Secretary of the Treasury for Terrorism and Financial and Intelligence, David Cohen, exchanged letters with Aslan about reports that Halk Bank had been involved in efforts to receive Iranian oil revenues paid by oil buyers in India. (Tr. 1109-11, GX7002).

In March 2012—around the same time that Zarrab and Halk Bank began to extract Iranian oil revenues from Halk Bank and transfer them to Dubai using gold exports, for the purpose of making the funds available to send international payments for Zarrab's Iranian customers—Atilla and Aslan met with then-Under Secretary of the Treasury for Terrorism and Financial and Intelligence, David Cohen, in Washington, D.C. They held an in-depth discussion about Halk Bank's involvement in Iranian oil payments, and the uses of Iran's oil revenues held at Halk Bank. Atilla and Aslan told Under Secretary Cohen that Iranian oil proceeds were used to facilitate trade between Turkey and Iran, but that Halk Bank did not allow Iran to acquire currency or gold. (Tr. 1116-17). There was also a discussion of deceptive practices that Iran used to evade sanctions, and the mechanisms that Halk Bank had in place to detect and prevent those efforts. (Tr. 1117-18, 1418-20).

In September 2012, after Zarrab had been working with Halk Bank for approximately six months, Under Secretary Cohen again met with Atilla and others from Halk Bank in Turkey to discuss recent changes in U.S. sanctions against Iran. (Tr. 1118-19). Atilla reported that Iran had approached Halk Bank about helping Iran acquire gold, but that Halk Bank had rejected the approach.

Under Secretary Cohen described Iran's strong interest in acquiring gold and the deceptive practices they could use to try to acquire it. (Tr. 1121-22; GX7028). Atilla assured Under Secretary Cohen that Halk Bank ensured that it was not used for sanctions evasion,

including by following know-your-customer practices, obtaining copies of transactional documents like bills of lading, and other procedures. (Tr. 1122-23; *see also* GX7028 ("They [Halk Bank] insist on being extremely careful, however, and demand documents to understand every part of a transaction and the relationship between commercial entities in order to minimize the risk that they are unwittingly involved in financing sanctioned activities.")).

In November 2012, Under Secretary Cohen spoke with Aslan by phone to re-emphasize Treasury's concerns about Iran's interest in gold and the risks that Halk Bank faced as a result of Turkey's and Iran's economic relationships becoming concentrated within Halk Bank as other financial institutions stopped doing Iranian business. (Tr. 1123-28). For months, Atilla had been tracking Turkish export data and exchanging with Aslan and others at Halk Bank public reports about the gold export spike—driven almost entirely by gold exports by two of Zarrab's companies, Royal Denizcilik and Safir Altin—and analysts' conclusions that the spike was connected to Turkey's payment for Iranian petroleum products. (*See, e.g.*, GX2015, 2015-T, 2016, 2016-T, 2018, 2024, 2024-T, 2025, 2025-T, 2027, 2027-T, 2033, 2033-T, 2034, 2034-T, 2036, 2044, 2044-T, 2049, 2049-T). And Atilla and Aslan had met with Zarrab, NIOC, NICO, and Sarmayeh Exchange just one month before, where they discussed NIOC's use of Zarrab's companies to transfer Iranian oil revenues to Dubai using gold exports. In the November phone call with Under Secretary Cohen, however, Aslan assured Cohen that the gold trade complied with sanctions and gave the impression that it simply was part of a robust trade between Turkey and Iran. (Tr. 1127-28).

Less than a month after this phone call, Turkish Deputy Prime Minister Ali Babacan publicly stated that, because of international sanctions, Iran was using the revenues of its oil sales to Turkey to buy gold. (Tr. 1129; GX7005 at 2). Under Secretary Cohen wrote Aslan a

letter dated December 20, 2012, expressing concerns that Halk Bank was facilitating such gold transactions, warning that doing so would expose Halk Bank to U.S. sanctions, and asking for clarification as soon as possible. (GX7005). Atilla prepared two drafts of a proposed response for Aslan, each claiming that "[t]he trade in gold between Turkey and Iran is carried on between privately owned companies dealing in jewelry business." (GX746, 748). Atilla made the same claim during a February 28, 2013 meeting with Under Secretary Cohen in Turkey (Tr. 1131-34, GX7029; *see also* Tr. 1363-64), a May 2013 call with then-Director of OFAC Adam Szubin (Tr. 1446), and during an October 2013 phone call with Director Szubin. (Tr. 1256-57). During his February meeting with Under Secretary Cohen, Atilla further claimed that "Halk Bank is not in the business of ensuring the GOI access to its profits." (GX7029 at 2).

In his February 2013 meeting with Under Secretary Cohen, as well as a second meeting that month with Director Szubin, Atilla discussed Halk Bank's role in Iran's purchase of goods. Cohen and Szubin described the example of South Korean banks that had been involved in transactions to transfer Iranian oil funds based on forged transaction documents. (Tr. 1429-30; GX7020, 7029). Atilla told Treasury officials in these meetings that "Halk . . . refuses to deal with new exporters, insisting on seeing five years of commercial history" and that "it [Halk] is only allowing the larger companies to engage in trade with Iran." (GX7020 at 3-4; *see also* GX7029 at 2 ("Executives assured Cohen, however, that even though they are processing large amounts of humanitarian exports, the bank remains rigorous in its due diligence . . . They also emphasized that only large, well-known customers are being permitted [to] transact through Halk Bank.")). These meetings were held after Aslan's February 5, 2013 instruction to Zarrab—a significant gold trader with no history in food transactions—that the bank would have to stop

allowing oil income to be used for precious metals trade but that "there is huge demand in food medicine and similar commodities." (GX1002-T at 7).

At the conclusion of Atilla's February 2013 meeting with OFAC Director Szubin, the two had a private one-on-one meeting so that Director Szubin could frankly convey the seriousness of Treasury's concerns about Halk Bank's business with Iran. (Tr. 1436-37). After Director Szubin's and Under Secretary Cohen's February meetings with Atilla, Director Szubin sent Atilla and Aslan a follow-up letter broadly summarizing those meetings, and included a reference to a recent action Treasury had taken to designate a Greek businessman for violating the oil sanctions, intended as a warning to Atilla and Aslan about the consequences of failing to comply with the Iranian sanctions. (Tr. 1437-43; GX7006).

After these meetings and the letter, Atilla falsely told Treasury officials that Halk Bank was completely withdrawing from Iranian gold trade well in advance of the July 1, 2013 effective date on the IFCA's restriction against facilitating the sale or supply, directly or indirectly, of gold to Iran. First, in a May 17, 2013 phone call with OFAC Director Szubin, Atilla falsely represented that Halk Bank would stop intermediating sales of gold to Iran two to three weeks before July 1. In that call, Atilla also reiterated his prior claim that the sales of gold were "only to privately owned companies." (Tr. 1446). Second, Atilla sent separate emails on July 1, 2013 to Director Szubin and Under Secretary Cohen falsely representing that Halk Bank had "stopped mediating the transactions of exporters related to the trade of precious metals with Iran as of 10 June 2013." (GX7009, 7022).

Halk Bank's own accounting of Zarrab's gold transactions, however, showed that between June 11 and June 30, 2013, Zarrab's companies conducted sales of approximately three metric tons of gold to Iranian banks and companies owned by Iranian banks. (GX2523-4).

Though the gold was in fact exported to Dubai so that it could be sold and the proceeds used for international payment orders on behalf of the banks, the exports were marked in Halk Bank's records as for Iran. (*Id.*). Halk Bank's records further reflect that between July 2, 2013 and October 24, 2013, Zarrab's companies sold another approximately 6.5 metric tons of gold to Iranian banks. But in an October 29, 2013 call with Director Szubin, Atilla falsely claimed that Halk Bank was not involved in any gold sales between Turkey and Iran, and had stopped any involvement prior to July 1. (Tr. 1452, 1454; *see also* Tr. 1252-57; GX7021).

During this time, Atilla also spoke with Treasury officials about Halk Bank's decision to restrict international companies from humanitarian trade so that more Iranian oil proceeds would be available for Halk Bank's business with Zarrab. Atilla claimed that the decision was based on Turkey's desire to give preference to Turkish exports (Tr. 1454-55; *see also* GX7011), even though Zarrab's companies, even if their transactions had been real, were not claiming to export goods from Turkey.

Under Secretary Cohen traveled to Turkey in December 2013 for another meeting with Halk Bank, but that meeting did not take place in light of Zarrab's, Aslan's, and others' arrests by Turkish police. (Tr. 1146-47). Under Secretary Cohen next met with Atilla in October 2014 in Washington D.C. New Halk Bank General Manager Taskesenlioglu was also present. This meeting took place after Zarrab had re-started his fake food business with Halk Bank. Under Secretary Cohen asked Atilla and Taskesenlioglu about Zarrab, and Atilla gave a starkly understated description of the bank's relationship with one of its biggest customers. Atilla described Zarrab as someone to whom the bank had lent money and who had been involved in the gold trade with Iran, and asked if Treasury anticipated sanctioning him. (Tr. 1149-51, 1346-47). Atilla did not disclose that Zarrab was a major, multi-billion-dollar purported supplier of

food to Iran, and did not disclose that Zarrab had participated with Halk Bank in extracting billions of dollars' worth of Iranian oil revenues from accounts at Halk Bank through gold and food transactions.

### 4. Atilla's Arrest

On March 27, 2017, agents with the Federal Bureau of Investigation ( "FBI") arrested Atilla at John F. Kennedy International airport as he prepared to board a flight to London. The agents conducted a post-arrest interview of Atilla. (*See* GX70). During that interview, Atilla claimed to have had limited interactions with Zarrab, and disclaimed any involvement in the sanctions-evasion scheme at Halk Bank. Atilla also claimed to be a Turkish government official, and warned the FBI that his arrest would result in an international incident between the United States and Turkey.

### 5. Trial

On September 6, 2017, the Government filed the fourth superseding indictment (the "Indictment"), which charged Atilla and others in six counts with (i) conspiracy to defraud the United States, in violation of 18 U.S.C. § 371 ("Klein Conspiracy Count"); (ii) conspiracy to violate IEEPA, in violation of 50 U.S.C. § 1705 (the "IEEPA Conspiracy Count"); (iii) bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (the "Substantive Bank Fraud Count"); (iv) conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349 (the "Bank Fraud Conspiracy Count"); (v) money laundering, in violation of 18 U.S.C. § 1956 (the "Substantive Money Laundering Count"); and (vi) conspiracy to commit money laundering, also in violation of § 1956 (the "Money Laundering Conspiracy Count").

Atilla's trial on the charges in the Indictment began on November 27, 2017. The Government's case-in-chief included testimony from twelve witnesses, including testimony from two expert witnesses about the U.S. sanctions regime and Iran, Reza Zarrab, David Cohen,

Adam Szubin, and Huseyin Korkmaz, a Turkish police officer who had been involved in the public corruption investigation in Turkey. In addition to the witness testimony, the Government also introduced, among other things, dozens of wiretapped telephone conversations obtained during Korkmaz's investigation, electronic messaging application communications between Zarrab and Aslan, emails, and bank records detailing thousands of transactions passing through the U.S. financial system.

The defense also put on a case, which consisted primarily of Atilla's testimony. During his testimony, Atilla repeatedly made claims that were demonstrably false, based on the other evidence adduced at trial, including:

- Atilla claimed that Halk Bank "was a bank that was trying to comply with the U.S. sanctions, and I believe that it was a bank that complied with them," (Tr. 2048), an assertion that was odds with all of the evidence introduced at trial, including Zarrab's testimony about the scheme itself, documentary evidence that showed the flow of funds matching Zarrab's description, wiretapped conversations in which the scheme was discussed, and testimony from Treasury officials about OFAC's concerns.

- Atilla disclaimed any participation in a meeting on October 4, 2012 between Zarrab, Halk Bank officials, and Iranian oil and bank officials. (Tr. 2082-83). Atilla's testimony was directly contradicted, however, by, among other things, Zarrab's testimony about that same meeting and wiretapped calls corroborating that testimony. In one such call, which occurred shortly after the October 4 meeting, Zarrab spoke with an official at another Turkish bank and explained what had occurred at the October 4 meeting, including that he had "talked things out with Hakan and others." (GX205-T).

