```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        S4 15 Cr. 867 (RMB)

 5   MEHMET HAKAN ATILLA,

 6                   Defendant.

 7   ------------------------------x

 8

 9                                        May 16, 2018
                                          10:15 a.m.
10

11

12   Before:

13                    HON. RICHARD M. BERMAN,

14                                                  District
     Judge
15

16

17                        APPEARANCES

18   GEOFFREY S. BERMAN,
          United States Attorney for the
19        Southern District of New York
     MICHAEL D. LOCKARD,
20   SIDHARDHA KAMARAJU,
     DAVID W. DENTON, JR.,
21   DEAN C. SOVOLOS,
          Assistant United States Attorneys
22

23

24

25
```

1

2              (APPEARANCES Continued)

3

4

5    HERRICK, FEINSTEIN LLP (NYC)
          Attorneys for defendant Atilla
     BY:  VICTOR J. ROCCO, Esq.
6         THOMAS E. THORNHILL, Esq.
          – and –
7    FLEMING RUVOLDT, PLLC
     BY:  CATHY A. FLEMING, Esq.
8         ROBERT J. FETTWEIS, Esq.
          – and –
9    LAW OFFICES OF JOSHUA L. DRATEL, P.C.
     BY:  JOSHUA LEWIS DRATEL, Esq.
10                   Of counsel
          –and–
11   McDERMOTT WILL & EMERY
     BY:  TODD HARRISON
12
     Also Present:
13        JENNIFER McREYNOLDS, Special Agent FBI
          MICHAEL CHANG-FRIEDEN, Paralegal Specialist USAO
14        MS. ASIYE KAY, Turkish Interpreter
          MS. SEYHAN SIRTALAN, Turkish Interpreter
15

16

17

18

19

20

21

22

23

24

25

1           (In open court)

2           THE COURT:  Good morning, everybody.

3           So, we have a lot of ground to cover, and this may

4    take a while.  I'm anticipating probably more than an hour,

5    maybe two.  We'll see.

6           So let me start by welcoming you all here and

7    mentioning at the outset that this is something of an

8    exceptional sentencing proceeding in the sense, among others,

9    that in addition to U.S. citizens who generally follow our

10   cases, there no doubt are large number of Turkish citizens who

11   are also very interested in and are following these

12   proceedings.

13          So for that reason, that is to say, the Americans who

14   are interested and the Turkish people, and others, who may be

15   interested, I'm planning to arrange that a copy of the

16   transcript of today's proceeding, verbatim and without edits,

17   will be made publicly available as soon as possible, and

18   hopefully some time today, on the internet.  The idea is so

19   that everyone will know exactly what was said here, and so that

20   everybody can evaluate the outcome for themselves.

21          We also have certified Turkish language interpreters

22   who will interpret these proceedings and everything that is

23   said here.

24          I don't intend to summarize the details of this case

25   at this proceeding, but I refer to and incorporate by

1    reference, first, the full written transcript of Mr. Atilla's

2    trial, and second, all of the relevant prior court rulings,

3    including, without limitation, the Court's Rule 29(a) decision

4    and order dated February 7, 2018, which provides a good summary

5    with many of the key issues in this case.

6          That decision and order describes, for example,

7    meetings that Mr. Atilla held with others on behalf of the

8    Turkish state-owned bank, Halkbank, with senior U.S. officials

9    in Washington, D.C., and in Turkey, concerning the United

10   States sanctions against Iran.  And that includes with U.S.

11   officials, Former U.S. Undersecretary of the Treasury for

12   Terrorism and Financial Intelligence David Cohen, who testified

13   in the case about his interactions with Mr. Atilla and

14   Halkbank, and former Director of the Office of Foreign Assets

15   Control Mr. Adam Szubin, who testified that Mr. Atilla was the

16   principal representative of Halkbank with whom he interacted.

17         And in fact, during the trial, the following questions

18   and answers between defense counsel and Mr. Cohen on

19   cross-examination occurred.  Defense counsel Mr. Rocco asked:

20   "Q.  And how about in your" -- meaning David Cohen's --

21   "conversations with Halkbank, did you tell Halkbank, ever, that

22   sanctionable activities was unlawful or illegal or criminal?"

23         And Cohen responds, "Yes."

24         And then some lines below, Mr. Cohen says, "As I

25   testified just a moment ago, part of my standard presentation

1    on U.S. sanctions programs was that IEEPA-based sanctions,

2    which includes Executive Order 13622, that the violation of

3    IEEPA-based sanctions can expose the violater to sanctions or

4    potentially criminal prosecution."

5           Cohen had in the trial testified about Mr. Atilla's

6    extensive knowledge of the U.S. sanctions regulations.

7           In sentencing a defendant, which is what we're about

8    today, following the U.S. Supreme Court decisions in Gall v.

9    United States, Kimbrough v. United States, and United States v.

10   Booker, and following the Second Circuit decisions in United

11   States v. Crosby, and United States v. Regalado, we recognize

12   the following sentencing principles:

13          First, that the United States sentencing guidelines

14   are no longer mandatory; and second, that the Court must, and

15   in this case I have to great length, even before taking the

16   bench today, considered the United States sentencing guidelines

17   and all the other factors mentioned in 18, United States Code,

18   Section 3553(a), which include the following:

19          The nature and the circumstances of the offenses and

20   the history and characteristics of the defendant.  And as you

21   will see, these two factors are, to me, especially important in

22   this case.

23          The factors also include the need for the sentence

24   imposed to accomplish certain objectives, which include

25   reflecting the seriousness of the offense, promoting respect

1    for the law, and providing a just punishment for the offense.

2    And these three additional factors are also important in my

3    consideration and deliberation.

4         Also, the 3553(a) factors include the obligation to

5    afford adequate deterrence to future criminal conduct, to

6    protect the public from further crimes, to provide the

7    defendant with any needed medical care, educational or

8    vocational training or other correctional treatment in the most

9    effective manner.  And these factors are also of significance.

10        We also look at the kinds of sentences that are

11   available, the kinds of sentence and the sentencing range

12   established under the United States sentencing guidelines, even

13   though, as I say, they are no longer mandatory.

14        I do have a chart which in a minute or so we'll hand

15   out, it might make things easier for you, which reflects each

16   party's evaluation of the United States sentencing guidelines

17   and how they apply in this case.  And you'll see there is a

18   very, very wide disagreement or disparity in the

19   interpretations of the guidelines.

20        We also look at any applicable policy statements that

21   may have been issued by the United States sentencing

22   commission, we seek to avoid unwarranted sentence disparities

23   among similarly situated defendants, and, in appropriate cases,

24   to provide for restitution.

25        We always begin our sentencing analysis with a

1   sometimes unavoidably lengthy and technical United States

2   sentencing guidelines calculation.  Even though, as I said

3   before, the United States sentencing guidelines are no longer

4   mandatory.

5           But I'll give you all a heads up at this very early

6   point in the sentencing, which is that, while I certainly will

7   discuss the sentencing guidelines in detail and at some length,

8   as I'm required to do, my thinking is not to impose a guideline

9   sentence in this case, and to impose a sentence which is

10  appropriately lenient.

11          So let me pause for a moment and hand out, Christine

12  will hand out a copy of this chart.  It may help you follow the

13  discussion.

14          So preliminarily, again, I'm going to advise you that

15  there is wide disagreement among the various parties as to the

16  appropriate sentencing guidelines.  You may already be aware of

17  that.  And if you look at this chart, among other things,

18  you'll see that the U.S. probation department has determined

19  the applicable guideline range in this case to be life

20  imprisonment.  It couldn't in any event be that, because the

21  maximum possible sentence here is 105 years, which is in effect

22  a life sentence.  They've concluded that the offense level is

23  46, and what we call the criminal history category is I.

24          And by contrast, for example, the defense has

25  determined that the applicable guideline range in this case is

1    46 to 57 months of incarceration, based on an offense level of

2    23, and a criminal history category of I.

3         The government has determined that the applicable

4    guideline range in this case also to be life imprisonment,

5    noting that the maximum possible sentence is 105 years, based

6    on an offense level of 54, and a criminal history category of

7    I.

8         The government has also provided an alternative

9    calculation of the applicable guidelines range, which is 168 to

10   210 months, based on an offense level of 35, and a criminal

11   history category of I.

12        I should say here before I go further and start

13   talking about my own guidelines calculations, that I am

14   rejecting the idea completely that a life sentence for

15   Mr. Atilla would be appropriate, fair, or reasonable, or even

16   that 105 years would be an appropriate, fair, and reasonable

17   sentence, and I hope that will become clear as the discussion

18   proceeds.

19        So, I've determined that the applicable sentencing

20   guideline range in this case would be 97 to 121 months based on

21   an offense level of 30 and a criminal history category of I.

22   And I remind you again that even though I'm going to spend a

23   lot of time on these guidelines calculations, as I said at the

24   outset, I do not intend to impose a guidelines sentence.

25        So I calculated the offense level as follows:  I

1   started with a base offense level under 2S1.1(a)(1), and it is

2   in my opinion 26.  And I'll note that the defense and the

3   government's alternative calculation agree that this is an

4   appropriate starting point base offense level.

5         I then gave what is called an enhancement, two-level

6   enhancement due to conviction under 18 U.S.C. Section 1956.

7   All parties agree that this enhancement is appropriate.  It is

8   a plus two enhancement pursuant to United States sentencing

9   guidelines section 2S1.1(b)(2)(B).

10        Then I gave another two-level enhancement for what's

11  called sophisticated money laundering under United States

12  sentencing guidelines 2S1.1(b)(3).  Probation and the

13  government agree with this enhancement.

14        And then I added plus two for what's called

15  obstruction of justice pursuant to United States sentencing

16  guidelines section 3C1.1.  As to this, the government agrees

17  with the enhancement, I think the probation department said

18  that whether there was an enhancement here or not was in the

19  Court's discretion.

20        I subtracted what's called a two-level enhancement,

21  two-level reduction for minor role under United States

22  sentencing guidelines section 3B1.2(b).  And the defense agrees

23  with this reduction.

24        So I came up with what we call an adjusted offense

25  level of 30, and that yields a guidelines range of 97 to 121

1    months.

2            I'll note that the starting point for my calculation,

3    that is to say United States sentencing guidelines 2S1.1(a)(1),

4    is in accord with the starting point of the probation

5    department, the defense, and also the government's alternative

6    calculation.

7            So you can see, though, from the chart and from what

8    I've said, that the parties diverge dramatically as to whether

9    or which enhancements or reductions to or from the base offense

10   level should be applied to reach the adjusted offense level.

11           In my determination of the adjusted offense level, I

12   rejected the reduction proposed by the defense related to

13   conspiracy under United States sentencing guidelines 2X1.1.  I

14   did not feel that this reduction applied, because the

15   guidelines say that a reduction is warranted only if the

16   defendant or a co-conspirator did not complete all the acts for

17   the successful completion of the substantive offense or

18   offenses.

19           The Court is agreeing with the defense that under U.S.

20   sentencing guidelines 3B1.2, Mr. Atilla qualifies for a minor

21   role reduction.  This reduction is warranted because his role

22   in the offenses, as will be discussed in more detail to follow,

23   while important to the success of the conspiracies or schemes,

24   he appears in my judgment to have been substantially less

25   culpable than the -- they used the word "average," I'll use the

1  word "other participants" in the criminal activity.

2          This, of course, is difficult to assess in this case,

3  since only Mr. Zarrab's case has been adjudicated.  Mr. Atilla

4  appears less culpable, certainly than Zarrab, and Mr. Atilla

5  appears to have been following orders in large measure from his

6  boss, Mr. Aslan, who was the general manager of Halkbank at the

7  relevant times.

8          What we call application note three states in part:

9  "The fact that a defendant performs an essential or

10  indispensable role in the criminal activity is not

11  determinative.  Such a defendant may receive an adjustment

12  under this guideline if he or she is substantially less

13  culpable than the average participant in the criminal

14  activity."

15          Mr. Atilla in my judgment was less culpable.  Indeed,

16  at one point in the testimony, Mr. Zarrab said that Mr. Atilla

17  had thrown a wrench into the deal, and he also stated he,

18  Mr. Zarrab, that in one context, that Mr. Atilla was not open

19  to the idea that they were discussing.  I'll get into that

20  more.