- Atilla disputed that he had been pulled aside for a one-on-one conversation with Szubin during a February 12, 2013 meeting, in which Szubin had warned Atilla that Halk Bank was under intense scrutiny by OFAC. (Tr. 2061). However Szubin, who had no reason to perjure himself, testified that such a meeting did occur.

After deliberating for parts of four days, the jury found Atilla guilty of the Klein Conspiracy Count, the IEEPA Conspiracy Count, the Substantive Bank Fraud Count, the Bank Fraud Conspiracy Count, and the Money Laundering Conspiracy Count. The jury acquitted Atilla of the Substantive Money Laundering Count.

**C.      Atilla's Objections to the PSR**

On March 16, 2018, the defendant submitted several objections and proposed modifications to the offense conduct described in the PSR, most of which are grounded in his refusal to accept the jury's verdict or the Court's prior legal rulings.

**1.      Atilla's "General Objection" Has Already Been Rejected by the Court**

Atilla makes a blanket objection to several paragraphs of the PSR, claiming that "it repeatedly uses terms like 'prohibitions,' 'unlawful,' 'sanctions,' and 'restrictions,' both randomly and interchangeably, thus incorrectly implying, or directly stating, that a foreigner can be prosecuted for conduct that is merely 'sanctionable,' i.e., earns a listing on a sanctions list, when the law clearly does not support such a claim." But Atilla advanced this precise argument in his motion to dismiss the Indictment, and the Court rejected it. There is no basis to resurrect it in the description of the offense conduct in the PSR.

**2.      Atilla's Remaining Objections Are Also Meritless**

With respect to Atilla's "specific" objections, they have no merit for the following reasons.

1)      <u>Paragraphs 14 & 64</u>: The defendant disputes that he helped launder "billions" of dollars in restricted Iranian funds. The evidence at trial, however, made clear that that was the scope of the scheme at Halk Bank. Zarrab testified that the scheme laundered a "few billion" Euros of Iranian oil proceeds through Halk Bank, and that, as of the fall of 2012, the Iranian co-conspirators still held approximately €3 billion at Halk Bank. (Tr. 365; 416 GX206-T). Korkmaz testified that Zarrab's companies used Iranian oil funds at Halk Bank to export nearly half-a-billion dollars' worth of gold from July to December 2013 alone, and conducted approximately $1.5 billion worth of fake food transactions during the same time period. (Tr. 1681-85, 1843-44). As Zarrab's testimony and the other trial evidence made clear, the scheme used restricted Iranian

oil proceeds to fund illicit shipments of gold and fake food transactions that were intended to create a slush fund that Zarrab's Iranian clients, like NIOC, could use to fund international financial transactions, including financial transactions processed through U.S. financial institutions. (Tr. 267; GX6018, 6021, 6022, 6023, 6027, & 6031). The trial record also showed that the scheme involved both billions of dollars' worth of gold transactions (*see, e.g.*, Tr. 323-35, 363-64, 1163-64, 1683-84; GX9502) and billions of dollars' worth of fraudulent food transactions (*see, e.g.*, Tr. 558-73, 1685, 1844; GX9503). Finally, the bank records introduced at trial showed that hundreds of millions of dollars flowed through the various front companies set up by Zarrab for purposes of the scheme. For example, between June 2014 and November 2015, Centrica, one of Zarrab's front companies, engaged in more than $100,000,000 in transactions through U.S. financial institutions. (*See* GX8101-1, 8101-2, 8101-3, 8101-4, 8101-5, 8101-6, 8101-7, 8101-8, 8101-9, & 8101-10).

2) <u>Paragraph 15</u>: This paragraph provides a general description of the regulations imposed as part of the ITSR, which prohibit, in general, the export of goods or services from the United States or by a U.S. person. Atilla proposes to add a sentence to the end of the paragraph that reads "These sanctions were placed directly on U.S. persons, entities, and financial institutions, and are commonly referred to as primary sanctions." While the Government does not dispute that the provisions of the ITSR are commonly referred to as "primary sanctions," Atilla's proposed addition that these sanctions were placed "directly on U.S. persons, entities, and financial institutions" is a legal conclusion that is squarely at odds with the Court's decisions denying both Zarrab's and Atilla's motions to dismiss the charges in this case. In those decisions, the Court explicitly found that the IEEPA applies to non-U.S. persons who conduct or cause transactions that violate the ITSR, or who conspire to do so, with the purpose of exporting goods

or services from the United States for the benefit of Iran. (*See*, *e.g.*, October 17, 2016 Order

Denying Zarrab Motion to Dismiss) (D.E. 90 at 22-23 (holding that even though Zarrab was not

a "U.S. person," he could still be charged with violating the IEEPA and the ITSR)).

3)    <u>Paragraph 16</u>: This paragraph describes the tightening of U.S. sanctions against

Iran in an effort to cut off funding for Iran's nuclear program and support of terrorism, and in

particular, the United States' targeting of Iranian petroleum industry. Atilla requests that this

paragraph be stricken because it is "prejudicial" and because he claims not to have had

knowledge of Iran's activities. This paragraph is entirely appropriate, however, because it goes to

the seriousness of the crimes that Atilla committed—violating U.S. sanctions designed to curtail

Iran's behavior and protect the United States. That these were the purposes of the financial and

oil sanctions was also readily available public information. Atilla's feigned ignorance of the

general reasons why the United States had imposed sanctions on Iran is entirely belied by his

expertise in U.S. sanctions, which was demonstrated both through the fact that he was the Halk

Bank executive who regularly dealt with OFAC on difficult sanctions issues, and his own

testimony, in which he himself claimed to have understood the U.S. sanctions better than Adam

Szubin, the former OFAC director and Acting Under Secretary. (*See* Tr. 2070-71).

4)    <u>Paragraph 17</u>:  This paragraph describes U.S. sanctions imposed on the gold and

U.S. bank note transactions on behalf of Iran on July 30, 2012. Atilla asserts that this paragraph

should include a sentence that reads, "As of July 30, 2012, mediating gold transactions with

Iranian entities which were not owned by the Government of Iran was not subject to U.S.

sanctions." The Government objects to this addition because it is an inaccurate description of the

U.S. sanctions regime. While the sanctions imposed on July 30, 2012 were related to transactions

for the benefit of Iran, gold transactions on behalf of non-governmental Iranian clients would

still be barred by U.S. sanctions if they were on behalf of the Government of Iran or otherwise part of a scheme to avoid or evade the sanctions promulgated under the IEEPA—including the scheme in which Atilla participated. In other words, facilitating a gold transaction on behalf of a private Iranian entity (like a private Iranian bank) before July 30, 2012 as part of a larger criminal plan to facilitate the export of goods or services (like the processing of financial transactions) from the United States for the benefit of that Iranian bank or to clandestinely facilitate the indirect acquisition of U.S. currency or gold by an Iranian government entity would be subject to U.S. sanctions.

5)    <u>Paragraph 18</u>:  This paragraph describes additional U.S. sanctions adopted on December 11, 2012 concerning transactions facilitated by foreign financial institutions involving Iranian petroleum proceeds on behalf of the Central Bank of Iran. Atilla proposes three additions to this paragraph, two of which the Government believes are inappropriate. First, he proposes to add a sentence stating that there was nothing illegal about a foreign financial institution conducting business with Bank Sarmayeh and similarly situated Iranian banks. That statement sweeps too broadly, however, because it ignores the relevance of Bank Sarmayeh's client in the transaction. If, as here, Bank Sarmayeh was facilitating transactions on behalf of NIOC or CBI, then that certainly could run afoul of U.S. law. Second, Atilla proposes to describe the risks of violating the secondary sanctions for a foreign actor as losing access to the U.S. financial system. That description, however, omits the criminal penalties that the Court has already found attach to a violation of prohibitions against engaging in transactions to avoid the secondary sanctions.

6)    <u>Paragraph 19</u>:  This paragraph describes additional sanctions imposed by the United States on Iran in July 2012 and February 2013, which targeted transactions conducted by foreign financial institutions involving Iranian petroleum proceeds on behalf of, among other

entities, NIOC. In addition to reiterating his general legal objection, Atilla also seeks the insertion of language concerning the Joint Comprehensive Plan of Action (the "JCPOA") and its impact on certain U.S. sanctions. The JCPOA, however, is entirely irrelevant to Atilla's charged conduct, both because Atilla's offenses took place prior to JCPOA's implementation and because, even after JCPOA's implementation, Atilla's bank fraud, money laundering, and ITSR offenses, and his obstruction of Treasury's lawful functions, all would remain criminal. Indeed, Atilla's attempt to inject the JCPOA into this action is squarely at odds with his pre-trial posture, where he moved to preclude testimony about the JCPOA from one of the Government's experts because it was "completely irrelevant to this case." *See* Atilla Mem. in Support of Mot. in Limine at 13 ("Atilla MIL") (D.E. 319).

7) <u>Paragraph 20</u>: Atilla objects to the PSR's description of Atilla and Halk Bank using Zarrab's companies as intermediaries to transfer Iranian oil proceeds to Dubai, because, he claims, Zarrab drove the scheme. While it is undisputed that Zarrab played a significant role in the scheme, and indeed approached Halk Bank about conducting this business, that does not diminish Atilla's and Halk Bank's roles in the conduct. For example, while Atilla seeks to shift the blame to Zarrab, the evidence shows that it was Atilla and Aslan who ensured the scheme would continue to work through Zarrab's businesses. In particular, the evidence at trial established that, at a meeting in October 2012 between, among others, senior Iranian banking and government officials, Zarrab, Atilla, and Aslan, it was Atilla and Aslan who said that the Iranian transactions would not be conducted directly by Halk Bank, but rather should be channeled through Zarrab's companies. (*See* Tr. 396-97, 423-32; GX208-T). And while there is no dispute that Atilla himself did not receive bribes in connection with this business, Halk Bank—Atilla's employer—certainly profited handsomely from this business in the form of

millions of dollars in commissions. (*See* Tr. 660, 2088, GX2033, 2033-T). The PSR's description in Paragraph 20 is appropriate and entirely consistent with the evidence introduced at trial.

8)    <u>Paragraphs 22 & 49</u>:  Atilla disputes the PSR's characterization of him as "principal bank officer responsible for communicating with the U.S. Department of the Treasury about economic sanctions." Atilla's contention, however, is undercut by the testimony of David Cohen and Adam Szubin, senior-level Treasury officials who testified that they dealt principally with Atilla when discussing Halk Bank's sanctions compliance. (Tr. 1082, 1413).

9)    <u>Paragraph 25</u>:  Atilla objects to the PSR's reference to the fact that NIOC was identified as an agent or affiliate of the IRGC, on the ground that it is prejudicial. But again, the conduct here involved facilitating financial transactions on behalf of NIOC and the harm that imposed on the United States' national security. Given that activities that benefit NIOC could also serve to help IRGC, one of the principal threats to this country's national security, that connection is essential in assessing the seriousness of the offenses for which the jury found Atilla guilty. Treasury's determination that NIOC and NICO are agents or affiliates of the IRGC was also readily available public information. Accordingly, the PSR's reference to the IRGC's connection to the charged conduct in Paragraph 25, and elsewhere in the PSR, is appropriate.

10)    <u>Paragraph 26</u>:  Atilla claims that the PSR should include language stating that OFAC was aware of Zarrab's conduct but still did not sanction him. That addition would be inappropriate for two reasons. First, OFAC's actions with respect to Zarrab are entirely irrelevant to Atilla's culpability, because the scheme here focused on aiding entities that OFAC had in fact designated and sanctioned, including the CBI and NIOC. The fact that the scheme involved other participants who also were subject to possible scrutiny by OFAC has no bearing on the criminality or culpability of Atilla's actions. Second, there is no evidence in the record that

OFAC was aware of the full scope of Zarrab's conduct, Atilla's conduct, or anyone at Halk Bank's conduct. OFAC was not, for example, privy to the results of the Turkish investigation, or to the fruits of the FBI's investigation. Thus, the suggestion that OFAC knew of Zarrab's conduct, rather than harbored certain suspicions about Zarrab, is inaccurate and misleading.