21          I'm also rejecting the managerial supervisory

22  enhancement under United States sentencing guidelines 3B1.1(b)

23  proposed by the government, as Mr. Atilla's role in these

24  offenses did not rise to the level of a manager or supervisor

25  of the fraudulent scheme.  He, Mr. Atilla, was deputy manager

1    and a senior executive of Halkbank, but that is not the same

2    thing.

3            And Halkbank, by the way, I've mentioned a couple of

4    times, it should be noted clearly was not named as a defendant

5    in this case.

6            I think it's important that I explain that obstruction

7    enhancement in a little more detail.

8            In determining that the obstruction or impeding of

9    justice enhancement is required under United States sentencing

10   guidelines 3C1.1, the Court finds that Mr. Atilla gave some

11   false testimony under oath at trial, and I'm guided by the

12   following guidelines provisions.

13           The provision is if the defendant willfully obstructed

14   or impeded or attempted to obstruct or impede the

15   administration of justice with respect to the investigation,

16   prosecution, or sentencing of the instant offense of

17   conviction, and (b) the obstructive conduct related to the

18   defendant's offense of conviction and any relevant conduct, or

19   a closely related offense, then the Court is instructed to

20   increase the offense level by two levels.  Which I've done.

21           What we call application note four provides examples.

22   And one of them is providing materially false information to a

23   judge or magistrate.  Another one defines "material evidence"

24   as evidence, fact, statement or information that, if believed,

25   would tend to influence or affect the issue under

1    determination.

2            According to Second Circuit case law, where a

3    defendant lies under oath, the application of a sentence

4    enhancement is mandatory.

5            Based on the following examples of Mr. Atilla's what I

6    believe was materially false testimony at the trial, I do find

7    that there is a willful obstruction and that the enhancement is

8    warranted.

9            So here's the first example.  It has to do with what's

10   called a private meeting or referred to in the testimony as a

11   pull-aside.  It is discussed in the transcripts of the trial

12   dated December 12, December 18, 2017, and also December 19,

13   2017.  And there you'll find Adam Szubin, who, as I said

14   before, is the former Director of the U.S. Treasury

15   Department's Office of Foreign Assets Control, he testified,

16   and I believe credibly, at trial that he had what's called a

17   pull-aside for a one-on-one meeting with Mr. Atilla, in which

18   he told Mr. Atilla that to the extent that Mr. Atilla was

19   viewing this, that is to say, the discussion between Szubin and

20   Atilla on that occasion, to the extent he was viewing that as a

21   kind of routine discussion or routine visit to the U.S.

22   Treasury Department, that U.S. Treasury Department officials

23   were making across the globe, that was not the case.  Szubin

24   said that his trip to Turkey -- this was a meeting in Turkey --

25   was a very conscious effort to visit Halkbank by Mr. Szubin,

1    because of concerns that were pretty serious about what was

2    going on at Halkbank.

3             And that Mr. Szubin said, "We viewed them in a sort of

4    category unto themselves, that I wasn't having this same level

5    of conversation with any other bank around the world at that

6    time.  To in a sense underscore how serious this was," and this

7    is Mr. Szubin talking, "to make sure that he," Mr. Atilla, "was

8    not in doubt."

9             Mr. Szubin also testified that Mr. Atilla was the

10   principal representative of Halkbank with whom he regularly

11   communicated.

12            So the question was posed now to Mr. Atilla:

13   "Q.  Do you remember Mr. Szubin testifying about meeting you on

14   February 12, 2013?

15   "A.  Yes, I do remember.

16   "Q.  And among other things, he said that he had a private

17   pull-aside with you.  Do you remember him testifying to a

18   private pull-aside?

19   "A.  Such a thing did not happen."

20            The next question was that I'm repeating:

21   "Q.  It was at that meeting that Adam Szubin pulled you aside

22   for a private conversation; isn't that right?

23   "A.  No, I do not remember such a thing."

24            This was followed a little bit later by this question:

25   "Q.  It is your sworn testimony that you never had a private

meeting with Adam Szubin on February 12, 2013?

"A.  I'm saying this independent of any date.  There was never

any such private conversation or a meeting between me and the

individual where he pulled me aside and warned me about

something.  That never happened on any date.

"Q.  It never happened?

"A.  That is correct.  It never happened."

A second example that I relied upon was related to

what's called the fake food system.  The background here is

that Mr. Zarrab testified, and I believe credibly, about

discussing with Mr. Atilla and with Suleyman Aslan, Halkbank's

general manager and Mr. Atilla's boss, about a discussion or

discussions of a scheme or system for getting or unblocking

Iranian money or proceeds that were at Halkbank.  And it is

during this conversation that that arrangement was more or less

finalized.

Mr. Zarrab stated:  "the meeting that was held between

me, Mr. Suleyman and Mr. Hakan, in that meeting we finalized

this final version of how this method," and now this is me

adding, presumably referring to a method of unblocking Iranian

proceeds, "would work, and how the system would be

implemented."

So the question was asked:

"Q.  After you came back, were you in any meetings with

Mr. Zarrab in which you discussed with him that there was any

1    fake food system?"

2            Which is to say pretending, but not actually sending

3    food to Iran, in an effort to defeat the U.S. sanctions against

4    Iran.

5            And the answer from Mr. Atilla was:

6    "A.  Not after I came, not ever, did I talk about such a topic

7    with Zarrab."

8            Mr. Zarrab also testified, again, I think credibly,

9    that the idea of transferring money from a company called

10   Volgam to Centrica, those are two companies controlled by

11   Mr. Zarrab within Halkbank, came from Mr. Atilla.

12           And in the transcript, this is December 18, 2017, the

13   question was posed:

14   "Q.  Did you ever have a meeting with Mr. Zarrab in which the

15   idea of transferring the money from Volgam to Centrica within

16   Halkbank was from you?"

17           The answer from Mr. Atilla was:  "No, we haven't."

18           Followed by a question:

19   "Q.  Do you recall that he, Mr. Zarrab, said you asked whether

20   he could supply bills of lading, because it was difficult to

21   trace whether shipments actually occurred or not from bills of

22   lading?

23   "A.  We talked about bills of lading, but we didn't discuss the

24   traceability of bills of lading."

25           So that's a second example in my opinion.

1            A third -- I'm using these categories, by the way.

2      These are my usage.  The third is called fake documentation.

3      This regards documents that reflected that wheat was exported

4      from Dubai and also reflected that ships that were to be

5      utilized were too small capacity-wise to carry the purported

6      cargo loads to Iran.

7            And in this instance, this third instance, Mr. Zarrab

8      testified, I believe credibly, that Mr. Atilla advised him on

9      the phone to be careful about the documentation regarding trade

10     with Iran that was submitted to Halkbank.  And that

11     Mr. Suleyman Aslan had advised Mr. Zarrab that Mr. Atilla would

12     be calling him to suggest changes to documents that were

13     submitted to Halkbank, because that documentation reflected

14     incorrect products and incompatibility between the quantity of

15     goods allegedly shipped, and the capacity of the ships to

16     handle those quantities.

17           I'm now discussing the December 4, 2017 transcript.

18     Mr. Zarrab also testified that there was never any actual food

19     sent to Iran.

20           On December 18, 2017, this question was posed perhaps

21     by Ms. Fleming, I'm not sure, to Mr. Atilla:

22     "Q.  Are you telling Mr. Zarrab in this call how to do fake

23     documentation?

24     "A.  Never.

25     "Q.  Are you telling him, Mr. Zarrab, how to fix documentation

1    so you can help him with a fake food scheme?

2    "A.  No.  Absolutely not."

3           Mr. Atilla goes on to say in this answer:  "Here I'm

4    talking about examples.  I'm giving examples about possible

5    transactions.  It's not the actual transactions.  Actually,

6    this conversation took place after his questions, and then he

7    asked if they should look at the bigger vessels.  I said look

8    at both small vessels and big vessels.  I'm giving examples

9    here because of their submissions of the documents, what was

10   showing big and small vessels, so I was just giving examples

11   for the tonnage.  The documents that they gave was their

12   submissions.  That was their submissions."  I assume that

13   refers to Mr. Zarrab.  "Declarations, they were declarations,

14   that's why I asked them to control their declarations."

15          A final example that I will give you relates to

16   Mr. Atilla's contribution to the Iran sanctions avoidance

17   scheme.  Mr. Zarrab testified credibly that Mr. Atilla was very

18   knowledgeable about the sanctions against Iran, and the

19   Halkbank processes and procedures, and that Mr. Atilla made

20   contributions in the form of suggested approaches to make the

21   sanctions avoidance scheme appear that it was not violating the

22   American sanctions.

23          On November 29, 2017, the transcript says the

24   following.  Mr. Zarrab stated:

25   "A.  What I'm saying is at the beginning of the food trade,

1   where the method and the system was developed at Halkbank,

2   Mr. Hakan Atilla had his contributions into that."

3          Then on December 6, 2017, Mr. Zarrab also testified

4   that he discussed with Mr. Aslan the methods used which

5   Mr. Atilla had provided guidance in and made additions to.

6          The question posed again by Ms. Fleming to Mr. Atilla

7   and the answer Mr. Atilla gave was:

8   "Q.  I'm 47 years old, and up until this point throughout my

9   life, I have never been in a meeting or anywhere where

10  violating the sanctions against Iran was discussed, and anybody

11  pointed to Reza Zarrab or that I pointed to Reza Zarrab, and

12  there was never any point where I had reached an agreement with

13  Mr. Zarrab about anything about these things."

14         So those I raise by way of example to support the

15  two-level enhancement.  By the way, if the two-level

16  enhancement were not given, in my opinion, the sentencing

17  guideline range would drop to 78 to 97 months of incarceration.

18         So notwithstanding the fact that we've spent now

19  considerable time this morning on the sentencing guidelines

20  calculations, which I'm required to do at sentencing, as I said

21  before, it is not my intention to impose a guideline sentence

22  in Mr. Atilla's case.

23         And although I've considered each of the various

24  parties' proposed guidelines calculations, as is clear, I also

25  do not agree with the guidelines range calculations of I think

1    anybody -- probation, government or the defense.  I do believe

2    that, as I said before, a lenient non-guideline sentence is

3    called for in this case for reasons which I'll turn to.

4         That is after a careful review of all of the 18,

5    United States Code, Section 3553(a) factors.  I think that

6    evaluation clearly supports a non-guidelines sentence and says

7    that a non-guideline sentence is appropriate in this case.

8         For one thing, a guideline sentence, including

9    particularly those proposed by the probation department and the

10   government in its first calculation, that appears to be based

11   in significant measure on the multimillion dollar value or

12   amounts of goods involved in the transactions which I've been

13   discussing which are at the core of the Iran sanctions

14   avoidance scheme.

15        Such a sentence would be excessively punitive in my

16   opinion, and therefore, inappropriate, unreasonable, and

17   unfair.

18        There is a case called United States v. Adelson in the

19   District Court, the decision was written by Judge Rakoff and it

20   was affirmed on appeal.  It's become clear to me in this case

21   that that reasoning would apply throughout.

22        Mr. Atilla was, as the defense suggests, somewhat of a

23   cog in the wheel, and I would add at times a reluctant one at

24   that.  Or, perhaps better stated, as a person following orders

25   in these sanctions evasion schemes.  I do not believe that he

1    was a manager or a supervisor or a mastermind of the criminal

2    enterprises.

3            And notwithstanding the fact that Mr. Atilla

4    unquestionably furthered the Iranian sanctions evasion

5    conspiracies, and that he was found guilty by a jury of five of

6    six counts in the indictment, including four conspiracies, on

7    or about January 3, 2018, Mr. Atilla was, in my opinion, at

8    times a reluctant participant.  And indeed, Mr. Zarrab said at

9    one point that Mr. Atilla, as I mentioned before, threw a

10   wrench in the deal.  And I'm going to come back to this in a

11   little while.

12           So I intend, in sentencing Mr. Atilla, to place more

13   significance and greater emphasis and reliance upon the Section

14   3553(a) sentencing factors other than only relying on the

15   sentencing guidelines factors in the circumstances presented

16   here.  And they include, among others, the nature of the

17   offense and the history and characteristics of Mr. Atilla, as

18   well as, as I said before, the need for the sentence imposed to

19   reflect the seriousness of the defendant's conduct, to promote

20   respect for the law, to provide a just punishment, to afford

21   adequate deterrence, to protect the public from further crimes.

22   I've considered also avoiding sentence disparities, the kinds

23   of sentences available, in order to come up with a sentence

24   that I feel is sufficient, but not greater than necessary.