11)　　　Paragraph 27:　Atilla seeks the inclusion of language stating that he was not involved in the international financial payments that were conducted on behalf of Zarrab's and Halk Bank's Iranian clients. That proposed addition, however, conflicts with the jury's verdict. The jury found that Atilla was guilty of bank fraud, which necessarily means that the jury concluded that he was knowingly involved in the scheme to defraud U.S. banks involving Iranian payments that flowed through the U.S. financial system. Furthermore, Atilla also contends that this paragraph should include language indicating that he was not involved in the bribery and is not aware of the amounts of the bribes. While the Government agrees that there is no evidence that Atilla received any bribes or was aware of them, the evidence at trial, including the ledgers of Caglayan's bribes prepared by Zarrab's employees and Zarrab's testimony, clearly establish that Zarrab paid Caglayan tens of millions of dollars in bribes. (*See* GX3730, 3733, Tr. 309).

12)　　　Paragraph 28:　Atilla proposes editing the language in this paragraph to include the italicized language: "Zarrab and *his associates at various of the businesses that Zarrab owned or controlled used their own high level contacts* in the Iranian and Turkish governments to secure a role in transferring Iranian funds held in Turkey in the evasion of U.S. sanctions against Iran." That modification, however, ignores the role that Aslan played in the scheme, which included communications with Caglayan to discuss the Iranian business occurring at Halk Bank, as well as directing the Iranian business at Halk Bank to Zarrab in the first place. (*See*, *e.g.*, Tr. 310, 1637). Atilla also objects to the paragraph's description of Zarrab's letter to

Ahmadinejad, arguing that it is irrelevant to Atilla's case. But the Court rejected this same

argument when it denied Atilla's motion *in limine* seeking to preclude introduction of the same

letter at trial. *See* Atilla MIL at 19. Atilla is free to argue at sentencing that the letter is

insignificant, but there is no basis to disturb the Court's prior conclusion that the letter is relevant

to the conduct for which Atilla was convicted, or to include such argument in the PSR's

description of the offense conduct.

13)    <u>Paragraph 30</u>:  Atilla proposes adding language to this paragraph that states that it

was financial institutions in Dubai that conducted the financial transactions, "if any," through

U.S. financial institutions. Initially, Atilla's qualification of "if any," is directly contradicted by

the jury's conclusion that he was guilty of bank fraud, which necessarily required that the

scheme involved financial transactions passing through U.S. financial institutions, and the bank

data evidence that was introduced at trial, which demonstrated that, in fact, there were hundreds

of millions of dollars-worth of financial transactions that were processed by U.S. banks as a

result of the scheme. (*See* GX8101-1, 8101-2, 8101-3, 8101-4, 8101-5, 8101-6, 8101-7, 8101-8,

8101-9, & 8101-10). Furthermore, that same data also shows that, at times, Turkish banks other

than Halk Bank did process transactions through U.S. financial institutions as part of the scheme.

14)    <u>Paragraph 31</u>:  Atilla disputes that, as described in this paragraph, he and Aslan

told Zarrab how to describe the ultimate destination of the gold (*i.e.*, Iran or the UAE) on

customs documents. As even he acknowledges, however, Zarrab testified to precisely that. (Tr.

356-57). And Zarrab's testimony is corroborated by both a wiretapped conversation between

Zarrab and Happani in which Zarrab described how Atilla had provided such instruction, and

Halk Bank records showing that the destination for the gold identified on customs documentation

shifted in line with changes in the sanctions regime and around the time of these communications

between Atilla and Zarrab. (*See* GX229-T, 2511, & 3583). Thus, this paragraph in the PSR is amply supported by the evidence.

15)    Paragraph 32:  In his objection to this paragraph, Atilla simply denies that "he helped to devise a scheme to evade U.S. sanctions" and that Halk Bank itself was involved in sanctions evasion that would have subjected it to punitive action in the United States, including blocking of its assets. Thus, Atilla essentially claims that he and his employer are innocent of sanctions evasions, a claim that is directly contradicted by the jury's verdict and the extensive evidence introduced at trial.

16)    Paragraphs 33, 34, 54:  Atilla disputes that he attended a meeting in October 2012 with Zarrab, Aslan, and senior Iranian banking and oil officials (including officials from NIOC), in which the scheme was discussed. Again, as he is forced to acknowledge, Zarrab testified about such a meeting, and Atilla's participation in it. (*See* Tr. 384-88). Zarrab's testimony about this meeting is corroborated by, among other things, wiretapped conversations, including one that occurred soon after the meeting, in which Zarrab described the meeting to an official at another bank, and how he had further discussed those matters with Atilla. (*See* GX202-T). Moreover, in paragraph 34, the PSR states, "Atilla and Aslan agreed to accept foreign payments for Iranian oil, but only on the condition that arrangements not be made the public [sic], as they were concerned about questions from the U.S. Department of Treasury." Atilla argues that his name should not be included in this sentence, because only Aslan expressed concern about public exposure of the deal. Although it is true that Aslan is the one who voiced that concern, Zarrab's testimony makes clear that both Atilla and Aslan were part of the discussion about transferring to Halk Bank Iranian oil funds held at other financial institutions (*see* Tr. 384-88), and Atilla, as this matter was within Atilla's responsibilities as Deputy General Manager for international banking.

17)     Paragraphs 37 & 59:  Atilla objects to the PSR's description in these paragraphs of Halk Bank's continued mediation of Zarrab's gold transactions after June 1, 2013. While Atilla attempts to misconstrue Halk Bank's gold-transaction spreadsheets to support his argument, the fact is that both Zarrab and Korkmaz testified credibly that the gold trade continued at Halk Bank after June 1, 2013. (*See* Tr. 702-05; 1659).

18)     Paragraph 38:  Atilla argues that this paragraph should be edited to state that it was "Aslan" and Zarrab, rather than "Halk Bank" and Zarrab, who began to explore ways to exploit the humanitarian exceptions to the U.S. sanctions regime once the United States began to tighten its gold-related sanctions. Atilla's proposed change ignores, however, the evidence showing that he too was involved in those explorations, including Zarrab's testimony and WhatsApp communications between Zarrab and Aslan in which they discuss the methods devised by Atilla to handle the fake food trade. (*See* Tr. 558; GX1002-T).

19)     Paragraphs 40 & 41:  Atilla objects to the PSR's description of his conduct in April 2013 in support of the scheme. For example, he claims never to have participated in a conversation on April 10, 2013, with Aslan, in which Aslan directed him to conduct the transactions Zarrab was trying to complete. And similarly, Atilla disputes that he devised any method to avoid U.S. sanctions through fake food transactions. Atilla, as the Court knows, advanced these same arguments (including through his own testimony) to the jury, and nevertheless was convicted. There is no reason to give any more credence to this argument now, at the sentencing phase.

20)     Paragraph 42:  Atilla objects to the PSR's language that he had confirmed that NIOC had transferred a large amount of money directly to Zarrab's account, arguing that Halk Bank had in fact rejected the transaction. Again, Atilla simply ignores the evidence at trial,

which included a statement by Aslan in a wiretapped telephone conversation that Atilla had informed Aslan about the transfer. (*See* GX304-T). Atilla also argues that this paragraph should include a sentence that states that he never had any communications with Ahmed Ghalebani, Mahmoud Nikousokhan, or Seifollah Jashnaz. But such a sentence would be incorrect, given his proven participation in the meeting in October 2012 with, among others, Zarrab, Aslan, and Nikousokhan, in which they discussed the scheme. (*See* Tr. 384-88, GX202-T).

21)     Paragraphs 43-44:  In these objections, Atilla again disputes that he participated in the scheme by instructing Zarrab as to how to alter or falsify documents. The evidence at trial and the jury's verdict, however, undercuts conclusively Atilla's argument. (*See supra* p. 14).

22)     Paragraph 46:  Atilla objects to the description of additional bribes paid by Zarrab to obstruct the Turkish investigation into the scheme at Halk Bank as prejudicial. The Court rejected this argument when it allowed this evidence in at trial. But in any event, this evidence is relevant to Atilla's sentencing because it shows the scope of the plot at Halk Bank, and the relevance of the fact that, even after the arrests of Zarrab and others in Turkey, Halk Bank, including Atilla, continued to engage in the Iranian business in Halk Bank.

23)     Paragraph 47:  Atilla disputes that he attended any meeting at Halk Bank after Zarrab was released from prison in 2014 at which resumption of the Iranian business was discussed. Zarrab, however, testified that he did meet with Atilla and others at the bank to try to restart his Iranian business. (*See* Tr. 702-04). That testimony was corroborated by contemporaneous electronic communications about those meetings, in which the new General Manager was initially resistant (a resistance overcome by government intervention) but that "his team" supported Zarrab. (GX1270-80, 1270-T-1280-T). Similarly, with respect to the customs inspection forms, Atilla claims that Halk Bank repeatedly asked Zarrab for such forms, and that

he believed that Zarrab was obtaining legitimate forms from reputable companies. That assertion is patently unreasonable, however, given the public allegations against Zarrab, which included falsifying documents related to these transactions, and the fact that Zarrab never suggested to anyone at Halk Bank that he had now somehow entered into the legitimate food trade. (Tr. 704-05). In an intercepted conversation in July 2013, Atilla even discussed with Aslan his awareness that obtaining government documentation from Dubai was "very easy." (Tr. 1649-50).

24)     Paragraphs 52 & 53:  Atilla misconstrues these paragraphs to suggest that they describe a meeting between Zarrab and Atilla, when in fact these paragraphs plainly refer to a meeting between David Cohen and Atilla.

25)     Paragraph 57:  Here, Atilla simply disputes Szubin's testimony that he and Atilla had a one-on-one meeting in which Szubin cautioned Atilla about Halk Bank's activities. Atilla acknowledges, however, that Szubin testified about such a meeting. The Government submits that Szubin's testimony was credible, and that the Court should credit it.

26)     Paragraph 61:  This paragraph describes an October 2014 meeting between Cohen and Atilla at which, among other things, Halk Bank's relationship with Zarrab was discussed. In his objection, Atilla argues that he did not minimize Halk Bank's relationship with Zarrab. Cohen testified, however, about Atilla's description of that business, which omitted significant details, such as the extent of the gold trade Zarrab had engaged in with Halk Bank, that Zarrab was also engaged in the purported sale of food and medical products to Iran, or that Zarrab's gold customers were also his food customers. (Tr. 1149-53).

27)     Paragraph 65:  Atilla objects to the PSR's description of him as one of the leaders of the scheme. Given his position as one of the most senior executives at Halk Bank, his instructing Zarrab as to how to falsify documents, his involvement in devising the method by

which the scheme would be executed, including through direction to other Halk Bank employees, and his role in meetings with high-level Treasury officials, it is clear that Atilla was not some banking functionary, but rather was one of the key driving factors in the scheme. *See infra* pp. 38-42.

## DISCUSSION

## I.      The Correctly Calculated Guidelines Sentencing Range

There is no dispute that the five counts of conviction in this case should be considered as a single "group" pursuant to U.S.S.G. § 3D1.2. The scheme to launder the proceeds of oil sales belonging to the Iranian government in violation of U.S. economic sanctions was "ongoing or continuous in nature," and there is no dispute that the money laundering guideline, § 2S1.1, "is written to cover such behavior." Accordingly, the starting point for the determination of Atilla's base offense level is the money laundering guideline set forth in § 2S1.1.

### A.      The Base Offense Level Is Determined Pursuant to Section 2S1.1(a)(2)

Atilla asserts that the base offense level should be determined pursuant to the first provision of the money laundering guidelines, § 2S1.1(a)(1), which, according to Atilla's analysis, in turn should rely on the base offense level applicable to the IEEPA offense of which the defendant was convicted in Count Two, as determined under § 2M5.1. But Atilla's analysis ignores the plain terms of the money laundering guidelines.