25           And the sentence I impose is intended to comport with

1   both federal law and with principles of fundamental fairness.

2   It has been said in our courts that while a District Court must

3   consider each 3553(a) factor in imposing sentence, the weight

4   given to any single factor is a matter firmly committed to the

5   discretion of the sentencing judge.  That's from a case called

6   United States v. Ciappetta, a Second Circuit decision from

7   2008.

8           It's also been said that district judges have an

9   obligation to consider whether a sentence other than a

10  guideline sentence would be sufficient, but not greater than

11  necessary, to serve the purposes of sentencing.  Accordingly,

12  district judges have an obligation to consider whether to

13  depart from the guidelines sentencing range or to impose a

14  non-guideline sentence in every case.

15          That comes from a case called United States v. Corsey,

16  a Second Circuit decision from 2013.

17          And third, while in this category, before I turn to

18  the specific other factors under 3553(a), even if I did agree

19  with probation and the government guidelines ranges, that is to

20  say a base level of seven plus a 30-level enhancement for loss

21  amount, which I don't agree with, as I mentioned before, but

22  even if I did, I would nevertheless find that a downward

23  variance, that is to say a non-guideline sentence, would be

24  appropriate.

25          In the case called United States v. Algahaim, Second

Circuit decision from 2016, where the Court stated: "Where the

sentencing commission has assigned a rather low base offense

level to a crime, and then increased it significantly by what

is called a loss enhancement, that combination of circumstances

entitles a sentencing judge to consider non-guidelines

factors."

I refer you also to U.S. v. Johnson, 2018 W.L., it is

an Eastern District of New York case, dated April 27, 2018,

where the Court said, "I take seriously my responsibility under

the Supreme Court and Second Circuit precedent to determine an

independently reasonable sentence based on an individualized

application of the statutory factors in 3553(a).  Where

application of the loss enhancement leads to a patently" --

this is the judge from the Eastern District talking -- "a

patently absurd sentence, it is appropriate for the Court to

rely more heavily on the 3553(a) factors."

So, considering all those factors, here's what stands

out:  First, under the nature and circumstances of the offense

or offenses, extensive litigation, including the written

submissions of the parties and extensive motion practice in

this case, the evidence presented at trial, and the jury

verdict, all reflect that this is a serious case.  The jury

found, as I mentioned, four conspiracies, convicted Mr. Atilla

of participating in four conspiracies, which in fact overlap,

and one substantive crime of bank fraud.  The very first

conspiracy charged in the indictment, and for which was one of

those that Mr. Atilla was found guilty by the jury, was a

conspiracy to defraud the United States and so-called Klein

conspiracy.

In this connection, Mr. Cohen testified credibly that

Mr. Atilla told Mr. Cohen that Halkbank had a banking

relationship with Mr. Zarrab, and that it was a relatively

small relationship, but that it was ongoing.

(Continued on next page)

1          THE COURT:  (Continuing)

2          Mr. Cohen testified that Mr. Atilla assured us, the

3     treasury officials, that there was nothing to be concerned

4     about, presumably referring to Halkbank's dealings with

5     Mr. Zarrab.  There are other submissions that discuss this, but

6     I will skip over those.

7          While the crimes that were committed were serious, the

8     crimes of conviction do not involve crimes of violence or drugs

9     or terrorism, etc., crimes which sometimes do warrant very

10    stiff sentences, including sometimes life sentences such as

11    those suggested by the probation department and proposed by the

12    government in its primary and, I would suggest, alternate

13    sentencing proposals.

14         The probation department's and the government's first

15    proposed guidelines range are driven, it appears, in

16    substantial part by the huge amounts of money involved and

17    filtered through Halkbank through Zarrab companies and their

18    related Halkbank accounts.

19         In other words, one principal reason that the

20    government's primary and probation's only guidelines ranges are

21    life imprisonment is they are based upon very substantial

22    financial transactions in the hundreds of millions of dollars

23    and include a low base offense level of 7 or 8, which is

24    increased by 30 levels due to loss amount of more than $550

25    million.

1          It has been said that it is obvious that sentencing is

2     the most sensitive and difficult task that a judge is called

3     upon to undertake.  Where the sentencing guidelines provide

4     reasonable guidance, they are of considerable help to a judge

5     in fashioning a sentence that is fair, just, and reasonable.

6     But where the calculations under the guidelines are excessive

7     on their face, a Court is forced to place greater reliance on

8     the other considerations set forth in 3553(a) as carefully

9     applied to the particular circumstances of the case and to the

10    particular defendant.  The cite is *United States v. Adelson*.

11    That is the case I mentioned before.

12         In affirming Judge Rakoff in that case, the Second

13    Circuit said that, after carefully considering those factors,

14    the district court sentenced in that case Mr. Adelson to a

15    sentence substantially below the applicable guideline range of

16    life in prison.  The record demonstrates that the district

17    court's decision to impose a below-guidelines sentence was not

18    a failure or refusal to recognize the guidelines, but rather a

19    carefully considered reliance on the Section 3553(a) factors.

20         So that's the approach I'm taking here, although as

21    noted above I did not in fact agree with the probation or the

22    government's calculations in the first place, or the

23    defendant's for that matter.

24         The 3553(a) factors, apart from various guideline

25    ranges, clearly point to a significantly below guidelines

1    sentence.  Mr. Atilla, as I've said now several times, was a

2    reluctant participant and one who was following orders, albeit

3    improper orders in my judgment.

4            Approximately one month before Mr. Atilla's trial

5    began, Mr. Reza Zarrab, a Turkish Iranian gold trader, pled

6    guilty to each of the six counts which were also brought

7    against Mr. Atilla.  Mr. Zarrab agreed to cooperate with the

8    government, and in fact was one of the government's most

9    important witnesses in Mr. Atilla's trial.

10           The Court -- based upon, among other things, the

11   witness testimony at trial, corroborating evidence presented at

12   trial, and the jury verdict and my own observations for that

13   matter -- believed that Zarrab's testimony was credible, and it

14   was largely unrefuted.

15           During his plea allocution on October 26, 2017,

16   Mr. Zarrab summarized the various schemes or conspiracies

17   involved here and the substantive counts, and he at trial did

18   so by use of detailed diagramming, which he in fact made in the

19   courtroom and by which he and others were able to transfer or

20   free up millions upon millions of dollars of Iranian proceeds,

21   primarily from the sale of Iranian oil.  These proceeds were

22   held at Halkbank among numerous accounts, although they were

23   also blocked by the U.S. sanctions.

24           One end result of a series of intra, that is to say

25   within-Halkbank transfers was that the funds in furtherance of

the schemes or conspiracies became unblocked and were then used

to fund international payment obligations on behalf of Iran,

thus avoiding the sanctions upon trade in Iranian products that

was applicable.

        Mr. Zarrab also credibly explained Mr. Atilla's

involvement, sometimes commenting himself, Mr. Zarrab, upon

Mr. Atilla's reluctance to be involved in the sanctions-evasion

scheme.

        The witness that was called named Douglas Sloan of

Deutsche Bank explained credibly at the trial that the Iranian

economy is primarily petroleum based.  The petroleum industry

is predominantly U.S.-dollar based, and in order for the

Iranian economy to function, it therefore must conduct a lot of

its business in U.S. dollars.  That's in the December 12, 2017,

transcript.

        The charged conspiracies involved not only Mr. Zarrab

and Mr. Atilla, but very importantly, they also involved

Mr. Atilla's superior, Mr. Suleyman Aslan.  At the time he was

the general manager of Halkbank, and it appears that Mr. Aslan,

not Mr. Atilla, called the shots, clearly.

        The unrefuted evidence also shows that there were

other conspirators far more significant than Mr. Atilla

overall, including high Turkish government officials, and among

them a former economy minister of turkey named Zafer Caglayan.

And the testimony showed that substantial bribes were made by

1  Mr. Zarrab to facilitate the sanctions-evasion conspiracy or

2  schemes to Mr. Aslan and to Mr. Caglayan and perhaps others,

3  but it also showed that Mr. Atilla neither received nor

4  solicited any bribes.  And it also shows, as I mentioned, that

5  Halkbank was not charged as a defendant in this case.

6          So Iran was the chief beneficiary of the conspiracies

7  because it was able to evade U.S. sanctions, Zarrab was a major

8  beneficiary because he orchestrated and brokered the

9  transactions and profited handsomely, and Halkbank was a

10  significant beneficiary in terms of fees earned and the ability

11  to serve as one of Iran's principal Turkish bankers.

12          In its letter dated April 13, 2018, to the Court, the

13  government states that there were four principal categories of

14  financial beneficiaries of the sanctions-evasion schemes.

15          One were Iranian government entities;

16          Two were Iranian banks;

17          Three, according to the government was Halkbank and

18  Zarrab's network of companies; and,

19          Four were Turkish political and banking figures who

20  facilitated aspects of the scheme, and other than Atilla, were

21  paid from its proceeds.  Perhaps the government was referring

22  to Mr. Atilla as well, it's not clear.

23          Halkbank, although a significant beneficiary of the

24  scheme was not, as noted, named as a defendant in the case.

25          Clearly, Mr. Atilla was not a beneficiary of these

1    schemes, and I think that is very significant in this

2    sentencing.  Mr. Atilla, who was a named defendant, in no sense

3    was he a direct beneficiary of the schemes, and, as noted, it

4    is undisputed that he was not the recipient of, nor did he

5    solicit, any bribes paid by Zarrab.

6            In large measure Atilla appears to have been a person

7    doing his job, sometimes reluctantly or hesitatingly, under the

8    direction of the Halkbank general manager, Mr. Aslan, who did,

9    in fact, receive bribes.

10           It is difficult to see what Mr. Atilla got out of

11   these conspiracies and the bank fraud for which he was

12   convicted apart from the serious predicament he has found

13   himself in for the last 14 months.

14           Mr. Atilla was arrested and incarcerated on March 27,

15   2017, at JFK Airport on his way back to Turkey after a U.S.

16   business trip, one of approximately I would say ten to twelve

17   that I believe he had made to the U.S. over his career.

18           As of today he's been incarcerated for approximately

19   14 months.  After nine months of incarceration, he was

20   convicted following a jury trial of conspiracy to defraud the

21   United States, what we've referred to as the Klein conspiracy,

22   conspiracy to violate IEEPA, the International Emergency

23   Economic Powers Act, and the Iranian Transactions and Sanctions

24   Regulations.  He was also convicted of bank fraud and of

25   conspiracy to commit bank fraud and of conspiracy to commit

money laundering.  Mr. Atilla was acquitted of the substantive

money laundering count.

     At Mr. Atilla's highly publicized trial, the

government called 12 credible witnesses, including, among

others, Mr. Zarrab, Mr. Cohen, Mr. Zubin, and Josh

Kirschenbaum, formerly policy adviser to the U.S. Office of

Foreign Assets Control, among others.

     The defense, by contrast, called only two witnesses,

one of whom was Mr. Atilla.  Mr. Atilla under our system had

every right to testify.  Also under our system of justice, he

also had every right not to testify.  It was his choice.

     In addition to Atilla's own testimony, the defense

called an airlines company employee in order to corroborate

Mr. Atilla's testimony that he was not on a particular

telephone call because he was traveling at or about the time of

the call.

     The defense's affirmative case was patently

insufficient to rebut the government's case or to create

reasonable doubt in my opinion.

     In addition to witness testimony in the main case, the

government's case, significant documentary evidence was

introduced by the government, including a wiretapped phone

conversations, WhatsApp messaging communications, e-mails, and

bank records.

     Importantly, at the trial it became apparent to the

1    Court -- and I've said this several times now -- that

2    Mr. Atilla was neither a chief architect nor a beneficiary of

3    the various schemes to evade sanctions upon Iran.  While he

4    played a role in making things happen, he appears to have done

5    what he did to further these schemes principally at the

6    direction of his boss, Suleyman Aslan, at the time the general

7    manager of Halkbank.  He was following orders, as I said

8    before.

9          Mr. Atilla nevertheless was partly responsible, but by

10   no means principally responsible, for the organizing and for

11   the success of this multi-million-dollar conspiracies related

12   to the sanctions against Iran.

13         Here are some excerpts from the trial that perhaps

14   better illuminate Mr. Atilla's role and involvement.