Section 2S1.1(a)(1) applies only when it is possible to determine the offense level "for the underlying offense from which the laundered funds were derived." Section 2S1.1(a)(2) applies to any other conviction for a money laundering offense. Critical to the application of § 2S1.1(a)(1) is an underlying offense "from which the laundered funds *were derived*" (emphasis added). That phrase incorporates a distinction inherent in the money laundering statute between transactions in *proceeds* which are *derived* from criminal activity, and transactions in funds

obtained from any source which are designed to *promote* criminal activity. Two provisions of the money laundering statute, 18 U.S.C. §§ 1956(a)(1) and 1956(a)(2)(B), criminalize certain transactions in the *proceeds* of specified unlawful activity. The statute further defines "proceeds" as "property *derived from* or obtained or retained, directly or indirectly, through some form of unlawful activity." 18 U.S.C. § 1956(c)(9) (emphasis added). Section 2S1.1(a)(1) carefully tracks this language, making clear that it applies only to offenses involving the *proceeds* of specified unlawful activity.

By contrast, the offense charged in Count Six of the Indictment charges only a conspiracy to commit money laundering in violation of § 1956(a)(2)(A)—a separate section that makes no reference to "proceeds" or to funds "derived from" criminal activity. The specific allegation in the Indictment of which the jury found Atilla guilty charged that Atilla and others agreed "to transport, transmit, and transfer monetary instruments and funds to places in the United States from and through places outside the United States, in amounts exceeding $10,000, with the intent to promote the carrying on of specified unlawful activity." Ind. ¶ 100. In short, Atilla was not convicted of laundering money that was "derived from" any other offense. Rather, he was convicted of laundering money with the purpose of *promoting* unlawful activity—to wit, the sanctions violations and bank fraud offenses of which he was also convicted. There is no underlying offense from which those funds were *derived*; there are offenses which those funds promoted. Accordingly, § 2S1.1(a)(1) cannot apply, because no underlying offense level can be determined.

The one case on which Atilla relies, *United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011), is not to the contrary. In *Hanna*, the defendant was charged with a conspiracy to launder money in violation of three portions of the money laundering statute—§ 1956(a)(1)(A)(i), which

deals with transactions in the "proceeds of some form of unlawful activity;" § 1956(a)(2)(A), which charges promotional money laundering; and § 1957, which criminalizes transactions "in criminally derived property." *See United States* v. *Hanna*, 07 Cr. 20355 (MOB) (DAS) (E.D. Mich.) (D.E. 3 at 14-15) (*Hanna* Indictment). Thus, the defendant there was charged with offenses that criminalize dealing in funds *derived from* underlying criminal offenses. Those allegations are borne out by the description of the offense conduct, which makes clear that the "acts [which] were the basis for Count Eight of the Indictment, for Hanna's involvement in a money laundering conspiracy," were payments made "[t]o finance the transactions" for the purchase of telecommunications equipment in violation of the sanctions on Iraq. *Hanna*, 661 F.3d at 277. Put another way, Hanna was the *recipient* of payment for illegal shipments to Iraq— funds that were "derived from" the prohibited sales. Thus it was appropriate in that case to use the § 2S1.1(a)(1) calculation. Here, by contrast, where there is no allegation of a violation of 18 U.S.C. §§ 1956(a)(1), 1956(a)(2)(B), or 1957, only a conviction for a conspiracy to violate § 1956(a)(2)(A), the base offense level is properly calculated pursuant to § 2S1.1(a)(2), which applies to any circumstances not expressly covered by § 2S1.1(a)(1).

Under § 2S1.1(a)(1), the base offense level is "8 plus the number of offense levels from the table in § 2B1.1 . . . corresponding to the value of the laundered funds." Because the value of the laundered funds was greater than $550 million, the offense level is increased by 30 levels, U.S.S.G. § 2B1.1(b)(1)(P), resulting in a base offense level of 38.

Because subsection (a)(2) applies, Atilla's offense level is also increased by six levels because he "knew or believed that any of the laundered funds were . . . intended to promote . . . an offense involving . . . national security." *Id.* § 2S1.1(b)(1)(iii). As charged in the Indictment, Atilla intended to promote both the IEEPA violation charged in Count Two and the bank fraud

offenses charged in Counts Three and Four. Atilla was separately convicted of the IEEPA violation, and there can be no serious dispute that the IEEPA offense was one "involving national security." Therefore, Atilla's base offense level is increased to 44.

Because Atilla was convicted under § 1956(a)(2)(A), an additional two levels are added pursuant to § 2S1.1(b)(2)(B). Further, because that provision applies, and because "the offense involved sophisticated laundering," an additional two levels are added pursuant to § 2S1.1(b)(3). With respect to this last enhancement, the Guidelines define "sophisticated laundering" as one that typically involves the use of "fictitious entities," "shell corporations," "two or more levels (*i.e.*, layering) of transactions," and "offshore financial accounts." Virtually every one of these factors was present in this case, and the testimony at trial showed that Atilla was the architect of several of the factors that made the laundering sophisticated. (*See, e.g.*, GX1002-T at 23 (discussion of "the method proposed by Hakan Atilla); Tr. 649-55, 1627-30, 1650-56; GX261 T (Atilla directing falsification of documents to make transactions appear legitimate); Tr. 704-705 (Atilla directing additional paperwork to falsify transactions)).

Accordingly, Atilla's base offense level under § 2S1.1 is 48.

## B. An Adjustment for Atilla's Managerial Role Should Be Applied, and No Adjustment for a Mitigating Role Is Warranted

The PSR correctly assesses that Atilla was a "manager or supervisor" in a criminal activity of sufficient scope to warrant a three level increase to the base offense level pursuant to U.S.S.G. § 3B1.1(b). Not only does Atilla dispute that increase, he shamelessly asserts that he was in fact only a minor participant in the scheme, and that his offense level should be *decreased*.

In assessing whether an increase for a managerial role is appropriate, the Guidelines call for the consideration of multiple factors including "the exercise of decision making authority, the

nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 app. n. 4. "The fact that other persons may play still larger roles in the criminal activity does not preclude a defendant from qualifying for a § 3B1.1(b) enhancement." *United States v. Hertular*, 562 F.3d 433, 449 (2d Cir. 2009). The Second Circuit has also explicitly noted the propriety of applying leadership enhancements "when a business's top officer knows of corruption in the business and implicitly approves it by participating in the corruption." *United States v. DeRiggi*, 72 F.3d 7, 9 (2d Cir. 1995) (per curiam). In *DeRiggi*, which concerned the payment of bribes at a taxi inspection station to ignore inspection failures, the court noted that "[w]hile DeRiggi may not have been the scheme's inventor or originator, he was clearly one of its leaders. The district court emphasized that DeRiggi was the highest ranking authority at the inspection station, and exercised control over it. Regardless of DeRiggi's exact role in the conspiracy, his place in the inspection station hierarchy together with his participation in the conspiracy necessarily made him a leader in the scheme." *Id.* at 8. That encompassed not only the defendant's active participation in the scheme, but also his failure to do anything to stop it: "DeRiggi's ability to 'blow the whistle' is an aspect of his status as a leader, which we conclude is a supportable basis for the enhancement. It is self-evident that, by choosing to actively participate in the scheme rather than put a stop to it, DeRiggi put an imprimatur on this pervasive corruption." *Id.* at 8-9.

This conduct is particularly analogous here, where Atilla not only played a critical role in the design of both the gold and the food schemes, but also in the concealment of that scheme from Treasury officials. As the testimony of David Cohen and Adam Szubin proved, Atilla was

the bank's leader in communicating with the U.S. government about sanctions-related issues. (*See* Tr. 1082, 1413). In those communications, rather than "blow the whistle," Atilla dissembled, minimizing Halk Bank's dealings with Zarrab (Tr. 1149-50) and assuring U.S. officials that Halk Bank was not assisting the Government of Iran in accessing the profits from oil sales (GX7029 at 2).

In arguing that he played only a minor role, Atilla focuses on only two things: the fact that he was not paid bribes in connection with the scheme (which is undisputed), and the relative paucity of intercepted communications between Atilla and Zarrab. Neither suggests that Atilla deserves a minor-role reduction. Nothing about the fact that Atilla received no bribes indicates that he was not in fact a manager or supervisor. The Second Circuit has expressly noted that a supervisor "of a legitimate business who actively participates in criminal activity through the business may be eligible for an aggravating role adjustment, on the theory that the owner is enriched when the illegal activity adds to the business's bottom line." *United States v. Burgos*, 324 F.3d 88, 93 (2d Cir. 2003). Moreover, a manager need not be the originator of the scheme—the enhancement is routinely applied for "[l]ieutenant[s] . . . responsible for mak[ing] sure everything [was] running straight," *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) (internal quotation marks omitted); or for "couriers, offloaders or mid-level distributors," *United States v. Greer*, 285 F.3d 158, 182 (2d Cir. 2002), who are not at the apex of otherwise extensive criminal organizations, but who nevertheless exercise supervisory control within their domains.

Second, by focusing solely on his communications with Zarrab about the scheme, Atilla entirely ignores both the vast array of communications in which he lied to representatives of the U.S. government about the scheme and Halk Bank's dealings with Iran, and the extensive testimony about his participation in meetings in which the scheme was discussed. Atilla was a

participant in critical meetings in the fall of 2012 in which the structure of the scheme was discussed with representatives of NIOC and CBI, and at which Atilla and Aslan were the key participants from Halk Bank. (Tr. 386-88, 393-94). Atilla told Zarrab how to falsify documents to fool lower-level employees at Halk Bank who were reviewing them (Tr. 649-55, 1627-30, 1650-56; GX261 T), and was critical to restarting the scheme after the arrests of Zarrab and Aslan in late 2013 (Tr. 704-705). As the Government noted in its closing arguments, Atilla was the only Halk Bank official who remained with the bank for the entirety of the scheme—supervisors above him and subordinates below him were all replaced. Atilla thus represented a key lynchpin necessary for the success of the scheme and responsible for designing a method that would protect it from American scrutiny.

Accordingly, a three-level enhancement for being a manager or supervisor is warranted, and the base offense level should be increased to 51.

Though the Government concedes that the abuse-of-trust Guidelines enhancement does not apply to Atilla's conduct,[2] see U.S.S.G. § 3B1.3, the Court should consider Atilla's position of trust in its assessment of "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). "'[T]he primary trait that distinguishes' a position of trust from other positions is 'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'"

---

[2] The two-level enhancement for abuse of "a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense," pursuant to § 3B1.3, is not applicable in this case. "Whether a position is one of 'trust' within the meaning of § 3B1.3 is to be viewed from the perspective of the offense victims, and is a question of law for the court, subject to de novo review on appeal." *United States v. Wright*, 160 F.3d 905, 910 (2d Cir. 1998) (internal citations omitted). The Second Circuit has held that "the abuse of trust enhancement applies only where the defendant has abused discretionary authority entrusted to the defendant by the victim." *United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996). Because Atilla was not placed in his position of trust by the United States or by the banks he victimized, this technical standard bars the enhancement's application.

*United States v. Laljie*, 184 F.3d 180, 194 (2d Cir. 1999) (quoting *United States v. Viola*, 35 F.3d 37, 45 (2d Cir.1994)). Atilla was the Deputy General Manager for International Banking at Halk Bank, and, in addition to his title, served as Halk Bank's principal interlocutor with the U.S. government. As the evidence proved, Atilla's critical role in the scheme was concealing it from detection: He directed Zarrab to eliminate errors in the documents that would unravel the scheme, he rejected an Iranian proposal to conduct illegal transactions directly, and he lied to U.S. government officials about Halk Bank's business with both Iran and Zarrab. In short, not only did his position give him "the freedom to commit a difficult-to-detect wrong," Atilla's position was the role that made the scheme difficult to detect as to *any* of the participants. There is no doubt that Atilla's position of trust contributed substantially to the commission and concealment of his crimes, and the Court should recognize the significance of his position to the characteristics of the offense.