15         On November 30, 2017, the transcript shows that

16   Mr. Zarrab testified about a phone conversation between himself

17   and Mr. Atilla related to the food trade business that

18   Mr. Zarrab had earlier discussed with Mr. Atilla's boss,

19   Mr. Aslan.  The food trade business was one aspect of the

20   sanctions-evasion scheme.

21         Mr. Zarrab testified:  As of this whole conversation

22   Mr. Hakan Atilla was aware that we were going to be involved

23   and we were going to be conducting food trade with Iran, that

24   is, as of that day.

25         However, Mr. Zarrab said, At this time, Mr. Hakan

1   Atilla did not know that this transaction would not involve

2   actual trade.  This is me adding, for your information, as you

3   probably know already, there was no food actually traded to

4   Iran.

5         Now, back to Mr. Zarrab, So Mr. Hakan Atilla is trying

6   to understand this during the phone conversation.

7         Mr. Zarrab goes on to say, Mr. Hakan Atilla had

8   understood through his Halkbank general manager, Mr. Aslan, or

9   perhaps through the branch that there would be real food

10  traded, and now he's saying in this phone call that this is not

11  as he had thought.  So he's clearly stating that this does not

12  match up with what he heard.

13        Mr. Zarrab testified as follows, referring to the

14  conversation or meeting he had, Mr. Zarrab had, with Mr. Aslan

15  after the phone call with Mr. Atilla.

16        This is Mr. Zarrab talking:  I went and I told

17  Mr. Suleyman that I had talked to Mr. Hakan, and that Mr. Hakan

18  did not understand the matter completely, and I asked him how

19  we should go about it.

20        And how did he respond? was the next question,

21        Mr. Zarrab said:  The best I remember is that he gave

22  orders to unblock the transaction and to go ahead and carry it

23  out.

24        And here's the government asking:  And do you remember

25  who he gave these orders to?

1          And Mr. Zarrab responds:  To Mr. Hakan Atilla.

2          And the government asks:  How do you know that's who

3    he gave the orders to?

4          And Mr. Zarrab responds:  Because he called in my

5    presence and he gave these instructions.

6          At that point I asked a few questions of Mr. Zarrab as

7    follows:

8          I asked, who did?  Who called?

9          And Mr. Zarrab said:  Mr. Suleyman Aslan, your Honor.

10         And then I asked:  And he called who?

11         Mr. Zarrab said:  Mr. Hakan Atilla, your Honor.

12         And then I asked:  And you were on the call, or you

13   heard the call?

14         Mr. Zarrab said:  I was face to face with Suleyman

15   Aslan during a meeting at this time, sir.

16         Mr. Zarrab testified as follows, referring to a phone

17   conversation between him and Abdullah Happani, an associate of

18   Zarrab, that occurred after this meeting with Aslan.

19         And the government asked:  Do you see where you say

20   they placed a roadblock today, and I went there and had it

21   removed?

22         Mr. Zarrab says:  Yes.

23         The government says:  What did you mean?

24         And Mr. Zarrab says:  But just as I explained earlier,

25   Mr. Hakan Atilla did not know about this matter as of the first

1    time we had met.  So I approached Mr. Suleyman regarding this

2    matter and came to a solution.

3         Mr. Zarrab goes on to say:  Mr. Suleyman called

4    Mr. Hakan in my presence and told him that they will do this

5    business, and I'm conveying to Mr. Zarrab -- Zarrab is

6    talking -- Mr. Happani his associate.

7         And then the government says:  Do you see where you

8    say Hakan Atilla threw a wrench in the gears?

9         This is a question posed by the assistant:  Do you see

10   where you say Hakan Atilla threw a wrench in the gears?

11        Mr. Zarrab says:  Yes.

12        The government says:  What did you mean by that?

13        Mr. Zarrab says:  Just as it was heard in the first

14   phone conversation earlier, Hakan Atilla was not open to this

15   idea, for it to be conducted.

16        Zarrab goes on to testify about another phone

17   conversation.

18        The assistant asks this question:  Do you next see

19   where Mr. Aslan says, No, we don't have a problem in the food?

20   Do you have a problem with the method posed by Hakan Atilla?

21        Then he, Aslan goes on to say, related to the food

22   trade payments:  Do you see that?

23        And Zarrab says:  Yes, I see that, sir.

24        The assistant asks then:  What did you understand him

25   to mean?

1      Zarrab says:  We had held conversations about how the

2  food transactions would be handled with the bank, what methods

3  would be used, and he's asking whether the latest method that

4  we had reached an agreement on, that whether I had any problems

5  with that.  And this is the method that Mr. Hakan Atilla had

6  also provided guidance in and made additions to and that

7  provided -- and he's asking me if this last template was

8  something that I agreed with and if there are any issues that I

9  may have with it.

10      So Mr. Atilla, in addition to his arrest and

11  incarceration in the United States on his way back to Turkey,

12  has been a subject of widespread international focus.  As any

13  person confined pretrial, he was separated from his family, his

14  colleagues and his friends in Turkey, and his life has, I would

15  suggest, been turned upside down.

16      Atilla should, given the nature and the circumstances

17  of these offenses, particularly his relative role in them,

18  among other factors to be considered, in fairness receive a

19  lenient, nonguidelines sentence.

20      The second 3553(a) factor is called the history and

21  the characteristics of the defendant.

22      Mr. Atilla appears to have led an exemplary life in

23  Turkey apart from this case.  This is, in my view, an important

24  3553(a) factor for us to consider.

25      Mr. Atilla is a citizen of Turkey.

1              He's 47 years a old.

2              He's married, has an adult son.

3              He's been employed by Halkbank for his entire career.

4              He has a bachelor's degree in economics from Gazi

5     University in Ankara, Turkey.

6              After he graduated, Atilla entered the Turkish air

7     force as a private and was honorably discharged.

8              As noted, he has worked, loyally I would suggest, at

9     Halkbank virtually all of his adult life in increasingly

10    important capacities and positions and for approximately 23

11    years.

12             In 2007, Mr. Atilla became the head of financial

13    institutions and investor relations, and in 2011 he became a

14    deputy general manager of international banking.  And as of

15    2012, Mr. Atilla was a deputy general manager, and he reported

16    directly to Mr. Suleyman Aslan, then the general manager of

17    Halkbank.

18             By all accounts, as I've noted above, Mr. Atilla is

19    skilled in and knowledgeable about the U.S. sanctions program.

20    He is fluent in English, although as a safeguard the Court has

21    always used Turkish interpreters throughout these proceedings

22    to ensure that Mr. Atilla understands each word that is spoken.

23             He's also been a model prisoner during his

24    incarceration.  He received a positive MCC report, Metropolitan

25    Correctional Institution, with outstanding performance reviews

from his unit team leader, who concluded that he is a diligent

worker and that he demonstrates positive leadership skills

among his pierce.

          Mr. Atilla is extremely well regarded by his friends

and family and his Halkbank colleagues.

          The Court very often receives at sentencing letters of

support, but less often are there as many -- by the way, in

this case these are the letters I've received on his behalf.

There are 101 of them I believe.  But these letters are from a

foreign country.  As in this case, I've never received letters

which are quite I think as insightful, certainly never in this

amount, and never in this detail.

          Letters were sent by family, friends and work

colleagues, most in Turkish.  I believe they were translated by

the official court interpreters.  That's my understanding.  I

found them to be of great help in sentencing and important in

assessing this factor, history and characteristics of the

defendant.

          The letters appear sincere and insightful.  I have

read them, yes, as a judge with eyes wide open.

          The letters, to be sure self-selected, reflect well

upon Mr. Atilla and they also reflect well upon the Turkish

people who sent them.  Mr. Atilla is widely respected, as

described in these letters.  He is an exceptional family man

and a citizen who is married to, if I pronounce this correctly,

1    Burcin, who also works at Halkbank and has a son, Burcan, who

2    is attending college.

3         Mr. Atilla's parents also wrote in support of their

4    son, understandably.  They are retired and are also former

5    state employees.  His father, Mehmet Isik, is 74.  His mother

6    is also in her 70s, Ayse.

7         Mr. Atilla is consistently described as a person who

8    is devoted to his family, successful in his career, loyal to

9    his employer.  He's described as kind, gentle, modest in

10   lifestyle and considerate of and helpful to others.  He has

11   never, according to the letter writers, had any criminal issues

12   in his past.

13        These letters are from seemingly ordinary Turkish

14   people who appear well able to describe and explain who

15   Mr. Atilla is, namely, the characteristics of the defendant.

16   They cannot excuse Mr. Atilla's role in the sanctions scheme,

17   notwithstanding that some expressed their disbelief that he

18   could be involved in any unlawful activity.

19        The letters, in addition to supporting Mr. Atilla,

20   well represent ordinary Turkish people as far as I can

21   accurately perceive them.  They clearly suggest that people to

22   people, which is to say from Turkish citizen to American

23   citizen, from that, one would not conclude that U.S. and

24   Turkish relations would be anything but close, open, friendly

25   and direct.

1          Indeed, it is very difficult to reconcile the

2    collaborative, polite, informative kind and generous letters of

3    support for Mr. Atilla from ordinary Turkish citizens with the

4    sometimes very harsh rhetoric from Turkish government officials

5    about this case.

6          All of the letters are respectful.

7          For example, one starts, "Honorable Judge Berman, as a

8    lawyer in a southeast European country I am convinced that the

9    American legal system is a real and fair system which

10   contributes to justice being served.  I hope that this is the

11   case in this case and that justice will be served as well."

12         Another example, someone writes, "I sincerely believe

13   and have complete trust in American justice and society.

14         So let me read you one or two of these letters in

15   whole.

16         It is addressed to your Honor and it says, "I am a

17   49-year-old Turkish republic citizen.  I have a wife and a

18   12-year-old son, and I have been working at Halkbank for 19

19   years.  We've been working in the same bank as Mr. Mehmet Hakan

20   Atilla for the last ten years, and we have been frequently

21   interacting with each other at work regardless of working in

22   the same department or not.

23         "Mr. Atilla is a dutiful, kindhearted, truthful,

24   honest person who values justice.  He has established a

25   merit-based management approach in all the departments he had

1    managed.

2            "Your Honor, Mr. Atilla is a good person in the exact

3    sense that it is often mentioned in the Torah, the psalms and

4    our holy book, the Koran.  Hakan Atilla carries all the

5    required desired common values of humanity.  Mr. Atilla is one

6    of the few people I know whose whole private life consists of

7    his wife and his son.  He is respectful and loving to the

8    people around him and respects the ideas and values of

9    everyone.

10           "Mr. Hakan Atilla was the person who was by my side at

11   my mother's and father's funeral, whom I lost very suddenly and

12   unexpectedly.  The funeral was held in another city, but he

13   still attended without caring about the distance and the time.

14           "Mr. Hakan Atilla believes in fate.  That is why he

15   would never divert from the truth mentioned in the holy books,

16   and he would always defend his values with the truth.

17   Mr. Atilla is a person who says I will always be honest and

18   stick by the truth regardless of the consequences.

19           "Mr. Atilla is a person whom he and his family are

20   always in our prayers.  We pray so that he can reunite with his

21   family as soon as possible.  Mr. Hakan Atilla is the subject of

22   all our talks and conversations, even if he is not present.

23   The support and love of the Turkish people are with him.

24   Nobody can say that he has behaved immorally or treated someone

25   unfairly, nor has performed malpractice or hurt anybody.

1    Unlike some people, he would never go against his values.

2            "Your Honor, we are people who believe in destiny.  We

3    assume that you believe in it too.  Your Honor, life is short.

4    We believe that doing the right thing for this person who has

5    never digressed nor diverted from what is right and who has

6    never done anything haram, or, in other words, unkosher, like

7    spending a single lira belonging to someone else, as it has

8    been stated before in the process and which is also considered

9    a pillar of our religion.

10            "It should be an easy decision.  We want to believe

11   that you have the tender heart to make a decision that would

12   reunite him with his spouse and child and all of us.

13            "One can write and say many more things about

14   Mr. Atilla.  We believe in justice and in the truth and in what

15   is right.  We believe with all our hearts that a judge with

16   such expertise as yourself will not deny or deprive us from

17   such compassion and mercy.  May God almighty, Allah, be the

18   companion and guide to us all."

19            That is one of, as I said, 101.

20            Here are excerpts from some of the other letters.

21   "He" -- the "he" in all of these refers to Mr. Atilla -- "is

22   one of the most successful and esteemed high-level bank

23   executives in our country, and he is well respected within the

24   whole banking community."