### C. The Obstruction of Justice Enhancement Applies

The PSR correctly applies a three-level enhancement for Atilla's obstruction of justice under § 3C1.1. PSR ¶ 80. In objecting to this enhancement, Atilla ignores the most obvious reason for its application: his blatantly false, self-serving testimony at trial. Atilla's perjury makes application of the enhancement mandatory.

It is well-recognized that "false trial testimony is an appropriate basis for imposing an obstruction of justice upgrade." *United States v. Bonds*, 933 F.2d 152, 155 (2d Cir. 1991). Indeed, "[w]here the defendant lies under oath, the application of a sentence enhancement is mandatory." United States v. Morissett, 49 F. App'x 334, 339 (2d Cir. 2002); *see also United States v. Shonubi*, 998 F.2d 84, 86–87 (2d Cir.1993) (reversing for failure to apply U.S.S.G. § 3C1.1 sentence enhancement because "[i]f a defendant's lies are found to be willful, an obstruction of justice enhancement must be imposed at sentencing."). Although "[a]ny ambiguity

regarding the testimony must be evaluated in the light most favorable to the defendant[,] . . . such an enhancement is mandatory once its factual predicates have been established." *United States v. Mylett*, 97 F.3d 663, 668 (2d Cir. 1996).

That factual predicate is easily established in a case where a defendant's lies go directly to the conduct at the core of counts for which he ultimately was convicted. As the Second Circuit has recognized:

> Where, as here, the defendant's testimony relates to an essential element of his offense, such as his state of mind or his participation in the acts charged in the indictment, the judgment of conviction necessarily constitutes a finding that the contested testimony was false. Accordingly, assuming that the evidence also persuades the sentencing judge that the defendant knew, at the time of testifying, that the statements to which he testified were untrue, a section 3C1.1 enhancement would be appropriate.

*Bonds*, 933 F.2d at 155; *see also United States v. Stewart*, 686 F.3d 156, 177 (2d Cir. 2012) ("Here, as in *Bonds,* the jury's findings of guilt on Count One, charging conspiracy to defraud the United States, and Counts Four and Five, charging material support of terrorism, each required the jury to find that Stewart's actions were undertaken knowingly. The jury's findings contradicted Stewart's factual testimony to the effect that she did not engage in this conduct, or at least did not do so knowingly.").

As noted above, Atilla repeatedly made claims that were demonstrably false. He expressly denied participating in meetings with both Zarrab and Szubin that went to the core of his conduct, along with denying any participation or even knowledge of the scheme to launder Iranian oil proceeds out of Halk Bank. He did not merely deny participation in general terms; he made expressly false claims about his conduct and that of others. The jury's comprehensive verdict "necessarily constitutes a finding that the contested testimony was false," *Bonds*, 933 F.2d at 155, and the application of the perjury enhancement is therefore mandatory.

Accordingly, Atilla's base offense level is 54.

### D.    No Reduction Under § 2X1.1(b)(2) Is Appropriate

Atilla asks for a reduction under § 2X1.1(b)(2), which provides for a decrease of three levels for a conspiracy that does not result in the completion of a substantive offense, on the ground that he was acquitted of the substantive money laundering count charged in Count Five. But Atilla ignores the very words that he quotes. The reduction is inapplicable where "the defendant *or a co-conspirator* completed all the acts the conspirators believed necessary on their part for the successful completion of the substantive offense." There is no doubt that members of the conspiracy did in fact complete the substantive money laundering offense that was the object of the conspiracy charged in Count Six. For one, Zarrab pleaded guilty to committing the substantive offense. In addition, the evidence at trial amply proved that members of the conspiracy did in fact transmit hundreds of millions of dollars into the United States in order to promote their schemes of bank fraud and sanctions evasion. Atilla's suggestion that the money laundering conspiracy was entirely inchoate is laughable, and the jury's verdict as to Count Five has no bearing on whether *a co-conspirator* in fact committed the underlying substantive crime that was the object of the conspiracy. Therefore no reduction under this section may be applied.

### E.    Criminal History Category

There is no dispute that Atilla falls into criminal history Category I.

### F.    Applicable Sentencing Range

Pursuant to Chapter 5, Part A, cmt. n. 2, the total offense level of 54 is treated as a total offense level of 43. Offense level 43 and criminal history category I result in an applicable Guidelines range of life imprisonment. Pursuant to § 5G1.1(a), because a sentence of life imprisonment exceeds the statutory maximum sentence of 105 years, the Guidelines sentencing range is 105 years' imprisonment. The applicable fine range is $50,000 to $500,000.

### G.    Alternative Sentencing Range

In *United States v. Dhafir*, 577 F.3d 411 (2d Cir. 2009), a defendant convicted of both an IEEPA offense and a money laundering offense objected to the determination of his base offense level under § 2S1.1(a)(2). In *Dhafir*, the district court adopted the reasoning articulated above by the Government in this case. As described by the Court of Appeals:

> "Here," the district court wrote, "the unlawful activity charged in the money laundering counts is the transfer of funds in a manner intended to promote IEEPA violations. The counts are not based on the source of the funds but rather on the offense which their transfer was intended to promote." The court found that § 2S1.1(a)(1) "which establishes the base offense level with reference to the underlying offense from which the laundered funds were derived, is inapplicable ... Accordingly, the Court declines to read subsection (a)(1) as requiring it to refer to the source of funds to determine the base offense level in a case such as this, where the defendant is convicted of transferring the funds to promote an illegal activity other than that from which the laundered funds were derived."

*Id.* at 413. The Second Circuit did not reject that analysis, indeed it expressly noted that "[w]e do not hold that the district court erred in determining that the appropriate Guidelines provision was § 2S1.1(a)(2)." *Id.* at 415.

However, the Second Circuit remanded the case for resentencing to permit consideration of additional factors:

> We reiterate here that the district court is not bound in ambiguous circumstances such as these to choose one Guidelines range in particular, and is free to take the more flexible-and often, more direct-approach of arriving at a more appropriate sentence outside the Guidelines. In light of *Booker*, the judge could simply look at all of the facts, take both suggestions into account, consider the § 3553(a) factors, and come up with a "hybrid" approach if he so chose. . . . [W]e remand only to permit the district court to consider whether a different sentence would result from the application of this more flexible approach.

*Id.* On remand, the district court reaffirmed that the alternative Guidelines calculation would not affect the sentence, and resentenced the defendant to 264 months' imprisonment, which was affirmed on appeal. *See United States v. Dhafir*, 511 F. App'x 74 (2d Cir. 2013).

Although the Government believes that the plain text of the Guidelines and the money laundering statutes mandate the use of § 2S1.1(a)(2) to determine the defendant's base offense level, the Government also sets forth below the Guidelines calculation applicable under § 2S1.1(a)(1) in the event the Court elects to adopt the hybrid approach approved in *Dhafir*.

- Under § 2S1.1(a)(1), the base offense level is to be determined by reference to the offense level for the underlying offense from which the laundered funds were derived. Here, that offense level is determined pursuant to § 2M5.1, the Guideline applicable to the IEEPA offense charged in Count Two.

- Pursuant to § 2M5.1(a)(1), the base offense level is 26, because the offense involved the evasion of "national security controls."

- Although § 2S1.1(a)(1) cross-references the base offense level for the underlying offense, the enhancements for specific offense characteristics under § 2S1.1(b) are still applicable.

- Pursuant to § 2S1.1(b)(2)(b), because the defendant was convicted under § 1956, the base offense level is increased by two levels to 28.

- Pursuant to § 2S1.1(b)(3), because § 2S1.1(b)(2(B) applies and because the offense involved sophisticated laundering, the base offense level is increased by two levels to 30.

- Pursuant to § 3B1.1(b), because the defendant was a manager or supervisor of the relevant criminal activity, the base offense level is increased by three levels to 33.

- Pursuant to § 3C1.1, because the defendant obstructed justice by testifying falsely at trial, the base offense level is increased by three levels to 36.

The defendant's criminal history category remains I. Accordingly, under an alternative calculation of the money laundering guidelines using § 2S1.1(a)(1), Atilla's sentencing range would be 188 to 235 months' imprisonment. Pursuant to *Dhafir*, the Court has the discretion to consider this sentencing range, the sentencing range of 105 years provided by the application of § 2S1.1(a)(2), and the § 3553(a) factors to determine an appropriate sentence.

## II.     A Significant Incarceratory Sentence and Fine Are Warranted

As discussed above, the correctly calculated Guidelines sentencing range is 105 years' imprisonment, with a fine range of $50,000 to $500,000. Atilla argues that this range is "is not only draconian, it is barbaric." (Atilla Mem. at 21). But this range simply reflects the enormous gravity of the offense, which involved a concerted, sustained scheme to launder hundreds of millions of dollars of Iranian funds through the United States and to provide billions of dollars' worth of illicit funding to Iran and Iranian entities during critical periods of the international nuclear negotiations, all the while lying to the senior-most officials at Treasury to conceal the scheme and protect Atilla's employer from itself being blacklisted.

The Government recognizes, however, that a sentence effectively of life imprisonment has but rarely—though on at least one occasion—been imposed in cases most analogous to this one. (*See infra* pp. 60-65). The Government also recognizes the Court's discretion to consider both the Guidelines sentencing range of 105 years and the alternate § 2S1.1(a)(1) sentencing range of 188 to 235 months, along with the § 3553(a) factors, to determine an appropriate sentence. The Government respectfully and strongly urges that a significant incarceratory sentence is warranted here in order to adequately advance the legitimate purposes of sentencing, particularly to reflect the seriousness of the offense, to promote respect for the law, and to provide needed deterrence to others. Atilla's own obstruction of justice and adamant denial of responsibility also reflects the need for a substantial sentence.

As set forth below, a sentence greater than 188 months—the low end of the alternate Guidelines range—is necessary to fulfill the legitimate purposes of sentencing. The Government notes sentences of approximately 20 years imposed in *Dhafir* and *United States v. Vikram Datta*, cases analogous to this one in important respects, though involving vastly less serious, pervasive, and egregious sanctions-violation and money-laundering offenses.

### A. The Seriousness of the Offense and Need to Promote Respect for the Law

The gravity of Atilla's offenses was demonstrated by multiple witnesses at trial demonstrating that the U.S. sanctions laws at issue in this case were part of a broad international effort directly related to a variety of Iran's dangerous and deadly policies and actions, including its military nuclear program, its ballistic missiles program, it sponsorship of terrorist organizations and acts of terrorism, and its human rights violations.

Lisa Palluconi, the Sanctions Coordinator for OFAC and an expert in the Iran sanctions program (Tr. 92-95), testified about the comprehensive trade embargo that the United States has adopted on Iran as a result of Iran's actions and policies, and how sanctions against Iran expanded and escalated over time. The United States' economic sanctions against Iran derive from Presidential declarations in 1995 and 1997 of a national emergency with respect to the Government of Iran posing an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. (Tr. 98-100). As a result of this national emergency, which has been continuously in force ever since, the President established a comprehensive trade embargo on Iran. (Tr. 100-01; *see also* 101-05).

In addition to the Iranian sanctions program, the President also declared a national emergency with respect to proliferators of weapons of mass destruction, leading to the designation of Iranian entities as proliferators of weapons of mass destruction or supporters of WMD proliferators, including the IRGC, NICO, and NICO. (Tr. 105-06, 109, 118-19). Further steps were taken in 2012 and 2013 to address the national emergency with respect to Iran, including the oil and gold sanctions. (Tr. 120-32). Throughout this timeframe, Iranian sanctions were expanding and escalating. (Tr. 132).

Mark Dubowitz, an expert on Iran and Iranian economic sanctions (Tr. 154), testified about the Iranian regime's dangerous, deadly, and destabilizing actions that led to increasing

U.S. and international sanctions against Iran throughout the 1990s and 2000s. In March 2011 the Ayatollah Ali Khamenei declared a "year of economic jihad" in order to foil economic sanctions imposed against Iran by the United States, the European Union, and a number of other individual countries. (Tr. 158). The U.S. sanctions, particularly, were designed to try to punish the Iranian government for its illicit activities, including support for terrorism, and to attempt to influence Iran to change its conduct. (Tr. 163). Over time, the sanctions escalated in an effort to "change the calculus of the regime with respect to the full range of its activities, including its nuclear program, missile program, support for terrorism and other malign activity." (Tr. 163-64).