25            Another letter says, "Mr. Atilla extends a helping

 1    hand to everyone around him whenever they face difficulties, be

 2    it financial or otherwise.  If there is anything he can do to

 3    help, he tries to do it.  In other words, if he had just one

 4    slice of bread, he would gladly share it with others.  He helps

 5    everyone, anyone in need without ulterior motive."

 6          Another letter says, "At the time when my father had a

 7    very serious operation in Istanbul, he Hakan stayed with us

 8    through the whole process.  We cannot forget the incredible

 9    support he gave us with his continuous words of comfort.  He

10    even gave us the keys to his apartment in case we needed it.

11    In fact, I watched him comfort other patients' relatives and

12    some people he didn't even know at the hospital.  He was always

13    by our side and there for us."

14          There are many other examples that I could read.

15          I'll read one final from these letters.

16          "Hakan was not one of those greedy and ambitious

17    people who would want to do everything he gets his hands on.

18    Having a happy and peaceful life was very important for us.

19    Therefore, he always avoided being greedy."

20          So these are the letters from the Turkish people that

21    argue in my judgment persuasively not only because of the

22    letters, but for leniency and fall under the 3553(a) category

23    called history and characteristics of Mr. Atilla.

24          By the way, there is a letter, as you are all aware,

25    from the Turkish government in this case.  It's a short letter

I5G3ATI1                    Sentencing

1    sent from the Turkish government to the U.S. government which

2    reads:  "Accordingly, and without admitting or corroborating

3    any of the conduct alleged in the indictment, the embassy" --

4    this is I think from the Turkish embassy in the United States

5    to perhaps the State Department -- "the embassy kindly requests

6    the esteemed department's assistance for Mr. Atilla's urgent

7    release."  Dated October 23, 2017 from the Turkish embassy in

8    Washington.

9            So, moving along to the third 3553(a) factor, the need

10   for the sentence imposed to reflect the seriousness of the

11   offense, to promote respect for the law, and to provide just

12   punishment.

13           I will take one at a time in somewhat less detail than

14   we have been taking up until now.

15           There is no doubt in the Court's opinion, as noted,

16   that the Iran-sanctions-evasion schemes, conspiracies and its

17   participants, and those schemes included the Klein conspiracy

18   against the United States and, in fact, meetings with Atilla

19   and U.S. officials in Washington, D.C. at the U.S. Treasury

20   Department, I believe it's a serious matter.  It depended upon

21   and impacted, as with other sanctions cases, the U.S. financial

22   system and important issues of U.S. domestic security and U.S.

23   relations to its historical allies and to those who may be U.S.

24   antagonists.

25           The scheme in this case involved many millions of

1   dollars, largely in the form of Iranian oil proceeds held at

2   Turkey's state-owned Halkbank.

3           At the same time, the responsibility for and the

4   impact of these offenses cannot all be attributed only to

5   Mr. Atilla.  Mr. Aslan, Mr. Zarrab, Halkbank, Iran, others had

6   far more to gain financially and appear to have been far more

7   crucial players in the behavior we have been discussing.

8           The prosecutors here recognize that the advisory

9   sentencing guidelines range they propose is effectively a life

10  sentence, which has but rarely been imposed in cases most

11  analogous to this one.  And I note again that there is a

12  statutory maximum term of incarceration here of 105 years.

13          The government says that, pursuant to a case entitled

14  *U.S. v. Dhafir*, a Second Circuit decision from 2009, the Court

15  can elect to adopt a more flexible and lower proposed

16  guidelines sentence.  According to the government, under that

17  case, the Court has discretion to consider the guideline range

18  in the government's opinion of 168 to 210 months and also to

19  consider the sentencing maximum and also to consider the

20  Section 3553(a) factors to determine an appropriate sentence.

21          The defense counters the government and says that the

22  sentence here should be directed at vindicating and protecting

23  national security interests in a way that is consistent with

24  other dispositions for sanctions violations that have involved

25  other banks and the bankers who work for them, not on the basis

1    of some imagined amount of loss for funds allegedly laundered

2    as the presentence investigation report would have it.  The

3    defense goes on to say that Hakan has now spent 12 months in

4    detention more than 5,000 miles from his wife, his only son,

5    his aging parents, his family, and friends.  Mr. Atilla was a

6    banker who was at most -- this is the defense talking -- a

7    small cog in Zarrab's massive scheme, and was certainly not the

8    leader of the scheme.

9          Moving on to affording adequate deterrence to criminal

10   conduct.  The government argues that deterrence is an important

11   factor here to send a message to "a multitude of foreign banks

12   and businesses tempted to support a sanctions-evasion regime

13   while still enjoying the privilege of access to the United

14   States economy and financial system."

15         The defense responds that this prosecution in itself

16   will doubtless have a substantial impact on foreign bankers who

17   will be deterred from misconduct by Hakan's -- Mr. Atilla's --

18   sudden arrest and detention and the obvious long arm of U.S.

19   law enforcement authorities.

20         Deterrence is obviously an important 3553(a) factor in

21   this case, general deterrence even more important than specific

22   deterrence.  The Court believes that the likelihood that

23   Mr. Atilla would commit the kind of crimes for which he stands

24   convicted or, for that matter, any crime following this case is

25   virtually nonexistent.  General deterrence mostly will be

1    served by this prosecution and sentence.

2            Then moving to the issue of protecting the public.

3    Mr. Atilla does not in my judgment reasonably pose a threat to

4    commit any other crimes.  The unlawful actions taken in this

5    case were largely at the behest of others, including his boss,

6    Mr. Aslan, and appear to be out of character except perhaps as

7    they may have been driven by loyalty to his career employer,

8    Halkbank, and to his country.

9            The next factor, providing defendant with needed

10   medical and other care.  Mr. Atilla appears to be a very well

11   balanced, highly educated intelligent family man.  He has

12   received some medical treatment while incarcerated, and

13   probation is aware that Mr. Atilla has been affected

14   emotionally of course, as anyone would be, by his

15   incarceration.  His family no doubt will secure appropriate

16   additional medical treatment for him at such time as he gets

17   home to Turkey.

18           The Court will recommend that Mr. Atilla continue to

19   receive appropriate medical treatment while incarcerated.

20           Turning next to the kinds of sentences -- these are

21   all the 3553(a) factors -- the kinds of sentences available.

22   We've pretty much covered this topic already today, and I will

23   soon move to the next phase of sentencing, which is to hear

24   from the parties and Mr. Atilla if he wishes and to preview the

25   sentence.

1          But, before that, it's necessary that I mention that

2     the sentences on each count of conviction will in my

3     determination run concurrently.

4          The statutory maximum term of imprisonment on Count

5     One is five years.

6          The statutory maximum term of imprisonment on Counts

7     Two and Six is 20 years.

8          The statutory maximum term of imprisonment on Counts

9     Three and Four is 30 years.

10          There are no mandatory minimum terms of imprisonment

11     in this case.

12          The total statutory maximum term of imprisonment, as I

13     have said before, for all counts is 105 years, and that is if

14     the maximums were to be imposed consecutively rather than

15     concurrently, which will not happen here.  If the sentences

16     were to run concurrent, the maximum would be dramatically lower

17     at 30 years.

18          With regard to what we call supervised release, which

19     is the period of supervision following release from

20     incarceration, Counts One, Two and Six have a sentencing

21     guidelines range of one to three years of supervised release;

22     Counts Three and Four have a guidelines range of two to five

23     years.

24          Counts One, Two and Six have a statutory maximum of

25     three years, and Counts Three and Four have a statutory maximum

1    of five years.

2            In my judgment supervised release is unnecessary and

3    inappropriate here.  I'm not planning to impose any term of

4    supervised release.  It's the Court's intention that, upon

5    completion of Mr. Atilla's term of incarceration, that he will

6    be free to reunite with his family and colleagues in Turkey.

7            Then the fifth factor, the kinds of sentence in the

8    sentencing range established in guidelines.  As previously

9    mentioned several times, the Court has calculated the

10   guidelines range to be 97 to 121 months based on an adjusted

11   offense level of 30 and a criminal history category of I.

12           I have scrutinized all of the 18 U.S.C. Section

13   3553(a) factors both before I came on the bench and during this

14   proceeding, and they all lead in my judgment to a nonguidelines

15   sentence and one which is appropriately lenient in nature.

16           As to policy statements issued by the Sentencing

17   Commission, no Sentencing Commission policy statements other

18   than as reflected above or in the previous discussion are known

19   to the Court, and neither the defense or the government have

20   brought any to my attention.

21           And then the question of avoiding unwarranted sentence

22   disparities among similarly situated defendants.  I have

23   studied closely counsel's computations and proposed sentences.

24           The parties acknowledge that this case presents a

25   somewhat unique set of circumstances.  Comparators are not

readily available, nor are they dispositive.  The only in-case

comparator is Mr. Zarrab, who has not been sentenced, and his

circumstances as a cooperator and a major role player are very

different from Mr. Atilla's in any case.  The government

acknowledges that the crimes that Mr. Atilla committed are

without ready comparison.  The government also argues that the

individuals whose sentences the defense relies upon, each bear

substantial differences from Mr. Atilla.  The government

acknowledges that the defendants in those other cases cited by

the defense are not squarely comparable to Mr. Atilla.

They also cite *Amirnazmi*.  That's another case where

The defense contends that the government's prosecution

of Mr. Atilla is a notable departure from the long line of

cases in which banks and bankers accused of violating IEEPA or

otherwise engaging in activities designed to avoid sanctions

were not prosecuted.  Defense counsel also point out that the

individuals who have been convicted of IEEPA violations have

often received downward variances from the guidelines, and they

cite among other things, the *Banki* case, where there was a 63-

to 78-month guideline range and a 30-month sentence was

imposed.

They also cite *Amirnazmi*.  That's another case where

the guideline range was 97 to 121 months and where a 48-month

sentence was imposed.

And they cite *Sarvestani*, where the guideline range

was 57 to 71 months and a 30-month sentence was imposed.  In

1    that case, by the way, *Amirnazmi*, which is a Third Circuit

2    decision from 2011, the defendant was a dual citizen of the

3    United States and of Iran.  He was convicted after a jury trial

4    of multiple violations of IEEPA of making false statements to

5    federal officials and of bank fraud.  As I said, he received a

6    48-month sentence.  He was a chemical engineer who marketed a

7    software program to Iranian people and entered into agreements

8    with various Iranian entities in which he pledged to provide

9    technology to facilitate the construction of multiple chemical

10   plants.

11           In the *Banki* case, Judge Keenan was the trial judge.

12   The defendant there was a naturalized U.S. citizen who was

13   convicted after a jury trial of a conspiracy to violate IEEPA

14   and of a substantive offense of IEEPA violation and the Iranian

15   transactions regulations because he conducted an unlicensed

16   money transmitting business and made false statements to

17   federal officials.

18           In the *Sarvestani* case, presided over by Judge

19   Gardephe, the defendant was a non-U.S. citizen who pled guilty

20   to conspiracy to violate IEEPA.  The defendant operated

21   multiple companies that procured U.S.-made goods for Iranian

22   companies by shipping the goods through third-party countries.

23           The government here it should be noted also argues

24   that the sanctions matters that the defense relies on are

25   distinguishable because they often involved, this is a quote

1    from the government "significant acceptance of responsibility,

2    extensive internal investigations that were shared with

3    investigating authorities, the adoption of meaningful

4    compliance reforms, disciplining officers and employees who

5    directed or abetted the sanctions-violating conduct, the

6    payment of substantial monetary penalties reflecting the

7    seriousness of the offense conduct, and ongoing commitments to

8    cooperate with law enforcement in investigations."

9                   (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  (Continuing) And according to the

2   government, none of these are present here.

3        So given all the 3553(a) factors which are analyzed

4   above, I conclude, again, as I mentioned, that leniency in

5   sentencing is called for in Mr. Atilla's case.

6        Turning to the need to provide restitution, according

7   to probation and the parties, restitution is not an issue in

8   this case, and I do not intend to impose restitution as part of

9   the sentence.

10       As for a fine, the government requests a monetary fine

11  within the guideline range of 50,000 to $500,000.  The defense

12  does not make any recommendation for a fine, and the probation

13  department does not recommend a fine either, because it

14  concluded that, to the probation department, Mr. Atilla does

15  not appear to be able to afford to pay a fine.  In any event, I

16  do not intend to recommend a fine against Mr. Atilla.  I don't

17  thinking it is warranted or appropriate, based largely upon the

18  recommendation of probation.