In the early 2000s, the United States became increasingly concerned about Iran's nuclear program, especially after an Iranian exile group revealed the presence of clandestine nuclear facilities in Iran. (Tr. 164). The United Nations Security Council also passed multiple resolutions demanding that Iran suspend its nuclear enrichment and imposing sanctions on Iranian entities engaged in illicit nuclear or missile activities, including the IRGC. (Tr. 164-65). Mr. Dubowitz described the role of the IRGC in Iran's terrorist activities as well as its significant role in the Iranian economy, especially the financial, petroleum, construction, and defense industries. (Tr. 165-68).

David S. Cohen, the Treasury Under Secretary for Terrorism and Financial Intelligence from 2011 until early 2015, and Adam Szubin, the Director of OFAC during that time period and the Acting Under Secretary in 2015 and 2016, also testified about the important role that sanctions played in attempting to curb the Iranian regime's malicious behaviors, and especially its nuclear program. Over time, U.S. and international economic sanctions focused on attempting to isolate Iran and the Iranian economy from the international financial sector and international economy, with particular focus on Iranian oil proceeds, so as to pressure the regime while

offering the opportunity for negotiations over its nuclear program. (Tr. 1080-82, 1409-11).

Therefore, as the trial testimony made clear, one significant aim of the sanctions, especially the

sanctions against Iran's banking and oil sectors, was a diplomatic negotiation to limit or

eliminate Iran's military nuclear program. An interim agreement among the United States,

United Kingdom, France, German, Russia, China, and Iran concerning Iran's nuclear program

was reached in November 2013; a final agreement also including the European Union was

reached in July 2015 and implemented in January 2016. *See* Joint Plan of Action (Nov. 24, 2013)

("JPOA"), *available at* https://www.treasury.gov/resource-

center/sanctions/Programs/Documents/jpoa.pdf; Joint Comprehensive Plan of Action (Jul. 14,

2015) ("JCPOA"), (available at https://www.state.gov/e/eb/tfs/spi/iran/jcpoa/).

      It was precisely during this critical timeframe that Atilla and his co-conspirators's

monumental sanctions-busting scheme was in full swing, providing Iran access to billions of

dollars' worth of desperately needed funds for its banking system and the IRGC-linked NIOC

and NICO entities, including hundreds of millions of dollars routed through the U.S. financial

system, and to alleviate the very financial pressure that induced the regime to negotiate its

nuclear program. What effect this had on the negotiations and ultimate outcome may be

impossible to know, but there is no doubt that it significantly strengthened the regime during that

consequential time period.

      In his sentencing submission, Atilla seeks to undermine the gravity of the offenses,

downplaying them as merely "thwarting the foreign policy objectives of the United States" by a

foreign national lacking "any allegiance to the U.S." (Atilla Mem. at 24). This is a breathtaking

minimization of a concerted, prolonged, willful effort to evade and subvert U.S. sanctions that

were part of a highly public international effort to curb the nuclear ambitions of the world's

foremost state sponsor of terrorism and a leading threat to world peace and stability, in the course of which Atilla regularly spoke in person and by phone with senior U.S. government officials in Turkey and in the United States and repeatedly lied to them in an effort to conceal the scheme and avoid potentially devastating sanctions from being levied on his own bank. Whether Atilla owed any "allegiance" to the United States lacks any sentencing significance.

Moreover, in participating in a conspiracy to conceal Iran's involvement in international financial transactions that were processed through correspondent accounts located in the United States, Atilla also worked to undermine the integrity of the U.S. financial system. As Douglas Sloan and Rob Peri, senior compliance officers at Deutsche Bank and Citibank, respectively, testified, U.S. financial institutions take sanctions compliance and anti-money laundering very seriously and devote significant resources to ensuring that U.S. banks are not involved in facilitating illicit payments and supporting illicit activity. (Tr. 1541-43, 1546-48, 1702-13). Atilla knowingly sought to undermine those efforts and establish a system of laundering large-scale illicit Iranian funds through the United States.

### B. Atilla Willfully Violated U.S. National Security Controls, Defrauded U.S. Banks, and Laundered Money Through the United States

Atilla argues in his sentencing submission that he lacked fair warning that he could be held accountable for his offenses, which, according to Atilla, diminishes the blameworthiness of his conduct. (Atilla Mem. at 25-26). The jury has already rejected Atilla's argument about his state of mind by finding that he acted willfully, as the Court instructed it must to find him guilty.

Moreover, there is ample evidence supporting the jury's conclusion, including evidence that Treasury officials warned Atilla and his fellow bank managers that the consequences of running afoul of the sanctions promulgated pursuant to the IEEPA—which included the precious metals and petroleum sanctions set forth in Executive Orders 13622 and 13645—included

regulatory, civil, and criminal penalties. (*See, e.g.* Tr. 1106, 1187, 1190, 1191-92). Former Under Secretary Szubin specifically drew Atilla's attention to the designation of a foreign businessman for his transactions with designated Iranian entities to warn Atilla and his fellow bank managers of Treasury's seriousness about enforcing the sanctions and, in a later one-on-one meeting, explicitly warned Atilla that Treasury's concerns about Halk Bank placed it in "a category unto themselves." (Tr. 1435-1437). Atilla understood the warning: his reaction was "sweating." (Tr. 1437).

Atilla's repeated efforts to rely on his status as a foreign national as a purportedly mitigating factor ultimately boils down to the contention that, while Atilla knew that his conduct was unlawful and exposed Halk Bank to potentially devastating sanctions, he failed to appreciate that he could be arrested and criminally prosecuted for that conduct. But even if this were true—and there are ample reasons to conclude otherwise—Atilla's belief that he could undermine U.S. national security and world stability by conspiring with others to violate U.S. national security controls, defraud U.S. banks, and launder funds through the United States financial system while escaping personal accountability for his offenses would be anything but mitigating. To the contrary, this belief would militate in favor of a significant sentence to reflect Atilla's efforts to avoid responsibility for his actions and to serve as a clear warning to any other potential offender standing in Atilla's shoes.

### C.     Atilla's Sentencing Arguments Do Not Warrant a Reduced Sentence

Atilla raises a host of additional arguments to seek a significantly reduced sentence. Atilla argues that the effects of incarceration in the United States will be unusually difficult for him as a foreign national with no family here (Atilla Mem. at 36-37), that the sentence need not seek to protect the public from additional crimes because his future ability to work in international banking has been eliminated (*id.* at 38-40, 62-63), that the length of his sentence

has no effect on general deterrence (*id.* at 41-43), that a significant incarceratory sentence would be inconsistent with sentences imposed on similarly situated defendants and with deferred prosecution agreements entered into with foreign banks regarding sanctions-violating financial transfers (*id.* at 45-58), and that a sentence within the Guidelines sentencing range would be inherently disparate in light of statistics showing that a substantial percentage of sentences imposed in this District are below the applicable Guidelines ranges. (*Id.* at 58-61). None of these arguments warrant the extraordinary leniency Atilla seeks.

### 1. Comparable Sentences

Atilla argues that a significant sentence "would represent an unwarranted disparity . . . compared to the many situations . . . banks were accused of serious IEEPA violations, but simply paid money, entered into deferred-prosecution agreements ("DPAs"), and continued doing business without any of those banks' employees being charged criminally, detained, tried, convicted or sentenced to prison time." (Atilla Mem. at 52-58). But Atilla's attempt to compare his circumstances to these cases is misplaced. This "sentencing disparity" argument has nothing to do with "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct"; rather, Atilla argues that he should be let off lightly because officers at banks that entered into these DPAs were not convicted or sentenced at all. Thus, Atilla's argument is outside the bounds of the § 3553(a) analysis and should not be considered at all by this Court.

But a closer analysis of those cases shows why Atilla's analysis is factually wrong as well as legally irrelevant. There are significant differences between those cases and Atilla's, and those differences weigh in favor of a greater, not lesser, sentence based on the nature and circumstances of Atilla's offenses.

First, every single bank sanctions investigation that Atilla points to involved significant acceptance of responsibility by the banks, including extensive internal investigations that were shared with investigating authorities, the adoption of meaningful compliance reforms, disciplining officers and employees who directed or abetted the sanctions-violating conduct, the payment of substantial monetary penalties reflecting the seriousness of the offense conduct, and ongoing commitments to cooperate with law enforcement investigations. In some cases, the banks self-reported the sanctions violations to U.S. law enforcement and regulatory authorities; in other cases, as part of their internal investigations, the banks uncovered additional conduct that was previously unknown to authorities and fully disclosed the newly discovery offenses.

- In *United States v. ING Bank N.V.*, 12 Cr. 136 (PLF) (D.D.C.), a bank officer raised concerns about sanctions compliance with a European central bank (D.E. 2, Ex. A ¶ 66); the bank initiated two separate internal investigations involving 775 interviews in more than 18 jurisdictions (*Id.* ¶ 68); the bank appointed a high-level executive to coordinate cooperation with multiple law enforcement and regulatory investigations (*Id.* ¶ 72); the bank provided extensive, unredacted documentation and work product to investigators (*Id.* ¶ 73); and the bank adopted meaningful compliance reforms and disciplined more than 60 employees *Id.* (*Id.* ¶ 74). The bank entered into a DPA that provided for, among other things, the payment of $309,500,000 in monetary penalties and the bank's agreement to continue implementing remedial measures and to make documents and personnel available to law enforcement. (D.E. 2 ¶¶ 3, 5 & 6).

- In *United States v. ABN Amro Bank N.V.*, 10 Cr. 124 (CKK) (D.D.C.), after several years of regulators' concerns about bank's anti-money laundering and bank secrecy program, the bank self-identified sanctions-violating procedures in its Dubai branch and began an internal investigation (D.E. 2, Ex. A ¶ 73); the bank made significant revisions to its compliance functions, provided extensive documentation to investigators relating to its internal investigation, and made employees available for interviews by investigators (*Id.* ¶ 74); and the bank took disciplinary action against employees found to have failed in their duties, including termination, dismissal, and other sanction of senior management, audit, legal, and compliance officials (*Id.* ¶ 75). The bank entered into a DPA that provided for, among other things, the payment of $500 million in penalties, and the bank's agreement to continue implementing remedial measures and to make documents and personnel available to law enforcement. (D.E. 2 ¶¶ 3, 6 & 7).

- In *United States v. Barclays Bank PLC*, 10 Cr. 218 (EGS) (D.D.C.), the bank's senior management became aware of unlawful payments through its New York

branch and made a voluntary disclosure to OFAC and its banking regulators (D.E. 2, Ex. 1 ¶ 47); undertook an interview review that involved more than 175 interviews and review of more than 100,000,000 documents (*Id.* ¶ 48); and the bank made significant changes to its compliance programs (*Id.* ¶ 50). The bank entered into DPAs that provided for, among other things, the payment of $298 million in penalties and the bank's agreement to continue implementing remedial measures and to make documents and personnel available to law enforcement. (D.E. 2 ¶¶ 3 & 6).

- In *United States v. Credit Suisse AG*, 09 Cr. 352 (RCL) (D.D.C.), before U.S. regulatory and law enforcement investigations were initiated, the bank decided to discontinue all business with U.S.-sanctioned countries, except for certain private banking customers from Iran and Syria (D.E. 4, Ex. A ¶ 55); began terminating Iranian private banking relationships thereafter (*Id.* ¶ 56); adopted remediation efforts to address its compliance programs, policies, and training (*Id.* ¶ 57); and cooperated in law enforcement investigations, including conducting an internal investigation, sharing the results of that investigation, and making current and former employees available for law enforcement interviews (*Id.* ¶ 58). The bank entered into DPAs that provided for, among other things, the payment of $536 million in penalties and the bank's agreement to continue implementing remedial measures and to make documents and personnel available to law enforcement. (D.E. 2 ¶¶ 3 & 6).