19       So I'm going to take a short break and then move to

20  the next part of the proceeding, which is to talk about what we

21  call the presentence investigation report, which is a

22  confidential document and to preview the sentence that I intend

23  to impose.

24       So before the break I'm going to ask Christine to hand

25  out just to the lawyers, because these are confidential

1  matters, a chart that I prepared which discusses all the

2  defense objections to the presentence report, and my resolution

3  of those objections.  So you can take a minute or two.

4        I will say this about the objections.  They are

5  generally not made or perhaps not even appropriate if used, as

6  many are in this case, as an opportunity by defense counsel to

7  reargue prior rulings and/or to dispute the jury verdict.  My

8  evaluation is that of the 44 objections that were presented,

9  really only the objections to paragraphs 65 and to 67 impact

10  the calculation of Mr. Atilla's offense level and guidelines

11  range.

12        But you'll see that I did deal with every one of the

13  objections, and as to the guideline range, it's going to be a

14  non-guideline sentence.  So, they don't have much impact there

15  either.  But you can look these over.  These are just for the

16  attorneys and Mr. Atilla.  So five minutes, we'll resume.

17            (Recess)

18        (In open court)

19        THE COURT:  We're moving now to what is called the

20  presentence report which I've received, it was approved

21  April 4, 2018, together with an addendum of that same date.

22        I've received correspondence from the defense dated

23  3/26/18, 3/30/18, 4/13/18, 5/8/18, 5/4/18.  I believe I have

24  these dates right.  And 5/11/18.  And that's from the defense.

25  Hold on one second.

1    So let me go over that again.  These are the principal

2    submissions that I received from the defense, 3/26/18, 4/13/18,

3    and if there are ones that I missed I'll ask you and you can

4    supplement this list.  3/30/18, 5/8/18, that's from defense.

5    From the government, 4/4/18, 4/13/18, 5/14/18 and May 11, '18.

6    I think those are the principal ones.

7              Any that I missed, starting with the government?

8              MR. LOCKARD:  No, your Honor.

9              THE COURT:  How about defense counsel?

10             MR. ROCCO:  No, your Honor.

11             THE COURT:  Okay.  So, Mr. Rocco, have you and

12   Mr. Atilla had the opportunity to read and discuss the

13   presentence investigation report in this case, including its

14   addendum and sentencing recommendation?

15             MR. ROCCO:  We have, your Honor.

16             THE COURT:  Mr. Atilla --

17             MR. ROCCO:  I have reviewed it with Mr. Atilla, and

18   Mr. Atilla and I have discussed it and reviewed it and the

19   addendum.

20             THE COURT:  And the addendum and sentencing

21   recommendation?

22             MR. ROCCO:  Yes.

23             THE COURT:  Just for the record I'm going to ask

24   Mr. Atilla if he went over those materials with you.

25             THE DEFENDANT:  Yes, I read, your Honor.

1          THE COURT:  Okay.  Do you have any remaining

2    objections or any objections remaining to the presentence

3    investigation report?

4          MR. ROCCO:  Your Honor, Ms. Fleming is going to

5    address a technicality, Judge.

6          MS. FLEMING:  Of course.  Judge, we'll rest on

7    whatever objections we've already made.  We need to add one

8    that we had not put in writing related to the obstruction,

9    which is only to add for the record that there was a conscious

10   avoidance charge at the trial that might relate to perjury at

11   trial, and we think we need to put that on the record.  That

12   may help us with regard to an allegation -- and we

13   appreciate --

14         THE COURT:  I don't understand.

15         MS. FLEMING:  We understand that the Court has made

16   very detailed findings and put them on the record, and you

17   found that Mr. Atilla committed perjury at trial, and you said

18   as a basis for obstruction.  And you've made your findings very

19   clear.  We wanted --

20         THE COURT:  I did that when?

21         MS. FLEMING:  A few minutes ago, earlier today.  When

22   you were going through and indicating your preliminary findings

23   with regard to it.

24         THE COURT:  So if you could just indicate, that's what

25   I'm --

1          MS. FLEMING:  You did that earlier today.

2          THE COURT:  No, I know, but you're referring to?

3          MS. FLEMING:  When you were talking about the adding

4    two points for an obstruction of justice enhancement under the

5    guidelines, so we just wanted to put, we also wanted to add --

6          THE COURT:  Because his testimony was at variance with

7    other testimony.

8          MS. FLEMING:  Yes.  It was at variance with other

9    testimony.  And because of the jury verdict, it did not mean

10   that the jury did not accept all of his testimony, because

11   there was a conscious avoidance charge.

12         The only other objection, when I looked through the

13   addendum that the Court just handed out, on page 12, without

14   going to what it is, on paragraph 36, and without arguing with

15   the Court, we just want to note an objection --

16         THE COURT:  This is the objections to the presentence

17   investigation report?

18         MS. FLEMING:  This is your schedule that you just

19   handed out.

20         THE COURT:  It's called "Defendant's Objections Dated

21   April 13, 2018."  Is that the document?

22         MS. FLEMING:  That's the document.  That's correct.

23   Your Honor, without reading it, because I know it is a

24   sensitive document, but if you look on page 12, in paragraph

25   36, where the Court is going to add several sentences to

1   paragraph 36 in response to our objection and the government's,

2   we just noted an objection to those additional sentences.  We

3   don't think that is what the evidence is.

4           THE COURT:  Okay.  Mr. Atilla, do you have any further

5   objections yourself?

6           THE DEFENDANT:  No, your Honor.

7           THE COURT:  I'm sorry?

8           THE DEFENDANT:  No, your Honor.

9           THE COURT:  No.  Okay.

10          So I will, which is our practice, return the

11  presentence report to probation.

12          And at this point I'm happy to hear from defense

13  counsel, from Mr. Atilla, and from the government before I

14  preview the sentence I intend to impose.

15          MR. ROCCO:  Your Honor, if I may.

16          THE COURT:  Do it at the podium if you'd like.

17          MR. ROCCO:  I will.

18          THE COURT:  Okay.

19          MR. ROCCO:  Your Honor, thank you for the extensive,

20  very detailed, comprehensive and thoughtful review that your

21  Honor did of the record in this case.  You stole my thunder,

22  Judge.  And I learned a long time ago, at least I hope I

23  learned a long time ago that the art of litigation is the art

24  of knowing when to shut up.

25          But, I do say, if I may, Judge, that one of the things

1   that I was going to say in the lengthy presentation here this

2   morning that I've abandoned is that what we need to show the

3   world in proceedings such as this, especially today, especially

4   now, is that we Americans aren't bullies.  That we are a

5   generous and compassionate people.  That although we are a

6   nation of laws, justice is tempered by mercy.  Our judges are

7   as courageous as they are just, and as compassionate as they

8   are wise.

9        What I heard this morning, your Honor, I think

10  perfectly embodies those thoughts.  And I'm moved by them and

11  I'm sure everybody in this courtroom is moved by them.  And I

12  thank you for them and Mr. Atilla thanks you for them.

13       I have nothing else to say, Judge.  You have

14  reflected, I think, a deep understanding of what happened here.

15  And we ask you in imposing sentence, to understand that

16  Mr. Atilla's never sought any special treatment, there has been

17  no political interference.  Plainly, nobody's ever offered to

18  do anything for him.  He stands before the Court, and he cannot

19  say, he can only ask, that your Honor temper your judgment with

20  mercy.  We're asking you to open your heart, and to send him

21  home to his family and to his countrymen as soon as possible.

22  Thank you, Judge.

23       THE COURT:  Mr. Atilla, did you want to add something?

24       MS. FLEMING:  Mr. Atilla wrote out something in

25  Turkish and then we had it interpreted.  He's asked that I read

1   it.  Is that acceptable to the Court?

2           THE COURT:  Absolutely.

3           MS. FLEMING:  Just before I do, if the Court will

4   allow me just one moment of personal privilege if it will.

5   I've done this for a lot of years, both at this table and at

6   that table.  And this has been a very difficult and hard-fought

7   trial, as the Court saw.

8           I think everybody has shown real civility to each

9   other, and I think that the lawyers have all behaved very

10  professionally.  Of course all the courtesies of the Court were

11  always present.

12          But I really want to say, I know I'm speaking for

13  everyone at our table, that it's been a privilege to represent

14  Mr. Atilla.  What your Honor read in those letters is something

15  we have all seen over the last year under extremely difficult

16  circumstances by him.  He has really been just a gentleman

17  through and through.  I think the Court has seen it, and we

18  know that.  So I wanted to say that personally.

19          So on behalf of Mr. Atilla, here is the English

20  translation of what he asked me to share with the Court.  And

21  the last sentence he added during the break for the judge.

22          "Today is the first day of the holy month of Ramadan.

23  One of Islam's most sacred days.  Ramadan is a period where the

24  virtues of patience, sacrifice, leniency, mercy, and compassion

25  are heavily felt.  Muslims fast and understand those people who

1    are hungry and what it feels like to be hungry and to help

2    those in need.  The best way to understand another's life is to

3    internalize the other person's condition.

4          "I kindly request your understanding for the situation

5    that I and my family are in.  In this past year, I have learned

6    many new things, and what I used to consider as a priority, has

7    now profoundly changed.  As of now, apart from my family, I

8    have no other priorities.

9          "Thank you for your very thoughtful consideration."

10          THE COURT:  You're very welcome.  And the government?

11          MR. LOCKARD:  I'll take the podium, your Honor.

12          THE COURT:  Sure.

13          MR. LOCKARD:  So, your Honor, as we all know,

14    Mr. Atilla was convicted of the five felony offenses following

15    approximately four weeks of trial, in which he received the

16    full extent of due process and procedural protections as he is

17    entitled to under the American system of justice.

18          And I think from the proceedings so far this morning,

19    it is clear that in addition to a fair trial, Mr. Atilla will

20    also receive a fair sentence.  It is clear that the Court has

21    carefully and deeply considered all the proceedings in this

22    case, as well as the evidence that was introduced at trial, and

23    the relevant sentencing laws and factors.

24          I'd like to address the government's remarks to

25    principally the two areas that we think are extremely

significant in considering an appropriate sentence in this

case, which are both the nature and seriousness of the offense,

and the defendant's role in it.  Those are not only important

categories, but also big categories, and the Court has

addressed them at length this morning, but I would like to

share the government's view of what the evidence adduced at

trial shows about those two things.

I respectfully submit that the evidence showed through

approximately four weeks of testimony and thousands of

exhibits, that Mr. Atilla was a significant, not a minor, but a

significant participant, and not a reluctant one.

I respectfully submit that the evidence showed that

Mr. Atilla was a committed participant in a conspiracy to

undermine United States sanctions that related to Iran's

globally dangerous and destabilizing conduct, and in

particular, sanctions targeting Iran's illicit military nuclear

program.

I think the evidence showed that Mr. Atilla was a

participant in that conspiracy for more than three and a half

years, from 2012 until early 2016.  That he participated in

that conspiracy at the height of his professional standing and

responsibility, as the deputy general manager of Turkey's

second largest state-owned bank.

I submit that the evidence showed that this conspiracy

happened within Mr. Atilla's main areas of professional

responsibility as the deputy general manager for international

banking, a position that he rose to, following Mr. Suleyman

Aslan's promotion from that very same position to general

manager of the bank.  That they were within Mr. Atilla's core

professional responsibilities as deputy general manager for

international banking, for U.S. and international sanctions,

for Iranian banking and oil relationships.  In his position at

the bank, that was the main financial channel for Iranian and

Turkish trade.  At the bank, that was the sole repository of

Iranian oil revenues from Turkish purchases of Iranian

petroleum products.

          And that conspiracy succeeded to a massive scale,

because of Mr. Atilla's success in concealing that scheme and

in lying to the senior most U.S. officials responsible for the

implementation and enforcement of those sanctions.

          That scheme succeeded to a massive scale because of

Mr. Atilla's expertise in developing the means and methods by

which the conspiracy was carried out, both in the gold

transactions and in the fake food transactions.

          I submit that there was no one at the bank that had a

greater or more direct responsibility for stopping the offense

conduct.  But instead, Mr. Atilla actively joined and furthered

it, and as a result, greatly increased his bank's profits from

this enormous gold and food trade, and protected his bank from

what one witness at trial called a potential death blow of

 1    being sanctioned under the U.S. authorities for participating

 2    in that conduct.