- In *United States v. HSBC Bank USA, N.A.*, 12 Cr. 763 (ILG) (E.D.N.Y.), the bank began cooperating with U.S. law enforcement early in the investigation (D.E. 3, Ex. A ¶ 77), including producing voluminous records and making current and former employees available for interview (*Id.* ¶ 78); assisted in ongoing investigations of potential individual criminal wrongdoing (*Id.* ¶ 79); clawed back deferred compensation from senior AML and compliance officers (*Id.* ¶ 81(b)); significantly increased AML and compliance resources (*Id.* ¶ 81(c), (d)); made extensive changes to its compliance and AML programs (*Id.* ¶ 81(e), (f), (g), (i), (j), (l)); and terminated potentially risky relationships (*Id.* ¶ 81(h), (k)). The bank entered into a DPA that provided for, among other things, the payment of $1.256 billion in penalties and the bank's agreement to continue implementing remedial measures, to cooperate with law enforcement, and to enter a monitorship with respect to its compliance. (D.E. 2 ¶¶ 6, 7, 9).

- In *United States v. Credit Agricole Corporate and Investment Bank*, 15 Cr. 137 (CKK) (D.D.C.), the bank cooperated with U.S. authorities throughout the course of the investigation and undertook a voluntary and comprehensive internal review of its payment processing and compliance practices. (D.E. 8, Ex. A ¶ 67). The bank shared the results of its internal investigation with U.S. law enforcement (*Id.* ¶ 67(d)), made current and former employees available for interview (*Id.* ¶ 67(f)), and undertook significant improvements to its compliance program. (*Id.* ¶ 68). The bank entered into DPAs that provided for, among other things, the payment of $312 million in penalties and the bank's agreement to continue implementing remedial measures and to cooperated with law enforcement. (D.E. 8 ¶¶ 5, 6, 8, 10, 11, 12).

- In *United States v. Commerzbank AG*, 15 Cr. 31 (BAH) (D.D.C.), the bank cooperated with U.S. law enforcement throughout the investigation and undertook a voluntary and comprehensive internal review of its payment processing and compliance practices. (D.E. 2, Ex. A ¶ 76). The bank shared the results of its internal investigation with U.S. law enforcement (*Id.* ¶ 76(d), (e)), made current and former employees available for interview (*Id.* ¶ 76(h)), and undertook significant improvements to its compliance program. (*Id.* ¶ 77). The bank entered into DPAs that provided for, among other things, the payment of $742 million in penalties and the bank's agreement to continue implementing remedial measures and to cooperate with law enforcement. (D.E. 8 ¶¶ 5-8, 10-15).

- In *United States v. Lloyds Bank TSB*, 09 Cr. 7 (ESH) (D.D.C.), the bank cooperated in the investigation, including by conducting an extensive internal investigation and providing the results of that investigation to law enforcement (D.E. 2, Ex. A ¶ 36), and undertook revisions to its sanctions compliance program. (*Id.* ¶ 36). The bank entered into DPAs that provided for, among other things, the payment of $350 million in penalties and the bank's agreement to continue implementing remedial measures and to cooperate with law enforcement. (D.E. 2 ¶¶ 3, 3, 7).

- In *United States v. Standard Chartered Bank*, 12 Cr. 262 (JEB) (D.D.C.), the bank self-reported its sanctions-violative conduct to foreign and U.S. regulatory authorities. (D.E. 2, Ex. A ¶ 105). The bank fully cooperated with U.S. authorities throughout the course of the investigation, including by conducting a comprehensive internal review of its payment and compliance practices, waiving attorney-client privilege, providing reports and information from its investigation, and making current and former employees available for interview. (*Id.* ¶ 106). The bank made substantial revisions to its compliance program and increased its compliance resources. (*Id.* ¶ 107). The bank entered into a DPA that provided for, among other things, the payment of $227 million in penalties and the bank's agreement to continue implementing remedial measures and to cooperate with law enforcement. (D.E. 2 ¶¶ 3, 3, 7).

- Finally, in *United States v. BNP Paribas S.A.*, 14 Cr. 460 (LGS) (S.D.N.Y.), the bank provided substantial cooperation by conducting an extensive transaction review, identifying potentially violative transactions, responding to numerous inquiries and requests for information, providing voluminous records from foreign jurisdictions, and conducting interviews with dozens of current and former employees. (D.E. 13, Ex. A ¶¶ 71, 74). The bank also took corrective measures to enhance its sanctions compliance. (*Id.*). Earlier in its internal investigation, however, the bank delayed producing records from its branch in Switzerland and delayed providing information from a whistleblower in London that impaired the Government's ability to pursue prosecutions of individuals. (*Id.* ¶¶ 72, 73). The bank pleaded guilty to conspiring to violate IEEPA and the Trading With the Enemy Act, 50 U.S.C. App. §§ 3, 5, and 16, pursuant to a plea agreement that provided for $8.97 billion in monetary penalties, a five-year term of probation, an extended term of regulatory monitorship, and certain transactional limitations. (D.E. 20 at 6-9). As part of the bank's investigation, more than 40 employees

were disciplined, including certain employees who were separated or terminated and the bank agreed not to rehire them. (D.E. 22 at 4, 7).

This acceptance of responsibility by the banks and their significant remedial efforts are in stark contrast with the actions of Atilla and his employer, Halk Bank. Atilla's illegal activities were not self-reported; to the contrary, Atilla and his colleagues continually sought to conceal their activities from Treasury officials. In the wake of arrests in Turkey that brought at least a portion of the conduct to light, Atilla and his employer took no serious steps to conduct a legitimate internal investigation, to stop the sanctions-violating conduct, to reform their compliance program, or to discipline those involved. Instead, then-General Manager Suleyman Aslan was allowed to simply resign and when Halk Bank's client, Reza Zarrab, was released from Turkish prison, he and the bank picked up right where they had left off, with Atilla's knowledge and support.

These bank actions also demonstrate another fundamental flaw in Atilla's analysis. The rarity of criminal prosecutions of foreign bank officers and employees does not reflect a lessened culpability for those individuals or selective prosecution of Atilla, but rather the difficulties of such investigations and prosecutions. For example, criminal investigations of individuals arising out of the BNP Paribas investigation were frustrated by delays in disclosures of information and limitations based on foreign privacy laws that caused statutes of limitations to lapse. (*See* 14 Cr. 460 (LGS) (S.D.N.Y.) (D.E. 13, Ex. A ¶¶ 72, 73)). Investigations and prosecutions of foreign nationals can also be hampered by extradition restrictions—such as those involving Turkey, which does not extradite Turkish nationals—and by lack of foreign governmental cooperation—as in this case.

None of those factors in any way diminishes Atilla's culpability for his offenses or warrants sentencing leniency. If anything, the bank cases demonstrate yet another basis on which

Atilla and his colleagues were on fair notice that U.S. sanctions extend to foreign banks and foreign nationals who were involved directly in U.S. financial transactions on behalf of sanctioned entities or jurisdictions, or who conspired with others who are involved in such transactions.

Atilla's efforts to draw analogies between himself and individual defendants who received relatively short terms of imprisonment are similarly flawed. Notably, Atilla repeatedly compares himself to defendants with dramatically lower Guidelines sentencing ranges, reflecting the correspondingly dramatically lower seriousness of their offenses. While Atilla's Guidelines range is 105 years' imprisonment, he draws the Court's attention to defendants like Reza Banki, with a Guidelines range of 63 to 78 months; Ali Amirnazmi, with a Guidelines range of 97 to 121 months; and Seyed Amin Ghorashi Sarvestani, with a Guidelines range of 57 to 60 months. (Atilla Br. at 45-51).[3] Each of these defendants bears substantial differences from Atilla and his offense.

As an initial matter, Banki's conviction was vacated and the sentence imposed is therefore of extremely limited value for this Court's consideration. *United States v. Banki*, 685 F.3d 99, 108-15 (2d Cir. 2012) (vacating convictions for conspiring to violate the IEEPA and operating as an unlicensed money remitter). But even on its facts, *Banki* is otherwise easily distinguishable. Between approximately May 2006 and September 2009, Banki participated in

---

[3] Atilla also attaches a chart, the selection methodology of which is unexplained and which he acknowledges is not comprehensive, of other sentences imposed in various sanctions prosecutions. (Atilla Mem. at 50-51, Ex. B). Sentencing is an individualized proceeding that depends on the applicable Guidelines range, whether the defendant was convicted after trial or as the result of a plea agreement, whether the defendant cooperated, the nature and circumstances of the offense, the history and characteristics of the defendant, and numerous other factors that are particular to each case. Atilla's lengthy chart, which is devoid of significant details, is unhelpful in making comparisons and appears to be an attempt to avoid careful consideration of the facts with brute numerical force.

hawala transfers in which an individual or entity would transfer funds to Banki's bank account in the United States, and a family member in Iran would disburse a corresponding amount to a recipient in Iran. *Id.* at 103-04. Banki contended that these transfers, totaling approximately $3.4 million in the aggregate, were simply family remittances permitted by a general license for such transfers and, indeed, the trial court's failure to instruct the jury on the family-remittance license was the basis for the Second Circuit's vactur of his IEEPA conviction. *Id.* at 109-12.

Amirnazmi pursued an ambitious goal to transform Iran "into an independent chemical powerhouse," *United States v. Amirnazmi*, 645 F.3d 564, 567 (3d Cir. 2011), but his actual achievements fell far short of this aim. As the sentencing court noted, "I am sorry to say this if Dr. Amirnazmi is offended by it, I do not think he is very effective." *United States v. Amirnazmi*, 08 Cr. 429 (CMR) (E.D. Pa. Feb. 17, 2010) (D.E. 195 at 108). Despite Amirnazmi's persistent scheme to improve Iran's chemical capacity, his most significant achievement was a licensing agreement for software with an Iranian entity, which ultimately expired without a consummated deal. *Amirnazmi*, 645 F.3d at 569. At sentencing, the court also gave significant weight to Amirnazmi's advanced age and significant medical conditions. *Amirnazmi*, 08 Cr. 429 (CMR) (E.D.Pa. Feb. 17, 2010) (D.E. 195 at 106-07, 114); *see also id.* at 83-84.

Sarvestani supplied satellite equipment to Iranian companies, and some of those sales included parts that were sourced from the United States. *United States v. Sarvestani*, 13 Cr. 214 (PGG) (S.D.N.Y. Sept. 12, 2013) (D.E. 45 at 4-5). Sarvestani contended that the satellite equipment was sold to a provider of residential internet and communications services, *id.* at 8-9, 19, though the Government argued that there were at least some potentially non-residential applications of the equipment. *Id.* at 16; *see also id.* at 24. The amount of trade involving U.S. parts apparently was approximately several hundred thousand dollars' worth. *Id.* at 12, 17-18.

After his arrest, Sarvestani met with law enforcement in an effort to provide substantial assistance, though these efforts did not result in a cooperation agreement or motion pursuant to § 5K1.1 of the Guidelines. *Id.* at 7. In addition to a below-Guidelines, but still comparatively substantial, sentence of 30 months' imprisonment, the court also imposed a fine at the top of the Guidelines range. *Id.* at 28.

In short, none of these defendants' conduct and personal circumstances compare to Atilla's. The magnitude of Atilla's conduct easily dwarfs each of Banki's, Amirnazmi's, and Sarvestani's by several orders of magnitude. Nothing in the record indicates that either Banki or Sarvestani met with or assisted any Iranian government entities or Specially Designated Nationals. Amirnazmi met with the Iranian President and supplied software to an Iranian state-owned company between 1997 and 2000, but never successfully provided any technical assistance to Iran after that. None of these defendants actively sought to deceive U.S. government officials over a period of several years. None of these defendants' offenses went to the heart of U.S. and international sanctions' efforts to curb Iran's military nuclear program. Indeed, each of the defendants has at least one highly notable mitigating circumstance lacking in this case: Banki's convictions were vacated, Amirnazmi suffered from advanced age and serious medical and psychological conditions, and Sarvestani attempted (albeit unsuccessfully) to cooperate. None of these is in any way comparable to Atilla's massive sanctions-violating scheme to clandestinely supply billions of dollars' worth of funding to Iran, NIOC, and the Iranian banking sector while repeatedly lying to Treasury officials.