 3           So, addressing Mr. Atilla's role, both at the bank and

 4    in the offense conduct, I'm going to address both his role in

 5    terms of formal responsibilities and position, as well as some

 6    concrete examples of how he exercised that role and

 7    responsibility, and respectfully submit that this shows that

 8    not only was Mr. Atilla a leader -- not the leader, certainly,

 9    and I think we're very candid about the scope and scale of the

10    conspiracy and the range of participants that it had.  But I

11    think the law is also clear that a conspiracy can have multiple

12    leaders, each with separate layers of responsibility.  And even

13    someone who is supervised by others can in turn exercise

14    managerial responsibility within their sphere.

15           But at the very least we would submit that this shows

16    that Mr. Atilla was certainly not a minor participant, and I'll

17    explain why we think that the evidence shows that that's the

18    case.

19           As I mentioned, Mr. Atilla was the deputy general

20    manager for international banking.  And in that role, he was

21    the person responsible for Halkbank's international banking

22    relationship, both its U.S. correspondent account, a very

23    important lifeblood of an international bank in having access

24    to U.S. dollar transactions and the U.S. financial system.

25    Also responsible for the bank's relationships with other

I5G3ATI3                    Sentencing

international banks, especially Iranian banks, and an

enormously important one was the Central Bank of Iran which had

a multibillion dollar account at Halkbank to hold the proceeds

of Iran's sales of oil and natural gas to Turkey.

          Because of that, Mr. Atilla, also as part of his

position at the bank, had responsibility for Halkbank's

involvement in the Iranian oil trade.  All of this is happening

within the heartland of what it is that he does at the bank.

          Mr. Atilla, getting down more granularly, joined in

and actively participated in this conspiracy at an important

level in 2012.  I think that's shown in a number of ways.  It's

shown through his participation.  There are not many people who

are participating in a lot of different high-level important

meetings.  Mr. Atilla is doing that.  He is meeting not only

with the undersecretary for the U.S. Treasury Department, the

director of OFAC, he's also meeting with senior officials of

the National Iranian Oil Company, he is meeting with senior

officials of Iranian banks on both sides of what's happening.

The conduct to evade and undermine the sanctions, and the

meetings to conceal and lie about what's happening.

          He is applying his sanctions expertise to give

instruction and direction to Mr. Zarrab and his employees about

how to document these transactions.  And that's shown in the

evidence when, in August of 2012, which is shortly after

Executive Order 13622, which includes the sanctions provisions

1    relating to the facilitation of gold acquisition by the

2    government of Iran, within days, the export documentation for

3    Mr. Zarrab's companies' gold exports switches wholesale from

4    being exported to Iran to being exported to Dubai.  The obvious

5    reason for doing that is to conceal the government of Iran's

6    role in funding these gold purchases, and benefit that it

7    obtains from having that gold resold in Dubai, so that there is

8    a ready access to a huge pool of essentially unregulated funds

9    in Dubai for the government of Iran and Iranian banks.

10           And as Mr. Zarrab testified, and as I think the rest

11   of the evidence is consistent, it was Mr. Atilla who directed

12   that change.

13           Again, in February of 2013, when the bilateral trade

14   requirement came into effect as a result of the IFCA, it

15   switches again back from Dubai to Iran.  And in a recorded

16   phone call, Mr. Zarrab describes how that's Mr. Atilla's

17   instructions, and it is because of the sanctions.  And that's

18   in order to appear to comply with the bilateral trade

19   requirement governing oil revenues, and this is all

20   Mr. Atilla's personal involvement and direction in aspects of

21   the gold trade.

22           With respect to the fake food trade, Mr. Atilla's

23   boss, Mr. Aslan, calls it "Atilla's method."  At a time when

24   Mr. Aslan and Mr. Zarrab have no reason to believe that their

25   communications are going to be intercepted or recovered.  This

1    is how they among themselves are describing the fake food

2    system.  Mr. Atilla gives directions to Mr. Zarrab about how to

3    better falsify documents and transactions, about how to correct

4    errors relating not only to transaction amounts, to the

5    purported volume of the sales, and to the purported ships that

6    are being used in the fake documents.  He protects Mr. Zarrab

7    from being required to submit bills of lading and other

8    documents that he cannot submit without exposing the scheme to

9    detection.  And all of this simultaneous to making contrary

10   representations to the United States Treasury Department.

11            So I'd like to address for a moment about how

12   Mr. Atilla's role compares to the average participant in the

13   offense, which is the relevant phrasing of the guidelines.

14            So as the Second Circuit has explained, the average

15   participant is the average participant in the offense.  Because

16   of the scope and scale of the offense, that covers a pretty

17   large ladder of people, including, as the Court already has

18   noted, government of Turkey officials, Mr. Atilla's boss

19   Suleyman Aslan, and Mr. Zarrab and his employees and companies.

20   It also involves other people at the bank who are less senior

21   than Mr. Atilla.  It includes Levant Balkan, who was charged as

22   a co-defendant and who had a less senior position and a shorter

23   participation in the conspiracy.  The Court and jury saw

24   Mr. Atilla's e-mail exchanges with Hakan Aydogan, where

25   Mr. Atilla gives Mr. Aydogan instructions to reduce the amount

1    of documentation that the bank required from Mr. Zarrab.

2    Mr. Aydogan is a lower-level employee than Mr. Atilla.

3           It includes a whole host of Mr. Zarrab's employees,

4    like co-defendant Abdullah Happani, who was a manager of

5    Mr. Zarrab's offices.  Another Zarrab employee, Camellia

6    Jamshidy, and a whole host of gold couriers, money couriers,

7    people involved in operating front companies or exchange house

8    accounts.  It includes the Iranian government officials and oil

9    officials.

10          It is a wide ladder, and Mr. Atilla certainly had more

11   responsibility and more discretion and more authority than a

12   lot of those people.  He did not have the most authority in the

13   offense.  He is not the top defendant.  But he is a significant

14   defendant.  And we submit that the evidence is inconsistent

15   with a minor role for Mr. Atilla.

16          So I'd like to address a little bit the evidence about

17   Mr. Atilla's role and whether or not he was a reluctant

18   participant.  It is an important consideration for Mr. Atilla's

19   culpability and the appropriate sentence.  And I'd like to take

20   the opportunity to walk the Court through how the government

21   assesses that evidence through the evidence that was adduced at

22   trial.

23          So specifically, the Court has highlighted, and I

24   think appropriately so, whether the events of April of 2013

25   illustrate that Mr. Atilla was a reluctant participant.  I'll

suggest that it does not show that, and I'd like to walk

through the evidence and why it is that we think it does not

show that.

So, as has already been discussed at length, in April

of 2013, Mr. Zarrab and Mr. Atilla spoke about the fake food

business that Mr. Zarrab was in the process of starting up.

That he was starting up at the instruction of the bank, not on

his own initiative. At this time, Mr. Atilla was already a

full-fledged member of this conspiracy for about a year through

the gold transactions. He was not a new member of the

conspiracy at this point. He already had been lying to the

U.S. Treasury officials about Halkbank's role and knowledge of

the gold trade since 2012 in meetings and in phone calls with

Mr. Cohen and Mr. Szubin. He already had given Mr. Zarrab and

his employees directions about how to document the gold exports

in order to appear to comply with the precious metal sanctions

provisions and the oil provisions.

All of this, we submit, suggests that Mr. Atilla was

not a reluctant participant in the conspiracy. And in fact,

Mr. Atilla himself, when he testified, he testified "Nobody can

make me do something that I don't want to do."

So how do we interpret this phone call? And we

suggest that what this episode shows is not that Mr. Atilla was

less culpable as a result of this reluctance that he showed.

It shows that Mr. Atilla was concerned about detection. Not

1    about the moral impact or the legal impact, but about detection

2    of the scheme.

3         Mr. Atilla at this point, as Mr. Zarrab credibly and

4    candidly testified, did not yet know that these food

5    transactions would be entirely fake.  Mr. Atilla recognized on

6    the face of the description of the scheme that it was

7    problematic and unrealistic.

8         Mr. Atilla in April of 2013 had just been warned in

9    recent meetings with Treasury officials, he had just had the

10   pull-aside with OFAC Director Szubin.  He had just received a

11   letter from Director Szubin drawing his attention to a Greek

12   national who had in fact been sanctioned under the secondary

13   sanctions for providing services to Iran's oil industry.

14        Calling that a threat may be a little bit overbroad,

15   but it was certainly, it was certainly a pitch that was high

16   and tight.

17        So this is the context in which Mr. Zarrab has this

18   conversation, and Mr. Zarrab himself testified Mr. Aslan just

19   didn't understand how this was supposed to work.

20        So from all of that evidence, we suggest that the best

21   and the clearest inference to be drawn from this episode is not

22   that Mr. Atilla had any moral or legal reluctance about the

23   fake food trade.  He had a security or detection-related

24   concern.  And after he received the phone call from Mr. Aslan,

25   which in his trial testimony Mr. Atilla denied ever happened,

1    but the evidence showed that it did, he immediately and without

2    any evidence of any further hesitation worked to improve that

3    method, and to lie to Treasury officials about it.

4           And you can see that including, among other places, in

5    Defense Exhibit 211, and related exhibits which are the e-mails

6    between Mr. Atilla and Mr. Aydogan shortly after that April 10

7    phone call.  You can see it in the July 2nd through July 9

8    phone calls between Mr. Atilla and Mr. Aslan and Mr. Zarrab.

9    And you can see it in Mr. Atilla's future communications with

10   the Treasury Department about Halkbank's involvement in the

11   food trade and its relationship with Mr. Zarrab.

12          Mr. Atilla has never claimed that he did this because

13   he was ordered to.  He's never claimed that he did it because

14   he had no choice.  In fact, Mr. Atilla had an opportunity to

15   explain his conduct, and in more than a day of testimony under

16   oath in this courtroom, he flatly denied that any of it ever

17   happened.

18          Just one last exhibit that we think is significant in

19   evaluating this.  We think that is also consistent with another

20   time that Mr. Atilla raised a concern about detection, and that

21   was Government's Exhibit 304-T, which is the phone call

22   discussing Mr. Atilla's warning to Mr. Aslan that the National

23   Iranian Oil Company had transferred funds directly to

24   Mr. Zarrab's bank account.  The reason Mr. Atilla raised that

25   is that is a serious detection problem.  We know he had no

1    problem with the less direct, less detectable system that was

2    supposed to be followed, for NIOC to transfer the funds first

3    to an Iranian bank and then to Mr. Zarrab.  And we submit that

4    is all consistent with Mr. Atilla being neither a cog nor a

5    reluctant participant in this offense.

6              So I'd like now to turn, unless the Court has any

7    questions, to our assessment of the seriousness of the offense,

8    the seriousness and nature of the offense.

9              So, in the government's sentencing submissions, we

10   were again I think pretty candid that it is hard to find a

11   ready comparison for this case or for this offense.  And the

12   reason that it is hard to find a comparison is because, to our

13   knowledge, there has not been a bigger criminal sanctions

14   evasion prosecution in a U.S. court than this case.  This is

15   the biggest sanctions evasion case prosecuted in the United

16   States that we are aware of.  The scope and scale is massive.

17             The context of that offense are U.S. national security

18   controls that were adopted to address a persistent and

19   long-running threat to national security and international

20   security by the government of Iran, and its actions and its

21   policies.

22             There are sanctions that targeted a dangerous regime

23   with globally significant activity, grave human rights

24   violations, a long history of support and funding for foreign

25   terrorist organizations, and acts of terrorism, an illicit

1    ballistics missile program, and an illicit military nuclear

2    program.  That, as the U.S. and international community became

3    increasingly aware of and increasingly concerned about,

4    resulted in increasingly targeted sanctions against the

5    government of Iran, its financial and oil sectors, the very

6    sanctions that are in some ways at the heart of this case.

7            This is not a case about drugs, it's not a case about

8    shipments of weapons.  But it is, in a very real sense, a case

9    about nuclear capability.  Nuclear capability by the world's

10   foremost state sponsor of terrorism.

11           This is activity that happened contemporaneously with

12   the adoption and implementation of those sanctions,

13   contemporaneously with a sustained and coordinated

14   international effort to try and get Iran to stop that military

15   nuclear program.

16           And it undermined those negotiations and those efforts

17   in a way that was both big, monumental in scope, and momentous

18   in timing.