While the crimes that Atilla committed are without ready comparison, the Government respectfully submits that more apt sentencing analogies can be made to IEEPA violator Rafil Dhafir, who was sentenced to 264 months for conspiring to launder several million dollars to

Iraq, 03 Cr. 64 (NAM) (N.D.N.Y.); and Vikram Datta, who was sentenced to 235 months for conspiring to launder millions in drug proceeds, 11 Cr. 102 (LAK) (S.D.N.Y.). Significant fraud offenders like Raj Rajaratnam, sentenced to 132 months for insider trading, 09 Cr. 1184 (LAP) (S.D.N.Y.); Mathew Martoma, sentenced to nine years for insider trading, 12 Cr. 973 (PGG) (S.D.N.Y.); Mark Mazer and Dmitry Aronshtein, each sentenced to 20 years for a multi-hundred-million-dollar scheme to defraud the city government, 11 Cr. 121 (GBD) (S.D.N.Y.); Bernie Madoff, sentenced to 150 years for a multi-billion-dollar investor fraud, 09 Cr. 213 (DC) (S.D.N.Y.); Hassan Nemazee, sentenced to 12 years for a multi-hundred-million-dollar bank fraud, 09 Cr. 902 (SHS) (S.D.N.Y.), Phillip Bennett, sentenced to 16 years for securities fraud, 05 Cr. 1192 (NRB) (S.D.N.Y.), or Bernie Ebbers, sentenced to 25 years for securities and accounting fraud, 02 Cr. 1144 (BSJ) (S.D.N.Y.), also provide useful landmarks. While none of these defendants is squarely comparable to Atilla, each involved crimes with enormous financial consequences and show that extremely serious offenses often warrant extremely serious sentences.

Dhafir operated a fraudulent charity that transmitted money to Iraq in violation of the Iraqi Sanctions Regulations, 31 C.F.R. Part 575, promulgated pursuant to IEEPA, and the promotional money laundering statute. *United States v. Dhafir*, 577 F.3d 411, 412-13 (2d Cir. 2009). Dhafir was also convicted of tax offenses, visa fraud, and health care fraud. *Id.* The amount of funds laundered to Iraq totaled approximately millions of dollars. *United States v. Dhafir*, 03 Cr. 64 (NAM) (N.D.N.Y. May 22, 2012) (D.E. 724 at 5). The applicable Guidelines sentencing range was either 324 to 405 if the offense level were based on § 2S1.1(a)(1), or 210 to 263 months if based on § 2S1.1(a)(2). *Id*. at 30. Employing the discretion allowed it by the Second Circuit's decision in *Dhafir*, 577 F.3d at 415, the sentencing court considered both

ranges as well as the § 3553(a) factors and imposed a sentence of 264 months' imprisonment. *Dhafir*, 03 Cr. 64 (NAM) (N.D.N.Y. May 22, 2012) (D.E. 724 at 31).[4] The court did not find either of the alternative Guidelines ranges unreasonable, but believed the lower range did not sufficiently reflect the seriousness of the offenses, promote respect for the law, provide just punishment, afford adequate deterrence, or protect the public. *Id*. at 30-31. The court imposed a sentence somewhat below the higher Guidelines range based principally on the defendant's positive and significant influence within the community, including numerous charitable works and assistance to the needy. *Dhafir*, 03 Cr. 64 (NAM) (N.D.N.Y. Oct. 27, 2005) (D.E. 684 at 38-39).

Datta was a perfume merchant who used his stores along the U.S.-Mexican border to help drug traffickers launder narcotics proceeds. *United States v. Garza-Gonzalez*, 12-647-cr, 512 Fed. Appx. 60, 62-63 (2d Cir. Feb. 21, 2013) (summary order). Datta laundered approximately $7 million in drug proceeds, *id*. at 66, and faced a Guidelines sentencing range of 235 to 293 months. *United States v. Datta*, 11 Cr. 120 (LAK) (S.D.N.Y. Jan. 20, 2012) (D.E. 87 at 27). The court described Datta as hardworking, extraordinarily devoted to his family, very charitable to others, and highly regarded by his employees. (*Id*. at 50). The court also found that the risk of recidivism was low because it reasonably confident that Datta had learned his lesson, and noted the significant impact of Datta's imprisonment on his family. (*Id*. at 50-51) But the extent of the

---

[4] Atilla argues that his circumstances are more like Dhafir's co-conspirators Ayman Jarwan or Osameh Al Wahaidy, sentenced to lesser sentences of 18 months' imprisonment and 24 months' probation, respectively. (Atilla Mem. at 50-51). Both defendants cooperated with law enforcement and testified at Dhafir's trial. *Dhafir*, 03 Cr. 64 (NAM) (N.D.N.Y.) (D.E. 499 at 1; 504 at 1). Atilla's omission of this significant distinguishing factor is symptomatic of his cavalier analysis of sentences imposed in other cases.

illegal activity was great and that the defendant had shown little or no remorse. (*Id*. at 49)

Moreover, the court found general deterrence to be an important consideration:

> I am reasonably confident from what I heard at this trial that there quite likely is an attitude widely held along the border that as long as you close [y]our eyes you can avoid confirming positively that a substantial part of a flood of cash coming across the border from Mexico is very dirty drug money, it's okay to go ahead and [d]o the business. And it is extremely important more so than in most cases that the sentence I impose in this case send that message very loudly, very clearly and that it leave no doubt in the mind of anybody tempted to facilitate this brutal drug trade and what goes with it that if they're going to do it and they get caught, it is going to go very badly for them.

(*Id.* at 49-50).

Just as the *Datta* court found it appropriate to send a clear message that a "see no evil, hear no evil" way of doing cash business in a heavy drug-trafficking border area was socially dangerous and personally culpable, this case presents an opportunity to send the same clear message about national security controls. Every excuse Atilla has offered to diminish his culpability and responsibility and to justify his offenses could equally be invoked by a multitude of foreign banks and businesses tempted to support the Iranian regime and its malign activities while still enjoying the privilege of access to the United States economy and financial system. The court should firmly and unequivocally reject those excuses with an appropriately serious sentence.

The Government recognizes that Atilla's national security offenses, money laundering, and bank fraud are not exactly the same as fraud offenses like insider trading, procurement fraud, and investor fraud committed by defendants like Rajaratnam, Martoma, Mazer, Aronshtein, Madoff, Nemazee, Bennett, and Ebbers. Those defendants, by and large, committed their crimes for personal gain, and, for some of those defendants, individual victims were deprived of money as a result. Atilla committed his offenses to benefit his bank's customers, Zarrab and Iran, and to

increase the bank's profitability (which charged commissions on these huge volumes of transactions) and protect and enhance his own stature within the bank. The harm caused by Atilla's offenses did not fall on individual victims, but were suffered by the entire nation and the integrity of the U.S. financial system. But the fraud cases the Government cites amply demonstrate that when crimes involve huge sums of money, there is a correlation between the amount of money involved and the seriousness of the offenses and the dangers to the community. These cases amply demonstrate that sentencing courts do not shy away from imposing sentences that are correspondingly serious, reflecting the nature and circumstances of the offenses and the need to promote respect for the law and protect the public.

Madoff, for example, was sentenced to effectively life imprisonment with a 150 year sentence—a sentence imposed by Judge Chin, who was also the author of the panel's decision in *United States v. Singh*. 877 F.3d 107 (2d Cir. 2017) (*see* Atilla Mem. at 3, 22), discussing the virtues of understanding the diverse frailties of humankind. *Id.* at 121.[5] The Madoff sentence, contrasted with the Circuit's decision in *Singh*, simply illustrate an obvious truth: that context matters, that the particular facts and circumstances of the case matter. *Singh* was decided in the context of an upward variance from a 15 to 21 months Guidelines range to a 60 months sentence for illegal reentry, 8 U.S.C. § 1326(b), where neither Probation nor the Government sought an above-Guidelines sentence and the Circuit perceived factual misunderstandings in the sentencing proceedings. *Id.* at 111-12, 117-22. But as sentences imposed in different cases, with different facts and circumstances, make clear, an understanding of the diverse frailties of humankind does not require sacrificing the importance of just punishment and imposing a sentence that reflects

---

[5] Judge Chin also joined in the Second Circuit's summary affirmance of Mazer's and Aronshtein's 20-year sentences. *See United States v. Mazer*, 631 Fed. Appx. 57 (2d Cir. Nov. 15 2015) (summary order).

the seriousness of the offense and the need to protect the public and to promote respect for the law. The Government respectfully submits that the facts and circumstances of this case warrant giving serious weight to these sentencing factors and imposing a sentence that is correspondingly serious.

### 2. Atilla's Remaining Arguments Are Unpersuasive

Atilla offers a series of additional arguments in support of his request for leniency, which are unpersuasive individually and in the aggregate. Atilla argues, for example, that a lenient sentence is warranted because he will never be in a position to commit a financial sanctions offense again, regardless of the term of imprisonment to which he is sentenced. (Atilla Mem. at 38-40). But there is no factual support for this assertion. There is no indication that any participants in the conspiracy, other than Atilla and Zarrab, have suffered any real consequences from their conduct, despite the public exposure of their roles. None of their co-defendants has been arrested in Turkey since the December 2013 law enforcement action that was so quickly and severely quashed, and there appears little prospect that any will be extradited in light of their nationalities.

Indeed, some of these conspirators appear to be capable of returning to their former political and financial spheres of influence. According to press reports, former Turkish Minister of the Economy Zafer Caglayan, who received tens of millions of dollars' worth of bribes in exchange for his support for the sanctions-evasion scheme, was recently elected as a delegate to his political party's national congress. AHVAL, *Disgraced Turkish former minister returns to AKP* (Mar. 13, 2018), *available at* https://ahvalnews.com/akp/disgraced-turkish-former-minister-returns-akp. According to press reports, following his release from prison in Turkey former Halk Bank General Manager Suleyman Aslan was briefly appointed to the Board of Directors of Halk Bank as well as another state-owned bank, Ziraat Bank, before resigning in early 2014.

HURRIYET DAILY NEWS, *Graft suspect resigns from state-run Ziraat Bank around one month after appointment* (Mar 9, 2014), *available at* http://www.hurriyetdailynews.com/graft-suspect-resigns-from-state-run-ziraat-bank-around-one-month-after-appointment-66275. Atilla's contention that it would be impossible for him to return to the banking industry in Turkey is speculative. It appears that, if he continues to deny responsibility, he has every reason to hope that he, too, could regain something like his former stature.

Atilla argues that the Court should not consider general deterrence at all, pointing to selective quotations lifted from various law review articles about the uncertainties in gauging the deterrent effect of sentences. (Atilla Mem. at 41-43). But courts in this district, with more practical experience with criminal prosecutions and sentencing than the articles' authors, have the discretion to conclude otherwise. *See, e.g., Datta*, 11 Cr. 102 (LAK) (S.D.N.Y. Jan. 20, 2012) (D.E. 87 at 49-50).

Finally, Atilla argues that a lenient sentence is warranted because his offenses are "aberrational" behavior in an otherwise law-abiding life. (Atilla Mem. at 32). It simply defies reason, however, to contend that Atilla's sustained course of conduct—lasting from 2012 through the end of 2015, occurring under multiple General Managers and despite various other changes in the bank's senior management—as well as his adamant rejection of responsibility and efforts to deceive the Court and the jury, are an aberration from his true character.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the correctly calculated Guidelines sentencing range is 105 years' imprisonment. The Government further submits that a sentence of greater than 188 months' imprisonment, and at least comparable to sentences of 20 years' imprisonment imposed in analogous cases, is necessary to reflect the seriousness of the offense, promote respect for the law, and to deter others from similarly

endangering this country's national security and world peace and stability. A fine within the

Guidelines range of $50,000 to $500,000 is also warranted.

Dated:	April 4, 2018
	New York, New York

<div style="margin-left:40%">

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By:	_____/s/_____

Michael D. Lockard/Sidhardha Kamaraju/
David W. Denton, Jr.
   Assistant United States Attorneys
Dean C. Sovolos
   Special Assistant United States Attorney

</div>