19           And Mr. Atilla was not in the least unaware of those

20   facts.  Mr. Atilla was a student of the sanctions from the

21   world's best teachers:  The Undersecretary for Terrorism and

22   Financial Intelligence of the U.S. Treasury Department.  The

23   director of OFAC.  Mr. Atilla was told directly and repeatedly

24   and in person throughout the entire offense conduct what these

25   sanctions were, why they existed, the concerns that the

1  American and international communities had about Iranian

2  sanctions efforts, proliferation efforts, its weapons of mass

3  destruction programs, and he engaged in the conduct anyway.

4          As the Court knows, organized criminal activity is

5  more dangerous and more difficult to root out than individual

6  activity.  This was highly organized, highly organized criminal

7  activity involving both Mr. Zarrab and Halkbank, and a number

8  of its senior officers, including Mr. Atilla, and government of

9  Turkey officials, and government of Iran officials.

10         And the victims of that offense, there's no one

11  particular person or group of persons that can be identified to

12  say "these are the victims."  I think that in some ways, the

13  most distinguishing factor between some of the other financial

14  crimes cases, the Madoffs and the Dreiers and the cases like

15  that.  But that doesn't make the case less serious.  In fact,

16  it is because the case is more serious that there is no readily

17  identifiable particular victim.  It is so serious that

18  everybody is a victim of it.

19         The gravity of the threat, the fact that it's global

20  in nature, the threat not only of a state sponsor of terrorism

21  having nuclear military weapons, but also the threat of a

22  nuclear arms race in the Middle East, these are threats that

23  face everybody.

24         I think when the Court considers the letters that have

25  been submitted on Mr. Atilla's behalf, the Court clearly has,

1    and clearly should consider those letters.  But I think those

2    letters have to be squared with the evidence that was

3    introduced here in this courtroom, evidence that was introduced

4    by live witnesses subject to cross-examination, evidence that

5    was introduced through recordings of conversations, and

6    contemporaneous e-mails.

7           And while in one dimension of his life Mr. Atilla may

8    have exhibited an honesty and an integrity and a commitment to

9    truth, in this offense, for a period of several years, the

10   heart, the heart of his participation, was lying and deception.

11   That is the heart of what he did for more than three years as

12   one of the significant players in this offense.  As someone

13   whose participation outlasted every other single person at the

14   bank.  It outlasted Mr. Aslan's.  It outlasted Mr. Balkan's.

15   It outlasted Mr. Aydogan's.  It outlasted everybody else.

16          I suggest that is not an aberration.  It is consistent

17   with how Mr. Atilla conducted himself in his post-arrest video,

18   which the Court saw, and it is consistent with how he conducted

19   himself under oath on the witness stand in words that he

20   directed not only to the jury, but also to the Court.

21          And when the rubber hit the road, Mr. Atilla chose

22   lies and deceptions, not honesty and integrity, and I think

23   that is appropriate for the Court to consider in determining

24   the appropriate sentence.

25          So, I'll land on a slightly more technical issue of

1    the guidelines and how they work.  So the guidelines, the Court

2    has noted there's a pretty big disparity in how the guidelines

3    can play out, depending on which guidelines provision you rely

4    on.  Whether the guidelines are calculated under the first

5    prong of the money laundering guideline or the second prong of

6    the money laundering guideline.  But that doesn't show that the

7    guidelines are in any way arbitrary.  I think what it shows is

8    that different guidelines measure different things.

9           So in one prong of the money laundering guidelines,

10   looking at the volume of money that was involved in the

11   offense, it adds a dramatically increasing effect on the

12   guidelines calculation.  Under another provision, no account

13   whatsoever is given to the volume of money that's in play, and

14   it results in a dramatically lower guidelines calculation.

15          But I think the guidelines recognize that.  They

16   recognize that in comment two to guideline section 2M1.5.

17          So, the correctly calculated guidelines, we submit,

18   are based on the second prong of 2S1.1 which does incorporate

19   the volume of funds involved.  As a strictly guidelines matter,

20   we think that is correct.  And I'll talk about why we didn't

21   recommend a 105-year sentence in a moment.

22          But under the alternate range, based on the sanctions

23   provision, there is no enhancement whatsoever for a lot of

24   aspects of the offense conduct, but comment two recognizes

25   that.  And comment two says that a greater sentence may be

I5G3ATI3                    Sentencing

1    warranted based on the degree to which the violation threatens

2    security, the volume of commerce, the extent of planning or

3    sophistication, and whether there were multiple occurrences.

4              And your Honor, every single one of those four factors

5    is present to an extreme degree in this case.  I've already

6    talked about the national security implications of the offense;

7    the volume of commerce, unparalleled; the extent of planning or

8    sophistication, it was extremely well planned and

9    sophisticated; and it happened persistently and repeatedly over

10   a period of years.

11             So while there is a lower guidelines calculation that

12   results from the alternate calculation, I think the guidelines

13   themselves recognize circumstances under which that may be

14   inappropriately low, and we suggest that all of those are

15   present here.

16             So in the government's view the correctly calculated

17   guidelines calculation, which is the statutory maximum of 105

18   years.  There is the alternate calculation --

19             THE COURT:  It is actually life, subject to the

20   statutory maximum.

21             MR. LOCKARD:  Correct, your Honor.  I shorthanded it.

22   Life subject to the statutory maximum.  Which, again, is

23   effectively life, given the number of years.

24             There is the alternate guidelines calculation, which,

25   depending on whether the Court applies a minor role adjustment,

1    is the 97 to 121 months, or, as we suggest, 168 to 210, based

2    on our analysis of what the evidence shows about Mr. Atilla's

3    role in the offense.

4          But we did not suggest a 105-year sentence.  I think

5    we agreed that effectively a life sentence not only is rarely

6    imposed, but is also inappropriate for Mr. Atilla.

7          And so, we very deliberately and consciously made a

8    recommendation that a sentence comparable to approximately 20

9    years would be both appropriate and supported by comparable

10   cases.  That is a significantly below guidelines sentence

11   recommendation.  It is about 80 years below guidelines.

12         But we think that a significant sentence is necessary

13   in a case like this where scope of the conduct is unparalleled,

14   the national security implications are grave, the defendant,

15   though not the leader, certainly a person of significance and

16   discretion, and supervisory ability.  And given the nature of

17   the threat involved, and the kind of conduct that was engaged

18   in, we think that the sentence should reflect the nature and

19   seriousness of the offense, promote respect for the law, and

20   afford sufficient deterrence for others who might seek to

21   engage in a similar offense.

22         Thank you, your Honor.

23         THE COURT:  Thank you.  So, I'm then going to adopt

24   the findings of fact in the presentence report, unless defense

25   counsel has any further objections to those already in the

I5G3ATI3                    Sentencing

1    record.

2              MR. ROCCO:  No, your Honor.

3              THE COURT:  Mr. Atilla, do you have any further

4    objections?

5              THE DEFENDANT:  No, your Honor.

6              THE COURT:  How about the government?

7              MR. LOCKARD:  No, your Honor.

8              THE COURT:  Hold on one second.

9              (Pause)

10             THE COURT:  So, what I'm going to do at this point is

11   preview the sentence that I intend to impose, and then I'm

12   going to move forward and impose it.

13             So I intend to impose a sentence here of 32 months of

14   incarceration with credit, of course, for time already served.

15             The offense level I've determined is 30, the criminal

16   history category is I, and the appropriate guidelines range is

17   97 to 121 months.

18             On each count of conviction, I intend to impose that

19   same sentence of 32 months and they are to run concurrently.

20             And if the defense is still seeking a recommendation,

21   you can think this over, I would recommend incarceration at a

22   BOP operated non-administrative facility which provides medical

23   care and is near New York City, and you requested specifically

24   FCI Danbury which will facilitate family and Turkish consulate

25   visits, if you want that recommendation.

1          MR. ROCCO:  Yes, your Honor.

2          THE COURT:  Okay.  I don't intend to impose any

3    supervised release for reasons that I mentioned before and I

4    incorporate here by reference.  Nor do I intend to impose a

5    fine for the reasons that I mentioned before and incorporate

6    here by reference.  Nor do I intend to impose restitution, also

7    for the reasons I mentioned before in terms of review of the

8    presentence materials.

9          I do intend to impose a $500 special assessment, which

10   is mandatory under 18, United States Code, Section 3013.

11         And briefly, the reasons for the sentence as I

12   mentioned before, of course, sentence is the most difficult

13   process of a federal court.  So I've taken great deal of time

14   and effort, which I'm supposed to do, and determined that the

15   offense level was 30, the criminal history category I.  the

16   guideline range that I came up with was 97 to 121 months,

17   making this a lenient sentence.

18         I think it is an appropriate sentence, having reviewed

19   the factors, all of them at 3553(a), and finding that those

20   factors, with the exception of the guidelines range sentence,

21   were more impactful, considering the nature and circumstances

22   of the offense, Mr. Atilla's history and characteristics,

23   reflecting the seriousness of the offense, trying to promote

24   respect for law, provide a just punishment, and afford adequate

25   deterrence to criminal conduct, protecting the public from

1    further crimes, and providing needed medical treatment,

2    educational or vocational training or other correctional

3    treatment in the most effective manner.

4            So I'm happy to hear from, if they wish to be heard,

5    defense counsel, Mr. Atilla, and the government one more time

6    before I impose that sentence.

7            MR. ROCCO:  Your Honor, we have nothing further to

8    say, thank you.

9            THE COURT:  Mr. Atilla?

10           THE DEFENDANT:  No, your Honor.  Thank you very much.

11           THE COURT:  And how about the government.

12           MR. LOCKARD:  No, your Honor.

13           THE COURT:  So I would ask Mr. Atilla and counsel to

14   stand and I will impose the sentence.

15           Having considered the Sentencing Reform Act of 1984,

16   United States sentencing guidelines, and the particularly the

17   factors under 18, United States Code, Section 3553(a), it is my

18   judgment that Mr. Mehmet Hakan Atilla be committed to the

19   custody of the bureau of prisons to be imprisoned for a term of

20   32 months with credit for the time he has already served.  And

21   that's on each count of conviction and to run concurrently.

22           And I'm making the recommendation with respect to FCI

23   Danbury that I mentioned a few minutes ago and will include

24   that here.

25           I'm not imposing supervised release for reasons I

1    mentioned before, and incorporate here by reference.  I'm not

2    imposing a fine, also for reasons that I mentioned before and

3    the statements in the presentence investigation report.  I do

4    not think that restitution is appropriate.  So there is no

5    restitution because there is no victim within the meaning of

6    the statute, 18, United States Code, Section 3663 or 3663(a).

7    I am imposing a $500 special assessment, which is due

8    immediately.

9            And as for the reasons for this sentence, it is a

10   sentence that as best I could reflects all of the factors at

11   3553(a) in the order of significance I found them in this case.

12   And I incorporate that entire discussion from this morning here

13   by reference.

14           Does either counsel know of any legal reason why the

15   sentence should not be imposed as so stated?

16           MR. ROCCO:  No, your Honor.

17           MR. LOCKARD:  No, your Honor.

18           THE COURT:  Then I hereby order the sentence to be

19   imposed as so stated.

20           Mr. Atilla, you have the right to appeal this

21   sentence.  If you are unable to pay the costs of an appeal, you

22   have the right to apply for leave to appeal in forma pauperis.

23   If you request, the clerk of court will prepare and file a

24   notice of appeal on your behalf immediately.

25           Do you understand your appeal rights?

I5G3ATI3                        Sentencing

1          THE DEFENDANT:  Yes, your Honor.  Thank you very much.

2          THE COURT:  And at this point is the government

3    seeking to dismiss any open aspects of the case if there are

4    any?

5          MR. LOCKARD:  There are none, your Honor.  There is an

6    underlying superseding indictment and we ask the Court to

7    dismiss those charges with respect to Mr. Atilla.

8          THE COURT:  I grant that application.

9          Starting with the government, did you wish to add

10   anything further to today's sentencing proceeding?

11         MR. LOCKARD:  Nothing further, your honor.

12         THE COURT:  How about the defense?

13         MR. ROCCO:  Nothing further, Judge.

14         THE COURT:  I think that then concludes our work for

15   today.  Mr. Atilla, I wish you the best of luck going forward.

16         THE DEFENDANT:  Thank you, your Honor.

17         THE COURT:  We are adjourned.

18         (Adjourned)

19

20

21

22

23

24

25